# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF TEXAS
# MARSHALL DIVISION

| | | |
|---|---|---|
| FUNCTION MEDIA LLC | § | Civil Action No. 2007-CV-279 |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | |
| | § | |
| GOOGLE INC. AND YAHOO!, INC. | § | |
| | § | |
| Defendants. | § | JURY TRIAL DEMANDED |

## PLAINTIFF'S OPENING CLAIM CONSTRUCTION BRIEF

# TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................1

BACKGROUND ON PATENTS ........................................................................2

TERMS FOR CONSTRUCTION .......................................................................2

  A. Legal Principles .........................................................................................2

    1. Legal principles specific to means-plus-function limitations ....................2

    2. Legal principles concerning indefiniteness................................................3

  B. Means-Plus-Function Limitations.................................................................4

    1. "means for applying corresponding guidelines of the Media Venues" ....................4

      a. The "means for applying corresponding guidelines" is the PGP...................5

      b. This claim term is not indefinite. ..........................................................8

      c. "Hardware" is not incorporated into the interface claims............................9

    2. "means for transmitting"........................................................................11

      a. The "means for transmitting" refers to a functionality of the PGP.............12

      b. This claim term is not indefinite. ..........................................................12

      c. The "means for transmitting" is not the communication network..............13

    3. "means for a Seller to select the Media Venues".....................................14

    4. "means for a Seller to input information" & "means for said Media Venues to input said guidelines and information"................................................14

      a. The function associated with this claim term does not include the limitations of the "whereby" clause..........................................................16

      b. The structure associated with the "means for the Seller to input information" is the Seller interface software. ..............................................18

      c. The structure associated with the "means for said Media Venues to input said guidelines and information" is the Media interface software..................................................................................19

  C. Non-Means-Plus-Function Limitations .........................................................19

    1. "create a presentation that complies with said guidelines of the Media Venues selected" & "create an electronic advertisement for publication to the selected Internet Media Venues" ........................................................19

    2. "processing … the electronic advertisement … in compliance with the presentation rules of the Internet Media Venue" ....................................22

    3. "publish" .................................................................................................24

945534v1/08426-010020

4. "A method of using a network of computers to contract for, facilitate and control the creating and publishing of presentations, by a Seller, to a plurality of Media Venues owned or controlled by other than Seller" & "A method of using a computer system allowing a Third-Party Professional to manage, create, and publish customized electronic advertisements, for a Seller, to Internet Media Venues owned or controlled by other than the Seller and other than the Third-Party Professional" ...............................................26

5. "Media Venue" & "Internet Media Venue"......................................................29

6. "self-serve interface," "first interface to the computer system," "each of the Internet Media Venues is prompted to input presentation rules," "prompting each of the Internet Media Venues… to input presentation rules," "a second interface to the computer system through which a Seller is prompted to input information to select one or more of the Internet Media Venues," "Third-Party Professional is prompted to input information to select one or more the Internet Media Venues," "prompting the Third-Party Professional … to input information to select one or more of the Internet Media Venues," & "third interface to the computer system" ...........................................30

    a. The selection dispute.....................................................................32

    b. The location dispute......................................................................34

    c. The "self-serve" dispute...............................................................34

7. "selection information input by Seller" ..........................................................35

8. "presentation rules".........................................................................................35

9. "design or style standards" & "look and feel" ..............................................36

10. "distribution factors".......................................................................................37

11. "computer program design filter" & "computer program distribution filter"..........39

12. "automatically applying or comparing the Internet Media Venue design or style standards to the information input by the Seller or the advertisement," "automatically applying or comparing the Internet Media Venue distribution factors to the information input by the Seller or the advertisement," and "automatically applying or comparing the Internet Media Venue presentation rules to the information input by the Seller or the advertisement," & "computer controller processes the advertisement by automatically applying or comparing the Internet Media Venue presentation rules to the information input by the Seller or the advertisement"..........................40

13. "blocked URLs"..............................................................................................42

14. "advertisement generation program" ............................................................43

15. Indefiniteness for purportedly "mixing different statutory classes" .....................44

CONCLUSION.........................................................................................................45

945534v1/08426-010020

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Bancorp Services, L.L.C. v. Hartford Life Insurance Co.,*
    359 F.3d 1367 (Fed. Cir. 2004)..................................................................................4

*Braun Medical v. Abbot Laboratories,*
    124 F.3d 1419 (Fed. Cir. 1997)..................................................................................3

*CCS Fitness, Inc. v. Brunswick Corp.,*
    288 F.3d 1359 (Fed. Cir. 2002)................................................................................26

*Cordis Corp. v. Medtronic Avenue, Inc.,*
    511 F.3d 1157 (Fed. Cir. 2008)................................................................................21

*Exxon Research & Engineering Co. v. United States,*
    265 F.3d 1375 (Fed. Cir. 2001)..................................................................................4

*Fonar Corp. v. General Elect. Co.,*
    107 F.3d 1543 (Fed. Cir. 1997)........................................................................... 39-40

*Harris Corp. v. Ericsson, Inc.,*
    417 F.3d 1241 (Fed. Cir. 2005)..................................................................................3

*Hyperion Solutions Corp. v. Outlooksoft Corp.,*
    422 F. Supp. 2d 760 (E.D. Tex. 2006)......................................................................34

*Intergraph Hardware Tech. Co. v. Hewlett-Packard Co.,*
    2004 WL. 5643969 (E.D. Tex. July 1, 2004) ............................................................23

*Intellectual Property, Inc. v. UA-Columbia Cablevision,*
    336 F.3d 1308 (Fed. Cir. 2003)..................................................................................3

*IPXL Holdings LLC v. Amazon.com, Inc.,*
    430 F.3d 1377 (Fed. Cir. 2005)................................................................................44

*In re Iwahashi,*
    888 F.2d 1370 (Fed. Cir. 1989)..................................................................................3

*Mettler-Toledo, Inc. v. Fairbanks Scales,*
    551 F. Supp. 2d 576 (E.D. Tex. 2008).......................................................................3

*Microprocessor Enhancement Corp. v. Texas Instruments Inc.,*
    520 F.3d 1367 (Fed. Cir. 2008)........................................................................... 44-45

*Miles Laboratories, Inc. v. Shandon, Inc.,*
   997 F.2d 870 (Fed. Cir. 1993)........................................................................4

*N. America Vaccine, Inc. v. America Cyanamid Co.,*
   7 F.3d 1571 (Fed. Cir. 1993).....................................................................3-4

*Phillips v. AWH Corp.,*
   415 F.3d 1303 (Fed. Cir. 2005)....................................................................2

*Seven Networks Inc. v. Visto Corp.,*
   2006 WL 3840109 (E.D. Tex. 2006).........................................................40

*Ultra-Tex Surfaces, Inc. v. Hill Brothers Chemical Co.,*
   204 F.3d 1360 (Fed.Cir.2000).......................................................................3

*Vitronics Corp. v. Conceptronics, Inc.,*
   90 F.3d 1576 (Fed. Cir. 1996).......................................................................2

*Wenger Manufacturing, Inc. v. Coating Machine System, Inc.,*
   239 F.3d 1225 (Fed. Cir. 2001)....................................................................3

*Yodlee, Inc. v. Cashedge, Inc.,*
   No. 05-01550, 2006 WL. 3456610 (N.D. Cal. Nov. 29, 2006)..................45

*Young v. Lumenis, Inc.,*
   492 F.3d 1336 (Fed. Cir. 2007)....................................................................4

## FEDERAL STATUTES

35 U.S.C. § 112, ¶6......................................................................................2-3

# INTRODUCTION

Not surprisingly for the *Markman* process, there is considerable disagreement between Plaintiff Function Media ("FM") and either Defendants Google Inc. or Yahoo!, Inc. about the meaning of the claim terms in the patents-in-suit. Indeed, several of the disagreements are fundamental to the reading of the patents and repeat themselves throughout the parties' proposed constructions: [1] Are any of the claim terms indefinite? (FM says no, Google says yes); [2] Does the Central Controller/Presentation Generation Program of the claimed invention "create" ads (FM's view), or does creation instead occur at the Seller interface/Presentation and Configuration Program (Google/Yahoo's view)?; and [3] Do the interfaces claimed in the patents encompass software only (FM's position), or do they require hardware as well (Google/Yahoo's position)?

What <u>is</u> surprising for this *Markman* process is the level of disagreement on these key issues between Google and Yahoo themselves, and even more so between Google/Yahoo and the claim construction experts they hired. Thus, for example, Google asserts that nearly every claim term in dispute is indefinite and incapable of construction, whereas Yahoo has only occasionally adopted that argument and instead has proposed constructions for most disputed terms. Likewise, Google/Yahoo maintain that it is the patents' Presentation and Configuration Program, and not the Presentation Generation Program, which "creates" ads. Yet Google's expert has apparently gone off script, testifying that the Presentation Generation Program creates the ads. *See* Ex. F (Jenevein Depo.), at 116:19-25. Not to be outdone, Yahoo's expert rejected Google/Yahoo's use of a dictionary definition that supposedly defines "interface" to require both software and hardware, and he now accepts a definition that encompasses software only. *See* Ex. G (Kincaid Depo.), at 118 & 123-24. Indeed, it is a testament to the weakness of Google/Yahoo's other construction

945534v1/08426-010020

positions that one or both of their own experts in their depositions repeatedly either rejected those positions or were unable to defend them.

FM's claim constructions find ample support in the text of the claims, in the specification, in the file histories, in the extrinsic evidence, and—very frequently—in the testimony of Google and Yahoo's own experts. Defendants' constructions, by contrast, ignore the claim language, the specification, and indeed common sense—in many cases reading out the preferred embodiment or rendering the invention unworkable. Little wonder, then, why their experts so often ran away from Defendants' positions. The Court should adopt FM's constructions.

## BACKGROUND ON PATENTS

FM will provide background information about the patents when it files its technology tutorial.[1]

## TERMS FOR CONSTRUCTION

### A. Legal Principles

A claim term is construed to mean what a "person of ordinary skill in the art . . . at the time of the invention" would understand the term to mean, after having read the term "not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005) (en banc). Claim construction focuses primarily on the claims themselves, the patent specification, and the file history. *See id.* at 1314, 1317-18. Moreover, a proposed claim construction that excludes a preferred embodiment "is rarely, if ever, correct." *Vitronics Corp. v. Conceptronics, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996).

#### 1. Legal principles specific to means-plus-function limitations

A claim term expressed as "a means … for performing a specified function without the recital of structure, material, or acts in support thereof" is construed to cover "the corresponding

---

[1] The patents-in-suit are attached as Exhibit A ('045 patent), Exhibit B ('025 patent), and Exhibit C ('059 patent).

945534v1/08426-010020

structure, material, or acts described in the specification or equivalents thereof." 35 U.S.C. § 112,

¶6. Structure corresponds to the claimed function if either the specification or the prosecution history links or associates that structure to the function recited in the claim. *See Braun Med. v. Abbot Labs.*, 124 F.3d 1419, 1424 (Fed. Cir. 1997). In construing means-plus-function terms, courts "may not import functional limitations that are not recited in the claim, or structural limitations from the written description that are unnecessary to perform the claimed function." *Wenger Mfg., Inc. v. Coating Mach. Sys., Inc.*, 239 F.3d 1225, 1233 (Fed. Cir. 2001).

For computer-implemented means-plus-function terms, the corresponding structure is the algorithm for performing the claimed function. *See Harris Corp. v. Ericsson, Inc.*, 417 F.3d 1241, 1253 (Fed. Cir. 2005). An algorithm is a step-by-step process, *see In re Iwahashi*, 888 F.2d 1370, 1374 (Fed. Cir. 1989), which can be "expressed textually, or shown in a flow chart," *Mettler-Toledo, Inc. v. Fairbanks Scales*, 551 F. Supp. 2d. 576, 589 (E.D. Tex. 2008). It "is not limited to a formula of mathematical symbols," and specific source code need not be disclosed. *Mettler-Toledo*, 551 F.Supp.2d. at 588-89.

