**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | |
|---|---|
| **FUNCTION MEDIA, L.L.C.,** | **Civil Case No. 2:07-cv-279 (CE)** |
| **v.** | |
| **GOOGLE, INC. AND YAHOO!, INC.** | **JURY TRIAL DEMANDED** |

### GOOGLE INC.'S MARKMAN BRIEF

Dockets.Justia.com

# TABLE OF CONTENTS

I.     INTRODUCTION AND SUMMARY ........................................................................1

II.    ARGUMENT ......................................................................................................3

       A.     Means-Plus-Function Terms under 35 U.S.C. § 112, ¶ 6 .....................3

              1.     '045 Patent Means-Plus-Function Terms......................................4

                     a.     "Means for applying corresponding guidelines of
                            the media venues" ..........................................................4

                            i.     The '045 Specification Fails to Disclose
                                   Any Structure Corresponding to Either
                                   the Presentation and Configuration
                                   Program or the Presentation Generation
                                   Program. ...........................................................5

                            ii.    The Seller Using the Presentation and
                                   Configuration Program First Creates
                                   Presentations Compliant with Media
                                   Venue Guidelines............................................8

              2.     The Remaining Means-Plus-Function Terms Are
                     Indefinite, Because the Only Disclosed Structure is
                     Generic Hardware or Unspecified Software ...........................13

       B.     Disputed Terms For Which the Parties Offer Constructions ..............14

              1.     Internet Media Venue / Media Venue.......................................15

              2.     Publishing the Electronic Advertisement to One or More
                     of the Selected Internet Media Venues ...................................17

              3.     Second / Third Interfaces to the Computer System
                     Through Which a Seller / Third Party Professional is
                     Prompted to Input Information to Select One or More of
                     the Internet Media Venues ......................................................19

                     a.     The Plain Language of the Claim and the
                            Specification Show that the Seller and Third
                            Party Professional Select Particular Internet
                            Media Venues through the Second Interface .............20

                     b.     The Specification Discloses that the Second and
                            Third Interfaces are at the Seller and Third Party
                            Professional Locations, Respectively. .......................22

              4.     The "Creation" Disputes .........................................................24

a.  Create an Electronic Advertisement [for the Seller] for Publication to the Selected Internet Media Venues .............................................................24

b.  Create a Presentation That Complies With Said Guidelines of the Media Venues Selected ...................................27

c.  Processing … the Electronic Advertisement … in Compliance with the Presentation Rules of the Internet Media Venue ....................................................28

5.  First Interface to the Computer System ...................................29

6.  Self-Serve Interface ................................................................31

7.  Owned or Controlled by Other than the Seller .........................32

8.  Presentation Rules / Distribution Factors ................................34

C.  Terms Which Cannot be Construed Due to Indefiniteness....................36

1.  The Asserted Apparatus Claims of the '025 and '059 Patent are Indefinite Because the Claims Recite Both an Apparatus and a Method of Using the Apparatus...................36

2.  Certain Asserted Dependent Claims of the '025 Patent Are Indefinite Because the Scope of the Claims Cannot Be Determined. .......................................................................39

a.  FM's Proposed Constructions Render the Asserted Claims Insolubly Ambiguous Because the Constructions Are Purely Functional And Not Supported By The Specification ...........................................39

b.  The Asserted Claims Are Insolubly Ambiguous Because They Are Defined in the Alternative. ...........................41

c.  The Asserted Claims are Insolubly Ambiguous Because They Are Subjective and the Specification Provides No Guidance as to the Correct Construction....................................................43

i.  The First Set of Terms is Entirely Subjective......................................................43

ii.  The Second Set of Terms Has No Plain Ordinary Meaning and Is Not Described in the Specification. .........................................44

III.  CONCLUSION.......................................................................................45

# TABLE OF AUTHORITIES

**CASES**

*Acacia Media Techs. Corp. v. New Destiny Internet Group*,
    405 F. Supp. 2d 1127 (N.D. Cal. 2005) ...............................................44

*Allen Eng'g Corp. v. Bartell Indus., Inc.*,
    299 F.3d 1336 (Fed. Cir. 2002).............................................................36

*Aristocrat Technologies Australia Pty. Ltd. v. Int'l Game Tech.*,
    521 F.3d 1328 (Fed. Cir. 2008)..................................................... passim

*Atmel Corp. v. Information Storage Devices, Inc.*,
    198 F.3d 1374 (Fed. Cir. 1999)...............................................................3

*B. Braun Med., Inc. v. Abbott Labs.*,
    124 F.3d 1419 (Fed. Cir. 1997)...............................................................3

*Biomedino, LLC v. Waters Techs. Corp.*,
    490 F.3d 946 (Fed. Cir. 2007)......................................................... passim

*Brookhill-Wilk 1, LLC. v. Intuitive Surgical, Inc.*,
    334 F.3d 1294 (Fed. Cir. 2003)..............................................14, 15, 26

*Catalina Marketing Int'l v. Coolsavings.com, Inc.*,
    289 F.3d 801 (Fed. Cir. 2002).................................................................8

*Datamize, LLC v. Plumtree Software, Inc.*,
    417 F.3d 1342 (Fed. Cir. 2005)..............................................................43

*Ex parte Lyell*,
    17 USPQ2d 1548 (1990).........................................................................37

*Ex Parte Timothy J.O. Catlin et al*,
    Appeal 2007-3072, Slip. Op. at 8-12 (BPAI February 3, 2009) ...................4

*Exxon Research & Eng'g Co. v. United States*,
    265 F.3d 1371 (Fed. Cir. 2001)..............................................................36

*Halliburton Energy Services, Inc. v M-I LLC*,
    514 F.3d 1244 (Fed. Cir. 2008)......................................36, 39, 40, 45

*Helmsderfer v. Bobrick Washroom Equipment, Inc.*,
    527 F.3d 1379 (Fed. Cir. 2008)....................................................14, 17

*In re Marosi*,
    710 F.2d 799 (Fed. Cir. 1983)................................................................40

*In re Paulsen*,
    30 F.3d 1475 (Fed. Cir. 1994)................................................................15

# TABLE OF AUTHORITIES

*In re Swartz,*
    232 F.3d 862 (Fed. Cir. 2000)..................................................................................10

*IPXL Holdings, LLC v. Amazon.com LLC,*
    430 F.3d 1377 (Fed. Cir. 2005)..............................................................................37

*LizardTech, Inc. v. Earth Resource Mapping, Inc.,*
    424 F.3d 1336 (Fed. Cir. 2005)..............................................................................23

*Markman v. Westview Instruments, Inc.,*
    517 U.S. 370 (1996)..........................................................................................14, 15

*Microprocessor Enhancement Corp. v. Texas Instruments, Inc.*
    520 F.3d 1367 (Fed. Cir. 2008)..............................................................................38

*Microsoft Corp. v. Multi-Tech Sys., Inc.,*
    357 F.3d 1340 (Fed. Cir. 2004)..............................................................................11

*Novo Indus. v. Micro Molds Corp.,*
    350 F.3d 1348 (Fed. Cir. 2003)....................................................................26, 29, 38

*Orthokinetics, Inc. v. Safety Travel Chairs, Inc.,*
    806 F.2d 1565 (Fed. Cir. 1986)..............................................................................36

*Phillips v. AWH Corp.,*
    415 F.3d 1312 (Fed. Cir. 2005) (*en banc*) ........................................14, 15, 20, 26

*Solomon v. Kimberly-Clark Corp.,*
    216 F.3d 1372 (Fed. Cir. 2000)..............................................................................36

*SRI Intern. v. Matsushita Elec. Corp. of Am.,*
    775 F.2d 1107 (Fed. Cir. 1985)..............................................................................44

*Teleflex, Inc. v. Ficosa North America Corp.,*
    299 F.3d 1313 (Fed. Cir. 2002)..............................................................................15

*Union Pacific Resources Co. v. Chesapeake Energy Corp.,*
    236 F.3d 684 (Fed. Cir. 2001)..........................................................................42, 43

*Vitronics Corp. v. Conceptronic, Inc.,*
    90 F.3d 1576 (Fed. Cir. 1996)..........................................................................14, 20

## STATUTES

35 U.S.C. § 112......................................................................................... passim

# I.  INTRODUCTION AND SUMMARY

To clarify the issues for the Court, Google begins with the points of agreement between Google and Function Media ("FM"):

- All of the patents require at least three primary actors:  a "seller," a "media venue," and a "central controller."  Dkt. #82, Plaintiff's Opening Claim Construction Brief ("FM Br.") at 9.  The '059 patent additionally requires a fourth actor: a "third party professional," which is also undisputed.

- The parties agree that there is an affirmative "creation" step required by the claims, though they dispute which of the actors must perform this step.  Google asserts that it is the "seller" in the '045 and '025 patent, and the "third party professional" in the '059 patent, while FM believes it is the "central controller."

- All the claims cover software.  Google contends that the claims could cover hardware too, but FM believes the claims only require software.

While there are many other claim disputes, most stem from two issues:  first, FM has put forward 2,000 pages of infringement contentions that assert 84 claims in three patents against numerous products, creating many claim disputes and failing to reasonably put Google on notice regarding the scope of the case it intends to try.  Second, all of FM's asserted patent claims stand rejected by the Patent & Trademark Office ("Patent Office") in the parallel *inter partes* reexamination proceedings ("reexams").  Thus, while some of the discussion in FM's brief may seem abstract or academic, many of the claim construction disputes can be traced to the inconsistency between the broad constructions FM's litigation counsel proposes in its brief and the narrow constructions FM's prosecution counsel has argued in the reexams.  It is no wonder that FM's $900-per-hour expert disagrees with Google's constructions: he was never shown the reexams, nor did FM submit these materials – and little of the other relevant file histories – to the Court.  Had FM provided these materials, FM's errors, omissions, and inconsistencies would be apparent – as FM argues narrow, nuanced constructions to the Patent Office, but FM and its expert argue much broader constructions to the Court.[1]  For instance:

---

[1] A summary table of the claim construction disputes is attached to this brief as Exhibit 1.  All lettered exhibits are attached to the Declaration of Jason W. Wolff in Support of Google Inc.'s Markman Brief, which is attached  as Exhibit 2.

- FM's prosecution counsel argued in the reexams that "selecting a media venue" meant "*directly* select[ing] the media venue",[2] however FM's expert Dr. Rhyne opined exactly the opposite, stating FM's construction included the possibility that "the seller may also select [media venues] *indirectly*." *See* Dkt. #82-7, Declaration of V. Thomas Rhyne ("Rhyne Decl.") at ¶ 61 (emphasis added).

- FM's prosecution counsel argued in the reexams that "presentation rules" meant "content, size, look or feel of the advertisements" but not "cost" or "time span."[3] Once again FM's expert Dr. Rhyne testified to the opposite, stating that FM's construction included cost and any time information as presentation rules. *See* Dkt. #82-9, Deposition Transcript of V. Thomas Rhyne ("Rhyne Tr.") at 231:6-8 ("So clearly, then, they're saying that the cost would be included, publication dates, and deadlines and blocked URLs, etc.").

Thus, of the myriad claim construction disputes, the court may be well advised to focus initially on the five independent claims that have been asserted, as all five have common issues that could dispose of this case outright without requiring the substantial amount of work that is necessary to contend with all 84 asserted claims. Among the more global issues are:

- The '045 patent has means-plus-function claims. There is insufficient written description to support the (largely) agreed functions of the claims under 35 U.S.C. 112 ¶¶ 2 and 6, particularly the "means for applying." It is undisputed that the specification discloses no specific "systematic sequence of mathematical and/or logical operations" [read: algorithms] corresponding to those functions; FM asserts, rather, that such algorithms and software programs could have been implemented by a person of ordinary skill in the art. Whether these algorithms were capable of being implemented is not the test for definiteness under 112 ¶ 2 for a means-plus-function claim. Rather, the statute requires specific structure—in this case specific algorithms—to be disclosed. This is fatal to the '045 patent because, for means-plus-function limitations the patentee is required to show not just what the limitations are but also *how* the disclosed structure performs the function [*see* Part II.A].

- All the patents have several structural issues, but the most significant ones are: (1) the claims all require that the seller be prompted to create presentations for the selected media venues, hence the seller's selection of media venues drives the seller interface prompting that create the presentation—FM rewrites this requirement by excising the term "prompted" from the claim language and moving this "creation" requirement to the "central controller" [*see* Part II.B.4]; (2) the claims all require that the selected media venues receive the created presentations—FM ignores the context of the disputed terms (*e.g.* "transmit…to," "publishing…to," and "displayed on") in the claims [*see id.*]; and (3) multiple separate and distinct interfaces at different locations are required by each of

[2] *See* Exh. A, Re-examination Control No. 95/001,061, Response to 1st Office Action, Dec. 23, 2008 ("'045 Re-exam Response") at 28 (italics added); *see also* Exh. B, Re-examination Control No. 95/001,073, Response to 1st Office Action, Feb. 23, 2009 ("'025 Re-exam Response") at 40 (selecting "individual content locations") and Exh. C, Re-examination Control No. 95/001,069, Response to 1st Office Action, Jan. 21, 2009 ("'059 Re-exam Response") at 21 and 22 ("selecting particular media venues ('websites')" (emphasis added)).

