# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## MARSHALL DIVISION

| | | |
|---|---|---|
| FUNCTION MEDIA LLC | § | Civil Action No. 2007-CV-279 |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | |
| | § | |
| GOOGLE INC. AND YAHOO!, INC. | § | |
| | § | |
| Defendants. | § | JURY TRIAL DEMANDED |

## PLAINTIFF'S REPLY TO DEFENDANT GOOGLE INC.'S MARKMAN BRIEF

Dockets.Justia.c

# TABLE OF CONTENTS

A.  Means-Plus-Function ("MPF") Limitations ....................................................... 1

    1.  "means for applying corresponding guidelines of the Media Venues (MVs)" ........................................................................................................ 1

        a.  Google has failed to prove indefiniteness. .................................... 1

        b.  The Seller does not create ads. ...................................................... 3

    2.  Other MPF Terms ............................................................................................ 6

B.  Non-MPF Limitations ................................................................................................ 7

    1.  "Media Venue," "Internet Media Venue" .............................................. 7

    2.  "publishing the electronic advertisement to one or more of the selected Internet MVs," "publish the advertisement to the Internet MV" ........................... 8

    3.  "a second interface to the computer system through which a Seller is prompted to input information to select one or more of the Internet MVs," "third interface to the computer system," "Third-Party Professional is prompted to input information to select one or more of the Internet MVs," "first interface to the computer system" ................................... 9

        a.  The limitations do not require selection of specific MVs. .......................... 9

        b.  The limitations do not contain a "location" element. ................................ 11

        c.  Software vs. hardware .............................................................................. 12

    4.  "create a presentation that complies with said guidelines of the MVs selected" & "create an electronic ad for publication to the selected Internet MVs" .................................................................................................... 12

    5.  "processing … the electronic advertisement … in compliance with the presentation rules of the Internet MV" ................................................................. 14

    6.  "self-serve interface" ..................................................................................... 15

    7.  "owned or controlled by other than the Seller" .................................... 16

    8.  "presentation rules," "distribution factors" ......................................... 17

C.  Google's Indefiniteness Arguments .................................................................... 17

    1.  The asserted independent apparatus claims do not improperly mix classes. ........................................................................................................... 18

2. The asserted dependent claims of the '025 are not insolubly ambiguous. ......................................................................................................... 19

    a. Defining "processing" as "execute/ing a systematic sequence of mathematical and/or logical operations" does not render the "processing" limitations indefinite. ...........................................................19

    b. Use of the word "or"..................................................................................20

    c. Google's "entirely subjective" and "no guidance" arguments ..................22

CONCLUSION............................................................................................................................. 23

# <u>TABLE OF AUTHORITIES</u>

## <u>Cases</u>

*Aristocrat Techs. Australia Pty Ltd. v. Int'l Game Tech.*,
    521 F.3d 1328 (Fed. Cir. 2008) ................................................................. 2

*Bancorp Services, L.L.C. v. Hartford Life Ins. Co.*,
    359 F.3d 1367 (Fed. Cir. 2004) ............................................................... 1

*Biomedino, LLC v. Waters Techs. Corp.*,
    490 F.3d 946 (Fed. Cir. 2007) ................................................................. 2

*Datamize, LLC v. Plumtree Software, Inc.*,
    417 F.3d 1342 (Fed. Cir. 2005) ............................................................. 22

*Dow Chem. Co. v. United States*,
    226 F.3d 1334 (Fed. Cir. 2000) ............................................................. 12

*Halliburton Energy Servs., Inc. v M-I*,
    514 F.3d 1244 (Fed. Cir. 2008) ............................................................. 19

*Intel Corp. v. United States Int'l Trade Comm'n*,
    946 F.2d 821 (Fed. Cir. 1991) ............................................................... 12

*Intellectual Property, Inc. v. UA-Columbia Cablevision*,
    336 F.3d 1308 (Fed. Cir. 2003) ............................................................... 1

*Intergraph Hardware Tech. Co. v. Hewlett-Packard Co.*,
    2004 WL 5643969 (E.D. Tex. July 1, 2004) .......................................... 20

*IPXL Holdings LLC v. Amazon.com, Inc.*,
    430 F.3d 1377 (Fed. Cir. 2005) ............................................................. 18

*Mass Engineered Design, Inc. v Ergotron, Inc.*,
    559 F. Supp. 2d 740 (E.D. Tex. 2008) ................................................... 22

*Medical Instrumentation & Diagnostics Corp. v. Elekta AB*,
    344 F.3d 1205 (Fed. Cir. 2003) ............................................................... 1

*Microprocessor Enhancement Corp. v. Texas Instruments*
    520 F.3d 1367 (Fed. Cir. 2008) ........................................................ 18, 19

*SuperSpeed, LLC v. Int'l Bus. Machines*,
    2009 WL 383255 (E.D. Tex. Feb. 11, 2009) ......................................... 2, 6

***Union Pacific Resources Co. v. Chesapeake Energy Corp.,***
    236 F.3d 684 (Fed. Cir. 2001) ................................................................... 21

*Versata Software, Inc. v. SAP America, Inc.,*
    2009 WL 1408520 (E.D. Tex. May 19, 2009) ......................................... 3

*Wenger Mfg., Inc. v. Coating Mach. Sys., Inc.,*
    239 F.3d 1225 (Fed. Cir. 2001) ................................................................ 6

Over and over again, Google's Response Brief ignores or sidesteps the arguments Function Media ("FM") presented in the Opening Brief. FM's Brief cites specification provision after specification provision and expert admission after expert admission. Yet Google simply fails to address them, instead constructing arguments that often are not even logically consistent within the false parameters Google constructs, let alone in the circumstances that the law requires here—an examination of the intrinsic evidence such as the specification, claims, and prosecution history, buttressed by the extrinsic evidence of not only FM's expert, but Google's too.

## A.     Means-Plus-Function ("MPF") Limitations

### 1.     "means for applying corresponding guidelines of the Media Venues (MVs)"

#### a.     Google has failed to prove indefiniteness.

It is important while considering Google's various indefiniteness arguments to keep in mind the heavy legal burden Google faces. "[A] challenge to a claim containing a means-plus-function limitation as lacking structural support requires a finding, by clear and convincing evidence, that the specification lacks disclosure of structure sufficient to be understood by one skilled in the art as being adequate to perform the recited function." *Intellectual Property, Inc. v. UA-Columbia Cablevision*, 336 F.3d 1308, 1319 (Fed. Cir. 2003). As such, even if Google's indefiniteness arguments raised close questions—which they do not—FM would still prevail. *See Bancorp Services, L.L.C. v. Hartford Life Ins. Co.*, 359 F.3d 1367, 1371 (Fed. Cir. 2004).

