1              IN THE UNITED STATES DISTRICT COURT
            FOR THE EASTERN DISTRICT OF TEXAS
2                     MARSHALL DIVISION

3  FUNCTION MEDIA, L.L.C.    :
                            :
4  VS.                      :        No. 2:07-cv-279(CE)
                            :
5  GOOGLE, INC., ET AL       :

6

7          *********************************

8                   REPORTER'S RECORD
                  MARKMAN HEARING
9                  August 25, 2009

10         *********************************

11  APPEARANCES:

12  (See Attached Sign-In Sheet)

13

14

15

16

17

18

19          Proceedings reported by machine shorthand,

20  real-time translation and transcribed with

21  computer-assisted transcription.

22

23  Deputy Court Reporter:   Judith G. Werlinger, CSR

24

25

# INDEX

                                                    Page

FOR THE PLAINTIFF:

Mr. Tribble............................  4

Mr. Grinstein.......................... 31

Mr. Nelson............................. 42


FOR THE DEFENDANT:

Mr. Verhoeven.......................... 54


REBUTTAL FOR THE PLAINTIFF:

Mr. Nelson............................. 123

Mr. Grinstein.......................... 132

Mr. Tribble............................ 134


**PLAINTIFF'S** MOTION TO COMPEL and **DEFENDANT'S** MOTION
for PROTECTIVE ORDER to PRECLUDE DEPOSITIONS of THREE
TOP-LEVEL GOOGLE EXECUTIVES

FOR THE PLAINTIFF:

Mr. Nelson............................. 140

FOR THE DEFENDANT:

Ms. Candido............................ 146

REBUTTAL FOR THE PLAINTIFF:

Mr. Nelson............................. 152

Adjournment............................ 156

Court Reporter's Certificate........... 157

# PROCEEDINGS

1
2          COURT SECURITY OFFICER:  All rise.
3          THE COURT:  Please be seated.
4          All right.  Got a claim construction
5 hearing set in Case 2:07-cv-279, Function Media against
6 Google.
7          What says the Plaintiff?
8          MR. TRIBBLE:  Plaintiff is ready, Your
9 Honor.
10          THE COURT:  Mr. Tribble.
11          For the Defendants?
12          MR. GILLAM:  Your Honor, on behalf of
13 Google, Gil Gillam.  Also, we have Charles Verhoeven, Ed
14 DeFranco, on the back row, Amy Candido and Jason Wolff,
15 and on behalf of Google with us today is Shana Stanton
16 and Doug Hudson.  We're ready.
17          THE COURT:  Mr. Gillam.  Good to see all
18 of y'all.
19          All right.  Pass out the awards first.
20          Thank you for your agreements, I guess,
21 that you sent in.
22          You need to -- I've got an hour and a
23 half a side set -- you know, set aside to conduct the
24 hearing, and then I'll go into the issues related to the
25 protective order, the motion to compel, after we

1   conclude the Markman presentation.

2                  But, Mr. Tribble, who's going to speak on

3   y'all's side?

4                  MR. TRIBBLE:  Your Honor, I'm going to

5   speak and then Mr. Grinstein is going to speak, and

6   Mr. Nelson is going to speak.

7                  THE COURT:  All right.  Well, y'all need

8   to know the usual rule -- well, are y'all wanting to do

9   this term-by-term, or y'all want to do it just the

10   standard way I would do it?

11                 MR. TRIBBLE:  We've arranged our

12   presentation according to the standard way that the

13   Court proceeds.

14                 THE COURT:  Okay.  Well, you -- then in

15   that case, you need to use at least half of your time in

16   your opening presentation or you're going to be limited

17   to a like amount of time in rebuttal.

18                 MR. TRIBBLE:  I understand, Your Honor.

19                 THE COURT:  You may proceed.

20                 MR. TRIBBLE:  Thank you.

21                 And, Your Honor, I didn't make

22   introductions, but with me today is Joe Grinstein and

23   Justin Nelson, Otis Carroll, Charlie Ainsworth, and

24   Calvin Capshaw.

25                 Also, we have our client, the president

1  of Function Media and the inventor, Mr. Michael Dean.

2  THE COURT: Okay.

3  MR. TRIBBLE: Your Honor, we've arranged

4  our presentation in the manner shown. I'm going to

5  speak first about the proper function and structure of

6  the means-plus-function claims in the '045 patent; then

7  Mr. Grinstein is going to discuss the law and apply that

8  law to the issue of whether the claims are indefinite or

9  not; and then Mr. Nelson will cover the terms in the

10  '025 and the '059 patents.

11  And so just going through it, this is

12  Claim 1 of the '045. Four of the five

13  means-plus-function terms that are in dispute are in

14  this patent, and the first one is the means for applying

15  corresponding guidelines of the media venues.

16  The parties agree that the function of

17  this is just what it says, to apply the corresponding

18  guidelines of the media venues. They disagree as to the

19  structure. And this slide sets out both sides'

20  contentions.

21  Now, I should say that Google's first

22  position is that this claim is indefinite; but in the

23  alternative, it proposes the structure set forth in the

24  right column. And basically is -- we have identified

25  the structure for the means-for-applying term. It is a

computer software executable on a processor capable of
identifying one or more selected media venues for
publication, accessing data representing each identified
media venues guidelines, accessing data representing
Seller information, and executing a systematic sequence
of mathematical or logical operations upon the accessed
Seller information to create a presentation customized
for each identified media venue in a form that complies
with the accessed guidelines of the media venue, plus
any equivalents of that structure.

So here's the -- the primary dispute as
to this term is basically where are the presentations
which include advertisements?  Where are the
presentations being created in the system?

As we saw, Claim 1 is a method claim, and
it is a method of using a network of computers.  And so
there are computers, the Seller has a computer, the
media venue will have a computer, and then there's a
central system.  It's set forth in Figure 1b in the
patent, and there's a central processor.

Function Media believes that the
specification clearly discloses that the ads or
presentations are created by the Presentation Generation
Program, or the PGP, which is located at the Central
Controller and Presentation Processor which is Item 1000

in Figure 1b.

And so we believe the -- the spec clearly discloses that it's created in the Central Controller, the -- the central computer system operated by the system operator.

Google, on the other hand, maintains that the ads or presentations are created by the Seller, and let's walk through that.

The disclosure is pretty clear, in our view, that the PGP at the central computer is where the guidelines are applied in this set.

And first of all, the Presentation Generation Program, the very name of that software module itself says that it's -- it's -- it's the presentation generator right there. But if that's not enough, over and over again in the spec, it says the Presentation Generation Program creates a presentation for each and every media outlet.

And I've listed these and have the citations in the slides, and so I won't walk through them word-for-word. But it says it over and over and over again in the spec. And this is a point that in the briefing was unresponsed to by Google. I'm not sure what they're going to say about this.

Now, here's the basis of Google's

argument.  The preamble of Claim 1 is as shown on the

slide, and it talks about that it's a method of using a

-- a network of computers to contract for, facilitate,

and control the creating and publishing of

presentations, comma, via Seller, comma.  And so that's

basically -- in their specifica -- there's certain parts

of the specification that they pull out, but this is the

gist of it.

But in fact, when you look at the

language, it's clear that the Seller -- the only sense

that the Seller is creating a presentation is through

the use of the invention, through the use of a network

of computers.

It's a method of using a network of

computers.  The Seller's using it, the media venues are

using it, the central operator is using it.  They're all

using it to create presentations, but it's -- it's

actually -- the central system itself is actually

creating and generating the presentations.

Is that by the Seller or on behalf of the

Seller?  I suppose you could say that.  It's just like

someone could say they're -- as we say in our brief, you

could say, well, I made coffee, but, you know, it's the

coffee pot that's actually making the coffee.  And

that's basically the situation that we have here.

1                    And -- and I'll just point out, at the

2      end of the claim, there's a whereby clause that -- we'll

3      talk about it a little later -- but the

4      means-plus-function elements are all elements that the

5      en -- the entire claim is modified by, whereby the

6      Seller may -- one of the things they may do, it says

7      create a presentation that complies with the guidelines.

8                    But it also says, and transmit the

9      presentation to the selected media venues.

10                    I don't think there will be any dispute,

11     Your Honor, that the Seller does not transmit anything

12     directly to the media venues.  It -- the Seller -- the

13     only thing transmitted is from the central system to the

14     media venues.  I think that point will be undisputed,

15     and so this -- this language about what the Seller can

16     do in a -- in some sense, it doesn't mean that the

17     Seller's actually creating the presentations.

18                    In column 41 of the specification, for

19     example, it -- this is a discussion of using

20     presentation rules on the Seller's computer.

21                    But if you read what it says, it says:

22     In -- in the software that's on the Seller's computer is

23     the PACP, the Presentation and Configuration Program.

24     And it says right here it would prompt the Seller for

25     the necessary optional information to complete the

1 presentations.

2 And in -- if you look in the flow charts

3 at Figure 4g, for example, I believe it's -- excuse me,

4 Figure 4a. It's Item 11142. If you look at that item

5 in the flow chart, it -- basically it says that the

6 guidelines are being used to restrict the input by the

7 Seller. That's how it's described in the flow chart,

8 not as generating a presentation. And this talks about

9 -- this column 41 talks about controlling and monitoring

10 the input of information.

11 And so are the rules present at the

12 Seller's computer in the preferred embodiment? Yes.

13 But are they being used to generate a presentation at

14 the Seller's computer? No. Not a presentation that is

15 the object of the invention, the presentations that are

16 being transmitted to the media venues. It's a

17 restriction on input.

18 And as I said, Google has no answer for

19 the mountain of references in the spec that say that

20 it's the PGP in the central computer that creates the

21 ads or presentations.

22 Another reason that Google's argument is

23 wrong is the specification makes clear in column 42 that

24 the only mandatory application of the presentation rules

25 occurs at the PGP.

1          And this language here in lines 48

2 through 50, after saying that the PGP generates the

3 presentations using the guidelines, it says:  This

4 duplication of function also ensures that the latest

5 version of the presentation rules database has been

6 applied to every presentation.

7          It talks about duplication of function

8 and redundancy.  Because the rules are in use at the

9 Seller when they're inputting the information, but --

10 and then they're used again to create the presentations

11 at the PGP.

12          But note, the real version of the rules,

13 the only version that you can be sure are the actual

14 guidelines of the media venues, which that's what's

15 required by this function, it has to apply the

16 corresponding rules of the selected media venues.

17          The rules -- the only copy of the rules

18 that's always up-to-date is the copy of the presentation

19 rules that are at the PGP.  Because the Seller could

20 input information using a set of rules, but those rules,

21 even though they're synchronized, the rules come from

22 the media venue into the central computer to the PGP.

23 And so those changes are eventually replicated to the

24 Seller's side.

25          But the only current version of the

rules, which is what the claim language and the function of this term requires be applied, that's the only place that that's always residing is at the PGP.

THE COURT:  Well, even though or even assuming the PGP is the program that's performing the function, don't you still have to drill down and show me what algorithms are being carried out?

MR. TRIBBLE:  Well, we believe we've done that in our language.  We have those four steps --

THE COURT:  I mean --

MR. TRIBBLE:  -- to walk through.

THE COURT:  Well --

MR. TRIBBLE:  The algorithm -- you know, they have to obtain the rules, obtain the information for the ad and -- and go through it.  And then for each rule, the specification discloses that there are many different types of rules.  And for each rule -- you know, the software would implement each rule on the information supplied by the Seller, which is disclosed in the specification.

The -- and this -- just hitting this creation argument of whether it's created at the central computer by the PGP module -- software module on the Seller's side, even if there's some activity going on on the Seller's side, the only required mandatory

application of the guidelines is being done at the PGP,

because those are the presentations that are then

transmitted to the media venues.

And so what that means is, in this

invention, the -- the other use of rules being made at

the Seller's computer is not required for this

invention.

Under the **Wenger** case, the structure --

you should not -- the Court should not import structural

limitations from the written descriptions that are

unnecessary to perform the claimed function.

And so in this case, the invention would

work fine if there were no presentation rules, nothing

was done with them, and the Seller's side, they just

input the information.  It says, the checking is done by

the PGP, and that information is used to create the

presentations.  That's all that's necessary.  And so it

would be improper to import additional structural

limitations.

You know, we cite column 43 in the

specification where it talks about new presentations are

created in their entirety at the PGP.  This is not a

joint creation.  The creation of the real presentation's

going on at the PGP.

Now, I did want to point out something

1 from the file history.

2     The original Claim 1 of the '045 as

3 applied for, didn't contain this limitation, the means

4 for applying limitation. And we've set -- set out the

5 history in this slide that the Examiner rejected Claim 1

6 due to a prior art reference named Mandeberg.

7     And in the response to that office

8 action, the response dated January 22nd, 2002, the

9 applicants amended their claim to add the means for

10 applying and argued that that distinguished Mandeberg by

11 adding a creation element to the claim.

12     And look at what they said. And this is

13 the intrinsic evidence. This is right in the file

14 history. The creation of multiple open-access

15 presentations being done without the Seller making

16 changes within a code editor is new to the art, and

17 being practiced only within our invention and its

18 commercial application.

19     And so this shows that -- you know, this

20 confirms that the creation is going on in the central

21 system, and that the -- anything going on at the

22 Seller's side is superfluous.

23     And, again, in the notice for allowance,

24 the Examiner actually noted that the closest prior art

25 did not disclose a system for selecting media venues

owned by other than the Seller and creating a

presentation that complies with the proper guidelines.

And then amazingly, on the final point on

this creation issue, Google's own expert -- we asked him

in deposition where the presentations were being

generated.  We actually pointed out the Presentation

Configuration Program -- and the Presentation Generation

Program, and he said we were right, that Google, it's

new argument is just wrong.  It's the Presentation

Generation Program that does the creation.

Now, the next term is means for

transmitting said presentations to a selected media

venue of the media venues.

And, again, Google says this term is

indefinite.  Mr. Grinstein will address that in more

detail.  But the structure disclosed in the spec is

computer software executable on a processor capable of

initiating a data transmission to a specified electronic

destination, and equivalents.

Now, to -- I think it's implied -- it's

implicit in our proposed construction, but we did last

night put a little more granularity.  And you had asked,

you know, about drilling down in -- in steps, and so we

believe that --

THE COURT:  Well, I'm not sure how far

1 down you got to drill.

2         MR. TRIBBLE:  Of course.

3         THE COURT:  -- but -- but I -- but I know

4 you have to start.

5         MR. TRIBBLE:  Of course, Your Honor.

6         And so we're happy with our original

7 proposed construction; but if it pleases the Court to

8 have more detail about what steps the software module is

9 performing, we've set it out in this slide, and

10 basically it's programmed to recognize each of the

11 selected media venues, obtain the location of each of

12 those venues, and initiate the transmission to those

13 venues.  And we incorporated some of the language, I

14 believe, out of Google's proposal by putting in the

15 phone lines and the network and Internet connections.

16         And -- and basically here we set out the

17 support in the spec for each of these parts of the

18 structure.  It refers -- it mentions that the PGP

19 transmits the information.  I want to point out, it

20 transmits the presentation to the appropriate

21 destination.  That's the appropriate selected media

22 venue and the address.

23         The components about the Internet and the

24 phone lines, et cetera, come from column 13.

25         And then also in Figure 4g it

specifically calls out in flow chart forum that the

Central Controller and Presentation Processor, that's

where the PGP resides, it identifies internal directory

indices and references affected by edits or new

presentation and adds to the required publication list,

and then it publishes.  And that's basically the steps

that are set out in the construction that I just showed

the Court.

The next term is means for a Seller to

select.

Again, Google says this is indefinite;

but in the alternative does propose structure.  And we

believe we've set out the proper structure of this

software component of the invention.  It's basically

software executable on a processor capable of presenting

electronic forms, allowing the selection of media venues

and equivalents.

And, you know -- you know, basically the

software, it presents the forms that the Seller can use

to input the information, and then it recognizes the

Seller's responses.  And that's the means by which the

Seller selects the media venues.  And the supporting

spec is partly in column 40.

Oh, this is an important part, Your

Honor, and we'll talk about this.  But basically the

1  spec makes clear that the -- basically these are aspects

2  of the Seller interface that we're talking about, and

3  the Seller interface, it's called out in the spec in

4  column 40.  That's sent by the system operator to the

5  Seller on CD-ROM or DVD or a download file can be

6  transmitted to them, and then it's installed on the

7  Seller's computer.

8              And I just wanted to point out that the

9  Seller's getting the software module from the system

10  operator, and then installs it on his computer.

11              And it talks about how it allows the

12  Seller to choose the venues.  And then it sets forth in

13  column 40 and 41, in Slide 34 here, this quoted part, it

14  talks about the Seller is presented with a series of

15  forms containing yes/no choices, text entry area --

16  areas, menu-driven choices, and other data and

17  information entry methods, and it leads the Seller

18  through the process.  And so that's basically the

19  structure for the means for a Seller to select.

20              THE COURT:  Basic user interface --

21              MR. TRIBBLE:  Yes, Your Honor.

22              THE COURT:   -- is what you're saying?

23  Okay.

24              MR. TRIBBLE:  Now, one argument I'm --

25  that we thought had gone away during the briefing, to be

honest, but then when we were trying to work out

agreements on certain aspects of the proposed

constructions, it became apparent that Google is

sticking with this idea that hardware must be

incorporated in every single one of these

means-plus-function terms.  And we just believe that's

improper, and -- and here's why.

First of all, the claim is a method of

using a network of computers which is necessarily done

through software.  Each of these aspects have software

that relate to the using of the network of computers.

Each claim element begins with the word

"providing," and this is important.  The claim is

written -- as I said, there -- Sellers are using the

network, media venues are using the network, system

operators are using the network.  They're all using it

to do the -- to accomplish the things in the whereby

clause, you know, by creating the presentations and

transmitting them.

This claim is written from the viewpoint

of the system operator because it's the only one that's

doing any of the providing of any of these items.  And

-- and this is important.

You know, for example, we just saw, a few

slides ago, providing means for the Seller to input

information.  We saw how the system operator would

literally send a CD-ROM or transmit a download file to

the Seller and the Seller would then install it on the

Seller's computer.  Okay?  Not the system operator's

computer, but -- and so this is written from the

viewpoint of the system operator.

This -- this installation of the Seller

interface and the media interface is made clear in the

example at the end of the patent, right before the

claims in column 53.

