# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### MARSHALL DIVISION

| | | |
|---|---|---|
| FUNCTION MEDIA, L.L.C. | § | |
| | § | |
| vs. | § | CASE NO. 2:07-CV-279 |
| | § | |
| GOOGLE, INC. | § | |

## <u>MEMORANDUM OPINION AND ORDER</u>

After considering the submissions and the arguments of counsel, the court issues the following order concerning the claim construction issues:

## I.      Introduction

The plaintiff Function Media, L.L.C. ("FM") alleges the defendant Google, Inc. ("Google") infringes three of its patents: U.S. Patent Nos. 6,446,045 B1 ("the '045 patent"), 7,240,025 B2 ("the '025 patent"), and 7,249,059 B2 ("the '059 patent"). The '025 patent is a continuation of the '045 patent, and the '059 patent is a continuation-in-part of the '045 patent. The '045 patent application was filed on January 10, 2000, and the '045 patent issued on September 3, 2002. The '025 patent issued on July 3, 2007, and the '059 patent issued on July 24, 2007.

This opinion resolves the parties' claim construction disputes. The court will briefly discuss the technology at issue and then will address the claim construction issues.

## II.      Background of the Technology

The three FM patents disclose both methods and systems that automate the process of formatting and delivering advertising to all types of media. FM's patents describe the prior art as being inefficient and expensive because advertisers had to negotiate separately with each individual media venue in which they wished to advertise. Specifically, the prior art required the advertiser

Dockets.Justia.com

to submit proposed advertising materials to each media venue. Each media venue had its own guidelines and requirements for advertisements, such as color, size, and word count. Thus, the advertiser often had to customize its proposed advertising materials for each media venue to satisfy the media venues' guidelines and requirements. The advertiser also had to negotiate separate contracts with each media venue. Once published, maintaining consistent advertising information across media venues was difficult, because the advertiser had to update each advertisement separately.

FM's patents disclose an invention that automates the creation, publication, and display of advertisements in formats that comply with the media venues' guidelines. Sellers, wishing to advertise, submit their proposed advertisements and select targeted media venues using the disclosed system. Likewise, the media venues enter their advertising formatting rules using the disclosed system. A central ad modification engine processes and customizes the advertisements for publication and display using the information submitted by the sellers and media venues. The invention also automates pricing and purchasing of advertising and permits sellers to automatically update their advertisements.

### III.    General Principles Governing Claim Construction

"A claim in a patent provides the metes and bounds of the right which the patent confers on the patentee to exclude others from making, using or selling the protected invention." *Burke, Inc. v. Bruno Indep. Living Aids, Inc.*, 183 F.3d 1334, 1340 (Fed. Cir. 1999) (quoting *Corning Glass Works v. Sumitomo Elec. U.S.A., Inc.*, 868 F.2d 1251, 1257 (Fed. Cir. 1989)). Claim construction is an issue of law for the court to decide. *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 391 (1996).

To ascertain the meaning of claims, the court looks to three primary sources: the claims, the specification, and the prosecution history. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370 (1996) (quoting *Unique Concepts, Inc. v. Brown*, 939 F.2d 1558, 1561 (Fed. Cir. 1991)). Under the patent law, the specification must contain a written description of the invention that enables one of ordinary skill in the art to make and use the invention. 35 U.S.C. 112; *Id.* at 978. A patent's claims "must be read in view of the specification, of which they are a part." *Markman*, 52 F.3d at 979. "For claim construction purposes, the description may act as a sort of dictionary, which explains the invention and may define terms used in the claims." *Id.* "One purpose for examining the specification is to determine if the patentee has limited the scope of the claims." *Watts v. XL Sys., Inc.*, 232 F.3d 877, 882 (Fed. Cir. 2000).

Nonetheless, it is the function of the claims, not the specification, to set forth the limits of the patentee's claims. Otherwise, there would be no need for claims. *SRI Int'l v. Matsushita Elec. Corp.*, 775 F.2d 1107, 1121 (Fed. Cir. 1985) (en banc). The patentee is free to be his own lexicographer, but any special definition given to a word must be clearly set forth in the specification. *Intellicall, Inc. v. Phonometrics*, 952 F.2d 1384, 1388 (Fed. Cir. 1992). And, although the specification may indicate that certain embodiments are preferred, particular embodiments appearing in the specification will not be read into the claims when the claim language is broader than the embodiments. *Electro Med. Sys., S.A. v. Cooper Life Scis., Inc.*, 34 F.3d 1048, 1054 (Fed. Cir. 1994).

