# EXHIBIT A
# PART 1

Dockets.Justia.com

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re application of: Stone, et al

Reexamination Control No.: 95/001,069

U.S. Patent No.: 7,249,059

Reexamination Request Filed: July 21, 2008

For:    INTERNET ADVERTISING SYSTEM
AND METHOD

Examiner:    Jeffrey L. Gellner

Technology Center/Art Unit: 3993

Attn: Mail Stop "Inter Partes Reexam"
Central Reexamination Unit
Office of Patent Legal Administration
United States Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450

Dear Sir:

Transmitted herewith is a Response to Office Action:

☐    No additional fee is required.
☒    Applicant is entitled to small entity status under 37 CFR 1.27
☒    Also attached: Certificate of Service

The fee has been calculated as shown below:

☐    Please charge my Deposit Account No. 504592 in the amount of $00.00. An additional copy of this transmittal sheet is submitted herewith.

☒    The Commissioner is hereby authorized to charge payment of any fees associated with this communication or credit any overpayment, to Deposit Account No. 504592, including any filing fees under 37 CFR 1.16 for presentation of extra claims and any patent application processing fees under 37 CFR 1.17.

Respectfully submitted,

Michael F. Heim
Reg. No. 32,702

Heim, Payne & Chorush, LLP
600 Travis, Suite 6710
Houston, Texas 77002
Phone: (713) 221-2000
Facsimile: (713) 221-2021
Date: January 21, 2009

8620-v1/1039.0010

DEFENDANT'S
EXHIBIT
**152**
2:007-CV-279 (CE)

Please type a plus sign (+) inside this box → | + |

PTO/SB/021 (08-00)
Approved for use through 10/31/2002. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number

| **TRANSMITTAL FORM** | Application Number | 95/001,069 |
|---|---|---|
| | Filing Date | July 21, 2008 |
| | First Named Inventor | Lucinda Stone |
| *(to be used for all correspondence after initial filing)* | Group Art Unit | 3993 |
| | Examiner Name | Jeffrey L. Gellner |
| Total Number of Pages in This Submission | Attorney Docket Number | 1039-0010 |

## ENCLOSURES *(check all that apply)*

| | | |
|---|---|---|
| ☒ Fee Transmittal Form | ☐ Assignment *(for an application)* | ☐ After Allowance Communication to Group |
| ☐ Fee Attached | ☐ Drawing(s) | ☐ Appeal Communication to Board of Appeals and Interferences |
| ☒ Amendment/Reply | ☐ Licensing-related Papers | ☐ Appeal Communication to Group *(Appeal Notice, Brief, Reply Brief)* |
| ☐ After Final | ☐ Petition | ☐ Proprietary Information |
| ☐ Affidavits/declaration(s) | ☐ Petition to Convert to a Provisional Application | ☐ Status Letter |
| ☐ Extension of Time Request | ☐ Power of Attorney, Revocation Change of Correspondence Address | ☐ Other Enclosure(s) *(please identify below):* |
| ☐ Express Abandonment Request | ☐ Terminal Disclaimer | *Post Card and Certificate of Service* |
| ☐ Information Disclosure Statement | ☐ Request for Refund | |
| ☐ Certified Copy of Priority Document(s) | ☐ CD, Number of CD(s) | |
| ☐ Response to Missing Parts/ Incomplete Application | | |
| ☐ Response to Missing Parts under 37 CFR 1.52 or 1.53 | Remarks | |

## SIGNATURE OF APPLICANT, ATTORNEY, OR AGENT

| Firm or Individual Name | Michael F. Heim |
|---|---|
| Signature | *Michael F. Heim* |
| Date | January 21, 2009 |

## CERTIFICATE OF MAILING

I hereby certify that this correspondence is being sent by Express Mail to the Commissioner for Patents, Alexandria, VA 22313 on this date: January 21, 2009.

| Typed or Printed Name | Amber L. Branum | | |
|---|---|---|---|
| Signature | *Amber B* | Date | January 21, 2009 |

The collection of information is required by 37 CFR 1.53(b). The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 12 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA. 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: **Commissioner for Patents, P. O. Box 1450, Alexandria, VA 22313-1450.**

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re application of: Stone, et al

Reexamination Control No.:  95/001,069

U.S. Patent No.: 7,249,059

Reexamination Request Filed:  July 21, 2008

For:    INTERNET ADVERTISING SYSTEM
        AND METHOD

Examiner:      Jeffrey L. Gellner

Technology Center/Art Unit: 3993

Attn: Mail Stop "Inter Partes Reexam"
Central Reexamination Unit
Office of Patent Legal Administration
United States Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450

Dear Sir:

In response to the Office Action mailed October 17, 2008, please enter and consider the following remarks.

The pending claims are reflected in the **Listing of Claims** following the Response.  In this Response, no amendments have been made to the claims.

An **Appendix** and three **Exhibits** are attached, following the Listing of Claims.

## REMARKS

Patent Owner Function Media respectfully acknowledges receipt of the First Office Action mailed October 17, 2008. In that Office Action, the Examiner rejected claims 1-52 as follows: (1) claims 1-3, 9-23, 27-29, 35-49 as anticipated under § 102(a) and (e) by the Mason '075 patent; (2) claims 1-23, 25-49, 51-52 as anticipated under § 102(b) by the AdForce document; (3) claims 1-3, 9-23, 27-29, 35-49 as anticipated under § 102(b) by the Brown '368 patent; (4) claims 1-3, 9-23, 27-29, 35-49 as obvious under § 103(a) by the Aaddzz Brochure document in view of the Mason '075 patent; (5) claims 1-23, 25-49, 51-52 as obvious under § 103(a) by the Aaddzz Brochure document in view of the AdForce document; (6) and claims 24 and 50 as obvious under § 103(a) by the Mason '075 patent in view of the Wojcik '493 patent, the Aaddzz Brochure document in view of the Mason'075 patent in view of the Wojcik '493 patent, the AdForce document in view of the Wojcik '493 patent, the Aaddzz Brochure document in view of the AdForce document in view of the Wojcik '493 patent, and the Brown '368 patent in view of the Wojcik '493 patent. Function Media respectfully requests reconsideration for the reasons that follow.

## I.    Background

The inventors of the '059 patent are employees and principals of Function Media, the current Patent Owner. The '059 patent is a continuation-in-part of the '045 patent. Prior to their work on the '045 invention, the inventors had developed an Internet-based directory, called First Traveler's Choice (FTC). FTC generated presentations[1] that were derived from information submitted by bed-and-breakfast innkeepers. Prospective customers could review the FTC presentations over the Internet. Through discussions with their innkeeper clients, the inventors realized that a significant problem existed for companies wishing to advertise goods or services in multiple venues on the Internet. Specifically, they discovered that on-line advertisers were required to learn the particular rules for every media outlet where they wished to publish ads, and then had to produce and submit separate ads customized to comply with the rules of each individual media outlet. The inventors also knew from their experience as a media outlet operator that the process of negotiating the placement, content, and publication of a seller's presentation was a time-consuming process, requiring significant interaction and coordination between the media outlet and seller. Furthermore, the existing process did not provide media outlets with an adequate method of implementing quality control standards over submitted presentations. In an attempt to solve these problems, the inventors sought a more efficient approach that minimized the amount of work required of sellers who wanted

---

[1]    The terms "presentation," "advertisement," and "ad" are used interchangeably herein.

1

to advertise in multiple on-line media outlets, while providing media outlets with a greater degree of control over the submitted advertising materials. The `045 patent discloses and claims that approach.

As a result of the inventions disclosed in the `045 patent, sellers are able to create multiple presentations customized to meet the requirements of a variety of media outlets, with considerable savings in time and effort. These savings are achieved because the different custom presentations are created automatically in software, based on a single entry of information:

> This invention improves on the prior art by automatically publishing the information and data received from sellers in an open-access format that is readily available to public automatic search and index programs as well as to on-demand search programs. With this invention, the seller's presentation can be published in several different directories or indexes, taking on a different style, look, and feel in each as a result of the **automatic restructuring** of the data entered by the seller. This is accomplished by using different presentation formatting guidelines and rules for the targeted directories or indexes. This single-entry and automatically distributed method is more efficient than managing each directory or index individually. `045 patent at 5:10-23.

The `045 patent claims a method that automatically creates presentations customized to the media venue's guidelines from information input by a seller. The automated creation method disclosed in the preferred embodiment is capable of applying editing, style, graphics, data, and content controls to the seller information, as well as design specification and architectural requirements of individual media venues. `045 patent at 4:64-5:5. In other words, presentation data input by the seller takes on a different style, look, and feel when presented in different media outlets, due to "the automatic restructuring of the data entered by the seller" in accordance with guidelines specified by each media venue.

Like the `045 patent and other patents from the same family, the `059 patent describes the use of a network of computers to automatically create and publish customized presentations to a plurality of media venues, via the application of specific presentation rules to input data. The `059 specification also includes, among other things, descriptions of "third party professionals" and how they interact with the managing, creation, and publication of the presentations described in the `045 patent. Prior to the `059 patented inventions, sellers who wanted to use third party professionals to assist with advertising efforts had to find, select, and negotiate with such third parties on their own and then, once a third party professional had been hired, constantly send data back and forth regarding the development and distribution of a particular advertisement. This type of collaborative advertisement creation was particularly time consuming and labor intensive as the needs, concepts,

goals and resources of the seller had to be communicated and reconciled with the capability and availability of the selected professional, and multiple drafts of an advertisement had to be sent back and forth between them for *each* individual media venue. Furthermore, either the professional or the seller, or both, needed to know the respective presentation rules of each media venue prior to creating and publishing an advertisement.

The inventors sought to solve these problems by facilitating collaboration between sellers and third party professionals. The `059 inventions allow for the selection of media venues by a third party professional on behalf of a seller, and the creation of advertisements conforming to the presentation rules of the selected media venues using information entered by a third party professional on behalf of a seller, among other things. As noted in the specification:

> The seller [can] utilize [the invention of the `059 patent] to retain, employ, [or] contract with ... Third Party Creative or Management Professionals. These professionals may perform a variety of ... functions or services [for] the seller ... [including providing] the complete conception, creation, and execution [of an advertisement] ... for the seller. The invention allows the seller to appoint a Third Party Professional as their agent to facilitate the implementation of presentation creation or publishing within the invention. As their agent the Third Party Professional would have the ability to make decisions and commit the seller in all aspects of the invention. `059 patent at 17:20-43.

In short, the `059 patent discloses: (1) the use of three separate interfaces and three separate databases for use by three separate entities (a seller, a third party professional, and media venues), (2) a first interface prompting a media venue to input presentation rules[2] and a first database storing these presentation rules, (3) a second interface prompting a seller to input identifying information and a second database storing this identifying information, , (4) a third interface prompting a third party professional hired by the seller to input media venue selection information and advertising content and a third database storing this selection and content information, and (5) a computer controller (a) applying the presentation rules of the media venue(s) selected by the third party professional to advertising content input by the third party professional to create customized, guideline-compliant electronic advertisements for the selected media venues, and (b) automatically publishing the electronic advertisements to the selected media venues for display.[3]

---

[2] Presentation rules are also referred to as "guidelines." These terms should be treated synonymously.

[3] Portion (5) of this statement assumes the presentations rules of a selected media venue allow for publication of an advertisement from the seller/ third party professional to that venue. However, it should be noted—here and throughout this Response—that an advertisement for a media venue selected directly by the third party professional may not be created and published to that selected media venue if that media venue has a presentation rule that prohibits the advertisement's content from being published on that media venue or that prohibits the particular seller or third party professional from submitting an advertisement to the media venue.

In the preferred embodiment, some of the information input into the system through the first, second, and third interfaces and stored on the first, second, and third databases (respectively) is "synchronized" with—or copied to—related databases that are accessible by other interfaces. `059 patent at 17:20-43; 23:26-34, 34:11-18, 44: 29-39; 22:54-64, 33:62–34:7, 44:14-24.    More specifically, in the preferred embodiment, the third (*i.e.,* third party professional) interface has access to a database holding copies of the presentation rules input by media venues, and the second (*i.e.,* seller) interface has access to a database holding copies of the media venue selection and advertisement content information and the information input by the third party professional the seller hired, as well as a database holding copies of the presentation rules input by media venues. Furthermore, both the second (seller) interface and the third (third party professional) interface have software with the capability to "mimic" the creation software used by the computer controller[4], allowing both the seller and the third party professional to "preview" each presentation that is—or will be—published at virtually any point in time. This greatly reduces the time and effort formerly required for collaboration between a seller and a third party professional, as it allows sellers to monitor and review a third party professional's work, while simultaneously reducing the time and effort required of a third party professional to create advertisements for a number of media venues.

