**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | | |
|---|---|---|
| FUNCTION MEDIA, L.L.C. | § | |
| | § | |
| vs. | § | CASE NO. 2:07-CV-279-CE |
| | § | |
| GOOGLE INC. AND YAHOO, INC. | § | |

### MEMORANDUM OPINION AND ORDER

**I.     Introduction**

Pending before the court is the defendant Google Inc.'s ("Google") motion to exclude certain expert opinions (Dkt. No. 329). Google contends that the plaintiff Function Media, L.L.C.'s ("FM") damages expert, Walter Bratic, employs irrelevant data and unreliable methodologies to form his opinions. For the reasons set forth below, Google's motion to exclude is GRANTED in part and DENIED in part.

**II.    Factual and Procedural Background**

On July 3, 2007, FM sued Google for patent infringement. FM alleges that Google infringes U.S. Patent Nos. 7,240,025 B2 ("the '025 patent") and 7,249,059 B2 ("the '059 patent"), which claim methods and systems that automate the process of formatting and delivering advertising to all types of media.

Google argues that portions of Walter Bratic's opinion on reasonable royalty damages should be excluded. According to Google, Mr. Bratic's opinions are based on data that is not relevant under *Georgia-Pacific* and use unreliable methodologies. Specifically, Google asserts that the following testimony from Mr. Bratic should be excluded: (1) Google's acquisitions of entire companies, (2) any valuation using the present price of Google's stock, (3) marketing agreements, (4) profit

estimations that include Google's costs, and (5) valuations that do not identify or analyze the non-patent elements. In its response brief, FM raises the additional issue of (6) Houlihan Lokey's royalty rates. Finally, in a supplemental filing, FM agrees not to mention the total dollar purchase price of the acquisitions, but FM still wants to rely on certain acquisitions to rebut certain arguments made by Google.

### III. Analysis

#### A. Legal Standard

Expert opinion testimony is permitted if "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." Fed. R. Evid. 702. Under the Federal Rules of Evidence, the trial judge must ensure that all expert testimony is relevant and reliable. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 148 (1999); *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993). "When the methodology is sound, and the evidence relied upon sufficiently related to the case at hand, disputes about the degree of relevance or accuracy (above this minimum threshold) may go to the testimony's weight, but not its admissibility." *i4i Ltd. P'ship v. Microsoft Corp.*, 2009 WL 4911950, at *14 (Fed. Cir. Dec. 22, 2009).

#### B. Google's Company Acquisitions

The defendant argues that Mr. Bratic should be precluded from testifying about Google's company acquisitions. According to the defendant, the amount Google pays to acquire entire companies is not relevant to *Georgia-Pacific* Factor 2–the price Google would pay for a license to the patents in suit. *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970), *modified sub nom. Georgia-Pacific Corp. v. U.S. Plywood-Champion Papers, Inc.*,

446 F.2d 295 (2nd Cir. 1971). Specifically, Google argues that the company acquisitions are irrelevant because they did not involve comparable patents, the purchase price of an entire company is irrelevant and prejudicial, and valuations of developed technology and goodwill are not probative evidence of a reasonable royalty. In sum, Google appears to argue that no evidence of its company acquisitions is relevant in this case.

On the other hand, FM argues that its expert's limited use of Google's acquisitions in his analysis is appropriate. According to FM, Google's expert, Michael Wagner, admits that he has relied on company acquisitions in his own analyses. FM also contends that, unlike most companies who obtain rights to patented technology through licenses, Google primarily obtains patented technology by acquiring companies. Because Google relies upon acquisitions, instead of traditional licenses, to procure intellectual property, Mr. Bratic used these acquisitions in his analysis. As the briefing and argument developed, FM agreed to restrict its use of acquisition evidence to limited issues. The court will therefore address the admissibility of the following acquisition issues: (1) purchase price of acquisitions; (2) value of impressions in the Doubleclick acquisition; (3) Applied Semantics acquisition; (4) dMarc acquisition; and (5) YouTube and AdMob acquisitions.

*1.     Purchase Price of Acquisitions*

In a supplemental notice, FM stipulates, "Function Media agrees not to mention, discuss, or otherwise refer to the dollar value of any acquisition made by Google." As such, FM is precluded from offering any opinions or testimony regarding the dollar amount Google paid to acquire any organization.

3

### 2. *Value of Impressions in Doubleclick Acquisition*

Mr. Bratic relies upon an internal Google document, which states that $2 billion of Doubleclick's purchase price was spent to acquire an additional 2 billion impressions per week for Google's AdSense for Content. According to FM, Mr. Bratic compared this value Google places on acquiring impressions to his own proposed royalty rate. The court finds that the Mr. Bratic's use of the Doubleclick acquisition is relevant to the jury's determination of a reasonable royalty. Thus, Mr. Bratic is permitted to discuss that Google valued the additional 2 billion impressions per week at $2 billion.

### 3. *Applied Semantics Acquisition*

FM states that Mr. Bratic intends to rely on the Applied Semantics purchase price to demonstrate Google's valuation of entering the advertising market. According to FM, Google has admitted that its sole reason for purchasing Applied Semantics was to delay a competitor from participating in the AdSense for Content market. Thus, according to FM, the amount Google was willing to pay to exclude a competitor from the accused product's market is directly relevant to the amount Google would pay in a hypothetical negotiation to enter that same market.

The court is persuaded that Google's acquisition of Applied Semantics is relevant. Thus, Mr. Bratic may testify that Google paid 23% of its net assets to acquire Applied Semantics. But, as FM agreed in its stipulation, Mr. Bratic may not discuss the dollar amount that Google paid for Applied Semantics.

