IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

FUNCTION MEDIA, LLC          *     Civil Docket No.
                             *     2:07-CV-279
VS.                          *     Marshall, Texas
                             *
                             *     January 19, 2010
GOOGLE, INC.                 *     8:30 A.M.

TRANSCRIPT OF JURY TRIAL
BEFORE THE HONORABLE CHAD EVERINGHAM
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

FOR THE PLAINTIFFS:     MR. MAX TRIBBLE
                        MR. JOSEPH GRINSTEIN
                         Susman Godfrey
                         1000 Louisiana Street
                        Suite 5100
                        Houston, TX   77002
                        MR. JUSTIN NELSON
                        Susman Godfrey
                        1201 Third Avenue
                        Suite 3800
                        Seattle, WA   98101
                        MR. JEREMY BRANDON
                        Susman Godfrey
                        901 Main Street
                        Suite 5100
                        Dallas, TX   75202
                        MR. ROBERT PARKER
                        Parker, Bunt & Ainsworth
                        100 East Ferguson
                        Suite 1114
                        Tyler, TX   75702

APPEARANCES CONTINUED ON NEXT PAGE:

COURT REPORTERS:        MS. SUSAN SIMMONS, CSR
                        MS. SHELLY HOLMES, CSR
                        Official Court Reporters
                        100 East Houston, Suite 125
                        Marshall, TX   75670
                        903/935-3868
(Proceedings recorded by mechanical stenography,
transcript produced on CAT system.)

APPEARANCES CONTINUED:


FOR THE DEFENDANTS:    MR. CHARLES VERHOEVEN
                       MS. AMY CANDIDO
                       Quinn Emanuel
                       50 California Street
                       22nd Floor
                       San Francisco, CA   94111

                       MR. EDWARD DEFRANCO
                       Quinn Emanuel
                       51 Madison Avenue
                       22nd Floor
                       New York, NY   10010

                       MR. HARRY L. GILLAM
                       Gillam & Smith
                       303 South Washington Avenue
                       Marshall, TX   75670

                   P R O C E E D I N G S


                  COURT SECURITY OFFICER:  All rise.

                  (Jury in.)

                  THE COURT:  Okay.  Thank you.  Please be

seated.

                  Morning, Ladies and Gentlemen.  Thank you

for being here timely.

                  We're going to begin today's morning

session with some preliminary instructions that I'm

going to give you.  We'll follow that with the opening

statements from the lawyers.  And probably by the time

we've concluded with opening statements from both sides,

it will be time for our morning recess.  So that will be

1    the schedule going forward this morning.

2              I'll try to take a recess every morning

3    10 after 10:00 or so, or 10:15; take a 20-minute recess,

4    and then we'll come back and work until noon.  I'll try

5    to break near noon and then come back about 1:15, and

6    then take an afternoon recess as well.

7              So that will be kind of the day's

8    schedule, and we'll conclude between 5:00 and 5:15 every

9    day.

10             Members of the Jury, you have previously

11   been sworn as the jury to try this case.  As the jury,

12   you will decide the disputed questions of fact.  As the

13   Judge, I will decide all questions of law and procedure.

14             From time to time, during the trial and

15   at the end of the trial, I will instruct you on the

16   rules of law that you must follow in making your

17   decision.

18             This case involves a dispute relating to

19   United States patents.  Before summarizing the positions

20   of the parties and the legal issues involved in the

21   dispute, let me take a moment to explain what a patent

22   is and how one is obtained.

23             The United States Constitution grants

24   Congress the powers to enact laws to promote the

25   progress of science of special useful arts by securing

1  for limited times to authors and inventors the exclusive

2  right to their respective writings and discoveries.

3            With this power, Congress enacted the

4  patent laws.

5            Patents are granted by the United States

6  Patent and Trademark Office, sometimes called the PTO.

7            The process of obtaining a patent is

8  called patent prosecution.  A valid United States patent

9  gives the patent owner the right for up to 20 years from

10  the date the patent application was filed to prevent

11  others from making, using, offering to sell, or selling

12  the patented invention within the United States or from

13  importing it into the United States without the patent

14  holder's permission.

15            A violation of the patent owner's rights

16  is called infringement.  The patent owner may try to

17  enforce a patent against persons believed to be

18  infringers by a lawsuit filed in federal court.

19            To obtain a patent, one must file an

20  application with the PTO.  The PTO is an agency of the

21  federal government and employs trained examiners who

22  review applications for patents.

23            The application includes what is called a

24  specification, which must contain a written description

25  of the claimed invention telling what the invention is,

how it works, how to make it, and how to use it so others skilled in the field will know how to make and use it.

The specification concludes with one or more numbered sentences.  These are the patent claims. When the patent is eventually granted by the PTO, the claims define the boundaries of its protection and give notice to the public of those protections and of those boundaries.

After the applicant files a patent application, a PTO Patent Examiner reviews the patent application to determine whether the claims are patentable and whether the specification adequately describes the invention claimed.

In examining a patent application, the Patent Examiner reviews records available to the PTO for what is referred to as prior art.  The Examiner also will review prior art, if it is submitted to the PTO by the applicant.

Prior art is defined by law, and at a later time, I will give you specific instructions as to what constitutes prior art.  However, in general, prior art includes things that existed before the claimed invention that were publicly known or used in a publicly accessible way in this country or that were patented or

1 described in a publication in any country.

2          The Examiner considers, among other

3 things, whether each claim defines an invention that is

4 new, useful, and not obvious in view of the prior art.

5          A patent lists the prior art that the

6 Examiner considered.  This list is called the cited

7 references.  After the prior art search and examination

8 of the application, the Patent Examiner then informs the

9 applicant in writing what the Examiner has found and

10 whether any claim is patentable, and thus will be

11 allowed.  This writing from the Patent Examiner is

12 called an office action.

13          If the Examiner rejects the claims, the

14 applicant then responds and sometimes changes the claims

15 or submits new claims.  This process, which takes place

16 only between the Examiner and the patent applicant, may

17 go back and forth for some time until the Examiner is

18 satisfied that the application and the claims meet the

19 requirement for a patent.

20          The papers generated during this time of

21 communicating back and forth between the Patent Examiner

22 and the applicant make up what is called the prosecution

23 history.  All of this material becomes available to the

24 public no later than the date when the patent issues.

25          The fact that the PTO grants a patent

1  does not necessarily mean that any invention claimed in

2  the patent, in fact, deserves the protection of a

3  patent.

4           For example, the PTO may not have had

5  available to it all of the information that will be

6  presented to you.  A person accused of infringement has

7  the right to argue here in federal court that a claimed

8  invention in the patent is invalid, because it does not

9  meet the requirements for a patent.

10          Let's take a moment to look at the

11 patents in this case.  You were provided with a notebook

12 this morning that has in it a glossary of claim terms

13 and the two patents that are at issue in this case.

14          If you'll flip to the second tab, you'll

15 see the '025 patent.  If you'll flip over to -- I

16 believe it's the third page -- show it to you.  This is

17 what's referred to as the cover page of the patents.

18 The cover page of the patents provide identifying

19 information, including the date the patent issued, which

20 is up in the top right-hand corner, the patent number

21 along the top, as well as the inventors' names, the

22 filing date, and a list of the cited references

23 considered by the PTO.

24          The specification of the patent begins

25 with an abstract, which is also found on the cover page.

1  In your copy, it will be over in the right-hand column

2  under the heading abstract.

3             The abstract is a brief statement about

4  the subject matter of the invention.  Next come the

5  drawings.

6             If you'll flip the page a couple of pages

7  over, you'll see a series of drawings.

8             The drawings illustrate various aspects

9  or features of the invention.  At the conclusion of the

10  drawings, you will find the written description of the

11  invention.

12             I believe it's after Figure 5(h), which

13  is the last drawing.

14             The written description is organized into

15  two columns on each page.

16             The next several pages include the

17  written description, and if you'll flip over, I believe

18  that it's Column 64 of the '025 patent.

19             At the bottom of Column 64, the

20  specification ends with numbered paragraphs.  The

21  numbered photographs are the patent claims.  The patent

22  claims determine the scope of the invention.  With

23  respect to the '025 patent, the patent claims are

24  included through the end of the patent, Column 88.

25             Now, to help you follow the evidence, I

will now give you a summary of the positions of the

parties.   The Plaintiff in this case is Function Media,

LLC.   The Defendant in this case is Google,

Incorporated.

The patents involved in this case are

U.S. Patent Nos. 7,240,025 B2 and 7,249,059 B2.   For

convenience, the parties and I will often refer to the

patents by the last three digits of the patent number.

So in other words, this case involves the '025 patent

and the '059 patent.

The Plaintiff filed suit in this Court

seeking money damages from the Defendant for allegedly

infringing Claims 1, 20, 37, 52, 63, 90, 179, and 231 of

the '025 patent, and Claim 1 of the '059 patent.

The Defendant denies that it infringes

the asserted claims of the '025 and '059 patents.   And

the Defendant also contends that the patents are

invalid.

Your job will be to decide whether Claims

1, 20, 37, 52, 63, 90, 179, and 231 of the '025 patent,

and Claim 1 of the '059 patent, have been infringed.

If you decide that any of these claims

have been infringed, you must consider the Defendant's

defenses and then determine any money damages to be

awarded to the Plaintiff to compensate it for the

1 infringement.

2 Now, it is my job as Judge to determine
3 the meaning of any claim language that needs
4 interpretation.  You must accept the meanings I give you
5 and use them when you decide whether any claim of the
6 patents have been infringed and whether any claim is
7 invalid.

8 You have been provided with a copy of the
9 meanings I have adopted for certain claim terms, and
10 that -- those meanings are included in the glossary of
11 claim terms in the beginning -- on the first tab of your
12 notebook.

13 I'm going to give you an outline of the
14 trial at this point.

15 Soon, the lawyers for the parties will
16 make what is called an opening statement.  Opening
17 statements are intended to assist you in understanding
18 the evidence.  What the lawyers say is not evidence.
19 After the opening statements, the parties will present
20 their evidence.

21 After all the evidence is presented, the
22 lawyers will again address you to make final arguments.
23 Then I will instruct you on the applicable law.  You
24 will then retire to deliberate on a verdict.

25 I'll now say a few words about your

conduct as jurors.  First, you are not to discuss this case with anyone, including your fellow jurors, members of your family, people involved in the trial, or anyone else nor are you allowed to permit others to discuss the case with you.

If anyone approaches you and tries to talk to you about the case, please let me know about it immediately.

Now, occasionally you may pass a lawyer involved in the case or a witness or a member of their staff in the hallways.  We're in fairly close quarters in this building.  If those folks look at the ground and avert your gaze, please don't assume that they're being rude or standoffish.  They're trying to follow the rules of the Court and avoid any contact with jurors.

So, please, if they don't talk to you or don't approach you, don't hold it against the lawyers, okay?  The lawyers, under the rules of the Court, are prohibited from having direct contact with the jurors. So I always try to tell my jurors that they're not being rude; they're just trying to abide by the rules of the Court, okay?

And, second, do not read any news stories or articles or listen to any radio or television reports about the case or about anyone who has anything to do

1  with it.

2              Third, do not do any research, such as

3  consulting dictionaries, searching the internet, or

4  using other reference materials, and do not make any

5  investigation about the case on your own.

6              Fourth, if you need to communicate with

7  me, simply give a signed note to the bailiff to give to

8  me.

9              And, fifth, do not make up your mind

10  about what the verdict should be until after you have

11  gone to the jury room to decide the case, and you and

12  your fellow jurors have discussed the evidence.  Keep an

13  open mind until then.

14              And during the trial, it may be necessary

15  for me to confer with the lawyers out of your hearing or

16  to conduct a part of the trial out of your presence.

17  I'll handle these matters as briefly and as conveniently

18  for you as I can, but you should remember that they are

19  a necessary point of any trial.

20              Let's talk about what constitutes

21  evidence.  The evidence you are to consider in deciding

22  what the facts are consists of, one, the sworn testimony

23  of any witness; two, the exhibits which are received

24  into evidence; and, three, any facts to which the

25  lawyers stipulate.

1           Now, the following things are not

2   evidence, and you must not consider them as evidence in

3   deciding the facts of this case:

4           One, statements and arguments of the

5   attorneys; two, questions and objections of the

6   attorneys; three, testimony that I instruct you to

7   disregard; and finally, fourth, anything you may see or

8   hear when the Court is not in session, even if what you

9   see or hear is done or said by one of the parties or by

10  one of the witnesses.

11          Let's talk about direct and

12  circumstantial evidence.  Evidence may be direct or

13  circumstantial.

14          Direct evidence is direct proof of a

15  fact, such as testimony by a witness about what that

16  witness personally saw or heard or did.

17          Circumstantial evidence is proof of one

18  or more facts from which you could find another fact.

19          Now, I'm going to give you an example

20  that I've used in the past in other trials.  It seems to

21  work fairly well in illustrating the difference between

22  direct and circumstantial evidence.

23          I have an eight-year-old son, and he

24  really likes cake, okay?  Occasionally on the weekends,

25  his mother will bake a simple yellow sheet cake, set it

1  out to cool.  When it becomes cool, she'll frost it with

2  chocolate frosting.  That's his favorite kind of cake.

3  He knows that he's not supposed to eat cake until after

4  dinner, but if I were to go into the kitchen and find a

5  corner of that cake missing and crumbs across the dining

6  room floor into his bedroom, I might find him in his

7  closet with chocolate -- in his closet with chocolate

8  frosting on his cheeks and a big grin on his face.

9  I might say:  Son, did you eat a piece of cake, and he

10  might tell me no, okay?  That would be direct evidence.

11  That's testimony of a witness about -- or by a witness

12  about what the witness saw or heard or did.

13            Now, as a parent, I might choose to

14  disbelieve that direct evidence in favor of the

15  circumstantial evidence of the missing piece of cake,

16  the crumbs across the floor, the frosting on his cheeks,

17  and the grin on his face.

18            So the jurors are required to consider

19  both types of evidence, both direct and circumstantial.

20  And that's why the law makes no distinction between the

21  weight to be given either direct or circumstantial

22  evidence.  It's for you to decide how much weight to

23  give any evidence.

24            Now, in deciding the facts of this case,

25  you may have to decide which testimony to believe and

which testimony not to believe.  You may believe

everything a witness says, part of it, or none of it.

In considering the testimony of any witness, you may

take into account, first, the opportunity and ability of

the witness to see, hear, or know the things testified

to; second, the witness' memory; third, the witness'

manner while testifying; fourth, the witness' interest

in the outcome of the case and any bias or prejudice;

fifth, whether other evidence contradicted the witness'

testimony; sixth, the reasonableness of the witness'

testimony in light of all the evidence; seventh, any

other factors that bear on believability.

The weight of the evidence as to a fact

does not necessarily depend on the number of witnesses

who testify.  You must consider only the evidence in

this case.  However, you may draw such reasonable

inferences from the testimony and exhibits as you feel

are justified in the light of common experience.

You may make deductions and reach

conclusions that reason and common sense lead you to

make from the testimony and the evidence.  That's a long

way of saying do not check your common sense at the

courthouse door.

It's your collective common sense that

separates you from the rest of the folks in the

1 courtroom and enables you to best decide the facts and

2 issues that you're going to be called upon to decide in

3 this case.

4            The testimony of a single witness may be

5 sufficient to prove any fact, even if a greater number

6 of witnesses may have testified to the contrary, if,

7 after considering all the other evidence, you believe

8 that single witness.

9            Talk about burdens of proof.  We hit on

10 this in jury selection briefly, but when a party has the

11 burden of proof on any claim or affirmative defense by a

12 preponderance of the evidence, it means you must be

13 persuaded by the evidence that the claim or affirmative

14 defense is more likely true than not true.

15            You should base your decision on all of

16 the evidence regardless of which party presented it.

17            Now, when a party has the burden of

18 proving any claim or defense by clear and convincing

19 evidence, it means the party may persuade you that it is

20 highly probable that the facts are as that party

21 contends.  Such evidence requires a higher standard of

22 proof than proof by a preponderance of the evidence.

23            Again, you should base your decision on

24 all of the evidence regardless of which party presented

25 it.

1          Now, when knowledge of a technical

2   subject matter may be helpful to the jury, a person who

3   has special training or experience in that technical

4   field, called an expert witness, is permitted to state

5   his or her opinion on those technical matters.

6          However, you are not required to accept

7   that opinion.  As with any other witness, it is up to

8   you to decide whether to rely on it.

9          During the trial of this case, certain

10  testimony may be presented to you by way of depositions.

11  The testimony of a witness who, for some reason, cannot

12  be present to testify from the witness stand is usually

13  presented either in writing or by way of video under

14  oath in the form of a deposition.

15         Such testimony is entitled to the same

16  consideration, and insofar as possible, is to be judged

17  as to credibility, weighed, and otherwise considered by

18  the jury in the same way as if the witness had been

19  present and had given from the witness stand the

20  testimony read or shown to you from the deposition.

21         Now, it's the duty of the attorney on

22  each side of a case to object when the other side offers

23  testimony or other evidence which the attorney believes

24  is not properly admissible.  Upon allowing testimony or

25  other evidence to be introduced over the objection of an

1  attorney, the Court does not, unless expressly stated,

2  indicate any opinion as to the weight or effect of such

3  evidence.

4          As stated before, the jurors are the sole

5  judges of the credibility of all witnesses and the

6  weight and effect of all of the evidence.

7          When the Court has sustained an objection

8  to a question addressed to a witness, the jury must

9  disregard the question entirely and may draw no

10 inference from the wording of it or speculate as to what

11 the witness would have said if permitted to answer any

12 question.

