1                    IN THE UNITED STATES DISTRICT COURT
                      FOR THE EASTERN DISTRICT OF TEXAS
2                              MARSHALL DIVISION

3    FUNCTION MEDIA, LLC          *    Civil Docket No.
                                  *    2:07-CV-279
4    VS.                          *    Marshall, Texas
                                  *
5                                 *    January 19, 2010
     GOOGLE, INC.                 *    1:15 P.M.
6
                          TRANSCRIPT OF JURY TRIAL
7             BEFORE THE HONORABLE CHAD EVERINGHAM
                    UNITED STATES MAGISTRATE JUDGE
8

9    APPEARANCES:

10   FOR THE PLAINTIFFS:      MR. MAX TRIBBLE
                              MR. JOSEPH GRINSTEIN
11                             Susman Godfrey
                              1000 Louisiana Street
12                            Suite 5100
                              Houston, TX   77002
13                            MR. JUSTIN NELSON
                              Susman Godfrey
14                            1201 Third Avenue
                              Suite 3800
15                            Seattle, WA   98101
                              MR. JEREMY BRANDON
16                            Susman Godfrey
                              901 Main Street
17                            Suite 5100
                              Dallas, TX   75202
18                            MR. ROBERT PARKER
                              Parker, Bunt & Ainsworth
19                            100 East Ferguson
                              Suite 1114
20                            Tyler, TX   75702

21   APPEARANCES CONTINUED ON NEXT PAGE:

22   COURT REPORTERS:        MS. SUSAN SIMMONS, CSR
                             MS. SHELLY HOLMES, CSR
23                           Official Court Reporters
                             100 East Houston, Suite 125
24                           Marshall, TX   75670
                             903/935-3868
25   (Proceedings recorded by mechanical stenography,
     transcript produced on CAT system.)

APPEARANCES CONTINUED:

FOR THE DEFENDANTS:     MR. CHARLES VERHOEVEN
                        MS. AMY CANDIDO
                        Quinn Emanuel
                        50 California Street
                        22nd Floor
                        San Francisco, CA   94111

                        MR. EDWARD DEFRANCO
                        Quinn Emanuel
                        51 Madison Avenue
                        22nd Floor
                        New York, NY   10010

                        MR. HARRY L. GILLAM
                        Gillam & Smith
                        303 South Washington Avenue
                        Marshall, TX   75670

P R O C E E D I N G S

          COURT SECURITY OFFICER:  All rise.

          (Jury in.)

          THE COURT:  Please be seated.

          Sorry, Ladies and Gentlemen.  There's a
lot of up and down in here.

          If you recall at the beginning of the
trial, I gave you some instructions and said that
sometimes that I'd have to take up some matters outside
of your presence.  And the reason that we do it that way
is so we don't waste a lot of your time in court bench
conferences, if we can avoid it.  We've already had one
of those, so that's why I mention that.

1          Let's proceed on cross-examination.

2          MR. VERHOEVEN:  Yes, Your Honor.  I have

3     some exhibit binders.

4          May I approach and pass those out?

5          THE COURT:  Yes.

6          MR. VERHOEVEN:  Don't worry; I don't

7     intend to use all these exhibits, so it's not going to

8     take that long.  This is for the witness.

9          May I proceed?

10         THE COURT:  Yes, please.

11    MICHAEL DEAN, PLAINTIFF'S WITNESS, PREVIOUSLY SWORN

12             CROSS-EXAMINATION (CONTINUED)

13    BY MR. VERHOEVEN:

14         Q.   Mr. Dean, you used to be Vice President of a

15    company called CFN Financial Services, correct?

16         A.   Yes.

17         Q.   What was CFN Financial Services?

18         A.   It was a mortgage broker construction lender.

19         Q.   What was your position there?

20         A.   I managed the loan side of it.

21         Q.   And what were your responsibilities?  Could

22    you describe them to the jury, please?

23         A.   I was the broker for CFN Financial Services,

24    and CFN arranged loans for contractors and developers

25    and then sold those loans to private money lenders.

1        Q.    And you were Vice President of CFN for about

2   ten years; is that right?

3        A.    Yes.

4        Q.    You were in charge of dealing with borrowers?

5        A.    Yes.

6        Q.    Now, isn't it true, Mr. Dean, that in or about

7   March of 1996 -- let me withdraw the question.

8             Where were you -- where were you living when

9   you had this job at CFN?

10        A.    Santa Cruz, California.

11        Q.    California?

12        A.    Yes.

13        Q.    Isn't it true that in about March of 1996, the

14   California Deputy Real Estate Commissioner filed an

15   accusation against you and your company, CFN Financial

16   Services?

17        A.    Yes.

18        Q.    And you personally were accused of accepting

19   or receiving trust funds from lenders or investors in

20   connection with mortgage loans and of depositing the

21   trust funds into bank accounts without authorization?

22        A.    Yes.

23        Q.    And diverting those funds?

24        A.    Yes.

25        Q.    And isn't it true, sir, that in response to

1  that you filed a stipulation?

2      A.   Yes.

3      Q.   And isn't it true, sir, that in that

4  stipulation, you admitted that you accepted or received

5  trust funds from lenders or investors in connection with

6  mortgage loans, and that you withdrew, diverted, or

7  dispersed those funds from those trust accounts?

8      A.   Yes.

9      Q.   After that, did you cease being Vice President

10  of CFN?

11      A.   Yes.

12      Q.   When was that approximately?

13      A.   I believe that was 1994 -- '94.

14      Q.   Then you subsequently moved to Dallas in '97?

15      A.   Yes.

16      Q.   Why did you move to Dallas?

17      A.   We moved to Dallas to -- we were in San

18  Francisco, and the phones were ringing off the hook with

19  our East Coast clients, et cetera.  So we moved to be

20  more centrally located.

21          MR. VERHOEVEN:  Your Honor, may I briefly

22  approach the bench?

23          THE COURT:  Yes.

24          (Bench conference.)

25          MR. VERHOEVEN:  I think the evidence

shows that that's not why he moved to Dallas.  Do you want me to stop and --

THE COURT:   I've given you as much latitude as I'm giving you on this.  Let's move on to something else, okay?

MR. VERHOEVEN:  Okay.  Thank you, Your Honor.

(Bench conference concluded.)

Q.  (By Mr. Verhoeven) You might want to move your mic a little closer.  Justin tells me it's a little hard to hear over there.

A.   Sorry.

Q.   I'd like to switch subjects now, Mr. Dean, and talk about the conception of your invention.

A.   Yes.

Q.   You conceived of the inventions claimed in all of the asserted claims in the '025 patent by April 30th, 1998, correct?

A.   Yes.

Q.   Is it correct that you didn't do anything to memorialize any conception that took place during the 1997 or 1998 time period?

A.   That's correct.

Q.   So there's nothing I could look at, if I wanted to try and corroborate and confirm that you came

up with this idea, and confirm your recollection of when

your conception is, is there?

     A.   I believe -- I believe during discovery, we

gave you a variety of documents supporting our

conception.

     Q.   Well, let's look.  You had your deposition

taken the same day, as I said before, September 9th,

2009.  I asked you that in your deposition, Page 63,

Lines 16 through 24.  I'd like to play what you said at

your deposition in response to that question.

     A.   Okay.

                    (Video clip played.)

                    QUESTION:  If I wanted to try and

corroborate or confirm your recollection of your

conception during this timeframe, is there anything I

can look at that would memorialize it?

                    ANSWER:  During the '97 and '98

timeframe?

                    QUESTION:  That's correct.

                    ANSWER:  Early '98?

                    QUESTION:  That's correct, sir.

                    ANSWER:  No.

                    (End of video clip.)

                    MR. NELSON:  Completeness, Your Honor?

                    THE COURT:  Yes.

1    MR. NELSON:  Let me ask the same question

2  and let's broaden the timeframe to include 1999.

3    Is there any documentation or other --

4  any other form of memorialization of your or Ms. Stone's

5  concept that I can find, if I went looking for it?

6    ANSWER:  Absolutely.

7    THE COURT:  Proceed.

8    Q.   (By Mr. Verhoeven) Okay.  But my question to

9  you is, your conception during 1997 and 1998.  Did you

10  understand that?

11    A.   Yes.

12    Q.   Not 1999.  You've testified that you conceived

13  of it prior to 1997 and 1998, correct?

14    A.   Yes.

15    Q.   And I'm asking you, are there documents that

16  exist from that timeframe that would corroborate your

17  testimony that you conceived of it during that

18  timeframe, and the answer is no, correct?

19    A.   Correct.

20    Q.   Thank you.

21    Is it true that you can't identify anything in

22  Claim 1 of the -- well, let me back up.

23    MR. VERHOEVEN:  Your Honor, may I move

24  this back over here again?

25    THE COURT:  Yes.

1          MR. VERHOEVEN:  Thank you, Your Honor.

2     Q.   (By Mr. Verhoeven) Can you see this, Mr. Dean?

3     A.   Yes.

4     Q.   I'm going to ask you a question about Claim 1

5 of the '025 patent.  I just have it here so you can look

6 at it, if you need to.

7     A.   Yes.

8     Q.   Is it correct that you can't identify anything

9 in Claim 1 of the '025 patent that you contributed to

10 the invention as opposed to Ms. -- Ms. Stone?

11     A.   No.

12     Q.   I'm sorry.  So you can't -- that is correct,

13 you cannot identify anything that you contributed as

14 opposed to Ms. Stone?

15     A.   I cannot.

16     Q.   So that is correct?

17     A.   Yes.

18     Q.   Okay.  And you can't identify anything that

19 Ms. Stone came up with in Claim 1 of the '025 patent

20 that you did not, correct?

21     A.   I cannot identify anything.

22     Q.   Now, you testified that at one point you hired

23 a gentleman by the name of Mohammed Hasan.

24          Do you remember that testimony?

25     A.   Yes.

    Q.   And you hired him for the purposes of helping
you program the Virtual Cities product, right?

    A.   Yes.

    Q.   Remind me again, what was the name of that
product?

    A.   Virtual Cities Reservation Network.

    Q.   And you hired Mr. Hasan because you were a
fairly new programmer without much experience, and
Mr. Hasan had a great deal of experience; is that
correct?

    A.   That's correct.

    Q.   You needed Mr. Hasan to help you finish the
program -- the programming for your Virtual Cities
Reservation Network, didn't you?

    A.   Yes.

    Q.   And Mr. Hasan was working for you in 1998,
correct?

    A.   Yes.

    Q.   And he worked for you until at least 2002,
correct?

    A.   I believe so.

    Q.   And did he work on anything else besides
programming the Virtual Cities Reservation Network?

    A.   No.

    Q.   According to you, however, during those four

or five years that he worked on the Virtual Cities

Reservation Network to program it because you needed

help, he nevertheless didn't conceive even a single step

or component of the claims of the patent.

        Is that your testimony?

    A.   That's my testimony.

    Q.   Mr. -- does Mr. Hasan have a consulting

agreement with either you or your counsel?

    A.   I'm not sure.

    Q.   You don't know?

    A.   I'm not sure.

    Q.   Now, let's turn back to Claim 1 of the '025

patent.

        When you filed Claim 1 of the '025 patent --

when you filed Claim 1 of the '025 patent, there was no

system or program that practiced every component of

Claim 1, correct?

    A.   That's correct.

    Q.   Do you see the element up here that says the

first interface?

    A.   Yes.

    Q.   Isn't it true that you never programmed

Virtual Cities Reservation Network to have the interface

for the different internet media venues?

    A.   That's correct.

1    Q.   And is it correct that you and Ms. Stone never

2  developed a media venue interface?

3    A.   That's correct.

4    Q.   And you never had a business or system that

5  worked to incorporate inputs from internet websites and

6  advertisers, correct?

7    A.   That's correct.

8    Q.   You never -- you never had one, right?

9    A.   That's correct.

10   Q.   And isn't it true that the Virtual Cities

11  Reservation Network did not have a database for storing

12  the presentation rules?

13   A.   That's not correct.  It did.

14   Q.   Okay.  Well, I'd like to take a look again at

15  your deposition for the September 9, 2009, and let's

16  play Page 61, Lines 23 through 62, Line 9.

17              (Video clip played.)

18              QUESTION:  How did that site deal with

19  presentation rules, if it didn't store them?

20              ANSWER:  When we -- we were applying the

21  presentation rules manually when we -- when we wrote

22  the -- when we took the information that had been given

23  to us, we were then applying the presentation rules as

24  we were building the presentations.  So it was not

25  driven from a database.

1          QUESTION:  Did that site have a database?

2          ANSWER:  No.

3          QUESTION:  It didn't have a database at

4  all?

5          ANSWER:  No.

6          (End of video clip.)

7          MR. NELSON:  Optional completeness, Your

8  Honor.

9          THE COURT:  Let's wait until redirect.

10  I'll allow you to get into that, okay?

11     Q.   (By Mr. Verhoeven) Now, you released the

12  Virtual Cities Reservation Network -- maybe my choice of

13  the word released is inaccurate, but you displayed it --

14  you displayed the Virtual Cities Reservation Network in

15  February of 2000, right?

16     A.   Yes.

17     Q.   That was at a trade show?

18     A.   Yes.

19     Q.   And after you -- you attended that trade show

20  and presented it, only two bed and breakfasts that you

21  can remember actually used it, right?

22     A.   Yes.

23     Q.   You sent CDs that contained the Virtual

24  Cities' software to these bed and breakfasts, right?

25     A.   Yes.

1     Q.   And you only sent CDs to four bed and
2 breakfasts, right?

3     A.   I believe there were more, but -- but I can
4 only think of four.

5     Q.   Okay.  You can only think of four right now?

6     A.   Well, I'm not even sure I can think of those
7 four right now.

8     Q.   You only sent it to a few?

9     A.   Yes.

10     Q.   And this was the final product you sent out to
11 them, right?

12     A.   Yes.

13     Q.   And isn't it true that you had a great deal of
14 difficulty with these bed and breakfast people operating
15 your fine product, didn't you?

16     A.   Yes.

17     Q.   It didn't work very well for them, did it?

18     A.   No, it didn't.

19     Can I explain?

20     Q.   You can explain on redirect, sir.

21     In 2001 or 2002, isn't it true that you
22 decided to give up on the Virtual Cities Reservation
23 Network?

24     A.   Yes.

25     Q.   And since that time, isn't it true that

1  neither yourself nor Ms. Stone has ever considered

2  pursuing the Virtual Cities Reservation Network business

3  again?

4      A.   That's correct.

5              MR. VERHOEVEN:  Your Honor, I may need to

6  approach on this.  I don't want to run into anything.

7              THE COURT:  Okay.

8              (Bench conference.)

9              THE COURT:  What's the issue?

10              MR. VERHOEVEN:  He testified on direct

11  that the virtualcities.com was very successful, and I

12  would like to cross him on that by asking -- by

13  inquiring into him that he sold or established the fact

14  that he sold Virtual Cities for $4,000 to Ms. Stone's

15  brother-in-law, and then bought it back a few years

16  later for $4,000.  It rebuts the notion that it was a

17  very successful site, but I don't want to go into it if

18  Your Honor thinks it's out of bounds.

19              MR. NELSON:  He also said it's still in

20  business and --

21              THE COURT:  Well, I'm going to allow you

22  to go -- you can go into that.

23              MR. VERHOEVEN:  Thank you.

24              THE COURT:  He testified that it was the

25  longest running website and all that.

1          MR. VERHOEVEN:  Yeah.  Thank you.

2          (Bench conference concluded.)

3     Q.   (By Mr. Verhoeven) Now, Mr. Dean, do you

4  remember testifying on direct examination this morning

5  something to the effect that the virtualcities.com site

6  was very successful?

7     A.   Yes.

8     Q.   Isn't it true, Mr. Dean, that in 1996 or 1997,

9  you sold Virtual Cities to a man -- to a man named Robin

10  Pimental, correct?

11     A.   Yes.

12     Q.   And you sold Virtual Cities to Mr. Pimental

13  for $4,000?

14     A.   Yes.

15     Q.   And then a few years later, 2003 or 4,

16  Ms. Stone bought Virtual Cities back from Mr. Pimental,

17  right?

18     A.   Yes.

19     Q.   And she paid $4,000, right?

20     A.   Yes.

21     Q.   Isn't it true that you never used Virtual

22  Cities' own advertising technology to display ads on

23  virtualcities.com, sir?

24     A.   That's correct.

25     Q.   So you have this great invention for

1 advertising, and you never even used it on your own

2 site.  Isn't that true, sir?

3     A.    Yes.

4     Q.    You did use some advertising technology on the

5 Virtual Cities' site, though, didn't you?

6     A.    Yes.

7     Q.    And what you did use is you used Google's

8 technology to display ads on your website for Virtual

9 Cities, didn't you, sir?

10     A.    Yes.

11     Q.    All right.  Let's take another look at Claim 1

12 of the '025 patent.

13               MR. VERHOEVEN:  I think we can put it on

14 a chair here so we don't have to keep pulling that easel

15 out, if that's okay.

16               That's not going to work.

17               I apologize, Your Honor.  It's a very

18 heavy easel.  It takes a few minutes to -- we'll try to

19 get a lighter one in tomorrow.

20               All right.  Put Claim 1 of the '025

21 patent up again.

22     Q.    (By Mr. Verhoeven) Okay.  Now, you see the

23 preamble up here, sir?

24     A.    Yes.

25     Q.    I don't know if you can read that.

1          A computer system for creating and publishing

2 customized electronic advertisements for a seller to

3 internet media venues owned or controlled by other than

4 the seller.

5          Do you see that?

6     A.    Yes.

7     Q.    Now, before you began working on your patents,

8 networks of computers were well-known in the industry,

9 correct?

10    A.    Yes.

11    Q.    You didn't invent the idea of using a computer

12 to both create and publish electronic advertising, did

13 you, sir?

14    A.    I'm sorry.  What's the question again?

15    Q.    Do you think you invented the idea of using a

16 computer to both create and publish in electronic

17 advertising?

18    A.    No.

19    Q.    Now, let's look at the first element.  The

20 first interface to the computer system through which

21 each of the internet media venues is prompted to input

22 presentation rules for the internet media venue for

23 displaying electronic advertisements on the internet

24 media venue.

25          Now, you would agree with me, sir, that

1 software interfaces were known before your work on the

2 '025 patent; isn't that true?

3     A.   Yes.

4     Q.   And self-serve interfaces where a user could

5 interact with the software were well-known before your

6 work on the '025 patent, weren't they, sir?

7     A.   Yes.

8     Q.   For example, text entry boxes as part of the

9 software component of an interface were known before

10 your work on the '025 patent; isn't that right?

11     A.   Yes.

12     Q.   The idea of interfaces that prompt users for

13 inputting information to a computer system, that was

14 known before your work on the '025 patent, wasn't it?

15     A.   Yes.

16     Q.   In fact, the hardware for actually doing the

17 input was known before your work on the '025 patent,

18 wasn't it, sir?

19     A.   Hardware?

20     Q.   The hardware for actually doing the input,

21 that was also known before your work on the '025 patent,

22 wasn't it?

23     A.   Our '025 patent is a software program with a

24 software interface.  The hardware your -- I'm sorry.  I

25 don't understand.

1    Q.   Well, let's -- when I asked you this question

2  at your deposition, you understood it, so let me play --

3              THE COURT:  Well, let's try to rephrase

4  it.

5              MR. VERHOEVEN:  I will, Your Honor.

6              THE COURT:  Tell them what you mean by

7  hardware.

8    Q.   (By Mr. Verhoeven) Well, this software works

9  with hardware, doesn't it, sir?

10   A.   Yes.

11   Q.   And the software has to have hardware, doesn't

12 it?

13   A.   Yes.

14   Q.   And the hardware that would be used to

15 actually do the input, that was known before your work

16 on the '025 patent, wasn't it, sir?

17   A.   Yes.

18   Q.   Okay.  Now, let's go to the next element right

19 there, first database.  Do you see it?

20   A.   Yes.

21   Q.   It says a first database storing the

22 presentation rules input by the internet media venues

23 through the first interface.

24         Do you see that, sir?

25   A.   Yes.

1     Q.   Now, databases were known before your work on

2  the '025 patent, weren't they, sir?

3     A.   Yes.

4     Q.   Let's go to the next element.  This one talks

5  about a second interface right there.

6          Do you see that, sir?

7     A.   Yes.

8     Q.   And I'll read it for the record.

9          A second interface to the computer system

10 through which a seller is prompted to input information

11 to select one or more of the internet media venues and

12 prompted to input information to create an electronic

13 advertisement for publication to the selected internet

14 media venues.

15     A.   Yes.

16     Q.   So sometimes we refer to this as the seller

17 interface, right?

18     A.   Yes.

19     Q.   Because that's in your patent; that's where

20 the seller comes in and puts in his or her ads, right?

21     A.   Yes.

22     Q.   Now, you didn't consider seller interfaces to

23 be new or unique when you had your idea for the patent,

24 did you, sir?

