1    IN THE UNITED STATES DISTRICT COURT
         FOR THE EASTERN DISTRICT OF TEXAS
2                  MARSHALL DIVISION

3   FUNCTION MEDIA, LLC          *    Civil Docket No.
                                 *    2:07-CV-279
4   VS.                          *    Marshall, Texas
                                 *
5                                *    January 22, 2010
    GOOGLE, INC.                 *    1:15 P.M.
6
                    TRANSCRIPT OF JURY TRIAL
7          BEFORE THE HONORABLE CHAD EVERINGHAM
               UNITED STATES MAGISTRATE JUDGE
8

9   APPEARANCES:

10  FOR THE PLAINTIFFS:    MR. MAX TRIBBLE
                           MR. JOSEPH GRINSTEIN
11                          Susman Godfrey
                           1000 Louisiana Street
12                         Suite 5100
                           Houston, TX   77002
13                         MR. JUSTIN NELSON
                           Susman Godfrey
14                         1201 Third Avenue
                           Suite 3800
15                         Seattle, WA   98101
                           MR. JEREMY BRANDON
16                         Susman Godfrey
                           901 Main Street
17                         Suite 5100
                           Dallas, TX   75202
18                         MR. ROBERT PARKER
                           Parker, Bunt & Ainsworth
19                         100 East Ferguson
                           Suite 1114
20                         Tyler, TX   75702

21  APPEARANCES CONTINUED ON NEXT PAGE:

22  COURT REPORTERS:       MS. SUSAN SIMMONS, CSR
                           MS. SHELLY HOLMES, CSR
23                         Official Court Reporters
                           100 East Houston, Suite 125
24                         Marshall, TX   75670
                           903/935-3868
25  (Proceedings recorded by mechanical stenography,
    transcript produced on CAT system.)

APPEARANCES CONTINUED:


FOR THE DEFENDANTS:    MR. CHARLES VERHOEVEN
                       MS. AMY CANDIDO
                       Quinn Emanuel
                       50 California Street
                       22nd Floor
                       San Francisco, CA   94111

                       MR. EDWARD DEFRANCO
                       Quinn Emanuel
                       51 Madison Avenue
                       22nd Floor
                       New York, NY   10010

                       MR. HARRY L. GILLAM
                       Gillam & Smith
                       303 South Washington Avenue
                       Marshall, TX   75670


                    P R O C E E D I N G S

          COURT SECURITY OFFICER:  All rise.

          (Jury in.)

          THE COURT:  Please be seated.

          Counsel, you may continue.

          MR. DEFRANCO:  Thank you, Your Honor.

   KAREN DELFAU, DEFENDANT'S WITNESS, PREVIOUSLY SWORN

               DIRECT EXAMINATION (CONTINUED)

BY MR. DEFRANCO:

     Q.   Ms. Delfau, welcome back.  Let's try to pick

up where we left off.

          Before lunch, we were talking about DFA.  Do

you remember that?

1     A.   Yes.

2     Q.   Now, you told us a little bit about

3 information that an advertiser could put into the

4 system.

5          Do you remember that?

6     A.   Yes.

7     Q.   Can you just give us a sentence of reminder of

8 what that information is?

9     A.   So the ad properties include start date and

10 time and a lot of targeting criteria.  So where the ad

11 is served to -- to which sites, to a time of day, a day

12 of week, to even a geographical region that the user is

13 at.

14     Q.   How specific were each of those?  In other

15 words, targeting criteria to sites, if I put in a

16 website, a particular site, what would happen?

17     A.   It would be targeted to that site.  You could

18 even drill down to a specific section of a site.

19     Q.   And you gave some other examples.

20     A.   Yes.

21     Q.   Would you remind me.  Those are geographic?

22     A.   Geographical targeting.

23     Q.   Is there a limit on the number of sites a user

24 could put in to target?  Do you remember?

25     A.   It's a database limit of 600 or something.

1     Q.   And if -- let's pick ten.  If an advertiser

2 put in ten sites to target, how many of those sites

3 would the ad appear on?

4     A.   All ten.

5     Q.   Let's turn to -- back to exhibit -- I think I

6 showed you this or we talked about.  If not, I

7 apologize, but let's talk about Exhibit 373, please.

8          And I'd like to turn -- again, just by way of

9 reminder, can you tell us what this document is?

10     A.   This is the DART for Advertisers User Guide.

11     Q.   Now, I've looked on this document.  I can't

12 find a date.

13          Do you know about when this document dates

14 from?

15     A.   All of these documents date from '98.

16     Q.   And if you would, turn to page -- when you say

17 all these documents, you mean the documents we've been

18 looking at this morning?

19     A.   The training material, the user guide.

20     Q.   If you turn to Page 4627, please.

21          And my question is, at the top of the page,

22 can you tell me what's shown there?

23    A.   So that's part of -- it's an explanation of

24 the different fields in the ad properties page where you

25 go in and set targeting criteria.

1          And the first field is the by-site features.

2     So that is where you specifically are -- are -- have

3     purchased ad space and are targeting the ads to that

4     site.

5          Q.   Now, let's turn to another page in the

6     document, 4619, please.

7               Can you just tell us what's depicted on that

8     page, please?

9          A.   So this is where the media buyer would go and

10    basically type up the order and say, hey, here's -- here

11    are the sites that I -- where I bought advertising

12    space.  This is the length of the campaign.

13              They might list the targeting criteria,

14    geographic targeting, et cetera, that the advertiser

15    would have to enter in the ad properties page.

16         Q.   And what types -- what types of sites could

17    the DART -- well, first, where did the ads come from

18    again?

19         A.   From the DART production database.

20         Q.   And where would those ads be served?  Can you

21    give us an example of that?

22         A.   Well, they can be served to any site on the

23    internet.  So if I went to CNN and General Motors had

24    targeted an ad to CNN, it would be served to my browser.

25         Q.   Could they be served to publishers that had

1  signed up with DFP or DART for Publishers?

2      A.   Yes, any site.  It didn't matter what ads or

3  what technology was used.

4      Q.   And, actually, I've got a note in here.  Tell

5  me if it's right or wrong.  It's on Page 4607.

6      A.   Yes.

7      Q.   There's something in there called concepts.

8           Do you see that?

9      A.   Yes.

10      Q.   And could you read that -- that sentence for

11  us, please?

12      A.   DART for Advertisers Network:  A DART for

13  Advertisers Network is a database of client, either

14  advertiser or agency, information that is used to place

15  ad campaigns or buys on any site on the worldwide web.

16      Q.   And where would -- again, where would an

17  advertiser put in information relating to the sites they

18  wanted ads to appear on?

19      A.   There's two places on the buy page that the

20  media buyer recaps the order, and then in the ad

21  properties page, on that buy -- buy sites field.

22      Q.   And you -- you mentioned the word database.

23  Was that a DART database?

24      A.   Yes.

25      Q.   And, again, what -- well, not again, but what

1  information was stored in the DART database?

2       A.   All of the client information about the

3  client, the ad, the sites.

4       Q.   Was -- was there -- I don't know if you -- how

5  much you know about the server system, but did -- DFA

6  and DFP, did they use the same database within DART; do

7  you know?

8       A.   Yeah.  It's only one database.

9       Q.   One database -- there -- was that database

10 used for advertiser-related information?

11      A.   Advertiser and publisher.

12      Q.   Okay.

13      A.   The whole application is run off that

14 database.

15      Q.   And can you tell us a little bit about -- the

16 process about how the ad would appear when a page was

17 viewed in the user's browser?

18      A.   Right.  So if I'm visiting a website and I'm

19 using CNN as the example, when I log in or I access the

20 CNN page, the CNN server will start serving the website

21 or the web page that you see.

22           And in that website are tags that make a call

23 to the DART AdServers to serve the ad to that browser on

24 that page.  And it's all seamless.  As a user, you don't

25 know that those two elements are coming from different

1 servers.

2      Q.    Okay.  Let's -- let's turn to another

3 document.  It's Exhibit 149.

4           Same question:  Have you seen this document

5 before?

6      A.    Yes.

7      Q.    Whose handwriting is on the front?

8      A.    That's mine.

9      Q.    Okay.  And can you give us -- a note here, can

10 you give us a little background on -- on what this

11 document is about?

12      A.    So when -- as I said here, when I arrived,

13 there wasn't a whole lot of documentation.  There was

14 just this collection of information that the four sales

15 engineers, who had already been on the DART projects

16 since the fall, had started putting together.

17           And this is information that they kind of

18 threw together to give to clients.  And this was one of

19 the reasons I was hired so that I could take this

20 information and turn it into kind of a friendly training

21 program and easy-to-use documentation.

22      Q.    Okay.  There's handwriting in this document?

23      A.    Yes.

24      Q.    Is that -- is that your -- can you look at it?

25 Is that your handwriting?

1     A.   Yes, it is.

2     Q.   And what does that handwriting reflect,

3 generally?

4     A.   So this was a draft I used to start jotting

5 down my thoughts about how I'd want to reorganize it,

6 separate information maybe into a training module into

7 user documentation, edits.

8     Q.   Do you know -- sorry.  Do you know back in

9 February of 1998 whether this documentation was given to

10 any customers at DoubleClick?

11     A.   I know it was, because I gave it to some

12 customers.

13     Q.   Well, tell us about that, please.

14     A.   Well, so about two months after I joined -- it

15 was either late March, early April -- I went to a

16 conference in Copenhagen, and they brought me there as

17 kind of a baptism by fire to start helping clients learn

18 the system.

19        And this was the only document that we had to

20 leave with the clients.  So it was -- IDG, who was

21 having their European kind of sales conference, and we

22 were one of their presenters.

23     Q.   And this was in what year?

24     A.   1998.

25     Q.   Let's -- let's turn to another page of this

1  document, please.  It's 3524.

2            MR. DEFRANCO:  Can we just make that a

3  little bit bigger?  It's kind of hard -- great.  Thank

4  you.

5       Q.   (By Mr. DeFranco) Can you tell us what this is

6  depicting?

7       A.   So this is from a website publisher

8  perspective, the -- kind of an overview of the

9  difference rules that the publisher needs to fulfill.

10 And for each role, the individual tasks -- and those

11 were actual -- the names of the links in the

12 application.

13      Q.   And what -- you mentioned the word trafficker

14 earlier.

15      A.   Yes.

16      Q.   What's a trafficker?

17      A.   So that is the employee at the publisher or

18 the website who is responsible for entering the

19 targeting information about the ad.

20      Q.   Okay.

21      A.   All the information about the ad.

22      Q.   And where do they enter that information?

23      A.   In the DART for Publishers application.

24      Q.   Application meaning?

25      A.   User interface.

1   Q. And let's turn to Page 3537, please.

2   The -- the top there, it says keyword

3 targeting.  That's this section of this manual?

4   A. Yes.

5   Q. Okay.  Why don't you please describe for us

6 generally what this section was about.

7   A. So keyword targeting allows ads to be targeted

8 based on a keyword search that the user performs in the

9 website, not in the search engine.

10   So if I was on CNN, for example, and I wanted

11 to find an article I knew was in there yesterday about

12 the storms, I might type in storms, and then I could

13 have an ad that had been targeted to storms that could

14 be matched to that.

15   Q. Okay.  Let's keep going.  Let's turn, if I

16 have it right, to 3573, we wanted to ask you about.

17 This page reads set general properties?

18   A. Yes.

19   Q. Do you see that?  Can you tell us what this

20 page is about, please?

21   A. So this refers to the previous ad properties

22 page that we looked at earlier, and it describes some of

23 the fields and gives instructions on what type of

24 information needs to be included in those fields.

25   Q. And ad categories, did you mention that?

1    A.   It's one of the attributes or properties that

2  you would set about an ad.

3    Q.   And just -- there's some text there.  Can you

4  give us a little more information about how that worked

5  in the DoubleClick system?

6    A.   Sure.

7         Ad categories can be used two ways:  Either to

8  only serve ads of one category in a website or to

9  exclude ads from a category on a website.

10    Q.   I've been told to talk faster.

11        Okay.  Now, you mentioned the notion of a

12  trafficker.  What if -- what if a -- what would a

13  trafficker do if the ad to be served came from a DF --

14  DFA customer?

15    A.   It can be entered in just the same way.

16  There's the possibility of ensuring -- I'm trying to

17  make this simple -- ensuring that the way that the ad is

18  fetched comes from within the DART system.

19        So the publisher/trafficker would enter

20  information like any other ad that is received, and then

21  can use an internal redirect to fetch the ad from the

22  DART system.

23    Q.   Now, could DFA, DART for Advertisers, could --

24  in 1998, could that be used as a standalone system?

25    A.   Yes.

1    Q.    And how about for DFP, DART for Publishers?

2    A.    Yes.

3    Q.    Could those systems be used together?

4    A.    Yes.

5    Q.    And can you tell us about when they're used

6    together some of the common elements of the -- of the

7    centralized DART system located at DoubleClick that they

8    would use?

9    A.    Well, from -- from the application

10   perspective, it's the same application.  It -- just

11   different fields are shown, if you're logged in to DART

12   for Advertisers versus DART for Publishers.

13         So in that respect, it's, you know, a good

14   part of it is the same.

15   Q.    I've got a note here to ask you about sharing

16   matching fields.

17         Does that mean anything to you?

18   A.    It does.

19   Q.    I'd like to hear about it, please.

20   A.    So the way that the names of the fields are

21   displayed is they are stored in the DART database, and

22   many of the fields are common.

23         So, for example, ad name, when you see ad name

24   on the application, it's the same label in DFA and DFP.

25   And so, for example, one of my responsibilities when I

started was to go and help ensure capitalization was consistent.  And so if I changed ad names so the A was capital and the N was capital, it would change it in both in DFA and DFP.

