```
 1              IN THE UNITED STATES DISTRICT COURT
               FOR THE EASTERN DISTRICT OF TEXAS
 2                      MARSHALL DIVISION

 3  FUNCTION MEDIA, LLC          *    Civil Docket No.
                                 *    2:07-CV-279
 4  VS.                          *    Marshall, Texas
                                 *
 5                               *    January 25, 2010
    GOOGLE, INC.                 *    8:20 A.M.
 6
                    TRANSCRIPT OF JURY TRIAL
 7          BEFORE THE HONORABLE CHAD EVERINGHAM
               UNITED STATES MAGISTRATE JUDGE
 8

 9  APPEARANCES:

10  FOR THE PLAINTIFFS:    MR. MAX TRIBBLE
                           MR. JOSEPH GRINSTEIN
11                          Susman Godfrey
                           1000 Louisiana Street
12                         Suite 5100
                           Houston, TX   77002
13                         MR. JUSTIN NELSON
                           Susman Godfrey
14                         1201 Third Avenue
                           Suite 3800
15                         Seattle, WA   98101
                           MR. JEREMY BRANDON
16                         Susman Godfrey
                           901 Main Street
17                         Suite 5100
                           Dallas, TX   75202
18                         MR. ROBERT PARKER
                           Parker, Bunt & Ainsworth
19                         100 East Ferguson
                           Suite 1114
20                         Tyler, TX   75702

21  APPEARANCES CONTINUED ON NEXT PAGE:

22  COURT REPORTERS:       MS. SUSAN SIMMONS, CSR
                           MS. SHELLY HOLMES, CSR
23                         Official Court Reporters
                           100 East Houston, Suite 125
24                         Marshall, TX   75670
                           903/935-3868
25  (Proceedings recorded by mechanical stenography,
    transcript produced on CAT system.)
```

APPEARANCES CONTINUED:


FOR THE DEFENDANTS:     MR. CHARLES VERHOEVEN
                        MS. AMY CANDIDO
                        Quinn Emanuel
                        50 California Street
                        22nd Floor
                        San Francisco, CA   94111

                        MR. EDWARD DEFRANCO
                        Quinn Emanuel
                        51 Madison Avenue
                        22nd Floor
                        New York, NY   10010

                        MR. HARRY L. GILLAM
                        Gillam & Smith
                        303 South Washington Avenue
                        Marshall, TX   75670

P R O C E E D I N G S

                (Jury out.)

                THE COURT:  Be seated.

                We're on the record outside the presence

of the jury in 2:07-CV-279.

                I had an issue raised in chambers

regarding the extent to which I would allow testimony

from the expert concerning the technology that was

included in the Carl Meyer agreement and whether Google

used that technology.

                The Plaintiff had objected to that

testimony based on a ruling that I had made at pretrial

related to the 30(b)(6) testimony that had been given

by -- by the Google corporate witnesses.

And so if you want to state your position briefly for the Plaintiff, then I will allow the Defendant an opportunity to respond.

MR. GRINSTEIN: Your Honor, for the Plaintiff, Joe Grinstein.

Our position was is that we were denied the opportunity in fact discovery to inquire of Google about the nature of this technology, the value of it, the relevance of it to Google.

We asked those questions specifically of Mr. Chen in his 30(b)(6) testimony. He gave us no answers.

Now in their rebuttal expert report, sort of long after fact discovery was even served, after the opening expert reports, Google tries to back-field this failure in fact discovery by having Mr. Lanning fill it in. And we believe that directly contradicts your Court's earlier order.

THE COURT: Okay. Google's response?

MR. VERHOEVEN: Your Honor, Mr. Verhoeven on behalf of Google.

We disagree with Plaintiff's counsel on this. We disclosed Mr. Lanning's opinion in the Rule 26 report. We provided Mr. Lanning for deposition. The

1  testimony that we're proffering has to do with expert

2  opinions concerning the technology claimed in the

3  Meyer's patent and the relationship to that technology

4  to the accused Google technology.

5           We followed the rules and provided his

6  opinion under Rule 26 and offered Mr. Lanning for a

7  deposition.  We see no prejudice, and we think it's

8  perfectly appropriate for Mr. Lanning to testify.

9           THE COURT:  Okay.  Those arguments mirror

10 those that were given to me in chambers.  Based on the

11 ruling I made at pretrial, I'm going to exclude

12 testimony on that issue.

13          We've still got about two more minutes.

14 Bring them in and have them seated at 8:30.

15          COURT SECURITY OFFICER:  All rise.

16          (Recess.)

17          COURT SECURITY OFFICER:  All rise.

18          (Jury in.)

19          THE COURT:  Thank you.  Please be seated.

20          Ladies and Gentlemen, thank you again for

21 being here timely.  I hope each of you had a good

22 weekend.  We are going to continue this morning with the

23 direct examination of Google's technical expert.

24          Proceed, Mr. Verhoeven.

25          MR. VERHOEVEN:  Thank you, Your Honor.  I

1  have an updated binder --

2                  THE COURT:  Okay.

3                  MR. VERHOEVEN:  -- I'd like to pass out,

4  if I might, Your Honor.

5                  THE COURT:  Please.

6                  Does the witness have a copy?

7                  MR. VERHOEVEN:  Yes, Your Honor.  I put

8  one up there earlier.

9                  THE COURT:  Okay.

10                  MR. VERHOEVEN:  Thank you, Your Honor.

11                  THE COURT:  Please proceed.

12     MARK LANNING, DEFENDANT'S WITNESS, PREVIOUSLY SWORN

13                  DIRECT EXAMINATION (CONTINUED)

14  BY MR. VERHOEVEN:

15      Q.   Morning, Mr. Lanning.

16      A.   Morning.

17                  MR. VERHOEVEN:  Okay.  Charles, if we

18  could put up DX Demo 160, please.

19      Q.   (By Mr. Verhoeven) Just to refresh where we

20  left off on Friday afternoon, you -- Mr. Lanning, you

21  had already talked about your first opinion of

22  non-infringement with relation to what I'll refer to as

23  at the creation step.  And we'd finished that, and you

24  moved on to the publishing two step.

25                  Do you recall that, generally?

1      A.   Yes, I do.

2      Q.   And you talked about this slide, but just so

3  that we can refresh the jury on this, let's go back to

4  this slide.

5           This is the claim language and the Court's

6  construction; is that right?

7      A.   That's correct.

8      Q.   And can you just refresh the jury as to the

9  starting point here of your analysis, the claim relating

10 to the publishing-to element?

11     A.   Yes.  The publishing-to element, this is the

12 exact language that's in the claim of Claim 1 of the --

13 of the '025 patent, and -- and that's as shown at the

14 top, which is -- I've highlighted the word to, which it

15 means publishing to, one or more, of the selected

16 internet media venues in the first box on the top.

17     Q.   And the Court construed it in what way?

18     A.   And the Court's construed it as I've shown on

19 the middle box, which means placing or making available

20 the customized electronic advertisement within the

21 framework of and at each internet media venue so that it

22 is accessible by end-users, consumers, viewers, or

23 buyers.

24     Q.   Okay.

25     A.   And -- and --

1      Q.   Go ahead.

2      A.   And then because that construction includes

3 the three words, internet media venue, the Court has

4 also provided an instruction for what internet media

5 venue is, and that's in the bottom box.

6      And internet media venues means internet

7 locations where presentations are placed or made

8 available to present the information within the

9 framework of the media so that it is accessible by

10 end-users, consumers, viewers, or buyers, which now

11 putting that together means that you take the middle box

12 and that definition and where it gets the internet media

13 venues, that's publishing to internet locations.

14      Q.   Now, for ease of reference, I'm going to refer

15 to this element as the publishing-to element.

16      Do you understand me?

17      A.   Yes, I do.

18      Q.   Okay.  And did you have an opinion as to

19 whether the publishing-to element in the asserted claims

20 is met by Google's accused products?

21      A.   Yes, I do.

22      Q.   Please tell the jury your opinion.

23      A.   That the publishing-to element is not met by

24 the Google products, because the Google products do not

25 publish to each of the internet media venues or the

1 internet locations.

2     Q.   Okay.  And you've prepared a demonstrative to

3 help the jury understand.

4            MR. VERHOEVEN:  Let's go to the next

5 slide, 165, please.

6     Q.   (By Mr. Verhoeven) And you already started

7 this, so I'm not going to ask you to go into as much

8 detail, but could you summarize again so the jury can

9 get refreshed on what you're talking about here?

10     A.   Yes.  There's two different pieces of

11 information here I'd like to point out and remind you

12 of.

13          The first is that there are houses with unique

14 street addresses, and I think we're all familiar with

15 how unique street addresses work a city, if we want to

16 receive a package or mail.  And also, there's the post

17 office, which has the address above it, 101 Main Street.

18 Up above that, I finished talking about how the internet

19 has unique addresses, and described that that top number

20 you see with the periods is a typical internet address.

21 And this was a little over 4 billion unique addresses

22 that were initially defined.

23          In 1998, because the internet got so popular

24 and so many addresses were being used, they expanded

25 that to be more than a hundred times bigger than that

number now.  And there's only -- about a few years ago,
there were only about 6-1/2 billion people in the
population worldwide.  So now there's many more
addresses, millions of addresses for every person in the
world, to just make sure -- they wanted to make sure
that every internet address was unique.

Q.  Okay.  And let's go to the next slide that you
had prepared here, DX Demo 167.

And can you tell the jury what this is -- what
you're showing here?

And you can just tell Charles when to move on
to the next slide, if you'd like to, when you're ready.

A.  Okay.  Okay.  I've had these slides prepared
to explain this publishing-to in a little similar terms.

Every once in a while, my wife will look over
my shoulder when I'm reading patents like these are and
just shake her head and say they look like a foreign
language when you read these -- these claims, and just
walk away.

So what I thought I would do for this
publishing-to limitation is provide an illustration.
And I've added a new object down on the bottom right.
That resembles a package.  And I think we all realize if
we were in Marshall, Texas, and wanted to deliver a
package to the house on the bottom left with the address

1  987 Oak Drive, there are two basic ways that we could

2  get that package to that house.

3                    THE WITNESS:  Next slide.

4      A.    This way shows that we simply take the package

5  to the post office, and then the post office delivers

6  the package to the house on the bottom left.

7                    THE WITNESS:  Next slide, please.

8      A.    But alternatively, we could just take the

9  package directly to the house.  No need for going

10  through the post office.

11                    THE WITNESS:  Next slide.

12      A.    Now --

13                    THE WITNESS:  If I could go back -- I'm

14  sorry, Charles.  If I could go back to the previous

15  slide.  There.

16      A.    Now, if we could apply this to what the

17  patents require by this publishing-to claim, taking the

18  package at the bottom and thinking of that package as an

19  advertisement, and if we were to think of the post

20  office as the internet media venue or the internet

21  location and the houses on the left as the internet

22  users, the package, the advertisement, would be placed

23  or made available at the post office, and then the post

24  office would deliver the package to the house.

25                    So this is what the -- the patents are

1  describing or requiring by this claim, that the package

2  be placed or made available at the internet media venue,

3  and the internet media venue, in my simple example here,

4  would be the post office.  Then the post office would

5  deliver it to the house.

6              THE WITNESS:  Next slide, Charles.

7              MR. VERHOEVEN:  Charles?

8       A.    Now, this example is -- again, the package is

9  an advertisement, but this example is how the Google

10  system works.

11              The Google system does not place the ad on the

12  internet media venue or at the post office.  Instead,

13  they place it directly at the house or directly on the

14  end-users or internet user's browser.

15              That finishes that set --

16      Q.    (By Mr. Verhoeven) Okay.

17      A.    -- of illustration.

18              MR. VERHOEVEN:  Charles, let's go to DX

19  Demo 356.

20      Q.    (By Mr. Verhoeven) What does this show?  What

21  are you depicting here, Mr. Lanning?

22      A.    I've had these slides created to add -- now,

23  you can still see that the -- the parts of the slide are

24  similar.  You can think of the top right portion as

25  being the post office, that cnn.com.

1        Now, cnn.com is an internet media venue, and

2   if I have an ad system that -- like is shown on the

3   bottom right-hand corner of this slide, the ad system

4   takes or publishes the advertisements to the internet

5   media venue, which is in this example cnn.com.

6        Now, you can think of the green squares that

7   are labeled used cars, fine jewelry, and eat at Joe's

8   just like packages.  The advertisement system is taking

9   those or sending those to internet media venue.

10        And the internet media venue sends the

11   advertisements to each of the internet users just like

12   the post office would send the package to each of the

13   homes.

14                THE WITNESS:  Next slide.

15        Q.   (By Mr. Verhoeven) What does this slide

16   depict, sir?

17        A.   Taking this same example, the first thing I'd

18   like to point out is in the top right, if you look at

19   the CNN box, you see a dashed box around that page on

20   the bottom right-hand corner.  That's just a hole or a

21   blank spot in the web page that CNN has left for

22   advertisements.

23                THE WITNESS:  Yes.  And Charles has

24   highlighted that for us now.

25        A.   But that's -- so there's no package at the

1  internet media venue.  Instead, the way that Google --

2  the way the Google system does it is it delivers the

3  packages or the advertisements directly to each of the

4  different internet users as I've shown with the green

5  boxes, and those ads could be different based on the

6  content that the user is looking at.

7          So if the top person on the left was looking

8  for a restaurant, then the advertisement eat at Joe's

9  would show up.  If the woman in the middle was looking

10  at jewelry, then some type of fine jewelry advertisement

11  would show up, and so on for the cars.  If a person is

12  looking at cars for sale, then Google would send an

13  advertisement or a package directly to that user.

14     Q.   So does this -- let's go back -- this is the

15  Google system; is that what you're showing?

16     A.   Yes, this is the Google system, and I've

17  highlighted in red at the bottom of the page that Google

18  just publishes the advertisements to the internet users,

19  not -- not to the internet media venue.

20          MR. VERHOEVEN:  Can we go back one slide,

21  please, Charles?

22     Q.   (By Mr. Verhoeven) And this is a depiction

23  from what you understand the Function Media's patents

24  describe?

25     A.   Yes, that's correct.

1          And this is the way they've described -- and I

2    have them in red -- published to the internet media

3    venue in the red text there.

4        Q.    Okay.  All right.  Have you prepared any --

5    did you do any testing on your own to -- to verify that

6    this is the functionality of the Google patents as

7    opposed to the -- excuse me -- of the Google products as

8    opposed to the patents?

9        A.    Yes, I did.

10       Q.    Okay.

11             MR. VERHOEVEN:  Let's go to DX Demo 157,

12   please.

13       Q.    (By Mr. Verhoeven) And can you tell the jury

14   what you've created here?

15       A.    I've been talking about the -- my ranch

16   website for my horses.  What you see -- I've -- let me

17   start over a little bit so I don't confuse you.

18             I've -- I've made two different tests where

19   I've actually modified my website so that it -- it

20   actually simulates both of the different scenarios that

21   we just talked about, about how the patents are

22   described or what the patents require, and then how the

23   Google system presents ads.

24             And this is actually -- I've taken the

25   stallions web page -- let me explain a little bit about

what's on this page.  This is what you would see for

this example, if you typed in tlranch.com on your

computer, on your web server, this would come back to

you.  And what you see on the left-hand corner, you see

three words that says home and stallions and bulls.

If a person were interested in my stallions,

they would click on the stallions page, and this is what

would be shown.  So I have the pictures of two of my

stallions.  At the bottom, I have the website -- or my

logo for my ranch and the information for how someone

can send me an e-mail, if they're interested.

And I've also included ads on the right-hand

side of the page, and what they are -- it's -- it's a

little bit hard to read them, but they're different

horse-oriented type ads that I've chosen.  And one is

about greener pastures, which is the Quarter Horse

Association website; the middle one that says gifts.

They make a lot of silver belt buckles and silver wear;

and then the bottom has to do with the Paint Horse

Journal.

Q.  Now, when you did this test, is it correct you

were acting as the publisher?

A.  Yes, the Twisted L Ranch.

I'm the publisher of the Twisted L Ranch, or

in this case, the Twisted L Ranch would be the internet

media venue.

So I actually modified my website and put this information on the server and requested this page at my browser, and then I captured what I -- a typical internet user would see with this information.

Q.   Okay.

MR. VERHOEVEN:  Let's go to the next slide, please, DX Demo 162.

Q.   (By Mr. Verhoeven) And what are you depicting here?

A.   On this slide, again I'm showing the internet media venue on the right, which is my website page, not only the website page but with the advertisements included; the website ID, or my website identity is tlranch.com as shown on the bottom of the slide.

Now, that is the internet location, and people don't remember numbers like I showed you very well.  If someone asked me what my website ID is, very few would remember that big long number with the periods that I showed you earlier.  And so the internet has computers in it that will translate this internet address, this tl.ranch.com into that number that I showed you with all the periods.

That way people can just remember the text at the bottom, if they want to go to my ranch, which is

1  much simpler.

2          And what I'm showing by this example is that

3  it's the same scenario as the packages, which are the

4  advertisements, are at the post office, which is my

5  internet media venue, and they're being transferred to

6  each of the internet users.

7                  THE WITNESS:  And, Charles, if you could

8  blow up the left-hand side on the internet users,

9  please.

10     A.   And I'm showing here that I transfer, as the

11 internet media venue, the ads all down to the different

12 internet users.  And they would see that all, and that

13 would all be at the internet media venue or at the post

14 office.

15          I know what ads are being transferred down,

16 and I send those down to the users when they type in

17 tlranch.com.

18                  MR. VERHOEVEN:  Let's go to the next

19 slide, please.  It's DX Demo 191.

20     Q.   (By Mr. Verhoeven) What are we showing here?

21     A.   This is where I'm showing that if you take the

22 claims, as they're required, that there's a computer

23 controller that would publish the ads, that computer

24 controller would publish the ads to my website or to my

25 internet media venue.

Again, you can think of that -- those ads as the packages. This is the -- what's being required by this element of the claims as the publishing ads to the internet media venue.

Q. Okay. And did you do another test on --

A. Yes, I did.

Q. Okay.

MR. VERHOEVEN: Let's go to DX Demo 158.

Q. (By Mr. Verhoeven) Okay. Mr. Lanning, can you tell the jury what they're looking at here?

A. Now, this is a second test that I've done where I've now modified my website for the second scenario or to make it work with the AdSense for Google product.

So I've now modified my website, and I've defined on my web page where the ads would go that are going to be published from Google. And this is representative of what is shown to a user using -- when they use the Google AdSense system, when they type in tlranch.com. Again, this is the second example.

MR. VERHOEVEN: Charles, could we highlight the ads on the right so that the jurors can see that a little bit easier?

Q. (By Mr. Verhoeven) Mr. Lanning, could you just explain to the jury what I've just highlighted?

1     A.    Yes.   What you've highlighted is the section

2  for my web page where I went in as the publisher.   I'm

3  the publisher in this instance, and I have defined where

4  I want the ad to be on my web page.

5          I didn't want it to be in the middle on top of

6  the pictures for my stallions.   I wanted it to be out of

7  the way over on the right and not conflict or compete

8  with my content of my website.

9          Now, I also defined the size of that ad, and I

10 also defined the background to be white, and I've

11 defined how I want the text to show up.   And you can see

12 the three different colors of the text for the ad.   And

13 so those would be considered the presentation rules of

14 the internet media venue or the presentation rules in my

15 website that I've defined as the publisher.

16    Q.    Okay.

17          MR. VERHOEVEN:   Can we go to the next

18 slide, DX Demo 163, please?

19    Q.    (By Mr. Verhoeven) And, Mr. Lanning, can you

20 explain to the jury what this slide is showing?

21    A.    Yes.   As I implemented this on my website for

22 how the Google AdSense system worked, the -- my website,

23 if you look at the web page, does not include any ads

24 like it did on the previous scenario or previous --

25 previous example.

1         Instead, only my website content is there.

2    There's nothing on the right-hand side of the page,

3    which means the post office -- back to our illustration,

4    our simple illustration, there's no packages in the post

5    office.

6         I don't have any idea as the publisher what

7    ads the Google system is going to send, because they're

8    sending them directly to the internet users.  They're

9    using our simplified example.  The Google system is

10   sending the package directly to the house.

11        So if you look at the bottom right that says

12   Google, that represents the Google AdSense system, and

13   that Google system is sending the different

14   advertisements or the different packages to each

15   internet users.

