1    IN THE UNITED STATES DISTRICT COURT
        FOR THE EASTERN DISTRICT OF TEXAS
2                MARSHALL DIVISION

3   FUNCTION MEDIA, LLC          *    Civil Docket No.
                                 *    2:07-CV-279
4   VS.                          *    Marshall, Texas
                                 *
5                                *    January 20, 2010
    GOOGLE, INC.                 *    1:20 P.M.
6
                   TRANSCRIPT OF JURY TRIAL
7        BEFORE THE HONORABLE CHAD EVERINGHAM
               UNITED STATES MAGISTRATE JUDGE
8

9   APPEARANCES:

10  FOR THE PLAINTIFFS:    MR. MAX TRIBBLE
                           MR. JOSEPH GRINSTEIN
11                          Susman Godfrey
                           1000 Louisiana Street
12                         Suite 5100
                           Houston, TX   77002
13                         MR. JUSTIN NELSON
                           Susman Godfrey
14                         1201 Third Avenue
                           Suite 3800
15                         Seattle, WA   98101
                           MR. JEREMY BRANDON
16                         Susman Godfrey
                           901 Main Street
17                         Suite 5100
                           Dallas, TX   75202
18                         MR. ROBERT PARKER
                           Parker, Bunt & Ainsworth
19                         100 East Ferguson
                           Suite 1114
20                         Tyler, TX   75702

21  APPEARANCES CONTINUED ON NEXT PAGE:

22  COURT REPORTERS:       MS. SUSAN SIMMONS, CSR
                           MS. SHELLY HOLMES, CSR
23                         Official Court Reporters
                           100 East Houston, Suite 125
24                         Marshall, TX   75670
                           903/935-3868
25  (Proceedings recorded by mechanical stenography,
    transcript produced on CAT system.)

APPEARANCES CONTINUED:

FOR THE DEFENDANTS:     MR. CHARLES VERHOEVEN
                        MS. AMY CANDIDO
                        Quinn Emanuel
                        50 California Street
                        22nd Floor
                        San Francisco, CA   94111

                        MR. EDWARD DEFRANCO
                        Quinn Emanuel
                        51 Madison Avenue
                        22nd Floor
                        New York, NY   10010

                        MR. HARRY L. GILLAM
                        Gillam & Smith
                        303 South Washington Avenue
                        Marshall, TX   75670

P R O C E E D I N G S

COURT SECURITY OFFICER:  All rise.

(Jury in.)

THE COURT:  Please be seated.

MR. TRIBBLE:  May we approach, Your Honor?

(Bench conference.)

MR. TRIBBLE:  We have a nine-minute video depo, but it's their tax guy to talk about the U.S. international issues, so we've agreed with them to close the courtroom for this depo.

THE COURT:  Okay.  Okay.  Let me go ahead and do it, then, all right?

1                MR. VERHOEVEN:  Thank you, Your Honor.

2                THE COURT:  Well, Mr. Tribble, come here.

3 And also, can you bring your -- your exhibit man up

4 here, your co-counsel, that -- just in chambers.  Bring

5 him up here and get Ms. Candido up here and put on the

6 record the objections I had sustained in chambers.

7                MR. VERHOEVEN:  Should we go right now?

8                THE COURT:  I can do it right now.

9                MR. TRIBBLE:  No, I think it's fine to do

10 it now.

11                THE COURT:  Okay.

12                MR. TRIBBLE:  Or we can do it later.

13                THE COURT:  Well, tell you what.  For

14 purposes of the record, we had an in-chambers conference

15 off the record before we came in here today related to

16 demonstratives.  And what I told Ms. Candido was that

17 she can tender me those demonstratives that she had

18 objections to, and I would overrule them for the record,

19 or I would give her a running objection, whatever she'd

20 like.

21            What I'm telling you is I'm going to let

22 you play your -- your depositions without -- with the

23 understanding that her objections to them are preserved,

24 okay?

25            MR. VERHOEVEN:  Understood.

1           THE COURT:  They were timely made.  I
2   don't know the extent to which this gets into the same
3   issues.  I just don't want her to think that she waived
4   her objections, okay?
5           MR. VERHOEVEN:  Okay.
6           THE COURT:  If she wants to follow up
7   with the copies of the slides that are going to be used
8   in Mr. Bratic's testimony, that's fine, too.
9           MR. VERHOEVEN:  Maybe we'll do that just
10  to make sure.
11          THE COURT:  Okay.  That's fine.
12          MR. VERHOEVEN:  Okay.  Thank you.
13          (Bench conference concluded.)
14          THE COURT:  All right.
15          Ladies and Gentlemen who are seated in
16  the courtroom, I've got another issue that the parties
17  have agreed and the Court has considered it.  It's going
18  to become necessary again to close the courtroom during
19  the testimony that's about to be displayed to the jury.
20  So if you could leave at this time.  And, once again, I
21  will try to keep these closures as brief as possible.
22  And I'll have the court security officer notify you
23  immediately when the courtroom is reopened.
24  ███████  ██████  ██  ████████
    **SEALED BY ORDER OF THE COURT**
25  ████  █████  ██  ██ █  █████  ██████  ██████



SEALED BY ORDER OF THE COURT



**SEALED BY ORDER OF THE COURT**



**SEALED BY ORDER OF THE COURT**



**SEALED BY ORDER OF THE COURT**



SEALED BY ORDER OF THE COURT

SEALED BY ORDER OF THE COURT



SEALED BY ORDER OF THE COURT



SEALED BY ORDER OF THE COURT



SEALED BY ORDER OF THE COURT

**SEALED BY ORDER OF THE COURT**

MR. PARKER:  Your Honor, the Plaintiff

calls Lucinda Stone.

THE COURT:  Ms. Stone, come around.  If

you'll please pull the microphone toward you and keep

your voice up and speak into the microphone.

LUCINDA STONE, PLAINTIFF'S WITNESS, PREVIOUSLY SWORN

<u>DIRECT EXAMINATION</u>

<u>BY MR. PARKER</u>:

Q.   Would you introduce yourself, please, ma'am.

A.   My name is Lucinda Stone.

Q.   Are you nervous?

A.   I'm sorry?

Q.   Are you nervous?

A.   Yes.

Q.   This -- this will be very brief.  I only have a few questions.

The jury's heard that you live in Tyler, correct?

A.   Yes.  We've been there about five years.

Q.   What do you do in Tyler?

A.   I run our internet business called virtualcities.com.

Q.   Well, the jury's heard that -- the name of that company before, and I'm going to try to avoid repeating what they've heard from Mr. Dean.

Can you just go ahead and quickly refresh our memories about what Virtual Cities is?

A.   Sure.  Virtual Cities is a lodging directory where bed and breakfasts, country inns, small hotels, and vacation rentals and dude ranches can present their facilities.

1          As a side to that, we have a large recipe site

2   that has over 6,000 recipes from innkeepers, chefs, and

3   culinary professionals.

4      Q.   What -- what are your day-to-day duties and

5   responsibilities?

6      A.   I basically run the business.  I do all of the

7   accounting.  I work with customer service with our

8   property owners.  I do the artwork, the presentation of

9   our web pages, and the upkeep of our website.

10     Q.   The jury heard yesterday one of Google's

11  counsel asking Mr. Dean about selling Virtual Cities,

12  and I don't remember whether it was '96 or '97 back in

13  there.

14          Do you recall that?

15     A.   Yes, I do.

16     Q.   Can you explain that?

17     A.   The money -- the $4,000 came from Michael's

18  brother-in-law, and he was going to lend it to him.

19  Michael felt he needed some sort of a collateral or

20  compensation for that loan.  So it was with the premise

21  that we would buy it back from him at a certain time.

22     Q.   But he actually sold it to his brother for

23  $4,000 with the deal that he could buy it back?

24     A.   Yes.

25     Q.   -- is that correct?

1    A.    Yes.

2    Q.    Was the money paid back and did you get the

3 company back?

4    A.    Yes.

5    Q.    Did that company ever own these patents?

6    A.    No, it did not.

7    Q.    Has it ever owned these patents?

8    A.    It has not.

9    Q.    Did it own your bed and breakfast advertising

10 internet directory?

11    A.    No, it did not.

12    Q.    When did you first meet Michael Dean?

13    A.    Michael and I met in 1974.  He was building

14 homes in Santa Cruz, and I was visiting a neighbor

15 across the street, and they introduced us.

16    Q.    Okay.  Well, let's -- let's talk a little bit,

17 then about your -- your early background.

18         Where did you grow up and where did you go to

19 high school?

20    A.    I grew up in Saratoga, which is part of

21 Silicon Valley, which when I was a kid, they used to

22 call it Santa Clara Valley, in Northern California, and

23 I went to -- I graduated from Saratoga High School.

24    Q.    What did you do after graduating?

25    A.    I took some college courses.  I was a

1  housewife for a while, and then I got involved in the

2  community. I started working. And I worked in a public

3  library and a college library for about eight years, and

4  then I got into nonprofit charity work.

5       Q. Okay. What sort of nonprofit and charity

6  work?

7       A. I was -- I got involved with children

8  services, and I worked briefly for a public radio

9  station. My real love was the children services. I

10  became -- or -- I became a development director for

11  Mount St. Joseph-St. Elizabeth Home for Unwed Teenagers

12  and Abused Girls in San Francisco, and then I also

13  worked as a development director for Sunny Hill's

14  Children Services in Marin County.

15       Q. What is a development director?

16       A. We are in charge of all of the funding for the

17  agency. So that would include grant writing, capital

18  campaigns, working with volunteers, doing the special

19  events, all -- and the publicity and the marketing of

20  the agency.

21       Q. Do you have any children?

22       A. I have three kids. Jessica, Genevieve, and

23  Roger.

24       Q. What about grandchildren?

25       A. I have two grandchildren. I have a grandson,

1  Christopher, who is serving our country in Iraq right

2  now, which we pray for every day.  I have -- excuse

3  me -- a little nervous here.

4         I have a grandson who's seven, Cory, and one

5  on the way.

6     Q.   So what did you do, then, after you worked for

7  these charities that you mentioned?

8     A.   I also did a little bit of grant research for

9  suicide prevention in San Francisco and also the

10 American Heart Association.  I volunteered for the March

11 of Dimes, and then I became Executive Director of Big

12 Brothers/Big Sisters in Sonoma County, California.

13    Q.   Okay.  Did you do any work in the political

14 area?

15    A.   I worked for a political consulting firm for a

16 while, and thankfully, it's about the time I met

17 Michael, and he had decided to get involved in the

18 internet.

19    Q.   You didn't prefer the political consulting?

20    A.   No.

21    Q.   And you -- you met Michael again, is that it?

22 About that time?

23    A.   We ran into each other again in 1994, and

24 we've been together ever since.

25    Q.   And was it about that time that you began

1  virtualcities.com?

2      A.   Yes, it is.

3      Q.   What -- what is it or what was it that

4  interested you and interested Michael about the

5  internet?

6      A.   Everything.  I mean, it was such a new

7  frontier.  And from my experience in working with -- in

8  a library, I knew that people were hungry for -- to have

9  that information at their fingerprints.  So it was just

10  an exciting place to start out in those days, and it was

11  very new.

12          You had dial-up modems that went kind of

13  (makes sound), and you waited for pages to come up.  But

14  it also was a great blending of my talents, because I

15  worked in libraries so I was good at organizing

16  information.  And then the work I did for charity and

17  marketing and working with the media and promoting, it

18  just fit together really well.

19          And Michael and I worked really well, too,

20  because he was so enthusiastic and ready to experiment

21  with a new -- new frontier.

22      Q.   Did you and Mr. Dean eventually come up with

23  an idea that you thought you might get a patent on?

24      A.   Yes, we did.

25      Q.   The jury has seen those patents in some

detail.  Why don't you just go ahead and in general

describe yours and Mr. Dean's idea to the jury in your

own words, the idea that you thought could become a

patent.

     A.   Our patents cover where a seller can go into a

real simple interface, a seller/advertiser.  They can

choose various media venues to advertise with.  They can

input information that will end up creating an ad, and

that would get into a central processor that also had

the information from the media venue of all the criteria

that a media venue would want.

          From having a website of our own, we knew how

important it was to have the look and feel throughout

your pages.  And so we thought it was very important

that a seller could do this in one easy manner, and a

media venue could accept these ads without having to

worry about whether they fit within their page.

     Q.   Okay.  Well, what was wrong with the old way

of doing things?

     A.   It was pretty cumbersome.  For one thing, a

seller -- like with our innkeepers, for instance, when

we were talking with them, if they had to advertise with

us, they had to know what the criteria is, what kind of

information we wanted from them, and then they had to

provide that.

1        If they had to make a change, like in the
2  early days with companies going in and out of business
3  on the internet, a lot of them were changing their
4  e-mail address quite a bit, so they would have to call
5  us and tell us to change it.

6        It was the same with if they advertised -- if
7  they were smart, they advertised on a whole bunch of
8  different websites.  So each place that they advertised,
9  they had to do the same thing over and over again.  They
10 had to find out what that -- that web page needed.  They
11 had to give it to that website company.  And then if
12 they had a change, they had to contact all of us all
13 over again.

14        So it was very cumbersome, and we thought that
15 our patent would address that issue.  On the other side
16 of it, if you had a website and you wanted to accept
17 advertisements, you either had to accept the ad the way
18 it was, because there were companies that distributed
19 like banners that all looked alike, or you had to
20 contact each of those advertisers and let them know what
21 your criteria was.

22     Q.   When did you and Mr. Dean come up with this
23 idea from a timeframe standpoint?

24     A.   Well, it didn't happen overnight, and it took
25 quite a bit.  But we started talking about it in --

forming our idea in late 1997, and then in December, we

moved to Dallas and we continued that collaboration

until about August of '98.

Q.   The jury's heard that after, I think, maybe

April or so in '98, Mr. Dean enrolled in some

programming classes and started working with a Mr. Hasan

on the first phase of programming.

What were you doing on this project around

that period of time?

A.   Actually, Michael started taking classes in

January of 2008 (sic).  He started programming right

away, but we -- by April is when we desired -- decided

to hire Mr. Hasan, and I think we did hire him in -- in

May sometime.

During that time, Michael was the primary

point person for working with the programming and all of

the stuff with our new technology.  And I was running

the Virtual Cities business because that was the only

source of the income we had at the time.

Q.   Did you assist in the programming?

A.   No.  I'm not a programmer.

Q.   So what was your involvement in the process?

A.   Once Michael was programming something and he

had a piece of it done, we would review it to see if we

were on the same page as far as the progress of our

system was.

Sometimes I'd make a comment; sometimes I wouldn't, because he was pretty good about what direction we were going in. And I also had a little bit of input about the style and the look of our software. I did the artwork for the -- the software manual and also for the CD that our software -- that encompassed our software.

Q. Did Mr. Hasan contribute in any way to the idea that ultimately became the patent?

A. Absolutely not.

Q. His sole role was in programming; is that correct?

A. That's correct.

Q. So how did it come about, then, that you filed an application for a patent or patents on this idea?

A. When Michael had finished the first phase of the software program and the first phase of the programming, we knew we needed to have some protection, and we weren't sure what kind of a protection we needed. So he called an attorney, and we were advised to get a patent for this.

Q. Okay. You are listed as an inventor --

A. Correct.

Q. -- on the patent. Your role was not

1 programming, but your role, as I understand your

2 testimony, was contributing to the development of this

3 idea, correct?

4     A.   Yes.  Michael and I were -- it's really

5 wonderful, because when -- we're together all the time,

6 but the synergy of what we can create together was a

7 real give and take.  And that was my part of it, is

8 working with him in that area.

9     Q.   How many patents do you and Mr. Dean have

10 today?

11     A.   We have six.

12     Q.   Okay.  And which ones are you asserting

13 against Google?

14     A.   We're asserting two, which you've heard.  It's

15 the '025 and the '059.

16     Q.   Why are you suing Google?

17     A.   Well, they're using our idea.  They're using

18 our system and they're making a lot of money.  They're

19 making billions of dollars off of that, and we feel that

20 the Patent Office has given us that property.  They have

21 granted us the right to keep that property, and we think

22 that we should be compensated for that.

23     Q.   What did you do to try to figure out whether,

24 in your mind, Google might be infringing your patent?

25     A.   We looked at their system -- their -- their

pages online, and it took a while of investigating and

looking at those pages. But once we looked at enough,

there was no doubt about it; we thought they were

infringing.

Q. Now, you were doing this --

MS. CANDIDO: Objection. Move to strike.

THE COURT: Overruled.

Q. (By Mr. Parker) You were -- you were doing

this while you were waiting on the patent to issue; is

that correct?

A. We already --

Q. You did this investigation?

A. Well, we already had our parent patent, the

'045. We had filed that January 10th of 2000, so we

already had that. And the other two patents that we're

asserting today had not been issued yet.

Q. And the '045 has the same specifications and

the same drawings as the '025 and '059, correct?

A. Yes.

Q. Ms. Stone, let me briefly turn to the question

of damages. You heard Mr. Dean testify about reasonable

royalty, licenses, and lump sums.

A. Yes.

Q. Okay. Do you agree with his testimony about

damages?

          A.    Absolutely.

          Q.    Did you have conversations with Mr. Dean back
in those days about whether to license your patents?

          A.    Yes.

          Q.    If you had been approached by Google, would
you have been open to licensing your patents to Google?

          A.    Oh, yes, we would have.

          Q.    And what kind of license would you have
sought?

          A.    Well, we were definitely interested in a
running royalty.

                    MR. PARKER:  Your Honor, I pass the
witness.