## 2. Legal principles concerning indefiniteness

To overcome the statutory presumption that a patent's claims are valid, a defendant must prove invalidity by clear and convincing evidence. *See Ultra-Tex Surfaces, Inc. v. Hill Bros. Chem. Co.*, 204 F.3d 1360, 1367 (Fed. Cir. 2000). Thus, for example, "a challenge to a claim containing a means-plus-function limitation as lacking structural support requires a finding, by clear and convincing evidence, that the specification lacks disclosure of structure sufficient to be understood by one skilled in the art as being adequate to perform the recited function." *Intellectual Property, Inc. v. UA-Columbia Cablevision*, 336 F.3d 1308, 1319 (Fed. Cir. 2003). Likewise, to prove a claim invalid for indefiniteness, a defendant must prove by clear and convincing evidence that "one of ordinary skill would not understand what is included" within the claims. *N. Am.*

945534v1/08426-010020

*Vaccine, Inc. v. Am. Cyanamid Co.*, 7 F.3d 1571, 1579 (Fed. Cir. 1993). If one skilled in the art "would understand the bounds of the claim when read in light of the specification," the claim is not indefinite. *Miles Lab., Inc. v. Shandon, Inc.*, 997 F.2d 870, 874-75 (Fed. Cir. 1993).

Indeed, a claim term is not indefinite if it "can be given any reasonable meaning." *Young v. Lumenis, Inc.*, 492 F.3d 1336, 1345 (Fed. Cir. 2007). If the claim is subject to construction—in other words, if it is not insolubly ambiguous—it is not invalid for indefiniteness. *See Bancorp Services, L.L.C. v. Hartford Life Ins. Co.*, 359 F.3d 1367, 1371 (Fed. Cir. 2004). Claims are indefinite only if reasonable efforts at claim construction prove futile, and "close questions of indefiniteness in litigation involving issued patents are properly resolved in favor of the patentee." *Id.* at 1371; *accord Exxon Research & Eng'g Co. v. United States*, 265 F.3d 1375 (Fed. Cir. 2001).

If the Court can construe the terms here and give them "any reasonable meaning"—which even Yahoo admits can be done for many of the claims—they are not indefinite. FM has demonstrated below a reasonable construction for each of the relevant terms. The terms, therefore, are not indefinite. Because Defendants bear the burden of proving indefiniteness by clear and convincing evidence through a motion for summary judgment or otherwise, FM will defer detailed discussion about whether many specific terms are indefinite until after Defendants have tried to meet their evidentiary burden—something they cannot do given the reasonable constructions set forth below.

## B. Means-Plus-Function Limitations

### 1. "means for applying corresponding guidelines of the Media Venues"

| Term | FM | Google & Yahoo |
|------|-----|----------------|
| **means for applying corresponding guidelines of the Media Venues.** '045, | Function (Agreed):  applying corresponding guidelines of the Media Venues.<br><br>Structure: computer software executable on a processor capable of | Google & Yahoo: This claim is indefinite because it lacks sufficient structure in the written description. *Biomedino LLC v. Waters Technology Corp.*, 490 F3d 946, 952 (Fed. Cir. 2007).<br><br>Google & Yahoo: Structure: a Seller interface |

| Term | FM | Google & Yahoo |
|---|---|---|
| Claim 1. | (1) identifying one or more selected Media Venues for publication; (2) accessing data representing each identified Media Venue's guidelines; (3) accessing data representing Seller information; and (4) executing a systematic sequence of mathematical and/or logical operations upon the accessed Seller information to create a presentation customized for each identified Media Venue in a form that complies with the accessed guidelines of that Media Venue, and equivalents. | including a central processor, operating system, ROM, RAM, clock, communication port, video driver, video monitor, input devices (*e.g.*, standard keyboard, mouse, or other replacement items), modem, network interface, data storage device, a presentation database including information related to the Seller's choice of media or venues as well as the presentation of their products, goods, or services; a Seller database; a presentation rules database including information from the Internet Media Venue to control and limit the style and editing of the presentations; and a Presentation & Configuration Program (which lacks any structural description). |

Although the parties have agreed on the function of this term, they have a dispute as to the structure. FM contends that the relevant structure is associated with the Presentation Generation Program ("PGP"). Defendants' position as to this term encapsulates three arguments that recur throughout their proposed constructions: (a) that the appropriate structure for this claim relates to the Seller interface because ads are allegedly "created" there; (b) that this claim term is indefinite; and (c) that the Seller interface encompasses both software and hardware.

### a. The "means for applying corresponding guidelines" is the PGP.

The fundamental area of dispute for this claim term is whether the structure is the PGP (as FM contends) or the Seller interface (as Defendants contend). The claim language, the specification, and Defendants' own experts give the same conclusion: the structure supporting the claimed function is the PGP. As explained by FM's claim construction expert, Dr. Thomas Rhyne, a person of ordinary skill in the art would understand that the "means for applying" is performed by the algorithms associated with the PGP disclosed in the specification. Ex. D (Rhyne Decl.), ¶31. The PGP (1710) runs on the Central Controller and Presentation Processor (1000)—the central computer belonging to the operator of the invention. *See* '045 Patent, Fig. 2a. The PGP "applies guidelines" by performing a series of algorithmic operations that process a Media

-5-

Venue's guidelines together with a Seller's presentation data to "create" a final presentation.

Those operations are:

1. Identifying one or more selected Media Venues for publication, *see* '045, at Fig. 4e (11292) & 43:28-32;
2. Accessing data representing each identified Media Venue's guidelines, *see* '045, at Fig. 4d (11232), 42:36-42, Fig. 4e (11294), (11300), & 43:42-51;
3. Accessing data representing the Seller's information, *see* '045, at 17:1-11, Fig. 4d (11230), & 42:36-42; and
4. Executing a systematic sequence of mathematical and/or logical operations upon the accessed Seller information (using the accessed guidelines) to create a presentation customized for publication to each identified Media Venue in a form that complies with the accessed guidelines of that Media Venue, *see* '045, at Fig. 4d (11230), 42:36-42, Fig. 4e (11294), (11300), (11320), (11312), & 43:42-51.

*See also* Ex. D, ¶¶31-34.

Defendants' proposed structure for this term suggests that the act of ad "creation" occurs not at the Central Controller and Processor (via the PGP), but rather at the Seller interface (via the Presentation and Configuration Program ("PACP")). But Defendants' argument runs directly contrary to the specification and claim language. Indeed, the very term "Presentation Generation Program" defines itself to be a program that generates presentations. What's more, the specification is replete with references confirming that it is the PGP that creates ads.[2] Recognizing this, Google's own claim construction expert, Dr. Jenevein, did not hesitate to reject Defendants' position and confirm that ads are created by the PGP—not the PACP:

> **Q**. Now, on page 7—well, let me ask you this question: according to the specification, which portion of the invention actually creates the ads? Is it the presentation configuration program? Is it the presentation generation program?
> **A**. It's the presentation generation program.

Ex. F, at 116:19-25.

---

[2] *See, e.g.*, '045, at 3:28-31 ("The present invention's <u>Presentation Generation Program</u>, along with the Presentation Rules Database, then <u>creates a presentation</u> for each and every media outlet the Seller has chosen.") (emphases added); 18:63-19:1 ("The Presentation Generation Program 1710 utilizes the information submitted by the Sellers and held in the Presentation Database 1640, Inventor Database 1660, and Seller Database 1630. The <u>Presentation Generation Program</u> uses these databases to <u>create the requested presentations</u> for the various desired resident or non-resident media . . . .") (emphasis added); *id.* at 17:4-11 (same).

Despite the crush of evidence to the contrary, Defendants assert several strained arguments to support their position that it is actually the PACP at the Seller interface that creates ads. All of them are unavailing. Defendants point first to the preamble of '045 Claim 1:

> A method of using a network of computers to contract for, facilitate and control the creating and publishing of presentations, by a Seller, to a plurality of Media Venues owned or controlled by other than the Seller, comprising . . . .

'045, at 63:57-60. As Defendants see it, this preamble suggests that the Seller actually "creat[es] and publish[es] [the] presentations." Yet the very point of the invention—as reflected in this preamble itself—is to have a <u>centralized computer</u> assist the Seller in the Seller's desire to generate and disseminate advertisements. That the "network of computers" assists the Seller in the creation and publication process does not mean that the Seller itself is ultimately doing the creation—as confirmed repeatedly by the specification references to the creation function of the PGP. By way of example, coffee machines allow their owners to "make coffee." But it is the machine, and not the owner, that ultimately applies heat to coffee grounds and water to brew the coffee. Likewise, while a Seller may "create and publish" ads via the computer network, it is actually the network that is doing the creation and publication—as emphasized by the preamble's reference to the network's "facilitat[ing] and control[ling]" the creation/publication process.

Defendants also cite to the "whereby" clause that concludes '045 Claim 1: "whereby the Seller may select one or more of the Media Venues, create a presentation that complies with said guidelines of the Media Venues selected, and transmit the presentation to the selected Media Venues for publication." Again, however, this clause is discussing the effect of the operation of the claimed network—using that network, a Seller can create and publish presentations. This clause does not suggest that the creation and publication are being done by the Seller directly.

Finally, Yahoo points to parts of the specification that suggest that presentation rules could be utilized at the Seller's location since the invention may alter, limit, or control the Seller's inputs

945534v1/08426-010020

based on presentation rules and/or allow a preview of an ad. *See, e.g.,* '045, at 42:19-37. This unclaimed, additional feature of the preferred embodiment does nothing, however, to alter the logic flow disclosed in the patents, which confirms that the creation process occurs at the Central Processor via the PGP. For example, the logic charted at Fig. 4c of the '045 (block 11200) through Fig. 4h demonstrates how presentations preferably get created and transmitted to Media Venues. All of this logic is implemented at the Central Controller 1000, through the PGP 1710. In contrast, Figs. 4a and 4b show the logic for a preferred Seller interface. Yet none of this logic relates to "creating" a presentation. Rather, this logic simply discusses the entry of "selection" and "presentation information" that then gets transmitted to the central controller for the actual processing shown in Figs. 4c to 4h to create the ad. Indeed, even the possible compromise argument that the PGP and the PACP jointly "create" ads is foreclosed by the specification, which reminds the reader that creation occurs at one and only one place:

> The <u>Presentation Generation Program 1710</u>, using the information contained within the Presentation Rules Database 1650, then formats the presentation information for each client outlet, channel, resident media, or non-resident media (blocks 11300, 11294). <u>New presentations are created in their entirety</u>, while only the portions of existing presentations affected by any modifications are republished.

'045, at 44:36-42 (emphases added). If new presentations are created "in their entirety" by the PGP, necessarily no part of that creation is occurring at the PACP/Seller interface.

### b.  This claim term is not indefinite.

This claim term is the first of many that one or both Defendants assert is indefinite. Here, in accordance with the legal principles set forth in Part A2 above, the specification clearly links the recited function of applying the corresponding guidelines to a corresponding structure in the specification—namely, the PGP 1710. *See, e.g.,* '045, at 57:27-31 & 58:9-12. The PGP "applies guidelines" by (1) identifying one or more selected Media Venues for publication; (2) accessing data representing each identified Media Venue's guidelines; (3) accessing data representing Seller

-8-

information; and (4) executing a systematic sequence of mathematical and/or logical operations upon the accessed Seller information to create a presentation customized for each identified Media Venue in a form that complies with the accessed guidelines of that Media Venue. *See* subpart "a," above. This is a sufficient algorithmic disclosure to constitute the structure for these claims.