[3] '059 Re-exam Response at 24.

independent claims—FM disagrees that the interfaces need be at different locations [*see* Part II.B.3.b.].

These and other issues are addressed in detail below.

## II.     ARGUMENT

The claim terms in dispute can be generally grouped into three categories: "means-plus-function" terms (largely the '045 patent) (Part II.A); terms for which the parties have proposed different constructions (Part II.B); and terms which are indefinite (Part II.C).  Each of these categories are addressed in turn.

### A.     Means-Plus-Function Terms under 35 U.S.C. § 112, ¶ 6

There is no dispute that the claim limitations of the '045 patent are "means" limitations subject to § 112, ¶ 6.  "After identifying the function of the means-plus-function element, [a] court looks to the written description to identify the structure corresponding to that function."  *Id*. "Structure disclosed in the specification is 'corresponding' structure only if the specification or prosecution history clearly links or associates that structure to the function recited in the claim." *B. Braun Med., Inc. v. Abbott Labs*., 124 F.3d 1419, 1424 (Fed. Cir. 1997).  "If one employs means-plus-function language in a claim, one must set forth in the specification an adequate disclosure showing what is meant by that language.  If an applicant fails to set forth an adequate disclosure, the applicant has in effect failed to particularly point out and distinctly claim the invention as required by the second paragraph of section 112."  *Id.* at 1425.

All claims must be definite (*see* discussion of indefiniteness generally below at Part II.C), but § 112, ¶¶ 2 and 6 impose particular requirements on claims written in means-plus-function format: the Court must determine "whether sufficient structure was disclosed in the specification based on the understanding of one skilled in the art."  *See Atmel Corp. v. Information Storage Devices, Inc*., 198 F.3d 1374, 1378 (Fed. Cir. 1999).  It is not a disclosure of "structure" to state that techniques known in the art could be used to perform a function.  *See, e.g., Biomedino, LLC v. Waters Techs. Corp*., 490 F.3d 946, 948 (Fed. Cir. 2007) ("The inquiry is whether one of skill in the art would understand the specification itself to disclose a structure, not simply whether that person would be capable of implementing a structure").

Where the corresponding structure for a means-plus-function limitation includes a general purpose computer or microprocessor – as is the case here – the required "structure" corresponding to the claimed function must also include the algorithm by which the computer or microprocessor performs the claimed function. *Aristocrat Technologies Australia Pty. Ltd. v. Int'l Game Tech.*, 521 F.3d 1328, 1333 (Fed. Cir. 2008) ("The corresponding structure for a § 112, ¶ 6 claim for a computer-implemented function is the algorithm disclosed in the specification."); *see also Ex Parte Timothy J.O. Catlin et al*, Appeal 2007-3072, Slip. Op. at 8-12 (BPAI February 3, 2009) (specification failed to disclose an algorithm corresponding to the claimed means and thus was indefinite). In fact, the court may notice that a recurrent theme in FM's positions is that the mysterious "presentation generation program 1710" is the end-all of the claims—*i.e.*, the black-box solution to nearly every claim construction dispute.

1. **'045 Patent Means-Plus-Function Terms**

   a. **"Means for applying corresponding guidelines of the media venues"**

The sole independent claim of the '045 patent requires "providing means for applying corresponding guidelines of the media venues."[4] According to the patent specification, media venues have guidelines relating to "presentations," such as "presentation templates; blocked words; blocked phrases; . . . grammar guidelines; spelling dictionaries; presentation size restrictions; . . . and any other guidelines, benchmarks, or controlling algorithms." Dkt. #82-2 ("'045 patent") at 17:60-67. The claimed method requires a "means for applying" those guidelines in the process of creating presentations that a seller wants to transmit to selected media venues for publication.

The parties' dispute regarding this claim limitation is twofold. First, they dispute where the function of "applying corresponding guidelines" occurs in the system. Google asserts that the seller *creates* presentations—including by applying the guidelines—at the seller interface *using* the Presentation and Configuration Program ("PACP"). FM contends that this function is solely performed by the central controller's so-called Presentation Generation Program ("PGP").

---

[4] The parties agree that the claimed function is "applying corresponding guidelines of the media venues."

*See* FM Br. at 5-8. Second, the parties dispute whether the specification discloses any meaningful structure corresponding to these programs.

FM argues in its brief that the specification discloses a "sequence of mathematical and/or logic operations" that the PGP executes to create publications. Google agrees that a sequence of mathematical and/or logic operations is required but asserts that the '045 patent portrays the alleged structure (the PGP or the PACP) simply as black-boxes. It therefore fails to provide any meaningful disclosure of how media venue guidelines are applied or what the corresponding "sequence of mathematical and/or logical operations" are.

### i. The '045 Specification Fails to Disclose Any Structure Corresponding to Either the Presentation and Configuration Program or the Presentation Generation Program.

As a threshold issue, whether the Court finds that the guidelines are *applied* by the seller using the PACP (as argued by Google) or that the PGP applies the guidelines (as argued by FM), which is further discussed below, is secondary given that there is no mathematical or logical algorithm disclosed for performing claimed function for the "means for applying."

The patent makes clear that the seller, using the PACP, creates presentations at the seller interface. The patent also states summarily that the PGP can perform a subsequent, redundant processing of a presentation's compliance with media venue guidelines after the seller has created the presentation. In that sense, the PGP in combination with the PACP could be considered a "means for applying corresponding guidelines of the media venues" – if the "seller" qualifications in the language of claim 1 are ignored. The patent fails to disclose sufficient structure corresponding to either the PACP or the PGP for performing the agreed upon (or re-written) function, which even FM asserts requires "executing a systematic sequence of mathematical and/or logical operations." *See* Exh. F, Declaration of Roy M. Jenevein ("Jenevein Decl."), at VI.C.3. In this regard it is important to understand the scope of the claimed invention according to FM, particularly in the reexams:

- "Thus, when the MPF limitations are properly interpreted, claim 1 requires the ability to automatically create multiple presentations in software that conform to individual guidelines of multiple media venues via the manipulation of information input by the seller." '045 Re-exam Response at 10.

- "The '045 invention 'automatically access and applies not only editing, style, graphics, data, and content rules, but also design specification and architectural requirements to the design environment,' ['045 patent at 4:67, 5:1-3] thus allowing for the creation of presentations that comply with the design and architectural requirements of any and all participating media." '045 Re-exam Response at 10.

- "There is certainly no computer software in AdForce that operates to take seller information and, via the application of guidelines of each selected media venue, generate a plurality of presentations that each comply with the corresponding media venue guidelines of the media venues where the presentation is to be published." *Id.* at 15.

- "The MarketMatch system thus does not modify or restructure the presentation to meet the 'technology' requirements of a media venue or take into account that media venues may have other guidelines, and therefore having a presentation using the 'correct' technology for a particular media venue may not necessarily mean that the ad meets a media venues other formatting guidelines. Specifically, this system fails to apply any guidelines, standards, or rules that effect design and style (or look and feel) of each presentation." '045 Re-exam Response at 24.

The '045 patent must disclose what the "structure" corresponding to the recited "means for applying corresponding guidelines of the media venues" actually is, and how this structure performs the recited function; it is not enough to disclose the desired result. *See Biomedino*, 490 F.3d at 948 ("The inquiry is whether one of skill in the art would understand the specification itself to disclose a structure, not simply whether that person would be capable of implementing a structure"). FM must point to the specific algorithm[5] described by the patent that discloses a step-by-step procedure for applying corresponding guidelines of the media venues that is clearly linked to the PGP. *See Aristocrat*, 521 F.3d at 1333. If, for instance, the presentation guidelines for one of the selected media venues required radio ads, and another selected media venue required television ads, and the seller input text information or a photo, there is no disclosure of how the media venue guidelines would be applied to the information to "create" the appropriate presentation for each venue, or even "apply" the guidelines. Moreover, the breadth of functionality asserted by FM is completely subjective. There is no disclosure at all of how "look

---

[5] An "algorithm" is a step-by-step procedure for solving a problem. *See Merriam-Webster Online Dictionary*, available at http://www.merriam-webster.com/dictionary/algorithm, accessed May 13, 2009.

and feel," "design and style," or "architectural" guidelines alleged to be covered by the means-plus-function elements are to be applied.

FM's expert, Dr. Rhyne, admitted that no algorithm is disclosed in the patent and instead testified that a person of skill in the art would know how to implement one. Rhyne Tr. at 237:17-25 ("I don't think they give you software. I think for anyone of skill in the art if they understand what I just told you to do, they know how to do that."). The inventors testified the same.[6] This is exactly the type of non-disclosure that renders a computer implemented means-plus-function claim invalid for indefiniteness. *Biomedino*, 490 F.3d at 948.

The '045 patent discloses no algorithm by which either the PGP or the PACP "appl[ies] corresponding guidelines of the media venues" or "creates" presentations. FM argues that columns 42 and 43 of the '045 patent disclose "executing a systematic sequence of mathematical and/or logical operations upon the accessed seller information (using the accessed guidelines) to create a presentation. . . in a form that complies with the accessed guidelines." *See* FM Br. at 6. FM's citations to the specification mischaracterize its content. The specification states that the PGP "analyses [sic] the information [in the presentation message from the Seller Interface] using the format and style guidelines contained within the Presentation Rules Database 1650 (blocks 11230, 11232)." '045 Patent at 42:39-42. The specification says nothing about what this "analysis" is, or how exactly the PGP performs it. Next, the PGP "formats the presentation information for each client outlet, channel, resident media, or no-resident media (blocks 11300, 11294)." *Id.* at 43:42-46. Again, the specification provides no description of what this

---

[6] When questioned how exactly the Presentation Generation Program worked, the inventor Mr. Dean's response was to meander through unrelated boxes in the figures ultimately concluding that "Whoever was the operator of the invention in combination with whoever was the programmer installing this would know how to handle the programming and set those rules in motion." Exh. D, Deposition Transcript of Michael Dean ("Dean Tr.") at 265:19-266:7, *see also* 251:2-255:10 ("Q: Is there any disclosures in any of your patents about how a radio ad would be modified to conform to the look and feel specified by a media venue? A. No, of course not. The assumption is – it seems to me that someone coming in that wanted to set this system up would have the knowledge that they would bring with them to do the programming specific for media venues that the operator of the invention has chosen to embrace or use on the market. So if you've got an operator of an invention…and he brings a programmer…that programmer would either have to have experience in radio to help set up the system and do the programming so that it could handle specific media venues."). Ms. Stone, the co-inventor, said she was not a programmer but suspected Mr. Dean or a skilled programmer would know how to implement it. Exh. E, Deposition Transcript of Lucinda Stone ("Stone Tr.") at 33:8-34:24; 36:21-37:24; 75:20-77:7.

"formatting" is or how it is performed. Finally, in an alternative embodiment concerning resident directories (FM disclaimed resident media venues during prosecution and has not asserted its claims against them here), the specification states that "[n]ew presentations are created in their entirety, while only the portions of existing presentations affected by any modifications are republished." *Id.* at 43:42-48. The specification is silent as to how these "new presentations are created" and it is not even clear that the functions recited are related to the "applying" function.

This black-box description is not an "algorithm" and cannot constitute sufficient structure to disclose how the recited function of "applying corresponding guidelines of the media venues" is accomplished. FM's conclusion that the PGP "execut[es] a systematic sequence of mathematical and/or logical operations upon the accessed Seller information" (*see* FM Br. at 6 (*citing* Rhyne Decl. at ¶¶ 31-34)) fails to reach anywhere close to the level of specificity required for a step-by-step algorithm. This renders the means-plus-function limitation indefinite as a matter of law.[7] *See Biomedino,* 490 F.3d at 953; *Aristocrat,* 521 F.3d at 1333.