Google's indefiniteness argument as to this claim term (and many of the others) rests on a simple premise: Google contends that MPF terms that cover computer software must include actual code to be definite. Google would not itself characterize its argument in this manner—and, for good reason, given that the Federal Circuit has expressly rejected that contention. *See, e.g.*, *Medical Instrumentation & Diagnostics Corp. v. Elekta AB*, 344 F.3d 1205, 1214 (Fed. Cir. 2003). So Google attempts to backdoor a "code" argument by suggesting that, for this limitation to be definite, FM must point to "specific algorithms" within the patent that can accomplish every conceivable

manner of "applying" guidelines. Thus, reasons Google, unless FM disclosed precisely how to transform text inputs into a TV ad, the claim lacks sufficient structure. Google Br. ("G.Br."), at 6.

But this argument would effectively require FM to provide a complete set of code that could tackle every conceivable "application" of guidelines. The Federal Circuit, however, requires no such exactitude. Rather, "[w]hile the specification must contain structure linked to claimed means, this is not a high bar . . . ." *Biomedino, LLC v. Waters Techs. Corp.*, 490 F.3d 946, 950 (Fed. Cir. 2007). So long as sufficient logical structure is disclosed to identify to one of ordinary skill in the art precisely what is claimed, a patentee is "not required to produce a listing of source code or a highly detailed description of the algorithm to be used to achieve the claimed functions . . . ." *Aristocrat Techs. Australia Pty Ltd. v. Int'l Game Tech.*, 521 F.3d 1328, 1338 (Fed. Cir. 2008). In short, as this Court has stressed, the "relevant parts" of an algorithm or logical operation must be disclosed—but "the entire detailed algorithm [need not] be included as part of the recited means." *SuperSpeed, LLC v. Int'l Bus. Machines*, 2009 WL 383255, at *9 (E.D. Tex. Feb. 11, 2009).

According to the patent, (1) the PGP identifies an Internet MV for publication; (2) it accesses data representing that Internet MV's guidelines; (3) it accesses data representing the Seller's information; and (4) it creates an ad by processing the guidelines together with the Seller's information. This process is described not only in the textual discussion of the patent (*see* '045, at 17:1-11; 42:36-42; 43:28-32; 43:42-51), but also in a detailed flow chart of the algorithm, showing the necessary inputs and the operations to be performed on them (*see* '045, at figures 4d & 4e). This identified structure comes directly from the patent, and it is sufficient both by itself and for one of skill in the art to identify the structure of the means that FM claimed. *See* Ex. D to FM Br. (Rhyne Decl.), ¶31. That FM did not disclose specifically how to create radio and TV ads, as Google contends, *see* G.Br. at 6, misses the point entirely. The patent's disclosure of the logical operation to create the online ads, described above, identifies sufficient structure not only to create radio and TV ads, but also for one skilled in the art to create Internet ads by formatting the ad

2

content in a red color or Times New Roman font. The fundamental point that Google misses is that the patent specification discloses the general logical operation, which is more than sufficient under the case law. The Federal Circuit has made clear the devil is not in these details that Google focuses on—as an "entire detailed algorithm" is not necessary for FM's claims to be definite. *See SuperSpeed*, 2009 WL 383255, at *9.

FM's recited structure for the "means for applying" easily clears the low definiteness threshold because it contains sufficient structure linked to a claimed means, and certainly structure sufficient for a person of ordinary skill to determine what is claimed. FM's expert, Dr. Rhyne, has opined specifically that the logical operation/algorithmic structure disclosed in the patent for the "means for applying" (and the other means-plus-function terms) is sufficient for one of ordinary skill to determine what precisely is claimed. *See* Ex. D to FM Br, ¶¶30-48. As such, Google cannot prevail on a "clear and convincing" evidentiary burden. Indeed, Google almost acknowledges as much by failing to move for formal summary judgment of indefiniteness. What's more, as discussed below, Google itself has identified an alternative structure for this claim term—a tactic that also cuts strongly against ruling that this claim is clearly and convincingly indefinite, as this Court has recognized. *See Versata Software, Inc. v. SAP America, Inc.*, 2009 WL 1408520, at *10 (E.D. Tex. May 19, 2009) ("A party's proposed construction of a disputed term in its P.R. 4-3 disclosures supports the conclusion that a disputed term is not indefinite.").

### b. The Seller does not create ads.

As a fallback to its indefiniteness position, Google alternatively asserts that the structure associated with this means is the PACP. Yet Google ignores FM's briefing when Google argues that it is the Seller through the PACP, and not the central processor through the PGP, that creates ads. In so doing, Google likewise ignores the myriad of specification references cited by the FM proving that it is the PGP that creates ads. *See, e.g.*, '045, at 3:28-31; 18:63-19:1; 17:4-11. And Google ignores the testimony of his own expert, who, when asked to choose whether the PACP or

the PGP creates ads, opted for the latter.  Indeed, Google even ignores the very name of the PGP—"Presentation <u>Generation</u> Program," which leaves no doubt as to where presentations are generated.

### i.    Google's textual arguments are wrong.

Google instead relies upon a series of strained textual arguments to attempt to suggest that Claim 1 requires that the Seller itself "create" presentations at the Seller interface.  But as FM discussed in its Opening Brief (and which Google never rebuts), the claims speak to a system that can be <u>used by the Seller</u> to create presentations.  By way of example, a person might place inputs for coffee into a coffee machine in order to make coffee—coffee grounds, a filter, and water.  That person may be using the machine to make coffee, but, in the end, it is the machine that actually brews the drink.  That is true here as well—Claim 1 of the '045 discusses how a Seller can use the "network of computers" to create presentations, but the '045 discloses that it is the PGP and not the Seller that actually formats the presentations and transmits them to their destination.  And, notably, the flow charts concerning the PACP (*see* Figs. 4a and 4b) do not depict creation.  The flow charts concerning the PGP (*see* Figs. 4d and 4e), by contrast, depict the creation of rule-compliant ads.