DEF is a media venue, and it talks about

how the system operator sends the necessary software to

the media venue DEF, and the DEF installs the software

on their computer, the media venue computer.

Same with the Seller Interface in column

54.  The system operator sends the software to be

installed to the Seller.  The Seller installs it at the

Seller's computer.

The patent never contemplates or

discloses that the system operator provides any of that

hardware to the Seller or to the media venue.  And, in

fact, it disclaims it.  It shows just the opposite,

okay, that they already have their computers.  There's

this preexisting network of computers that can

communicate to -- together over the Internet or so

forth.  But what's being sent out or provided is the

software, not the hardware.

And so what that means is, not -- not as

to every element.  We saw means for transmission that

does have a hardware component, but the preferred

embodiment disclosed -- it doesn't have any providing of

hardware for means for Seller input, means for Seller

selecting media venues, means for media venue to submit

information about guidelines.  It doesn't have -- and so

including hardware in those terms would exclude the

preferred embodiment, which we know from *Vitronics* is

rarely, if ever, correct.

And so what's being disclosed as to these

aspects to a person of ordinary skill, they would look

at this providing.  It's providing a software module,

and that's why the structure is the software.  And we

refer the Court to Judge Davis' very recent opinion in

the *IP Innovations* case where he construed the term

"control means," and he specifically in the last

paragraph of his -- and we have made the Court aware of

this through a filing of notice of supplemental

authority, I believe -- the -- but it talks about that

the means -- when discussing "control means," the means

specified in the patents call for structure within the

executable program that inter -- interacts with the

workspace data structure.

And he notes that it -- it is, of course, the user who makes a selection of workspace displays through the use of a pointer control device, such as a mouse, and thus the control means must necessarily be those program components that facilitate the user selection of the workplace -- workspace. But he concludes therefore the structure recited in the specification for the control means term is executable computer code implementing selectable graphical user interface pop-up menus and icons and equivalents. It's just a software module and none of the hardware.

And so if you look at it, this invention -- okay, this invention, it doesn't include all these hardware aspects that Google is trying to load up into the structure.

And as I said, basically what we're talking about on the means for inputting and the means for selecting, these are aspects of the software code that is the Seller Interface. And, you know, we asked Yahoo!'s expert -- Yahoo! is no longer in the case, but they were a Defendant and fighting vigorously at the time. And their claim construction expert, you know, he confirmed that it's actually the software that does the prompting. The prompting is used for the means for

selecting the media venues.  That's what's being

discussed here.

Dictionary definitions confirm.  The

Microsoft Computer Dictionary from 1999 confirms

Definition No. 2, software that enables a program to

work, et cetera, is software.  It doesn't say hardware

and software.

Ironically -- and I'll be honest, I don't

remember if it was Google or Yahoo!, one of the

Defendants in the -- their claim construction expert was

relying on the Microsoft Computer Dictionary, but on a

prior version that I believe said --

THE COURT:  Some parts of it may be

correct, Mr. Tribble.

MR. TRIBBLE:  The -- and so it was

recognized as authoritative.

But then, of course, the application data

of the patent is closer in time to 1999 than it is to

that prior version.  And, of course, the 1999 definition

supports our position and refutes Google's, and it was

Yahoo!'s expert and he did admit that it defines the

interface as software.

And he then had to admit at the end that

if he were rewriting his expert report today, noting the

application date of the -- the '045 patent, that he

would certainly use our version, the 1999 dictionary, and not the prior one that he had decided.

And now here's another example in the specification where it makes clear that the invention doesn't include the Seller's computer or the media venues's computer. It says in column 5, the present invention partially resides on the Seller's computers. Hardware doesn't reside on hardware; software resides on -- on hardware.

A person of ordinary skill looking at this would understand that the invention as to the Seller and media venue interfaces is just a software.

That's what the invention is because it's -- it's residing on the Seller's computers, and because the operator is not providing -- as required by the claim language, is not providing any hardware, other than what hardware is present in the central system, such as part of the means for transmission, for example.

And so looking at that, a person of -- of ordinary skill would understand that the structure of this aspect of the invention, the structure of the invention is just software.

Google's own expert did make some admissions himself. He had drawn a -- a diagram of what he felt was the user interface, and he didn't include

any hardware in that; it was only the software modules.

He understood that it was software.  He admits there's

no -- no hardware included in how he represented the

user interface.

And -- and as I said, we honestly thought

that this issue had been dropped.  We briefed it for

three pages in our opening brief, and the only response

ever in any briefing by Google is one-and-a-half lines

in a footnote.  And they say, while the specification,

indeed common sense, dictates that hardware, such as the

computer, is a necessary part of an interface to the

claimed system, the critical issue is where the

interface is located.

And so that goes as to the creation issue

which I discussed earlier.  You know, the -- the

statement about the interface, of course, is refuted by

Google's own expert where he admits that the interface

is just software.

Now, the next term is means for the

Seller to input information.

I referred to this, and -- and we've set

forth the structure here.  It's computer software

executable on a processor capable of presenting

electronic forms allowing the Seller to input

information, and equivalents.

1            And this is the only means-plus-function

2 term where there's a dispute over the function.  We say

3 that the function is what it says, it's enabling a

4 Seller to input information.  Google says it's input

5 information to do all of the following...which basically

6 sets forth every aspect of the invention.  Okay.  And

7 the basis for their argument is -- is simple.

8            Here is a blowup of a picture of Claim 1

9 as it's shown in the '045 patent.  There's a whereby

10 clause.  And so basically Google argues that that

11 whereby clause modifies only limitation e).  And we say

12 no, no, no.  That's -- you know, that's an object of the

13 invention.  That's what the invention as a whole is

14 doing.  It's -- it's achieving those or performing

15 those, you know, selecting of the venues, the crea --

16 creation of the presentations and transmissions and so

17 forth.  And the reason we say that is very simple.

18            One of the things -- as I pointed out

19 earlier, one of the things is it transmits the

20 presentation to the selected media venues.  That's not

21 part of the Seller inputting information.  If you look

22 at Diagram 1b, it's just not in there.  If you look at

23 the flow charts in Figure 4 -- Figures 4a through g,

24 it's just not in there.

25            The Seller doesn't transmit anything to a

media venue.  The Seller only transmits information to the central processor.  It's the central processor that does the transmitting to the media venues.

And so this whereby clause can't possibly be modifying limitation e).  It's -- it's applicable to the claimed invention as a whole.

We point out that there are semicolons after A, B, C, D, and E, and then there's the whereby clause.  A semicolon indicates it's just not part of limitation e).

This is -- might seem a little hypertechnical, but I mean, it's just so clear.

Limitation c), the first line goes all the way to the right.  It's right-justified because it was all typed in as one line of text with no carriage return.

Limitation e) doesn't go all the way to the right.  If -- if they even put the semicolon and then put space whereby to keep modifying just limitation e), then the information, semicolon, would have been right-justified as the first line of element c) is.  Instead, they hit a carriage return, because it's not modifying just limitation e).

We also dug up the file history.  It says "need site."  This is in the amended application that I

referred to earlier.  But you can see again when element

-- when Claim 1 was submitted, the amended Claim 1,

it -- there's a little extra space between element e)

and the next line where the whereby clause starts.  And

you can see the information, it's -- the first line of

element e) is not right-justified.

And so just for comparison to Claim 1 of

the '025, it does have a whereby clause that only

modifies a particular element, and it was typed without

a semicolon, typed together on the same line,

right-justified, et cetera.  It's completely different

than Claim 1 of the '045.

The structure we cited, just briefly

here's the support for that structure that's in the

specification, column 17, lines 25 through 45.  It's --

calls out that the Seller Interface or the CAPC will

prompt the Seller for necessary information in

presentations they have selected.

The flow chart talks about the facilities

operator -- that's the Seller -- entering, editing --

excuse me, the media venue entering, editing, updating

presentation information.  Excuse me, that is the

Seller.  I apologize.

And -- and finally, in Claim 5 of the

'045, it's a dependent claim and it adds the following

means-plus-function: Means for said media venue to
input said guidelines and information.

Again, we've set forth the structure as
-- as previously discussed. This is -- the invention is
software that's sent to the media venue and resides on
their computer. So the structure of this invention is
this software element as we've set forth.

The -- the support in the specification
is in columns 33 and 53 as set forth here. It talks
about prompting and the setting of standards.

And basically, Your Honor, we believe
that we've set forth the appropriate structure for each
of those means-plus-function claims as they relate to
this invention as disclosed in the specification.

Thank you.

Now Mr. Grinstein will talk briefly.

THE COURT: Before you --

MR. TRIBBLE: Yes.

THE COURT: -- pass the ball to your
colleague, back on the means for transmitting.

MR. TRIBBLE: Yes, Your Honor.

THE COURT: You had --

MR. TRIBBLE: Do you have the -- okay.
I've got it.

THE COURT: You had supplied, I guess,

1  updated constructions.

2                MR. TRIBBLE:  Can you go to 29?

3                THE COURT:  Are there cites that you can

4  point me to in the specification where the patentee

5  linked these steps to the function?

6                MR. TRIBBLE:  Oh, yes, Your Honor.

7                THE COURT:  And I may have missed it.  I

8  think that you said it was implicit in your other

9  construction.

10                MR. TRIBBLE:  It was.  It was.  And

11  certainly column 3, lines 31 through 34, talks about the

12  PGP transmits the presentation to the appropriate

13  destination.

14                And so -- and so that -- it recognizes

15  the appropriate destination and obtains the location for

16  the transmission.

17                And in Figure 4g, it talks -- it doesn't

18  say PGP.  It says the Central Controller and

19  Presentation Processor identifies the internal directory

20  indices and references affected by the edits and adds

21  the required publication list.

22                And basically these directories and

23  indices are shown as Item 3000 in Figure 1b.  And so we

24  believe that's the disclosed -- disclosure of the

25  structure for that element.

                    THE COURT:  Thank you.

                    MR. TRIBBLE:  Thank you.

                    MR. GRINSTEIN:  Your Honor, my name is
Joe Grinstein.  I'm going to be discussing the issue of
whether or not the claims of the '045 are indefinite, an
argument that's been raised by Google.

                    Google has contended that each of the
means-plus-function claims in Claim 1 of the '045 and
then again the additional limitation in Claim 5 of the
'045 are indefinite.

                    And as this Court is well aware, the
indefiniteness arguments that Google is asserting puts a
heavy burden on Google.  Because the '045 patent was
issued; it's entitled to a presumption of validity; and
for that reason, in order for Google to prevail on its
indefiniteness arguments, it's got to show by clear and
convincing evidence that the claims of the
means-plus-function claims are indefinite.

                    Now, what exactly must be disclosed to
make a means-plus-function claim covering software
definite?

                    Well, the Federal Circuit acknowledged in
***WMS Gaming*** and in the ***Aristocrat*** case, the patentee has
to disclose some sort of an algorithm in order to make a
software claim definite.  But what exactly does that

mean?

Well, as the cases have further explained, an algorithm is simply a logical operation. It's a series of steps that the processor undertakes in order to perform a particular function. And that algorithmic disclosure does not have to be extensive. It doesn't have to include source code. That's what the *Aristocrat* case says. It doesn't have to be highly detailed. That's also what the *Aristocrat* case says.

As Your Honor acknowledged in the *SuperSpeed* case, a similar sort of language, there have -- doesn't have to be some extensive entire detail algorithmic disclosure in order to make a means-plus-function software claim definite.

So in short, the test is, there's got to be a description of an algorithm or a logical operation. But there's no need to disclose code, there's no need to disclose a highly detailed mathematical algorithm, none of that. Just what needs to be disclosed is a series of steps in order for a processor to perform a function.

And this inquiry as to definiteness heavily favors the patentee.

As the Federal Circuit mentioned in the *Biomedino* case, which is also a means-plus-function software indefiniteness issue, that the specification

must contain structure links to claim means, but that is

not a high bar.  All the patentee has to do is recite

some structure.  And, in fact, if the issue is even

close on indefiniteness, the patentee wins.  The Federal

Circuit explained that well -- as well in the ***Exxon***

***Research*** case.

So let's talk about the first

means-plus-function claim that's at issue, the first

means-plus-function limitation that is in Claim 1 of the

'045, the means for applying.

As Mr. Tribble indicated, this is the

structure that Function Media has identified for the

means-plus-function claim means for applying.  I'm going

run quickly through each of these elements of the

algorithmic disclosure that Function Media made in the

'045 patent.

The first thing that Function Media did

was tie this means for applying down to the Presentation

Generation Program 1710.  You can see the discussion of

1710 in Figure 2a of the '045 patent.

And the algorithm is a step-by-step

process perceived as follows:  The PGP first -- it

actually doesn't have to be first -- but the PGP

identifies one or more selected media venues for that --

for which there's going to be a publication.  The patent

describes that. Column 43 of the '045 talks about how

the PGP identifies specific media venues to which ad

content's going to be published.

The second thing the PGP does is it

accesses the data representing each of those media

venues' rules. Again, the '045 describes that in column

17, talks about the PGP access -- accessing a database

having the rules for the various media venues. Further

discussion in column 17 at 54 as to that particular

element.

Then the PGP accesses data representing

information from the Seller that the Seller has input in

terms of ad content. Again, the '045 talks about that

in column 18, among other places, how the PGP accesses

the information from the Sellers and is held in the

presentation database. See further disclosure of that

in column 17.

And, finally, the PGP processes -- it

executes mathematical or logical operations upon the

Seller information that its accessed and upon the media

rules that is accessed to create and format a final

presentation.

There's a variety of disclosures of that

in the specification. Mr. Tribble ran through about 10

or 12 of them in a row. I've decided a few

representative examples.

You see Figure 4e talking about that formatting step that -- that occurs. The '045 patent at column 43 does the same thing.

So, in sum, the specification provides more than sufficient disclosure of an algorithmic operation.

The first step, as we discussed, is a media venue is identified. Then the PGP obtains the data for that media venue's rules. Then the PGP obtains the data from the Seller regarding content. Then the PGP applies that data to the media venue data to create a presentation that complies with all of those rules. And then it repeats all that as necessary for the appropriate media venues. That is the algorithmic disclosure in the '045.

And importantly, Function Media presented expert testimony to this Court from Dr. Rhyne, one of ordinary skill in the art, testified that somebody of his skill would understand from the specification that that is the particular algorithmic disclosure that Function Media made with respect for the means for applying. That's in his report at page 8.

So what are Google's indefiniteness arguments? I think it summarizes them at page 6 of its

brief, and you can break them into three basic
arguments.

First, Google contends that all Function
Media is really doing is disclosing a desired result.

Second, it complains that F -- Function
Media has failed to disclose a step-by-step algorithm.

And third, Google complains that Function
Media's disclosure doesn't explain every possible
example of ad creation and therefore it's in --
indefinite.  All of those are untrue.

First of all, Function Media did not
merely disclose the desired result in its structure.  If
that were the case, you would hear Function Media here
asserting a structure for this claim that was a means
for applying a software running on a microprocessor that
applies rules.  That would be an example of a structure
that merely discloses the desired result.

But, of course, that wasn't Function
Media's disclosure of algorithm.  That's not our
asserted structure for this particular claim term.  I've
just discussed that.

The second thing Google argues is that
Function Media has failed to disclose a step-by-step
algorithm and failed to identify that as part of the
structure.

Again, as I've just explained, there is a multi-step algorithmic disclosure for this particular function, for the means for applying. There's extensive specification discussion of all of the steps of that particular structure. There's flow charts that are included within the patent, and if additional testimony, additional evidence was needed, Function Media presented expert testimony confirming the existence of that structure to someone of ordinary skill in the art.

And the final argument that Google asserts is that Function Media has to explain to the public, via the patent, every single potential element or every potential scenario by which a presentation could get created. And so it gives the example in the brief that Function Media has failed to disclose how the invention could create a radio ad, how the invention could create a television ad, so on and so forth.

But what Google is doing right there is really trying to back door code argument into the case. Because the only way that Function Media could possibly disclose every theoretical example of how the PGP could create a presentation would be to include a ton of code within the patent disclosure to explain every single particular little element of the issue of means for applying.

1          And, of course, the Federal Circuit

2 doesn't require that.  It's explicit that all you need

3 is a generalized logical operation.  You don't have to

4 have a disclosure of code.

5          But, essentially, that's what Google is

6 asking for with respect to this claim term.

7          Now, each of the parties have identified

8 to this Court supplemental authority on this particular

9 issue.  Google submitted supplemental authority, the

10 **Blackboard** case.  Function Media identified supplemental

11 authority, the **IP Innovation** case.  Both of these cases

12 have come out in roughly the last month.  I think it's

13 instructive to talk about those cases at this particular

14 point because the analysis in both of those decisions

15 supports Function Media's structure in this case.

16          The first case is the **Blackboard** case.

17 It's a Federal Circuit decision.  The claim term at

18 issue in the **Blackboard** case was means for assigning a

19 level of access to and control of each data file based

20 on a user of the system's predetermined role in a

21 course.

22          And the patentee in **Blackboard** said the

23 structure for that means term is simply a server

24 computer with an access control manager, an ACM, and

25 equivalents thereof.

And I've reproduced right here the entire specification support for that particular structure that was cited in the Federal Circuit **Blackboard** case. Two sentences. The first sentence said the ACM creates an ACL, which is an access control list. And the second sentence says there are various restrictions that you might see in that particular access control list. That was the extent of the structure disclosed, nothing else.

The Federal Circuit looked at that and concluded that in this particular instance the ACM is just a black box that performs recited function and how it does it is left undisclosed. And for that reason it shot down that particular means-plus-function software term.

Here, on the other hand, Function Media has easily satisfied that particular rule because Function Media has described the means by which the PGP creates a formatted ad, described the inputs for that particular ad, it described the process for that ad, it has -- it went on for far more than two sentences in the specification describing that algorithm, and it included flow charts, and on top of all that, had an expert, Dr. Rhyne, confirm that structure.

So Function Media easily passes the **Blackboard** rule in this particular case.

1              The second piece of supplemental

2   authority that's instructive here is the *IP Innovation*

3   case.  This is a district court opinion from Judge

4   Davis, and this particular opinion is interesting for

5   several aspects.

6              First, it follows *Blackboard* and cites

7   and applies the *Blackboard* rule.

8              Secondly, it issues -- it deals with the

9   claim term display object means for generating a display

10  object.  In other words, a generation term, much like in

11  this case we're talking about generation of

12  presentations.