This court's claim construction decision must be informed by the Federal Circuit's decision in *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (en banc). In *Phillips*, the court set forth several guideposts that courts should follow when construing claims. In particular, the court reiterated that "the *claims* of a patent define the invention to which the patentee is entitled the right

to exclude." *Id.* at 1312 (emphasis added) (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)). To that end, the words used in a claim "are generally given their ordinary and customary meaning." *Id.* (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)). "[T]he ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Id.* at 1313. This principle of patent law flows naturally from the recognition that inventors are usually persons who are skilled in the field of the invention. *Id.* The patent is addressed to and intended to be read by others skilled in the particular art. *Id.*

The primacy of claim terms notwithstanding, *Phillips* made clear that "the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Phillips*, 415 F.3d at 1313. Although the claims themselves may provide guidance as to the meaning of particular terms, those terms are part of "a fully integrated written instrument." *Id.* at 1315 (quoting *Markman*, 52 F.3d at 978). Thus, the *Phillips* court emphasized the specification as being the primary basis for construing the claims. *Id.* at 1314-17. The Supreme Court stated long ago that "in case of doubt or ambiguity it is proper in all cases to refer back to the descriptive portions of the specification to aid in solving the doubt or in ascertaining the true intent and meaning of the language employed in the claims." *Bates v. Coe*, 98 U.S. 31, 38 (1878). In addressing the role of the specification, the *Phillips* court quoted with approval its earlier observations from *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998):

> Ultimately, the interpretation to be given a term can only be determined and confirmed with a full understanding of what the inventors actually invented and

> intended to envelop with the claim. The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction.

*Phillips*, 415 F.3d at 1316. Consequently, *Phillips* emphasized the important role the specification plays in the claim construction process.

The prosecution history also continues to play an important role in claim interpretation. The prosecution history helps to demonstrate how the inventor and the PTO understood the patent. *Id.* at 1317. Because the file history, however, "represents an ongoing negotiation between the PTO and the applicant," it may lack the clarity of the specification and thus be less useful in claim construction proceedings. *Id.* Nevertheless, the prosecution history is intrinsic evidence. *Id.* That evidence is relevant to the determination of how the inventor understood the invention and whether the inventor limited the invention during prosecution by narrowing the scope of the claims. *Id.*

*Phillips* rejected any claim construction approach that sacrificed the intrinsic record in favor of extrinsic evidence, such as dictionary definitions or expert testimony. *Id.* The *en banc* court condemned the suggestion made by *Texas Digital Systems, Inc. v. Telegenix, Inc.*, 308 F.3d 1193 (Fed. Cir. 2002), that a court should discern the ordinary meaning of the claim terms (through dictionaries or otherwise) before resorting to the specification for certain limited purposes. *Phillips*, 415 F.3d at 1319-24. The approach suggested by *Texas Digital*–the assignment of a limited role to the specification–was rejected as inconsistent with decisions holding the specification to be the best guide to the meaning of a disputed term. *Id*. at 1320-21 (quoting *Vitronics*, 90 F.3d at 1582). According to *Phillips*, reliance on dictionary definitions at the expense of the specification had the effect of "focus[ing] the inquiry on the abstract meaning of words rather than on the meaning of claim terms within the context of the patent." *Id*. at 1321. *Phillips* emphasized that "[t]he patent system

is based on the proposition that the claims cover only the invented subject matter." *Id.* What is described in the claims flows from the statutory requirement imposed on the patentee to describe and particularly claim what he or she has invented. *Id.* The definitions found in dictionaries, however, often flow from the editors' objective of assembling all of the possible definitions for a word. *Id.* at 1321-22.