This unique combination of features allows advertising to flourish because it permits media venues, sellers, and third party professionals that are "strangers" to each other to be brought together via participation in the system.   The claimed invention allows sellers to select and use the services of third party professionals, and allows these selected third party professionals to control the placement and content of seller presentations, while allowing the media venues to retain control over the content, look, and feel of the advertisements they receive and display.   This method maximizes exposure and revenue for all three entities while saving each of them cost and effort.   Indeed, the paradigm shift brought about by the `059 patent family is its express teaching not to upload pre-created ads into the system, which already have a set and singular look and feel, but rather to enter into the system raw advertising content that is then used by the system to create ads whose look and feel can be changed to match the look and feel of any number of media venues to which the advertising content is to be published.

In the following discussion, Patent Owner will focus on the basic fundamental differences between the claimed invention and the cited prior art in an attempt to narrow the issues and to streamline these proceedings, with the understanding that it reserves the right to address other

---

[4] These programs use the "copies" of information held in the databases accessible by their respective interface.

4

differences in future responses.[5]  Before addressing the specific rejections, however, Patent Owner first will address certain claim limitations.

## II.    Background of the Claims and Specification

### A.    The PTO Applies the Broadest Reasonable Interpretation of a Claim that is Consistent with the Specification

During a reexamination proceeding, the PTO examines claims using their "broadest reasonable interpretation." MPEP §§ 2258(I)(G), 2658; *In re Yamamoto*, 740 F.2d 1569, 1572 (Fed. Cir. 1984). This standard is different than the broadest <u>possible</u> interpretation, because the PTO is constrained by certain guidelines imposed by both the MPEP and the Federal Circuit. Notably, the PTO can only give claims the broadest construction that is both <u>reasonable</u> and <u>consistent with the specification</u>. *In re Morris*, 127 F.3d 1048, 1054 (Fed. Cir. 1997); MPEP § 2111. Further, the Federal Circuit has made it clear that the PTO must pay deference to <u>any</u> interpretive guidance offered in the patent specification:

> Some cases state the standard as "the broadest reasonable interpretation," [citation omitted] others include the qualifier "consistent with the specification" or similar language [citation omitted]. Since <u>it would be unreasonable for the PTO to ignore any interpretive guidance afforded by the applicant's written description</u>, either phrasing connotes the same notion: as an initial matter, the PTO applies to the verbiage of the proposed claims the broadest reasonable meaning of the words in their ordinary usage as they would be understood by one of ordinary skill in the art, <u>taking into account whatever enlightenment by way of definitions or otherwise that may be afforded by the written description contained in the applicant's specification.</u> *Id.* at 1054 (emphasis added). *See also Phillips*, 415 F.3d 1303, 1314-5 (Fed. Cir. 2005) ("... claims must be read in view of the specification, of which they are a part.... [T]he specification is always highly relevant to the claim construction analysis. Usually, it is dispositive.").

Function Media respectfully submits that the specification and claim context are largely dispositive of the proper claim interpretation in this reexamination. Although neither Requester nor the PTO provided a specific interpretation of any claim terms, it is clearly the view of both that the claims may be interpreted sufficiently broadly to overlap with the prior art. With all due respect, both Requester's and the PTO's implied interpretation of these claims are unreasonable in light of the specification.

---

[5] Each independent claim of the `059 patent contains at least one element that is supported only by new matter added in the `059 patent application. Accordingly, the priority date for every claim in this patent is July 11, 2002—the filing date of the `059 patent application. However, to the extent that any obviousness prior art cited by the PTO is dated after the filing of the `045 patent, then Patent Owner may antedate that prior art to the extent that it only discloses subject matter disclosed in the parent `045 application. 37 C.F.R. § 1.131.

### B.    The Context of Claims 1 and 27

The `059 patent includes 52 claims. Claims 1 and 27 are independent claims, while claims 2-26 and 28-52 are dependent on these claims, respectively. Claim 1 provides:

1.  A computer system allowing a third party professional to manage, create and publish customized electronic advertisements, for a seller, to internet media venues owned or controlled by other than the seller and other than the third party professional, comprising:

   a first interface to the computer system through which each of the internet media venues is prompted to input presentation rules for the internet media venue for displaying electronic advertisements on the internet media venue;

   a first database storing the presentation rules input by the internet media venues through the first interface;

   a second interface to the computer system through which a seller is prompted to input information identifying the seller; and

   a second database storing the identifying information input by the seller through the second interface;

   a third interface to the computer system through which the third party professional is prompted to input information to select one or more of the internet media venues and prompted to input information to create an electronic advertisement for the seller for publication to the selected internet media venues;

   a third database storing the information input by the third party professional through the third interface; and

   a computer controller of the computer system processing and publishing the electronic advertisement to one or more of the selected internet media venues whereby the electronic advertisement is displayed on the one or more of the selected internet media venues in compliance with the presentation rules of the internet media venue.

The plain language of claim 1[6] recites an apparatus for allowing a third party professional to manage, create and publish customized electronic advertisements to internet media venues on behalf of an individual seller. The claimed apparatus requires the computer system to provide:

   (1) a first interface that prompts one or more internet media venues to input presentation rules, and a first database[7] to store these rules;

---

[6] Claim 1 and claim 27 directly track one another and thus should be construed consistently.  In its First Office Action, the PTO used identical references to the prior art to anticipate each and every element of claims 1 and 27.  *See, for example,* OA at 104-106, 160-162, regarding rejection of claims 1 and 27, respectively, based on the Mason `075 patent.  Accordingly, the rejection of these two claims will be addressed together throughout this Response, due to the page number restriction on this Response.  A similar analysis of the plain language of claim 27 is attached as an Appendix.

6

(2) a second interface that prompts a seller to input information identifying itself, and a second database to store this information;

(3) a third interface that prompts a third party professional to

(a) input information to select media venue(s) and

(b) input information that will be used to create an electronic advertisement for the seller, and a third database to store this information; and

(4) a computer controller that

(a) processes the aforementioned information to create the electronic advertisement from the information input by the third party professional, and

(b) publishes this advertisement to the one or more selected internet media venues for display. When "processing" the advertisement information, the computer controller (via the use of internal software) modifies the advertisement information in accordance with internet media venues' rules, thus creating a customized rule-compliant advertisement for publication to and display on each selected internet media venue. `059 patent at 24:25-47; 25:1-5, 45-60. Once the controller creates the electronic advertisement, the computer controller publishes that advertisement to the one or more selected media venues.

While all of the limitations of claims 1 and 27 must be considered when determining patentability, there are three specific limitations that clearly distinguish these claims from all of the cited prior art: (1) the requirement of three separate interfaces for use by three separate entities, where information input via these interfaces is stored in three separate databases, (2) a computer controller that creates one or more electronic advertisements that comply with the presentation rules entered by internet media venue(s) by processing the information input by the third party professional with the presentation rules of the media venues selected by the third party professional, and (3) the computer controller automatically publishing[8] the one or more electronic advertisements to the selected media venues. These three limitations have been misconstrued by Requester and the PTO. Accordingly, the guidance provided by the specification for these three limitations will be discussed below.

1. **The Claims Require Three Separate Interfaces For Use By Three Separate Entities, and Storage of Input Information on Three Separate Databases**

---

[7] The `059 specification defines the term "database" as referring to "the structural or relational storage of data within files" as well as to "the tables or sub-divisions of data storage within those databases or files." `059 patent at 12:9-16.

[8] The definition of "publishing" will be discussed below, in section II(B)(3).

The plain language of claims 1 and 27 requires that the system/method must involve three separate entities: (1) a seller, (2) one or more media venues, and (3) a third party professional. The specification is entirely consistent with the plain and unambiguous claim language. *See* `059 patent at 14:3-11:15: 28-33; 15:46-16:15. Figures 1a and 1b of the `059 patent clearly depict three separate interfaces—a Seller Interface (4000), a Media Interface (6000), and a Third Party Professional Interface (7000). As shown by Figures 2c, 2e, and 2f, these interfaces contain different internal components and are individually tailored for use by one of the three "types" of participants in the system (*i.e.,* either a seller, an internet media venue, or a third party professional). Figure 2a of the patent shows that in the preferred embodiment, the information entered by these three entities is stored in three separate databases located on the Central Controller and Presentation Processor (1000). Specifically, the Seller Database (1630) stores identifying information input by the seller, the Presentation Rules Database (1650) stores presentation rules input by media venues, and the Presentation Database (1640) stores the media venue selection and content information input by the third party professional.

### a.    Seller Interface/ Seller Database

The Seller Interface (4000), shown in Figure 2c, "is both the gateway to the present invention and the controlling software interface for the seller." `059 patent at 35:16-18. When a Seller first accesses the system, "the Seller Interface 4000 ... specifically the Configuration and Presentation Program 4715[9] ... will prompt the Seller for the necessary information." `059 patent at 21:44-67. The Presentation and Configuration Program (4715), prompts the seller to provide relevant information and, in the preferred embodiment, enables the seller to select and hire third party professionals. Fig. 2c; *see also* `059 patent at 35:15-17, 38-45. More specifically:

> [T]he new Seller/client is presented with a series of forms containing yes/no choices, text entry areas, menu driven choices, and other data and information entry methods. These forms lead the Seller through his establishment as a client of the given instance of the present invention. This portion of the Presentation and Configuration Program 4715 prompts the Seller for information such as contact numbers, contact address, payment methods, and other Seller/client information for the use of the management of the instance of the present invention in working with and servicing the Seller. `059 patent at 52:42-53.

In the preferred embodiment, the seller-provided information is stored on the Seller Database (1630) located on the Central Controller and Presentation Processor (1000). *See* `059 patent Fig. 2a. The

---

[9] The terms "Configuration and Presentation Program 4715" and "Presentation and Configuration Program 4715" are used interchangeably in the `059 patent. Both refer to the same software shown in Figure 2c.

specific fields within the Seller Database (1630) will contain all of the necessary information regarding the seller:

> The Seller Database 1630 will have data fields containing company name, contact name, marketing name, physical address, phone, email address, credit card or other payment information, contract dates, product or reservation types for presentation, data transfer modem information, third-party accessible management software, and any other information fields deemed necessary to support the proposed sellers. The seller will input this information when first accessing the present invention and joining as a Seller. The Seller Interface 4000 FIG. *2e,* specifically the Configuration and Presentation Program 4715 FIG. *2e,* will prompt the Seller for the necessary information. `059 patent at 21:52-64.

Upon entering the information, the seller is presented with a selection of third party professionals who services the seller may choose to use. `059 patent at 53:32-34; 52:63-53:1.

It should be noted that, in the preferred embodiment of the invention, the Seller Interface (4000) also provides a way for the seller to communicate and coordinate with a hired third party professional, by allowing the seller to view presentations that have been created by the third party professional. `059 patent at 77:64 – 78:6.  In the preferred embodiment, the contents of the Presentation Rules Database (1650), the Presentation Database (1640), and the Seller Database (1630), which contain the information entered by selected internet media venues, third party professionals, and sellers, respectively, are synchronized with related databases accessible by the Seller Interface (4000) and the Third Party Professional Interface (7000). `059 patent at 23:26-34, 34:11-18, 44: 29-39 (Presentation Rules Database synchronization); 22:54-64, 33:62–34:7, 44:14-24 (Presentation Database synchronization).  Accordingly, the Seller Interface (4000) has access to the media venue selection information input by the third party professional, the creative information input by the third party professional, and the Presentation Rules entered by the internet media venues. This allows the seller to "preview" the presentations for each of the selected internet media, via the Seller Interface (4000) and the Presentation and Configuration Program (4715).  In this instance, the Presentation and Configuration Program (4715) "mimics" the processing and creation functions performed by the Presentation Generation Program (1710)—processing the presentation information entered by the third party professional in accordance with the Presentation Rules of the media venues selected by the third party professional, creating and then displaying the resulting advertisement to the seller via the Seller Interface (4000). In the preferred embodiment, whenever a third party professional or a media venue enters new information, the new data is stored in the appropriate database on the Central Controller and Presentation Processor (1000), and then synchronized with a database accessible by the Seller Interface. This greatly reduces the time and

effort formerly required for collaboration between a seller and a third party professional, as it allows a seller to monitor and "preview" a third party professional's work, while simultaneously reducing the time and effort required of a third party professional to create advertisements customized to the specific guidelines of media venues.