### 4. *dMarc Acquisition*

FM contends that Google's acquisition of dMarc is relevant because it refutes Google's asserted licensing strategy. Google has expressed a strong preference for lump-sum licenses. But

the dMarc acquisition included milestone and benchmark payments contingent on future performance. As such, Mr. Bratic uses the dMarc transaction to prove that, in a hypothetical negotiation, Google might have paid FM a running royalty or some other non-fixed amount.

FM's argument regarding the structure of the dMarc transaction is well-taken. Mr. Bratic may testify that Google paid for dMarc over a period of time and that those payments were contingent. FM may not, however, discuss the amount of Google's payments or the total value of the dMarc acquisition.

### 5. *YouTube and AdMob Acquisitions*

FM argues that expert testimony regarding Google's YouTube and AdMob acquisitions should be admitted. As in the dMarc transaction, discussed above, FM contends that the YouTube and AdMob acquisitions contradict Google's asserted preference for lump sum licensing. But FM has not sufficiently shown how the YouTube and AdMob acquisitions refute Google's licensing preference. Therefore, FM may not discuss Google's acquisition of YouTube and AdMob.

### C.  **Valuations Using Google's Current Stock Price**

Google also seeks to exclude testimony and opinions that rely on Google's current stock price to calculate the price of Google's patent licenses. The defendant argues that the present-day value of its stock is irrelevant in determining the value of stock consideration paid years ago. For example, in 1999, Google paid Stanford University with a quantity of stock that, at that time, was worth approximately $160,000. Mr. Bratic notes that Stanford sold the stock in 2004 and 2005 for $336 million, and if Stanford had retained the Google stock, its present value would be $3.4 billion.

In response to Google's argument, FM contends that the present value of Google's stock is relevant because Google chose to pay for the licenses with stock, not cash. The court agrees with

FM. The increased value of Google's stock is relevant to the jury's determination of the overall value of the Stanford license. Accordingly, the court denies Google's motion on this point.

## D. Marketing Agreements

The defendant argues that Mr. Bratic should be precluded from testifying about the Google / AOL Interactive Marketing Agreement because it is not a patent license. FM counters Google's assertion and claims that the AOL agreement encompasses patent rights. The citations to Mr. Wagner's testimony indicate that FM is correct. Thus, the court denies the motion to preclude testimony about the AOL marketing agreement.

## E. Profit Estimates that Include Costs

According to Google, Mr. Bratic improperly treats costs as profits in his calculations, thus inflating the profitability of Google's accused products. Mr. Bratic treats Traffic Acquisition Costs, money that Google pays publishers to compensate them for participating in Google's AdSense for Content Online, as profits. In support of Mr. Bratic's calculations, FM argues that these Traffic Acquisition Costs are included in Google's revenue, and Google has complete control over the amount it distributes to publishers. Furthermore, FM notes that Mr. Wagner, Google's expert, admits that it is proper to examine profits enabled by the patent. But Google counters that FM is taking Mr. Wagner's statement out of context. Mr. Wagner believes that downstream publisher profits should only be included if the publishers were independently infringing the patent, and there is no accusation of independent infringement by the publishers.

Under the present facts, the court is persuaded that money paid by Google to publishers for use of the accused product is a cost, not a profit. Therefore, Mr. Bratic is precluded from testifying

otherwise. But Mr. Bratic may, however, testify about revenue calculations that include Traffic Acquisition Costs.

F.    **Identification or Analysis of the Non-Patented Elements**

Google argues that Mr. Bratic does not use reasonable or reliable methods to analyze *Georgia-Pacific* Factor 13, which is "[t]he portion of the realizable profit that should be credited to the invention as distinguished from non-patented elements, the manufacturing process, business risks, or significant features or improvements added by the infringer." *Georgia-Pacific*, 318 F. Supp. at 1120. Mr. Bratic allegedly ignores evidence that many non-patented elements of the accused products contribute to their profitability. But FM argues that Mr. Bratic analyzed Factor 13 using the method recommended in Mr. Wagner's textbook–separating out the infringing product and looking at the incremental profit as compared to the next best alternative. The court is not convinced that Mr. Bratic's analysis is sufficiently unreasonable or unreliable to merit exclusion.

G.    **Houlihan Lokey's Running Royalty Rate**

FM asserts that Mr. Bratic should be allowed to testify about Houlihan Lokey's running royalty rate. Houlihan Lokey is an outside consulting firm Google hired to evaluate a fair and reasonable price for its company acquisitions. As part of its valuation analyses, Houlihan Lokey calculated a royalty rate, which is a value estimate of the company's technology based on its total revenue. FM contends that Houlihan Lokey's royalty rates relate to *Georgia-Pacific* Factor 12, which is "[t]he portion of the profit or of the selling price that may be customary in the particular business or in comparable businesses to allow for the use of the invention or analogous inventions." *Id.*

Google argues that the Houlihan Lokey rates are irrelevant because they are directed to technology generally, not just patents. Yet Google's own damages expert, Mr. Wagner, admits that he has used combined technology licenses and royalty rates for technology in other cases. Thus, Mr. Bratic's use of these royalty rates has some "general acceptance." *See Daubert*, 509 U.S. at 594. Although the Houlihan Lokey royalty rates may not be as relevant as purely patent royalty data, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Id.* at 596. Therefore, Mr. Bratic's opinions and testimony regarding the Houlihan Lokey royalty rates are admissible.

## IV. Conclusion

For the reasons expressed above, the court grants in part and denies in part Google's motion to exclude.

SIGNED this 15th day of January, 2010.

_____
CHARLES EVERINGHAM IV
UNITED STATES MAGISTRATE JUDGE