13         Now, the law of the United States permits

14 the Judge to comment to the jury on the evidence in the

15 case.  Such comments are only expressions of the Judge's

16 opinion as to the facts, and the jury may disregard them

17 entirely, since the jurors are the sole judges of the

18 facts.

19         Now, this conclude my preliminary remarks

20 and instructions, Ladies and Gentlemen.

21              Is the Rule to be invoked?

22         MR. TRIBBLE:  We haven't discussed that,

23 Your Honor, but I thought it would be invoked after

24 opening argument.

25              THE COURT:  Well, I'd like to go ahead

```
 1   and swear the witnesses, if I can, if it's going to be
 2   invoked.
 3                   MR. TRIBBLE:  Very well.
 4                   Gil, do you want to invoke the Rule?
 5                   MR. GILLAM:  Yes, Your Honor, with the
 6   exception of experts, Your Honor.
 7                   THE COURT:  All right.  Well, do we have
 8   witnesses who are here that can come inside the bar and
 9   be sworn at this time?
10                   MR. TRIBBLE:  Your Honor, we have a
11   two-person Plaintiff here, two-person company.  We would
12   like Lucinda Stone excepted from the Rule as well.
13                   THE COURT:  Okay.
14                   MR. VERHOEVEN:  We have no objection with
15   that, Your Honor.
16                   THE COURT:  Okay.  If they come inside
17   the bar, I'll go ahead and --
18                   (Witnesses sworn.)
19                   THE COURT:  Okay.  Well --
20                   MR. VERHOEVEN:  I'm sorry, Your Honor.
21   We have an expert here as well.  I apologize.
22                   THE COURT:  That's alright.  I'll just
23   swear him at the time he takes the stand.
24                   MR. VERHOEVEN:  Thank you, Your Honor.
25                   THE COURT:  All right.  Well, those
```

1 witnesses who were just sworn included expert and two

2 party representatives, and I understand there's no

3 objection to excepting the party representatives; is

4 that correct?

5                    MR. VERHOEVEN:  That's correct, Your

6 Honor.

7                    THE COURT:  Okay.  Those experts will be

8 exempt from the Rule.  But with respect to the other

9 witnesses, counsel understands their obligation that

10 they need to retire from the courtroom and remain

11 outside the presence, hearing, and proceedings in Court

12 and are not to discuss the case among themselves or with

13 anyone else, the only exception being they may discuss

14 it with the lawyers.

15                    The Plaintiff may address the jury.

16                    MR. TRIBBLE:   Thank you, Your Honor.

17                    MR. VERHOEVEN:  Your Honor,

18 Mr. Verhoeven.  May I have a side-bar, please?

19                    THE COURT:  Yes.

20                    MR. VERHOEVEN:  Thank you.

21                    (Bench conference.)

22                    MR. DEFRANCO:  I do believe that the

23 parties exchanged demonstratives last night to be used

24 in openings, and there are a couple of objections that

25 we probably should address rather than interrupting the

1   flow of the argument.

2               THE COURT:  I'm in chambers every morning

3   at 8:00 o'clock before we start trial.  I've been there

4   since 7:30 this morning.  I understand that my clerk

5   came out to see you before trial to see if y'all needed

6   to see me about anything.

7               So, you know, what are the objections?

8               MR. DEFRANCO:  You-all had some

9   objections to our slides, didn't you?  Are you going to

10  let them pass?

11              MR. TRIBBLE:  Yeah, sure.

12              MR. DEFRANCO:  Okay.

13              MR. TRIBBLE:  We'll let them pass.

14              THE COURT:  All right.  The objections

15  have been withdrawn by both sides.

16              Proceed.

17              MR. VERHOEVEN:  If we see anything in the

18  future -- if we have something before the Court, we

19  should --

20              THE COURT:  Yes, particularly, if my

21  briefing attorney comes out and inquires if there's

22  anything to take up.  So it's -- yeah, I'll be in

23  chambers every morning by 8:00, 30 minutes before we

24  start with the jury.

25              MR. VERHOEVEN:  Thank you.

```
 1                    THE COURT:  The objection is withdrawn.

 2                    Let's proceed.

 3                    (Bench conference concluded.)

 4                    MR. TRIBBLE:  Good morning.

 5                    My name is Max Tribble, and I represent

 6    Function Media as well as its owners, Michael Dean.

 7                    Please stand.

 8                    (Complies.)

 9                    MR. TRIBBLE:  And Lucinda Stone.

10                    You'll hear from Michael Dean as the very

11    first witness in this trial, and you'll hear later on in

12    the case from Ms. Stone.  You'll also hear during this

13    case from the attorneys, Mr. Robert Parker, Joe

14    Grinstein, and Justin Nelson.

15                    And what you'll hear is that this is a

16    case about property rights, intellectual property

17    rights.  Function Media holds patents that give it the

18    exclusive right to revolutionary, specialized technology

19    for handling internet advertising in a way that allows

20    millions of advertisers to advertise on millions or even

21    billions of web pages in a way that is automated, easy

22    to use, and more profitable than anything that had come

23    before, and in a way that sends customized ads,

24    customized for each website according to the rules for

25    their particular website.
```

1                   The evidence will show that Michael Dean

2    and Lucinda Stone conceived of their invention in 1998.

3    They disclosed their invention to the Patent Office in

4    January of 2000.  And they applied for a series of

5    patents, which, after going through the lengthy

6    examination process that you saw the video about a few

7    weeks ago, the Patent Office granted a series of patents

8    relating to their invention.

9                   This lawsuit is about two of those

10   patents, the '025 and the '059, which are in your juror

11   notebooks.

12                  Now, Function Media has brought this

13   lawsuit to enforce its patent rights.  As you will hear

14   from Google's own expert, the most important patents

15   usually have to be litigated, because major infringers

16   rarely want to pay the full value of what the inventions

17   are worth.

18                  And it is quite appropriate that we're

19   here today in Marshall, a town named for John Marshall,

20   the longest serving Chief Justice of the United States

21   Supreme Court, a man who devoted his entire life to the

22   rule of law, regardless of the size and the form of the

23   parties before him.

24                  Now, our -- as you heard from the Court,

25   our Founding Fathers thought that patent protection is

1 so important that they wrote it into the United States

2 Constitution.  And our law provides that every patent,

3 including these patents at issue here -- every patent

4 provides the patent holder the exclusive right or the

5 right to exclude all others from making, using, or

6 selling the patented invention.

7             And in this way, a patent is like a deed

8 to property.  And like any property owner, the patent

9 holder has the absolute right to keep all others off its

10 property.  If someone trespasses or uses your property,

11 the law requires that they pay for that use.

12             And patent law is the same way.  And like

13 trespass, it doesn't matter whether the patent infringer

14 knew about the patent or not.  If Exxon drilled a well

15 on your property and generated $5 billion in revenues,

16 they would have to pay you a reasonable royalty, a

17 percentage of what they generated from drilling a well

18 on your property, regardless of whether they knew it was

19 your property or not.

20             And it is also no defense to complain

21 that the patent holder never implemented the invention,

22 never sold it, or was just too small to have generated

23 as much money.

24             If Exxon drilled a well on your land, it

25 would still have to pay you a reasonable royalty, even

1   if you didn't have oil rigs yourself or refineries, even

2   if you didn't drill the well yourself.  It's your

3   property.  It doesn't matter.

4          The evidence will show that my clients

5   conceived of their invention first.  They applied for

6   patent -- excuse me -- for patents protecting it.  And

7   the evidence will show that Google is using that

8   technology and, therefore, must pay a reasonable

9   royalty.

10          And the evidence will show that Google

11   has generated over $5 billion in revenues.  In applying

12   the industry standard rate of 12 percent, that results

13   in reasonable royalty damages of $600 million.

14          Now, let me talk about Function Media.

15   Function Media is a Texas company.  It's owned 100

16   percent by Michael Dean and Lucinda Stone.  Michael Dean

17   and his wife have been living in Texas for the last 12

18   years.  He's originally from California.  He's a

19   decorated Vietnam veteran.

20          When he came home from Vietnam, he moved

21   back to his hometown, Santa Cruz, California, where he

22   met Lucinda Stone.  Lucinda Stone was originally from

23   California.  She was the Director of Development for

24   several centers for abused children, and eventually

25   became the Executive Director of Big Brothers/Big

1  Sisters of Sonoma County, California.  And since then,

2  she's been an entrepreneur in the internet advertising

3  business.

4          Let me give you some background about the

5  invention.  In 1994, the internet was just starting.  In

6  that year, Michael Dean and Lucinda Stone decided to

7  create an internet advertising website specializing in

8  promoting bed and breakfast hotels.  They still run that

9  business today.  It's called Virtual Cities, and it has

10 become one of the most successful bed and breakfast

11 directories on the internet.

12         In running their business, Mr. Dean and

13 Ms. Stone had a lot of clients who were literally

14 mom-and-pop operations, and they were operations that

15 wanted to harness the power of the internet and

16 advertise on even more websites than Virtual Cities, but

17 there were several problems.

18         The systems available at that time were

19 hard to use, expensive, and required specialized

20 training.  Many of the systems required you to go

21 through an ad agency who had specialized technicians who

22 would manually format the ads to be sent out over the

23 internet.

24         It was all very time-consuming,

25 labor-intensive, and it was also difficult for the

1  websites that wanted to run ads, especially small- and

2  medium-size websites, who -- they just didn't have

3  enough viewers to justify all the expense and the effort

4  that was required in order to run ads.

5          And so let's -- let's take a look at how

6  things worked back before the Function Media inventions.

7          Now, for a seller or advertiser to

8  advertise on even just one website -- one advertiser,

9  one website, there were several steps involved.  The

10  advertiser would have to negotiate a contract.  They'd

11  have to specify the way it wanted the ad to look on the

12  website, and either the publisher, the website itself,

13  or the advertiser would have to customize the ad

14  according to the specifications of the advertiser.  And

15  then the ad would have to be uploaded to the website.

16          Now, it was very expensive, cumbersome,

17  labor-intensive, but the complexity of that system,

18  think about it.  If the same seller -- they don't want

19  to advertise on just one website.  If they wanted to

20  advertise on multiple websites, the complexity would

21  grow tremendously.

22          And then think about it.  In the real

23  world when you had multiple advertisers and who wanted

24  to advertise on multiple websites, the complexity would

25  grow even more tremendously.  And that is where the

1  Function Media invention came to be.

2            Mr. Dean and Ms. Stone, they were a

3  website operator.  They saw things from a different

4  point of view.  Prior to this time, the industry thought

5  that an advertiser wouldn't pay for an ad unless they

6  had total control over how it looked.

7            But as a website operator, Mr. Dean and

8  Ms. Stone realized that it was very important to the

9  website to have ads that fit with the color scheme and

10 the look and feel of the website that didn't clash.

11 And in this way, they were going against the prior art,

12 what had come before.  The entire industry disagreed

13 with them on this point.  And instead, they came up with

14 a system that conceived of a new way to do things, and

15 here's what I mean by look and feel.

16            I went to the University of Texas, and so

17 I might go to the UT website.  My young law partner over

18 there, Jeremy Brandon, he went to Texas A&M.  He might

19 go to the A&M website.

20            I'm sure that the people at UT and A&M,

21 they spent an awful lot of time and an awful lot of

22 money to make their sites as pleasing to the eye as

23 possible.  And the last thing the UT site would want is

24 to have a maroon ad being run on their website, and the

25 last thing A&M would want would be to have a burnt

1   orange ad run on their website.

2              That's look and feel; it's color scheme;

3   it's things like that.

4              And so Google's own documents talk about

5   the fact that the way to make the most money on

6   advertising is to have the ads fit with the color scheme

7   of the entire website.  Choosing the right palettes of

8   colors can mean the difference between ads your users

9   will notice and ads they will skip right over.

10             And when an ad gets clicked on, that's

11  when the website gets paid.

12             And so the invention of Michael Dean and

13  Lucinda Stone, back in 1998, was simply this:  You had

14  the advertiser, the seller, and you had the websites.

15  They realized, looking at it from a website point of

16  view, that you needed customized ads for each particular

17  website.

18             This could be UT; this could be A&M; and

19  you needed them -- the same ad customized according to

20  the color scheme and look and feel of each particular

21  website.

22             And so they conceived of inserting a

23  central processing system that would act as a middle man

24  to automate the whole process and to customize the ads.

25  You could have advertisers, or sellers they're called in

the patent, enter in their proposed ad as well as the

information about what websites they wanted to target

for their ad.  You could have all the websites send

their color rules.

Here's UT.  And the different formatting

rules from each website would go to the central system.

The central system would decide which websites were

appropriate for the ad and would format the ad according

to the different rules that had been put in by each

website, and then send the customized ads out to the

websites.

And that was the invention that is --

aspects of which are included in the patents-in-suit

today, the '025 and the '059 patent.

Now, in 1998, Michael Dean and Lucinda

Stone started to develop -- started to implement a

computer system that -- that embodied all of this.  They

implemented phase one, as you'll hear testimony about,

and it turns out that implementing a new computer system

is a lot more expensive and time-consuming than they

thought.

They implemented phase one, and it

worked, as you will see.  And they included in the

software -- in the source code of the software, they

included place holders for the rest of the system.

But it turns out that -- that this was 1998.  They were

years ahead of their time.  And the market didn't yet

understand how this would revolutionize the internet

advertising industry.  And so the -- the programming was

just too expensive to be justified at that time.

And so they stopped.  They stopped and didn't fully

implement the system, but that's okay.  A patent holder

is not required to implement the system.

You'll hear Google argue they -- they

didn't program the full system; it didn't work; they

failed.  That's irrelevant.  The fact of the matter is

that all an inventor has to do -- he doesn't have to

build the system.  He has to disclose enough in the

written description, in the figures in the patent, to

allow a person skilled in this field to build the

system.

And take a look.  That's exactly what

they did.  All these figures and flow charts and

description, that's all that's required.  They followed

the rules, and that's exactly what they did.

Now, let's talk about -- oh, by the way,

this disclosure in the '025, it's exactly the same as

the disclosure filed for their original patent that they

filed in January of 2000.  That's an important date:

January 2000.  They filed this same disclosure

disclosing their invention, the exact same disclosure as

is right here in the '025.

            And that was almost three years before

Google's infringing system, AdSense for Content, came

out.  That's an important fact.

            Now, let's talk about Google.  You've

heard -- probably heard about Google.  It's one of the

largest internet companies in the world.  It has

headquarters in California, over 20,000 employees,

offices all over the world.  And it's most famous for

internet searching.

            But Google doesn't really make any money

from its internet search.  It makes over 95 percent of

its revenues from internet advertising, and it primarily

does that in two ways.

            The first is search advertising, and

here's the way that works:  You type in search terms at

google.com, and it pulls up search results right here,

and along with it, it includes ads.

            And if you click on an ad, then Google

gets paid for that advertisement.  And that's all I'm

going to say about it.  That is not at issue in this

lawsuit.  All the money they make from their internet

search, that's not at issue in this lawsuit.

            The other way that Google does

advertising is they advertise -- they provide

advertisements for other people's websites, just like

the Function Media invention.

So here, for example, is a real website,

cheese.com, and you'll see there are these ads on the

right-hand side, ads by Google.  And if you click on

those ads, then Google gets paid, and they pay a large

percentage of the money to the actual website,

cheese.com.

And so let me talk to you a minute about

infringement.  The first question you'll be asked at the

end of this trial is whether Google's AdSense for

Content and its -- in combination with its other

products, whether that infringes the Function Media

patents, whether it does the same thing as what is

covered by the Function Media patents.

And as Plaintiff, we bear the burden of

proof.  The Judge has instructed you that our burden on

infringement is a preponderance of the evidence, more

likely than not.  And so that's where we have a feather;

we have 1 ton on each side.  It's 51 percent or just

ever so slightly -- if the evidence ever so slightly

weighs in our favor, we've met our burden of proof of a

preponderance of the evidence.

Now, we don't have time to go through

1  every claim asserted here.  We're asserting, basically,

2  of the '025, there are eight different claims that we

3  believe are infringed.  Here's Claim 1 to just give you

4  a feel for what's going to be discussed during this

5  lawsuit.

6              Keep this in mind.  If even one claim is

7  infringed of a patent, that means the patent is

8  infringed.  We don't have to prove all eight, although

9  we will.

10             Now, you will hear from Dr. Thomas Rhyne.

11  He's right out there.  Dr. Rhyne is one of the most

12  accomplished engineers in the nation.  He has multiple

13  degrees, a Ph.D.  He has had the honor of teaching both

14  at the University of Texas and Texas A&M.

15             And Dr. Rhyne will explain to you that --

16  that for every claim that we're asserting, each and

17  every element is embodied in Google's system, and,

18  therefore, they infringe these patents.

19             Now, to be fair, Google denies

20  infringement, but I think at the end of the day, you'll

21  see through that.  Google is going to say, for example,

22  that their systems operate in such a way that they don't

23  publish ads on a website; that what happens is there's a

24  hole created in a viewer's browser -- web browser, like

25  Internet Explorer; and that they serve ads to that hole;

1  they don't serve it to the website.

2          But you'll find, I think, that Dr. Rhyne

3  will explain that that's just a word game.  And you'll

4  see various documents.  It says:  Ads by Google.  And

5  you'll see Google document after Google document that

6  says that what they do is they put ads on websites.

7  And it's just a word game.  And while we're on the

8  subject of word games, Google's other non-infringement

9  argument is this:  The patents say that the system

10 selects a website on which to display an ad, but Google

11 will say that their system takes a website and then

12 selects ads to display on it.