25     A.   By themselves, no.

1    Q.   So you did not consider seller interfaces to

2 be new or unique when you had your idea for the patent,

3 correct?

4    A.   That's correct.

5    Q.   And you did not consider internet advertising

6 to be new or unique at the time you had your idea for

7 the patent either, did you?

8    A.   No.

9    Q.   There were people out there doing internet

10 advertising before, right?

11    A.   That's correct.

12    Q.   And you don't know whether the concept of a

13 website that listed two or more media venues which a

14 seller could choose to advertise on was new or unique,

15 did you?

16    A.   I'm sorry.  Say that again.

17    Q.   You don't know -- you aren't sure whether the

18 concept of a website that listed two or more media

19 venues which a seller could choose to advertise on was

20 new or unique before you came up with your invention, do

21 you?

22    A.   I don't know.

23    Q.   Would you agree with me that the concept of an

24 advertiser advertising on multiple media venues was not

25 something that was new or unique during this timeframe?

1    A.   Yes.

2    Q.   Could you please read the element that begins

3 computer controller to yourself?  That's the last one

4 down here.

5    A.   (Complies.)

6         Okay.

7    Q.   You got it?

8         Computer controller, this is what we talked

9 about, the processing and publishing.

10    A.   Yes.

11    Q.   Are you with me?

12    A.   Yes.

13    Q.   Now, computer controllers were well-known

14 before the '025 patent, weren't they, sir?

15    A.   Yes.

16    Q.   And you would agree with me that a central

17 controller that publishes a single advertisement is

18 certainly not something that would be new or unique

19 prior to your invention, right?

20    A.   Yes.

21    Q.   And you would agree with me that a central

22 controller that published multiple advertisements was

23 not something that was new or unique prior to your

24 invention?

25    A.   Yes.

1   Q.   So a central controller that processes --
2   processes and publishes electronic advertisements on the
3   internet, that was around before your invention, wasn't
4   it, sir?
5   A.   I'm sorry.  Say that again.
6   Q.   A central controller?
7   A.   A computer controller?
8   Q.   I'm sorry.  I misspoke.  Thank you.
9   A computer controller that processes and publishes
10  multiple advertisements for internet advertising, that
11  was around before you came up with your invention,
12  wasn't it?
13  A.   Yes.
14  Q.   You didn't consider that the publication of
15  advertisements on the internet was something that was
16  new or unique, did you?
17  A.   No.
18  Q.   And you would agree with me that the concept
19  of a website serving as a media venue with presentation
20  rules for advertisers, that that was not something that
21  was new or unique prior to the time that you came up
22  with your invention?
23  A.   No.
24  Q.   You agree with me, right?
25  A.   I agree with you.

1     Q.   Now, I believe you testified on your direct

2 examination that no one had ever come up with the

3 automated centralized system that you came up with

4 before.

5     A.   Yes.

6     Q.   Did I hear that right?

7     A.   I believe so, yes.

8     Q.   Okay.  Have you ever heard of DoubleClick?

9     A.   Yes.

10    Q.   You're aware of a system called DoubleClick?

11    A.   Superficially, yes.

12    Q.   You became aware of DoubleClick in at least

13 2001, right?

14    A.   Just from a name standpoint.

15    Q.   You became aware of a company called

16 DoubleClick by at least 2001, right?

17            MR. NELSON:  Can we approach, Your Honor?

18            THE COURT:  Yes.

19            (Bench conference.)

20            MR. NELSON:  This is -- I've let some of

21 this stuff go by, but this is clearly on the edge, if

22 not over the line, on trying to say that he's committing

23 fraud on the Patent Office, and, in fact, he's using the

24 same quote that he's taken out of context that he had

25 and we put it out for summary judgment motion on

DoubleClick.

THE COURT: He can testify or he can ask whether he's aware of the system and whether he disclosed it to the Patent Office, but beyond that, we're not going to go there.

MR. VERHOEVEN: I have no intention of going there.

THE COURT: That's the limit as to what you can do, but I think he's entitled to ask those questions. Let's move on.

(Bench conference concluded.)

Q. (By Mr. Verhoeven) Now, just to pick up the flow here before the interruption, I think I asked you if you became aware of that DoubleClick by at least 2001, right?

A. Superficially, yes.

Q. You became aware of the entity called --

THE COURT: Well, let's move on.

MR. VERHOEVEN: Move on, okay.

THE COURT: He's answered the question.

Q. (By Mr. Verhoeven) You understood that agencies who wanted to advertise on the internet could sign up with DoubleClick, and then DoubleClick would serve banner ads, right?

A. Yes.

1     Q.   And you understood that DoubleClick would

2  publish those banner ads on multiple media venues,

3  didn't you, sir?

4     A.   Yes.

5     Q.   And the agencies who advertised on

6  DoubleClick, they were third-party professionals, right?

7     A.   I'm not sure.

8     Q.   Well --

9             MR. VERHOEVEN:  Your Honor, I'd like to

10  play from his deposition dated September 10th, 2009, if

11  I may.  This is Page 272, Lines 8 through 12.

12             (Video clip played.)

13             QUESTION:  Those agencies would be

14  representing sellers, correct?

15             ANSWER:  Yes.

16             QUESTION:  Third-party professionals?

17             ANSWER:  Yes.

18             (End of video clip.)

19     Q.   (By Mr. Verhoeven) So the advertisers or the

20  third-party professionals would create the ads on

21  DoubleClick.  You understood that, right?

22     A.   Yes.

23     Q.   And you understood that DoubleClick had

24  presentation rules, right?

25     A.   I'm assuming so, yes.

1     Q.   Is it -- is it your testimony that DoubleClick

2 is not an automated system?

3     A.   It's my testimony that DoubleClick is an

4 automated -- I'm not familiar with -- with the internal

5 workings of DoubleClick, but, yes, it would be an

6 automated system.

7     Q.   So you admit that DoubleClick is an automated

8 system?

9     A.   Yes.

10     Q.   And do you admit that DoubleClick was prior to

11 your invention?

12     A.   Yes.

13     Q.   And do you admit that DoubleClick was not

14 disclosed to the Patent Office?

15     A.   Actually, I'm not sure whether they were prior

16 to our invention.

17     Q.   So you don't know one way or the other?

18     A.   No.

19     Q.   Would you admit that DoubleClick was not

20 disclosed to the Patent Office in the prosecution of

21 your patents, sir?

22     A.   Yes.

23     Q.   The Patent Office didn't know about

24 DoubleClick when it was looking at your patents did it,

25 sir?

1    A.    That's correct.

2    Q.    Now --

3    A.    Excuse me.  Can I clarify that?

4              THE COURT:  Yes.

5    A.    DoubleClick is not cited in the patents.  I

6    don't know what the Examiner was aware of.

7    Q.    (By Mr. Verhoeven) Did you know that

8    everything the Examiner looks at gets listed on the face

9    of the patent?  Did you hear His Honor tell the jury

10   that?

11   A.    I believe it's a case of everything that the

12   Examiner believes is pertinent to the -- to the

13   technology.

14   Q.    Is listed on the face of the patent?

15   A.    Yes.

16   Q.    And DoubleClick is not listed on the face of

17   any of your patents, is it?

18   A.    No, it's not.

19   Q.    Fair to say the Patent Office wasn't aware of

20   DoubleClick?

21   A.    I don't mean to argue, but they were either

22   not aware of it or they didn't consider it appropriate.

23   Q.    Do you have any --

24   A.    And I sincerely don't mean to argue.

25   Q.    Do you have any basis --

1                THE COURT:  Well, let's move along,

2   Counsel.  He's testified --

3                MR. VERHOEVEN:  Yes, Your Honor.

4                THE COURT:  -- he's not sure what the

5   Patent Office was or was not aware of, so let's move on.

6                MR. VERHOEVEN:  Yes, Your Honor.

7        Q.   (By Mr. Verhoeven) So going back to your

8   testimony on direct that no one had created this

9   automated system before, let me ask you another

10  question.

11               You're aware of AdForce, right?

12       A.   Yes.

13       Q.   And you became aware of AdForce in April of

14  2006, correct?

15       A.   Yes.

16       Q.   And in April of 2006, you understood that

17  AdForce was an internet advertising site, right?

18       A.   Yes.

19       Q.   And do you know whether AdForce existed prior

20  to your invention?

21       A.   I have no idea.

22       Q.   Do you know whether AdForce was a fully

23  automated system?

24       A.   In 1996, I'm not sure that I knew anything

25  more than just the name then.

1     Q.   You didn't even know how it worked?

2     A.   No, I did not.

3     Q.   Okay.  Mr. Dean, are you familiar with an

4 advertising system called Overture?

5     A.   Yes.

6     Q.   Overture was a search engine where a user

7 would type in a key word?

8     A.   Yes.

9     Q.   And when the user typed in a search word,

10 search results would appear, correct?

11    A.   Yes.

12    Q.   And search results would be from advertisers,

13 right?

14    A.   Yes.

15    Q.   And the advertisers, they would pay Overture

16 for placement, right?

17    A.   That's correct.

18    Q.   And these are internet advertisers, right?

19    A.   Yes.

20    Q.   So if an advertiser paid enough, the

21 advertiser would become high on the list of responses in

22 response to key word searches by internet users, right?

23    A.   I believe so, yes.

24    Q.   That's how Overture worked basically?

25    A.   I believe so.

1    Q.   These search results, they consisted of a one-

2  to two-line description and a link to the advertiser's

3  site, right?

4    A.   I believe so, yes.

5    Q.   The advertisers created that link and

6  submitted it to Overture, right?

7    A.   I don't know.

8    Q.   Okay.  Let's play your deposition testimony

9  from September 10th, 2009, Page 320, Lines 20 to 23,

10 please.

11              (Video clip played.)

12              QUESTION:  You understood in September of

13 2004 that the advertiser created the link and submitted

14 it to Overture?

15              ANSWER:  Yes.

16              (End of video clip.)

17    Q.   (By Mr. Verhoeven) The advertisers had also

18 created a one- to two-line description and submitted

19 that to Overture, right?

20    A.   Yes.

21    Q.   Now, Mr. Dean, you understood in 2004 that

22 Overture did not allow advertisers to select particular

23 media venues in which to have their ads published,

24 didn't you?

25    A.   I'm sorry.  Ask that -- repeat that, please.

1     Q.   Yes.

2         Mr. Dean, you understood in 2004 that Overture

3 did not allow advertisers to select particular media

4 venues in which to have their ads published, didn't you?

5     A.   I'm not sure.

6     Q.   In September of 2004, let me try -- I think I

7 may have misspoke on my question, and I apologize.  Let

8 me try it again.

9         In September of 2004, did you understand that

10 Overture allowed advertisers to select particular media

11 venues in which to have their ads published?

12    A.   I'm not sure.

13    Q.   You're not sure?

14    A.   I'm not sure.

15    Q.   Let's go to --

16    A.   As I sit here today, I'm not sure.

17    Q.   Let's -- let's see -- we asked you that

18 question at your deposition as well.

19    A.   Okay.

20    Q.   September 10th, 2009, Page 321, Lines 4

21 through 7.

22             (Video clip played.)

23          QUESTION:  In September of 2004, did you

24 understand that Overture allowed advertisers to select

25 particular media venues in which to have their ads

published?

ANSWER:  No.

(End of video clip.)

Q.   (By Mr. Verhoeven) Does that refresh your recollection that as of September 2004, Overture did not allow advertisers to select particular media venues in which to have their ads published?

A.   Yes.

Q.   And was it your understanding that Overture had a search engine and you submitted the advertising to that search engine, but there was no choice of media venues?  Is that correct?

A.   I believe that's correct.

Q.   Okay.  Let me switch subjects now, Mr. Dean. I'd like to talk about the prosecution of your patents, generally.

First question:  Would you agree with me that Ms. Stone's role in the prosecution of the Function Media patents was fairly limited?

A.   Yes.

Q.   She didn't help draft the claims of the patent, did she?

A.   She reviewed and -- she reviewed the claims and reviewed all the prosecution, but, no, she didn't assist the attorneys in drafting them.

1     Q.   Did she help draft the claims?

2     A.   No.

3     Q.   She didn't help draft the specification, did

4 she?

5     A.   The first draft of the specification, I did.

6 And she and I would work on it, and that would -- that

7 was turned over to -- to an attorney that we then worked

8 on from there to get the final submission.

9     Q.   So it's your testimony she did help draft the

10 specifications?

11    A.   I primarily drafted the specification.

12    Q.   Did she help?

13    A.   We collaborate on everything.

14    Q.   So that's a yes?

15    A.   Yes.

16    Q.   All right.  Let's play your deposition

17 testimony from March 16th, 2009.

18          MR. VERHOEVEN:  This is page -- for the

19 record -- Charles, for the record, this is Page 83,

20 Lines 2 through 3.

21          Go ahead.

22          (Video clip played.)

23          QUESTION:  Did she help draft the

24 specification?

25          ANSWER:  No.

1                    (End of video clip.)

2        Q.   (By Mr. Verhoeven) Can you turn in your

3    binder -- I have tabs in there, sir, and you can see

4    there's DX numbers.  Do you see those?

5        A.   Yes.

6        Q.   Can you turn in your binder to DX132, please?

7        A.   Okay.

8                    MR. VERHOEVEN:  And I believe this is in

9    evidence, Your Honor.  May I put it on the screen?

10       A.   My binder is blank.

11       Q.   (By Mr. Verhoeven) Okay.  I apologize for

12   that.

13                   MR. VERHOEVEN:  May I approach, Your

14   Honor?

15                   THE COURT:  Yes.

16                   MR. VERHOEVEN:  Are the other copies

17   blank, too?

18                   MR. NELSON:  Can you tell us which one?

19                   MR. VERHOEVEN:  DX132.

20                   Charles, let's put this up on the screen.

21   And if you will, bring out the top half of the document,

22   please.

23       Q.   (By Mr. Verhoeven) Mr. Dean, can you identify

24   DX132 for the jury?

25       A.   Yes.  This is an interview summary in the

prosecution from the Examiner in the prosecution of the '025 patent.

Q. Who attended this interview?

A. I believe myself and Henry Croskell.

Q. So this is an interview you had with the Examiner?

A. Yes. Henry Croskell, myself, and the Examiner, Andrew J. Fisher.

Q. He flew to Washington -- well, let me take that back.

The Examiner is in Washington, D.C., right?

A. Yes.

Q. So you flew to Washington, D.C., from -- from here?

A. Yes.

Q. So you flew to Washington, D.C., with Mr. Croskell to attend this interview?

A. Yes.

Q. What did Mr. Fisher say during this interview?

A. I don't recall.

Q. What did you say?

A. I don't recall.

Q. Do you remember the substance of what you said?

A. No. We -- we interviewed all of our patents.

1    Q.   You don't remember the substance of what you

2  said?

3    A.   No.

4    Q.   Did you discuss any amendments of the claims?

5    A.   It says claims discussed, claims of record.

6    Q.   Do you remember discussing any of the -- any

7  amendments to the claims during this interview?

8    A.   I don't remember.

9    Q.   What did Mr. Croskell say during this

10 interview?

11   A.   I don't remember.

12   Q.   Did you take any notes of this interview?

13   A.   No.

14   Q.   Let's mark --

15   A.   Actually -- well, I may have taken notes for

16 Mr. Croskell.

17   Q.   Were those notes -- do they still exist?

18   A.   I don't know.

19   Q.   Let's go to -- in your binder to DX133.  This

20 is in evidence as well.

21             MR. VERHOEVEN:  Charles, can you put it

22 on the screen and highlight the top portion?

23   Q.   (By Mr. Verhoeven) Can you identify this

24 document for the jury, please, Mr. Dean?

25   A.   This is another interview summary, and this is

1  in, I believe, the '059 patent prosecution.

2       Q.    So you went to Washington again to interview

3  the Patent Examiner in connection with what became the

4  '059 patent, correct?

5       A.    That's correct.

6       Q.    So you flew from here to Washington with

7  Mr. Croskell?

8       A.    Absolutely.

9       Q.    Can you please describe for me what was

10  discussed in this interview to the extent you recall any

11  of it?

12       A.    Well, other than the notes here, I don't

13  recall.  I do note that they left Henry Croskell's name

14  off of this, though.

15       Q.    So you have no independent recollection of

16  this interview?

17       A.    No.

18       Q.    You don't remember what you said during the

19  interview?

20       A.    No.

21       Q.    Do you recall the gist of the interview?

22       A.    It says applicant discussed in detail key

23  differences between the invention and the reference

24  Peckover.

25       Q.    Okay.  But beyond reading the document, do you

1  recall the gist of the interview?

2      A.   No.

3      Q.   Anything that Mr. Ade said, A-D-E.

4      A.   No, I don't recall.

5      Q.   What about Mr. Croskell; do you remember

6  anything Mr. Croskell said during this interview?

7      A.   No.

8      Q.   Did you take any notes?

9      A.   If I did, it was for -- for Henry Croskell.

10      Q.   Do you know where they are?

11      A.   No.

12      Q.   Mr. Dean, you personally became aware of

13  Google's AdSense for Content in or around August of

14  2004, correct?

15      A.   Yes.

16      Q.   And the reason you became aware of Google's

17  AdSense for Content in or around 2004 is because

18  Ms. Stone signed up for AdSense to put ads on the

19  Virtual Cities website; is that correct?

20      A.   That's correct.

21      Q.   Is it correct that in 2005, Google was

22  infringing your technology?

23      A.   Yes.

24      Q.   And is it true that in 2005, you had an intent

25  to sue Google for patent infringement in the future?

1    A.   In 2005, we were -- we took it to attorneys

2  and we were discussing whether or not they actually

3  infringed.

4    Q.   Is it true that in 2005, you had an intent to

5  sue Google for patent infringement in the future?

6    A.   We were discussing with the attorneys whether

7  infringement was in place and -- and whether or not we

8  would sue.

9    Q.   Did you have an intent in 2005 to sue Google

10 for patent infringement in the future?

11   A.   Our intent was to take it to the attorneys,

12 discuss the possibility of suing.

13   Q.   Let me play -- I asked you this question at

14 your deposition, September 10th, 2009.

15   A.   Okay.

16   Q.   I'd like to play your answer from that.

17        MR. NELSON:  Your Honor, I'm not sure

18 there's anything -- if they're trying to play it for

19 impeachment purposes, I think he gave an answer here,

20 and I don't see any --

21        THE COURT:  I'll overrule the objection.

22   Q.   (By Mr. Verhoeven) This is from the September

23 10th, 2009 transcript, Page 443, 17 through 24.

24             (Video clip played.)

25             QUESTION:  Did you have an intent as of

1  2005 with respect to whether or not you would be suing

2  Google for patent infringement in the future, yes or no?

3                    ANSWER:  Yes.

4                    QUESTION:  And your intent was that you

5  would be, right?

6                    ANSWER:  Yes.

7                    (End of video clip.)

8       Q.   (By Mr. Verhoeven) Now, you never called

9  Google between 2005 and 2007, did you, sir?

10      A.   No.

11      Q.   Never spoke to anyone at Google?

12      A.   No.

13      Q.   Never sent them any letters?

14      A.   No.

15      Q.   Instead, you sued Google on the very same day

16  your patent issued, didn't you, sir?

17      A.   Yes, the day that the '025 patent issued.

18                    MR. VERHOEVEN:  No further questions.

19                    THE COURT:  Redirect?

20                    MR. NELSON:  Yes, sir.

21                    MR. VERHOEVEN:  If I could just have a

22  second to move this easel out of my way.  Is that okay?

23                    MR. NELSON:  Yes, sir.

24                    Charlie, are you ready?  Are you ready?

25                    VIDEO TECH:  I am.

<u>REDIRECT EXAMINATION</u>

1

<u>BY MR. NELSON:</u>

2

 Q. Let's leave off actually directly where

3

Mr. Verhoeven stopped your questioning.

4

   In 2005, could you have sued on these patents?

5

 A. No. These patents didn't issue until July of

6

2007.

7

 Q. Now, Mr. Verhoeven spent some time, both right

8

before lunch and after lunch, trying to catch you in

9

some alleged inconsistencies, and I'd like to talk about

10

those.

11

   And, first of all, do you stand by what you

12

said in the deposition?

13

 A. Yes.

14

 Q. Okay. Now, he first asked you --

15

   MR. NELSON: And could we go to --

16

 Q. (By Mr. Nelson) He said whether you were

17

programming. Do you recall that testimony about whether

18

you were programming in April 1998?

19

   MR. NELSON: Can we put up -- can we put

20

up that question on the board, please, Matt? It's

21

Line 61, Page 61, and said --

22

 Q. (By Mr. Nelson) And he said -- the question

23

that he asked you --

24

   MR. NELSON: And let's go down a little

25

1  bit more, please.  Yeah, that.  From 8 to 13, please.

2      Q.   (By Mr. Nelson) Okay.  Now, he asked you

3  specifically about April 1998 and programming.