Q.   Okay.  How about error messages; were there any common error messages between the two?

A.   About 75 percent, I would imagine, are common.

Q.   Can you explain that, please?

A.   So if you are entering an ad name and you entered maybe a dollar sign and the dollar sign wasn't accepted in that field, you would get an error message saying special characters cannot be entered into this field.

And that would be true whether you were in DFA or DFP.  It would be the exact same message that would be displayed.

Q.   Could -- on the publisher's side now, could a publisher restrict, limit, or select what specific type of ad they wanted to have displayed on their page?

A.   Yes.  Kind of by default, they could, depending on which tags they implemented, or they could just by policy say we only want a certain type of ad.

Q.   Does that -- could you explain that in terms of the ads -- types of ads you described for us this morning?

1  A. Well, in terms of the three types of ads, a

2 publisher could say I only want to run image ads.  I

3 don't want to run anything else, or I only want to run

4 the html or rich media type of ads, or I only want to

5 run text ads.

6  Q. And is one -- I asked you this morning about

7 click commands.

8   Is one of those a click command?

9  A. The click command is really on the

10 advertiser's side.

11  Q. Okay.  Could you explain that, please?

12  A. Well, a click command is a way of tracking

13 clicks on a text ad.

14  Q. All right.  Let's -- let's go back to

15 Exhibit 149, please.

16   Now, are you familiar with the term look and

17 feel --

18  A. Yes.

19  Q. -- in internet parlance?

20  A. Yes.

21  Q. Could -- could a publisher using the DART

22 system impact or influence the look and feel of

23 advertisements that would appear on a publisher's page?

24  A. Yes.

25  Q. Could you explain that, please?

1     A.   So one way that a publisher could do that

2 would be by saying I only accept ads of a certain size

3 or shape.

4          Another way could be with the screen that we

5 went over earlier, which the publisher could enter

6 attributes saying I want a specific background color to

7 be shown, or I want a border to be shown, or I want a

8 font color to be blue all the time.

9          There's -- any number of html attributes could

10 be used to change how an ad was displayed.

11     Q.   All right.  Let's explore that for a minute.

12          Let's go to Page 3560, if I have that right.

13          Is there a portion of this page that relates

14 to the look-and-feel aspects that we discussed?

15     A.   Yeah.  It's those four fields that are

16 described under this site, configuration paragraph.

17     Q.   Okay.  Have you gone through all of those

18 before?

19     A.   Yes.  I used to train clients on this.

20     Q.   And is that -- that ability or functionality

21 within the DART system, was that in existence in 1998;

22 do you remember?

23     A.   Yes, it was.

24     Q.   Let's turn to Exhibit 370, please.

25          Whose handwriting is on this?

1    A.    That's my handwriting.

2    Q.    And can you tell us again, please, what this

3 document is?

4    A.    So this document is basically a summary that I

5 wrote for my manager on February 1st of 1999 to say here

6 we are one year later; this is what we have that's out

7 available to clients.  Here's the projects we're still

8 working on.  Here are the things that we still want to

9 update.

10          I think I also indicated which writer was

11 working on which document.

12    Q.    And when -- when is this document from?

13    A.    February 1st, 1999.

14    Q.    And does it have anything to do -- you got --

15 you got to DoubleClick in February of '98, right?

16    A.    Yes.

17    Q.    So this is a year later?

18    A.    A year later.

19    Q.    And what were you doing for that first year,

20 generally?

21    A.    All these documents.

22    Q.    Okay.

23    A.    In addition to training.  At the beginning, I

24 was training all the clients in the U.S. and in Europe,

25 also.

1    Q.    And does this document reflect functions of

2    the -- of the system that were in place in 1998?

3    A.    Yes, it describes them.

4    Q.    Let's turn to Page 4062.

5          Now, we looked -- we looked at this briefly

6    before.

7          Can you, just in a sentence or two, remind us

8    what this is?

9    A.    So this is the -- the actual user interface of

10   what I just described a moment ago where you enter the

11   frame headers and frame footers that surround an ad --

12   Q.    Okay.

13   A.    -- to be served.

14   Q.    Okay.  I want to ask you about some specific

15   statements on this page.  There's something that says BG

16   color --

17   A.    Yes.

18   Q.    -- equals number sign and then a bunch of F's

19   somewhere?

20   A.    Yes.

21   Q.    Is that it?

22   A.    Yes.

23   Q.    Can you tell us what that is, please; what

24   that reflects?

25   A.    So that's an html attribute that specifies, in

1  this case, that the background color is white.  You

2  could use -- and it's a hexadecimal code that's used to

3  specify the actual color.

4        So you could use any hexadecimal code for a

5  color and specify it as the background color of this --

6  on this site for all ads served there.

7     Q.   Okay.  Let's take an example of an ad.  Let's

8  start with a text ad.

9        If -- if a text ad were being used and this

10  command, this code, was there, what would happen?

11     A.   Well, if -- so basically, you have the html or

12  ASCII text of the ad that is surrounded by these headers

13  and footers and then served into the ad slot on the

14  page.  And so any attribute in here is applied to that

15  ad slot.

16        So, for example, if you had a font color or

17  font size that could change it, you could change the

18  background color of that ad slot, the border.

19     Q.   Okay.  How about -- would it be different for

20  image ads, a different type of ad?

21     A.   So these parameters are not applied to image

22  ads.

23     Q.   Meaning what?

24     A.   So an image ad is served without this -- you

25  could think of this as a wrapper or a package around the

1  ad, these -- these two command lines or lines of code --

2  sorry.

3      So an image is served to a different set of

4  tags that doesn't have these.

5      Q.  But in a text ad?

6      A.  A text ad could have this, yes.

7      Q.  Yes.  Thank you very much.

8          THE COURT:  Cross-examination?

9          MR. NELSON:  Yes, sir.

10                CROSS-EXAMINATION

11  BY MR. NELSON:

12     Q.  Good afternoon, Ms. Delfau.

13     My name is Justin Nelson.  We haven't met

14  before.  I think I am the latest in the line of lawyers

15  at this podium today that decided this is a blue tie

16  day, so I apologize for that.

17     You are aware that AdSense for Content Online

18  is the accused product in this case, right?

19     A.  I don't know about those kind of details.

20     Q.  Okay.  You stated earlier today that you have

21  not read the patents in this case; is that right?

22     A.  That's true.

23     Q.  Okay.  And let me ask you -- let's go straight

24  to -- I'm a little bit confused from your testimony

25  about how the system works, and I'm hoping you can

1 clarify some things for me.

2          MR. NELSON:  Your Honor, may I go to the

3 easel?

4          THE COURT:  Yes.

5          MR. NELSON:  Can we put up Page 46 from

6 her deposition testimony, in the middle of the page,

7 Lines 7 through 17?

8     Q.   (By Mr. Nelson) Ms. Delfau, is this your

9 description of how DART for Publisher works here?

10    A.   Sorry.  I'm just reading it.

11    Q.   No, no, please take your time.  If you want to

12 have it zoomed out, we can do, if you want context.

13    A.   Could you repeat the question?

14    Q.   Yes.

15         Is this your testimony about how DART for

16 Publisher works in this specific answer here between the

17 publisher and the advertiser?

18    A.   No, that's not what the answer to this

19 question was.

20    Q.   What was the answer to this question about?

21    A.   So this question was, could any DART for

22 Publisher's client serve any ad that was in the system,

23 and the answer is no, each ad network has the -- their

24 own advertisers and have made deals with their

25 advertisers.

1              It's not like it's a big pool of all ads.

2    Each has a little space that's reserved for their own

3    ads.

4         Q.   Okay.  I want to ask you about that.  So

5    you -- on your direct testimony, I think you gave the

6    example of what General Motors or something like that,

7    and General Motors would be gm.com, or would it be -- GM

8    would be the advertisers?

9         A.   Be the advertiser.

10        Q.   Okay.  GM would be an advertiser down here; is

11   that right?

12             Can you see this?  Should I move it up?

13        A.   It's okay.

14        Q.   Okay.  Now, GM would advertise on what; like a

15   site like cars.com; is that right?

16        A.   Right.

17        Q.   Is that right?

18        A.   Uh-huh.

19        Q.   And cars.com and GM would independently

20   negotiate the deal to place the ads on cars.com; is that

21   right?

22        A.   Yes.

23        Q.   Okay.  And say GM wanted to place an ad on

24   another site, car.com, or something like that.

25        A.   Uh-huh.

1        Q.   GM would do a separate deal --

2                  THE COURT:   Excuse me.

3                  If you wouldn't mind answering yes or no.

4                  THE WITNESS:  I'm sorry.  Yes.

5                  THE COURT:   That's okay.  It's hard for

6    her to write down uh-huhs and huh-uhs.

7                  THE WITNESS:  Sorry.

8        Q.   (By Mr. Nelson) Car.com, that would be a

9    separate deal negotiated between GM and car.com; is that

10   right?

11       A.   Right.

12       Q.   Okay.  Now, say Ford wanted to advertise on

13   cars.com, it would negotiate a separate deal with

14   cars.com?

15       A.   Yes.

16       Q.   And it would negotiate a separate deal with

17   car.com?

18       A.   Yes.

19       Q.   Okay.  Now, if GM wanted to run an ad on --

20   let me ask -- let me ask it separately.

21            Would these two systems, the GM ad on cars.com

22   and the GM ad on car.com, be able to intermingle?

23       A.   Could you repeat?  The GM --

24       Q.   Let me ask it -- how you say it right there.

25                  MR. NELSON:  The last line, 16 and 17,

1  can we highlight that?

2      Q.   (By Mr. Nelson) You say the ads don't go

3  cross-network.

4          Is that -- what you mean here, right, is that

5  the cars.com ads that GM puts on cars.com, it can't put

6  that same ad on car.com?

7      A.   Yes, it can.

8      Q.   Well, it has to negotiate separately with

9  car.com.

10     A.   But you enter -- when you do your --

11     Q.   Yes or no.  And I'm trying really hard to to,

12 you know, ask a specific question.  And, please, just

13 if -- I'd appreciate it if you can answer that, I'll

14 give you a chance to explain if there's something that's

15 missing.  But I'd really appreciate it if you could help

16 me, because I don't understand it.

17         GM puts a separate ad on both of these

18 websites; is that right?

19     A.   Can I ask one question?

20     Q.   Sure.  Please.

21     A.   So GM is a DART for Advertisers's client,

22 right?  GM is using DART for Advertisers in this

23 scenario?

24     Q.   I believe you're -- this is DART for

25 Publishers, right?  If this were a DART for

1  Publishers --

2      A.   Then -- then that is all backwards.

3      Q.   Then -- okay.  So this -- this is an example

4  of DART for Publishers or DART for Advertisers; is that

5  what you're talking about?

6      A.   Well, if we're talking about GM as an

7  advertiser, that's a DART for Advertiser example.

8      Q.   Okay.  Okay.  Fair enough.

9           Now -- so what you're saying is this is DFA,

10 and cars.com would submit the ad to DFA, right?

11     A.   No.

12     Q.   Okay.  GM would submit the ad to DFA?

13     A.   Yes.

14     Q.   Okay.  And let's please go to -- I believe

15 it's Defendant's Exhibit 373.

16          This is DART for Advertisers now.  And let's

17 go -- you looked at Page 4 of this document.  Let's go

18 to Page 3 of this document.

19               MR. NELSON:  And let's zoom in on the

20 bottom chart right there.  The bottom part of it.

21               Thanks.

22     Q.   (By Mr. Nelson) Now, is this -- this is DART

23 for Advertisers, correct?

24     A.   Yes.

25     Q.   Now, this has it that the sites are at the

1 bottom rung, and the advertisers, the buys, are in the

2 middle rung, but you've just told me that it's the

3 opposite.

4        And what I've drawn here, you've said is DART

5 for Advertisers, but that's the exact opposite on that

6 screen, right?

7    A.    No.

8    Q.    Why not?

9    A.    This is -- this is how it works.  So you've

10 just drawn it upside down.  If -- if we're talking about

11 GM being the advertiser, then GM negotiates or buys

12 advertising space on Sites 1 through 6.  And in their --

13 and when I said database, that was in quotes, kind of --

14 you think of it as their little application, their home

15 where they have all their ads.  That becomes, in a

16 sense, their network.

17    Q.    Site refers to what?

18    A.    Ad space that the advertiser has purchased

19 in -- from the website.

20    Q.    Okay.  And buy refers to what?

21    A.    An order, a deal negotiated as the purchase of

22 ad space.  It's just a description of the order.

23    Q.    Whose buy, the website's buy or the

24 advertiser's buy?

25    A.    The advertiser's buy.

1    Q.   Okay.  And so the advertiser is doing separate

2  buys.

3              MR. NELSON:  Let's zoom in on Site 4, if

4  we can, and take that up.

5    Q.   (By Mr. Nelson) The advertiser has a separate

6  buy with the two independent buy boxes; is that right?

7  One of the --

8              MR. NELSON:  Could you maybe highlight

9  the two buy boxes?

10   Q.   (By Mr. Nelson) One of the site buy boxes goes

11 to the second buy -- one of them goes to the second buy

12 box, and the other one goes to the third buy box; is

13 that right?

14   A.   No.  This is kind of showing that I think that

15 third buy can be served on Site 4 and 5, or it could be

16 served on, you know, 2 out of all the sites on the

17 worldwide web.

18          This is not intended to show exactly which

19 sites are shown.  It's kind of implying that there can

20 be many buys and many sites in a buy.

21   Q.   Cars.com negotiates a separate deal with GM

22 than car.com?

23   A.   It's a media buyer who is doing that, not

24 cars.com.  So the answer is no.