16        Now, this is the actual performance of my test

17   with my website, and the first picture we looked at --

18   if we can just pop back to the first picture --

19             MR. VERHOEVEN:  Can you tell us which?

20             THE WITNESS:  Sorry.  158.

21             MR. VERHOEVEN:  158.

22             THE WITNESS:  If we can highlight again,

23   Charles, the ad on the right.

24      A.   This is a result as -- from my web browser, if

25   I were an internet user.  If you look -- and I have no

idea as the publisher what ads the Google system would
choose to display on the web page when people typed in
tlranch.com.

If you notice, this ad starts with Spanish
horses.  It has different types of horse videos and
advertisement for taking pictures of horses.  It goes
down to the bottom to having monogrammed horse halters.
I have no idea until I actually typed in tlranch.com
what advertisements Google would choose for my website.
This is one example.

I also typed in tlranch.com the next day and
Google chose a different -- completely different set of
ads for the same website.  This is where they're
deciding based on content what ads should be shown on my
website or my web page.

Q.   Okay.

MR. VERHOEVEN:  Let's go back to DX Demo
163, please.

Q.   (By Mr. Verhoeven) So to summarize, you're
saying that the Google system doesn't publish the ads to
tlranch.com but instead publishes them directly to the
internet users?

A.   Yes.  As shown by the -- on the bottom right,
nothing goes to the internet media venue from the Google
system.  It's the same way as sending the packages

directly to the houses.

The post office or my internet media venue, because I'm the publisher, I know that none of those messages went to my website, to my internet media venue. They all went directly to users, and I have no idea which ads were going to be displayed, how many were going to be displayed, and if any at all.

MR. VERHOEVEN: Let's go to the next slide, DX Demo 159.

Q. (By Mr. Verhoeven) Now, this is just the claim language we looked at Friday afternoon, right?

A. Yes, it is.

Q. So just to remind the jurors, there's the highlighted -- you see the highlighting there?

A. Yes.

Q. That's the element in the claim we're talking about?

A. Yes. This all started with the element that's in the claims, specifically Claim 1 of the '025 patent. This is the element that I've highlighted in the patent, which I'm saying that the Google system does not do.

And I have to also consider and use the Court's order of what that means to make sure that I'm using the full meaning. And that's shown on the right-hand side.

1    Q.   Okay.  And it's your opinion that the Google

2  accused system, AdSense for Content and AdSense for

3  Mobile, do not meet this element?

4    A.   Yes.  They just simply do not send the ads to

5  the internet media venue.

6    Q.   Okay.

7            MR. VERHOEVEN:  Let's go to the next

8  slide, DX Demo 179.

9    Q.   (By Mr. Verhoeven) And this -- this highlights

10 two other elements.  Do you see those?

11   A.   Yes, I do.

12   Q.   And can you explain to the jurors -- walk

13 through those two elements for the jury, please?

14   A.   These are two other elements that I believe

15 the Google system does not do or does not meet the

16 required elements of this claim.

17           The first -- and they're hard to read, so like

18 the other slides, I've pulled them out in larger text on

19 the right.

20           The first one says:  Seller is prompted to

21 input information to select one or more of the internet

22 media venues.  And -- and we know from the previous

23 slide for construction, internet media venues are

24 internet locations.

25           And then the second one that's -- the second

1 limitation that's highlighted and shown on the right is

2 the electronic advertisement is displayed on each of the

3 one or more of the selected internet media venues.

4 　　　Q.　And it's your opinion that these elements are

5 not met; is that what you said?

6 　　　A.　Yes, that's correct.　The Google system does

7 not perform these functions.

8 　　　Q.　And have you prepared some demonstratives to

9 help explain that?

10 　　　A.　Yes, I have.

11 　　　　　　MR. VERHOEVEN:　Let's go to the next

12 slide, DX Demo 357.

13 　　　Q.　(By Mr. Verhoeven) And can you walk us

14 through -- this is a set of slides as I understand it;

15 is that right, sir?

16 　　　A.　Yes.

17 　　　Q.　Okay.　Can you just walk us through?　You can

18 tell Charles to go to the next slide when you're ready.

19 　　　　　　Can you just walk us through for the jury what

20 you're showing here?

21 　　　A.　Okay.　First off, now I've shown and I think

22 we've seen some information about bass fishing before.

23 　　　　　　Now I'm showing how the Google AdSense system

24 really works, and it -- and the name of the product

25 gives us a hint, because the name of the product is

AdSense for Content.

And the AdSense for Content means the content that's being viewed by the person at the computer on the web browser or on the web page. So on the first step, Google needs to do -- what the Google system needs to do is look at the -- analyze the page that the person is looking at to figure out the content or to give the system an idea of what is being looked at by the person.

THE WITNESS: Next slide, Charles.

A. And I've signified that with this magnifying glass. Now, the magnifying glass is the Google system analyzing the content, and it comes up with words that are descriptive of the content that's being looked at by the user. And those words I've listed on the left-hand side of the page, which are bass, fishing, tackle box, spinner bait, rods, and boat.

Now, Google has these words that describe the content of what the internet user is looking at. The Google system goes to the next step.

THE WITNESS: Okay, Charles.

A. Now, the Google system -- what's represented by all the different colors on the right, you see all the different colored boxes on the right.

The Google ad system has millions of ads in its database that are stored, and it's -- what's

represented by the colored squares are different types

of ads.

So the first step that's performed by the

Google AdSense system is to take those descriptive words

of the content that are listed on the left that a person

is looking at on their web page and compare those words

with -- against those millions of ads that are in their

database to determine which ads are relevant.

I usually refer to that as a relevancy test,

which is the first hurdle that an ad needs to -- or that

all of this -- ads, the ones that are chosen, are

competing with -- with many other ads.

THE WITNESS:  Okay.  Next slide.

A.   Now, what's shown by the blue squares is that

the Google system now has decided -- what's denoted by

the blue squares is these are the possible ads or the

relevant ads that match up with the words on the left:

Bass, fishing, tackle box, spinner bait, rods, and boat.

But now the Google system is not finished.  There's

still one more big, significant step that needs to be

performed.

THE WITNESS:  Okay, Charles.

A.   That Google system conducts an auction of the

ads.  And as we discussed on Friday, when a person

inserts an ad or when they create an ad, they provide a

1  bid.  And this auction is similar to an auction that we

2  might all attend, whether it's for antiques or something

3  else, is that we might have a list of ads or information

4  that we want, but it -- I -- I kind of messed that up

5  and confused.

6           What has to happen and what's represented on

7  this slide is the different ads and the amount that the

8  advertisers have bid.  And you can see that some of the

9  ads have a single dollar sign, which means that's the

10 least money.  There's one ad on the left-hand side in

11 the middle --

12           THE WITNESS:  Charles, if you can

13 highlight that one.  If we can highlight -- maybe I've

14 confused you.  Yes, that one.

15      A.    That's the ad with multiple dollar signs.

16 That means an advertiser has bid a lot of money to have

17 their ad used.  There's other ads with less dollar

18 signs.

19           Now that Google has looked at the auction,

20 they figured out how many ads are going to be presented

21 on the user's website.

22           THE WITNESS:  Next slide, Charles.

23           MR. VERHOEVEN:  Go ahead to the next

24 slide, Charles.

25      A.    And I've represented that with the squares on

the left.  Now, you can see that there's -- there's four

squares on the left-hand side of the page that have a

yellow box around them.  That is used -- I've used that

to signify which ads have won the auction.

And the first one that's shown has the one

with the 5-dollar sign.  And these four ads then are

sent to the web page that the internet user is looking

at.

THE WITNESS:  Go ahead, Charles.

A.   And that's shown -- and that's what those ads

would look like.  So that shows that they're -- how

those ads are selected and how the auction is performed.

And then the ads finally show up on the web page.

Q.   (By Mr. Verhoeven) Now, this process that you

just walked us through is a description about how

AdSense for Content works, correct?

A.   Yes, that's correct.

Q.   And how many times is this process performed

by Google?

A.   It's hard to believe, but this is done

millions of times per second.  It's done for every --

every time a user displays a web page, Google does this

to determine which ads are going to be shown on that web

page.

So if there's a million people looking at web

1  pages that have AdSense's advertisements on them, the

2  Google system needs to do this every time that web page

3  is displayed.

4      Q.   Okay.  Now, have you prepared some

5  demonstratives to take this system that you just

6  described and apply it to the -- and illustrate it with

7  relevance to the claim language we just looked at?

8      A.   Yes, I have.

9      Q.   Okay.

10          MR. VERHOEVEN:  Let's go to the next

11  slide, DX Demo 363.

12      A.   This --

13          MR. VERHOEVEN:  Go ahead, Charles, and

14  click it to the -- keep going.  One more.

15      Q.   (By Mr. Verhoeven) Okay.  Mr. Lanning, can you

16  explain to the jury what they're looking at here?

17      A.   Well, the first thing that I'd like to point

18  you to is the text at the bottom of this slide.

19          This is what I believe is -- this is the claim

20  language that -- and includes the claim language that

21  Google does not allow advertisers to input information

22  to select internet media venues and does not display ads

23  on each selected internet media venue.

24          And now I'm going to go through an example to

25  show you why I believe that's true.

1        And would you like me to walk through --

2    Q.   Yes, please.

3    A.   Now, I'm going through the full process as the

4 expression goes, soup to nuts, or from beginning to end.

5 In the first part of the process, we need to get an ad

6 created.  An advertiser needs to go to the Google

7 AdWords interface and define their ad.  And I'm showing

8 that with the top left box on the slide that's labeled

9 Google AdWords.

10        And this is where Google advertisers input ad

11 information, keywords, placements, and bids.  And we

12 went through that in a lot of detail last Friday

13 afternoon.

14        And they also -- once they have that

15 information, they've entered that information, they hit

16 the enter key.  And I'm showing that that information is

17 going to the Google ad system by the dollar sign in the

18 middle and the -- and the words lose weight fast.

19        THE WITNESS:  Charles, if you could just

20 kind of make sure everyone's looking at the right spot

21 there.

22        Thank you.

23    A.   So that information is going into the Google

24 ad system.

25        Now, there's something different on this

slide.  There's a red square over on the right with a single dollar sign.  Now, as I walk through the example, that red square is going to represent this new ad that we just created.  The dollar sign is representing just the -- a lower bid.

Remember, we had from one to five dollar signs.

THE WITNESS:  Next slide, please.

A.   Now this ad has to go into the Google database and be stored with millions of other ads that other advertisers have entered earlier.

THE WITNESS:  Go ahead, Charles.

A.   That's shown by the red square going into the database.

Now we've created an ad, and the Google AdSense system has stored that in the Google's ad database.

THE WITNESS:  Next slide.

A.   Okay.  Now, I'm making the transition, because we're going through the process.  Now that the ad is stored, now there's another person.  And this slide represents a person that's viewing a website called free dieting.

And Google -- like I showed before, Google reads the content of this page to try to figure out the

1  best words to use for placing ads on this web page.  And

2  the best words that they've analyzed is shown by the

3  words on the left-hand side.

4                    THE WITNESS:  Next page.

5      A.    Now, this is the first hurdle, remember, that

6  I talked about that the ad has to get across before it

7  can go to the next step, which is auction, which I'll

8  talk about in a minute.  But this is the relevance

9  hurdle.

10           The first thing that this ad with the red

11  square has to do is it has to be chosen by the Google

12  system that it's relevant or more relevant than many

13  other ads.  And that's being showed -- shown by the red

14  box.  All the other ads that it's competing with are

15  shown by the blue boxes.

16                    THE WITNESS:  Okay.  Charles.

17                    MR. VERHOEVEN:  Wait one second.  Go

18  back.

19                    THE WITNESS:  Sorry.

20      Q.   (By Mr. Verhoeven) So on this slide, did the

21  advertiser's red ad make the first hurdle?

22      A.    They don't always make it.  A lot of times

23  they don't.  But to show and complete the illustration,

24  I'm assuming for this illustration an example that the

25  red box is selected by the Google system, that it's

relevant, so that I can show what happens on the next one.

It doesn't need to be the case. It's competing with a lot of different ads. There's a lot of times it's not.

Q. So just -- just to follow up on that, the ad that you showed was lose weight fast, right?

A. That's correct.

Q. The one that's represented by the red box?

A. That's correct.

Q. And the web page's contents, as represented on the left here, relate to that subject matter, losing weight?

A. The -- the words on the left are what were calculated or figured out by the Google system when it read the content that was signified by that magnifying glass.

Q. So the first step is Google determined that the red ad, lose weight fast, was relevant to the web page; is that right?

A. Yes.

Q. Okay. Go ahead.

THE WITNESS: Next page, please.

A. Now, this is the next big hurdle that our new ad that's signified or shown by the red box has to pass

1   before it's shown on the internet user's site.

2          It has to go to an auction.  Note that it's --

3   it's a lot -- it only has a single dollar sign, and,

4   again, there's other ads where other advertisers had bid

5   more.  But this ad, the red box representing our new ad,

6   has a single dollar sign, and this is showing the ads

7   that it's competing against.

8                  THE WITNESS:  Next slide.

9      Q.   (By Mr. Verhoeven) What does this depict,

10  Mr. Lanning?

11     A.   This depicts the four ads that are chosen as

12  shown by the yellow around the blue boxes.  So for the

13  auction, only the ads which have the yellow squares

14  around them have been chosen by the Google system to

15  send to the user that's looking at that web page -- free

16  dieting, fast dieting -- I've just forgotten the name of

17  the web page, but it's the dieting web page.

18     Q.   Okay.

19                 MR. VERHOEVEN:  Next slide, please.

20     Q.   (By Mr. Verhoeven) And what does this show?

21     A.   This shows that the four ads that are going to

22  be sent to the web page that the user's looking at do

23  not include the red box.  The red box has lost out.

24  It's over on the bottom, left-hand corner of the slide.

25  The -- all of the blue ads that bid more are going to be

1  sent to the -- to this web page.

2              THE WITNESS:  Next.

3      A.    As shown -- as I'll show with this

4  illustration, the animation takes these ads and moves

5  them across to the web page.

6              And so what we can see by that is even though

7  the new ad that's -- that's shown by the red box crossed

8  the first hurdle of relevance in my example, it did not

9  pass the auction.  So, therefore, it did not get

10  selected.  So the user -- the user cannot select the ad

11  to be presented or -- or -- I need to -- the user does

12  not input information to select the internet media

13  venue.

14              THE WITNESS:  Maybe we can go to the next

15  slide.

16              MR. VERHOEVEN:  Sure.

17              THE WITNESS:  It will be a lot easier.

18  I'm thinking I might be losing you.

19              MR. VERHOEVEN:  The next slide is DX Demo

20  179, please.

21      Q.    (By Mr. Verhoeven) So this is the claim

22  language you started with on this -- these two elements,

23  right?

24      A.    Yes.

25      Q.    Okay.

1    A.   So what's -- let's explain.

2         What I've explained the Google system does not

3    do is that the seller is not prompted to input -- input

4    information to select one or more of the internet media

5    venues.  And the electronic advertisement is not

6    displayed on each of the selected internet media venues,

7    because even though the advertisement might have made it

8    past the first hurdle, if it didn't pass the auction, it

9    would not be displayed; therefore, the seller cannot

10   select the ad to be displayed on each of the one or more

11   selected internet media venues.

12             MR. VERHOEVEN:  All right.  Let's go to

13   the next slide, DX Demo 354.  This is just a summary

14   slide.

15   Q.   (By Mr. Verhoeven) And does this summarize

16   your opinions with respect to the Google accused

17   products and whether or not they infringe the two

18   patents asserted in this case?

19   A.   Yes, it does.

20   Q.   And can you just summarize for the jurors your

21   conclusions?

22   A.   Yes.  The -- the first part is what we

23   cover -- what I covered last Friday afternoon.

24        And that's the Google system does not permit

25   advertisers to input information to create an electronic

advertisement customized to each of the selected

internet media venues' presentation rules, which means

that -- and as we talked about -- or as I described last

Friday, the user that enters the ad, or the advertiser,

does not -- is not allowed by the Google system to

customize the ad in any way.  All they do is enter the

plain text.

        The second point with the No. 2 is Google does

not publish ads to internet media venues.  Instead,

Google sends ads directly to users.

        Now, that point is the point that I described

with the simple illustration of the package.  What I'm

saying by this one is that Google does not send the

package to the post office.  Instead, Google sends ads

directly to the users.

        The third point is that Google does not allow

advertisers to input information to select internet

media venues and does not display ads on each selected

internet media venue.

        While the Google system allows advertisers to

input information, they do not select the internet media

venues.  The Google system selects the -- or the Google

system just provides ads to web pages that have already

been selected by the user.  And once they're selected,

the Google system does not display ads on each selected

internet media venue.

Q.   Thank you, Mr. Lanning.

Now, in addition to the issue of whether or not the Google accused products infringe or don't infringe each of the elements of the asserted claims, were you also asked to look into the issue of whether or not the two asserted Function Media patents were valid or invalid?

A.   Yes, I was.

Q.   And I know you're not a lawyer, are you, sir?

A.   No, I'm not.

Q.   But did you have some understanding of the rules of the road with respect to the legal framework for assessing validity or invalidity in this case?

A.   Yes, I did.

Q.   Okay.  And have you prepared a slide to help walk through your understanding?

A.   Yes, I have.

Q.   Okay.

MR. VERHOEVEN:  Let's go to DX Demo 197.

Q.   (By Mr. Verhoeven) And all I want you to do is tell the jury your understanding as to the rules of the road here for the legal framework that you had in mind when you conducted your analysis.

A.   Okay.  There's two different legal doctrines

that are defined for determining -- that are used to

determine whether a patent is -- should be considered or

is considered valid or invalid in this case.

And there -- and those are called anticipation

and obviousness.  Now, as I've shown here, the first

thing that you need to do or that I need to do, when I'm

analyzing a patent to determine whether it's valid or

not, is -- the first thing I need to determine is what

date that the patent is entitled to, meaning if it's

invalid, some -- a system has to be out there being sold

or doing the functions of the patent before the

patent -- so I need -- the first thing I need to do is

determine what date should I use for the patent that

it's entitled to.

And then I need to determine what -- whether

the -- there are systems out there that are publicly

available for sale or that have been sold or that are

publicly available and being operated that do the same

thing as the patents are describing.

And as then discussed before last week, this

invalidity is like infringement in that in order to show

invalidity for anticipation, I need to show that the

system performs every claim element, not just some of

them, but I need to show that the system, the prior art

system, needs to perform each and every claim element.

1    Q.   So that's the first legal doctrine, right?

2  Anticipation?

3    A.   Yes, it is.

4    Q.   And just to summarize, what you're saying is

5  if there were systems publicly available or sold before

6  the priority date of the patents and those systems

7  disclose everything claimed in the patents, then under

8  your understanding, the patents would be invalid under

9  anticipation?

10    A.   That's correct.

11    Q.   Okay.  And can you explain to the jury the

12  next legal doctrine that you used when you analyzed this

13  issue?

14    A.   Yes.  That -- that doctrine is obviousness, as

15  I've shown in the underlying bold text that says

16  obviousness.

17        Again, for obviousness, I -- the first thing

18  that I need to do is define -- determine the priority

19  date or what date the patents are entitled to, which is

20  the same bullet or the same first line under

21  anticipation.

22        And then I need to determine if a system

23  doesn't do all the -- the claims or all the elements of

24  a claim, would it be obvious to a person of ordinary

25  skill in the art.  And I'll explain what I mean by a

1  person of ordinary skill in the art.

2          But would it be obvious to a person of

3  ordinary skill in the art to either modify that system

4  so that it had all of the limitations of the claim, or

5  combine it with other systems that have those lim -- had

6  the missing limitations so the end result of that system

7  would include all the limitations of the claim.

8      Q.  Okay.  And if you were to so find, then your

9  understanding is the patent would be invalid for

10 obviousness?

11     A.  That's correct.

12     Q.  And that's a separate legal doctrine from

13 anticipation?

14     A.  Yes, it is.

15     Q.  Okay.  Now, you mentioned this phrase person

16 of ordinary skill in the art.

17          Is that a legal term?

18     A.  Yes, it is.

19     Q.  Okay.

20          MR. VERHOEVEN:  Let's go to the next

21 slide.

22     Q.  (By Mr. Verhoeven) Do you have an opinion as

23 to what a person of ordinary skill in the art would be

24 in this case with these patents?

25     A.  Yes, I do.  And I've provided that opinion

earlier in my expert reports, and that's what you see on
this slide.

As you can see, there's two or three sections
for my definition. It wasn't just a real quick
definition of person that writes software. It's a
little more detailed than that.

There's three sections. One is they have a
college degree. The second section is -- is describing
the experience they need to have with a whole bunch of
different acronyms that look like a foreign language,
probably, to you. And then the third bullet is
different types of experience. I will describe this
later. If I say an internet engineering professional or
one of ordinary skill, this is the definition that I'm
referring to.