                    THE COURT:  Okay.  Cross-examination?

                    MS. CANDIDO:  Yes.  Thank you, Your
Honor.

                         CROSS-EXAMINATION
BY MS. CANDIDO:

          Q.    Good afternoon, Ms. Stone.

          A.    Hi.

          Q.    My name is Amy Candido.  I don't think we've
ever formally met.

                    I'd like to ask you first, you have -- have
you ever study computer science?

          A.    No.

1     Q.   And you mentioned before you're not a

2 programmer, correct?

3     A.   Correct.

4     Q.   You're not a computer engineer either?

5     A.   No, I'm not.

6     Q.   Can you read source code?

7     A.   Parts of it, yeah, simple parts probably.

8     Q.   Do you recall -- well, excuse me.

9         I'd like to -- you had your deposition taken

10 in this case in April 17th, 2009.

11         Do you recall that?

12     A.   That was the first one, yes.

13     Q.   And you were asked at your deposition the same

14 question regarding source code, and I'd like to play

15 that answer.

16     A.   Okay.

17     Q.   Question and answer.

18         MS. CANDIDO:  Charles, could you please

19 play Page 267, Lines 8 through 14?

20         MR. TRIBBLE:  Can I get that page number?

21         MS. CANDIDO:  Page 267, Lines 8 through

22 14.

23         (Video clip playing.)

24         QUESTION:  You can't point me to any

25 documents that do that, right, as you sit here?

1          ANSWER:  I can't read the source code,

2 so, correct, I could not point you to a document.

3          QUESTION:  That was my point.

4          Okay.  I understand your testimony.  So

5 you believe it's there, but you couldn't read the code

6 to establish that it's there; is that fair?

7          ANSWER:  That's fair.

8          (End of video clip.)

9     Q.   (By Ms. Candido) Ms. Stone, you don't have any

10 knowledge of the technical details of how to implement

11 the system in your patents, correct?

12    A.   That's correct.

13    Q.   For example, you could not have implemented

14 the central controller in your patents; is that correct?

15    A.   Myself personally, no.

16    Q.   Ms. Stone, you testified that you and Mr. Dean

17 conceived of the inventions claimed in the asserted

18 claims of the patents-in-suit by August of 1998; is that

19 correct?

20    A.   Yes.

21    Q.   You're not aware of any documents dated before

22 that time that relate to the conception of your

23 invention, are you?

24    A.   Before April of '98?

25    Q.   Yes.  That's correct.

1    A.   Yeah.   There are some materials that we

2 presented you that had dates before April of '98 on it.

3    Q.   So is your testimony -- I just want to be

4 clear, because there have been a couple of different

5 months, I think, floating around in this testimony.

6    A.   Okay.

7    Q.   Is it your testimony that you conceived of the

8 inventions in the asserted claims of the patents by

9 April of 1998 or August of 1998?

10    A.   April.

11    Q.   Okay.  I think you may have said August before

12 or I misheard you.

13    A.   Oh, I'm sorry.  It's definitely April.

14    Q.   Okay.  And prior to that time, your testimony

15 is that there are documents that relate to the

16 conception of your invention that exist today; is that

17 correct?

18    A.   That's correct.

19    Q.   At your -- at your deposition, you were asked

20 if you were aware of any documents dated before March of

21 1998 that relate in any way to the conception of your

22 invention.

23        Do you recall that?

24    A.   I recall being asked that.  Which deposition

25 are you talking about?

1      Q.   At this time, I'm talking about your

2   deposition from September of 2009.

3      A.   Okay.  Yes.

4      Q.   And do you recall whether you were able to

5   identify any documents dated before March of 1998 that

6   relate to the conception?

7      A.   I think I identified a couple of them.

8      Q.   You mentioned, I believe, at your deposition a

9   portion of source code that you -- you saw that may have

10  been dated earlier than March of 1998.

11          Aside from that, are you aware of any other

12  documents that relate to the conception of your

13  invention prior to March of 1998?

14     A.   We produced a workbook that I worked on, and

15  that was to do the artwork for the software.  And I

16  believe there are some dates within that that were on

17  that workbook.

18     Q.   Well, I'd like to go ahead and play the

19  portion of your deposition from September of 2009.

20          MS. CANDIDO:  That's Page 8, Lines 10

21  through 15 -- I'm sorry -- Page 68, Lines 10 through 15.

22  Page 68, Lines 10 through 15.

23          (Video clip playing.)

24          QUESTION:  Prior to March of 1998, are

25  you aware of any documents, other than the source code

1  you've already identified, that would relate in any way

2  to the conception of the invention that you believe you

3  and Mr. Dean came up with?

4           ANSWER:  I don't recall any at this time.

5           (End of video clip.)

6      Q.   (By Ms. Candido) Ms. Stone, you weren't

7  involved in the process of applying for the patents at

8  issue in this case; is that correct?

9      A.   That's correct.

10     Q.   And you didn't have any involvement in writing

11 the patent claims in those patents; is that correct?

12     A.   That's correct.

13     Q.   You didn't draft any portion of the

14 specification or written description in those patents?

15     A.   Correct.

16     Q.   And you didn't draft any of the diagrams in

17 those patents?

18     A.   Yes.

19     Q.   Yes, it's correct you did not?

20     A.   Well, I think you asked me a double negative,

21 so I was trying to say yes.

22     Q.   I'll try to clarify.

23     A.   Okay.

24     Q.   Is it correct that you did not draft any of

25 the diagrams in the patents-in-suit?

1       A.    Yes.

2       Q.    You were just asked about Mr. Hasan.  Is it

3  correct you and Mr. Dean hired a programmer named

4  Mohammad Hasan to help program the Virtual Cities

5  Reservation Network?

6       A.    Yes.

7       Q.    And you hired Mr. Hasan in April or May of

8  1998; is that correct?

9       A.    I think we made the decision in April, and we

10 ended up hiring him in May.

11      Q.    And Mr. Hasan worked part-time for you for a

12 couple of years; is that correct?

13      A.    Yes, he did.

14      Q.    But Mr. Hasan never finished implementing your

15 ideas, did he?

16      A.    That's correct.

17      Q.    Even with Mr. Hasan's help, you and Mr. Dean

18 never had an embodiment of your invention that contained

19 media venue interface, correct?

20      A.    That's not correct.

21            Oh, I'm sorry.  You said media venue

22 interface?

23      Q.    That's correct.

24      A.    That's correct, yes.

25      Q.    So just so the record is clear, even with

1  Mr. Hasan's help, you and Mr. Dean never had an

2  embodiment of your invention that contained a media

3  venue interface, correct?

4       A.   That's correct.

5       Q.   And, Ms. Stone, as far as you know, there has

6  never been a complete embodiment of the inventions

7  claimed in the patents-in-suit, correct?

8       A.   Yes.

9       Q.   Yes, that's correct?

10      A.   Yes.

11      Q.   Thank you.

12           Mr. Dean testified yesterday about a video of

13  the Virtual Cities Reservation Network.

14           Do you recall that testimony?

15      A.   Yes.

16      Q.   I'd like to ask you a few questions about the

17  Virtual Cities Reservation Network.

18           The Virtual Cities Reservation Network had no

19  media venue interface, correct?

20      A.   It did not have a media venue interface;

21  you're correct.

22      Q.   The Virtual Cities Reservation Network only

23  had a seller interface, correct?

24      A.   Yes.  We started with the seller.  That was

25  our first phase.

1    Q.  But you never had -- completed anything other

2 than first phase; is that correct?

3    A.  We didn't get to the second phase.

4    Q.  So sellers that used the Virtual Cities

5 Reservation Network could only place ads on your media

6 venue; is that correct?

7    A.  That's correct.

8    Q.  The name of that media venue was

9 lodgingreservations.com; is that correct?

10    A.  Yes.

11    Q.  The Virtual Cities Reservation Network was not

12 a complete embodiment of the Function Media patents,

13 correct?

14    A.  That's correct.

15    Q.  And when Virtual Cities Reservation Network

16 was up and running, you only had a handful of people

17 using it, correct?

18    A.  Yes.

19    Q.  Ms. Stone, I'd like to ask you a few questions

20 about your internet businesses --

21    A.  Okay.

22    Q.  -- that you -- you were just testifying about.

23 You work for a company called ONS; is that correct?

24    A.  Yes.

25    Q.  And you're the only employee of ONS?

1      A.   At this time.

2      Q.   You're the President; is that correct?

3      A.   President, bottle washer, everything, yes.

4      Q.   Do you own 100 percent of ONS?

5      A.   Yes, I do.

6      Q.   You testified that ONS runs a lodging

7 directory; is that correct?

8      A.   Yes.

9      Q.   And that lodging directory resides on

10 virtualcities.com; is that correct?

11     A.   It does.

12     Q.   ONS -- excuse me -- ONS generates revenue from

13 people who pay to be a part of the Virtual Cities

14 Reservation -- I'm sorry -- strike that.

15          ONS generates revenue from people who pay to

16 be part of the Virtual Cities lodging directory; is that

17 correct?

18     A.   Yes, they do.

19     Q.   And you also have another company called

20 Virtual Cities, correct?

21     A.   Yes.  It's a corporation, yes.

22     Q.   And you on -- sorry -- strike that.

23          Mr. Dean founded Virtual Cities; is that

24 correct?

25     A.   Yes, he did.

1    Q.   But you took over the operation of Virtual

2 Cities in 2004; is that correct?

3    A.   Yes.

4    Q.   And it was --

5    A.   Actually, that's incorrect.  I'm sorry.

6 Taking over the operations, I took over ownership in

7 2004.

8    Q.   Okay.  In 2004, you bought Virtual Cities from

9 Robert Pimentel; is that correct?

10    A.   Yes, I did, but Michael and I live as a

11 married man and woman, and it's both of ours.

12    Q.   You and Mr. Dean live as a married man and

13 woman?

14    A.   Yes, we do.

15    Q.   You're not actually married?

16    A.   Well, we live as a married couple in Texas,

17 and we have for 15 years, so we're married.

18    Q.   Have you ever had a civil marriage ceremony?

19    A.   Not yet.

20    Q.   So you're not actually married; is that

21 correct?

22    A.   According to the state of Texas, we are.

23    Q.   You're common-law married?

24    A.   Yes.

25    Q.   Virtual Cities has zero employees; is that

1  correct?

2      A.   It has me.

3           Oh, Virtual Cities, no.  It has zero

4  employees.

5      Q.   You've never received any outside financing

6  for ONS or Virtual Cities aside from you and Mr. Dean;

7  is that correct?

8      A.   That's correct.

9      Q.   You and Mr. Dean looked into getting private

10 funding for your business from investors, correct?

11     A.   We looked into getting funding to develop our

12 system that we had patented.

13     Q.   Were you ever able to obtain private funding

14 for the system that you developed?

15     A.   Michael went and met with venture capitalists,

16 but they basically told us we were too old.

17     Q.   So the question was, you've never received any

18 funding from outside investors; is that correct?

19     A.   That's correct.

20     Q.   You met with a -- let me rephrase that.

21          Mr. Dean contacted a woman at Bank of America

22 about getting funding; is that correct?

23     A.   I believe she contacted us through somebody

24 that knew about us.  I think it was Michael's sister

25 that knew her, and the first contact she had was with

1   me, because she -- I was the one who answered the phone.

2        Q.    Did Bank of America ever give you any funding?

3        A.    They did not.

4        Q.    Ms. Stone, you have used Google's product

5   AdSense for Content, correct?

6        A.    In the context of Virtual Cities, yes.

7        Q.    And AdSense for Content, to be clear, is one

8   of the products that Function Media accuses of

9   infringement, correct?

10        A.    Yes.

11        Q.    You began using AdSense for Content in August

12   of 2004, correct?

13        A.    I believe it was August 31st, 2004.

14        Q.    You signed up with Google to have Google place

15   ads on your website, virtualcities.com, right?

16        A.    Yes.

17        Q.    So in other words, you became an AdSense for

18   Content publisher in 2004; is that correct?

19        A.    Yes, we did.

20        Q.    So you and Mr. Dean used Google's technology

21   AdSense for Content to display ads in virtualcities.com

22   instead of your own technology, right?

23        A.    Yes.

24        Q.    And you made as much as $2,000 a month from

25   having Google's AdSense for Content ads on your website,

1  right?

2      A.    That's the most I made in a month, yes.

3      Q.    At some point when you were using Google's

4  AdSense for Content, you began to think that there might

5  be an issue with Google possibly infringing your

6  patents, correct?

7      A.    That's correct.

8      Q.    That point was in August of 2004 when you

9  first saw the AdSense interface, right?

10      A.    I don't think that I made that realization

11  that quickly.  I think it was sometime when we started

12  using the other side, the AdWords side, that I realized

13  the extent of what may be happening there.

14      Q.    Do you recall at your deposition being asked

15  about when you first saw the AdSense interface and the

16  conclusions that you drew?

17      A.    Yes.  And I think in that deposition I was

18  confused about which came first.  I had forgotten

19  whether we had done AdWords or AdSense first, so I'm a

20  little fuzzy about what I actually said there.

21      Q.    Well, let's look at your deposition clip on

22  that point.  It's from April 17, 2009.  It's Page 154,

23  Lines 10 through 18.

24               (Video clip playing.)

25               QUESTION:  And earlier you testified that

1 when you first saw the media venue interface, you

2 thought there was an issue?

3     ANSWER:  Yes.

4     QUESTION:  And you first saw -- media

5 venue, this so-called media venue interface, which you

6 said was the AdSense interface in August of 2004,

7 correct?

8     ANSWER:  Yes.

9     (End of video clip.)

10  Q.   (By Ms. Candido) You thought there might be an

11 issue, but you continued to use your AdSense account,

12 correct?

13  A.   Yes.

14  Q.   And you continued to make money from the

15 display of Google's AdSense for Content ads on your

16 website, right?

17  A.   I -- well, we gave it right back to Google,

18 too, because we used that money to put ads with the

19 AdWords on our site, so...

20  Q.   If you could just answer the question that I

21 asked.

22  A.   I'm sorry.

23  Q.   So I'll ask it again.

24  A.   Okay.

25  Q.   You continued to make money from the display

1  of Google's AdSense for Content ads on your website,

2  right?

3      A.   Yes.

4      Q.   But at some point, you and Mr. Dean decided

5  that you wanted to look into possibly suing Google,

6  correct?

7      A.   I think it was about 2005 that we came -- that

8  we were investigating that -- that option.

9      Q.   Ms. Stone, you personally began to investigate

10 Google's technology, right?

11     A.   Yes.

12     Q.   And as you just stated, did you begin that

13 investigation -- that investigation began in earnest in

14 2005; is that correct?

15     A.   Yes.

16     Q.   As part of your investigation, you looked at

17 Google's online documentation about its products, right?

18     A.   Yes.

19     Q.   I'd like to show you Defendant's Exhibit 140.

20 And we can have that displayed on the overhead, and as

21 well I have a binder for you.

22          MS. CANDIDO:  If I may approach, Your

23 Honor?

24          THE COURT:  Yes.

25     Q.   (By Ms. Candido) So, Ms. Stone, if you would

1 take a look at Defendant's Exhibit 140. It's on the

2 screen or in the binder in front of you.

3      A.   Oh, okay. I read it. Yeah. Okay.

4      Q.   Do you recognize this exhibit?

5      A.   Yes.

6      Q.   This is one of the documents that you created

7 in connection with your investigation of Google; is that

8 correct?

9      A.   That's correct.

10      Q.   The date on Defendant's Exhibit 140 appears

11 cut off. It says March 13, and then it just has 2-0-0.

12 You agree that it weren't cut off, that would read March

13 13, 2005, correct?

14      A.   That's correct.

15      Q.   This is a printout of a Google AdWords

16 document, correct?

17      A.   Yes.

18      Q.   And is that your handwriting on the left side

19 of Page 1?

20      A.   It is.

21      Q.   Would you please turn to Page 3 of this

22 document?

23           MS. CANDIDO: And, Charles, if you would

24 pull up the third page, please.

25      Q.   (By Ms. Candido) Is this your handwriting on

1  the bottom of Page 3?

2      A.   That is.

3      Q.   Could you please read out -- well, I'm sorry.

4          At the bottom of Page 3, there's also a line

5  from the handwriting up to a paragraph.

6          Do you see that?

7      A.   Yes.

8      Q.   On the left margin?

9      A.   Yes.

10      Q.   Could you please read out loud for the jury

11  the paragraph in the typed text that your handwritten

12  line is pointing to?

13      A.   Our technology -- oh, I'm sorry.

14          Our technology ensures that your ads appear in

15  the most relevant location across the web so that your

16  customers find you.  For more information about

17  advertising publishers within your industry, please

18  visit www.dot -- I can't read that.

19      Q.   That's okay.  It goes on

20  google.com/ads/metrics/html.

21      A.   Okay.

22      Q.   At the bottom of this page, you have the

23  letter A and then a note.  Would you please read your

24  note out loud for the jury by the first letter A?

25      A.   Their sellers choose locations, keywords, and

1  type matches; thus, end up on different websites.

2      Q.   So I believe you said websites?  Is that what

3  it says?

4      A.   Oh, I'm sorry.  Media sites.

5      Q.   In your notation, when you said their sellers,

6  you were referring to Google's sellers or advertisers,

7  correct?