### c.    "Hardware" is not incorporated into the interface claims.

As FM reads the specifications, the invention disclosed in the patents includes <u>software</u> provided by the Operator of the invention to the Sellers (the Seller interface) and to the Media Venues (the Media Venue interface).[3] Defendants, by contrast, insist that these interfaces must be construed to <u>also</u> include the associated <u>hardware</u> necessary to run that software. This dispute about software vs. hardware repeats itself in many of the other contested claim terms.

An analysis of the specification confirms that FM's reading of the interface terms is the correct one. The '045 patent contemplates three primary actors: (1) a Seller who wishes to provide an advertisement; (2) a Media Venue who wishes to display an advertisement; and (3) the Operator of the invention, who manages the computer network that links the Seller to the Media venue and then creates and publishes the ads. *See, e.g.*, '045, at 53:18-56:17. As the patent further explains, it is the Operator of the invention who provides the software interfaces to the Seller and to the Media Venue. *See, e.g.*, '045, at 53:63-64 ("ABC [the manager of the invention] sends DEF [a Media Venue] the necessary software to be installed on their computer."); *id.* at 54:60-67; *see also* Ex. F (Jenevein Depo.), at 81-82 (confirming that the Operator of the invention provides the software to the Seller and to the Media Venue).

The claim language reflects this arrangement, as Claim 1 of the '045 talks in terms of "providing" a means to apply, a means to transmit, a means to select, etc. As demonstrated above,

---

[3] In the case of the '059 patent, there is also software provided by the Operator of the invention to Third-Party Professionals (the Third-Party-Professional interface).

it is the Operator of the invention who "provides" these means. And the provided "means" is software. To interpret these "means for" terms to include both software and hardware would be to suggest that the Operator of the invention provides, for example, the Seller's computer to the Seller. Defendants' reading of the claims would thus exclude the preferred embodiment, which nowhere suggests that the Operator "provides" a computer to the Seller or the Media Venue. Indeed, the specification expressly contemplates that the Operator provides the software interface for installation on the Seller's pre-existing computer: "The present invention partially <u>resides on the Sellers' computers</u>, controls and edits the presentation, and then automatically transmits that information and data for publication in traditional media and electronic networks." '045, at 5:27-30 (emphasis added). To interpret the interface terms to include the Seller's computer, as Defendants would have it, would thus mean that the invention resides on the invention—a nonsensical reading. *See* Ex. D, ¶72.[4]

Both side's experts agreed that resort to dictionary definitions would further assist the Court in the construction of the "interface" terms, given that "interface" is a term of ordinary usage in the field of computers. FM's expert, Dr. Rhyne, looked to the *IEEE Standard Dictionary of Electrical and Electronic Terms*, IEEE Standard No. 100 (1996) to confirm that an interface need not include hardware. *See* Ex. K (IEEE Standard Dictionary), at 66756 (defining "interface," among other things, as "a hardware <u>or</u> software component that connects two or more components for the purpose of passing information from one to the other") (emphasis added); Ex. D, ¶72.

---

[4] Defendants also point to Figs. 2c and 2e of the '045, which are labeled "Seller Interface" and "Media Interface" respectively and which include a depiction of hardware. Yet, as Dr. Rhyne explained, these figures merely show the intended operating environment for the provided interface software. *See, e.g.,* Ex. E (Ryhne Depo.), at 60-61, 71, 163-64. That the interface software cannot work without hardware does not mean, however, that the interface itself must include hardware. Were that so, "interface" would necessarily also include electricity since electricity is also necessary for the software to run. And, on that theory, "[y]ou could go forever" in further defining "interface." Ex. G (Kincaid Depo.), at 102.

Yahoo's expert, Mr. Kincaid, relied by contrast on the second edition of the *Microsoft Computer Dictionary* (1994) for a definition of "interface" that is at best ambiguous as to whether hardware is a necessary component of an interface. *See* Ex. G, at 110-15; *see also* Ex. H (1994 edition of *Microsoft Computer Dictionary*). Mr. Kincaid's initial choice of the 1994 edition was odd, however, given that Microsoft later published a 1997 edition and then a 1999 edition of the same dictionary, both of which were closer in-time to the filing date of the first FM patent (2000). And both of those newer dictionaries defined "interface" to include only software:

> **Interface**. **2**. Software that enables a program to work with the user (the user interface, which can be a command-line interface, menu-driven, or a graphical user interface), with another program such as the operating system, or with the computer's hardware.

Ex. J (1999 edition) (underlining added); *see also* Ex. I (1997 edition, with essentially the same definition). In his deposition, Mr. Kincaid confirmed that these latter two definitions expressly define "interface" to include only software, Ex. G at 118, and that, if he were to "rewrite" his expert declaration after seeing the two newer Microsoft definitions, he would have used the 1999 definition instead, *id.* at 123-24 ("**Q**. I am saying if you were to rewrite your expert report today would you cite the '94 dictionary definition or the 1999 dictionary definition now that you know '99 exists? **A**: I would—I would use the '99 dictionary.") (objection omitted). Yahoo's expert thus conceded that the proper "interface" definition should encompass "software" only—a concession fatal to Defendants' "hardware" argument.[5]

### 2. "means for transmitting"

| Term | FM | Google & Yahoo |
|---|---|---|
| **means for transmitting said presentations** | Function (Agreed): "transmitting said presentations to a selected Media | Google & Yahoo: This claim is indefinite because it lacks sufficient structure in the written description. *Biomedino LLC v. Waters Technology Corp.*, 490 F3d 946, 952 (Fed. Cir. 2007). |

---

[5] Google's expert, Dr. Jenevein, did not attempt to define "interface." This is not surprising, given that Dr. Jenevein's own Patent No. 6,173,291 depicts a "user interface," yet does not include hardware in that depiction. *See* Ex. M ('291 patent, at Fig. 11); Ex. F, at 157-58. ("Q…. [D]oes figure 11 show hardware? A. The simple answer to that is no.").

945534v1/08426-010020

| Term | FM | Google & Yahoo |
|------|-----|----------------|
| **to a selected Media Venue of the Media Venues.** '045, Claim 1. | Venue of the Media Venues.<br><br>Structure: computer software executable on a processor capable of initiating a data transmission to a specified electronic destination, and equivalents. | Google & Yahoo: Structure: On-demand, direct dial-up phone lines, network, or Internet connection between Seller interface, Media Interface, and Central Controller and Presentation Processor; standard Internet connections between Buyer Interface and Central Presentation and Selection Server; and a high-speed network or Internet connection between Central Controller and Presentation Processor and Central Presentation and Selection Server. Connections between components may be accomplished by any combination of public switched phone network, cellular, Personal Communication System, dedicated data lines, microwave, private network, shared data network, or satellite network. |

The parties have agreed on the function for this claim term. As to the structure, FM sees it as the software associated with the PGP. Defendants, by contrast, incorrectly assert that the structure includes all network hardware necessary to effectuate a communication.

### a. The "means for transmitting" refers to a functionality of the PGP.

As the claim language suggests, this term concerns the task of ultimately transmitting a presentation to the appropriate Media Venue. The specification makes clear that it is the PGP that does so: "The Presentation Generation Program 1710 [] either transmits the presentation to the appropriate destination or holds it for a publication date to be submitted for a particular deadline or predetermined promotional market." '045, at 3:28-34; *accord* '045, at 45:8-13.

### b. This claim term is not indefinite.

Defendants' indefiniteness argument as to this term ignores the fact that the specification plainly links the recited function of "transmitting said presentations to a selected Media Venue of the Media Venues" to the PGP. *See e.g.,* '045, at 45:8-13, 51:23-47 & 57:27. The PGP accomplishes this function by initiating a data transmission to a specified electronic destination. *See id.* Again, this algorithmic description is sufficient structure for this claim term.

945534v1/08426-010020

c.     The "means for transmitting" is not the communication network.

Much like they wish to incorporate hardware into the definition of "interface," Defendants here seek to define the "means to transmit" to include the entire communications network necessary to effectuate a transmission—including, for example, even a dial-up phone line or Internet connection. Yet, as discussed above, both the specification and the claims contemplate that the Operator of the invention will "provide" the "means for transmitting." Under Defendants' view, therefore, the Operator would need to provide, for example, Internet connections to the Seller and the Media Venue. As Google's expert admits, nothing in the patent—and particularly in the preferred embodiment—suggests that this is what occurs. *See* Ex. F, at 123. To the contrary, the specification describes that the Operator is taking advantage of pre-existing communication networks through which Sellers, Buyers, and Media Venues are connected. *See, e.g.,* '045, at 13:64-14:2, 30:45-49.

Defendants also appear to suggest via their construction that the Seller interface is involved in the transmission of presentations to Media Venues. But this argument flows from their incorrect conclusion, discussed above, that presentations are created at the Seller interface. Moreover, Fig. 1b from the '045 diagrams the communication flows associated with the invention and resolves any doubt on this issue:



-13-

As the figure demonstrates, the Seller Interface 4000 communicates <u>only</u> with the Central Controller and Presentation Processor 1000 (where the PGP 1710 resides). There is no direct communication link between the Seller Interface and any Media Venue. Instead, it is from the Central Controller that presentations are transmitted to their ultimate Media Venue destinations (via the PGP).

### 3.     "means for a Seller to select the Media Venues"

| Term | FM | Google & Yahoo |
|---|---|---|
| **means for a Seller to select the Media Venues.** '045, Claim 1. | Function (Agreed): enabling a seller to select the Media Venues.<br><br>Structure: computer software executable on a processor capable of presenting electronic forms allowing the selection of Media Venues, and equivalents. | Google & Yahoo: This claim is indefinite because it lacks sufficient structure in the written description. *Biomedino LLC v. Waters Technology Corp.*, 490 F3d 946, 952 (Fed. Cir. 2007).<br><br>Google & Yahoo: Structure: a Seller interface including a central processor, operating system, ROM, RAM, clock, communication port, video driver, video monitor, input devices (*e.g.*, standard keyboard, mouse, or other replacement items), modem, network interface, data storage device, and further including a Presentation & Configuration Program (which lacks any structural description). |

All parties look to the structure associated with the Seller interface for this term. The dispute here is once again whether that structure includes only software, or both hardware and software. For the reasons discussed above, FM's interpretation of "interface" should prevail. Defendants' indefiniteness argument as to this term also has no merit. Here again, the specification clearly links the recited function of enabling a Seller to select Media Venues to a corresponding structure in the specification—namely, the PACP 4715. *See, e.g.,* '045, at 40:44-41:46; 27:55-61**.** The PACP performs this function by presenting electronic forms allowing for selection. *See id*.