>    **ii.**     **The Seller Using the Presentation and Configuration Program First Creates Presentations Compliant with Media Venue Guidelines**

The plain language of claim 1 shows that the seller, aided by the PACP 4715 at the seller interface, creates presentations, and the preferred embodiment in the specification that contains what little description there is for this limitation confirms this. The preamble of claim 1 states that it is a "method of using a network of computers to contract for, facilitate, and control the creating and publishing of presentations, <u>by a seller</u>." The preamble language was amended and argued during prosecution and the preamble provides antecedent basis for the recited term "presentations." *See Catalina Marketing Int'l v. Coolsavings.com, Inc.*, 289 F.3d 801, 808-9 (Fed. Cir. 2002). Even FM's expert admits that the preamble is a limitation. *See* Rhyne Tr. at 211:2-9 ("I can tell you that having carefully examined the preamble of claim 1 of the '045 and

---

[7] The patent similarly fails to disclose any structure corresponding to the PACP, portraying it also as a black-box that performs various functions. Therefore, claim 1 is indefinite regardless of whether the Court accepts either parties' structure because the patent fails to disclose sufficient structure for either program.

claims 1 and 179 of the '025, because I find language in those preambles that is referred to later in the limitations of the claims. . . it's my opinion that those preambles are limiting").

The body of claim 1 also recites that <u>the seller</u>, through a "means for the seller to input information," creates presentations compliant with the guidelines of the selected media venues: "whereby <u>the seller</u> may . . <u>. create a presentation that complies with said guidelines of the media venues selected</u>. . ." '045 Patent at 64:5-9 (emphasis added). Because created presentations must be compliant with the guidelines of the selected media venues, the seller's act of creation necessarily incorporates the function of the recited "means for applying corresponding guidelines of the media venues."

Nevertheless, FM argues for page after page that this whereby clause is superfluous because of a punctuation mark, leading FM to the conclusion that the whereby clause "does not suggest that the creation and publication are being done by the Seller directly" (*see* FM Br. at 7). While FM's statement is technically correct, its conclusion is wrong: the claim does not *suggest* that creation is performed by the Seller directly – rather, the claim *expressly requires it*.[8] As noted in the Jenevein declaration, one of skill in the art would recognize that the whereby clause modifies the "means for the seller to input information" because all of the actions specified in the whereby clause ("select one or more of the media venues, create a presentation that complies with said guidelines of the media venues selected, and transmit the presentation to the selected media venues for publication") are functions performed by this means limitation. *See* Jenevein Decl. at VI(D), ¶ 6(a).

FM also redrafts the function for this limitation, arguing that presentations are created by the "means for applying corresponding guidelines of the media venues." *See* Dkt. #82 at 5. FM's position on this limitation is disingenuous: "creating" and "means for applying" are distinct terms carrying distinct requirements. FM then drops the agreed-upon function

---

[8] Claim 1 of the '045 patent originally had the "and" immediately before the whereby clause in element (e). During prosecution, the patentees moved the "and" after element (d). Whether the whereby clause is part of the body of the claim or solely a part of element (e), it limits the claims and further defines the functions of the recited means.

("applying") and uses its redrafted function ("creating") to support its assertion that Google's expert Dr. Jenevein abandoned Google's position. This is simply not so, because the premise of FM's question is misplaced. The issue is not whether the PACP (seller side) or the PGP (central controller side) create presentations, the issue is that the limitation requires, which is that the guidelines for the selected media venues are *applied*.

Assuming arguendo that FM's redrafted function is correct and that presentations are *created* by the "means for applying," which FM incorrectly maintains as being only the PGP, there is still no basis for FM's conclusion. *See* FM Br. at 5. For instance, FM's argument is belied by dependent claim 3, which expressly adds a "means for creating structured presentations from the seller's input" to the system of claim 1. Under established rules of claim differentiation, which FM itself cites (*id*. at 34), the "means for applying" of claim 1 does not include a "means for creating."[9] The language and organization of the claims establish that the creating and applying functions are distinct and both performed by the seller.

In addition to the claim language, the specification also discloses that the PACP of the seller interface initially aids the function of "applying corresponding guidelines of the media venues" through a series of question prompts to the seller, which are dictated by the presentation rules of the seller selected media venues:

> Upon choosing media and presentations, the Seller is then presented with a series of questions to answer [through the Seller Interface 4000]. . . The responses to the questions asked, text entry areas, photos, graphics, and other input, either required or optional, are monitored by the Presentation and Configuration Program 4715 using the information within the Presentation Rules Database 4650 to guide the Seller in the creation of a presentation that meets the style, editorial, and content guidelines of that instance of the present invention for each media venue or outlet chosen. '045 Patent at 27:64-28:9 (emphasis added).
>
> …

---

[9] Of course, the fact that claim 1 fails to recite a "means for creating" – despite the whereby clause's recitation that presentations are "created" – begs the question of whether the purported invention of claim 1 is even operative as-written. *See In re Swartz*, 232 F.3d 862, 863 (Fed. Cir. 2000) ("if the claims in an application fail to meet the utility requirement because the invention is inoperative, they also fail to meet the enablement requirement because a person skilled in the art cannot practice the invention").

The Seller could then choose one or two or all of the media/means of communication in which to be represented, with all presentations created by the Presentation and Configuration Program 4715 (blocks 11130, 11132). The Presentation and Configuration Program 4715 would then prompt the Seller for the necessary and optional information to complete the presentations (block 11140, 11142). It should be noted that each presentation might have very different standards for publishing the same information. <u>In those cases, the same questions or at least similar prompts may be presented to the Seller, requiring the entering of virtually the same information in multiple locations on the forms</u>. Although this may seem redundant to the Seller, the differences will become apparent because each separate entry is controlled by the information contained within the Presentation Rules Database 4650. '045 patent, 41:18-33 (emphasis added) (blocks 11140 and 11142 shown below).



'045 patent, Fig. 4a (depicting seller interface in which seller's input is restricted based on guidelines).

The specification could not be more explicit on this point: presentations are created by the seller, in a manner that "meets" the media venue guidelines, using the PACP of the seller Interface 4000. *Id.* at 28:2-9. Indeed, FM even argued this feature during the prosecution of its related patents, stating that media venue guidelines are applied during the seller's input of information. *See* Exh. G1, Prosecution History of U.S. Patent 6,829,587 ("'587 Pros. Hist."), Aug. 12, 2003 Amendment at 17 (pg. 104 of 400 of Exh. G1, part 1) ("Within our invention as defined by the new and amended claims, design and technical specifications and standards are ***applied*** <u>during the information input and design process</u>." (emphasis added)).

By arguing that the PGP of the central controller – not the seller using the PACP of the seller interface – creates the customized presentation "by performing a series of algorithmic operations that process a media venue's guidelines together with a Seller's presentation data,"

FM ignores its preferred embodiment, and its argument in a related application,[10] showing that the guidelines are applied during the input and design process by the seller. Even FM's expert testified the PACP of the seller interface was a "key piece of inventive software that is associated with the second [seller] interface."[11] *See* FM Br. at 5-6. The specification teaches that the seller, not the central controller or PGP, first creates the guideline-compliant presentations.

In fact, after the *seller* creates a presentation for the selected media venues and transmits that presentation to the central controller, the PGP can perform a *redundant* processing to verify the presentation's compliance with the media venue guidelines:

> Once the Presentation Generation Program 1710 has either confirmed the authenticity and origin of the presentation message [from the Seller Interface 4000] . . . the Presentation Generation Program 1710 then analyses the information using the format and style guidelines contained within the Presentation Rules Database 1650 (blocks 11230, 11232). This process parallels the functions performed by the Presentation and Configuration Program 4715 and the Presentation Rules Database 4650. This duplication of function ensures both quality control of content and prevents tampering of the process by either the Seller or any non-authorized entity. This duplication of function also ensures that the latest version of the Presentation Rules Database 1650 has been applied to every presentation. This embodiment of the present invention updates any changes in the Presentation Rules Database 1650 to the Presentation Rules Database 4650 using update messages to the Seller Interface 4000. Although this method should result in the Presentation and Configuration Program 4715 always using the best and most current information that has been updated to the Presentation Rules Database 4650, the integrity of the presentations is critical enough to require the duplication of this function.

'045 patent, 42:36-58 (emphasis added).

The specification is quite clear that the PGP performs a "duplication" of the functions previously performed by the seller with the PACP. And as discussed above, the specification is equally clear that the seller originally creates the presentations and, in doing so, applies the relevant guidelines using the PACP. FM's attempt to re-write the function of this element and recast the PGP of the central controller as the relevant structure, rather than the PACP, is contradicted by the claim language and the specification, each of which consistently refer to the seller as the subject that is performing the required function.

---

[10] *See, e.g., Microsoft Corp. v. Multi-Tech Sys., Inc.*, 357 F.3d 1340, 1349-50 (Fed. Cir. 2004) (the prosecution history of one patent is relevant to an understanding of the scope of a common term in a related patent).

[11] Rhyne Tr. at 93:23-94:2 and 214:18-215:19.

### 2. The Remaining Means-Plus-Function Terms Are Indefinite, Because the Only Disclosed Structure is Generic Hardware or Unspecified Software

For all of the remaining means-plus-function limitations in the '045 patent in dispute, the specification similarly fails to describe any particularized structure that is directly linked to the claimed functions. The only structures that could even arguably perform the recited functions are generic hardware, a black-box, and a desired output, not specific software or algorithms.

For example, claim 1 requires a "means for a seller to select the media venues," and a "means for the seller to input information."[12] The patent states that a seller can use some unspecified interface to interact with the system, but it does not sufficiently describe this interface, either through a description of specific structures or a disclosure of specific software algorithms, to satisfy the written description requirements for a means claim. The only disclosed "structures," which are shown in Figures 2a-2e, are general purpose computers running unspecified software. The claims are indefinite because they do not describe the structure of that software, either via recitation of source code, a description of specific algorithms, or any other manner beyond vague and generic descriptions of its intended result. These "means" are described as nothing more than generic hardware and a black-box *program*; leaving a person of skill in the art without any guidance from which to determine what type of computer algorithms would be the same or equivalent structure such as to be within the scope of the claims. *See Biomedino,* 490 F.3d at 953; *Aristocrat*, 521 F.3d at 1333.[13]

The same is also true for the "means for transmitting said presentations to a selected media venue of the media venues."[14] FM cites to one paragraph of the specification as allegedly disclosing a structure to perform this function, but this passage says only that "[t]he Presentation

---

[12] See '587 Pros. Hist., Aug. 12, 2003 Amendment at 17 (pg. 104 of 400 of Exh. G1, part 1) (arguing with respect to claims that included a "means to input information" that "Within our invention as defined by the new and amended claims, design and technical specifications and standards are applied during the information input and design process." (emphasis added)).

[13] If the Court does construe the corresponding structure of these means as embodied in the "Presentation and Configuration Program" of the seller interface, as urged by FM, the Court should construe the specific required structure and operation of this "program" consistently with the other constructions related thereto, including the meaning of "apply," "select" and "create" as discussed below.

[14] The parties agree that the claimed function is "transmitting said presentations to a selected media venue of the media venues."

Generation Program 1710 will proceed to publish or place the presentation;" it does not state *how* the program will transmit the presentation. '045 patent, 45:6-13. Indeed, based on the claim itself, *transmitting* is different from *publishing*. *See* claim 1 ("and transmit the presentation to the selected media venues for publication"). The only structures disclosed in the patent for transmitting are "phone lines, network, or Internet connections" between the various processors and servers (*id*. at 13:55-14:30) and the "modem or network connections to perform [the] transmission" between the Seller Interface and the Central Controller and Presentation Processor (*id*. at 41:66-42:14). While these structures are not directly linked to the function of transmitting a presentation to a selected media venue, they are the only structures disclosed for "transmitting" anything in the '045 patent, leaving out any algorithm, protocol, or methodology for actually transmitting any of the myriad types of presentations to a myriad types of media venues.[15] Either the claim term is indefinite for failure to disclose with the requisite specificity a "means for transmitting," or this claim covers only the generic hardware identified in the patent.

### B.     Disputed Terms For Which the Parties Offer Constructions

The claim language alone defines the scope of a patented invention. *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 373 (1996). Any claim construction analysis must begin and remain centered on the actual claim language, because the patentee chose to use that language to "particularly point out and distinctly claim the subject matter which the patentee regards as his invention." *Brookhill-Wilk 1, LLC. v. Intuitive Surgical, Inc*., 334 F.3d 1294, 1298 (Fed. Cir. 2003) (internal cites omitted); *Helmsderfer v. Bobrick Washroom Equipment, Inc.*, 527 F.3d 1379, 1383 (Fed. Cir. 2008) ("The patentee chooses the language and accordingly the scope of his claims."). This primary focus on the claim language flows from the above-mentioned "bedrock principle" that the scope of an invention is defined solely by the claims. *Phillips v. AWH Corp*., 415 F.3d 1312, 1312 (Fed. Cir. 2005) (*en banc*) (internal cites omitted); *see also*

---

[15] The various types of "presentations" are defined at 11:11-16 and exemplary media outlets are found at 3:13-22 ("newspapers, magazines, periodicals, guidebooks, catalogs … CD-ROMs, and interactive media and networks; and in other media, such as billboards, skywriters, bus benches, radio, interactive kiosk…").