Google also disputes that the structure associated with this limitation—"means for applying"—even corresponds to the structure in the patents for the creation of presentations.  Google insists that "creating" is distinct and different from "means for applying," G.Br., at 9-10, yet it never explains how.  There is no logical result of the "application" of guidelines to a Seller's inputs other than the creation of a presentation, just as the patent discloses.  Indeed, the patent ties the process of "applying" guidelines to the Presentation Generation Program, thus confirming that the generation (*i.e.*, creation) of presentations involves the "means for applying": "It is through the process of forcing corrections to be made, examined, and reviewed by management that the information contained within the Presentation Rules Database 1650 [that is, the "presentation guidelines"] and the algorithms <u>which apply that information within the Presentation Generation Program 1710</u> are refined (block 11272)."  '045, at 43:14-19.

Although Google ignores the claim differentiation arguments in FM's Opening Brief, here it offers one of its own—that dependent Claim 3 of the '045 adds a "means for creating structured presentations from the Seller's input," so the "means for applying" in Claim 1 must not involve "creating." But Google overlooks the word "structured." The patents discuss the concept that the creation of new presentations may alter the structure of existing indexes of presentations. *See, e.g.*, '045, at 19:23-27 ("While <u>creating</u> or updating the Sellers' presentations, the Presentation and Generation Program 1710 will determine which portions of the general presentation framework and <u>structure</u> on the overall directory or index require updating and republishing.") (emphasis added); *id.* at 44:59-62 (same). This unasserted dependent claim thus speaks to a method of creating special presentations that fit within the structure of a specific index. Indeed, this claim supports <u>FM's</u> arguments, not Google's. Dependent Claim 3 is necessarily narrower than independent Claim 1, so Claim 1 must cover the "creation" of both structured and unstructured presentations.

### ii. Google's specification support is lacking.

As discussed above, this claim is definite and the specification defines that it is the PGP that creates presentations. Google's third alternative argument is that creation/application of guidelines occurs <u>both</u> at the PACP and the PGP. For support, Google cites the patents' discussion, particularly in columns 41 and 42 of the '045, about an unclaimed feature of the invention that in certain instances may guide a Seller's input of information through the PACP based upon Media Venue ("MV") rules. But this feature is not part of the necessary structure for the "means for applying." In the same textual discussion cited by Google—column 43 of the '045—the patent makes clear that <u>all</u> of the process of presentation creation ultimately occurs at the PGP:

> The <u>Presentation Generation Program 1710</u>, using the information contained within the Presentation Rules Database 1650, then formats the presentation information for each client outlet, channel, resident media, or non-resident media (blocks 11300, 11294). <u>New presentations are created in their entirety</u>, while only the portions of existing presentations affected by any modifications are republished.

'045, at 43:42-48 (emphases added). Google only acknowledges this specification section once, and then only to discount it by claiming that it refers to "an alternative embodiment concerning resident directories (FM disclaimed resident MVs during prosecution and had not asserted its claims against them here)." G.Br., at 8 (emphasis added). But this attempt to dismiss the specification in just a conclusory parenthetical is wrong, given that: (1) this text in column 43 is part of the same embodiment cited by Google in columns 41 and 42; and (2) the specification here expressly refers to "non-resident media," *see* '045, at 43:45-46.

Given that the PGP applies presentation rules to create presentations "in their entirety," the only necessary structure for this claim limitation is the PGP. Any other recitation of structure is superfluous and should be excluded. *See Wenger Mfg., Inc. v. Coating Mach. Sys., Inc.*, 239 F.3d 1225, 1233 (Fed. Cir. 2001).[1]

### 2. Other MPF Terms

Google's treatment of the other MPF claims is cursory at best. Google drops one of the terms—"means for said MVs to input said guidelines and information"—it earlier identified for construction. As to the others, Google merely repeats its misunderstanding as to the level of specificity required in reciting MPF structure. Each of these terms is tied to a disclosed structure of either the PACP or PGP, and as discussed above the inventors need not have provided any detailed algorithms or recitation of source code for them to be definite. *See SuperSpeed*, 2009 WL 383255, at *9; Ex. F to FM Br., at 117:22-118:14. Rather, for the reasons described in detail in FM's Opening Brief—and not really attacked by Google in response—the structure discloses sufficient logical operations to render the claims not indefinite. Google has thus not satisfied its burden of proving by clear and convincing evidence that the '045 patent's claims are indefinite.

---

[1] Google attempts to support its conclusion that "means for applying" corresponds to the PACP with reference to a statement made during the prosecution of a different patent application. But that application involved a different set of claims, which require neither the act of creating nor a "means for applying." Those claims drew upon portions of the '045 specification that describe how a pre-processing analysis of data could occur at the PACP prior to transmission to the PGP for processing and creation. This pre-creation analysis is separate and distinct from the "means for applying," claimed in the '045, whereby the PGP processes the input information and creates the ad.

## B.    Non-MPF Limitations

### 1.    "Media Venue," "Internet Media Venue"

The patents expressly define "Media Venues" to mean "those physical <u>or</u> virtual locations where presentations are placed or made available" so as to be accessible by end users.  045, 10:39-42 (emphasis added).  The only dispute here is the proper construction of "virtual locations." Google believes that a virtual location is nothing more than an "address" that corresponds to the physical location of a MV's computers.  *See* G.Br. at 15-18.  But such a narrow construction reads "virtual" completely out of the glossary definition—"location" alone would have sufficed.

Even if virtual locations were somehow synonymous with addresses—which they are not—Google has improperly created an end-run around "virtual location" by tying these addresses to "<u>locations where computers exist</u>."  G.Br. at 18.  Computers, of course, are tangible and "exist" only at physical locations.  These physical locations are not somehow transformed into virtual ones merely because they house computers.  Google's cited "support"—that presentations are published "<u>to</u>" MVs "<u>for display on</u>" those MVs so as to be "<u>accessible by the end users, consumers, viewers, or Buyers</u>," *see* G.Br. at 16—in fact proves that a MV has to be something other than an address corresponding to the physical location of a MV's computers. If virtual locations are simply "locations where computers exist for publishing content on the Internet," *id.* at 18, a Buyer could not even access and view presentations without burglarizing the location that houses the computers. Google cannot reasonably contend that the Court should construe "virtual" right out of "virtual locations" and "Internet" right out of "Internet Media Venues."