13             The structure that the patentee asserted

14  was there, simply displays system object, and its

15  equivalents.  And here's the entirety of the disclosed

16  structure that the *Blackboard* patentee cited in support

17  of that particular means.

18             The first paragraph up top there from the

19  '412 patent and then just those two highlighted lines at

20  the bottom, that's what's discussed in the *IP Innovation*

21  case.

22             Judge Davis applies *Blackboard* and *IP*

23  *Innovation* and says that the relevant inquiry under

24  *Blackboard* is whether or not a person of ordinary skill

25  would understand from the structure of the patent what

the algorithm disclosed is.  And Judge Davis concludes that, in that particular instance, it was easily understood by persons of ordinary skill.  And in so doing, Judge Davis rejects the Defendant's argument which was you didn't tell us a sufficient number of instances of how it generates those display objects.  We need to see in every particular instance how a display object could possibly be generated.

Judge Davis says, no, that's not what's required under the Federal Circuit case law because to do that would require the disclosure of code.  And, again, Function Media easily satisfies the standard that Judge Davis instituted in the *IP Innovation* case for satisfying the *Blackboard* rule.

There are four other means-plus-function terms that Google has asserted are indefinite.  It spends about one-and-a-half pages in its brief doing that.  Not much argument as to any of those particular terms.  That alone probably indicates that Google hasn't asserted clear and convincing evidence as to indefiniteness.  I will run through them quickly.

The means for transmitting.  Function Media's structure is disclosed there.  There's also the alternate construction which Mr. Tribble discussed with you.  And as you'll recall, he identified the structure

1    for that transmission upon this Court's questions.

2              Means for a Seller to select the media

3    venues.  Again, the disclosure of the step-by-step

4    process for selecting the media venues is identified by

5    Function Media, and it appeared -- the structure

6    supporting that appears, among other places, at columns

7    40 and 27 of the '045 patent.

8              Means for a Seller to input information.

9    Again, the structure that Function Media identifies,

10   which Google doesn't do much to dispute in its briefing,

11   and the support for that particular structure in column

12   17 of the '045, as well as Figure 4a.

13             And finally, the same thing can be said

14   for means for the said media venue to input.

15             The only additional thing -- point I'd

16   like to make with respect to the means-plus-function

17   terms is I invite the Court, especially on the means to

18   input limitations, to review Judge Davis's recent

19   opinion in *IP Innovation*, especially as to the control

20   means term, in which he makes it quite clear that the

21   control means can be satisfied merely by a structure

22   that talks about pop-up menus, which is similar to the

23   forms structure that Function Media has identified.

24             MR. NELSON:  Good afternoon, Your Honor.

25   Justin Nelson for the Plaintiffs.

1          THE COURT:  Good afternoon.

2          MR. NELSON:  I get the duty of going over

3  the claims of the '025 and the '059, first on the

4  disputed claim construction terms, and then on whether

5  the claims are indefinite.  These are not

6  means-plus-function claim terms on the indefiniteness

7  claims.  These are just straight up indefiniteness

8  terms.

9          First, here is the claim -- Claim 1 of

10  the '025 patent, and there are essentially three

11  disputed issues which I will walk through briefly.

12          The first is the first interface to the

13  computer system, which has two issues, the first of

14  which Mr. Tribble went over in his presentation, and

15  that's whether it's software which is what Function

16  Media says or whether it's software or hardware.  And

17  then second, whether it's at the Internet venue

18  location, which is what Google says.

19          And to recap briefly here -- first of

20  all, so the Court is aware, their software or hardware

21  position is a change from the briefing.  It was software

22  and hardware in the briefing, in their 4-5 disclosure or

23  their 4-5 chart it's software or hardware.

24          It's also a change from their position on

25  what they're saying in the '045, which is it's software

1  and hardware.

2  We think that they're both wrong.  As

3  discussed by Mr. Tribble, the proper definition here is

4  software.  We -- the patent specification talked about

5  software.  We looked at the Microsoft dictionary

6  definition.  The Kincaid deposition and the Jenevien,

7  his own patent which discussed how one can have software

8  only.

9  The second part of this claim is whether

10  the interface has to be physically at -- or at least I

11  think it's physically at the Internet media venue

12  location.  I think that's what they're driving at, Your

13  Honor, although the -- the construction still --

14  Google's proposed instruction is certainly unclear on

15  that point.

16  But the key thing here is that there is

17  absolutely no location requirement that appears in the

18  claim or specification.  It is true that the preferred

19  embodiment here is the sending -- having it on a

20  Seller's computer, sending a CD-ROM.  Mr. Tribble went

21  over specifications where it can be a downloadable file.

22  But it does not exclude having it elsewhere and --

23  THE COURT:  Is there any disclosure of it

24  elsewhere, though?

25  MR. NELSON:  No, Your Honor.  It -- it is

just whether it is -- if we go back to Mr. Tribble's
slides, it talks about whether you can have a
downloadable file, and it lists multiple ways to have
it, but it does -- it does not have it on the --
anywhere that it is actually over the Internet per se.

But it certainly does not exclude that
specification. And this is from the *Intel* case. It's
in our briefs, where a specification does not require a
limitation, that limitation should not be read from the
specification into the claims.

And so what Google is trying to do is
improperly import the preferred -- the preferred
embodiment to -- to limit what the claim means.

And if we just go back to the actual
claim here, it just says a first interface to the
computer system through which each of the Internet media
venues is prompted to input presentation rules.

And so at the time the art was certainly
about CD-ROMs and downloadable files, but there's no
reason to just make it so limited.

And we do have what people of ordinary
skill think, and the three experts here, none of them
have said it's only done through CD-ROM or -- or on the
Seller's computer. This is our expert, Dr. Rhyne, that
does not require -- one of ordinary skill would not

require that the interface software be necessarily

installed on the Seller's computer.

This is Yahoo!'s expert Kincaid.

Question:  Is it your belief that the

only way to infringe the claims of the '025 patent is to

install software via CD-ROM?  No.

And notably, Google's expert here has no

opinion, is silent on this point.

The second interface is similar to the

first interface, except there's one more issue.  The

first two are software versus hardware and at the

Seller's location.

The -- the other one is to enable the

Seller, which is -- essentially what Google wants it to

do is whether the Seller has to pick a specific website.

The specification in the patents made clear that the

answer to that is no.  We cited one specification cite

here, the '025 patent at 28:45-49, and specifically 48

and 49, talking about the media and advertising channels

that the Seller wishes to participate in, and this is

claim differentiation.  This is from the '025 patent,

Claims 21 through 24.

And if you look at what's going on,

Google wants to limit essentially the definition of

enablement or of the second interface to only be Claim

24, including identification of individual Internet

media venues.  But the claim in the -- the -- the three

preceding claims clearly speak to having targeting other

than through individual Internet media venues.

And so what Google is trying to do here

is essentially create a loophole where none exists and

to muck up and make unclear the claim.

Their only real response here, Your

Honor, is essentially an estoppel argument, that we

somehow disavowed this indirect selection in the reexam,

but that's just not true.

First of all, to get the standard right,

the **Purdue Pharma** case, that there must be a clear and

unmistakable disavowal of the scope during prosecution,

and that just did not happen here.  Nowhere, nowhere,

and I think Google will admit this, does Function Media

say that the Seller has to pick a specific site.  What

they do say is that we -- there's some quotes about

direct selection, but that just begs the issue of what

direct selection means.

And so at most, the reexam makes clear

the obvious point, that the Seller participates in the

selection process.

Well, of course that's true, but it does

not discuss -- the reexam does not discuss how the

1  Seller participates, whether it's through individual

2  selection or the Internet media venue or by targeting

3  advertising channels or demographics or other methods

4  which is, of course, what the '025 patent goes over in

5  Claims 21 through 24, for example.

6                    The third term is the computer

7  controller, which actually has a couple of terms built

8  in here.  The first one is Function Media defining it to

9  be one whole term with processing and publishing built

10 in, and Google break -- breaking up just publishing and

11 processing.

12                   And, first of all, to -- to give some --

13 some scope here, we do believe that the com -- the

14 preamble informs what is going on in this -- in this

15 term.  And you can see that by the fact the computer

16 system is referred to in the preamble here.  It's also

17 referred to in the very first element.  The first

18 interface to the computer system which is followed all

19 the way down through the relevant claim term here, the

20 computer controller of the computer system.  The same is

21 true with the Internet media, venue all the way down.

22                   Now, interestingly enough, in the '045,

23 Google would have the whereby clause read on the entire

24 patent.  But here they completely ignore the whereby

25 clause and pretend that it doesn't even exist; where it

clearly modifies, at the very least, this term itself.

And so we have the term where it talks about how it must be in compliance with the presentation rules of the Internet media venue, and the preamble which talks about again creating and publishing customized electronic advertisements. Google simply ignores both the surrounding claim language and the preamble.

So, first, let's talk about publishing. And if you see on the term, the term says processing and publishing, and so we have put publishing second in our definition. Google talks about it first, so I will just take them in the order Google does.

Our definition is directly from the glossary. This is the '025 patent 11:49-52. The only difference is the highlighted information presentation or information. We have substituted in the specific of what it is here, customized electronic advertisement, instead of presentation or information.

I don't think Google really disagrees with that. Its own definition says electronic advertisement. The only question then is whether to add the word "customize" there, which is what the preamble itself says and also what the whereby clause certainly implies, that it's customized there.

1          Google's position is inconsistent with

2  the specification in the glossary.  It's inconsistent

3  with the term as a whole.  And indeed there's an agreed

4  construction of publishing on the '045 patent which

5  talks about publishing, which is the publication --

6  which is the definition from the glossary with, of

7  course, the one exception is substituting in

8  presentation or information for a customized electronic

9  advertisement.  That's an agreed construction in the

10 '045.  This also applies to Claim 90 of the '025 patent.

11         Computer controller is -- and the

12 processing is the second part of it.  And the question

13 here really is we say that processing means to take the

14 inputted information to create the presentation, and we

15 pulled that from the preamble itself which takes -- it

16 says the computer system for creating and publishing the

17 customized electronic advertisements.

18         The specification is specific here on

19 this point as well.  This is 17 -- column 17, line 54

20 through 61.

21         The -- the presentation rules database is

22 processed through the Presentation Generation Program

23 and that creates the presentations which are tra --

24 transmitted to the central presentation and selection

25 server.

And, again, here it's talking about --
this was 52:4-14. Go back here to -- I'm sorry, column
17, 54 through 61. Again, it's processing through
creation.

And then the '025 patent, 52:4-14, is
talking about the input of information prompting the
Seller for information that is then used for the
creation of presentation that then goes to the
Presentation Generation Program, along with the
presentation rules database that then creates the
presentation.

And, again, the term itself is what
specifies the central controller's performing the
processing. This is from the disputed term, the
language itself, the computer controller of the computer
system is processing and publishing the electronic
advertisement. And the structure of the claim gives
support to this as well.

If you look again at the preamble, it's
the computer system for creating and publishing the
customized electronic advertisements. And then this
last phrase, the last term, the computer controller of
the computer system processing and publishing, so that
the processing is -- creation is the end result of such
-- of such processing, in compliance with those

presentation rules discussed in the patent.

Google, by contrast, simply self defines. And if you take out the agreed language of executing a systematic sequence of mathematical and/or logical operations, what you really have is process meaning process. That is, if you look -- go back to the highlighted language, processing means process. And this is -- so they just refuse really to define the relevant case law.

Your Honor, we have -- yesterday the -- the -- Judge Folsom in the **Parallel Networks** decision issued a similar related issue on the *O2* case about self definition, and we have that as supplemental authority if -- if the Court would like it.

May I approach the bench?

THE COURT: Yes.

MR. NELSON: And if you turn to page 24 of that decision, it tees up the issue of whether inter -- intercepting just means intercepting, and citing *O2*, the Defendants say that it can't just mean that. And then at the end of the discussion, on page 29, is what the Court concludes which intercepting, it rejects that, that intercepting cannot just mean intercepting, and instead gives a definition that does not include the -- the word that's used in the claim.

1             And this is exactly -- we have exactly

2   what's going on in *O2*.  In deciding that "only if" needs

3   no construction because the term has a well understood

4   definition, the district court failed to resolve the

5   parties' dispute because the parties disputed not the

6   meaning of the words themselves, but the scope that

7   should be encompassed by this language.

8             This is exactly what we have here.  And

9   these same disputes apply also to the '025 patent and to

10  Claim 1 of the '059 patent.

11            I'm briefly going to discuss

12  indefiniteness and -- but save most of that for

13  rebuttal.

14            The way I understand it, and Google can

15  correct me if I'm wrong here, there were four

16  indefiniteness arguments in their briefs.  We are now

17  focusing on two, which is their cascading or's argument

18  and their argument that the claims are indefinite for

19  being purely functional.

20            Their argument is that somehow the claims

21  are indefinite because they lack meaning or that -- that

22  they're subjective, number one, or that it's mixing

23  statutory classes by apparatus and method.  I believe

24  they dropped that -- those two arguments.  So if Google

25  addresses these two, we'll address those in rebuttal.

1                    Thank you, Your Honor.

2                    THE COURT:  Okay.  Thank you.

3                    You've got 19 minutes left for rebuttal.

4                    MR. NELSON:  Thank you, Your Honor.

5                    MR. VERHOEVEN:  Good afternoon, Your

6    Honor.  Charles Verhoeven on behalf of Defendant Google.

7                    THE COURT:  Good afternoon.

8                    MR. VERHOEVEN:  If we could go to Slide

9    5.

10                   There's a number of terms, Your Honor, in

11   the briefing papers and there's no way I can cover

12   everything and so I thought I would give you a road map

13   of what I intend to cover.  Of course, if Your Honor has

14   any questions about specific things, I'll do my best to

15   answer those questions.

16                   But essentially, Your Honor, the parties

17   have met and conferred and narrowed some of these

18   issues, and I think there's still sort of four

19   categories of issues that I'd like to address today,

20   Your Honor.

21                   The first is the selection of media

22   venues through the second interface, and then of the

23   '059 patent, the same language appears through the third

24   interface.  And there's basically two issues left over

25   on the -- on those elements, Your Honor.

The first is, who selects the media venues. Does the Seller select the media venues in the '025 patent or not? And in the '059 patent, does a third party select the media venues or not?

The second point on the selection element, Your Honor, is whether there's a locational requirement, and I'll go into that, Your Honor.

The second big -- at least as we see it, big issue for claim construction today, Your Honor, appears in the same part of the claims. It's in the Seller Interface part of the claims of the '025 and '059 patent, and that's what I'll call the creation language where the Seller is prompted to create an electronic advertisement.

And there, we've successfully negotiated away half of the issues, but there still remains one issue, Your Honor, and the issue is who creates the electronic advertisement in that element, in the Seller Interface element. Is it the Seller who creates the electronic advertisement or not? And then in the '059, is it the third party that creates the electronic advertisement or not?

And then the second issue we've resolved, which was, what does it mean, this phrase, creating an electronic advertisement for publication to the selected

1   Internet media venue.  So we've reached agreement on

2   that o.  E, so the only issue on the creation is who

3   creates.

4                    Next slide, please.

5                    Then there's two other claim terms that,

6   at least from our viewpoint, besides the

7   means-plus-function claims, there's two other claim

8   terms that we -- I want to address today, the processing

9   claim and the publishing claim.  And I'll address those

10  after talking about the -- the first subjects.

11                   And then finally, Your Honor, I'll

12  address the indefiniteness.  And I agree with counsel

13  for Plaintiffs in terms of how we reduced these issues.

14                   So the first issue is the

15  means-plus-function limitation of the '045, which I'll

16  cover, Your Honor.  And the second issue is what I'll

17  call the cascading or's, a purely functional language

18  issue.

19                   So, Your Honor, first let me start with

20  the sele -- question of who selects, and I'm going to --

21  the evidence sort of -- over who selects the media venue

22  and who creates is very overlapping, so I'm going to

23  address the question of who selects or who creates at

24  the same time, if I may.

25                   Next slide.

1           So the fundamental dispute here, Your

2   Honor, is Google's position is that -- and this is in

3   the Seller Interface and we'll get to the claim language

4   in the Seller Interface element.  Google's position is

5   it's the Seller that selects the media venues and it's

6   the Seller that creates the presentations in that claim

7   language.  And it's Function Media's position that the

8   Seller is not selecting the media venues and the Seller

9   is not creating presentations; that happens at the

10  system -- on the systems side.

11          We believe that our position is correct,

12  Your Honor, and I'm just going to follow the traditional

13  claim construction rules of the road here, and I'll

14  start with the claim language, Your Honor.

15          And if you look at the '025 and the '059

16  patents, this is -- it's hard to read, Your Honor, but

17  we -- this is the element here.  Just start with Claim 1

18  of the '025.

19          The claim language itself in our view

20  clearly states that it's the Seller that selects the

21  media venues.  It says, quote, a second interface to the

22  computer system through which a Seller is prompted to

23  input information to select one or more of the Internet

24  media venues.

25          The language on its face says it's --

it's the second interface and the Seller is prompted to do something. To do what? To input information to select one or more of the identified media venues. That's what the claim language says right on its face.

Same thing with the 179 independent claim which is asserted, Your Honor. It says prompting the Seller through a second interface to the computer system to input information to select one or more of the Internet media venues.

And, again, the same language appears in Claim 1 of the '059 patent, Your Honor.

THE COURT: Well, may I interrupt you?

MR. VERHOEVEN: Yes, Your Honor.

THE COURT: If the claims meant what you say they mean, why wouldn't the patentee have drafted them just to read, "A Seller is prompted to select one or more of the Internet media venues"?

MR. VERHOEVEN: Well, I -- I suppose you could say it that way. But if we go to the next slide, I think that if you look at the -- to answer your -- I'll attempt to answer your question, Your Honor.

If you look at the grammatical structure of that sentence, right here, Your Honor, and I've just taken the first quote out of the '025. So the language is, quote, a Seller is prompted to input information to

select one or more of the Internet media venues, close

quote.

Grammatically, that clause has one

subject and two verbs, and the antecedent of those two

verbs is the subject, the subject now, which is the

Seller.  The Seller is doing the actions.  Grammatically

the way you should be reading that sentence -- forget

about the -- the specification.  Just reading it in

isolation, I would submit that both of those verbs,

the --

THE COURT:  The verb is prompted, though?