*Phillips* does not preclude all uses of dictionaries in claim construction proceedings. *Phillips*, 415 F.3d at 1322. Instead, the court assigned dictionaries a role subordinate to the intrinsic record. *Id.* at 1317-19. In doing so, the court emphasized that claim construction issues are not resolved by any "magic formula." *Id.* at 1324. The court did not impose any particular sequence of steps for a court to follow when it considers disputed claim language. *Id.* at 1323-25. Rather, *Phillips* held that a court must attach the appropriate weight to the intrinsic sources offered in support of a proposed claim construction, bearing in mind the general rule that the claims measure the scope of the patent grant. *Id.* at 1324.

Means-plus-function claim terms are governed by § 112, ¶ 6, which states that a claim term "may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof." 35 U.S.C. § 112, ¶ 6. After the function of the means-plus-function limitation has been identified, the "court looks to the written description to identify the structure corresponding to that function." *Micro Chem., Inc. v. Great Plains Chem. Co.*, 194 F.3d 1250, 1258 (Fed. Cir. 1999). As the Federal Circuit stated in *In re Donaldson Co.*, 16 F.3d 1189 (Fed. Cir. 1994) (en banc):

> [I]f one employs means-plus-function language in a claim, one must set forth in the specification an adequate disclosure showing what is meant by that language. If an

applicant fails to set forth an adequate disclosure, the applicant has in effect failed to particularly point out and distinctly claim the invention as required by the second paragraph of section 112.

*Id.* at 1195. The court must determine whether "one skilled in the art" would find enough structure disclosed in the specification to find the claim sufficiently definite. *Atmel Corp. v. Info. Storage Devices, Inc.*, 198 F.3d 1374, 1378 (Fed. Cir. 1999). For software-based means-plus-function limitations, the corresponding structure in the specification is the algorithm that performs the claimed function. *Harris Corp. v. Ericsson, Inc.*, 417 F.3d 1241, 1253 (Fed. Cir. 2005). The specification must disclose enough detail about the algorithm, such as a formula, prose, or a flow chart, to provide the structure required by § 112, ¶ 6. *Finisar Corp. v. DirecTV Group, Inc.*, 523 F.3d 1323, 1340 (Fed. Cir. 2008). The court now turns to a discussion of the relevant claim terms.

## IV.    Agreed Constructions

The parties have stipulated to the construction of the following terms in the claims:

"Publishing" means "the act of placing or making available the presentation or information within the framework of a media venue so that it is accessible by the end users, consumers, viewers, or buyers."

"Presentations" means "any content intended to inform or influence the viewers or readers of a given media venue. It may be in an advertising, public service, editorial, informational or any other format. It may be text, graphics, audio, multimedia, or a combination of any communication methods."

"Seller" means "a person, corporation, partnership, group, or any other legal entity that desires representation of its goods, products, services, reservations for services, ideas, views, or any legal intent or desire to be made public and offered for sale, exchange, trade, or

distribution either paid for or free."

"Network of computers" means "two or more computers that may communicate either continuously or on-demand for the purpose of sharing, processing, transferring information and data."

"Media venues" means "those physical or virtual locations where presentations are placed or made available to present the information within the framework of the media so that it is accessible by the end users, consumers, viewers, or Buyers."

"Internet media venues" means "internet locations where presentations are placed or made available to present the information within the framework of the media so that it is accessible by the end users, consumers, viewers, or Buyers."

"Presentation rules" means "rules to be set by a media venue for use in creating advertisements to be published on that media venue."

"Create an electronic advertisement for publication to the selected internet media venues" means "create an electronic advertisement for publication in a form customized to each of the selected internet media venue's presentation rules."

"Selection information input by the seller" means "the selection of information input by the seller targets one or more internet media venues."

"Blocked URLs" means "internet locations that are precluded from displaying a presentation."

"Third party professional" means "professional individuals as well as business entities that traditionally create and manage advertising, either in whole or in part for sellers, or supply content, products and services to those that create and manage advertising."

"Create an electronic advertisement for the seller for publication to the selected internet media venues" means "create an electronic advertisement for publication in a form customized to each of the selected internet media venue's presentation rules."

## V.    Disputed Constructions

### A.    "Means for transmitting said presentations to a selected media venue of the media venues"

Claim 1 of the '045 patent states in part: "A method of using a network of computers to contract for, facilitate and control the creating and publishing of presentations, by a seller, to a plurality of media venues owned or controlled by other than the seller, comprising: . . . *means for transmitting said presentations to a selected media venue of the media venues.*" (emphasis added). Both parties agree that this is a means-plus-function claim term and its function is "transmitting said presentations to a selected media venue of the media venues."