### b.    Media Interface/ Presentation Rules Database

The Media Interface (6000) contains a variety of internal software programs. Fig. 2e. One of these programs is the Media Configuration Program (6717), which prompts the media venue for the input of presentation rules to control the style, editing, content, and/or format of presentations created for and submitted to the media venue. In the preferred embodiment, these rules are ultimately stored in the Presentation Rules Database (1650) located on the Central Controller and Presentation Processor (1000). *See* `059 patent Fig. 2a. This information is used to process the content information input by the third party professional to create presentations that conform with the guidelines of the one or more internet media venues that have been selected by the third party professional, thus insuring that the creation process will produce customized presentations that are acceptable for display on each selected media venue.

The Media Interface (6000), in conjunction with a Media Configuration Program (6717), "introduces the Media to the instance of the present invention ...[and] presents the Media with a series of questions to answer." `059 at 41:28-40. *See also* `059 patent at 40:1-19 ("The Media Configuration Program 6717 will prompt the Media for the necessary information."). These questions include, in part, queries regarding the internet media venue's presentation rules:

> The Media Interface 6000 <u>prompts</u> the [Media] operator <u>for input that describes and sets the standards for the presentations</u> ... The inputs set the upper and lower limits of quantities <u>such as amounts of text and size of images, restrictions of language and reference, standards of style and presentation, choices of type fonts and colors.</u> `059 patent at 74:29-75:32.

In the preferred embodiment, these rules are ultimately stored on the Presentation Rules Database (1650) located on the Central Controller and Presentation Processor (1000). *See* Fig. 2a. *See also* `059 patent at 35:25-29. As described in the `059 patent specification:

> <u>The Presentation Rules Database [1650] will have data fields containing information that controls and limits the style and editing of the presentations to be created</u> ... for this given Media's product or service ... The data fields contained in the Presentation Rules Database [1650] will vary from Media type to Media type, depending on the types of media and interactive presentations that are supported by the given instance of the present invention and the design of the presentations. Some fields that might be maintained are presentation templates; blocked words; blocked phrases; blocked references; blocked URLs; grammar guidelines; spelling dictionaries; presentation

10

size restrictions; photo or graphics specifications such as size, compression, and file format; and any other guidelines, benchmarks, or controlling algorithms. `059 patent at 40: 41-64.

The information in the Presentation Rules Database (1650) "is submitted and updated directly by means of the Media Interface 6000 and specifically the Media Configuration Program 6715." `059 patent at 23:4-34. The presentation rules stored in the Presentation Rules Database (1650) are used to format, structure, and/or edit the information stored in the Presentation Database (1640) into electronic advertisements that conform to the guidelines of the media venues selected by the Third Party Professional for publication and display.

As noted above, the contents of the Presentation Rules Database (1650) is synchronized with related databases accessible by the Seller Interface (4000) and the Third Party Professional Interface (7000). `059 patent at 23:26-34, 34:11-18, 44: 29-39 (Presentation Rules Database synchronization). This allows both the seller and the third party professional to "preview" what a presentation for a specific media venue looks like via their respective interfaces and the use of the Presentation and Configuration Program (4715) and the Third Party Professional Configuration Program (7717), respectively. *See* `059 patent at 71:62-72:12; *see also* 55:14-25; 67:61-68:10. By allowing both the seller and the third party professional to easily access and view presentations for selected internet media venues, the amount of time and effort required to create collaborative customized advertisements may be significantly reduced.

### c.    Third Party Professional Interface/ Presentation Database

The Third Party Professional Interface (7000) of the preferred embodiment is depicted in Figure 2f. The Third Party Professional Interface contains a variety of internal software programs. One of these programs is the Third Party Professional Configuration Program (7717), which prompts the Third Party Professional to input information to select one or more internet media venues, as well as information to be used in presentations to be displayed on those media venues. In the preferred embodiment, this information ultimately is stored in the Presentation Database (1640) located on the Central Controller and Presentation Processor (1000), and is used by Presentation Generation Program (1710) to create electronic advertisements that conform to the guidelines of the selected media venues.

The Third Party Professional Interface (7000), in conjunction with a Third Party Professional Configuration Program (7717), "introduces the Media to the instance of the present invention ...[and] presents the Third Party Professional with a series of questions to answer." 45:23-27. "The preferred embodiment of the present invention allows Third Party Creative and Management

11

Professionals to have a 'self-serve' vendor or supplier relationship to the Sellers who use the present invention to access, create and manage presentations intended for publication." `059 patent at 69:24-27. "It should be noted that at any point after the completion of the initial installation of the software and the completion of any steps required by the operators of the invention to join the network, the Seller may review and purchase or retain any of the goods or services of the Third Party Professionals currently represented by the instance of the invention." `059 patent at 77:20-27.

> For the Seller this relationship and process is accomplished through the Presentation and Configuration Program 4715 which allows for the interactive access to ... the services, content, and products of the Third Party Professionals. For the Third Party Professional the process is controlled through the [Third Party Professional] Configuration Program 7717, which allows for the interactive access, by the Third Party Professional. Through the [Third Party Professional] Configuration Program 7717 a presentation may be created and presented through the Central Control and Presentation Processor 1000 and the Seller Interface 4000 to those Sellers using the present Invention [for approval by the Seller]. `059 patent at 69: 36-47.

When a third party professional acts as the agent of the seller with regard to the creation, management and publication of an advertisement, the third party professional can enter media venue selection information and electronic advertisement creative information for use in a seller's advertisement in the same manner that a seller would have—albeit through a separate Third Party Interface (7000). Accordingly, the Third Party Professional Configuration Program 7717 will "[offer] the choices of media and presentations" to the third party professional and allow it "to choose in which presentations and which media or advertising channels the Seller wishes to participate." `059 patent at 35:16-36. Once the third party professional selects the media venues in which it desires to advertise the seller's products or services, the Third Party Professional Interface 7000, specifically the Third Party Configuration Program 7717, "will prompt the [Third Party Professional] for the necessary information for the ... media [it has] selected." `059 patent at 22:51-54; 44:12-77. *See also* 43:29-31 (stating that once the media venues have been selected, the Configuration Program "would then prompt the [third party professional] for the necessary and optional information to complete the presentations"); and 35:16-36 (After choosing the media venues and presentations, the Third Party Professional "is then presented with a series of questions to answer."). In the preferred embodiment, the answers to these questions are stored in the Presentation Database 1640.

> The responses to the questions asked, text entry areas, photos, graphics, and other input [by the Third Party Professional], either required or optional, are monitored by the [Third Party Professional] Configuration Program [7717] using the information within the Presentation Rules Database [1650] to guide the [Third Party Professional] in the creation of a presentation that meets the style, editorial, and

12

content guidelines of that instance of the present invention for each media venue or outlet chosen. '059 patent at 35:16-36.

"This [presentation] information is the majority of the data that, when combined with portions of the information within the Seller Database 1630 and the Presentation Rules Database 1650 and processed through the Presentation Generation Program 1710, creates the presentations." '059 patent at 22:27-37. The Presentation Generation Program 1710 then will publish or place the presentations and any supporting components in their proper location on the Independent Presentation Directories and Indexes 3000 for presentation to the Buyer. 57:46-51; Fig. 1b.

Due to its unique set-up and configuration, the '059 inventions allow third party professionals to quickly and easily select internet media venues in which to run a seller's ad campaign, and create advertisements for these media venues, each of which conforms to the specific guidelines of each individual internet media venue. As noted previously, in the preferred embodiment the contents of the Presentation Database (1640) are synchronized with a database accessible by the Seller Interface (4000). '059 patent at 22:54-64, 33:62 – 34:7, 44:14-24 (Presentation Database synchronization). This greatly reduces the time and effort required for the third party professional and the seller to collaborate, as it allows both the third party professional and the seller to "preview" the presentations via his their own interfaces, and also allows the third party professional to quickly and easily make any necessary modifications. At the same time, it still allows the media venues to retain control over the content and look and feel of the advertisements they receive and display.

### d. Prosecution History Support

The prosecution history of the '059 patent reinforces that the three claimed entities are separate and distinct. In the second Office Action, the PTO rejected then-pending claims 1 and 27[10] based on a patent issued to Sparks, *et al.* Office Action mailed July 7, 2006, at 3-4. In the Request for Reconsideration, filed September 5, 2006 (attached as Exhibit 1), Patent Owner pointed out that "there is no 'third interface' for a 'third party professional' " in Sparks, and "therefore there can be no 'third database storing the information input by the third party professional though the third interface.'" Request at 18. Patent Owner pointed out that Sparks only disclosed a system for use by sellers and internet media venues—not by third party professionals—and, furthermore, that all steps in the process disclosed by Sparks were controlled by a single computer operator—a "direct

---

[10] Claims 1 and 27 were numbered as claims 21 and 47 at the time of the Office Action.

contradiction to the concept of a 'third party professional' having input into the design and creation of the 'advertisement.'" Request at 18-19.

In its Reasons for Allowance, the PTO agreed, and made it clear that the allowance of the `059 patent claims was based primarily on the "third interface," the "third database," and the "computer controller ... processing and publishing" features of claim 1 and 27. *See* Notice of Allowability (April 13, 2007) at 2-6 (attached as Exhibit 2). The Examiner noted that although many pieces of prior art disclosed a first and second interface with an associated first and second database, as claimed in the patent, each of these pieces of prior art lacked "a third interface" through which a third party professional is prompted to input both selection information and creative information, which are stored in a "third database," and a "computer controller ... processing and publishing the electronic advertisement to one or more of the selected internet media venues whereby the electronic advertisement is displayed on one or more of the selected media venues in compliance with the presentation rules of that venue." *Id.* To the extent the PTO is using a different interpretation here, it can hardly be deemed "reasonable" if it conflicts with a prior interpretation.

2. **Computer Controller Creating One or More Advertisements in Compliance with Media Venue Presentation Rules (via Processing the Content Information Input by Third Party Professional with Presentation Rules of Media Venues Selected by Third Party Professional)**

As noted in the Abstract, the `059 patent discloses "an ad modification engine [that] processes or customizes the advertisement for publication and display on each internet media venue in compliance with the media venue's presentation rules." In claims 1 and 27, a central controller processes the creative data entered by the third party professional in accordance with the rules of the media venues it selected, thereby creating one or more rule-compliant electronic advertisements. Once an internet media venue has entered its presentation guidelines, a seller has entered identifying information and selected a third party professional to use, and the media venue selection and presentation information have been entered by a third party professional, the Presentation Generation Program (1710) "creates a presentation designed to conform to the requirements set forth by each media" by applying the venue guidelines (stored in the Presentation Rules Database (1650)) to the information supplied by the third party professional. `059 patent at 81:66-82:2. At this juncture, the Presentation Rules Database (1650) contains the presentation rules input by media venues, the Seller Database (1630) contains identifying information entered by the Seller, and the Presentation Database (1640) contains the media venue selection and the electronic advertisement creative data

14

input by a third party professional.[11]  *See* `059 patent at 21:44-67 (Seller Database); 22:27-51 (Presentation Database); 23:5-26 (Presentation Rules Database).

The specification states that once the internet media venues have been selected, the third party professional is prompted "for information, based on the criteria set forth by each media outlet and held in the Presentation Rules Database 1650 … that is then used in the creation of presentations [for the selected media venues]." `059 at 81:58-62. At this point:

> The Presentation Rules Database 1650  … holds all the criteria, formatting architecture, and distribution factors for each participating media outlet. The … Presentation Generation Program 1710, along with the Presentation Rules Database 1650 … then creates a presentation for each and every media outlet … chosen. The Presentation Generation Program 1710 then … transmits the presentation to the appropriate destination." `059 at 63:52-62. *See also* `059 patent at 81:63-82:2.