13         Dr. Rhyne will explain that that is just

14 a word game.  It is just chicken and egg, and that their

15 system absolutely does what is required by the patents.

16         Now, Google's other contention in this

17 case is that the patents are invalid; that the Patent

18 Office made a terrible mistake; and that these two

19 patents never should have been issued.

20         Now, remember, our burden of proof on

21 infringement is a preponderance of the evidence.

22 Google's burden to prove invalidity is clear and

23 convincing evidence.  And the reason for that is that

24 these two patents have gone through the examination

25 process, and they are presumed, under the law, to be

1  valid.

2          And so, therefore, to overcome that

3  presumption of validity, Google must establish that

4  they're invalid by clear and convincing evidence.

5          Now, Google is going to have two

6  invalidity arguments.  First, it's going to argue what

7  is called anticipation.  And what that means is they're

8  going to have to prove that there was some prior system

9  that satisfied for each claim we're asserting, each and

10 every element; that we weren't first; there was a system

11 out there that did all of this.

12         Dr. Rhyne will explain it's just not

13 there.  The fact of the matter is, there was no system

14 prior to us that did the automated customization that is

15 required by these patents.

16         Now, keep in mind there will be a lot of

17 evidence coming in.  Don't be confused.  Google cannot

18 cobble together a piece from this system over here and a

19 piece from that system over there in order to come up

20 with all the elements.  All elements have to be in a

21 single prior system.  It's just not there.

22         So Google will resort to a fall-back, a

23 secondary argument, known as obviousness, and they will

24 say, even though this patented system wasn't out there

25 in the real world, even though no one had done this

1  before, it would have been obvious to a person skilled

2  in this field to do this.

3              And so, of course, the question is, if it

4  was so obvious, why wasn't anyone doing it?

5              And the question is, doesn't everything

6  look obvious once you know the answer?

7              It's like in a -- when I was going to

8  school, they had -- in the math book, they would have

9  the answers to every odd question, the answers in the

10  back of the book.  And that was to help you.  You would

11  see the answer and then, of course, it was obvious.  You

12  could figure out how to get that result.

13              And that's exactly the case here.

14  Once someone puts it down in writing in a patent

15  then, of course, it's obvious, but the fact of the

16  matter is, the industry was headed in a different

17  direction.  No one had this central processing

18  system that did the customization for each website.

19  The industry was headed in a different direction,

20  because they thought that advertisers wouldn't pay for

21  an ad that they didn't have total control over, unlike

22  our system.

23              And it's proven by the fact that we made

24  our initial disclosure in January of 2000.  We filed for

25  the '059 patent in July of 2002.  AdSense for Content,

the accused infringing product by Google, came out in late 2002.

We filed for the '025 in September of 2004 with the same specification that we had filed back in January of 2000.  Both of these patents issued in July of 2007, and then we filed this suit to enforce our rights.

And then three months later, Google filed for a similar patent.  How can they claim that our patents were not new and novel when they're applying for a patent on similar technology three months after us and seven and a half years after our original disclosure?

And by the way, in their patent -- you'll hear about this.  This is the Tomasz patent.  He's at Google.  When he filed for this, he didn't disclose any of the prior art that Google says invalidates our patents.

And so they tell the jury these prior systems were the same thing as what you're doing, but they tell the PTO not one word.  The fact of the matter is, nobody did what we do before.

Now, I want to talk a little bit about damages.  There's no doubt about it.  We're asking for a reasonable royalty of 12 percent.  That's $600 million.  You will hear testimony that Google generated over $5

1  billion in revenue from these products.

2             And you'll even hear from Google's own

3  expert that in cases like this one, the question is,

4  what is the fair value to Google, not just to Function

5  Media?

6             THE COURT:  You've got 10 minutes

7  remaining.

8             MR. TRIBBLE:  Thank you, Your Honor.

9             And the formula for damages that the

10  Court will tell you that you are to use in this case is

11  called a reasonable royalty.  And as we've discussed, if

12  you have property, and an oil company drills a well on

13  it, they pay you a royalty, a percentage of the money

14  generated from that well.

15             And the question you have at the end of

16  the day, because I think that -- at the end of the

17  trial, I think you will agree that the patents are

18  infringed.  The patents are valid.  The question you

19  will have at the end of the day is, what percentage

20  reasonable royalty applies here?

21             And you're going to hear, I believe, that

22  the test is, what would Google pay if it knew about the

23  patents; it agreed, it agreed with us that they were

24  infringed; and it agreed with us that the patents are

25  valid?  In that hypothetical circumstance, then what

1   reasonable royalty would Google pay?

2               And you will hear testimony by a forensic

3   accountant, Walt Bratic, with 20 years' experience in

4   this field, and he's spent numerous hours pouring

5   through Google's accounting and financial records and

6   surveying the industry to find out what would be a

7   reasonable royalty in these circumstances.

8               And why 12 percent?  You're going to hear

9   that in 2007 when Google's infringement started, the

10  average -- the industry average rate for internet

11  advertising was 13-1/2 percent.  And in 2008, by the

12  way, it was 15.8 percent.

13              And so you will hear how important

14  AdSense for Content is to Google.  Sergey Brin, the

15  founder of Google, called the infringing product

16  Google's monetization engine.

17              Others at Google pointed out the beauty

18  of AdSense for Content.  It's our invention, but it's

19  automated competitive advantage that does the

20  formatting.

21              And what did it do?  Faster penetration

22  into the market; better monetization, more money; better

23  margins via a low cost infrastructure, higher profit

24  margins.

25              That's our system, because we have the

 1  center processing system that -- that serves as the

 2  middle man between advertisers and websites.

 3                    And so because of that importance and

 4  because of the 13-1/2 percent rate in 2007 and the 15.3

 5  percent rate in 2008 and because of a lot of other

 6  analyses that in great detail, you will hear about from

 7  Mr. Bratic, the appropriate rate for a reasonable

 8  royalty in this case is 12 percent.

 9                    And that applies to revenues.  And 12

10  percent of the $5 billion in revenues is $600 million.

11                    Now, what is Google going to say in

12  response?  We're just a small company.  But Google's

13  expert concedes that that doesn't matter.  That is

14  irrelevant.

15                    They're going to say that Google doesn't

16  pay big money for patents, but you'll see that Google

17  paid 2 percent of their entire company for just a single

18  patent and that 2 percent today is worth $1.8 billion

19  for a single patent.

20                    And Google's own expert -- Google will

21  say:  We don't pay a running royalty.  We only pay a

22  one-time lump sum.  But Google's own expert agrees that

23  it would be quote, unquote, crazy to agree to anything

24  other than a running royalty under these circumstances.

25  And you might -- you'll also hear that Google sends --

the majority of this $5 billion, they share that with

what are called the Google partners, the websites.

In other words, of the $5 billion, the

majority of that gets -- Google shares with the actual

websites.  They have to get paid something; otherwise,

they wouldn't run the ads.  You will see that Google is

sharing profits with its partners.

And Google's own documents say that

Google has such dominant market share in this industry,

internet advertising, because of our invention that they

could pick the percentage at a lower amount if they

wanted to.  But they want to maintain their dominant

position.

And you'll hear from Google's own

mouth -- or, frankly, seeing a document, that in

Google's view, the party that holds the patent is the

person that's dictating -- has the stronger position in

dictating the terms under which the infringing party

would pay.

And so I just ask you to keep in mind, as

you go through this case -- you're going to hear a lot

of testimony.  Keep in mind, pay attention to what

Google said in documents before this lawsuit was filed

versus what they say now, now that we're here in Court.

And finally, I would just say, pay

```
 1  attention to the documents.  Listen to the witnesses.
 2  Judge their demeanor; judge their truthfulness.  And
 3  keep in mind, nothing I say is evidence.  The evidence
 4  is going to come from the witness stand and from the
 5  documents that we're going to show you.
 6              And the same is true, of course, for
 7  Google's attorney.  And I just ask you, keep that in
 8  mind.  Pay attention to the documents.  Look at what
 9  they said before there was a lawsuit.
10              Thank you.
11              THE COURT:  Thank you.
12              MR. VERHOEVEN:  Your Honor, I'm just
13  going to pull an easel up, if I may.
14              THE COURT:  Of course.
15              MR. VERHOEVEN:  May I proceed, Your
16  Honor?
17              THE COURT:  Yes, sir.
18              MR. VERHOEVEN:  Charles, is this on?
19  Okay.  Good morning, Members of the Jury.  My name is
20  Charlie Verhoeven, and I represent Google.
21              Before I start with my argument, I'd like
22  to just introduce you to the other members of our team.
23  We have four people from Google here today: Shana
24  Stanton and Tim Alger.  In the pews there, we have Doug
25  Hudson and Leslie Altherr.
```

1              In addition to myself, at counsel table,

2    we have Gil Gillam, Ed DeFranco, and Amy Candido.

3              We also have our paralegal, O'Neil Bryan.

4    Neil?

5              And then Charles Duncan is the guy that's

6    going to help me with my slides.  So you can put some

7    names to faces.

8              As the Court has told you and as

9    Mr. Tribble has told you, Google has two defenses in

10   this case.  And the Court has told you, you need to keep

11   an open mind and listen to all the evidence before you

12   make up your mind.

13             And I appreciate that you're going to do

14   that, because the evidence that Google has is very

15   compelling.  The first -- the first defense is that

16   Google does not infringe.  And the second defense is

17   that the patents here are invalid.

18             Now, Function Media has the burden to

19   show you that Google infringes.  And as the Court will

20   instruct you, in order to do that, they have to prove by

21   a preponderance of the evidence that Google infringes

22   each and every element of an asserted claim.

23             It's not enough that it's similar or

24   there may be some overlap.  You need to actually look at

25   each element and ask, for each element, is Google

1  infringing the claim?

2          Now, Mr. Tribble made a number of

3  generalizations and statements saying that Google

4  infringed, but he didn't go through the elements of any

5  of the claims and apply those to the Google system to

6  show you that they met those claims.

7          I intend to do that.  I intend to show

8  you that there's at least three different elements, big

9  elements, in these claims that Google does not infringe

10 and that the Plaintiff will not be able to show you that

11 Google meets those claims.

12         So you saw the property boundary analogy.

13 Well, a patent is not something physical that you can

14 see.  It's -- what you do is, you look at the claim in

15 the back of the patent and see what the boundaries are

16 of that claim and whether or not Google is within those

17 boundaries.

18         And what we're going to show you is that

19 in three important respects, for three elements, Google

20 does not meet those claims, and it's outside of the

21 boundaries, not on the property.  And I'm going to go

22 through that in more detail in a minute.

23         The second defense is that the patents

24 here do not deserve to be valid.  Now, surely, it's

25 true.  The Patent Office issued these patents, but we're

1   going to show you that there's others out there out in

2   the marketplace who are doing the exact same thing that

3   Mr. Dean and Ms. Stone patented, but they were doing it

4   before.

5                    And we're going to go through element by

6   element and show you these systems that were doing

7   everything that's claimed in the Function Media patents

8   but were doing it before.

9                    And there's two systems we're going to

10  show you that did that.

11                   The first one is called AdForce.  So

12  we're going to present witnesses and documentation that

13  show you there's a system out there that did what the

14  Function Media patents did, but it did it before.

15                   And guess what?  The Patent Office didn't

16  know about it.

17                   There's another system called DoubleClick

18  that did the same thing before.

19                   Mr. Tribble said, well, there was no

20  central controller, that what you saw was those nuts and

21  bolts going around that did that before the Dean patent.

22  That's not true.

23                   We'll show you evidence that, in fact,

24  both AdSense (sic) and DoubleClick did that, and they

25  did it before Mr. Dean and Ms. -- Mr. Dean and Ms. Stone

1  came up with their patent.

2                 The Patent Office didn't know about

3  AdForce, and the Patent Office didn't know about

4  DoubleClick.

5                 And so what I ask you to do, as you hear

6  this evidence, is to ask yourself this question:  What

7  if the Patent Office did know about AdForce?  What if it

8  did know about DoubleClick?  What if it saw the evidence

9  that you're going to see when we present it at this

10  trial?  Would it have issued these patents?

11                 We think you would conclude that it would

12  not, because the patents aren't new and unique, because

13  somebody else did it before.

14                 I'm also going to talk a little bit about

15  damages.  Plaintiff is asking for $600,000 dollars -- or

16  excuse me -- I wish.  They're asking for $600 million,

17  $600 million.  They didn't tell you how long the license

18  was for.  Two years.  $600 million for two years.

19                 Now, Mr. Tribble -- if I may go around to

20  this easel, please, Your Honor?

21                 THE COURT:  Yes.

22                 MR. VERHOEVEN:  He showed you a pie

23  chart, and he said 12 percent.  Well, what's important

24  to note here is that's 12 percent of what's called

25  revenue.  Not profit, revenue.

```
 1              And Google -- and I'll show you this --
 2  Google, the vast majority of its revenue, it gives back
 3  to the publishers, and it only keeps a piece of it.  And
 4  I'll go through that.
 5              So the important thing to look at here is
 6  profit.  How much of Google's profit do they say they're
 7  entitled to?  And if you did a pie chart of that, it
 8  comes to 65 percent.
 9              Now, this might be mathematically
10  correct -- or it is mathematically correct.  It may not
11  be illustrated absolutely correct.
12              But they're saying here's Google's
13  profit, okay, and that Mr. Dean and Ms. Stone are
14  entitled to all of this; 65 percent of all of the profit
15  that Google made, they want you to give to them for two
16  years, and Google only gets to keep the remainder.
17              Is that reasonable?  We think you'll
18  conclude it's not.
19              So that's a summary of what I'm going to
20  talk about today.  I'd like to go now to -- to talk a
21  little bit about my client, Google.
22              Now, Google's got a story, too, and it's
23  a pretty good story.  I don't know if you've read about
24  Google.  Most of you have probably used Google if you've
25  done searching on the internet.
```

1          Google has a search service.  You can go

2 on to the Google site and type in words and it will

3 search for websites for you and bring you back

4 information.  That's free for internet users.

5          Google has a whole bunch of other

6 services, too.  It -- you can have free e-mail on

7 Google.  It's called Gmail.  And you don't have to pay

8 anybody for it.  You just set up your account, and then

9 all of a sudden, you've got an e-mail account.

10          Google has all kinds of other services.

11 They have a map service.  You can go on to Google, and

12 if you're trying to find out how to get from Point A to

13 Point B, and you haven't been there before, you click on

14 the map service, and it will give you directions and a

15 map for free.

16          Most of the products -- most of the

17 services that Google provides for internet users, like

18 you and me, it provides for free.

19          Now, how does it do that?  It does that

20 because it also manages advertising.  So when you do a

21 search, you'll see some what are called sponsored links.

22 And it makes money when internet users, like you and me,

23 click on those links.

24          Now let's go to the demo slide 3,

25 Charles.

1              So Google was started by two grad

2   students in Stanford University, Sergey Brin and Larry

3   Page, and it was actually started in a garage, Susan

4   Wojcicki's garage, and there's a picture of it right

5   there.

6              There's Sergey Brin and Larry Page.  They

7   were just students at Stanford at the time, and they had

8   an idea for a way to organize information on the

9   internet.

10             The internet is this vast cyberspace

11  area, and it's hard for people to get to where they want

12  to go.  And they came up with an idea to organize it and

13  allow people to efficiently search for what they wanted.

14  And they created what's called the Google search engine.

15             Let's go to the next slide.

16             By 2000, Google had a search engine that

17  people could use, and it looked like this.  You've

18  probably seen it before, if you've ever gone to Google.

19  By 2000, they were successful enough that they moved to

20  Palo Alto -- to an office.  They could afford an office

21  at that point, and they moved to Palo Alto.

22             And let's go to the next slide.

23             And they launched something called

24  AdWords.  And this was the -- you remember Mr. Tribble

25  said there's one thing that's not being accused here,

1 and this is the AdWords system.

2              And the way the AdWords system work --

3 let's go to the next slide -- is you can type in a

4 search -- and I'll just use this pointer here -- type in

5 a search, so, for example, Mavericks, click the button,

6 and then you get this page here.  And on the page, you'd

7 get search results, things you might want to click on

8 when you're searching for Mavericks.

9              And these are actual websites.  They're

10 not advertisements.  But then over here on this side, it

11 says sponsored links.  You see that?  And these are

12 advertisements.

13             And if you click on this, then you'd --

14 it would take you to an ad site or to another website

15 that wanted you to buy some products or something, and

16 every time an internet user like you or me would click

17 on this, then Google would make some money on

18 advertising.  And that was called AdSense for Search.

19             Now, that product is not accused here,

20 but that was the first big search -- first big

21 advertising product that Google had.

22             Now let's fast-forward to 2002.  AdWords

23 for Search had become successful.  It went from 350

24 advertisers to thousands of advertisers.  And at that

25 point in 2002, Google came up with another idea.  Let's

1    match ads, relevant ads, to actual web pages.

2              So what's the difference?  Well, here

3    you're doing searches, and you have sponsored links.

4    For this new idea, which is called AdSense for Content,

5    it would apply if you already knew the website that you

6    wanted to go to.

7              Maybe it was on one of your favorite

8    links or you actually knew the URL, the address, and you

9    could type it in, and you would just go to the website.

10   And this was a system that would manage ads in that

11   situation.

12             Let's go to the next slide.

13             So this was called AdSense for Content.

14   Now, AdSense for Content was an ingenious new

15   technology.  And how it worked is, Google would -- there

16   would be publishers on the website.