4          Now, first of all, this question is not the

5  exact same question, right, because this question is

6  talking about code, and the question that Mr. Verhoeven

7  asked was about programming; isn't that right?

8      A.   Yes.

9      Q.   Okay.  Second of all, your answer was not as

10  of April 1998; you specifically clarified that it was

11  1997 or 1998, correct?

12          MR. VERHOEVEN:  Objection, form, leading.

13      A.   Yes.

14          THE COURT:  Sustained.

15      Q.   (By Mr. Nelson) Okay.  Now, Mr. -- Mr. Dean,

16  earlier in your deposition, had you previously explained

17  when specifically in the 1997 and '98 period you had --

18  you had come to programming?

19          MR. VERHOEVEN:  Objection, leading.

20          THE COURT:  Overruled.

21      A.   I believe so, yes.

22      Q.   (By Mr. Nelson) Okay.

23          MR. NELSON:  Can we put that on the

24  board, please?  Let's go to your deposition, Page 29,

25  Line 9.

1      Q.   (By Mr. Nelson) And -- okay.  So Question --

2   could you -- could you read that aloud, please?

3      A.   It says:  And April '90 -- the QUESTION:  And

4   April '98 comes to mind, because that's when you started

5   taking classes; is that right?

6           ANSWER:  Well, I may have actually been taking

7   classes earlier than that, but, you know -- and once

8   again, this is 10 years ago, so I'm saying that, you

9   know, late '97, early '98, was the timeframe that all of

10  this was solidified in our minds.

11     Q.   Now, was this testimony that you gave, was it

12  almost right before the testimony that Mr. Verhoeven

13  played to the jury?

14     A.   Yes.

15     Q.   Okay.  Now, let's go -- right after that quote

16  that he played, let's please go to Page 65 of your

17  deposition, Lines 10 through 20, please.

18           Now, in this question, right after the clip

19  that he plays, you're talking about programming,

20  correct?

21     A.   Yes.

22     Q.   Okay.  And you see that that's Lines 10

23  through 17; is that right, Mr. Dean?  Is that a fair

24  statement?

25     A.   Yes.

1    Q.   Okay.  Could you please read for me and the

2  jury your answer talking about your programming?

3    A.   My answer was:  I started programming as soon

4  as -- in fact, I actually started program -- started

5  some programming before I even started classes, because

6  I -- you know, I started some of the self-help things

7  just to familiarize myself with programming; then --

8  then started taking the classes, and I -- and I worked

9  very hard.  I took -- I took almost every class there

10  was at that college in programming.

11    Q.   Okay.  And, again -- now, he asked you -- and

12  thank you, Mr. Dean.

13          MR. NELSON:  And actually, let's go

14  higher up, on Page 64, please.

15    Q.   (By Mr. Nelson) He asked you if you had been

16  programming in 1998.  Do you remember that?

17          And you said, I believe, yes, and then he

18  played a deposition testimony out of context.

19          And -- and my question to you, sir, is, did

20  you testify at your deposition that you actually had

21  been programming in 1998?

22          MR. VERHOEVEN:  Object to the

23  characterization, Your Honor.

24    A.   Yes.

25          THE COURT:  Sustained.

1    Q.   (By Mr. Nelson) Okay.  Let me rephrase.

2         Did you testify in your deposition that you

3    actually had started programming in 1998, as you just

4    testified on the stand?

5    A.   Yes.

6    Q.   Okay.

7              MR. NELSON:  Let's please go to Page 64,

8    Line 7.

9    Q.   (By Mr. Nelson) And this is, is it not,

10   Mr. Dean, the very next question and answer after the

11   completeness one that I read for the jury?  Isn't that

12   right?

13   A.   Yes.

14   Q.   Okay.  And could you please read that one

15   aloud to the jury.

16   A.   Well, there's -- there's various -- there's

17   various databases and files, et cetera, that we were

18   programming when we got started -- started programming

19   in '98.  I don't remember exactly which ones we're

20   talking about, but we've produced them.

21   Q.   Isn't that exactly what you testified on the

22   stand just now?

23   A.   Yes.

24   Q.   Now, Mr. Verhoeven also testified -- and he

25   said -- about databases, and he questioned your

recollection about databases.  Do you recall that

testimony?

MR. VERHOEVEN:  Objection to the word

testimony.  I didn't testify, Your Honor.

THE COURT:  Well, overruled.  The jury

will recall the question and answer.

Q.   (By Mr. Nelson) Do you recall when

Mr. Verhoeven questioned you about databases and whether

your system had a database?

A.   Yes.

Q.   And Mr. Verhoeven said that you had testified

that it did not have a database.  Do you remember that?

A.   Yes.

Q.   Okay.  On the same --

MR. NELSON:  Let's go to Page 62.

Q.   (By Mr. Nelson) Is this the same page that Mr.

Verhoeven was questioning you about?

A.   I believe so.

Q.   Okay.  Let's go to the bottom of the page,

just a few lines down from what Mr. Verhoeven was

questioning you about.  Let's go to Line 22 through

Line 60 -- Page 63 of the next page.

Could you please read that one --

MR. NELSON:  Just to Page -- the -- yeah.

Okay.

1    Q.   (By Mr. Nelson) Could you please read that

2  aloud.

3    A.   It starts out:  Could consider.  We actually

4  have to -- you're right.

5    Q.   Okay.

6    A.   We actually have to clarify that, because from

7  the standpoint of the presentations being stored, they

8  were being stored in their entirety in a directory

9  structure that could be considered a database by our

10  broad definition of database.

11          So, yes, that site had a data -- had a

12  database.

13    Q.   Keep on going.

14    A.   It's not -- it's not SQL access or anything

15  like that or Oracle.  All we're talking about is the --

16  is the structure storage of the data that will then be

17  served.  So, yes, that site had a data -- had a

18  database.

19    Q.   Thank you.

20          And, Mr. Dean, you were deposed for how many

21  days in this case?

22    A.   I believe three.

23    Q.   And, again, you stand by -- Mr. Verhoeven

24  asked you some questions, and today on the stand, you

25  answered, I'm not sure to a couple of them; is that

1  right?

2     A.   Yes.

3     Q.   Do you stand by what you said at your

4  deposition at that time?

5     A.   Yes.

6     Q.   Thank you.

7          Now, Mr. Verhoeven also asked you, and he

8  implied some things about some -- some conversion.  What

9  timeframe were we talking about when you had your job

10 with CFN Financial?

11    A.   I believe it was up to 1993.

12    Q.   Okay.  And, Mr. Dean, did you file a specific

13 statement with the Commission explaining specifically

14 why you did what you did?

15    A.   Yes.

16    Q.   Okay.  Can you please explain to the jury what

17 happened.

18    A.   These -- on construction loans, we would

19 manage the disbursement of the -- of the funds.  And

20 many times you would have to -- there would be problems

21 on the -- on the -- on the project or whatever, and

22 you'd have to advance some of those disbursements.

23         I did that.  I did that under the power of

24 attorney that I had representing the investors, and I

25 did it solely to protect their interest, to try and get

1  project -- that project finished.

2      Q.   Did you ever take any investor's money?

3      A.   Never.

4      Q.   Does real estate brokerage have anything to do

5  with whether Google infringes these patents?

6      A.   No.

7      Q.   Now, at the beginning of Mr. Verhoeven's

8  testimony -- or excuse me -- his cross-examination of

9  you, he asked you some questions and asked you to define

10  some claim terms.

11         Do you recall that testimony?

12     A.   Yes.

13     Q.   Do you know who is responsible for defining

14  the claim terms?

15     A.   The -- the Court is responsible.

16     Q.   Has the Court given definitions of the claim

17  terms that Mr. Verhoeven was asking you to define?

18     A.   Yes.

19     Q.   Okay.

20         MR. NELSON:  Do you have -- you can

21  actually go to your glossary.  It's actually in the

22  glossary of terms in the juror notebooks.

23         Could we pull up that glossary?

24     Q.   (By Mr. Nelson) Now, Mr. Dean, I recall

25  Mr. Verhoeven asking you about internet media venues.

1          Does that have a definition, as given by the

2    Court, on this page?

3         A.    Yes, it does.

4         Q.    Okay.

5              MR. NELSON:  Can we highlight that?

6         Q.    (By Mr. Nelson) And can you read for the jury

7    the definition of internet media venues, as given by the

8    Court?

9         A.    Yes.  The term -- the term is internet media

10   venues, and the meaning is:  Internet locations where

11   presentations are placed or made available to present

12   the information within the framework of the media so

13   that it is accessible by the end-users, consumers,

14   viewers, or buyers.

15        Q.    And did the Court also define the word

16   media --

17              MR. NELSON:  Let's go to the next page,

18   please.

19        Q.    (By Mr. Nelson) Did the Court also define the

20   word media venues?

21        A.    Yes, it did.

22        Q.    Could you please read for the jury the

23   definition that this Court has given for media venues?

24        A.    The term is media venues.  The meaning is:

25   Those physical or virtual locations where presentations

```
 1   are placed or made available to present the information
 2   within the framework of the media so that it is
 3   accessible by the end-users, consumers, viewers, or
 4   buyers.
 5        Q.   Thank you.
 6             Now, Mr. Verhoeven asked you about the sale of
 7   VC, Inc., to a particular person.  Do you recall that
 8   testimony and what you stated?
 9        A.   I'm sorry?
10        Q.   Did you recall the sale of Virtual Cities --
11        A.   Yes.
12        Q.   -- that -- that question and answer?
13        A.   Yes.
14        Q.   And he asked you about whether you sold it to
15   a particular person.
16        A.   Yes.
17        Q.   Who was that person?
18        A.   That was my brother-in-law.
19        Q.   Uh-huh.
20             And did -- what was included in the sale of
21   Virtual Cities for that?  Was it -- was it the URL
22   itself?
23        A.   Yes, and an agreement -- and an agreement that
24   I would be able to purchase that back.
25        Q.   Yes.
```

1          And were you operating your bed and breakfast

2    website on other websites besides Virtual Cities at that

3    time?

4        A.    No.

5        Q.    Okay.  Thank you.

6          And Mr. Verhoeven asked you and went through

7    some of the specific terms of -- specific elements of

8    the patent Claim 1.

9          Do you remember that?

10       A.    Yes.

11       Q.    What is your understanding of whether the

12   claim has to be interpreted as a whole?

13       A.    That is my understanding, that -- that any

14   claim, you can't pick it apart piece by piece and -- and

15   try to define what that means.  You have to read the

16   whole claim and -- and apply the whole claim to the

17   conditions.

18       Q.    Can you please -- I know you said that on your

19   direct, but Mr. Verhoeven was questioning you.  Could

20   you please tell again for us and the jury what was new

21   and unique about your inventions here?

22       A.    What was new and unique about our inventions

23   was the ability for a seller to go to one location,

24   input information to create an ad, input -- also input

25   information about where he wanted to -- where they

1  wanted to display that ad, and have it -- have it input

2  as raw text or nonformatted, just pure data, and have

3  that information transmitted to a central controller

4  that would contain a presentation generation program

5  that would combine that information with the

6  presentation rules and information from the various --

7  from the media venues and would generate a customized

8  advertisement that would be sent specifically to those

9  media venues.  That's what our invention was.

10      Q.   Now, we showed a demo and a video of what you

11  had done about the system and what you had implemented

12  about the patent.

13          Do you recall that demo?

14      A.   Yes.

15      Q.   And we saw some features and places of the bed

16  and breakfasts.

17      A.   Yes.

18      Q.   Do you recall that?

19      A.   Yes.

20      Q.   Now, is that equivalent to a seller putting in

21  advertisement raw information into the seller interface?

22      A.   Absolutely.  That's an example of a complex

23  ad.  You can -- obviously, if you can do the complex,

24  you can do the simple.

25          But that's an example of filling out check

boxes and -- and text boxes and drop-down lists and

putting in raw information, pure data, no formatting.

    Q.   Now, Mr. Verhoeven asked you some questions

about the operation of the DoubleClick system and the

AdForce systems.

        Do you recall that?

    A.   Yes.

    Q.   And, first of all -- I think you testified to

this, but your knowledge of -- of those sites were -- I

think you said superficial; is that right?

    A.   Yes.

    Q.   Okay.  And is it fair to say that you will

defer to the experts on both sides about whether

DoubleClick and AdForce have any of the elements of the

claims at issue here?

    A.   Yes.

    Q.   And with respect to DoubleClick and AdForce --

let's take it one by one, actually.

        With respect to DoubleClick, from what you

know of, from your general understanding, is DoubleClick

the same as your invention?

    A.   Absolutely not.

    Q.   Same question for AdForce:  From what you

know, based on your understanding, is AdForce the same

as your invention?

1    A.    It is not.

2                    MR. VERHOEVEN:  Objection, Your Honor.

3                    The witness is testifying that he's

4    deferring to the experts, and he has no knowledge.

5                    THE COURT:  Overruled.

6        Q.    (By Mr. Nelson) Let me repeat that question.

7    From what you know on your personal knowledge, is

8    AdForce the same as your invention?

9        A.    No.

10                   MR. NELSON:  Thank you, Your Honor.

11                   MR. VERHOEVEN:  May I approach, Your

12   Honor?

13                   THE COURT:  Approach, yes.

14                   (Bench conference.)

15                   MR. VERHOEVEN:  They opened the door on

16   this.  Did you ever take any money from anybody?

17                   There's default judgments against this

18   gentleman for fraud, and he's testified he never took

19   any money from anybody.  He's testified that -- that --

20   that he didn't convert these funds for his own use; he

21   did it for the benefit of them.  That is flatly

22   contradicted by all the other documents.

23                   THE COURT:  Well, no, it's not.  He could

24   not have used it for his own benefit -- I'm going to

25   stick with my prior ruling, because the testimony was

effectively within the scope of what the stipulation

was, and I'm going to stick with my prior ruling.

I've allowed you to go into it on cross, and I'm going

to -- but I do not find that he's opened the door to go

any further than he's already gone.

                  MR. VERHOEVEN:  Okay.

                  THE COURT:  Do you have any other issues?

                  MR. VERHOEVEN:  I do not.

                  THE COURT:  Okay.  Thank you.

                  (Bench conference concluded.)

                  MR. VERHOEVEN:  I have no further

questions.

                  THE COURT:  Okay.  Thank you,

Mr. Verhoeven.

                  Okay.  You may step down, sir.

                  Call your next witness.

                  MR. TRIBBLE:  Your Honor, Plaintiff calls

Brian Axe by deposition.

                  THE COURT:  Okay.

                  MR. TRIBBLE:  I have the times, if it

would help the Court.

                  THE COURT:  Well, why don't you give it

to me at break.

                  MR. TRIBBLE:  Very well.

                  THE COURT:  All right.  Ladies and

Gentlemen, recall my prior instructions this morning on

deposition testimony.  The next witness will be

presented to you by means of deposition testimony.

                 (Video playing.)

                 QUESTION:  Can you tell us your full

name.

                 ANSWER:  Brian Axe, Brian Paul Axe.

                 QUESTION:  And what is your work address?

                 ANSWER:  1600 Amphitheatre Parkway,

Mountain View, California, 94014 (sic).  I'm not sure of

the zip, actually.

                 QUESTION:  Are those Google offices?

                 ANSWER:  Yes.

                 QUESTION:  Can you just summarize for me

your positions you've held at Google?

                 ANSWER:  Sure.  Yeah.  The next position

was the -- mentioned -- when I mentioned the AdSense for

Content lead, product manager lead.  And I held that

from December 2002 until August of 2008.

                 And then I took a two-and-a-half-month

sabbatical, and when I returned in November of 2008, I

joined the applica -- the apps group at Google and have

been working on our photo products.

                 QUESTION:  Okay.  Have you looked at the

patents asserted in this case?

1    ANSWER:  No, I have not.

2    QUESTION:  Okay.  Now -- and publishers

3 can publish ads via AdSense through an online interface,

4 right?

5    ANSWER:  Yeah.  Publishers get code by

6 which the code then executes and pulls in ad -- ads that

7 are displayed to user.

8    QUESTION:  But the publishers can use

9 Google's system through an online interface.  That's one

10 way, right?

11    ANSWER:  They can go to an online

12 interface and pull code, which they put on their pages,

13 yes.

14    QUESTION:  Let's talk about the online

15 users.  How do they join AdSense, the publishers?

16    ANSWER:  So the online publishers come

17 through a browser interface that then displays code to

18 them.  They put in information.  And they can pull code

19 snippets that they then insert into their websites.

20    QUESTION:  And who approves whether they

21 become a publisher or not?

22    ANSWER:  We have a mix of algorithms that

23 look at the information that they input, as well as

24 humans that look at different criteria, and then they're

25 either approved through an automated or a manual

1  approval based on that flow.

2              QUESTION:  But the automated or manual

3  approval, that's approval by Google, right?

4              ANSWER:  Correct.

5              QUESTION:  Now, let's talk about the

6  online interface.

7              Now, there is an online interface for ad

8  feeds (sic) for content, right?

9              ANSWER:  There's a web page that the

10 publishers go to and pull information and look at

11 reports.

12             QUESTION:  Is there an online interface

13 for ad feeds (sic) for content?  Yes or no.

14             ANSWER:  I guess I need more context.

15 What do you mean by interface?

16             QUESTION:  Have you ever used the term

17 online interface?

18             ANSWER:  Have I...

19             Probably.  I can't remember specific

20 instances.

21             QUESTION:  I mean, do you feel you can't

22 answer the question yes or no?  Is there an online

23 interface for ad feed -- excuse me -- AdSense for

24 Content?

25             ANSWER:  So there's -- there's a web page

1 that publishers can go to and pull information. And

2 whether that web page is described as an interface

3 depends on if -- yeah. I don't know.

4 So there's a -- there's a page by which

5 publishers can pull information, both reports, as well

6 as code for their pages.

7 QUESTION: I'll ask it again. Do you

8 feel you can't answer the question yes or no? Is there

9 an online interface for AdSense for Content?

10 ANSWER: If I define interface in the way

11 that it -- let's see. So is there...

12 So there's a web page that people access

13 through a browser. Whether you call that an interface

14 or not is -- is a judgment call that one could make.

15 QUESTION: Can you answer the question

16 yes or no?

17 ANSWER: No.

18 QUESTION: Is there a term you're

19 comfortable with?

20 How do people -- how do publishers enter

21 information into the AdSense system? Is there a form?

22 ANSWER: Online forms --

23 QUESTION: Okay.

24 ANSWER: -- feels like a term.

25 QUESTION: Okay. So let's talk about

online forms.  There are online forms for publishers to

use for AdSense for Content, right?

ANSWER:  Yes.

QUESTION:  Now, the forms -- or excuse

me -- the reports -- you referred to reports being

served up by Google for publishers, correct?

ANSWER: Yes.  Yes.

QUESTION:  That -- the serving of

reports, that's a self-serve; it's an automated feature,

correct?

ANSWER:  Let's see, yes.  We have -- so

we have reports that are served when the publishers put

in information.

We also have reports that -- for the

larger publishers that we send out to the large

publishers via e-mail and -- and Excel spreadsheets,

et cetera.

QUESTION:  But for the online users,

those reports are served up -- they're self-served;

they're served up automatically by the Google system,

correct?

ANSWER:  They are served up when a

publisher puts in information without other human

involvement, yes.

QUESTION:  And they can enter in

information concerning the formatting of advertisements,
the way the ads will look on their website?

ANSWER:  So they can configure the
backgrounds, and now more recently, fonts, border
colors, into this online form by which a script is
returned that they put on their website.

QUESTION:  And choose the color of the
ads?

ANSWER:  And choose the color of the ads.

QUESTION:  The ad unit size?

ANSWER:  The ad unit size, yes.

QUESTION:  Format?

ANSWER:  Yeah.  Can you describe format?

QUESTION:  Length and width?

ANSWER:  Length and width and size, yes.

QUESTION:  Okay.  Take a look at
Plaintiff's Exhibit 16.  This is a page about AdSense
published by Google, right?

ANSWER:  Yeah.  It has a URL here, so we
believe that to be so.

QUESTION:  And you see -- halfway down
under products, do you see it says:  AdSense lets you
customize the appearance of ads to match the look and
feel of your site?  Correct?

ANSWER:  It does say that.

1            QUESTION:  You would agree with me that

2    the ability to customize the look and feel of ads to be

3    displayed on a publisher's website is an important

4    aspect of AdSense, wouldn't you?

5            ANSWER:  Yeah.  So the ability to

6    configure ads so that you could change the borders --

7    the borders, the colors, the font size, where the ad

8    appears within a site, all those things are important

9    aspects.

10           QUESTION:  And -- and you talked about

11   configuring the -- the colors and borders and text and

12   everything.  That's part of the look and feel of the ad,

13   right?

14           ANSWER:  Those could be described as part

15   of the look and feel of the ad, along with other

16   elements, as we mentioned.