25   Q.   A media buyer like what?

1    A.   At General Motors, the media buyer will go out

2 and contact websites and negotiate buys with all of

3 these different websites.

4    Q.   Let's go back to your deposition testimony on

5 that Page 46.

6         You used the example of the New York Times and

7 CNN.  And to zoom out, this is your testimony about DART

8 for Publishers, isn't it?

9    A.   Yes.

10    Q.   Okay.  So DART for Publishers, New York Times,

11 CNN, and they negotiate the deals with these same

12 advertisers, GM and Ford; is that right?

13    A.   Yes, they could.

14    Q.   Okay.  Is this correct, Ms. Delfau?

15    A.   It is accurate if you're talking about the

16 New York Times being one client and CNN being a separate

17 client.

18    Q.   Yes, a separate client.  And assuming they are

19 separate clients, there's no cross-network here,

20 correct?

21    A.   Right.  It's -- it's the same as if I'm online

22 banking and we both go to Chase Bank, I'm only going to

23 log in and see my accounts.  I'm never going to log in

24 and see your accounts.

25    Q.   The newyorktimes.com submits this ad to DART

for Publisher, correct?

A.   Any of the -- both of their ads there.  You have GM and Ford.

Q.   Yeah.  New York Times submits their ads, their ads to DART for Publisher?

A.   Yes.

Q.   GM does not submit its ad to DART for Publisher.  It submits it to the New York Times.

A.   If GM is a DART for Advertiser's client that we talked about earlier, it submits it to DART for Advertiser.

Q.   Ma'am, I'd like you to focus on DART for Publisher.

     Within DART for Publisher, if GM submits its ad to New York Times, it submits it to New York Times and not to DART for Publisher; is that correct?

A.   That's not necessarily correct.

Q.   If it's only a DART for Publisher -- if it's not a DART for Advertiser, that is correct.

A.   Can I explain why it's not correct?

Q.   Sure.  Please.

A.   So the majority of advertisers like these big advertisers, they always work with an agency.  They always work with a third-party system.  So they would probably not submit it directly to New York Times.  It

would probably be submitted to their ad-serving system,

whether that's Atlas or DFA or whatever it is.

    Q.   Okay.  Their ad-serving system?

        Okay.  Fair enough.  But it's their own media

buy; is that right?

    A.   Yes.  Yes.

    Q.   Okay.  Now, you do agree that it's the

publisher who submits the ad to DART for Publisher,

correct?

    A.   Yes.

    Q.   Okay.

        MR. NELSON:  Could we please go to

Defendant's Exhibit 149?

    Q.   (By Mr. Nelson) You looked at this document,

correct?

    A.   Yes.

    Q.   Okay.  By the way, you gave some dates and you

said this document was created on such and such date,

and there wasn't a date on that document.

        What is your corroboration for when that

document was created, if it was not on the document

itself?

    A.   Some of the documents had dates.

    Q.   For the documents that do not have dates on

them, what is your corroboration for the dates on those

documents?

     A.    Each document has a different case.  If you
show me a document, I'll tell you how I have determined
the date.

     Q.    Okay.  Well, do you recall with Mr. DeFranco
you gave some testimony, and you said there was not a
date on that document?

     A.    I'm sorry.  I don't remember which one it was.

     Q.    Okay.  Let me ask you generally, if there is
not a date on the document, do you have any
corroboration, besides your testimony, for what the date
on that document is?

     A.    Some of it is from memory; some of it I know
the sequence of events.  Some of it is because there are
features that are described that I know when they came
out, basically, and when we launched them.

     Q.    When did you write the note that says February
1998?

     A.    This right here?

     Q.    Yeah.

     A.    Was when the lawyers asked me to provide this
documentation.

     Q.    So this handwriting is not contemporaneous
handwriting.  This is handwriting that you did to give
to the lawyers in this case?

1     A.   Only the two that have the -- they had

2  Post-Its on the front document.  Only those two.  Any

3  writing within a document happened in the '90s.

4     Q.   The note -- the note that says this was

5  created in February 1998, in this specific example, this

6  is not handwriting from 1998, correct?

7     A.   That's correct.

8     Q.   It's handwriting from 2008 or 2009 or

9  something, correct?

10     A.   Yes.

11     Q.   Okay.  And the same would be true for the

12  other Post-It Note document that we saw?

13     A.   Yes.

14     Q.   What is your corroboration for this document

15  that it was created in February 1998?

16         I'm not asking about your memory or the

17  sequence of events.  Can you point me to anything in the

18  written record that corroborates this document as being

19  created in February of 1998?

20     A.   I didn't say --

21          MR. DEFRANCO:  Objection to form, Your

22  Honor.

23          THE COURT:  Overruled.

24     A.   I didn't say it was created in February '98.

25  I was given this document in February '98 when I

1   arrived.  It was already in existence.

2       Q.   (By Mr. Nelson) And what is your written

3   corroboration for that?

4           Again, I'm not asking about -- you

5   understand -- and the reason why I'm asking is that

6   there is a requirement in patent law -- are you aware

7   there's a requirement in patent law that there has to be

8   a written corroboration for documents --

9       A.   I don't know patent law.

10      Q.   -- that's separate?

11              THE COURT:  Is there an objection?

12              MR. DEFRANCO:  I'm sorry?

13              THE COURT:  Is there an objection?

14              MR. DEFRANCO:  I'd object to instructing

15  the witness on the law.

16              THE COURT:  Well, overruled.

17              You can answer to the extent you know.

18      Q.   (By Mr. Nelson) So the reason why I'm asking

19  is because there is a separate requirement.  The patent

20  laws say it can't just be your memory.

21              So my question is, what, besides your memory,

22  gives us corroboration here that this document was

23  created in February 1998 and not sequence of events or I

24  remember be given this document?

25              But is there anything in the written record

1  that you can point us to?

2      A.    If I had a chance to take a look at this

3  document, I can tell you what existed at that time.

4      Q.    Okay.  Well, you know, maybe I'll leave that

5  for Mr. DeFranco, if he wants to ask that.

6            Right now, as we speak, you can't point me

7  to anything as I asked this question; is that right?

8      A.    I don't have time to --

9            MR. DEFRANCO:  Objection, Your Honor.

10  That wasn't the answer.

11      Q.    (By Mr. Nelson) Okay.  Now, let me put up --

12            THE COURT:  Overruled.

13      Q.    (By Mr. Nelson) Let's go, again, to Page 12 of

14  this document.

15            MR. NELSON:  20 -- next page.  There we

16  can.

17            Can we blow up that lower left-hand

18  corner, please?

19      Q.    (By Mr. Nelson) This is, what, DART for

20  Publisher we're looking at?

21      A.    Yes, it is.

22      Q.    And this is the advertiser in DART for

23  Publisher; is that right?  This advertiser at the bottom

24  right here?

25      A.    Yes.

1   Q.   And it's explaining what the advertiser can do

2  in DART for Publisher; is that right?

3   A.   No.

4   Q.   It says view insertion order, doesn't it?

5   A.   This is not what the -- I'm sorry.  I'm

6  looking at the trafficking line.

7       You're looking at the advertiser line.

8       MR. NELSON:  Okay.  Let's zoom back out.

9   Q.   (By Mr. Nelson) Okay.  And the advertiser --

10  the arrows are pointing to what the advertiser can do.

11       You see the three arrows to the three lower

12  boxes of what the advertiser can do?

13   A.   Yes.

14   Q.   Okay.  This is what the advertiser can do in

15  DART for Publisher, correct?

16   A.   Yes, if the publisher allowed the advertiser

17  to have access.  This is not a DFA advertiser.  This is

18  just any advertiser.

19   Q.   Okay.  If the publisher is allowed access by

20  the site, they can see this; is that right?

21   A.   The publisher is the site.

22   Q.   I'm sorry.  If the publisher -- if the

23  advertiser is allowed access by the publisher; is that

24  right?

25   A.   Yes.

1     Q.   Okay.  If the access is granted, the

2 advertiser can view insertion order, correct?

3     A.   Yes.

4     Q.   The advertiser can view ad placement, correct?

5     A.   Yes.

6     Q.   The advertiser can view reports?

7     A.   Yes.

8     Q.   Can the advertiser input?

9     A.   No.

10     Q.   Okay.  Let's go back to here.  The advertiser

11 is not prompted to input, are they?

12            MR. DEFRANCO:  Objection, Your Honor.

13            THE COURT:  Hold on a second.

14            What's the objection?

15            MR. DEFRANCO:  Objection, for the record,

16 he's showing a fact witness a claim patent.

17            THE COURT:  It's overruled.

18     Q.   (By Mr. Nelson) The advertiser is not prompted

19 to input, is it?

20     A.   I have not read that.

21     Q.   You just testified the advertiser is not

22 inputting, correct?

23     A.   The advertiser is inputting in DART for

24 Advertisers.  This is DART for Publishers.

25     Q.   In DART for Publishers, the advertiser is not

1  inputting, is it?

2      A.   No.

3      Q.   And newyorktimes.com is negotiating -- and I

4  think you just testified to this -- independent deals

5  with Ford and GM; is that right?

6      A.   Yes.

7      Q.   Okay.

8              MR. NELSON:  Could we put up our opening

9  slide, our first opening slide?

10     Q.   (By Mr. Nelson) This is a fair

11 characterization of the seller, which is, what, GM in

12 this circumstance is negotiating with the New York

13 Times, correct?

14             The seller is negotiating with the website?

15     A.   GM is buying space.

16     Q.   Okay.  And this is happening in this

17 particular instance, correct, GM to New York Times,

18 buyer/seller, website/seller, right?

19     A.   No.

20     Q.   Well, the website -- someone is buying ads,

21 right?

22     A.   GM is buying space.

23     Q.   Okay.  All right.  And on a one-to-one

24 transaction, right?

25     A.   Not necessarily.

1     Q.   And you just told me there is a one-to-one --

2 New York Times or a media buyer is negotiating

3 independently with -- with GM, correct?

4     A.   Yes, that is correct.

5     Q.   Okay.

6           MR. NELSON:  Let's go to the next slide.

7     Q.   (By Mr. Nelson) And so it would happen on

8 multiple times, the media buyer, right, would have to

9 independently negotiate for all of these advertisers,

10 correct?  In DART for Publisher?

11     A.   There's not a media buyer on DART for

12 Publishers.  There's a sales person.

13     Q.   The sales person for newyorktimes.com is

14 independently negotiating with the different

15 advertisers, correct?

16     A.   Yes.

17     Q.   Okay.  And the sales person would have to do

18 that --

19           MR. NELSON:  Let's go to the next slide.

20     Q.   (By Mr. Nelson) -- for all of the different

21 advertisers; isn't that true?

22     A.   Right.  The same way as a magazine.  You have

23 a sales person who goes and negotiates ads.

24     Q.   Okay.  Mr. Dean testified, Jeff Dean -- do you

25 know who Jeff Dean is?

1      A.    Yes.

2      Q.    Okay.  Have you met Jeff Dean?

3      A.    I met him two days ago.

4      Q.    Okay.  He testified that DoubleClick was not

5  appropriate for Google, because DoubleClick -- its

6  products could not scale to -- to large -- to many -- to

7  having many publishers.

8            I think he said that it could not scale to

9  millions of -- of publishers.  I think his exact

10  quote -- I don't have his exact quote, but he said it

11  couldn't scale to millions.

12           Do you agree that the DoubleClick system could

13  not scale to millions?

14     A.    I don't have exact knowledge of that.  That's

15  not my character of expertise.

16     Q.    Okay.  Thank you.

17               MR. NELSON:  I'll pass the witness.

18               THE COURT:  Redirect?

19               MR. DEFRANCO:  Yes, Your Honor.

20               Let's go to Exhibit 149, please.

21                 REDIRECT EXAMINATION

22  BY MR. DEFRANCO:

23     Q.    Ms. Delfau, that note on the front, that's a

24  note that you wrote, I think you said, when you were

25  asked to find whatever documents you could for this

1　case; is that correct?

2　　　A.　　That's correct.

3　　　Q.　　And what is it that you wrote there when you

4　found this document?

5　　　A.　　I explained when I got the document.  So I was

6　given this when I arrived in February 1998.  This was

7　written by the sales engineers for internal use and was

8　the basis for additional or later docs.

9　　　Q.　　Now, on cross-examination, you weren't given

10　the chance to completely explain how you would date this

11　document to when you first arrived at DoubleClick.

12　　　　　Is there anything else you'd like to add?

13　　　A.　　Well, it was there when I arrived.  It was

14　part of the information I used to learn about the

15　system.  If I went and took a look at the explanation of

16　all the ad properties, I could identify that they were

17　properties that were there in 1998.

18　　　Q.　　Now, when you first arrived at DoubleClick,

19　did you have any experience with DoubleClick system?

20　　　A.　　No.

21　　　Q.　　Okay.  Were there documents that you looked at

22　to --

23　　　A.　　This was really the only one.

24　　　Q.　　Got to let me finish.

25　　　A.　　Sorry.

1    Q.   I got to do my job.

2    A.   Sorry.

3    Q.   That's okay.

4    Were there documents that you looked at to

5 familiarize yourself with the system at that time to get

6 up to speed to do your job?

7    A.   Yes.

8    Q.   Could you -- we have a number of documents in

9 this binder.  You were asked generally about them on

10 cross.

11    Using your best memory, could you just point

12 those out to us one at a time, please?

13    A.   The documents that I used to get familiar with

14 the system?

15    Q.   When you first arrived, are there any others,

16 other than Exhibit 149, you would point to?

17    A.   No.  The rest of the documents were all

18 written by my group after that.