Q. Okay. So just for completeness, then, it's
your -- as you state on this slide, it's your opinion
that a person of ordinary skill would have a bachelor's
or master's level of college degree in computer science,
computer engineering or equivalent; is that right?

A. Yes, that's correct.

Q. And can you just put into the record your
opinion as to what this second element would be, the
experience that would be -- that a person of ordinary
skill would have?

1    A.   Okay.  In the -- the -- the second bullet or

2 the second paragraph on this slide, I've described the

3 two years of experience in design, generation,

4 configuration, and serving of web page content using one

5 or more website creation tools and be familiar with the

6 operation and functionality provided by each of the

7 following internet suite protocols.

8        Let me stop there and explain what I mean by

9 that.

10        This person I'm saying is not only -- the

11 first bullet is saying it's a person with a college

12 degree in computer science.  That's typically where

13 they'd learn how to write software programs.  So this is

14 a programmer or a person with a programming degree is

15 the first bullet.

16        The second bullet says it's not enough for

17 that person just to have a -- a college degree.  They

18 need to have some experience so they really know how to

19 do this.  And the experience they need to have is with

20 how to create a website, like my tlranch.com, and how

21 that website is published and created.  And they also

22 need to be familiar with the internet protocols, which

23 are the internet -- which are the protocols or the rules

24 used for the website to communicate with all the

25 different users' computers.

          To give you an idea, that IPv4 or IPv6.  The
IPv4 means Internet Protocol Version 4.  Now, Internet
Protocol Version 4 is the one version of the protocol
that was initially defined that had a little over 4
billion addresses.

          The IP Version 6 would be known to one of
ordinary skill, someone that has experience of the newer
version that came out in 1998, which then expanded those
number of addresses to a lot bigger.

          The others are -- so the protocols include TCP
and UDP, IPv4 or IPv6, http, Java programming language,
or JavaScript, and one or more versions of HTML, or its
variance, for example, XHTML and XML.  So there's a lot
of different languages and experience that a person
needs to have to be one of ordinary skill in the art.

     Q.   And very briefly, the last bullet, can you
explain what you're describing there?

     A.   Yes.  The patents also included requirements
for inventory systems and producing tickets and
ticketing systems.  So I've included this requirement
for a person to have experience in online transaction
processing systems.  What that means is inventory.

          If you were to buy a ticket for a sporting
event, the online transaction processing system needs to
make sure it takes that seat out of the inventory so

 1  they don't double-book the seat.  Or if you make a

 2  reservation for a hotel or a motel, those are the type

 3  of systems, online transactions.

 4          They have to do that quickly so that two

 5  people don't get the same seat or the same room

 6  somewhere.  And that includes databases and database

 7  configuration, synchronization, and management for

 8  performing real-time inventory control.

 9      Q.    Go ahead and have a drink of water.

10      A.    My mouth got dry.  Sorry.

11      Q.    There's a lot of talking here.

12  Ready?

13      A.    Okay.  Yes.

14      Q.    Now, did you do any research or

15  investigation -- let me withdraw the question.

16          So we've covered sort of your understanding of

17  the rules of the road on this issue of validity, right?

18      A.    Yes, sir.

19      Q.    And so the next question is, did you do --

20  with those rules of the road in mind, did you do any

21  research or investigation into the issue of whether the

22  two asserted patents here were new or unique or were

23  valid or invalid?

24      A.    Yes, I did.

25      Q.    Can you explain to the jury what you did --

1 what research and investigation you did?

2     A.    Well, the first thing I did, as I explained on

3 Friday, is I analyzed the patents and their claims.

4 That required me to go through them multiple times to

5 understand exactly in my mind what the patents were

6 describing and what the claims were requiring.

7         And then I did my own investigation about --

8 and went online, on to the internet, and looked for

9 systems that existed for the public before these

10 patents -- before the priority date of these patents.

11         And I also looked back to remember what I

12 would call the state of the art or how things really

13 worked and what was available at the time of these

14 patents, in the 2000 timeframe.

15         The internet and computers have really changed

16 in the last two -- or ten years, since 2000.  We're now

17 in 2010.  So I have to take my mind back and I look at

18 different information to make sure that my mind is

19 synchronized back to the way things were, the state of

20 the art in 2000.

21         I also then investigated over a hundred

22 different documents which described different systems

23 that were available.

24         I also looked at -- I think that -- I was just

25 thinking.

1    Q.   Did you read any transcripts?

2    A.   Yes.   There were deposition transcripts for --

3  from people.   Their depositions were taken in this case

4  for some of the prior art systems, and I've read those

5  deposition transcripts by the people that were involved

6  by these systems.

7    Q.   Okay.   And as a result of your investigation

8  and analysis of this issue, Mr. Lanning, have you formed

9  an opinion as to whether or not either of the two

10  patents asserted in this case are valid?

11    A.   Yes, I have.

12    Q.   Can you please tell the jury your opinion.

13    A.   That the Function Media patent, specifically

14  the '025 patent and the '059 patent, are invalid because

15  there were systems out there doing the same thing before

16  these patents were -- before the priority date of these

17  patents.

18    Q.   And have you identified some systems that you

19  think were doing the same thing?

20    A.   Yes, I have.

21    Q.   And can you please tell the jury what systems

22  you've identified.

23    A.   There's three systems that I've identified --

24  at least three systems.

25         The first system was built by a company called

AdForce.

The second system was built by a company called DoubleClick.

And the third system was built by a company called NetGravity.

MR. VERHOEVEN: Charles, if we could put up DX demo 200.

Q. (By Mr. Verhoeven) What are we looking at here, Mr. Lanning?

A. There were multiple documents that I used to get an understanding of the systems. What is represented here is one document for each of those systems.

The first document you see is the cover page for the user guide for the AdForce system.

The second one says -- that says DoubleClick next to it, the page that I'm showing there is the DART user manual.

And the third --

Q. Let me just interrupt you. You said DoubleClick and then you said DART. I just don't want the jury to get confused.

What is the relationship between DoubleClick and DART?

A. Right. As you probably figured out by now,

engineers love acronyms.  And so the DoubleClick was the company.  The DART was the name they came up with for their overall advertising and publishing system.  And we'll talk about that in more detail.  Sorry for slipping in the DART on you, but that was the name that they referred to the overall ad processing system.

          And the final document that I'm showing you is the NetGravity -- one of the documents from the NetGravity system.

     Q.    So let's walk through each of these and your analysis of them and start with the AdForce system.

               MR. VERHOEVEN:  Next slide, please, Charles.

     Q.    (By Mr. Verhoeven) And can you just describe -- so depicted on here is the AdForce user guide 2.6; is that right, sir?

     A.    That's correct.

     Q.    This is -- this is the document.  Do you have a copy of this document?

     A.    Yes, I do.  And I've tried to print it on its original size so that you can see.

          This is what a user of the AdForce system would use to understand the AdForce system.  And we'll go through this in more detail.

     Q.    Now, can you start -- we'll go through the

1 AdForce system and apply it to the claims, but can you

2 start generally by just generally telling the jury what

3 was the AdForce system, Version 2.6?

4     A.   Sure.  The Ad -- the AdForce system was an

5 internet advertising system that had multiple interfaces

6 and multiple databases.

7         It had an interface for publishers where they

8 could define their internet media venue and the

9 presentation rules for their internet media venue.

10         It also had a second interface for advertisers

11 or sellers that could define their advertisements.

12         And it had databases to store this information

13 for both publishers and advertisers.  And the overall

14 AdForce system published ads to users -- the internet

15 user of web pages.

16     Q.   Okay.

17         MR. VERHOEVEN:  Let's go to the next

18 slide, please.

19     Q.   (By Mr. Verhoeven) And what are you depicting

20 here, Mr. Lanning?

21     A.   Well, let's start in the middle.  In the

22 middle, we see the '025 patent, and I've -- I referred

23 to earlier the priority dates or the date that the

24 patent was entitled to.

25         For the '025 patent -- you can see right

1  underneath the letters, '025 patent, is a 1/10/99.  And

2  that's showing the priority date for the '025 patent,

3  which is January 10th --

4      Q.    That says '99.

5      A.    Just a second.  I need to look at something.

6      Q.    Okay.  Take your time.

7      A.    This is the priority date for the '025 patent,

8  which is January 10th, 1999.

9          Going to the right for the '059 patent would

10  be July 11th, 2002.  It is shown with the date

11  underneath the '059.

12          As shown by the AdForce system, which is on

13  the left and highlighted, the AdForce system was being

14  sold and was in use before the Function -- both of the

15  Function Media patents, as shown by this slide.

16          And that's one of the requirements that I need

17  to show, is that it was the prior art or this system was

18  on sale or being sold and used before the priority date

19  of these patents.

20      Q.    Okay.

21              MR. VERHOEVEN:  Let's go to the next

22  slide, please, DX demo 403.

23      Q.    (By Mr. Verhoeven) And this is a picture of

24  the user manual here, this document here.

25      A.    Yes, it is.  And what I've blown up on the

1  screen is the copyright date of 1998 that's on the first

2  page of the -- of the document.

3          MR. VERHOEVEN:  Let's go to the next

4  slide, DX demo 204.

5      Q.    (By Mr. Verhoeven) And this, on the left-hand

6  side, it looks like it's Page 2-4 of the user manual.

7          Can you read that?

8      A.    Yes.

9      Q.    Okay.  And can you describe what you're

10  showing here to the jury, please.

11      A.    This is actually out of the user manual.  This

12  is Page 2-4.  So what you're seeing on the screen is

13  just this page out of the user manual.

14          And there's two pieces of information that I'd

15  like you to refer -- that I'd like you to refer to on

16  looking at this slide.

17          First, the bottom part of this slide that's

18  right out of this manual also says:  Copyright, AdForce,

19  1998.

20          On the right-hand side that I've blown up, the

21  text that says:  Delivering over one billion ads per

22  month to leading sites, including Netscape and

23  GeoCities, this is the actual web force -- a page from

24  the actual AdForce website, which is giving the latest

25  news.

And so this is telling people that come to the AdForce website, that the AdForce system was not only being sold, but it was in use and it was sending over one billion ads out per month.

Q.   Okay.  Now, you've taken -- is it correct that you've taken the AdForce -- the results of your information with respect to AdForce and applied them to the claim elements in the asserted claims in this case?

A.   Yes, it is.

Q.   Okay.  Let's walk through that.

MR. VERHOEVEN:  Let's go to the next slide.

Q.   (By Mr. Verhoeven) And this is just Claim 1 of the '025 patent, which we've seen several times, right?

A.   Yes, it is.  My job and my analysis is, I needed to show that the AdForce system actually used or performed each of the functions.

So I've provided a checklist here so that we can walk through it so that I can show you that the AdForce system performed each of these requirements of this claim.

Q.   Okay.

MR. VERHOEVEN:  Let's go to the next slide, DX demo 206.

Q.   (By Mr. Verhoeven) And it looks like on the

1  left, you have Claim 1 (a), the first element in Claim

2  1; is that right?

3      A.    That's the preamble.

4      Q.    And then what are we looking at on the

5  right-hand side?

6      A.    And on the right-hand side is, again, another

7  page that's from Chapter 1 of this user guide.  I'm just

8  putting it up on the screen so you can see, but this is

9  the actual page.

10         And this page is describing on Chapter 1, the

11 introduction, that AdForce is a full-service advertising

12 solution designed to create manage, target, and report

13 advertising on the worldwide web.

14         Now, when you see worldwide web, you can

15 translate that into internet.  The worldwide web and

16 internet are synonymous type terms.

17     Q.    Now, you've heard of Dr. Rhyne, the

18 Plaintiff's expert in this case, right?

19     A.    Yes.

20     Q.    And he submitted a report on the issue of

21 validity, correct?

22     A.    Yes, he did.

23     Q.    Are you aware of whether or not Dr. Rhyne

24 disputes that this element is present in AdForce?

25     A.    I don't believe Dr. Rhyne disputes this

1 element, no.

2     Q.   Okay.

3             MR. VERHOEVEN:  Let's go to the next

4 slide.

5     Q.   (By Mr. Verhoeven) So you -- what does this

6 check represent?

7     A.   What is shown on this slide is, I've now shown

8 that the preamble of the claim or the first part of

9 Claim 1 is -- is performed by the AdForce system.  So

10 the checkmark denotes I've -- I've already shown that,

11 but that's done by AdForce.

12     Q.   So the next element is 1 (b).  That's the

13 first interface element, which we've already looked at,

14 correct?

15     A.   Yes.

16             MR. VERHOEVEN:  Let's go to the next

17 slide.

18     Q.   (By Mr. Verhoeven) And what are we looking at

19 here, Mr. Lanning?

20     A.   Okay.  This, again, is -- or it's similar to

21 what we looked at before, but this is the claim language

22 from that element.

23           And the construction is:  The rules to be set

24 by a media venue for using and creating advertisements

25 to be published on that media venue.

1          And examples are, as I've shown in the bottom

2    box, applying background color, comparing ad size.

3          You know, so we don't get lost here, we're at

4    the first interface on these patent claims that's

5    referring to the publisher interface.  So using my

6    example earlier, this would be for the publisher or the

7    internet media venue, if you will.

8          This -- this would apply to me if I were

9    Twisted L Ranch, so this is the first interface.

10        Q.    And the first interface, the -- the publisher

11    is prompted to input presentation rules, correct?

12        A.    Yes.  As the claim at the top, where it says 1

13    (b) says:  A first interface to the computer system

14    through which each of the internet media venues -- and

15    that's what I just referred to; that's the publisher,

16    the internet media venue; that would be Twisted L Ranch

17    in my earlier example -- is prompted to input

18    presentation rules for the internet media venue for

19    displaying electronic advertisements on the internet

20    media venue.

21          And those presentation rules, examples of

22    those presentation rules are at the bottom, applying

23    background, color, and comparing ad size.

24        Q.    Okay.  So this would be the publisher, and the

25    publisher would choose things like ad size and

background color of the ads and things like that?

A.    That's correct.

Q.    Okay.

A.    That's like I showed you on my website, that I was choosing the background color of white for the area of ads; I decided what the size should be and where it's located.  Those are examples of presentation rules.

MR. VERHOEVEN:  Let's go to the next slide, please, DX demo 209.

Q.    (By Mr. Verhoeven) Okay.  And on the left, it looks like you've reproduced the claim language for element (b); is that right?

A.    That's correct, so that we can all keep track of which element we're talking about.  There's a lot of different elements here in these claims.

Q.    And what are we looking at on the right-hand side?

A.    On the right-hand side, this is another page from the AdForce user guide.  And if we look at the top right or the middle right --

THE WITNESS:  Charles, if we can highlight a little bit where it says ad sizes on the right-hand size.

A.    We just discussed that the presentation rules would be ad size.  This is where a publisher can define

the ad size.

That 468x60 probably doesn't mean anything to you, but the way that ad sizes are typically defined is in pixels, which you can think of a pixel being a dot on the screen.

So this is 468 pixels wide and 60 pixels tall. If I wanted a different size ad, I could choose one of those other dimensions that you see. And this box goes down and provides a lot of different sized ads.

Q. (By Mr. Verhoeven) Okay.

THE WITNESS: If we can go back.

A. The next box is that -- you can see the box that has the small red square around it in the middle that says Java ready. This is another definition or presentation rule for a publisher to define, do I want the programming language or -- or ads which require the programming language Java on my site.

If I click it, that's okay. If I unclick it, that means my presentation rule is, I don't want any ads that require the Java programming image.

Q. Okay.

MR. VERHOEVEN: Let's go to the next slide.

Q. (By Mr. Verhoeven) And what are you illustrating here, Mr. Lanning?

1    A.   What I'm illustrating here is to make sure

2  that we orient ourselves correctly with the claim and

3  where this claim fits in the AdForce system.

4        Again, the first interface is the publisher

5  interface, which is shown by the computer on the top

6  right.  And you see a box that's coming out of that

7  computer that's labeled publisher on the top right.

8              THE WITNESS:  Charles, if we can kind of

9  show that over on the right-hand.  Sorry.  No, not that

10 one.  Over on the right-hand side, there where it says

11 ad size.

12   A.   That's that 468x60 where I'm defining the

13 number of pixels in my ad, and I'm saying that it's Java

14 ready.

15       So this shows how the AdForce system fits in

16 the claim and -- and that these -- this claim limitation

17 is being met by the AdForce system.

18             THE WITNESS:  Okay, Charles.

19   Q.   (By Mr. Verhoeven) Now, this page we looked

20 at --

21             MR. VERHOEVEN:  Go back one slide,

22 please, Charles.  There's a bigger picture of it.

23   Q.   (By Mr. Verhoeven) So this page we're looking

24 at on the right, for the record, is it correct that this

25 is from an exhibit in evidence, DX 403?

1      A.    That's correct.

2      Q.    And the control number is G5629; is that

3   right?

4      A.    That's correct.

5      Q.    Okay.

6            MR. VERHOEVEN:  Let's go to DX demo 211.

7      Q.    (By Mr. Verhoeven) And here we have

8   Claim 1 (b) still on the left and a different page on

9   the right.  Can you tell the jury what you're showing

10  here?

11     A.    Yes.  Again, this is a different page out of

12  the AdForce user manual.  This is going to look a lot

13  more complex to you.  Again, it looks like a foreign

14  language, but this is the type of information that a

15  publisher would see.

16           And so this is further support that the

17  publisher can define the presentation rules.  And I've

18  highlighted two areas or two examples of presentation

19  rules, and the --

20           THE WITNESS:  Charles, the first box --

21  or both of them, yeah.  If you can get both of them,

22  that's good.

23     A.    This is, again, the width 468x60.  And on the

24  right, we see a new -- a new parameter, a new attribute

25  they call it that we haven't talked about before, and

1   that's frame border.

2         Right now the frame border for this ad is

3   zero, which means there's no frame border. It's like a

4   picture frame around a picture.

5         If I wanted to change that presentation rule

6   where I just wanted to have a frame border, all I would

7   do is change that zero into a one and then save it, and

8   then my ad would -- on the AdForce system would have a

9   border around it.

10     Q. Now, we talked about a person of ordinary

11   skill in the art. Do you remember that generally?

12     A. Yes.

13     Q. Would a person of ordinary skill understand

14   how to put in this frame border?

15     A. Yes. This is -- these are standard html-type

16   attributes. So one of ordinary skill in the art would

17   know or be familiar with over a hundred different

18   attributes that you could use to describe your website

19   and different presentation rules as well.

20         So even though this looks somewhat cryptic to

21   you, one of ordinary skill in the art, this would be

22   pretty familiar to them.

23     Q. Okay.

24         MR. VERHOEVEN: Let's go to DX demo 213,

25   please. I'm going two slides over, because we need to

1  speed up a little bit.

2      Q.   (By Mr. Verhoeven) Can you explain to the jury

3  what slide we're looking at here, Mr. Lanning?

4      A.   Yes.  This is from a -- another AdForce

5  document that's describing specifically to publishers

6  how to set background and color.  You see --

7              THE WITNESS:  Yes, Charles.  If you can

8  highlight the background color.

9      A.   It's typically referred to as BG color.  BG

10  stands for background.  This is an example for how a

11  publisher would set the presentation style for the

12  background color of their ad.

13              If I wanted different colors, this is where I

14  would set it.

15              THE WITNESS:  The next slide, please.

16  Oh, no.  I don't have a next slide, so let me -- I -- I

17  thought I might have one that makes it a little easier.

18      A.   But the BG color -- and you see the zeros,

19  that means that in this case, they want a background

20  color black.  That's what that means.

21      Q.   (By Mr. Verhoeven) Okay.

22              MR. VERHOEVEN:  All right.  Let's go to

23  the next slide.

24      Q.   (By Mr. Verhoeven) And so you put a check

25  under element (b).  Can you explain to the jury why you

1    put that check there?

2        A.   Yes.   This -- this means that I believe, and

3    I've done an analysis, that the AdForce system performs

4    this limitation, which is shown by (b).

5        Q.   All right.

6                 MR. VERHOEVEN:  Let's go to the next one.

7        Q.   (By Mr. Verhoeven) Limitation (c):  First

8    database restoring the presentation rules input by the

9    internet media venues through the first interface.

10                And what are we looking at here?

11                MR. VERHOEVEN:  For the record, this is

12   DX demo 215.

13       A.   I'm sorry.  I'm seeing a different page number

14   on the bottom than what you said.

15       Q.   (By Mr. Verhoeven) 215?

16       A.   Oh, I see it now.  Sorry.  It's down --

17       Q.   That's okay.

18       A.   -- way down in the bottom.  I was looking at

19   the other numbers.  All right.  Yes, it is 215.