8      A.   Yes, I was.

9      Q.   And then under that, you have the letter B and

10 a note.  Would you please read your note out loud for

11 the jury next to the letter B?

12     A.   Our sellers choose media venues.

13     Q.   And when you say, our sellers choose media

14 venue, you're referring to the Function Media patents?

15     A.   Yes, I am.

16     Q.   So it was your observation that Google's

17 sellers choose locations, keywords, and type matches,

18 and thus, end up on different media sites, and sellers

19 in your patents choose media venues; is that correct?

20     A.   That's correct.  I was pointing out the

21 similarities.

22     Q.   I'd like you to turn, please, to Defendant's

23 Exhibit 111 in your binder.

24         MS. CANDIDO:  And, Charles, if you would

25 pull up Exhibit 111, please.

1    Q.    (By Ms. Candido) Ms. Stone, do you recognize

2  this document?

3    A.    Yes, I do.

4    Q.    This document is a page from Google AdWords

5  that you printed out, correct?

6    A.    Yes.

7    Q.    And is that your handwriting on the page?

8    A.    It is.

9    Q.    And, again, you printed out the document that

10 is now marked Defendant's Exhibit 111 on March 13, 2005,

11 correct?

12    A.    Yes.

13    Q.    Again, the date is cut off, so that's why I

14 asked.

15          And you wrote the note on this printout around

16 the same time; is that correct?

17    A.    Yes.

18    Q.    Again, in this document, there's a line in

19 your handwriting pointing to a paragraph of typed text.

20          Do you see that?

21    A.    Yes.

22    Q.    Would you please read the first full paragraph

23 on the page under the heading, Can I choose the specific

24 sites in the Google network where my ads appear?

25    A.    You can decide which general type site will

1  display your AdWords ads.  Your ads will always appear

2  on the Google search site, but you can also choose to

3  have your campaigns appear on your content network or

4  search engine network or both.  Learn how to view or

5  edit your ad distribution preferences.  Please click

6  here.

7      Q.   Okay.  I'm sorry.  I meant to direct you to

8  the first full paragraph under the question that's

9  posed.  It begins at this time.

10        Do you see that paragraph?

11      A.   Yeah.

12        At this time, it isn't possible to select

13  specific sites where you'd like your ads to appear, and

14  it isn't possible to see a report of the individual

15  pages where your ads have appeared, because our

16  advertising service dynamically matches the keywords you

17  select to the content, sites, and products available in

18  our network.

19        You want me to go on?

20      Q.   Please.

21      A.   We can't guarantee that your ads will appear

22  in a particular location at a specific time; however,

23  Google technology ensures that your ads appear only

24  within high level quality websites and -- or I'm

25  sorry -- sites and products that are directly relevant

1  to your service.

2      Q.   And would you now please read your note at the

3  bottom of the page, your handwritten note?

4      A.   Could be out for them, question mark.

5      Q.   I'm sorry.  I believe -- does it say:  Could

6  be an out for them; is that correct?

7      A.   Yes.  Sorry.

8      Q.   I know it's hard to see these things from a

9  distance.

10          And in your handwritten note, them refers to

11  Google, correct?

12      A.   Yes.

13      Q.   While you were doing this investigation of

14  Google, you never informed Google that you thought that

15  there might be an issue with respect to Function Media's

16  patents, did you?

17      A.   No.

18      Q.   You never sent Google an e-mail to let them

19  know your concerns?

20      A.   No.

21      Q.   You never sent Google a letter to let them

22  know your concerns?

23      A.   No.

24      Q.   You never called Google up on the phone to let

25  them know your concerns?

1    A.    No.

2    Q.    Prior to filing this lawsuit, did you ever ask

3    anyone at Google if they wanted to license your patents?

4    A.    No.

5    Q.    I believe you testified earlier that sometime

6    in 2005, you and Mr. Dean decided that you intended to

7    sue Google for patent infringement, correct?

8    A.    No.  I think that we were investigating

9    whether we were going to sue you for patent

10   infringement.

11   Q.    Did you have an intent, as of 2005, with

12   respect to whether or not you would sue Google for

13   patent infringement in the future?

14   A.    We were still investigating, yes.  Yes.

15   Q.    Your intent is that you would sue Google in

16   the future, correct?

17   A.    I wouldn't say would, because that is a

18   definite, and we did not know anything definite in 2005.

19   Q.    Are you aware that Mr. Dean has testified that

20   you did have an intent in 2005 of suing Google for

21   patent infringement in the future?

22   A.    An intent, yes.

23   Q.    So I need to rephrase my question again.

24   A.    Okay.

25   Q.    Is it correct to say that you and Mr. Dean had

1   an intent in 2005 to sue Google for patent infringement

2   in the future?

3      A.   Yes.

4      Q.   But you didn't file this lawsuit against

5   Google until July of 2007, two years later, right?

6      A.   That's correct.

7      Q.   Prior to suing Google in July of 2007, did you

8   contact Google to let them know that there was an issue,

9   and you were considering litigation?

10     A.   No.

11     Q.   On July 3rd, 2007, the '025 issued, correct?

12     A.   Yes, it did.

13     Q.   And you didn't contact Google that day to let

14   them know about the patent, did you?

15     A.   I think it was pretty close to that date.

16     Q.   Well, just to be clear, on July 3rd, 2007,

17   neither you nor Mr. Dean called up to or wrote to Google

18   to inform them about the existence of your patent?

19     A.   Not at all, no.

20     Q.   And the same day that the '025 patent issued,

21   you filed this lawsuit against Google, correct?

22     A.   Yes.

23     Q.   And then the '059 patent issued on July 24th

24   of 2007, correct?

25     A.   Yes, it did.

1     Q.   And on that same day, you amended the lawsuit

2 to assert the '059 patent against Google, correct?

3     A.   Yes.

4     Q.   You didn't call up Google first to inform them

5 about the '059 patent issuing?

6     A.   No.

7     Q.   Now, going back for a moment to 2005, after

8 you decided that you had a future intent to sue Google

9 for patent infringement, you continued to use the

10 AdSense system, correct?

11     A.   Yes.

12     Q.   In 2005, you didn't go on your website and

13 remove all of the AdSense for Content ads?

14     A.   No.

15     Q.   In fact, you didn't take -- even take off

16 Google's ads off your website -- sorry.  Let me start

17 that question over.  I think I had three negatives in

18 that one.

19          In fact, you didn't take Google's ads off your

20 website even after you filed suit against Google in

21 2007, correct?

22     A.   I started removing them right before we filed.

23     Q.   Well, when you had your deposition taken in

24 September of 2009, you testified that you still have

25 Google's AdSense for Content ads on your website; is

that correct?

A.   That's correct.  To this day, I still have a few stragglers out there.

MS. CANDIDO:  Thank you.

THE COURT:  Redirect?

MR. PARKER:  Very briefly, Your Honor.

REDIRECT EXAMINATION

BY MR. PARKER:

Q.   Ms. Stone, how long have you called Michael Dean husband?

A.   It's been about 15 years.

Q.   How long has he called you wife?

A.   About 15 years.

Q.   But you haven't gotten around to having an actual ceremony or celebration?

A.   You know, we keep talking about it, but it's just -- it's almost like throwing a monkey wrench. Everything is so wonderful with us right now.

Q.   On the screen shots that we saw during cross-examination that contained your handwritten notes, I believe they were dated in '05 --

A.   Yes, they were.

Q.   -- is that correct?

And they were there for two years before the patents in this case issued, weren't they?

1    A.    Yes.

2    Q.    Therefore, those notes do not apply to these

3 patents, correct, or did I misunderstand?

4    A.    Correct.  Correct.

5    Q.    Are you aware of any rule that requires a

6 patent owner to call up and have contact with someone

7 who is infringing their patent before you set out to

8 protect it?

9    A.    No.  In fact, I -- we were fearful of doing

10 that, because from what we understood, is, if we did

11 notify them, they could sue us in California.

12    Q.    And what would be the problem with that?

13    A.    We couldn't afford a lawsuit that we had to go

14 to California to fight.

15    Q.    Okay.  Did -- you and Mr. Dean thought this

16 was your most viable way to protect your property --

17    A.    Yes.

18    Q.    -- is have this case where you live?

19    A.    Yes.

20              MR. PARKER:  Thank you, Your Honor.

21 That's it.

22              THE COURT:  Recross?

23              MS. CANDIDO:  Side-bar, Your Honor?

24              THE COURT:  Yes.

25              (Bench conference.)

                    MR. VERHOEVEN:  I took notes on the last

question, and the patents in this case issued two years

later, and the patents in this case include the '045,

Your Honor, and the '045 was asserted against us, and I

think that opens the door.

                    THE COURT:  Well, to what?

                    MR. VERHOEVEN:  To their --

                    THE COURT:  What -- what --

                    MR. VERHOEVEN:  -- explanation for why

they --

                    THE COURT:  What do you want to -- what

do you want to get into?

                    MR. VERHOEVEN:  Well, I think that --

                    THE COURT:  She testified that the --

earlier in her testimony, that the '045 had already

issued, right?

                    MR. VERHOEVEN:  Well, I think it -- I

think -- what I would suggest is that it's appropriate

to set the -- for an accurate record, because they sued

Google on the '045, and it did -- it did not issue two

years later; it issued in 2003.

                    And in this -- and the question was, the

patents in this case issued two years later, and the

patent -- and the patents in this case, when they filed

it, included the '045.  And --

```
1                    THE COURT:  What do you -- what do you --
2                    MR. VERHOEVEN:  -- what I would propose
3    is that there was a patent in this case.  I won't say
4    it's invalid, nothing like that.  There was a patent
5    that was asserted in this case that -- that had issued,
6    issued in 2003.  It's not -- it's not here now, but it
7    was asserted.
8                    And just to set the record correct --
9    correctly, because that's actually what the facts were,
10   Your Honor.
11                   THE COURT:  You can -- you can ask the
12   question whether you had originally asserted the '045
13   patent, but you're not asserting it in this trial.
14                   That's the extent of it, okay?
15                   MR. VERHOEVEN:  Thank you, Your Honor.
16                   MR. TRIBBLE:  He can't ask any questions,
17   right?
18                   MS. CANDIDO:  No.  I understand.  It's
19   me.
20                   THE COURT:  No.  That's right.
21                   MR. VERHOEVEN:  Thank you.
22                   (Bench conference concluded.)
23      Q.  (By Ms. Candido) Ms. Stone, there was a patent
24   originally asserted in this lawsuit, the '045 patent; is
25   that correct?
```

```
 1      A.   Yes.

 2      Q.   When did that patent issue?

 3      A.   I believe it was 2002.

 4      Q.   And that '045 patent is not a part of this

 5 trial; is that correct?

 6      A.   That's correct.

 7      Q.   But when the '045 patent issued and you

 8 subsequently formed a belief that Google might be

 9 infringing Function Media's patents, you didn't call

10 Google about the '045 patent either, did you?

11      A.   No.

12               MS. CANDIDO:  Thank you.

13               THE COURT:  Redirect?

14               MR. PARKER:  Nothing further, Your Honor.

15               THE COURT:  Okay.  Ma'am, you may step

16 down.

17               THE WITNESS:  Do I --

18               THE COURT:  Somebody will take care of

19 it.

20               THE WITNESS:  Okay.

21               THE COURT:  Call your next witness.

22               MR. TRIBBLE:  Your Honor, we're now going

23 to call by video deposition Ms. Bravomalo.  And it's

24 about four minutes long, Your Honor.

25               (Video playing.)
```

1               QUESTION:  Please state your full name

2 for the record.

3               ANSWER:  Mireya Bravomalo.

4               QUESTION:  How long have you worked at

5 Google?

6               ANSWER:  Seven years, about seven years.

7               QUESTION:  What is your position at

8 Google?

9               ANSWER:  I'm currently the global revenue

10 recognition manager.

11               QUESTION:  What are your job

12 responsibilities as global revenue recognition manager?

13               ANSWER:  I oversee the recording of the

14 revenue for Google.

15               QUESTION:  You understand that you are

16 here in a corporate capacity today as Google's corporate

17 representative for certain designated topics; is that

18 right?

19               ANSWER:  Yes, I do.

20               QUESTION:  You understand that with

21 respect to those topics, your answers bind the

22 corporation?

23               ANSWER:  Yes, I do.

24               QUESTION:  You agree that according to

25 this document, in bold letters, AdSense for Content is

1 the leading mechanism to capture brand spend and to

2 leverage the growth of the internet, correct?

3                ANSWER:  That's what the title says,

4 so -- and, in fact, all these people work in AdSense

5 Online or AdSense for Content.  I mean, they are the

6 people who are writing the presentation, so of course

7 they're going to say something that highlights their

8 importance.

9                QUESTION:  Could you just please read for

10 me and the jury that box in bold letters at the bottom

11 of Page 2?

12                ANSWER:  AFC is the leading mechanism to

13 capture brand spend and to leverage the growth of the

14 entire internet.

15                QUESTION:  You would agree that according

16 to the AdSense for Content team at Google, AdSense for

17 Content is what they saw as the leading mechanism to, in

18 their words, leverage the growth of the entire internet,

19 correct?

20                ANSWER:  That's what the presentation

21 says.  They need to have a catchy phrase, right, to

22 capture the audience.

23                QUESTION:  You agree that according to

24 this document, AdSense is designed to monetize the

25 traffic and to create revenue for Google when Google

1 attracts readers through all of Google's other products,

2 such as Google Video, Google News, Google Print, Google

3 Site Maps, and others?

4          ANSWER:  I mean, that's what the

5 illustration says.

6          QUESTION:  Thank you.

7          ANSWER:  As you say, they attract by

8 Google other products.

9          QUESTION:  I'm sorry.  Could you repeat

10 that?

11          ANSWER:  I mean, it attracts through --

12 the acquisition of the products were through other

13 products, and at the back end, maybe AdSense, correct.

14          QUESTION:  And AdSense monetizes that,

15 correct?

16          ANSWER:  That's what the illustration

17 says.  I don't have any knowledge.

18          QUESTION:  In terms of the importance of

19 a particular feature of AdSense for Content to the

20 product's profits, success, and strategy, do you know

21 which, if any, features contribute to the product's

22 success and profitability?

23          ANSWER:  I don't know.

24          (End of video clip.)

25          MR. TRIBBLE:  Your Honor, we now call by

video depo Google's Amin Zoufonoun.  He's in corporate

development, I believe.  This is about three and a half

minutes long.

                    (Video playing.)

                    QUESTION:  Can you please state your full

name for the record.

                    ANSWER:  Sure.  Amin Zoufonoun.

                    QUESTION:  Mr. Zoufonoun, who is your

employer?

                    ANSWER:  Google.

                    QUESTION:  What do you do for Google?

                    ANSWER:  I am in corporate development,

so my group is responsible for strategic acquisitions

and investments for the company.

                    QUESTION:  What is your specific title?

                    ANSWER:  Principal, corporate

development.

                    QUESTION:  How long have you been with

Google?

                    ANSWER:  Since September of 2003.

                    QUESTION:  Mr. Zoufonoun, in this

document, what do you think the letters I and P stand

for?

                    ANSWER:  Again, I mean, I can't say what

the -- I don't know who drafted this and for what

purpose, so I can't say conclusively what IP in this

context stands for.

QUESTION:  You are telling me and the

jury that in this document, when it says opportunistic

acquisitions for IP, you don't know what the phrase IP

means; is that right?

ANSWER:  I can't conclusively say what --

I know what it means, no.

QUESTION:  Does Google monetize content

through advertisements?

ANSWER:  Sure.

QUESTION:  If Google were to choose to

monetize FeedBurner, it would be through advertisements,

correct?

ANSWER:  That I can't say, because it

depends.  I think it -- again, it depends on a number of

factors and the most salient one being user experience.

QUESTION:  Can you please read for me and

the jury, under status, what Google was recommending to

deal with this issue, risk?

ANSWER:  Under status for Item No. 1, the

documents --

(Video stopped.)

MR. NELSON:  Your Honor, may we approach?

THE COURT:  Yes.

1  (Bench conference.)

2  MR. NELSON:  They have not raised this

3  issue, and they have notice of our clips, but what is

4  ████ ██ ██ ████ ████ ████ ██████ ██ ██ ████

5  ████   **REDACTED BY ORDER OF THE COURT**

6  ████

7  I just want to be clear, we have

8  disclosed that to the other side.  They have not

9  objected to this, but in light of what just happened

10  downstairs, I just want -- I'm trying to be really

11  careful here.

12  MS. CANDIDO:  We do object to that in

13  light of the conversation.

14  MR. NELSON:  Well, that's why I brought

15  it up.  I've given them plenty of notice.

16  THE COURT:  Well, hold on.  Hold on a

17  second.

18  Are you objecting to it on the grounds

19  that it's the purchase price of an acquisition, or is

20  it -- or are you objecting to me having the courtroom

21  open while it plays?

22  MS. CANDIDO:  The -- the former.

23  THE COURT:  Okay.  That objection is

24  overruled.  I just didn't know if I needed to excuse

25  folks.  I will, but I -- I understand your objection to

1 the relevancy of it.

2 　　　　　MS. CANDIDO:  If I could, I think my

3 client would have an issue with the -- with the

4 courtroom, but --

5 　　　　　THE COURT:  Okay.

6 　　　　　MS. CANDIDO:  -- I can check briefly to

7 make sure that's -- if that's okay.