### 4.     "means for a Seller to input information" & "means for said Media Venues to input said guidelines and information"

| Term | FM | Google & Yahoo |
|---|---|---|
| **means for the Seller to** | Function: enabling a | Google & Yahoo: This claim is indefinite because |

-14-

| Term | FM | Google & Yahoo |
|------|----|----------------|
| **input information;** '045, Claim 1. | Seller to input information<br><br>Structure: computer software executable on a processor capable of presenting electronic forms allowing the Seller to input information, and equivalents. | it lacks sufficient structure in the written description. *Biomedino LLC v. Waters Technology Corp.*, 490 F3d 946, 952 (Fed. Cir. 2007).<br><br>Google & Yahoo: Function: enabling the Seller to input information to select one or more Media Venues, create a presentation that complies with said media guidelines of the selected Media Venues, and transmit the presentation to the selected Media Venues for publication. |
| **whereby the Seller may select one or more of the Media Venues, create a presentation that complies with said guidelines of the Media Venues selected, and transmit the presentation to the selected Media Venues for publication.** | whereby the Seller may select one or more of the supported Media Venues, input information for use by the computer programming in creating customized advertisements in accordance with the controls set by each Media Venue, and transmit each customized presentation to each respective Media Venue for publication. | Structure: a Seller interface including a central processor, operating system, ROM, RAM, clock, communication port, video driver, video monitor, input devices (*e.g.*, standard keyboard, mouse, or other replacement items), modem, network interface, data storage device, and a Presentation & Configuration Program (which lacks any structural description).<br><br>------------------------------------------<br><br>Defendants ask the Court to construe the whereby clause with the "means for the Seller to input information" limitation. |
| **means for said Media Venues to input said guidelines and information.** '045, Claim 5. | Structure: computer software executable on a processor capable of presenting electronic forms allowing the Media Venue to input guidelines and information for that Media Venue, and equivalents. | Structure: a media interface including a central processor, operating system, ROM, RAM, clock communication ports, video driver, video monitor, input devices (*e.g.*, standard keyboard, mouse, or other replacement items), modem, network interface, and data storage device, and a Media Configuration Program (which lacks any structural description). |

Unlike the other means-plus-function claims, the parties here have a dispute as to the function that is performed by the "means for the Seller to input information." FM sees the relevant function as "enabling a Seller to input information," according to the plain language of the claim. Defendants, by contrast, read the final "whereby" clause in Claim 1 of the '045 as modifying specifically this "means for the Seller to input" limitation (and no others)—despite the fact that the

-15-

structure and punctuation make clear that the "whereby" clause modifies <u>all</u> the limitations collectively. Defendants would require the "means for the Seller to input" to perform all the functions they say are suggested by the whereby clause—*i.e.*, selection, creation, and transmission. As to the structure for this claim term, the parties also have the same dispute about "interface": FM sees it as software, and Defendants would require hardware as well.

### a. The function associated with this claim term does not include the limitations of the "whereby" clause.

The parties agree in part on the function of this claim, insofar as both sides contend it involves "enabling the Seller to input information." Defendants go farther, however, requiring that the limitations from the "whereby" clause be imposed upon the "means for the Seller to input information."

Claim 1 of the '045, as it was printed in the patent, reads:



The structure and punctuation of Claim 1 demonstrates that the "whereby" clause operates to summarize the effect of the previous steps (a) to (e), and not to provide limitations on just clause (e). First, there is a semicolon immediately proceeding the "whereby" clause. That semicolon separates the clause not only from the "means for a Seller to input information" element but also from all of the preceding limitations of the claim. A semicolon also follows at the end of clauses (a)-(d), thus showing within this very claim that a semicolon signifies the break between

-16-

clauses. Consequently, the semicolon after "information" at the end of the first line of clause (e) signifies the end of that clause. And the "whereby" clause that follows the semicolon necessarily relates back to <u>all</u> the elements that precede it—not just to the final element. Were the "whereby" clause intended to modify only the final limitation (e), the inventors logically would have employed a comma. Indeed, they did precisely that in drafting Claim 1 of the '025:

> **1.** A computer system for creating and publishing customized electronic advertisements, for a seller, to internet media venues owned or controlled by other than the seller, comprising:
>
> a first interface to the computer system through which each of the internet media venues is prompted to input presentation rules for the internet media venue for displaying electronic advertisements on the internet media venue;
>
> a first database storing the presentation rules input by the internet media venues through the first interface;
>
> a second interface to the computer system through which a seller is prompted to input information to select one or more of the internet media venues and prompted to input information to create an electronic advertisement for publication to the selected internet media venues;
>
> a second database storing the information input by the seller through the second interface; and
>
> a computer controller of the computer system processing and publishing the electronic advertisement to one or more of the selected internet media venues in compliance with the presentation rules of the internet media venue, whereby the electronic advertisement is displayed on each of the one or more of the selected internet media venues in compliance with the presentation rules of the internet media venue.

When the inventors wished for a "whereby" clause to modify just a single claim limitation, as they did for the final "computer controller" limitation in Claim 1 of the '025, they knew to use a comma instead of a semicolon.

Second, the formatting and structure of Claim 1 of the '045 shows the existence of a full line break between the semicolon and the "whereby" clause—presumably accomplished by hitting "enter" on the keyboard after typing the semicolon and thus signifying a difference in kind between that line and the "whereby" clause. If the enter-key had not been hit, then the line "providing means for the Seller to input information" would be fully justified to the right margin, much like the line "providing means for transmitting said presentations to" is in element (c):

> c) providing means for transmitting said presentations to
>    a selected media venue of the media venues;
> d) providing means for a seller to select the media venues;
>    and
> e) providing means for the seller to input information;
>    whereby the seller may select one or more of the media
>    venues, create a presentation that complies with said
>    guidelines of the media venues selected, and transmit
>    the presentation to the selected media venues for
>    publication

If the "whereby" clause were intended to modify just element (e), the drafters would have run the clause together with the "providing means for the Seller to input information" clause—much like they did in Claim 1 of the '025, as discussed above. No hard return or line break would be necessary, and indeed such a break would be grammatically and structurally inappropriate. This disassociation between the "whereby" clause and element (e) is made even clearer in the prosecution history of the '045, when this particular claim was proposed:

> 1  (Amended) A method of using a network of computers to contract for, facilitate and control
>    the creating and publishing of presentations, by a seller, to a plurality of media venues owned
>    or controlled by other than the seller, comprising:
>
>    a) providing a media database having a list of available media venues;
>
>    b) providing means for applying corresponding guidelines of the media venues;
>
>    c) providing means for transmitting said presentations to a selected media venue of the
>       media venues;
>
>    d) providing means for a seller to select the media venues; and
>
>    e) providing means for the seller to input information;
>       whereby the seller may select one or more of the media venues, create a presentation
>       that complies with said guidelines of the media venues selected, and transmit the
>       presentation to the selected media venues for publication.

Ex. L (excerpt from '045 Prosecution History), at D064755-57. This formatting and structure simply confirms what is evident from the patent—that the "whereby" clause describes the resulting capacity provided by the claimed method.

<blockquote>

**b.**  **The structure associated with the "means for the Seller to input information" is the Seller interface software.**

</blockquote>

As with the "means for the Seller to select," the structure relevant to the "means for the Seller to input" is software associated with the Seller interface, and specifically the PACP. The

'045 specification describes the PACP as the interface software that prompts and enables the

Seller to input selection information and advertising content:

> The Presentation and Configuration Program 4715 is both the gateway to the present invention and the controlling software interface for the Seller. The Presentation and Configuration Program 4715 introduces the Seller to the instance of the present invention and allows the Seller to choose in which presentations and which media or advertising channels the Seller wishes to participate. The Presentation and Configuration Program 4715 offers the choices of media and presentations to the Seller, giving requirements and cost for each. Upon choosing media and presentations, the Seller is then presented with a series of questions to answer.

'045, at 27:55-28:2. As discussed above, the Seller interface consists of software, and not (as

Defendants suggest) all hardware and other peripheral equipment necessary to run that software.

> ### c. The structure associated with the "means for said Media Venues to input said guidelines and information" is the Media interface software.

Likewise, the structure associated with the related term "means for said Media Venues to

input said guidelines and information" is the Media interface software, and specifically the Media

Configuration Program. As the '045 specification explains:

> The Presentation and Configuration Program [sic] 6717[6] is both the gateway to the present invention and the controlling software interface for the Media. The Media Configuration Program 6717 introduces the Media to the instance of the present invention. The Media Configuration Program 6717 presents the Media with a series of questions to answer.

'045, at 33:45-56. Again, this interface consists of software—not software and hardware.

## C. Non-Means-Plus-Function Limitations

### 1. "create a presentation that complies with said guidelines of the Media Venues selected" & "create an electronic advertisement for publication to the selected Internet Media Venues"

| Term | FM | Google & Yahoo |
|---|---|---|
| **create a presentation that complies with said guidelines of the Media Venues selected.** '045, Claim 1. | produce a presentation customized to each of the selected Media Venue's presentation rules. | Google & Yahoo: create a presentation that complies with the guidelines of all the selected Media |

---

[6] The reference here should be to the "Media Configuration Program 6717." This typographical error is corrected in the next several sentences, so there is no confusion as to which program the specification is referring.

-19-

| Term | FM | Google & Yahoo |
|------|----|----|
| | | Venues. |
| **create an electronic advertisement [for the Seller, '059] for publication to the selected Internet Media Venues.** '025, Claims 1 and 179; '059, Claims 1 and 27. | produce an electronic advertisement in a form customized to each of the selected Internet Media Venue's presentation rules. | Google & Yahoo: create an advertisement for placement at all the Internet Media Venue locations selected by the [Seller/Third-Party Professional] for public display. |

The primary dispute as to this term is whether the FM patents teach [1] the creation of a single identical presentation for <u>all</u> selected Media Venues that somehow complies with the presentation rules of <u>all</u> selected Media Venues (Defendants' position) or [2] the creation of multiple customized presentations, each tailored to the presentation rules of each respective Media Venue (FM's position). Only FM's construction makes sense. Indeed, Defendants' proposed construction is not only contrary to the specification and the preferred embodiment but also would render the invention inoperable.[7]

The specification explains that the invention allows each Media Venue to input its own presentation rules so that the system can create and publish a customized ad to each Media Venue in accordance with the presentation rules of that Media Venue:

> The Presentation Generation Program 1710 … formats the presentation information for <u>each</u> client outlet, channel, resident media, or <u>non-resident media</u>. . . . With this invention, the Seller's presentation can be published in several different directories or indexes, <u>taking on a different style, look, and feel in each</u> as a result of the automatic restructuring of the data entered by the Seller. This is accomplished by using <u>different</u> presentation formatting guidelines and rules for the targeted directories or indexes.

'045, at 43:28-51 & 5:10-24 (emphases added); '025, at 59:9 (software "creates a presentation

---

[7] Defendants' proposed "creation" construction touches upon additional disputes that repeat in other claim limitations. These include (1) whether the limitations require the creation of an ad for placement "at … the Internet Media Venue location" and (2) whether the limitations mean that the Seller/Third-Party Professional can select Media Venues only by identifying specific websites. These disputes are discussed below in Parts C3 and C6a, respectively.

945534v1/08426-010020

designed to conform to the requirements set forth by <u>each</u> media") (emphasis added).[8]  Nowhere do the specifications or file histories provide support for Defendants' position that a single identical ad gets published to multiple Media Venues in compliance with the combined presentation rules of all selected Media Venues. Moreover, Defendants' proposed construction contradicts the specification and the preferred embodiment because, under Defendants' interpretation, an ad arguably must be published to every targeted Media Venue ("create an advertisement for placement at <u>all</u> the Internet Media Venue locations selected"). But the patents plainly contemplate that a Media Venue may input "blocked URLs" and "blocked words," which will operate to prevent publication of any presentation originating from the blocked Seller—notwithstanding that Seller's selection of the Media Venue that inputted the block. *See, e.g.,* '025, Claim 79; *see also* Part C13 below.

Indeed, the invention could not even work under Defendants' proposed construction that the invention has to create an ad that complies with conflicting presentation rules. *See Cordis Corp. v. Medtronic Ave., Inc.*, 511 F.3d 1157, 1174 (Fed. Cir. 2008) ("a construction that renders the claimed invention inoperable should be viewed with extreme skepticism"). If, for example, ESPN.com wanted blue-colored text ads, and CNNSI.com wanted red-colored text ads, no system could create a single blue/red ad that would satisfy both. Thus, under Defendants' construction, there could be neither customization of ads across multiple Media Venues nor freedom of the Seller to select Media Venues with different look-and-feel rules. The patents envision no such restrictions and, in fact, describe the opposite. *See, e.g.,* 045, at 5:10-24, 27:55-28:2 & 43:28-51.

---

[8] Statements made by the Applicant in the course of prosecuting the '059 confirm both that an ad is created separately for <u>each</u> Media Venue to which it is published and that the created ad is customized to have the look and feel for <u>each</u> Media Venue. *See, e.g.,* Ex. L (9/5/06 Request for Reconsideration), at D066483 ("[Prior Art] does not disclose the claimed 'first interface' through which one or more Internet Media Venues … are prompted to enter their presentation rules so that a Seller's advertisement can be automatically modified by the claimed internet advertising system for publication/display at <u>each</u> such Internet Media Venue <u>in compliance with the presentation rules for that Internet Media Venue</u>.") (emphases added).