*Vitronics Corp. v. Conceptronic, Inc*., 90 F.3d 1576, 1582 (Fed. Cir. 1996) ("the words of the claims themselves ... define the scope of the patented invention").

In addition to the claim language, the Court may also look to other intrinsic evidence such as the specification and prosecution history of the asserted patent. *See, e.g., Vitronics*, 90 F.3d at 1583. However, while the written description and prosecution history can be helpful in determining the meaning of claim language, they do not define a patentee's right to exclude: that is the "function and purpose of claims." *Markman*, 52 F.3d at 980. Indeed, when the language at issue is straightforward, construction may involve "little more than the application of the widely accepted meaning of commonly understood words." *Phillips*, 415 F.3d at 1314.

Claim language is presumed to carry its ordinary meaning. "We have frequently stated that the words of a claim are 'generally given their ordinary and customary meaning.'" *Phillips*, 415 F.3d at 1312-13 (internal citations omitted). A patentee may choose to be his own lexicographer by assigning a novel definition to a claim term, but any such term must be defined "with reasonable clarity, deliberateness, and precision." *In re Paulsen*, 30 F.3d 1475, 1480 (Fed. Cir. 1994). Absent an express intent to provide such a novel definition, the presumption of ordinary meaning prevails; it is "a 'heavy presumption' that a claim term carries its ordinary and customary meaning." *Teleflex, Inc. v. Ficosa North America Corp*., 299 F.3d 1313, 1325 (Fed. Cir. 2002) (internal cites omitted); *see also Brookhill-Wilk*, 334 F.3d at 1298.

1.    **Internet Media Venue / Media Venue**

| **Claim Term** ('045, '025, and '059 patents, *passim*) | **Google's Proposed Construction** | **FM's Proposed Construction** (*see* **FM Br. at 29-30**) |
|---|---|---|
| media venues / internet media venues | those physical or virtual locations / internet locations (i.e., addresses) where presentations are placed or made available to present the information within the framework of the media so that it is accessible by the end users, consumers, viewers, or Buyers | those physical or virtual locations / internet locations (e.g., web servers, domain names, internet addresses, websites) where presentations are placed or made available to present the information within the framework of the media so that it is accessible by the end users, consumers, |

| | | viewers, or Buyers |
|---|---|---|

The parties dispute the scope of the term "virtual location" as used in the express definition of the patents, particularly as it relates to "internet media venues." Google's position is that a "virtual location" is similar to a physical location: it is a discrete, identifiable media venue location at which presentations are placed or made available. End users, consumers, viewers, or Buyers may go to the media venue and access the presentations located on those venues. Each "virtual location," like its physical location counterpart, requires a unique identifying address so that sellers may select the media venue and so that buyers can know where to access the media venue content. The express definition clearly draws a distinction between media venues and "end users, consumers, or Buyers." But FM's construction broadens the express definition so that it might cover a buyer's computer or a web browser – neither of which would qualify as a "media venue" under the express definition, the plain language of the claim, or in view of disclosure of the specification.

The '045 patent defines media venues as "those physical or virtual locations where presentations are placed or made available to present the information within the framework of the media" for access by end users. '045 patent, 10:39-42. The claims of the '025 and '059 patents specify that media venues must be "internet" media venues. The claim language indicates that media venues, regardless of whether they are physical or internet media venues, correspond to specific locations. For instance, in the '045 patent, the preamble of the independent claim states that the invention is a method for "creating and publishing presentations, by a seller, _**to**_ a plurality of media venues," and the body states that the method is for "transmitting said presentations _**to**_ a selected media venue" and that the "seller … transmit[s] the presentation _**to**_ the selected media venues for publication." Similarly, the independent claims of the '025 and '059 patents recite that electronic advertisements are displayed "on" and published "to" internet media venues. _See_ Dkt. ##82-3, 82-4 ("'025 patent"), claims 1, 179; Dkt. ##82-5, 82-6 ("'059 Patent"), claims 1, 27.

FM's definition of "virtual location" as including "e.g., web servers, domain names, internet addresses, and websites" conflates incompatible concepts, and loses sight of the fundamental point – that a "virtual location" is the particular location selected by the Seller. Further, FM's construction implicitly includes the buyer, seller, and even the central controller locations. This is improper: the express definition of the claim itself excludes the buyer location as being the media venue because it says that the presentation is accessible by the buyer from the media venue.

Moreover, the terms "buyer," "seller," and "media venue" are all separately defined as three different entities situated at three different locations. The preambles also make this distinction too by stating that the seller and the media venue are not co-owned, and thus are separate and distinct entities (e.g., "owned or controlled by other than the seller"). Furthermore, the seller and buyer locations should not be included within the scope of "media venue" because these three terms are each used differently within the claims. *See, e.g.,* '025 patent, claim 163 ("displays the electronic advertisement … to a buyer.") and 164-173, 178; '045 patent, claims 13-15 (claiming the steps and means corresponding to a "buyer"). Different terms in the same claims presumably have different meanings. *See, e.g.*, *Helmsderfer*, 527 F.3d at 1382.[16]

### 2. Publishing the Electronic Advertisement to One or More of the Selected Internet Media Venues

| Claim Term (claims 1, 79, 90, 148,[17] 179, 258, 269, '025 patent; claims 1, 27, '059 patent) | Google's Proposed Construction | FM's Proposed Construction (*see* FM Br. at 24-26) |
|---|---|---|
| publishing the electronic advertisement to one or more of the selected internet media venues [publish the advertisement to the internet | placing or making available the electronic advertisement at one or more of the selected internet media venue locations for public display | placing or making available the customized electronic advertisement within the framework of each internet media venue |

---

[16] FM's expert appears to agree that the media venue is a different location from the buyer's location, but he refused to be pinned down, ultimately saying he had not formed an opinion on the scope of the terms. *See* Rhyne Tr. at 303:8-25 (qualifying his answer after FM's counsel objected).

[17] Claim 148 of the '025 patent recites that the computer controller "publishes the modified or reformatted advertisement to the one or more of the selected internet media venues for display." For the same reasons discussed in this subsection, Google contends that this phrase should be construed as "places or makes available the modified or reformatted advertisement at the one or more selected internet media venue locations for public display."

| media venue] | | so that it is accessible by the end users, consumers, viewers, or Buyers |

Google asserts that, in the disputed limitations, publishing an electronic advertisement "to" selected internet media venues means placing or making available the electronic advertisement at the location of the selected internet media venues. FM's construction largely parrots the express definition for the defined term "publishing" without resolving the dispute over how to understand the term in the context of the specific claims. *See* FM Br. at 26.

The claims recite publishing an electronic advertisement "to" selected internet media venues. Internet media venues, as discussed above, are the locations where computers exist for publishing content on the Internet. Whether the presentation is published or made available "within the framework" of the internet media venue, the electronic advertisement must be provided to a media venue so that it may be obtained by an end user, consumer, viewer, or buyer.

The specification supports Google's construction. The central controller causes finalized presentations created by the seller to be sent directly to the selected media venues to be published. '025 patent, 44:47-55 ("The presentations. . . are formatted into media transaction messages and sent to the appropriate Media Interface 6000 for processing and ultimate publication. . . . the Media Interface 6000 . . . will process the message and schedule the publication of the presentation."); *see also id.*, 52:13-17, 59:34-38. The patent gives the example of an Internet media venue DEF Sports Web placing received ads at the location of its website. *See id. at* 55:35-39 ("The DEF Sports Web receives electronically the Seller information, agreements, payment information, web pages to be displayed and banner advertising *to be placed on their web site*. . . "). The specification further discloses that published presentations can be searched for by commercial search engines and web browsers, each of which perform search operations by examining the content on web pages. *Id.*, 35:14-18, 51-55. Thus, the specification shows that presentations themselves are placed or made available at the Internet media venue. FM even explained its claims in these terms in the reexams where it said: "Thus, in the context of claim 1, the phrase 'publish the electronic advertisement to one or more of the selected media

venues' requires that an electronic advertisement be electronically <u>placed or made available **on** a media venue</u>, such as a website, for display to—and viewing by—and end user, customer, or buyer." '025 Re-exam Response at 7 (emphasis added).

In its brief to this Court, however, FM proposes the specification's definition of "publishing" as its construction. But the term for construction is not merely "publishing," it is "publishing electronic advertisements *to…*" the selected internet media venues. By ignoring the rest of the claim language, FM seeks to leave an open question as to whether any presentation that bypasses the media venue entirely meets this limitation, such as a presentation that is sent to the "buyer" but not to the media venue. FM Br. at 26. FM's position is inconsistent with the express definition of "publishing" (which itself acknowledges the role of the buyer as separate from the venue), "media venue" (which is a unique location), and "buyer" (which is also at a unique location). An internet media venue has a specific media venue location and publishing a presentation "to" an internet media venue or making a presentation available "within the framework" of the internet media venue, both mean placing the presentation at the media venue location so that a buyer might access it there. As is noted above, FM's position is also inconsistent with the use of "buyer" in other claims. *See* '045 patent, claims 13-15 and '025 patent, claims 163-173, 178.

3.    **Second / Third Interfaces to the Computer System Through Which a Seller / Third Party Professional is Prompted to Input Information to Select One or More of the Internet Media Venues**

| Claim Term (claims 1, 179, '025 patent; claims 1, 27, '059 patent) | Google's Proposed Construction | FM's Proposed Construction (*see* FM Br. at 30-34) |
|---|---|---|
| a second interface to the computer system through which a seller is prompted to input information to select one or more of the internet media venues | software or hardware at the seller location through which the seller is prompted to enter information to the computer system to enable the seller to select one or more internet media venues | software that enables the seller user to interact with the computer system through which the seller user is prompted to enter information to select one or more internet media venues |
| third interface to the computer system [through which the | software or hardware at the third party professional location through | software that enables the third party professional |

| third party professional is prompted to input information to select one or more of the internet media venues] ('059 patent, claims 1, 27) | which the third party professional is prompted to enter information to the computer system to enable the third party professional to select one or more internet media venues | user to interact with the computer system |
| --- | --- | --- |

The parties disagree on two main points with respect to these constructions. First, Google asserts that prompting a seller or third party professional to "input information to select one or more of the internet media venues" means that the seller or third party professional actually chooses particular internet media venues through the interface. Second, Google asserts that the seller and third party professional interfaces are situated respectively at the seller and third party professional locations. FM, on the other hand, proposes a construction so broad that virtually *any* information – including the selection of keywords – would qualify as information "to select one or more internet media venues." FM also argues that the unspecified software (but not hardware) for these interfaces are not required to be located anywhere in particular. FM's positions are contrary to the plain language of the claims, the clear disclosure of the specification, and its arguments in the reexaminations.

a. **The Plain Language of the Claim and the Specification Show that the Seller and Third Party Professional Select Particular Internet Media Venues through the Second Interface**

Claim 1 of the '025 patent recites that a seller is "prompted to input information to select" specific internet media venues through the seller interface.[18] The plain meaning of this language is that a seller selects particular internet media venues through the Seller Interface, and this is sufficient to end our inquiry. *See Vitronics*, 90 F.3d at 1582 ("we look to the words of the claims themselves ... to define the scope of the patented invention"); *Phillips*, 415 F.3d at 1312-13 ("We have frequently stated that the words of a claim are 'generally given their ordinary and customary meaning.'") (internal citations omitted). While FM makes much of the claim's

---

[18] For purposes of this discussion, Google will focus on the language of the '025 patent relating to the second, or "seller" interface. The '059 patent uses identical language for the third, or "third party professional" interface, and the specification and FM's own statements show that the third interface has the same functionality as the second. *See, e.g.*, '025 Re-exam Response at 12 ("the third party professional can enter media venue selection information and electronic advertisement creative information. . . in the same manner that a seller would have – albeit through a separate Third Party Interface (7000)."); *see also* '059 Patent, Abstract, 42:5-46:3.

reference to "input information to select," its argument misses the point: the question is whether that input results in the "selection" of a particular internet media venue at which the seller desires to publish its electronic advertisement. FM repeatedly asserted during the co-pending reexaminations that "selecting a media venue" requires <u>direct</u> selection by the seller. *See, e.g.,* '025 Re-Exam Response at 40 (distinguishing prior art because it had no way "to select individual content locations" within a network); *see also* '045 Re-Exam Response at 28, '059 Re-Exam Response at 21-22.