Equally problematic is Google's threshold assertion that a "virtual location" is somehow synonymous with—and limited to—an <u>address</u>. *See* G.Br. at 15 (defining "virtual locations / Internet locations" as "<u>*i.e.*</u>, addresses") (emphasis added).  The terms plainly are not synonyms, *see, e.g.,* Ex. D to FM Br., ¶¶66-67, which perhaps explains why Google confines its "*i.e.,* addresses" construction to the claim-construction chart instead of discussing it in the body of the brief.  In any

event, the specification expressly contradicts Google's addresses-only position because it lists a "website" as a specific example of a MV. *See, e.g.,* '025 at 3:24 & 4:1.

By contrast, FM's construction—that "virtual locations" include "websites," "domain names," and "addresses"—is proper for the reasons explained in its Opening Brief. Google's arguments against it do not hold water. First, a Seller <u>can</u> select a "website" or a "domain name" (just as a Seller can select an "address"). Second, Google incorrectly asserts that FM's construction "implicitly include[s]" the "Buyer, Seller, and even the central controller locations." G.Br. at 17. It does not. What it does include are "virtual" cyberspace locations such as websites, which again are described in the specification as specific examples of MVs and which are nowhere excluded by the plain language of "virtual locations" or otherwise. *See, e.g.,* '025 at 3:24 & 4:1.

### 2. **"publishing the electronic advertisement to one or more of the selected Internet MVs," "publish the advertisement to the Internet MV"**

The parties initially had two disputes with respect to "publishing": (1) FM contended that Google had improperly omitted from its definition the concept of "making available"; and (2) FM contended that Google had improperly inserted an "at the media venue location" limitation. Google has now conceded the "making available" point via an amended proposed construction. The remaining question, then, is whether Google can amend the glossary's definition of "publishing" to include an "at the MV location" limitation that appears nowhere in the patent.

As a threshold matter, Google's effort to shoehorn a "location" limitation into "publishing" is superfluous since both Google and FM agree that a MV (to which an ad is "published") is a "physical or virtual <u>location</u>." More fundamentally, Google's proposed addition of "at the MV" into the claim construction is a re-write of the pertinent claim limitations—all of which speak in terms of publishing "to" a MV, not "at the MV." Google simply makes up the "at" language, citing alleged specification support that nowhere suggests an "at" requirement.

Moreover, Google seems to be contending again (this time via the "**at** the MV **location**" language) that ads must be delivered to tangible MV computers at a certain physical address. This proposed amendment of "publishing" correlates closely with Google's attempt to excise "virtual locations" from the glossary's definition of MV, and it is as wrong here as it was there. Figure 1b, for example, depicts both the option of transmitting the ad to the MV user (*see* line extending from block 1000 to block 6000) and the option of bypassing the MV user in favor or direct publication to a MV website for display to a Buyer through a browser (*see* line from block 1000 to block 3000 and corresponding line extending from block 5000 to block 3000).

In sum, Google has provided no basis for deviating from the glossary definition of "publishing" that FM proposes.[2] That definition—"placing or making [the ad] available within the framework of each MV so that it is accessible by the end users"—is in harmony with the glossary's definition of "MV" (properly construed) and the specification (which not only lists a cyberspace "website" as an example of a MV but also notes that Buyers can access ads through a browser). As Google's own expert admits, "publishing" does not have to involve placing an ad on a server: "It just has to be placed on the Internet." Ex. F to FM Br., at 147 (emphasis added).

3.     **"a second interface to the computer system through which a Seller is prompted to input information to select one or more of the Internet MVs," "third interface to the computer system," "Third-Party Professional is prompted to input information to select one or more of the Internet MVs," "first interface to the computer system"[3]**

a.     **The limitations do not require selection of specific MVs.**

---

[2] Google misperceives FM's construction when it states that FM seeks to construe "publishing" and ignore "publishing electronic advertisements to." FM is not ignoring anything. FM has simply adopted the glossary's definition of "publishing," which itself explains precisely what is meant by "publishing electronic advertisements to." The system publishes an electronic ad to an Internet MV by placing the ad, or making the ad available, within the framework of the MV so that it is accessible to end users.

[3] "Selection information input by Seller" is a similar limitation that Yahoo, but not Google, asked the Court to construe. Because Yahoo is no longer a party to the case, the Court need not construe it. Additionally, as noted in notes 13 and 14 of FM's Opening brief, Google and FM have proposed relatively similar constructions for two additional limitations in this family: "each of the Internet MVs is prompted to input presentation rules" and "prompting each of the Internet MVs … to input presentation rules." Given that Google has not advanced arguments for its proposed constructions of these two limitations, the Court should adopt FM's constructions.

Google argues that FM's construction of "prompted to input information to select one or more of the Internet MVs"—which FM defines as "prompted to enter information to select one or more Internet MVs"—is somehow "contrary to the plain language of the claims." G.Br. at 20. Putting the claim language next to FM's proposed definition, however, shows this not to be true.

To the contrary, it is Google that rewrites the disputed limitations to require the selection of <u>particular</u> Internet MVs. But selection of particular Internet MVs by name (as opposed to selection of Internet MVs via keyword information, for example) is nowhere required by the patents. "Information to select" means "information to select," whether specific-name, keyword, or some other form of selection information. The claim language is broad and unqualified.

Google cites to three specification provisions, but none support Google's position. In citing to the first one, '025, 28:46-52, Google asserts that "the Seller chooses the media and presentations" but omits the specification's discussion of "advertising channels" (discussed below) which appears in this very same passage. Google's second citation, *id.* at 42:8-16, provides no support because it merely discusses one of many selection examples that appear in the specification. And the third citation, *id.* at 13:50-53, merely begs the question because it speaks in terms of Seller choice (which, for example, could be a choice based on specific website or advertising channel).

Indeed, the dependent claims in the '025 prove that a Seller's "information to select" is not confined to identification of particular MVs but instead includes <u>both</u> the selection of particular MVs, *see* '025 Claim 24, and the selection of MVs via the input of targeting information such as advertising channels and demographics, *see id.*, Claims 21 and 23. FM dedicated almost a page of its Opening Brief to this point, but Google is silent in response.

The specification likewise contemplates selection information other than specific-name selection. FM's Opening Brief, for example, pointed to the specification's discussion of selecting venues via "advertising channels." Google's response, in a footnote, is simply that "advertising channels" are not "relevant" because they are not "equate[d] with the claimed MVs." G.Br. at 21

n.19. But this argument ignores the very specification support that FM cites: "[the Seller interface] … allows the Seller to choose in which presentations and which media or advertising channels the Seller wishes to participate." '025, at 28:47-48 (emphasis added).