MR. VERHOEVEN:  Well, the -- the

prompting does come from the interface.  There's no

question about that.  But who is being prompted?  The

Seller is being prompted.

THE COURT:  Right.

MR. VERHOEVEN:  And -- and the sys -- the

interface is not selecting.  It's prompting the Seller

to select.

So the way -- and we'll get into the spec

in a second, Your Honor.  But the way that the spec

talks about it, and this has not been cited in the

argument so far today at least, is the interface

presents a menu.  It presents options for the Seller,

and then the Seller inputs the information to select and

to create the presentation.  I'll go through that in detail.

But you're right.  The prompting is done by the -- by the interface.  And -- and if you look at -- if we go back a slide, and you look at the larger clause, Your Honor, it does say a second interface to the computer system through which a Seller is prompted.

So who prompts?  The Seller Interface prompts.  Okay.

But who -- what -- who is being prompted? The Seller's being prompted.

And to do what?  Being prompted to input information to select one or more of the Internet media venues.

So we -- we would submit that the reading -- the plain reading of the claim would indicate that it's the Seller who's selecting.

If I could go to the -- two slides over.

And then all I've done here is, this is the same quote, Your Honor, but I've highlighted the creation language.

You can see that the grammatical setup in the claims is the same for the creation language, too.

So just like the Seller being prompted to input information to select, Claim 1 of the '025 says, a

Seller is prompted to input information to create an
electronic advertisement for publication to selected
Internet media venues. So it's an identical grammatical
construct, Your Honor.

And, again, the subject that -- that's
being prompted is the Seller, and the thing the Seller
is being prompted to do is to input information to
create an electronic advertisement. This is true for
Claim 1. It's also true for Claim 179, and it's true
for Claim 1 of the '059. All of those claims has that
same grammatical const -- construct. Prompted to input
information to create.

Now, let's go to the spec. Slide 13.

And now, so we've looked at the claims,
Your Honor. Let's look and see what the spec says. I'm
going to spend a little bit of time on this spec, and
just please cut me off, Your Honor, if you have read all
this. But I think it's very helpful to look at the spec
because the -- Function Media's counsel's presentation
has left out all of these cites I'm going to go through
which all occur in the spec.

So right -- right at the start of the
patent in column 4, line 17 through 20, discussing the
invention in general, it says: The present invention
allows for lower cost to management when used with all

1 media outlets by creating a self-serve, automated

2 billing environment for the Seller's creation and

3 display of presentations.  That's, again, column 4,

4 lines 17 through 20.

5           Next slide.

6           This is column 5, lines 1 through 4, Your

7 Honor.  And this is characterized as one of the

8 improvements of, quote, the invention, close quote, over

9 the prior art.  And it says, quote, this invention

10 improves on the prior art by creating a controlled,

11 managed environment for Sellers in which to create their

12 presentations.  That's what it says.

13           Again, it's talking about the invention.

14 Not saying, oh, here's an example.  This is one of the

15 improvements of the invention over the art.

16           Next slide, please.

17           This, Your Honor, is again in column 5.

18 This one's lines 28 to 31.  And this is in the section

19 of the patent called objects of the invention.

20           And it lists one of the objects of the

21 invention, quote, to allow sellers to create

22 presentations on their computers that are automatically

23 transmitted to be published and viewed on electronic

24 networks and other traditional advertising media, close

25 quote.

So, again, column 5, lines 28 through 31, objects of the invention, to allow Sellers to create presentations.  That supports this reading that I'm advocating, Your Honor, for this claim language.

Let's go to the next slide, column 6, lines 3 through 11.

Specification states, quote, by creating a self-serve, automated, direct billing environment for the Sellers to create their presentations in.  And then it goes on and the next sentence says, quote, allowing the sellers to create their presentations with a cafeteria-style selection and billing.  And it goes on again.  Twice in the paragraph reiterating that what this thing is doing is it allows the Sellers to create their presentations.

Now, Your Honor, I'm going to go to column 28 where it gets into a little bit more of the specifics of how this thing works.  Column 28, lines 42 through 48.  All of these cites are to the '025.  I apologize for not mentioning that, Your Honor.

And here it says, quote, the Presentation and Configuration Program 4715 is both the gateway to the present inven -- invention and the controlling software interface for the Seller.  The Presentation and Configuration Program 4715 introduces the Seller to the

instance of the present invention and allows the Seller

to choose in which presentations and which media or

advertising channels the Seller wishes to participate,

close quote.

And 4715 is a box illustrated in Figure

2c of the spec.  I put it on the screen, Your Honor.

And this is, of course, 4000 Seller Interface.

So this language is, I would submit, the

portion of the spec that is talking, that they

corresponds, shall I say, to the second interface claim

language.  It's this thing on the spec.  It's called the

Seller Interface.

And the -- the thing that's -- the

gateway that allows the Sellers to choose is this

program called the Presentation and Configuration

Program, something that was not cited once by Plaintiff.

That's located -- where is that located?

Well, you can see that Seller -- the picture on 2c is

that the Seller Interface is its own computer.  It's got

a CPU there.  It's got a -- at 4500 says data storage

device.  And then on the data -- data storage device is

a bunch of programs, and one of those programs is 4715,

the Presentation and Configuration Program.

Okay.  Then the spec continues, Your

Honor, and I'm just walking step by step through this,

and I apologize if this is hard to read.

This is just right after that last sentence in the spec which is column 28, lines 48 through 56.  It says, the Presentation and Configuration Program 4715 offers the choices of media and presentations to the Seller, giving requirements and cost for each.  Upon choosing media and presentations, the Seller is then presented with a series of questions to answer.

So this is saying that this program, 4715, which is located at the Seller Interface, offers these choices to the Seller.

And who chooses?  The Seller chooses. The Seller chooses the media and the presentations.

After the Seller do -- does that, a series of questions are presented by the interface, and it says the answering of these questions contributes to three other databases it refers to there, Your Honor.

Next slide.

This slide 19, Your Honor, is the next sentence in the spec.  This is column 28, lines 56 through 63.

It says, the responses to the question -- questions asked, text -- text entry areas, photos, graphics, and other input, either required or optional,

are monitored by the Presentation and Configuration

Program 4715, using the information within the

presentation rules database 4650 to guide the Seller in

the creation of a presentation that meets the style,

editorial, and content guidelines of that instance of

the present invention for which media -- for each media

venue or outlet chosen.

So here we've got a reference to the

presentation rules database 4650.  Where is that?

That's in Figure 2c.  It's on the same data storage

device 4500 in Figure 2c, and I've highlighted it there

in the Seller's database.

So the Presentation and Configuration

Program 4715 is working with 4650 at the Seller

Interface to guide the Seller in the creation of a

presentation that meets the style editorial and content

guidelines, et cetera.  And notice it says for each

media venue or outlet chosen.  Okay.

So the spec here in column 28 where --

you just flipped over to the next slide, I think.

In column 28, using pretty general

language, pretty clearly says that this interface -- it

corresponds to the claim language that's the second

interface, that that's at the Seller Interface, that

it's got a program.  It's not the -- it's not the PGP.

It's the PACP program, and that's the program that's

prompting the Seller to do what?  To select the media

venues and create the presentations.

Now let's go to -- let's fast forward to

column 47 -- or, excuse me, 41, Your Honor.

Plaintiff has cited -- this is a -- a

whole section of the spec, and it starts, the Seller's

use of the present invention.  And it goes on after that

to talk about what happens when a Seller's done with the

Seller's inputs.

And what the Plaintiff counsel has done

is they've cited to what happens after the Seller is

done.  What I want to walk through, Your Honor, is how

this describes what the Seller does at the Seller

Interface.

So column 41, lines 11 through 18,

Seller's use of the present invention.  The preferred

embodiment of the present invention allows Sellers to

have a self-serve relationship.  And it says, this

relationship in process is accomplished through the

Presentation and Configuration Program 4715, that we

already saw at column 28.

Next slide.

Then the spec continues at column 41,

line 60 through column 42, line 2.  It says, upon

entering the information to establish the client

relationship -- again, this is column 41, 60 through

42:2.  Upon entering the information to establish the

client relationship, the new Seller/client is presented

with the forms that give the choices of presentations.

And it goes on.  And it says, this information comes

from the presentation rules database 4650.

Okay.  Again, 4650 is on the Seller

Interface located at the Seller's location in this

Figure 2c.

Next slide.

The spec continues.  As an example --

now, this is column 42, lines 8 through 16, Your Honor.

As an example, if the instance of the

present invention were configured to support "sailboats

for sale," the Seller may be given the choice of three

Internet directories that specialize in boating-related

goods and services, two printed magazines, and a subscri

-- subscription-based CD-ROM.

So on this example they're saying, we've

got this example of "sailboats for sale" and Seller goes

on to the Seller Interface and it's prompted with three

different possibilities.

Then it continues, quote, the Seller

could then choose one or two or all of the media/means

of communication in which to be represented, with all

presentations created by the Presentation and

Configuration Program 4715.

Well, we already saw 4715 is at the

Seller Interface, so what I have illustrated here is

Figure 4a, which corresponds to blocks 1130 and 1132.

If you look at Figure 4a, 11 -- 11130

says, quote, facilities operator chooses presentations.

Who's the facilities operator at 11130?  That's the

person at the Seller's location operating the interface.

So, again, in the specific example, we

see the Seller has choices by the interface, but who

does the choosing?  Who does the selecting?  The Seller.

Next slide, Slide 23.  And this is a

continuation of the same discussion in column 42, lines

16 through 24.  The presence of the Seller's chosen.

Next thing, the Presentation and

Configuration Program 4715 would then prompt the Seller

for the necessary and optional information to complete

-- complete the presentations.  It should be noted that

each presentation might have very different standards

for publishing the same information.  In those cases,

the same questions or at least similar prompts, may be

presented to the Seller, requiring the entering of

virtually the same information in multiple locations on

the forms.

So what does this say?  It's saying after you choose your media venues -- in the example you have three choices, say you choose all three, then you get prompted to enter the information to create your presentations.  And you should note that each of these different presentations, these three presentations, might have different rules because they're different -- you know, one is a CD-ROM, one's a media outlet.  They have different rules for how you're supposed to create your presentations.

And it -- then it continues.  In those cases, the Seller is going to have to answer the same questions, or at least similar prompts, over and over again.  That's because the Seller's creating all the presentations right there at the Seller Interface.

Next slide, Slide 24.

In the next sentence in the -- in the spec, column 42, lines 25 through 28, continues, although this may seem redundant to the Seller, the differences will become apparent because each separate entry is controlled by the information contained in the Presentation Rules Database 4650.

So basically what -- at least as I read this, Your Honor, what's being described is, you've got

all of these programs they're talking about on the data
storage device at the Seller Interface and the Seller is
choosing which media venues the Seller wants, and then
entering repeatedly information creating the Seller's
electronic advertisements in different formats,
depending upon the different rules which are provided
for in 4650 of 2c, the Presentation Rules Database,
which is also on the Seller's interface.  All of this
happened so far on the Seller Interface.

Next slide.

Then at column -- then column 42
continues.  It says, after the Seller -- and this is
column 42, lines 38 through 44 -- after the Seller has
chosen the channels and means of communication and has
entered the information necessary to create all the
selected presentations, the Presentation and
Configuration Program 4715 notifies the Seller of the
cost and payment methods.

So, in the spec at least, the Seller
creates -- makes all of its selection and creates all of
its presentations and then is told what the cost is.

Now, all of this happens, Your Honor,
before there's any transmission from the Seller
Interface to the Central Controller, which is
illustrated in different figures in the patents, and

1  I'll get to later.  But I wanted you to see this --

2  these initial steps as described in the spec, before the

3  pre -- Presentation Generation Program and central

4  server is even involved that occur.

5            These steps that I just went through,

6  Your Honor, correspond to the element we're looking at,

7  which is the second interface; or the '059 patent, the

8  third interface.  It's the interface where the Seller is

9  prompted to input the information.

10           The cites that we looked at from

11  Plaintiff's counsel were from a different part of the

12  spec, and I'll get to that later.

13           So we've looked at the claims, we've

14  looked at the spec.  Looking at the prosecution history,

15  the last piece of the intrinsic evidence, we would

16  submit, Your Honor, the prosecution history also

17  supports Google and Google's position.

18           We believe the record will show that at

19  -- that Function Media distinguished the claims over

20  prior art by argue -- by arguing that the prior art did

21  not allow sellers to select Internet media venue.  And

22  I've just cut and pasted out of here -- out of the

23  briefs and out of the prosecution history.

24           This is from a September 5th, 2006,

25  request for reconsideration on the '059 patent,

distinguishing a prior art reference, Sparks, Your

Honor.  And in this request for reconsideration, the

patentee says, within Sparks there is no system or

method for a "client" to select an Internet media venue.

So it's distinguishing a piece of prior

art by saying, unlike its patent, in Sparks, the client,

which is the Seller in this case, the client can't

select the internet media venue.

Now, Your Honor, that's what they said to

the PTO.  Now they're saying their invention does not

include the concept of a Seller selecting the media

venue.  It's mutually exclusive.  Either Sparks is not

distinguishable on this ground, or they have disclaimed

a system in which the Seller does not select.

Next slide.

In the reexam file histories, which are

going on right now, Your Honor, all three patents are in

reexam, Your Honor, Function Media also distinguished

over the prior art by arguing that it did not have --

that the prior art did not have the ability to directly

select media venues.  And, again, one of the references

involved in the reexam is this Aaddzz system.  It's

A-a-d-d-z-z.

And in distinguishing that, the patentee

said the Aaddzz references also lack a means for a

Seller to select media venues that is equivalent to the operation of the Presentation and Configuration Program 4715.  In fact, the Aaddzz system does not allow any mechanism for a Seller to select particular media venues in which it would like to display a presentation.

So before the PTO, contemporaneous with this very case, Your Honor, the patentee is distinguishing a piece of prior art by saying that in that piece of prior art, the Aaddzz system, the system does not allow any mechanism for a Seller to select particular media venues.

But before this Court on claim construction, Your Honor, on the second interface limitation, they're saying there is no requirement that the Seller selects any particular media venue.  Mutually inconsistent statements, Your Honor.  Either their patent is distinguishable from Aaddzz because their patent does allow and require that the Seller selects particular media venues.  That's new.  That's something that's new over the Aaddzz art, or they've said something to -- that's not correct to the Patent Office, because they've said so explicitly in distinguishing this reference.  There's no ambiguity whatsoever about it.

THE COURT:  Is there a difference in

1  whether it allows or whether it requires?

2          MR. VERHOEVEN:  No, there is not,

3  because -- because the -- because if you had a system --

4  according to their invention, it has to have -- it has

5  to include that you can do this.  The Seller selects it.

6  That's how they distinguish it over the prior art.  And

7  so what they're saying now is there's no requirement

8  that the Seller can do that.  We can have our patent

9  without any selection.  And -- and the reason they're

10 doing that is because the accused technology doesn't

11 have any ability for the advertisers to select any media

12 venues, and they want to walk away from it.

13          But, yes, the -- the patent itself has to

14 include this as -- as an innovation over Aaddzz, that

15 the Seller can do this.  And they're saying, Claim 2

16 doesn't mean the Seller can do this.

17          Next.  I'll be quick here.  I know I'm

18 taking some time, Your Honor.

19          Next, Slide 28, from the same discussion,

20 the reexam history talking about the Aaddzz system.  And

21 this is just crystal clear, Your Honor.  They say the

22 Aaddzz system, not the advertiser, decides where to

23 display ads via automatic ad targeting.  Accordingly,

24 advertisers using the Aaddzz system have no ability to

25 directly select media venues where their ads are to be

published, as required by Claim 1.

Your Honor, I don't know how more clear you can get than that. They're saying before the PTO that in the prior art system, it's the system, not the advertiser that's doing the selection; whereas in their invention, it's the advertiser who directly selects media venues where the ads are to be published and they -- just in case there's any doubt, "as required." Okay?

But now, before this Court, they're saying there's no requirement that the advertiser has to select the media venue. That's not how you should read that claim.

There's no way that you can hold these state -- this statement here, together with the statements they're making today in claim construction is any -- is in any way consistent. They have clearly and unambiguously disavowed their argument that they're making today in their reexam representations to the Patent & Trademark Office.

And I'm going to speed up a little bit, Your Honor.

Slide 29. This isn't an isolated incidence here, Your Honor. With respect to yet another reference, they say in their reexam response, nor is the

apparatus and/or method for selecting particular media

venues, paren, quote, websites, ever discussed in the

Mason patent.  Again, distinguishing a piece of prior

art saying it didn't allow the ability to particularly

select.

Next slide.  And they did it again in

another reexam response on the '025, distinguishing the

Brown reference.  And they say, quote, in fact, the sys

-- the system simply does not provide any means for a

Seller to select Internet media venues for display of

advertisements.

Why are they saying that?  Because

they're saying their system, that's what it does, that's

what's new about it, that's what's unique about it.  But

here they're saying, well, it's -- actually that's not

required at all.  Inconsistent statements.

Next slide.

As Your Honor well knows, statements made

during the prosecution history will limit the scope of

the claims if there's any doubt about it, which we don't

think there is.  And I like this quote from the Federal

Circuit.  It -- claim construction is not a request for

a mulligan to erase statements made during prosecution,

and rather -- rather than read the whole quote, I'll

just let it sit there, Your Honor. The Court can read

1    it.

2                    THE COURT:  I tell you what, before you

3    move on to your next slide --

4                    MR. VERHOEVEN:  Okay.

5                    THE COURT:  -- take about a 15-minute

6    recess and see if I can't do something about the

7    temperature in here.

8                    MR. VERHOEVEN:  Thank you, Your Honor.

9                    COURT SECURITY OFFICER:  All rise.

10                   (Recess.)

11                   COURT SECURITY OFFICER:  All rise.

12                   THE COURT:  Please be seated.

13                   All right.  Proceed.

14                   MR. VERHOEVEN:  Thank you, Your Honor.

15                   I -- I, too, would like to notify Your

16   Honor of another case that wasn't in the papers.  I

17   apologize for this, Your Honor.  This is a case in which

18   Google was a party; however, I was recently retained in

19   this case.  Wasn't involved in the briefing; otherwise,

20   I would have put it in there.  I have given a copy to

21   opposing counsel.

22                   If I may approach and hand it up?

23                   THE COURT:  Of course.

24                   MR. VERHOEVEN:  Thank you, Your Honor.

25                   This is a --

                    COURT REPORTER:  Can you give me one

second --

                    MR. VERHOEVEN:  Absolutely.