Google contends that this means-plus-function term is indefinite because it lacks sufficient structure in the written description. According to Google, the specification does not disclose a mathematical or logical algorithm for performing the claimed function. FM responds that the specification links the recited function to the corresponding structure, which is the PGP 1710. Specifically, FM points to language in the specification, which states that the PGP "either transmits the presentation to the appropriate destination or holds it for a publication date to be submitted for a particular deadline or a predetermined promotional market." ['045 Patent, 3:31-34]. The specification also explains that the PGP "publish[es] or place[s]" the presentations to media venues. ['045 Patent, 45:8-13].

FM is correct, as a preliminary matter, that the specification indicates that the PGP is the corresponding structure for the "means for transmitting" element. *See Medtronic, Inc. v. Advanced*

*Cardiovascular Sys., Inc.*, 248 F.3d 1303, 1311 (holding that a structure is a "corresponding structure" only if the specification or prosecution history clearly links the structure to the recited claim). In this context, however, the court must determine if the specification discloses sufficient detail about the PGP algorithm. As discussed in Section III, the specification must describe enough of the algorithm to provide the necessary structure for a means-plus-function limitation. *Finisar*, 523 F.3d at 1340. In *Blackboard, Inc. v. Desire2Learn, Inc.*, 574 F.3d 1371 (Fed. Cir. 2009), the patent claimed a "means for allowing access to and control of the data file . . . based on the access level of the user," and the corresponding structure was an "access control manager." *Id.* at 1382. The plaintiff argued that the specification, specifically the following sentence, sufficiently disclosed the access control manager's structure: "Education support system [] provides multiple levels of access restrictions to enable different types of users to effectively interact with the system . . . while preserving confidentiality of information." *Id.* at 1384. The court rejected the plaintiff's argument: "[T]hat language 'simply describes the function to be performed.' It says nothing about how the access control manager ensures that those functions are performed." *Id.* (quoting *Aristocrat Techs. Austl. Pty Ltd. v. Int'l Game Tech.*, 521 F.3d 1328, 1334 (Fed. Cir. 2008)) (citations omitted). Likewise, the '045 patent specification states that the PGP transmits, publishes, or places the presentation onto the media venue locations. But the specification does not describe the means or steps taken to accomplish the end result; the PGP is merely a black box that accomplishes the claimed function. FM's citations to Fig. 4g and, in particular, to boxes 11380 and 11382 are insufficient. The activities described in those citations are preparatory to the claimed function of transmitting. And, the activities described in box 11390 are simply descriptions of the end result. As such, this claim

term is indefinite.  Because claim 1, the only independent claim of the '045 patent, is indefinite, the court need not construe the remaining disputed '045 patent terms.

**B.      "First interface to the computer system"**

Claim 1 of the '025 patent states in part: "A computer system for creating and publishing customized electronic advertisements, for a seller, to internet media venues owned or controlled by other than the seller, comprising: a *first interface to the computer system* through which each of the internet media venues is prompted to input presentation rules for the internet media venue for displaying electronic advertisements on the internet media venue." (emphasis added).  FM contends that "first interface to the computer system" means "software that enables the internet media venue user to interact with the computer system."  In contrast, Google argues that this term means "software or hardware at the internet media venue location that enables a person working on behalf of the internet media venue to interact with the computer system."  The primary differences between FM's and Google's proposed definitions are the location of the interface and the inclusion of hardware.

Google's proposal requires the first interface to be physically located at the internet media venue location.  Google points to several passages in the specification that describe the internet media venues installing software on their local computers to implement the first interface.  [*See, e.g.,* '025 Patent, 54:63-67 ("[The entity operating the invention] sends [the internet media venue] the necessary software to be installed on their computer.  A computer operator at [the internet media venue] installs the software on their computer that is then configured as Media Interface []")].  These specification passages cited by Google refer to the preferred embodiment of the invention.  Claims should not be limited to the scope of the preferred embodiments of an invention.  *Phillips*, 415 F.3d at 1323.  Unlike the specification's description of the preferred embodiment, the plain language of the claim does not

11

require that the interface be physically located at any particular computer. Thus, the court will not impose a location requirement.