Each presentation created is "designed to conform to the requirements set forth by each [and every] media." 81:66-82:2. The specification also describes the creation process as follows:

> The Presentation Generation Program 1710 utilizes the information submitted by the Sellers and/or their Third Party Professional agents and held in the Presentation Database 1640 … and Seller Database 1630. The Presentation Generation Program 1710 uses these databases **to create the requested presentations** for the various desired … media … using the Presentations Rules Database 1650 for style and control guidelines." `059 patent at 24:44-54.

The created electronic advertisements then are published to the selected internet media venues.

The `059 invention "automatically applies not only editing, style, graphics, data, and content controls, but also design specification and architectural requirements to the design environment," [`059 patent at 6:62-65] thus "[allowing] for the creation of presentations that comply with the design and architectural requirements of any and all participating media." `059 patent at 5:15-18. The claimed invention "edits and structures data and information" provided by a third party professional "into consistent, designed and controlled presentations." `059 patent at 17:17-21. In the method of claim 27, the third party professional does *not* create presentations itself—it merely selects media venues from a list and inputs data relevant to its presentation (*e.g.,* product description, product photos, contact information, *etc.*), as requested. Once this information has been entered, customized presentations incorporating that data which conform to the guidelines of each and every media venue selected are <u>automatically created</u> by the presentation generation software.

---

[11] All of these databases are located on the Central Controller and Presentation Processor (1000). *See* `059 patent Fig. 2a.

### 3. Computer Controller Automatically Publishing Electronic Advertisements to Selected Internet Media Venues

Once the Presentation Generation Program (1710) has created all the electronic advertisements, it "will proceed to publish or place the presentations and any supporting components in their proper locations on the ... Independent Presentation Directories and Indexes 3000" `059 patent at 57:44-51; *see also* Fig. 1b. The `059 specification defines the term "publishing" as:

> The act of placing or making available the presentation or information within the framework of media venue so that it is accessible by the end users, consumers, viewers, or Buyers. This may mean placing an HTML page on an Internet directory, printing a 12-word classified ad in [an online] newspaper, adding a hotel presentation to a multimedia, CD-ROM or guidebook, or any number of other examples. `059 patent at 14:56-64.

Thus, in the context of claims 1 and 27, the phrase "publishing the electronic advertisement to one or more of the selected internet media venues" requires that an electronic advertisement be electronically placed or made available on a media venue, such as a website, for display to—and viewing by—an end user, customer, or buyer. Furthermore, the claims require that a computer controller automatically publishes the electronic advertisement on a media venue following its creation. It should be noted that this does <u>not</u> necessarily mean that the advertisement will be published *immediately*—just that the computer controller will *automatically* publish the presentation after its creation. `059 patent at 56:52-57:2 (discussing "urgent" versus "course of business" publishing).

### III.   All Claims Should Be Allowed

### A.   The Prior Art Fails to Disclose a Seller Interface/ Database Separate From a Third Party Professional Interface/ Database, and Also Fails to Either "Create" or "Automatically Publish" Electronic Advertisements in Accordance with Claims 1, 27

Each piece of prior art cited by the PTO has at least two critical deficiencies: (1) it only discloses a single interface (and a single corresponding database) for use by either a seller OR a third party professional; and (2)(a) it does not disclose the ability to automatically create multiple electronic advertisements that conform to the individual guidelines of multiple media venues via the manipulation of information input by a third party professional, or (2)(b) it does not disclose automatically publishing the electronic advertisements to the selected media venues.

The first critical deficiency in <u>each and every</u> piece of prior art is the fact that there are only ever two entities—or "types" of parties—allowed to be a part of any given transaction: either (1)(a) a seller and (b) one or more internet media venues, OR (2)(a) a third party professional and (b) one or more internet media venues. Accordingly, each piece of prior art provides—<u>at most</u>—an interface

16

and database for input and storage (respectively) of presentation rules by one or more media venues, and a SINGLE interface for a third party professional OR a seller to input the seller's identifying information, media venue selection information, and information to create an electronic advertisement, and a SINGLE database to store this information.[12]

No piece of prior art provides for, suggests, or anticipates a system, method, apparatus, or means of allowing sellers to <u>collaborate</u> with third party professionals in the creation and/or management of presentations submitted to media venues in conformance with the rules of those media venues. In fact, most—if not all—of the prior art references <u>teach away</u> from these limitations. The prior art systems expect that either a seller <u>OR</u> an advertising agency[13] will be using the system, and therefore these systems only provide a <u>single</u> interface/database combination for use by that entity. In other words, there is only ever one interface—whose properties, characteristics, and functionality are fixed—that can be used by an entity seeking to create and/or place an advertisement. As a result, any seller who wishes to use the services of a third party professional must find, collaborate, and communicate with that professional outside the advertisement system— exactly the problem the '059 invention was designed to solve! The requirement of two separate, individualized interfaces allows the innovative, in-system collaborations of the patented invention. Accordingly, any combination of prior art systems results in a non-collaborative system that has—at most—one interface with fixed functionality for use by a SINGLE entity (a seller or a third party professional), and a SINGLE database to store all of the information input via that interface. No inter-system communication or collaboration (as described above) would be present. Thus there is clearly no reason to combine any of the prior art references in the way suggested by the Office Action, as all the systems teach away from a collaborative set-up.

Each and every piece of prior art has at least one other critical deficiency, in addition to the one discussed above—either that (1) a rules-compliant advertisement is never <u>created</u> by the system[14], and/or (2) advertisements are not automatically published to selected media venues. Once again, the majority of prior art teaches away from these limitations, as most systems require a third party professional (or other user) to upload a manually created ad into the system, and/or do not

---

[12] It should be noted that many of the prior art systems only allow for the entry and storage of <u>part</u> of this information and, furthermore, that in the present system a seller must enter identifying information about itself, and a third party professional must supply the creative and media venue selection information.
[13] *I.e.*, one that has been selected by the seller outside of the system and prior to the advertising agency's participation in the system.
[14] And/or the method disclosed does not allow for the creation of an advertisement via processing a third party professional's input information with the presentations rules of internet media venues.

automatically publish advertisements. Accordingly, there is clearly no apparent reason to combine any of the prior art references in the way suggested by the Office Action.

The PTO also has failed to articulate any apparent reason to combine the prior art materials in the manner proposed by the Office Action. And even if there was some reason to do so, it is axiomatic that even if combined, these references still fail to meet all of the claimed limitations for the reasons set forth above.

Accordingly, it is respectfully submitted that the cited art does not teach or suggest all limitations of claims 1 and 27, and thus the patentability of these claims should be confirmed. Because claims 2-26 all depend from claim 1, and claims 28-52 all depend from claim 27, the patentability of these claims also should be confirmed.[15]

## B. The Anticipation Rejections Should Be Withdrawn

### 1. Mason `075 Patent

Independent claims 1 and 27, as well as dependent claims 2-3, 9-23, 28-29, and 35-49, were rejected under § 102(a) and (e) as anticipated by the Mason `075 patent. OA at 104, 160. However, Mason fails to disclose all of the limitations of claim 1 and claim 27. Accordingly, these claims are not anticipated by Mason and, as a result, neither are dependant claims 2-3, 9-23, 28-29, or 35-49.

The Mason patent was originally designed to provide an efficient method for "national advertisers" to perform national or regional promotions by simultaneously placing advertisements on a large number of geographically-targeted "local" newspaper websites. Mason at 1:10-20. Mason describes obtaining Internet advertisements from an advertiser via uploading pre-existing advertisements onto the system (not creating them), then—if necessary—creating "derivative" ads by resizing the original ad to fit the size specifications of one or more websites. These derivative advertisements are then reviewed by an "art director." If the art director approves the derivative advertisements,[16] the system "places links" to the derivative advertisements on the targeted websites, or provides the links to webmasters for the sites. The overall goal of this system was to quickly and easily transform the dimensions of a pre-existing image advertisement (created outside of the system) so that it could be displayed on a number of websites with different size requirements. This system was designed for use by the advertising department of a large national corporation ("seller") OR an advertising agency ("third party professional")—but not both, and certainly not via "separate

---

[15] Although each piece of prior art and/or prior art combination will be addressed below, it should be noted that that the listing of limitations not taught or suggested by the prior art is not intended to be exhaustive.

[16] If the art director rejects the derivative advertisements, the original advertisement must be and re-created outside of the system by the advertiser, and then uploaded into the system once again.

18

interfaces." Contrary to the Requester's assertions, Mason is not a system with three separate interfaces and three separate databases, that allows for the interactive participation of three separate entities, nor does the Mason system create electronic advertisements or automatically publish such advertisements to media venues. Instead, Mason fails to disclose ANY media venue interface and **discloses only a SINGLE interface** for use by an ad agency OR advertiser. Furthermore, it requires the "uploading" of a pre-created image advertisement at the outset, as well as review and approval of a finalized advertisement by an "art director" prior to publication.

### i. Claims 1, 27

The Mason patent fails to disclose a number of critical elements of claims 1 and 27, including: a first interface prompting media venues to input presentation rules; a second interface prompting a seller for identifying information and a database storing this information; a third interface prompting a third party professional to input information to select one or more internet media venues in which to publish an advertisement; and a computer controller that creates and automatically publishes the advertisements. Each of these limitations will be discussed below.

### a.  Mason Lacks a First Interface Prompting Media Venues to Input Presentation Rules.

The Mason patent wholly fails to disclose a first interface that prompts one or more internet media venues to input presentation rules. Although the patent displays a database that stores the "parameters" of specific websites (*see* Fig. 1), it does not disclose an interface that allows the internet media venues themselves to input this information. The patent states that "one or more central processors are provided with information regarding the parameters of a plurality of advertising spaces on unrelated online websites." Mason patent at 3:11-14. The patent specification never describes who or what inputs this information, or how they do it. The implication is that the operator of the system will input this information. In any case, it is clear that the internet media venues do not update this information themselves. "As indicated by the three columns in the drawings, the GNI system periodically and/or continuously updates the specification for online newspaper websites. The parameters which the GNI system monitors are [URL addresses, file size requirements, *etc.*]." Mason at 6:7-16. In other words, this system is "self-updating," in that an operator of the system monitors media venues' rules, regulations, and requirements, and then manually updates the database storing this information as necessary. Although the Mason patent does not clarify exactly who or how this information will be input into the system, it does NOT disclose—or even imply—that individual internet media venues will interact with the system in this way.

19

The PTO cites the Mason patent at 6:7-26 and 3:14-18 as anticipating this first interface. However, these passages do not describe or disclose the existence or implementation of an internet media venue interface, let alone a self-serve media venue interface that "prompts" each "media venue" to input its presentation rules.

### b.   Mason Provides an Interface/ Database Combination for Either a Seller OR a Third Party Professional—NOT Both

The Mason patent is clearly designed for use by a third party professional hired by a smaller company ("ad agency") OR a seller with a large internal advertising or art department ("advertiser")—but not both.   The top block of Figure 1 contains the phrase "Ad Agency/ Advertiser," implying that this system is designed for use by one or the other of these entities, but certainly not both. Moreover, even if the Mason system permitted interactive use by both sellers and third party professionals, which the Patent Owner disputes, Figure 1 shows that both would have access to the system only via a SINGLE password controlled interface.