17             Publishers are just anybody.  It could be

18   you, if you had your own website.  It could be a big

19   corporation that had its own website.  But it's people

20   who have websites that have content, what's called

21   content, information on the web.

22             And Google would ask these publishers, if

23   they wanted to participate, to put a piece of Google's

24   computer code on their website.  And then if an internet

25   user went to that website, Google would analyze the

1  actual text on the website, what's called the content of

2  the website, and figure out what was being said on that

3  website.

4            And then Google would take its database

5  of ads that it had, and it would go through a complex

6  algorithm and figure out which of the ads are relevant

7  to the actual text on the website.  This is called

8  contextual targeting.

9            Let's go to the next slide, please.

10            So this is an example of AdSense for

11  Content.  This would be the publisher, bass fishing and

12  here would be the content.  This is the actual page that

13  an internet user would go to read.

14            Now, this could change from day to day.

15  It's whatever it is on that site.  And these -- the end

16  result is, these are the ads that Google would serve,

17  and you see they all relate to fishing.

18            So here, the website is bass fishing, the

19  content is fishing, and Google would figure out that's

20  what the website was and then serve ads relating to the

21  same subject matter.  No one had ever done this before.

22  This was something brand new that Google did.

23            Let's go to the next site -- next slide.

24            So let me try to show you how it works

25  through a demonstrative here.  So step one, I go to --

1  I'm a user.  I go to this website.  This all happens in

2  a fraction of a second, so you don't even see it with

3  your eyes.

4           But I go to this website as an internet

5  user, and then the next thing that happens -- go ahead,

6  Charles -- is Google would analyze, read the content

7  that's actually on the web page.

8           Next.  Next slide.

9           And then it would determine these are the

10 subject matters that are on that website.  It would

11 figure that out.

12          Next.

13          Then Google would go to its ad database.

14 And here -- this is just a representation of all the ads

15 that are potential candidates in this database, and it

16 would look for ads that are relevant to these subjects.

17          Go ahead.

18          And it would figure out, here are ads

19 that are relevant, okay?  But that's not all this system

20 would do.  It's got another step.  It's called an

21 auction.

22          Let's go to the next step.

23          Then once it determined which of these

24 ads is relevant, Google would then conduct an online

25 auction, and it would look at a number of factors, one

1  of which is how much each of the advertisers bid to be

2  served ads by Google.

3                    Go ahead.

4                    And then only a few of those ads would

5  win the auction, okay?

6                    And then the next step.

7                    And then after all that process, Google

8  would take these winning ads that match the content of

9  the site and won the auction, and then those would be

10 placed into that sponsored link ads by Google category.

11 This all would happen in (snaps fingers) a fraction of a

12 second.

13                    So if you have a fast enough internet

14 connection, you wouldn't even see it.  The pages come

15 up, boom, like that.

16                    But all of these processes went through.

17 No one had ever done this before.  The patents in this

18 case don't talk about doing this.  This is -- this is

19 very sophisticated technology that Google developed.

20                    It was also win/win for everyone.  Users

21 would see the ads targeted to what they were interested

22 in.  So you see, I'm interested in fishing, I'm going to

23 be more likely to be interested in these ads because

24 they're -- they concern fishing instead of Viagra or

25 some other ad you get inundated with that you don't

1    like.

2            So users liked it; advertisers liked it,

3    because it increased the likelihood that users will

4    click on their ads, so their advertising is more

5    successful.

6            And the publishers, the bass fishing

7    people like it for the same reason.  Because they make

8    money every time an ad gets clicked on, because Google

9    collects that money from the advertisers and gives the

10   vast majority of it back to the web publishers.

11           They're like an auctioneer.  They keep a

12   commission, but they give the most of it back to the

13   publishers.

14           So this is -- this is the accused

15   technology.  It's called AdSense for Content.  This was

16   created years before the patents at issue in this case

17   were published -- or issued.  Excuse me.

18           The evidence shows that Google

19   actually -- will show that Google itself obtained its

20   own patents on its contextual targeting technology.  And

21   the patents issued only after this had already become

22   very successful.

23           It's important to note that the success

24   of AdSense for Content has nothing to do with the

25   patents in this case.  Mr. Tribble didn't really

1  explain, I don't think, what was new and unique about

2  its patents other than to say it's centralized.

3           But this isn't a success, because there

4  was a centralized controller.  This isn't successful

5  because it allowed an advertiser to go to one place,

6  which is what the patents talk about.

7           AdSense for Content was successful

8  because it came up with a revolutionary, new technology

9  for reading web pages, matching them to relevant ads,

10 conducting an auction, and then placing those ads.  A

11 super complex system that had never been done before and

12 is not talked about in the patents.  So that's Google.

13          Now, real quickly, let's talk about

14 Function Media's patents.

15          Let's go to Slide 15.

16          Now, Mr. Tribble talked a lot about the

17 patents, but he never went through the actual claims.

18 And your job is to go through the claims, look at the

19 elements, and apply them to the accused technology.

20          So let's look at the claims.  And I'm

21 summarizing here for brevity, but let's go.

22          This is Claim 1 of the '025 patent.  It's

23 the same representative claim that Mr. Tribble used.

24 This claim is very similar to all the other claims, and

25 we have, as I said, three reasons we think we don't

1   infringe, and it applies to all the claims, including

2   this one.  So we'll use this one as a representative

3   example.

4            The claims, basically, to help you

5   understand it, talk about essentially three things.

6   The first is what's called a first interface.  And in

7   the first interface is a subject called Media Venues

8   Input Presentation Rules.  Well, how can you translate

9   that into English?

10           What that is, it -- an interface is a

11  software program that these media venues can use to

12  interface with the system.  And the media venues is a

13  fancy word for these publishers, website owners.

14           So the first part of their patent is

15  having this interface for publishers, otherwise known as

16  media venues, with input presentation rules.

17           What are presentation rules?  How big

18  your ad should be.  Presentation refers -- basically,

19  that translates into an ad.  How big your ad is, what

20  background color it should have, those are presentation

21  rules, okay?

22           Then the next part is the second

23  interface here.  And the second interface is for the

24  sellers.  In our case, the sellers are called

25  advertisers.

1          So it's an interface that the advertisers

2    will have on their computer.  And this element talks

3    about sellers are advertisers inputting information to

4    select internet media venues.  What does that mean?

5    They're inputting information to select publishers,

6    websites.

7          And then secondly, this says, in the

8    second interface, that the advertisers input information

9    to create an electronic advertisement.

10          So this talks about a second interface

11    where the advertisers do two things:  They input

12    information to select these websites, and they input

13    information to create their advertisements, okay?

14    And then the third big piece of this -- and again, I'm

15    summarizing here -- is a computer controller.  A

16    computer controller processes and publishes electronic

17    advertisement.

18          So there's a centralized controller, and

19    what it does is, it processes and publishes the ads to

20    these websites.  It publishes them to the selected media

21    venue.

22          So let's walk through an illustration to

23    help understand how that works, okay?

24          So these are media venues, travel.com,

25    outdoors.com, and they're inputting presentation rules,

1   the ad size, font, color, border, and it goes to this

2   central controller.  So they input that into there.

3              The next step in the patent is, you have

4   the seller or advertiser.  And the seller and

5   advertiser -- Charles -- it does two things:  It inputs

6   information to select one or more of the internet media

7   venues, one or more of these guys, and it inputs

8   information to create an ad that's customized to each of

9   the selected internet media venue presentation rules.

10             So it has to make its ad customized to

11  the rules that each of these guys have.  So, for

12  example, say travel.com says, your ad has to be purple,

13  and outdoor.com, your ad has to be green.  It creates a

14  different ad for each of the different media venues in

15  accordance with the presentation rules.

16             The next step.

17             And that goes to central controller, too.

18             Next.

19             And then the last step is, the computer

20  controller processes and publishes those ads and

21  publishes them to the websites.

22             So it processes and publishes the lose

23  weight fast ad in purple to travel.dot, in accordance

24  with its presentation rules, and processes and publishes

25  the lose weight fast advertisement to the website

1   outdoors.com.

2                   So that's, basically, a simplification,

3   but it's, basically, what the patents talk about.

4                   That's their invention.

5                   All right.  Now let's talk about

6   noninfringement.

7                   The evidence will show that Google does

8   not infringe this claim or any of the other claims for

9   three reasons.

10                  In order for you to find infringement,

11  you have to remember it's Function Media's burden to

12  prove that Google infringes each and every element of

13  the claims.

14                  So we were just looking at the claims.

15  They have to show each and every one of those elements

16  we went through are infringed.

17                  It's not enough for Function Media to

18  show that the accused products resemble what the patent

19  is talking about.  It's not enough if they're similar or

20  if you think there's an overlap.

21                  Your job as jurors is to take each claim

22  and ask the question, did they prove that Google meets

23  that?

24                  And here, if there's just one claim

25  that's not met, you have to find noninfringement.

1                    Now, the evidence will show that Google

2    does not infringe for three reasons.  Let's go through

3    them.

4                    Let's go to 21.

5                    Okay.  Let's start with this element.

6    This is from the claims.  It says, the seller is

7    prompted to input information to create an electronic

8    advertisement for publication to the selected internet

9    media venues.

10                    Next slide.

11                    The Court in this case has told us what

12   that means, and the Court said, the term create an

13   electronic advertisement for publication to the selected

14   internet media venues means create an electronic

15   advertisement for publication in a form customized to

16   each of the selected internet media venues presentation

17   rules.

18                    What does that mean?  That means, to

19   translate that into layperson's terms, when the seller

20   here, the advertiser, is creating electronic

21   advertisement, he or she has to do so in a way that's

22   customized to each of this selected publishers' internet

23   media venues presentation rules.

24                    It has to be customized to each website

25   that the advertiser selected.  That's what this claim

1  is.

2              Next slide.

3              Now, the Google system, we'll present

4  evidence, it doesn't do that.  Advertisers can't do

5  that.

6              Here in the Google system -- let's go to

7  the next -- go ahead -- what an advertiser can do is

8  input ad information, key words, placements, and bids.

9              Next slide.

10              The evidence will show that an advertiser

11 on Google's AFC system cannot change the ad to conform

12 to the specific presentation of rules of the websites.

13 The advertiser cannot change the color of their ads.

14 They cannot change the font of their ads.  They cannot

15 change the borders or settings.

16              Just one generic submission, not

17 customized, is what the seller does.  Doesn't use this

18 claim language.

19              Go ahead to the next.

20              So they submit that, and it's the same no

21 matter what the -- where this is published.

22              Next -- next, please.

23              So, again, Google does not permit

24 advertisers to input information to create an electronic

25 advertisement customized to each of the selected

1    internet media venue presentation rules.  That's number

2    one, the first reason that Google doesn't infringe.

3                    Let's go to the second reason.  Same

4    claim, we're going through -- you're going to have to go

5    through and look at each of these elements and decide if

6    they're met.

7                    Second reason, this is a computer

8    controller.  It says that the computer controller of the

9    computer system processes and publishes the electronic

10   advertisement to one or more of the selected internet

11   media venues.

12                   Again, translating it into layperson's

13   terms, this central controller processes and publishes

14   the ad to one or more of the selected websites.  They

15   say media venues.  It's a publishing website, okay?

16                   The Court order, the Court's construction

17   of what this means, says this term -- the term means

18   placing or making available the customized electronic

19   advertisement within the framework of and at each of the

20   internet media venues, at each internet media venue.

21   So this element requires that the central computer

22   publish the ad to the website.  Now, we'll see Google

23   doesn't do that.  It doesn't do it at all.

24                   Let's go to the next slide.

25                   The way Google works is, you and I, we're

1  internet users, right?  We get on to the internet, and

2  let's say we go -- we're interested in the news because

3  of the tragedy that we've been reading about.  So we go

4  to CNN to find out the latest, okay?

5            So you type -- you happen to have it on

6  your favorites list.  You don't need to do a search.

7  You just type it in, and it goes straight to the CNN

8  website.

9            And what happens in a fraction of a

10  second in the Google system is the site comes down to

11  your computer, but guess what?  It's got a blank where

12  the ads are supposed to be, okay?

13            And if you have a slow enough connection

14  or if your internet is not doing so well, you may have

15  seen that.  Sometimes your page loads, and there's a

16  blank, and it takes a minute, and then the ad comes up.

17  But if you have a fast one, you don't see it.  But

18  that's how it works.  That's the first step.

19            Next slide.

20            Then what Google does is, it does all

21  that contextual targeting we talked about and finishes

22  that.  And then what does it do when it's finished; it's

23  decided what ads it wants to place?  Does it publish

24  them to the website?  No.

25            What Google does is it publishes them

1  directly to you, publishes them directly to your browser

2  on your internet, to every one.  It never publishes the

3  ad to the website.

4             Well, the claim we just saw requires

5  publication to the website.  In fact, the website

6  doesn't even know what ads are being displayed on its

7  web pages.  Google handles all of that.

8             So that element is not met.

9             Let's go to the third element.

10            There's a third reason why Google doesn't

11 infringe, and that relates to these two elements here.

12 The first says -- and this is the second interface we

13 looked at -- the seller is prompted to input information

14 to select one or more of the internet media venues.

15 Seller is prompted to input information to select the

16 websites it wants to advertise on.

17            And then later, it says -- after this

18 processing and publishing is done, it says:  Whereby the

19 electronic advertisement is displayed on each, each of

20 the one or more of the selected internet media venues.

21 That doesn't happen on the Google system.

22            Go to the next slide, Charles.

23            So here's how Google works.

24            Go ahead.

25            The Google puts -- and again, as we saw,

1 | puts in the ad information, key words, placement, bids.

2 | Next.

3 | Goes into Google.

4 | Next.

5 | Google has the submission from that

6 | advertiser.  What does Google do with it?

7 | Go to the next slide.

8 | It puts it in its database.

9 | Go ahead.

10 | Among all these other ads, okay?  It

11 | doesn't just take the ad that selects -- the selection

12 | that was made and just send it to the publishing

13 | website.  No.  If that ad wants to get displayed, it has

14 | to go through the process you looked at earlier.  It's

15 | one of millions of potential ads.

16 | Next step.

17 | And you remember, the next step is the ad

18 | has to be selected for relevance.  So all these other

19 | ads, they don't get selected because they're not

20 | relevant.

21 | In this example, the ad that we're

22 | looking at did get selected, so it passed the first

23 | step.

24 | Go to the next step.

25 | But then it's got another hurdle.  It's

1    got to win the auction.  So even though it's relevant,

2    if it doesn't win the auction, it's not going to get

3    displayed.

4                    So go to the next slide.

5                    So in this case, in this example, it

6    didn't bid enough money, so it doesn't get selected.

7                    Next slide.

8                    So what happens is, even though the

9    advertisers said, I want to be on this website -- go

10   ahead -- it doesn't get displayed.  Other ads get

11   displayed.  It loses.

12                   THE COURT:  You've got 10 minutes

13   remaining.

14                   MR. VERHOEVEN:  Thank you, Your Honor.

15                   So this is the third reason why Google

16   doesn't infringe.  On the Google system, there is no --

17   you don't just select a website and you get published

18   there.  You have to be selected for relevance, and then

19   you have to win the auction.

20                   There's no -- you might or you might not.

21   But it's not the case that you select a website, and

22   then you get processed and published, and your ad gets

23   displayed on each of the websites you selected.  It

24   doesn't happen that way.

25                   So for those three reasons, Google

1 doesn't infringe.  We're going to present evidence on

2 this, and we are confident that once you carefully look

3 at the elements, you'll find there's no infringement.

4              Now, we also contend that the Function

5 Media patents are invalid.  And I'm not going to go

6 through the slides on this, because I don't have enough

7 time, but we have evidence that both AdForce and

8 DoubleClick, as I said, were doing the same thing that

9 Function Media was doing before Function Media did it.

10             And we're going to present expert

11 testimony; we're going to present documents from these

12 systems; we're going to present witnesses who actually

13 wrote the AdForce system, worked on the AdForce system,

14 work on the DoubleClick system.

15             You can look into their eyes and assess

16 for yourself, did they do it?  Did they do it before

17 these folks did it?  And we think that you will conclude

18 that they did.

19             Now, it's important for you -- on this

20 invalidity analysis, under the law, for you to

21 understand that it doesn't matter whether or not AdForce

22 obtained a patent on its system.  All that matters is

23 whether it did it first.

24             Now, some people think, well, the first

25 person at the Patent Office wins.  That's not the law.

1  You're only entitled to a patent if you were the first

2  person to do it.

3              It doesn't matter -- if somebody else did

4  it before you and what you're doing is not new or

5  unique, you're not entitled to a patent.  It doesn't

6  matter that the other person filed for their own patent

7  or not.  That's irrelevant.

8              What matters is, did they do it first?

9  And we're going to present evidence that they did do it

10 first.

11             Now let me talk about damages for a

12 minute.  We don't think any damages are appropriate in

13 this case.  We think that Google does not infringe, and

14 we intend to prove it to you.

15             We also think that the patents are

16 invalid, and we intend to prove that to you.  The Patent

17 Office didn't know about the art we're going to show

18 you.  But you might disagree with us, and if you do, we

19 need to talk about damages.

20             For damages, the Court will instruct you

21 that if you find there's liability, that the appropriate

22 measure of damages is a reasonable royalty.  Emphasis on

23 reasonable.