17           QUESTION:  Google tells the publishers,

18   if you want the biggest revenue impact for the smallest

19   effort, we recommend optimizing your color palettes,

20   correct?

21           ANSWER:  That's what this statement says.

22           QUESTION:  Choosing the right palettes

23   can mean the difference between ads your users will

24   notice and click and ads they'll skip right over.

25           ANSWER:  That's what this says.

1    QUESTION:   This is a page published by

2 Google, correct?

3    ANSWER:   Yes.

4    QUESTION:   This is what Google is telling

5 its customers, right?

6    ANSWER:   This is what a page on Google's

7 site is telling its customers.

8    QUESTION:   And Google is telling its

9 customers that choosing the right color palettes can

10 mean the difference between an ad getting noticed and

11 clicked on and an ad just being skipped over, correct?

12    ANSWER:   So Google employees who wrote

13 this -- yeah -- specifically said:  Choosing the right

14 palettes can mean the difference between your ads your

15 users will notice and click and ads they'll skip right

16 over.

17    QUESTION:   And that's a pretty important

18 aspect, right?

19    ANSWER:   So that's -- that's what's

20 stated in this document, and in my experience with ads

21 and optimizing ads, the formatting and placement of ads

22 are important aspects.

23    QUESTION:   Do you know who at Google came

24 up with the idea of allowing customization of look and

25 feel by publishers for the AdSense system?

1          ANSWER:  So I know that we've always --

2 let me think about this.  Yeah.  I -- I don't recall who

3 came up with the idea.

4          QUESTION:  You just don't know, right?

5          ANSWER:  I just don't know.

6          QUESTION:  Okay.

7          ANSWER:  Yeah.

8          QUESTION:  Who was the architectural

9 person whose name you gave me with regard to the

10 centralized system and the data centers?

11          ANSWER:  Jeff Dean.

12          QUESTION:  And let's look at the first

13 sentence of the next paragraph.  It says:  Google

14 AdSense refers to the online programs through which we

15 distribute our advertisers' AdWords ads for display on

16 the websites of our Google network members, as well as

17 programs to deliver ads on television and radio

18 broadcasts, right?

19          ANSWER:  It says that, yes.

20          QUESTION:  And, again, so the Google

21 AdSense system, Google describes that as an online

22 program through which Google distributes its

23 advertisers' ads, right?

24          ANSWER:  Yeah.  It says what you first

25 described.

1          QUESTION:  And -- and it describes the

2  AdSense system as distributing ads for display on the

3  publishers' websites, right?

4          ANSWER:  It says:  Google AdSense refers

5  to the online programs through which we distribute our

6  advertisers' AdWords ads for display on the websites of

7  our Google network members...

8          QUESTION:  Talks about display on

9  websites, right?

10          ANSWER:  It says display on websites.

11          QUESTION:  Okay.  And Google is the one

12  that distributes the ads that are displayed, right?

13          ANSWER:  As we talked before, Google

14  creates a code snippet which then gets put into the

15  publisher's Web Server, which then gets executed by the

16  browser by which ads are seen by users.

17          QUESTION:  But the sentence that we're

18  reading it says:  Google AdSense refers to the online

19  programs through which we distribute ads, right?

20          ANSWER:  It says:  Through which we

21  distribute our advertisers' AdWords ads.

22          QUESTION:  And when it says:  We

23  distribute the ads, the we refers to Google, right?

24          ANSWER:  I think that's what's implied.

25  I didn't write this document, but that would be my

1  guess.

2                  QUESTION:  Well, that's -- that's how you

3  would read the document, right?  We refers to Google.

4                  ANSWER:  Through which we distribute our

5  advertisers' ads.

6                  I think so.  I'm just -- you know, that's

7  pretty comprehensive.  There could be partners involved

8  also with that.  We have partners that help us display

9  ads.

10                 QUESTION:  Well, when it says:  We

11  distribute our advertisers' ads, do you see any

12  reference to anyone other than Google there?

13                 ANSWER:  I don't see any reference to

14  anybody else.

15                 QUESTION:  Does this appear to be an

16  authentic Google e-mail?

17                 ANSWER:  Yes, it appears to be so.

18                 QUESTION:  Do you believe you received

19  this e-mail?

20                 ANSWER:  I believe so.

21                 QUESTION:  The -- the subject is the ASFE

22  UI -- separate word, UI -- road map meeting minutes,

23  February 28th, correct?

24                 ANSWER:  Correct.

25                 QUESTION:  And the ASFE, what does that

1  stand for?

2              ANSWER:  I'm pretty certain it stands for

3  AdSense front end.

4              QUESTION:  These are the forms and

5  reports that users use to use AdSense, right?

6              ANSWER:  That's right.

7              QUESTION:  And then it says UI.  What

8  does that stand for?

9              ANSWER:  It must be user interface, would

10 be my guess.

11             QUESTION:  Does this refresh your

12 recollection about whether Google refers to a user

13 interface for AdSense?

14             ANSWER:  Well, this is an example of

15 where they use the term, yes.

16             QUESTION:  So Google does use the term

17 user interface?

18             ANSWER:  It's in this document, and this

19 is from Google, so yes.

20             QUESTION:  If you got -- if you had a

21 meeting with minutes sent to you every week from the

22 user interface road map meetings, over five and a half

23 years, that'd be -- it'd be over a few hundred of these

24 minutes, right?

25             ANSWER:  That's why I'm describing, is

that this is a format that Shirin was using, and it could have been a different format, a different description, a different team structure.

So this specific AdSense front end UI road map meeting minutes, I would suspect that it'd be less than the number that you're saying, and the title could have changed.  Many times we refer to it as the front end versus the back end, so...

QUESTION:  Didn't you just say the 250 would not be a bad approximation?

ANSWER:  250 -- let's see.  So many core team meetings of which there were weekly or monthly notes sent out, and different product managers would put different descriptions.

So I can't say that would be a good approximation of this specific line item.  I imagine that if we look for other notes, there'd probably be a lot that were just -- of this potential weekly would have just been AdSense front end; AdSense back end. Different descriptions.

QUESTION:  At any rate, as you sit here now, you don't deny that AdSense has a user interface, do you?

ANSWER:  So one could refer to the front-end system as having a user interface.

```
1              QUESTION:  Okay.  How important is
2   AdSense to Google?
3              ANSWER:  Yeah.  In what -- in what
4   respect?
5              QUESTION:  Well, let's take AdSense for
6   Content.  While you were product manager, let's say for
7   the year 2007, was that an important product for Google?
8              ANSWER:  How would you define importance?
9   If you define it by revenue, if you define it by --
10             QUESTION:  Sure.  Revenue.
11             ANSWER:  -- users?
12             So by revenue, the majority of the
13  revenue comes through search, but a nontrivial amount of
14  revenue --
15             THE REPORTER:  A what?
16             ANSWER:  -- a nontrivial amount of
17  revenue came through AdSense for Content, a nontrivial
18  amount came through AdSense for Domains -- since saying
19  AdSense is pretty broad -- a nontrivial amount also came
20  through the direct AdSense online.
21             QUESTION:  And nontrivial, is that
22  another way of saying important, an important amount?
23             ANSWER:  Yes.  So was it revenue that
24  Google or Google's management would care about?  I would
25  say, yes.
```

QUESTION:  Would you say that AdSense for Content was huge for Google?

ANSWER:  I would say that about search. I would say that about search.  It's hard for me to say that about content.

QUESTION:  You would not say that about content; is that right?

ANSWER:  Well, I could have said that, but if I were to use my judgment now, I would say that it's -- it's been a good product offering in a good space with good traction, and it's been a good product for Google.

MR. TRIBBLE:  Okay.  Let's mark this as the next exhibit.

QUESTION:  Is this part of the Google 2007 strategy review?

ANSWER:  It appears to be so, yes.

QUESTION:  And did you contribute to the substance of this report?

ANSWER:  I'm listed as a contributor, so either this report or documents I may have created likely were used in this report.

QUESTION:  Can you turn to Page 15?

Do you see the first sentence where it says:  AFC is huge, with 650,000 publishers, 2.2 million

1  websites, 4 billion daily page views, 13 billion daily

2  impressions, and about $5 million in daily revenue?

3                    Do you see that?

4                    ANSWER:  I see that.

5                    QUESTION:  Do those numbers sound correct

6  to you for 2007 when you were the product manager for

7  AdSense for Content?

8                    ANSWER:  That sounds about right.

9                    QUESTION:  When it says, AFC is huge,

10 that means AdSense for Content was huge for Google,

11 right?

12                   ANSWER:  No.  It means the author of

13 this -- and specifically, I think -- if I were to

14 speculate, I think it's Kim who wrote this, who

15 typically speaks in a bit of hyperbole, as described

16 here.

17                   QUESTION:  Kim Malone?

18                   ANSWER:  Yes.

19                   QUESTION:  What was her position?

20                   ANSWER:  She was the AdSense online

21 operations manager.  When we talked about the manual,

22 plus the automated, many of her people were -- would

23 work on the manual side of the business.

24                   QUESTION:  Manual or online?

25                   ANSWER:  Well, manual review of mostly

the online.

QUESTION:  Was she within your department?

ANSWER:  She's within the online sales operations group, which is not my department.

QUESTION:  Okay.  Did you get a copy of this strategy review back at the time?

ANSWER:  I imagine I received this in e-mail.  Whether I read it in full detail, I can't recall.

QUESTION:  Well, you were the product manager for online for content, AFC, right?

ANSWER:  That's correct.

QUESTION:  And so on Page 15, if you had seen the statement, AFC is huge, would you have sent an e-mail to Kim Malone telling her that that's an overstatement, that that's just wrong?

ANSWER:  Sometimes I would.  In this case, I didn't.

QUESTION:  How do you know that?

ANSWER:  I don't know it for certain.  I may have.

QUESTION:  Why did you -- why do you believe you didn't?

ANSWER:  Why do I believe I didn't?

1  Because she's usually pretty responsive about changes

2  that I ask her to make, and it would be changed in the

3  document.

4           QUESTION:  And isn't this a pretty fair

5  statement:  AFC is huge?

6           ANSWER:  I think it's all relative.  So

7  if I were a startup company, I would think these numbers

8  were huge.  If I'm Google, then they're nontrivial.

9           QUESTION:  So you don't think $5 million

10 in daily revenue is huge?

11          ANSWER:  So it's -- it's definitely a big

12 number, and if it were 5 million for a company that I

13 was running, I would be pretty excited about that.

14          QUESTION:  Don't you think Google was

15 pretty excited about $5 million a day in daily revenue

16 from AdSense for Content?

17          ANSWER:  Well, I'd say that -- yeah.  I

18 don't know how I can answer.  So who at Google -- who

19 would make that statement?  I know that it was a product

20 that was doing well and had a nontrivial amount of

21 revenue that came up in many discussions.

22          QUESTION:  You wouldn't call it huge?

23          ANSWER:  Yeah.  I just wouldn't use -- I

24 wouldn't write -- I don't think that I would write that

25 term directly myself.

1              QUESTION:  But somebody at Google wrote

2 that, right?

3              ANSWER:  Yes.

4              QUESTION:  Okay.  And this was an

5 internal document, correct?

6              ANSWER:  Yes.

7              QUESTION:  Internal document about

8 Google's confidential strategy review in 2007, right?

9              ANSWER:  Yes.

10              QUESTION:  Okay.  This is an article from

11 USA Today that we obtained online.  Have you ever seen

12 this article before?

13              ANSWER:  Give me a moment.

14              Yes.  I've -- this article looks familiar

15 to me.

16              QUESTION:  Was this circulated to you

17 internally at Google around the time that it was

18 created, or is this something you've seen recently?

19              ANSWER:  No.  This -- well, let's see.

20 So I think I remember seeing this possibly posted on one

21 of the walls at Google in print form.

22              QUESTION:  Posted on like a bulletin

23 board?

24              ANSWER:  On a bulletin board, yes.

25              QUESTION:  And what's the date in the

1  bottom right?

2                    ANSWER:  Well --

3                    QUESTION:  Is that the print date?

4                    ANSWER:  -- I think that's the print

5  date.

6                    QUESTION:  Okay.  That's --

7                    ANSWER:  Yeah.

8                    QUESTION:  -- the print date.

9                    ANSWER:  Yeah.  That's why I was looking

10  for the date.  This -- it doesn't seem to be in the

11  document.

12                    QUESTION:  But you recall that this

13  article was posted on a bulletin board at Google back

14  around the time it was published?

15                    ANSWER:  Yeah.  It looks like -- the

16  article URL seems to have a date in it --

17                    QUESTION:  Uh-huh.

18                    ANSWER:  -- July 4, 2007, which feels

19  about right for my memory of seeing this when I -- yeah,

20  from the timeframe that I recall this article.

21                    QUESTION:  That's your best recollection?

22                    ANSWER:  Yes.

23                    QUESTION:  Okay.  Let's -- and take a

24  look at Page 2.  I wanted to ask you about some quotes

25  and statements about Ms. Wojcicki and AdSense.

1              ANSWER:  Uh-huh.

2              QUESTION:  Do you see the second

3  paragraph, one sentence?

4              It says:  In 2003, she came up with her

5  multimillion-dollar brainstorm, AdSense.

6              ANSWER:  It does say that.

7              QUESTION:  Is that true?

8              ANSWER:  Yeah.  It's true that somebody

9  wrote this.

10             QUESTION:  Is the statement true?

11             ANSWER:  I -- I can't answer that.

12             QUESTION:  Okay.

13             ANSWER:  I don't know.

14             Okay.  Let's -- you see the section

15 titled, A Really Novel Idea?

16             ANSWER:  Uh-huh.

17             QUESTION:  Yes?

18             ANSWER:  Yes.

19             QUESTION:  That's referring to AdSense,

20 correct?

21             ANSWER:  There's a quote here that says:

22 It was a really novel idea at the time to serve ads that

23 were targeted dynamically.  That's a quote from Susan.

24             QUESTION:  Is that true?

25             ANSWER:  Yeah.  I don't know.  I mean, I

1  could -- I could guess at it.

2              QUESTION:  Well, you were product manager

3  for AdSense back in 2003, right?

4              ANSWER:  Uh-huh.

5              QUESTION:  Yes?

6              ANSWER:  Yes.

7              QUESTION:  Was AdSense a really novel

8  idea back in 2003?

9              ANSWER:  Well, I know that people were

10 not able to take ads at a very specific topic basis and

11 find topics on web pages and match them, so I know that

12 that was something that wasn't being done by others at

13 that time.

14             QUESTION:  So was it a novel idea at that

15 time?

16             ANSWER:  Yeah.  So it wasn't being done

17 by others, and advertisers, users, and publishers found

18 value from them.

19             (End of video clip.)

20             THE COURT:  Does that conclude the offer?

21             MR. TRIBBLE:  It does, Your Honor.

22             THE COURT:  Okay.  Would you bring the

23 lights up?

24             MR. TRIBBLE:  Plaintiff will also call

25 Angela Lai, a Google engineer, by deposition.  Both

sides cuts together are under six minutes.

                    THE COURT:  Okay.  Well, we'll go ahead

and hear the testimony and then take our afternoon

recess.

                    MR. TRIBBLE:  Okay.

                    (Video playing.)

                    QUESTION:  Ma'am, could you please state

your name and home address for the record?

                    ANSWER:  My name is Angela Lai.  Home

address is 1190 Morton Court, Mountain View, California.

                    QUESTION:  How long have you been working

for Google, Ms. Lai?

                    ANSWER:  Since August 2004.

                    QUESTION:  What is your current title?

                    ANSWER:  Engineering director.

                    QUESTION:  Advertisers are prompted to

input various types of information through the user

interface, correct?

                    ANSWER:  Yes.

                    QUESTION:  Now, the ads by Google that

we've been talking about, say on flowers.com, these ads

are displayed on the website, are they not?

                    ANSWER:  They are displayed -- I -- we

have -- we have been trying to be precise about that.

When you say on the website, you're saying they're

1 displayed on the site with a particular URL that appears

2 to the user, and there are ads on the site that -- that

3 are rendered on the browser.

4          QUESTION:  So is that your answer?

5          ANSWER:  Yes.

6          QUESTION:  So then it is displayed on a

7 website?

8          ANSWER:  If you define it that way, yes.

9          QUESTION:  And would you define it in any

10 other way?

11          ANSWER:  So I think that -- I don't know

12 whether you're asking me the entering process, in which

13 case I think we need to be more precise about what is a

14 website.

15          QUESTION:  I'm asking you just -- I

16 thought it was a simple question.

17          ANSWER:  Yeah.  I am -- I am trying to --

18 I am trying to understand.  I -- it's just that we have

19 tried to be very precise about this earlier on this

20 display part, and I think I -- I'm just trying to

21 understand what question you're asking me.

22          QUESTION:  And I'm just asking sort of an

23 everyday Joe question.

24          ANSWER:  Uh-huh.

25          QUESTION:  And, you know, if my dad was

1  to come to me and say, you know, Jeremy, are ads by

2  Google displayed by websites, or if he was to come to

3  you and say, Ms. Lai, are ads by Google displayed on

4  websites, what would your answer be?

5              ANSWER:  So I would probably ask them,

6  what do you mean?

7              QUESTION:  Okay.  So it's not clear to

8  you what a website is in this context?

9              ANSWER:  I understand you're asking me

10  what somebody might ask me, but, I mean, you are asking

11  me as -- as a lawyer in the case, also, so I --

12              QUESTION:  Yes, ma'am.  I mean, I am a

13  lawyer, and I am in this case, but I'm just -- I'm just

14  really trying to find out if ads are displayed on

15  websites or they're not.  They either are or they

16  aren't, or you can't answer it.

17              ANSWER:  I don't think I can answer that,

18  because you're -- you haven't told me what is a website.

19  A website on an URL, as rendered on a browser, ads are

20  displayed on the page, yes.

21              QUESTION:  So if I'm going to

22  www.flowers.com, is that a website to you, flowers.com?

23              ANSWER:  Flowers.com is a URL.  That's

24  the trouble that I'm having, at the same time, very

25  precise about, you know, what -- what we ask customers

1    to input, and you are using the term website, and so I'm

2    just still having trouble.  People call website for

3    different things, right?

4                 QUESTION:  So you're saying the answer to

5    the question, whether an ad by Google is displayed on a

6    website depends on how one defines a website?

7                 ANSWER:  Yes, because that question means

8    different things, if you ask it differently.

9                 QUESTION:  Well, let's take a look at

10   what Google says about this.

11                I'll hand you what's been previously

12   marked as Exhibit 6.  Exhibit 6 is a screen shot from a

13   Google AdSense help file, correct?

14                ANSWER:  Yes.  And I -- I -- I just want

15   to be clear, I am not responsible for Google AdSense at

16   Google.

17                QUESTION:  I understand, but you would

18   agree with me that somebody at Google wrote this help

19   file, right?

20                ANSWER:  Yes.

21                QUESTION:  And let's look at the very

22   first sentence here.  Under the bold headline, What is

23   Google AdSense on Exhibit 6.

24                It says:  Google AdSense is a fast and

25   easy way for website publishers of all sizes to display

relevant, unobtrusive Google ads on their website's

content pages and earn money.

Do you see that?

ANSWER: Uh-huh, yes.

QUESTION: So Google is saying here, are

they not, that Google ads are displayed on publisher

websites, right?

ANSWER: So I think you are saying what

this page says, and I -- when you say Google says, I

don't want to say I know what Google says.

QUESTION: I'm sorry. Did you --

ANSWER: This is a help page that

explains what AdSense does, right?

QUESTION: Right. And you just told us a

while ago that Google -- somebody at Google wrote this

page.

ANSWER: Yes.

QUESTION: And it wasn't, you know,

somebody without authority from Google writing this

page, right?

ANSWER: What do you mean by authority?

QUESTION: Well, Google allowed this page

to be placed on its website help file, right?

ANSWER: Yes.

QUESTION: And so Google is saying here,

are they not, that Google AdSense is a fast and easy way

for website publishers of all sizes to display relevant,

unobtrusive Google ads on their website's content pages.

ANSWER:  Yes.

QUESTION:  Do you have any reason to

disagree with what Google's saying there in its screen

shots?

ANSWER:  I don't have reasons to

disagree.

(End of video clip.)

MR. TRIBBLE:  That concludes that

submission, Your Honor.

THE COURT:  All right.  Ladies and

Gentlemen, we're going to take our afternoon recess at

this time.  Take 20 minutes.  Be back ready to come in

the courtroom at 3:30.

Please remember my prior instructions,

and don't talk about the case.  Have a nice recess.

COURT SECURITY OFFICER:  All rise.

(Jury out.)

THE COURT:  All right.  On Mr. -- y'all

have a seat.

On Mr. Axe's deposition, what amount of

time is charged to the Plaintiff?

MR. TRIBBLE:  I have it here, Your Honor.