19    Q.   They were written as -- as what?

20    A.   As user documentation or training material for

21 our clients at that time.

22    Q.   And was that part of your job at the time?

23    A.   Yes, it was.

24    Q.   Now, you were asked about DFA and DFP.

25 Again, could those two systems -- well, DFA is for

1  which?

2       A.   DART for Advertisers.

3       Q.   And DFP?

4       A.   DART for Publishers.

5       Q.   Could they be used independently?

6       A.   Yes.

7       Q.   Could they be used in different ways?

8       A.   They could.

9       Q.   How is that?

10      A.   Well, they could be used together.  So an

11  advertiser could use DART for Advertisers to serve ads

12  to websites that use DFP, that didn't use DFP, that used

13  another system, that used an in-house system.

14           So any site; it didn't matter what kind of

15  ad-serving system they were using.

16      Q.   In your experience in '98, were some customers

17  of DFA, the advertising side, also customers of DFP, the

18  publisher's side?

19           Let me put it differently.  Did those two

20  share customers at times?

21      A.   I don't know for a fact if they shared

22  customers, but I know that customers who used one

23  application worked with other customers who used the

24  other application.

25      Q.   Well, why don't you explain.  If an ad was put

1  in -- how was an ad put in again on the DFA side?

2      A.   The advertiser would go to the DFA UI and --

3      Q.   UI is?

4      A.   User interface.

5           -- and enter the information about the ad.

6      Q.   And the publisher information you told us

7  about earlier, like font size and color, how would that

8  be put in on the publisher's side, please?

9      A.   Through that screen shot that we looked at

10 that had the frame parameters, background color.

11     Q.   And could an ad that was put in, as you

12 described on the advertiser's side, be viewed on

13 multiple publisher websites in the DART system?

14     A.   Yes.

15     Q.   How would that happen, please?

16     A.   Well, just by targeting any -- or choosing any

17 of those -- any sites.  You know, I think I said up to

18 600.  It might be only 256 sites that you can target for

19 one ad placement.  But you can use the one same ad and

20 target all of those X number of sites.

21     Q.   Thank you very much.

22              MR. NELSON:  One question.

23              THE COURT:  Recross.

24              MR. NELSON:  Let's please put up Page 46

25 of your deposition again.

<u>RECROSS-EXAMINATION</u>

<u>BY MR. NELSON:</u>

    Q.   This is Page 46 of your deposition, Lines 7 through 17.  And you state, starting on Line 9:  It wasn't like there was a pool of ads that chose among websites.  If you consider a website an ad network, that ad network -- the New York Times, for example -- could only have ads that they had negotiated with their clients served to them.

        Another website, CNN, has their own database of ads that can be served, but the ads don't go cross-network.

        That was your sworn testimony, correct?

    A.   Yes.

    Q.   Do you stand by that testimony?

    A.   I do, but you're not asking the question that this answers.

    Q.   Yes or no, do you stand by that testimony?

    A.   Yes, I do.

    Q.   Thank you.

        MR. DEFRANCO:  Two more questions.  I apologize.

<u>REDIRECT EXAMINATION</u>

<u>BY MR. DEFRANCO:</u>

    Q.   For the sake of the record, can you explain to

1  us how that is different than what you were asked?

2      A.   Yes.  Can you put it back up?  Do you have it?

3  That's fine.  I can talk about it.

4      Q.   Just an explanation, then I have one more

5  question.  Go ahead.

6      A.   Okay.  So as I mentioned, when I started at

7  DoubleClick, the primary business was an ad network.

8  And so that ad network had -- I don't know exactly how

9  many sites -- but say it had 50 websites that were part

10 of that ad network.

11          And so in that sense, the ad network is very

12 big and has a pool of ads that can be served throughout

13 any of those sites.  However, in this instance, what we

14 were talking about here is individual clients of DART

15 for Publishers could only have access to the ads that

16 they actually booked.

17          Just as I mentioned before like an online

18 banking system, I only have access to my account.  I

19 don't have access to your account.

20     Q.   Okay.  Great.

21          Now, just -- I said one more; a couple more.

22 In the center of DFA and DFP is DART, right?

23     A.   Right.

24              MR. NELSON:  Objection, Your Honor

25 outside the scope of recross.

```
 1                    THE COURT:  Overruled.
 2        Q.   (By Mr. DeFranco) If I pulled the plug on
 3   DART, what would happen to DFA and DFP?
 4        A.   You couldn't use either of them.
 5        Q.   Thank you.
 6                    MR. DEFRANCO:  No questions.
 7                    MR. NELSON:  No recross.
 8                    THE COURT:  May this witness be excused?
 9                    MR. DEFRANCO:  Yes, Your Honor.
10                    MR. NELSON:  Yes, Your Honor.
11                    THE COURT:  You may step down.
12                    THE WITNESS:  Thank you.
13                    MR. DEFRANCO:  May I have one minute to
14   confer?
15                    THE COURT:  Yes.  Who will be your next
16   witness?
17                    MR. DEFRANCO:  Steven Rupp, Your Honor,
18   Rupp, R-U-P-P.
19                    THE COURT:  Okay.  Here you go, Mr. Rupp.
20   Come around.  If you'll stand here and take the oath.
21                    THE WITNESS:  Sure.
22                    (Witness sworn.)
23                    THE COURT:  If you'll come around this
24   way, there's a seat over here.  Try to speak into the
25   microphone for me and keep your voice up.
```

1          THE WITNESS:  Okay.

2          THE COURT:  If you'll talk slowly, it

3  will make it easier for our court reporter to take down

4  what you're saying.

5          THE WITNESS:  Okay.

6      STEVEN RUPP, DEFENDANT'S WITNESS, SWORN

7          DIRECT EXAMINATION

8  BY MR. DEFRANCO:

9      Q.   Good afternoon, Mr. Rupp.

10     A.   Good afternoon.

11     Q.   Please state your full name for the record.

12     A.   Steven William Rupp.

13     Q.   And where do you currently work?

14     A.   I work at Google.

15     Q.   And you're here to tell us also about

16  DoubleClick.

17          Do you understand that?

18     A.   Yes.

19     Q.   You were -- when did you start at DoubleClick?

20     A.   I started at DoubleClick in November of

21  1998 -- in '99.  Sorry.

22     Q.   Okay.  November of?

23     A.   November of 1998.

24     Q.   And let's -- for the record, can you just tell

25  us a little bit about your educational background?

1    A.   I got a bachelor's degree in electrical

2 engineering from Rensselaer Polytechnical Institute in

3 1988.

4    Q.   And what was your -- so did you join -- well,

5 I don't want to -- just give us briefly -- you worked

6 for a number of companies between when you graduated and

7 joined DoubleClick; is that right?

8    A.   Yes.

9    Q.   Okay.  Let's talk about DoubleClick.

10          What was your first position there?

11    A.   I was a software engineer working on the back

12 end data processing system.

13    Q.   What was the back end data processing system?

14    A.   So the back end data processing system is

15 responsible for taking the daily ad serving event data

16 so the record of the ads that were shown and the ads

17 that were clicked on, processing that and putting the

18 results in the reporting database.

19    Q.   And was that -- what -- what system was that

20 part of?

21    A.   That was part of the DART system.

22    Q.   And at the time in 1998, what other products

23 did that -- that DART system work with at DoubleClick?

24    A.   So there were two main products, DFP, DART for

25 Publishers, and DFA, DART for Advertisers.  They were

1   both built out of the DART technology.

2       Q.   And how long were you working on the back end?

3       A.   Three or four years.

4       Q.   Three or four years at DoubleClick?

5       A.   On that particular project, yes.

6       Q.   And just give us a sentence about DFA, please.

7       A.   DFA is a product for online advertisers and ad

8   agencies.  It allows them to create online ad campaigns,

9   run them on various websites, collect all the

10  information into a central place, and run reports on it.

11      Q.   And DFP?

12      A.   DFP is a product for online publishers of

13  websites.  It allows them to manage ad campaigns and

14  control which ads they show on their websites.

15      Q.   And did they both use DART?

16      A.   Yes.  They were both built out of the DART

17  technology.

18      Q.   And did they work together in that sense?

19      A.   Absolutely.

20      Q.   Could you just give us a few sentences on

21  that?

22      A.   First of all, they shared almost all their

23  technology.  So they had a common ad server, a common

24  back end data processing system, the part that I worked

25  on.  There was a common database.  Most of the UI and

reporting code was shared between the two systems.

Q. Now, could you give us a little bit more detail of the -- of the pieces that you were responsible for in the centralized or back end DART system?

A. So a description of the back end?

Q. Yeah. Can you just walk us -- I don't want to take the time to do a drawing. Can you just walk us through the pieces?

A. Sure.

There were three main kind of functions of the back end.

The first one was to collect all the ad-serving log data. So we had hundreds of AdServers around the world in various data centers. And the log manager component collected those logs into our main data center. In 1998, it was in New York.

The next component was called Derive. It was an application that was mostly responsible for data hygiene. So cleaning up the event data. If someone were, say, clicking on their own ad to try and make it look like it was performing better, it would detect that and strip out that data so that we didn't count it for the publisher or the advertiser.

So the Derive piece also took those hundred AdServer logs and reorganized them into fewer larger

files to make the processing easier.

The main component was called Report Master, and it's the piece that actually did the processing of the daily data.

So it took all the event data for the day and counted the ad views and the ad clicks in various ways and put those results into the reporting database. Then publishers or advertisers could log in to the user interface, run reports, and see what happened for the day, see how many ads were shown, where they were shown, things like that.

Q. DFA, DART for Advertisers, did it use some, all, most of the components you described?

A. All of that technology, as well as DFP. When the back-end processed an ad, it didn't matter whether it was a DFA ad or a DFP ad. Most of the processing was identical.

Q. If -- if I unplug the DART back end, would DFA or DFP work?

A. They would both go down. Neither would work.

Q. Is there a product called DART Enterprise?

A. Yes.

Q. What is DART Enterprise?

A. So DART Enterprise was a rebranding of an AdServer product we acquired from a company called

NetGravity in 1999.

So an ad-serving system similar -- similar to DART for Publishers, but it was for companies that wanted to own and operate their own AdServers.

So we would provide them the software. They would install it on their own computers and their own data center and run it and operate it themselves.

DART for Publishers and DART for Advertiser, DoubleClick owned the computers and ran them for the clients. So it was a service we provided.

Q.   Okay.  And would DART Enterprise -- was it DART for Enterprise or DART Enterprise?

A.   Just DART Enterprise.

Q.   Okay.  Did DART Enterprise, that product, did that work with DFA or DFP?

A.   Back then, no.  It was a separately operating product.

Q.   Okay.

MR. DEFRANCO:  Well, we've come a long way, but thank you.  That's all I have.

THE WITNESS:  Okay.

THE COURT:  Cross-examination.

MR. TRIBBLE:  Briefly, Your Honor.

CROSS-EXAMINATION

BY MR. TRIBBLE:

1    Q.   You currently -- you currently work for
2 Google?
3    A.   Yes.
4    Q.   Do you work with Ms. Delfau at Google?
5    A.   Not as much now, but I have in the past.
6    Q.   Okay.  The -- during your testimony, you
7 didn't refer to or show us any documents; is that fair
8 to say?
9    A.   That's correct.
10   Q.   Didn't show us any source code for these
11 systems you're talking about, correct?
12   A.   Correct.
13   Q.   Didn't show us a video of the operating
14 systems, what it looked like, correct?
15   A.   Correct.
16   Q.   You didn't show us any usage reports or any of
17 the tons of paper that must have been generated by these
18 systems back in 1998, correct?
19   A.   They didn't generate any paper, but okay.
20   Q.   Surely, there were manuals, instruction
21 manuals.
22   A.   There was user documentation.  I think Karen
23 went through a lot of that.
24   Q.   There would have been documentation -- I'm
25 talking about at DoubleClick.  There would be

documentation at DoubleClick, correct?

A.    There was user documentation back in 1998 and '99.  There wasn't a lot of engineering documentation yet.  It was actually one of the things that --

Q.    It was in the source code?

A.    Pardon?

Q.    Certainly, there was source code for running these systems, correct?

A.    Yes.

Q.    The software that makes the program run.

A.    Yes.  We have a source control system.

Q.    And DoubleClick was bought by Google in 2007, correct?

A.    The deal closed in 2008, but yeah.

Q.    Okay.  In 2008, Google bought DoubleClick; isn't that right?

A.    Yes.

Q.    Has Google provided you with any documentation from DoubleClick coming from 1998 that corroborates any of the testimony that you've just given?

A.    The user documentation wouldn't talk about the -- the back-end technology.

          THE COURT:  Well, yes or no.

          THE WITNESS:  Oh.

A.    No.  From -- from that time period, no.

1    Q.    (By Mr. Tribble) And you just testified that

2    the systems all worked together, right?

3    A.    Yes.

4    Q.    Do you recall giving a sworn deposition in

5    this case?

6    A.    Yes.

7    MR. TRIBBLE:  Can we put up on the screen

8    Page 20, Lines 15 to 24?

9    Q.    (By Mr. Tribble) In your deposition, there was

10   the following testimony by yourself:

11   Question:  Now, please explain the

12   relationship between the DART Enterprise product and the

13   DFA -- that's DART for Advertisers -- and the DFP --

14   that's DART for Publishers -- products, please.

15   Answer:  From what standpoint?

16   Question:  Well, first of all, do they

17   interoperate, or are they separately operating products?

18   And your answer was:  They're separately

19   operating products.

20   Was that your sworn testimony just this last

21   September 18th, 2009?

22   A.    Yes.

23   Q.    One other question.  In the DFP system, the

24   DART for Publishers system, that was a system for

25   publishers, right?