20                This is another page of the AdForce user

21   manual, which is describing that there's two different

22   databases in the AdForce system.  I've highlighted one

23   of the databases that is website management.  That's the

24   database for the publishers.

25                The other database is for the advertisers,

1  which we'll talk about in a little bit.

2      Q.   And this -- so far, are these pictures we've

3  been looking at out of this manual?

4      A.   Yes.

5      Q.   Okay.  And this one is from Page 5443; is that

6  right?

7      A.   Yes, it is.

8      Q.   Now, do you know whether Plaintiff's expert,

9  Dr. Rhyne, disputes that the element (c) of Claim 1 is

10 met by AdForce?

11     A.   He does not dispute that it's met.

12     Q.   Okay.

13          MR. VERHOEVEN:  Let's go to the next

14 slide.

15     Q.   (By Mr. Verhoeven) So you put a check on (c);

16 is that right?

17     A.   Yes.  That (c) has shown that it has the

18 database.

19     Q.   Okay.  Let's go to (d), the next element,

20 which is the second interface we've seen testimony about

21 already, right?

22     A.   Yes.

23          MR. VERHOEVEN:  And going to DX demo 218

24 for the record, this is an illustration from an exhibit

25 in evidence, DX 403, Page 5542.

1      Q.   (By Mr. Verhoeven) Mr. Lanning, can you tell

2  us what we're looking at here?

3      A.   Yes.  If we look on the left side of the page,

4  this is the claim limitation that I've labeled (d).

5           Now, this limitation has two parts to it, so I

6  want to show you each of those parts.

7           The first part is -- I've highlighted in

8  red -- the seller's prompted to input information to

9  select one or more of the internet media venues.

10          Now, we've gone to the second interface, and

11  that's referring to the advertiser interface.  So now

12  we've left the publisher interface, and we've gone to

13  the advertiser interface.

14          And this is describing what the advertiser --

15  the patent refers to it as the seller, and I use those

16  terms interchangeably for the seller or the advertiser.

17          So the first step I need to show is that the

18  AdForce system prompts the seller to input information

19  to select one or more of the internet media venues.

20               THE WITNESS:  So if we can go back to the

21  slide.

22      A.   What you see on the right is another page

23  right from the AdForce user guide where the advertiser

24  looks at the different internet media venues, and those

25  are listed by -- where you see Ad-Tech, Alpha Web

Services, those are all different internet media venues.

And all the advertiser needs to do is just check the ones that they want to select for their ad.

So this is where the advertiser is selecting the internet media venues, okay?

Q.   Okay.

MR. VERHOEVEN:  Go to the next slide.

Q.   (By Mr. Verhoeven) What are we looking at here, Mr. Lanning.

MR. VERHOEVEN:  It says DX demo 219 for the record.

A.   This is just to orient ourselves with the system.  And as I explained earlier, we've left the publisher, which is shown by the top box on the right, top computer, and now we're at the bottom on the bottom right, which is the advertiser.

And we have the AdForce system or the computer controller of the AdForce system in the middle.

Q.   Okay.

MR. VERHOEVEN:  Let's go to the next slide, DX demo 220.

Q.   (By Mr. Verhoeven) Can you explain to the jury what we're looking at here, sir.

A.   Yes.  Remember I said that there were two parts to this limitation?  This is the second part where

the seller is prompted to input information to create

electronic advertisement for the publication to the

selected internet media venues.  And you see that, and

that's highlighted in red.

THE WITNESS:  Okay, Charles.  If we can

go back to the --

A.    This is another page out of the AdForce user

manual that's out of the advertiser section.

Q.    (By Mr. Verhoeven) And let me just interrupt

you.  For the record, you're looking at DX 403 in

evidence, Page 5535?

A.    Yes, that's correct.

Q.    Okay.  Go ahead.

A.    What I'd like to address your attention to

first is the top part of this screen menu that says

creative selection.

Now, creative, in terms, is an advertisement.

That's what a lot of the advertisers refer to as an

advertisement.  So when you see the word creative,

creative means advertisement.

And this is the creative section, and this is

where --

THE WITNESS:  If we can go back, Charles

now.

A.    And they're prompted to input information to

1 select the internet media venues.  And that's what

2 this -- this slide is doing with the -- the different ad

3 sizes that they have.

4     Q.   Now, you've highlighted the second part of

5 Claim 1 (d):  Prompted to input information to create an

6 electronic advertisement.

7          I think the last -- in your testimony jut now,

8 you talked about selecting.  Does this show anything

9 with respect to the second part, prompting

10 information -- let me start over.

11     A.   Sorry.

12     Q.   Prompted to input information to create an

13 electronic advertisement?

14     A.   Yes.  What you see -- and this is the

15 creative, and that's what I was referring to.

16          And right underneath the two words at the top

17 are creating size, style, and file.  So this is input to

18 create an advertisement.

19          And the ad size is over on the -- right there

20 is -- that's describing what screen we're looking at to

21 the user.  And then ad sizes, and then also where you

22 see the ad styles then if you -- yeah -- I'm talking a

23 little faster than the computer here, so -- okay.

24          So for ad styles in the middle, you see the

25 letters GIF 89.  Now, that probably wouldn't mean too

much to you, but to one of ordinary skill, that same
picture or an image.

So if I have an ad that's a picture of
something, that's the way I would do that.  If I
selected down to Java Applet, the J-A-V-A, that would be
different types of information to create.

If I typed -- if I selected html script, that
could be something as basic as a text ad that I would be
entering to create, and that would be information to
create an electronic advertisement.

Q.   Okay.

MR. VERHOEVEN:  Let's go to the next
slide, DX demo 226.

Q.   (By Mr. Verhoeven) And you've checked element
(d)?

A.   Yes.  Following the same logic as before, the
(d), that second interface, has been shown on the
AdForce system.

Q.   Based on the documents we looked at?

A.   Yes.

MR. VERHOEVEN:  Let's go to the next
element, element (e), the second database.  Next slide.

A.   As I discussed earlier, the AdForce system
provided two different types of databases.  Before I
highlighted in red the website, now I'm highlighting

1  advertising.

2      So this shows that it has an advertising

3  database or a database to store the advertiser

4  information.

5      Q.    (By Mr. Verhoeven) And do you know whether

6  Plaintiff's technical expert, Dr. Rhyne, disputes that

7  this element (e) is met in the AdForce system?

8      A.    He has not disputed this element.

9      Q.    Okay.

10          MR. VERHOEVEN:  So let's go to the next

11  slide.

12     Q.    (By Mr. Verhoeven) So you've checked off (e)?

13     A.    Yes, I have.

14     Q.    So let's go to the last element of Claim 1,

15  the computer controller element.

16     A.    Yes.

17          MR. VERHOEVEN:  And let's go to the next

18  slide, please.

19     Q.    (By Mr. Verhoeven) Can you tell the jury, what

20  are we looking at here?

21     A.    This is another page from the AdForce user

22  manual that's describing how the overall system works.

23  And I've use this page to illustrate the claim language

24  or -- of that element (f) that we saw on the table.

25     Q.    Let me just interrupt for one second.

1          So what we're looking at is a page from DX 403

2   in evidence, Page 5639; is that correct?

3       A.    That's correct.

4       Q.    Okay.  Go ahead.

5       A.    And I've highlighted to show that the AdForce

6   system performed the element that I have shown have

7   shown with the small letter (f).  I've highlighted this

8   description of the AdForce system.

9          And it says:  When a user views a web page,

10  the web tag makes a request to the AdForce server for an

11  advertisement, which is then delivered to the user,

12  which is describing the -- how the overall AdForce

13  system sends advertisements to the user.

14      Q.    Okay.

15                MR. VERHOEVEN:  Let's go to the next

16  slide, please.

17      Q.    (By Mr. Verhoeven) Now, you've checked the

18  last Claim 1 of the '025 patent, element (f)?

19      A.    Yes.

20      Q.    Can you explain to the jury your opinion with

21  respect to element (f)?

22      A.    That the AdForce systems meets this element as

23  well.

24      Q.    So is it your opinion that all of the elements

25  of Claim 1 of the '025 patent are anticipated by

1  AdForce?

2      A.   Yes.  As I've shown with the checkmarks for

3  every one of the preamble and every one of the elements

4  of Claim 1, the AdForce system performs the

5  functionality, as required by Claim 1 of the patents --

6  or sorry.  I shouldn't say patents.  It's Claim 1 of the

7  '025 patent.

8      Q.   Okay.

9          MR. VERHOEVEN:  Let's go to the next

10  slide.  This is DX demo 341.

11     Q.   (By Mr. Verhoeven) Now, this is really

12  complicated.  Can you explain to the jury why you had

13  this one created?

14     A.   Yes.  The patent claims -- this is one of the

15  charts that I drew initially when I started analyzing

16  the patents, because the claims have multiple

17  dependencies in some areas, and there's a lot of

18  different claims.

19          So in order to understand where the claims are

20  at and which other claims a claim might depend on, I

21  generated this chart.

22          And I've also used this -- or am going to use

23  this same chart today to walk through and make sure we

24  have the checklist of the claims that we walked through

25  to show that the AdForce system performs the function of

these other claims as well.

Q.   Now, the -- this demonstrative exhibit lists six claims in blue, correct?

A.   Yes, that's correct.

Q.   And what are the -- why are there six claims in blue?

A.   Because these are claims that I've already described as we've walked through.

Q.   Well, you've described Claim 1.  Is it correct that the other -- the other five blue claims are also asserted claims?

A.   Yes.  That -- they're asserted.  It gets a little confusing, that, but Function Media has asserted the claims that are in blue.  But that doesn't mean that is the only claims I need to analyze.

For instance, if they assert Claim 20 -- Claim 20 is shown over on the left-hand side of the screen -- Claim 20 also depends on Claim 6.

THE WITNESS:  And, Charles, just to make sure everyone's kind of with us, this chart can look kind of complicated -- if we kind of --

A.   So there's Claim 20.  That's an asserted claim, but in order for me to show that the AdForce system invalidates Claim 20 or that it performs all of the functions that are required by Claim 20, I not only

have to look at the text for Claim 20 and the claim

language for it, but I also have to look at Claim 6, and

then Claim 6 depends on Claim 1.

　　　　And so that's what this chart is showing, the

different claims.

　　Q.　Okay.  And you've got checkmarks on Claim 20

and Claim 6, as well as Claim 1.  Why do you have

checkmarks on those two claims?

　　A.　Because those claims, we've already -- I've

already described that functionality for Claim 1, and so

I've put a checkmark.

　　　　For instance, on Claim 20, it requires

information entered by a seller target, an IMV.  We

didn't have enough room in the box, so I abbreviated

internet media venue to be IMV.

　　　　And so I believe I've already shown that the

AdForce system performs that functionality, so I've put

a checkmark in there.

　　　　And Claim 6, this is a self-interface -- or

sorry.

　　　　Claim 6 says that it's a second interface, is

self-serve.  Well, self-serve means a person can go

through it, in my mind, without an expert or somebody

sitting with them.

　　　　And that's what these menu screens that we've

walked through that are in the AdForce user guide show,
so I've checked Claim 6 to show that I've already proven
that and shown you that.

Q. So is it your opinion that dependent Claim 20
is in -- is also anticipated by the AdForce system?

A. Yes, it is.

Q. Let's go to asserted Claim 52 on the other
side of the exhibit, which describes color standards and
depends on Claim 47 and Claim 1.

Do you see that?

A. Yes.

Q. Can you summarize for the jury your opinion
with respect to Claim 52?

A. And so Claim 52 requires color standards, and
it requires -- and so it's dependent -- and I've shown
that the different color standards are included.

Claim 47 includes design or style standards
that are automatically applied or compared to the ad,
and I've shown that those are performed by the AdForce
system, and so I've put a check in the Claim 47 there.

Q. And this is based on the documents we've
already looked at?

A. That's correct.

Q. Okay. So there's three other asserted claims
on the bottom here. Let's start with Claim 37, which

1  depends on four other claims, 36, 32, and 31 and 1.

2          Just for the interest of time here, you put

3  checkmarks on Claims 1, 31, and 32.  Does that mean that

4  you believe you've already shown evidence that those are

5  met?

6      A.   Yes, that's correct.

7      Q.   So let's just talk about the ones that don't

8  have checkmarks, Claims 36 and 37.

9          Are you with me?

10     A.   Yes.

11     Q.   Have you prepared a slide with respect to

12  those two claims?

13     A.   Yes, I have.

14          MR. VERHOEVEN:  Let's go to the next

15  slide, DX demo 240.

16     Q.   (By Mr. Verhoeven) And if you could tell the

17  jury what we're looking at here.

18     A.   This is another page out -- or it's -- it's

19  the same page that I showed you earlier from the AdForce

20  manual, which shows the AdForce system performs the

21  requirements of Claims 36 and 37.

22          Specifically, that the --

23          THE WITNESS:  Thank you, Charles.

24     A.   -- the computer system of Claim 32, wherein

25  the self-serve interface for the internet media venue

prompts the internet media venue for a choice of

advertisement types.

Now, this slide is showing -- and then let me

finish 37 while he has that blown up.

In the computer system for Claim 36, wherein

the choice of advertisement includes a text, so I have

to show that the publisher can choose different

advertisement types that they want shown on their web

page and that one of those types in 37 is a text ad.

THE WITNESS:  And if we can go back

quickly to the page.

A.   Now, what one of ordinary skill, a person

would understand as a publisher looking at this page, if

I did not want to include text, I would choose the top

part and -- of all of the text that you see.

THE WITNESS:  Charles, if we could

highlight the part that says html tag, the first -- no.

Sorry.  Yes, that's an html tag, but what

I'm referring to is a little lower than that, for all of

that --

A.   There's the html tag.  If I chose that, then

text would not be included, because to the left of that

text, it says GIFs only, meaning images only.

So I would not be able -- I could choose, as a

publisher, that test would not be included; however, if

1  I chose the text below that --

2            THE WITNESS:  If you can highlight the

3  text right below -- there.

4      A.   If I chose all of that information below that

5  and pasted that into my web page or my website, then

6  text ads would be included.

7            So both of the Claims 36 and 37 are performed

8  by the AdForce system.

9      Q.   (By Mr. Verhoeven) And for the record, this is

10 the same screen shot we looked at early from DX 403 in

11 evidence, Page 5643, correct?

12     A.   Yes.

13     Q.   All right.

14           MR. VERHOEVEN:  Let's go back to the next

15 slide, DX demo 342.

16     Q.   (By Mr. Verhoeven) And it looks like you put a

17 check on Claims 37 and 36; is that right?

18     A.   That's correct.

19     Q.   And that represents that you believe those

20 elements are met by AdForce?

21     A.   Yes.

22     Q.   Okay.  Let's go to the last asserted claim

23 here, Claim 90, on the bottom right, and you've

24 checked -- already checked Claims 1, 47, 45, and 62.

25           Why have you done that?

1    A.   And 31 is also checked.

2         47, it's a little confusing with this.

3              THE WITNESS:  If you see that it turns to

4  the left after 45, Charles, that's what I'm referring

5  to.

6    A.   It goes from 45 to 31, then to Claim 1.  Not

7  from 45 to 47.  You see that little black line where I

8  turned left at 45?

9    Q.   I misspoke.  I apologize, Mr. Lanning.

10   A.   Okay.

11   Q.   So just to set the record straight, Claim 90

12 depends on four other claims, 62, 45, 31, and 1; is that

13 right?

14   A.   That's correct.

15   Q.   And you've checked off 62, 45, 31, and 1.  Why

16 did you do that?

17   A.   Because I believe that I've already shown that

18 the AdForce system performs the functionality of these

19 claims.

20   Q.   So that leaves Claim 90.

21             MR. VERHOEVEN:  Let's go to the next

22 slide, DX demo 251.

23   Q.   (By Mr. Verhoeven) And can you explain -- and

24 for the record, this is depicting Claim 90 on the left,

25 and on the right is an image from DX -- Exhibit DX 403

1  in evidence, Page 5634; is that correct?

2       A.   Yes, that's correct.

3       Q.   Now, can you describe for the jury what we're

4  looking at here --

5       A.   Yes.

6       Q.   -- and how it applies to Claim 90.

7       A.   Claim 90 requires the addition of distribution

8  factors.

9            THE WITNESS:  And if we can highlight

10 down towards the -- if we -- if we look at apply or

11 compare the internet media venue distribution factors.

12      A.   Do you see the words distribution factors?

13 This is a new part of -- of what's being claimed.  So

14 what I need to show that the AdForce system performs is

15 that it actually does this function for distribution

16 factors.

17           THE WITNESS:  If we can pop back to

18 the -- to the page.

19      A.   Now, down on the bottom of the page, I've

20 listed ad size as being a distribution factor.  And

21 AdForce allowed a publisher to specify the ad size.

22           THE WITNESS:  Okay.  If we can leave

23 that, Charles, but then up -- highlight where it says ad

24 sizes on the screen over on the right.

25      A.   It's highlighted in black on the actual -- do

1   you see where it's ad sizes?  We've looked at that

2   before.  That would be the 468x60 that's highlighted in

3   black.

4        Q.   (By Mr. Verhoeven) All right.

5                  MR. VERHOEVEN:  Let's go to the next

6   slide, DX demo 344.

7        Q.   (By Mr. Verhoeven) This is the same chart.

8   And do you believe Claim 90 should have a check on it,

9   too?

10       A.   Yes.

11       Q.   Okay.  We don't have a check on that, but you

12  think there should be one on there; is that right?

13       A.   Yes.

14       Q.   Okay.

15                  MR. VERHOEVEN:  Let's go to the next

16  slide, DX demo 345.

17       Q.   (By Mr. Verhoeven) What are you depicting

18  here, Mr. Lanning?

19       A.   That Claim 179 is another independent claim,

20  but with the equal sign, I'm saying it's essentially the

21  same as Claim 1, and, therefore, the AdForce system

22  performs the functionality of Claim 179.

23       Q.   Based on the same analysis you've already

24  provided to the jury?

25       A.   That's correct.

1    Q.   And asserted Claim 231?

2    A.   Claim 231 is -- what I'm showing here is

3    essentially the same as Claim 52.  And the checkmark in

4    the box on the right is denoting that I believe that the

5    AdForce system performs that functionality of Claim 231

6    as well.

7    Q.   Okay.  We're almost through all the asserted

8    claims.  We have one more claim to go.

9              MR. VERHOEVEN:  Let's go to the next

10   slide, DX demo 254.

11   Q.   (By Mr. Verhoeven) What are we looking at

12   here, Mr. Lanning?

13   A.   We switched gears a little bit.  We've

14   switched patents.  So we've just -- I've just finished

15   all of the asserted claims and their associated claims

16   for the '059 (sic) patent.

17             Now, this checklist is showing Claim 1 for the

18   '059 patent.  Claim 1 for the '059 patent is a little

19   different, and you can see now -- and now I have

20   checkmarks for most of the elements of the letters, but

21   there's areas where I don't have checkmarks, and so I

22   believe I haven't shown yet that the AdForce system

23   performs the functionality.

24             So all, in my mind, we need to go through are

25   the -- the ones that do not have a checkmark.  So (a) is

1  the first one we need to go through, which is referred

2  to the preamble.

3      Q.   Okay.  We don't have a lot of time, so let's

4  keep going as fast as we can here.

5           MR. VERHOEVEN:  Next slide, DX demo 255.

6      Q.   (By Mr. Verhoeven) What does this show?

7      A.   This shows that the preamble is met and that

8  there's a third party or an agency that provides the

9  advertising for the software -- or for the advertisers.

10 That's what this claim for the '059 requires with the

11 new parts in it.

12     Q.   And for the record, you're referring to Page

13 5441 of DX -- Exhibit DX 403 in evidence?

14     A.   Yes.

15     Q.   Okay.

16           MR. VERHOEVEN:  Let's go to the next

17 slide, DX demo 256.

18     Q.   (By Mr. Verhoeven) What are we looking at

19 here?

20     A.   This is the next element that I listed as (d)

21 that's different in the '059 patent than the -- Claim 1

22 of the '025.  And it's requiring that the seller is

23 prompted to input information identifying the seller.

24 And I've shown this as another page out of AdForce where

25 the person needs to identify themselves with a log in

1  with a name and a password.

2      Q.   This is -- we're looking at a page out of the

3  user manual?

4      A.   That's correct.

5      Q.   And -- and the person entered Elvis underscore

6  Doe and then a password?

7      A.   Yes.  And the stars are the password, but

8  systems typically don't display your password so the

9  people can see it.

10          MR. VERHOEVEN:  Let's go to the next

11  slide, DX demo 257.