8 　　　　　THE COURT:  Please check.

9 　　　　　MS. CANDIDO:  Okay.

10 　　　　　THE COURT:  We had a couple of issues

11 downstairs, so that was one of them.

12 　　　　　MR. NELSON:  And then...

13 　　　　　(Pause in proceedings.)

14 　　　　　MS. CANDIDO:  This one clip is fine, Your

15 Honor.

16 　　　　　THE COURT:  Okay.  All right.  Your

17 objection to the substantive aspect of it is overruled.

18 　　　　　MS. CANDIDO:  Thank you.

19 　　　　　(Bench conference concluded.)

20 　　　　　ANSWER:  -- says recommend BD Team to

21 engage in acquisition discussions with AS.

22 　　　　　QUESTION:  Doesn't it mean that at the

23 time of this document, February 2003, Google saw the

24 main risk to the Content Ads program to be ████████

25 ████████　　　REDACTED BY ORDER OF THE COURT　　　██　████████

**REDACTED BY ORDER OF THE COURT**

QUESTION:  Okay.  Many of -- and not just
speaking about the deals we've talked about, but just
generally, Google would often structure its acquisitions
to have an upfront purchase price and then milestone or
earn-out payments if certain goals were reached,
correct?

ANSWER:  We've certainly had deals
structured in that manner, yes.

(End of video clip.)

MR. NELSON:  Your Honor, Plaintiff calls
Walter Bratic to the stand.

And before we start, can you --

THE WITNESS:  Your Honor, I have not been
sworn.

THE COURT:  My clerk was telling me that.

Hold on just a second.

Y'all have an issue to take up before --

(Bench conference.)

MR. NELSON:  I'm just trying to get some clarification about what specifically with Applied Semantics I can get into.

Can I talk about ▮ ▬▬▬▬▬ ▬▬▬▬

▮ **REDACTED BY ORDER OF THE COURT**  ▮ which is not -- I mean, that's in the Houlihan-Lokey documents, and I -- I just don't know what -- what's going on.  And I really want to be -- I'm trying so hard to be careful.

MS. CANDIDO:  We're trying to be cooperative with respect to that quote --

MR. NELSON:  That's --

MS. CANDIDO:  -- and not close the courtroom for two questions.

MR. NELSON:  I understand, but...

THE COURT:  I don't -- I'm not sure either what -- exactly which portion of it Google is requesting that the courtroom be closed for.

MS. CANDIDO:  Justin, if you could clarify -- I'm sorry.  You're talking about the technology charges?

MR. NELSON:  Yes.  Yes.

MS. CANDIDO:  I think that that -- that

1  that portion is okay.  Not the portions where it's

2  valuing --

3            MR. NELSON:  I understand.

4            MS. CANDIDO:  -- specifically assets, but

5  a charge in the accounting prospect is fine.

6            MR. NELSON:  And there's one issue about

7  ■ REDACTED BY ORDER OF THE COURT    We found in the transcript at the

8  opening argument where Mr. Verhoeven specifically talks

9  about -- ███ ████ ███████████ █████ ████ ███ ██ ███

10 ████ ██ ██ **REDACTED BY ORDER OF THE COURT**

11           THE COURT:  Listen, I'm going to stick

12 with my ruling, okay?

13           MR. NELSON:  Okay.

14           THE COURT:  On that.

15           How -- I'm going to do this as fairly as

16 I can closing the courtroom, but it's -- it isn't by

17 agreement at this point, okay?

18           MS. CANDIDO:  I understand.

19           THE COURT:  So -- but -- but I understand

20 the -- I understand y'all are requesting that it be

21 closed for portions of it.  I just need you to approach.

22 You know, I'm putting it on you --

23           MR. NELSON:  Yes, sir.

24           THE COURT:  -- to raise the issue with

25 me.

1          MR. NELSON:  Do you want me to preserve

2 any objections that I have about things beyond the scope

3 of the revenue share, or does that just not matter?

4          THE COURT:  Well, I think it's preserved.

5          MR. NELSON:  Okay.  Thank you.

6          MS. CANDIDO:  Your Honor, so is now the

7 time you want to handle our objections to the slides?

8          THE COURT:  You have them to tender to

9 me?

10          MS. CANDIDO:  There's the specific

11 slides.

12          THE COURT:  Okay.

13          MS. CANDIDO:  There's one additional

14 slide I neglected to mention, but -- I had mentioned it

15 to Justin, but I had not mentioned outside.

16          These calculations here are new.  They're

17 not in the report or his deposition.  These rates are

18 and the royalty base is, but these calculations are new.

19          MR. NELSON:  He discloses all of these

20 rates.  It's a summary slide that talks about the rates,

21 and it's clear which one he's talking about.

22          MS. CANDIDO:  These calculations are

23 simply not in the report or the deposition.

24          MR. NELSON:  I understand that, but he

25 has the rates in there.  This is a summary slide talking

about everything else that's in there.

          THE COURT:  Well, you're not going to get to this until the end of his testimony.

          MR. NELSON:  Correct.

          THE COURT:  Okay.  Well, we're going to be on a break then, so I'll take it up at the break. But with respect to those others that she's handed me, these were presented timely in chambers, and she lodged an objection to those, and I've overruled.  I'm going to allow the use of these slides for demonstrative purposes.

          And to the extent there was a substantive objection made in chambers as well, I've overruled that objection, which I feel I'm being consistent with the orders that I issued at pretrial, as well as the issues that Ms. Candido raised, particularly with the computation and testimony concerning the profit premium issues that were raised in the slides.

          So your objection is preserved.  You may have a running objection through the course of Dr. Bratic's testimony to those topics, okay?

          MS. CANDIDO:  We appreciate that, Your Honor.

          THE COURT:  All right.  And I'll file these as Court's 1 to indicate what I've ruled on.

1          MS. CANDIDO:  Thank you.

2          MR. NELSON:  Thank you.

3          (Bench conference concluded.)

4          THE COURT:  All right.  Mr. Bratic, if

5    you'll be sworn in.

6          COURTROOM DEPUTY:  Raise your right hand.

7          (Witness sworn.)

8          THE WITNESS:  May I be seated, Your

9    Honor?

10         THE COURT:  Yes.  Speak into the

11   microphone and keep your voice up.

12         THE WITNESS:  Thank you.

13         <u>WALTER BRATIC, PLAINTIFF'S WITNESS, SWORN</u>

14                    <u>DIRECT EXAMINATION</u>

15   <u>BY MR. NELSON:</u>

16      Q.   Good afternoon.

17      A.   Good afternoon.

18      Q.   Please state your name for the record.

19      A.   Sure.  My name is Walter Bratic.

20      Q.   Mr. Bratic, where are you from?

21      A.   Houston, Texas.

22      Q.   Have you been asked to perform a damages

23   analysis on behalf of Function Media in this case?

24      A.   Yes, I have.

25         MR. NELSON:  Could we put up the slides?

1    Q.   (By Mr. Nelson) Mr. Bratic, is this a summary

2 of qualifications that you have prepared?

3    A.   Yes.

4    Q.   Could you please take me and the jury through

5 some of these qualifications that you have?

6    A.   Okay.

7    Q.   Let's start at the first one.  It says

8 certified licensing professional.  First, who certified

9 you, and second, what does that mean?

10    A.   All right.  Well, the organization that

11 certified me as a certified licensing professional is

12 the Licensing Executive Society of the United States and

13 Canada.

14    Q.   And how do you become a certified licensing

15 professional through the Licensing Executive Society?

16    A.   Okay.  Well, now we've got to go to the third

17 point, the third line item on the chart where it says 30

18 plus years experience in patent licensing and analysis.

19 So when I applied for this designation as a certified

20 licensing professional, I had to demonstrate to the

21 Licensing Executive Society that I have actually been

22 negotiating licenses for intellectual property, patents,

23 trademarks, trade secrets, for 30 some years.

24 The first license I ever negotiated was back in 1975

25 when I first got out of college.

1       So I had to demonstrate to them that I had all

2 that experience, and then I had to give them a number of

3 references of clients who they could validate and verify

4 that I actually represented those clients.

5       And those clients have been universities,

6 corporations, individual inventors, and the like.

7    Q.  And just to be clear for the jury here, this

8 is -- we're talking about real world licensing

9 negotiations?

10    A.  Yes, real world.  For example, I was a chief

11 financial officer of a company that made -- I'm sorry,

12 we didn't make -- we designed equipment for the energy

13 market.  And we had 35, 40 engineers in the company.

14 And they were developing ideas and concepts, and so we

15 were working to patent those ideas.

16       I, as the chief financial officer, was

17 responsible for getting involved in licensing our

18 technology to other people who had interest in our

19 technology.

20       Likewise, we came across some technology from

21 other companies or inventors that we were interested in

22 getting rights to, so I negotiated what we called

23 in-bound licenses as well.

24       And that was all part of my years of

25 experience that I had to document for the Licensing

Executive Society.

Q. We skipped over the second bullet point there, which is certified public accountant in Texas. Could you just briefly summarize that, Mr. Bratic?

A. Yes. I'm a certified public accountant, and I've been licensed by the State of Texas since 1981 to be a certified public accountant.

And what that means is, I actually receive a license from the State of Texas. And in order to get that license, I had to take a number of courses in college in accounting subjects to qualify to take the exam. Then I had to take a multi-part exam. Then I had to have experience working in public accounting, which I did for a number of years, and then every year, I have to renew my license by taking 40 hours of class.

In other words, I have to go to school every year for 40 hours, document my classes and send them in to Austin to get my license renewed.

Q. And, Mr. Bratic, are you also a forensic accountant?

A. Yes. I'm a certified forensic expert.

Q. What does that mean?

A. Well, I have two designations in forensics, but, basically, it's forensic investigations where,

basically, it really involves into digging into economic

financial accounting details to ferret out what

happened, whether it was a fraud or other things.

Q. Now, we've talked about the third bullet

point. What is your educational background, as

reflected in those next two bullet points?

A. Well, I have -- in the middle of the slide, I

am a -- I have a bachelor's degree in economics and a

minor in accounting from the University of Pennsylvania,

which is in Philadelphia, Pennsylvania.

I also have what's called an MBA or a Master

of Business Administration from the Wharton School at

the University of Pennsylvania. And that's a -- after

my four-year program and my bachelor's degree, I then

attended the same university to get an additional degree

in business, which took another two years.

Q. And the next bullet point is -- could you

please describe for the jury this next bullet point?

A. Well, it says guest lecturer on intellectual

property and author of articles on licensing and

valuation, and maybe I'll start with the latter part of

that phrase.

But I have written a number of articles over

the years for various publications on licensing issues,

valuation of intellectual property, patents.

1          I have lectured and have attended many

2   conferences in the United States and around the world

3   where I have been invited by your governments or

4   conferences to speak on the subject of intellectual

5   property licensing and valuation.

6          I also teach every year courses in the fall

7   and in the spring at the University of Houston Law

8   School on intellectual property subjects, and I've been

9   doing that for now seven or eight years.  In fact, my

10  next class will be next month.

11      Q.   And your last bullet point, can you please

12  describe that?

13      A.   Just briefly, and I don't mean to be speaking

14  too fast.  I hope I'm not.

15          But I also sit on the editorial board of a

16  publication called Managing Intellectual Property.  And

17  that's a publication that's a -- published in the United

18  States, in Europe, in Asia.

19          It's a worldwide publication for lawyers and

20  for business people dealing with the subject of

21  intellectual property, whether it's highlighting issues

22  about various lawsuits that are important or that courts

23  have ruled on or trends in economics of licensing or

24  business activity involving intellectual property.

25          Anyway, long and short of it, my role on the

editorial board -- and I've been on that about 10

years -- one of my jobs as an editorial board member is,

I assist in reviewing articles or screening articles to

make sure that they, you know, are -- I'm, basically, a

quality control guy from time to time for different

articles that may appear in the magazine, and I've also

authored articles for that publication.

Q.   Are you being compensated here at your

standard hourly rate?

A.   I am.

Q.   What time (sic) of generally your time here

is -- call it real-world negotiating licenses or

participating in the negotiation of licenses versus

court-related expert testimony?

A.   In the last few years, court-related or

litigation-related matters, whether they're patents or

other types of IP or any other issues, including

bankruptcy issues, have been a little more than half my

time.

The other time, I'd say 45 percent to 40

percent, depending on the year, has been devoted to

licensing and valuation issues.

Q.   Is the way you charge for your services

consistent with other experts in this field?

A.   Yes, it is.

1    Q.   Was your compensation here dependent in any

2 way on the outcome of this case or the conclusions that

3 you've reached?

4    A.   No, none whatsoever.

5              MR. NELSON:  Your Honor, at this point,

6 we'd move to qualify Mr. Bratic as a qualified expert in

7 the fields of patent licensing and patent damages.

8              MR. VERHOEVEN:  No objection, Your Honor.

9              THE COURT:  The Court will hear his

10 testimony, as will the jury.

11              MR. NELSON:  Let's go to the next slide,

12 please.

13    Q.   (By Mr. Nelson) Now, we're going to be talking

14 about this in a lot of detail, but briefly, could you

15 please summarize for the jury the opinion that you've

16 reached in this case?

17    A.   Yes.  What I -- my opinion in this case has

18 shown in the -- if I can get it to work, the box over

19 here on the right -- oh, there it is.

20         My opinion is that a reasonable royalty, which

21 is the amount of damages that would be due and owing in

22 this case, to date are about $607 million.

23         Now, that's based on a formula I used, which

24 is commonly used to determine license amounts, which is

25 a royalty rate, which I'm going to be talking in a

little more detail about where that came from, but I
determined that an appropriate and reasonable royalty
rate in this case would be 12 percent of the sales of
the accused products.

To date, since July 2007, which is the date
I've been asked to assume is the date of first
infringement, through this past Monday, January 18th,
2010, Google's accused sales for AdSense for Content
online and AdSense for Content mobile, have been a
little over $5 billion.

So if you multiply a 12 percent royalty, which
is like paying rent on an apartment, times the -- for
example, the number of months you might stay in the
apartment, the usage of $5 billion, you end up with
reasonable royalties of $607 million.

Q.   And we're going to spend some time going
through how you calculated both of those numbers, but
for now, before we get into that, could you please
describe the procedures and how you performed your
analysis in this case?

A.   Okay.  Well, I've been working on this project
off and on for about a year and a half, and there are a
number of procedures I performed as part of my study and
research investigation to reach my opinions.

And I'll shorten up what I've done, because it

took a long period of time and covered a lot of things,
but as a high-level thing, one of the things I did, I
looked at the legal pleadings, because both parties
filed legal documents with the Court, and I've reviewed
various of those types of documents.

Google has produced a lot of business records,
and what I mean by business records, they've produced a
lot of sales records and detailed sales records I was
able to go through to figure out how they got just a
little over $5 billion in infringing sales.

They proved -- excuse me -- they produced
information on various acquisitions that Mr. Zoufonoun
talked about, so they've made acquisitions of companies.
They produced information that I've studied regarding a
license activity that they've engaged in.

A number of Google witnesses, some of which
you've seen the clips of today, have been deposed, and
I've read their depositions, and I've also read the
exhibits and studied the exhibits to those depositions.
Function Media has also produced documents that I've
studied and poured over.

I've also interviewed on several occasions Dr.
Rhyne, who's Function Media's technical expert, and I
interviewed both Mr. Dean and Ms. Stone on several
occasions before filing my expert report.

1    So -- oh, and I might say that I also read the

2 expert report of Google's damages expert, Mr. Wagner.  I

3 read his expert report.

4    And I also read Mr. Lanning's expert report,

5 and he was the -- he's the technical expert for Google,

6 as I understand it.

7    So that's kind of a high-level overview of the

8 different kinds of things I did.

9    Q.    Why, Mr. Bratic, is Function Media entitled to

10 a reasonable royalty here?

11    A.    Well, the patent law -- and I'm not a lawyer,

12 but as I understand the law, what the law says is that a

13 patent owner is entitled to no less than a reasonable

14 royalty.

15    Function Media doesn't have products that use

16 the '045 and '0 -- '025 and '059 patents, and so,

17 therefore, they don't compete with Google and haven't

18 lost any sales.  But the patent statute says you can

19 still claim no less than a reasonable royalty.

20    So, in my opinion, a reasonable royalty is the

21 appropriate measure of damages in this case.

22    Q.    Okay.

23    MR. NELSON:  Let's go to the next slide,

24 please.

25    Q.    (By Mr. Nelson) What are we looking at here,

1  Mr. Bratic?

2      A.    What you're looking at here is a

3  representation of what's called a hypothetical

4  negotiation.  What we know has actually happened is that

5  the patents are in litigation here, and no license was

6  ever executed between Function Media and Google.

7          Now, the court cases, and one in particular

8  I'm going to talk about a little more called

9  Georgia-Pacific, which is a patent case from almost 30

10 years ago, that case, the Court talked about setting up

11 a hypothetical negotiation.

12         And you can see here at the bottom, I say the

13 hypothetical negotiation takes place in July 2007.

14 So the Court -- I'm required to assume, as the Court

15 instructed me to assume, that Function Media, as the

16 patentee and the licensor, and Google, as the licensee

17 and infringer, would have sat down at the time of

18 Google's first infringement of the patents-in-suit,

19 which would have been on or July -- around July 3rd,

20 2007.