In the end, Defendants' construction is so unsupportable that even Google's expert would not adopt it. As he readily admitted, both the specification and the claims speak to the creation of multiple presentations—each tailored to the presentation rules of each Media Venue:

> **Q**: And say the Seller creates—or wants an ad that says 'Eat at Joe's' and there's ten different Media Venues that that ad is going to go on, does the system create one single uniform ad that looks the [same] on each of those ten Media Venues, or does the system format that same ad in ten different ways to comply with the way those ten different Media Venues want it to look? …
>
> **A**: There's certainly writing in the specification that implies that the ad may differ or may be created differently for different Media Venues.
>
> **Q**: You think the claims, though, suggest something else?
>
> **A**: I don't think I said that.

Ex. F, at 142-43.

**2.** **"processing … the electronic advertisement … in compliance with the presentation rules of the Internet Media Venue"**

| Term | FM | Google & Yahoo |
|---|---|---|
| **processing…the electronic advertisement…in compliance with the presentation rules of the Internet Media Venue.** '025, Claims 1 and 179; '059, Claims 1 and 27. | executing a systematic sequence of mathematical and/or logical operations upon the inputted information to create an electronic advertisement customized for each selected Internet Media Venue in a form that complies with the presentation rules set by that Media Venue. | Google: this claim is indefinite because the "in compliance with the presentation rules of the Internet Media Venue" language does not specify which Internet Media Venue's presentation rules must be complied with. Yahoo: obtaining and applying the presentation rules from the first database to create the electronic advertisement in compliance with the presentation rules of the Internet Media Venue. |

Google does not propose a construction for this term and instead argues that one aspect of it—"in compliance with the presentation rules of the Internet Media Venue"—is indefinite. Yahoo agrees with FM that there is no indefiniteness issue. The disputes between FM and Yahoo center around Yahoo's improperly narrow definitions of "processing" and the processed information, Yahoo's introduction of a "database" limitation that nowhere appears in this particular term, and Yahoo's conclusion that presentation rules must come from the first database.

-22-

One of ordinary skill in the art reading the '025 and '059 would understand this claim limitation to mean "executing a systematic sequence of mathematical and/or logical operations upon the inputted information to create an electronic advertisement customized for each selected Internet Media Venue." First, "processing" is a well-known term that—in the computer industry—means "executing a systematic sequence of mathematical and/or logical operations." Ex. D, ¶54. Indeed, Judge Ward has adopted this precise construction. *See Intergraph Hardware Tech. Co. v. Hewlett-Packard Co.*, 2004 WL 5643969 (E.D. Tex. July 1, 2004). And Google's expert acknowledges that computer processing can be defined this way.[9] Second, the end result of the "processing" in this limitation is the creation of a customized ad that complies with the presentation rules of the Media Venue to which it is published. *See* Part C1 above. Third, the specification is clear that the "inputted information" to be processed is (1) information inputted by the Media Venue through the first interface and (2) information inputted by the Seller through the second interface. *See, e.g.,* '025, Fig. 4a (blocks 1130 and 1140), Fig. 4b (block 1170), Fig. 4d (blocks 1120, 11232), Fig. 4e (blocks 11292, 11294, 11312), 17:50-60 & 18:25-29.

Yahoo's construction appears to accept the premise that the end result of the processing is the creation of a customized ad—except that, as noted above, Yahoo incorrectly believes that one identical ad is published to all selected Media Venues. *See* Part C1. With respect to the unique disputes raised by this claim limitation, Yahoo contends that "processing" requires <u>obtaining the presentation rules</u> from the first <u>database</u> and then <u>applying</u> those rules to create an advertisement.

There are several problems with Yahoo's proposed construction. First, as Yahoo's expert admits, an ad cannot be created using only presentation rules. *See* Ex. G, at 17:50:42. Rather, the system also has to have Seller-provided information such as advertising content. *See e.g.* '025, at

---

[9] *See* Ex. F, at 216 ("**Q.** Now, … Function Media's definition says 'executing a systematic sequence of mathematical or logical operations.' Starts that way, right? **A.** Yes. **Q.** I mean, when you see that sort of phrase, do you think of computer processing? **A.** That's a computer processing term certainly, mathematical and logical operations.").

19:40-55. Second, Yahoo's definition of "processing" is much too narrow. Processing does not require, and is not limited to, "obtaining and applying." One of ordinary skill in the art would not interpret general "processing" as synonymous with any specific type of processing. Ex. D, ¶57. Indeed, different claims within the '025 describe different types of processing. *See, e.g.,* '025, Claims 140-142. Third, Yahoo's addition of the database element is not proper because: (a) the common definition of "processing" does not require that data be accessed from a database; and (b) the at-issue claim already contains an independent database limitation, making the addition of a database concept to this element superfluous.

Lastly, Google's indefiniteness argument is incorrect because the patents clearly specify which presentation rules must be complied with—namely, those belonging to the Media Venue to which the ad will be published. For example, the '025 specification states that the PGP identifies the Media Venue(s) to which the presentation will be published and formats the ads for publication to those identified Media Venues (in compliance with the presentation rules of each):

> In the preferred embodiment of the present invention, each Central Controller and Presentation Processor 1000 may support any number of client outlets, channels, resident media, or non-resident media. . . . .The Presentation Generation Program 1710, using the information contained within the Presentation Rules Database 1650, then formats the presentation information for each client outlet, channel, resident media, or non-resident media (blocks 11300, 11294).

'025, at 44:27-40 (emphases added); *id.* at 43:31-37.

**3.      "publish"**

| Term | FM | Google & Yahoo |
|---|---|---|
| **publish the advertisement to the Internet Media Venue.** '025, Claims 79, 90, 258, 269 | placing or making available the customized electronic advertisement within the framework of each Internet Media Venue so that it is accessible by the end users, consumers, viewers, or Buyers. | Google & Yahoo: place the advertisement at the Internet Media Venue location for public display. |
| **publishes the modified or reformatted advertisement … to the one or more** | places or makes available the modified or reformatted advertisement within the | Google & Yahoo: places the modified |

| Term | FM | Google & Yahoo |
|---|---|---|
| **of the selected Internet Media Venues for display by an advertisement generation program in compliance with the Internet Media Venue presentation rules.** '025, Claims 148. | framework of each Internet Media Venue so that it is accessible by the end users, consumers, viewers, or Buyers by an advertisement generation program in compliance with the Internet Media Venue presentation rules. | or reformatted advertisement at the one or more Internet Media Venue locations for public display. |

The dispute here can be stated simply: should "publish" be defined as it is in the patents' glossary, or not? The patents' glossary defines "publishing" as "<u>placing or making available</u> the presentation or information within the framework of the Media Venue so that it is accessible by the end users, consumers, viewers, or Buyers." *See* '025, at 11:49-52 (emphasis added).

Notwithstanding the fact that the glossary definition includes both the concepts of "placing" and of "making available," Defendants inexplicably have dropped "making available" in favor of an unsupportable "place the advertisement at the Media Venue location" formulation. Defendants' construction contradicts not only the glossary but also Defendants' own definition of "Media Venue," in which Defendants construed Media Venues as locations "where presentations are placed <u>or made available</u>." *See* Part C5, below. If there is any reason why "making available" is proper in the "Media Venue" context but improper in the context of "publishing" to the Media Venue, Defendants have not supplied it.

Defendants' erroneous construction appears to be based on Yahoo's expert's mistaken belief that a patentee cannot be his own lexicographer—such that Defendants are free to ignore the specification in favor of their expert's own definition of "publishing":

> **Q**. Why didn't you include the definition that was included in the glossary for "publishing"?
> **A**: The definition in the glossary in terms of "publishing" is not consistent with what I understand [publishing] to be. …
> **Q**: So why didn't you go straight from the glossary for the concept of publishing?
> **A**: Because I agree—let's see, because I disagree with what the publishing – the phrase "publishing" in the glossary contains.

Ex. G, at 89:8-13, 91:2-9 (objections omitted). This is obviously contrary to the law. *See, e.g., CCS Fitness, Inc. v. Brunswick Corp.,* 288 F.3d 1359, 1366 (Fed. Cir. 2002).

Defendants' proposed addition of "at the Media Venue location" is similarly improper, because it ignores the specification and rewrites the claim. Nowhere does the claim speak in terms of placing the ad at "the Media Venue location." Instead, by using the term "publish," the claim speaks broadly to "placing or making [the advertisement] available <u>within the framework of each Media Venue so that it is accessible by the end users</u> . . . ." Moreover, the specification confirms that the invented system is not limited to placing an ad at the Internet Media Venue's physical location, but rather is free to make the ad available through the Buyer's interface (for example):

> The Presentation Generation Program 1710 creates presentations that can be accessed by the buying public in location/outlet-appropriate formats and availability through the . . . Buyer's Interface 5000.

'025, at 52:28-35. Indeed, Google's expert ultimately admitted in his deposition that the "publishing" contemplated by the patent ought to be construed broadly: "It doesn't have to be a server. It just has to be placed on the Internet. It could be on a client for that matter as long as the client has an IP address." Ex. F, at 147.[10]

> **4.** **"A method of using a <u>network of computers</u> to contract for, facilitate and control the creating and publishing of presentations, by a Seller, to a plurality of Media Venues <u>owned or controlled by other than Seller</u>" & "A method of**

---

[10] The disputes addressed above with respect to the "create," "processing," and "publishing" limitations repeat themselves in connection with the following disputed limitation: "a computer controller of the computer system processing and publishing the electronic advertisement to one or more of the selected internet media venues in compliance with the presentation rules of the internet media venue, whereby the electronic advertisement is displayed on each of the one or more of the selected internet media venues in compliance with the presentation rules." '025, Claim 1. FM does not presently believe that Defendants' proposals with respect to this limitation differ in any meaningful respect from what has already been discussed with respect to the limitation's constituent parts. And Defendants have not disputed FM's construction of "computer controller." Thus, the Court should adopt FM's proposed construction for this limitation: "a computer processor of the computer system executing a systematic sequence of mathematical and/or logical operations upon the inputted information to create an electronic advertisement [1] customized for each selected internet media venue in a form that complies with the presentation rules set by that internet media venue and [2] placing or making available the customized electronic advertisement within the framework of each internet media venue so that it is accessible by the end users, consumers, viewers, or buyers [--] so that the electronic advertisement is displayed on each internet media venue in a form customized to each internet media venue's presentation rules." Dkt No. 73-3. (Ex. B to Joint Claim Construction Statement).

945534v1/08426-010020

**using a computer system allowing a Third-Party Professional to manage, create, and publish customized electronic advertisements, for a Seller, to Internet Media Venues <u>owned or controlled by other than the Seller</u> and other than the Third-Party Professional"**

| Term | FM | Google & Yahoo |
|---|---|---|
| **A method of using a network of computers to contract for, facilitate and control the creating and publishing of presentations, by a Seller, to a plurality of Media Venues owned or controlled by other than Seller, comprising ... '045, Claim 1.[11]** | A method of using a computer network that facilitates and controls the creation and publication of presentations, by a Seller, to multiple Media Venues owned or controlled by other than Seller, that includes | Google: The preamble limits this claim and the phrase "owned or controlled by other than the Seller" means that the Media Venue ultimately controls the publishing of presentations.<br><br>Yahoo: A method of using the Sellers' computers, the Media Venues' computers, and the Resident Media computers, that may communicate either continuously or on-demand for the purpose of sharing processing, transferring information and data to contract for, facilitate, and control the creating and publishing of presentations, by a Seller, to a plurality of Media Venues owned or controlled by other than the Seller, comprising |

Google's proposed construction of "owned or controlled by other than the Seller" is confusing and demonstrably incorrect. Similarly, Yahoo's construction of "a network of computers" is incorrect because it unnecessarily includes "Resident Media computers"—a term that appears nowhere in the patents and that has simply been appended to the claim.