Google's construction is also supported by the specification. The specification discloses that software in the seller interface (the Presentation and Configuration Program 4715) presents the seller with "choices of presentations, interactive sales presentations, resident and non-resident media that are supported by the given instance of the present invention," and that the seller chooses the media and presentations. '025 patent, 41:62-64, 28:46-52. "As an example, if the instance of the present invention were configured to support 'Sailboats For Sale,' the Seller may be given the choice of three Internet Directories that specialize in boating-related goods and services … The *Seller could then choose one or two or all of the media/means of communication in which to be represented*, with all presentations created by the Presentation and Configuration Program." *Id*. at 42:8-16 (emphasis added); *see also id*. at 13:50-53 (stating that presentations "can be simultaneously published or displayed in a variety of traditional and electronic media as *chosen by the Seller through the Seller Interface 4000*.") (emphasis added).[19] FM's construction attempts to improperly expand the scope of the claims to cover techniques such as keyword-targeted advertising. *See* FM Br. at 32-34. FM's expert, Dr. Rhyne summarizes FM's position multiple times as covering "indirect" selection of the media venue through keyword-targeting:

> Thus, the '025 specification discloses that the seller could either directly select media venues by name or **indirectly select** media venues through the use of "channels." Moreover, there is nothing about the term "selected" that implies only direct selection (as opposed to either or both direct and/or indirect selection). Rhyne Decl. at ¶¶ 53 and 61 (emphasis added).

---

[19] FM relies on language in the specification referring to "advertising channels," but nothing in the patent defines this term or equates it with the claimed "media venues." Thus, the language cited by FM is not relevant. The inventors could have included "advertising channels" in their definition of media venues, but chose not to.

FM and Dr. Rhyne's position is exactly the opposite of what FM's prosecution counsel argued to the Patent Office in the reexams, and perhaps explains why FM's litigation counsel chose not to disclose the reexam proceedings to Dr. Rhyne and he chose not to review them even after he found out about them. *See* Rhyne Tr. at 23:3-26:19. In the reexams, FM argued a much narrower construction—one where indirect selection was expressly not within the scope of the claims:

- "In fact, sellers using the Aaddzz system have <u>no ability to **directly select** the media venues</u> where their ads are to be published, as required by claim 1" '045 Re-Exam Response at 28 (bold added).

- "Nor is … **selecting particular** media venues ("websites") ever disclosed in the Mason patent." '025 Re-Exam Response at 21 (emphasis added).

- "In fact, the [Brown '368 patent] system simply does not provide any means for a seller to select internet media venues for display of advertisements, as there is … **no means to select individual content locations** within that network." '025 Re-Exam Response at 40 (emphasis added).

- "The Aaddzz system, not the advertiser, decides where to display ads via 'automatic targeting'—i.e., the system itself dynamically decides on which media venues a presentation should be displayed…Accordingly, advertisers using the Aaddzz system have no ability to **directly select** the media venues where their ads are to be published, as required by claims 1 and 27." '059 Re-Exam Response at 46 (emphasis added).

As the specification shows, and as FM argued to the Patent Office, "information to select" means exactly what it says: the seller provides the information that selects ("chooses") the particular media venues through the Seller interface.[20] Google's construction tracks the plain meaning of the claims and the express disclosure of the specification and therefore should be adopted.

> **b.** **The Specification Discloses that the Second and Third Interfaces are at the Seller and Third Party Professional Locations, Respectively.**

As FM has also asserted to the Patent Office, the seller and third party professional are separate entities. *See, e.g.*, '059 Re-Exam Response at 8 ("The plain language of claims 1 and 27

---

[20] *See also, e.g.,* '059 patent, 70:25-61 ("the new Third Party Professional/client is presented with the forms that give the choices of presentations. . . [and] resident and non-resident media. . . the Third Party Professional [chooses] the methods and means of communication"). FM argued to the Patent Office that third party professionals must select internet media venues: "the '059 inventions allow third party professionals to quickly and easily select internet media venues in which to run a seller's ad campaign." *See* '059 Re-exam Response at 13; *see also* Exh. H1, Prosecution History of U.S. Patent 7,249,059 ("'059 Pros. Hist."), Sept. 5, 2006 Amendment at 13-21 (pgs. 244-252 of 564 of Exh. H1) (forcefully arguing the separateness of the second and third interfaces multiple times to overcome the prior art Sparks patent).

requires that the system/method must involve three <u>separate</u> entities. . .") (emphasis in original). These separate entities have separate interfaces at different locations. *Id.* ("Figures 1a and 1b of the '059 patent clearly depict <u>three separate interfaces</u>. . . these interfaces contain <u>different internal components and are individually tailor for use by. . . either a seller, an internet media venue, or a third party professional</u>") (emphasis added).[21]

The specification shows that the second (seller) and third (third party professional) interfaces reside on computers at the respective locations of the seller and third party professional.[22] *See* '025 patent at 25:21-24 (any "personal, workstation, or server-grade computer with sufficient processing capacity, program and data storage capacity, and memory may be used as a Seller Interface 4000"); '059, 42:11-14; '025, 13:45-47 ("Each of [the Seller Interface 4000, Buyer Interface 5000, and Media Interface 6000] includes hardware, software programs, databases, communications programs and devices."). The seller downloads and installs the software required to implement the interface on his or her computer, the software including "a Presentation and Configuration Program 4715 . . . and other programs as may be necessary or desirable." '025 patent at 28:36-41, 41:18-26, Fig. 2c, Fig. 4a, blocks 11102 ("Facility Installs Presentation and Configuration Program"), 11104 ("Facility Installs and Configures Software"); *see also* 55:60-67 (a seller is sent "the necessary software to be installed on their computer. . . A computer operator at [the seller] installs the software on their computer than then is configured as Seller Interface 4000 FIG. 2c."). Similarly, the third party professional installs the software for implementing the third interface on its computer. '059 patent, 45:12-19; 69:48-55; *see also* 75:39-49 ("ABC sends AAA [a third-party professional] the necessary software to be installed on their computer. . . AAA installs the software on their

---

[21] Again, the preamble limitation "owned or controlled by other than the seller," which was again argued during the '045 and '059 patent file histories, also make this separateness distinction.

[22] For each of the three "interface" terms, FM attempts to cast the essential dispute as being whether or not the interfaces must include both hardware and software. *See, e.g.,* FM Br. at 9-11. This is inaccurate. While the specification (and indeed, common sense) dictates that hardware, such as a computer, is a necessary part of an interface to the claimed system, the critical issue is *where* this interface is located. Referring to the seller interface, the specification emphasizes that the software part is installed locally to the seller's computer.

computer that is then configured as Third Party Professional Interface 7000 FIG. 2f.").[23]  In fact, FM even emphasized this separate and distinct location feature of the seller interface and the creating of advertisements during prosecution of the '045 patent to overcome a rejection by the Patent Office.  *See* Exh. I1, Prosecution History of U.S. Patent 6,446,045 ("'045 Pros. Hist."), Jan. 22, 2002 Amendment at 10 (pg. 46 of 342 of Exh. I1) ("What is not common in the art are open-access presentations that are created and published from data input into a remote program at a Seller's location…") (emphasis added).

Thus, the intrinsic evidence shows that the claimed second and third interface are located respectively at the seller and third party professional locations, and that the seller and third party professional select internet media venues through these interfaces.

### 4.    The "Creation" Disputes

As is mentioned in the introduction, the root cause of several of the disputes between the parties has to do with either the claim terms "create" or "creating" or the function of "creation." The parties agree that the claims require a creation step, the dispute is over when and where, and presumably how, it occurs.  While the language giving rise to this dispute is somewhat different in each claim, the overarching arguments are similar.  Google contends that the claim language recites what is supposed to create the presentation and when, which is consistent with one embodiment (the seller creates the presentations), while FM largely ignores the claim language and argues that the specification teaches another embodiment (the PGP creates the presentations) and that claims must cover this other embodiment instead.  There does not seem to be a dispute that the specification at least states that there can be two distinct creation processes and that the seller is responsible for one and the central controller is responsible for the other.

### a.    Create an Electronic Advertisement [for the Seller] for Publication to the Selected Internet Media Venues

| Claim Term ('025 patent, claims 1 and 179; '059 patent, claims 1 | Google's Proposed Construction | FM's Proposed Construction (*see* FM Br. at 19-22) |
| --- | --- | --- |

---

[23] The specification provides no description or disclosure for a single interface handling these multiple functions. *LizardTech, Inc. v. Earth Resource Mapping, Inc*., 424 F.3d 1336 (Fed. Cir. 2005) (finding the patent specification did not support a broad claims under the written description requirement).

| **and 27)** | | |
|---|---|---|
| create an electronic advertisement (for the seller ['059]) for publication to the selected internet media venues | create an advertisement for placement at the internet media venue locations selected by the seller ['025] / third party professional ['059] for public display | produce an electronic advertisement in a form customized to each of the selected media venue's presentation rules |

FM seeks to erase the term "create" from this limitation and vaguely redefine it as "produce." As the court will see elsewhere, FM then tries to smuggle the "create" limitation into the separate "processing" limitation of the same claims. Additionally, based on a plain reading of the claim language, Google asserts that this limitation requires creation of a single presentation compliant with the guidelines of all selected media venues, whereas FM argues that many advertisements are created, one unique advertisement for each selected media venue.

Claim 1 of the '025 patent, which is representative, recites "a second interface. . .through which a seller is prompted. . . to input information to create an electronic advertisement for publication to the selected internet media venues." '025 patent at 65:3-7. The specification confirms that "create" means "create" – the seller, using the PACP in the seller interface, creates a complete presentation customized to the requirements of the selected media venues. "Upon choosing media and presentations, the Seller is then presented with a series of questions to answer. . . [the PACP uses] the information within the Presentation Rules Database 4650 to *guide the Seller in the creation of a presentation* that meets the style, editorial, and content guidelines of that instance of the present invention for each media venue or outlet chosen." (emphasis added). *Id*. at 28:51-63; *see also* 3:31-39. Indeed, a key objective of the invention is to "improve[] on the prior art by creating a controlled, managed environment *for the sellers in which to create their presentations*." *Id*. at 5:1-4 (emphasis added).

Additionally, claim 1 of the '025 patent recites that a single advertisement is created in a form appropriate for placement at the selected internet media venues. The claim consistently refers to an advertisement in the singular: a seller selects internet media venues and "create[s] *an* electronic advertisement for publication to the selected internet media venues"; and a computer controller publishes "*the* electronic advertisement to one or more of the selected internet media

venues", whereby "*the* advertisement is displayed on each of the one or more of the selected internet media venues." *See* '025 patent, 65:3-16 (emphasis added). The plain language of the claim, which forms the "beginning and the end" of the inquiry, therefore compels a construction requiring the creation of a single advertisement for publication to the seller's selected internet media venues. *See, e.g., Phillips*, 415 F.3d at 1314.

FM's primary argument is that Google's construction "would render the invention inoperable," though FM provides no explanation of why this is so. *See* FM Br. at 20. It is a "bedrock principle" of patent law that an invention is defined by its claims. *Phillips*, 415 F.3d at 1312; *see also Brookhill-Wilk* , 334 F.3d at 1298 ("In construing claims, the analytical focus must begin and remain centered on the language of the claims themselves, for it is that language that the patentee chose to use") (internal cites omitted). FM is constrained by the claim language it chose to use, and the natural and literal reading of this claim language is that "create a presentation" covers creating a single presentation for placement at the locations selected by the seller.[24]

Moreover, if FM's construction were adopted, then these claims would be indefinite because the second so-called "creating" limitation found in these claims ("processing…the electronic advertisement…in compliance with *the* presentation rules of *the* internet media venue") does not specify *which* internet media venue's presentation rules must be complied with. The root term "internet media venue" is used ten times in claim 1 of the '025 patent but is referred to variously in singular <u>and</u> plural forms of "internet media venue(s)" and "selected internet media venue(s)." The claim ultimately terminates by referring only to "*the* internet media venue" (singular) leaving the reader to wonder, if only one internet media venue was intended, which internet media venue presentation rules must be complied with. In view of the

---

[24] FM asks the Court to implicitly re-write the claim to transmute "a presentation" into "one or more presentations" and "the presentation" into "the one or more presentations." The Court cannot re-write the claim during construction contrary to the plain and ordinary meaning of the language of the claim itself. *See, e.g., Novo Indus. v. Micro Molds Corp*., 350 F.3d 1348, 1358 (Fed. Cir. 2003).

express language of the claim, Google's construction is the only one that comports with that language and therefore should be adopted.

### b. Create a Presentation That Complies With Said Guidelines of the Media Venues Selected

| Claim Term (´045 patent, claim 1) | Google's Proposed Construction | FM's Proposed Construction (*see* **FM Br. at 19-22**) |
|---|---|---|
| create a presentation that complies with said guidelines of the media venues selected | create a presentation that complies with the guidelines of the selected media venues | produce a presentation customized to each of the selected media venue's presentation rules |

As with the prior construction, FM seeks to erase the term "create" from claim 1 and replace it with the term "produce." Once again, Google asserts the unremarkable proposition that "create" means "create." Additionally, this limitation also requires the creation of a single presentation that complies with the guidelines of all media venues selected.