Google's primary line of attack on this claim term comes from a statement made by FM's counsel in the pending re-examination proceedings that three Prior Art references did not allow for "direct selection" of MVs or selection of "particular" MVs and so were distinguishable on that basis. Google takes these statements completely out of context. In making these statements, re-exam counsel in no way argued or suggested that the FM patents allowed only selection of specific MVs. Indeed, it would not have made any sense to limit the FM patents in this regard, as these Prior Art references do not allow for any selection whatsoever (whether by name, channel, or otherwise). *See, e.g.,* Ex. C to G.Br., Response to 1st Office Action regarding '059, at 46 ("The Aaddzz Brochure also fails to disclose an interface that prompts an advertiser (Third Party Professional or Seller) to enter **information to select** media venues.") (emphasis added); *id.*, at 21 ("Certainly, Mason does not disclose an interface 'prompting' users for the selection of media venues, **or information to be used in the selection**.") (emphasis added); Ex. B. to G. Br., Response to 1st Office Action regarding '025, at 40 ("In fact, the [Brown] system does not provide **any means for a Seller to select** internet media venues.") (emphasis added). In short, FM has not disavowed the full scope of this claim term.

### b. The limitations do not contain a "location" element.

The disputed limitations—"a first interface to the computer system [for MVs]," "a second interface to the computer system [for Sellers]," and "a third interface to the computer system [for Third-Party Professionals]"—require only a first, second, and third interface. They do not specify how the software interface is to be provided or where the software must be located. That the Seller, MV, and Third-Party Professional are separate entities using separate interfaces in no way means that the disputed limitations require a specific "location" for the respective interfaces. For example,

if the software interfaces were provided as website interfaces, the MV, Seller, and Third-Party Professional could use those software interfaces from any computer connected to the Internet. It is true that the preferred embodiment describes installation of the interfaces onto the respective entities' computers, but this fact of course does not impose a "location" requirement given that no such requirement appears in either the claim or the specification. *See, e.g., Dow Chem. Co. v. United States,* 226 F.3d 1334, 1342 (Fed. Cir. 2000) (as a general rule, claims of a patent are not limited to the preferred embodiment); *Intel Corp. v. United States Int'l Trade Comm'n,* 946 F.2d 821, 836 (Fed. Cir. 1991) ("Where a specification does not require a limitation, that limitation should not be read from the specification into the claims.").

### c. Software vs. hardware

Google has abandoned its position on the "software vs. software and hardware" dispute that FM addressed at length in its Opening Brief. *See* G.Br. at 23 n.22 (noting that this is not an "essential" dispute or the "critical issue"). Because Google offers no argument or evidence in response to FM's position here, it has waived this issue and this Court should adopt FM's position.

### 4. "create a presentation that complies with said guidelines of the MVs selected" & "create an electronic ad for publication to the selected Internet MVs"

FM addresses above Google's argument that it is the Seller (and not the PGP) that creates ads. Google adds nothing new here with respect to the apparatus/method claims.

With respect to Google's one-sentence assertion that FM has tried to erase the term "create" in favor of the term "produce," G.Br. at 25, FM is simply trying to ensure clarity if Google thinks "create" is ambiguous. Google requested that the Court construe the creation limitations, and FM provided a synonym for "create" in light of Google's apparent belief that "create" is ambiguous. If Google prefers "create" to "produce," FM has no objection.

Google similarly in one sentence asserts that FM "tries to smuggle the 'create' limitation in the separate 'processing' limitation of the same claim." *Id*. But FM has done no such thing. FM

12

correctly included "create" when defining "processing" because creation is the end-result of the "processing," which FM and Google each define as a standalone term to mean "executing a systematic sequence of mathematical and/or logical operations." The invention, of course, does not process merely for the sake of processing. *See* Ex. D to FM Br., at ¶¶50-57.

Google's next argument—that the creation limitation "requires creation of a single presentation compliant with the guidelines of all selected MVs," G.Br, at 25—is faulty on multiple levels. In making this argument, Google plucks claim language out of context and then proceeds to construe it nonsensically—all the while ignoring both the preamble that Google admits is limiting and the specification that teaches just the opposite.

That the claim language refers to an ad "in the singular" does not mean that a single, <u>identical</u> ad is published to the respective MVs; it means only that the system creates a single, <u>customized</u> ad for publication to each of the selected MVs (which, of course, enter separate presentation rules). *See, e.g.,* '025, Claim 1 ("A computer system for creating and publishing **customized** electronic advertisement**s**, for <u>a Seller</u>, to Internet MV**s**…; each of the Internet MVs is prompted to input presentation rules….") (emphases added). While Google notes the "bedrock principle" of patent law that an invention is defined by its claims, it then proceeds to ignore claim language proving that ads are customized to each MV. Google also ignores the wealth of specification evidence and expert testimony (including that of Google's own expert) cited by FM that makes it clear that customized presentations are published to each MV. *See* FM Br. at 20-22.

Further, if the claims required the creation of a single identical presentation for all selected MVs, the invention disclosed in the specification could not work. Google dismisses this argument simply by stating that "FM provides no explanation of why this is so." G.Br. at 26. Yet FM's Opening Brief provided a specific example of how Google's construction would render the invention unworkable, to which Google again offers no response. *See* FM Br. at 21.

Finally, Google argues that the "creating" limitation is indefinite because it "does not specify which Internet MV's presentation rules must be complied with." G.Br. at 26. FM's Opening Brief cited exemplary specification provisions that show that the rules "to be complied with" are those of the MVs to which the advertising content will be published. *See* FM Br. at 24. But here again, rather than address these provisions (and far from providing "clear and convincing evidence" of indefiniteness), Google ignores them and instead constructs a convoluted "plain language" argument without citation to the specification. *See* G.Br. at 26.

5. **"processing … the electronic advertisement … in compliance with the presentation rules of the Internet MV"**

Google contends that "processing" means the same thing as "create" under FM's construction. It does not. As already explained in Part B4 above, creation is the end-result of "processing"—which FM has separately defined as "executing a systematic sequence of mathematical and logical operations upon the inputted information …." And, given the specification, the "processing" that occurs at the central controller involves the processing of raw input information that ultimately results in the creation of a customized ad. *See* '025 at Figs. 4d and 4e; *id.* at 17:51-18:8; 19:46-55; 20:2-15; 44:36-45.