                    COURT REPORTER:  -- to go into a

different file?

                    (Pause.)

                    THE COURT:  Go ahead.

                    MR. VERHOEVEN:  Thank you, Your Honor.

          I bring this case to the Court's

attention because it is somewhat similar to the

selection issue which Your Honor is going to be looking

at.

               This is the **Bid For Position versus AOL,

Google** case before Judge Friedman in the Eastern

District of Virginia, and as such it represents wisdom

and not binding precedent, but I thought it would be

useful for Your Honor to be aware of the case.

               This had a claim -- basically the same

accused technology is accused -- was accused in that

case as this one for Google -- from Google's standpoint.

This had a claim that was somewhat similar.  Talked

about at Claim 1, a method for automatically managing an

auction for determining relative priority for a service

in a system wherein priority is based on the relative

value of related bids.  And the first step was receiving

bid management data, including information for selecting

one of the two or more positions of priority that the

first bidder wishes to maintain in the auction.

So you have this grammatical construct,

Your Honor. It's little bit broader than the one in our

case, but it says receiving -- so the system is

receiving bid management data, including information for

selecting a position of priority.

So instead of selecting a media venue,

here you're selecting a position of priority and

auction, but it has the same grammatical construct, Your

Honor.

And the -- and the dispute was almost

identical to the dispute today. Google argued that the

bidder, which is equivalent to the advertiser, Your

Honor -- that the bidder selected the one or more two --

one of the two or more positions of priority, that that

information for selecting language meant that the bidder

selected.

And the Def -- the Plaintiff in the case

said no, no, it's the sys -- the bidder just submits

information, and the system then selects position of

priority based on the information. So that was somewhat

similar.

Also, in the -- so if you'll -- and,

again, the claim language -- I think I just covered this
-- is similar. Information for selecting was the
construct in **BFP**. Information to select, which is
narrower, I think, is the language here.

The next slide.

The spec in the **BFP** case also was similar
to in this case where it described the bidder, which is
equivalent to the advertiser here, choosing a position
of priority, which is the same as what we have in the
spec here.

And the next slide, please.

Judge Friedman in that case held that the
information for selecting meant information entered by
the bidder that indicates the bidder's choice of the one
or more -- one of the two or more positions of priority.
And the Court explained the specification in the amended
claims, it is the bidder and not the system that chooses
the position of priority.

So although there's differences in the
claims and there's differences in the facts a little
bit, it's somewhat similar to this case, and we've got
another district court that has found that it's the --
essentially the Seller -- the bidder is essentially the
Seller in that patent when you have even broader claim
language information for selection instead of prompted

information to select.

One other thing, Your Honor.  You had asked me if this information to select, why do you have -- why don't you just say to select.  And my partner, Mr. DeFranco, on the break pointed out it to me.  I thought it would be useful to repeat this.

That if you look at the claim in its entirety, it's talking about a computer system and different steps in the computer system.  And so it's got this second interface.

And the reason it says information -- the -- the Seller enters information to select is it's -- it's claiming how the Seller is selecting.  The Seller is -- is on the system.  It's entering information instead of picking up the phone or -- or doing some other thing.  That's why that -- that's probably why that language, enters information to select, is there, instead of just to select.  So I thought I would relay that to Your Honor.

Turning quickly to -- to finish off these claim terms.

THE COURT:  Well, I always like an answer to my question, even if it's after the break, okay, so I appreciate you coming back with that.

MR. VERHOEVEN:  Thank you, Your Honor.

Turning to, really briefly, and I'll move on to the next -- some of the other issues. I want to address just briefly some of Function Media's arguments in support of their proposal: The Seller doesn't select, and the Seller doesn't create.

They cite to the specification, and they actually said that there were mountains of cites to the specifications in support of their position. But the cites on which Function Media rely don't correspond to the Seller Interface claim language. That -- those are cites to the specification where it's describing after the Seller inputs the information, creates the presentations, and transmits it to the Central Controller. That's the first time. And I'll -- I'll go into the specifics, but that's the first time this Presentation Generation Program gets -- comes into play. And that's after the Seller's already input all the information.

And so if you look at the claims --

Go to the next slide.

And this is just a rough correlation, but if you read the spec and then you look at, for example, Claim 1 of the '025 where it's talking about this second interface and this second database, if you read the specs, there's no question that that's talking about

1    4000 Seller Interface that we already went through in

2    great detail.  And the program involved in there is the

3    Presentation and Configuration Program.

4                    Now, go to the next slide.

5                    It's only when you go to -- when the

6    Seller's done and the Seller's transmitted all this --

7    the Seller Interface transmits all the information

8    entered by the Seller to the Central Controller and

9    Presentation Processor 1000, that you get to this --

10   this Presentation Generation Program which you can see

11   down there, it's 7 -- looks like 1710, which is resident

12   on a separate computer.

13                   So by this point, at least in the spec,

14   Your Honor, the -- the presentations have already been

15   created, and we saw in detail how they're created.  And

16   the Seller has already selected media venues.

17                   So I would submit, Your Honor, that the

18   cites to this later part of the spec are not

19   particularly useful because they don't correspond to the

20   claim language at issue.

21                   Next slide.

22                   And just to go -- just to go back, after

23   the cites that we went through that I showed you, Your

24   Honor, the next thing that happens in the system at

25   column 42, line 61 through 64, is after the Seller has

entered all this information and created these

presentations, this -- excuse me, a new program called

the Communication and Transport Program 4760 performs

the transmission of the Seller's presentation

information from the Seller Interface 4000 to the

Central Controller and Presentation Processor.

Okay.  So if you look at 4760, that's

located at Seller Interface 4000, and I have highlighted

the little box there on the bottom left, the

Communication and Transportation Program -- or Transport

Program.  That program -- it's after the Seller is done

entering all the information, that program then

transfers that information --

Go to the next slide.

-- and it goes from Seller Interface 4000

-- this is Figure 1b I'm looking at, Your Honor -- from

Seller Interface 4000 to a different module, the Central

Controller and Presentation Processor, Figure 1000.  And

it's only after that transfer that you have language

about what the Presentation Generation Program does.

So let's go to the next slide.

So I would submit, Your Honor, that

citing to this later part of the spec that talks about

the Presentation Generation Program, or PGP, cannot be

used to erase the disclosures in the spec that the

1 Seller selection and creation limitations and the Seller

2 Interface elements occur before -- before it's even

3 transmitted.

4 Just because occasionally the spec refers

5 to creating in -- in the -- in this later step or

6 recreating can't erase the fact that in prior steps

7 the -- at the Seller Interface, the Seller created in

8 the first instance.

9 Also, I would note for the record, Your

10 Honor, that in this supposed mountain of evidence that

11 the Plaintiff quickly went -- very quickly went through

12 about PGP creating --

13 THE COURT: Small mountain, right?

14 MR. VERHOEVEN: -- none of those cites in

15 there -- you can't read them, they went by them so fast,

16 but none of those cites, I will represent to Your Honor,

17 talked about the PGP selecting media venues. So that's

18 one important distinction.

19 But also, the -- the fact that there are

20 some references -- and I will admit, Your Honor, there

21 are some references that use the word "creating" in

22 connection with the PGP. They exist in the spec. They

23 exist after the references talking about creating the

24 presentation to the Seller Interface.

25 How do we -- how do we make those two

1  things work together?

2              Well, let's go to slide 42.

3              It's easy.  If you look at the spec and

4  you read what's going on in the system, what's happening

5  is that the Presentation Generation Program is accessing

6  these presentations from its database after it gets

7  transferred and then doing a double-check to make sure

8  the presentation, which has already been created, Your

9  Honor, have still complied with the rules database.  And

10 if you look at the -- and this is just one excerpt.

11             This, Your Honor, is column 43, lines 31

12 through 45.  I'll just read the highlighted portions

13 here.

14             It says, the Presentation Generation

15 Program 1710 then analyzes the information using the

16 format and style guidelines contained within the

17 Presentation Rules Database.

18             And if you look at Figure 2a, this is the

19 corresponding figure.  We're now at the Central

20 Controller, so the file -- the information is

21 transferred.  Presentation Generation Program is

22 resident on the computer there.  It's got a CPU and a

23 data storage device, and it's -- there's 1710, and

24 there's a Presentation Rules Database 1650 that's also

25 resident on the Central Controller.

1          Now, the spec goes on and it says, quote,

2   this process parallels the functions performed by the

3   Presentation and Configuration Program 4715.  This,

4   quote, duplication of function ensures both quality

5   control that goes on.

6          So the spec is very clearly saying that

7   what the Presentation Generation Program is doing, Your

8   Honor, is it's performing a parallel function.  It's

9   doing the same thing that's already been done.

10          Does that support an argument that you

11  can erase the earlier step where the Seller is required

12  to input the selection and the creation information?

13  No, it can't.  Otherwise, you wouldn't be paralleling

14  anything because the other thing didn't exist in the

15  first place.

16          And you might ask, well, why would you do

17  that?  Well, the spec expressly says why.  It says, this

18  duplication of function ensures both quality control of

19  content and prevents tampering with the process by

20  either the Seller or any non-authorized entity.

21          And then it continues, this duplication

22  of function -- again, duplication of function -- also

23  ensures that the latest version of the Presentation

24  Rules Database has been applied to every presentation.

25          So the spec clearly says that what the

PGP is doing is parallel to what's already been done, and it's a duplication of function of what's already been done. So if the -- if the PGP is creating a presentation, it's dup -- it's duplicating what's already been done at the Seller Interface, which is to create a presentation.

So the fact that there might be some cites to the PGP creating a presentation, cannot erase, we would submit, the intrinsic evidence, the claim language that clearly says that the Seller creates the presentation in the first instance.

So that concludes my argument on that -- on the issue of who creates and who selects, Your Honor. And I'd like to move on now, unless there's any questions, to the locational issue.

This issue -- I'm going to confine my argument to the second and third interface -- the second interface in the '025 patent, third interface in the '059.

Let's go to the next slide.

So this crystallizes the issue as I see it, Your Honor. Google's proposal is that the second interface is at the Seller location in the '025 patent, and that the third interface, in the '059 patent, is at the third-party professional location. And Function

1 Media says there's no limitation in terms of where the

2 interface should be located.

3         Next slide.

4         If you look at the claims, Your Honor,

5 the initial step -- it's pretty clear that you have

6 three different entities that are doing things here.

7 You've got this computer system with its Central

8 Controller.  You've got Internet media venues which

9 interface at the first interface, and for the record,

10 I'm -- I'm talking about Claim 1 of the '025 patent.

11 And then you've got a Seller that's interfacing with the

12 second interface.  So you've got three different

13 entities.  This is true --

14         Next slide.

15         Same thing on the 179.  I'm not going to

16 belabor the point.  You can just see it by looking at

17 the claims, Your Honor.

18         And then if you look at Claim 1 of the

19 '059, you've got -- here you've got four different

20 entities because you've also got a third-party

21 professional that's basically handling the Seller's

22 creation and selection information.  Okay.  If the

23 Seller isn't sophisticated enough to do it itself,

24 you've got a claim in the patent that talks about hiring

25 a third party to do it.  So these are different

entities.

          Next slide.

          In the context of the '045, Function Media also basically admits that, at least in the '045, there's three primary actors. I'd submit that there's three different -- in the '025, there's three different actors; in the '059, there's four different actors, Your Honor. So we have different actors.

          Then if you look at the specification -- Your Honor asked this question of Plaintiff's counsel, and I agree with the response of Plaintiff's counsel, that the only disclosures in the spec show that the interface -- for example, Seller Interface is located, sent to the Seller location. All of the examples in the spec have that happen. And here's a couple of examples, Your Honor.

          This example is from the detailed example we're excerpting out of it. It's column 54, line 53 through 55, line 3. And in this example from the spec, it's talking about media participation in the invention, and it comes up with the company called DEF Corporation and ABC Company is running the system and DEF Corporation decides that it will promote one of the five Internet websites that it publishes on the ABC instance of the invention.

1            And you can pretty -- it's pretty clear

2 from reading this that DEF Corporation is a

3 quote/unquote media venue that's participating in this.

4            And then the next step in the example is

5 after DEF Corporation decides that it's going to

6 contract with ABC, what happens next?  Step 2.  ABC

7 sends DEF the necessary software to be installed on

8 their computer.

9            Step 3, the computer operator at DEF

10 installs the software on the computer, and that then is

11 configured as Media Interface 6000.

12            I didn't put up Media Interface 6000.

13 It's a picture that's very similar to the ones we've

14 looked at.  It's got a stand-alone computer with its own

15 storage device, CPU, what have you.

16            If you go to the next slide, please.

17            The same example has a section on Seller

18 participation, Your Honor.  And it's the same deal.

19 Here they call it XYZ Corporation.  It's pretty clear if

20 you look at this that the XYZ Corporation is the Seller

21 in this example.  It's right under the heading Seller

22 Participation, colon.

23            Next step, 1, is the XYZ Corporation

24 makes the decision to use ABC's services to promote its

25 basketball team.  So it decides I'm going to contract

with ABC.

Next step.  ABC sends XYZ the necessary software to be installed on their computer.  There's nothing unclear about that.  It sends them the software. The software is resident at their location.

The next step.  The -- Step 3, a computer operator at XYZ installs the software.  Where's the computer operator?  It's at XYZ.  It installs the software on their computer that then is configured as a Seller Interface 4000.

So here on the Seller's side, the Seller Interface is located at the Seller's location.

So the specification supports the notion that there's a locational element to this, which is what Google's proposing here.

And then finally, Your Honor, turning to the prosecution history, perhaps this is most probative.

In the prosecution of the '045 patent, the patent was rejected over a piece of prior art called Mandeberg, and Mande -- the Mandeberg reference disclosed systems and methods for generating displays at a central location for storage, such as in restaurants.

And in the Mandeberg reference, data for presentations are collected from a client and site database and stored in a centrally located presentation

database.  And this is the primary reference actually

that the Examiner used on the '045, rejecting it.  So it

is the biggest piece of prior art in the '045

prosecution history.

And let's go to the next slide, please.

The applicant, in responding to this

rejection by the PTO, argues that Mandeberg did not

render the claims unpatentable because it did not teach

an open network where presentations are created and

published from data, quote, input into a remote

location, close quote.

And I'll -- this is a cut and paste of

the exact text that's in the response to Office Action

dated January 22, 2002.

Quote, open access presentations and

dynamic presentations are both common in the art.  What

is not common in the art are open-access presentations

that are created and published from data input into a

remote program at a Seller's location.  And then it goes

on, with results in updating the database, et cetera, et

cetera.

So in the actual prosecution history, in

addition to the fact that only -- the only spec cites

show being sent to the Seller's location and to the

media venue's location, in addition to that, in the

prosecution history for this family here, the biggest

piece of prior art that the Examiner had a problem with

on the initial allowance process was this Mandeberg.

　　　　　　　　And the way that -- one of the ways they

got around Mandeberg is they say, what is not common in

the art is instances in which data's input into a remote

program at Seller's location.

　　　　　　　　All right.  Now they're saying -- that's

what they said to the PTO.  Now they're saying, ah, it

doesn't have to be at the Seller's location.

　　　　　　　　So when they're in front of the PTO

distinguishing a piece of art that doesn't require a

locational requirement, they say their patent is -- it's

new and unique because it has this feature, and now

they're saying this -- this feature should be erased

from the claims.

　　　　　　　　That concludes my argument, Your Honor,

on the locational element unless Your Honor has any

questions.

　　　　　　　　Let me move on to the other two terms

that -- other than the means-plus-function terms,

there's two other terms that I want to briefly address,

Your Honor, and I'll get to the means-plus-function

terms.

　　　　　　　　Just for shorthand, I'm going to called

them processing -- the first one processing, and the

second one publishing.

This corresponds -- these terms are found

in that last element that talks about the computer

controller, and I don't have a slide for this, but Your

Honor might remember that Plaintiff's presentation, they

have asked Your Honor to take the entirety of that whole

phrase, the computer controller, which is already

really, really long and to construe the entire thing

with something that's even longer.

We don't feel that is necessary or

helpful to the jury, Your Honor.  So what we've done is

there's -- you know, most of that language is already

covered, already has ordinary meaning or covered by

other resolutions of claim interpretation terms.  We've

pulled out the two things that we think from that

long -- lengthy discussion of the -- of the controller

that we think should be construed.

So the first one is the processing

element.  Okay.  So let's start with the parties'

proposed constructions.

And what I'd like to do here, Your Honor,

is just -- let's see where we've got similarities and

where we've got differences because there's some

overlack (sic) -- -lap in the parties' proposed

constructions.

So let's go to the next slide.

All right. This highlighted the similarities, Your Honor, and both constructions talk about processing as being executing a systematic sequence of mathematical and/or logical operations upon the...so that part of it is the same.

The next slide.

Then what Google has added after that basically just tracks the plain language of the term. So the -- the phrase is up in the title here, Your Honor, Processing...the Electronic Advertisement...in Compliance With the Presentation Rules of the Internet Media Venue. That's what the claim language says.

And Google's proposed construction is basically that processing means executing a systematic sequence of mathematical and/or logical operations. And then the rest of it just basically tracks the phrase.

So you see, it says, upon the electronic advertisement, which is found in the claim term itself, electronic advertisement, to process it in compliance with the presentation rules of the Internet Media Venues and the -- the actual language says, in compliance with the presentation rules of the Internet Media Venues.

So, frankly, Your Honor, we could just

construe the word "processing" as executing a system --

a systematic sequence of mathematical and/or logical

operations, from Google's standpoint, because the rest

of this is pretty much parroting what the actual

language says and shouldn't be problematic to anyone

because it's just repeating what the language says.

Let's look at Function Media's proposal.

So we've got --

Let's go to the next slide.

So we've got the executing a systematic

sequence of mathematical and/or logical operations which

is the same as Google's.  But then Function Media goes

on to essentially to insert the creation construction

from the Seller Interface element into the next element,

the computer controller element.

So they add to create an electronic

advertisement customized for each selected Internet

media venue in a form that complies with the

presentation rules set by the media venue.  This is the

creation step.

Now, if you look at the actual claim

language on the top of the title, there's nothing about

creation.  You're processing.  And what they're doing is

they're trying to insert, in a later step in the claims,

this phrase:  To create an electronic advertisement.

1 That's not what the claims say.  And that's why we have

2 a problem with their proposed construction, Your Honor.