Google also contends that the interface consists of "software or hardware." Although the specification includes text and figures describing the interface as having both software and hardware, [*see, e.g.,* '025 Patent, Fig. 2e & 31:48-57], the court agrees with FM that the invention is a software invention, and the hardware illustrates the intended operating environment for the software. Because the intrinsic evidence does not clearly specify whether the claimed interface must contain hardware, reference to extrinsic evidence is helpful. Computer dictionaries published around the time the first FM patent was filed define "interface" as including software only. *See* Microsoft Press, Microsoft Computer Dictionary 241 (4th ed. 1999) (defining "interface" as "software that enables a program to work with the user . . . , with another program . . . , or with the computer's hardware"). This extrinsic evidence thus indicates that persons of ordinary skill in the art would not regard the term "interface" as requiring hardware. When read as a whole, the patent discloses a software invention. Although hardware is necessarily required to operate the software, there is no indication that the inventors intended to claim hardware. Therefore, the court construes this claim to mean "software that enables the internet media venue user to interact with the computer system."

C.      **"Second interface to the computer system"**

Claim 1 of the '025 patent states in part: "A computer system for creating and publishing customized electronic advertisements, for a seller, to internet media venues owned or controlled by other than the seller, comprising: . . . *a second interface to the computer system* through which a seller is prompted to input information to select one or more of the internet media venues and prompted to input information to create an electronic advertisement for publication to the selected

12

internet media venues." (emphasis added). FM contends that "second interface to the computer system" means "software that enables the seller user to interact with the computer system through which the seller user is prompted to enter information to select one or more internet media venues." In contrast, Google argues that this term means "software or hardware at the seller location through which the seller is prompted to enter information to the computer system to enable the seller to select one or more internet media venues."

The arguments regarding the location and hardware requirements for the first interface, discussed in Section B, apply with equal force to this second term. In addition, Google contends that prosecution history estoppel requires this second interface to be at the seller's location. Google quotes a portion of the patentee's response to a claim rejection: "What is not common in the art are open-access presentations that are created and published from data input into *a remote program at a Sellers* [sic] *location.*" ['025 Prosecution History, Amend. dated Jan. 10, 2000, at 10] (emphasis added). The next sentence, however, distinguishes the claimed invention from the prior art based upon the lack of a code editor, not through location: "The creation of multiple open-access presentations being done *without the Seller making the changes within a code editor is new to the art . . . .*" *Id.* (emphasis added). This prosecution history does not show a clear disavowal of all locations other than the seller's location. *See Cordis Corp. v. Boston Scientific Corp.*, 561 F.3d 1319, 1329 (Fed. Cir. 2009) ("A disclaimer must be 'clear and unmistakable,' and unclear prosecution history cannot be used to limit claims.").

Google also contends that the claim language requires the seller to select particular Internet websites as media venues. Google relies heavily on statements made during prosecution, particularly in the re-examination proceedings. The court rejects this construction. Claim 1 requires the seller

"to input information to select one or more of the internet media venues."  By contrast, claim 24 requires "the computer system of claim 20, wherein the selection information includes identification of individual internet media venues."  And claim 20 requires that "the selection information input by the seller *targets* one or more internet media venues."  (emphasis added).  These dependent claims require the seller to input information more specific than what claim 1 requires.  The statements in the re-examination, particularly those related to the Aaddzz reference, indicate that the seller had no ability to select the internet media venues.  For example, the patentee argues, "Aaddzz will figure out the best pages, not just sites, for your ad.  Aaddzz will use ad performance data . . . to statistically determine the best pages." ['045 Re-exam Response, dated Dec. 23, 2008, at 28 (quoting Aaddzz Highlights reference)].  The court has also reviewed the patentee's statements concerning the Mason and Brown references.  These statements do not amount to a disavowal of claim scope to the extent that Google's limitation is appropriate.

As such, the court defines the term "second interface" to mean "software that enables the seller user to interact with the computer system through which the seller user is prompted to enter information to select one or more internet media venues."