The patent specification alternates between the use of the words "advertiser" and "advertising agency of a national advertiser" throughout the patent, or uses the phrases "advertiser or advertising agency" or "advertiser/advertising agency." *See, e.g.,* Mason at 6:20-23 ("while representatives of the <u>advertiser or advertising agency</u> can have access to monitor all phases of the campaign"—these representatives shown in Figure 1 as being subparts of an advertiser OR advertising agency, and have access to the system via the same interface); 7:5-13 ("invention ... provides accounting information including contacts at <u>both [1] the advertiser/advertising agency</u> and <u>[2] the target newspaper websites</u>"). For example, the specification states that "the inventors of the present systems believe there is a need for a more efficient method for <u>national advertisers</u> to purchase ... advertisements on the website of local newspapers" (Mason at 1:61-65) and that "[e]mbodiments of the present invention enable <u>an advertiser or an intermediary [*i.e.,* an advertising agency] to electronically purchase multiple online advertising spaces</u>." Mason at 2:56-59. If a third party professional ("advertising agency") has been hired by a seller to create or manage advertisements for a seller, then the third party professional will be the one using this system—it would either create an ad to be uploaded into the system, or use a pre-existing ad obtained from the Seller. If a Seller ("national advertiser" or "advertiser") already has a satisfactory pre-existing advertisement, then the Seller itself (via its "advertising department") could use the system—there would be no need to hire a third party professional. This is the exact situation the `059 invention was designed to rectify—the `059 patent can be used by Sellers who *don't* have a pre-existing advertisement and *don't* have an

20

internal art department, and need to coordinate with a Third Party Professional to create original advertisements and place those advertisements.

According to the Mason specification "the advertising agency of a national advertiser is provided with access to a system of the present invention," and "more than one department of the advertising agency can have access to the system" via the use of passwords. *Mason* at 5:35-42; Figure 1. It should be noted that the seller (advertiser) is NOT a "department" of the advertising agency. *Id.* This diagram assumes that either an advertising agency with multiple internal departments OR a national advertiser with its own internal advertising department will be using the system, and that multiple members of either entity will need access to the system. In fact, a "comment box" within Figure 1 states that that there is "<u>one gateway</u> into [the system] specific to individual client"—*i.e.,* one interface that can be accessed and used by the advertiser and/or its agents via password. Mason Figure 1; *see also* Mason at 5:35-46.

Furthermore, neither Figure 1 of the Mason patent nor the written specification disclose or imply the use of two *separate* databases to store (1) a seller's identifying information and (2) internet media venue selection information and creative input for use in an advertisement. In fact, Figure 1 of Mason implies that all of this information will be stored in a single database. Nor is the apparatus and/or method for selecting particular media venues ("websites") ever discussed in the Mason patent. Although the specification states that certain embodiments would enable "geographical targeting" of websites (Mason at 2:24-29, 40-39-46), there is no explanation of how a user of the system will be able to do this (or where this information would be stored, if it was actually entered into the system). Certainly, Mason does not disclose an interface "prompting" users for the selection of media venues, or information to be used in the selection.

The PTO contends that the Mason specification at 5:47-61, stating that "the advertiser can upload one or more original ads" and then discussing the "modification" of these ads, discloses a "second interface" which "prompts a seller to enter information identifying the seller." OA at 105. The PTO cites a subset of this (5:53-57) as disclosing an interface prompting a "third party professional" to "input information to create an electronic advertisement." The specification passage cited by the PTO (3:24-42) as disclosing a database storing the identifying information entered by a seller states that "an original advertisement is loaded onto a central processor, for example, by downloading the original advertisement off a website of the company wishing to place the advertisement ([*i.e.,*] the advertiser)." *Id.* These portions of the specification describe either an advertiser OR an ad agency using a SINGLE interface to upload a pre-existing advertisement into the system. Nothing in these passages describes a seller entering "identifying information," such as

21

its name, address, telephone number, and method of payment, into a separate database tied to that seller's input. The portion of Figure 1 that does imply that either an ad agency or an advertiser could enter such information about itself is the "Account Information" block located on the left hand side of Figure 1[17]—however this information is also entered via the same single interface discussed above. OA at 105.

Clearly, there is only a SINGLE database for EITHER an ad agency OR an advertiser to enter identifying information and through which to upload a pre-existing advertisement and a SINGLE database in which to store this information. The Mason patent does not disclose or contemplate interactive use by an advertiser and an ad agency.

c.     **Mason Does Not Disclose a Computer Controller that Automatically Creates an Electronic Advertisement**

The Mason system does not create electronic advertisements. Instead, it requires third party professionals (or sellers) to "upload" an image to a central server by, for example, "downloading the original advertisement off a website of the company wishing to place the advertisement (the advertiser)." Mason at 3:24-30;  Fig 1. The system requires that "[a]t least one, and preferably a plurality of original advertisements [created outside of the system] are obtained and also input" into the system. Mason at 3:20-23.  In other words, the third party professional (or seller) must already have created an advertisement in order to use this system (or must have access to a previously created ad).  As noted by the PTO, this original advertisement "typically ... must be modified," in which case it is "used to form derivative advertisements which conform to the configuration parameters of a plurality of ... websites." Mason at 3:28-31.  Since Mason clearly requires the input of a pre-existing advertisement into the system, the Mason system does not "create" advertisements as required by the `059 patent.

d.     **Mason Does Not Disclose a Computer Controller that Automatically Publishes an Electronic Advertisement[18] to a One or More Selected Media Venues**

The Mason patent does not teach or disclose a computer controller that <u>automatically</u> publishes advertisements. As shown in the middle column of Figure 1, each re-sized or "derivative" advertisement requires the review and approval of an "art director." *See also* Mason at 3:35-40 ("before the derivative advertisements are transmitted to the online newspaper websites or

---

[17] The PTO cites this block as disclosing a "third database" that "stores the [media venue selection and creative] information input by the third party professional through the third interface."

22

webmasters of those sites, they are displayed on a computer screen of at least one person responsible for the quality of those derivative ads.") This step occurs after an original advertisement has been transformed into a derivative advertisement, but before "GNI Places the BUY with the Online Newspaper."[19]   As noted above, the advertisements uploaded in Mason must be image ads. Stretching and skewing image files can lessen the image quality, and result in extreme distortion of the image. Accordingly, the Mason system requires that a human being manually review and approve each re-sized image—presumably ensuring that each derivative advertisement is of at least a minimum quality and readability, something that could not be "automated" by the system. "If the reconfigured ad is approved, it is stored for placement. If the ad is not approved, the advertising agency or advertiser [must] create and provide a new image," upload the image to the system, and begin the process again.   The inclusion of a human to review and approve or disapprove an advertisement prior to publication teaches away from a system that includes a computer controller that automatically creates and publishes rule-complaint advertisements.

For at least these reasons, Patent Owner respectfully requests that the PTO withdraw the anticipation rejection based on the Mason `075 patent. Patent Owner respectfully submits that the claims depending from claims 1 and 27 are patentable for the reasons outlined above. In addition, a number of the dependent claims include limitations that merit patentability in their own right, as discussed briefly below.

> **ii.      Dependent Claims: 2-3, 9-23, 28-29, and 35-49**

> **a.      Claims 9/35**

The Mason `075 patent does not disclose a second interface "[prompting] the seller with a choice of appointing a third party professional to act as the agent of the seller to create or manage customized electronic advertisements," as required by claims 9/35. As noted above, the Mason system assumes that either a Seller OR a third party professional will use the system. In the latter case, the Mason patent assumes that a third party professional has already been hired outside of the system—it provides no apparatus or means for a seller to find, evaluate, hire, or coordinate with a third party professional. The PTO cites Mason at 5:62-67 as anticipating this element. However, this portion of the specification merely states that "according to criteria which are determined by GNI in conjunction with [the advertiser or ad agency using the system], GNI then forwards the . . . derivative advertisement links to the respective ... websites ... for which the links have been

---

[19] The PTO cites this portion of Figure 1 as disclosing "publication." OA at 105. Although Patent Owner does not agree that this constitutes "publishing," as described in the `059 patent, Patent Owner will put aside this issue in this Response.

configured." This has nothing to do with a seller ("advertiser") selecting a third party professional ("advertising agency")—it merely states that the system will forward derivative advertisements to selected internet media venues ("websites"). Accordingly, the Mason `075 patent fails to anticipate this limitation.

b.   **Claims 14/40**

The Mason `075 patent fails to anticipate claims 14/40 as it fails to disclose a third party professional interface that "prompts the third party professional with a choice of advertisement types." The Mason patent requires the third party professional to upload "an original advertisement"—*i.e.,* "an image" into the system. Since this is a pre-existing advertisement, which will only be modified in size and shape, it would be nonsensical to offer the third party professional a "choice of advertisement types." This query, as described in the `059 patent, is designed for entities that are *creating* an *original ad* from input text and image information—this limitation is unnecessary in the Mason system, as a pre-existing advertisement is being used. Furthermore, the Mason patent makes it clear that the original advertisement uploaded to the system should be "an image," and that the "derivative advertisements" based on this original advertisement are "electronic images."

The PTO cites the language at 3:43-46 of the Mason patent as anticipating this limitation. This portion of the specification states that "derivative placement advertisements ... are electronic <u>images</u> which can take many forms such as fixed or streaming banners, interstitial ads, tile ads or micro-cites." The specification then goes on to describe the general size ranges for these types of advertisements, and then states that "the present invention ... is not limited to any particular size or format of ads." Mason at 3:49-50. These passages do not disclose an interface that "<u>prompts</u> [a user] <u>with a choice</u> of advertisement types"—they state that the derivative ads are "electronic images" that can have a variety of sizes and shapes (based, presumably, on the shape and size requirements of particular websites), and that these ads my be placed in a variety of locations on a website or as "pop-up" advertisements. They in no way disclose or imply that a third party professional will have any sort of "choice" about the "type" of advertisement that will be displayed on a website—and certainly do not disclose an interface that "prompts" a third party professional with such choices. Accordingly, the Mason `075 patent fails to anticipate this limitation.

c.   **Claims 15-17/41-43**

Claims 15-17/41-43 of the `059 patent are dependant on claims 14 and 40, respectively. These claims require that the "choice of advertisement types" offered to the third party professional

24

include "text ads" (15/41), "image ads" (16/42), and/or "interactive ads" )17/43). Since, as noted above, the Mason patent does not disclose a third party professional interface that "prompts the third party professional with a choice of advertisement types," it necessarily does not disclosure these specific "type of advertisement offered" claims.

The PTO cites Mason at 3:43-56 as anticipating all six of these claims. However, as noted above, the Mason patent only allows for "images ads," and, more importantly, does not offer a third party professional a "choice" of advertisement types. This passage simply states that the "derivative advertisements" of the Mason patent are not limited to one particular type of advertisement—nothing more. Accordingly, the Mason '075 patent fails to anticipate these limitations.

### iii.    Conclusion

Given the marked differences between the '059 claims and the Mason '075 patent disclosures, Patent Owner respectfully requests confirmation of all claims over the Mason patent.

### 2.    AdForce Reference

Independent claims 1 and 27, as well as dependant claims 2-23, 25-26, 28-49, and 51-52, were rejected under § 102(b) as anticipated by AdForce. However, the AdForce reference fails to disclose all of the limitations of claim 1 and claim 27. Accordingly, these claims are not anticipated by AdForce and, as a result, neither are the dependent claims.

AdForce describes an ad management system designed for use by an advertising agency on behalf of various sellers to facilitate the targeting and placement of the sellers' presentations, and to evaluate the "success" of those placements. The AdForce system was designed to be managed and administered by "an Ad Sales Organization, ISP, or Ad Agency." AdForce at 1-4. Employees of the agency in charge of an instance of the system would be "SuperUsers" of the system, and would use the "SuperUser" module to manage advertisement distribution on their network. *Id.* An "Advertiser Module" was distributed to and used by advertising agencies, and the AdForce "Web Publisher Module" was distributed to and used by web publishers. As shown by the diagram on page 2-5, the AdForce Service[20] was clearly designed to be used by only two entities: "Advertisers"—*i.e.,* "ad agencies signed up" to use a particular instance of the invention, and "Web Publishers"—*i.e.,* web publishers that wish to offer space for displaying ads that are "signed up" to use a particular instance of the invention.[21] *See* AdForce at 1-4—1-5; *see also* AdForce at 3-8—3-9. As stated on page 1-3,

---

[20] *I.e.,* an instance of the AdForce system being managed and administered by "an Ad Sales Organization, ISP, or Ad Agency."

[21] AdForce also discloses use of the system by "SuperUsers," who are "Network users who are able to perform any Web publisher or Advertiser operation in addition to Network system-administrative functions"—in other words, network administrator-type personnel to manage and shape a specific instance of

AdForce is a "full-service Internet advertising solution . . .[designed] to meet the unique requirements of any advertising or Web publishing organization." AdForce at 1-3.