24             How do you determine that?  Well, the

25 Court will tell you that you have to imagine a

1  hypothetical negotiation.  And that negotiation will be

2  between Function Media -- actually, between Mr. Dean and

3  Ms. Stone on the one hand and Google on the other.

4                And you're supposed to pick a specific

5  time for that hypothetical negotiation.  That's July of

6  2007 when the patents issued.  And you need to imagine

7  that Mr. Dean and Ms. Stone are negotiating with Google

8  and try to figure out what you think would be a

9  reasonable outcome of that negotiation.  That's the

10 test.

11                Now, Google says -- Google.  I apologize.

12 Mr. Tribble says that the outcome of that negotiation

13 was -- would be that Google would say:  You can have 65

14 percent of all the profit that we've made doing this, 65

15 percent.

16                Now, we contend that's simply not

17 reasonable.  Google spent a lot of money and a lot of

18 time developing these systems well before the patents

19 issued.

20                The evidence will show that Mr. Dean and

21 Ms. Stone weren't able to write a software program that

22 practiced their patents.  They didn't know how to write

23 code.  They had to have somebody else to help them do

24 it.  And then even, it didn't work.

25                The evidence will show that they were

1  unable to write this customization they were talking

2  about.  They didn't even have any software to do that.

3  They couldn't do it.  The evidence will show the part

4  that they did develop, they tried to sell, and they

5  tried to give away, and no one wanted it.

6            In light of that and in light of the

7  creativity and the contextual targeting that has nothing

8  to do with the patent that was the reason for the

9  success of AdSense for Content, we believe you'll

10  conclude that their number is grossly exaggerated.

11            Now, I want to conclude by saying one

12  last thing.  This not a case about Google copying

13  somebody's patent.  Google -- it's undisputed, Google

14  had no knowledge of these patents, no knowledge

15  whatsoever.

16            The evidence will show the first time

17  Google learned about these patents was when Function

18  Media sued Google.  And guess when they sued them?  The

19  first day their patent issued.

20            The evidence will show that Mr. Dean and

21  Ms. Stone knew about Google and suspected they might be

22  infringing in 2005.  Did they pick up the phone?  No.

23  Did they send a letter?  No.  Did they try to contact

24  Google at all?  No.  What did they do?  They waited, and

25  on the first day their patent issued, they sued.

```
 1              Is that conduct that deserves $600
 2   million in damages?  We think no.
 3              Would Google have agreed, under those
 4   circumstances, to give away 65 percent of its profits
 5   from its hard work that it did without knowing anything
 6   about these patents?  We think you'll conclude no.
 7              So I thank you very much for listening to
 8   me and for your service as jurors.  I'll have one more
 9   chance to talk to you at the end of the case after the
10   evidence has been presented, and I look forward to doing
11   that.  Thank you for listening.
12              THE COURT:  All right.  Thank you,
13   Counsel.
14              Ladies and Gentlemen, we're going to take
15   our morning recess at this time.  Just over 20 minutes.
16   Be back ready to come in the courtroom at 10:35, and
17   we'll start at that time with the first witness.
18              Remember my prior instructions, and don't
19   talk about the case.
20              COURT SECURITY OFFICER:  All rise.
21              (Jury out.)
22              THE COURT:  All right.  Y'all have a
23   seat.
24                The arm's-length rule is in effect.
25   Stay within an arm's length of the podium, please,
```

1  Mr. Verhoeven.

2              MR. VERHOEVEN:  I apologize.

3              THE COURT:  Well, it's okay.  I'm just --

4  Judge Ward is kind enough to let us use his courtroom

5  for this case.  I understand it's a big case for both

6  sides.  But if you poke a hole in his screen, he's going

7  to send us downstairs, okay?

8              So I don't know the -- in addition to

9  imposing other penalties, okay?  So please be mindful of

10 the screen when you're using it.

11             MR. VERHOEVEN:  So I shouldn't be

12 pointing up to the screen then?

13             THE COURT:  Well, I don't mind if you

14 point up to it.  I just don't want you to hit it too

15 hard and poke a hole in it.

16             MR. VERHOEVEN:  Okay.  Thank you.

17             THE COURT:  Okay.  Come back and be ready

18 to start at 10:35.  Court's in recess.

19             COURT SECURITY OFFICER:  All rise.

20             (Recess.)

21             COURT SECURITY OFFICER:  All rise.

22             (Jury in.)

23             THE COURT:  Please be seated.

24             Counsel, approach.

25             (Bench conference.)

1           THE COURT:  All right.  Just for purposes

2   of the record, I'm exempting expert witnesses from the

3   Rule -- the prosecution of the Rule and the client

4   representatives that we discussed before opening

5   statement.

6           But it's the responsibility of the

7   lawyers to keep anyone out that would be covered by the

8   rule, okay?  I can't police who comes in and out of the

9   courtroom.  I just -- and I'll -- you know, I always let

10  them stay for opening statement.

11          I don't know if anybody's out there, but

12  it's y'all's responsibility, okay?

13          MR. VERHOEVEN:  Yes, Your Honor.

14          MR. NELSON:  Thank you, Your Honor.

15          THE COURT:  Okay.

16          (Bench conference concluded.)

17          THE COURT:  Plaintiff may call its first

18  witness.

19          MR. NELSON:  Yes, Your Honor.  Plaintiff

20  calls Michael Dean.

21          THE COURT:  Mr. Dean, if you'll have a

22  seat right there.  Try to keep your voice up and speak

23  into the microphone for me, okay?

24          THE WITNESS:  Yes, sir.

25          MICHAEL DEAN, PLAINTIFF'S WITNESS, SWORN

1                        DIRECT EXAMINATION

2    BY MR. NELSON:

3        Q.   Good morning.

4        A.   Good morning.

5        Q.   Please introduce yourself.

6        A.   My name is Michael Dean.

7        Q.   Mr. Dean, where do you live?

8        A.   I live in Tyler, Texas.

9        Q.   How long have you lived in Tyler?

10       A.   We moved there in 2004.

11       Q.   And --

12       A.   So five years.

13       Q.   And how long have you lived in Texas?

14       A.   We moved to Texas in 1997.

15       Q.   You said we.  Who is the we?

16       A.   Lucinda Stone, my wife.

17       Q.   Where did you go to high school?

18       A.   Manteca, California.

19       Q.   And is that where you're from?

20       A.   Yes.

21       Q.   Now, before -- we're going to talk a little

22   bit more about your background and these patents, but I

23   want to ask you a couple of questions first about what

24   Google's counsel, Mr. Verhoeven, said in his opening

25   statement.

1          He said that Google had this new idea in 2002.

2   In 2002, Mr. Dean, was this automated customization a

3   new idea?

4       A.   Absolutely not.

5               MR. VERHOEVEN:  Objection, Your Honor.

6   May I approach?

7               THE COURT:  Yes.

8               (Bench conference.)

9               MR. VERHOEVEN:  There's a motion in

10  limine granted on opinion testimony, Your Honor.

11              THE COURT:  It's overruled.

12              And, listen, we're not going to -- I

13  mean, I understand that was a limine point, but we're

14  not going to try this case up here at the bench.  So to

15  the extent you can make those objections from counsel

16  table, I expect you to do it.

17              MR. VERHOEVEN:  Yes, sir.

18              (Bench conference concluded.)

19      Q.   (By Mr. Nelson) Was this automated

20  customization a new idea in 2002?

21      A.   No, it was not.

22      Q.   Mr. Verhoeven also stated that Google's

23  success has nothing to do with the patents in this case.

24  In your opinion as the inventor of the patents here, is

25  it possible to have an automated customized system

 1   without these patents?

 2        A.   No, it is not.

 3        Q.   Mr. Verhoeven also stated that you were

 4   considering suing Google in 2005.

 5             Just so the record is clear, were these

 6   patents that we're talking about today, had they issued

 7   in 2005?

 8        A.   No.  These patents did not issue until July of

 9   2007.

10        Q.   Mr. Dean, could you please explain briefly why

11   you are here today suing for patent infringement?

12        A.   Yes.  The -- the patents that contain

13   fundamental core -- core inventions to a process are

14   rarely ever licensed outside the scope of litigation.  I

15   believe that if we had contacted Google in California,

16   they would have filed suit in California in their

17   backyard, and I -- it would just be prohibitively

18   expensive for us to have allowed that to happen.

19             MR. VERHOEVEN:  Objection.  No

20   foundation.  Move to strike.

21             THE COURT:  All right.  Overruled.

22        A.   So that's the reason we are here today.

23        Q.   (By Mr. Nelson) Thank you, Mr. Dean.

24             Now, we talked about -- we left off and you

25   had graduated high school in the late '60s.

1       After you graduated high school, what did you

2  do next?

3      A.   After high school, I went -- a year, year and

4  a half of -- excuse me -- a year and a half or so of

5  college, and then I joined the Army.

6      Q.   What year did you join the Army?

7      A.   1969.

8      Q.   Was that during the Vietnam war?

9      A.   Yes, it was.

10      Q.   Did you volunteer for the Army in 1969?

11      A.   Yes, I did.

12      Q.   Were you an enlisted man?

13      A.   Yes.  I started out as an enlisted man and

14  became an officer.

15      Q.   Did you receive any specialized training in

16  the military?

17      A.   Yes, I did.  I started out with infantry

18  training and was selected to attend Engineering OCS;

19  that's Engineering Officer Candidate school.

20       After Engineering Officer Candidate school, I

21  was commissioned as a second lieutenant in the Army

22  Corps of Engineers.

23       After that, I was sent to a military

24  intelligence course, where after graduating from that, I

25  had a dual specialty in the military of engineering and

1  also military intelligence.

2          After that, I was given orders to go to

3  Vietnam as an advisor, and the Army gave me specialty

4  training to prepare me to be an advisor, several

5  courses; the primary one being the Defense Language

6  Institute to learn to speak Vietnamese.

7      Q.   Did you actually go to Vietnam?

8      A.   Yes, I did.

9      Q.   Did you see combat there?

10     A.   I was in the front-line positions the whole

11  time I was in Vietnam.

12     Q.   What decorations, if any, did you receive?

13     A.   I was awarded a Bronze Star.  I was awarded an

14  Air Medal.  That was given for 100 combat assaults.  I

15  was awarded a Vietnamese Cross of Gallantry with Silver

16  Star, and I was awarded a combat infantry badge referred

17  to as a CIB.

18     Q.   When did you return from Vietnam?

19     A.   I returned home in 1972.

20     Q.   Where did you return to?

21     A.   California.

22     Q.   What did you do when you got back?

23     A.   When I got back, I joined the Army Reserve and

24  got into construction.

25     Q.   What did you do as part of the Army Reserves?

1    A.    In the Army Reserves, I was -- I was a company

2 commander of a combat engineer unit.

3    Q.    Did you attend any more college besides the

4 year or so you had attended before you went to Vietnam?

5    A.    Yes.  After I -- after I got back, I attended

6 probably a year, a year and a half, but I didn't have

7 the money to attend full-time.  I had to work and make a

8 living.

9    Q.    I'm going to skip ahead a few years.  When did

10 you first become interested in the internet?

11    A.    The first time I discovered the internet was

12 in 1994.

13    Q.    How did you become interested in the internet?

14    A.    The -- I was in the -- I was in the process of

15 exploring a bulletin board system, which was the old

16 electronics bulletin boards that they had in those days,

17 and I was trying to -- I was looking at setting up an

18 advertising system, a local advertising system for the

19 Santa Cruz community.

20         And in doing this, we started testing the

21 internet, abandoned the concept of the electronic

22 bulletin board.  And I've been hooked on the internet

23 ever since.

24    Q.    Could you please describe for the jury the

25 state of internet technology as it existed in this 1994

1  timeframe?

2      A.   In 1994, the -- the -- the internet was in its

3  infancy.  It was -- it was nothing like it is today.

4  There was no broadband.  All connections were done with

5  a dial-up modem.  You may have had a 144 or 288 dial-up

6  modem.  The browsers were slow.  They'd come in all

7  pixilated.  There was no Internet Explorer.  There was

8  no Netscape.  The browser we used in those days was

9  called Mosaic.

10     Q.   Was there a Google?

11     A.   No.

12     Q.   What kind of internet business were you and

13  Ms. Stone interested in back then?

14     A.   At that point in time, Lucinda and I quickly

15  embraced the internet.  And what we saw as the huge

16  potential of the internet was to provide small

17  entrepreneurs, small companies, small sellers as we saw

18  them, and to provide them a platform that they could

19  promote their products or services all across the United

20  States and do it electronically and do it frequently.

21     Q.   Did you obtain an internet address for that

22  business?

23     A.   Yes, we did.

24     Q.   What was the name of that internet address?

25     A.   It was www.virtualcities.com.

```
 1      Q.   What did you do first at that internet
 2 address?
 3      A.   At first, what we did was we explored the
 4 various types of sellers.  And we were trying to look
 5 for that perfect market.  And in doing that, we came
 6 upon the concept of doing a directory for bed and
 7 breakfasts, country inns, and small hotels.
 8           And those owner/operators, those mom-and-pop
 9 operations, if you will, they could be the poster child
10 for what -- what has really made the internet great.
11 They had -- they had limited financing for their -- for
12 their ad campaigns.  They were -- they were local in
13 their -- in their position, but they needed to spread
14 their message nationally to influence those people that
15 were traveling to their area.
16           So it was -- we considered it a perfect fit
17 for what the internet was becoming and how -- and how we
18 knew that the internet would grow and thrive.
19      Q.   Was it successful?
20      A.   Yes, it was.  We -- we were one of the first
21 ones to start up.  We currently -- I believe we're
22 currently the longest running bed and breakfast
23 directory of that kind on the internet.
24           We -- we were recognized and recommended by
25 state associations all across the United States, by the
```

1  national association, PI.  It was very successful.

2      Q.   Let's move down the road a little bit.  When

3  was the first time that you started thinking about what

4  ultimately became the inventions in this patent -- in

5  these patents here?

6      A.   The first time was 1997, late 1997.

7      Q.   Could you please describe for the jury how you

8  conceived of your inventions at issue in this case?

9      A.   What we conceived of was creating a single

10  site where these individuals that I spoke of -- that not

11  only bed and breakfasts but all sorts of sellers in all

12  sorts of industry that needed to reach out and spread

13  their information, to gather -- gather clients and

14  customers, we envisioned a site where they could come to

15  one location, and at that location, they could input the

16  information that they wanted their message to be, the

17  information of what they had to sell, what they had to

18  promote.

19          They could then input the information of where

20  they wanted these presentations to go and press a single

21  button, and the whole system would take care of

22  distributing those in a customized format to all of

23  these locations that they wanted to advertise on.

24      Q.   Was the ease of use something that you were

25  considering?

1    A.   Very, very much so, because the -- the -- in

2  1997, the internet advertising was very difficult for

3  these small -- small businesses, because they would

4  have -- they would have to figure out where they wanted

5  to put their presentations or their advertisements.

6  They would have to contact those, negotiate a contract

7  or agree to a standard contract.  They would then have

8  to -- have to get the -- get the rules, the presentation

9  rules or the requirements for those advertisements,

10  because the websites just wouldn't put up anything.  So

11  they had to get that.

12        Then they had to design the ad or pay someone

13  else to design the ad or submit required information.

14  It was -- it was a very frustrating process, a very long

15  process for these -- for -- for the innkeepers we were

16  dealing with, and -- and by our analysis for everyone

17  trying to get their message out.

18    Q.   How did you and Ms. Stone work together in

19  coming up with these inventions?

20    A.   Yeah, that's -- that's rather -- that's rather

21  humorous.  At the time -- at the time that we started

22  working on this, Lucinda and I were living in San

23  Francisco, and we had -- we were working out of our

24  house.

25        And the -- we were in a 1920s house, small

1 bedrooms, rather unusual configuration by today's

2 standards, but -- so she had her office in one bedroom

3 and I had my office in a second bedroom.  And if you

4 opened the office doors, you could -- not office

5 doors -- excuse me -- the closet doors of the closet in

6 that bedroom, you could see straight through to the

7 other room.

8            So we would end up -- we arranged our desks so

9 that we would end up sitting there, and when we started

10 talking and brain-storming, I would turn towards her and

11 she would turn towards me, and we would be talking

12 through this closet.

13           So it -- it struck us as a bit unusual, but we

14 had a lot of good brain-storming sessions through that

15 closet.

16     Q.    You mentioned that some of your clients had

17 some frustrations.  These were advertiser clients?

18     A.    Yes, they were.

19     Q.    Could you please describe in a little more

20 detail the frustrations that these seller-side

21 advertisers were facing in this timeframe?

22     A.    Yes.  The -- the advertisers had no central

23 location to go to to -- in order to manage their ad

24 campaigns.  They would get no help.

25           It was -- it was always a case of -- of a

1  piecemeal operation; that they would have to manage all

2  the contacts; that they would have to intimately have a

3  relationship and know with each and every place that

4  they were going to advertise -- they wanted to advertise

5  their bed and breakfast, and they had to know minutia

6  detail.

7          Some sites will accept certain amounts of text

8  plus an image.  Some sites want more text.  It was just

9  very difficult and very frustrating for them.

10     Q.   Now, you mentioned that you were a web

11  publisher; is that right?

12     A.   That's correct.

13     Q.   Was it important in coming up with these

14  inventions that you were a web publisher?

15     A.   Yes.  One of the things we brought to -- to

16  this -- this brain-storming and this inventive process

17  is that we were publishers.  So we were seeing the flip

18  side of the advertisers' difficulty, of that seller's

19  difficulty.  I mean, when you're dealing with your

20  clients and they're frustrated, that's not good for

21  anyone.

22          So we were -- we were having to deal

23  one-on-one with each one of them.  We were having to

24  solve individual problems.  Many times, they would be

25  submitting material and they would have gotten the

1  standards mixed up with somebody else's standards.  So

2  we would have to go back to them.