1        MR. GRINSTEIN:  Mr. Axe, for the
2 Plaintiff, was 19 minutes and 32 seconds.
3        To the Defendant --
4        THE COURT:  That's 20 minutes?
5        MR. GRINSTEIN:  Yes, Your Honor.
6        To the Defendant was 11 minutes, 48
7 seconds, 12 minutes.
8        THE COURT:  That's 12 minutes.
9        And for the other deponent?
10        MR. GRINSTEIN:  Ms. Lai?
11        THE COURT:  Ms. Lai.
12        MR. GRINSTEIN:  Ms. Lai was 6 minutes, 5
13 minutes, 47 seconds, if you're counting.
14        THE COURT:  Well, is that all for the
15 Plaintiff?
16        MR. GRINSTEIN:  Six -- oh, I'm sorry,
17 Your Honor.  Six minutes entirely to the Plaintiff.
18        THE COURT:  All right.  Be back at 3:30.
19        Court's in recess.
20        COURT SECURITY OFFICER:  All rise.
21        (Recess.)
22        COURT SECURITY OFFICER:  All rise.
23        (Jury in.)
24        THE COURT:  Please be seated.
25        Call your next witness.

1          MR. GRINSTEIN:  Your Honor, Plaintiff

2   calls Dr. Tom Rhyne.

3          THE COURT:  Dr. Rhyne, please speak into

4   the microphone and please keep your voice up, sir.

5          THE WITNESS:  Thank you.

6          THE COURT:  Proceed.

7   VERNON THOMAS RHYNE, Ph.D., PLAINTIFF'S WITNESS, SWORN

8                  DIRECT EXAMINATION

9   BY MR. GRINSTEIN:

10      Q.   Could you please state your full name for the

11  jury.

12      A.   Ladies and Gentlemen, my full name is Vernon

13  Thomas Rhyne, but as you just heard, I generally go by

14  Tom.

15      Q.   And do you have a Ph.D. degree?

16      A.   Yes, I do.

17      Q.   All right.  So I will refer to you as

18  Dr. Rhyne.

19      A.   Okay.

20      Q.   Where do you live, Dr. Rhyne?

21      A.   I live in Austin.  I've lived there almost 30

22  years.

23      Q.   Are you currently employed?

24      A.   Not on a full-time basis.  I'm retired as a

25  professor of electrical engineering from Texas A&M

1  University, although I live in Austin.  But I do a good

2  bit of this expert witness kind of consulting work as

3  part of my retirement.

4      Q.   Okay.  I want to ask you a couple of questions

5  about your resume.  First of all, do you have a book of

6  exhibits in front of you?

7      A.   Actually, I was provided with two big books of

8  exhibits.

9           MR. GRINSTEIN:  Your Honor, may I

10 approach?

11          THE COURT:  Yes.

12     Q.   (By Mr. Grinstein) Dr. Rhyne, I'd like to show

13 you what's been marked as Plaintiff's Exhibit 91.

14     A.   I have it.

15     Q.   Can you tell us what that is?

16     A.   It's the first page of about a 20 or so --

17 18-page resume that summarizes my work experience and

18 some of my technical background, the education that I've

19 had.  And at the first, it says a little bit about my

20 family.

21     Q.   I'd like to talk to you about your education

22 first.

23          Can you describe to the jury what your

24 education is?

25     A.   I went to high school in La Marque, which is a

small town near Galveston.  When I graduated there, as

it shows there, I went to Mississippi State University

and finished a bachelor of science degree in electrical

engineering in 1962.

I then went to work for NASA out in Virginia.

And while I was there, I enrolled in the University of

Virginia and completed a master's degree in electrical

engineering in 1964.  I was taking some classes on a

part-time basis.

After several years at NASA, I took

educational leave and went to Georgia Tech, and I

finished a Ph.D. there with a focus -- it says

electrical engineering, but my particular interest was

in what's today called computer engineering using

electrical engineering.  I used to build computers, so

it had both hardware and software in -- in my studies.

Q.    What did you do after you received your Ph.D.?

A.    I was offered an opportunity to teach at Texas

A&M, and I came back to Texas to College Station.  And

while I was there, I held a number of positions,

including starting the computer engineering program as a

specialty within the Electrical Engineering Department.

I've also taught at a couple of other places.  I was a

professor -- I was an instructor at Georgia Tech during

part of my time there.  And I've also taught as a senior

lecturer, the very top bullet there, at the University
of Texas after I moved to Austin in 1984.

Q. What kind of classes did you teach at the
University of Texas?

A. At the University of Texas, I taught two
graduate classes in what's called the evening school. I
was working full-time at a research company in Austin,
and there are a lot of other people who work full-time
at the technical companies there, like Motorola, IBM,
Texas Instruments. And employees there would like to
complete maybe a master's degree or a Ph.D.

So the University of Texas teaches classes
that start usually about 5:30 or 6:00 at night. So I
would finish my workday and drive down to the
university. The other students would do the same. And
most of my classes would be students who were full-time
employees somewhere else, and I taught high-speed
computer arithmetic, which is how to add, subtract,
multiply, and divide real fast, and I taught computer
architecture, which is the way you design the whole
computer kind of from the view of the programmer, not so
much -- a little bit down in the nuts and bolts and the
transistors and stuff. But really kind of the external
structure that the programmer sees.

Q. Now, you mentioned that some of your students

1    were in the industry -- excuse me -- in industry.

2    Have you ever worked in industry?

3         A.    In my career, I'm about 50/50.  I've worked

4    full-time at a number of places.  I mentioned NASA.  I

5    worked full-time for several years at Motorola in

6    Austin.  I worked about 12 years -- it's probably up

7    there -- at a company with a really long name.  It's

8    called the Microelectronics and Computer Technology

9    Corporation.  It's abbreviated as MCC several times in

10   that section of my resume.

11            It was a research company that was started by

12   a bunch of other companies that are American companies

13   who wanted to pool their money and some of their

14   employees who actually moved to Austin.  That's why I

15   moved to Austin.  And I directed an integrated chip

16   design group there for a number of years.  And the last

17   three years I was there, I was the Vice President in

18   charge of all the software development that was going on

19   at that company.

20            In addition, every summer I was at A&M. Almost

21   every summer.  I would move somewhere.  I'd take my

22   family and we would go to a fun place.  We went to

23   California; we went to Minneapolis, and I would work in

24   some industry there with the intent of knowing what's

25   really going on out in fields.

1    And that way when I came back and taught my
2  students at A&M, I had a better understanding of sort of
3  the actual practice of engineering instead of just being
4  overly theoretical.
5    Q.  Dr. Rhyne, have you written any papers or
6  written any books in the field of computer engineering?
7    A.  I have.  While I was at the University, I
8  published about 30 papers in what are called archival
9  reference journals.  I presented a bunch of papers at
10  conferences much like college professors do.
11    I also published a successful textbook that
12  was adopted around 30 or 40 universities both in the
13  United States and in the world, overseas.  It actually
14  won an award from the American Society for Engineering
15  Education, and it was titled Fundamentals of Digital
16  Systems Design.  It was an introductory course on the
17  basics of doing computer design.
18    Q.  All right.  Now, Dr. Rhyne, I think we've
19  heard discussion that that case involves the internet.
20    A.  Yes.
21    Q.  Can you explain to us any particular
22  experience you've got with the internet?
23    A.  I have -- I can, I guess.
24    Actually, I started working with the internet
25  before it was the internet.  The predecessor to that was

a communication system developed by the United States

Department of Defense.  It was called ARPANet, and that

stood for the Advance Research Projects Agency

administered out of Washington, D.C.

And if you had a research contract with the

Department of Defense, you were authorized to be able to

connect to that communication system.  So it wasn't open

like today's internet is, but it was strictly originally

set up for people doing research under funding from the

DOD.

And I brought ARPANet to A&M.  We had some

researchers there who were doing DOD research.  And then

when I moved to Austin to work for MCC in 1983, we -- I

sort of bootlegged off the University of Texas an

ARPANet connection, and they agreed to let us come in

through it because we were doing Department of Defense

research as well.

And I've continued to do research and use the

internet since that time.  Also, I mentioned that I

directed the software development at MCC.  One of the

projects that I didn't actually direct but I directed

all the testing of the results was a program called

EINet.  That stood for Enterprise Integration

Networking.

And it was a business development program, and

it put together one of the first internet browsers.  It

was named Galaxy.  It spun out and hasn't been nearly as

successful as companies like Motorola -- excuse me --

like Microsoft or Netscape, but it was an early web

browser.  And they also developed what's called a

crawler, which is a piece of software that goes out

around all the different places.

It would be kind of like having somebody drive

around the town and look around and say where are all

the restaurants.  It goes out on this big network and

looks for places that might have interesting

information.  I was responsible for all the testing for

that for a couple of years.

Q.   Dr. Rhyne, have you won any awards for your

engineering work?

A.   A few.  I guess the two that I personally

consider the most significant are awards that came from

my peers in my profession.  In 1980, I was identified as

the Outstanding Young Electrical Engineering Educator in

the United States by the American Society for

Engineering Education.  I was teaching at A&M at the

time.

And I think in 1990, I was selected by the

IEEE as a fellow, which is the highest level of -- of

honorary membership that that society offers.

Q.   What is the IEEE?

A.   It's the Institute for Electrical and Electronics Engineers.  It's the largest professional society in the world, because it's international.  And it's the professional society for electrical engineers, a variety of scientists who work in that general area, and also for computer scientists, although there is another society called the ACM that's also very successful and popular for computer sciences.

Q.   Did the IEEE cite any bases for giving you the fellow status?

A.   They did.  They always give you what they call a citation.  And mine says for my contributions to computer engineering and computer engineering education.

Q.   And what's your current status at the IEEE?

A.   I'm what's called a life fellow.

Q.   How do you get to be a life fellow?

A.   You don't die.  If the number of years you were a member of the IEEE, and I date back to 1962, and your age equals a hundred, you become a life member.  And they offer you the opportunity not to have to pay dues anymore, but I usually do.

Q.   Do you have any professional registrations?

A.   I have two.  I'm a registered professional engineer as an electrical engineer in the state of Texas

and have been since the 1960s.  And I'm also what's

called a registered patent agent.

Q.   What's a patent agent?

A.   Okay.  I have to explain that often.

If you're an inventor and you have an idea for

something, like Mr. Dean and Ms. Stone, it's a

complicated process to go through all the back and forth

and write all the papers and file all the forms and have

those interviews and things.

You generally seek someone to provide

assistance to you.  And if -- if you go to the -- to the

United States Patent Office and take a test that they

offer every year, if you pass that test and it covers

all the procedures that one goes through to get a patent

in the first place -- if you pass it and you're an

engineer or scientist, you're called a patent agent.

If you're an attorney, and I'm sure there's several in

this room, you become a patent attorney.  But that means

you have either a science or engineering degree as an

agent or a law degree as a patent attorney, and you've

passed that test.

And I took it and passed it, I guess, about 10

years ago.

Q.   Now, did you prepare a report in this case?

A.   I've actually prepared two reports.

Q.   And are you being paid for your work as an
expert in this matter?

A.   I am as is typical for all people who work as
testifying expert witnesses.  I'm being paid by the
hour, an hourly rate.

Q.   Does how much you get paid depend on what
happens in this case?

A.   No.  I get paid exactly the same amount either
way that this case turns out.

MR. GRINSTEIN:  At this point, Your
Honor, we'd move to qualify Dr. Rhyne as an expert in
computer engineering and computer science.

MR. VERHOEVEN:  No objection.

THE COURT:  All right.  The Court and
jury will hear his opinion.

THE WITNESS:  Thank you, sir.

Q.   (By Mr. Grinstein) Dr. Rhyne, there's been a
lot of technical jargon that's already come out in this
case, and I just want to make sure we're all on the same
page, so I'd like to do just a real short internet 101.
And I don't think -- we're not talking about the claims
of the patents.  We're just talking about what the
internet is, so can you describe to the jury what is the
internet?

A.   Let me take just a few minutes.  It was

interesting.  I was trying to think about it.  If my mom

were sitting here, were she still alive, I think she'd

be having a little trouble with some of the terms.  My

grandson wouldn't be having any trouble at all.

        But let's just start with the internet.  The

internet is this worldwide connection of computers and

communications linkages.  People ask who pays for it;

kind of everybody pays for it.  There's no particular

agency that funds it.

        But a lot of different computer facilities are

willing to let communications come in, figure out what

to do with them, and send them on.  And so it's like a

big spider's web of communications and computer

equipment.

        The next thing that I think you've been

hearing a bit about are websites.  When the first

development ideas came out about putting together this

network, one of the terms that was coined -- actually, I

think in France or somewhere -- was the worldwide web.

They were using that spider web idea.  And in fact, www

is the term you see in front of lots and lots of

addresses on the internet, and that stands for the

worldwide web.

        Now, a website is a place on the internet

where you can go and see information, and it's -- it's

identified at the lowest level with a number much like a
phone number.  And we have area codes and, you know,
seven digits here in the United States.  Some places
they have eight digits for bigger areas.

But sort of on top of that number, there are
these terms that you can understand a little better.  I
heard the phrase www.flowers.com.  The com means it's a
commercial institution.  We've got a lot of other little
things that go in, like org for organizations and things
like that.

But when somebody talks about a place on the
web or an internet place, they're talking about
something you can go and seek out and get information
from.  And the way you tend to seek it out is on a
computer or nowadays on a cell phone.

You can have an application program that's
called a browser, and that browser is a piece of
software that knows how to go out onto this internet and
look for a particular place or a location and bring it
back and put it on your screen.

And typically, what you'll see on the little
phone or the big screen like this is text and graphics
and animation and maybe you'll get sound; you can read
your mail; you can check your bank balance, all those
kinds of things.

1        So we're talking about websites on the

2   internet.  And you'll hear some discussion in my own

3   remarks about browsers, okay?

4        Q.    Okay.  With that behind us, let me ask have

5   you been asked to provide an opinion on the issue of

6   infringement in this case?

7        A.    Yes.

8        Q.    Have you also been asked to provide an opinion

9   on the issue of validity?

10       A.    Yes.

11       Q.    Are you going to provide that validity opinion

12  today?

13       A.    No.

14       Q.    When will you be providing that opinion to the

15  jury?

16       A.    I expect to do that after the witnesses for

17  Google testify about the issue of whether the patents

18  are, in fact, valid over the prior art or not.

19       Q.    And why are we hearing you on validity again

20  later?

21       A.    Because the burden of proof for validity or

22  invalidity, as Google will assert, as I understand it,

23  lies with Google.  And my responsibility will be to do

24  what's called rebuttal, if -- if after I hear those

25  opinions, I have different opinions.  And I will explain

1  those at that time.

2      Q.   So this is part one of your testimony?

3      A.   This is the part for which Function Media

4  bears the responsibility to prove.

5      Q.   And, again, just so we're clear with the

6  terminology, can you describe to the jury what it means

7  to infringe a patent -- the understanding you applied in

8  this case?

9      A.   I will be very careful about this answer,

10  because the person who will explain to you what the law

11  of infringement means is not me.  It will be Judge

12  Everingham.

13          But in forming my opinions, the way I have

14  looked at it is that we'll be looking at claims and

15  somebody characterized the claims as a deed to a piece

16  of land.  Some advantages about that; there's a little

17  bit of disadvantage.  That's not always the perfect

18  analogy.

19          But if there is a claim and it has a certain

20  scope of coverage and somebody either has a system or

21  sometimes you can have -- we'll see one -- a claim on a

22  method of doing something that falls within that scope

23  and they either sell or offer to sell or make or use

24  that system or method, then as I understand the law,

25  they have infringed that claim.

1    Q.   And just so we're clear when you're discussing

2 infringement, you'll be discussing the claims of the

3 patent?

4    A.   I will deal with the claims and -- and the

5 meanings of the terms in the claims in relation to what

6 I have learned in my study happens with the Google

7 system.

8    Q.   Can you explain briefly to the jury what's the

9 difference between the claims of a patent and the

10 specification of a patent the understanding you applied

11 in this case?

12    A.   Okay.   I probably can do that quickly, because

13 it's been done sort of a couple of times.   But if we

14 could bring up Exhibit 1, which is the '025 patent.   I'd

15 like to spend a minute or two just talking about it.

16 I believe the jury may have a copy of it, but we'll put

17 it on the screen.

18         MR. VERHOEVEN:   Your Honor, may I

19 approach the bench briefly?

20         THE COURT:   Yes.

21         (Bench conference.)

22         MR. VERHOEVEN:   I don't have any problem

23 with this witness' testimony, except I don't think it's

24 appropriate for him to go on long narratives.   This

25 should be a Q-and-A process.

1          MR. GRINSTEIN:  He's only said one

2    sentence so far.

3          MR. VERHOEVEN:  Well, I know, but in the

4    background he's been going on and on about -- basically

5    giving a lecture without any Q and A.  And this should

6    be a Q-and-A process.

7          THE COURT:  Well, it needs to be done in

8    question and answer, but it's direct examination now.

9    The first witness, the inventor, when he was going

10   through that -- that software video that he had, did not

11   proceed in Q and A.  But there was no objection.  I'm

12   going to give him some latitude to explain on direct,

13   but, you know, when you get a breaking point in his

14   answer, follow up with the next question.

15         MR. VERHOEVEN:  Yes, Your Honor.  I don't

16   want to interrupt unnecessarily, or should I object if I

17   feel it is going on too long?

18         THE COURT:  Well --

19         MR. GRINSTEIN:  You can kick me.

20         MR. VERHOEVEN:  I'll kick you?

21         THE COURT:  Object if you feel that it's

22   necessary.

23         MR. VERHOEVEN:  Okay.

24         THE COURT:  And I'll get involved, but

25   follow the instruction.

1          MR. GRINSTEIN:  Thank you.

2          (Bench conference concluded.)

3      Q.   (By Mr. Grinstein) So, Dr. Rhyne, I think you

4  have in front of you the '025 patent.  And can you

5  describe for us what you see on the first page of this

6  patent as it relates to your understanding of the

7  specification?

8      A.   All patents that I've had any exposure to,

9  certainly recently issued patents, Ladies and Gentlemen,

10 look about the same on the first page.

11         And if I can do this, I have a little tremor

12 that I've developed in my old age, but I'll try to do

13 this.  There's the number of this patent.  This is the 7

14 millionth, 240 thousandth and 25th patent issued by the

15 United States Patent Office since it was formed many,

16 many years ago.

17         We'll refer to it as the '025 patent, just

18 using the last three digits.  It's already been done

19 that way several times.

20     Q.   What day was it issued?

21     A.   It was issued on July the 3rd of 2007.  Just

22 for your interest, it's always a Tuesday.  They issue

23 all patents in the United States on Tuesdays, kind of a

24 historical characteristic that happened back in the

25 beginning days.

1    Q.    What do we see on the left side?

2    A.    Okay.  On the left side, we've got the United

3 States patent, okay?  And you can see it's been issued

4 to Stone and others.  You've already heard from Mr.

5 Dean.  It's my understanding that you'll hear from

6 Lucinda Stone.

7    Q.    Okay.  And then what follows after this first

8 page?

9    A.    There's some -- some -- some important

10 information about when it was filed.  This particular

11 application was filed -- we need to go up just a little

12 bit higher, Matt.

13          Okay.  Right there.

14          Okay.  This was filed on September the 30th,

15 but because of formalities at the Patent Office and the

16 fact that this is a continuation, it actually has the

17 right to reach back to an earlier filed application that

18 was filed on January the 10th of 2000.  That's what's

19 called the priority date, as I understand it.

20    Q.    Okay.  And then what -- turning away from this

21 first page, what are the pages that follow?

22    A.    Immediately thereafter, although there's an

23 intermediate page with some documents on it, there's all

24 these drawings.  And Mr. Dean went through those,

25 Mr. Grinstein, and I think he said, as is shown, that

there are 35 of these.

Some are system diagrams and some are flow charts.

Q.   What comes after the drawings?

A.   Then comes what's commonly called the written part of the specification or the written description. And you can see that it's shown in two columns.  That's always the case.

And the columns have numbers like 1 and 2, and there are always numbers down the middle.  So if I wanted to refer to that line right there that says related to automated media creation and publication, I would say that's Column 1, Line 15.

And we may do some of that as we go through, or it may have with other testimony.

Q.   And what follows after this specification section?

A.   Eventually, you reach a point where the claims start.  And in this patent, it's on Column 64, which -- and you will always see a sentence that says something like we claim, or if there's only one inventor, I claim. Or in this case, they use the phraseology what is claimed is.

And from that point on to the end of the patent are numbered paragraphs, some of which will have

indentations that make up each and every one of the

claims.

     Q.   All right, Dr. Rhyne.  As part of your work in

this case, have you had the opportunity to review how

Google's products operate?

     A.   Yes, I have.

     Q.   And what materials did you review to gain that

understanding of how Google's products operate?

     A.   A large number of documents that were produced

by Google as part of the litigation and also documents

that were found originally on the internet.

          You saw some of them being discussed during

those clips that we played a little while ago for the

depositions.