1    A.   Yes.

2    Q.   It was the publisher who would add the ads to

3 the system, correct?

4    A.   Yes.  The publisher traffics ads in the -- in

5 the DART for Publisher system.

6    Q.   Yes, not the advertiser.

7    A.   The advertiser would publish traffic ads in

8 the DART for Advertisers system.

9    Q.   Do you remember --

10          MR. TRIBBLE:  Let's go to Page 24, Line

11 23 through 25, Line 18.

12    Q.   (By Mr. Tribble) You were asked:  What was the

13 essential functionality of the DFP system?

14          Answer:  Again, in terms of a description of

15 the product?

16          Question:  Yes.

17          Answer:  An online advertising system for

18 publishers so that they could put ads on their websites.

19          Question:  People who were using the DFP

20 system back then in '98, '99 period, were they typically

21 then uploading ads of advertisers that they contracted

22 with and then using the system to serve those ads on to

23 their websites?

24          Answer:  Are you talking about publisher

25 users?

1          Question:  Yes.

2          Answer:  Yes.

3          Was that your sworn testimony on September 18,

4  2009?

5      A.   Yes.

6              MR. TRIBBLE:  Pass the witness.

7              THE COURT:  Redirect?

8              MR. DEFRANCO:  Just a few, Your Honor.

9              Can somebody put up that first piece of

10  testimony, please, about separability?

11             Do you have it?  I apologize.

12             Have you got it?  I'm sorry.

13                 REDIRECT EXAMINATION

14  BY MR. DEFRANCO:

15     Q.   You were just asked about this testimony,

16  right?

17     A.   Yes.

18     Q.   After you were asked a question without having

19  this in front of you.

20             Do you remember that?

21     A.   Yes.

22     Q.   Now, you said here -- the answer you were

23  asked about, they're separately operating products.

24             Do you see that?

25     A.   Yes.

1     Q.   Let's go to the question.

2         The question says:  Please explain the

3 relationship between DART Enterprise and the DFA and DFP

4 products.

5         Do you see that?

6     A.   Yes.

7     Q.   Now, you're an engineer, right?

8     A.   Uh-huh.

9     Q.   You see that and there?

10    A.   Yes.

11    Q.   Does that separate out DART Enterprise from

12 what's the remainder of that sentence?

13    A.   Yes.  I mean, to me, the question was about

14 whether DART Enterprise was a separate operating

15 product.

16    Q.   Did you talk about DART Enterprise on your

17 direct examination?

18        Do you remember that?

19    A.   No.

20    Q.   On direct, didn't I ask you about DART

21 Enterprise, what that was?

22    A.   Oh, yeah.  Yeah.

23    Q.   What is DART Enterprise?

24    A.   DART Enterprise is an ad-serving product we

25 acquired from NetGravity.

1    Q.   And did that product work with DFA and DFP?

2    A.   No.  It was separate from DFA and DFP.

3    Q.   Does that mean that DFA and DFP didn't work

4 together?

5    A.   No.

6    Q.   Now, you were also asked about documents.  You

7 were shown -- just to be quick here, you were shown lots

8 of documents, marketing-related documents and manuals at

9 your deposition, right?

10        Do you remember that?

11   A.   Yes.

12   Q.   You were on the technical and engineering

13 side?

14   A.   Correct.

15   Q.   And we're talking about the timeframe of 1998.

16        Are you aware of that?

17   A.   Yes.

18   Q.   And are you aware of any technical or

19 engineering documents that have survived from that time

20 period?  Have you seen any of those?

21   A.   No.

22            MR. DEFRANCO:  Okay.  Thank you very

23 much.

24            THE COURT:  Recross?

25            (Bench conference.)

1          MR. TRIBBLE:  I don't want to violate

2    anything.  I mean, can I ask him if he went to

3    DoubleClick and looked for any documents?

4          THE COURT:  If he went to DoubleClick and

5    looked for any --

6          MR. TRIBBLE:  Yeah.

7          THE COURT:  Well, at what -- at what

8    timeframe would they -- was the company purchased or --

9          MR. TRIBBLE:  He said it closed in

10   2000 -- I don't know, Your Honor, because he said it

11   closed in 2008.  I'm not --

12         THE COURT:  You can ask -- you can ask

13   that question.

14         MR. TRIBBLE:  Okay.

15         (Bench conference concluded.)

16                  RECROSS-EXAMINATION

17   BY MR. TRIBBLE:

18        Q.   Just one question.

19        A.   Okay.

20        Q.   My one question is:  Did you go to DoubleClick

21   and look and see if they, in fact, had any manuals or

22   source code or files that would help us with this issue

23   in this trial?

24        A.   Yeah.  I looked through my e-mail.  I looked

25   through the manuals that I had, yes.

1  Q. And did you point us to any of those manuals

2 today?

3  A. None of the manuals I had were from that time

4 -- none of the technical documentation that I had was

5 from that time period.

6  Q. Okay. So you looked through manuals and

7 things, but you didn't have anything that could

8 corroborate your testimony as of the 1998 timeframe that

9 you've been testifying about?

10  A. Correct.

11    MR. TRIBBLE: Okay. Thank you.

12    THE COURT: Redirect?

13    MR. DEFRANCO: Yes, Your Honor -- no.

14 All set.

15    THE COURT: You're through?

16    MR. DEFRANCO: I'm done.

17    THE COURT: May this witness be excused?

18    MR. DEFRANCO: Yes, Your Honor.

19    MR. TRIBBLE: Yes, Your Honor.

20    THE COURT: Okay. You may step down.

21 Thank you for coming.

22    MR. DEFRANCO: I'll now call Mark

23 Lanning, Your Honor.

24    THE COURT: Well, I tell you what, Ladies

25 and Gentlemen, what I'm going to do is, I'm going to

take our afternoon recess early today. I'm going to

break you until a quarter until 3:00.

We're going to come back, and we're going

to go -- we'll probably go another hour -- another hour,

maybe a little bit more. I'm going to let y'all go home

a little bit early today. Y'all have worked hard all

week, and I'm going to try to get you out of here

between 3:45 and 4:00 today, all right?

So don't talk about the case. Remember

my prior instructions. And I'll see you back in here at

a quarter until the hour.

COURT SECURITY OFFICER: All rise.

(Jury out.)

THE COURT: Court's in recess.

(Recess.)

COURT SECURITY OFFICER: All rise.

(Jury in.)

THE COURT: All right. Please be seated.

Mr. Verhoeven, call your next witness.

MR. VERHOEVEN: Your Honor, Google calls

Mr. Mark Lanning.

THE COURT: Come around, sir.

Was this witness previously sworn?

MR. VERHOEVEN: He was not.

(Witness sworn.)

1          THE COURT:  Try to keep your voice up and

2    speak into the microphone for me.

3          THE WITNESS:  Okay.

4          MARK LANNING, DEFENDANT'S WITNESS, SWORN

5                    DIRECT EXAMINATION

6    BY MR. VERHOEVEN:

7      Q.    Good afternoon, Mr. Lanning.

8      A.    Good afternoon.

9      Q.    Could you please tell us your full name?

10     A.    Mark Reed Lanning.

11     Q.    Where do you live, Mr. Lanning?

12     A.    I live in Greenville, Texas, which is located

13   between here and Dallas off of Interstate 30.

14     Q.    Can you tell us a little bit about yourself?

15     A.    Yes.  I'm married.  My wife and I will

16   celebrate our 35th wedding anniversary in May.  We have

17   three children and eight grandchildren.

18     Q.    Can you tell the jury what you do for a

19   living, Mr. Lanning?

20     A.    Yes.  I'm a consultant, technical consultant.

21   I also have a horse and cattle ranch that we raise both

22   horses and cattle for sale to people in Texas and many

23   other states around the country.

24     Q.    What's the name of your consultant company?

25     A.    Telecom Architects, Incorporated.

1    Q.    What about your cattle ranch?

2    A.    It's -- the name of it is The Twisted L Ranch.

3    Q.    Did you say that was in Greenville?

4    A.    Yes, I did.

5    Q.    Okay.  I'd like you to tell the jury a little

6    bit about your work history and your work experience, so

7    why don't we start at the beginning.

8          What was your first job?

9    A.    My first job was when I joined the Army in

10   1974.  They -- specifically, it was the Signal Corps or

11   the Army security agency.

12   Q.    Okay.  What did you do there, sir?

13   A.    I was a computer technician and software

14   programmer for the military after extensive training

15   over a two-year period.

16   Q.    Did you receive any awards while you worked

17   there?

18   A.    Yes, I did.  I received four different awards,

19   and I need to probably explain a little bit.  In the

20   Army, at the time in 1974, there were different courses

21   that we would sign up for that I enlisted for.

22          The first course was 38 weeks long, and the

23   Army has a little different way of training people than

24   going to college.  We went to class five days a week,

25   ten hours a day.  And they let us sit on bar stools, so

it wasn't really easy to fall asleep during class.

And then during the weekends, we did our normal military activity. And so after 38 weeks, I graduated from my first course as the top graduate or top of my class. They referred to it as honor graduate. At the time for motivating the students, they gave the honor graduate three different choices when you graduated at the top of your class. The first choice was to stay and become an instructor of the class. The second choice was to pick any assignment around the world that I wanted to go to. And the third choice was to go to another course.

One of the things I was interested in was to learn as much as I could. So I chose another course after my first 38-week course. The first course was on all the different types of voice and data communication equipment that's used by the military. They call it encrypted or crypto equipment. It's how the military sends data and voice around the world so people can eavesdrop on it. So I was referred to as a crypto technician at the time.

My second course, after my second course, I was the honor graduate, the top graduate of that course, so I thought that was a pretty good deal. So I actually selected to -- to -- a third course to attend.

1    And about a year and a half had past at that

2 time.  I selected a fourth course on programming, and it

3 was the state of the art programming of the systems at

4 the time -- it was around the middle of 1975 at that

5 time -- on how to program some of the most advanced

6 computers the military had.

7    After graduating as the top graduate of that

8 course and after four times in a row, the military

9 offered me an option I couldn't refuse.  They offered me

10 a position to become part of a small team to work on the

11 White House communication staff to upgrade the White

12 House communications for voice and data all around the

13 world to do that.

14    Q.   Okay.  And this work at the White House that

15 you mentioned, can you explain to the jury what kind of

16 work that involved?

17    A.   Yes.  The White House has both voice circuits

18 for telephone calls where they need to call anywhere in

19 the world.  They need to not only call the different

20 embassies they have but other U.S. properties.  But they

21 also have connections to a lot of other leaders around

22 the world.

23    And so those voice connections was what we

24 upgraded.  They had an old network at the time, and we

25 upgraded it to the state of the art equipment.  And when

the President speaks to another president, they really

don't want a lot of people eavesdropping on that

conversation.  So they use the latest state of the art

encryption technology to encrypt those voice calls.

They also needed to have data communications

for messages and for different -- sending different

messages or documents around the world.  We also

upgraded their communications network so they could send

messages all over the world.  And those were either

confidential or not confidential.

And in order to work with all of this

information and documents, I was -- I obtained the top

secret security clearance.  And top secret security

clearances also include access to different information,

and so I had a special access that was called

the sensitive information access where we were actually

reading documents that were coming to and from the White

House.

It was a little interesting, but it was always

difficult to make sure you didn't discuss any of this

information with people.  Some of the -- the classrooms

were not like classrooms like you would think of

classrooms.  We actually worked in a big safe.

When we would go into our classroom, I felt like a

banker, because it had a large safe door on it that

1   would be closed just like a bank safe would be and then

2   opened and they closed it.  There were many days we

3   didn't have any idea what the weather was, because we

4   were working with top secret information all day long.

5        Q.   So, Mr. Lanning, you understand this case

6   involves the internet, right?

7        A.   Yes, I do.

8        Q.   Did the work that you did over at the White

9   House have anything to do with the internet?

10       A.   Yes, it did.  In the data communications

11  for -- for this network, we interfaced and we actually

12  helped build the first generation of the internet.  It

13  was referred to as the ARPANET, and that's an acronym.

14  It's not too hard.  It's a network that was sponsored

15  and paid for by a government agency called the Advanced

16  Research Projects Agency, and they contracted with a

17  company out of Boston to build the ARPANET network, the

18  first internet.  That network essentially became the

19  internet.

20       Q.   Okay.  Did there come a time when you left the

21  Army, left the military?

22       A.   Yes.  I left with an honorable discharge in

23  1977.

24       Q.   Okay.  And what did you do next, Mr. Lanning?

25       A.   I had started flying when I was in the

1 military off time and received my private pilot's

2 license, so I wanted to continue flying. And I went to

3 an aeronautical university in Florida. The name of that

4 university is Embry-Riddle Aeronautical University.

5 And so I was taking flight training. I was also

6 attending aeronautical engineering courses full-time.

7 And in turn for tuition and a salary, the university

8 paid me for maintaining their simulator equipment, the

9 flight simulators for the different jets and airplanes.

10 Where I knew quite a bit about the computers and

11 software, I maintained that and worked my way through

12 the first part of my education for the aeronautical

13 university for an engineering degree.

14      Q.   What did you do after that, Mr. Lanning?

15      A.   I received an offer from IT&T, which is

16 International Telephone & Telegraph. Some of the people

17 that I'd worked with in the military went to IT&T and

18 they called me and asked me if I would join

19 International Telephone & Telegraph.

20      Q.   Approximately when was this?

21      A.   1979.

22      Q.   Okay. And did you join IT&T?

23      A.   Yes, I did. I joined IT&T, Defense

24 Communications Division.

25      Q.   And at the time, what was IT&T Defense

1  Communications?

2      A.    IT&T was a lot like AT&T at the time.  They

3  provided international voice and data networks.  They

4  also provided equipment that would perform in these

5  different networks.