12      Q.   (By Mr. Verhoeven) What are we looking at

13  here, Mr. Lanning?

14      A.   This element requires -- you have a third

15  interface.  We've already talked about a first

16  interface, a second.  This is a third interface.  And

17  the third interface requires the third-party

18  professional, which is a -- like an agency that would

19  provide the ads.

20          And what is shown by this page --

21              THE WITNESS:  If we can --

22      A.   What is shown by both of these pages from the

23  AdForce user guide is that this -- this claim limitation

24  is met.  And they are the same page or very similar

25  pages to what I've shown you before.

1    Q.    (By Mr. Verhoeven) Okay.

2              MR. VERHOEVEN:  Let's go to the next

3    slide, DX demo 258.

4    Q.    (By Mr. Verhoeven) We're back to the claim

5    chart for the '059, and can you summarize your opinion

6    with respect to whether AdForce anticipates each and

7    every element of Claim 1 of the '059 patent?

8    A.    Yes.  The AdForce system performs each and

9    every limitation of the -- Claim 1 of the '059 patent,

10   as I've shown here, with the checkmarks on the

11   right-hand side next to each one of those elements of

12   Claim 1.

13             MR. VERHOEVEN:  Your Honor, I'm going to

14   switch subjects.  Is now a good time?

15             THE COURT:  It is.

16             Ladies and Gentlemen, we're going to

17   break now for our morning recess.  Please be back ready

18   to come in the courtroom at 10:30.

19             Remember my prior instructions, and don't

20   talk about the case.  Have a nice break.

21             COURT SECURITY OFFICER:  All rise.

22             (Jury out.)

23             THE COURT:  All right.  Court's in

24   recess.

25             MR. VERHOEVEN:  I have one question.  I

1  can do it after the break.

2              THE COURT:  That's okay.

3              MR. VERHOEVEN:  Side-bar, please.  Sorry.

4  Just a point of order, Mr. Lanning may want to talk

5  about Dr. Rhyne's rebuttal points.  I'm assuming I

6  have -- I should cover that now, and -- and I won't be

7  permitted to call him after Dr. Rhyne testifies, but

8  I -- I would like to do it the other way, if I could.

9              THE COURT:  Are you going to restrict it

10 to things he's identified in his report?

11             MR. VERHOEVEN:  I'm going to restrict it

12 to his testimony, so it might even be less than that,

13 so -- it probably would be more efficient, I think.

14             THE COURT:  Okay.  Any objection?

15             MR. GRINSTEIN:  None, Your Honor.

16             THE COURT:  Okay.  Then we'll proceed

17 that way.

18             MR. VERHOEVEN:  Thank you, Your Honor.

19             (Recess.)

20             COURT SECURITY OFFICER:  All rise.

21             (Jury in.)

22             THE COURT:  Please be seated.

23             Continue.

24             MR. VERHOEVEN:  Thank you, Your Honor.

25    Q.   (By Mr. Verhoeven) Mr. Lanning, let's switch

to the second reference that you referred to.
The first one was AdForce, right?

A. Yes.

Q. And the second one was this DoubleClick and DART system; is that right?

A. Yes, sir.

MR. VERHOEVEN: Charles, could you go to DX Demo 259, DoubleClick DART system.

Q. (By Mr. Verhoeven) And, Mr. Lanning, can you please describe for the jury -- before we go into the -- the claim elements, just generally, what is -- what is the DoubleClick DART system?

A. Like the AdForce system, the DoubleClick DART system was an internet advertising system that provided interfaces to publishers and advertisers. It was a competitor to AdForce system at the time.

Q. And this says DFA, DART for Advertisers; DFP, DART for Publishers.

Can you -- can you explain what you're referring to there?

A. Yes. The DoubleClick DART system is the overall advertising system, and then the DoubleClick company decided to split the software up into two -- at least two different modules that were referred to DART for Advertisers, the DFA, that would be the software for

1 advertisers; and DFP, DART for Publishers, that would be

2 for the publishers internet media venues.

3       Q.    And do those two applications work together?

4       A.    Yes, they did.

5       Q.    Can you explain that to the jury?

6       A.    Yes.  They were integrated together.  The

7 module would be sent to an advertiser, the software

8 module, to install on their computer or to use if they

9 wanted to do advertising, define advertisements.

10           If a publisher wanted to define their internet

11 media venue or the portions of their website and their

12 presentation rules, they would use the DFP product.

13 But both of those were integrated into one system so

14 that if any part of the back end system that did all the

15 ad processing failed, then both DFA and DFP would fail

16 as well.

17           MR. VERHOEVEN:  Let's go to the next

18 slide, DX Demo 260.

19       Q.    (By Mr. Verhoeven) Can you please tell the

20 jury what you're illustrating here?

21       A.    I'm illustrating here that the DART system was

22 out being sold and was actually performing -- producing

23 these ads in 1998, which, as shown by this slide, is

24 before the priority date of the '025 patent of January

25 10th, 1999, and the '059 patent of July 11th, 2002.

1    Q.   All right.

2              MR. VERHOEVEN:  Let's go to the next

3    slide.

4    Q.   (By Mr. Verhoeven) This is the claim chart for

5    Claim 1 of the '025 patent, right?

6    A.   Yes, for DoubleClick.

7    Q.   And you're going to walk through this with the

8    evidence?

9    A.   Yes, I am.

10   Q.   Okay.

11             MR. VERHOEVEN:  Next slide, DX Demo 263.

12   Q.   (By Mr. Verhoeven) This has Claim 1(a),

13   element (a), on the left and some documents on the

14   right.

15             Can you please explain to the jury what you're

16   illustrating here, Mr. Lanning?

17   A.   Yes.  What we're going to do now is we're

18   going to -- we're going to go through these same claim

19   limitations for Claim 1 as I did earlier for the AdForce

20   system.  It's just that I need to show that the -- I

21   need to show that DART's -- let me start all over, since

22   I messed that all up.

23             I need to show that DoubleClick's DART system

24   performs the functionality that's required by the patent

25   claims just like the AdForce system.

1           And what's shown on this slide is it's

2    defining the preamble in both the DART for Advertisers

3    document that's shown on the top, which explains in the

4    final sentence that ads can be placed on any site on the

5    worldwide web, which is the internet.

6           And here's the definition on the bottom right

7    that DART stands for.  It stands for dynamic

8    advertising, reporting, and targeting.  And it explains

9    that it's the ad server that powers the DoubleClick

10   network.

11      Q.   In your opinion, is that element of Claim 1(a)

12   met by the DART system?

13      A.   Yes, sir.

14           MR. VERHOEVEN:  Let's go to -- I'm going

15   to skip some slides, Charles, in the interest of time.

16   Let's go to DX Demo 265.

17      Q.   (By Mr. Verhoeven) And on the left-hand side

18   of this slide, you've got element (b) of Claim 1, right?

19      A.   Yes, that's correct.

20      Q.   And then what are we looking at on the

21   right-hand side?

22      A.   On the right-hand side, the DART system

23   performs similarly to the AdForce system.  This might

24   look familiar to you of what we looked at earlier, but

25   this is defining the publisher preferences for the first

interface.

And I've shown the publisher and I've shown two examples:  Frame border equals one and background color equals green that goes in to the DART computer controller.

Q.   So this is similar to what we looked at with AdForce?

A.   Yes, it is.

Q.   And for the record, the documents we're looking at -- or the first one on the top is -- is it correct that that's DX370 in evidence at Page 4062?

A.   Yes, sir.

Q.   And the one on the bottom is, correct, it has DX149 in evidence, Page 3560?

A.   Yes, sir.

Q.   Okay.

MR. VERHOEVEN:  Let's go to the next slide, DX Demo 266.

Q.   (By Mr. Verhoeven) And, again, we have Claim 1(b) on the left-hand side, and is it correct that you're illustrating a page screen from DX -- Exhibit DX370 in evidence, Page 4062?

A.   Yes.  This is a page from one of the DART manuals that I used that's explaining how background color for the advertisement is set.

1         In this case, it's a white background color
2    with all the Fs that you see.
3         Q.   Okay.  Is it your opinion that element (b) of
4    Claim 1 of the '025 patent is disclosed in the DART
5    system?
6         A.   Yes, sir.
7         Q.   Okay.
8              MR. VERHOEVEN:  Let's go to DX Demo 268.
9         Q.   (By Mr. Verhoeven) And here we have on the
10   left-hand side, element (c) of Claim 1, and then on the
11   right-hand side, it looks like this is a depiction of a
12   page from Exhibit DX149 in evidence, Page 3519; is that
13   correct?
14        A.   That's correct.
15        Q.   Can you please explain to the jury what
16   they're looking at here and how it applies to
17   Claim 1(c)?
18        A.   This information is from a DART manual, a DART
19   document; describes the ad database, which meets claim
20   (c) of this limitation.
21        Q.   Okay.  And is it your opinion that claim -- we
22   withdraw that question.
23             Is it your opinion that element (c) of Claim 1
24   is met by the DoubleClick DART system?
25        A.   Yes, sir.

1           MR. VERHOEVEN:  Let's go to DX Demo 270,

2   please.

3       Q.   (By Mr. Verhoeven) And here on the left-hand

4   side, we have element (d) of Claim 1 and a couple of

5   documents.

6           For the record, the first one is Exhibit DX373

7   in evidence, Page 4627; is that right?

8       A.   That's correct, yes, sir.

9       Q.   And the second one is Exhibit DX594 in

10  evidence, with a big, long number; the end of it is

11  209-11.

12          Do you see that?

13      A.   Yes, sir.

14      Q.   Okay.  Can you explain to the jury what --

15  what these documents are and how they relate to your

16  opinion?

17      A.   Yes.  They were two -- two parts to element

18  (d) as we discussed in AdForce -- for the AdForce

19  system.

20          This is showing -- the highlighted portion

21  that's shown is showing how the DART system meets this

22  claim requirement.

23          And also on the right is an example -- it's

24  hard to read, I know -- but this is an example of the

25  menu interface that was supplied to the -- the second

1  interface or the advertiser interface.

2      Q.   What does that menu interface show?

3      A.   It shows the requirements for this -- for this

4  claim element.

5              THE WITNESS:  If we could go back to

6  the --

7              MR. VERHOEVEN:  If you could go back,

8  Charles.

9      A.   It's -- it's showing an example of how the

10  seller is prompted to input information to select one or

11  more of the internet media venues.

12      Q.   (By Mr. Verhoeven) And this highlighted

13  language here, you highlighted that there, right?

14      A.   Yes.

15              MR. VERHOEVEN:  Can we highlight that

16  box?

17      Q.   (By Mr. Verhoeven) And can you explain to the

18  jury why you highlighted that?

19      A.   It's because this -- this says and it explains

20  to the -- to the seller how they can buy and target

21  different websites with the text, the buy-site pages to

22  which ad placement is targeted.

23              MR. VERHOEVEN:  Let's go to DX Demo 272,

24  please.

25      Q.   (By Mr. Verhoeven) And on the left -- on this

1  exhibit -- excuse me.  On the left on this slide is

2  Claim 1, element (c), the second part; is that right?

3     A.   Yes, that's correct.

4     Q.   That's the information to create an

5  electronic --

6     A.   Yes, it is.

7     Q.   And on the right, you've got two documents.

8  The first is Exhibit DX373 in evidence, Page 4625,

9  correct?

10     A.   Yes, sir.

11     Q.   And the second is Exhibit DX594 in evidence,

12  the same page we looked at, 209-11?

13     A.   Yes, sir.

14     Q.   Can you explain to the jury how these pages

15  relate to the second part of element (d) of Claim 1?

16          THE WITNESS:  If we can highlight the

17  yellow portion that's highlighted in the first document.

18     A.   This describes how an advertiser is prompted

19  to create information, an electronic advertisement for

20  publications for the internet media venues.

21          If you see, there's two areas here, but I'd

22  like to point you to the bottom part where it says ad

23  HTML.  The description for that, HTML stands for

24  hypertext metalanguage (sic), which means that's the

25  language used by the website advertisers and publishers,

HTML text of an enhanced creative.

And remember that creative is another word used for an advertisement.

Q. Okay. And do you have an opinion as to whether or not element (d) of Claim 1 is disclosed by the DoubleClick DART system?

A. Yes, I do.

Q. What's your opinion?

A. That it is disclosed.

MR. VERHOEVEN: Let's go to DX Demo 274, please.

Q. (By Mr. Verhoeven) And on the left of this slide, we have element (e) of Claim 1, second to the last element.

In the right-hand slide, we have a page out of Exhibit DX373 in evidence, Page 4607; is that correct?

A. That's correct, yes, sir.

Q. Can you please explain to the jury what you're showing here?

A. This is a page out of a DART document which describes that the -- there's a database on the DART system for storing the information input by the seller.

Q. And do you have an opinion --

A. Excuse me.

Q. That's okay. Would you like to take a drink

1  of water?

2      A.   I'm doing too much talking.

3      Q.   I'm going real fast.  I apologize.

4      A.   Okay.  Sorry.

5      Q.   Let's go to -- all right.  Do you have an

6  opinion as to whether element (e) of Claim 1 is

7  disclosed by the DoubleClick DART system?

8      A.   Yes.  The DART system discloses this system as

9  well.

10         MR. VERHOEVEN:  Let's go to DX Demo 276,

11 please.

12     Q.   (By Mr. Verhoeven) And here again on the

13 left-hand side is the final element of Claim 1 of the

14 '025 patent, element (f).  And on the right-hand side,

15 it appears that this is an illustration from Exhibit

16 DX149 in evidence, Page 3560; is that correct?

17     A.   Yes, sir.

18     Q.   Can you please explain to the jury what we're

19 looking at here?

20     A.   This is another page from a DART document

21 which is describing the process that's required by this

22 claim element of how the ads -- the computer controller

23 of the DART system publishes the electronic ads.

24     Q.   Okay.  And the next slide, DX Demo 276(a),

25 also has element (f) of Claim 1 with the separate

document on the right. This is a page from Exhibit DX596 in evidence, Page No. 40242; is that correct?

    A.    Yes, it is.

    Q.    And can you please explain to the jury what we're looking at here and how it applies to element (f) of Claim 1?

    A.    This is describing how the database and how the -- well, let me start over so I don't go too fast here.

        The bottom diagram or -- or picture on the bottom that says site's web server, that's the internet media venue. And then you also have on the right, DFA AdServers; that's the advertisement.

        So this is a picture that I've selected to just show that the DART system integrates the web servers or the web publishers with the ads on the system.

                MR. VERHOEVEN:  Let's go back to that slide.

    Q.    (By Mr. Verhoeven) Mr. Lanning, do you have an opinion as to whether element (f) of Claim 1 of the '025 patent is met by the DoubleClick DART system?

    A.    Yes, sir.

    Q.    What's your opinion?

    A.    And that is the DART system meets this element

1    as well.

2              MR. VERHOEVEN:  Let's go to slide DX Demo

3    277.

4        Q.   (By Mr. Verhoeven) Okay.  This is Claim 1 with

5    all the elements.  You have got checks on every element.

6    Can you summarize for the jury your opinion with respect

7    to whether Claim 1 of the '025 patent is anticipated by

8    the DoubleClick DART system?

9        A.   With all the check marks that I've shown on

10   the right-hand side of this screen, similarly the way we

11   did for -- the way I did for AdForce is -- my opinion

12   is, is that all of the limitations of Claim 1 of the

13   '025 patent are met by the DoubleClick DART system.

14       Q.   All right.

15             MR. VERHOEVEN:  Let's go to the next

16   slide, DX Demo 346.

17       Q.   (By Mr. Verhoeven) This is this complicated

18   slide we looked at before.  In the interest of time, I'm

19   just going to go through the boxes that aren't checked.

20             Is it fair to say that the boxes that aren't

21   checked, in your opinion, you've already shown evidence

22   that those elements are met?

23       A.   Yes.  The way -- in the same way that I

24   described for the AdForce system for this complicated

25   chart is the boxes that are checked, I believe that I've

already shown by the screen shots and the different

pages of the DART manual.

    Q.   Okay.  And you've got -- Claim 36 and 37 isn't

checked yet.

         MR. VERHOEVEN:  Let's go to the next

slide, DX Demo 347.

    Q.   (By Mr. Verhoeven) We've got 36 and 37 on the

left-hand side.  On the right-hand side, you've got a

document -- a page from the document.  It appears to be

Exhibit DX149 in evidence, Page 3573; is that correct?

    A.   Yes.

    Q.   And can you please explain to the jury how

this page relates to whether Claims 36 and 37 are met?

    A.   Yes.  This page describes -- well, first off,

the Claims 36 and 37, what's new about them or what's

different than the previous claims is that they require

that the self-serve interface for the internet media

venue, which is the first interface, prompts the

internet media venue for a choice of advertisement types

in 36, and then one of those advertisement types in 37

needs to be a text advertisement.

         As I've shown by the blow-out from the page,

from the DART document, is this talks about -- this

describes ad categories, which is a scroll box that

lists the categories in which each ad can be placed.

1    Q.   And in your opinion, does the DART --

2   DoubleClick DART system disclose the additional elements

3   that are claimed in Claim 36 and 37?

4    A.   Yes, sir.

5                MR. VERHOEVEN:  Let's go to DX Demo 349.

6    Q.   (By Mr. Verhoeven) Okay.  Another box that

7   wasn't checked was Claim -- Dependent Claim 28.

8         Do you remember that?

9    A.   Yes, that's correct.

10    Q.   And we've got that on the left.  On the right,

11   we have a page from page DX373 in evidence, Page

12   No. 4623, correct?

13    A.   Yes, sir.

14    Q.   Can you please explain to the jury how this

15   page relates to Claim 28?

16    A.   Claim 28 requires that the seller be able to

17   input advertising content to create a text

18   advertisement, meaning of just characters, letters, and

19   numbers.

20         As you can see by the highlighted part, as

21   soon as we have it blown up here, is that select the

22   insertion order type.  This is where the advertisers

23   selecting the insertion order type, and this serves text

24   instead of banners.

25         If you see where it says click command, and

1 then it says hyphen, serves text instead of banners,

2 that meets the requirement for Claim 28.

3     Q.   Okay.

4             MR. VERHOEVEN:  Now let's go to DX

5 Demo 351.

6     Q.  (By Mr. Verhoeven) This is -- this is the last

7 box that wasn't checked in the dependent claim chart we

8 looked at, Claim 90.

9         And on the right, you've got another

10 DoubleClick DART document.  And the question I have is:

11 Can you explain to the jury what -- how this document

12 relates to Claim 90?

13     A.   Yes.  As I described for the AdForce system,

14 Claim 90 requires that the publisher be able to define

15 publi -- or comparison -- let me start over.

16         That the -- that the publisher is able to

17 define presentation rules, which include the

18 distribution factors.  And keyword targeting is a

19 distribution factor, as I've listed on the bottom.  And

20 the DART publisher was allowed to specify keywords.

21         And that's what's being described by this

22 keyword targeting out of the DART DoubleClick document.

23             MR. VERHOEVEN:  For the record, I'll just

24 state that on DX Demo 351, the excerpt is -- the

25 document is from DX149 in evidence, 3537.

1    Q.    (By Mr. Verhoeven) In your opinion, does the

2  DoubleClick DART system disclose the additional elements

3  of Claim 90?

4    A.    Yes, sir.

5              MR. VERHOEVEN:  Let's go to the next

6  slide, DX Demo 352.

7    Q.    (By Mr. Verhoeven) So now all the boxes are

8  checked?

9    A.    Yes.

10    Q.    Does that accurately reflect your opinion that

11  the DoubleClick DART system discloses all these

12  elements?

13    A.    Yes, it does.

14              MR. VERHOEVEN:  Let's go to the next

15  slide, DX Demo 353.

16    Q.    (By Mr. Verhoeven) Now, we've already

17  testified as to this slide with respect to AdForce that

18  Claim 179 is subsequently equivalent to Claim 1; 231 is

19  subsequently equivalent to Claim 52.

20              Is that your same opinion with respect to the

21  DART system?

22    A.    Yes.

23    Q.    So it's your opinion that 179 and 231 are

24  disclosed for the same reasons that Claim 1 and Claim 52

25  are met?

1      A.    Yes, sir.

2      Q.    Okay.

3            MR. VERHOEVEN:  Last claim, '059 patent,

4  DX Demo 296.

5      Q.    (By Mr. Verhoeven) Now, this patent -- this

6  claim is the same as the earlier ones, except it has

7  that third party; is that right?

8      A.    Yes.  Yes, that's correct.

9      Q.    Okay.  Let's quickly go through and see what

10  your opinion is to whether the third party is disclosed.