21     Q.    What is your understanding, Mr. Bratic, about

22 whether Google's damages expert, Mr. Wagner, applies the

23 same methodology?

24     A.    He applied the same methodology.

25     Q.    Okay.

1                    MR. NELSON:  Next slide, please.

2        Q.   (By Mr. Nelson) What are we looking at here?

3        A.   Well, first of all, you'll see at the very

4   bottom, I'm showing you that Georgia-Pacific case, where

5   it came from.  But there's some basic guidelines, if you

6   will, or rules that govern the hypothetical negotiation

7   between Function Media and Google.

8             One is that the hypothetical negotiation, as

9   I've already said, occurs in July of 2007 when the '025

10  patent was first infringed.  Both parties, Function

11  Media and Google, understand that the '025 and '059 are

12  valid patents and that Google has infringed those

13  patents.

14       Q.   And let me stop you there.

15            How does that differ from real-world licenses

16  that are negotiated?

17       A.   Well, in many of -- in most of the licenses

18  I've ever dealt with in the real world and that I'm

19  familiar with, there's usually a question mark as to

20  whether the patent is really valued.  I may have --

21  valid.  Excuse me.  It may have issued, but there's

22  still a question mark that it -- you know, that it may

23  not be a valid patent.

24            And there's always a question mark whether

25  the -- in license negotiations, whether the company that

might need to take a license, whether they infringe or not.

So these are question marks and issues that are part of the give and take in a real-world negotiation.

That doesn't happen here, because both Function Media and Google have to assume that the patent is -- the patents are valid and that Google has infringed those patents.

Q.   And what else would they agree on?  What's that last bullet point?

A.   The last part, they agree on what the products are.  In other words, what are the products that will be licensed.  And they will agree on what the royalty rate should be for that license.

Q.   Okay.

MR. NELSON:  Let's go to the next slide.

Q.   (By Mr. Nelson) And what does this show?

A.   Well, that's that same formula we talked about.  I've just kind of highlighted it in red on the left side, because I'm really going to spend some time right now talking about the royalty rate portion of this formula to arrive at reasonable royalties.

Q.   Now, Mr. Bratic, to you, what is the benefit of a running royalty?

1    A.   Well, one of the benefits of running

2 royalties, as Mr. Dean has mentioned during his

3 testimony, is, both parties get to participate in the

4 upside in sharing the risk.

5         In other words, the licensee, if the products

6 aren't sold, then there's no royalty paid.

7         If there are significant sales or lots of

8 sales, then the patent -- the licensor or the patentee,

9 in this case, Function Media, would have the opportunity

10 to benefit from that additional performance of those

11 underlying product.

12    Q.   Now, is -- in some cases, is a lump-sum

13 license appropriate?

14    A.   Sure.  That can be the case.

15    Q.   Is it appropriate here?

16    A.   I don't believe it would be appropriate or

17 would have been arrived at in this case.

18    Q.   Why not?

19    A.   Well, in this case, based on my study and my

20 investigation, these patents are worth in the hundreds

21 of millions of dollars, and Google would not have wanted

22 to pay all that money upfront in July of 2007.  It would

23 have been more logical for them to say:  We'll pay you a

24 royalty as these sales occur.

25    Q.   Did you also base your opinion on the

1  comparable licenses in the Georgia-Pacific Factors here?

2    A.   Oh, yes, of course.  I looked at

3  Georgia-Pacific Factors, which I'm going to explain in a

4  little more detail, and actually, some of Google's own

5  licensing practices.

6    Q.   Okay.

7         MR. NELSON:  Let's go to the next slide.

8    Q.   (By Mr. Nelson) What are we looking at here,

9  Mr. Bratic?

10   A.   Okay.  Now, this is just -- that's an earlier

11  slide, but what I've got here in the left-hand corner is

12  8 to 20 percent for Function Media.

13   Q.   What does that represent?

14   A.   Now, that represents Function Media's starting

15  position in its negotiations.

16        Based on my interviews of Mr. Dean and the

17  documents I've reviewed from -- you know, from Function

18  Media's records, Function Media had -- and Mr. Dean and

19  Ms. Stone had been researching in the early part of this

20  decade, well before the patents issued, how the internet

21  industry was evolving and how licenses in that industry

22  were evolving and licenses for royalties.  And so they

23  knew that royalties were running at least 8 percent.

24        Now, Mr. Dean also said in my interviews, and

25  as he's testified here in Court, that the 20 percent was

1  very appropriate because he -- because he believed these

2  patents were very important, and Google was getting lots

3  of benefits from these patents.

4        So he would have approached a negotiation

5  insisting on a 20 percent royalty.  So that's what's on

6  the left-hand side.

7     Q.   And it says:  Patentee has upper hand.  Are

8  you basing that on evidence in the record?

9     A.   Yes.  I'm basing it on Google's own statements

10  about the perspective of the patentee, what the patentee

11  has going into the hypo -- into a negotiation.

12             MR. NELSON:  Your Honor, we have about a

13  minute and a half clip.  Is -- should we finish the

14  clip, or do you want to take a break now or --

15             THE COURT:  Let's keep going.

16             MR. NELSON:  Okay.

17     Q.   (By Mr. Nelson) I'm going to show you --

18  you're aware -- let me ask you first:  Are you aware of

19  who Johnny Chen is?

20     A.   Yes.  Mr. Chen is an executive at Google, and

21  I understand that he was the person designated to be

22  responsible for testifying about licensing issues at

23  Google, you know, in this litigation.

24     Q.   Okay.  We're about to play Mr. Chen's

25  testimony, which is Lines 10:09 through 18; 11:02

through 8; 13:24 through 14:08; 52:17 through 20; 63:05

through 9; and 89:14 through 21.

MR. VERHOEVEN:  May I approach, Your

Honor?

THE COURT:  Yes.

(Bench conference.)

MR. VERHOEVEN:  They're going to play a

whole slew of designations of this witness within the

context of another witness testifying.

I would submit that if they want to play

designations for Mr. Chen, they would compile them and

submit them like they did with the other witnesses.  I

think this is inappropriate to have the expert do a

running commentary on these deposition designations that

are all glumped together like this.

MR. NELSON:  All right.  Response?

THE COURT:  Well, yes.

MR. NELSON:  First of all, they're all

disclosed in Mr. Bratic's report.  Rule 32 allows this.

This goes directly to the point he has.  It's a minute

and a half clip.

THE COURT:  I'll let you play the clips

that you disclosed in his report and ask him what -- you

know, whether he relied on them, but, you know, we're

going to -- we're almost to the afternoon break.  You

know, let's not move back and forth from depo clips to
the testimony.

Rule 32, I'm not sure which provision
you're citing to me there, but I'll take a look at
whether it says that you're entitled to do --

MR. NELSON:  Okay.

THE COURT:  -- what you're getting ready
to do.

I'm going to -- I'm going to allow it.  I
don't think there's any prejudice to you, and I think
that he can use the clips to support what his expert's
saying.

So I'm going to let you do it at this
point.

MR. NELSON:  Thank you.

(Bench conference concluded.)

MR. NELSON:  Let's go ahead and play the
clip, please.

(Video playing.)

QUESTION:  Please state your full name
for the record.

ANSWER:  Johnny Chen.

QUESTION:  You understand, Mr. Chen, that
you are under oath?

ANSWER:  Yes.

1    QUESTION:  You understand that the oath

2    that you just took is just as solemn as what you took as

3    if you were before a jury; is that right?

4    ANSWER:  Yes.

5    QUESTION:  What is your current position

6    at Google?

7    ANSWER:  Business development manager.

8    QUESTION:  You understand you are here as

9    Google's corporate representative for certain topics in

10   this case?

11   ANSWER:  Yes.

12   QUESTION:  You understand that with

13   respect to these topics, you are not just testifying in

14   your personal capacity and that you are testifying as

15   Google's corporate representative; is that correct?

16   ANSWER:  Yes.

17   QUESTION:  You understand, with respect

18   to those answers, your answers bind the corporation for

19   this lawsuit; is that correct?

20   ANSWER:  Yes.

21   QUESTION:  Do you believe that it is a

22   good thing to have intellectual property and to protect

23   ideas?

24   ANSWER:  Yes.

25   QUESTION:  You agree that the value of

1 intellectual property is not something that just Google

2 values, correct?

3      ANSWER: I would assume other companies

4 value their intellectual property.

5      QUESTION: Okay. But do you know whether

6 Google has a strategy of trying to acquire assets from

7 third parties with respect to patents?

8      ANSWER: Again, the word strategy -- the

9 word strategy is very vague. I can say that we have no

10 formal policy in acquiring licenses for patents.

11      (End of video clip.)

12    Q. (By Mr. Nelson) Now, Mr. Bratic, Mr. Chen

13 there has testified about the fact that Google has no

14 formal policy.

15      Did you also rely on e-mails that Mr. Chen

16 wrote about what Google's position would be in any

17 hypothetical negotiation?

18    A. Yes.

19      MR. NELSON: Let's put up Plaintiff's

20 Exhibit 313, please, and let's blow that up.

21    Q. (By Mr. Nelson) This is from Johnny Chen; is

22 that right? I'm sorry. This is Plaintiff's Exhibit

23 313.

24      MR. NELSON: If we can scroll out again

25 and see this.

1     Q.   (By Mr. Nelson) And so --

2            MR. NELSON:  Yeah.  And so let's go back

3 in.

4     Q.   (By Mr. Nelson) And this is from Johnny Chen;

5 is that right?

6     A.   It is.

7     Q.   And can you please maybe describe what's going

8 on in this document to the jury?

9     A.   Yes.  This is an internal e-mail from Mr. Chen

10 to somebody else at Google dealing with the issue about

11 a license that Google was in negotiations to take.

12            In other words, Google was going to license in

13 the technology from a company on the subject line called

14 VoiceAge.  So that's kind of the backdrop of this memo.

15     Q.   Okay.  And what is he saying here in this

16 first highlighted portion?

17     A.   Right.  Well, it says here:  I think just

18 saying that we want to cap because we are Google does

19 not seem like a compelling argument.

20     Q.   What -- what is he saying there?

21     A.   Well, what he's saying is a cap mean -- you

22 know, a cap, a limit, on how much we -- we, Google,

23 would pay to VoiceAge.  He's saying that just saying

24 we're Google is not enough to force the other people to

25 take or accept the cap.

1    Q.   Okay.  And what's that next highlighted

2 portion right there?

3    A.   It says:  If you want to take our patented

4 technology, you need to pay the license fees.

5    Q.   What does that mean?

6    A.   Well, that just means saying -- he's saying

7 here that if you wanted to take -- Google wanted to take

8 the technology from VoiceAge, they'd have to pay

9 VoiceAge license fees.

10    Q.   Okay.  And this last highlighted portion says:

11 Take it or leave it.

12    A.   Right.

13    Q.   What does that mean?

14    A.   Well, what that means in the context of this

15 memo, is, basically, that Google is saying that you

16 either have -- they either have to take the license, as

17 proposed by VoiceAge, or they have to leave it, meaning

18 don't practice the patents.

19    Q.   Okay.  And does this support your position

20 that Google would come into this hypothetical

21 negotiation knowing that the patentee, Function Media

22 here, has the upper hand because they would essentially

23 have to take it -- take the license or leave it, meaning

24 don't practice the technology?

25    A.   Yes, as well as the fact that Georgia-Pacific

1 requires the parties to assume that the patents are

2 valid and have been infringed.  So you would take a

3 license or you don't get to use the technology.

4      Q.   Okay.  Thank you.

5           MR. NELSON:  Let's go to the next slide,

6 please.

7      Q.   (By Mr. Nelson) What are we looking at here?

8      A.   Okay.  I mentioned several times that

9 Georgia-Pacific case.  And what this is, is a list of 15

10 factors.  That case, the Court -- that was a patent

11 infringement case, and one of the issues in that case

12 was reasonable royalties for patent infringement.

13          The Court in that case said there's 15 factors

14 to look at.  And I'll jump to the 15th real quick,

15 because I mentioned that before.  That's the

16 hypothetical negotiation, Factor 15.

17          The Court said:  Use these 15 factors as a

18 checklist.  These 14 factors, apply them in every patent

19 infringement case.

20          Now, that doesn't mean they all are important

21 or that they all necessarily apply, but you have to go

22 through that checklist and -- and investigate it.

23 And then at the end of all of those 14 factors, the

24 Court said, you roll them all up into the hypothetical

25 negotiation to figure out how that license, for example,

with Google and Function Media, would have shook out

after that analysis of those 14 factors.

Q.    And are we going to go through all of these 14

factors to determine how they affect the starting point

of the negotiations in this hypothetical negotiation?

A.    Yes, we are.  And I might add, there's one

other thing the Court said in that case -- two other

things the Court said.  Not all -- because there's 14

factors here, they're not all of equal weight

necessarily.  You have to look at every single case and

the specifics of every case.

So they don't all necessarily have equal

weight.

And the Court also said there are other

factors you can consider.  You're not limited to these

15.

Q.    Okay.

MR. NELSON:  Let's go to the next slide,

please.

Q.    (By Mr. Nelson) Mr. Bratic, what are we

looking at here?

A.    Well, what I've done is, these 15 factors,

some of them go together.

In other words, they cluster for similar

subject matter.  So what I've done is I've kind of

grouped them in buckets, because they're similar themes.

And so you see, I have one theme for licensing characteristics, one for commercial success, and I list the Georgia-Pacific factor number within each of those buckets.

And so I've kind of taken the 15 factors and put them in five buckets, and that's how I'm going to discuss them.

Q.   Okay.  We're going to talk about each of these buckets.

A.   Yes.

Q.   Okay.

THE COURT:  Well, we'll talk about them after the break.

MR. NELSON:  Yes, sir.

THE COURT:  Ladies and Gentlemen, be back ready to come in the courtroom at 3:35.

Remember my prior instructions, and don't talk about the case.  Take 20 minutes.

COURT SECURITY OFFICER:  All rise.

(Jury out.)

THE COURT:  All right.  Y'all have a seat.

Mr. Tribble, to which side do I charge the three deposition clips?  Is that all to y'all?

1           MR. TRIBBLE:  Bravomalo is -- excuse me,

2  Your Honor.  Bravomalo was all Function Media, and you

3  can just charge all of it to us.  I think they had 14

4  seconds or something in there.  I'll give them a couple

5  of minutes.

6           Oh, never mind.  They had four minutes,

7  Your Honor.

8           THE COURT:  Is that the first clip?

9           MR. TRIBBLE:  Well, Your Honor, I'll have

10 to give you that information.  I had it here.  Here it

11 is.

12           Okay.  On Hutchinson, it was 5 minutes,

13 46 seconds to Function Media; 3 minutes, 29 seconds to

14 Google.

15           Zoufonoun, Function Media, 3 minutes, 35

16 seconds; 17 seconds to Google.

17           And Bravomalo is all -- all Function

18 Media, 4 minutes and 14 seconds.

19           THE COURT:  Okay.  Thank you.

20           I'll see y'all at 3:35.

21           There's an issue about a slide that I

22 assume we're going to get to this afternoon.

23           MS. CANDIDO:  Yes, Your Honor.

24           THE COURT:  Well, give me a copy of the

25 slide to take with me, if you have a copy.

1                    Thank you.

2                    MS. CANDIDO:  Thank you.

3                    THE COURT:  All right.  We're in recess.

4                    (Recess.)

5                    COURT SECURITY OFFICER:  All rise.

6                    (Jury in.)

7                    THE COURT:  Please be seated.

8                    Counsel, approach real quick.

9                    (Bench conference.)

10                    THE COURT:  All right.  The rates, as I

11   understand it, were disclosed previously, correct?

12                    MR. NELSON:  Yes.

13                    MS. CANDIDO:  That's correct.

14                    THE COURT:  Tell me what -- tell me what

15   these other numbers represent on your AdSense for

16   Content and AdSense for Mobile Online.

17                    MR. NELSON:  These are simply -- so we're

18   about to get to a slide, or later on, that is broken

19   down by the revenues for AdSense for Content Online, the

20   revenues for AdSense for Mobile Online.  And it breaks

21   it out by each product, and this is the total.  So it's

22   one plus one equals two -- or one plus -- you know.

23                    THE COURT:  Well, were these numbers

24   previously disclosed?

25                    MS. CANDIDO:  No, they were not.  The

revenues are numbers were disclosed.

THE COURT: But adding them together wasn't?

MR. NELSON: Yes, they were.

MS. CANDIDO: I'm sorry. To be clear, Google's revenue clearly was disclosed. They've used it for the purposes of applying this rate to the revenue calculated damages figure. The only damages figure provided was based on this red-line calculation down here, none of the other information.

THE COURT: But as I read these two numbers, are they just summed?

MR. NELSON: Yes.

MS. CANDIDO: Well, these two are summed to get to here.

THE COURT: Right.

MS. CANDIDO: They never applied this rate to the revenue to get these numbers. These are damages figures.

MR. NELSON: If I can try to stay your argument, so I think what she's saying -- sorry.

MR. VERHOEVEN: She should have her own --

MR. NELSON: All right.

MS. CANDIDO: They have the revenue

figures.  Those were in his report.  He's applied these

percentages to the revenue to get the damages figure.

THE COURT:  So 8 percent multiplied by

whatever the revenue?

MS. CANDIDO:  Correct.

THE COURT:  Okay.

MS. CANDIDO:  But he's never provided

those calculations before.

THE COURT:  Well, I'm overruling that

objection.  These are percentage calculations and

figures that have previously been provided.  I'm going

to overrule it.