With respect to "owned or controlled by other than the Seller" (the dispute between FM and Google), FM contends that the phrase means exactly what it says: somebody other than the Seller owns and controls the Media Venues to which the ads are published. This is consistent with how the patent uses "owned or controlled" throughout. The FM patents discuss two primary types of Media Venues: [a] those that are owned by the Operator of the invention ("Resident Media"); and [b] those that are not owned by the Operator of the invention ("Non-Resident Media"). *See,*

---

[11] The same issues that are discussed in this section apply to the following analogous term from the '059 patent: "A method of using a computer system allowing a Third-Party Professional to manage, create, and publish customized electronic advertisements, for a Seller, to Internet Media Venues owned or controlled by other than the Seller and other than the Third-Party Professional, comprising . . . " ('059, Claim 27). For the sake of brevity, FM will not discuss the '059 term separately here. Instead, FM refers the Court to its proposed construction of these terms in Dkt No. 73-3 (Ex. B to Joint Claim Construction Statement).

945534v1/08426-010020

*e.g.,* '025, at 11:25-30, 12:4-8. Within "Non-Resident Media" are two subcategories of media: [a] Non-Resident Media "owned or controlled by other than Seller"; and [b] Non-Resident Media owned or controlled by the Seller. *See, e.g.,* '025 Claim 1. In all of these instances, "owned or controlled" refers to ownership or control in the legal sense. *See* '025, at 12:5-7 ("Resident Media refers to media that is wholly owned or controlled by the management, operators or affiliates of the given instance of the present invention."); Ex. L (excerpt from '045 Prosecution History, Amendment dated 2/6/02), at D064760-62 (distinguishing a Prior Art reference on the ground that the '045, in using the terminology "owned or controlled by other than the Seller," refers to business entities legally unrelated to the Seller and thus teaches a business-to-business model instead of an internal model allowing Sellers to publish to their own Media Venues). Indeed, in allowing the '045, the Examiner noted that the Prior Art disclosed "an 'in-house' system" and not "a system for selecting Media Venues owned by other than the Seller…." *See* Ex. L (January 2002 Notice of Allowability), at D064771.

Rather than simply accept the clear teachings of the specification and the prosecution history, Google has opted to manufacture a construction out of the blue. Google's construction of "owned or controlled by other than the Seller"—that "the Media Venue ultimately controls the publishing of presentations"—is not only inconsistent with the patent's use of the term, it is confusing on its own terms. It is entirely unclear from where Google derives this language and what exactly "ultimately controls" is intended to mean. Perhaps "ultimately controls" simply means, as should be obvious, that the publisher has the final say in the sense that it can discontinue its use of the invention at any time. Google's expert appears to believe exactly that, though even he had difficulty defining the phrase "ultimately controls." *See* Ex. F, at 99-102. If "ultimately controls" simply conveys the notion that a Media Venue could at any time stop using the invention, it adds nothing to the understanding of the claims. Regardless, Google's proposed construction is

945534v1/08426-010020

nowhere supported in the specification and nowhere sanctioned by the claim, which talks in terms of "Media Venues owned or controlled by other than the Seller."

With respect to the appropriate definition of "computer network" (the dispute between FM and Yahoo), Yahoo seeks to introduce "Resident Media computers" into the definition. As noted above, "Resident Media" is defined in the patent to mean "media that is wholly owned or controlled by the management, operators or affiliates of the given instance of the present invention." '025, at 12:5-7. But the term "Resident Media" appears nowhere in the claims. Further, the ensuing part of Yahoo's definition—"for the purpose of sharing processing, transferring information and data"—does not make any sense and is not required by the claim. Yahoo's position finds no support in the specification and is confusing at best.

### 5. "Media Venue" & "Internet Media Venue"

| Term | FM | Google & Yahoo |
|------|-----|----------------|
| **Media Venue.** '045, Claim 1; '025, Claims 1 and 179; '059, Claims 1 and 27. | those physical or virtual locations (*e.g.*, web servers, domain names, internet addresses, websites) where presentations are placed or made available to present the information within the framework of the media so that it is accessible by the end users, consumers, viewers, or Buyers. | Google & Yahoo: those physical or virtual locations (*i.e.*, addresses) where presentations are placed or made available to present the information within the framework of the media so that it is accessible by the end users, consumers, viewers, or Buyers. |
| **Internet Media Venue.** '025, Claims 1 and 179; '059, Claims 1 and 27. | Internet locations (*e.g.*, web servers, domain names, internet addresses, websites) where presentations are placed or made available to present the information within the framework of the media so that it is accessible by the end users, consumers, viewers, or Buyers. | Internet locations (*i.e.*, addresses) where presentations are placed or made available to present the information within the framework of the media so that it is accessible by the end users, consumers, viewers, or Buyers. |

The term "Media Venues" is defined in the patents' glossary. The parties have agreed to use that definition but have a dispute as to the meaning of a particular phrase within the glossary's definition, "virtual locations." This dispute is encapsulated within the competing parentheticals in the above-tabled limitations. Defendants have proposed a totally unreasonable—and unsupportable—construction: that "virtual locations" should be defined to mean only "addresses."

-29-

FM has proposed a parenthetical containing an exemplary list of "physical or virtual locations": "(*e.g.,* web servers, domain names, internet addresses, websites)."

No person of ordinary skill in the art would read "virtual locations" to be synonymous with, or in any way limited to, "addresses." Defendants' parenthetical describes but a single type of "virtual location"—and, even then, opts for "addresses" instead of "Internet addresses" (with the peculiar result that "111 Main Street" could constitute a "virtual location" under Defendants' proposal). Defendants' proposal also fails to recognize that the patents' specification expressly mentions a website and provides examples of other virtual locations (such as Internet bulletin boards, news groups, and interactive media and networks). *See, e.g.,* '045, at 3:13-22.

One of ordinary skill in the art would understand that a "virtual location" could also include (for example) a website, URL, or any other virtual location "where presentations are placed or made available … so that [the information] is accessible by the end users, consumers, viewers, or Buyers."[12] Ex. D, ¶¶66-67; '025, at 10:61-64. Had the patentees meant to limit "virtual locations" to "addresses," they simply would have used "addresses."

> **6.** **"self-serve interface," "first interface to the computer system," "each of the Internet Media Venues is prompted to input presentation rules," "prompting each of the Internet Media Venues… to input presentation rules," "a second interface to the computer system through which a Seller is prompted to input information to select one or more of the Internet Media Venues," "Third-Party Professional is prompted to input information to select one or more the Internet Media Venues," "prompting the Third-Party Professional … to input information to select one or more of the Internet Media Venues," & "third interface to the computer system"**

| Term | FM | Google & Yahoo |
|---|---|---|
| **self-serve interface.** '025, Claims 6 and 185. | interface that the [Internet Media Venue user/Seller] uses without requiring the | Google & Yahoo: software and hardware at the [IMV/Seller] location that a person working on behalf of the [IMV/Seller] uses |

---

[12] An address is a numeric value that typically changes dynamically, as it represents a node on the Internet. A URL, by contrast, consists of static text—such as www.google.com—and represents an Internet domain. Ex. D, ¶ 67.

-30-

| Term | FM | Google & Yahoo |
|---|---|---|
| | aid of anyone else . | directly without the aid of anyone else. |
| **first interface to the computer system.** '025, Claims 1 and 179; '059, Claims 1 and 27. | software that enables the Internet Media Venue user to interact with the computer system. | Google & Yahoo: software and hardware at the Internet Media Venue location that enables a person working on behalf of the Internet Media Venue to interact with the computer system. |
| **each of the Internet Media Venues is prompted to input presentation rules.** '025, Claim 1; '059, Claim 1. [13] | each Internet Media Venue [user] is prompted to input presentation rules | Google & Yahoo: every one of the Internet Media Venues is prompted to input presentation rules |
| **prompting each of the Internet Media Venues… to input presentation rules.** '025, Claim 179; '059, Claim 27. [14] | each Internet Media Venue [user] is prompted to input its presentation rules | Google & Yahoo: every one of the Internet Media Venues is asked to input presentation rules |
| **a second interface to the computer system through which a Seller is prompted to input information to select one or more of the Internet Media Venues.** '025, Claims 1 and 179.[15] | software that enables the Seller user to interact with the computer system through which the Seller user is prompted to enter information to select one or more Internet Media Venues. | Google & Yahoo: software and hardware at the Seller location in communication with the computer system through which the Seller is prompted to enter information to enable the Seller to select one or more Internet Media Venues. |

The principal disputes here are [1] whether the patents claim an interface consisting of "software and hardware" (Defendants' position) or an interface consisting of only "software" (FM's position); and [2] whether the patents claim only selection of specific Media Venues by a Seller (Defendants' position) or, more broadly, selection of Media Venues using the Seller-

---

[13] There does not appear to be any significant distinction between the proposed constructions for this term. The Court should adopt FM's construction because it tracks the unambiguous language of the claim.

[14] There does not appear to be any significant distinction between the proposed constructions for this term. The Court should adopt FM's construction because it tracks the unambiguous language of the claim.

[15] The same issues that are discussed in this section apply to the following analogous terms from the '059 patent: "Third-Party Professional is prompted to input information to select one or more the Internet Media Venues," ('059, Claim 1; "prompting the Third-Party Professional … to input information to select one or more of the Internet Media Venues," ('059, Claim 27); and "Third interface to the computer system," ('059, Claims 1 and 27). For the sake of brevity, FM will not discuss the '059 terms separately here. Instead, FM refers the Court to its proposed construction of these terms in Dkt No. 73-3 (Ex. B to Joint Claim Construction Statement).

945534v1/08426-010020

inputted "information to select" (FM's position). The first dispute as to software/hardware is addressed in Part B1c above. The selection dispute is addressed in subpart "a" below.

Additional disputes with respect to the "interface" terms are: (1) whether the interfaces must physically reside at the Media Venue/Seller locations (Defendants' position) or whether the claims contain no such requirement (FM's position); and (2) whether the "self-serve interface" should be construed as an interface that is used "directly without the aid of anyone else" (Defendants' position) or as an interface that is used "without requiring the aid of anyone else" (FM's position). These disputes are addressed in subparts "b" and "c" below.

### a. The selection dispute.

The disputed claim language is "input information to select." The parties agree that the person inputting the "information to select" is the Seller. But the parties disagree as to whether [1] the patents claim <u>only</u> a system/method wherein a Seller selects a Media Venue by inputting the name of that Media Venue or by selecting a specific Media Venue from a list (Defendants' view); or [2] the patents claim a system/method wherein a Seller inputs selection information—be it names of websites, advertising channels, keywords that are then matched to website content, or otherwise—that the system then uses in its final selection process (FM's view).

This dispute should not long detain the Court. Nowhere do the claims limit the type of selection information that can be entered by a Seller, and nowhere do the claims require that the Seller have final say in where ads are published. Nor do the claims require the input of specific names of websites over other selection information (*e.g.*, channels). The relevant claim limitations are broad, and they are clear on their face: a Seller inputs selection "<u>information</u>"—whether individual website names, advertising channels, or other targeting information—that is used "<u>to select</u>." The claims do not dictate how the system uses that selection information, and the claims do not require the system to publish to all targeted Media Venues.