Claim 1 of the '045 patent recites "<u>whereby the seller</u> may select one or more of the media venues, <u>create a presentation that complies with said guidelines of the media venues selected</u>, and transmit the presentation to the selected media venues for publication." This language says what it means: the seller creates a presentation compliant with the guidelines of the media venues it has selected, and then transmits the presentation to those selected media venues for publication. As discussed above, the specification confirms that "create" means "create": the seller, using the software in the Seller Interface, is guided through a series of questions or prompts to actually create a complete presentation customized to the requirements of the earlier-selected media venues. '045 patent, 27:64-28:9; 4:64-68.

FM argues that the specification discloses only that the seller "inputs information" into the seller interface and that thereafter, through some undisclosed process, the Presentation and Generation Program ("PGP") of the central controller "creates" presentations from that information. *See* FM Br. at 5-8.[25] This mischaracterizes the alleged invention and the claim

---

[25] During prosecution of the related '587 patent, the inventors argued that the limitation "providing a means to input" required "design and technical specifications and standards <u>are applied during the information input and</u>

language. After the seller, using the PACP of the seller interface, creates the presentation and

transmits it to the central controller, the PGP of the central controller performs a redundant

verification of the *presentation's* compliance with the media venue guidelines. '045 patent,

42:36-58 (quoted, *supra*, at 12). As discussed above, the specification discloses that the PGP

duplicates the PACP's function in "analyzing" presentation guidelines, but both the specification

and claims recite that the seller creates the presentations. *See, e.g.*, *id*. at 41:18-21, 58-60.

### c. Processing … the Electronic Advertisement … in Compliance with the Presentation Rules of the Internet Media Venue

| Claim Term ('025 patent, claims 1 and 179; '059 patent, claims 1 and 27) | Google's Proposed Construction | FM's Proposed Construction (*see* FM Br. at 19-22) |
|---|---|---|
| processing … the electronic advertisement … in compliance with the presentation rules of the internet media venue | executing a systematic sequence of mathematical and/or logical operations upon the electronic advertisement to process it compliance with the presentation rules of the internet media venues | executing a systematic sequence of mathematical and/or logical operations upon the inputted information to create an electronic advertisement customized for each selected Internet Media Venue in a form that complies with the presentation rules set by that Media Venue |

This limitation is grouped with the "creating" issue because FM's position is that the

"processing" limitation means "creating." While Google agrees that a systematic sequence of

mathematically and/or logical operations are required for the processing limitations, Google's

view is that this limitation largely needs no construction in view of the other terms offered in

dispute, and it disagrees with aspects of the construction offered by FM.

First, there is no "creating" in these claims limitations. There is a "processing"

requirement, and "processing" means something other than "creating" because the term

"creating" is also used in the same claim (in the preamble and in the second interface limitation

('025 patent) and third interface limitation ('059 patent). Different terms in the same claim

---

design process," which is entirely consistent with the specification and Defendants' claim construction arguments. *See* Pros. Hist. of the '059 Patent at 17 ( Aug. 12, 2003 Amendment) (emphasis added).

presumably have different meanings.[26] Google addressed the real "creating" limitations above. Second, FM's proposed constructions fail to account for the fact that the _advertisement_ was already created in an earlier step, and the limitation expressly refers to processing the "advertisement," and not processing the "input information."[27] The point of these limitations is obviously the redundant processing of the earlier created advertisement from the second interface ('025 patent) or third interface ('059 patent) limitations. Furthermore, FM's proposal refers to creation of a "customized advertisement for each selected Internet Media Venue." There is no support for the "each" limitation, the claim language, as is discussed above, refers to creating _an_ advertisement for the selected media venues. The court should not judicially amend the claims to add the limitation "each" when no such limitation is present in the issued claim or implied from the specification. _See Novo Indus. v. Micro Molds Corp._, 350 F.3d 1348, 1357-58 (Fed. Cir. 2003). To the extent that FM's construction on this "each" issue is found correct, then this limitation is indefinite because it refers to the presentation rules of the internet media venue (singular) without specifying which internet media venue's presentation rules (some? all? selected? non-selected?) must be complied with.

### 5. First Interface to the Computer System

| Claim Term ('025 patent, claims 1 and 179; '059 patent, claims 1 and 27) | Google's Proposed Construction | FM's Proposed Construction (_see_ FM Br. at 31-34) |
|---|---|---|
| first interface to the computer system | Software or hardware at the internet media venue location that enables a person working on behalf of the internet media venue to interact with the computer system | software that enables the internet media venue user to interact with the computer system |

---

[26] How exactly all these terms FM seems to use interchangeably differ is unclear, but that is largely an issue Google will reserve for enablement and written description issues that are beyond the scope of the claim construction. For instance, according to FM the term "creating" means "creating" and "producing" and the term "applying" means "creating" in the '045 patent, but the term "processing" means "creating" and "to create" means "to produce" in the '025 and '059 patents.

[27] _See, e.g.,_ '025 Re-exam Response at 15, footnote 12, noting the difference between the express definition of "presentations" (a.k.a. "advertisements") and "input information."

The main dispute between the parties regarding this term is the location of the recited first interface. Based on the unambiguous disclosure of the specification, and FM's own representations to the Patent Office, Google maintains that the first interface resides at the location of the internet media venue operator.

Claim 1 of the '025 patent recites "a first interface to the computer system through which each of the internet media venues is prompted to input presentation rules." The specification discloses that the first interface is part of the media venue computer. *See, e.g.*, '025, 31:54-57 ("A personal, workstation, or server-grade computer with sufficient processing capacity, program and data storage capacity, and memory may be used as Media Interface 6000."), 13:42-47 ("Each of [Seller Interface 4000, Buyer Interface 5000, and Media Interface 6000] includes hardware, software programs, databases, communications programs and devices.").

As described above in connection with the Seller and Third Party Professional Interfaces, the specification discloses that internet media venue operators install the software necessary to implement the interface on their local computers. *See, e.g.*, '025 patent, 54:58-67 ("ABC [the entity offering the invention] sends DEF [the internet media venue operator] the necessary software to be installed on their computer. [] A computer operator at DEF installs the software on their computer that then is configured as Media Interface 6000."). The first interface allows a person working on behalf of the internet media venue to interact with the claimed computer system. *See, e.g.*, *id*. at 55:1-2 ("After installation and setup the DEF operator does basic information input as prompted by the Media Interface 6000 FIG. 2e of the present Invention."). Moreover, during prosecution of the related '045 patent, FM argued that other interfaces which are similarly described as installed on the particular actor's computer, are used at remote locations to input data. *See* '045 Pros. Hist., Jan. 22, 2002 Amendment at 10 (pg. 46 of 342 of Exh. I1) ("What is not common in the art are open-access presentations that are created and published from <u>data input into a remote program at a Sellers [sic] location</u>…" (emphasis added)).

Contrary to the specification and prosecution history, FM's construction is ambiguous and apparently intended so FM can assert that the first interface can be anywhere and still meet

the limitations of the claims. FM's construction is also contrary to its assertion that each of the first, second, and third interfaces are separate and distinct entities: "Figures 1a and 1b of the '059 patent clearly depict three separate interfaces. . . these interfaces contain different internal components and are individually tailored for use by one of the three "types of participants in the system (i.e., either a seller, an internet media venue, or a third party professional)." *See* '059 Re-exam Response at 8. FM's distinction between the seller, third party professional, and internet media venue interfaces in the '059 reexam corroborates Google's construction and flatly contradicts its own. The language "owned or controlled by other than the seller" would also be improperly excised from the claim if FM's construction were correct.

### 6. Self-Serve Interface

| Claim Term<br>('025 patent, claims 6, 31, 185, 210) | Google's Proposed Construction | FM's Proposed Construction<br>(*see* FM Br. at 30-34) |
|---|---|---|
| self-serve interface | software or hardware at the [internet media venue / seller] location that a person working on behalf of the [internet media venue / seller] uses directly without the aid of anyone else | interface that the [internet media venue user / seller] uses without requiring the aid of anyone else |

The parties disagree primarily on the meaning of "self-serve." Google asserts that a "self-serve" interface is exactly that: an interface that is used directly by an internet media venue or seller without the aid of anyone else. FM, on the other hand, argues that a "self-serve" interface is an interface which the internet media venue or seller generally uses with the help of another entity, such as "customer-support personnel," but does not "require" such help. *See* FM Br. at 34. This argument attempts to read "self-serve" out of the claim, in a manner inconsistent with the plain language of the claim and the disclosure of the specification.

As discussed above, the seller and media venue interfaces are located on-site at the seller and media venue locations. *See, e.g.,* '025 patent, 41:18-26; 54:58-67. FM argued similarly during prosecution of its parent '045 patent, asserting that, "What is not common in the art are open-access presentations that are created and published from <u>data input into a remote program at a Sellers [sic] location</u>…" '045 Pros. Hist., Jan. 22, 2002 Amendment at 10 (pg. 46 of 342 of

Exh. I1) (emphasis added). The "self-serve" language of claims 6/185 and 31/210 further limit the Seller and Media Venue interfaces, respectively. Therefore, the "self-serve" interfaces recited by claims 6, 31, 185, and 210 are interfaces that allow the relevant user to interact with the system in a "menu-driven" manner, allowing the user to serve him or herself. *See, e.g.*, 65:29-31, 66:53-56.

FM appears to agree that the "self-serve" element allows a user to use an interface without the aid of anyone else. FM seems to disagree, however, that the interface needs to be "completely" self-serve and argues rather that such an interface does not preclude a user who relies on outside "help" or "customer support." As with the other terms in dispute, FM's argument obscures the real issue: whether a "self-serve" interface excludes an "interface" where the user actually does interact with a human being in some manner to obtain the benefits allegedly afforded by the claimed system. Google's position is that if an end-user interfaces with a system by interacting with human personnel of the system operator – including "customer service" personnel – this use is not properly characterized as "self-serve." Accordingly, this type of interface is not properly encompassed by the claimed "self-serve" interface.

### 7. Owned or Controlled by Other than the Seller

| Claim Term ('045 patent, claim 1; '025 patent, claim 1; '059 patent, claim 1) | Google's Proposed Construction | FM's Proposed Construction (*see* FM Br. at 27-29) |
|---|---|---|
| owned or controlled by other than the seller | the media venue ultimately controls the publishing of the presentations | N/a (term does not require construction); FM's expert: ownership or control of the media venue refers to ownership or control in the legal sense |

Google asserts that the phrase "owned or controlled by other than the seller" recited in the preamble to claim 1 should be construed to require that the media venue controls the publishing of the presentations. Even though FM acknowledges that the seller does not own or control the media venue and fails to raise any substantive objection to Google's construction, FM is not helpful in addressing the core of the dispute.

Claim 1 of the '045 patent, which is representative, indicates that while the seller creates and publishes presentations <u>to</u> media venues, the seller does not "own or operate" these media venues. The specification confirms that these media venues, not the seller, control the publishing of the presentations to the public/buyers. After a seller creates a presentation, the presentation is formatted and "sent to the appropriate Media Interface 6000 for processing and ultimate publication." *See* '045 patent, 43:53-56. The media interface then "schedules the publication of the presentation depending on the media type, venue, available dates or other considerations [for the media venue]." *Id*. at 43:57-62. The seller's involvement with the presentation ends at transmission of the message: ultimately, the media venue determines whether, when, and how the presentation should be published. *See* Jenevein Decl. at VI(C).

FM acknowledges that the disputed phrase means "somebody other than the Seller owns and controls the Media Venues to which the ads are published." *See* FM Br. at 27. Dr. Rhyne's report states that the "specification is clear that ownership or control of the media venue refers to ownership or control <u>in the legal sense</u>." Rhyne Decl. at ¶ 62 (emphasis added). Non-resident media venues are media venues that are not wholly owned or controlled by the central controller. Thus, under FM's implicit interpretation, if the seller is related to the central controller "in the legal sense," then the central controller cannot control the media venue in any way (*e.g.* in part). Such an interpretation seems unusual, but it would be acceptable by Google if the claims were so limited. Google's construction reconciles this issue by placing ultimate control of the publishing in the hands of the media venue. *See* '045 patent, 43:52-62 ("The presentation destined for non-resident publication are formatted into media transaction messages and sent to the appropriate Media Interface 6000 for processing and ultimate publication.").