Google's cited "support"—that this computer-controller limitation refers to "processing the advertisement" and not to "processing the input information"—is another example of Google's reading the claims without consulting the specification. The specification provides zero support, and Google cites none, for the proposition that an ad qua ad (as opposed to raw input information) is transmitted to the central controller for processing. The only thing that is transmitted to the central controller for processing is raw input information, *see id.*, and the central controller indisputably performs the processing described by this limitation, *see* '025 Claim 1 ("a computer controller of the computer system processing and publishing"). Accordingly, the only reasonable way to read this language in light of the specification is to read it as FM reads it.

Google's remaining arguments here are recycled from elsewhere. Google argues that FM's construction "fail[s] to account for the fact that the advertisement was already created in an earlier step," but this argument depends on Google's faulty argument that the Seller creates the ad at the second interface. *See* Parts A1b and B4, above. Google also re-asserts its single-presentation-for-multiple-MVs argument and its which-MV-rules-are-complied-with argument, but these arguments are demonstrably incorrect for the reasons explained above and in FM's Opening Brief.[4]

### 6. "self-serve interface"

Google's mischaracterizes FM's construction of self-serve as "an interface which the Internet MV or Seller generally uses <u>with the help of another entity, such as customer-support personnel</u>…." G.Br. at 31. FM contends no such thing. To the contrary, FM contends that a self-serve interface is one that can be used without requiring the aid of anyone else. The reason for the "without requiring" part of FM's construction is singular and straight-forward: to make clear that a user's mere ability to consult help menus or customer-support personnel <u>if they so choose</u> does not transform a self-serve interface into a non-self-serve one. The ability to get help is an option—not a requirement—and a decision to exercise that option does not alter the character of the interface. Were it otherwise, no interface could be self-serve because every user of every interface has the hypothetical option of picking up the telephone and asking somebody how to perform a function.

---

[4] Google originally proposed that the Court construe "a computer controller of the computer system processing and publishing the electronic advertisement to one or more of the selected internet MVs in compliance with the presentation rules of the internet MV, whereby the electronic advertisement is displayed on each of the one or more of the selected internet MVs in compliance with the presentation rules." While Google's brief discusses the "processing" and "publishing" elements of this limitation, the brief does not discuss Google's proposed construction for "whereby the electronic advertisement is displayed on each of the one or more of the selected internet MVs in compliance with the presentation rules." Google's proposed construction for that element—"the advertisement is displayed on every one of the internet MVs selected by the Seller"—appears only in a chart accompanying Google's brief. There is a good reason why Google has failed to advance an argument in support of its proposed construction: the patents plainly contemplate that a MV may input "blocked URLs" and "blocked words," which will operate to prevent publication of presentations originating from the blocked Seller notwithstanding the Seller's selection of the MV that inputted the block. *See, e.g.,* '025, Claim 79. In light of this, and given FM's correct constructions for the "processing" and "publishing" elements, the Court should adopt FM's construction for the computer-controller limitation in full. Dkt No. 73-3. (Ex. B to Joint Claim Construction Statement).

**7.** **"owned or controlled by other than the Seller"[5]**

Google's proposed construction of this term is incomprehensible, unsupported, and unnecessary. A MV that is "owned or controlled by other than the Seller" means exactly what it says: somebody other than the Seller owns or controls the MV. It means nothing more, and nothing less. This limitation was added in specific response to the PTO's rejection of an earlier-drafted claim on the basis that creating and publishing ads to a Seller's <u>own</u> MV (*e.g.*, the Seller's own website) was known in the Prior Art. *See* Ex. L to FM Br. (Feb. 6, 2002 Amendment at 6-8 and PTO Notice of Allowance at 2). Google's brief ignores this point.

Google's proposed construction—that the "MV ultimately controls the publishing of the presentations"—adds nothing except confusion, in part because it introduces (without basis) the separate "publishing" limitation into the proposed definition of "owned or controlled." The at-issue claims make clear that "owned or controlled by other than the Seller" modifies "MV"—not "publishing." *See, e.g.*, '025 at 64:60-61. To the extent that Google is suggesting that "owned or controlled" requires a publisher manually to approve, schedule, or otherwise control the publishing of an ad (beyond signing-up for the system and inputting presentation rules through the first interface), Google's construction finds no support in either the claims or the specification. Google's specification citations only describe the transmission of print or other ads that are to be physically published and therefore require further handling by the MV user. Google ignores the specification description of the transmission of <u>Internet</u> ads, to which these claims are directed, directly to a website for display by a browser and without handling by the MV. *See* '025, Fig. 1b; *see also* Part B2, above. To the extent that Google is merely suggesting here that publishers retain the right to

---

[5] The "owned or controlled" element appears in Claim 1 of the '025: "A method of using a network of computers to contract for, facilitate and control the creating and publishing of presentations, by a Seller, to a plurality of MVs owned or controlled by other than Seller." In its Opening Brief, FM addressed not only the "owned or controlled" element but also the "network of computers" element. *See* FM Br. at 27-28. In light of the Yahoo/FM settlement, the Court no longer needs to address the "network of computers" element because the dispute with respect to that element was solely a dispute between FM and Yahoo. Google did not propose a construction for "network of computers."

cease participating at any time, Google's construction is an inconsequential statement of the obvious.

### 8. "presentation rules," "distribution factors"

Google's proposed construction of "presentation rules"—"rules that control and limit the style and editing of presentations"—is too narrow. In clinging to its construction, Google yet again does not address the arguments that FM makes in its Opening Brief. For example, the specification lists types of presentation rules (such as blocked URLs) that have nothing to do with "style and editing," *see, e.g.,* '025 at 5:4-15 & 18:45-46—and indeed states outright that presentation rules may include not only "style and editing" rules but also publishing-based presentation rules such as distribution factors. *See* '025 Abstract ("presentation rules … include design or style standards for look and feel, editorial standards, <u>and distribution factors</u>") (emphasis added). Google also ignores the claims themselves, which discuss various types of presentation rules that include but extend beyond "style and editing" rules. *See, e.g.,* '025 Claim 79 ("distribution factors").

FM's proposed construction of "presentation rules," unlike Google's, encapsulates the different types of rules that are described in the specification and articulated in the claims. Presentation rules are, in fact, rules that are used by the computer system in creating ads for publication to the respective MVs. *See* FM. Br. at 35-36; *see also* '025, 5:19-26; 19:40-55; *id* 44:36-40; *id.* 55:4-16; *id.* 18:29-50. Google argues wrongly that, "under FM's construction, no difference exists between a distribution factor and a presentation rule." In fact, the cited claims and specification provisions prove that distribution factors are but one type of presentation rule.