3       Go to Slide 58, please.

4       If you look -- again, I'm just pulling an

5 example claim.  Look at Claim 1 of the '025.  You can

6 see from the claim language itself, there is a reference

7 to the phrase "to create an electronic advertisement."

8 But it just doesn't appear in the processing step.  It

9 appears in the second interface portion of the claim.

10       And the processing phrase which we are

11 construing now, creation's already occurred.  It was

12 created in the second interface step.

13       What the -- what the computer controller

14 and computer system step is talking about is processing

15 the already-created electronic advertisement and

16 publishing the electronic advertisement.  "The" refers

17 backs to, to create an electronic advertisement which

18 occurs in the second interface step.

19       So if you look at the claim language,

20 it's very clear that the creation occurs at the second

21 interface step, which is the Seller Interface in the

22 spec, and not during the subsequent processing and

23 publishing.

24       Next step -- or next slide.

25       And this is -- I'm not even going to read

this, Your Honor, because I've already covered it in 15

different slides.  If you look at the spec, the spec

clearly says that the Seller creates the presentations

at the Seller Interface through the configuration and --

and -- Presentation and Configuration Program.  I'm not

going to cover that again.  But just point out the spec

supports that that occurs at the Seller Interface.

And then finally -- I'll skip this next

slide and go to Slide 61.

The -- the effort by Function Media to

import this limitation into a later element is perhaps

best shown by looking at their proposed construction for

the Seller Interface creation stuff, Your Honor.  And

here we've got a little box that highlights it.

So the claim term in the Seller Interface

step is creating an electronic advertisement for

publication to the selected Internet media venues.

Function Media's construction for that

element and that step is creating an electronic

advertisement in a form customized to each of the

selected media venue's presentation rules.  Okay?

The parties have agreed to that

construction, Your Honor.  We -- we compromised and

agreed to that construction.  That is a construction of

an element in the Seller Interface step.

                    Now, when you go to the processing step,
which occurs in a different place in the claims, later
down on the page, what they have simply done is taken
their construction from the creation step and repeated
it, added it on to the processing step.

                    And so we would submit that that's
completely inappropriate, and there's no support in the
spec for that and processing should just mean
processing.  It's not creating.

                    THE COURT:  Does your expert agree with
you on -- on that point where the ad is actually
created?

                    MR. VERHOEVEN:  Well, our expert -- there
is a reference to our expert testifying that the PGP
creates.

                    THE COURT:  Right, and that's in --

                    MR. VERHOEVEN:  He also --

                    THE COURT:  -- the 1000, right?

                    MR. VERHOEVEN:  He also -- he also
testified in a different place that the Seller creates.

                    Yes, you're right.  I'm sorry, Your
Honor.  That's the 1000.

                    THE COURT:  Okay.

                    MR. VERHOEVEN:  He also testified the
Seller creates in a different place.

1          Mr. DeFranco can get me the --

2          Can you bring up that slide?

3          MR. DeFRANCO:  Yeah.

4          MR. VERHOEVEN:  But, again, Your Honor,

5   if you look at the spec, it's true that the spec uses

6   the word "create," and I wouldn't say a mountain of

7   times, but it uses the word create two, three, four

8   times when it's talking about what the PGP is doing.

9          But it's undeniable, Your Honor, that the

10  PGP doesn't do that until after the Seller's already

11  done it.  And what the PGP is doing, Your Honor, and I

12  covered this already, is it's paralleling the functions

13  already performed by the PACP Program and duplicating

14  those functions.

15         So the fact that through

16  cross-examination our expert said that, I don't think

17  shows that it's not already -- the same thing isn't

18  already done earlier.

19         I don't know if that answers your

20  question, Your Honor.

21         THE COURT:  It does.  Thank you.

22         MR. VERHOEVEN:  Well, I just --

23  Mr. DeFranco just put on the screen...

24         So he said -- he said -- he also said the

25  Seller creates it.  You can see by reading that, Your

Honor.

And -- and you can -- you can play word games, Your Honor.  You can play word games.  You can say what the PGP is doing is, quote -- quote/unquote, creating because it's pulling a file out of a database, checking it against some rules.  You can characterize that any way you want to.

But that can't change the fact that the Seller's already done it, and the first person to do it, the -- the person who created the content, who decided where do I want to advertise and what's my message and who do I want to target, is not the PGP, it's the Seller.  And the spec says the Seller does that through this PACP Program from a whole bunch of steps we already went over, and its only after that -- and -- and it gets transferred, that the PGP does further processing.  In order to do that, it pulls it up, looks at it, checks it against the rules again, parallels some of the functions that have already been done.

To point to that fact in a couple of places where the spec might characterize that as creating and say that erases what the Seller did and that erases the claim language that clearly says that at the Seller Interface -- the second interface, I should say, Your Honor, at the second interface the Seller is

1  prompted to enter information to create an electronic

2  ad, that in fact because there's a cite that says the

3  PGP, quote/unquote, creates, that that erases that claim

4  language, it erases those earlier steps, we would submit

5  that's completely unsupported by the spec.

6              Now let me go on to the next term, Slide

7  62.

8              Can anyone tell me how I'm doing on time?

9              THE COURT:  I can if you will give me

10  half a second.  You can -- let's go off the record real

11  quick.

12             (Pause.)

13             MR. VERHOEVEN:  Now if I can turn to the

14  next term, and I'll move a little bit more quickly, Your

15  Honor.

16             The publishing step.  The publishing is

17  in the glossary, Your Honor.  And I'm not sure if the

18  briefs adequately convey this, but there are defined

19  terms in the glossary, and there's no doubt, if you look

20  at the prosecution history, Your Honor, that the

21  patentee intended those glossary terms to be situations

22  in which the patentee was acting as his own

23  lexicographer.

24             So if you look at the prosecution

25  history, the PTO said, I'm going the give these terms

their ordinary meaning, unless you come back and tell me that you're acting as your own lexicographer. And the patentee then came back and said, I'm acting as my own lexicographer.

So we've stipulated, I think, to the terms in the glossary, both sides have, Your Honor.

On publishing, that does appear in the glo -- in the glossary, Your Honor. However, the phrase that we're construing is not merely the phrase "publishing." It's the longer phrase, quote, publishing the electronic advertisement to one or more of the selected Internet media venues.

And so really briefly, Your Honor -- I won't take much time on this -- start with the claim language.

The claim language specifically claims that you're publishing to some -- somebody specific. You're publishing to the Internet media venues. So that's why in our proposed construction we incorporated the concept of who you're publishing to. Publishing to the Internet media venues.

If you look at the spec, Slide 64, the specification also explains that the presentations created by the Seller are sent to the media venues. So this is column 44, lines 47 through 55.

It says, the presentations destined for non-resident publication -- so just for Your Honor's reference, non-resident publication means to a third party. Not -- not something that's owned by the Seller -- or excuse me, by the operator of the system. So, presentations destined for non-resident publication are formatted into media transaction messages and sent to the appropriate media -- media interface. So the spec would support this.

And I'll give you one more spec cite. Slide 65, Your Honor. This is from that old ex -- the example we looked at with DEF.

And here also -- this is a later step. This is after you've downloaded the software and set up your media interface.

Step 10, DEF Sports Web receives electronically the Seller information, agreements, payment information, web pages to be displayed, and advertising to be placed on their website.

So the presentation in the spec gets sent to the media venue which is what we're proposing and what Function Media is saying is not required.

So that's -- it's pretty simple. That's what the argument is there, Your Honor.

And I believe, before I move on to the

next subject, that I heard counsel, Mr. Tribble,

admitting several times in Slides 28, 38, and 39 of his

presentation, in connection with the '045 patent, the

specification required transmission of the media files

to the -- to the media venue's location.

So I don't know why the spec would

require that in the means-plus-function claims, but --

or in the '045 patent, but not anywhere else.  The --

the spec says it.

All right.  Let's move to the

means-plus-function limitations, Your Honor.

Slide 66.  Let's go to slide 67.

So the parties dispute the construction

of five, means-plus-function limitations, are all in the

'045 patent, Your Honor.  I'm not going to read them

all.  You can just see them there.

Next slide.

Google's position, Your Honor, is the

'045 specification fails to disclose sufficient

structure for the means-plus-function limitations.  It

is well settled that if one employs means-plus-function

language in the claim, one must set forth in the

specification an adequate disclosure showing what is

meant by the language.

It's -- it's settled law that if such a

1  disclosure is not disclosed, the claims are invalid for

2  indefiniteness.

3             The next slide.

4             The Federal Circuit has found recently in

5  the last few years that computer-implemented

6  means-plus-function limitations require that the

7  patentee disclose an algorithm.  And the **Aristocrat** case

8  is probably the best known case for that.  We cite here

9  the -- a different case.  I'm not going to spend the

10  time reading this because I want to move on, Your Honor.

11             Function Media --

12             Next slide.

13             Function Media -- this is interesting.

14  They identify the Presentation Generation Program as

15  meeting this disclosure requirement.  That's -- is the

16  structure in connection with the first

17  means-plus-function element which is the means for

18  applying, Your Honor.

19             But it's well established, Your Honor,

20  that simply identifying a software program is not

21  enough.  That does not meet the standard.  That is not a

22  disclosure of an algorithm.

23             In the recent Federal Circuit decision in

24  July of this year, the **Blackboard** decision, the Federal

25  Circuit basically said, if all you're doing is

essentially identifying a black box that performs a recited function, that's not enough. And that's what's happening here.

The PGP that Function Media identifies is essentially a black box. It performs a recited function. How it does so, what mathematical algorithm it uses, what logic algorithm it uses is simply undisclosed.

Just to walk through the **Blackboard** decision, since it is a new decision and it wasn't in the briefs, Your Honor, in **Blackboard**, at issue was whether the specification disclosed sufficient structure for the claim term "means for assigning." The patentee argued that the disclosed access control manager, ACM software, was the structure that performed the claimed function.

So it's the same thing as here. They pointed to a software program. The Plaintiff here points to the PGP, which is a software program.

Next slide.

The patentee in **Blackboard** also argued that the language in the specification describing the function of the ACM program was corresponding structure.

In particular, the patentee argued that the ACM creates an access control list for one or more

1   subsystems in response to a request for a subsystem to

2   have its resources protected; and secondarily, it

3   provides multiple levels of access restrictions to

4   enable different types of users to effectively interact

5   with the system.

6                    Next slide.

7                    The Court found that this identification

8   of, quote/unquote, structure was inadequate, and the

9   claims were indefinite because there was no disclosure

10  in the specification describing how the ACM performed

11  the two identified functions.

12                   And the Court says, quote, but the

13  recitation of the ACM is not a description of structure.

14  What the patent calls the access control manager is

15  simply an abstraction that describes the function of

16  controlling access to course materials, which is

17  performed by some undefined component in the system.

18  The ACM is essentially a black box that performs a

19  recited function.  But how it does so is left

20  undisclosed."

21                   Next slide.

22                   So here, Your Honor, as in *Blackboard*,

23  the patentee has not disclosed any algorithm,

24  mathematical operations, logical operations.

25                   Here also, as in *Blackboard*, the

structure, quote/unquote, Function Media identifies is merely language describing functional activity performed by the PGP.  This does not describe -- this does not describe how the PGP performs these functions, and therefore it's inadequate under **Blackboard** as a matter of law.

Now let's look at -- this slide here, Your Honor, has Function Media' proposed structure.  So you've got a three-word phrase "means for applying."

And what Function Media has done is they've gone to the spec and just picked a bunch of steps, a bunch of functional steps identifying media venues, accessing data, representing the guidelines, accessing data representing Seller information, executing -- this one, 4, is particularly interesting, executing a systematic sequence of mathematical and/or logical operations upon the access Seller information to create -- and then it describes a function, to create a presentation customized for each identified Media Venue in a form that complies with the access guidelines of that Media Venue, or equivalents.

Well, 4 is most telling because it's showing that nowhere is the so-called mathematical and/or lor -- and/or logical operations disclosed.  They don't even -- all they can do is say mathematical and/or

1 logical operations. Each of those four things are

2 functions, not structure.

3                 And the other thing that I think is

4 really notable about this, Your Honor, is how did they

5 choose these four? I mean, the PGP does a whole bunch

6 of stuff. How is a person of ordinary skill -- skill in

7 the art, reading the simple phrase "means for applying,"

8 able to pick these four and not some other four?

9                 There's simply no linkage which, Your

10 Honor, I'm sure knows is required for

11 means-plus-function claims, that links these functions,

12 which aren't even structures, to the means for applying.

13 You could go on and pick four others or -- or pick just

14 one of the four others.

15                 You have to have a linkage. There has to

16 be something in the spec that says to a person of

17 ordinary skill in the art, this means for applying is

18 clearly -- the spec, when it's talking about these four

19 things, is clearly talking about the means for applying.

20 Not one piece of evidence presented by the Plaintiff

21 showing where that linkage is in their presentation or

22 in their briefs, Your Honor.

23                 Let's go to the next slide.

24                 So in their briefs, Function Media at

25 page 6, when talking about means for applying,

identifies four operations, and there's a bunch of
cites.  And I want to walk through those, Your Honor, if
we have time.  Because if you look at each of these
cites, you can see that none of them is disclosing a
mathematical or logical algorithm.

So first -- the first cite, Function
Media cites to Figure 2a as structure for the means for
applying.

But Figure 2a, if you look at it, Your
Honor, this isn't disclosing an algorithm, it doesn't
disclose mathematical operations.  What is it?  Well,
it's a picture of a computer.  It's a picture of a CPU
and a data storage device.  The software programs are
just listed as boxes.

So the Presentation Generation Program
which they rely on, 1710, that disclosure is what?  It's
a black box.  Well, it's not a black box, it's a white
box, but it's a box.

So this -- this just can't be sufficient
under **Aristocrat** or under **Blackboard.**

Let's look at the next -- the next cite.

They go to their first item, and they
cite to Figure 4e, in particular at 11292, as providing
the structure or providing the mathematical algorithm.

Well, if you look at Figure 4e, what does

it talk about?  It's just another box that just
describes a function.  There's no mathematical or
logical operation disclosed there.

Let's go to the next cite down there,
Step 1.  Column 43, lines 28 through 32.

It says, having passed the presentation
information for the content -- for content and style,
the Presentation Generation Program next determines the
directories and presentations indexes in which this
information should be published.

Again, that's not a mathematical
algorithm, it's not a logical algorithm, that's just
describing functional language.

Let's go -- and the next slide.  Item 2
of their evidence, Figure 4d, 11232.  It's another box.
Presentation and format guidelines, link, language, and
other content restrictions.  That's not an algorithm.
That's not a mathematical func -- logic function.  It's
just a black -- it's just a box that doesn't tell us
anything.

Next slide.

They then cite column 42, 36 -- lines 36
through 42.  And we've pulled out that cite.  It says,
once the Presentation Generation Program has either
confirmed the authenticity and origin of the

1    presentation message or the message is passed through

2    the General Management Program, the Presentation

3    Generation Program then analyzes the information using

4    the format and style guidelines contained within the

5    Presentation Rules Database.

6                    Again, under the ***Blackboard*** precedent,

7    this is telling us what happens, but it's not telling us

8    how it happens.  This is purely functional language.

9    This does not disclose a mathematical algorithm or a

10   logical algorithm.

11                   Next slide, 82.

12                   This is their third cite for Point No. 2,

13   citing to Figure 4e.  Again, this citation does not

14   disclose any math or logic.  A couple of boxes and a

15   flow chart.  Format dat -- data for directory or

16   presentation index.  Tells you what it does.  Doesn't

17   tell you how it does it.  Neither of these references

18   tells a person of ordinary skill how the guidelines are

19   applied; rather, they just describe functional language.

20                   And let's go to the next slide.

21                   I -- I think what I'll do, Your Honor, if

22   you bear with me one second.

23                   In the interest of time, Your Honor, it's

24   getting late in the day --

25                   THE COURT:  You've got about 7 minutes

1 left, so --

2          MR. VERHOEVEN:  Yeah, I go through all of

3 these -- I go through every -- every reference and those

4 four things in these slides --

5          THE COURT:  If you want --

6          MR. VERHOEVEN:  -- it's just -- it's just

7 more or less --

8          THE COURT:  -- to just tender your

9 slides, I'll -- I can --

10         MR. VERHOEVEN:  Yeah, it's just more of

11 the same, and I'd just be pulling it up and saying the

12 same sentence afterwards, which is, it doesn't disclose

13 -- you know what I'm going to say, it doesn't disclose a

14 mathematical or logical algorithm.

15         So in the interest of time, I'm going to

16 skip over these, but I will represent to Your Honor that

17 for all those four cites in their brief, we've looked at

18 every single cite and pulled it up so you can see it for

19 yourself, Your Honor.

20         Now let's go to Slide 87, please.  And

21 this point, I think, is pretty important.

22         Function Media is asserting that --

23 they've disclosed a bunch of stuff, flow charts, and --

24 and they've referred to a whole bunch of things.  And

25 that a person of ordinary skill could look at this

patent and figure out what the algorithm should be and

could figure out how to write the software program to do

it, and that therefore that meets the requirements for

means-plus-function claims in **Aristocrat** and **Blackboard**,

not so, Your Honor.  Not so.

It's black-letter law.  And **Blackboard**

repeats this.  That is not the test for

means-plus-function claims.  It's not whether a person

of ordinary skill could figure it out.  This is a

disclosure requirement.  It has to be in there,

black-letter law.

THE COURT:  The question, though, is

whether one of skill in the art would know what it is

from the disclosure, right?

MR. VERHOEVEN:  No.  Well --

THE COURT:  Isn't there a case --

MR. VERHOEVEN:  The -- the question is

not whether it's enabled.  Let me put it that way.  It's

not whether a person of ordinary skill could -- could

figure out what the algorithm is even though it's not

disclosed.  The algorithm has to be disclosed, otherwise

you're just claiming functional.

THE COURT:  Well --

MR. VERHOEVEN:  And so -- go ahead, Your

Honor.

1          THE COURT:  I understand that.  Well, but

2  isn't there a case, though -- it doesn't deal with

3  software algorithm, but deals with the disclosure of a

4  title of an article -- it's like EEPROM or something in

5  the title, and the Court had found a -- at least

6  sufficient evidence from that record that one of skill

7  in the art would have understood from the title that the

8  -- what the corresponding structure was.