   **D.**     **"Publishing the electronic advertisement to one or more of the selected internet media venues"**

Claim 1 of the '025 patent states in part: "A computer system for creating and publishing customized electronic advertisements, for a seller, to internet media venues owned or controlled by other than the seller, comprising: . . . a computer controller of the computer system . . . *publishing the electronic advertisement to one or more of the selected internet media venues* in compliance with the presentation rules of the internet media venue, whereby the electronic advertisement is displayed

on each of the one or more of the selected internet media venues in compliance with the presentation rules of the internet media venue." (emphasis added). FM contends that "publishing the electronic advertisement to one or more of the selected internet media venues" means " . . . placing or making available the customized electronic advertisement within the framework of each internet media venue so that it is accessible by the end users, consumers, viewers, or buyers . . . ." In contrast, Google argues that this term means "placing or making available the electronic advertisement at one or more of the selected internet media venue location for public display." The primary differences between the two proposed constructions are how closely they track the glossary's "publishing" definition and whether they add the modifiers "customized" and "each."

FM and Google's proposals apparently differ on the meaning of "publishing," as used in the claim. The '025 patent specification contains a "Patent Application Glossary," which defines several terms. The glossary defines "publishing" as "[t]he act of placing or making available the presentation or information within the framework of media venue so that it is accessible by the end users, consumers, viewers, or Buyers. . . . " ['025 Patent, 11:48-52]. FM's proposed construction closely tracks the glossary's definition of "publishing." The Federal Circuit recently affirmed that "[w]hen a patentee explicitly defines a claim term in the patent specification, the patentee's definition controls." *Martek Biosciences Corp. v. Nutrinova, Inc.*, 2009 WL 2780367, at *13 (Fed. Cir. Sept. 3, 2009). Therefore, the court adopts the portion of FM's proposed construction containing the phrase, "so that it is accessible by the end users, consumers, viewers, or Buyers." Next, Google suggests that the actual claim language requires "publishing . . . *to* one or more of the selected internet media venues." (emphasis added). As a consequence, Google includes the word "at" in its

proposed construction. The court agrees with Google's position and thus adopts a construction reflecting that the publication occurs "at" the selected internet media venues.

As stated above, FM proposes a "*customized* electronic advertisement within the framework of *each* internet media venue," whereas Google does not include the modifiers "customized" or "each." Neither the glossary definition of "publishing" nor the body of the claim contains the word "customized." Claim 1's preamble, however, does state, "A computer system for creating and publishing *customized* electronic advertisements . . . ." (emphasis added). Moreover, the parties have agreed that "create an electronic advertisement for publication to the selected internet media venues" means "create an electronic advertisement for publication in a form *customized* to each of the selected internet media venue's presentation rules." *See* Section IV (emphasis added). In light of this agreement, the court will include the term "customized" in the construction.

Like "customized," the "each" modifier does not appear in the glossary definition of "publishing." But "each" does appear in the body of claim 1: "whereby the electronic advertisement is displayed on *each* of the one or more of the selected internet media venues." (emphasis added). The use of "each" in the "whereby" clause teaches that the advertisement must be displayed on every selected internet venue. The court finds that the inclusion of "each" in the claim construction is proper. Therefore, the court defines the term "publishing the electronic advertisement to one or more of the selected internet media venues" to mean "placing or making available the customized electronic advertisement within the framework of and at each internet media venue so that it is accessible by the end users, consumers, viewers, or buyers."

**E.** **"Processing . . . the electronic advertisement . . . in compliance with the presentation rules of the internet media venue"**