As with other prior art system, the AdForce system assumed that a third party professional (referred to an "Advertiser") has been hired and given complete authority by a seller to create and manage advertisements and advertising campaigns for that seller, or that a Seller itself had an internal advertising department. *See* 6-8 and 6-11, showing both ad agencies ("JOadvertising," "!On-Target Advertising," "Alpha Advertising Agency") and individual advertisers ("Joe's Guitars," "Adidas") signed up as "Advertisers" on the system). However, the system was designed for use by ad agencies OR sellers with advertising departments—it was not designed and did not allow for collaborative use on a single campaign by both a seller and a third party professional.

AdForce was designed "to create, manage, target, and report advertising on the World Wide Web." AdForce at 1-1. The AdForce service included the following major components, as listed on page 1-3:

- Campaign Scheduling and Approval
- Ad Targeting
- Inventory Management
- Ad Delivery
- Reporting
- Auditing
- Billing

Notably missing from the list of "major components" is any mention of ad creation. The reason that the AdForce reference does not list creation as a major component is simple—AdForce did not provide any method or apparatus to automatically create advertisements. Instead, the AdForce system required advertising professionals to know the guidelines of each media venue they wished to publish to, manually create a presentation for each media venue, and then upload each individual presentation to the server.

### i. Claims 1, 27

The AdForce reference fails to disclose a number of critical elements of claims 1 and 27, including: a second interface prompting a seller for identifying information, and a database for the storage of this information, and a computer controller that processes input presentation rules and

---

the AdForce system, being used by an "Ad Sales Organization, ISP, or Ad Agency." AdForce at 1-4. However, as most of the SuperUser-only functions of the system are merely administrative, this type of user will be generally ignored for the purposes of this Response. Although this manual is for use by a SuperUser, an Advertiser can perform most of the operations in chapters 6 and 8 ("Advertising," *see* pages 6-22 to end, and "Media plans," *see* pages 8-9 to end. ) and a Web publisher can perform most of the operations in chapters 7 ("Content", *see* pages 7-12 to end).

media venue selection and creative input, creating a rule-complaint advertisement for the selected media venue from the third party professional's input information. Each of these limitations will be discussed in-depth, below.

### a.    AdForce Provides an Interface/ Database Combination for Either a Seller OR a Third Party Professional—NOT Both

As noted above, the AdForce Service was designed to be used by only <u>two</u> entities: "Advertisers" (a third party professional acting on behalf of a seller) and "Web Publishers" (media venues). AdForce at 2-5. Accordingly, the system only provides two separate interfaces—one for Advertisers, and one for Web publishers.[22] An Advertiser may have multiple "campaigns" running on the AdForce system. *See* AdForce at 6-10—6-11, 6-14 ("campaigns"), and 6-18 ("agency buy"). It is the Advertiser that "creates, copies, and modifies campaigns" on behalf of a seller. *Id.* at 3-8. The AdForce system is designed to receive advertisements from Advertisers and deliver them to Web sites, and does not allow any input from—or even about—a seller. The system provides no separate mechanism or method for a seller to access the system in any way. The system, in effect, has no "knowledge" of the seller itself. Since the AdForce does not disclose a Seller interface that "prompts the seller for identifying information," it therefore also does not disclose a separate database to store this information. Accordingly, there are only two interfaces to the system.

The PTO cites the "add new advertiser" text and windows on 6-2 as anticipating the "second" or "seller interface" limitation, and the "advertiser list" and window on 6-8 as anticipating the "second" or "seller database" limitation. However, pages 6-2—6-7 show the addition of a new Advertiser (*i.e.,* third party professional) to the system by a SuperUser, and the entering of information about the Advertiser by a SuperUser. This information has nothing to do with any seller. Furthermore, this interface is being used by a SuperUser[23], not a seller. *See* page 6-2 ("The following steps are for …SuperUser[s] only."). Pages 6-8—6-9 show how a SuperUser can "view" and "edit" an Advertiser previously added to the AdForce system. Although these pages show that data entered by a SuperUser about an advertiser (third party professional) is being stored in a database, they do

---

[22] Although technically an individual seller could be added as an "advertiser," that seller would take the place of a third party professional in the system—in which case there would be no separate third party interface or database. However, since the system was designed for use by advertising agencies, this Response will assume that the "Advertiser" using the system is a third party professional, not an individual seller.

[23] A SuperUser works for the party that owns and manages this instance of the AdForce system, and can be a Network Administrator, Sales Executive, Site Administrator, Sales Administrator, or a Traffic Administrator. *See* AdForce at 4-8; 4-10; *see also* window at 6-6, where the "agency percent" selection item demonstrates that the Network Owner/ Administrator is essentially a "middleman," or "broker" between advertising agencies and web publishers.

not disclose the storage of information about a seller—which makes sense, as no information about a particular seller is ever entered into the AdForce system.

> **b.    AdForce Does Not Disclose an Apparatus or Method that Processes Input Creative Data in Accordance with Presentation Rules to Create a Fully Rule-Compliant Advertisement**

Chapter 6 of AdForce discusses Advertising. On page 6-22, AdForce describes "Creatives," which are defined in the AdForce Glossary as "advertising banners." AdForce at G-8. In the discussion of Creatives, the AdForce reference states that the AdForce server <u>receives advertisements from Advertisers</u> and delivers them to Web sites. *Id.* at 6-22. But AdForce states that "[t]he submitted advertisements must be entirely correct and follow AdForce Service's rich media ad guidelines, or campaign delivery can be delayed." *Id.* at 6-22. While the "AdForce service can <u>deliver</u> virtually any ad style," <u>it does not create these ads</u> for the advertiser (*i.e.,* the advertising agency or "third party professional" using the system). *Id.* The advertiser must upload these advertisements to the system.        Thus, while the AdForce server is capable of <u>receiving</u> advertisements from advertisers and <u>forwarding</u> advertisements to media venues, it **does not create** presentations by applying the guidelines of selected media venues to the information input by the third party professional. Instead, the AdForce reference explains that the advertiser must itself author the advertisement (or "Creatives") and must submit the completed advertisement to the AdForce server for delivery to the media venues. AdForce does not disclose any "creation" software capable of applying media venue guidelines to advertising content entered into the system by a seller. Thus, AdForce does nothing to alleviate the extensive workload required of third party professionals to learn and conform their presentations to the disparate guidelines of various media venues, which is a central aspect of claims 1 and 27.

The PTO cites pages 6-22 and 6-30 as anticipating the creation of a rule-compliant advertisement by processing   creative information input  by the third party professional with presentations rules entered by a media venue. However, neither of these pages disclose or suggest software or hardware that creates a presentation via processing user information. Rather, these passages make evident that the advertising presentations must be created by the advertiser and uploaded to the AdForce server for distribution.

To create an advertisement, the AdForce advertiser must first familiarize itself with the guidelines of particular media venues as described in Web site questionnaires. *See* AdForce at 8-1–8-7. The advertiser then must manually create ads that conform to these guidelines, upload each ad into the AdForce server, and then describe its characteristics—*i.e.*, size and file format—to the

server. Thus, it is the advertiser's responsibility to read, understand, and apply these guidelines when creating an ad for the AdForce system. The AdForce system does not attempt to "apply" or "process" these guidelines in any way—it simply provides them in a centralized location to facilitate access by the advertisers. There is certainly no computer hardware or software in AdForce that operates to take information input by an advertiser and, via the processing this data with the guidelines of each selected media venue, generate a plurality of presentations that each comply with the corresponding media venue guidelines of the media venues where the presentation is to be published. Yet the limitations of claims 1 and 27 clearly requires such a piece of hardware or software. In fact, the approach outlined in the AdForce reference is not substantially different than the prior art described in the '059 Background. AdForce (like most of the other references cited by the PTO) highlights the exact problem the '059 invention was created to solve—*i.e.*, that third party professional had to know the guidelines of various venues and then create a number of individual presentations that conform to each media venue's guidelines. Rather than meeting the limitations of claims 1 and 27, the AdForce reference only reinforces the need for such a solution.

The manner in which the seller-created advertisement is uploaded to the AdForce server is described in Chapters 6 and 7. *See* AdForce at 6-28—6-34. Initially, the advertiser selects an ad to be inserted into a particular media venue. This is done by selecting the "Pick File" tab, as shown on page 6-28. Once the advertiser selects the "Pick File" tab, the software displays a folder where pre-existing creatives have been previously stored by the advertiser. AdForce at 6-28—6-29. After the advertiser selects the specific advertisement for uploading, the advertiser must identify the file format ("ad style") of the presentation and the size ("ad size") of each presentation. *Id.* at 6-30. *See also id.* at 7-16 and 7-17 (requiring an advertiser to enter descriptions [size and style] of presentations uploaded into the system prior to distribution). In the example on page 6-30, a Seller is shown uploading a first creative (Creative #1) to a specified URL address, with a pre-defined ad style (GIF89) and ad size (468 x 60). Clearly, the AdForce program is not creating these creatives for the advertiser. Instead, the advertiser manually creates an ad that complies with media venue guidelines[24], uploads the ad into the AdForce system, and then identifies the ad's characteristics. AdForce even notes that an ad can be entered into the AdForce service before the advertiser creates the ad, using the "No Image Yet" option. AdForce at 6-77. This option is used to serve as a placeholder until the presentation is subsequently created and uploaded by the seller. *Id.* This clearly illustrates that the AdForce system does not create presentations – instead it is merely an

---

[24] This "creation" is done externally—*i.e.,* outside of the AdForce system.

uploading process used to place the manually created presentations into the AdForce system for distribution.

Accordingly, the AdForce reference fails to anticipate the "a computer controller ... processing ... the electronic advertisement," creating an advertisement that is "in compliance with the presentation rules of [a selected] internet media venue." For at least that reason, Patent Owner respectfully requests the PTO to withdraw the § 102(b) rejection based on AdForce.

The dependent claims 2-23, 25-26, 28-49, and 51-52 were also rejected by the PTO based on the AdForce reference. Patent Owner respectfully submits that these claims are patentable for the reasons outlined above, and for the additional reasons set forth below.

### ii.    Dependent Claims: 2-23, 25-26, 28-49, and 51-52

#### a.    Claims 3/29

As noted above, the AdForce reference patent does not disclose a system or method that prompts a third party professional to enter information "to create" an advertisement for a seller, as claimed in the `059 patent—instead, it requires the third party professional to upload a manually created rule-compliant creative into the system. Accordingly, AdForce reference also does not anticipate the prompting of a third party for information for the "creation" of advertisements for "one or more sellers," as required by claims 3/29. The PTO cites pages 1-1, 6-31, and 6-70 as anticipating this claim. However, none of these pages discloses "creation" of an advertisement, as claimed in the `059 patent. Accordingly, the AdForce reference fails to anticipate this limitation.

#### b.    Claims 4-5/30-31

As noted above, the AdForce reference does not disclose any sort of "second interface" that prompts "the seller to input" any sort of information, as it designed for use by only two entities: third party professionals and media venues. Furthermore, the system assumes that a seller has already hired a third party professional and has given that party complete control over creating and managing an ad campaign for the seller. Accordingly, the AdForce reference necessarily fails to disclose a second interface, much less one that "prompts the seller to input information to select a third party professional," as required by claims 4/30. The PTO cites the "agency owner"-related text and graphic on page 6-7 as anticipating this limitation. However, the "agency owner" is merely the "individual in charge of the Advertiser's account"—*i.e.,* the specific SuperUser (employee) who is in charge of the third party professional's account which, as the guide notes, "is not necessarily the individual [SuperUser] who entered the Advertiser." AdForce at 6-7; *see also* 6-2 (stating that the "Adding an Advertiser" actions can only be performed by a "limited SuperUser."). Furthermore, this "owner" information is being input by a SuperUser—not a seller, or any other "client" of the

30

system, for that matter. Accordingly, the AdForce reference fails to anticipate this limitation. As claims 5/31 depend on claims 4/30, they are also not anticipated by the AdForce reference. (The PTO cited the same text and graphic as anticipating these limitations).