3         We had to review every item that came in in

4  order to make sure that the ultimate ad that we created

5  was correct and accurate not only for their custom --

6  their custom content and their custom message but also

7  for -- for our standards that we were trying to maintain

8  on that website as far as look and feel, as far as the

9  design and style of our website.

10     Q.   You testified about this at the very beginning

11  of your testimony.  But, Mr. Dean, please tell the jury

12  whether you were aware of any type of automated

13  customization that could access multiple websites before

14  what you and Ms. Stone did?

15     A.   No.  There was absolutely nothing out there

16  available that could take the raw data and generate

17  custom ads that would satisfy the needs of a multitude

18  of websites, to keep that look and feel, that design and

19  style, and be true to what the -- what those website

20  owners, those publishers, were trying to accomplish.

21     Q.   Can I stop you there?

22         You mentioned the phrase look and feel.  Can

23  you please describe for us what you mean by the look and

24  feel?

25     A.   Yes.  That's a -- that's a term used by

```
 1  programmers and web internet publishers.  And what we
 2  mean when we -- when we talk about that is that -- is
 3  that the design of it, the color combinations, the
 4  layout on the screen, the navigation through it.
 5  And each publisher spends a huge amount of time and
 6  effort working on their site to try and perfect what
 7  they consider -- and this is an opinion that -- that no
 8  two publishers will agree on.  But they try to perfect
 9  the perfect environment for the type of clients that
10  they're going to attract.
11          They look at demographics on who they are.
12  They study who's at their site.  And they work very hard
13  to maintain that look and feel consistency across their
14  website.
15      Q.   Does the look and feel allow the publisher,
16  the web publisher, control over the appearance of his
17  site?
18      A.   Yes.
19      Q.   In your experience as a website publisher, is
20  the look and feel of a website important?
21      A.   Yes.  As I said, that's -- that's everything
22  to a web publisher.  They -- they're -- their whole
23  mission in life is to build a better appearance and a
24  better functionality for that website.  That's all
25  they've got to offer.
```

1          They've got -- all of them have lots of

2     information.  The question comes down to ease of use,

3     consistency, how pleasing is it to the eye, how

4     consistent, can you find the information.

5          Q.   Now, can you please describe for us what was

6     your idea?  What was your breakthrough here?

7          A.   The breakthrough on that was -- and it was

8     probably through that -- I mean, it was through that

9     closet, but the breakthrough was that we came -- we had

10    the realization that these two objectives of the -- the

11    seller wanting to get their message out and having a

12    customized message and the website publisher's objective

13    of maintaining that look and feel, of developing a

14    consistency on their site, those weren't mutually

15    exclusive.

16          We believed there was a way to more

17    efficiently combine those objectives and allow for an

18    even flow of work and a flow of these advertisements

19    with much less anguish, you might say, on both sides.

20    Yes.

21          Q.   Was your idea limited to just bed and

22    breakfast sites?

23          A.   No, absolutely not.  We -- we -- we started

24    with the bed and breakfast site -- no.  Excuse me --

25    yes.  We started with our bed and breakfast clients,

1  because we already had relationships with these clients.

2  We understood the bed and breakfast industry, and we had

3  good contacts.

4         But we viewed our patents and this patent,

5  this invention that we had done, this system as being

6  applicable to all internet advertising across a wide

7  spectrum of almost any service, idea.

8         Whatever you wanted to promote, this would

9  help promote it by getting it out and getting it into an

10  acceptable format for those websites that were

11  struggling, trying to bring in your advertisement, but

12  by the same token, not violate their -- violate their

13  look and feel and violate their -- what they were

14  striving for.

15     Q.    What did you do to implement these ideas?

16     A.    In -- in early 1998, I went out and bought

17  computer programming books.  I enrolled in local -- at a

18  local junior college in computer programming classes and

19  started -- started programming these interfaces.

20     Q.    Now, what happened after you started to

21  program these interfaces and began attending these

22  classes?

23     A.    Well, I started attending the class -- or

24  reading the books, attending the classes.  And it was a

25  very intense time, because I was on a -- on a mission to

1   learn this -- learn this.

2          And shortly after that, we hired a programmer,

3   Mohammed Hasan, who had actually been an instructor at

4   the -- the junior college, and we hired him as a

5   part-time programmer to help me program that system.  I

6   mean, I was a novice programmer to start with, and I

7   needed his experience and expertise.

8      Q.   When did you hire Mr. Hasan?

9      A.   That was May of 1998.

10     Q.   Now, did all three of you, Ms. Stone,

11  Mr. Hasan, and you -- all three of you work on the

12  programming?

13     A.   No.  Lucinda doesn't -- does not program.  She

14  was very much -- she was running the business, and I was

15  doing the programming, along with Mohammed Hasan.  But

16  somebody had to take care of the core business that we

17  had while we were working on this project for the

18  future.

19     Q.   Now, I want to be very clear about this for me

20  and the jury here.

21          Was Mr. Hasan involved in any way in coming up

22  with the ideas that became these patents?

23     A.   Absolutely not.  We hired Mr. Hasan in -- in

24  May of '98.  It was certainly -- by April of '98,

25  Lucinda and I had well mapped out and diagrammed how

1   this system was going to function and the intricacies

2   and the interactions of the various pieces and the

3   results that we wanted out of it.

4            So it was all mapped out.  I had already

5   been -- programming for a while on it, and then we hired

6   Mr. Hasan.

7        Q.   I think you just testified to this, but by

8   April of 1998, had you and Ms. Stone come up with this

9   idea of automatically formatting advertisements?

10       A.   Yes.

11       Q.   When did you start the patent application

12   process?

13       A.   We started the patent application process in

14   April of 1999.

15       Q.   And what happened?  Can you describe that

16   briefly?

17       A.   Yes.  We had -- we had essentially finished

18   the program, and we were going back in and improving the

19   efficiency.  But the program -- the program was

20   finished, and I -- I called a -- an attorney to ask him

21   how could we protect this.

22            We were very excited about it.  We wanted to

23   go out and show, and it -- and we felt we needed some

24   sort of protection.  In talking to him, he recommended

25   that we file a patent application.

1      Q.    When did you file your first patent

2 application on these inventions?

3      A.    The first patent application was filed in --

4 on January 10th of 2000.

5      Q.    You testified that you started programming and

6 implementing these ideas in early 1998; is that right --

7      A.    Yes.

8      Q.    -- approximately?

9           Were those programs, implementations of the

10 inventions described in your patents?

11      A.    Yes, they were.   This was -- was what you

12 might call phase one of -- of the total invention.   We

13 had to address the need -- we first had to address the

14 needs of the bed and breakfast clients that we were

15 starting out with.

16      Q.    Okay.

17      A.    So that's where we started.

18      Q.    Yes.   So could you go into -- what was phase

19 one?

20      A.    Phase one was -- was -- we created a seller

21 interface so that the bed and breakfast clients could

22 enter all their information that was required for -- to

23 create a presentation, transmit it.

24           We completed the central processor and the --

25 and we -- we completed the presentation generation

1    program.   That was the part that took the various

2    standards that were required, combined them with the

3    custom message from the -- the innkeeper, and then

4    generated and placed that ad on the internet.

5         Q.   Did you create a website that had this?

6         A.   Yes, we did.

7         Q.   What was the name of that website?

8         A.   It was lodgingreservations.com;

9    www.lodgingreservations.com.

10        Q.   Now, there was some argument by Google's

11   counsel -- I want to be clear on this.

12             Mr. Dean, did you complete this first phase of

13   your patent application and invention?

14        A.   Yes.

15        Q.   Do you have a video showing the operation of

16   stage one of your system?

17        A.   Yes, we do.

18        Q.   Before we actually play the video, could you

19   please describe for the jury what we are about to look

20   at and how it came about?

21        A.   These -- the video is from the actual -- an

22   actual seller interface, and it's -- it's off of a

23   computer from 2002.  That program was essentially -- I

24   mean, everything that's there was the same as when it

25   was -- or in January of 2000.

1          And so -- so we're going to have a video of

2   how a bed and breakfast innkeeper might interact with

3   our system through that seller interface.

4          We're then going to take you to a video of an

5   actual presentation that was on the web at

6   lodgingreservations.com in that 2002 -- it's from a

7   Granbury Inn, and it's in that 2002 period.  It was an

8   actual presentation from there.

9          And we'll take you through that and show you

10  how the data that was entered by the innkeeper, that

11  custom message that was entered by the innkeeper was

12  converted from their raw text input and was converted

13  and reformatted into the standards of the

14  lodgingreservations.com website.

15      Q.   Okay.  Let's go ahead and see the video.

16              (Video playing.)

17      Q.   (By Mr. Nelson) What are we looking at here,

18  Mr. Dean?

19      A.   Yes.  That's -- that's the -- that would just

20  be the desktop that the innkeeper would have on that

21  interface.  Here's a log-in screen.

22          I'll try to be brief here and keep up with it.

23  This is the splash screen that just comes up first,

24  shows the version numbers, et cetera.

25          Okay.  That -- that -- can we pause there?

1          Just quickly, that's an error message because

2   this particular database carries a credit card number in

3   it from 2002.  So the program believes that it's

4   expired, which I'm sure it is.  So that's the reason

5   we're getting the error message.

6          Let's continue.

7          And so you see across the top, we have all

8   these various -- various boxes or buttons.  And by

9   pressing those buttons, we get input screens.  And we're

10  just going to go to a couple of them because of time

11  constraints.

12         This is the general information.  So here's

13  where the innkeeper would put things such as directions

14  to their inn.

15         Let's pause -- continue.

16         Pause.

17         Okay.  We're looking at the attractions tab,

18  and this is where the innkeeper, through that new button

19  on the other side, would have input various attractions

20  that they wanted to promote in order to get people to

21  come to -- to come to their area.

22         So -- and this is -- this was especially

23  important with innkeepers, because they have a very

24  tough time not only getting the message out that you

25  should come to my inn and I have a beautiful bed and

1  breakfast, but here are the things that you can do and

2  why you should stay an extra day.

3              So that was the promotion; that was the sales

4  that we were trying to facilitate.

5              Go on.

6              So this is where they put -- they put the

7  message about each attraction.  And once again, this is

8  a test machine, so some of these are -- are -- so they

9  were -- this particular test -- our tester was putting

10 in these -- these various attractions.

11             Let's pause there.

12             Was putting in these various attractions,

13 putting in the -- the custom message and then putting in

14 the -- you know, the titles, et cetera.

15             Now, what we're looking at here -- what you're

16 looking at with this presentation, this is a -- this is

17 a preview screen or a preview system within the seller

18 interface.

19             So when -- the concept was that to help these

20 sellers envision what was going to show up on the

21 internet, we would allow them to input all their

22 information, hit that view screen, and the program would

23 generate a -- you know, one example of how this -- how

24 this is going to show up.

25             And you'll notice that -- that it's -- you

1   know, the raw data that you saw being input in those

2   text boxes and on the text boxes concerning the

3   attractions, plus the photographs that were being

4   attached to it, are now being presented in a format with

5   this beige background and in this -- in this

6   listing-type format.

7              Let's go on.

8              So -- so that's the attractions.  We're going

9   to close that.  And then we're going to take a look at

10  rooms.

11             So this -- this is where a bed and breakfast

12  operator would promote each room, because bed and

13  breakfasts are -- let's pause.

14             Bed and breakfasts are well known for having

15  rooms with character.  This was not designed to be used

16  for a standard, cookie-cutter motel situation.  This

17  is -- these are people that are very proud of their

18  inns.  They are very -- they spend extensive time making

19  themes for the various rooms, and they want to show it

20  off.

21             So this is where they would input the names of

22  the rooms.

23             Let's go on.

24             And here's -- let's pause.

25             Here's where they would put in the description

1  for that room.  So you had a long description.  You also

2  had a requirement for a short description.

3           And, again, this is being put in as raw data.

4  Just fill in the text box.  The innkeeper didn't have to

5  do any formatting, no consideration.  The innkeeper

6  concentrated on getting their message that we would then

7  promote.

8           And you'll see there's check boxes at the

9  bottom.

10           Go ahead.

11           There we go.  Let's pause there for a second,

12  too.

13           This -- this is a series of check boxes that

14  allow the innkeeper to just quickly check a box based on

15  the various -- various amenities that that room might

16  have.

17      Q.   Mr. Dean, may I stop you there?

18      A.   Yes.

19      Q.   Could each different innkeeper check different

20  boxes when it went to this interface?

21      A.   Oh, absolutely.  These were -- all of these

22  were optional.  In the text boxes, this was a suggested

23  list.  And down -- down on the bottom, you'll notice it

24  says other room amenities where they could actually put

25  custom amenities that we had never heard before.

1           So it was designed for those to be -- you

2   know, these boxes to be checked where the standard is

3   just to speed up the process and help these people

4   identify ways of promoting and ways of identifying and

5   differentiating the rooms that they had to offer.

6           But you'll notice that they're not typing in

7   any of that.  They're just putting the check box in.

8           Go ahead.

9           And here's where we do a view -- okay.  Let's

10  hold it.  Hold it right there, please.

11          Once again, this is the preview function

12  within the -- now, this is before the data has ever been

13  transmitted to the central location.  This is setting

14  on -- this is within that seller interface that the

15  seller has the ability to preview and make sure that he

16  likes what he's come up with.

17          So -- and you can see they put in a short

18  description, and then off to the right-hand side there,

19  there's a list of those check boxes that were the

20  amenities.  So the innkeeper checked a box, and then the

21  text of the amenities shows up on the preview.

22          Go ahead.

23          Now we're closing this, and we're going to go

24  on, and we're going to show you a -- a sample -- not a

25  sample.  This is an actual innkeeper presentation that

1  appeared on the internet at that point in time.

2          Can we pause there?

3          As you had seen in the previous screen with

4  the -- with the -- with the -- with that innkeeper

5  interface or that seller interface, we want to call it,

6  they were able to put in images and put in the name of

7  the inn, a description for the inn, and the various

8  amenities.  And these amenities are for the -- for the

9  overall inn.

10         And you'll notice that this looks entirely

11 different than the preview that you had seen before.

12         And the reason for that was that the innkeeper

13 used the preview to examine or test or make sure that he

14 was -- he was telling everything he needed to tell.

15         But then when he transmitted the information,

16 the information was transmitted purely as raw data.

17 There was no formatting; there were no backgrounds;

18 there were no colors.  Nothing was transmitted other

19 than the pure raw text, which boxes were checked,

20 information that would just drop straight into a

21 database.  There was no formatting.

22         Go ahead.

23         And what we're going to show here is that --

24 well, let's -- I think we're scrolling down here, so --

25 and you can see this is fairly lengthy information, and

1    there are the amenities.  So out of a broad list of

2    amenities, this -- this innkeeper -- and let's hold

3    right there.

4           This is Baker Street Harbour B&B on the Lake,

5    nice little bed and breakfast right on the lake in

6    Granbury, and -- and this is how they wanted people to

7    perceive their inn.  This is how they wanted to promote

8    their business.

9           Owner/operators.  They live right on the

10   premise, and they bring you breakfast in the morning.

11          So let's go ahead.

12          And you see, we're going to go to the

13   attractions.

14          Let's stop right here.

15          On the attraction -- this is the same -- this

16   is the result from the Baker Street Harbour Bed and

17   Breakfast of the same type of data that we saw being

18   input on the other side, that of the -- of the

19   attractions.

20          Go ahead.

21     Q.   Can I stop you right there before we go on?

22     A.   Sure.

23     Q.   This -- these were the attractions picked by

24   this particular Baker Street Harbour B&B.

25          Could, say, another innkeeper down the road in

1  Granbury pick other attractions would then show up on

2  the site as well that would be different from the

3  attractions that the Baker Street Harbour B&B picked?

4      A.    Absolutely.  Because what we were trying to do

5  was give these people the power of the internet, the

6  power for them to get a personalized message customized

7  to their -- to their situation and what they wanted to

8  sell, and allow them to get that out.

9          So what we're talking about is that the Baker

10  Street Harbour desired to put up this Dinosaur Valley

11  State Park.  There was a Captain's House Breakfast

12  nearby.  They would have a totally different list.  They

13  would have a different description.

14          Sometimes they would have the exact same

15  attraction, but it would have different photographs, and

16  it would then have different descriptions.

17          We got many e-mails from people complimenting

18  us on this -- this format from the standpoint that it

19  provided a -- almost a travel guidebook that was

20  individually produced by these various bed and

21  breakfast --

22      Q.    Okay.  Let's go on.

23      A.    -- innkeepers.

24          Let's go on.

25          So this is Granbury, Texas, and we'll just

1 take a quick look here at -- at -- and see what Baker

2 Street Harbour put up.

3          There's the Granbury Opera House, so they did

4 that.  And once again, that formatting is entirely

5 different than that preview you saw.  The courthouse,

6 the county jail.  There's Lake Granbury.  And over here,

7 we have one of the -- one of the few remaining, at that

8 time, outdoor drive-inns.

9     Q.    The county jail was a historical place?

10    A.    Yes.

11    Q.    Go on.

12    A.    Sorry.

13          Okay.  We'll quickly go to the rooms on that

14 bed and breakfast.  And once again, let's stop right

15 there.

16          They were -- they were able to put in the

17 customized room information for each and every room.  So

18 if they had a nine-room inn and all nine rooms were

19 different, they would put in nine different

20 descriptions.  And they would have nine different

21 amenities, possibly, depending on that room.