          I've also reviewed the other depositions for

other individuals from Google besides the two that we

saw.  I have studied the software, at least portions of

it that has been made available.  It's a highly

confidential, highly valuable piece of property that

Google has.  I have looked at that.

          And I've also been given the opportunity by

Google to participate as if I were an advertising

seller.  They gave me an account and let me go in and

make an ad and put it in.  We were very careful to not

let it accidentally show up on somebody's website and

have somebody click on it and want to come buy something from me.

But I also served as a publisher, what's called an internet media venue in the claims, and successfully specified a set of constraints on what I wanted my ads to look like on my website. And then I actually successfully got my ad to show up on my publisher website.

Q. And after looking at all those materials, what is your opinion on the issue of infringement in this case?

A. I believe that -- that Google infringes several of the claims of the '025 patent and one claim of the '059.

Q. Okay. We're going to get into the specifics of that later in great detail. But let me first ask you about the difference between independent claims and dependent claims.

A. Okay.

Q. And so if we can, can we take a look at this first demonstrative. What are we looking at here, Dr. Rhyne?

A. This is the first claim in the '025 patent.

Q. And what kind of claim is it?

A. It's an independent claim.

1    Q.   Why do you say that?

2    A.   Well, you can see in the first paragraph of

3  this claim there's no reference to any other claim.  It

4  sort of starts out on its own:  A computer system for

5  creating and publishing.

6          And that's what an independent claim is.  It

7  doesn't make reference to any other claim in the '025

8  patent.

9          MR. GRINSTEIN:  Can we take a look at the

10  next demonstrative, Matt?

11    Q.   (By Mr. Grinstein) And, Dr. Rhyne, this

12  demonstrative entitled Claim 20, can you tell us what

13  you see here?

14    A.   Let's start with the lower claim, which is

15  not, as I understand, it's not actually being asserted,

16  but it's in the root from Claim 1 to Claim 20.

17  And what it says -- you can see in its very first line

18  that it makes reference to Claim 1.  So it says:  The

19  computer system of Claim 1 wherein the second interface

20  is the self-serve interface.  So it's a dependent claim.

21  It says to infringe Claim 6, you have to infringe Claim

22  1.  And if you do, you also have to do this other thing.

23  And then if you do that as well, you infringe Claim 6.

24  And then when you go up to Claim 20, it says the

25  computer system of Claim 6, and that means you don't

even get to Claim 20 unless you infringe Claim 1 and

infringe the extra limitation of Claim 6.  And then you

have to do the extra thing added by Claim 20.

Q.   So when you analyzed infringement of say Claim

20 in this case, what claims did you have to analyze?

A.   I started with Claim 1, and having found

infringement there, as I will explain, I then looked at

the additional limitation of Claim 6, and I found

infringement there, and that led me to Claim 20, and

then I looked at the limitation of Claim 20 on top of

that pile of other claims.

Q.   Okay.  Let's get some more background behind

us.

In these claims, I see some technical terms,

some jargon, things like that.  What did you do to

inform your understanding of what the terms in those

claims mean?

A.   I did four things.

Q.   Okay.

A.   Okay.  First, there were some terms that the

parties discussed amongst themselves, Google and

Function Media and their attorneys.  And they agreed on

a definition.

If you hear somebody -- and I may say it -- a

construction or meaning.  They agreed that this term is

going to mean that. And Judge Everingham agreed with

their agreement. And so for some terms, we had what are

called agreed-upon definitions.

As you might expect, for other terms, there

wasn't any agreement, okay? In that case, they were

submitted to Judge Everingham, and he came up with the

definition, and he issued what's called an opinion.

And in that opinion, he went down other terms

and said, okay, when you look at this term, this is what

it's going to mean. And you have a glossary of the

terms, I understand.

I think somebody made reference to it earlier

today. Those are the summation of the agreed-on terms

and the terms that Judge Everingham specified meanings

for.

Q. So what are the -- those sound like the ways

that the Court -- that the parties have defined the

terms.

Were there other ways that you looked at for

term meaning?

A. Yes. There were some terms still left over,

okay? And the patent itself provides a glossary, a set

of internal definitions sort of acting as its own

dictionary.

If you go to Column 7 at the bottom of that

1   column, around -- I guess it's about Line 63 -- there's

2   a heading that says patent application glossary, and

3   there are a bunch of other terms.  And for a few of the

4   terms that turned up in the claims, I didn't have an

5   agreed-on definition, and I didn't have a definition

6   from Judge Everingham.

7          And a good example of that is the term

8   database.  And it appears right at the bottom of

9   Claim 8, and I used in that case the definition

10  that's -- that's put right there in the patent as to

11  what the patent meant when it talks about a database.

12      Q.   What if you couldn't find a definition in any

13  of those places?

14      A.   I didn't have many of those, but if anything

15  like that came up, I used what would be considered the

16  ordinary and customary meaning to someone who is skilled

17  in this art, somebody who understands computers and the

18  kinds of things that we're talking about here.

19          And those were the four things that I did.

20      Q.   Now, the two patents at issue in this case,

21  the '025 and the '059, I think as we discussed, issued

22  from the Patent Office in July of 2007.

23          So what is your opinion about how long Google

24  has been infringing the claims of those patents that

25  you've analyzed?

1    A.    Well, based on my study of the Google systems

2 and my reading of the testimony of the deponents for

3 Google and certain documents that provided timelines, I

4 believe that the infringement that Google has done

5 starts with that issue date of -- in July of 2007.

6    Q.    Okay.  Let's spend some time analyzing the

7 first claim in this case that we're going to talk about

8 which is Claim 1 of the '025 patent.

9    A.    Okay.

10    Q.    Do you see that up there?

11    A.    I do.

12    Q.    And I want to just discuss with you some of

13 the general structure of the claim, what's going on in

14 it.

15         But I just want to be clear, when we're

16 talking about the claim, we'll be talking about it

17 later, will you apply the Court's definitions and the

18 agreed definitions and those other things that you've

19 discussed?

20    A.    I did that in my report, and I will do that

21 faithfully during my testimony here.

22    Q.    Okay.  So what we're going to do right now is

23 just a high-level summary.  And I want to ask you,

24 looking at that claim, what are the different entities

25 that are at least discussed in the claim?

1    A.    Well, the claim is for a computer system,

2 okay?  But it deals with sellers, which is one entity.

3 That would be also what we would call advertisers.

4 It deals with publishers, okay?  But the way it refers

5 to publishers in the terminology of the claim is as a

6 three-word term:  An internet media venue.  And the

7 Court's given us a definition of that, and we'll look at

8 it.

9          But we've got people who want to sell

10 something, people who have the capability of showing an

11 advertisement for that seller, and then in between them,

12 we have this last part here, which is a computer

13 controller, which is the computer system that takes the

14 information input by the seller and what are called

15 presentation rules -- we'll get into that more

16 specifically -- from the publishers or internet media

17 venues, and kind of munches it together to produce -- at

18 the bottom, it says -- the very last four lines:

19 The electronic advertisement is displayed on each of the

20 one or more selected internet media venues in compliance

21 with the presentation rules of the internet media venue.

22    Q.    Okay.  And I want to discuss the structure of

23 this claim a little bit with you.

24          This first part up here right after the Number

25 1, that paragraph, what is that?

1    A.   That's called the preamble.  It's just the

2  introductory part of the claim.

3    Q.   Okay.  And then these parts that follow

4  afterwards, these indented paragraphs, how are you going

5  to refer to those?

6    A.   I'll refer to those as elements or

7  limitations.  They -- they set forth what the claim

8  covers.

9    Q.   Okay.  Now, as far as the preamble is

10 concerned, you see it's a computer system for creating

11 and publishing.

12         Can you just summarize what you've seen there?

13    A.   Well, it's a computer system for creating and

14 publishing customized electronic advertisements for a

15 seller to the internet media venues owned or controlled

16 by other than the seller.  That's just what it says.

17    Q.   This phrase, owned or controlled by other than

18 the seller, what's that referring to in your

19 understanding?

20    A.   Okay.  What's excluded by that is -- is when

21 an internet media venue, a website, shows advertisements

22 for its own company.

23         For example, if you go to cnn.com to check the

24 news, you might see an ad down on the bottom for Wolf

25 Blitzer's show, which is on CNN.

        Or if you go to Fox, you might see -- I can't
remember the lady who does all the crime stuff.  They
advertise their own products on that -- on that website.
That's not what this claim covers.  You have to be
looking at advertisements that are put on a web screen
when you look at it for somebody other than the person
who's putting up the web.

        So when we talk about flowers.com, that's a
place where you can go buy flowers.  But if they also
show you an ad, for example, for people who make pretty
glass vases that they don't make, but they'd like you to
take a look at, because they'll get paid a little bit if
you look at that ad, then that's what we're talking
about here.

    Q.   Okay.  The first element of the claim talks
about a first interface.  And I think first interface is
a defined term in this case, but for our purposes here,
can you just describe to the jury what -- what is an
interface for purposes of computers?

    A.   Well, I've got a very precise definition for
you, but if I -- if I just -- kind of what you just
casually say, it's a place where you can get into and
out of, get information from and put information into a
computer program.

        It's software that lets you interact in some

way either by seeing something or sending something in
to the computer.

    Q.   Now, in the language of this first element of
the claim, what do these internet media venues do at
that first interface?

    A.   Well, the interface must prompt them -- and
we'll talk about that word -- to input what are called
presentation rules for how the electronic advertisements
will be displayed on those internet media venues, those
websites.

    Q.   Can you give an example of a presentation
rule?

    A.   Sure.  Color.  I think in the opening
Mr. Tribble showed you a UT burnt orange website.  And
to be politically correct, he showed you a maroon A&M
website.  Well, that's a good example:  Color.

        Other examples are the font.  If that -- a
typeface, whether it's going to be italics or exactly
what the characters are going to look like, how big they
are, things like that are what the presentation rules
will be.

    Q.   Okay.  Following the claim down to the next
limitation element, what happens to this information
once it's in -- input by the internet media venues?

    A.   It's stored away so it can be used later, and

the term that the claim uses is a database, and we'll

deal with the specific definition that the patent itself

provides.  It provides a very broad definition.

I think I heard Mr. Dean use that terminology

earlier for what a database is.

Q.   Okay.  This next element of the claim, can we

call that the seller interface?

A.   Absolutely.  I think I've already heard one of

the attorneys for Google refer to it that way.

Q.   And can you explain what the claim says a

seller is prompted to do at the seller interface?

A.   Two things, okay?  They're prompted to input

information, to select one or more internet media

venues.  So it's information to select where you'd like

your ad to go, if you can get it there.

And the second thing, they're to input

information to create an electronic advertisement for

publication to those selected internet media venues.

Q.   Let's talk about the information to create

first.

Could you give us an example of what

information to create might be?

A.   Okay.  I think I have an example of that, if

we just -- I just made up one, okay?  If I'm going to be

a seller and I'm going to sell caps, okay, here's

1  information to create an ad.  It's not really an ad yet,

2  because it's not exactly the way it might show up on a

3  website, but it's just some text.

4         My daughter, who was in the advertising

5  business, would say collateral.  It's just some words

6  that are supposed to relate to Tom's Cap Store, and I'm

7  just hypothesizing that maybe I sell what are called

8  give-me caps, just little caps that might have a logo

9  for a football or a baseball team or a business or

10  something on them, and they're the best.

11         So that's information that will be used

12  downstream to create the ad, but it's been customized to

13  me because it's my got my name and my caps, and in

14  reality, it probably would have a website address where

15  you would click to go find out more about my business.

16  But that's what is information to create.

17     Q.   Okay.  Following along with this hypothetical

18  of Tom's Cap Store, what information to select might you

19  be prompted to enter?

20     A.   Well, an example is, let me pick a place I'd

21  like to have it go.  I'd like to have it go specifically

22  to some baseball website that I found, like maybe the

23  sportingnews.com or something.

24         Or I could put in terms that I think relate to

25  websites, sometimes called key words, where I would say,

1  if you've got some websites out there that tend to focus

2  on baseball or tend to focus on football, that would be

3  another place I might want to put one of these ads.

4        It would be worth my while to potentially

5  invest some money in having that ad show up and be

6  clicked on on those websites.

7        Q.   Okay.  Following the logic of the claim, after

8  we have been at the second interface and there's been a

9  prompting to input, what happens to that information?

10       A.   It's stored.

11       Q.   Okay.  And then in the final element of the

12  claim -- it's a long one -- but using the examples that

13  you've already discussed, could you put it all together

14  for us?

15       A.   Okay.  Well, what this says is that we've got

16  a computer controller, and it's going to do two things.

17  It's going to process and then publish the electronic

18  advertisement to one or more of these places, okay?

19       And it will make sure that the processed and

20  published ad is in compliance with the rules of wherever

21  it's going to go up.

22       Q.   And have we created a demonstrative to sort of

23  show --

24       A.   We have.

25       Q.   -- what happens with your cap ad?

1    A.   I did, okay?  And I had a maroon one, but we

2   decided we just don't have time to do it.  So here's --

3   here's where I -- we found a website that's pretty much

4   UT-oriented.  It's www.mackbrown-texasfootball.com.  I

5   mean, this must be where people who are enamored with

6   the UT football team go.

7            And you can see lots of planning here.

8   They've got the Longhorn logo.  They've got a picture of

9   Colt McCoy, the Manning award here.  They've got all

10  this stuff.

11           But then if they provided a space for

12  advertisements to be shown, they -- let's say they

13  specified a rule that I want the headline for any ads

14  put on my website to be in burnt orange text.

15           So if you remember, I just entered:  Buy Tom's

16  caps.  I might have entered a headline Tom's caps, but I

17  didn't specify burnt orange.  I didn't specify that my

18  return address here -- it's kind of hard to see -- but

19  it's in green.

20           That's making my ad be in compliance with the

21  rules that mackbrown-football.com specified to allow an

22  ad to show up on their website.

23    Q.   And just to be clear,

24  mackbrown-texasfootball.com, in the language of the

25  claim in your example, what is that?

1          A.    That is an internet media venue.

2          Q.    Okay.  Now, we've been talking about here this

3   morning -- or this afternoon -- excuse me -- about Claim

4   1 of the '025 patent.

5                Are there other claims of the '025 patent that

6   you're going to analyze for us today?

7          A.    There are seven other claims.

8          Q.    And we'll talk about the specifics of them

9   later?

10         A.    There's one other independent claim, and there

11  are six claims that depend on Claim 1, and one claim

12  that depends on Claim 179, which is the other

13  independent claim.

14         Q.    But we'll get there later?

15         A.    You bet.

16         Q.    Then let me ask you some really quick

17  questions about the other patent in the case, the '059

18  patent.

19                And I think we've got up here '059 patent,

20  Claim 1.  And just very briefly, can you describe how

21  this '059 patent, Claim 1, differs from the '025 patent,

22  Claim 1, you just did five minutes ago?

23         A.    Yes.  It adds what's called a third-party

24  professional.

25                So the first party is the seller; the second

party is the internet media venue or publisher.  This is
a third-party professional who will manage, create, and
publish customized electronic advertisements.

This is someone who maybe is in the
advertising business.  They're not selling caps.
They're not putting up a website for football fans, but
they go out and find people who need help in
advertising, and they say:  Look, let me work with your
ad.  I'll help you get it up in the right places.

Q.   And how do the interfaces in this claim
differ?

A.   There's a first that's the same as before.
There's a first database the same as before.  Second
interface, it's a little different, and we'll deal with
that.  There's a second database that stores a little
bit different set of information.

And then we come down, and what's new here,
primarily, is a third interface to the computer system
through which the third-party professional is prompted
to input information to select and information to
create.

There's a third database for storing that
information.  And then we hit the computer controller.
So it just adds this third guy.

Q.   Okay.  Let's switch gears --

1    A.    All right.

2    Q.    -- and talk about Google for a second.

3    A.    Okay.

4    Q.    And let me show you the next demonstrative.

5  Up here, I think we've got a picture that we've seen

6  already today.

7          What are we looking at?

8    A.    This is a website, an internet media venue,

9  known as -- I think it's www.cheese.com.

10   Q.    People who really like cheese?

11   A.    It's for cheese-o-philes.  I guess you would

12 say people who want to know cheese by name and cheese by

13 countries.

14         And so this would be a place where if you

15 really, really, really like cheese.  I mean, I've seen

16 stores that are devoted just to cheese.  I'm sure you

17 may have.  That's where you would go, to cheese.com, and

18 it would tell you a lot of stuff about cheese.

19   Q.    And what do you see over on the right side of

20 cheese.com website?

21   A.    Well, what we've got here -- by the way, this

22 was taken right off of a web browser picture on a

23 computer.  This is real, okay?

24         You can see it says sponsored links, Ads by

25 Google.  So the people who operate cheese.com went into

a relationship with Google, were accepted as one of the

publishers for Ads by Google.

And you can see here four advertisements --

that's called an ad unit in Google terminology -- that

have been placed on the right-hand side as a result of

this relationship between cheese.com as a publisher

and -- and Google as an advertising facilitator.

Q.   What Google software program did cheese.com

most likely have used to enter into that relationship?

A.   Most likely one -- and there are two terms

that sound a little bit alike, but we've got to be

careful:  AdSense, S-E-N-S-E.

Q.   Okay.  And these ads over on the right side,

what Google software program did they likely use in

order to have their ads displayed on cheese.com?

A.   It's another Google service called AdWords.

Q.   Okay.  Now, in reaching your conclusions in

this case, which we're going to talk about, did you

experiment at all with the Google system?

A.   I did.  I mentioned earlier that Google

provided an opportunity for me to use AdWords and

actually create and submit an advertisement and to use

AdSense and actually enter publication rules and then

have that advertisement show up on the website that --

that I had used as if I were cheese.com.  We just had a

1   different one.

2      Q.   And did you record the results of your

3   experiments?

4      A.   Yes.  We used a computer program that as I

5   moved the mouse around and did the things on the screen,

6   it actually captured it as a movie.

7      Q.   And I've got in my hand this DVD, Plaintiff's

8   Exhibit 24.  Is this what you recorded the results of

9   your experiment on?

10      A.   Yes, it is.

11      Q.   Okay.  Are we going to be talking about clips

12   that you prepared in PX24?

13      A.   Right.  We'll go into it and pull out little

14   pieces that I think will help me explain my

15   understanding of how the Google system operates.

16      Q.   Okay.  What we're going to do now is start

17   talking about the claims of the '025 patent.

18          And, first of all, let me show you this

19   demonstrative.  Can you tell us what this demonstrative

20   is telling us?

21      A.   Those are the eight claims that -- that I will

22   be discussing.

23          Claim 1, we've already looked at very briefly.

24   It's an independent claim.

25          I showed you that between Claim 1 and Claim

20, there's a claim that really is not being asserted

for infringement.  That's Claim 6.

But we will get to Claims 20, 37, 52, 63, and

90, as 20 through 90 are dependent claims that depend on

Claim 1.

And then we will also look at Claim 179, which

is a different type of claim, and -- and it has one --

one dependent claim, 231.

Q.    Now, are there two main Google products that

you have analyzed for infringement in this case?

A.    Yes.

Q.    What are those products?

A.    One of them Google refers to as AdSense for

Content.  I think you heard it referred to as AFC in one

of those demonstrative -- clips that was played a little

while ago.

And then there's a second product that's

called AFM, which is AdSense for Mobile Phones.  And I

will talk about it as well.

Q.    I didn't hear you mention AdWords.  Is AdWords

part of your infringement analysis in this case?

A.    Absolutely, yes, it is.  It's just that Google

refers to the system that uses AdWords for the sellers

to input the information to create and the other

information to select as AdWords.

1          But when they talk about the composite between

2   the sellers and the internet media venues, they just

3   call that system AdSense for Content or AdSense for

4   Mobile.  But AdWords is part of my infringement

5   analysis.

6       Q.    Okay.  I want to start our discussion today

7   about the AdSense for Content product, and we will talk

8   about AdSense for Mobile a little later.

9          Is that okay?

10      A.    That's perfectly fine.

11      Q.    Let me show you the next demonstrative we

12  prepared in this case, and can you just describe what

13  the structure of this is?

14      A.    I -- I had a table made to break out all of

15  the pieces of the claim.  And some of -- one of you said

16  earlier to the jury that in order to infringe a claim,

17  you have to infringe everything.  It's all or nothing.

18  And so this is a -- kind of a demonstrative aid that

19  will allow me to deal with each of the pieces of Claim

20  1, and then I will show why I believe that the Google

21  system meets each of them.

22          And at the end, I will offer an opinion that

23  because the system meets each of these pieces, it

24  infringes Claim 1.

25      Q.    Now, up at the top, we have what you described

earlier as the preamble; is that right?

A. Yes.

Q. In analyzing whether Google meets the discussion or the definitions of the preamble, did you apply any definitions that either this Court has supplied or the parties agree to?

A. There are several here that have either been agreed to or the Court has set forth.

MR. GRINSTEIN: Next demonstrative, please.