6          The Defense Communications Agency did a lot of

7  this same or provided a lot of the same equipment

8  networks that I had worked on at the White House.

9      Q.    Okay.  And what did you do while you were

10 there?

11     A.    I was a software and hardware engineer working

12 on a team -- working with the team that built a large

13 software program, a computer system, that we referred to

14 as a message storing forward system.

15         That's a long name for what's referred to now

16 as an e-mail system.  If you think about what an e-mail

17 system does, it takes messages, stores them, and then

18 forwards them on to the recipients.

19         And we built the message storage and

20 forwarding system, effectively an e-mail system, for all

21 of the U.S. embassies all around the world and connected

22 that e-mail system to all of the U.S. embassies.

23         Later that was sold to two airlines and was

24 used to connect all of the gates, teletypes to all of

25 the passenger gates for the airlines worldwide.

1    Q.   As part of your job there, did you do any

2  programming?

3    A.   Yes, I did.  I was one of the main software

4  programmers.  We actually started with the system where

5  they provided the hardware without any software.  It was

6  a great education, but it was a big project, because we

7  wrote what is referred to as an operating system on your

8  PC.  That would be like Windows.

9         We wrote our own operating system.  We wrote

10 all the software for the communications protocols.  We

11 even had to write all the software that interfaced with

12 the printers and storage systems.  So it was a great

13 on-the-job training for how all the system software

14 works in a large computer system.

15    Q.   Did you do any work with networking protocols?

16    A.   Yes.  A big part of the system had to do with

17 network protocols.  We had some of the latest packet

18 switching protocols in the system for connections in --

19 in the United States.

20         But then as we went to some of the --

21 connected to some of the third-world countries, we also

22 had to use some of the most basic communication

23 protocols, because their systems weren't as advanced as

24 the ones in the United States.

25         A lot of those protocols are very similar to

what was used, if not the same protocols, in the first

version of the internet, the ARPANET network that I

referred to.

Q.    Now, during this time that you worked at IT&T,

did you continue to pursue your formal education?

A.    Yes, I did.  IT&T assigned me to a site in

Dallas where in turn for maintaining both the hardware

and software of this large e-mail system for Braniff

Airlines, they paid for my full-time education.

So I -- while I worked full-time for IT&T

Defense Communications Division, I went full-time to

Southern Methodist University in Dallas.

Q.    And at SMU, did you obtain a degree?

A.    Yes, I did.  I obtained a bachelor of science

in computer science in 1983.

Q.    Did there come a time that you stopped working

at IT&T?

A.    Yes.  Shortly after I graduated, I received an

offer from Digital Switch Corporation that's located in

Plano just north of Dallas.

Q.    When was that approximately?

A.    In 1983, after I graduated.

Q.    In 1983, can you describe for the jury what

Digital Switch Corporation was?

A.    Digital Switch Corporation was a large

hardware and software development company that built

telephone switches, specifically long-distance telephone

switches for companies like MCI and Sprint.

If you remember the commercials with the pin

drop for Sprint, the new digital network that you can

hear a pin drop, I was behind the scenes working on the

Sprint network and the equipment that was actually

performing those telephone calls.

Q.   What did you do at Digital Switch Corporation?

Can you describe that for the jury?

A.   I had two or three different responsibilities

over time.  I started as what we refer to as an

individual contributor, a software development engineer.

I was later promoted to a software development

manager, and later to the director of software

development for a large product that they referred to as

a signal transfer point.

Q.   Okay.  Did you develop anything when you were

there?

A.   Yes.  The signal transfer point was a large

packet switch that uses communications protocols that

are the same as what are used in the internet and for

telephone calls, to switch telephone calls.  When you

make a phone call from one person to another, this

signal transfer point transfers the information that the

1  dialed digits that you've dialed so that the telephone

2  switches can connect your voice call.

3      I also worked on the standards committees to

4  define caller ID.  The caller ID that you see on your

5  telephones at your house and on your cell phones, I

6  actually worked with the standards committees to define

7  how that would be implemented in the telephone networks.

8      Q.   Did there come a time when you were promoted

9  at Digital Switch Corporation?

10     A.   Yes.  Shortly after -- or about after a year

11 of software engineer, developing, writing software, I

12 was put over a software development group of about 15

13 people.

14     Later on, I was promoted to the director of

15 software development, and I had about 50 engineers

16 working for me at the time developing software.

17     Q.   Did there come a time when you ceased working

18 there at that company?

19     A.   Yes.  After Digital Switch, then I received

20 another offer to work for Tandem Computers.

21     Q.   And when was this?

22     A.   That would have been in 1987.

23     Q.   And in 1987, can you tell the jury what Tandem

24 Computers, what that company was?

25     A.   Some people hear Tandem Computers and they

confuse it with Tandy Corporation, which is Radio Shack. That's not what Tandem Computers was.

Tandem Computers built very large scale computer systems that were what we refer to as fault-tolerant, meaning that if one or parts of the system failed, the system would keep working.

In the 1980s timeframe, in the 1990s, Tandem Computers were the computers that were used for bank ATM networks. If you did -- if you ever did an ATM transaction for a bank, the odds are you used the Tandem computer and the software that we were working on.

Tandem Computers were also used by the New York Stock Exchange and the NASDAQ for all the stock transactions to make sure that every stock transaction was kept accurately and none were lost.

And that's one of the main reasons for the large fault-tolerant systems.

Q. What were your title or titles at Tandem Computers?

A. I was initially hired at Tandem Computers as the director of development, both hardware and software. Later I was promoted to the vice president of development. I was then promoted to the vice president of system -- systems engineering where I was responsible for all the architecture of the software and the

1  hardware of the systems.

2      Q.   Did you have some engineers reporting to you?

3      A.   Yes, I did.  At that time that I was the vice

4  president of development for Tandem Computers, I had

5  over a hundred engineers working for me at that time.

6      Q.   During the course of your career, have you

7  written software code?

8      A.   Yes, I have.  I've written lots of code.

9      Q.   If you had to estimate, how many lines of

10 computer code would you estimate that you've written in

11 your career?

12     A.   It would easily be over a million lines of

13 software code that I've written.  That would be an easy

14 bet.

15     Q.   Now, did there come a time when you left

16 Tandem Computers?

17     A.   Yes.  Yes, there was.  In 1991, I left Tandem

18 Computers to start my own consulting company.

19     Q.   Is that what became Telecom Architects?

20     A.   Yes, that's correct.

21     Q.   And that's your consulting company now?

22     A.   Yes, it is.

23     Q.   Can you give the jury some flavor of the types

24 of clients you've consulted with at Telecom Architects?

25     A.   Yes.  For Telecom Architects, I do technical

consulting for legal cases like I'm doing today, but I
also do technical consulting and custom software
development for large communications, telecommunications
companies, and the suppliers of these telecommunications
companies.

I've consulted for Motorola in Chicago,
British Telecom in London, and Sprint Nextel, and
they're based mainly on the East Coast in Western
Virginia.

Q.   Let's take British Telecom as an example.
What kind of work did you do for British Telecom as part
of your consulting company?

A.   British Telecom hired me to be the program
manager of a very large cellular network upgrade that
they were planning.  And they also had to upgrade their
billing system for billing all of their cellular network
clients.

At the time, the British telecom cellular
network was the largest cellular network in the world,
and I was the program manager, and I had over a
billion-dollar budget to upgrade all of their cellular
network and their -- and their billing system.

I had over 600 engineers that I was
responsible for that were located in six different
countries.  So it kept me busy flying all over the world

1  to integrate this -- this project.

2      Give you an idea, I have over 3 million miles

3  on American Airlines from flying all over the world to

4  integrate this project.  That lasted for a period of

5  three to four years.

6      Q.   This experience that you had that you've been

7  describing, would you characterize it as relevant to

8  internet-related systems?

9      A.   Yes.  All of the experience from Tandem

10  Computers and Digital Switch Corporation, we used the

11  packet switching protocols and the communication

12  protocols that are used in the internet.

13      A lot of the equipment that we've worked on is

14  actually used to route the packets or the messages that

15  go back and forth in the internet for computers to

16  communicate with each other.

17      Q.   When you refer to protocols, can you give us

18  examples of what you're talking about?

19      A.   The best description that I had, a chief

20  engineer from MCI explained it to me years ago.

21  Protocols are like languages, and he was Chinese, and so

22  he was doing the different greetings that you meet with

23  different people from different cultures.

24      Protocols are the same way.  Communications

25  protocols are a set of roles or a set of standards that

you use so that two computers can communicate with each other.  His example was if you -- if two people spoke in different languages, they wouldn't communicate very well.  So a protocol is a common language or set of rules between computers that they use to communicate with each other.

MR. VERHOEVEN:  Your Honor, at this point, I would like to move to qualify Mr. Lanning as an expert in computer engineering and computer science.

THE COURT:  Any objection?

MR. GRINSTEIN:  No objection.

THE COURT:  The Court and the jury will hear his opinion.

MR. VERHOEVEN:  Thank you, Your Honor.

Charles, do we have the system going for us here?

Okay.  Thanks.

Q.   (By Mr. Verhoeven) Now, Mr. Lanning, you were retained by Google as an expert witness in this case, correct?

A.   Yes, I was.  Yes, I am still.

Q.   And are you charging for your time?

A.   Yes, I am.  I charge at my normal customary rate for legal consulting the same as I do for technical consulting.

1     Q.   And what is your rate that you're charging?

2     A.   $400 an hour.

3     Q.   Does your payment that you're receiving depend

4 on any way on the outcome of this case?

5     A.   No, it does not.

6     Q.   You get paid the same no matter what happens?

7     A.   Yes.  That's correct.

8     Q.   All right.  Now, are you aware of the two

9 patents that are being asserted in this case?

10    A.   Yes, I am.

11    Q.   That's the '025 and the '059 patent?

12    A.   Yes, that's correct.  It's the same patents

13 that you've been hearing about all week.

14            MR. VERHOEVEN:  And, Charles, maybe you

15 could put up DX Demo 172.

16    Q.   (By Mr. Verhoeven) These are just the cover

17 pages of these patents, correct?

18    A.   Yes, it is.

19    Q.   Okay.  Just for background, can you -- I know

20 that -- you may not know this, but the jurors have heard

21 a lot about these patents already, but just very briefly

22 can you tell the jurors your understanding of the

23 general subject matter these patents concern?

24    A.   These patents address an online internet

25 advertising system.  They also include an inventory

1   control and ticket-selling system.

2          And they describe how an advertiser can create

3   an ad and select the different internet media venues --

4   you've heard that word -- specifically websites that you

5   see.  We'll talk more about a little later.

6          They also include an interface for a

7   publisher, a website to define where the ad should

8   appear and how it should appear.

9          They also require databases for storing the

10  information that's provided both by the publisher and

11  the advertiser, and describe how the ads are published

12  to the different internet media venues.

13         You'll -- you've heard that word a lot.  I'll

14  use that synonymously with websites a lot of the time.

15     Q.   Now, Mr. Lanning, can you let the jury know

16  what your assignment was, what did Google ask you to do

17  when they retained you?

18     A.   Well, I had two assignments.  One was to

19  analyze the patents and the Google products and

20  determine if the patents in the claims of the patents,

21  if the Google products infringed the patent claims.

22         The second part of the work that I was asked

23  to do was to determine if there was any prior art that

24  existed before these patents, which I refer to as a

25  validity analysis.

1     Q.   Okay.  Well, let's start with the first

2 assignment that -- the issue of whether there's

3 infringement or no infringement, okay?

4     A.   Okay.

5     Q.   Now, you're not a lawyer, correct?

6     A.   No, I'm not.

7     Q.   Before you performed your analysis, did you

8 have any understanding of the legal sort of rules of the

9 road that you needed to follow in order to use as a

10 framework for your analysis?

11    A.   Yes, sir.

12    Q.   Can you tell the jury what your understanding

13 of the rules of the road were?

14    A.   Rules of the road for infringement is that for

15 Google products to infringe, they have to perform each

16 and every limitation of the claim.

17           And I was in the courtroom when that has been

18 discussed before.  So if there's an asserted claim, in

19 order for the Google products to infringe, they have to

20 infringe each and every element of the claim, not just

21 most of the elements, not just about the elements, and

22 elements -- use elements or limitations, that's all the

23 different parts of the claim that you see that look

24 somewhat like paragraphs.  We'll talk about that in more

25 detail later.

1    Q.   Okay.  And did you have an understanding as to

2  what the accused products were in this case?

3    A.   Yes.  The accused --

4    Q.   Or are -- excuse me.

5    A.   I was going to correct that.

6         The accused products are Google's AdSense for

7  Content product and another product that they -- with

8  the name AdSense for Mobile as they're used with

9  different interfaces of Google products.

10   Q.   Now, on this first assignment on the issue of

11 whether there's infringement or not, what did you do to

12 look into the issue or research the issue?

13   A.   I did a lot of different things and took a lot

14 of -- a lot of hours to do this.  But the first thing

15 that I needed to do was to read through and analyze the

16 patents and understand the patents.

17        If you've glanced at the patents, you know

18 they're not small.  I think they're about 81 pages in

19 length; 80 approximately.  There's a lot of different

20 claims in the patents.

21        So my first job was to read and analyze the

22 patents and understand the claims.  And then I needed to

23 understand the Google products in order to understand

24 whether the Google products infringed these claims or

25 not.

1          So one of the first things I did is I went

2   online to the Google website that you've seen slides of

3   already this week, and I looked at the Google AdWords

4   product and the different slides that were associated

5   with the AdWords product to associate myself with the

6   product.  They also have some help files I looked at.