11            MR. VERHOEVEN:  Claim 236 -- or Slide

12  DX297.

13      Q.    (By Mr. Verhoeven) Can you tell us what we're

14  looking at here?

15      A.    This is that page from the DART documentation,

16  DoubleClick DART system documentation.

17            THE WITNESS:  Charles, if we can

18  highlight in parenthesis at the bottom where it's blown

19  up where it says advertiser or agency.

20      A.    This third-party professional is equivalent to

21  an agency or an ad agency.  And this is what is

22  described in this DART document that agencies, or

23  third-party professionals, are supported and used by the

24  DART system.

25      Q.    (By Mr. Verhoeven) And this, for the record,

1  is DX373 in evidence, Page 4607?

2      A.   Yes, sir.

3           MR. VERHOEVEN:  Let's go to the next

4  slide, DX Demo 298.

5      Q.   (By Mr. Verhoeven) What are we looking at

6  here?

7      A.   This requires the seller to input information

8  identifying the seller, and that's what's shown by the

9  box that says log in to DART for advertisers.  That's

10 the log in for the seller.

11     Q.   And can you explain to the jury how that

12 relates to element (d) of Claim 1?

13     A.   Yes.  In element (d), if we look at the last

14 part of the claim element, it says:  Which a seller is

15 prompted to input information identifying the seller.

16 And so if you are logged into the DART system, it would

17 be similar to a log-in screen that I showed you for the

18 AdForce system, where there would be typically a user

19 name and then a password.  And that's what they mean --

20 what is meant by this page of the document that says log

21 in to DART for advertisers.

22     Q.   For the record, this is Exhibit DX373 in

23 evidence, Page 4610, correct?

24     A.   Yes, sir.

25     Q.   Is it your opinion that element (d) of Claim 1

1  is met by the DoubleClick DART system?

2       A.   Yes, it is.

3       Q.   Of the '059 patent?

4       A.   Yes, sir.

5       Q.   Okay.

6                 MR. VERHOEVEN:  Let's go to DX Demo 299.

7       Q.   (By Mr. Verhoeven) This is element (f) of

8  Claim 1 of the '059 patent, correct?

9       A.   Yes.

10      Q.   And there's two documents that you're

11 disclosing on the right.  The first is Exhibit DX373 in

12 evidence, Page 4627, correct?

13      A.   Yes, sir.

14      Q.   And the second is Exhibit DX594 in evidence,

15 Page 209-11?

16      A.   Yes, sir.

17      Q.   Can you please describe -- explain to the jury

18 why you put these documents up and how they relate to

19 element (f) of Claim 1?

20      A.   Yes.  These are two different pages of the

21 DART documents which support that the DART system

22 performed the functionality as required by the

23 third-party professionals prompted to input information

24 to select one or more of the internet media venues.

25           And that's shown by the buy-site page, the

1  highlighted portion, which is the buy-site page as to

2  which the ad is targeted.

3          I read that wrong.  Let me -- let me correct

4  that.

5          The buy-site pages to which the ad placement

6  is targeted.

7      Q.   Okay.  And the second document on the right?

8      A.   That's an example of the menu interface

9  that -- that is used in the DART system as I discussed

10 before.

11     Q.   Okay.

12              MR. VERHOEVEN:  Let's go to DX Demo 300.

13     Q.   (By Mr. Verhoeven) Here we've highlighted --

14 you've highlighted the bottom part of element (f) of the

15 '059 patent.

16          And on the right-hand side, for the record,

17 you have Exhibit DX373 in evidence, Page 4625.  And,

18 again, Exhibit DX594 in evidence, Page 209-11, correct?

19     A.   Yes, sir.

20     Q.   Can you please explain to the jury why you

21 brought those two pages up and how they relate to this

22 highlighted bottom portion of element (f) of Claim 1 of

23 the '059 patent?

24     A.   Yes.  This is the second portion which is

25 where the -- the seller, the agency, is prompted to

1  create.

2              THE WITNESS:  And, Charles, if you would,

3  if you could include the -- the line -- the row below

4  the highlighted yellow that says ad HTML.

5      A.   These -- these two statements that are

6  included in the DART document support that the DART

7  system performs this functionality of prompting the

8  seller to input information, or the agency in this case,

9  which would be the third interface, to create an

10  electronic advertisement for the seller -- for

11  publication for the selected internet media venues.

12     Q.   Okay.

13             MR. VERHOEVEN:  Next slide, DX Demo 301.

14     Q.   (By Mr. Verhoeven) This is a depiction of all

15  of the elements of Claim 1 of the '059 patent.  You've

16  put check marks on each of them?

17     A.   Yes.  As I've shown by all the check marks to

18  the right, this is for the '059 patent, Claim 1, that

19  the DART system performs all the functionality required

20  by Claim 1 of the '059 patent.

21     Q.   So we've been through all of the asserted

22  claims of the two patents.

23             Can you summarize for the jury, again, your

24  opinion as to whether or not the DoubleClick DART system

25  anticipates those claims?

1    A.   Yes.   The DART DoubleClick system performs all

2   of the elements of all the asserted claims of the '025

3   patent and all the elements of Claim 1 of the '059

4   patent.   Therefore, I believe both the DART -- the

5   DoubleClick DART system invalidates both of these

6   asserted patents.

7        Q.   Now, you had a third reference that you refer

8   to at the beginning of your testimony on the issue of

9   validity or invalidity.

10            Do you remember that?

11       A.   That's correct, the NetGravity reference.

12       Q.   Okay.

13            MR. VERHOEVEN:  Let's go to DX Demo 302.

14       Q.   (By Mr. Verhoeven) And this is -- can you just

15   describe for the jury, generally, before we go into the

16   specifics, what is NetGravity and what is AdServer?

17       A.   The NetGravity -- NetGravity had an online

18   internet advertising system as well.  AdServer was the

19   name of their product that produced these ads.

20       Q.   Okay.

21            MR. VERHOEVEN:  Let's go to the next

22   slide, DX Demo 302(a).

23       Q.   (By Mr. Verhoeven) What are you depicting

24   here?

25       A.   I'm depicting here that the -- like the

AdForce system and the DART system, that the NetGravity

AdServer system was in use and being sold in 1998, which

is before the priority dates of both the '025 and '059

patent.

Q.    Okay.

            MR. VERHOEVEN:  And let's go to the next

slide, DX Demo 303.

Q.    (By Mr. Verhoeven) Can you tell the jury what

we're looking at here?

A.    Yes.  This is the description in the ad

server, NetGravity's AdServer documentation, which

describes the requirements of the preamble for Claim 1.

            And I can highlight -- maybe I should just

read that part that's highlighted:  This guide is

designed to give the AdMaster a quick overview of how to

create, schedule, run, and report ads served on a

website using AdServer 3.0.

            And I -- you can see probably the rest of it

unless you'd like me to read it.  My voice is about

ready to go.

Q.    Okay.  And we're looking, just for the record,

at Exhibit DX422 in evidence, Page 7160, right?

A.    Yes, sir.

Q.    Okay.

            MR. VERHOEVEN:  Let's go to the next

1  slide, DX Demo 304.

2      Q.   (By Mr. Verhoeven) And we're looking at

3  Exhibit DX422 in evidence, Page 164, and then another

4  pull-out from Page 188; is that right?

5      A.   Yes, sir.

6      Q.   And can you please explain to the jury what

7  we're looking at here?

8      A.   This is a menu from the ad server,

9  NetGravity's AdServer program, which is providing the

10  first interface, which is the publisher to present or

11  input where it's prompting the publisher to input the

12  presentation rules for the internet media venue on its

13  website.

14              MR. VERHOEVEN:  Let's go to the next

15  slide, DX Demo 305.

16      Q.   (By Mr. Verhoeven) On the left, you have

17  element (c) of Claim 1 of the '025 patent.  On the right

18  is Exhibit DX422 in evidence, Page 226, correct?

19      A.   Yes, sir.

20      Q.   Can you please explain to the jurors what

21  you're showing here?

22      A.   This is from another -- or another page of the

23  NetGravity AdServer product documentation, which defines

24  that they use what is referred to as relational

25  databases.  And they're listing the types of databases

that are used by the AdServer product, which meets this

first -- which meets this limitation of a first

database.

MR. VERHOEVEN:  Let's go to the next

slide, DX Demo 306.

Q.   (By Mr. Verhoeven) In here you've got a couple

of pages and some pull-outs.  For the record, it looks

like it's Exhibit DX882 in evidence; is that right?

A.   That's correct.  Yes, sir.

Q.   Can you walk us -- can you please explain to

the jury what you're showing here?

A.   Yes.  The NetGravity AdServer program had

every limitation of this asserted claims, except for

one, and -- and that -- and that element that's missing

is what's referred to as the seller interface or the

second interface.

And so this -- this reference I'm referring to

as being obvious, as I discussed earlier, because not

all of the elements have been met by the NetGravity

AdServer program.

What this slide is showing is quotes from

documents.  I'm showing pages of documents from a person

named Tom Shields, and as I've described on the top of

this slide, Tom Shields was the creator of the

NetGravity AdServer product.  These notes were in 1996.

Now, the part that's missing from the NetGravity

AdServer program and -- not program but product -- is a

way for a seller to just log in and for the programmer

for the product to prompt a seller for input.

This is -- these are documents where -- that

were personal documents of Tom Shields where he's

listing the need of users of the AdServer product, that

they needed to have a log-in interface for sellers.

THE WITNESS: And if we could highlight

the top -- the quote that's in red, please, Charles.

A. It says: Advertisers and agencies. These

products -- the products of these servers will probably

only differ in UI. What that means is user interface,

meaning the products are the same. All it is, is

they're going to differ in the user interface or the

log-in screen.

And then he goes on to say in his internal

notes: The base functionality will remain the same as

the rep firms connect and aggregate information from

many sites and place ads across them.

So he's saying and the way I interpret this

and understand his testimony from his deposition is that

all the functionality was already in the AdServer system

for the seller. It was just the publishers were

entering information for the seller. There wasn't a

1  separate log-in interface.

2         And I know time is short, but the other quote

3  is also support for it was well-known by the NetGravity

4  people that this functionality of allowing a seller to

5  log in was much requested, known, as I've shown in the

6  text in the red:  Automatic mechanism for accepting

7  media from advertisers directly has been much requested.

8         What he means by that is he knows in 1996 that

9  they need to have a log in where advertisers can

10  directly log in to the advertising system as we saw on

11  the AdForce and the DoubleClick DART system.  It's just

12  that NetGravity was missing that log-in interface.

13     Q.   (By Mr. Verhoeven) So do you have an opinion,

14  based on your review of the evidence, as to whether it

15  would have been obvious to a person of ordinary skill to

16  add that interface to the NetGravity system at the time

17  of the patent -- of the priority dates?

18     A.   Yes, I do.  It would have been obvious, and

19  this wasn't -- isn't just hypothetical.  It's actually

20  listed by the creator of the product, that they

21  understand -- they know what it is.  It's a matter of

22  just implementing it on the NetGravity AdServer system.

23     Q.   Thank you.

24     A.   And so, therefore, the NetGravity AdServer

25  system would be obvious or render the Function Media

1  patents invalid due to obviousness.

2      Q.   All right.

3           MR. VERHOEVEN:  Let's go to the remaining

4  elements of Claim 1, DX Demo 307, please.

5      Q.   (By Mr. Verhoeven) And this is, for the

6  record, a depiction of a page from Exhibit DX405 in

7  evidence, Page No. 8128, correct?

8      A.   That's correct, yes, sir.

9      Q.   Can you please explain to the jury what you're

10  depicting here and how it relates to element (d) of

11  Claim 1?

12     A.   To show obviousness, as I discussed earlier, I

13  can describe obviousness in two ways.

14  Would it have been obvious to the people working on the

15  system to modify the current system?  So I just finished

16  showing you that it was obvious to the creator of the

17  NetGravity AdServer system that they needed to modify

18  the system.

19           The other part or way that I can show

20  obviousness is to show that it can be combined with

21  other systems where it's missing.  This, again, is not a

22  hypothetical situation.

23           What this text is showing, this -- I'm trying

24  not to confuse you.  This is an AdForce document for

25  AdForce advertisers explaining to them how an AdForce

advertiser can connect with the NetGravity AdServer

program.

So you can log in as a seller of the AdForce

system, create your ad, and then it can be published on

the NetGravity AdServer program. So that's another way

that this seller interface can be provided in the

NetGravity system. It could be combined with the

AdForce system.

Q. Okay.

MR. VERHOEVEN: Let's go to the next

slide, DX Demo 308.

Q. (By Mr. Verhoeven) This is element (e) of

Claim 1 of the '025 patent. We're looking at Exhibit

DX422 in evidence, Page 218, correct?

A. Yes, sir.

Q. Can you please explain to the jury what you're

showing here?

A. This is support from the NetGravity AdServer

documentation that a second database is included in the

NetGravity AdServer product.

Q. Okay.

MR. VERHOEVEN: Let's go to the next

slide, DX Demo 309.

Q. (By Mr. Verhoeven) And on the left-hand side

is element (f) of Claim 1 of the '025 patent. And on

the right appears to be a depiction of the page from

Exhibit DX422 in evidence, Page 187.

     A.   Yes, sir.

     Q.   Can you please describe for the jury what

you're showing here?

     A.   Yes.  I needed to show that the NetGravity

AdServer system performed the functionality as required

by element (f).  And this is one -- one of the pages

that describes how the NetGravity AdServer system

operated.

          And this is consistent with what's being

required by this element, and that's what this page is

showing.

               MR. VERHOEVEN:  Let's go to DX Demo 310.

     Q.   (By Mr. Verhoeven) Can you please explain to

the jurors what you're illustrating on this slide,

Mr. Lanning?

     A.   Yes.  This -- this slide also has excerpts

from other NetGravity AdServer documentation.  As you

can see with the titles that are in red, the NetGravity

text ads could be created on the NetGravity AdServer

system as well as creating custom HTML ads, which we

described earlier is a type of text ad.

     Q.   Okay.  And for the record, you're illustrating

Exhibit DX422, Page 185 and Page -- they're both Page

1  185, correct?

2     A.   Yes, sir.

3     Q.   Okay.

4          MR. VERHOEVEN:  Let's go to the next

5  slide, DX Demo 311.

6     Q.   (By Mr. Verhoeven) This is a depiction of

7  Exhibit DX422 in evidence, Page 164, correct?

8     A.   Yes, sir.

9     Q.   Can you please explain to the jury what

10 you're -- what you're showing here?

11    A.   This is another page from the AdServer

12 documentation, which shows that the AdServer system

13 supported as self-serve menu-driven interface.

14         You can see by the different inputs that were

15 provided here that it would be self-serve, that the user

16 would just either enter the information or click on the

17 information they wanted.

18         MR. VERHOEVEN:  Let's go to DX Demo 312.

19    Q.   (By Mr. Verhoeven) And this is a depiction of

20 Exhibit DX422, Page 188, correct?

21    A.   Yes, sir.

22    Q.   And can you please explain to the jury what

23 you're showing here?

24    A.   This page is describing -- this, again, is

25 another page out of the NetGravity AdServer document

that's describing how custom styles are created.

Q.   Okay.  And you -- you have the heading design

or style standards.  Why do you have that there?

A.   Because these are the way that the -- let me

just -- design or style standards.

THE WITNESS:  And if we look at -- if we

can just highlight, Charles, quickly, under the red text

on the first paragraph -- or first and second ones.

Yes, something like that is good.

A.   This is saying, in addition to using

predefined styles, you can create your own custom styles

that conform to the design of your site.

So this is defining how the ad -- the

AdServer -- AdServer system supports a publisher

entering their presentation rules.

Q.   (By Mr. Verhoeven) Okay.

MR. VERHOEVEN:  And let's go to the next

slide, DX Demo 313.

Q.   (By Mr. Verhoeven) This is a depiction of

Exhibit DX 422, Page 163, correct?

A.   Yes, sir.

Q.   And can you please explain to the jury what

you're illustrating here.

A.   The title that I've included on this site is

targeting media venues in red.  It's creating a

targeting profile. This is where the seller can target

specific websites or select internet media venues.

Q. Now, Mr. Lanning, do you -- in summary, with

respect to the AdServer product we're looking at here,

do you have an opinion as to whether that product,

either alone or in combination, would render the

asserted claims of the two patents that Function Media

is asserting in this case obvious?

A. Yes, sir.

Q. And can you please tell the jury what your

opinion is.

A. My opinion is, is the NetGravity AdServer

product renders the claims of -- the asserted claims of

the '025 patent and Claim 1 of the '059 patent obvious,

and for two reasons.

The first reason is, is that the NetGravity

AdServer system could be modified as I showed you with

the Tom Shields quotations. He knew what needed to be

modified and how; and secondly, that it could be

combined with the AdServer system to provide the seller

interface.

So it's met all of the requirements of the

claims due to obviousness or because of obviousness.

Q. Thank you, Mr. Lanning.

MR. VERHOEVEN: I have nothing further.

1          THE COURT:  Cross-examination.

2                 CROSS-EXAMINATION

3  BY MR. GRINSTEIN:

4     Q.    Morning, Mr. Lanning.

5     A.    Good morning.

6     Q.    I understand your voice is cracking a little

7  bit, so if you need to stop at any time, take a drink,

8  just let me know.

9     A.    Great.  Thanks.  Appreciate it.

10    Q.    I want to make sure we can hear you.

11          I want to start by asking you just a couple

12  questions about your background, Mr. Lanning.  I think

13  we heard on direct that you've had a long career in the

14  military and in industry; is that right?

15    A.    That's correct.

16    Q.    But you don't have a master's degree; is that

17  right?

18    A.    That's correct.

19    Q.    You don't have a Ph.D.; is that right?

20    A.    That's correct.

21    Q.    You've never taught full time at a university;

22  is that right?

23    A.    No, I have not.

24    Q.    You have not published any articles in any

25  peer-reviewed academic journals; is that correct?

1     A.   No, that's not correct.  I've published two

2 articles.

3     Q.   What are those two articles?

4     A.   They were two different articles for how --

5 I'm trying to figure out the best way to summarize very

6 technical articles, but in the cellular network, how

7 different SIM cards are selected and managed for the

8 most part.

9     Q.   Those are in peer-reviewed academic journals?

10     A.   Not in academic journals.  Sorry.  I heard the

11 part where you said published.

12     Q.   No.  My question was, have you been published

13 in peer-reviewed academic journals?

14     A.   No, sir.

15     Q.   And have you ever written a textbook?

16     A.   No, sir.

17     Q.   Now, you are a member of the IEEE

18 organization; is that correct?

19     A.   That's correct, yes, sir.

20     Q.   But you are not a fellow in the IEEE like Dr.

21 Rhyne is, correct?

22     A.   That's correct.

23     Q.   And you are not a patent agent; is that

24 correct?

25     A.   No, sir, I'm not.

1    Q.    And you've never been an inventor on any

2 patents; is that correct?

3    A.    That's correct, yes, sir.

4    Q.    And just like every expert -- every other

5 expert in this case, you are being paid for your time

6 that you've worked on this case; is that correct?

7    A.    Yes, sir, I am.

8    Q.    I assume you don't see anything wrong with

9 that, right?

10    A.    No, sir.

11    Q.    Let's talk about your noninfringement opinions

12 first, okay?

13    A.    Okay.

14             MR. GRINSTEIN:  And can we go to Slide DX

15 demo 161.

16    Q.    (By Mr. Grinstein) I want to talk about this

17 particular slide.  It was on the issue of creation.

18             Do you remember this slide?

19    A.    Yes, I do.

20    Q.    And you used this slide to support your

21 reading of Claim 1 that Claim 1 requires that the seller

22 itself enter information to create an electronic ad that

23 is itself customized to each of the selected internet

24 media venue's presentation rules, right?

25    A.    I don't think that's quite accurate, if I

1  heard you correctly.  I think you've mischaracterized.

2          Did you use the word selected?  Did I not hear

3  it or --

4      Q.    I'm sorry.  Let me say it again.

5          You used this slide to support your

6  interpretation of Claim 1 of the '025 patent that the

7  seller itself creates an ad or enters information to

8  create an ad that is customized to the -- in a form

9  customized to each of the selected internet media venues

10  'presentation rules; is that right?

11     A.    Let me just classify.  I'm reading the slide

12  as you're asking the question, and each time you're

13  missing some words.  Can we agree that that's the slide

14  I used, or is there something different you're asking

15  me --

16     Q.    Well, what was the argument you were making

17  with respect to the slide?

18     A.    The argument that I was using for the slide

19  is -- is what's shown on the slide; that the seller is

20  prompted to input information to -- and then I go down

21  to the bottom where it's the Court's creation -- create

22  an electronic advertisement for publication in a form

23  customized to each of the selected internet media

24  venue's presentation rules.