(Bench conference concluded.)

THE COURT:  Please proceed.

Q.   (By Mr. Nelson) We were on this bucket slide,

and could you please describe -- I think you were in

the -- just ending your description of the different

buckets here; is that right?

A.    Right.

Well, what I was saying right at the break

was, those 15 Georgia-Pacific Factors, there's a

relationship among some of them to make them similar.

So I just reorganized that list of 15 and put them in

these buckets.

For example, licensing characteristics I put

Georgia-Pacific Factor 1, 2, and 12 under that bucket

for a discussion for that subject and then so forth and

so on with the other buckets that are all highlighted in

yellow.

Q.   Thank you.

Now, let's go to the next slide, please.  What

is this?

A.   Well, I've highlighted licensing

characteristics in red, because that's the first of the

Georgia-Pacific buckets I'm going to talk about.

Q.   Okay.  Let's go to the next slide.

Now, Mr. Bratic, did Function Media have any

relevant licenses for these patents-in-suit?

A.   No.

Q.   What did you look to to determine whether the

starting point that you previously described of 8 to 20

percent was in the same ball park of reasonability?

A.   Well, one of the things I did -- I mean, I did

a number of things, but one of the things I looked at, I

looked at internet industry royalty rates.

And this is an annual publication from a --

from the Licensing Economics Review.  And if I can just

briefly describe what it is.

So this is from various years, from 2001

through 2008.  And there's a column telling you what the

average royalty rate was for licenses.  I'm going to

give you an example.  I've highlighted 2006, because

that's the year right before the hypothetical

negotiation.

          And in 2006, for example, the average royalty

rate for licenses in the internet industry was 13

percent.  Now, it also said the median was 9 percent.

     Q.   What's the difference between the average and

the median?

     A.   Well -- and let me go to the far right and

explain that this publication looked at 107 licenses in

the internet industry licenses.  And so the average

means, if you took all the royalty rates for all 107

licenses, the average in that year was 13 percent.

The 9 percent, as a median, meant that half of the 107

licenses were above 9 percent and half were below 9

percent.  So those give you some data points and

benchmarks, if you will.

          Now, that was -- of course, the important

thing about this chart is that the royalty rates have

been climbing in the internet industry from 2001 through

2008.  And they were even higher in 2007, the year of

the hypothetical negotiation.

     Q.   Now, why was -- you have 2006 highlighted in

red on this chart.

1      A.    Right.

2      Q.    Why is 2006 in particular highlighted?

3      A.    Well, that was the year before the

4  hypothetical negotiation.  So -- so, again, one of the

5  things about Georgia-Pacific in the hypothetical

6  negotiations, it's assumed that Function Media and

7  Georgia -- excuse me -- and Google would have known

8  about certain information, including this kind of

9  information.

10         That's just assumed and attributed to the

11  parties in a negotiation.

12     Q.    Now, in 2007, halfway during the timeframe of

13  this actual hypothetical negotiation, what happened to

14  the rates?

15     A.    Well, the rate actually increased.  The

16  average went up to 13-1/2 percent for the average, and

17  the median went up to 10 percent.

18         And the reason these royalty rates have been

19  climbing during the better part of this decade is

20  because the internet has become more important as a

21  major factor in everyday life and everyday economics.

22     Q.    And actually, what happened in 2008 according

23  to this study?

24     A.    Well, the average and -- both the average and

25  the median rate actually went even higher.

1    Q.   Now, are you aware on -- about whether

2  Google's expert, Mr. Wagner, has ever relied on these

3  studies?

4    A.   Yes.  He has looked at industry royalty rates

5  as well.

6    Q.   And are you aware, Mr. Bratic, one way or

7  another whether the 2009 study has come out yet?

8    A.   No, it has not, because we're at the very

9  beginning of 2010.

10    Q.   Okay.  Now, did you also look at Google's

11  licenses and the relevant technology field?

12    A.   Yes.

13    Q.   And can you briefly describe what you looked

14  at?

15    A.   Well, Google -- as I mentioned earlier, I

16  studied and investigated various Google licenses that

17  Google executed, both technology that Google licensed

18  out as well as licenses that Google licensed in --

19  technology that Google licensed in, including any patent

20  rights.

21    Q.   Did you rely on the testimony of Mr. Chen for

22  any descriptions of the licenses or the lack of

23  testimony from Mr. Chen?

24    A.   Yes.  A number of the licenses -- I should say

25  some of the licenses that were produced by Google, I

couldn't rely on or make any interpretation of because
Mr. Chen didn't know anything about them and couldn't
say much about them.

           MR. NELSON:  May we approach, Your Honor?

           THE COURT:  Yes.

           (Bench conference.)

           THE COURT:  Are we there?

           MR. NELSON:  No, actually we're not.

           THE COURT:  Okay.

           MR. VERHOEVEN:  I'm just trying to take
notes at the same time.  I'm sorry.

           MR. NELSON:  I'm about to play a
deposition clip, and I know Your Honor had expressed an
issue on it before, and I wanted to have the ruling.
Mr. Bratic has relied on these I-don't-know answers.
There's a few short clips of Mr. Chen testifying,
including on Meyer that he doesn't know.

           THE COURT:  I'm going to allow it.

           MR. VERHOEVEN:  While we're here, so I
don't take another time, putting up exhibits and having
this witness testify as to what Google meant by those
exhibits, I didn't stand up the first time, but if that
happens again, I'm going to stand up and object.

           THE COURT:  Well, I'll be waiting for it.

           MR. NELSON:  Fair enough.

                    (Bench conference concluded.)

     Q.   (By Mr. Nelson) Mr. Bratic, did you rely on

Mr. Chen's testimony about his lack of knowledge and

inability to tell you about what some of these licenses

meant?

     A.   Yes.

     Q.   Okay.  Let's please play excerpts of the Chen

deposition, Page 139:25 through 143; 244:05 through

246:10; 247:20 through 22; 249:18 through 22; and 252:20

to 253:02.

                    (Video playing.)

                    QUESTION:  What were the circumstances of

this negotiation between Hewlett-Packard and Google?

                    ANSWER:  I can't speak to the

circumstance, as I was not involved in this negotiation.

                    QUESTION:  What technology is involved in

the patent purchase and sale agreement?

                    ANSWER:  In the third patent is method

algorithms and computer programs for optimizing the

performance of messages, including advertisements in an

interactive measurable medium.

                    And then the two -- the two applications

are system and methods for improving the performance of

electronic media advertising campaigns through

multi-attribute analysis and optimization and method

algorithms and computer programs for optimizing the

performance of messages, including advertisements in an

interactive measurable medium.

So it seems that these patents are

related to algorithms and methods and computer programs.

QUESTION:  How did this patent portfolio

come to your attention?

ANSWER:  To my personal attention?

QUESTION:  To Google's attention.

ANSWER:  I do not know.

QUESTION:  Can you tell me anything with

respect to the circumstances of how Google purchased

this patent portfolio?

ANSWER:  You mean how this came about in

the first place?

QUESTION:  Yes.

ANSWER:  Is that your question?  I don't

know.

QUESTION:  Did Carl Meyer -- who is Carl

Meyer, first of all?

ANSWER:  Carl Meyer is an individual

residing at 20252 Hill Avenue in Saratoga, California.

QUESTION:  Besides that, you don't know

anything about who Carl Meyer is?

ANSWER:  He appears to be the owner of

these patents.

QUESTION: Besides what is on the face of the agreement, can you tell me anything else about Carl Meyer?

ANSWER: No.

QUESTION: Did Carl Meyer threaten to sue Google?

ANSWER: I don't know.

QUESTION: How much did Google contribute to Twister for Twister to buy the licensed patents?

ANSWER: I don't know.

QUESTION: Do you know whether Mitsubishi offered Google the standard terms it offered everybody else?

ANSWER: I don't know.

QUESTION: One way or the other?

ANSWER: I don't know.

QUESTION: Are you aware of an agreement between Google and Alcatel-Lucent?

ANSWER: Yes. I saw this during yesterday's deposition preparation.

QUESTION: Other than what's on the face of the document, can you tell me anything about the circumstances behind this agreement?

ANSWER: No.

1                    (End of video clip.)

2       Q.   (By Mr. Nelson) Mr. Bratic, are you aware of

3  other answers that we didn't play of Mr. Chen testifying

4  that he did not know of Google's licensing and the

5  circumstances behind those licenses?

6       A.   Yes.

7       Q.   And when he didn't know about what Google

8  licensed and why Google licensed, how did that affect

9  your opinion for Google's licenses here?

10      A.   Well, in those circumstances, it made it very

11 difficult to understand the circumstances and nature of

12 those licenses.  And one of the things you have to do in

13 order to analyze licenses is understand something about

14 their nature.

15      Q.   Now, did you define the relevant field for the

16 technology at issue of Google's licenses here?

17      A.   Yes.

18      Q.   And what was that relevant field?

19      A.   Search and advertising.

20      Q.   Do you know whether you and Mr. Wagner,

21 Google's expert, are in agreement on the relevant

22 technology field here?

23      A.   Yes, we are.

24      Q.   And did you rely on any deposition -- let

25 me -- let me back up.

1          Why did you -- I understand why you would rely

2   on advertising licenses.  Why would you rely on search

3   licenses as being part of the relevant field?

4       A.   Well, because based on my investigation and

5   study in this case, my extensive discussions with

6   Dr. Rhyne, for example, and what I learned, is that

7   search alone doesn't monetize.

8          And what happens -- with AdSense for Content

9   Online and AdSense for Mobile Online is what happens is

10  Google uses its search techniques and abilities in an

11  automated fashion, but Google has to monetize that

12  search.  And the only way Google makes money is by

13  marrying advertising to search capability.  And that's

14  why they're relevant.

15      Q.   Is this the monetization that we've heard so

16  much about during this trial?

17      A.   Yes.  Monetization means how do you make

18  money?  How do you generate revenues or sales?  How do

19  you generate profits?

20         Monetizing means you've got to be able to make

21  money with it.  And search by itself doesn't monetize,

22  because Google makes search available for free.  Google

23  monetizes search by marrying it or coupling it with

24  advertising, and then it's able to generate revenues.

25            And in the case I gave you, at least $5

1  billion to date for the accused products.

2      Q.    Now, did you rely on any deposition testimony

3  from Google's corporate witnesses about what this

4  relevant technology field was and the relationship

5  between search and advertising?

6      A.    Yes.

7      Q.    Okay.

8              MR. NELSON:  Can we please play the

9  deposition testimony of Amin Zoufonoun who we just heard

10  from previously?

11             This is Page 254, Lines 1 through 15.

12             MR. VERHOEVEN:  Same objection, Your

13  Honor.

14             MR. NELSON:  No, no.  Sorry.  We have not

15  heard this particular testimony of the witness.

16             MR. VERHOEVEN:  This also takes away our

17  ability to do 106 designations, Your Honor.  It's not

18  the way the designation should be played.

19             MR. NELSON:  Rule 32(a) --

20             THE COURT:  Overruled.

21             MR. NELSON:  Let's play the clip, please.

22             (Video playing.)

23             QUESTION:  The core would include

24  essentially search and advertising, correct?

25             ANSWER:  That's my understanding, yes,

search and search-related advertising as we've known it

throughout Google.

        QUESTION:  Well, you agree that AdSense

and AdWords, under any definition of core and under

Google's corporate definition, fall within the

70-percent core, correct?

        ANSWER:  I would characterize it as such,

yes.

        (End of video clip.)

    Q.   (By Mr. Nelson) Now, Mr. Bratic, did -- were

you able to rely on some of Google's licenses in the

preparation and analysis of your opinions here?

    A.   Yes.

        MR. NELSON:  Let's please go to

Plaintiff's Exhibit 318.

    Q.   (By Mr. Nelson) What are we looking at here,

Mr. Bratic?

    A.   Well, it may be hard to see on the screen.

What this is, this is a license agreement that was

executed back in 1998 between Google and Stanford

University.

    You see it says the Board of Trustees of

Leland Stanford University.

    Q.   And what was this license about?

    A.   This license was basically a license for a

patent application relating to Google's search engine,
which actually Stanford had the rights to that patent
application, and they were licensing it to Google.  And
it was really the core of the start of Google.

Q.   Was -- Google's search application, was it
able to be monetized?

A.   No.  You couldn't monetize it.  You had to do
something with it like couple it or marry it to
advertising.

Q.   Does Mr. Wagner, Google's expert, agree with
you that this is a relevant license to be analyzed in
this litigation?

A.   Yes.

Q.   Now, were there any relevant terms --
particular relevant terms that you looked at in your
analysis of this license?

A.   Yes.  There were a few.

Q.   Okay.  Let's just go through them.  Let's just
start with what's highlighted.

A.   Okay.

Q.   What are we looking at here?

A.   Well, this was a license that says Google
desires a license under said technology, software, and
inventions.  So this was a license to a patent
application -- important patent application for search

1  capability.

2  　　　　It also included technology license.  For

3  example, it included the rights to software and source

4  code.  So it was more than just a bare license for a

5  patent.

6  　　Q.  Okay.  Let's go to the next highlighted

7  portion.

8  　　　　And what's the relevance of this particular

9  clause?

10  　　A.  Well, this is the patent application that was

11  licensed.  And all it's pointing out here is the license

12  patent here is defined to mean the patent application,

13  because at that time the patent hadn't issued yet.

14  　　Q.  Now, how does that affect your analysis that

15  this was just for a patent application and not for the

16  patent itself?

17  　　A.  Well, at the time in 1998 when this license

18  was executed, because it was a patent application, it

19  was no certainty the patent would issue.

20  　　　　In our hypothetical negotiation, we know the

21  patents were issued, and they're also assumed to be

22  valid in the hypothetical negotiation between Function

23  Media and Google.

24  　　　　So that would tend to favor Google -- I mean,

25  Function Media in their negotiations with Google.

1    I should also point out in fairness that up

2 above the technology license that we talked about, the

3 earlier section -- I can't see the number.

4    Q.   1.4?

5    A.   I'm sorry.  1.4.  That involved more than just

6 a patent application.  That Stanford license involved

7 technology, software rights and the like.

8    So in that sense, there was more being given

9 to Google by Stanford than Function Media would give to

10 Google in this case.  And so that would tend to tilt or

11 favor the negotiation on that point in Google's favor.

12  Okay.  Now, are there any other terms?

13    A.   Yes.

14    Q.   Being it's -- let's see the next one.

15    A.   The licensed field of use meant -- means

16 internet search applications.  In other words, there

17 was -- in other words, there was a limitation or a

18 restriction on what Google could do with the licensed

19 technology.

20    It was limited to search applications.  In the

21 hypothetical negotiation, there's no limits to what

22 Stan -- excuse me -- Google does with Function Media's

23 patents so long as they pay for the use.

24    Q.   So is it fair to say that this particular

25 factor would cut in Function Media's favor in comparison

1　between the license and the hypothetical negotiation?

2　　　A.　Yes.

3　　　Q.　Okay.　What's the next clause here?

4　　　A.　Well, this is a clause that said that this

5　particular license from 1998 was going to be exclusive

6　for six years.　In other words, Google would enjoy

7　exclusivity for at least six years, according to this

8　license back in 1998.

9　　　Q.　How would that affect your comparison of this

10　license with the hypothetical negotiation in this case?

11　　　A.　The hypothetical negotiation in this case is

12　not an exclusive license.　Function Media gets to

13　license other companies or other individuals that they

14　want.　So that tends to favor Google in this

15　hypothetical negotiation.

16　　　Q.　Is it fair?

17　　　A.　Because Google is getting less than Google

18　got, for example, in the Stanford license in terms of

19　restrictions.

20　　　Q.　Is it a fair summary of your testimony that of

21　the factors that you looked at, a couple cut in favor of

22　Function Media and a couple cut in favor of Google in

23　terms of comparing this license with the hypothetical

24　negotiation?

25　　　A.　Yes, that would be a fair summary.

1    Q.   Now, what were the terms of the license

2 between Google and Stanford?

3    A.   Okay.  Well, let's see.  There's a feature

4 about the royalties, and I think there it is.  You're

5 going to highlight it.  Section 8.1.

6         So what happened is, in recognition of this

7 license in 1998, Google gave Stanford 25 -- excuse me --

8 I'm sorry -- 2 percent of the stock of Google at that

9 time.  So whatever stock Google had at that time, they

10 gave to Stanford.  And that was about 2 -- a little over

11 2-1/2 million shares of stock.

12    Q.   Now, was -- the 2 percent back then in 1998,

13 is it still equivalent to 2 percent of Google today?

14    A.   No.

15    Q.   What approximate percentage does that

16 2 percent, then, work out to today?

17    A.   A little less than 1 percent.

18    Q.   Okay.  At the time of the hypothetical

19 negotiation in July 2007, how much -- once you do the

20 dilution of the little less than 1 percent --

21    A.   Yeah.

22    Q.   -- could you please tell the jury how much

23 that stock was worth in July of 2007?

24    A.   Yeah.  That was about $1.4 billion.  In other

25 words, if you took those original shares that were given

to Stanford by Google and if you said what's the value
of them at the time of the hypothetical negotiation in
July 2007, it's about $1.4 billion.

Q.    Now, since then, has the stock increased a
little bit?

A.    It's gone up and it's gone down a little.
Right now, it's a little higher.  If you were to look at
it based on last Friday, because Monday was a holiday,
the stock price would have been worth about 1.5 billion,
just a little higher.