Nor does the specification require what Defendants wish to read into the claims. Indeed, the specification expressly describes a situation where the Seller might enter selection information other than a specific website: "The Presentation and Configuration Program [the Seller interface] introduces the Seller to the instance of the present invention and allows the Seller to choose in which presentations and which media or advertising channels the Seller wishes to participate." '025, at 28:45 (emphasis added); *accord* '025, at 27:1. Moreover, although the Seller can input information to select, the patents contemplate that this will be merely targeting information to be used by the system—information that might be trumped, for example, by a targeted Media Venue's blocked URLs. *See, e.g.,* '025, at 18:29-50, 27:1-22, & Claims 80-89. The specification compels a construction wherein the system is making the final call as to whether advertising content will appear on any given site.

Moreover, several dependent claims in the '025—and well-settled principles of claim differentiation—dispose of any argument that the above-tabled limitations (from the independent claims) require specific-website-selection by a Seller. Yahoo relies on the declaration of its expert to support its position that the patents allow only specific-website-selection by a Seller. But that same expert testified in his deposition that he "wasn't asked to take a look at" dependent claims relating to other forms of selection and that, in any case, he had never heard of the concept of claim differentiation and was unaware as to how that might impact Yahoo's position. Ex. G, at 160:20-21, 171:2-7. The patent's necessarily-narrower dependent claims speak to a Seller's ability to target media venues by way of, for example, targeting demographics and advertising channels. *See, e.g.,* Claim 23 (discussing targeting via demographics); Claim 21 (discussing targeting via advertising channels). In stark contrast to Claims 21 and 23, other dependent claims speak to a Seller's ability to select media venues by identifying the specific websites. *See, e.g.,* Claim 24 ("wherein the selection information includes identification of individual Internet Media Venues").

-33-

These dependent claims prove, then, that the "information to select" from Claim 1 is not as narrow as Defendants would have it. If independent Claim 1 involved <u>only</u> the identification of specific websites by name (or from a list), Claim 24 would be superfluous and Claims 21 and 23 nonsensical. *See Hyperion Solutions Corp. v. Outlooksoft Corp.*, 422 F. Supp. 2d 760, 772 (E.D. Tex. 2006) ("Bedrock principles of claim construction counsel against a construction that renders additional limitations superfluous.").

### b. The location dispute.

The Court can also quickly dispose of Defendants' contention that the claimed interfaces must somehow reside physically at the Seller/Media Venue locations. While the specifications show that—in the preferred embodiment—the interface software is preferably provided to the intended user via physical delivery for installation on a user's computer, one of ordinary skill reading the specifications would understand that the claims contain no such limitation. Ex. D, ¶71. Defendants are improperly reading a characteristic of the preferred embodiment into the claim.

### c. The "self-serve" dispute.

There is a subtle difference between FM and Defendants regarding the proper definition of "self-serve." FM proposes "uses without requiring the aid of anyone else," while Defendants propose "uses directly without the aid of anyone else." FM's definition is better for two reasons: (1) Defendants' "uses directly" phraseology is unclear, to the point that even Yahoo's expert couldn't explain it;[16] and, (2) though it would be improper to take this view, Defendants' construction could arguably be used as a backdoor attempt to exempt out those interface users who elect to take advantage of help menus or customer-support personnel when using the interface— voluntary elections that should not transform a "self-serve interface" into a non-self-serve one.

---

[16] Ex. G, at 138:7-11 ("**Q**: Is there some sort of indirect use of the self-serve interface that you mean to exclude by using the word 'directly' in the definition of self-serve interface? **A**: No.").

945534v1/08426-010020

### 7. "selection information input by Seller"

| Term | FM | Google & Yahoo |
|------|-----|----------------|
| **selection information input by the Seller.** '025, Claims 20 and 199. | information input into the computer system by the Seller that is used to select | Yahoo: information input by the Seller to enable the Seller to select one or more Internet Media Venues |

The dispute here is the same as the selection dispute that is addressed in Part C6. For the reasons already identified, FM has proposed the proper construction.

### 8. "presentation rules"

| Term | FM | Google & Yahoo |
|------|-----|----------------|
| **presentation rules.** 025, Claims 1 and 179; '059, Claims 1 and 27. | controls to be set by a Media Venue for use by the computer system programming in creating advertisements for publishing on that Media Venue | Google & Yahoo: rules that control and limit the style and editing of the presentations created by the system. |

The dispute here is whether "presentation rules" should be defined to include [1] only those rules that control "the style and editing" of presentations (Defendants' position) or [2] any rule that is used by the system "in creating advertisements for publishing" (FM's position).

One of ordinary skill in the art would understand that "presentation rules" are controls that are set by a Media Venue and ultimately used by the computer system in creating ads for publication to that Media Venue. *See* Ex. D, ¶73. This reading comes directly from the specification, which describes a PGP that uses presentation rules in the processing of Seller information to create a customized ad for publication to a respective Media Venue. *See, e.g.,* '045, at 43:28-51 & 5:10-24. The specification even lists various types of presentation rules:

> the upper and lower limits of quantities such as amounts of text and size of images, restrictions of language and reference, standards of style and presentation, choices of type fonts and colors, as well as the cost of presentations and demographics of the [] subscribers or viewers, … [as well as] presentation templates; blocked words; blocked phrases; blocked references; … blocked URLs; grammar guidelines; [etc.] ….

'025, at 5:4-14 & 18:40-45.

-35-

Defendants' proposed construction is too narrow. It suggests that, in order to qualify as a "presentation rule," a rule <u>must</u> include both "style and editing" parameters, and only "style and editing" parameters. Nowhere, however, does the specification limit presentations rules in this way. Indeed, the '025 Abstract directly refutes Defendants' construction because it makes clear that presentation rules can include "distribution factors" as well as "style and editing" parameters:

> An internet advertising system and method that provides a Seller self-serve control for creation, publication, and display of advertisements on Internet Media Venues owned or controlled by entities other than the Seller in a form automatically modified to comply with the Media Venues' <u>presentation rules, which may include design or style standards for look and feel, editorial standards, and distribution factors.</u>

*See* '025 Abstract (emphasis added). Moreover, as described above, the specification provides several specific examples of presentation rules—some of which plainly are not "style and editing" parameters (*e.g.*, blocked URLs). Finally, the '025 claims differentiate several types of presentation rules: "design or style standards" that control the look and feel of the ad (*e.g.*, Claim 62); editorial standards that control the content of the ad (*e.g.*, Claim 78); and "distribution factors" that control whether specific advertising content or advertisers can be associated with a particular Media Venue (*e.g.,* Claim 79).

### 9. "design or style standards" & "look and feel"

| Term | FM | Google & Yahoo |
|---|---|---|
| **design or style standards.** '025, Claims 62-63, 226, 241, and 242. | presentation rules which control the look and feel of an advertisement | Google & Yahoo: this term is indefinite because it is unclear what the term means or does not mean. |
| **control look and feel of the advertisement.** '025, Claims 47, 62-63, 226, 241, and 242. | control the appearance of an advertisement | Google & Yahoo: this term is indefinite because it is unclear what the term means or does not mean. |

Even though "design or style standards" needs no definition (to a person of ordinary skill in the art or otherwise), the very first page of the '025 confirms what a person of ordinary skill in the art would already know: "design or style standards" for ads are standards concerning an ad's

-36-

"look and feel." *See* '025 Abstract, quoted above. Separately, '025 Claim 47 expressly states that "design or style standards" control the "look and feel of the advertisement":

> … further comprising a computer program design filter to automatically apply or compare the Internet Media Venue design or style standards to the information input by the Seller or the advertisement to control the look and feel of the advertisement to be displayed on the Internet Media Venue.

The '025 even provides examples of "design or style standards" in the dependent claims. *See , e.g., id.* at Claims 50-53 (font, color, size).

Further, one of ordinary skill in the art would understand that an ad's "look and feel" is synonymous with the ad's appearance. *See, e.g.,* Ex. D, ¶¶75-76. The '025 specification and claims (as quoted above) provide more context to conclude that "look and feel"—which is linked to "design or style standards" (which are defined to include guidelines concerning font, color, and size)—concerns appearance. Indeed, Google's own website for the accused advertising system uses the phrase "look and feel" to describe appearance.[17] The Court should thus reject Defendants' indefiniteness arguments.

### 10. "distribution factors"

| Term | FM | Google & Yahoo |
|---|---|---|
| **distribution factors.** '025, Claims 79, 90-91, 258, 269-70. | rules concerning whether advertising content may be published on a particular Media Venue | Google & Yahoo: information about where the Internet Media Venue will make the advertisement available, such as billboards, skywriters, bus benches, radio, interactive kiosk, or any other form of customer advertising, outreach, or information distribution |

One of ordinary skill in the art would understand that distribution factors are presentation rules concerning whether advertising content may be published on a particular Media Venue. Ex. D, ¶77. Indeed, '025 Claim 79 expressly describes "distribution factors" as such:

---

[17] *See* Ex. N (screenshot from Google website) ("Customize ads to complement your site. You spend lots of time perfecting your website's <u>look and feel</u>, and we want AdSense to fit in. <u>So we let you customize the appearance of your ads</u> to fully complement your site by choosing from over 200 colors and 24 pre-set color palettes….") (emphases added), *available at* https://www.google.com/adsense/static/en_US/AfcOverview.html?sourceid=aso&subid=ww-ww-et-pubsol& medium=link.

-37-

> The computer system of claim 1, wherein the Internet Media Venue presentation rules comprise distribution factors, further comprising a computer program distribution filter configured to automatically apply or compare the Internet Media Venue distribution factors to the information input by the Seller or the advertisement to determine whether to publish the advertisement to the Internet Media Venue.

Further, the '025 specification lists the types of distribution factors that a Media Venue could input to determine whether an ad is eligible to be published to the Media Venue. *See* '025, at 69:28-49 (listing blocked URLs, content standards, blocked words, blocked phrases, available publication dates, website demographics).

Defendants' proposed construction—"information about where the Internet Media Venue will make the advertisement available, such as billboards, skywriters, [etc.]"—is inescapably confusing, nonsensical, and inconsistent with the specification. First, the construction literally does not make sense in light of Defendants' proposed definition of Internet Media Venues: "Internet locations (*i.e.*, addresses) where presentations are placed or made available." *See* Part C5. When Defendants' construction of "Internet Media Venue" is paired with Defendants' construction of "distribution factors," the nonsensical result is that "Internet locations where advertisements are made available must make advertisements available on billboards, skywriters, and bus benches." Second, Defendants' construction of "distribution factors" implies that it is the Internet Media Venue that makes an ad available. Yet the patents describe, and claim, just the opposite: a computer system wherein the <u>Operator of the invention</u> makes an ad available to a subscribing Media Venue (in accordance with the presentation rules, including distribution factors, of that Media Venue). *See, e.g.*, '025, at 45:65-46:6. Third, to add to the confusion, Defendants' proposed construction lists examples of <u>Media Venues</u> (both Internet and non-Internet)—not examples of distribution factors. *See, e.g.,* '025, at 52:1-2 (defining these media to include billboards, skywriters, bus benches, etc.). Yet again admitting what his client would not,

-38-

Google's expert upon being questioned about the confusion inherent in Defendants' definition of "distribution factors" concluded that the definition had to be changed (though he could not propose any alternative). Ex. F, at 202.

**11.      "computer program design filter" & "computer program distribution filter"**

| Term | FM | Google & Yahoo |
|------|-----|----------------|
| **computer program design filter.** '025, Claims 47, 62-63. | software that processes design or style standards | Google & Yahoo: this term is indefinite because it has neither ordinary meaning nor support in the written description. |
| **computer program distribution filter.** '025, Claims 79, 90-91. | software that processes distribution factors | Google & Yahoo: this term is indefinite because it has neither ordinary meaning nor support in the written description. |

The only dispute here is, again, whether these terms are indefinite. FM contends that the terms mean "software that processes design or style standards" (in the case of a "design filter") and "software that processes distribution factors" (in the case of a "distribution filter"). Defendants do not offer an alternative construction, but instead contend that these terms are indefinite for "[lack of] support in the written description." This argument not only ignores the claims and specification but also improperly attempts to shoehorn means-plus-function requirements into the '025 claims (which are not written in means-plus-function language).