## 8.    Presentation Rules / Distribution Factors

| Claim Term | Google's Proposed Construction | FM's Proposed Construction (*see* FM Br. at 35-39) |
|---|---|---|
| presentation rules (claims 1, 179, '025; claims 1, 27, '059 | rules that control and limit the style and editing of the presentations created by the system | controls to be set by a media venue for use by the computer system programming [sic] in creating advertisements for publishing on that media venue[28] |
| distribution factors ('025 patent, claims 79. 90-91, 258, 269-70) | information about where the internet media venue will make the advertisement available, such as billboards, skywriters, bus benches, radio, interactive kiosk, and any other form of customer outreach or information distribution | rules concerning whether advertising content may be published on a particular Media Venue |
| design or style standards | this term is indefinite (*see* Part II.C below) | presentation rules which control the look and feel of an advertisement |
| Control look and feel of the advertisement | this term is indefinite (*see* Part II.C below) | control the appearance of an advertisement |

In line with the plain meaning of the claim language, the specification shows that "presentation rules" are rules that control and limit the style and editing of presentations created within the computer system of the claimed invention. FM's construction of presentation rules and of the various recited further limitations of presentation rules, is ambiguous and provides no meaningful scope to any of the terms and thus renders them all indefinite.

Claim 1 of the '025 patent recites that "each of the internet media venues is prompted to input presentation rules. . . for displaying electronic advertisements." '025 patent, 64:63-67. These presentation rules for displaying electronic advertisements are used "to guide the Seller in the creation of a presentation that meets the style, editorial, and content guidelines of that instance of the present invention for each media venue or outlet chosen." 28:60-63. As the Seller enters information and creates a presentation, the PACP uses information contained in the "Presentation Rules Database" and "controls and monitors that entered information to conform to

---

[28] As discussed above in subsections a and b, claims 1 of the '025 and '059 patents recite that the seller and third-party professional, respectively, create the ads – not the "computer system programming." *See* '025 patent, 65:3-7 ("a seller is prompted. . . to input information to create an electronic advertisement for publication to the selected internet media venues"); '059 patent, 88:56-60 ("the third party professional is prompted. . . to input information to create an electronic advertisement. . . for publication to the selected internet media venues").

the controlling format and style for each targeted media venue or outlet presentation." *Id.* at 42:31-37. The specification notes that presentations may be distributed to any number of media types, including "billboards, skywriters, bus benches, radio, interactive kiosk, and any other form of customer outreach or information distribution." *Id.* at 58:63-67; *see also* 52:1-4, 3:25-28, 4:2-5. Google's constructions flow from this intrinsic record.

FM's construction for "presentation rules" seeks to expand the scope of this term to any controls set by a media venue used in any way "in creating advertisements for publishing" on that media venue. However, FM argued to the Patent Office that "presentation rules" are limited to style and editing rules, asserting that these rules allow media venues the "ability to limit the content [i.e., edit] or 'look or feel' [i.e., style] of an advertisement." *See* '025 Re-exam Response at 23. FM distinguished style and editing rules from more general publishing considerations such as, for example, presentation <u>cost</u> and <u>timing of display</u>. *Id.* FM's construction goes against its assertions to the PTO and the plain language of the claims.[29]

FM's constructions break down even more quickly for "distribution factors," and the other limitations that relate to the presentation rules. Under FM's construction, no difference exists between a "distribution factor" and a "presentation rule;" by definition, "whether" an ad is published will depend on its compliance with all relevant presentation rules. Likewise, FM's constructions fail to meaningfully distinguish between the other presentation rule limitations, and are in fact circular: FM defines "design or style" standards with the language "look and feel" and then separately defines the term "look and feel." Substituting FM's proposed construction in for the language of claim 47 makes the claim read like nonsense.[30] *See* Exh. K. FM's difficulty in coming up with consistent constructions stems from the fact that none of these asserted subcategories for the "rules" are disclosed in the original written description. *See* Exh. J1,

---

[29] FM's expert, Dr. Rhyne, testified that under FM's construction, and contrary to what FM argued to the Patent Office, cost and publication dates were covered by FM's constructions of "presentation rules." Rhyne Tr. at 231:6-8 ("So clearly, then, they're saying that the cost would be included, publication dates, and deadlines and blocked URLs, etc."). In fact, he also testified that cost and size were also distribution factors. *Id.* at 253:21-23; 256:1-257:16 ("cost, speed, all of these things could play a role.").

[30] As discussed below in Part II.C.2 below, the terms "design or style standards" and "control look and feel of the advertisement" are indefinite.

Prosecution History of U.S. Pat. No. 7,240,025 ("'025 Pros. Hist."), Feb. 13, 2006 Amendment at 3-73 (pgs. 131-201 of 444 of Exh. J1) (adding 397 new claims).

### C. Terms Which Cannot be Construed Due to Indefiniteness

35 U.S.C. § 112, ¶ 2 states, in relevant part, that "[t]he specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention." The Federal Circuit has explained that §112 ¶ 2 requires an applicant to set forth what he regards as his invention "with sufficient particularity and distinctness, i.e., the claim must be sufficiently definite." *Allen Eng'g Corp. v. Bartell Indus., Inc.*, 299 F.3d 1336, 1348 (Fed. Cir. 2002) (emphasis added); *see also Solomon v. Kimberly-Clark Corp.*, 216 F.3d 1372, 1377 (Fed. Cir. 2000). The definiteness inquiry focuses on whether one skilled in the art would understand *the scope of the claim* – as opposed to possible meanings of individual words or phrases in the claim in the abstract – when the claim is read in light of the rest of the specification. *Orthokinetics, Inc. v. Safety Travel Chairs, Inc.*, 806 F.2d 1565, 1576 (Fed. Cir. 1986).

A claim should be held indefinite if "the claim is insolubly ambiguous, and no narrowing construction can properly be adopted." *Exxon Research & Eng'g Co. v. United States*, 265 F.3d 1371, 1375 (Fed. Cir. 2001). "[T]his standard is met where an accused infringer shows by clear and convincing evidence that a skilled artisan could not discern the boundaries of the claim based on the claim language, the specification and the prosecution history, as well as her knowledge of the relevant art." *Halliburton Energy Services, Inc. v M-I LLC*, 514 F.3d 1244, 1249-1250 (Fed. Cir. 2008).

#### 1. The Asserted Apparatus Claims of the '025 and '059 Patent are Indefinite Because the Claims Recite Both an Apparatus and a Method of Using the Apparatus.

Claim 1 of the '025 patent, claim 1 of the '059 patent, and all claims depending from either claim,[31] are invalid because they recite both an apparatus and a method of using that

---

[31] *See* '025 patent, claims 6, 11, 15, 16, 17, 20, 23, 28, 29, 30, 31, 36, 45, 46, 47, 62, 63, 79, 90, 91, 140, 141, 148; '059 patent, claims 14, 25. It is noted that this issue is dispositive only of the apparatus claims, not the method claims. There are 397 claims in the '025 patent.

apparatus in a single claim. FM contends that these claims are directed to "a computer system consisting of certain enumerated components," but points only to language such as "interfaces" and "databases" in purported support for its construction. *See* FM Br. at 44-45.

A claim that attempts to cover both an apparatus and a method of using that apparatus is invalid as a matter of law. *IPXL Holdings, LLC v. Amazon.com LLC*, 430 F.3d 1377, 1384 (Fed. Cir. 2005) ("[the asserted claim] is indefinite under 35 U.S.C. § 112, as it attempts to claim both a system and a method for using that system.");[32] *see also Ex parte Lyell*, 17 USPQ2d 1548, 1550 (1990) ("the statutory class of invention is important in determining patentability and infringement."). An invention "which purports to be both an apparatus and a process in a single claim, is ambiguous and properly rejected" as indefinite under 35 U.S.C. § 112, ¶ 2. *Id.*

While claim 1 of the '025 patent and claim 1 of the '059 patent are both styled as apparatus claims, the bodies of the claims (and nearly all of their dependent claims)[33] are defined as methods of using the apparatuses. The recited "first interface," for instance, is defined by the actions of an internet media venue interface user that inputs presentation rules through the first interface. '025 patent, 64:63-67. Similarly, the recited "second interface" is defined by the actions of a seller interface user that inputs information to select internet media venues and create an electronic advertisement through the second interface. *Id.* at 65:3-9. The "third interface" recited by claim 1 of the '059 patent is defined by the actions of a third party professional, who inputs information to create an electronic advertisement for the seller through the third interface. '059 patent, 88:56-61. Furthermore, the claims expressly recite the act of "storing" the information input by the users. Additionally, the recited "computer controller of the computer system" is defined by the "processing and publishing" functions it performs based on the user-input information. The only way to understand the apparatus claims is as a method

---

[32] In *IPXL*, the Federal Circuit found claim 25 of U.S. Patent No. 6,149,055 to be indefinite. Claim 25 reads:
The system of claim 2 wherein the predicted transaction information comprises both a transaction type and transaction parameters associated with that transaction type, and the user uses the input means to either change the predicted transaction information or accept the displayed transaction type and transaction parameters.

[33] *See* claims 6, 11, 15, 16, 17, 20, 23, 28, 29, 30, 31, 36, 45, 46, 47, 62, 63, 79, 90, 91, 140, 141 and 148 of the '025 patent; claims 14 and 25 of the '059 patent; Jenevein Decl., Secs. VI(D)-(E), paras. 2(b).

of using the recited apparatus, which is entirely consistent with the approach FM takes to all the claims: to treat the apparatus and method claims as one and the same.

FM contends that these interface limitations recite "enumerated components" of a computer system that "all speak to a functionality of the system" and cites to *Microprocessor Enhancement Corp. v. Texas Instruments, Inc.* 520 F.3d 1367, 1375 (Fed. Cir. 2008) for the proposition that "apparatus claims [are] not invalid for using functional language." FM Br. at 44. However, *Microprocessor Enhancement* is readily distinguished from the present facts: there, the apparatus claims contained presumptively means-plus-function elements, which were limited to a structure "capable of performing the recited functions." *Id.* at 1375. The apparatus claims are not presumptively means-plus-function, and therefore FM's argument that the claims involve "system components that are capable of prompting, storing and processing" is misplaced. The claims recite performing specific functions in a particular sequence to actively input, store, and process information – they do not recite structures "capable" of performing those functions.

FM implicitly argues that the preamble's recitation of the claim as a "system" is sufficient for the Court to infer that the patentees intended the limitations to be structural. Essentially, FM asks the Court to rewrite the claim language to recite, for example, a first and second interface "for prompting," first and second databases "for storing," and a computer controller "for processing and publishing." That is not the claim language. The patentees chose to use particular language to claim their purported invention, and the Court cannot change the clear language of these claims during construction – not even to correct a defect in order to preserve validity. *See Novo Indus.*, 350 F.3d at 1358 (holding that the district court erred by correcting a claim defect during claim construction: "[s]ince we cannot know what correction is necessarily appropriate or how the claim should be interpreted, we must hold [the claim] invalid for indefiniteness in its present form"). However, even if the apparatus claims did recite means-plus-function language, the claims would still be indefinite because the specification discloses no corresponding structure for performing the recited functions such as "applying," "processing" and "creating" just as in claim 1 of the '045 patent. *See* Jenevein Decl. at VI(D), ¶¶ 6-8.

2. **Certain Asserted Dependent Claims of the '025 Patent Are Indefinite Because the Scope of the Claims Cannot Be Determined.**

Claims 47, 62, 63, 79, 90, 91, 140, 179, 226, 241, 242, 258, 269, 270, and 319 of the '025 patent are each indefinite because the claims recite ambiguous language that cannot be defined in view of the specification, thereby rendering the claim scope indefinite. Broadly speaking, these claims are indefinite on three independent grounds. First, FM's proposed constructions are purely functional and are not supported by the specification. Second, the asserted claims contain alternative claim language, including cascading "or" terms, that render the claims insolubly ambiguous. Third, the claims recite facially-ambiguous terms and phrases that are given no precise meaning in the specification.

a. **FM's Proposed Constructions Render the Asserted Claims Insolubly Ambiguous Because the Constructions Are Purely Functional And Not Supported By The Specification**

FM's proposed construction for each of the disputed terms appearing in claims 47, 62, 63, 79, 90, 91, 140, 226, 241, 242, 258, 269, 270, and 319 of the '025 patent is purely functional: each construction is based on "**execute/ing a systematic sequence of mathematical and/or logical operations**" to apply or compare various internet media venue information (e.g., presentation rules) to the information input by the seller or the advertisement. The specification of the '025 patent fails to disclose any structure that would allow a person of skill in the art to determine the proper scope of these claims under FM's functional constructions. FM alleges that its "executing" language simply describes the necessary "processing" to accomplish the claimed applying and comparing functions, but even a perfunctory review of the specification passages on which FM relies disproves this position.