Finally, Google advances no argument in support of its proposed construction of "distribution factors" and ignores altogether the wealth of evidence against it. *See* FM Br. at 38-39. Google also fails to explain how FM's proposed construction "reads like nonsense" when substituted in Claim 47; it plainly does not.

### C. Google's Indefiniteness Arguments

### 1. The asserted independent apparatus claims do not improperly mix classes.

FM explained in its Opening Brief why Claim 1 of the '025 and Claim 2 of the '059 do not mix statutory classes of invention. These claims are directed to a computer system consisting of various components with certain functionality—not to a method of using the claimed system.

Google's position is also refuted by the plain language of the claim, which recites certain claimed components and the requisite functional capabilities of each:

> "A computer <u>system for creating and publishing</u> customized electronic advertisements … <u>comprising</u>: <u>a first interface to the computer system through which</u> each of the Internet MVs is prompted …; <u>a first database storing</u> …; <u>a second interface to the computer system through which</u> a Seller is prompted …; <u>a second database storing</u> …; <u>and a computer controller of the computer system processing and publishing the electronic advertisement</u>….."

'025, Claim 1. Google's argument that FM is rewriting the claim language "to recite, for example, a first and second interface for prompting, first and second database for storing, and a computer controller system for processing and publishing" is belied by the claim language itself. This is exactly the language of the claims. It is Google that seeks a rewrite.

That a user ultimately uses the claimed system / functionalities of the claimed system is, of course, elementary and no bar to patentability. To mention a user in the claim is not to claim the user. The *IPXL* case upon which Google (solely) relies does not dictate the conclusion that Google seeks. There, the claim required both a system <u>and</u> a method of use whereby "<u>the user uses</u> the input means to either change … or accept…." *IPXL Holdings LLC v. Amazon.com, Inc.*, 430 F.3d 1377, 1384 (Fed. Cir. 2005) (emphasis added). Here, by contrast, the claims are infringed regardless of any method of use that may or may not be employed by the user.

Google attempts to distinguish the holding in *Microprocessor Enhancement Corp. v. Texas Instruments*—that apparatus claims are not necessarily invalid for using functional language, *see* 520 F.3d 1367, 1375 (Fed. Cir. 2008)—by arguing that "there, the apparatus claims contained presumptively MPF elements," G.Br. at 38. But this argument reads into the holding a qualification

that was nowhere sanctioned by *Microprocessor*. Google's stretch is perhaps best illustrated by its failure to cite to a single case that stands for the rule it advocates—namely, that apparatus claims are invalid for using functional language unless they are really MPF claims. In fact, *Microprocessor* describes just the opposite. *See* 520 F.3d at 1375 ("Functional language may also be employed to limit the claims without using the MPF format."); *August Tech. Corp. v. Camtek, Ltd*., 2008 WL 2774696, at *4 (D. Minn. July 14, 2008) (recognizing holdings in other cases that "IPXL does not apply when the claims describe what the apparatuses do when used a certain way" rather than a specific method of using the system).

        **2.**        **The asserted dependent claims of the '025 are not insolubly ambiguous.**

As Google acknowledges, a claim limitation cannot be held indefinite unless Google demonstrates by <u>clear and convincing evidence</u> that "a skilled artisan could not discern the boundaries of the claim" and that "no narrowing construction can properly be adopted." G.Br. at 36. Google's indefiniteness arguments seem more like throwaway points than serious efforts at meeting this high hurdle (especially considering that Google offers alternate definitions for many of the terms it contends are indefinite). Google offers <u>no evidence</u>—let alone clear and convincing evidence—that the at-issue terms are insolubly ambiguous.

        **a.**        **Defining "processing" as "execute/ing a systematic sequence of mathematical and/or logical operations" does not render the "processing" limitations indefinite.**

Google argues that, in every instance where FM has construed a term to mean "executing a systematic sequence of mathematical and/or logical operations," FM's construction is "purely functional" and "insolubly ambiguous." G.Br. at 39. The question for the Court is whether a skilled artisan would know what it means to "process" or "execute a systematic sequence of mathematical and/or logical operations," or whether he would throw up his hands and profess an inability to "discern the boundaries of the claim." *See Halliburton Energy Servs., Inc. v M-I*, 514 F.3d 1244, 1249 (Fed. Cir. 2008).

Indeed, Google itself has answered this question—in FM's favor. Google proposes the exact same construction for "processing" in one of the disputed terms. *See* G.Br. at 28. Moreover, this District adopted this same construction in another software case. *See Intergraph Hardware Tech. Co. v. Hewlett-Packard Co.*, 2004 WL 5643969, at *5 (E.D. Tex. July 1, 2004). This phrase is well understood in the industry to describe computer processing, and FM asks nothing more than to apply this standard definition. *See* Ex. D to FM Br., ¶54; *see also* Ex. E1 to FM Br., at 260:5-23.

Google seems to want to bootstrap into these apparatus/method claims the structural requirements that accompany MPF claiming. This is improper. Despite ample opportunity to do so, Google has never contended that the '025 claims are in effect MPF claims. *See* P-R 4-1(a) (requiring early identification of such claims). Google, then, cannot now be heard to argue that MPF structural requirements should apply to these non-MPF terms. In any event, and although not required, the dependent claims go a step further by describing specific types of "processing." *See, e.g.,* '025, Claim 47 ("automatically applying or comparing"). And so does the specification. *See, e.g., id.* at Fig. 4d & 43:34-58, *id.* at 36:45.

### b.    Use of the word "or"[6]

Google does not like the word "or," but it has provided no clear and convincing evidence why the patentees' use of that word should invalidate their duly-issued claims. Google contends that the at-issue limitations are indefinite because "a person of skill in the art would be unable to determine the scope of the claim." G.Br. at 41. But the 1945 case on which Google relies involved an ambiguous claim limitation that is far afield from the limitations here.