9          And so the question is not -- I mean,

10  you're correct, the question is whether, on the one

11  hand, if -- if all of this -- if an expert or one of

12  ordinary skill in the art would know how to draw the

13  algorithm, then there's no sufficient structure to

14  disclose it.  But if you know by looking at the

15  description what was doing what the algorithm was, then

16  there is sufficient structure, correct?

17          MR. VERHOEVEN:  I -- I think I would take

18  one minor quibble with that, and that is, the whole

19  purpose behind the means-plus-function requirements,

20  Your Honor, is you shouldn't be able to just claim

21  means-plus-function and functional language without a

22  corresponding structure.  You get to -- there's specific

23  rules if you're going to claim that way.  And there are

24  disclosure rules.

25          So, for example, set aside software

patents.  Say we're talking about a widget, and you say

means for X.  Then you got to go to the spec.  You got

the find where in the spec the hardware is or the

structure is for that widget that that means is talking

about.  And then that claim is limited to that structure

plus equivalents, black-letter law.

In the patent -- in the software context

it gets a little tricky, and that's why we've had this

recent case law.

THE COURT:  More than a little.

MR. VERHOEVEN:  Right.  Recent case law

with **Aristocrat** and **Blackboard** -- if I could just read

you this quote from **Blackboard** that's on the slide here,

Your Honor.  This is from the July decision.

Quote, a patentee cannot avoid providing

specificity as to structure simply because someone of

ordinary skill in the art would be able to devise a

means to perform the claimed function.  To allow that

form of claiming under section 112, paragraph 6, would

allow the patentee to claim all possible means for

achieving that function.

So that's the point I -- I guess I'm

trying to make, Your Honor.

So what we have here is just that

situation, I would submit.  You've got your black boxes,

1  you got your -- your program, you've got a description

2  of functional language, and then we're -- we're all fine

3  and dandy if you're just claiming regular claims; but if

4  you try to claim means-plus-function claims and all you

5  do is describe function, then you got a problem, because

6  you've elected to do these really broad claims that --

7  just a means for and -- and put out a function.

8              And if -- if -- just as in **Blackboard**, if

9  your response is, well, people could figure out a way to

10  do it, well, that subverts the whole purpose under

11  section 12, paragraph 6, which says, if you're going to

12  claim this way, you're limited to the way you did it;

13  and if you don't disclose the way you did it, then it's

14  invalid because you're just claiming functional language

15  without a structure that's linked.

16              THE COURT:  How do I reconcile that

17  position, though, with the cases that say that they

18  don't have to disclose all of the code?

19              MR. VERHOEVEN:  Well, I think that -- you

20  know, that's a broad question.  There's lot of cases out

21  there.

22              But I think that -- that what those cases

23  are saying is, look, you don't have to put the whole

24  software program, but you have to disclose how you're

25  doing -- how you're accomplishing these functions.  So

1  you have to disclose enough to disclose a mathematical

2  or logical algorithm.  Those are the magic words the

3  Federal Circuit decided to use, and so we're all limited

4  by those words.

5              THE COURT:  The description of that

6  process, right?

7              MR. VERHOEVEN:  Well, there has to be an

8  algorithm actually in the -- in the -- in the spec that

9  corresponds to the function that you're claiming.

10             So if you say means for performing

11  function X, and it's a software patent, there's got to

12  be an algorithm that shows how you accomplish that

13  function.

14             Now, does that go down to the level of

15  submitting a thousand-page C program in C language or

16  something that -- that has every single process step?

17  They said no.  But they have said what you have to do is

18  you have to disclose the algorithm that shows how you

19  accomplish that function.

20             And here, there's no algorithm at all.

21  It's -- everything, every cite we look at here is purely

22  functional language.  There's no mathmat -- let's see,

23  what does an algorithm mean?  It's either math or logic

24  is the -- at least the way I read it when I read these

25  cases.  And I don't see any of that in there.  There's

no algorithm disclosed.  Instead, it's just functional

language.

And so I would submit that saying, well,

a person could figure out how to do this based on this

disclosure, would viol -- be violative of the sentence I

read you -- read to you from the **Blackboard** case,

because what that would -- if there's no structure -- if

there's no algorithm or -- or how it's disclosed, that

would permit the patentee just to claim the function and

have that function read on every single conceivable way

of performing that function, which is the danger of the

means-plus-function claims.

And why the Federal Circuit is coming

back and pushing back on those, especially on the

software patents and saying, look, if you're going to

claim a software patent and means-plus-function

language, you have a new stand -- you have a different

standard and you have to -- you have to show me the

math.  And that's not done here.

Two sentences on -- tell me if I'm out of

time, Your Honor.  I don't have a clock in front of me.

THE COURT:  You are, but I'll let you

finish up, because --

MR. VERHOEVEN:  Two sentences on **Red Hat**.

**Red Hat**, two things.  One, code was disclosed in **Red Hat**

so, it's not a question of did you disclose the code, at least the way I read it quickly.

Secondly, I think there is some question as to the language in **Red Hat**, Your Honor, to compare against this new Federal Circuit decision because there's some statements in **Red Hat** about the -- a person of ordinary skill in the art could figure out -- figure it out, that that's enough. And I think that needs to be compared very carefully against what the Federal Circuit just said.

And then fin -- the final point -- I have three points, sorry.

The final point is the system in **Red Hat** is a completely different system. Here they're external elements, but they weren't in the **Red Hat** case.

So if I'm out of time, I'll -- I'll sit down, Your Honor.

THE COURT: All right. Thank you.

MR. VERHOEVEN: Thank you, Your Honor.

MR. NELSON: Your Honor, I'm going to go and address the '025 and '059 terms, which took about an hour of theirs, and then Mr. Tribble is going to address creation and Mr. Grinstein is going to address briefly anything on the indefiniteness claim.

If you have any questions about any of

these, please feel free to stop any three of us and
we'll -- we'll happily answer any question you might
have.

I want to address first their argument on
selection.  And, Your Honor, not only is this creating a
straw man argument, not only is it creating a mountain
out of a mole hill, it's essentially turning flat land
into Everest is what they're trying to do.  There is no
dispute here.  They have misstated our position.

We agree with Google that the Sellers
select.  And that -- they went -- they spent about 20 or
30 minutes walking through the reexams, talking about
how we distinguish it on the basis of Seller selecting.
Absolutely true.  That's absolutely true.

But what they are trying to do here is
limit what select means, and they're trying to back door
into that by saying they have to pick a specific
website.  They went through the prosecution history, and
not one -- not a single one of those references did you
see any distinguishing of saying they have to pick a
specific website.  Not once.  Not once.

Let's go to Slide 116, please -- I'm
sorry, 120.  I got it.

I noticed in all their argument here they
completely ignored -- completely ignored Claim 24 of the

1   '025 patent.  They are trying to fit every single thing

2   into their definition and to -- includes identification

3   of individual Internet media venues.

4                But the patent and the spec is broader

5   than that.  The slide before talks about the media and

6   advertising channels the Seller wishes to participate.

7   It's how they select.  You can select through picking a

8   particular website.  You can select through channels.

9   And this is what Claims 21 through 24 lay out.

10              So they -- again, they talk about all

11   this reexam stuff, but it is completely irrelevant.  It

12   is selecting.  Okay.  Well, what next?  The last bullet

13   point, Your Honor, on this slide.

14              The reexam does not discuss how they are

15   selecting.  Is it through targeting, advertising

16   channels, demographics, or other methods?  Those are the

17   claims.  That's what we're trying -- excuse me -- that's

18   what we're trying to do.

19              I'm going to turn now to location, and

20   actually before I get to that, just really briefly, I

21   want to just stick on the selection for a second.

22              If you turn to the second interface and

23   you read the second interface claim, it says the Seller

24   is prompted to input information to select.  It does not

25   say the Seller is prompted to enter the web domain.  It

says input information, and that is the question.

They are trying to read input information to include only websites. That is specifically disallowed by the claim differ -- claim differentiation and the patent.

They talked about location information. And, again, their entire argument is premised on the fact, and it is true, in the preferred embodiment it is downloadable on the Seller's computer. But that does not answer the question. There are -- it does not exclude that it can be happening in other places.

So, for example, when the Seller logs in and the interface pops up because it's on a website over a connection, the Seller is using its computer, but the website is coming in through that format as well. There is nothing, nothing in the spec or the file history that excludes that.

And the **Intel** case specifically says that what Google is trying to do here is disallowed. When a specification does not require a limitation, that limitation should not be read from a specification into the claims.

They cite a piece of the prosecution history, but, again, it's completely irrelevant. It does not answer the question.

1                We don't dispute that a Seller at a

2   remote location could input.  That's not the question.

3   The question is where the interface is.  And there is

4   nothing, not a single piece in the record, in the file

5   history, in the reexam, in the patent that talks about

6   that it has to be, that it has to be at the Seller's

7   computer.

8                And if you go -- let's go to Slide 122

9   really quickly.

10                And, again, they said, well, they're not

11  disputing it on the first interface.  It's only the

12  second interface they're talk -- the third interface

13  they're talking about.  But look at the claim language,

14  Your Honor.  There is no difference between how it's

15  talked about with respect to the first interface and the

16  second interface.

17                So if it's from the first interface, it

18  can be anywhere, it's a logical conclusion the second

19  and third.  It is not -- the claim language is not tied

20  to a particular location.

21                Finally -- or not finally, but on

22  processing, let's please turn to Slide 133.

23                They ignore the fact that the

24  specification talks about that it's processed through

25  the Present -- Presentation Generation Program that

1  creates the presentation.

2          And I heard Google's counsel say –– was

3  something that again is specifically disallowed under

4  the case law, processing means process.  That does not

5  answer the question.  *O2* specifically prohibits this

6  court from construing it like that.  There is a question

7  about what process means.  And –– and to say that

8  processing just means process is wrong as a matter of

9  law.

10          On Slide 136, they say, well, where is

11  the creating coming from?  We talked about the

12  specification.  We also talk about the preamble.  They

13  ignore the preamble.  They ignore the whereby clause

14  here, which talks about it, creating and publishing.

15  It's pro –– and then it says it's processing and

16  publishing that results –– the end result is creation.

17  That computer control is the last re –– last step.

18          Mr. Tribble is going to talk about

19  creation in more detail.  But it's –– again, in –– in

20  the second interface, it's providing prompting to input

21  information, to input information to create.  That is

22  the question.

23          And I think Google will agree that if

24  we're right on creation, then they are wrong on this

25  point.  And so I –– we have other arguments, but if

we're right on creation and it's at the PGP, then that's
it.

On publishing, I'm not sure of the
dispute.

Can we go to 126, please?

They say that all they're doing is
defining publishing and then also putting in terms of --
of the patent from -- from the spec. But that's just
not true, Your Honor. It's -- it's plain as day from --
from their definition.

This is the definition from -- from the
glossary which they agree is self-defined here. That
is, so that it is accessible by the end users,
consumers, viewers, or buyers.

Let's go back a slide to Google's
definition. That appears nowhere, nowhere in Google's
definition, not a single place. They have just cut that
off. Ours, as we talked about, simply substitutes
customized electronic advertisement for presentation of
information.

They have this argument, well, that --
well, their latter part says -- well, it's at one or
more of the selected Internet media venue locations for
public display.

But we have that, too; it's just at the

end of the claim.  That's the "so that" clause at the

end of the -- at the end of the claim.  That -- in other

words, they have taken what we've done, condensed it,

and taken out the middle part about what the glossary

says.  That is completely -- completely disallowed.  And

I think they would -- I have not yet heard a reason for

why they have taken out that phrase from the spec.

                And finally, Your Honor, they haven't --

                THE COURT:  Well --

                MR. NELSON:  Excuse me.

                THE COURT:  Why did you insert in there

to create an electronic advertisement customized for

each selected Internet media venue?

                MR. NELSON:  Well, Your Honor, that's --

that is the processing term.  We're talking about the

publishing term.  And -- and so why -- why did we put in

create the electronic advertisement customized to each

selected --

                THE COURT:  Yes.

                MR. NELSON:  -- Internet?

                Well, that's because we think, going back

to the preamble, Your Honor -- Your Honor, on -- on --

on processing, that that is -- the preamble and the

whereby -- whereas clause -- the whereby clause limit

that.

1          Let's go to Slide 133, please.

2          Again, it's what does processing mean,

3 and processing being the end result of creation.  And so

4 that's the specification talking about it.  That's again

5 the specification talk -- this is an important point,

6 Your Honor.  This is the specification.  Prompting the

7 Seller for information that is then used in the creation

8 of presentations.  It's not that it's automatically

9 created.  It is then used in the creation of

10 presentations.

11          And then the Central Controller -- this

12 is from the term.  The Central Controller is the one

13 that's performing the processing.  And then this is

14 from, again, the preamble, that the -- it says, creating

15 and publishing, they did not deny that the preamble

16 limits this claim, they did not deny that at all, and

17 it's obvious that it does limit it.

18          And so the end result -- we start out

19 with the preamble talking about creating and publishing.

20 And then the end result is processing and publishing,

21 the end result of which is creation.

22          So we have used the preamble and then the

23 whereby clause which says the electronic advertisement

24 being displayed on each one of those more selected

25 Internet media venues in compliance with the

presentation rules of the Internet media venue.

If -- are there -- if there are any more questions on this process -- okay.

THE COURT: I don't.

MR. NELSON: With that, I'll turn it over.

One more point, Your Honor. Let me just -- on Slide 143, please.

They did not mention indefiniteness on the '025 or the '059. We'll rest on the briefs on that, except to say that -- just emphasize the very high standard, especially for non-means-plus-function claims for this Court to find, if there's any way to read it and to make them make sense, we think they completely make sense, but any doubt is given to us on that.

MR. GRINSTEIN: Your Honor, three very quick points on the means-plus-function indefiniteness terms.

(Cell phone rings).

MR. GRINSTEIN: The Google argument is the four-step means-plus-function term --

THE COURT: Excuse me a second.

MR. GILLAM: Pardon me, Your Honor, I thought it was off.

THE COURT: Go ahead.

1       MR. GRINSTEIN:  The Google argument with

2  respect to why Function Media's four-step algorithm

3  wasn't an algorithm was to look at Step 1 and say,

4  that's not an algorithm, to look at Step 2 and the

5  support we cite for that and say that's not an

6  algorithm, to look at Step 3 and say that's not an

7  algorithm, and so on and so forth.  Well, that's true.

8  If you've got a logical flow and a series of steps, each

9  one of those steps isn't going to be an algorithm.  Our

10 point was put them together, and then you've got the

11 algorithm.

12      So to say, you know, Function Media's

13 support for the -- Step 1 didn't create an algorithm,

14 I'll agree.  It's all the steps together with all the

15 support together creating the four-step process which is

16 what creates the algorithm and which is what makes Claim

17 1 of the '045 a special means for applying definite.

18      As to the **Red Hat** which we call **IP**

19 **Innovation**, I don't believe Google's counsel's efforts

20 to distinguish that case were particularly accurate.

21      First of all, there was no code disclosed

22 in the **IP Innovation** case.  I put up the two places

23 where there was any structural support cited by the

24 Court.  That was it.  There was no code.  In fact, Judge

25 Davis said the Defendants are trying to force the

patentee to include code, and I am rejecting that

because code is not required.

Also, that case is not inconsistent with

**Blackboard**.  In fact, Judge Davis cites **Blackboard** and

applies it in that case.  So I think it's particularly

instructive because it's the first I think Eastern

District post-**Blackboard** application of the **Blackboard**

principle.

MR. TRIBBLE:  Brief -- briefly, Your

Honor, creation.

I mean, I don't know, it seems like a

mountain of evidence to me, but at any rate, the spec

couldn't be clearer, that it says over and over again

that the PGP creates the presentation, creates the

presentation in conjunction with, creates new or updated

presentations created by the PGP over and over and over

again in the spec.

And -- can we pull up the patent and go

to, like, Figure 4a?

In contrast -- and it's not true.  I was

accused of not having said anything to the Court about

what happens on the Seller's side, and that's not true.

Let's go to 4a.

I specifically pointed out to the Court

the flow chart and the description in the specification

1  of what is happening on the Seller's side.  And it's

2  described very clearly as -- in column 41 of the '045 as

3  monitoring or con -- and controlling the input of

4  information.

5          So basically here's -- here's what

6  happens.

7          4a, please.  Thank you.

8          The Seller inputs information from which

9  an ad is going to be created.  There's a Presentation

10  Rules Database over there because there's error

11  checking.  Maybe there's a preview function, I believe

12  is mentioned in the spec.

13          At any rate, then if the Seller is

14  satisfied, that information about an ad is transmitted

15  to the Central Processor of the central system, the CPC,

16  where the PGP takes that information, verifies that it

17  complies with those rules, and if it's for multiple

18  venues, it looks up each venue and sees what rules apply

19  and performs those operations to enforce those rules for

20  each venue.  And it's all spelled out in the Figure 4

21  charts.

22          We didn't have time to go over this

23  because we spent half our argument on things they have

24  now dropped.

25          For example, the hardware versus software

issue.  We didn't hear one word about that, even though

in meet-and-confer, we specifically asked them over and

over again, aren't you going to drop this hardware

versus software argument, because you -- in the '025

claim, you've now dropped that argument?  And they

specifically said, no, we're not.  So we've got to argue

about it.  And so here it is.  You know, we've -- it's a

red herring.

Anyway, let's take a look at Figure 4a.

And it's right here, 1140 at the bottom.

Blow up 1140 and 11 -- 11142, the bottom

two boxes.

This is what's going on on the Seller's

side.

The facility's operator -- that's the

Seller -- enters, edits, or updates presentation

information.  It's information about a presentation in

11142.  This is the Presentation Rules Database that's

on the Seller's side.

Its system restricts input based on

directory and content guidelines by specific subject

areas.  This is what's referred to in column 41 as

monitoring and controlling the input of information.

Let's go to 4b.

That information flows on down -- 11170

at the bottom, you see the Seller then sends

information, edits, or updates to the Central

Controller.  It doesn't say sends a presentation.  It

says the Seller is sending information.

And what about that edits?  You can send

just an edit or an update.  That's clearly information

that you could use it along with other things to create

a presentation.

Let's go to 4c.

Item 11200, the Central Controller

receives information.  Does it say it receives a

presentation?  No, it receives information.

And then it goes through 4d.  It analyzes

the presentation data in 11230.

It verifies that it passes.  That's block

11280.