Claim 1 of the '025 patent states in part: "A computer system for creating and publishing customized electronic advertisements, for a seller, to internet media venues owned or controlled by other than the seller, comprising: . . . a computer controller of the computer system *processing . . . the electronic advertisement . . . in compliance with the presentation rules of the internet media venue*, whereby the electronic advertisement is displayed on each of the one or more of the selected internet media venues in compliance with the presentation rules of the internet media venue." (emphasis added). FM contends that "processing . . . the electronic advertisement . . . in compliance with the presentation rules of the internet media venue" means "executing a systematic sequence of mathematical and/or logical operations upon the inputted information to create an electronic advertisement customized for each selected internet media venue in a form that complies with the presentation rules set by that media venue." In contrast, Google argues that this term means "executing a systematic sequence of mathematical and/or logical operations upon the electronic advertisement to process it in compliance with the presentation rules of the internet media venues." The relevant difference between the two proposed constructions is the object of the processing step: "the electronic advertisement" or "the inputted information." Nowhere within the computer controller limitation does the term "inputted information" appear. The claim language unambiguously states that the act of "processing" is applied to the "electronic advertisement." Therefore, the court construes the term "processing . . . the electronic advertisement . . . in compliance with the presentation rules of the internet media venue" to mean "executing a systematic sequence of mathematical and/or logical operations upon the customized electronic advertisement to make it comply with the presentation rules of the internet media venues."

## F.     "Design or style standards"

Claim 62 of the '025 patent states, "The computer system of claim 45, wherein the presentation rules of the internet media venue comprise *design or style standards*, further comprising a computer program design filter to automatically apply or compare the internet media venue design or style standards to the information input by the seller or the advertisement to control look and feel of the advertisement to be displayed on the internet media venue." (emphasis added). FM proposes that "design or style standards" should be construed as "presentation rules which control the look and feel of an advertisement." Google does not offer a proposed construction because it contends that the claim is indefinite. The claim is indefinite, according to Google, due to the multiple cascading "or"s in the claim language and because the proposed construction is purely functional.

To support its multiple "or"s argument, Google cites *In re Archbold*, 151 F.2d 350 (C.C.P.A. 1945), which held that the use of multiple "or"s in the term "volatile solvent of the class of a lower alcohol, ketones, acetone, *or* ethyl acetate, benzene, *or* ether" rendered the claim indefinite because it "introduced the element of uncertainty as to the scope to be attached to the members of the group." *Id.* at 351-52 (emphasis added). *Archbold* is distinguishable from the present case, because the disputed claim term in *Archbold* was a Markush group; the multiple uses of "or" introduced uncertainty as to which elements were members of the group. *Id.* at 352. In claim 62, the use of "or" in "design or style," "apply or compare," and "the information . . . or the advertisement" presents a binary choice between two options–an ordinary skilled artisan would not find any uncertainty in these choices. Thus, the court finds no indefiniteness due to the use of the word "or."

Google also contends that the claim is indefinite because it uses purely functional language. But "apparatus claims are not necessarily indefinite for using functional language." *Microprocessor*

*Enhancement Corp. v. Tex. Instruments Inc.*, 520 F.3d 1367, 1375 (Fed. Cir. 2008). Functional language may be used as a limitation in an apparatus claim. *K-2 Corp. v. Salomon S.A.*, 191 F.3d 1356, 1363 (Fed. Cir. 1999). Similarly in this case, the functional language modifies an apparatus, "the computer system," which was defined in previous claims. The court is not persuaded that the claim's use of functional language renders it indefinite. The court defines "design or style standards" as "presentation rules which control the look and feel of an advertisement."

> **G.** **"Automatically apply or compare the internet media venue design or style standards to the information input by the seller or the advertisement" & "Automatically apply or compare the internet media venue distribution factors to the information input by the seller or the advertisement"**

Claim 62 of the '025 patent states, "The computer system of claim 45, wherein the presentation rules of the internet media venue comprise design or style standards, further comprising a computer program design filter to *automatically apply or compare the internet media venue design or style standards to the information input by the seller or the advertisement* to control look and feel of the advertisement to be displayed on the internet media venue." Similarly, claim 90 states, "The computer system of claim 62, wherein the internet media venue presentation rules comprise distribution factors, further comprising a computer program distribution filter to *automatically apply or compare the internet media venue distribution factors to the information input by the seller or the advertisement* to determine whether to publish the advertisement to the internet media venue." FM proposes that the these claims should be defined as "execute a systematic sequence of mathematical and/or logical operations to apply or compare the internet media venue's <design or style standards / distribution factors> to the information input by the seller or to the advertisement." Google advances the same indefiniteness arguments that the court rejected in Section F. The court construes the term "automatically apply or compare the internet media venue design or style standards to the

19

information input by the seller or the advertisement" to mean "execute a systematic sequence of mathematical and/or logical operations to apply or compare the internet media venue's design or style standards to the information input by the seller or to the advertisement." Likewise, the court construes the term "automatically apply or compare the internet media venue distribution factors to the information input by the seller or the advertisement" to mean "execute a systematic sequence of mathematical and/or logical operations to apply or compare the internet media venue's distribution factors to the information input by the seller or to the advertisement."