### c.    Claims 7/33

As noted above, the AdForce reference discloses only two interfaces and—at most—two databases. Accordingly, the AdForce reference does not disclose or imply the existence of "a fourth database" storing information entered by a third party professional that identifies that professional. In the AdForce invention, such information would be stored in the same database as any other information entered via the third party professional (advertiser) interface. The PTO cites the text and windowing accompanying "adding a new user" on page 4-7 as anticipating this limitation. However, the section of the AdForce reference is directed towards setting up a particular instance of the AdForce system, and thus "entering, editing, and deleting SuperUsers". AdForce at 4-1. Accordingly, the interface depicted is for use by a Network Administrator to add a SuperUser to the system—not for a third party professional to enter information about itself. Furthermore, the AdForce reference does not disclose or imply that this information will be stored in a database separate from the ones already mentioned. Accordingly, the AdForce reference fails to anticipate this limitation.

### d.    Claims 8-9, 25-26/34-35, 51-52

As noted above, the AdForce reference does not disclose a "second interface" that prompts "the seller to input" any sort of information, as it designed for use by only two entities: third party professionals and media venues. Claims 8-9, 25-26/34-35, 51-52 all depend on the existence of a second interface that "prompts a seller to enter information" of some sort, and it therefore are not anticipated by AdForce for the reasons mentioned in claims 1/27 and 4-5/30-31.

### iii.    Conclusion

Given the marked differences between the `059 claims and the disclosures of the AdForce reference, Patent Owner respectfully requests confirmation of all claims over the AdForce reference.

### 3.    Brown `368 Patent

Independent claims 1 and 27, as well as dependent claims 2-3, 9-23, 28-29, and 35-49, were rejected under § 102(b) as being anticipated by the Brown `368 patent. However, the Brown patent fails to disclose all of the limitations of claim 1 and claim 27. Accordingly, these claims are not anticipated by Brown and, as a result, neither are the dependent claims.

The Brown patent describes a system wherein a "computer mediated communications ("CMC") network[25] provides content and subscriber data to a queue builder and receives content segment playlists." In other words, the Brown patent describes the mechanism by which a "network for an interactive service"—such as the network of a particular ISP—can send data about its subscribers and about the advertisements[26] it has for display to a "queue builder," and, upon request, receive back a playlist (or "queue") of which advertisements to display to a particular subscriber, on a particular location, at a particular time, organized by the priority in which the advertisements should be displayed. Brown at 4:3-15; 3:28-44. Essentially, it assembles targeted advertisement playlists for a CMC network, based on descriptions of the advertisements the CMC network currently has for display, as well as descriptions of the network's individual subscribers and the advertisement display locations.

More specifically, the system assembles "queues" via the use of "rules" developed by "rule developers" based on the descriptions of (1) the network's subscribers, (2) the "content segments" available for display, and (3) the locations that are available to display those advertisements, obtained (primarily) from the CMC network. *Id.* The chart attached hereto as Exhibit 3, provides a summary of relationships between the data types, what they describe, and who submits the description, as described in the Brown '368 specification (as well as citations to where such information is located in the Brown specification).

After the "descriptions" listed above (and described in the attached chart) have been entered into the system, "rule developers" analyze the data and develop "rules" and "relational databases" that ensure that certain "content segments" (*i.e.,* advertisements) are targeted to and slotted for display to a particular "subscriber" to the CMC network in an appropriate "content location" and at an appropriate time. A "queue builder" then uses these rules and databases to assemble queues for each of the network's subscribers, content locations, and content segments. When a specific request from an application of the CMC network is received—identifying the "current subscriber, the content location of the request, the date and time of the request, and the type of content record (*e.g.,* advertisement, movie, still picture)"—these queues are then combined into a single playlist, and delivered by the on-line queue manager to the CMC network.

### i. Claims 1, 27

---

[25] Hereinafter, the provider or operator of a "computer mediated communications network" will be referred to as a "CMC network." However, the Brown specification alternately refers to this network as the "service provider" and "communications service."

[26] It should be noted that the advertisement information passed to the Brown system consists a description of the advertisement, rather than the advertisement itself. *See* Exhibit 3.

The Brown patent fails to disclose a number of critical elements of claims 1 and 27. First of all, the patent wholly fails to disclose a multiplicity of "media venues," as there is only one entity to which advertisement playlists are transmitted. Furthermore, the one entity that receives these playlists is not "prompted" to put in presentation rules—in fact, it has no ability to input any such rules. Nor does the Brown patent contemplate the use of any "presentation rules" to create one or more electronic advertisements.

Although the Brown patent may imply the existence of some sort of advertiser interface, that interface is used ONLY to input descriptive information regarding the content of that advertiser's content segment (*e.g.*, advertisement), and therefore this interface does not meet the limitations of a "second interface" that prompts a seller to "input information identifying the seller," as required by the '059 patent.

Furthermore, the Brown patent also fails to disclose any sort of "third-party professional," as described in the '059 patent, using the system to enter seller advertising content on behalf of a seller, or make media venue selections.[27] In fact, the system simply does not allow ANY party to select "media venues" for display of advertisements, as there is only one entity to which advertisements can be delivered (the CMC network), and no means to select individual content locations within that network. As a result, the Brown patent also fails to disclose "publishing [electronic] advertisements to <u>one or more selected internet media venues</u>."

The Brown system also does not create—or even handle in any way—the "content segments" of advertisers, which are "pre-created" and stored on a server located within the CMC network prior to the network's use of the system. *See* Fig 2., block 420 ("on-line service data storage"). Instead, the system obtains <u>descriptions</u> of the "content segments"—as well as descriptions about the CMC network's subscribers and potential display locations within the network—from the CMC network itself, and then uses these descriptions to create targeting rules and to generate queues.

Each of these elements will be discussed below in detail.

a.    **Brown Lacks First Interface/Database and Input/Storage of Presentation Rules by a Media Venue**

In Brown system patent, "applications" of the CMC network "request" that a "playlist" of advertisements that the CMC network should display at a particular location to a particular

---

[27] Although the Brown patent does discuss "third parties," this term—as used in the Brown patent—does not refer to "third party professionals" as described in the '059 patent. The "third parties" of the Brown patent are electronic information sources external to the host network that provide information (demographic information, buying patterns, ad "click-thru" information, *etc.*) about specific subscribers to the network host, *not* ad agencies or providers of advertising content or management services.

subscriber (at that point in time). Brown at 4:3-15; *see also* 16:24-48. In response, the Brown system then delivers a "playlist" of advertisements to that media venue, based on a combination of stored "queues" the system has created for that particular subscriber, content location, and time frame. Brown at 14:24-28; 16:64-66; 17-30-41. The development and content of these playlists is dictated by the rules created and entered by "rule developers" of the system—the CMC network (which contains the locations on which the content segments will be displayed) has no control over the creation of these rules, and is certainly not "prompted" to put in "presentation rules" of its own.

The Brown patent only discloses receiving <u>requests</u> for playlists from—and transmitting playlists to a <u>single entity</u>—the CMC network. Brown at 3:33-37 ("data is provided that uniquely identifies ... content or application locations *within* the service [CMC network] where targeting requests may be generated); 4:3-7 ("applications of the communications service send requests for content segment playlists to the on-line queue manager"). Accordingly, the Brown patent lacks a multiplicity of "media venues," as required by the `059 patent. Furthermore, the CMC network operator has <u>no control</u> over what content segments a playlist for a particular content location (within the network) contains, because it cannot enter "presentation rules" for the particular content locations within the network. All the CMC network is allowed to do is enter can do is "<u>[input] data</u> ... <u>that uniquely identifies and describes content or application locations within the service</u> where targeting requests may be generated"—*i.e.,* describe a content location within the network on which a content segment may be displayed. Brown at 3:28-38; *see also* 6:29-35; 11:39-44.

Table 5 indicates that this content location identification data may include "location name—name used internally to identify the content location" and "location description—a brief description of the content location. This field may link the base entity record to addition[al] descriptive data that provide[s] genre-type descriptive data." In other words, the CMC inputs information <u>describing the location where a content segment may be placed.</u>

Based on this "content location" information, "<u>rule developers can create profiles of</u> subscribers, content segments, and <u>content locations</u>" that can be used to "target content segments to specific users [or] to content locations ... by creating a rule that defines the priority of a specific content segment for a specific subscriber, subscriber profile, content location [or] <u>content location</u> <u>profile</u>." 3:50-62; *see also* 13:19-26, 32-35. This means that "rule developers"—who are not a part of the CMC network—are the people who develop and enter rules about what type of advertisement should be delivered to a particular content location, and therefore it is the "rule developers" who decide what sorts of ads should be delivered to a specific content location. The CMC network itself

has no control over or input into the advertisements that will be referenced in a playlist for a particular content location.

The PTO cites block 40 of Figure 3 and the text at 7:2-5 as disclosing an "interface prompting a media venue to input presentation rules." OA at 115. However, block 40 shows the CMC network inputting information into the system, and the test at 7:2-5 describes "loading data into the queue from external sources .. [such as] the computer mediated communications network 40." Neither Figure 3 nor the passage describing it in any way disclose or imply that an interface is prompting multiple media venues to input presentation rules. The PTO cites block 50 of Figure 1 and Block 510 of Figure 3 as disclosing a database that stores "presentation rules" entered by "media venues." These figures depict the "Information Warehouse Manager" portion of the system, which receives and stores all the data received from the CMC network, advertisers, and third party data suppliers, as shown in the chart above. However, nothing in these figures indicates that the information warehouse manager is storing any sort of "presentation rules."

The Brown patent fails to disclose the use of the system by more than one entity that has the ability to display advertisements—as the CMC network itself contains all the possible display locations for advertisements, and does not allow for the input of any sort of "presentation rules" by this entity. In fact, the Brown patent fails to disclose any sort of interface that prompts multiple media venues "to input presentation rules ... for displaying electronic advertisements on the media venue," and therefore also fails to disclose a database that stores this information. Accordingly, Brown patent fails to anticipate this limitation.

### b. Brown Provides An Interface/ Database Combination For Either A Seller OR A Third Party Professional—NOT Both; And This Interface Does Not Prompt For The Input Of Any Of The Claimed Information

As described above, the CMC network inputs the majority of descriptive information required by the system, regarding network subscribers, content segments, and content locations within the network. However, the Brown patent also states that "for content segments, the base entity data will be provided by the advertiser in conjunction with the network service in order to ensure that the segment is identified properly." Brown at 11:7-12. Table 4 gives examples of what such information might be, and includes a "segment description—a brief description of the material contained in the content segment file" as well as "segment media type—the media type (i.e. gif file, video stream, text file, application, etc) of the segments)." Thus, although the Brown patent may imply the existence of some sort of advertiser interface, the information that an advertiser can enter via this interface is limited to content segment identification information—*i.e.,* a description of the

35

advertiser's advertisement. This interface clearly does not prompt a seller to "input information identifying the seller," as required by the `059 patent, and therefore fails to meet this claim limitation.

In fact, no information of any sort describing the advertiser itself is ever entered into the system by any party to the system. This is logical, as information about the advertiser is not necessary for the invention of the Brown patent—in fact, information about the advertiser is virtually immaterial to the Brown system, as the advertiser would have has an account with the network provider, and both the network provider and the seller have opportunities to "describe" the advertiser's advertisement.

Furthermore, the Brown patent also fails to disclose any sort of "third-party professional," as described in the `059 patent, using the system to enter seller advertising content on behalf of a seller, or make media venue selections. Although the Brown patent discloses obtaining information from "an advertiser's customer/ marketing database 42, and a third party information source 44 (or third party databases)," these two external sources are not people or parties who are "prompted" for information by an interface, but electronic storage sources whose data is electronically "imported" by an "import session controller 512." Brown at 7:2-5; Fig. 3.; 7:28-8:44. *See also* Brown at 3:38-41 ("In addition to data from the communications network provider, third party data that describes the subscribers may also be input into the queue builder from third party databases."). Thus, this passage does not disclose any sort of "interface" or "prompting" as disclosed in the `059 patent. It should also be noted that in the Brown patent, the term "third parties" does not describe "third party professionals" as described in the `059 patent—they are information sources external to the host network that provide information (demographic information, buying patterns, ad "click-thru" information, *etc.*) about specific subscribers to the network host.—*not* ad agencies or providers of advertising content or management services. *See* 3:39-44; ("[T]hird party data that describes the subscribers may also be input into the queue builder 10 from third party databases 44. The information warehouse manager 50 will attach this third party data to the existing subscriber data base to provide more information for creating profiles of populations within the subscriber base."); *see also* 6:67-7:5. In fact, the specification teaches away from the third party data supplier having any type of "interaction" with the system, as "incoming data from third parties ... will be read from electronic files on diskettes, tapes, and files sent through telecommunications lines into the importer/translator processing module 500." Brown at 5:66-6:3.