22          I mean, when you're on the lake, some -- some

23 units or some rooms have lake views and some rooms do

24 not.  So this gave them the flexibility to do this

25 customized presentation.

1          And all of it was done -- all this text -- all

2     this text was input just as pure text, and it was

3     transmitted to the central processor in that

4     presentation generation program.  It was -- it was sent

5     purely as raw text.

6          There's no formatting, no backgrounds, no

7     colors.  Then -- then our presentation generation

8     program can reconfigure it in any way that our program

9     sees fit.

10          Go ahead.

11          And this is just other rooms.  Dr. Doyle's

12     Suite.  And you can see the list of amenities is longer

13     for that room, shorter for the next room.

14          So I believe -- I believe that's the end of

15     that -- of that Baker Street Harbour presentation.

16     Q.    Okay.  Great.  Mr. Dean, what would have been

17     necessary to complete the system disclosed in your

18     patents at this point?

19     A.    At the point that we -- at the point the -- of

20     the items that we had completed, we had mastered the

21     difficult parts of it.

22          That -- that interface, as you saw, created

23     multipage presentations.  They were very complex.  There

24     was lots of information, because we believed in putting

25     out lots of information for those innkeepers and for

```
 1   those travelers.
 2         The -- what we would have done to go forward
 3   is to -- is to take that shell, if you will, take the
 4   internal programming, and do the exact same thing for
 5   the media venue to allow them to input their -- their
 6   presentation rules and their design and style standards.
 7   That was the part that we never finished.  But the level
 8   of difficulty was not there.  We had -- we had
 9   accomplished the level of difficulty.  We had gotten
10   over the hurdles.
11         So -- so, yes, it would have -- we could
12   have -- we could have accomplished it.
13      Q.   Did the patent describe how to complete the
14   system that you just described here?
15      A.   Yes, it did.
16      Q.   Why didn't you complete the system?
17      A.   We -- we -- I mean, quite frankly, we're a
18   small mom-and-pop business, and we ran -- ran out of
19   money.
20      Q.   Did you try to get venture capital or other
21   sources of funding to continue trying to develop your --
22   your business in this system?
23      A.   Yes, we did.  I -- I -- I met with venture
24   capitalists, and I was told that we were too old.  I was
25   told that they were looking for fresh faces with
```

1 briefcases.

2     Q.   Is that a quote?

3     A.   That's a direct quote.

4     Q.   Now, let's talk about what was going on within

5 Virtual Cities during those days.  What was the division

6 of labor, if any, between you and Ms. Stone?

7     A.   Well, Lucinda was definitely -- she was the

8 boss.  She was running the business.  If there were any

9 technical issues, then I handled the technical issues.

10 But she ran the shop.

11     Q.   Now, were you also handling the patent

12 matters?

13     A.   Yes.  I dealt with the attorneys and dealt

14 with the PTO, the Patent Office, to push forward our --

15 our -- our patents on -- on our invention.

16     Q.   You stated before that you filed your first

17 application on January 10th, 2000; is that right?

18     A.   Yes.

19     Q.   Did that application later become a patent?

20     A.   Yes, it did.  It became the '045 patent.

21     Q.   Okay.  While that '045 application was

22 pending, did you file for another patent related to that

23 '045 patent?

24     A.   Yes -- yes.  You're allowed to -- upon

25 allowance from the PTO, you're allowed to then file a

1  continuation of that.

2      Q.    Let me stop you right there.  Could you just

3  explain for us, what is a continuation?

4      A.    A continuation application for a patent is a

5  patent application that has a filing date, but -- but

6  the specification and the drawings and the figures all

7  come from a previous -- a previous patent.

8            Like in our case, everything relates back to

9  that January 2000 date.  That specification carried

10  forward through -- through our advertising patents.

11  It -- it didn't change in those continuations -- those

12  continuation applications.

13      Q.    What was the patent application that you filed

14  in 2002 that was a continuation of that original January

15  10th patent application?

16      A.    The -- that one was the -- what became the

17  '059 patent, the second patent that we're -- that we're

18  dealing with here today.

19      Q.    And was there also the '587 patent?

20      A.    Yes.  There was a -- we had the '045.  There

21  was a continuation off of that to the '587.  That -- we

22  filed a continuation that then became the '045 -- I

23  mean -- excuse me -- I get confused with these -- became

24  the '025.

25      Q.    Now, just to be clear for all of us and for

1  the jury, could you please remind the jury whether the

2  specification, the figures, the descriptions -- were

3  those the exact same in the '025 patent and the '059

4  patent that was originally filed in the Patent &

5  Trademark Office on January 10th, 2000?

6      A.    Yes, they were exactly the same.  If you take

7  the -- if you take the figures -- the figures and the

8  specification from the '045 filed January of 2000 is

9  exactly the same in the '0 -- in the '587, which was a

10 continuation, and it's exactly the same in the '025 that

11 was a continuation of the '587.

12         So that specification, that disclosure, that

13 teaching, if you will, where we were -- we were laying

14 out how someone could use our invention, could build our

15 invention, and we were pointing out the importance of

16 our invention, that specification carries forward

17 through all of those, all the way back to January of

18 2000.

19         MR. NELSON:  Permission to approach the

20 bench, Your Honor?

21         THE COURT:   Yes.

22     Q.   (By Mr. Nelson) Mr. Dean, I'm going to hand

23 you what is Plaintiff's Exhibit 1, the '025 patent, and

24 Plaintiff's Exhibit 3, which is the '059 patent.

25     A.   Yes.

1        MR. NELSON:  And could we please put up

2   Plaintiff's Exhibit 1 for the jury?

3        Q.   (By Mr. Nelson) Mr. Dean, what are we looking

4   at here on that first page and the cover of what's on

5   the patent?  If you can maybe show that to the jury,

6   too.

7        A.   Yes.  This is the cover sheet of an original

8   patent issuance from the -- from the PTO, from the

9   Patent Office.  And it has -- it has their seal, which

10  is how you can tell that this is the original awarded

11  patent.

12       Q.   Okay.  Let's go to the first page of the

13  patent itself.  And, Mr. Dean, you are listed as one of

14  the inventors on this patent; is that right?

15       A.   Yes.  Lucinda and I are -- are the inventors.

16            MR. NELSON:  And if you could go, please,

17  to the top right-hand side.

18       Q.   (By Mr. Nelson) Could you just describe for

19  the jury what we're looking at here and what this means.

20       A.   Yes.  That's -- that's -- we refer to this as

21  the '025 patent, but that's the full patent number.  And

22  underneath --

23            MR. NELSON:  And the jury should have a

24  tab on this in its jury notebook under the '025 patent.

25       A.   And -- and the -- and then underneath that is

1    the date that it was issued, which was July of 2007.

2        Q.    (By Mr. Nelson) Now, if you go down on that

3    left-hand side column, does it say when the application

4    was filed?

5        A.    Yes.  It shows -- right in the middle there,

6    it shows September 30th of 2004.

7        Q.    That's Line 22?

8        A.    Yes.

9        Q.    Okay.  Now, could you please look at Line 63

10   and explain what the sentences mean in Line 63 for the

11   jury.

12       A.    That's -- that's the list of continuations, or

13   the heritage, you might say, or the parents of this

14   patent.  And you can see it goes from the -- from the

15   continuation application, and then it goes to that '587,

16   and then it goes back all the way to January 10th of

17   2000, which is the '045.

18            That lineage is what carries that

19   specification forward for the -- for this continuation

20   application.

21       Q.    Mr. Dean, what is the relationship between the

22   claims in the '025 patent that is one of the

23   patents-in-suit here today and the application that was

24   filed January 2000?

25       A.    Yes.  The -- the claims in the '025 patent

1  come directly from the specification that was filed in

2  January 10th of 2000.  So that '025, every claim in

3  there is supported in that original application of

4  January 10th, 2000, that the Examiner reviewed.

5      Q.   Now, let's briefly put up Exhibit 3, the '059

6  patent, which is also a jury tab.

7          Again, what is this first page, this cover

8  page, Mr. Dean?

9      A.   Yes.  Again, we have -- we have the cover page

10  from the U.S. PTO showing the seal, the U.S. Government

11  Department of Commerce seal, and the awarding of the

12  '059 patent.

13          MR. NELSON:  And let's again go to the

14  first page of the patent.  And let's blow up that upper

15  right-hand corner.

16      Q.   (By Mr. Nelson) Mr. Dean, does this describe

17  when the patent was issued and what its number is?

18      A.   Yes.  That's the full number of the '059, and

19  it shows it being issued July 24th of 2007.

20      Q.   Okay.

21          MR. NELSON:  And let's then also go

22  quickly to Line 63 of this patent.

23      Q.   (By Mr. Nelson) And this one, Mr. Dean, what

24  does it say on Line 63?

25      A.   This says that it's a continuation-in-part.

1          Q.    What is a continuation-in-part?

2          A.    You have two types of -- to my knowledge, you

3    have two types of continuation applications.

4                You have a continuation application that takes

5    the specification and directly moves it forward, and

6    your claims come off of that.

7                When you have a continuation-in-part, what has

8    happened is, you're using the original specification,

9    that January 10th of 2000, and then you're adding some

10   new substance to it.  You're adding some new inventive

11   ideas that you've come up with over that period of time.

12         Q.    Now, it says that you filed this application

13   July 11th, 2002.  Is that when you filed this

14   application?

15         A.    That's correct.

16         Q.    Again, you and Ms. Stone are the named

17   inventors on this patent?

18         A.    Yes.

19         Q.    Now, we've talked about this '045 patent and

20   the '587, which was the first continuation, and then, of

21   course, the two patents-in-suit.

22               Which of these four patents, just to be clear,

23   are we talking about today and which are you asserting

24   here against Google?

25         A.    We are asserting the -- the '025 and the '059.

1       Q.    Now, I'm -- I'm hoping, Mr. Dean --

2               MR. NELSON:  Can we go back to

3   Plaintiff's Exhibit 1, please?

4       Q.    (By Mr. Nelson) Could you -- orient ourselves

5   a little bit on this patent and -- and describe

6   briefly -- we've talked about what's on the first pages.

7               MR. NELSON:  Let's go to Page 3 of the

8   patent.

9       Q.    (By Mr. Nelson) What are we looking at here in

10  Page 3 going forward?

11      A.    This is -- this is the start of the section of

12  the specification called the figures.  I believe there's

13  35 pages of drawings and flowcharts.

14              And this is -- this is meant to give graphical

15  information, visual information, in conjunction with the

16  written specification so that someone reading this

17  patent can actually build this system, understand its

18  importance, and understand the -- the -- how all the

19  pieces fit together, if you will.

20              These are very -- very important guidelines

21  for a programmer on -- or for anyone trying to -- trying

22  to duplicate what we've done.  And patents are teaching

23  vehicles.  They're meant to tell someone skilled in the

24  art exactly what you've done that's important and that

25  is your invention.

1     Q.   Now, what is after these figures?

2     A.   After the figures comes the written

3  specification, the written part of the specification,

4  and this is a detailed text and narrative that then

5  relates back to those figures.

6          And -- and you'll see, there's block numbers

7  spread throughout.  Each one of those block numbers

8  typically will refer you to someplace on the -- the

9  figures.  And the whole idea is to provide the best

10 teaching possible to convey this invention.

11    Q.   Okay.  Let's stop at Column 64, which is where

12 we are right now up on the screen.

13    A.   Yes.

14              MR. NELSON:  Could you zoom in, please,

15 on that bottom right-hand?

16    Q.   (By Mr. Nelson) What is happening here,

17 Mr. Dean, in this patent?

18    A.   This -- this is -- this is the first claim.

19    Q.   And maybe just wait a couple of seconds, if

20 the jury wants to catch up in its own notebook.

21    A.   Sorry.

22    Q.   Okay.  Why don't you go on?

23    A.   Yeah.  This is -- this is the -- the first

24 part of Claim 1 of the '025, the independent claim -- or

25 one of the independent claims of the '025.

1    Q.   Now, before this -- what is claimed at the

2  bottom of Column 64, is everything in this '025 patent

3  the same, the figures and the written specification, as

4  what you filed to the Patent Office on January 10th,

5  2000?

6    A.   Yes, it is.  There's -- this patent has 397

7  claims.  Each one of those draws upon the material that

8  we submitted in January of 2000.  It's that January of

9  2000 specification that is the core teaching of our

10 invention.

11   Q.   Now, perhaps we could use some of the figures

12 to illustrate how your invention works, if that's okay.

13   A.   Sure.

14   Q.   Is there a particular place in the patent

15 that -- that we should turn?

16   A.   Yes.  Let's look at -- I believe -- let's

17 start with 1b.

18   Q.   Okay.  Okay.  Let's go to Figure 1b.  This is

19 near the front of the patent.

20   A.   Yes.

21   Q.   Okay.  And we're going to highlight some

22 things up on the screen.  And, Mr. Dean, maybe using

23 Figure 1b as a guide, could you please explain how the

24 invention works to the jury?

25   A.   Maybe we'll just take a second and --

1     Q.    Sure.

2     A.    I see lots of shuffling going on.  There's a

3  lot of paper there.

4        Okay.  Figure 1b is an overview of our

5  invention, and it shows the relationship of all the

6  various components or entities or -- or, you know,

7  the -- it shows the relationship and how these things

8  interact.

9        And once again, this figure is -- is further

10  described in the written -- written description, so it's

11  meant that someone would sit down, have this figure in

12  front of them, and be reading the reference material to

13  this figure.

14     Q.    Let's start maybe at the top left, which is

15  the seller interface.  Could you please describe, what

16  is the seller interface?  Can you give me an example of

17  that?

18     A.    Well, the -- the example of that seller

19  interface is the seller interface that we demoed in

20  our -- in our video.

21        That's the interface that allows the seller to

22  sit down and input raw data to input his custom message,

23  his advertising message, if you will, that he wants to

24  promote a product or a service or -- or who knows what,

25  and it allows him to then input information on where he

1  wants to advertise.  And it's done at that location.

2  When -- when he presses the submit button, the raw data

3  containing that information to -- that information

4  concerning his advertising message and the

5  information -- and that's the information to create his

6  ad.

7  　　　Q.　　Now, is the seller interface software?

8  　　　A.　　Yes.  I'm sorry.  Yes.  The seller

9  information is -- I mean, the seller interface is purely

10  software.

11  　　　Q.　　Okay.

12  　　　A.　　And when they hit that submit button, that raw

13  data is then transmitted to 1,000, which is the central

14  controller and presentation processor.

15  　　　Q.　　Okay.  Now, could you -- besides what you just

16  demoed to the jury, can you give another example perhaps

17  of a seller interface and how the seller interface is

18  used.

19  　　　A.　　Well, let's -- and we've talked about a fairly

20  complicated seller interface or a very complicated one,

21  which was our bed and breakfast.

22  　　　　　　If we -- if we -- we might take a more simple

23  one that would be allowing general merchandise, and

24  we'll use an example of a seller that's -- that is

25  selling T-shirts.

1          So that seller would -- would sit down, and he

2    would input:  Buy my T-shirts.  And so that would be the

3    information to create.  He's created his ads -- or his

4    ad:  Buy my T-shirts.  That's the message he wants to

5    hammer on.  That's the message that's going to bring him

6    his income.

7          So having done that, he then -- he then inputs

8    where he wants that message to go.  And he's looked at

9    his demographics, and he says, I want this message to go

10   to all college campus -- college campus websites.

11         So he puts in the information about going to

12   college campus websites, and that information is

13   submitted.

14         So there you've got your two components of raw

15   data.  You've got your advertising message:  Buy my

16   T-shirts.  You've got your -- and it could be buy shoes,

17   you know, buy umbrellas, whatever.

18         And then he -- and then he says all campus --

19   all college campus websites.  So that's then submitted

20   to the central controller and presentation processor.

21     Q.   Now, we've talked about the seller interface.

22   Is the web publisher internet media interface described

23   on this Figure 1b as well?

24     A.   Yes, it is.

25     Q.   Where is that?

1        A.    That would be block 6,000 over there.

2        Q.    Okay.  And what is that?

3        A.    Well, and that would be where whoever was

4   managing the website for the university or college

5   campus, they would be inputting their standards.

6             And Mr. Tribble gave you an example, so you

7   might rise -- have a college that -- UT, that was

8   putting in -- we want our backgrounds to have burnt

9   orange, and we're not going to accept anything else.

10  And you've got another one that says red.  You've got

11  another that says -- so they're putting in their school

12  colors.  They're putting in something that's going to

13  compliment and is going to fit into the design and style

14  to control that look and feel that I talked about of

15  their website.  They're protecting that look and feel.

16       Q.    Now -- and where does that information go?

17       A.    That -- that information -- on 6,000, that

18  information then goes back to when they submit it, and

19  it's the same -- it's the same process.  It's submitted

20  as raw data.

21            They don't actually put in the formatting

22  commands.  They put in the raw data that it takes to --

23  to say what background -- what background they want or

24  what -- what controllers they want.  So that raw data is

25  then transmitted to 1,000 again.

Q.   Okay.  And let's go to 1,000.  Is there any other figure that that also describes or goes into detail about, Figure 1,000?

A.   Yes.  On 1,000, if we could -- on that one, we need to flip over to -- to -- I believe it's 2a.

Q.   Okay.  And what are we looking at here, Mr. Dean?

A.   2a is a -- and once again, I need to stress that when you file a patent application, what you do is you put in what you consider to be the best embodiment of the system, the best design for a variety of reasons. So although this -- you know, this -- this -- this shows up as a given embodiment that could be built, the patent is not designed to be limited to that.