Q. (By Mr. Grinstein) First, we've got a definition of the word publishing that the Court provided. Did you apply that?

A. I absolutely did.

Q. Next, we've got a definition of the word seller. Did you apply that?

A. I read that thing, and I said, I can't imagine anybody that's -- that's -- other than -- I mean, it's so complete in finding every possible seller, I was just impressed with it, and I did. I did.

Q. And next, we've got claim term internet media venues. Did you apply that?

A. Yes.

Q. Now, the internet media venue agreed construction starts internet locations, and then it says

 1 where presentations, and it's got some other

 2 information.

 3          What is an internet location?

 4     A.   Cheese.com; mackbrownfootball.com.

 5     Q.   So is that an internet location --

 6     A.   Yes.

 7     Q.   -- that we're looking at right now?

 8     A.   Yes.  It's what you see when you point your

 9 browser at one of these websites, and you get

10 information that is available to you at that location,

11 that that's what the Court's construction identifies.

12     Q.   Okay.  So let's go to the claim chart we've

13 got here again, and the first term I see in the preamble

14 is a computer system.

15          Do you see that?

16     A.   Yes.

17     Q.   Do you understand that there's any controversy

18 or dispute in this case as to whether Google operates a

19 computer system?

20     A.   I think there's no controversy, based on

21 something that I've seen, that Google has said about

22 themselves.

23     Q.   Now, in the course of reviewing materials in

24 this case, did you review something called admissions?

25     A.   I did.

1   Q.   And just give your understanding that you

2   applied as to what admissions are in a lawsuit.

3   A.   Well, in doing this kind of work for nearly 30

4   years, I've learned that in a litigation, such as this,

5   each party has the right to submit questions to the

6   other party, and the other party is required to provide

7   an answer in writing that someone at that other party --

8   some official will say, yeah, that answers -- is what

9   the answer is.

10   Q.   Okay.  Let's look at the next demonstrative.

11   And this is Function Media's Request for Admission

12   No. 1.

13   A.   Uh-huh.

14   Q.   And Function Media asked Google:  Admit that

15   Google operates a computer system that creates

16   advertisements referred to as ads by Google.

17          And what did Google respond?

18   A.   They responded:  Google admits that AdSense

19   runs a computer system.

20   Q.   So is there any -- do you think there's any

21   dispute in this case that we're talking about a computer

22   system?

23   A.   I have not seen it, and I think this shows

24   why.

25   Q.   All right.  Let's go back to our chart of the

1    words.

2              The next thing that the preamble talks about

3    is:  Facilitating the creating and publishing of

4    customized electronic advertisements.

5              Have you seen evidence that the Google system

6    does that?

7         A.   Yes.

8         Q.   And are we going to get into that evidence

9    later?

10        A.   You have to kind of work your way through the

11   rest of the claim to see the details of that, but, yes,

12   I have.

13        Q.   Okay.  And lastly, there's a discussion there

14   that says:  Two internet medias owned or controlled by

15   other than the seller.

16             And we discussed this earlier, but just to be

17   clear, is AdSense a product that is intended for sellers

18   who don't own AdSense websites?

19        A.   That's not the only thing it can be used for,

20   but that's certainly -- that AdSense for Content, that's

21   what it's intended to do.

22        Q.   Okay.  And going back to our cheese.com

23   demonstrative, this is cheese.com, and these are

24   advertisements.

25             Do these advertisers own cheese.com?

1       A.    No.   No.   Like here, it's Pillsbury, okay?

2  They're selling Totino's pizza.

3            If you -- if you -- I can't read it, but if I

4  could, those little purple internet locations, which I

5  would say is a return address, those are for businesses

6  other than the business that operates cheese.com.

7       Q.    So if somebody owns cheese.com, somebody else

8  owns who's supplying those advertisements?

9       A.    Those are the ads that we're talking about.

10      Q.    Okay.  Back to the demonstrative, what's your

11 opinion about whether or not Google meets the

12 limitations of the preamble of Claim 1 of the '025

13 patent?

14      A.    They do.

15      Q.    All right.

16      A.    That's why I've asked to have a check put on

17 this slide.

18      Q.    Great.

19            Now let's talk about the next limitation, a

20 first interface.

21            Again, in analyzing this limitation, did you

22 apply any definitions?

23      A.    I applied a couple of definitions that -- that

24 have shown up in the glossary of claim terms.

25      Q.    And our next demonstrative, the definition

there of the word presentation rules, did you apply

that?

    A.    Yes.

    Q.    And the next demonstrative, a definition of

the claim term first interface to the internet system,

did you apply that?

    A.    I would -- I would -- I did, and I would point

out to the jury specifically that it talks about

software, as opposed, for example, to hardware.

    Q.    And generally speaking, what is the name of

the Google software that you say satisfies this claim

limitation?

    A.    AdSense.

    Q.    Okay.  And who uses AdSense?

    A.    Internet media venues, to use the phrase of

the claim, but what -- they're what Google refers to as

publishers, people who operate websites where Google, if

they agree to it, can place an ad.

    Q.    Okay.  And how do publishers get access to the

AdSense interface?  What do they do to get it?

    A.    They go to an internet media venue location.

There's several ways to do it, but one of them is

www.adsense -- no, there's no www -- it's just

adsense.google.com.

    Q.    Let me show you the next demonstrative.  Does

1  this illustrate some of the ways that a publisher could

2  get access to AdSense?

3       A.   Yes.

4       Q.   Can you tell us what it's illustrating?

5       A.   Sure.  I've got three here, okay?

6            This represents somebody who is going to get

7  on the internet and go to that adsense.google.com, and

8  they will see on their screen a sequence of information

9  screens that will allow them as -- in the first place,

10 to apply to be a publisher and then further to specify

11 presentation rules for ads to go on their public -- this

12 is what's called an application programming interface or

13 API, and then on the right-hand side is something that

14 Google calls the direct interface where you call up, if

15 you're big enough, and you get a specialist at Google

16 who will do your ad for you -- do your presentation

17 rules for.

18      Q.   And in your opinion, which of these ways to

19 access the AdSense system infringe the '025 patent

20 Claim 1?

21      A.   Only the left two.

22      Q.   So AdSense online and the API?

23      A.   Absolutely.

24      Q.   Okay.  And those are what we're going to

25 discuss today?

1    A.   Yes.  I will not -- and I've carefully

2 excluded the direct.

3    Q.   All right.  Let's talk about online first.

4 And I think you just said this, but let me just get it

5 clear.  How does somebody get access to AdSense online?

6    A.   They get a browser, and they connect to the

7 internet, and they use their browser to go to

8 adsense.google.com.  I think you can also go to

9 google.com/adsense.  As I say, there are a couple of

10 ways you can get there.

11    Q.   And have you seen any testimony in this case

12 that impacts your opinion as to whether AdSense

13 qualifies, in the terms of the patent, as an interface?

14    A.   Yes.

15    Q.   Okay.  I want to show you a clip from the

16 deposition of Google's corporate representative about

17 AdSense, Mr. Jason Miller.  This is Miller, Page 104,

18 Lines 11 to 16.

19                    (Video playing.)

20                    QUESTION:  Just thumbing through these,

21 can you see, for example, on Page 2, that publishers can

22 navigate throughout AdSense interface using various

23 tabs, correct?

24                    ANSWER:  That's correct.

25                    (End of video clip.)

1      Q.   (By Mr. Grinstein) Does that clip bear on your

2  opinion as to whether or not AdSense constitutes an

3  interface?

4      A.   Yes.  And -- and what Mr. Miller was looking

5  at -- and I went back and checked this -- is a set of

6  printed pages that show a sequence of screen shots that

7  are called from the AdSense interface.

8           And when he looked at them, he agreed, as I

9  believe is the case, that that sequence of websites, web

10  pages is the AdSense interface.

11      Q.   Okay.

12      A.   It's the first interface of Claim 1.

13      Q.   Let's go back to our chart again.  And we see

14  that --

15           MR. VERHOEVEN:  I'm sorry.  May I

16  approach, Your Honor, real briefly?

17           (Bench conference.)

18           THE COURT:  Yes?

19           MR. VERHOEVEN:  I just want to make sure

20  I understand the rules of the road.  I mean, this --

21  this is -- they're playing a different witness's

22  testimony that's -- is this going to be designated as --

23           MR. GRINSTEIN:  30(b)(6) testimony.

24  Under Rule 32, I can use it for any purposes.

25           MR. VERHOEVEN:  But is it -- is it

```
 1  going --
 2                  MR. GRINSTEIN:  To allay your concerns,
 3  this has all been designated testimony to which you had
 4  a chance to object.
 5                  MR. VERHOEVEN:  Do you represent you're
 6  going to put it in the record then or --
 7                  MR. GRINSTEIN:  Well, it's 30(b) -- I
 8  don't think I have an obligation.  Under Rule 32, I can
 9  use it at any time for any purpose.  I mean, I can
10  put --
11                  MR. VERHOEVEN:  Here's my concern.
12                  MR. GRINSTEIN:  I can put a transcript in
13  the record, if they'll make you feel better.
14                  THE COURT:  What's the concern?
15                  MR. VERHOEVEN:  My concern is playing --
16  playing witness testimony that's not designated, it's
17  not going to be in the record, and showing it to the
18  jury like that.
19                  If he's going to represent that he
20  will -- that these excerpts are going to be designated
21  and played as part of the record, I'll take that, and it
22  will be a double -- two-way street for that then.
23                  MR. GRINSTEIN:  Well, I guess I don't
24  understand the difference between playing it for any
25  purpose with Dr. Rhyne and playing it again.
```

1        THE COURT:  Well, the court reporter is

2  going to have it in the record.  I'm not going to mark

3  it as an exhibit, but I think it will be in the record,

4  is what I'm telling you.

5        MR. VERHOEVEN:  Okay.  And that's --

6        THE COURT:  She'll -- she'll put it in

7  the record.  And to the extent, she doesn't, I'm

8  directing you to file the portions that are displayed to

9  the jury in the record.  And that will apply for both

10 sides.

11        MR. VERHOEVEN:  Thank you, Your Honor.

12        MR. GRINSTEIN:  Yes, Your Honor.

13        (Bench conference concluded.)

14     Q.   (By Mr. Grinstein) Back on this claim chart.

15 We were talking about the first interface.  And what

16 happens to the internet media venues at the first

17 interface?  What does the interface do to them?

18     A.   I guess I don't understand the --

19     Q.   I mean, is -- there's an action that occurs.

20     A.   Oh.

21     Q.   The first interface does something.  What does

22 it do?

23     A.   In accordance with the claim, it is -- it

24 prompts the internet media venues to input presentation

25 rules.

1       Q.    And what is a prompt?  I mean, what does that

2    mean?

3       A.    Well, I don't believe that there's a

4    definition for it, but the -- I've used a definition

5    that was provided, I think, by Mr. Miller, in fact, that

6    it's an instruction or a requirement that says you have

7    to do something before you can go on, okay?

8            It essentially says, by either an instruction

9    or a request, to ask for -- something you do before you

10   proceed.

11      Q.    Okay.  And what's being prompted to be input

12   are something called presentation rules.  And does the

13   patent divide presentation rules into different

14   categories?

15      A.    It deals with two types of presentation rules.

16      Q.    Okay.  And these types are mentioned in some

17   of the dependent claims; is that right?

18      A.    They're mentioned in the text or written part

19   of the patent, but they're also mentioned later on in

20   specific claims that say that -- Claim 1, where the

21   presentation rules include design or style standards.

22   And then there's a claim or two that say Claim 1 where

23   those presentation rules include distribution factors.

24   So at the highest level, you're talking at least the

25   possibility of having either one.

1     Q.   Okay.  And we'll look at some specific

2 definitions of these later, but can you just provide

3 examples of what design or style standards would be and

4 what distribution factors would be?

5     A.   Sure.  I think I mentioned earlier it would be

6 coloring of various parts of the advertisement.

7     Q.   That's design or style?

8     A.   Isn't that the one you asked -- I'm sorry.

9     Q.   Yeah.  I was asking design or style first.

10     A.   Yes.  Design or style.  It would be coloring.

11 It would be size.  Under certain circumstances, it would

12 be choice of what kind of typeface you want to use.

13 Things that have to do with -- we heard it earlier --

14 the look and feel that the ad will have when it shows up

15 on your website.

16     Q.   What are some examples of distribution rules?

17     A.   One of the -- I think the most interesting is

18 a blocked -- what's called a blocked URL.

19     Q.   Okay.  And what is -- what impact would that

20 have?

21     A.   Well, URL -- I told you earlier that each

22 individual website has like a number, like a phone

23 number, and that's -- in a way, that's -- that's

24 referred to as a universal resource locator.

25         And so a blocked URL says, I don't want

anybody with that particular website in their ad to ever

come here.  It's generally a way that you would use to

block competitors.

        If you were Nike, and you had a website, and

you agreed to accept ads by Google, the last thing you

would want to see would be an ad from Adidas that said,

hey, don't pay attention to those Nike guys.  We've got

much better shoes at much better prices.

        And so you could go in -- and I think many of

the publish -- most of those do -- and say, I don't want

to ever see an ad on my website that has as the return

address www.nike.com or something -- adidas.com.  It

gives you the ability to protect yourself against

somebody coming in that you don't want to come in.

        Q.   Now, you say that you experimented with the

Google system; is that right?

        A.   I did.

        Q.   Did you get access to the AdSense online

interface while you were doing your experiments?

        A.   I did.

        Q.   And is that experiment reflected in

Plaintiff's Exhibit 24?

        A.   That's one of the things that's in that video.

        Q.   Okay.  I'm going to show you a clip from

Plaintiff's Exhibit 24 right now, and I would like you

1  to explain to us how this shows that you're accessing an

2  interface and being prompted to input information.

3  And I'm going to stop you periodically and ask you

4  what's happening next, but can you please start and just

5  explain what you see initially?

6      A.   Okay.  It -- let's take a look at it,

7  Mr. Grinstein.  And it may be that we need to turn the

8  lights down.  I'm not -- I'm not sure.

9          You can see a yellow spot right here.  The way

10 this video works is, it shows where my mouse is, my

11 little -- that little pointer, and it shows where that

12 is.

13          And to be totally frank, Mr. Grinstein, I can

14 barely read that, but -- okay.  Up here --

15     Q.   It might be on your screen.  It might be a

16 little bit easier for you.

17     A.   Oh, perfect.  Okay.  Yes.  Thank you.

18              MR. GRINSTEIN:  So, Matt, can we stop

19 that?

20     A.   Okay.  Yeah.  Let's just start over again.

21 And what you can see -- and maybe you can help me.

22 While I'm reading here, you can --

23     Q.   (By Mr. Grinstein) Sure.

24     A.   What I've got --

25     Q.   So right here, what are you doing?  You're

1 entering something?

2     A.   I'm entering the e-mail address of my mock

3 publisher and the password that we assigned when we

4 established that account as a Google publisher.

5     Q.   Okay.  Now you're navigating up to this

6 toolbar.  What are you doing up there?

7     A.   I'm going to AdSense setup, and then I just

8 kind of went and --

9           THE WITNESS:  Can we back up just a

10 little bit.  And I'm sorry we're going to have to do

11 this.

12     A.   I went to AdSense for Content --

13     Q.   (By Mr. Grinstein) Uh-huh.

14     A.   -- okay?

15           And if you'll freeze it, you'll see -- later

16 on, we're going to take a look down at the bottom.  It

17 says, AdSense for Mobile Content.  But right now, you

18 asked me to talk about AdSense for Content.

19     Q.   Okay.  And then --

20     A.   All right.

21     Q.   -- you've clicked on AdSense for Content.

22 Then what happens?

23     A.   Then it took me to another web page, okay?

24 And so here, the first thing I was able to do is, it

25 gives me an opportunity to select the type of ad, okay?

1       Q.    And so does that constitute --

2                THE WITNESS:  Can we stop there for a

3   minute?

4       Q.    (By Mr. Grinstein) -- prompting in your

5   definition -- in your opinion?

6       A.    It does.  This is a menu-type prompt.  It

7   pulls down a little set of things, and there were three

8   of them:  Text only, that's only letters; image only,

9   that's just a picture; or you can have text or image,

10  okay -- or I think it says and.

11              But now I decided I was going to focus on

12  text, okay?

13      Q.    Okay.  And then we're going to continue?

14      A.    We're going to continue.  Okay.

15              Now, we need to stop here.  This is a very

16  rich page that does a lot of things that let me choose

17  presentation rules as a publisher, okay?

18              You want to ask me about some of those?

19      Q.    Sure.  What's that presentation rule right

20  there?

21      A.    That's color.

22      Q.    Okay.

23      A.    And over on the right-hand side, if you'll

24  take me -- okay -- over there, you can see that I get to

25  choose a color for -- I can pick a palette, which means

1  somebody has already picked this white/blue,

2  white/black/green, or I can go in and specify a color

3  for the border -- that's going to be around the ads --

4  the text of the title, the background of the ad, the

5  text of what's called the description, which is the

6  second and third line of the ad, and the text of that

7  URL, which is the return address that I hope somebody

8  clicks on to come buy my product --

9      Q.    Okay.

10     A.    -- all right?

11           And you can see the format.  I can't -- I

12 think I went over it.  I can pick size to some degree.

13 Let's see where I went next.

14     Q.    Okay.  Getting you there.

15     A.    Having done some choice --

16           THE WITNESS:  If you can stop it just for

17 a second.

18     A.    On the left-hand side right here, what it does

19 is, it gives me a feel for what a sample ad will look

20 like.  And notice, there's no -- no advertiser text.

21 It's kind of like your ad here.  It says add title, add

22 text, add URL, and then it -- then in this case, it has

23 a black border, a yellow background, green and purple

24 text, and a black ads by Google with white writing on

25 top of it so you can see it.

1      Q.    (By Mr. Grinstein) Okay.

2      A.    So then we want to continue here.  And that

3   actually -- is that not the end of that clip?

4      Q.    I think that might be the end of that clip.

5      A.    Okay.

6      Q.    All right.  And so did that clip just

7   demonstrate whether or not an AdSense user was being

8   prompted?

9      A.    It showed me, as a publisher, being prompted

10   to input presentation rules into the form of colors; I

11   can pick fonts; I can pick how -- size -- big the text

12   is and so forth, yes.

13      Q.    Okay.  We're done with the clip for now?

14      A.    Yeah.

15      Q.    And let me just ask a question.

16            MR. GRINSTEIN:  Can we see the next

17   demonstrative?

18      Q.    (By Mr. Grinstein) Now, this demonstrative,

19   I've entitled Google's Design or Style Standards Text

20   Ads.

21            Earlier, what did you say about what the

22   different types of presentation rules there are that are

23   discussed in the Google -- that are discussed in the

24   patents?

25      A.    Well, the patents discuss color; they discuss

1 size, those types of things.

2     Q.   Okay.  And I've entitled this Text Ads.  Can

3 you just tell us what a text ad is?

4     A.   A text ad is like that thing I showed you

5 earlier.  It's Tom's hats; buy my hats; they're the

6 best.  It's raw text, to use a phrase I heard Mr. Dean

7 use.

8         It's -- it's customized only in the sense that

9 it tells who I am and what my product looks like, but it

10 doesn't pick a particular typeface or size or color or

11 anything.  It's just text.  And that's what I'm talking

12 about here.

13     Q.   What if an advertiser wants to use a picture?

14     A.   Well, that would be an image ad, and I just

15 decided, because I didn't have a particular picture, I

16 was not -- I was not going to go down to the image ad

17 pathway, but certainly, AdSense allows publishers to

18 image ad.

19     Q.   Actually, will we discuss design or style

20 standards for image ads in a minute?

21     A.   Yes, we will.

22     Q.   All right.  So this demonstrative -- what is

23 this demonstrative telling us about the options

24 available in the Google system?

25     A.   This is what AdSense lets you do, as far as

1  entering, as an internet media venue or publisher,

2  design or style standards:  Color, size, what's called

3  corner style for the border, and font, which is the type

4  face.

5      Q.   And just so we're totally clear, are these

6  options that are being presented to the people who want

7  to run advertisements and who are advertisers, or are

8  these options being presented to people -- or to

9  websites on which advertisements will be displayed?

10     A.   This is not for the seller.  The seller has no

11  control over this, okay?  All the seller does in a text

12  ad is give me -- here are the characters that will be

13  displayed.  These are the options that the publisher

14  specifies as to how they're willing to accept ads on

15  their website.

16     Q.   Let's talk about color first.  Have you

17  reviewed any Google documents that confirm your

18  understanding that Google allows publishers to set color

19  for their advertise --

20     A.   Yes.

21     Q.   -- for advertisements?

22     A.   Yes, I have.

23     Q.   Let me show you Plaintiff's Exhibit 46.  And

24  can you just tell us what Plaintiff's Exhibit 46 is?