7          I also went to Google's AdSense web page and

8   familiarized myself with the AdSense product.  There's

9   been a lot of documents that have been produced by

10  Google in the case.

11         And the next step for me was to then go

12  through hundreds of pages.  It would not be an

13  exaggeration to say it would easily be thousands of

14  pages of documentation that's been produced to determine

15  how the Google products work specifically.

16         And then I looked at Google source code.

17  Program software program source code, when I refer to

18  source code, is the Google software for the products.

19         So I looked through many different source code

20  files.

21         And the way you can do that is I can look on

22  my computer or I can look at listings or I can print

23  them out and look at listings.  But the main time, I can

24  just look at them -- I have an editor that I look at

25  them in different ways to analyze the software.

1           I also read deposition transcripts by Google

2   employees to see what they said, to see what they were

3   asked and how they explained the products.

4           I'm trying to think if I did -- oh, I also

5   made modifications to my own website and performed tests

6   to --

7       Q.   Let me interrupt you there, Mr. Lanning,

8   because you haven't -- I don't think you've mentioned

9   your website before.

10          Can you describe that first before you

11  describe the tests you did?

12      A.   I'm sorry.  I have a website that I developed

13  in 1987.  I guess I have the wrong -- I was thinking

14  that was too long ago.

15          In 1997, for my ranch.  We have horses and we

16  raise horses.  We breed our own horses.  And I put the

17  horse information on my website that I've developed.

18  And we sell horses all over the world.  We're pretty

19  excited.

20          The internet advertising that I do on my

21  website people look at it, and we've sold horses into

22  Argentina, Berlin, Stockholm, Sweden, all over.  So it's

23  exciting.  I never know when I will receive an e-mail

24  message from someone that's seen my website.

25          But my website -- I have my own website.  It's

name is tlranch.com.  The name of my ranch is Twisted L

Ranch, and so the website is tlranch.com.

    Q.    Now, you mentioned you did some tests using

that website.

        Can you explain that in a little bit more

detail, please?

    A.    Yes.  I modified my website so that it would

use Google's AdSense products so that I could see the

ads on my website and see it work for real.

        I also joined Google's AdWords for my website,

to advertise my website.  And since I've joined Google's

AdWords, my website has been advertised over 750,000

times on the Google advertising network.

    Q.    So --

    A.    Sorry.

    Q.    So let me just break that down so -- just to

make sure we understand it.

        So you used Google both as a publisher and as

an advertiser; is that what you're saying?

    A.    Yes.  I wanted to make sure that I understood

both sides, how to be -- how Google worked as an

advertiser, how I would insert ads for real, and then

how I would actually work as a publisher on the Google

AdSense network.

        So I modified my website to become a publisher

where my website displays the Ads by Google.

Q.    Did you do any network analysis tests as part
of this?

A.    Yes.   To make sure that I understood
completely the types of internet messages that were
coming back and forth or coming to my browser on my
computer and being sent from my browser, I used some
specialized internet software which captured all the
messages and the information contained in those internet
packet messages so that I understood completely what was
happening at my browser with the different examples that
I talked about.

Q.    So based on this research and analysis and
testing that you've testified to, Mr. Lanning, have you
formed an opinion as to whether or not the two accused
Google products infringe any of the asserted claims in
this lawsuit?

A.    Yes, I have.

Q.    What is your opinion?

A.    My opinion is that the Google products, the
accused products, AdSense for Content and AdSense for
Mobile, do not infringe the Function Media patents,
specifically the '025 and the '059 patent.

Q.    Okay.   We'll go through the specific elements
in a second, but at a high level, can you just explain

1  to the jury why not; why don't they infringe?

2      A.    There's multiple reasons.  There's at least

3  three reasons or three of the limitations of the claims

4  that the Google products don't perform, that they don't

5  do.

6      Q.    Okay.

7              MR. VERHOEVEN:  Your Honor, I have a

8  binder that I'd like to pass out, if I might.

9              THE COURT:  Yes.

10             MR. VERHOEVEN:  I think the witness

11  already has it.  There you go.

12             Okay.  Charles, if we could go to DX demo

13  161.

14     Q.    (By Mr. Verhoeven) And, Mr. Lanning, I'm just

15  going to have you walk through -- we've got a set of

16  slides that I understand you've instructed to have

17  prepared.

18             Let me see if I can find a place where this

19  fits.  And this is the first one of those.  Could you

20  explain to the jury what we're looking at?

21     A.    Yes.  I provided -- on this slide, there's

22  three different pieces of information, and I'll start

23  with the page you see on the left.

24             This is the text for Claim 1 of the '025

25  patent.  And one of the limitations that I've

highlighted is the second -- it starts with the second

interface.

     Q.   Okay.  This highlighted right here

(indicating)?

     A.   Yes, it is.  It -- it's the second interface

that's referring to the seller interface.

     Q.   And can you just -- can you -- I don't know if

you can read that or -- it's probably on your monitor,

too.

          Can you read to the jury what the language is

you're referring to?

     A.   Yes.  It's the -- and it's easier to see,

because I -- I thought that I might have a hard time to

see it, so I've actually expanded that language up in

the top right-hand portion of the slide so it's easier

to see.

          And that language is:  The seller is -- or

sorry -- seller is prompted to input information to

create an electronic advertisement for publication to

the selected internet media venues.

     Q.   Okay.  And what else are we looking at here?

     A.   I've also included the Court's order that --

that defines what the term create an electronic

advertisement for publication to the selected internet

media venues means.

1          As it explains, continuing to read, is that

2 means to create an electronics advertisement for

3 publication in a form customized to each of the selected

4 internet media venues presentation rules.

5          And so looking at this claim, putting it all

6 together, this means that the seller is prompted to

7 input information -- I'm sorry.  Let me start over.

8          The seller is prompted to input information to

9 create an electronic advertisement for publication in a

10 form customized to each of the selected internet media

11 venues presentation rules.

12     Q.   And have you formed an opinion as to whether

13 this element is met in the accused products?

14     A.   Yes, I have.

15     Q.   What's your opinion?

16     A.   That the Google products don't perform this

17 function; that the Google products do not allow a seller

18 to input information to create an advertisement

19 customized to each of the selected internet media venues

20 presentation rules.

21     Q.   Okay.

22          MR. VERHOEVEN:  Let's go to the next

23 slide, please.  And for the record, this is DX demo 999.

24     Q.   (By Mr. Verhoeven) What are we looking at

25 here, Mr. Lanning?

1    A.    This slide is hard to see.  I'll -- I'll have

2  Charles expand or blow these portions of this slide up.

3        But specifically, this is one of the screens

4  of the Google AdWords product.  If you're an advertiser

5  and you want to create an advertisement, this is one of

6  the screens that you would go to on Google's AdWords

7  website.

8        And that's defined -- you can see up in the

9  top left, hopefully, in color, see the different colors

10 of Google and AdWords.  This is one of the screens for

11 Google AdWords.

12    Q.    Okay.  And is there a place on this box, on

13 this screen, that talks about an advertiser creating an

14 advertisement?

15    A.    The -- yes, there is.

16    Q.    Can you show the jury where that is?

17    A.    Yes.  It's the first portion of this slide

18 that's labeled create ad and key words.

19            THE WITNESS:  And if we can blow that up,

20 please.

21    Q.    (By Mr. Verhoeven) Okay.  So that's easier to

22 read.  Can you explain to the jury what we're looking at

23 here?

24    A.    Yes.  If I want to create an ad or an

25 advertiser wants to create an ad on the Google AdWords

1  system, they simply select their cursor to each one of

2  the boxes that you see next to the words headline and

3  those other words, and they just type in what I refer to

4  as plain text or raw text to describe their ad.

5        The display URL and the destination URL,

6  that's simply defining -- the advertiser is defining

7  where the -- where the -- your browser or where the

8  end-user's browser will go to if you click on the ad.

9        If you click on an ad, this is how the

10 advertiser tells the Google AdWords system or instructs

11 the Google's AdWords system what website it would go to.

12     Q.  So if I'm an advertiser -- let me see if I

13 understand this.  If I'm an advertiser and I want to use

14 AdSense for Content, this is where I go to create my ad?

15     A.  Yes, it is.

16     Q.  Okay.  And these are the boxes here?

17 Headline, description one, description two, display, and

18 destination URL, those are the boxes I would fill in?

19     A.  Yes.  And I would just simply type the

20 information that I wanted for my ad.

21     Q.  Okay.  And when Google -- when an advertiser

22 wants to create an ad on the AdSense for Content system,

23 is there anything else they do, or is this it?

24     A.  There's other fields on this screen.  If we

25 can go back to the main screen that -- the web page,

1  down towards the bottom of the screen, there's the word

2  placement.  So we can't really -- you can't -- I'm sure

3  you can't read it, because I can't read it.

4             THE WITNESS:  Thank you.

5       A.    And so this is placements.

6             So if I'm an advertiser and I know about

7  different websites out there that I want to place or

8  that I'd like to make sure -- or like to try to get my

9  ad published on, I would put information here for

10  placements.

11             MR. VERHOEVEN:  Okay.  Let's go to the

12  next slide.

13             A little technical difficulty, Your

14  Honor.  I got it taken care of.

15             Okay.  Can we -- Charles, can we

16  highlight the create an ad box again?

17       Q.    (By Mr. Verhoeven) Okay.  What is this showing

18  here?

19       A.    This is showing an ad that I typed in.  I

20  created this ad as part of my work on -- on this case.

21  I've typed in as my headline Texas Bass Fishing, and the

22  description was best lakes and pro shops and new reviews

23  for 2009.

24             What you see below that that's a lot of

25  different text and characters is the website, that if a

1  person clicked on the ad, that it would go to, which is

2  my fictitious website, which is texasbassfishing.com.

3      Q.   Now, we've heard from other witnesses in the

4  case about publishers' publication rules.

5          Are you familiar with that?

6      A.   Do you mean advertisers?

7      Q.   No.  Publishers.

8      A.   Yes.  For the publishers?

9      Q.   Yes.

10     A.   Yes, I've heard about that, yes.

11     Q.   And what was your understanding -- do you have

12  an understanding of generally what those rules would be?

13     A.   We're looking at an AdWords slide right now,

14  and you're asking me a question about publishers.  I

15  just want to make sure I'm clear.  I can answer the

16  question.

17     Q.   Sure.  I'm just asking about presentation

18  rules for media venues.  Do you have an understanding

19  generally what we're talking about?

20     A.   Yes, I do.  The presentation rules for media

21  venue are a presentation rule for a publisher or

22  website.

23          Now, I described earlier my website.  If I --

24  for tlranch.com, what's discussed is, the presentation

25  rules is the look and feel of how I want these ads, the

1  design or -- or sorry -- the presentation rules.

2       Q.   So the size of the ad?

3       A.   Yes.  The size of the ad, the background

4  color.

5       Q.   Font?

6       A.   Font size, font type, font color.

7       Q.   All right.  Now -- and when an advertiser

8  using AdSense for Content is creating an ad on this

9  menu, can the advertiser customize the ad to various

10 presentation rules and media venues?

11      A.   No, sir, they cannot.

12      Q.   Can they change the font?

13      A.   No, sir.

14      Q.   Can they specify background colors?

15      A.   No, sir.

16      Q.   Can they change the ad size?

17      A.   No, sir.

18      Q.   So all they can do is input these -- these

19 four fields?

20      A.   They can just select -- take their mouse,

21 select each one of those sections, and type, and they

22 just type what we refer to as the plain text or raw

23 text.  There's no options for the advertiser to modify

24 that text.

25      Q.   Okay.

1          MR. VERHOEVEN:  Can we go to DX demo 62,

2    please?

3          Okay.  This one is hard to read, too.

4          Charles, perhaps we could just start at

5    create an ad -- no, no, no, no.  A little bit further

6    down.  And then go all the way down below placements to

7    the bottom, right there, and bring that up.

8        Q.   (By Mr. Verhoeven) Is that a little bit easier

9    to read?

10        A.   Yes.  Hopefully, everyone can read that.

11        Q.   Okay.

12        A.   Again, this is a page from the Google AdWords

13   website.  This is another example that I've created.

14        Q.   Okay.  And does this -- this has -- I think it

15   has the same information we just looked at for create an

16   ad; is that right?

17        A.   No.  The --

18        Q.   A little bit different?

19        A.   Yeah.  The information is a little different

20   that I've created for this ad.

21        Q.   Okay.

22        A.   It's the same concept, but it's a little

23   different.

24        Q.   Can you walk this through for the jury, so

25   they understand?

1    A.   Yes.  You'll see on the headline for this ad,
2    I've typed in fast roof repairs, like I were a company
3    that was performing roof repairs.  Around this part of
4    the country, we all know that's a real important type
5    job.  So I thought that would be good with all the
6    storms that we have.
7         The next line, I've typed in an additional
8    description line of text, which says:  Free quotes on
9    repairs and -- and the next description line says:
10   Replacements.  Call today.
11   Q.   And then the display URL, what is that?
12   A.   And then I've provided a display URL, which is
13   my website address.  You can see that, that it's
14   roofrepair.com.  And that's what -- if the ad -- if the
15   person -- the end-user clicks on the ad, it will go to
16   the roof repair website.
17   Q.   Okay.  And then down in the placement section,
18   it looks like you filled in the box under enter as many
19   placements as you like.
20        Do you see that?
21   A.   Yes.
22   Q.   Can you explain to the jury what you put in
23   there?
24   A.   Yes.  What I've inserted here is, if I'm in
25   roof repair, I would know about different websites that

I want -- would like my ad to appear on.

And so I've listed both of those, and what you see on the first line is www.hometips.com.