25     Q.    So let me give you an example.  Say there's a

1 media venue.  We'll call it travel.com.  And travel.com

2 has a presentation rule, and that presentation rule is,

3 I want ads that have a purple background.

4          Are you with me?

5      A.   Yes, sir.

6      Q.   The way you read this claim and this claim

7 element is that the seller has to enter information into

8 the seller interface that is an advertisement with a

9 purple background to comply with travel.com's rule; is

10 that fair?

11     A.   Yes, sir, I believe so.

12     Q.   Okay.  So in the AdForce system, sellers

13 created advertisements -- they entered information to

14 create advertisements that were in a form customized to

15 each of the selected internet media presentation rules,

16 correct?

17     A.   Yes.  They met this claim, yes.

18     Q.   Okay.  And in the DoubleClick system, the way

19 the DoubleClick system worked is that sellers entered

20 information into the system to create an electronic

21 advertisement in a form customized to each of the

22 selected internet media presentation rules, right?

23     A.   Yes, sir.

24     Q.   So in the AdForce system, if the publisher

25 wanted a purple ad, then the AdForce seller created a

1  purple ad for that publisher, right?

2      A.   No, I wouldn't agree with that.

3      Q.   Isn't that what you just said how this claim

4  works?

5      A.   Yes, that is.

6      Q.   Okay.  So in order for AdForce to meet the

7  restrictions and elements of this claim, an AdForce

8  seller would have to create a purple ad if the AdForce

9  publisher wanted purple, right?

10     A.   No.  Sorry.  I wouldn't agree with that.

11     Q.   Where did I go wrong?

12     A.   Because as Dr. Rhyne explained, that if

13 this -- the best way I can explain it is, this is the

14 same way the Google system works, is that information is

15 entered -- I think I need to stop for a minute.  So I

16 guess I'm getting a little tired.

17     Q.   I'm sorry.  Do you need a minute?

18     A.   If I could just have a minute.

19     Q.   Sure.

20     A.   I've been going here for quite a while.

21     Q.   Take any time you need, sir.

22     A.   Okay.  If you can reask the question and let

23 me try to give it a start.  Let me try to get a little

24 energy back here.

25     Q.   Okay.  I guess what I'm trying to get at, Mr.

1  Lanning, is, with respect to infringement, you said that

2  what has to happen is a seller has to create a purple ad

3  because the media venue wants purple.

4        And so I'm trying to understand if you're

5  applying consistent interpretation with respect to

6  validity.

7        So my question is, in an AdForce system, if

8  the publisher wants a purple ad, does the seller in the

9  AdForce system create a purple ad?

10     A.   Not exactly, no.

11     Q.   Okay.  So you're reading your invalidity

12  references differently than the way you're reading your

13  infringement evidence; is that right?

14     A.   No, sir, that's not right.  I'm reading them

15  both the same.

16     Q.   Well, I guess I don't understand.  If you're

17  saying that in order to infringe this claim, to infringe

18  the Function Media claim, a seller has to create a

19  purple ad to make the purple internet media venue happy,

20  then why isn't the same case in AdForce that the seller

21  has to create a purple ad to make the AdForce

22  publisher -- purple publisher happy?

23     A.   Because this is the same way that the Google

24  system works.  And as Dr. Rhyne explained his criteria

25  for infringement, that the way the Google system worked,

1  it was sufficient just to enter some information.

2         And so the -- both the AdServer -- or the

3  AdForce system and the DoubleClick DART system work in

4  the same way that Google does in creating this ad.  So

5  that is consistent with the interpretation that

6  Dr. Rhyne has used to show infringement of the Google

7  products.

8       Q.   Okay.  So you are applying Dr. Rhyne's

9  understanding of how the claims operate when you're

10 discussing invalidity, but you're applying a different

11 understanding of how the claims operate when you're

12 discussing infringement; is that fair?

13      A.   No, that's not fair.  I'm consistent with what

14 I understand and interpret the claims to be.

15              MR. GRINSTEIN:  Can I see the next

16 demonstrative, Matt, please?  Oh, no.  There we go.

17      Q.   (By Mr. Grinstein) This just Claim 1 of the

18 '025 patent.

19              Do you see that, Mr. Lanning?

20      A.   Yes, I do.  Yes, sir.

21      Q.   You would agree with me that if the jury finds

22 that each of these elements of Claim 1 of the '025

23 patent is met by the Google system, then Google

24 infringes, right?

25      A.    If each and every element -- if the jury

1  finds -- if you find that each and every element is met

2  by the Google system, then the Google system would

3  infringe this claim.

4      Q.   And so if Google adds some additional features

5  to its AdSense system that are not claimed, but it still

6  does everything -- each and every thing that is

7  discussed in Claim 1 of the '025 patent, Google still

8  infringes, right?

9      A.   It -- that's correct, yes, sir.  It doesn't

10  matter if they have additional functionality.  What the

11  analysis needs to provide is, does the Google system

12  meet each and every limitation of the claim?  They can

13  have extra functionality, and that's okay.

14      Q.   Okay.  So if Google ads some bells and

15  whistles to AdSense, like auctions or things like that,

16  as long as the jury finds that each and every element of

17  this claim is met, those auctions and things like

18  content matching and all of that doesn't impact

19  infringement, right?

20      A.   I wouldn't agree with your question, sir,

21  because I believe what you refer to as the bells and

22  whistles describe the way the Google system works, which

23  is showing that Google does not infringe this claim.

24      Q.   Now, you agree -- you would agree, wouldn't

25  you, that Google has a first interface -- a first

1  interface for the internet media venues.

2        You agree with that, right?

3     A.    There is a first interface.  Are you just

4  asking me about the first three words, a first

5  interface, or what are asking me specifically?

6     Q.    Actually, I want to ask you, you would agree

7  with me that AdSense is -- qualifies as a first

8  interface to the Google computer system, wouldn't you?

9     A.    The AdSense interface would be a first

10  interface to the computer system.  Without reading the

11  rest of the limitation, I would agree with that part,

12  yes.

13     Q.    And actually, you agree with the next part of

14  the limitation, and that is, internet media venues in

15  the Google system are prompted to enter presentation

16  rules.

17        You agree with that, right?

18     A.    Yes.  That's correct, yes, sir.

19     Q.    Okay.  And you'd agree that this interface in

20  the Google system, it prompts.

21        You agree, right?

22     A.    Yes.  Those are menu prompt interfaces.

23     Q.    And you agreed on Friday -- in fact, you

24  testified on Friday that in AdSense, things like color

25  and font and other sorts of things qualify as

1 presentation rules, right?

2      A.   Now, we need to be clear so that we don't

3 confuse -- or so that I don't get confused and the jury

4 as well.

5           When you say AdSense, which interface are you

6 referring to?

7      Q.   The AdSense interface.

8      A.   And so that would be the publisher interface.

9      Q.   Yes, sir.

10      A.   Okay.  And the first interface.

11           So, yes, the AdSense interface allows the

12 publisher to define presentation rules, as I've shown --

13 showed by my website and background information and

14 things like that.  I would agree with that, yes.

15      Q.   And some of those presentation rules include

16 things like color, right?

17      A.   Yes.

18      Q.   And I didn't hear you dispute in your

19 testimony that there is a first database storing the

20 presentation rules in the Google system.

21           Did you -- did you say anything about that to

22 Mr. Verhoeven -- to -- to your lawyer?

23      A.   I don't dispute that the Google system has a

24 first database for -- for storing the present -- for

25 storing the presentation rules.  They've had a database

1 for storing the presentation rules since November of

2 2007.

3     Q.   I didn't hear you provide any testimony about

4 any dates, November 2007 or November -- not November

5 2007 during your direct testimony.  Did you?

6     A.   No, sir.

7     Q.   And you would also agree that in Google, there

8 is a second interface for sellers, and that interface is

9 called AdWords.

10        You would agree with me about that?

11     A.   There's a second interface for sellers to

12 input information, as I showed on multiple slides,

13 that's referred to as Google's AdWords product, yes.

14     Q.   And you'd agree that that interface prompts,

15 right?

16     A.   Yes, I would.  Yes, sir.

17     Q.   And you'd also agree, of course, that there's

18 a second database that stores information that has been

19 input into AdWords; is that fair?

20     A.   Yes.  Since -- since November 2007, yes.

21     Q.   There wasn't a second database for ads

22 information in the Google system before November 2007?

23     A.   You know, I have that wrong.  I was -- I was

24 thinking of the publisher interface.  So the answer to

25 your question is yes, without any qualification to the

1    date.

2        Q.    Okay.  You're doing okay, right?

3        A.    Yes.

4        Q.    Okay.  Let's talk next about this issue of

5    creation, if you wouldn't mind.

6                MR. GRINSTEIN:  And I'd like to look at

7    Defendant's Demonstrative 17.  Actually, can you roll it

8    back, please, Matt?  It's Defendant's Demonstrative 16.

9    Excuse me.

10       Q.    (By Mr. Grinstein) Were you here for openings?

11       A.    Yes, I was.

12       Q.    Opening arguments?

13       A.    Yes, sir.

14       Q.    And so you saw Google's attorney put this

15   specific demonstrative up during openings?

16       A.    I was sitting over in the corner, so it was

17   hard for me to see, but I believe this is one of the

18   slides, yes.

19       Q.    And this demonstrative is attempting to

20   explain Google's position on how the '025 patent

21   operates; is that fair?

22       A.    I wouldn't characterize this slide as how the

23   '025 -- how the Google -- I wouldn't characterize this

24   slide the way you have.  This is -- this is showing

25   something different from that.

1     Q.   It says '025 patent at the top, right?

2     A.   Yes, sir.

3     Q.   And it says that the first media interface,

4 that the media venues input rules.

5     Is that what it's attempting to show?

6     A.   Yes, it is.  Yes, sir.

7     Q.   Okay.  Now, let's look at Google's next slide,

8 and we've got a first -- a media interface called -- a

9 media venue -- excuse me -- called travel.com.

10     Do you see that?

11     A.   Yes, I do.

12     Q.   And, apparently, travel.com has got a rule,

13 and it says:  I want a purple ad.  And so here Google

14 has depicted that the seller has created a purple ad.

15     Do you see that?

16     A.   I'm just kind of -- I'm looking at this slide.

17 This slide is somewhat new to me.  I haven't studied

18 this slide.  So if I can just take a second to read it

19 through.

20     Okay.  Now I -- now I know what the

21 information is on the slide.  If you wouldn't -- if you

22 can ask me the question again.

23     Q.   Sure.  This is depicting Google's argument

24 that at the seller interface, the seller creates a

25 purple ad, because travel.com had a purple presentation

1  rule; is that fair?

2      A.    I don't know if that slide -- if that's what's

3  being depicted by this -- this slide.  This is not one

4  of my slides that I used.  So I'm -- I'm not sure the

5  series of the slides.

6            But I will agree with you that there are

7  internet media venues on the right-hand side and a

8  seller on the left, and there are two different colors

9  of ads.  But this could be used to depict what's

10  actually presented at the internet media venue when it's

11  displayed, so I'm not sure.

12      Q.    Let me ask you this question, Mr. Lanning:

13  Your view of the way that the '025 patent operates is

14  that a seller at seller interface somehow has to find

15  out the internet media venue presentation rules and then

16  enters information to create an ad that is customized to

17  those rules that the seller found out?  Yes or no.

18      A.    You're -- you're using a lot of nontechnical

19  language, so I need to interpret that for a little bit.

20  What do you mean that they found out -- that's --

21  that's -- I'm not trying to be difficult.  You're just

22  using language that wouldn't be clear to me and probably

23  wouldn't be clear to others.

24      Q.    Well, how does this -- in the way you view the

25  system, how does the seller create an ad that is

1  customized to the presentation rules of an internet

2  media venue, if the seller doesn't know what those

3  presentation rules are?

4      A.   Are you saying the seller does that?  In other

5  words -- I guess that's where I'm a little confused with

6  your question.  I -- I don't -- I don't know how to

7  answer your question, because I don't understand your

8  question.

9      Q.   You told me earlier that your view of the

10 patents and the way the '025 patent works is that if the

11 internet media venue, travel.com, wants a purple ad,

12 then the seller, at the seller interface, has to enter

13 information to create a purple ad.

14          That was your testimony 10 minutes ago, right?

15     A.   I don't know if that's exactly, but I would

16 agree that the seller needs to enter information.

17 Now, let's just be clear with the claim.  The seller is

18 prompted to input information to create an electronic

19 advertisement customized to each of the selected

20 internet media venues.  That's my testimony.

21     Q.   Okay.  And so if the internet media venue has

22 a purple presentation rule, does the seller, at the

23 seller interface, based on your understanding of how the

24 claim operates, have to enter information to create a

25 purple ad?

1    A.   They would need to input information to create

2  the purple ad, yes.

3    Q.   So how did they find out that the internet

4  media venue's rule was purple?

5    A.   That -- the seller interface would understand

6  that, and that's incorporated with the system.  And when

7  you ask, how would they find out, that's the part I'm

8  having the problem with.

9        Are you talking about the person, or are you

10 talking about the seller interface or the computer

11 controller, is why --

12   Q.   I'm talking about the seller who has to input

13 that information for the purple ad.

14   A.   But the seller is inputting information to

15 create an ad that's customized to each of the selected

16 internet media venues.

17       So the system -- the seller wouldn't know all

18 of the different presentation rules.

19   Q.   Ah.  So the seller inputs information, but the

20 system later figures out the presentation rules and

21 applies them to make the ad comply, right?

22   A.   No, sir, that's not correct.

23   Q.   Okay.  Tell me where in the claim it indicates

24 to you -- any information, any language, or any

25 definition that this Court has provided where it would

tell the seller, hey, the internet media venue's

presentation rule is purple ad, so, seller, you need to

enter information to create a purple ad.

Where is that disclosed in the language of the

claim or in the claim definitions?

A.    Okay.  If we can look back -- there's --

there's two places.

The first, the seller -- if we can look -- do

you want me to just say it by memory, or do we want to

look at --

Q.    Well -- well, here's the claim right here.

And, Mr. Lanning, I don't see anything that says, at the

seller interface, the seller is informed of presentation

rules, do you?

A.    Sorry.  I can only see the very top part of

that that says '025.

And your -- your question is, is -- is -- now

that I can see it, now, your question -- I can't see

you, but I can hear you.

Q.    There you go.

A.    Okay.  Now -- sorry -- your question is, now

that I can see the claim?

Q.    My question is, is -- does the claim ever

mention informing the seller of the internet media venue

rules?  Do you see those in the claim?

1    A.    I do not see the words informing the seller in

2  these claims, no, in these claims.

3    Q.    And do you see those words -- have you seen

4  those words in any claim construction, any claim

5  definition that you've applied in this case,

6  Mr. Lanning?

7    A.    No, sir.  Informing the seller is not in this

8  claim.

9          MR. GRINSTEIN:  Let's take a look at the

10  definition -- the definition of processing, please,

11  Matt.  I think it's -- there we go.

12    Q.    (By Mr. Grinstein) Now, this is a claim term

13  that the Court did define.  It says:  Processing

14  electronic advertisement in compliance with the

15  presentation rules of the internet media venue.

16          Do you see that?

17    A.    Yes, I do.  Yes, sir.

18    Q.    So, Mr. Lanning, if the seller has already

19  created an ad that's purple because the internet media

20  venue wanted that ad to be purple, then why does the

21  computer controller, in the last element of the claim,

22  need to process that ad and make it comply with the

23  purple rule?

24    A.    Well, that's real clear by the patents.  The

25  patents describe why that's done.

There's only one type of customization that's described by the patents, and the patent specification describes that a final redundant customization is performed to make sure all of the latest presentation rules have been applied.

And it also says that no tampering has occurred.

So there could be there's new presentation rules that come up at any time. There could be the -- the seller interface could have an older set of presentation rules.

So this is applying a final check, which is a redundant check, and applying the customized electronic advertisement.

Note that in the Court's construction that Judge Everingham has provided to us, that this is down -- just so to orient yourselves, we're going -- and you're probably not as familiar with the claims as we are, but this is the last element that I've described as element (f).

And the Court's construction is that this systematic sequence of mathematical and/or logical operations is performed -- logical operations on -- upon the customized electronic advertisement.

Well, what that means to me and is described

by the patents is a custom advertisement has to exist.

And the only place where that customized advertisement

could exist is in the seller interface when they provide

a custom advertisement.

And this is a final check that's a redundant

check and application of the presentation rules by the

system according to the internet media venues that are

selected.

Q.   Are you finished with your answer,

Mr. Lanning?

A.   Yes, sir.

Q.   So you're saying that when it does processing

in the final element, it's doing error checking?

A.   That might be one of the operations it's

doing.  It's not saying that it's -- it's not described

by the patent as error checking.  It's simply applying

the latest presentation rules or the most current for

the internet media venues, and it describes it as being

a redundant step.

It also says in the specification for the

patents that this step is performed to check to make

sure that there has been no tampering by the seller of

the advertisement.

Q.   Mr. Lanning, if you could just try to answer

my questions directly, it will probably help your

1  voice --

2       A.   I apologize.

3       Q.   -- if you just keep your answer to my

4  question.

5       A.   Okay.

6       Q.   So let me ask this question:  In this element

7  -- this description -- Court's construction of

8  processing, it doesn't use the word redundant, does it?

9            Do you see the word redundant there?

10      A.   No.  Redundant is not in there, no.

11      Q.   Do you see the word error checking or the

12  phrase error checking?

13      A.   No, sir, I do not.

14      Q.   The Court says:  Process the electronic ad to

15  make it comply.

16           Do you see that, make it comply?

17      A.   Yes, sir, I do.

18      Q.   The Court didn't write make sure it complies,

19  did it?

20      A.   No, it did not.

21      Q.   That's what you're basically arguing, isn't

22  it?

23      A.   No, sir, it isn't.

24      Q.   Let's -- let me -- let me ask you this

25  question:  If a seller entered an ad into the -- into

1 the claim described by the Function Media patents, and

2 that ad had errors, it didn't comply with the

3 publisher's presentation rules, is it your testimony

4 that in the last element, element (f), the processing,

5 the computer controller would fix it?

6     A.   It would make sure it complies.

7     Q.   That would be fixing it, right?

8     A.   Yes.  That would be making sure it complies

9 where if it did not -- not necessarily fixing it.  If it

10 did have errors or it did not -- if the ad did not

11 comply with the presentation rules of the internet media

12 venues, then this step would fix it, yes.

13     Q.   Okay.  So, for example, if a publisher's rule

14 was that I want a purple ad and the seller entered a

15 green ad, you would agree with me that in this

16 processing step --

17           MR. GRINSTEIN:  Matt, can you go back

18 one?

19     Q.   (By Mr. Grinstein) -- you would agree with me

20 that in this processing step, the central controller

21 would make that wrongly green to purple.  That's what it

22 says, right?

23     A.   I wouldn't agree with you totally, and I can

24 explain, if you'd like, but I'll just leave it at I

25 don't agree with your statement, no, sir.

1     Q.   Okay.  So your testimony is that if an ad

2  comes in that does not comply with the presentation

3  rules of the internet media venues, then the system will

4  ignore this claim construction and won't make it comply?

5     A.   No, sir.

6     Q.   Is that your testimony?

7     A.   No, sir, that's not my testimony either.

8     Q.   And just to be clear, in the Google AdSense

9  system, there are Google software modules that apply

10  publisher presentation rules to advertising information

11  that has been input by sellers, right?

12     A.   The Google system applies presentation rules

13  as the final step before it's transmitted to internet --

14  internet media venues or an internet location.

15        I misspoke.  It's not internet media venues.

16  Before it applies to the internet locations, as I

17  described with multiple slides earlier.

18     Q.   So in the Google system, if a publisher wants

19  a red ad, the Google system applies the red color to the

20  information that's been input by the seller to give that

21  publisher that -- that red ad they want, right?

22     A.   As the last step before the Google system

23  sends the ad to the internet location, it will apply the

24  publisher's presentation rules or the internet media

25  venues presentation rules.

1    Q.   And in your testimony earlier, I think on

2 Friday, you indicated to Google's lawyer that the

3 AdSense -- or I'm sorry -- AdWords interface, sellers do

4 not input information that is already customized to an

5 internet media venue's presentation rules, right, sir?

6    A.   Yes, sir.

7    Q.   But Google eventually has a computer process

8 that runs -- that makes that information comply with

9 those rules, right?

10    A.   Separate from the seller interface and seller

11 input, yes.