Q.    Now, are you primarily focused about it at the
time of the hypothetical negotiation?

A.    I am.

Q.    Okay.

A.    Because that would have been known.  That
would have been something that would have considered at
the hypothetical negotiation.

Q.    Now, did -- when Stanford got this stock, did
it have an agreement with the inventors of this patent
application about whether it would share in the proceeds
of this license agreement?

A.    Yes, it did.

Q.    What were the terms of that agreement?

A.    Well, first of all, the patent application
that we're talking about for that core search

capability, which was owned by Stanford, the inventors

were what became the two co-founders of Google:

Mr. Brin and Mr. Page.

And because they had worked on that invention,

which was owned by Stanford while they were students at

Stanford, Stanford gave them 28 percent of the stock

that they got from Google.

So of the 2 percent stock of the 2-1/2 million

shares, they gave up 28 percent of those 2-1/2 million

shares to Mr. Brin and Mr. Page, who are co-inventors of

that patent application.

Q.   Were you able, Mr. Bratic, to learn from

publicly available sources how much Stanford ended up

selling its remaining stock -- minus that 28 percent it

gave to Mr. Brin and Mr. Page -- how much it sold that

remaining stock for?

A.   Yes.

Q.   How much was that?

A.   They sold 72 percent that they held for around

$365 million.

Q.   Now, we saw earlier one of the terms of the

license was that Google had an exclusive license for a

period of, I think, six years is what the license said.

A.   That's the original license, correct.

Q.   What is your understanding -- as a patent

licensing expert, when someone has an exclusive license

for a period of years, are they then able to sublicense

that license?

     A.   Yeah.  In the case of this license, they had

the rights to sublicense this Stanford license.  In

other words, Google could turn around -- turn around and

license the technology they just got from Stanford.

     Q.   And are you aware whether Google licensed this

technology to others?

     A.   Yes, they did license this search technology,

Stanford's search technology.

     Q.   Could you please tell the jury whether -- when

Google licensed this technology, the form of how it

licensed the technology?

     A.   Yes.  The form -- when Google turned around

and licensed Stanford's search technology, it licensed

it in the form of running royalties based on usage.

     Q.   What did Google call that form of running

royalty?

     A.   Well, they called it, I believe, it was CPM,

cost per thousand.

     Q.   CPM stands for cost per thousand?

     A.   Thousand, yes.

     Q.   Can you please briefly explain what cost per

thousand means and why that is equivalent to a running

1  royalty?

2      A.    A running royalty is a usage royalty.    In

3  other words, you can pay based on a percentage of sales.

4  You can pay based on number of widgets manufactured.

5  So it's based on usage.   You know, the more you use, the

6  more you pay.   The less you use, the less you pay,

7  however you want to use it.

8          Now, in the case of what Google did as an

9  example, they would license it, because they were doing

10  search results.   I'll give you an example in a minute

11  with AOL.

12          So they would go out and do search results, so

13  they would charge per thousand search results they would

14  do for clients.   They would charge them so many cents

15  per thousand search results.

16          And because it's based on the volume or usage

17  of search results, that's a form of running royalty.

18      Q.    Do you have an example of how Google, when it

19  tried to license its search technology from this license

20  to others, whether it mentioned the fact that it was in

21  the process of applying for patents?

22      A.    Yes.

23      Q.    Let's please turn to Plaintiff's Exhibit 1665.

24      A.    16 --

25      Q.    And let's just pause here.   This is

Plaintiff's Exhibit 1665.

A.    Right.

Q.    Mr. Bratic, what is the date we're looking at of this document?

A.    May of 2001.

Q.    Okay.  Let's go to Page 14 of this document. What are we looking at here?

A.    Well, this is from that presentation in 2001, and this is a document talking --

MR. VERHOEVEN:  Excuse me, Your Honor. We believe this is outside the report.

MR. NELSON:  It's in the supplemental that he just filed, Exhibit 15.  We can approach if you want.

Your Honor, as you are aware, Google just produced a lot of documents.

THE COURT:  Well, let's approach.

(Bench conference.)

MR. NELSON:  This --

THE COURT:  Yes?

MR. NELSON:  This document was just produced.

THE COURT:  Voice down.

MR. NELSON:  Sorry, sorry.

This document was just produced.

1  Mr. Bratic discloses in a supplemental report where he

2  explained it as --

3              MR. VERHOEVEN:  16th of January.

4              MR. NELSON:  Your Honor, this is part of

5  the new production.  Mr. Bratic specifically says what

6  he relies on in the report.  It came from Apex

7  Production, and he disclosed it.

8              We were waiting to file the report until

9  we got the numbers.  Literally, as soon as we got the

10  numbers, we filed the supplemental report.

11              THE COURT:  When was the document

12  produced?

13              No, not the report.  The document on

14  which he's relying.

15              MR. NELSON:  Late November, early

16  December.

17              THE COURT:  Late November, early

18  December?

19              MR. NELSON:  Yes.

20              THE COURT:  I'm sustaining the objection.

21  And, counsel, we're not going to get into the timing of

22  the production.

23              MR. NELSON:  Oh, I'm sorry.

24              THE COURT:  -- of the documents in this

25  case.

1          MR. NELSON:  I'm sorry.

2          (Bench conference concluded.)

3          MR. NELSON:  Your Honor, actually --

4          (Bench conference.)

5          MR. NELSON:  It's time.  It's that time.

6          THE COURT:  Okay.  All right.

7          MR. VERHOEVEN:  I'm sorry.  What?

8          MR. NELSON:  Closing the courtroom.

9          (Bench conference concluded.)

10         THE COURT:  All right.  Ladies and

11 Gentlemen seated out in the audience, there are a couple

12 of issues that, once again, there's been a request to

13 close the courtroom from the public view by virtue of

14 the extremely confidential nature of the material.

15         So I'm going to have to ask you to leave

16 once again at this time.  Once again, I'll try to keep

17 the -- your absence at a minimum.  You'll be invited

18 back in promptly upon completion of the areas of

19 testimony that implicate the confidential production.

20         **SEALED BY ORDER OF THE COURT**

21

22

23

24

25



**SEALED BY ORDER OF THE COURT**



**SEALED BY ORDER OF THE COURT**



SEALED BY ORDER OF THE COURT



**SEALED BY ORDER OF THE COURT**



SEALED BY ORDER OF THE COURT



**SEALED BY ORDER OF THE COURT**



SEALED BY ORDER OF THE COURT



SEALED BY ORDER OF THE COURT



SEALED BY ORDER OF THE COURT

**SEALED BY ORDER OF THE COURT**

Q.   (By Mr. Nelson) Mr. Bratic, were you aware,
in the course of your negotiation and analysis of the
negotiation, of whether Google acquired the relevant
patented technology through other means beyond just
patent licenses?

A.   Yes.  One of the other ways that Google
acquired access to technology it wanted, which included
patents and patent application, was doing acquisitions,
like DoubleClick -- am I allowed to say that?

Q.   I think you can talk about that they did
acquire DoubleClick.

A.   Okay.

Q.   Yes.

1      A.    And Applied Semantics.

2      Q.    And you mentioned the Applied Semantics

3 transaction?

4      A.    That's another -- that's another example of

5 how they got access to technology and intellectual

6 property rights --

7      Q.    Okay.

8      A.    -- by buying companies.

9            MR. NELSON:  Now let's go to Plaintiff's

10 Exhibit 445.

11     Q.    (By Mr. Nelson) Mr. Bratic, did you rely upon

12 this document in the formation of your opinion here?

13     A.    Yes.  It was one of the many documents I

14 relied on and analyzed.

15     Q.    Okay.

16            MR. NELSON:  And let's go to the relevant

17 page, please.

18     Q.    (By Mr. Nelson) Mr. Bratic, in the bottom

19 left-hand corner, it says Houlihan Lokey Howard & Zukin.

20     A.    Yes.

21     Q.    Who is Houlihan Lokey Howard & Zukin?

22     A.    Okay.  That is an independent consulting firm

23 that values businesses.

24            So there are lots of companies like Google and

25 other companies that go to them when they do

acquisitions to get them to value the different assets

that they purchased.

Q. And, Mr. Bratic, what was the reason,

besides -- so Houlihan-Lokey -- or Google would go to

Houlihan-Lokey --

A. Yes.

Q. -- and ask them to provide a valuation for

Google; is that right?

A. Yes. Let me explain, if I can, briefly --

Q. Sure.

A. -- how it works.

What happens is, it's not that Houlihan-Lokey

determined the price. They were -- what the price was

determined, they have to come in afterwards for tax

reasons and for what we call financial reporting

purposes to prepare the financial statements of the

company for its investors and lenders and everybody

else.

They have to determine what that purchase

price was and how it gets allocated to the different

parts of the assets that were acquired.

And so that's the purpose for a company like

Houlihan-Lokey doing these kinds of studies.

Q. In the Applied Semantics acquisition --

A. Yes.

1       Q.   -- did Applied Semantics have any patents at

2  that time?

3       A.   They did.

4       Q.   And could you please explain?

5       A.   Well, based on my investigation and research,

6  I learned that -- in my study, I learned that Applied

7  Semantics -- at the time of this acquisition by Google,

8  Applied Semantics had one patent and one patent

9  application with the United States Patent & Trademark

10 Office.

11      Q.   How was this patent and patent application

12 related to its core technology?

13      A.   Well, it was -- part of the patented

14 technology that was being acquired was part of what was

15 called the CIRCA core patented technology.

16      Q.   And do you have a document about that?

17      A.   Yes.  That's how Google described the

18 acquisition.  They had a press release, I believe.

19      Q.   Okay.

20           MR. NELSON:  Let's go to Plaintiff's

21 Exhibit 846.

22      Q.   (By Mr. Nelson) What are we looking at here,

23 Mr. Bratic?

24      A.   This is a -- I believe a press release

25 regarding Google announcing that it acquired -- was in

1  the process of acquiring Applied Semantics.

2      Q.    Okay.  And in the press release, did they

3  discuss the fact that it was the patented CIRCA

4  technology?

5      A.    Yes.

6          MR. NELSON:  And let's go -- I think it's

7  the third paragraph up from the bottom, please.  That

8  third paragraph.  There we go.

9      A.    Yes.  Well, this is a description.  Google is

10  saying in its press release regarding this acquisition

11  that it's basically buying -- and the products they are

12  buying are Applied Semantics' products that are based on

13  its -- its being Applied Semantics -- patented CIRCA

14  technology.

15      Q.    (By Mr. Nelson) Okay.

16          MR. NELSON:  Now, let's go -- actually,

17  let's go back to Plaintiff's Exhibit 445.

18      A.    Yes.

19  ████  ███ ██ ███  ███  ██████  ███████

20  ██ █   **REDACTED BY ORDER OF THE COURT**

21  ███

22  ██████ ███ █████ █████ █████ ███ ██

23  █████████ ████ █████ ████ ██ ███ █████████

24  ████ ████

25   ███ ██ ██████ ███ █ ████ ██ ██ ███

1  ████  ██████ ████ █████ ██ ████  █████████  ████

2  ███

REDACTED BY ORDER OF THE COURT

3  ████

4  █████████ ███████ ███ ████ ████████

5  ████  ██████ ██████ ███████ ██████ █████████████

6  ██████ ██████ █████████ ███████████ ████ ███ ███ ██████

7  █████  ███████ ██████

8  ████  ██████ ████ ████ ███ █████ ████ ██████ ████

9  ████████ ███ ████ ███ █████ ████████ ████████ ██████

10 ███████ █████ █████ ███ ████████ ████████ ████████

11 ████

12  ███    █████

13      Q.    Whose testimony did you rely on?

14      A.    That was, I believe, Mr. Zoufonoun.

15      Q.    Okay.

16             MR. NELSON:  Let's please play

17  Mr. Zoufonoun's relevant testimony here.

18             (Video playing.)

19  ████████ ████ ███ ██ ████ █████ ███ ██ █████

20  ██ █    REDACTED BY ORDER OF THE COURT

21  ████                                            ██

22  ████

23  ████████ ██████ ████ ██ ██ █████ █████████

24  ████████ ██ ██ ██████ █████ ████ █████ █████ ███

25  ████████ █████ ████ ██ ███ █ █████ ███ █████ █████

**REDACTED BY ORDER OF THE COURT**

QUESTION:  In this context, when it says, Google, Inc., Acquisition of Applied Semantics, Inc., Valuation of Intangible Assets, why was Houlihan-Lokey hired?

ANSWER:  Again, I can't say with certainty why they were hired and what it means in this context.  If you want my best guess, I would say they are trying to assign value to intangible assets for the purposes of accounting.

(End of video clip.)

Q.   (By Mr. Nelson) And what was Google's inability to explain ▮▮ ▮▮▮▮▮▮▮▮ ▮▮▮ -- how is that relevant to your analysis?

A.   Well, I did my best to try and fill in the blanks.  And so I went back and I looked at the press release talking about the patented core technology for

Applied Semantics.

I went to the U.S. PTO website, I and my staff, working with my assistance -- under my assistance, and we found an Applied Semantics' patent and the Applied Semantics patent application.

And then, of course, I looked at the press release that said that Google was acquiring Applied Semantics' patented core technology.

And the core technology then -- Houlihan-Lokey said ███

███  ███  **REDACTED BY ORDER OF THE COURT**

████████  ███  ████  ████  ████  ████  ███  ████  ████████

████  ███████████

Q.  Now, Mr. Bratic, did -- based on your study --

A.  Yes.

Q.  -- did Google end up using this core technology it bought?

A.  No, it did not.

Q.  Why did Google purchase Applied Semantics?

A.  First of all, I should say, the only thing Google did use from Applied Semantics, based on my research, was the AdSense name.

In other words, what we now know as AdSense wasn't called AdSense before.  It only became that name after Applied Semantics was purchased.



REDACTED BY ORDER OF THE COURT



REDACTED BY ORDER OF THE COURT

**REDACTED BY ORDER OF THE COURT**

Q.   Did Houlihan-Lokey perform other outside consultant valuation studies besides the one it conducted on behalf of Applied Semantics?

A.   Yes, they did.

Q.   Did Houlihan-Lokey do a study with respect to DoubleClick?

A.   They did.

Q.   Okay.

MR. NELSON:  Let's please put on 1689.

Q.   (By Mr. Nelson) And, Mr. Bratic, what are we looking at here?

A.   Well, this is the cover page from the DoubleClick analysis done by Houlihan-Lokey, the same firm that did the study for Applied Semantics.

Q.   Now, would Houlihan-Lokey --

A.   And you can see that in the lower left-hand corner, Houlihan-Lokey.

Q.   When Houlihan-Lokey conducted this report, did Google rely on this report for its financial statements?

A.   Yes.

Q.   Was Google a public company at this time in 2007?

1    A.   By -- by -- yeah, by -- 2008 is the date of

2  this study.  But, yes, Google was a public company by

3  that time.

4    Q.   Are you aware of Google's obligations to

5  report accurately its financial statements?

6    A.   Well, yes.  Google is a public company, and I

7  think later on I have a document to show you -- a

8  document they filed at the Securities and Exchange

9  Commission.

10         And when they have to file their documents

11 with the Securities and Exchange Commission, they're --

12 they're subject to penalties, perjury and the like --

13   Q.   What --

14   A.   -- if they're false or misleading.

15   Q.   What did Houlihan-Lokey determine was the

16 technology royalty rate for this transaction and for

17 acquiring this technology?

18         Go on, Mr. Bratic.

19   A.   Yeah.  No.  What -- I was just going to

20 correct you just a little.

21   Q.   Sure.

22   A.   What they did is, the -- there was a key core

23 technology in this company, too, called DART.  It was

24 DoubleClick's product.  And it was an internet ad --

25 search and ad management system.  And Google acquired

1  this core -- developed core technology.

2       So what -- one of the things that Houlihan did

3  is, they acquired different assets -- and I'm not

4  suggesting at all that the only thing they bought when

5  they bought DoubleClick was this DART technology,

6  because that's not the case.

7

8

**REDACTED BY ORDER OF THE COURT**

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



REDACTED BY ORDER OF THE COURT

**REDACTED BY ORDER OF THE COURT**

Q.   Did you, in your analysis, rely on other Houlihan-Lokey studies in coming up with your royalty rate in this case?

A.   I did.

Q.   Do you have a chart showing that?

A.   In part, though.  I want to make it clear that's one of the many things I looked at.

Q.   All right.

1          MR. NELSON:  Let's go to the next slide,

2  please.  Next slide.

3               Yeah, there we go.

4      Q.   (By Mr. Nelson) What are we looking at here,

5  Mr. Bratic?

**REDACTED BY ORDER OF THE COURT**

19     Q.   Now, I want to focus on these other

20  transactions in --

21     A.   Right.

22     Q.   -- right below that.

23     A.   Right.

24     Q.   Were those transactions core technology to

25  Google, based on your analysis?

1     A.    Well, based on my analysis and the deposition

2 of Google witnesses, those -- all the other

3 transactions -- those transactions were not core

4 technology to Google.

5     Q.    Okay.  Now, what -- how did you apply these

6 different royalty rates?

7     A.    Well, first of all, let me also mention that

8 each one of these transactions either involved a

9 patent -- patents or patent applications or both.  And

10 so what I did is I took --

11     Q.    Let me -- let me stop you.

12          And do you know whether those patents and

13 patent applications related to the technology acquired?