One of ordinary skill in the art would adopt FM's constructions.  Ex. D, ¶¶80, 82. Indeed, '025 Claim 47 describes the function of the "design filter" as one of applying design or style standards to the Seller's information in order to control the look and feel of an advertisement. And '025 Claim 79 describes the function of the "distribution filter" as one of applying distribution factors to the information that has been inputted by the Seller in order to determine whether to publish an ad to the Media Venue. This, alone, is enough to make these terms definite. *See, e.g., Fonar Corp. v. General Elect. Co.*, 107 F.3d 1543, 1549 (Fed. Cir. 1997) ("As a general rule, where software constitutes part of a best mode of carrying out an invention, description of such a

-39-

best mode is satisfied by a disclosure of the functions of the software."); *Seven Networks Inc. v. Visto Corp.*, 2006 WL 3840109, at *5 (E.D. Tex. 2006) (construing "application program" as "software that performs tasks for an end user"). Moreover, the specification describes that the PGP functions [1] in one respect as the "design filter" and [2] in another respect as the "distribution filter." *See, e.g.,* '025, at 44:23-46 & Fig. 4d (blocks 11230, 11232, 11240).

12. **"automatically applying or comparing the Internet Media Venue design or style standards to the information input by the Seller or the advertisement," "automatically applying or comparing the Internet Media Venue distribution factors to the information input by the Seller or the advertisement," and "automatically applying or comparing the Internet Media Venue presentation rules to the information input by the Seller or the advertisement," & "computer controller processes the advertisement by automatically applying or comparing the Internet Media Venue presentation rules to the information input by the Seller or the advertisement"**

| Term | FM | Google & Yahoo |
|---|---|---|
| **automatically apply/ing or compare/ing the Internet Media Venue design or style standards to the information input by the Seller or the advertisement.** '025, Claims 47, 62-63, 226, 241-42, 269-70. | Execute/ing a systematic sequence of mathematical and/or logical operations to apply or compare the Internet Media Venue's design or style standards to the information input by the Seller or to the advertisement. | Google & Yahoo: these terms are indefinite at least because of the multiple, cascading "or" in the claims themselves, and particularly because the "information" must be input by the Seller "or" the [text] advertisement. |
| **automatically apply/ing or compare/ing the Internet Media Venue distribution factors to the information input by the Seller or the advertisement.** '025, Claims 79, 90-91, 258, 269-70 | Execute/ing a systematic sequence of mathematical and/or logical operations to apply or compare the Internet Media Venue's distribution factors to the information input by the Seller or to the advertisement. | Google & Yahoo: these terms are indefinite at least because of the multiple, cascading "or" in the claims themselves, and particularly because the "information" must be input by the Seller "or" the [text] advertisement. |
| **automatically … applying or comparing the Internet Media Venue presentation rules to the information input by the Seller or the advertisement.** '025, Claim 319. | Executing a systematic sequence of mathematical and/or logical operations to apply or compare the Internet Media Venue's presentation rules to the information input by the Seller or the advertisement. | Google & Yahoo: these terms are indefinite at least because of the multiple, cascading "or" in the claims themselves, and particularly because the "information" must be input by the Seller "or" the [text] advertisement. |

| Term | FM | Google & Yahoo |
|---|---|---|
| **computer controller processes the advertisement by automatically applying or comparing the Internet Media Venue presentation rules to the information input by the Seller or the advertisement.** '025, Claim 140. | computer processor executes a systematic sequence of mathematical and/or logical operations upon the inputted information to create an advertisement customized for each selected Media Venue in a form that complies with the presentation rules set by that Internet Media Venue by applying or comparing the presentation rules of the Internet Media Venue to the information input by the Seller or the advertisement. | Google & Yahoo: these terms are indefinite at least because of the multiple, cascading "or" in the claims themselves, and particularly because the "information" must be input by the Seller "or" the [text] advertisement. |

FM's proposed construction of these terms is clear and correct. As discussed in Part C2 above, "executing a systematic sequence of mathematical and/or logical operations" is a well-known way of describing the automatic "processing" that is performed by computer software. The phrase is used here simply to describe the processing that has to occur in order "to apply or compare the Internet Media Venue's [design or style standards / distribution factors / presentation rules] to the information input by the Seller or the advertisement," as required by the claim limitations. FM's position is that the underlined phrase is unambiguous and means exactly what it says. If there were any doubt, the specification describes exactly the process that is referenced in these limitations. *See, e.g.,* '025, at Fig. 4d (blocks 11230, 11232) & 43:34-58.

Rather than quibble with FM's proposed construction, Defendants argue that the claim terms are somehow indefinite because of the so-called "multiple, cascading 'or'[s]" in the underlined phrase. This argument does not hold water.

There are only two "or[s]" in the above-tabled limitations, except for the first limitation (which contains three "or[s]"). With respect to the first claim limitation, the extra "or" is of no moment. It is simply part of a phrase—"design or style standards"—that appears on more than one occasion in the '025. As explained in Part C9 above, that phrase would be well understood by a

-41-

person of ordinary skill in the art. Defendants cannot be heard to argue that this "or" is somehow confusing (or that it means something different) within the context of this particular limitation.

The "or" in "apply <u>or</u> compare" is similarly unambiguous. It separates two distinct words and makes perfect sense: the system can either apply the presentations rules to [X] or compare the presentation rules to [X]. [X], in turn, is simply the object of the "apply or compare" verb. This object is described in the claim as "the information input by the Seller <u>or</u> the advertisement." And here again, there is nothing confusing about the "or." It separates two completely different things: Seller-inputted information (on the one hand) and a pre-existing advertisement (on the other). As Google's expert acknowledged, the patents contemplate a situation in which the system is handling either entirely new presentations or modifying existing ones. Ex. F, at 214; *accord* '025, at 42:53-56 ("The information entered, either as a new presentation or as modifications to an existing presentation, can be sent to the Central Controller and Presentation Processor 1000 immediately or delayed for publication later.").

### 13. "blocked URLs"

| Term | FM | Google & Yahoo |
|------|-----|----------------|
| **blocked URLs.** '025, Claim 81. | Internet locations that are precluded from displaying a presentation | Google & Yahoo: this term is indefinite because it unclear what it means in view of the written description. |

One of ordinary skill in the art reading the FM patents would understand that "blocked URLs" mean Internet locations that are precluded from displaying a presentation. Ex. D, ¶87. A URL is, of course, an acronym for Universal Resource Locator—an example of which is www.google.com. A blocked URL is, in the context of the '025, a Seller Internet location that is precluded from displaying a presentation on a particular Media Venue because that Media Venue has blocked the Internet location. *See, e.g.,* '025, at 18:29-50 & Claim 81. Defendants' argument flies in the face of not only the specifications and claims but also Google's own website, which

uses precisely the same terminology: "You can block competitive ads, or other ads you want to keep off your site, simply by telling us which URLs to block." Ex. N (screenshot describing the accused products). And even Google's expert admits that a blocked URL is, in the parlance of the '025, a presentation rule that operates to preclude display of a presentation. Ex. F, at 207.

### 14. "advertisement generation program"

| Term | FM | Google & Yahoo |
|---|---|---|
| **advertisement generation program.** '025, Claims 148 and 327. | software that displays an electronic advertisement | Google: this term is indefinite because it has no ordinary meaning and no support in the written description.<br><br>Yahoo: advertising software at the Internet Media Venue location |

Although Google raises here yet another indefiniteness argument, Yahoo agrees with FM that "advertisement generation program" is not indefinite. Unfortunately, however, Yahoo's proposed construction is both incomplete and too restrictive.

A person of ordinary skill reading the '025 would have no difficulty concluding that the "advertisement generation program" referenced in Claim 148 is "software that displays an electronic advertisement," considering that the claims define it as such. Ex. D, ¶88; *accord* '025 Claim 143 ("The computer system of claim 1, further comprising an advertisement generation program for displaying the advertisement …."); '025 Claim 148 ("…wherein the computer controller publishes the modified or reformatted advertisement to the one or more of the selected Internet Media Venues for display by an advertisement generation program . . .").

Notwithstanding Google's indefiniteness argument, Google's expert unequivocally agreed that the patent in fact does define an "advertisement generation program"—and in exactly the same way that FM defines it: "**Q**: [S]o when it talks about an . . . advertisement generation program, it's expressly referring . . . to it as software for displaying the advertisement, right? **A**: Correct." Ex. F, at 220.

-43-

Yahoo's alternative construction introduces an "at the Media Venue location" limitation that appears nowhere in the claim and that would not be recognized by a person of ordinary skill in the art. Ex. D, ¶88. Yahoo's construction also fails to identify any function for the software, even though the plain language of the patent states—and Google's expert admits—that the associated claims describe the function of the software as one of displaying advertisements.

### 15.    Indefiniteness for purportedly "mixing different statutory classes"

Google (but not Yahoo) asserts that Claim 1 of the '025 patent is invalid because it impermissibly "mixes different statutory classes of inventions." Dkt No. 73-3. Google appears to be arguing that it is unclear whether infringement occurs when the system is created or only when a user actually uses the system.

Google is incorrect, as even Yahoo acknowledges. Claim 1 is directed to a computer system consisting of certain enumerated components—namely, a first interface, a first database, a second interface, a second database, and a computer controller. It is neither directed at, nor claiming, "a user using the system." To the contrary, the claimed components all speak to a functionality of the system: "a first interface to the computer system through which each of the internet media venues is <u>prompted</u>"; a first <u>database storing</u> the presentation rules input by the internet media venues"; a "second interface to the computer system through which a seller is <u>prompted</u>; a second <u>database storing</u> the information inputted by the seller"; and "a computer controller of the computer system <u>processing and publishing</u> . . . ."

The case that Google cites in purported support for its position, *IPXL Holdings LLC v. Amazon.com, Inc.,* 430 F.3d 1377, 1384 (Fed. Cir. 2005), involved a user limitation whereby "<u>the user uses</u> the input means to either change the predicted transaction information or accept the displayed transaction type . . . ." Here, by contrast, Claim 1 involves system components that are capable of prompting, storing, and processing. *See, e.g., Microprocessor Enhancement Corp. v.*

-44-

*Texas Instruments, Inc.,* 520 F.3d 1367, 1375 (Fed. Cir. 2008) (apparatus claims not invalid for using functional language in describing capabilities of claimed elements); *Yodlee, Inc. v. Cashedge, Inc.*, 2006 WL 3456610 at *4-6 (N.D. Cal. Nov. 29, 2006). Google cannot possibly prove by clear and convincing evidence all facts necessary to invalidate the presumptively-valid claim.

## CONCLUSION

In light of the foregoing, FM respectfully requests that the Court adopt its claim constructions as outlined above.

Dated: April 9, 2009        Respectfully submitted,

/s/ Max L. Tribble, Jr.

Max L. Tribble, Jr. - *Lead Attorney*
State Bar No. 20213950
mtribble@susmangodfrey.com
SUSMAN GODFREY LLP
1000 Louisiana, Suite 5100
Houston, Texas, 77002
Telephone: (713) 651-9366
Facsimile: (713) 654-6666

**OF COUNSEL**:

Joseph S. Grinstein
State Bar No. 24002188
jgrinstein@susmangodfrey.com

Jeremy J. Brandon
State Bar No. 24040563
jbrandon@susmangodfrey.com

SUSMAN GODFREY LLP
1000 Louisiana Street, Suite 5100
Houston, Texas 77002-5096
Telephone: (713) 651-9366
Fax: (713) 654-6666

## CERTIFICATE OF SERVICE

I hereby certify that, on April 9, 2009, a true and correct copy of the foregoing was served via ECF on all counsel of record.

/s/ Jeremy Brandon
Jeremy Brandon