A claim is indefinite if it uses purely functional language that renders the scope of the claim ambiguous. *E.g., Halliburton*, 514 F.3d at 1256 (finding functional definition of claim term ambiguous and therefore invalid). While it is not "intrinsically wrong" to use functional language in claims, the use of functional language renders claims indefinite when it fails "to provide a clear-cut indication of the scope of subject matter embraced by the claim." *Id.* (*citing In re Swinehart*, 439 F.2d 210, 212 (C.C.P.A. 1971)). An applicant can resolve ambiguity by,

for example, expressly linking the recited function to rules or examples in the specification that are sufficiently explanatory to apprise a person of skill in the art of the scope of the claim. *See, e.g., In re Marosi*, 710 F.2d 799, 803 (Fed. Cir. 1983) (finding claims definite where the applicant's disclosure provided "a general guideline and examples sufficient" to teach an artisan when the claim limitation was satisfied). FM has not done so here.

Nothing in the specification of the '025 patent discloses "a systematic sequence of mathematical and/or logical operations to apply or compare" the internet media venue's design or style standards, distribution rules, or presentation rules to the information input by the seller or to the advertisement. FM starts by saying that "executing a systematic sequence of mathematical and/or logical operations" is a "well-known way of describing the automatic 'processing' that is performed by computer software." *See* FM Br. at 41. This misses the point. Even if it were true that "executing mathematical or logical operations" could be used to describe a generic software "processing" functionality, the issue is whether this phrase "provide[s] a clear-cut indication of the scope of subject matter embraced *by the claim*." *Halliburton*, 514 F.3d at 1256 (emphasis added). FM has not clearly linked its amorphous "executing" clause to anything in the specification, and therefore this construction fails to indicate the scope of the asserted claims.

FM, perhaps aware of the weakness of its reliance on this "executing" phrase, further asserts that the specification itself "describes exactly the process that is referenced" by the limitations at issue in blocks 11230 and 11232 of Fig. 4d and 43:34-58 of the '025 patent. *See* FM Br. at 41. However, block 11230 ("Central Controller Analyses [sic] Presentation Data") and 11232 ("Presentation and Format Guidelines, Link, Language, and Other Content Restrictions") fail to provide any insight into what "executing mathematical and/or logical functions" might be – block 11232 merely lists information, and block 11230's oblique reference to "analyses" data is, if anything, even less definite than "executing." Similarly, 43:34-58 portrays the PGP as a black box, devoid of any meaningful structural or operational description: the passage discloses only that the PGP "analyses" [sic] information (43:34-37) and "reviews" the information (43:55-56). Given that these passages comprise, by FM's own admission, the

extent of the disclosure supporting its construction, there is little doubt that the specification fails to set forth a definition of "executing" with the required specificity to escape indefiniteness.

> **b.** **The Asserted Claims Are Insolubly Ambiguous Because They Are Defined in the Alternative.**

Claims 47, 62, 63, 79, 90, 91, 140, 226, 241, 242, 258, 269, 270, and 319 of the '025 patent each recite alternative language that renders the claims indefinite. Alternative claim language, such as the word "or," renders a claim indefinite if a person of skill in the art would be unable to determine the scope of the claim. *See, e.g., Application of Archbold*, 151 F.2d 350, 352 (C.C.P.A. 1945). In *Archbold*, the word "or" in "volatile solvent of the class of a lower alcohol, ketones, acetone, <u>or</u> ethyl acetate, benzene, <u>or</u> ether" rendered the claim indefinite because it introduced "uncertainty as to the scope to be attached to the members of the group." *Id*. Similarly, commentators have opined that "a spring or a weight for balancing" (as opposed to, *e.g.*, "balancing means") would be indefinite for improperly claiming different items as a single element. *See* Landis on Mechanics of Patent Claim Drafting (Ed. Faber) (5th Ed. 2003).

Each of the above-identified claims of the '025 patent contains alternative language that renders these claims indefinite. For example, three separate instances of the term "or" appear in claim 47, which recites "automatically apply <u>or</u> compare the internet media venue design <u>or</u> style standards to the information input by the seller <u>or</u> the advertisement." Given this language, equally reasonable interpretations of the claim in view of the specification include: 1) "automatically applying the internet media venue design standards to the information input by the seller"; 2) "automatically comparing the internet media venue style standards to the advertisement"; 3) "automatically applying the internet media venue design or style standards to the information input by the advertisement"; etc. The alternative language of claim 47 makes it impossible for a person of ordinary skill to determine the proper scope of the claim.

The frequently-recited claim phrase "applying or comparing" is particularly problematic from an indefiniteness standpoint. "Apply" and "compare" are distinct claim terms which presumptively convey different functions, but the specification provides no definition for either

term that would convey a particular meaning to a person of skill in the art. *See, e.g., Union Pacific Resources Co. v. Chesapeake Energy Corp.*, 236 F.3d 684, 692 (Fed. Cir. 2001) (finding indefinite claims that recited a step of "comparing," because the specification did not particularly define the term and "comparing" could have various meanings to a person of skill in the art). Further, while the system "compares," it does not state *what* is compared and fails to indicate any useful result generated by the comparison. *See* Jenevein Decl., VI(D), ¶¶ 6-8. The claim also does not indicate whether the repeated "or" terms in the overall phrase relate strictly to the first apply/compare pair, insert a decision step, or provide alternative combinations. *Id*. FM fails to directly address the indefiniteness issues surrounding the representative "apply or compare" phrase. FM's alternative language makes construction of these terms a guessing game.

The specification also fails to explain any difference between a "design standard" and a "style standard," making any choice between the two standards nebulous. Ignoring the "design or style standards" phrase, FM states instead that the extra "or" is "of no moment. It is simply part of a phrase. . .that appears on more than one occasion in the '025." FM Br. at 41. FM's inability to articulate any definition for this phrase emphasizes its lack of support in the specification; in fact, the phrase does not even appear in the specification, but only in claims added by FM more than six years after the '025 patent's priority date. *See* '025 Prosecution History at 3-73 (Feb. 13, 2006 Amendment) (adding 397 new claims). FM next contends that "apply or compare" is not ambiguous, because the "or" separates "two distinct words and makes perfect sense: the systems can either apply the presentations [sic] rules to [X] or compare the presentation rules to [X]." FM Br. at 41-42. This again fails to address Google's point. Neither the claims nor the specification explain what is meant by "apply" or "compare," which FM apparently acknowledges, given that it cites to no such explanation. Finally, FM argues that the third "or" is not indefinite because it "separates two completely different things: Seller-inputted information. . . and a pre-existing advertisement." *Id*. at 42. Again, this is precisely Google's point: because the "or" indicates two completely different things, the claim fails to specify what the presentation rules are being "applied" or "compared" to or how such functions might be

similar or different or dependent on their object.  Each of FM's arguments further corroborates Google's position that these claims are indefinite.

        **c.**      **The Asserted Claims are Insolubly Ambiguous Because They Are Subjective and the Specification Provides No Guidance as to the Correct Construction.**

Claims 7, 47, 62, 63, 79, 90, 91, 148, 226, 241, and 242 of the '025 patent each recite ambiguous terms that are subjective in their scope, and the specification provides no disclosure of what the reasonable scope should be.  These terms can be grouped into two sets.  A first set of terms, including "design or style standards" (claims 7, 62, 63, 226, 241 and 242) and "control look and feel of the advertisement" (claims 47, 62, 63, 226, 241,and 242), are entirely subjective and fail to give a person of skill in the art any indication of where the claim begins or ends.  The second set of terms, including "computer program design filter" (claims 47, 62 and 63), "computer program distribution filter" (claims 79, 90 and 91), and "advertisement generation program" (claim 148) are terms that FM coined for the first time in 2006.

        **i.**        **The First Set of Terms is Entirely Subjective.**

A claim is indefinite when a person of skill in the art can reasonably read the claim to have multiple meanings, and the specification fails to provide a definition for the claim terms or a basis for narrowing construction.  *See, e.g., Union Pacific*, 236 F.3d at 692.  The first set of terms listed above – "design or style standards" and "look and feel" – evoke only an idea in the mind of the reader and fail to convey any definite claim scope.  While both "design or style standards" and "look and feel" are purportedly sub-types of "presentation rules," their scope is entirely dependent upon a person's subjective opinion.  *Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1350 (Fed. Cir. 2005) (terms that are completely dependent upon a person's subjective opinion are indefinite).

FM contends that "design or style standards" needs no definition, but then argue circularly that this term concerns an advertisement's "look and feel" – itself another claim term. FM Br. at 36-37.  "Look and feel" is no more definite than "design or style" – they are entirely subjective and the scope cannot be discerned from the specification.  FM finally cites to the

phrase "look and feel" on Google's website (extrinsic evidence) to justify its construction. FM's attempt to construe these claims in light of the accused products, rather than the claim language itself, is improper and points out the lack of guidance in the intrinsic evidence. *See, e.g., SRI Intern. v. Matsushita Elec. Corp. of Am.*, 775 F.2d 1107, 1118 (Fed. Cir. 1985) ("[a] claim is construed in the light of the claim language, the other claims, the prior art, the prosecution history, and the specification, <u>not</u> in light of the accused device.") (emphasis in original).

### ii. The Second Set of Terms Has No Plain Ordinary Meaning and Is Not Described in the Specification.

The second set of terms; "computer program design filter," "computer program distribution filter," and "advertisement generation program," are purely functional limitations that convey, under FM's construction, only an intended result. While the patentees did not use presumptively means-plus-function language, the claims may as well have been drafted as "means for" limitations because the terms have no ordinary meaning and no limit on their scope. As discussed above in Part II.A, the specification fails to disclose any corresponding structure, steps, guidelines, or examples that explain how the claimed results are achieved, and indefiniteness here results whether they are means-plus-function limitations or not because there is no "computer program [X] filter" described in the specifications. *See Acacia Media Techs. Corp. v. New Destiny Internet Group*, 405 F. Supp. 2d 1127, 1131-41 (N.D. Cal. 2005) (invalidating claims containing coined terms "identification encoder" and "sequence encoder," which were not found in the specification, as indefinite). The lack of support for these terms is explained by the fact that FM coined the terms in a 2006 amendment. '025 Pros. Hist., Feb. 13, 2006 Amendment at 3-73 (pgs. 131-201 of 444 of Exh. J1) (substituting a new listing of claims).

FM argues that each claim "describes the function" of the filter. FM Br. at 39-40. This does not say what "a computer program [insert term here] filter" is, nor does it explain what a "filter" is. The specification fails to disclose any corresponding structure to these purely functional and subjective limitations. Similarly, FM argues that the specification discloses an "advertisement generation program" as being "software for displaying the advertisement," which

is little more than reorganizing the claim. *Id*. at 43-44. This does not give any reasonable scope for what a "advertisement generation program" is, or what its structure would be.

Because the specification contains no disclosure or explanation of the above elements and certain of the terms are coined terms which have no plain and ordinary meaning, a person of skill in the art would not be able to determine the type of structure or acts necessary to carry out the claim nor their scope. *See* Jenevein Decl., VI(D), ¶¶ 3-5, 10; *Halliburton*, 514 F.3d at 1254 ("a construction that results in an artisan not knowing… whether a particular composition standing alone is within the claim scope or not was the epitome of indefiniteness.")

### III. CONCLUSION

For the above reasons, Google respectfully requests that the Court adopt its proposed claim constructions.

Dated:  May 15, 2009

Respectfully submitted,

FISH & RICHARDSON P.C.

By:   /s/ Juanita R. Brooks
     Juanita R. Brooks - Lead Attorney
     (CA SBN 75934)
     E-mail:  brooks@fr.com
     Jason W. Wolff
     (CA SBN 215819)
     E-mail:  wolff@fr.com
     Fish & Richardson P.C.
     12390 El Camino Real
     San Diego, CA  92130
     Telephone:  (858) 678-5070
     Facsimile:  (858) 678-5099

     Thomas B. Walsh, IV
     Texas Bar No. 00785173
     E-mail:  walsh@fr.com
     Fish & Richardson P.C.
     5000 Bank One Center
     1717 Main Street
     Dallas, TX  75201
     Telephone:  (214) 747-5070
     Facsimile:  (214) 747-2091

     Harry L. Gillam, Jr.
     Texas Bar No. 07921800
     E-mail:  gil@gillamsmithlaw.com
     Melissa R. Smith
     Texas Bar No. 24001351
     E-mail:  melissa@gillamsmithlaw.com
     GILLAM & SMITH, L.L.P.
     303 South Washington Avenue
     Marshall, TX 75670
     Telephone: (903) 934-8450
     Facsimile: (903) 934-9257

Counsel for Defendant and Counter-Claimant
GOOGLE INC.

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the above and foregoing document has been served on May 15, 2009 to all counsel of record who are deemed to have consented to electronic service via the Court's CM/ECF system per Local Rule CV-5(a)(3).


/s/ Juanita R. Brooks
Juanita R. Brooks