FM explained in its Opening Brief why Google is incorrect, and Google has failed to provide clear and convincing evidence to the contrary. *See* FM Br. at 40-42. As Dr. Rhyne

---

[6] The at-issue limitations are "automatically applying or comparing the Internet MV design or style standards to the information input by the Seller or the advertisement," "automatically applying or comparing the Internet MV distribution factors to the information input by the Seller or the advertisement," "automatically applying or comparing the Internet MV presentation rules to the information input by the Seller or the advertisement," "computer controller processes the advertisement by automatically applying or comparing the Internet MV presentation rules to the information input by the Seller or the advertisement," and "design or style standards."

testified, one of ordinary skill in the art would not find these terms indefinite. Ex. D to FM Br., at ¶¶75-76, 85. "Design or style standards" are expressly defined in the Claim 47 of the '025 patent and in the Abstract as standards that "control the look and feel of the advertisement." *But see* G.Br. at 42 (contending, erroneously, that the phrase "design or style standards" appears "only in claims"). The patentees even provide specific examples of "design or style standards" such as color and font standards. *See, e.g.,* '025, Claims 50-53. With respect to the other disputed terms, the specification clearly discloses to one of ordinary skill in the art that the presentation rules may be applied to, or compared with, advertising content that is input by the Seller either as (1) a new advertisement or (2) as modifications to an existing advertisement. *See*, *e.g.*, '025, at 42:53-56: ("The information entered, either as a new presentation or as modifications to an existing presentation, can be sent to the Central Controller and Presentation Processor 1000 immediately or delayed for publication later.") (emphasis added). Even when an existing advertisement is modified, the PGP will reformat it (ensuring compliance with the presentation rules of the MV which it is published). *See*, *e.g.*, '025 specification, at 44:36-43.

Google appears particularly baffled by the words "apply" and "compare"—two words that have plain, ordinary, and separate meanings. The *Union Pacific* case cited by Google on this point is readily distinguishable. There, the plaintiff was arguing for a specialized and "complex" meaning of "compare" that was not explained in the written description. *See Union Pacific Resources Co. v. Chesapeake Energy Corp.*, 236 F.3d 684, 692 (Fed. Cir. 2001) (proposing to define "compare" as "the determination of TSD by correlation," which involves "a process of stretching and squeezing a TVD log by carefully choosing assumed bed dip angles"). Here, FM is proposing no such thing and instead is advancing a construction that is fully consistent with the specification and the plain meaning of the word.

Google has asked this Court to hold that it is impossible to construe five limitations and eleven duly-issued claims on the ground that these limitations/claims are "entirely subjective" and offer "no guidance" as to their boundaries.  But the scant two pages at the end of Google's brief hardly qualify as clear and convincing evidence of Google's extreme positions.

Google concedes that two of these terms—"design or style standards" and "look and feel"— relate to a MV's presentation rules. *See* G.Br. at 43; *see also, e.g.,* '025 Abstract (presentation rules include "design or style standards for look and feel").  Google then cites to a case as establishing that "terms that are completely dependent upon a person's subjective opinion are indefinite."  G.Br. at 43.  But these two terms, in the context of presentation rules (or any other context), are not "completely dependent upon a person's subjective opinion." G.Br. at 43 (citing *Datamize, LLC v. Plumtree Software, Inc*., 417 F.3d 1342, 1350 (Fed. Cir. 2005); *see Mass Engineered Design, Inc. v Ergotron, Inc.*, 559 F. Supp. 2d 740, 751 (E.D. Tex. 2008) (defendants failed to meet "high burden" of showing that the term "desired degree" "<u>depends solely on the user's subjective determination</u>") (emphasis added).  The words alone give the reader every indication of the type of presentation rules that are being implicated, and the patents solidify this understanding and resolve all doubt. *See, e.g.,* '025 Claims 50-53 (further describing "design or style standards," which the Abstract defines as standards for the "look and feel" of the ad, to include font, color, and size); *see also* Ex. D to FM Br., at ¶¶75-76 and Ex. E1 to FM Br., at 245:19 - 246:8 (confirming that one of ordinary skill would understand an ad's "look and feel" to be synonymous with appearance).  FM

---

[7] Google's "subjective" arguments are now confined to the "design or style standards" limitation and the "control the look and feel of the advertisement" limitation. Google originally contended that "blocked URLs" was indefinite as too subjective, but it now has dropped that argument and adopted FM's construction.

[8] The at-issue limitations are "computer program design filter," "computer program distribution filter," and "advertisement generation program."  The Court might wish to note that Yahoo originally proposed a construction for "advertisement generation program," which Google did not adopt (in light of its indefiniteness argument) and which FM rebutted in its Opening Brief.  Because Google has not advanced its own construction of "advertisement generation program," and because FM never asked for the term to be construed in the first instance, the Court need only decide the indefiniteness issue with respect to that term.

highlighted these points in its Opening Brief, but Google once again did not address them. Google also sidesteps its own website, which repeatedly uses "look and feel" to connote design, style, and appearance.

With respect to the remaining three terms, *see* n.8 above, Google appears to be arguing <u>for the first time</u> (though only via a single sentence) that these limitations should be construed as MFP limitations and therefore be subject to the structural requirements that accompany those limitations. Aside from being incorrect, this argument has been waived in light of Google's failure to identify these as MPF limitations in accordance with the Court's scheduling order. *See* P-R 4-1(a). In any event, FM explained in its Opening Brief why these limitations are not indefinite and cited two cases (ignored by Google) that refute Google's "purely functional" argument. The bottom line here, as elsewhere, is that Google has not offered clear and convincing evidence of indefiniteness—or, indeed, anything that comes close to it.

## CONCLUSION

For the reasons set forth herein and in FM's Opening Brief, FM respectfully requests that the Court adopt its claim constructions and reject Google's.

Dated: June 11, 2009                      Respectfully submitted,

/s/ Max L. Tribble, Jr.

Max L. Tribble, Jr. - *Lead Attorney*
 State Bar No. 20213950
mtribble@susmangodfrey.com
SUSMAN GODFREY LLP
1000 Louisiana, Suite 5100
Houston, Texas, 77002
Telephone: (713) 651-9366
Facsimile: (713) 654-6666

**OF COUNSEL**:

Joseph S. Grinstein
State Bar No. 24002188
jgrinstein@susmangodfrey.com

Justin A. Nelson
State Bar No. 24034766
jnelson@susmangodfrey.com

Jeremy J. Brandon
State Bar No. 24040563
jbrandon@susmangodfrey.com

SUSMAN GODFREY LLP
1000 Louisiana Street, Suite 5100
Houston, Texas 77002-5096
Telephone: (713) 651-9366
Fax: (713) 654-6666

## CERTIFICATE OF SERVICE

I hereby certify that, on June 11, 2009, a true and correct copy of the foregoing was served via ECF on all counsel of record.

/s/ Jeremy J. Brandon