Figure 4e, 11290, is it used on more than

one index?  Yes.

11292.  Identify all the directories.

111294 (sic), you get the rules from the

database.

11396, that's the Presentation Rules

Database.  Format the data for each directory.

And then this is all happening at the

Central Controller.  We saw where the Central Controller

receive the information in Figure 4b.  And so then what
it does -- and then Block 11312, it -- it generates the
new presentation.  It says it right here, the Central
Controller and Presentation Processor generates the new
presentation and prepares all information for
publication.

There's no description like that for the
Seller's side of things.  And so at the end of the day,
here's where we're left:  There's language about the
Seller creating presentations.

It's -- it's like Judge Ward making
coffee using a coffee maker.  A lot of those quotes they
showed you talk about the -- it's an environment through
which the Seller can create an ad, and it is.  But the
actual ad creation is being done by the Central
Processor and the Presentation Generation Program.  And
-- and at best, what they've shown you, there are rules
that are used to restrict input on the Seller's side.

But let's -- that's just not sufficient.
But assume it was.  What they've shown you, clearly, at
a minimum, there are two ways you can apply rules that
are corresponding.  And so if you disclose two ways to
do it, it's A or B.  So at a minimum, you can't possibly
exclude -- excuse me, one cannot possibly exclude the
PGP.  It would be either here or that (indicates) -- you

1　know, here or there, just --

2　　　　　　　　THE COURT:　Just as it can be created at

3　either location --

4　　　　　　　　MR. TRIBBLE:　Correct.

5　　　　　　　　THE COURT:　-- and still satisfy the

6　claim limitation?

7　　　　　　　　MR. TRIBBLE:　And so -- but in our view,

8　the proper construction -- that's worst case scenario, I

9　believe, this or that.　Okay?

10　　　　　　　　THE COURT:　Well, that depends on your

11　perspective, Mr. Tribble.

12　　　　　　　　MR. TRIBBLE:　Of course, Your Honor.

13　　　　　　　　But we believe that the proper

14　construction is just the -- the steps we cited in our

15　proposed structure which, by the way, could be silent as

16　to location.

17　　　　　　　　And the -- but if you were choosing

18　between the PGP and the CAPC on the Seller's side, it's

19　clear that the -- the language quoted in column 42, it

20　says you have to do that step -- as spelled out in the

21　flow charts in Figures 4, you have to do that step to

22　ensure that you are applying the most current version of

23　the rules.　And the version applied on the Seller's side

24　might not be the most current version.　And the claim

25　language requires applying the cor -- the media rules

corresponding to the venues. Those have to be the most current rules.

Thank you, Your Honor.

THE COURT: All right. Thank you. All right. The claim construction issues are under submission.

Tell me y'all have resolved your discovery matters during the recess.

MR. TRIBBLE: Regretfully no, Your Honor.

THE COURT: Give me a short overview of exactly what you want me to decide, bearing in mind that I've got a charge conference at 5 o'clock that I have scheduled for the jury trial I've been in now for about the last week and a half.

MR. NELSON: Three minutes is plenty of time, Your Honor.

There are three issues here. The first is the motion to -- their motion for protective order of Sergey Brin, Larry Page, and Susan Wojcicki, who are high-level executives at -- at Google. We believe they have unique, relevant knowledge.

Ms. Wojcicki is the lowest-level employee who has access to the -- or supervises the products.

Mr. Brin admitted -- or there's documents that say he invented this billion-dollar idea. It was

1   Sergey Brin's billion-dollar idea for this product.

2                   They have tried to run away from that as

3   much as possible.  But that alone -- if he -- if he were

4   not the founder of Google, it would be a non-issue for

5   everybody here.

6                   They are saying, well, because he's the

7   founder of Google, we shouldn't have to depose him.

8   That is not the standard.  He created -- he came up with

9   the idea that is the central idea in this case.

10                  Mr. Page is in charge of products and is

11  centrally involved in -- in planning and supervising and

12  actually directing how the product works.

13                  And Ms. Wojcicki, as well, has been

14  deposed of -- of -- on -- on these issues.  And I should

15  say that giving true life to the -- that success begets

16  a thousand inventors.  Ms. Wojcicki also has claimed

17  credit for inventing the accused system as well.  And

18  so, of course, we want to depose her on -- on that.

19                  So I'm happy to take any questions.  That

20  is a very broad overview of the motion for protective

21  order issue.

22                  The -- the Motion to Compel is related to

23  -- the first Motion to Compel is related to those three

24  executives searching their documents, plus two other

25  executives who by Google's own admission have relevant

1 knowledge that -- documents that have not been produced.

2 We want to search their presentations for relevant

3 documents.  We want to search their e-mails.

4                 I should say, going back to depositions,

5 Your Honor, we have offered -- this is in our briefing

6 -- we have offered for a limitation on time for -- we

7 understand they're busy executives, and we are -- we are

8 -- understand that and we are willing for reasonable

9 limitations on time on these.  But they -- they are

10 central to our case about proving those up.

11                 And on the -- on the documents, they, I

12 think, cannot say that they certify that all documents

13 from these executives have been produced.  In fact,

14 they're telling us that they can't -- they don't know

15 where any central repository for some of these documents

16 are.

17                 These documents are the business

18 presentations that the employees gave to Google

19 explaining the relevant products, and they're saying,

20 well, there's no way for us to do it.  We say search the

21 executives' files which you should have done anyway.

22                 Ms. Wojcicki was on a litigation hold.

23 They're just -- they've -- they've known about her

24 forever.  They just refuse to search her files.  Their

25 only real excuse for this is that we've waited too long

1  to ask.

2              I think the briefing makes clear we've

3  been asking for this since April.  We first asked for a

4  meet-and-confer on this in early June.  They told us in

5  August that it was not exclusive for us asking for more

6  information.

7              And -- and so we think it's clear that

8  that's really their only real argument that it's -- it's

9  -- it's overly burdensome; but we wanted to resolve this

10 months ago.  And they keep -- and we -- in one e-mail,

11 we said it's like Louisiana football.  They say, well,

12 keep on meet and conferring, keep on meet and

13 conferring, and -- and we have worked in good faith.

14             This is the first time that we're in

15 front of this Court on a Motion to Compel.  We have

16 tried very hard to resolve these issues, and we did not

17 want to burden this Court with -- with motions to

18 compel, but we need this information from these five

19 executives on e-mails and internal presentations because

20 they have relevant knowledge.

21             Google, for the first time in its brief,

22 conceded that, that it has relevant knowledge.  They

23 say, well, of course these executives are involved.  And

24 to that we say, exactly.

25             So that's generally -- and there are some

1  sub-issues, but that's generally on the motion to compel

2  on the executives.

3           There is an agreed expedited briefing on

4  this acquisition, whether we're -- the acquisition

5  information, whether we're entitled to price information

6  and valuation information -- literally the valuation

7  reports for Google's -- for Google's documents -- excuse

8  me, for Google's acquisitions.

9           Their only response -- their retort to

10  that is that we are not entitled to that because those

11  are irrelevant to ads.  But we say, and Google's own

12  documents make clear, that there is a so-called virtuous

13  cycle that ads beget -- users beget ads which beget more

14  users.  They mentioned YouTube.  They mention other

15  documents.

16           And, Your Honor, we have a couple of

17  documents to rebut their -- their -- their points on

18  this that -- are there from their own -- their own

19  documents that say it is a virtuous cycle, that ads

20  beget more ads, that they use other transactions to help

21  get -- to get users and to get advertisements.

22           And so all we're asking for for these is

23  basic and confirmatory price and valuation information,

24  or we have submitted an expert affidavit on this point

25  from -- from Mr. Bratic.  They have no response to that

except to call it self-serving. Mr. Bratic has

submitted a sworn declaration in this case to say that

he needs this information.

And, again, this is to limit their

burden, simply price and the valuation reports to

determine what was the intellectual property component

of that price for Google's transactions.

There is case law on point. We cited the

*Fresenius* case from the Northern District of California

which cites a Federal Circuit case that says that

acquisition documents and material is relevant. Their

only distinguishment of that case is to say, well, that

involved the same technology. But as we just talked

about here, the way Google works is that the -- the ads

beget ads. And -- and I think the important -- and

users beget ads.

The important -- one of the fundamental

things about this, Your Honor, is that we are talking

about a system that is at the heart of Google's

revenues. Depending on how you skin it, it's between 25

to 50 percent of Google's revenues. The executives are

actively involved.

So, for example, what they pay for a

minor acquisition in intellectual property on some

feature that is .1 percent of their revenues, and they

expect to grow, of -- and will think will generate more ads which uses our system is incredibly relevant to what -- what they would pay.

There's documents and evidence suggesting that their acquisition and licensing policy is to instead of license, just to buy the technology. And so that's how we think it's relevant. Mr. Bratic's declaration lays this out. They do not dispute it, except to say that it's self-serving.

And with that, I'll reserve my time in case the Court would like to hear more.

MS. CANDIDO: Good afternoon, Your Honor.

THE COURT: Good afternoon.

MS. CANDIDO: I'll address the acquisitions issue first.

Google provided Function Media with a list of all of its acquisitions and basic information about the technology at issue in those acquisitions. And Function Media selected a subset of acquisitions that it was interested in receiving additional information about. It selected those 17. That included all of the acquisitions that had anything at all to do with ads and some additional acquisitions that had nothing to do with ads, but that they selected for whatever reasons.

We provided the white papers, valuation reports, the final deal documents, and we have now agreed to provide communications with respect to those subset of more relevant deals that they've identified. Nevertheless, they now want the valuation information for all of Google's 60-plus acquisitions over time. Georgia -- and the reason for that they say it's relevant to damages.

Under *Georgia-Pacific* which sets out the factors that one should use in connection with a reasonable royalty analysis, the closest factor is Factor 2, which is the rate paid by the licensee for the use of other patents comparable to the patent-in-suit. And there's numerous cases interpreting *Georgia-Pacific* that focus on the comparable as being related technology and excluding licenses as being irrelevant, that have nothing to do with the technology at issue in the case.

That's the situation here. These are not even licenses. These are acquisitions. So you already have to take the leap that acquisitions are relevant.

But putting that issue aside, they're now asking for acquisitions that have nothing whatsoever to do with the patents at issue and with the technology at issue.

The case that they cite, this *Fresenius*

case is the only case that they've been able to find or
that we've seen that has -- even addresses acquisitions,
and it basically allowed for the production of
information about one acquisition and it was the
acquisition of the actual patents-in-suit in that case.
There could be nothing more comparable than that.

Here, despite the burden to Google of
compiling all this information that does not exist in
one place, they want information about how much Google
paid, as they say, for YouTube or for a company Cold
North Winds that's basically a conglomeration of digital
archives of newspapers.  How that can have any possible
relevance to what Google would have paid in a
hypothetical negotiation to license these patents --
it's clear, there is no relationship.

So for that reason, we think that the
information that they already have is more than adequate
on acquisitions and that the information they now seek
is irrelevant, it's extremely burdensome, and that they
should -- are not entitled to that information.

With respect to the depositions of
Google's top employees, basically Larry Page is -- and
Sergey Brin are the co-founders of Google.  Larry Page
is the president of products, and Sergey Brin is the
president of technology.  They're both members of the

Board of Directors, and together with Susan Wojcicki,
they're all part of Google's operating committee which
is made up of Google's top 16 executives.

Function Media should be barred from
taking these depositions because they do not have unique
personal knowledge relevant to the issues in dispute,
and Function Media can obtain the information that they
seek from other less burdensome means.  For example,
30(b)(6) depositions.

In their sur-reply, they say that they
need these depositions for three reasons.  They need to
-- information regarding why Google decided to launch
the accused system.  That clearly can be had from people
other than these top executives.

Two, the anticipated revenues from the ad
system.  That also plainly can be had from other lower
level employees at Google.

And three, the importance and novelty of
the system which also can be had from other people at
Google who are lower level employees, or through a
30(b)(6) deposition.  And that is the reason why those
executives' depositions should not go forward.

There's extensive case law that we've
cited in our brief.  If, for example, in a similar case,
the *Stellar Products versus Google* case, the Court --

the District Court in Florida recognized that the depositions of Sergey Brin and Larry Page should not go forward because the Plaintiff had not sought the information from other sources first. And this was a case in which the facts at issue were Larry Page and Sergey Brin's decision to apply for the first trademarks for Google. Certainly something that would be much closer to their knowledge than these general statements about the revenue or importance of Google's ad system. And --

THE COURT: Tell me -- tell me why -- assuming I agree with that proposition at least for now, tell me why they shouldn't have to search their files for documents they've requested.

MS. CANDIDO: The reason -- the document from -- is that over a year ago, the parties met and conferred about which custodians' files should be searched, the process that would be undertaken, and then Google went out and collected, reviewed and produced over 4-and-a-half-million pages of documents that took months and months obviously to -- to do that and to a great expense to the company. And that process was substantially complete by July of 2008.

Function Media never asked to have the files of these executives searched until June --

mid-June of 2009.  This seems to us to be a last-minute

litigation tactic to delay -- to divert us from other

activities and send us off on a potentially

millions-of-page goose chase through the files of these

top executives.

They had -- and more importantly, as

well, they -- the information may not be exactly

duplicative in the sense that each e-mail has already

been produced, but it's duplicative or cumulative in the

larger sense that it's not going to provide them with

any information that they don't already have with

respect to how the products work, with respect to -- you

know, decisions made about the products.

We have been engaged in several months of

discussions about how to collect and produce these

various board minutes and presentations to the board,

presentations to the executive management group, and we

have been doing that in good faith and producing all of

those that we can find.  So they have the information

that they need from other sources.

MR. NELSON:  Your Honor, I'm sorry, I

didn't mean to interrupt.

THE COURT:  Yes.  Well, I didn't know if

she was finished.

MS. CANDIDO:  I'm sorry, yeah, just give

me one second.  I think that...

THE COURT:  I'm --

MS. CANDIDO:  That's it.

THE COURT:  -- quite sure she doesn't want you to present her argument for her.  May not be sure of everything.

MR. NELSON:  I will limit this hopefully to less than two minutes, Your Honor.

It is ironic that Google, a search company, says it's having difficulty with search.

Let me first focus, though, on the depositions of -- of Wojcicki, Page, and Brin.

First of all, there is a Northern District of California case, from their home district, that says in this exact circumstance that Mr. Page should be dispo -- deposed because he has relevant and unique knowledge.

So let's -- I just want to focus, Your Honor -- let's forget about Mr. Page for a second, and let's focus on Mr. Brin and Ms. Wojcicki.

They have both claimed that they have invented the accused product.  There is no way that's not relevant.  They have both said it's a hundred -- Ms. Wojcicki said it was a hundreds of millions per year.  Mr. Brin, it's a billion-dollar idea.  We, of

course, don't have more documents.  We don't have the

notes about that because they haven't searched those

executives' files, but we do have it because some

executive sent it to some executive who sent it to some

person whose documents they did search.  And that comes

across that it is the -- Sergey's billion-dollar idea.

That goes directly to damages.  It goes directly to the

novelty of the invention, how important it is, and we

can't replicate that.

I can't believe they actually brought up

the 30(b)(6) point.  That is incredibly helpful, and I

wish I had remembered to say that in my opening

presentation.  We asked Google's 30(b)(6) witnesses

about these very things, and you know what they said?  I

don't know --

THE COURT:  Well --

MR. NELSON:  -- ask them.

So I'm not sure what else we could have

done to try to do it.

On -- on the documents -- on -- on the

acquisitions, let me just -- if I can put this up really

briefly to show what I was talking about before.

This is the virtuous cycle I was talking

about, which is attract readers, monetize traffic,

deepen engagement.  And you'll see that there are --

1  there are other documents, other acquisitions beyond

2  just AdSense for search that are -- that are there.

3                    And, again, the billion-dollar

4  opportunity, they say, well, so what?  Our answer is

5  that's -- we need to find out about that.

6                    THE COURT:  All right.

7                    MR. NELSON:  Thank you, Your Honor.

8                    MS. CANDIDO:  Your Honor, if I may.

9                    THE COURT:  I don't allow sur-rebuttal,

10 but I've got your briefs, and it's under submission.

11 Appreciate it.

12                   All right.  I'll get you a ruling on all

13 of this as quickly as I can.

14                   MR. TRIBBLE:  Your Honor, I just have one

15 item.  It's 10 seconds.

16                   THE COURT:  Yes.

17                   MR. TRIBBLE:  The Court has a mediation

18 deadline of October 2nd in its docket control order in

19 this case.  Google has an announced policy that they do

20 not settle patent cases.

21                   Does the Court -- I understand the

22 Court's order, but in light of this policy --

23                   THE COURT:  I -- I don't -- I don't

24 require mediation.  I mean, if one side or the other

25 says it will be fruitless, then I don't require it.  So

1  save your money as far as I'm concerned.

2            MR. TRIBBLE:  Thank you, Your Honor.

3            THE COURT:  All right.  I'll -- I'll just

4  consider that deadline to be vacated if there's no

5  interest in mediating the case.  If there is interest in

6  mediating the case, then go ahead and -- and comply with

7  the deadline.  If you need more time to select a

8  mediator, then, you know --

9            MR. TRIBBLE:  Thank you.

10            THE COURT:  -- you can -- you can have

11  some.

12            Yes?

13            MR. VERHOEVEN:  Appreciate that, Your

14  Honor.

15            I'm just -- we're not adopting that

16  characterization of our, quote/unquote, policy, but at

17  least from my personal standpoint, it's always important

18  to talk settlement throughout a case.

19            THE COURT:  Well --

20            MR. VERHOEVEN:  We'll -- we'll meet and

21  confer with the other side.

22            THE COURT:  What I don't want to have

23  happen is have a mediation turn into we'll settle this

24  case if you just drop your lawsuit.  Okay?

25            MR. VERHOEVEN:  Right.  Understood, Your

Honor.

THE COURT:  Okay.

COURT SECURITY OFFICER:  All rise.


(Proceedings adjourned).

1  <u>C E R T I F I C A T I O N</u>

2          I HEREBY CERTIFY that the foregoing is a

3  correct transcript from the stenographic notes of the

4  proceedings in the above entitled matter to the best of

5  my ability.

6  _____          _____
   JUDITH G. WERLINGER                        Date
7  CSR RMR CRR CMRS FAPR
   Deputy Official Court Reporter
8  State of Texas No. 731
   Expiration Date:  12/31/10

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25