### H. "Control look and feel of the advertisement"

Claim 62 of the '025 patent states, "The computer system of claim 45, wherein the presentation rules of the internet media venue comprise design or style standards, further comprising a computer program design filter to automatically apply or compare the internet media venue design or style standards to the information input by the seller or the advertisement to *control look and feel of the advertisement* to be displayed on the internet media venue." The court finds that the meaning of this term is self-evident and any further construction is unnecessary.

### I. "Publish the advertisement to the internet media venue"

Claim 90 states, "The computer system of claim 62, wherein the internet media venue presentation rules comprise distribution factors, further comprising a computer program distribution filter to automatically apply or compare the internet media venue distribution factors to the information input by the seller or the advertisement to determine whether to *publish the advertisement to the internet media venue*." For the reasons set forth in Section D, the court construes the term "publish the advertisement to the internet media venue" to mean "place or make

available the customized electronic advertisement within the framework of and at each internet media venue so that it is accessible by the end users, consumers, viewers, or buyers."

**J.** **"Computer controller processes the advertisement by automatically applying or comparing the internet media venue presentation rules to the information input by the seller or the advertisement"**

Claim 140 states, "The computer system of claim 1, wherein the *computer controller processes the advertisement by automatically applying or comparing the internet media venue presentation rules to the information input by the seller or the advertisement* to enforce compliance with the internet media venue presentation rules." Based upon its construction in Section E, the court is not persuaded that a construction of this analogous term is necessary.

**K.** **"The third party professional is prompted to input information to select one or more of the internet media venues"**

Claim 1 of the '059 patent states in part: "A computer system allowing a third party professional to manage, create and publish customized electronic advertisements, for a seller, to internet media venues owned or controlled by other than the seller and other than the third party professional, comprising: . . . a third interface to the computer system through which *the third party professional is prompted to input information to select one or more of the internet media venues* and prompted to input information to create an electronic advertisement for the seller for publication to the selected internet media venues." (emphasis added). FM recommends that "the third party professional is prompted to input information to select one or more of the internet media venues" should be defined as "the third-party professional is prompted to input information to select one or more internet media venues." Google proposes the following construction: "software or hardware at the third party professional location through which the third party professional is prompted to enter

information to the computer system to enable the third party professional to select one or more internet media venues."

Google's location and hardware arguments have been discussed and rejected in Section B. Therefore, the court defines this term to mean "the third-party professional is prompted to input information to select one or more internet media venues."

**L.** **"A computer controller of the computer system processing and publishing the electronic advertisement to one or more of the selected internet media venues whereby the electronic advertisement is displayed on the one or more of the selected internet media venues in compliance with the presentation rules of the internet media venue"**

Claim 1 of the '059 patent states in part, "A computer system allowing a third party professional to manage, create and publish customized electronic advertisements, for a seller, to internet media venues owned or controlled by other than the seller and other than the third party professional, comprising: . . . *a computer controller of the computer system processing and publishing the electronic advertisement to one or more of the selected internet media venues whereby the electronic advertisement is displayed on the one or more of the selected internet media venues in compliance with the presentation rules of the internet media venue*." Based upon its constructions in Sections D and E, the court is not persuaded that an additional construction of this analogous term is necessary.

**VI.** **Conclusion**

The court adopts the constructions set forth in this opinion for the disputed terms of the '045, '025, and '059 patents. The parties are ordered that they may not refer, directly or indirectly, to each other's claim construction positions in the presence of the jury. Likewise, the parties are ordered to refrain from mentioning any portion of this opinion, other than the actual definitions adopted by the

court, in the presence of the jury. Any reference to claim construction proceedings is limited to

informing the jury of the definitions adopted by the court.

SIGNED this 9th day of October, 2009.


CHARLES EVERINGHAM IV
UNITED STATES MAGISTRATE JUDGE