The only other "interface" disclosed is for the CMC network—whose operator inputs descriptions of the network subscribers, the content segments the network has to display, and the

content locations within the network where those content segments may be displayed. This interface does not "prompt" or provide for the entry of either "media venue selection" information or "information to create an electronic advertisement," as required by the `059. As discussed above, the "rule developers" of the system are the people who create rules that determine what advertisements should be delivered to which content locations within the CMC network—neither the advertisers for the CMC network have any choice in the matter. And, as will be discussed below, the Brown system does not create advertisements at all—instead, it requires that completed advertisements to be stored within the CMC network prior to the CMC network's use of the system. Accordingly, there is no need—and thus no provision for—the input of information to create electronic advertisements.

The PTO cites block 42 of Figure 3, Table 4, and the text at 7:2-5 of the Brown patent as disclosing a "second interface prompting a seller to input identification information." The PTO also cites block 44 of Figure 3, Table 5, block 130 of Figure 5, and the text at 9:34-38 and 11:39-43 as disclosing a "third interface ... prompting a third party professional to input media venue selection and ... information to create an electronic advertisement." Lastly, the PTO cites block 50 of Figure 1 and block 510 of Figure 3 as disclosing both a "second database" and "a third database" to store the information input via the second and third interfaces (respectively).

The disclosures of Block 50 of Figure 1 and Block 510 of Figure 3 were discussed above (see Response at 35, 36), and therefore will not be addressed again, other than to point out that they disclose an "Information Warehouse Manager" that receives and stores all the data received from the CMC network, advertisers, and third party data suppliers. The PTO's proposed "interface" disclosures will be discussed in depth, below.

Figure 3 of the Brown patent is an "overview" diagram of the Information Warehouse Manager (shown as block 150 of Figure 1) and its interaction with various "external" parties. See 2:57-58. Although Block 42 shows that a the importer/translator of the information warehouse manager can receive information from an advertiser. However, as mentioned above, this information is limited to the "content segment" identification/ description data discussed above. Accordingly, nothing in this Figure anticipates the aforementioned limitations. Block 44 shows that the importer/translator may receive data from a third party data supplier. However, the patent discloses that these databases only contain information on the subscribers to the network—and therefore that these databases may provide that information (and ONLY that information) to the system. This block shows an external third party data supplier (not described or mentioned in the `059 patent)

37

providing information regarding a subscriber to the network—NOT a third party professional inputting "media venue selection" or information to be used in the creation of an advertisement.

Tables 4 and 5 show information that may be included in the "base information" for "content segments" and "content locations," respectively. As noted earlier, this information is supposed to "uniquely identif[y] and describe" the content segments held by the network for display, and the locations within the network which may request the display of an advertisements. Brown at 3:28-38; *see also* 6:29-35. Nothing in these tables resembles "seller identifying information," "media venue selection information," or "information … to create an electronic advertisement."

The text portions of the specification citied by the Examiner that do not pertain to either the Figure or the Tables list above—namely 9:34-38, as well as block 130 of Figure 5—describe or depict the actions of "rule developers" or "profile editors" who are neither sellers nor third party professionals—they are human beings employed by the owner of the system itself to create profiles, rules, and "relationships" between the various pieces of data.

In sum, nothing in the text passages or figures cited by the PTO section discloses an interface that prompts a seller for information that identifies the seller, use of the system by a third party professional, or an interface that prompts a third party professional—or any other entity—to input media venue selection information or information to be used in the creation of an advertisement.

c.    **Brown Does Not Disclose an Apparatus or Method that Processes Input Creative Data in Accordance with Presentation Rules to Create a Fully Rule-Compliant Advertisement**

The Brown system also does not create—or even handle in any way—the "content segments" of advertisers, which are "pre-created" and stored on a server located within the CMC network prior to the network's use of the system. *See* Fig 2., block 420 ("on-line service data storage"). Instead, the system obtains <u>descriptions</u> of the "content segments"—as well as descriptions about the CMC network's subscribers and potential display locations within the network—from the CMC network itself, and then uses these descriptions to create targeting rules and to generate queues. The system TARGETS the placement of EXISITNG advertisements—nothing more. The system assumes that an advertisements have already been submitted by advertisers to the CMC network for display, and simply provides a target list of where, when, and to whom these advertisements should be displayed, and in what order. The system therefore does not disclose any sort of "ad creation."

The Brown patent states that the CMC network contains "an online application server [that is] connected to an online service data storage, "which holds subscriber account data, other business

38

data, and content files (*i.e.*, content segments). This data storage is interconnected to an on-line business service system...[that] sends information out to the Information Warehouse Manager." Brown at 6:54-59. The data located on the online service data storage (referred to as an "external data source") is "logically mapped ... to data structures of the queue builder" and then "imported" into the system by the information warehouse manager. In other words, the "content segments" must already have been transferred to (and stored on) the CMC network before the Brown system can be used. The Brown system requires the network provider to have the completed advertisement "in hand" for it to work. In fact, the specification specifically states that the information used to create rules for content segments will be "[provided] by the advertiser in conjunction with the network service to ensure that the segment is identified correctly." Brown at 11:7-12; *see also* Table 4. Table 4 gives examples of what such information might be, and includes a "segment description—a brief description of the material contained in the content segment file" as well as "segment media type— the media type (i.e. gif file, video stream, text file, application, etc) of the segments)." Clearly, the system both contemplates and requires that advertisers will have submitted or uploaded completed advertisements to the network prior to the use of this system—otherwise neither the network provider nor the advertiser would be able to enter this information, which is critical to the "rule making" process that creates prioritized queues.

The PTO cites the Brown text at 14:24-58, 13:28-36, and Table 8 as disclosing the "processing" of data input by the third party professional and the media venues to "create" an electronic advertisement "in compliance with media presentations rules of selected media venue." However, these portions of the specification discuss (1) how the "queue generator" creates "prioritized segment queues"—*i.e.*, lists of content segments for display to subscribers and content locations—that will be exported to the on-line queue manager (and eventually send to the network provider), and (2) the mechanism by which a "rule developer" or "analyst" (both human employees) of the system establishes the priority given to a specific content segment ("advertisement") with respect to a specific subscriber or content location. Neither of these sections have anything to do with "ad creation." Furthermore, as discussed above, there are no presentation rules or information to "process."

### d.    Brown Does Not Disclose a Computer Controller that Automatically Publishes an Electronic Advertisement

As noted above, the CMC network is the entity in the Brown system that both requests and receives content segment playlists and, as a result, the Brown patent fails to disclose use of the system by multiple media venues. Accordingly, the Brown system also does not disclose any means

or apparatus through which a party can select media venues on which to display and advertisement (nor does it allow any party to enter information to select a specific content location on the CMC network). Furthermore, the Brown system never contains or manipulates the pre-existing content segments, as they are all stored on the CMC network. Thus, the Brown patent clearly does not disclose automatically "publishing the electronic advertisement to one or more selected internet media venues," as required by claims 1 and 27.

For at least the reasons outlined above, the Brown patent fails to anticipate the limitations of claims 1 and 27, and Patent Owner therefore respectfully requests the PTO to withdraw the § 102(b) rejection based on the Brown patent. The dependent claims 2-3, 9-23, 28-29, and 35-49 were also rejected by the PTO based on the Brown patent. Patent Owner respectfully submits that these claims are patentable for the reasons outlined above, and for the additional reasons set forth below.

**ii.      Dependant Claims: 2-3, 9-23, 28-29, and 35-49**

**a.      Claims 3/29, 9/32, 14-19/40-45**

As noted above, the Brown patent does not disclose a system or method that has an interface that prompts a third party professional to enter information "to create" an advertisement for a seller or "to select a media venue," or that has an interface that prompts a seller to enter "identifying information," as claimed in the '059 patent. Accordingly, the Brown patent also does not anticipate the limitations in claims 3/29, 9/32, or 14-19/40-45, which all depend on the existence of one of these types of interfaces.

**iii.     Conclusion**

Given the marked differences between the '059 claims and the Brown patent disclosures, Patent Owner respectfully requests confirmation of all claims over the Brown patent.

**C.  Legal Standard for Obviousness Rejection by PTO**

The PTO bears the initial burden of factually supporting any *prima facie* conclusion of obviousness. MPEP §2142. For a claim to be obvious, every limitation must be disclosed in a combination of prior art. *Velander v. Garner*, 348 F.3d 1359, 1364 (Fed. Cir. 2003); *see also Abbott Labs. v. Sandoz, Inc.*, 500 F.Supp. 2d 846, 851 (N.D. Ill. 2007) ("the need to demonstrate the presence of all claim limitations in the prior art . . . has not been obviated [by *KSR*].") Furthermore, there must be an "apparent reason to combine the known elements in the fashion claimed by the patent at issue." *KSR Int'l Co. v. Teleflex, Inc.*, 127 S. Ct. 1727, 1740-41 (2007)(emphasis added). *KSR* further requires that a fact finder's "apparent reason" analysis be "explicit." *Id.* at 1741. By imposing this "apparent reason" requirement in *KSR*, the Supreme Court reaffirmed the bedrock principle that "a patent composed of several elements is not proved obvious merely by

40

demonstrating that each of its elements was, independently, known in the prior art." *KSR*, 127 S.Ct. at 1741. *KSR* also reaffirmed that "when the prior art <u>teaches away</u> from combining certain known elements, discovery of a successful means of combining them is more likely to be non-obvious." *Id.* at 1740 (emphasis added).

Under *Graham v. John Deere Co. of Kansas City*, which was confirmed by *KSR*, the obviousness issue requires determination of the following factual inquiries: (1) the scope and content of the prior art; (2) differences between the prior art and the claims at issue; and (3) the level of ordinary skill in the pertinent art. It is also necessary to conduct a factual inquiry into "secondary considerations [such] as commercial success, long felt but unsolved needs, failure of others, etc., ... to give light to the circumstances surrounding the origin of the subject matter sought to be patented." 383 U.S. 1, 17-18 (1966). "[R]ejections on obviousness cannot be sustained with mere conclusory statements; instead, there must be some articulated reasoning with some rational underpinning to support the legal conclusion of obviousness." *In re Kahn*, 441 F.3d 977, 988 (Fed. Cir. 2006).

It should be noted that, in determining the differences between the prior art and the claims, the question under 35 U.S.C. § 103 is whether the claimed invention <u>as a whole</u> would have been obvious. MPEP §2141.02(I); *In re Hirao*, 535 F.2d 67 (CCPA 1976). A prior art reference must also be considered in its entirety, *i.e.*, <u>as a whole</u>, including portions that would lead away from the claimed invention. *W.L. Gore & Assoc., Inc. v. Garlock, Inc.*, 721 F.2d 1540 (Fed. Cir. 1983), *cert. denied*, 469 U.S. 851 (1984); MPEP §2141.03(VI).

### D.    The Obviousness Rejections Should Be Withdrawn

#### 1.    Global Response on Obviousness

Each of the PTO's obvious rejections fail for at least two reasons: (1) the PTO has failed to cite apparent reason to combine, and all prior art lacks two critical components, (2) the prior art does not disclose—alone or in combination—allowing both a seller and a third party professional to use the system collaboratively, via separate interfaces uniquely geared for use by a specific entity type. Each of these reasons will be discussed in detail, below.

##### i.    PTO Has Failed to Cite Apparent Reason to Combine

Each of the PTO's obviousness rejections based on a combination of prior art references necessarily fail, as there is no "apparent reason" to combine the cited references in the manner suggested by the PTO. Neither the PTO nor Requester has cited any concrete reason that would have prompted a person of ordinary skill in the relevant field to piece together the elements contained in these references in the way claimed in the '059 patent. Requester repeatedly recites the same list of broad ephemeral "motivations" to combine the teachings of one reference with another, such as "the