But on -- on this, it shows -- and the key we want to point out here is -- is we've got those various databases under the 1600, so there's a whole bunch of databases, but the important item is to go down to 1710.

Q.   And what is 1710?

A.   And 1710 is the presentation generation program.  It's the presentation generation program that -- that does all the work.

The presentation generation program takes that custom message, brings in those requirements from the -- from the various websites, selects the website, and

1  combines that custom message to end up with a buy my

2  T-shirt ad in burnt orange, with the burnt orange

3  background, burnt orange lettering, some sort of

4  combination that was set up to complement their site.

5          At the same time that's going on, the

6  information from the -- from the college campus that was

7  running maroon or wanting maroon is being combined with

8  that same custom advertising message, the buy my

9  T-shirts, and it's coming out with a maroon ad that

10  says:  Buy my T-shirts.  And those are sent to the

11  appropriate place.

12          Once again, this is -- you know, it's a matter

13  of controlling that look and feel, and -- and it's also

14  a matter of providing the efficiency.  We had one stop;

15  we had one seller interface; he inputs the data.  And

16  I've given you two examples.  It could be 2,000 examples

17  of where it's going to go.

18      Q.   Now, referring back --

19          MR. NELSON:  Could we go back to

20  Figure 1b for a second?

21      Q.   (By Mr. Nelson) We've talked about these three

22  boxes.  Are there figures that go into detail for each

23  of these three highlighted boxes as well?

24      A.   Yes.  There's -- there's -- I believe there's

25  64 columns, plus other figures.  There's other figures

1  and then 64 columns of written description that lays out

2  what each one of these is and what -- and what it --

3  what its function is within the invention.

4      Q.    Okay.  And let's -- I want to focus briefly on

5  the seller interface again.

6          In this system, does the seller insert a

7  finalized advertisement?

8      A.    Absolutely not.

9      Q.    Okay.  Thank you.

10     A.    Raw data only.

11     Q.    Okay.  Finally, I want to switch gears and

12 spend the last few minutes of this morning talking about

13 the parties in this lawsuit.

14          First of all, who is -- what is Function

15 Media?

16     A.    Well, Function -- Function Media is a holding

17 company that Lucinda and I created to -- to hold our

18 patents and provide a license for -- I mean, provide an

19 entity for conducting licensing of those patents.

20     Q.    Did you and Ms. Stone assign the two

21 patents-in-suit to Function Media?

22     A.    Yes, we did.

23     Q.    Now, why did you form Function Media as

24 opposed to just holding the patents in your own name?

25     A.    Our other business interests are corporations,

1  and the advice we get is that we should have

2  corporations to hold this type of intellectual property

3  and act as an entity in the licensing.

4      Q.   And you and Ms. Stone are the 100 percent

5  owners combined?

6      A.   Yes.  We own 100 percent of it.

7      Q.   Where would be Function Media's headquarters,

8  if there are any?

9      A.   Well, Function Media is a Texas corporation.

10 It's owned by Lucinda and I, and we're here in Texas.

11 But I'm not sure I'd refer to it as headquarters.  These

12 Function Media licensing is the only operations going

13 on.

14     Q.   Now, you briefly touched upon this at the

15 beginning of your testimony today, but why are you suing

16 Google for patent infringement?

17     A.   This is -- these patents are our property.

18 These patents belong -- these are the property of

19 Lucinda and I.

20         And it was granted -- this property was -- was

21 granted -- this property right was granted to us by --

22 by the PTO through Congress and all the way back to the

23 Constitution.  This is -- this is our ownership right as

24 Americans to have these patents.

25         We -- Google is making a huge amount of money

1  off this system, and -- and we just want a fair royalty.

2  We want -- we want -- we want a fair licensing agreement

3  and royalty off of our property.

4       Q.   What do you think of Google as a company?

5       A.   I think they're great.  There's a -- I mean,

6  they're bright.  They're -- they have lots -- lots of

7  good products.  I just wish they would acknowledge and

8  license our technology.

9       Q.   Now, again, we touched upon this briefly at

10  the beginning of the testimony, but why didn't you

11  contact them before filing suit here?

12       A.   The -- the -- once again, the fundamental

13  patents that are at the core of really important

14  inventions, okay, these fundamental patents -- and

15  Google, I believe, has $5 billion worth of revenue, we

16  heard earlier.

17       Q.   For these -- just to be clear, for these

18  accused products only?

19       A.   Just for these accused products.  And so these

20  are core, fundamental, high-priority systems, and those

21  are rarely, if ever, licensed outside of the context

22  of -- of litigation.

23       Q.   Now, if Google had approached you at the time

24  that the '025 and '059 patents had issued, would you

25  have been willing to negotiate a license?

1          MR. VERHOEVEN:  Objection, calls for

2   speculation.

3          THE COURT:  Overruled.

4     Q.   (By Mr. Nelson) You may answer.

5     A.   Yeah.

6     Q.   You want me to repeat the question?  How about

7   this?

8     A.   Please.

9     Q.   Yes.  If Google had approached you at the time

10  of the '025 and '059 patents, when they issued, would

11  you have been willing to negotiate a license?

12    A.   Yes, I would.

13    Q.   Okay.  And what -- generally, what type of

14  license would you have been interested in negotiating?

15    A.   I would have been interested in negotiating a

16  running royalty.

17    Q.   Could you just maybe briefly describe for the

18  jury, what is a running royalty?

19    A.   Well, I believe -- at least what I mean from a

20  running royalty is that -- is that we would negotiate a

21  percentage, and going forward, Google -- we would get a

22  percentage of the -- of all the revenue.

23          It seems to me that that's only fair.  It's a

24  case of sharing in the upside, and if there isn't an

25  upside, then you don't get it.  If there is an upside,

1  then you -- you know, then you get your percentage.

2  But it's just -- it's a fair way of handling -- of

3  handling -- you know, it's a -- it's a fair way of

4  handling the system in any environment, but when you're

5  talking about the explosion that is the internet -- and

6  the internet -- I'm a true believer in the internet.

7  The internet has just begun.

8         This technology is going to go forward, and it

9  has -- it only has upside, and we are real believers in

10  it.

11    Q.   Now, have you had the opportunity to

12  specifically think about what any starting point would

13  have been for you in these negotiations that you would

14  have had with Google?

15    A.   Yes.  Lucinda and I have talked about it -- or

16  talked about it back then.

17    Q.   And more recently, too?

18    A.   Yes.

19    Q.   And what would that have been?

20    A.   It would have been 20 percent.

21    Q.   Why 20 percent as a starting point?

22    A.   These -- these are fundamental, core

23  technologies.  As much as -- as there's all kinds of

24  things happening, Google's system -- the accused

25  products do not work without our invention.

1          So, yes, there's $5 million (sic), but without

2    our system, there's nothing.

3          Q.   Now, Mr. Dean, in your personal experience as

4    a web publisher --

5          A.   Yes.

6          Q.   -- do publishers benefit from these

7    inventions?

8          A.   Absolutely.  We -- Lucinda -- Lucinda and I

9    were publishers on the Google system, and it's a very

10   beneficial system.

11         Q.   How is it beneficial to publishers?

12         A.   It allows -- it -- it allows the publishers to

13   monetize -- essentially, to monetize what would have

14   been sort of a lost opportunity by being able to -- to

15   stick ads on web pages or websites that -- that you've

16   got room for and convert that -- convert those views, if

17   you would, into cash flow.

18         Q.   And from your personal experience, what is the

19   cost to a publisher of adding these ads to their sites?

20         A.   It's next to nothing.

21         Q.   Okay.

22              MR. NELSON:  Thank you, Your Honor.

23   We'll pass the witness.

24              THE COURT:  Cross-examination.

25              MR. VERHOEVEN:  May I inquire how long

1  we're going, Your Honor?  Till noon?

2      THE COURT:  Nine minutes.

3      MR. VERHOEVEN:  Nine minutes.

4       CROSS-EXAMINATION

5  BY MR. VERHOEVEN:

6    Q.   Morning, Mr. Dean.

7    A.   Good morning.

8    Q.   Let me start with some background questions,

9  if I might.

10    A.   Sure.

11    Q.   You've completed a few years of college,

12  correct?

13    A.   Yes.

14    Q.   You have no college degrees, though; is that

15  right?

16    A.   No, I do not.

17    Q.   And is it -- is it fair that you did not take

18  any programming classes in college?  Right?

19    A.   No, that's not -- that's not true.  When I --

20  in 1998, when I went back to that --

21      THE COURT:  Well, just a second -- if

22  it's true, just say it's true.  If it's not true, just

23  say it's not.

24      THE WITNESS:  I'm sorry, Your Honor.

25      THE COURT:  You'll get a chance to

1  explain when your lawyers ask you additional questions.

2              THE WITNESS:  Okay.  Sorry.

3              THE COURT:  Proceed.

4      Q.  (By Mr. Verhoeven) Let me ask you this:  Did

5  you take any programming classes in college or after

6  college unrelated to Virtual Cities?

7      A.  No.

8      Q.  Before you worked on the Virtual Cities' --

9  well, let me back up.

10             The software that you showed the demonstration

11  for, that had a name, right?

12     A.  Yes.

13     Q.  It was called Virtual Cities Reservation

14  Network?

15     A.  Yes.

16     Q.  Now, before you worked on the Virtual Cities

17  Reservation Network, you had never programmed anything

18  else, had you, sir?

19     A.  No, I had not.

20     Q.  Now --

21             MR. VERHOEVEN:  Ed, if I could get the

22  claim chart over there.

23             Your Honor, may I come around here and

24  put it up here?

25             THE COURT:  Yes.

```
 1                    MR. VERHOEVEN:  And may I ask the witness

 2  a few questions from over here?

 3                    THE COURT:  Yes.

 4                    MR. VERHOEVEN:  Thank you.

 5       Q.   (By Mr. Verhoeven) Can you see this, Mr. Dean?

 6  Should I move it over here?

 7       A.   That might be better, yes.

 8       Q.   Okay.

 9                    MR. VERHOEVEN:  Is that okay, Your Honor?

10                    THE COURT:  Take a moment, please.  Make

11  sure that the Members of the Jury can see it as well.

12                    MR. VERHOEVEN:  Yes, Your Honor.

13       Q.   (By Mr. Verhoeven) Now, you gave a lot of

14  testimony about how your patent works, but I notice we

15  didn't -- you weren't asked about the actual claims

16  here, so I'd like to ask a couple questions about the

17  claims.

18            This is Claim 1 of the '025 patent; is that

19  right?

20       A.   That's correct.

21       Q.   And you understand that a patent is a property

22  right, right?

23       A.   Yes.

24       Q.   And that there's boundaries to that property

25  right, correct?
```

1      A.    Yes.

2      Q.    And you understand that the claim language

3  defined the boundaries of the patent, right?

4      A.    Yes.

5      Q.    And you understand that for someone to

6  infringe the patent, that they have to meet every one of

7  these elements, right?

8      A.    Yes.

9      Q.    Okay.  Now, this claim I'm going to use,

10  because it's a representative claim, has this first

11  interface you're talking about, right?

12     A.    Yes.

13     Q.    And can you describe for the jury what that

14  first interface is in that claim language?

15     A.    Do you want me to read it?

16     Q.    If that's how you'd like to describe it, sir.

17     A.    Well, I -- a first interface to the computer

18  system through which each of the internet media venues

19  is prompted to input presentation rules for the internet

20  media venue for displaying electronic advertisements on

21  the internet media venue.

22     Q.    Okay.  What does that mean?  Can you turn that

23  into non-patentees for the jury?

24     A.    Sure.  I believe so.

25          The -- if you recall, we -- we looked at

1 the -- I did a video that had the first interface of the

2 seller.  So within this, one embodiment of it -- and

3 once again, we were showing a preferred embodiment in

4 our patent application.

5        So one possible embodiment of it would be to

6 have the first interface, which in -- which the first

7 interface is for the internet media venue.  It would

8 look similar to that interface that I showed you on our

9 video.

10       Now, it wouldn't have the same questions.  It

11 wouldn't have -- I mean, obviously, the one you saw was

12 talking about a bed and breakfast and describing

13 bedrooms and everything else.

14       So this media venue interface would not have

15 that information.  That -- it would be replaced with

16 questions, such as what background do you want; what

17 font do you want to use; what other rules do you have

18 for the presentations that you want to accept?

19             MR. NELSON:  Your Honor, may we approach?

20 I'm sorry.  I didn't mean to interrupt.

21             THE COURT:  Yes, you may approach.

22             (Bench conference.)

23             MR. NELSON:  I just want to make sure

24 that Mr. Verhoeven is not going to violate the limine on

25 having Mr. Dean interpret any claim terms or what a

```
 1  claim term means, and especially --
 2              THE COURT:  He isn't going to do that,
 3  but, you know, we're not going to summarize claim
 4  language in lay language.  The jury is going to be bound
 5  by the Court's construction of the terms that the Court
 6  has construed.
 7              And so, you know, they went into his
 8  understanding of the invention, so I'm going to give you
 9  a little bit of latitude, but -- I mean, this -- you
10  need to start framing your question in the context of
11  the claim terms as construed by the Court, okay, because
12  this is going to be --
13              MR. VERHOEVEN:  I understand.
14              THE COURT:  -- going to be confusing to
15  them to have multiple --
16              MR. VERHOEVEN:  I understand.
17              MR. NELSON:  And --
18              MR. VERHOEVEN:  Can I just say something?
19              MR. NELSON:  I'm sorry, sir.
20              MR. VERHOEVEN:  I just want to establish
21  that media venues is their publishers.  Is that a
22  problem?
23              THE COURT:  Well, just ask him that.
24              MR. VERHOEVEN:  That's not a --
25              MR. NELSON:  And we'd ask for an
```

1  instruction that just says that you're ultimately going

2  to give the definitions.

3           THE COURT:  Well, they understand that.

4  They've got copies of them.  But I'll allow you to go

5  there, and then let's move on.

6           MR. VERHOEVEN:  Thank you, Your Honor.

7           MR. NELSON:  Thank you, sir.

8           (Bench conference concluded.)

9     Q.   (By Mr. Verhoeven) Now, this language here --

10  I just want to ask one more question.

11           This internet media venue --

12    A.   Yes.

13    Q.   -- language, is it fair to say that's

14  referring to publishers, internet media venues or

15  website publishers?

16    A.   You have two different internet media venues,

17  two different references in that -- in that first

18  element.

19           One is in reference to the operator of the

20  internet media venue, and the other is in reference to

21  the definition of the media venue.

22    Q.   The first interface for the computer system

23  through which each internet media venue is prompted to

24  input presentation rules, let me just ask you -- this is

25  a fancy word -- is that referring to website publishers,

1 or does that include website publishers?

2    A.   The first one would be referring to the -- to

3 the website publishers, yes.

4    Q.   And you talked about how the publishers would

5 input presentation rules, and that would go to the

6 central controller in your direct examination, right?

7    A.   Yes, because it says internet media venues is

8 prompted.

9    Q.   As of April 1998, it's correct, is it not,

10 sir, that neither you nor Ms. Stone had the technical

11 ability of writing software to create the media venue

12 interface?

13    A.   I believe we did.

14    Q.   Well, I'd like to play -- we took your

15 deposition.  Do you remember that?

16    A.   Yes.

17    Q.   And I'd like to play a clip from your

18 deposition dated September 9th, 2009, Page 61, Lines 8

19 through 17.

20          MR. VERHOEVEN:  Charles, do we have that

21 up?

22    Q.   (By Mr. Verhoeven) Let's see what you said at

23 your deposition in response to that question.

24          (Video playing.)

25          QUESTION:  As of April 1998, is it

 1  correct that neither you nor Ms. Stone had the technical

 2  capability of writing the software code to create a

 3  media venue interface?

 4              ANSWER:  In '97, '98; is that correct?

 5              QUESTION:  That's correct.

 6              ANSWER:  Yeah.  In '97 or '98, I did not

 7  have the ability to do that.

 8              QUESTION:  And neither did Ms. Stone, to

 9  your knowledge?

10              ANSWER:  Neither did Ms. Stone.

11              (End of video clip.)

12              THE COURT:  All right.  Nine minutes is

13  up, so now we're going to take our lunch recess, Ladies

14  and Gentlemen.  Be back ready to come in the courtroom

15  at 1:15.

16              Remember my prior instructions, and don't

17  talk about the case.

18              COURT SECURITY OFFICER:  All rise.

19              (Jury out.)

20              THE COURT:  All right.  I'll see you at

21  1:15.

22              MR. VERHOEVEN:  I was just going to say,

23  Your Honor, there may be a couple of issues that -- on

24  my cross, that to save time, I might want to address

25  with Your Honor before we start again, or should I

 1  just approach the bench?

 2              THE COURT:  Well, be down -- be down at

 3  chambers at 5 after 1:00, and I'll take them up in

 4  chambers, okay?

 5              MR. VERHOEVEN:  Thank you, Your Honor.

 6              THE COURT:  Okay.  If we need a record,

 7  I'll hold the jury out before we come back.

 8              MR. VERHOEVEN:  Thank you, Your Honor.

 9              (Recess.)

10              *     *     *     *     *

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CERTIFICATION

        I HEREBY CERTIFY that the foregoing is a
true and correct transcript from the stenographic notes
of the proceedings in the above-entitled matter to the
best of my ability.


/s/_____                    _____
SUSAN SIMMONS, CSR                            Date
Official Court Reporter
State of Texas No.:  267
Expiration Date:  12/31/10




/s/_____                       _____
SHELLY HOLMES, CSR                            Date
Deputy Official Court Reporter
State of Texas No.:  7804
Expiration Date  12/31/10