25     A.   This is an AdSense sort of a help document.

1  You can see it says --

2              THE WITNESS:  Just a little to the right,

3  Matt.

4      A.    It says:  Search for AdSense help.  It's the

5  kind of thing Google puts online for people who are

6  trying to use AdSense just to help them understand how

7  it works, what it does.

8      Q.    (By Mr. Grinstein) Okay.

9              MR. GRINSTEIN:  And I'd like to go to the

10 next page or the middle paragraph there.

11     Q.    (By Mr. Grinstein) And what does the

12 highlighted section there tell you about whether or not

13 Google offers color as a design or style rule to

14 publishers?

15     A.    Okay.  Well, I'm going to actually read the

16 first sentence as well.  I like it, okay?

17             It says:  You spend lots of time perfecting

18 your website's look and feel, and we want AdSense to fit

19 in.  So we let you customize the appearance of your ads

20 to fully complement your site by choosing from over 200

21 colors and 200 preset color palettes.

22             That's -- that's color combinations that

23 Google has already put together for you.

24     Q.    And have you prepared a demonstrative that

25 illustrates what these color options look like in the

1  AdSense system?

2     A.   Yes, I have.

3             MR. GRINSTEIN:  Let's take a look at the

4  next one.

5     Q.   (By Mr. Grinstein) Dr. Rhyne, what are we

6  looking at in this demonstrative, Presentation Rules:

7  Color?

8     A.   Well, if you remember when I showed you the

9  video, I kind of pointed over to the left side.  We did

10  it real quick, but when you pick your colors, they give

11  you -- like I said, your ad here, they make a little

12  mock ad.

13            They don't have any text from a seller, so it

14  always says:  Add title, add text, add URL, ads by

15  Google.  But I just experimented with four different

16  combinations, and I've caught a lot of flack for those

17  combinations.

18            But I've got a white with a black border; I've

19  got pink.  These are just different color combinations

20  that a publisher, if they wanted to, could select.

21     Q.   So there might be a publisher somewhere who

22  really wants a purple ad with baby blue text?

23     A.   I don't know.  Okay.

24            MR. GRINSTEIN:  Let's go back to the

25  demonstrative that lists the design or style standards

of text ads.

Q.    (By Mr. Grinstein) The next thing we see is
size.

A.    Yes.

Q.    How is size a design or style rule for a
publisher in the Google system?

A.    Well, the publisher specifies how much of
their page they're willing to have the ads take on.
I mean, if you really were cheese.com, you wouldn't want
somebody else to come in and splash an ad over 75
percent of your page and cover up your beautiful picture
of a big slice of cheese, all the things you're trying
to sell.

So they pick an area and they say, this is the
amount, the area of my web page I'm willing to have
somebody come into.  And what -- what then happens is
that, for example, in the Google system, once you've
picked that, if you have text, they'll wrap the text.
If you get a little narrower, they'll make the text
wrap.

If you had an image, they have a way of kind
of squeezing the image down a little bit so that that
border will fit on it.  But it's something that the
publisher specifies that it's how much of their web page
they're willing to have an advertisement take.

1    Q.   And have you seen any documents that confirm

2 your understanding that Google lets publishers set

3 design or size rules for size?

4    A.   Yes, I have.

5              MR. GRINSTEIN:  Let's look at Plaintiff's

6 Exhibit 69.

7    A.   All right.

8    Q.   (By Mr. Grinstein) And Plaintiff's Exhibit 69,

9 is this another one of those Google online help files?

10    A.   It is.  It's a particular one that's entitled

11 Quick Start Guide.  So they're telling you if you're

12 getting ready to use Google, here's the first few things

13 you do as a publisher, and you're off and running.

14              MR. GRINSTEIN:  Can we look at the second

15 page of this one, Matt?

16    A.   Okay.

17    Q.   (By Mr. Grinstein) And this highlighted

18 section, what does that tell you, Dr. Rhyne?

19    A.   It's Step No. 3 in the quick start.  Step No.

20 1 was to sign in; Step No. 2 was select an ad type; and

21 now we're down to the point where it says:  Take a

22 moment to customize your ads, so they'll match the look

23 and feel of your site.

24          Select the size you'd like from one of our

25 different ad formats keeping in mind that larger and

1  wider ad units tend to perform better.

2      Q.    So is this the advertiser saying how big they

3  want their ad to be or the website saying how big they

4  want ads to be that they get?

5      A.    It's the website saying:  This is the size I'm

6  allocating for the ads that are going to appear on my

7  website.

8      Q.    And have you prepared a demonstrative that

9  shows the different ad size options for publishers of

10 the Google system?

11     A.    I have.

12     Q.    And is that being showed right now?

13     A.    Yes.  What -- Ladies and Gentlemen, what this

14 is, is if -- I kind of captured the menu.  It talks

15 about prompting.  There're actually some ads that talk

16 about prompting with a menu.

17          This is a list of things that when I went in

18 and said, I'd like to pick a size, it gave me this list.

19 And there's some recommended size, medium and large

20 rectangles.

21          A skyscraper is a tall, thin ad area kind of

22 like we saw cheese.com over on the right-hand.

23 Remember, there were four ads in a row over on the

24 right?  That's kind of like a skyscraper.

25          And a banner is something across the bottom.

1           MR. GRINSTEIN:  Can we go back to the

2   previous demonstrative?

3       Q.   (By Mr. Grinstein) The next one we're got is

4   corner style.

5       A.   Yes.

6       Q.   All right.  Dr. Rhyne, can you explain how

7   that is a design or style rule offered to publishers in

8   the Google system?

9       A.   If you have a visible border around your ad

10  area, you have choices of either having square, what

11  Google calls slightly rounded, or rounded corners.

12  Again, your call.  You, as a publisher, get to decide.

13  That's what corner style means.

14      Q.   And have you seen any documents that confirm

15  your understanding that Google offered corner styles or

16  has offered corner styles to publishers as a design or

17  style?

18      A.   Right.  I saw a document that dates that back

19  to, I think, July of 2007 or something like that.

20      Q.   Let me show you Plaintiff's Exhibit 1212.

21      A.   Okay.

22      Q.   Can you tell us what Plaintiff's Exhibit 1212

23  is?

24      A.   This is a Google blog.  Now, I don't know if

25  you've heard that term.  That's -- it used to be called

a web blog -- oh, excuse me -- a web log, but nowadays,

it's become in the vernacular just a blog.

And it's just a collection of information that

people enter on a daily or weekly basis, and it's an

accumulation of information about how Google is working

inside AdSense, as it says there.

MR. GRINSTEIN:  Matt, can we go to

Page 235 of this particular blog?

Q.   (By Mr. Grinstein) And on this particular

page, was there a discussion that you saw that formed

your opinion about corner style in the Google system?

A.   Yes.

Q.   Big document.

A.   I have it.  I marked it, because my pages are

not numbered.  But here's what it says, and this is just

below a date of June the 28th of 2007, so we're around

that summer of 2007.

Q.   And this is Google writing this right here?

A.   It's the blog guy.

Q.   Okay.

A.   Okay.  It says:  As you'll recall, we recently

introduced new formats for AdSense ads.  This week we've

added a new dimension for publishers in customizing

these ad formats.

You've long been able to customize the size

and colors of your ad units.  Now you can also customize

the shape by selecting between square, slightly rounded,

or very rounded corners.

Q.  Did you prepare a demonstrative that shows the

corner styles that you can do in the Google system?

A.  I -- I certainly did.

Q.  Let's look at that.

A.  Okay.  Here I --

Q.  And what are we looking at right here --

A.  I'm sorry.

Q.  -- on this corner demonstrative?

A.  I'm going to wait till you come to the end.  I

apologize.

I went in to AdSense, and I left the color

scheme the same, but I set different types of border

corners.  The upper left is square; the upper right is

slightly rounded; and the center bottom is very rounded.

Q.  All right.  Let's go back to our chart that

we've been looking at.  We've got one more I want to

talk to you about, and that's font.

How is font a design or style rule in the

Google system?

A.  It's something that you, as a publisher, get

to select as to what typeface and what size of typeface

you would like to see in the text ads that you allow to

1  come to your website.

2      Q.   And has font been a rule that's been around

3  since the very beginning of AdSense?

4      A.   I think so.  I think so.  I think I've seen a

5  document that deals with that.

6      Q.   Well, let me show you a clip of Mr. Jason

7  Miller again --

8      A.   Okay.

9      Q.   -- Google's corporate representative for

10 AdSense.

11             MR. GRINSTEIN:  This is Miller, Page 149,

12 18 to 19.

13             (Video playing.)

14             QUESTION:  Can publishers choose font?

15             ANSWER:  They can now.

16             (End of video clip.)

17      Q.   (By Mr. Grinstein) What does that tell you

18 about whether or not publishers can choose font?

19      A.   It tells me I was wrong that they've been able

20 to do it, but they can now.  There's been a point in

21 which that was changed.

22      Q.   Okay.  Let's go back to another demonstrative.

23 Is this a demonstrative you prepared showing font

24 choices in the Google system?

25      A.   Yes.  This is a prompt and menu form.  And if

1  you go to font, you really only get three choices.

2  That's not a very rich set of fonts, but you get Aerial,

3  Times, and Verdana.  Those are just three different

4  typefaces.

5         If you have any experience with anything like

6  Microsoft Word or any of those kinds of text-editing

7  programs, they will give you fonts as a choice.  These

8  are just the three that they currently offer on AdSense.

9     Q.   All right.  Well, we've had a lengthy

10  discussion about text ads and the design or style rules

11  that a publisher can set for text ads.

12         Have you seen evidence that publishers can set

13  design or style rules for image ads?

14     A.   Yes.

15     Q.   Let me show you Plaintiff's Exhibit 58,

16  please.  Again --

17     A.   Give me a moment.

18     Q.   Sure.  Sorry.

19     A.   Okay.

20     Q.   Again, what is Plaintiff's Exhibit 58?

21     A.   It's an AdSense help page provided by

22  Google --

23     Q.   Okay.

24     A.   -- on the internet.

25     Q.   What's the question that's being answered in

1  this AdSense help page?

2      A.   Can I customize the appearance of image ads on

3  my site?

4      Q.   And what does Google tell someone that's

5  asking that question?

6      A.   They say:  The border color of image ads can

7  be customized using your color palette options.  The

8  border color -- and it means for an image ad -- will be

9  the same as the border color that you have selected for

10 text ads.

11     Q.   Can publishers in the Google system also input

12 presentation rules affecting the display URL on an image

13 ad?

14     A.   Yes, they will.  That would be overlaid on the

15 image, and among other things, it's my understanding

16 that Google will make sure that the color of the -- of

17 the return address, that display URL, will be chosen so

18 that if you happen to be on top of a dark image, it will

19 be a lighter color, and if you're on top of a light

20 image, it will be a darker color so you can see it.

21     Q.   Let's hear from Mr. Miller again.

22              MR. GRINSTEIN:  This is Page 158 of his

23 deposition, Lines 15 to 20.

24              (Video playing.)

25              QUESTION:  Let's turn to image

advertisements, and I realize we're only scratching the

surface now.  We'll get more into it a little later.

But here with image advertisements, publishers are

prompted to select colors for display URLs?

ANSWER:  Yes.

(End of video clip.)

Q.   (By Mr. Grinstein) Does that conform to your

opinion about whether or not publishers can do that?

A.    Mr. Miller and I are in complete agreement.

MR. GRINSTEIN:  Your Honor, we're about

now to play another clip from PX24.  It's one of those

videos that will probably take five minutes to go

through it.  Would you like us to do that or --

THE COURT:  Please proceed.

MR. GRINSTEIN:  Yes, Your Honor.

Q.   (By Mr. Grinstein) Now, did you experiment, in

Plaintiff's Exhibit 24, with entering different

presentation rules as a publisher into the AdSense

interface?

A.   Yes, I did.

Q.   Okay.  Let me show you the next clip from

Plaintiff's Exhibit 24, and I'm going to ask you again

to walk us through it and ask you to tell us how this

shows you, as a publisher, entering presentation rules.

MR. GRINSTEIN:  So if we can fire up,

1  Matt.

2              (Video playing.)

3       Q.    (By Mr. Grinstein) What are we seeing here?

4       A.    Okay.  We're picking the type of ad.  And I've

5  just sort of highlighted all the various choices and

6  then selected text only.

7       Q.    Is ad type a presentation rule?

8       A.    Yes.

9              Then I went -- and you can see this is where I

10 pulled out the menu.  I'm just moving up and down -- I

11 think down the menu, and I finally, I believe, selected

12 a 120x600 skyscraper ad, a tall, thin ad.

13      Q.    And is ad size a presentation rule?

14      A.    Yes, it is, with certain restrictions.

15 Then I went into the color palette or choice, and I

16 began to choose some different colors.  And you can see

17 then that this is -- I'm looking over to the left at the

18 color of the ad while I'm over on the right changing the

19 colors.  Here I've said yellow and green as the colors

20 with a black border.

21      Q.    And is ad color a presentation rule?

22      A.    Yes, it is.

23             And here I think I changed the color of that

24 return address URL from green to purple, if I remember.

25 That's what, you know, people have said didn't look very

1   good, but I just was picking something.

2                    THE WITNESS:  Okay.  That went by very

3   fast.  Matt, do you think there's any chance you can

4   back that up?

5                    Go forward, Matt.  Well --

6       Q.   (By Mr. Grinstein) I think the next clip was

7   on fonts.

8       A.   Okay.  And then we -- then we go to fonts, and

9   here you can see the choice of the three fonts.  I

10  believe I selected Times.

11      Q.   And is font a presentation rule in the Google

12  system?

13      A.   Yes.

14                   Then I got to check size.  I always check

15  large, okay, at my age.

16                   I got to select corners.  I believe I selected

17  very rounded corners.

18                   And so here you see an ad with yellow

19  background, green text, purple URL, and rounded corners.

20      Q.   Okay.

21      A.   Then it --

22                   MR. GRINSTEIN:  Stop right here, Matt.

23      A.   Yeah.  Yeah.  Yeah.

24                   MR. GRINSTEIN:  Go up and forward.

25      Q.   (By Mr. Grinstein) Can you tell us what's

1    about to happen next?

2        A.   I'm going to -- I'm going to go to continue,

3    and it's going to allow me to save that set of

4    publication rules out on the Google storage system,

5    their database, and it gave me a name.  This is the

6    name.  I could change the name if I wanted.

7            That's a text box, but it's 120x600 created on

8    September the 19th, which was when I was doing this

9    work.

10       Q.   All right.  Thank you, Dr. Rhyne.

11           What does this video show to you or

12   demonstrate to you about the ability of a publisher in

13   the Google system to enter presentation rules into the

14   AdSense interface?

15       A.   It shows that the AdSense user interface is

16   prompting me to enter presentation rules in a variety of

17   areas and then to save them away.

18       Q.   Now, we've talked a lot about design or style

19   rules.  We saw a bunch of different ones.

20           Have you seen any evidence, in your review of

21   the Google materials in this case, suggesting to you

22   whether or not those design or style rules are important

23   to the operation of the Google ad system?

24       A.   I have.

25       Q.   I'd like to show you a video --

1       A.   All right.

2       Q.   -- which is Plaintiff's Exhibit 36.  And this

3  is Plaintiff's Exhibit 36.  I'd like to tell you -- I'd

4  like us to watch it and then for you to tell us what

5  this video is and how it impacts your opinion.

6                    (Video playing.)

7                    UNIDENTIFIED WOMAN:  Colors play an

8  important part in keeping your ads looking professional

9  and a relevant part of your site.

10                   As text ads show, approximately 70 to 80

11 percent of the time, it's essential that they complement

12 your site.  There are several ways that you can do this.

13 Simple things like blending in the background of the ad,

14 the color of your site, and removing borders has proven

15 in the past to have a significant impact upon

16 click-through rate.

17                   Just be careful of not blending the ads

18 too much so they look like your site's content.  You can

19 also try to highlight the link and URL with shades that

20 compliment your site's colors.

21                   (End of video clip.)

22      Q.   (By Mr. Grinstein) What does this video --

23                   MR. VERHOEVEN:  Your Honor, I'm going to

24 object.  This was not in the report, and there was no

25 foundation laid before playing it.

1    MR. GRINSTEIN:  Plaintiff's Exhibit 36 is

2  in the report.

3    THE COURT:  Well, tell you what, we'll

4  take up there in the morning then.

5    All right.  Ladies and Gentlemen, I'm

6  going to excuse you for the evening.  Please remember my

7  prior instructions, and don't talk about the case.

8    One final instruction is to drive safely

9  on your way back to your homes this evening, and I'll

10  see you promptly at 8:30 in the morning.  If you'll be

11  here 8:20, 8:25, it will help us to get started right on

12  time.

13    Thank you very much, and you're excused

14  for the evening.

15    COURT SECURITY OFFICER:  All rise.

16    (Jury out.)

17    THE COURT:  You may step down, Dr. Rhyne.

18    All right.  Y'all have a seat.

19    What is the exhibit that was just played?

20    MR. GRINSTEIN:  It's Plaintiff's

21  Exhibit 36, I understand, from Mr. Brandon.

22    MR. BRANDON:  It's cited in Footnote 84.

23    MR. GRINSTEIN:  Excuse me?

24    MR. BRANDON:  It's cited in Footnote 84.

25    MR. GRINSTEIN:  In Footnote 84, Dr. Rhyne

```
 1  discusses it in his report, lays the foundation for --
 2                  THE COURT:  What is it?
 3                  MR. GRINSTEIN:  I'm sorry.  It's a --
 4  much like all these online AdSense help files that we've
 5  been looking at, Your Honor, this is an online AdSense
 6  help video telling you, here's all the things you can do
 7  with AdSense.
 8                  THE COURT:  Is it a Google video --
 9                  MR. GRINSTEIN:  Yes, Your Honor.
10                  THE COURT:  -- Mr. Verhoeven?
11                  MR. VERHOEVEN:  I'm just checking, Your
12  Honor.  If it's buried in a footnote, maybe I missed it.
13                  I apologize, Your Honor.
14                  THE COURT:  That's alright.  Well -- but
15  is it a Google video?  Do you dispute that?
16                  MR. VERHOEVEN:  Just bear with me, Your
17  Honor.  I'm looking at it right now.
18                  (Pause in proceedings.)
19                  MR. VERHOEVEN:  I apologize.  I had bad
20  information.  It was buried in a footnote in the report,
21  Your Honor.  I withdraw the objection.
22                  THE COURT:  Well, buried in a footnote,
23  but, nonetheless, it was in the report?
24                  MR. VERHOEVEN:  Yes, Your Honor, and I
25  withdraw the objection.
```

1          MR. NELSON:  Your Honor?

2          THE COURT:  Yes.  We'll pick up there

3   tomorrow.  The objection will be overruled, and I

4   assume I won't hear it in the morning.

5          Mr. Nelson?

6          MR. NELSON:  There's a logistical issue.

7   There are the acquisition documents that have not been

8   preadmitted.

9          THE COURT:  Right.

10          MR. NELSON:  And based on Your Honor's

11   ruling, I'm hoping to work it out with opposing counsel.

12   I'm hoping that there won't be any issues, but

13   Mr. Bratic is almost certainly going to go on the stand

14   tomorrow.

15          Our thought is to redact anything that

16   has to do with price when we publish it to the jury, but

17   we'd just like to alert Your Honor, we would like to

18   preadmit these exhibits before we talk to the jury

19   tomorrow.

20          THE COURT:  All right.  Well, talk about

21   them overnight.  I'm inclined to preadmit them, if

22   you've made the redactions indicated were appropriate

23   with the rulings on the Daubert motion, but if not, I'll

24   be in chambers at 8:00 o'clock in the morning.

25          And, you know, I don't know exactly when

1 | Mr. Bratic is going to hit the stand, but I'm sure we'll

2 | have some time either mid-morning or over the lunch

3 | hour --

4 |               MR. NELSON:  Yes, sir.

5 |               THE COURT:  -- to work through any issues

6 | that we've got, okay?

7 |               MR. NELSON:  Thank you.

8 |               THE COURT:  All right.  See you at 8:30

9 | to start, but I'll be in chambers at 8:00 in case

10 | anybody needs anything.

11 |               Court's in recess.

12 |               COURT SECURITY OFFICER:  All rise.

13 |               (Court adjourned.)

14 |               *      *      *      *      *

1
2
3                          <u>CERTIFICATION</u>
4
5              I HEREBY CERTIFY that the foregoing is a
6    true and correct transcript from the stenographic notes
7    of the proceedings in the above-entitled matter to the
8    best of my ability.
9
10
11
12   /s/_____          _____
     SUSAN SIMMONS, CSR                    Date
13   Official Court Reporter
     State of Texas No.:  267
14   Expiration Date:  12/31/10
15
16
17   /s/_____                _____
     SHELLY HOLMES, CSR                    Date
18   Deputy Official Court Reporter
     State of Texas No.:  7804
19   Expiration Date  12/31/10
20
21
22
23
24
25