The next website that I would prefer or like to have my ad placed on would be www.houseblogs.net.

Q.   Okay.  And let's go -- and so those are requests that you would make as websites you'd like to see your ad on, right?

A.   Yes.  I'd enter that information on this -- on the Google AdWords web page.

Q.   And would those be considered -- those two websites be considered media venues?

A.   Yes.  Those are -- are media venues.  They're websites.  That's the name of websites.

Q.   Okay.

MR. VERHOEVEN:  Let's go to the next slide, please, DX demo 60.

Q.   (By Mr. Verhoeven) What are we looking at here?

A.   If you recall, the first website that I specified down in that bottom part of the ad was hometips.com.

I provided an example of this website, which is the internet media venue, which is hometips.com.  You can see that in one or two places.  You can see it up in

the top left where it's -- there it is -- the

hometips.com.

Now --

Q.   Okay.  Let me interrupt you, and let's just go

back to the last slide.

MR. VERHOEVEN:  And, Charles, can you

highlight that bottom box again just so the jurors can

see?

Q.   (By Mr. Verhoeven) Go ahead.

A.   Yes.  And the first line is hometips.com, so

that is the internet media venue that we just looked at

that had the shower head and all the different

information on it.

Q.   Okay.

MR. VERHOEVEN:  Let's go back to the

hometips, DX demo 60, please, Charles.

Q.   (By Mr. Verhoeven) Okay.  And can you describe

why you're -- why you've displayed this for the jury?

A.   Yes.  The -- the content of this website -- or

the content of this internet media venue is all the

information that you see on the left-hand portion --

left-hand and even part of the right-hand side.

But what I'd like to point your attention to

is the right-hand side of this slide, which starts with

the text Ads by Google.

1            THE WITNESS:  And, Charles, if we could

2   highlight that, please.

3       A.    This is where the internet media venue, if --

4   for hometips.com, they've defined where they want ads on

5   their web page, and they've defined how they look, the

6   presentation rules.

7            So in this case, the hometips.com, you see

8   that there is a white background for all the ads, you

9   see the text headline, and the second line for each ad

10  is in blue.  So they've defined that as well.

11           And so those are the presentation rules for

12  hometips.com, which is an internet media venue.

13      Q.    (By Mr. Verhoeven) Okay.

14           MR. VERHOEVEN:  Let's go back to DX demo

15  62, please.  And highlight the bottom box again,

16  Charles.

17      Q.    (By Mr. Verhoeven) Okay.  And what was the

18  second placement you put in there?

19      A.    That's the second line, the houseblogs.net.

20      Q.    Okay.

21           MR. VERHOEVEN:  And let's go to DX demo

22  61?

23      Q.    (By Mr. Verhoeven) And what -- can you explain

24  to the jury why you put this up?

25      A.    Now, this is another website or an example of

houseblogs.net.  This is a different internet media

venue.

So the publisher of houseblogs.net created

this website.  And if we look, the content of this

website is in about the same area of the -- the slide,

but if we look at where the Ads for Google are at as

Charles is highlighting here, notice that they're in a

different place than what they were on the other

website, okay, because this person or this internet

media venue defined the presentation rules for -- for

this website, they didn't want the ads to be up on the

top right like the other website was.

Now, notice that the color of the ads, the

text in the ads is different.  They're not the bright

blue that we saw on the other website with the

showerhead.

And also there's a border that looks -- that's

around the ads that you can think of a frame -- they

refer to it as a frame border.  You can think of it as a

picture frame.  It's a line that outlines the ads.

So this internet media venue has described

very different presentation rules for how they wanted

Google to present the ads on this web page.

Q.  So just to summarize, the hometips.com had

blue headlines; this one has black; is that right?

1    A.    Yes.

2    Q.    And the hometips.com had no border; this one

3 has a border?

4    A.    Yes, that's correct.

5    Q.    Different placement on the page?

6    A.    Yes, that's correct.

7    Q.    And each of those are presentation rules that

8 the different websites have chosen?

9    A.    Yes.  And in addition to the size of the ad,

10 the size of the space, the houseblogs.net is different

11 than the other website, too.  They chose to have

12 different types of advertising by Tru-Value Hardware on

13 the top right-hand corner, and those are not Ads by

14 Google.  It's only the ones that start with Ads by

15 Google here.

16           MR. VERHOEVEN:  Let's go back to DX demo

17 62, please, Charles.

18    Q.    (By Mr. Verhoeven) So this is the slide where

19 you put in the two different placement requests.

20           MR. VERHOEVEN:  I don't need to highlight

21 that, Charles.  Thank you.

22    Q.    (By Mr. Verhoeven) But --

23           MR. VERHOEVEN:  So let's go back to the

24 create an ad section.

25    Q.    (By Mr. Verhoeven) Now, does this ad -- does

1  this menu allow the advertiser to specify whether the

2  headline should be blue or black?

3      A.   No, it does not.

4      Q.   Does it allow the advertiser to specify the

5  placement of the ad on the publisher's web page?

6      A.   No, it does not.

7      Q.   Does it allow the advertiser to specify the

8  font?

9      A.   No, it does not.

10      Q.   Does it allow the advertiser to create an ad

11  that's customized to the rules of the particular media

12  venues that have been requested?

13      A.   No, it does not.

14      Q.   Okay.

15          MR. VERHOEVEN:  Let's go back to the DX

16  demo 161.

17      Q.   (By Mr. Verhoeven) Let's take us back to the

18  claim language.  And can you just summarize again your

19  opinion, based on the evidence we just went through, as

20  to this element?

21      A.   Yes.  My opinion is that the Google AdSense

22  for Content and AdSense for Mobile products do not

23  infringe this claim and this limitation of this claim

24  because they do not allow a seller to create -- to input

25  information to create an electronic advertisement

customized in the form of each of the selected internet

media venues.

    Q.   And, Mr. Lanning, is this one of the reasons

why you've concluded that the Google accused products do

not infringe?

    A.   Yes, it's one of the reasons.

          MR. VERHOEVEN:  Your Honor, I'm going to

switch to a different subject.  I'll keep going, if

you'd like, but --

          THE COURT:  Let's move along.

          MR. VERHOEVEN:  Okay.  Yes, sir.

          THE COURT:  Thank you.

          MR. VERHOEVEN:  Let's go to slide DX demo

159.

    Q.   (By Mr. Verhoeven) And can you explain to the

jury what's being depicted on this screen, Mr. Lanning?

    A.   Yes.  There's three pieces of information.

They're similar to what I showed on the previous -- one

of the previous slides, but notice that I've highlighted

a different part of Claim 1.  And I've highlighted that

towards the bottom, and so it's easier for us to see,

I've pulled that out and put it up on the right-hand --

top right-hand corner of the slide.

          And it specifically says:  Publishing the

electronic advertisement to one or more of the selected

internet media venues.

And, again, I've also provided the Court's order for the term placing or making available the customized advertisement. It's -- it's the term -- or the Court's order for all of the text that's up on the top.

And -- and that means that placing or making available the customized electronic advertisement within the framework of and that each internet media venue so that it is necessary by the end-user -- so that it's accessible -- I'm sorry -- by the end-users, consumers, viewers, or buyers.

Q.   So putting together the language with the Court's construction, what's your understanding of this term -- or this element?  Excuse me.

A.   This element requires that the computer controller place or make available the advertisement at each internet media venue.

MR. VERHOEVEN:  Now, let's go to the next slide, DX demo 160.

Q.   (By Mr. Verhoeven) And can you walk us through?  What does this represent?

A.   Yes.  This represents, in a little bit different way -- the top two boxes represent what's included in the claim and the Court's claim construction

on the second box, and then I'll talk about the third

box in a little bit.

But the first box, the highlighted portion, is

the publishing to one or more of the selected internet

media venues.

In the second box, I've highlighted the words

and at, which in my -- which describes where the ad is

placed or made available, and it's at each internet

media venue so that it's accessible by end-users,

consumers, viewers, and buyers.

Now, when we look at the -- the element or the

text of this claim element, it also includes another

term that I've already referred to, the terms or the

words internet media venue.

The Court's also provided us a construction

for what an internet media venue means. And internet

media venues means internet locations where

presentations are placed or made available to present

the information within the framework of the media so

that it is accessible by end-users, consumers, viewers,

or buyers.

Q.    Okay.  And putting this all together, can you

explain, in sort of nonlawyer terms, your understanding

of what this means?

A.    Yes.  This means that advertisements are

1  published to each of the internet media venues based --

2  in general --

3      Q.   Okay.

4      A.   I don't know if you want me to go more

5  specific.

6      Q.   That's fine.

7           Have you prepared some slides to help the

8  jurors understand what this -- what your understanding

9  of this --

10      A.   Yes, I have.

11           MR. VERHOEVEN:  Let's go to the next

12  slide, DX demo 165.

13      Q.   (By Mr. Verhoeven) And what are we looking at

14  here, Mr. Lanning?

15      A.   I understand that this stuff can get pretty

16  complicated or sound pretty complicated, so I've tried

17  to make a simple example.

18           I think all of us realize how the mail system

19  works, that if we have a street address or a house

20  address, we have a unique address, and that's how we

21  receive packages, and that's how we receive letters.

22           On this slide, I've shown two different houses

23  on the left, and each one has a different address.  The

24  house on the top is 123 Birch Avenue.  The house on the

25  bottom is 987 Oak Drive.

1      The bigger building on the right -- hopefully,
2 you can see the logo and the text -- is the post office,
3 and I just chose 101 Main Street.  Seems like most post
4 offices are on Main Street.
5      What you see up towards the top, you see some
6 numbers.  You see the numbers 192.168.1.152.
7      Now, that's pretty cryptic, but that is an
8 internet address.  That is the way the internet -- like
9 the postman or like the mail -- the post office knows
10 how to deliver packages to your house or letters; this
11 is how the internet -- a unique internet address is
12 formed, and that's what it looks like.
13      That specific number I actually pulled off of
14 the computer, is the internet address for the computer
15 I'm using here in Marshall, Texas.
16      So the internet knows all over the world that
17 if they want to send messages to me on my computer in --
18 here in Marshall, Texas, they use that internet address.
19 And originally, there were more than four billion unique
20 addresses, and that -- when the internet started.  And
21 in 1998, they realized that they might run out of
22 addresses, so they've increased the number of addresses
23 to be many million times larger than all the people in
24 the world.
25      And so it's very important that each computer

1 that connects to the internet, whether it's the computer

2 at your home or your business, have a unique address,

3 just like you have a unique address for the house so

4 that you get the letters.

5          So that way the internet doesn't confuse

6 Paris, Texas, with Paris, France.  They're all unique

7 addresses.

8     Q.   Okay.

9          MR. VERHOEVEN:  Let's go to the next

10 slide.

11          THE COURT:  Okay.  Well --

12          MR. VERHOEVEN:  Okay.

13          THE COURT:  -- I think that's where we

14 get into some new material, and we'll pick up there on

15 Monday morning.

16          MR. VERHOEVEN:  Yes, Your Honor.

17          THE COURT:  Ladies and Gentlemen, I'm

18 going to excuse you for the weekend.  Thank you again

19 for your time and your hard work and your patience

20 throughout the trial.

21          We will convene promptly at 8:30 on

22 Monday morning.  Please remember my prior instructions.

23          Don't talk about the case with anyone,

24 including your fellow jurors.  Remember also my other

25 instructions about not reading or following any media

1   reports about the trial.

2                   And with that, have a nice weekend.

3   Please drive safely.  I'll see you Monday morning.

4                   COURT SECURITY OFFICER:  All rise.

5                   (Jury out.)

6                   THE COURT:  All right.  Step down.

7                   Why don't y'all have a seat.

8                   Plaintiff has used 11 hours and 30

9   minutes, and the Defendant has used 10 hours and 33

10  minutes.

11                  We're going to go a full day on Monday.

12  I see this case getting to the jury sometime noon on --

13  noonish on Tuesday.

14                  If we have to finish up a portion of the

15  testimony Monday morning -- or excuse me -- Tuesday

16  morning, I'm forewarning you, be ready to -- we'll --

17  we'll take a recess, a short recess after the conclusion

18  of the testimony, but you need to be ready to go into

19  final arguments, because I'm not going to delay those

20  until the afternoon.

21                  So I'm -- I've got another matter I've

22  got to attend to Tuesday afternoon, and if I have to

23  break that to come tend to the jury in y'all's case,

24  I'll do that, but I've got a pretrial conference in

25  another patent case that I need to handle Tuesday

afternoon.  So this case is going to be to the jury by

Tuesday.

MR. VERHOEVEN:  Is it 40 minutes for

closing?

THE COURT:  Well, I was going to give you

45 minutes, but --

MR. VERHOEVEN:  I'll take 45.

THE COURT:  -- you can talk me --

MR. TRIBBLE:  I think we're in agreement

at 45, Your Honor.

THE COURT:  Well, we'll -- I'll be

inclined to give you 45 minutes a side, if it looks like

we can get it to the jury by noon.

So, I mean, if -- on Tuesday, rather, but

I think we'll be there.  I'm going to have -- we can go

off the record for this.

COURT SECURITY OFFICER:  All rise.

(Court adjourned.)

*       *       *       *       *

CERTIFICATION


I HEREBY CERTIFY that the foregoing is a true and correct transcript from the stenographic notes of the proceedings in the above-entitled matter to the best of my ability.


/s/_____                    _____

SUSAN SIMMONS, CSR                            Date
Official Court Reporter
State of Texas No.:  267
Expiration Date:  12/31/10


/s/_____                       _____

SHELLY HOLMES, CSR                            Date
Deputy Official Court Reporter
State of Texas No.:  7804
Expiration Date  12/31/10