12    Q.   Okay.  And so you could say that Google was

13 correcting errors, couldn't you?

14    A.   No, sir, because there's no errors to create

15 in the first place, because the seller is not allowed to

16 input any information.  So there wouldn't be any -- any

17 way that the seller could enter the errors in the first

18 place.

19    Q.   Well, if the seller -- if an internet media

20 venue wanted a purple ad and the seller entered an ad

21 that wasn't purple, the Google computer processor would

22 fix that, wouldn't it?

23    A.   No, sir, I wouldn't agree with that.

24    Q.   Let me talk to you about the next issue, which

25 is selection.

1      The way you read the claims of the '025

2  patent -- excuse me -- is that they require that

3  advertisements appear on every single site which sellers

4  have input information to select for; is that fair?

5      A.   If you can show me the claim text or something

6  you're referring to, I'll make sure I'm answering the

7  right question.

8      Q.   Well, I'm trying to understand the testimony

9  you gave this morning, and so let me give you an

10 example.

11     The way you understand this patent is, if a

12 seller inputs information to select 10 websites, then

13 you say this patent requires that the advertisement gets

14 published to all 10 of those websites every one of the

15 selected internet media venues.

16     Is that your testimony?

17     A.   Yes.  I believe the language specifically is,

18 to each of the selected internet menus -- internet media

19 venues, which to means, to me, every selected internet

20 media venue.

21     Q.   And just so we can use an example, because

22 these things are a lot easier to understand with

23 examples, sellers select -- enters information to select

24 10 websites.  That means -- if the system is following

25 this claim, that means the ad has to be published to all

1  10 -- every one of those 10 websites, right?

2        That's how you understand the claim?

3     A.   Now, we're not talking about the Google system

4  anymore.  You're just asking me about the claim.

5     Q.   Right.

6     A.   Yes, that's the way I understand it, that the

7  advertisement be displayed on each of the selected

8  internet media venues.

9     Q.   And your argument about non-infringement is

10 that in the Google system, the ads don't get displayed

11 on every single website that a seller selects.  And you

12 cited things like this auction process and the content

13 matching, all those sort of things, right?

14    A.   Well, I think you've mischaracterized my

15 testimony from this morning.  There's multiple reasons,

16 I believe, that the Google system doesn't meet the

17 select limitation.

18    Q.   I'm just asking you about this one,

19 Mr. Lanning.  And in this particular limit -- this

20 particular argument that you made this morning -- or

21 maybe I misheard it, so you can -- you can correct me.

22        The argument I thought you made this morning

23 was that the Google system does not infringe because it

24 does not guarantee to a seller that their ads are going

25 to be delivered to each and every website internet media

1  venue that a seller enters information to select.

2          Was that what you were saying this morning?

3      A.   That's only half correct.  There's two parts

4  to what I've said.

5      Q.   I'm only asking you about that part.  Did I

6  get that part right?

7      A.   For that part, yes, sir.

8      Q.   Okay.  And so the -- the idea is, is that

9  sellers can sometimes get denied in the Google system.

10          They could want to go to cnn.com, but the

11  Google system can tell them no; is that fair?

12      A.   No, it isn't.  That totally mischaracterizes

13  the way the Google system work.

14      Q.   A seller can input a site target for cnn.com,

15  but their ad may not appear on cnn.com; is that fair?

16      A.   That's a -- that's a -- you're saying

17  something different now.  Google doesn't reject any ad.

18  It just simply doesn't present -- doesn't display it.

19      Q.   Isn't that the same way that the claims of the

20  '025 patent work, Mr. Lanning?

21      A.   No.

22      Q.   Yes or no?

23      A.   Isn't that the same way?  I --

24      Q.   Don't the claims of the '025 patent work the

25  same way, Mr. Lanning?  Yes or no.

1      A.    Same way as what?  Can you be specific?

2 Because we've talked about a lot of things.  When you

3 say the same way --

4      Q.    Don't the claims of the '025 patent also

5 provide that every one of the internet media venues for

6 which the seller has input information to select won't

7 necessarily get an ad?  Isn't that right?

8      A.    No, sir.  I absolutely disagree with that.

9      Q.    Okay.  Now, in doing your analysis of

10 infringement, you looked at every claim that Function

11 Media has asserted, right?

12      A.    Yes, sir.

13      Q.    You had to, because you had to understand

14 whether or not those claims were infringed; is that

15 fair?

16      A.    Yes.  Just to explain, initially, I didn't

17 know --

18               THE COURT:  Well, you --

19               THE WITNESS:  Sorry.  Sorry.

20               THE COURT:  If you could restrict your

21 answer to yes or no --

22               THE WITNESS:  Yes, sir.

23               THE COURT:  -- your lawyer will get a

24 chance to ask you that.

25               THE WITNESS:  Yes, sir.

1    Q.   (By Mr. Grinstein) So I take it you looked at

2  Claim 90; is that right?

3    A.   Yes.  As I've shown multiple times, yes, sir.

4          MR. GRINSTEIN:  Matt, can I have the

5  claim chart to Claim 90?

6    Q.   (By Mr. Grinstein) And this has got a bunch of

7  claims down at the bottom, but let's take a look at the

8  claim at top, okay, Mr. Lanning?

9    A.   Okay.

10    Q.   The claim at top says:  The computer system,

11  blah, blah, blah, wherein the internet media venue

12  presentation rules comprise distribution factors further

13  comprising a computer program distribution filter to

14  automatically apply or compare the internet media venue

15  distribution factors to the information input by the

16  seller or the advertisement to determine whether to

17  publish the advertisement to the internet media venue.

18          Have I read that correctly?

19    A.   Yes, sir.

20    Q.   And it says right here that this filter

21  determines whether to publish.

22          Do you see that language?

23    A.   I don't see the word whether to publish

24  anywhere.

25    Q.   Whether to publish.

1    A.    Oh, sorry.  Now I do see it.  Sorry.

2 Determine whether to publish the advertisement to the

3 internet media venue.

4    Q.    And the information that that filter is using

5 to determine whether to publish is information that was

6 input by the internet media venues, right?  That's what

7 the claim says, right?

8    A.    Yes.  That's -- that's -- those are the words

9 of the claim that you're pointing out.  I agree with

10 that.

11    Q.    And so whether to publish, it could be yes,

12 let's publish, or it could be no, let's not publish,

13 fair?

14    A.    To make sure I answer your question correctly,

15 we'd need to talk about the other dependent claims.  As

16 you show on your chart, there's other claims involved

17 with this as well.

18    Q.    I'm only asking you about this clause right

19 here (indicates), Mr. Lanning.  And that clause says

20 whether it's going to apply the distribution factors to

21 determine whether to publish.

22        That plainly means to determine yes, publish,

23 or no, don't publish.  That's fair, isn't it, Mr.

24 Lanning?

25    A.    Yes, it is.  That's what that claim -- we're

1  agreeing that that's what that claim says, yes, sir.

2      Q.   So when a seller got to this claim, Claim 90,

3  and they didn't put 10 media venues that they wanted to

4  select to publish to, Claim 90 says, no, no, no, you

5  don't necessarily get all 10, because this distribution

6  filter could tell you, no, we're not going to publish

7  there.

8          That's fair, isn't it?

9      A.   Yes.  I believe that's accurate, yes, sir.

10     Q.   So you're wrong, Mr. Lanning, when you say

11 that the claims of the '025 patent require that the ad

12 get published to each and every internet media venue

13 that the seller selects, because Claim 90 tells you that

14 the seller sometimes gets vetoed; isn't that right?

15     A.   No, sir, because the -- no, sir, I don't agree

16 with that.

17     Q.   Tell me where I went wrong.

18     A.   Because the Court's construction requires that

19 the ad be displayed on each of the selected internet

20 media venues.

21     Q.   That's each of the selected internet media

22 venues that were selected by the computer system; isn't

23 that right, Mr. Lanning?

24     A.   No.  That were collected -- that were selected

25 by the seller at the seller interface.

1     Q.   So are you saying that Claim 90 right here

2  can't possibly be right, because it contradicts the

3  Court's claim construction?

4     A.   No, that's not my testimony at all.

5     Q.   Okay.  So reconcile these two competing things

6  for us, Mr. Lanning.

7           If you're saying that the Court requires that

8  the ads get published to every internet media venue, and

9  on the other hand, this claim plainly says sometimes the

10 internet media venues can veto publishing, how do those

11 two things fit together?

12    A.   Now you're asking me to reconcile, so to me,

13 that's more of an open-ended question.  I can't answer

14 that with a yes or no.

15          So the way that I would look at that is I

16 would understand what the Court's construction was for

17 Claim 1, and specifically, for the last limitation of

18 Claim 1 for the processing and publishing to.

19          If we can look at that construction, I can

20 explain that construction, and then how I reconcile is

21 also look at the other dependent claims.

22          I didn't just take this claim, as I explained

23 earlier, in isolation.  I need to take this claim and

24 consider it with Claim 1 and all of the other claims

25 that you have listed below that claim.

1      Q.   Is that the fullest and best answer you can

2  give to my question, Mr. Lanning?

3      A.   Without you putting the slides up where I can

4  describe the Court's construction for processing and

5  publishing to, yes, sir, it is.

6      Q.   Okay.  I appreciate that.  Thank you.

7  Let's move to the next issue, which is publishing.  I

8  think we've called it sort of generally publishing.  And

9  let me start by asking you what you agree on.

10         You would agree that a website is an internet

11 media venue, correct?

12     A.   Yes.  I believe I've said that multiple times

13 today.

14     Q.   Okay.  And you would also agree that in the

15 Google AdSense system, Google displays ads on websites,

16 right?

17     A.   No, sir, I wouldn't agree with that.

18     Q.   You wouldn't agree with that?

19     A.   No, sir.

20     Q.   I'd like to take a look at some slides that

21 you put up in your own -- your own direct examination.

22 First of all --

23              MR. GRINSTEIN:  I think it's Slide 360,

24 DX Demo 360.

25     Q.   (By Mr. Grinstein) This is a slide you

1   yourself put up, and it says:  Google conducts an

2   auction to determine which ads will be displayed on the

3   web page.

4        The ad -- the slide you put up said displayed

5   on the web page, didn't it?

6        A.   Yes, that's correct.

7             MR. GRINSTEIN:  Can I see the next slide?

8        Q.   (By Mr. Grinstein) Then you put up another

9   slide, and it says:  And displays the winning ads on the

10  web page.

11       You put that slide up, too, didn't you?

12       A.   Yes, sir, I did.

13       Q.   Were you here for the testimony of

14  Ms. Wojcicki?

15       A.   No, I was not.

16       Q.   Okay.  Experts could have -- I mean, you could

17  have been here.  You weren't excluded, right?

18       A.   That's correct.

19       Q.   So -- well, let me show you what Ms. Wojcicki

20  said on this particular issue.

21       Do you know that in trial here a couple of

22  days ago, Ms. Wojcicki said that Google serves ads on

23  the site?  Were you aware of that?

24       A.   No, I wasn't, but --

25       Q.   That's all I'm asking.  Were you aware of

1    that?

2       A.   This is the first time I'm seeing this

3    information.

4       Q.   Okay.  Then I bet the next one is the first

5    time you've seen this, what Ms. Wojcicki said a little

6    later:  Google will serve ads on my site.

7            Were you aware that she said that?

8       A.   No, sir.

9       Q.   So despite what you put in your slides and

10   despite what Ms. Wojcicki says, you'll still say that

11   Google does not display ads on websites?

12           Is that your testimony?

13      A.   Absolutely.

14      Q.   Okay.  Well, will you agree with me that

15   Google publishes ads to websites?

16      A.   No, sir, I would not.

17      Q.   All right.  Well, maybe you don't know about

18   some of them or Ms. Wojcicki's testimony.

19           So were you aware that Ms. Wojcicki testified

20   that you found the right ads, and then AdSense served

21   them to this page?  Were you aware that she said that?

22      A.   No, I wasn't.

23      Q.   Let me show you some Google documents.  Maybe

24   this will help your opinion.

25                    MR. GRINSTEIN:  Your Honor, may I

1  approach?

2                  THE COURT:  Yes.

3       Q.   (By Mr. Grinstein) Mr. Lanning, while I'm

4  handing this out, in the interest of time, first, let me

5  ask you, do you know what a 10-K is?

6       A.   There's a lot of different 10-K terminology.

7  One is a smaller marathon, but I don't know if that's

8  what you're asking me about.

9           Can you be more specific?

10       Q.   Do you know what it means when a company files

11  a 10-K?

12       A.   In general, I do, yes.

13       Q.   10-K is a statement that a company files with

14  the Securities and Exchange Commission; is that right?

15       A.   I believe so.  I'm not an accountant, so I

16  don't -- or -- nor a tax person, so I don't know all the

17  specifics of that.

18       Q.   Well, you've worked in industry, right?

19       A.   Yes, I have.

20       Q.   And so you're aware that there are severe

21  penalties, criminal, civil penalties that a company

22  can -- can suffer if they say something false in a 10-K?

23  Have you heard that before?

24       A.   No, I haven't.  I don't know, but I would

25  assume that a company should be reasonable and truthful

about what they submit.

    Q.   Mr. Lanning, can you turn to Exhibit 1047 in your book.

    A.   (Complies.)

    Q.   And this is Google's 10-K from 2008.  And you can see up on the top, this particular document was filed --

    A.   Just a minute.

    Q.   I'm very sorry.

    A.   It's a large binder with a lot of documents.  Okay.  I have it now.

    Q.   You can see up on the top that this particular document was filed with the United States Securities and Exchange.

         Do you see that?

    A.   Yes, I do.

    Q.   And I would like you to turn to the bottom of Page 11.

    A.   (Complies.)

         MR. GRINSTEIN:  Matt, can you blow that up?

    Q.   (By Mr. Grinstein) Bottom of Page 11 is a paragraph that Google wrote to the Securities and Exchange Commission called AdSense Contextual Advertising Technology.

1        Do you see that?

2    A.    Yes, sir, I do.

3    Q.    And the last sentence on Page 11 says:  Upon

4  receiving a request, our software examines the content

5  of web pages and performs a matching process that

6  identifies advertisements that we --

7            MR. GRINSTEIN:  Next page, please.

8    Q.    (By Mr. Grinstein) -- believe are relevant to

9  the content of the specific web page.  The relevant ads

10  are then returned to the web page in response to the

11  request.

12        Were you aware that Google had made that

13  statement to the SEC in its 2008 form 10-K?

14    A.    No, sir.  This is the first time I'm seeing

15  this document.

16    Q.    So just so I can understand your opinion, Mr.

17  Lanning, even though there's evidence that Google itself

18  admits that ads are displayed on websites and even

19  though there's evidence that Google itself admits that

20  ads are sent to websites, you still dispute that in the

21  language of the claims, Google isn't placing ads at

22  websites?

23        Is that your testimony?

24    A.    Well, it's -- I can answer yes or no to two

25  parts.

1          First off, I do not agree with the premise of

2     your question that Google is saying that ads are

3     published to websites.  Web pages are different than

4     websites.

5          And so I do not agree that I'm in conflict at

6     all with what Google is saying on these documents.

7          Q.    Okay.  So when Google sends an ad to a web

8     page, that's totally different, in your mind, than

9     sending to a website?

10          A.    Oh, definitely, yes.

11          Q.    Okay.  So who has the web page?  Where does

12     the web page exist?

13          A.    You're using nontechnical language.  Who has

14     the web page?  What do you mean by that?

15          Q.    When Google sent an ad to the web page, where

16     is the ad getting sent?

17          A.    The -- the text, the way I interpret the text

18     that I'm seeing, is this is the way that people of

19     ordinary skill refer to sending the ad to the internet

20     user or the end user.  When they say they're sending it

21     to the web page, this is the same way of saying, in my

22     analogy, that I'm sending the package directly to the

23     internet user.

24          I'm sending it to the web page that's being

25     displayed, not the website that's the internet media

1  venue.

2      Q.   Okay.  So your testimony is, is that Google

3  can send an ad to a web page, and that is not the

4  same -- that is not sending it to a website.

5           That's your testimony?

6      A.   Yes.  I'm saying, the way that I've seen these

7  statements that you've shown me, these statements are

8  used -- the way people use these statements in the

9  industry and as I'm speaking to other technical people,

10  when they say show an ad on the web page, they're

11  referring to sending the ad directly to the web page

12  that's being displayed by the user, not to the website.

13      Q.   The web page is just part of the website,

14  right?

15      A.   I have web pages on my website, but this

16  language that you've highlighted is referring to the web

17  pages that are being displayed by the user.

18      Q.   And by the way, Ms. Wojcicki, in her

19  testimony, she says that Google displays ads on

20  websites.  She didn't use the term web page.  But you

21  don't credit that testimony.

22           Is that your testimony?

23      A.   I don't have all the context of what she was

24  using, but I don't have any reason at all -- it wouldn't

25  change my testimony at all that the Google ads clearly

1  send the advertise -- the Google system -- excuse me --

2  the Google system sends ads directly to the internet

3  user or the web page that's being displayed.

4      Q.  Mr. Lanning, I think we've used cnn.com a lot

5  in this case.  I think even a couple of your slides use

6  cnn.com as an example.

7          Do you recall that?

8      A.  Yes, sir.

9      Q.  Is it your testimony that an internet media

10  venue like cnn.com has a single IP address that serves

11  all the content from that particular internet media

12  venue?

13      A.  No.  There would be -- for large websites,

14  they can -- it could be just one, like my website has

15  just one, but there could be multiple internet addresses

16  that are used by an internet media venue.

17      Q.  Let me show you a picture of cnn.com.  You see

18  that?  It looks like cnn.com, right?

19      A.  It says CNN.  Looks like it, yes.

20      Q.  Do you know what happens if you block, at your

21  browser, all the content from a domain that's called

22  turner.com when you -- when you surf to cnn.com?

23  Do you know what happens?

24      A.  No.  I haven't performed any of those tests,

25  so I wouldn't know the way CNN implemented their

website.

Q. Let me show you what happens when you block all the other content, and you only display in your browser the contents from the cnn.com IP address. That's what you get. Does that surprise you, Mr. Lanning?

A. No, it does not.

Q. It doesn't surprise you, because in modern websites, content in those websites is assembled from a variety of different servers with a variety of different IP addresses; isn't that right?

A. No. That -- you -- you -- no, sir, I wouldn't agree with that.

Q. Well, in this particular website, I've blocked everything except the cnn.com IP address. And is it your testimony that if someone asked you on a street, does that look like the cnn.com website, you would say, yeah, that does look like it?

A. No, it's not. I would say it looks like the CNN website with somebody blocking a lot of information.

Q. Blocking a lot of information from IP addresses other than cnn.com, right?

A. I don't know anything about CNN. I haven't been included, so I can't answer your question.

Q. Now, your ranch website ran AdSense ads for a

1  while.  Is that an experiment you performed?

2      A.   Yes, it did.

3      Q.   And if I were to type the IP address of your

4  ranch website into my browser, I would have gotten

5  some -- I would have seen some Google ads, right?

6      A.   Yes, you would see on your browser some Google

7  ads.

8      Q.   But your testimony is that those ads were

9  never placed at your website, because they didn't live

10  in the servers that provided the content to your

11  website?

12          Is that your testimony?

13      A.   Yes, but my website never saw those ads.

14      Q.   Now --

15          THE COURT:  Well, now it's lunchtime.

16  Ladies and Gentlemen, be back ready to come in the

17  courtroom at 1:15.  Have a nice lunch, and remember my

18  prior instructions.  Don't talk about the case.

19          COURT SECURITY OFFICER:  All rise.

20          (Jury out.)

21          THE COURT:  All right.  We'll be in

22  recess until 1:15.

23          I believe that my clerk e-mailed copies

24  of the draft jury instructions and verdict form to

25  counsel over the weekend.  I'll see your delegation, as

1    it is, at 12:45 for the charge conference, okay?

2                    Y'all send whoever is in charge of giving

3    me your inputs to those drafts downstairs to my chambers

4    at 12:45.  That will give them a chance to grab a quick

5    bite before we get started, and we'll be back ready to

6    go at 1:15 before the jury.

7                    (Recess.)

8                    *      *      *      *      *

<u>CERTIFICATION</u>

I HEREBY CERTIFY that the foregoing is a true and correct transcript from the stenographic notes of the proceedings in the above-entitled matter to the best of my ability.

/s/_____          _____
SUSAN SIMMONS, CSR                  Date
Official Court Reporter
State of Texas No.:  267
Expiration Date:  12/31/10


/s/_____          _____
SHELLY HOLMES, CSR              Date
Deputy Official Court Reporter
State of Texas No.:  7804
Expiration Date  12/31/10