14     A.    Well, the technology acquired as part of those

15 acquisitions --

16     Q.    Yes.

17     A.    -- yes.

18     Q.    Okay.  Go on.

19     A.    Well, what I mean by that is, Google acquired

20 all those rights.

21     Q.    Yes.  Okay.

22     A.    In fact, if you go to the PTO website, you'll

23 see that there were assignments by these companies that

24 either owned the patents or patent applications, and

25 they were assigned to Google, much like Mr. Dean and Ms.

149

Stone assigned the patents-in-suit to Function Media.

**REDACTED BY ORDER OF THE COURT**

1      Q.   Now, let me focus you in on one of these

2  transactions, the dMarc Broadcasting transaction.

3      A.   Yes.

4      Q.   Mr. Bratic, are you aware with how that

5  transaction was structured?

6      A.   Yeah.  The structure of it?

7      Q.   Yes.

8      A.   Yes, generally.

9      Q.   Can you please describe for the jury how that

10  transaction was structured?

11      A.   Well, first of all, dMarc Broadcasting was an

12  acquisition that was intended to take AdSense, which we

13  know is AdSense Online, from the internet and expand

14  that core product into radio ads.

15  ████████████████████████████████████████████

16  ██ ██                                        ▌

**REDACTED BY ORDER OF THE COURT**

17  ██

18  ████████████████████████████████████████████

19  ████████████████████████████████████████████

20  ████████████████████████████████████████████

21  ██████

22    ██   ████

23    ████ ████████████████████████████████

24  ████████ ███████████████ ██ ███████ ████

25  ██████ ████████

REDACTED BY ORDER OF THE COURT

MR. NELSON:  Let's please go to the next slide.

Q.    (By Mr. Nelson) We've already talked about this a little bit --

A.    Yes.

Q.    -- Mr. Bratic.

How specifically did you rely on these industry rates here in the formation of your opinion as one data point?

A.    Well, again, it's one data point, and it's information that would have -- is -- is implied or it's assumed that these -- both Function Media and Google would have known about these industry royalty rates. And I might add that Function Media and Google at the hypothetical negotiation would also know about these Houlihan-Lokey studies.  Because unlike the real world of negotiations where nobody shares their information necessarily, in the hypothetical negotiation, as required under Georgia-Pacific, all the cards are on the table; in other words, no surprises.

So everybody goes in -- both Function Media and Google go in having knowledge of these facts in our hypothetical negotiation.

And I might add that in the 2006 and then 2007

1  timeframe, you will see that these industry royalty

2  rates are very consistent with the average pretax

3  royalty -- or technology rate used in the Houlihan-Lokey

4  studies, which was 12 percent.

5       Q.   Now, I want to be clear here.  Did you rely on

6  any one of these 107 or 115 licenses in particular in

7  the analysis here?

8       A.   No.  I didn't have access to all -- to those

9  individual licenses.

10      Q.   How did you use the study then?

11      A.   I used it as a data point or as a benchmark

12  for my analysis, as a guide post.

13      Q.   Okay.  Now, in sum, we've looked at these

14  licenses and licensing factors.

15           How do these three Georgia-Pacific Factors

16  relate and how do they affect the hypothetical

17  negotiation in this case?

18      A.   Well, my opinion, they would tend to push the

19  royalty rate up at the hypothetical negotiation.

20      Q.   Okay.

21           MR. NELSON:  Your Honor, may we approach?

22           (Bench conference.)

23           THE COURT:  Another issue?

24           MR. NELSON:  No.  This is just another

25  time where -- it's for approaching this profit margin

issue. And I'm going to try to be very limited, and it's going to be about two or three minutes, but we're going to get into confidential information.

THE COURT: Okay. That's what I --

MR. NELSON: Oh, yes.

THE COURT: Okay. Just a second. It's okay. How many times more times am I going to have to do this today?

MR. NELSON: This will be the second of three, and I don't know if we're going to get to the third.

THE COURT: Okay. Well, I just want to give them some advance notice, but, you know, I'm not -- well, I'll -- I'll tell them what I'm going to tell them.

MR. NELSON: Okay.

(Bench conference concluded.)

THE COURT: All right. Again, folks back there, I'm going to have to ask you to leave the courtroom at this time.

Just for your information, there's going to be a brief period of time that I need to ask you to step out to hear some confidential information.

There will be one other time as well, but I'm -- I'm breaking them up, because I'd rather have you

154

1 in here for as much of the testimony as I can let you in

2 here for.  So that's why I'm asking you to excuse

3 yourself at this time.

4                    I think it will take about two minutes to

5 get through this portion of the testimony.  Then there

6 will be another brief portion of the testimony possibly

7 before 5:00 o'clock today that I'll have to ask you to

8 leave again.

9                    So that's the schedule for today.

10

11

12

13              **SEALED BY ORDER OF THE COURT**

14

15

16

17

18

19

20

21

22

23

24

25



SEALED BY ORDER OF THE COURT



SEALED BY ORDER OF THE COURT



**SEALED BY ORDER OF THE COURT**

**SEALED BY ORDER OF THE COURT**

Q.   (By Mr. Nelson) I'm going to go ahead and get

started, Mr. Bratic.

A.   Sure.

Q.   Did you rely on documents also showing the

commercial success of the product for Google?

A.   Yes.

Q.   Okay.

        MR. NELSON:  Let's please turn to

Plaintiff's Exhibit 166, Page 15.

A.   Did you say 166?

Q.   (By Mr. Nelson) Yes.

A.   Thank you.

Q.   And actually, that reminds me --

        MR. NELSON:  I apologized for this

earlier.  It's been sitting right here.  But I have

notebooks.

        Let's please turn to Page 15 of this.

Q.   (By Mr. Nelson) Mr. Bratic, did you rely on

this document in the formation of your opinion?

A.   Yes.

Q.   Could you please read it to the jury?

1     A.   Well, this is an internal document at Google,

2  and it says:  The same big-thinking approach applies to

3  AdSense content pages.  Sergey's billion-dollar idea was

4  at an offsite three years ago when he said, quote, there

5  are hundreds of millions of searches but billions of web

6  pages out there.  Why aren't we monetizing them?

7     Q.   Was this a billion-dollar idea?

8     A.   It was much more than a billion-dollar idea.

9  It's eight times more than that.  It's been about 8

10 billion in sales so far.

11          And I might add, just to make sure everybody

12 knows who Sergey is, Sergey Brin is one of the

13 co-founders of Google.

14    Q.   Okay.

15          MR. NELSON:  Let's please go to

16 Plaintiff's Exhibit 1700.

17    A.   Okay.

18    Q.   (By Mr. Nelson) Now, Mr. Bratic, did you rely

19 on -- on this document?

20    A.   Yes.

21    Q.   Okay.  And what does -- how did Sergey Brin

22 describe AdSense for Content's technology?

23    A.   Well, the highlighted point here talks about

24 AdSense for Content, and it says:  This team engineered

25 a technology as we come --

1              MR. VERHOEVEN:  Sorry, Your Honor.  We

2  object to this as not in the report, the same issue as

3  before.

4              MR. NELSON:  Can we approach?

5              THE COURT:  Yes.

6              (Bench conference.)

7              MR. NELSON:  This literally came up at

8  the deposition of Sergey Brin a few days ago, and we did

9  searches.  We got a whole swath of documents.  Again, I

10 can't represent when specifically this came in, but

11 we've been trying our hardest to represent -- this -- we

12 just found out about this document.

13             THE COURT:  Well, it's already been

14 published, and I'm going to allow this, in light of

15 when -- when I know the testimony was taken from

16 Mr. Brin and the fact that the documents came in just

17 prior to his deposition.

18             So, I mean -- not prior.  I mean sometime

19 in November or December, correct?

20             MR. NELSON:  Yes.

21             THE COURT:  Okay.  I'm going to overrule

22 the -- overrule the objection.

23             (Bench conference concluded.)

24  MR. NELSON:  Let's please put that back on the board,

25 please.  And let's zoom in on what Sergey Brin

1 describes.

2     A.   Yes.  Well, what he said is that AdSense for

3 Content has become the monetization engine for Google,

4 and he talks about the billions of impressions and so

5 forth.  But also at the very end, he says it was a

6 colossal achievement.

7     Q.  (By Mr. Nelson) Okay.  Now, are you aware of

8 whether the CEO, Eric Schmidt, has also made similar

9 statements about the AFC being the monetization engine

10 of Google?

11     A.   Yes.

12            MR. NELSON:  Let's --

13     Q.  (By Mr. Nelson) Did you rely on any other

14 documents?

15     A.   Yes.  There were other documents like this.

16            MR. NELSON:  Let's please turn to

17 Plaintiff's Exhibit 372.

18     Q.  (By Mr. Nelson) What are we looking at here?

19     A.   This is a document for -- from an internal --

20 internal Google presentation in March of 2007, which is

21 shortly before the hypothetical negotiation.

22            And it says:  AFC Overview for Joan.  And I'm

23 not sure if I got her last name right, but I think it's

24 a lady by the name of Joan Bratty (phonetics).

25     Q.   Okay.  And did you rely on any portion of this

1  document?

2      A.   Yes.

3      Q.   Okay.

4          MR. NELSON:  Let's go to that page,

5  please.

6      Q.   (By Mr. Nelson) What does it say down here?

7      A.   Well, this says at the bottom that -- in this

8  document, that AFC, AdSense for Content, is the leading

9  mechanism to capture brand spend and to leverage the

10 growth of the entire internet.

11     Q.   And how does that affect your analysis?

12     A.   Well, that's clearly an indication, not just

13 of commercial success, but that AdSense for Content is

14 very valuable to help the company use as leverage or a

15 springboard for growth.

16     Q.   By the way, we heard testimony from Dr. Rhyne

17 today that there's AdSense for Content Online, and

18 there's AdSense for Content Direct --

19     A.   Yes.

20     Q.   -- which is not an accused product here.

21 You're aware of that?

22     A.   I am aware of that.

23     Q.   Can you please tell the jury, when we hear or

24 see figures for AdSense for Content in general, what is

25 the breakdown of revenues between AdSense for Content

1  Online and AdSense for Content Direct?

2      A.   AdSense for Content Online accounts for about

3  84 percent of total AdSense for Content sales, and then

4  the remaining 14 percent relates to AdSense for Content

5  Direct, which is not an accused product.

6      Q.   Now, in addition to Google's profit margin and

7  what their profit margin is, do publishers receive any

8  benefits from these patents?

9      A.   Oh, publishers receive, obviously, lots of

10 benefits.

11     Q.   What are the benefits that publishers receive?

12     A.   Well, one of the key benefits is that

13 publishers get significant payments from Google.  They

14 get to share in the ad revenues, and they get to take

15 the content on their website, which is not generating

16 any money for them, in terms of revenue, and they get to

17 monetize it.

18          That's -- that's what all these documents have

19 been talking about, monetizing, including monetizing

20 those websites.

21     Q.   What is your understanding from Dr. Rhyne

22 about the importance of these patents to enabling

23 publishers to benefit from this system?

24     A.   I'm sorry.  Could you repeat that again?

25     Q.   Sure.

1          What is your understanding from Dr. Rhyne

2     about the importance of publishers being able to benefit

3     from these invention?

4          A.    Oh.    Well, without practicing the

5     patents-in-suit, the publishers would not be able to

6     monetize or generate advertising revenue because all of

7     this is done in an automated fashion for these many,

8     many millions of publishers.

9          Q.    Do you have any evidence that Google knows and

10    is aware of the benefit to publishers?

11         A.    Oh, yes.

12              MR. NELSON:    Let's please turn to

13    Plaintiff's Exhibit 192.

14         A.    Okay.

15         Q.    (By Mr. Nelson) What are we looking at here?

16         A.    Well, this is a communications plan.    And I

17    might mention, if you -- if I can --

18         Q.    Yes, sir.

19         A.    -- the very top says:    Project -- just so

20    everybody knows -- Fresh Choice Launch.    That was

21    AdSense for Content Online.    And I mentioned that the

22    name changed.    After the acquired acquisition of Applied

23    Semantics, they then swapped out the name Fresh Choice

24    for AdSense.    But that's -- we're talking about AdSense

25    for Content Online.

1           And then if you look down here, it talks --

2    top-line positioning, and it says:  Google's fully

3    automated, self-service program allows publishers to

4    profit from showing Google AdWords on their websites.

5        Q.   Okay.  And did that affect your analysis here?

6        A.   Yes, because I have to look at the benefits to

7    those who practice the patent.  That's part of the

8    Georgia-Pacific analysis.  And benefits are not just to

9    Google, but it's to its publisher partners as well.

10       Q.   Did you rely on any other documents?

11       A.   Yes.

12            MR. NELSON:  Let's please go to

13   Plaintiff's Exhibit 677.

14       A.   677.  Okay.

15       Q.   (By Mr. Nelson) And what are we looking at

16   here, Mr. Bratic?

17       A.   I'm sorry.  This is a -- well, the title of it

18   is Content-Targeted Advertising Discussion.  Again, this

19   is an internal Google study from March 2003, which is

20   pretty close, I believe, to the time AdSense for Content

21   Online was launched.

22       Q.   Okay.  And is there a particular part of this

23   document you relied on?

24       A.   Yes.

25       Q.   Okay.

1          MR. NELSON:  Let's please go to 206 of

2   that document.

3          A.    206?

4          Q.    (By Mr. Nelson) Yeah.

5          A.    All right.  So this is one of the things

6   they're focusing on at Google, which is easy

7   monetization for hard-to-sell inventory.  And this is --

8   when we mean inventory, we mean to publishers' websites.

9   And so Google is talking about the ability to ease --

10  how easy it is to monetize hard-to-sell inventory; in

11  other words, inventory or publisher partner websites

12  that aren't generating any revenue or profits for the

13  partners or anybody else.

14         Q.    Did you rely on Google's public filings at all

15  to determine whether these products are a commercial

16  success?

17         A.    Yes.

18              MR. NELSON:  Let's please go to

19  Plaintiff's Exhibit 1047.

20         A.    Okay.

21         Q.    (By Mr. Nelson) What document is this,

22  Mr. Bratic?

23         A.    This is -- excuse me.  I mentioned earlier

24  about the Securities and Exchange Commission, and this

25  is a document called the 10-K filing.

1          It's an annual report that companies like

2 Google that are publicly traded -- in other words, their

3 stocks are sold on a stock exchange in the United

4 States.  They've got to file this kind of document

5 called the 10-K; file every year -- excuse me -- a 10-K

6 form every year.

7          And it's got a lot of financial information.

8 It's got a lot of discussion about the company's

9 business, its operations.  And this happens to be for

10 the year ended December 31st, 2008, I believe.

11     Q.   Mr. Bratic, did Google make any statements

12 related to AdSense in this public filing?

13     A.   They did.

14          MR. NELSON:  Let's please go to Page 12

15 of the pdf.

16     A.   What page was it?  I'm sorry.

17     Q.   (By Mr. Nelson) It's Page 9 of the document,

18 but it's Page 12 of the pdf.

19          MR. NELSON:  If you can zoom in on it up

20 on the screen.

21     A.   Okay.  Great.  Thank you.

22     Q.   (By Mr. Nelson) Did you rely on these

23 statements, Mr. Bratic, in the formation of your

24 opinion?

25     A.   Yes.  And if I can just read some of the

1 highlighted language -- I don't want to bore you with

2 everything, but it says:  Access to advertisers, so

3 that's part of the benefits.

4         It says:  Many small website companies and

5 content producers do not have the time or resources to

6 develop effective programs for generating revenue from

7 online advertising.

8         And then I'm jumping down:  And Google AdSense

9 promotes effective revenue generation.

10        The last sentence I've highlighted is:  The

11 Google network member determines -- the member --

12 network member would be the publisher -- determines the

13 placement of the ads on its website and controls and

14 directs the nature of the ad content.

15    Q.   Did the benefit to publishers -- aside from

16 Google's profit, did the benefit to publishers factor

17 into your determination of a royalty rate here?

18    A.   Yes.

19    Q.   How so?

20    A.   Well, as I said just a little while ago, you

21 have to consider, under Georgia-Pacific, the benefits to

22 everybody who practices the patent.

23              THE COURT:  Well, we're going to take up

24 there in the morning --

25              THE WITNESS:  Okay.

THE COURT:  -- okay?

Ladies and Gentlemen, I'm going to excuse you this evening.  We've got to break right -- just a little before 5:00 today.  I've got another commitment I need to attend to.

So if you'll remember my prior instructions, and don't talk about the case.  Have a nice evening and a safe trip home.

COURT SECURITY OFFICER:  All rise.

(Jury out.)

THE COURT:  All right.  Y'all have a seat.

Y'all have anything to take up tonight?

MR. VERHOEVEN:  Not from our side, Your Honor.

MR. TRIBBLE:  Nothing here, Your Honor.

THE COURT:  All right.  Court's in recess.

(Court adjourned.)

*     *     *     *

## CERTIFICATION

       I HEREBY CERTIFY that the foregoing is a true and correct transcript from the stenographic notes of the proceedings in the above-entitled matter to the best of my ability.


/s/_____       _____
SUSAN SIMMONS, CSR              Date
Official Court Reporter
State of Texas No.:  267
Expiration Date:  12/31/10


/s/_____       _____
SHELLY HOLMES, CSR            Date
Deputy Official Court Reporter
State of Texas No.:  7804
Expiration Date  12/31/10