IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

FUNCTION MEDIA, LLC          *     Civil Docket No.
                             *     2:07-CV-279
VS.                          *     Marshall, Texas
                             *
                             *     January 21, 2010
GOOGLE, INC.                 *     8:30 A.M.

TRANSCRIPT OF JURY TRIAL
BEFORE THE HONORABLE CHAD EVERINGHAM
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

FOR THE PLAINTIFFS:     MR. MAX TRIBBLE
                        MR. JOSEPH GRINSTEIN
                         Susman Godfrey
                        1000 Louisiana Street
                        Suite 5100
                        Houston, TX   77002
                        MR. JUSTIN NELSON
                        Susman Godfrey
                        1201 Third Avenue
                        Suite 3800
                        Seattle, WA   98101
                        MR. JEREMY BRANDON
                        Susman Godfrey
                        901 Main Street
                        Suite 5100
                        Dallas, TX   75202
                        MR. ROBERT PARKER
                        Parker, Bunt & Ainsworth
                        100 East Ferguson
                        Suite 1114
                        Tyler, TX   75702

APPEARANCES CONTINUED ON NEXT PAGE:

COURT REPORTERS:        MS. SUSAN SIMMONS, CSR
                        MS. SHELLY HOLMES, CSR
                        Official Court Reporters
                        100 East Houston, Suite 125
                        Marshall, TX   75670
                        903/935-3868
(Proceedings recorded by mechanical stenography,
transcript produced on CAT system.)

APPEARANCES CONTINUED:


FOR THE DEFENDANTS:      MR. CHARLES VERHOEVEN
                         MS. AMY CANDIDO
                         Quinn Emanuel
                         50 California Street
                         22nd Floor
                         San Francisco, CA   94111

                         MR. EDWARD DEFRANCO
                         Quinn Emanuel
                         51 Madison Avenue
                         22nd Floor
                         New York, NY   10010

                         MR. HARRY L. GILLAM
                         Gillam & Smith
                         303 South Washington Avenue
                         Marshall, TX   75670

                    P R O C E E D I N G S

            COURT SECURITY OFFICER:  All rise.

            (Jury in.)

            THE COURT:  All right.  Thank you.

            Please be seated.

            Pick up with the direct examination of

Mr. Bratic where we left off.

            MR. NELSON:  Yes, sir.

   WALTER BRATIC, PLAINTIFF'S WITNESS, PREVIOUSLY SWORN

            DIRECT EXAMINATION (CONTINUED)

BY MR. NELSON:

     Q.   Good morning.

     A.   Good morning.

1    Q.   When we last left, we were discussing benefits

2 that publishers received that is not part of Google's

3 profits, and I want to be clear on something so that

4 there's no confusion here.

5         You understand there's no allegation that the

6 publishers infringe or practice this patent, right?

7    A.   Yes.

8    Q.   Okay.  So you're only testifying about the

9 benefits that they would receive that are in addition to

10 Google's profits here, right?

11   A.   Correct.

12   Q.   Okay.  Was -- the benefit to publishers, was

13 that a factor in your determination of the royalty rate?

14   A.   Yes.

15   Q.   How did that factor one way or the other?

16   A.   Well, it factored in, because I have to look

17 at -- as Georgia-Pacific says, one of the

18 Georgia-Pacific factors is you have to look at the

19 benefits to all those who -- you know, who have

20 benefitted from the patent.

21        And you've got the benefits to Google from

22 practicing the patent and generating the ad revenues and

23 generating profits from those, and then you have the

24 publishers who benefit, because Google pays them

25 significant sums of money for the ads that are placed on

1 their websites that aren't generating revenue otherwise.

2     Q.    Now, Mr. Bratic, are you aware of Google's

3 argument that the royalty here -- excuse me -- that the

4 royalty here is too large because it's approximately

5 two-thirds of Google's profits?

6     A.    Yes, I was here when that argument was made.

7     Q.    Does Google's argument account for the

8 benefits that Google has apart from purely its profit

9 statement?

10          MR. VERHOEVEN:  Objection, leading.

11          THE COURT:  Sustained.

12     Q.    (By Mr. Nelson) What other benefits does

13 Google have besides just the pure profit?

14     A.    Well, Google's able to leverage off its other

15 assets.  There was a clip yesterday, a video clip, for

16 example, in the morning, I believe, where it talked

17 about Google's other business interests that don't

18 generate revenues but benefit from products like

19 AdSense.

20     Q.    Okay.

21          MR. NELSON:  Let's please put up

22 Plaintiff's Exhibit 1696 and let's go to the strategic

23 benefits.

24     Q.    (By Mr. Nelson) What are we looking at here,

25 Mr. Bratic?

1      A.   Well, this is an example of -- this is, again,

2   an internal Google document.  It talks about why AdSense

3   is strategic to Google.

4           And one of the benefits, it says, from a

5   strategic perspective, it builds a stronger Google ad

6   network.

7      Q.   Mr. Bratic, are you aware of whether

8   senior-level Google executives have recognized the fact

9   that there are benefits to Google besides a pure profit

10  statement?

11               MR. VERHOEVEN:  Objection, form, leading.

12               THE COURT:  Overruled.

13     A.   I'm sorry.  Could you repeat that?

14     Q.   (By Mr. Nelson) Yes.

15          Are you aware one way or the other whether

16  Google's senior-level executives have recognized these

17  benefits to Google aside from its pure profit?

18     A.   Yes.

19               MR. NELSON:  Let's go to Plaintiff's

20  Exhibit 549.

21     Q.   (By Mr. Nelson) And, Mr. Bratic, what are we

22  looking at here?

23     A.   This is an e-mail from Brian Axe at Google,

24  and he's talking about Content Ads.  And it's -- again,

25  it's an internal e-mail from March of 2003, which is

1 about or shortly before the launch of AdSense for

2 Content Online.

3      Q.   Okay.

4           MR. NELSON:  Let's go to Page 3 of this.

5      Q.   (By Mr. Nelson) Okay.  Who is L.P.?

6      A.   Larry Page, one of the co-founders of Google.

7      Q.   Okay.  And what is Mr. Page saying about this

8 market?

9      A.   Well, he's saying that the market for small

10 companies is way too conservative.  In other words, at

11 this time, Google was preparing projections about the

12 market for AdSense for Content.  And he was commenting

13 here that the market for these companies is way too

14 conservative.

15      Q.   Okay.  And who is E.S.?

16      A.   E.S. is Eric Schmidt, who is the Chief

17 Executive Officer of the company, and he's pointing out

18 realizing how big the gross revenue is for this

19 business.

20      Q.   Are you aware, Mr. Bratic, of whether

21 Mr. Schmidt has ever made any other comments about the

22 importance of revenue to Google wholly apart from

23 profits?

24      A.   Yes.  You know, there are things called

25 investor calls where -- or analyst calls where the

1  executives, like Mr. Schmidt, would get on a conference

2  call with industry analysts and investment analyst

3  people that follow the stock of Google and so forth, and

4  he has made comments to them in public that the most

5  important thing to Google is revenue.

6       Q.   Are you aware of how the Securities and

7  Exchange Commission of the federal government requires

8  Google to report these payments?

9       A.   Well, yes.  Google is required to report --

10  report the monies it receives from its advertising

11  revenue as revenue.

12       Q.   Did Google ever try to convince the Securities

13  and Exchange Commission that it did not have to report

14  these payments as revenue?

15       A.   Yes.

16       Q.   And what did the Securities and Exchange

17  Commission conclude?

18       A.   The Securities and Exchange Commission

19  concluded that Google has to report its advertising

20  revenue that it generates from the publisher websites as

21  revenue to Google.

22       Q.   Okay.

23            MR. NELSON:  Let's please go to

24  Plaintiff's Exhibit 370.

25            Oh, excuse me.  Before we get off this

1  one, let's go to the next page.

2      Q.   (By Mr. Nelson) And up at the top, you see it

3  says S.B.?

4      A.   Yes.

5      Q.   Who is S.B.?

6      A.   That's Sergey Brin, I believe.

7      Q.   Okay.  And what does S.B. say about the

8  benefits that this product will have to the rest of

9  Google's business?

10     A.   Well, in the first line, it says gross

11 revenue, 150 million at the end of this year.  So he's

12 talking about upon the launch of AdSense for Content

13 Online, it's going to generate $150 million by the end

14 of the first year.

15          And he goes on to say this does not factor in

16 that it will have benefits to the rest of the business.

17 In other words, that 150 million of revenues won't

18 reflect all the benefits to the company.  There's more

19 benefits that just aren't expressed in dollars and

20 cents.

21     Q.   Okay.  Have you seen any other documents that

22 express that Google values gross revenue wholly apart

23 from any profit?

24     A.   Okay.

25     Q.   Okay.

1          MR. NELSON:  Please let's go to

2  Plaintiff's Exhibit 375.

3      A.   375?

4      Q.   (By Mr. Nelson) Yes.  And it's Page 671 of

5  that document.

6      A.   Sorry.  375.  Okay.

7          MR. NELSON:  6 -- 671, Matt.

8      Q.   (By Mr. Nelson) Okay.  What does it say here,

9  Mr. Bratic?

10      A.   Well, first of all, this is another Google

11  internal document.  And it says:  Gross revenue is an

12  important measure of our business since it drives many

13  of our costs and is a key indicator of the value we

14  create for our partners.

15          Partners here would be the publisher partners.

16      Q.   Okay.  How does that affect your analysis?

17      A.   Well, it's just part of the fact that Google

18  recognizes that revenues on these ad placement of these

19  ads is very important to Google, and that there are

20  other benefits to Google that aren't reflected in those

21  revenue numbers they take in.

22      Q.   Okay.  Thank you.

23          MR. NELSON:  May we approach, Your Honor?

24          THE COURT:   Yes.

25          (Bench conference.)

THE COURT:  Excuse me just a second.  I was going to accomplish one other thing at this bench conference that dealt with the two documents that you asked --

MR. NELSON:  Oh, yes, sir.

THE COURT:  And I don't have the numbers written down.  If you could go and retrieve those, I'll go ahead -- I'm going to allow you to use one and not the other, but I'll do it for purposes of the record at this time, if you want me to.

MR. NELSON:  Yes, sir.

THE COURT:  But I know what you're approaching me about.

MR. NELSON:  Yes.

THE COURT:  To go ahead and close the courtroom.

MR. NELSON:  Yes.

THE COURT:  But I wanted to take care of that here at the bench, too.

MR. NELSON:  I can do it by memory.  1656 is what you did not allow them to use.

THE COURT:  Okay.  I'm sustaining that objection.

MR. NELSON:  1659 is what he can use.

THE COURT:  Okay.  The objection was it

1 was not timely included in his report, and I'm going to

2 overrule that objection based on the timing of the

3 production when the document was produced, okay?

4 (Bench conference concluded.)

5 THE COURT: Folks back in the audience,

6 we've got another issue with highly confidential

7 information that I need to take up at this time. I'm

8 going to have to ask you to exit the courtroom. And as

9 we did yesterday, I'll invite you back in as quickly as

10 I can.

**SEALED BY ORDER OF THE COURT**



SEALED BY ORDER OF THE COURT

SEALED BY ORDER OF THE COURT



**SEALED BY ORDER OF THE COURT**



**SEALED BY ORDER OF THE COURT**



**SEALED BY ORDER OF THE COURT**



**SEALED BY ORDER OF THE COURT**



**SEALED BY ORDER OF THE COURT**



SEALED BY ORDER OF THE COURT



**SEALED BY ORDER OF THE COURT**



**SEALED BY ORDER OF THE COURT**



**SEALED BY ORDER OF THE COURT**



**SEALED BY ORDER OF THE COURT**



**SEALED BY ORDER OF THE COURT**



SEALED BY ORDER OF THE COURT



**SEALED BY ORDER OF THE COURT**



SEALED BY ORDER OF THE COURT

SEALED BY ORDER OF THE COURT



SEALED BY ORDER OF THE COURT



SEALED BY ORDER OF THE COURT



SEALED BY ORDER OF THE COURT



SEALED BY ORDER OF THE COURT



**SEALED BY ORDER OF THE COURT**



**SEALED BY ORDER OF THE COURT**

SEALED BY ORDER OF THE COURT

MR. NELSON:  Let's please go to Slide 25.

Q.   (By Mr. Nelson) Now, Mr. Bratic, we've gone through some of the Georgia-Pacific Factors.

Are there some factors that either lower the rate or might be neutral here?

A.   Sure.

1    Q.   Okay.  And what are those?

2    A.   Well, I'm looking at the red bar here for

3 license terms, and there's four -- there's four

4 Georgia-Pacific factors here, one of which is the nature

5 and scope of the license.

6        Now, this license would be -- in the

7 hypothetical negotiation, would be a bare patent

8 license.  In other words, Google wouldn't get any

9 technology from Function Media.  They'd just get the

10 right to practice the patent.  So that would tend to

11 favor Google in this case in the hypothetical

12 negotiation.

13    Q.   Okay.  What about Factor No. 4?

14    A.   Well, that's the patent owner's willingness to

15 license.

16        Because Function Media doesn't have products

17 from which it can monetize its patents, then Function

18 Media has to work with companies like Google to generate

19 profits or generate -- excuse me -- a way for Function

20 Media to monetize its patents-in-suit.

21        So that would tend to benefit Google, because

22 Google is, if you will, the monetization engine in some

23 respect for Function Media's patent.

24    Q.   Okay.  What about No. 5?

25    A.   Well, here it talks about the competitive

nature of the parties, whether they're competitors or

not, and neither Function Media nor Google compete with

each other.  So that would tend to favor Google.

Q.    Okay.  And what about No. 7?

A.    Finally, the duration and -- of the patent --

well, the duration of the patent, under Georgia-Pacific,

is you go into the hypothetical negotiation and you get

a license for the life of the patent, for the duration

of the patent.  So I really consider this more or less a

neutral factor.

Q.    Okay.

          MR. NELSON:  Let's go to Slide 26,

please.

Q.    (By Mr. Nelson) What are we looking at here?

A.    Well, we're now talking about another bucket

of the Georgia-Pacific factors, about the benefits and

advantages of the invention.

Q.    Okay.  And did you analyze -- as part of your

analysis, did you rely on Dr. Rhyne and his opinions

about the importance of these patents here?

A.    Oh, yes, I did.

Q.    Okay.

          MR. NELSON:  Next slide, please.

Q.    (By Mr. Nelson) What are we looking at here?

A.    Well, this is a summary of some of the

benefits Google enjoys from -- and benefits that Google

enjoys and its publisher partners enjoy from the

patents.

Q.   Now, I know that the jury has seen a lot of

documents both from Dr. Rhyne two days ago and yesterday

and from yourself yesterday.

Are you relying on those documents to talk

about the importance of all of these factors here?

A.   Yes, and other documents I've seen.

Q.   Okay.  Let's just go through them quickly.

Automated?

A.   Yes.

Q.   Okay.  Scalable, you've seen documents about

that?

A.   Yes.  The scalability, and that means being

able to draw in, you know, millions of publishers

getting a very big system.

Q.   Okay.  Easy to use.  Were you here for

Mr. Dean's testimony?

A.   Yes.

Q.   Okay.  Did you hear him talking about trying

to solve the problem here, to make it easy to use?

A.   Yes.

Q.   Okay.  What about this last one?

A.   Customization, look and feel.  That, as I

understand, is a very important aspect of the

patents-in-suit, and allows for the customization

process so you can automatically create these ads that

have -- are customized to have the look and feel of the

publisher's website.

Q.   Let me ask you a question specifically to that

that I don't think has yet come up.

Have you seen any documents about -- or

evidence about the effect of even a change in font size

would have on revenue here?

A.   Yes, just changing a font size alone -- I saw

an internal group of memos saying that that would --

THE COURT:  Can you slow down a little

bit?

THE WITNESS:  I apologize.

THE COURT:  It's for her benefit as well

as the jurors.

THE WITNESS:  I apologize.

A.   Yes.  There was a document I saw that

indicated that Google, if they just changed the font

size in AdSense for Content Online, that could increase

their revenues by a hundred million dollars a year just

for that one change.

Q.   (By Mr. Nelson) Okay.  And does -- have you

seen any evidence that Google thinks its important for

```
 1  its own site to have these look-and-feel

 2  characteristics?

 3      A.   Yes.

 4      Q.   Okay.  Thank you.

 5           Now, we haven't really talked about this My

 6  Client Center, which is part of the '059 patent.

 7                MR. NELSON:  Actually, Your Honor, let me

 8  approach.

 9                (Bench conference.)

10                MR. NELSON:  I had not thought this is

11  confidential.  I do not think this is confidential.  It

12  is -- what I'm about to ask is -- and they have not

13  raised it as confidential.  It is -- it's 53 percent of

14  AdWords revenue comes through MCC, and I -- I just want

15  to be really careful here.

16                MS. CANDIDO:  I believe that's correct.

17  That's something I need to ask our client here.

18                MR. VERHOEVEN:  We can check with our

19  client right now.

20                MR. NELSON:  Is it okay if you can

21  explain to the jury why we're -- why I have to go back

22  and forth so much about trying to maintain the

23  confidentiality here?

24                THE COURT:  (Nods head.)

25                MR. NELSON:  Thank you.
```

1          MS. CANDIDO:  We can live with that.

2          THE COURT:  Okay.  All right.

3          MS. CANDIDO:  Thank you.

4          THE COURT:  I'll do that at a break.

5          MR. NELSON:  Thank you.

6          (Bench conference concluded.)

7     Q.   (By Mr. Nelson) Mr. Bratic, have you seen any

8  evidence about the percentage of revenue of AdWords that

9  comes through My Client Center, which is the accused

10 product -- part of the accused product in the '059

11 patent?

12    A.   Yes.  It's over 50 percent.  If my

13 recollection is correct, it's around 53 percent.

14    Q.   Thank you.

15          MR. NELSON:  Let's go to the next slide,

16 please.

17    Q.   (By Mr. Nelson) What are we looking at here,

18 Mr. Bratic?

19    A.   Well, this is based on my discussions, my

20 interviews of Dr. Rhyne and his testimony here in the

21 Court, that there's no acceptable non-infringing

22 alternatives.

23          And what that means is -- from an economic

24 standpoint is, there's no other way of achieving the

25 benefits of practicing the patents-in-suit, unless you

1  practice the patents.  In other words, there's no way to

2  get the same benefits in a non-infringing manner.

3       Q.   And we talked a little bit about this while

4  the courtroom was sealed.

5            Does that evidence support your opinion here,

6  that there is no available alternative non-infringing --

7       A.   Yes.

8       Q.   Thank you.

9       A.   I'm sorry.

10      Q.   No, no, that's okay.

11      A.   I didn't mean to speak over you.

12      Q.   And are you aware of Google's other arguments

13  about how they can just make changes and -- and what Dr.

14  Rhyne has said about those, about whether they can make

15  a change to make it an alternative here?

16      A.   Yes.

17      Q.   And what is your opinion about those?

18      A.   Well, it's that basically those arguments or

19  basically they're actually removing the functionality as

20  opposed to doing -- doing the same or similar

21  functionality just in a different way.

22           That's a very different situation.  It's not

23  the same.  It doesn't qualify for being an acceptable

24  substitute.

25      Q.   Okay.

1          MR. NELSON:  Let's please go to Slide 37.

2      Q.   (By Mr. Nelson) What are we looking at here,

3  Mr. Bratic?

4      A.   Well, this is the last two Georgia-Pacific

5  factors, one of which is relying on the opinion of

6  experts.  And I've relied on Dr. Rhyne's expertise in

7  forming part of my opinions.

8          And, finally, all those Georgia-Pacific

9  factors we've talked about, all 14 of them, roll up into

10  that hypothetical negotiation I was talking to you about

11  yesterday.

12      Q.   Okay.

13          MR. NELSON:  Let's please go to Slide 38.

14      Q.   (By Mr. Nelson) What is this?

15      A.   Now, this is just a recap of the 15 factors

16  and kind of how they would be affected in a hypothetical

17  negotiation.

18      Q.   Okay.  And this has --

19      A.   So --

20      Q.   I don't want you to go through them

21  individually and talk about them all --

22      A.   Right.

23      Q.   -- right now, but is this a fair summary of --

24      A.   It is.  And you can see the green arrows are

25  pointing up, so most of these factors are pointing up,

and that means they tilt in favor of Function Media in a

hypothetical negotiation.

There's three Georgia-Pacific factors that go

down that are in favor of Google.  And the big -- the

yellow lines going across are just that there's two

factors that, in my opinion, are neutral.

Q.   Okay.

MR. NELSON:  Let's go to the next slide.

Q.   (By Mr. Nelson) What is this?

A.   Well, that's just my opinion that a reasonable

royalty rate in this case would be 12 percent of the

sales of the accused products.

Q.   Okay.

MR. NELSON:  Next slide, please.

Q.   (By Mr. Nelson) Okay.  We've talked about the

rate.

A.   Yes.

Q.   Let's talk about the base.

A.   Right.

Q.   How did you determine that the base of the

accused products here was $5.061 billion?

A.   Well, Google produced a lot of detailed

financial records, and we went through those in great

detail and pulled out information regarding AdSense for

Content Direct sales, AdSense for Content Direct and

AdSense for Content Online.

    That information was provided through September 30th, 2009.  So I took that information and I kind of, what's called, analyzed or I kind of just pulled it forward to last -- up to this last Monday right before trial.

    Q.   Did you use conservative projections for the fourth quarter data here?

    A.   Yes.  In my view, I did.

    Q.   Okay.

    A.   I could have used higher estimates, but I didn't.

    Q.   Let me ask it differently.

    Were there higher rates that you reasonably could have used?

    A.   Higher growth rates I could have used, but I didn't.

    Q.   Okay.

        MR. NELSON:  Let's please go to Slide 41.

    Q.   (By Mr. Nelson) What are we looking at here?

    A.   That's just a breakdown of AdSense for Content Online and AdSense for Content Mobile sales.  And you can see the vast majority of them have been AdSense for Content Online, but they total a little over $5 billion dollars to date.

1       Q.    Okay.

2                 MR. NELSON:  Let's go to Slide 43.

3       Q.    (By Mr. Nelson) What is this?

4       A.    Oh, well, this is just the sum -- this is just

5   the final result.  If you take the 12-percent royalty

6   rate, based on my analysis of the Georgia-Pacific

7   factors, multiplied by a little over $5 billion in

8   accused sales from July 2007 to now, you'll get a

9   royalty of $607 million.

10      Q.    Now, that's a large number.

11      A.    It is.

12      Q.    Have you done any reasonableness checks here

13  to support that number?

14      A.    Yes.

15      Q.    Okay.  There are some we talked about while

16  the courtroom was closed.

17      A.    Right.

18      Q.    Okay.  Were there others that you also

19  discussed?

20      A.    I did.

21      Q.    Okay.

22                 MR. NELSON:  Let's go to Slide 49.

23      Q.    (By Mr. Nelson) What is this that we're

24  looking at?

25      A.    Well, this was -- I mentioned earlier, if you

1 had taken Google's stock -- I mean -- excuse me -- the

2 stock that was given to Stanford in the Google

3 transaction in 1998, that stock would have been worth at

4 the time of the hypothetical negotiation $1.4 billion.

5 And I'm showing that in comparison to the royalty to

6 Function Media of about $600 million.

7     Q.   Excuse me.  Now, you said this at the

8 beginning of your testimony yesterday.  We've looked at

9 a lot of documents, a lot of evidence.

10          What is -- is this all the evidence you relied

11 on in the formation of your opinion?

12     A.   No.  I've just given you an overview of the

13 many things I did; you know, the legal pleadings, the

14 detailed financial records.  I've looked at the

15 deposition transcripts.  I've looked at -- I've only

16 shown you some of the internal e-mails and slide

17 presentations from Google and witness depositions and

18 exhibits.

19          And I've relied on all of that information as

20 represented in both of my expert reports.

21              MR. NELSON:  Let's go to Slide 17.

22     Q.   (By Mr. Nelson) What are we looking at here,

23 Mr. Bratic?

24     A.   This is just, if you will, a summary of the

25 various licensing data points we discussed yesterday.

So you can see, to Function Media, their perspective going into the hypothetical negotiation, was looking for a royalty rate in the range of 8 to 20 percent of sales.

**REDACTED BY ORDER OF THE COURT**

We looked at the internet industry royalty rates in the year of the hypothetical negotiation, which was an average of 10 percent; a median of 13-1/2 percent.

So if you average all of these four lines, that gets you to 12 percent.

Q. Let me ask you a question: Do you think that a reasonable royalty rate of say -- on the lower end of the range of 8 percent would be reasonable here?

A. Yes, I think it would be reasonable. I think it would be in the lower end of the reasonable royalty range, but it's certainly would still be a reasonable royalty rate.

Q. Let me ask you a question on the other end of the scale, just to be clear.

A. All right.

**REDACTED BY ORDER OF THE COURT**

Q.    Okay.

MR. NELSON:  Let's go to the next slide. Actually, go to Slide 50, please.

Q.    (By Mr. Nelson) What are we looking at here?

A.    Well, what we're looking at here is I've just done various calculations to give the jury an example of how the formula works.

For example, if you took an 8-percent royalty, which is the low end of Function Media's numbers and the low end of industry royalty rates at the time, and I'm breaking it down for royalties for AdSense for Content Online and AdSense for Mobile Online.

But if you take 8 percent of the accused sales of about $5 million (sic), you end up with royalties of around almost $405 million.

Q.    Okay.  Let me stop you there.

MR. NELSON:  Can we approach?

```
 1                    (Bench conference.)

 2                    MR. NELSON:  I'd like to move to admit

 3     this as a summary of Mr. Bratic's opinion, but I didn't

 4     want to do it so that they're put in the position of

 5     having to object, and so I didn't --

 6                    MR. VERHOEVEN:  These are demonstrative

 7     exhibits, Your Honor.

 8                    THE COURT:  I'll sustain the objection.

 9     It can be used for demonstrative purposes.  There's too

10     much of his opinion testimony up in there.  It's a

11     demonstrative.

12                    MR. NELSON:   Okay.

13                    MR. VERHOEVEN:  Your Honor, while we're

14     here so I don't have to call another side-bar, when I'm

15     doing my cross, I intend to cover some of the same stuff

16     he's already closed the courtroom for.

17                    Rather than me come up and do a side-bar,

18     should I just tell you from the lectern that --

19                    MR. NELSON:  We have an objection to

20     Mr. Bratic being limited to what he can say in an answer

21     in open court to what Mr. Verhoeven asks.  And if he

22     wants -- I would rather that the courtroom be sealed for

23     the entire cross than have some, you know, back and

24     forth.

25                    I don't think that's appropriate, but I
```

1  want to make sure that my expert can testify truthfully

2  and completely about it.

3          MR. VERHOEVEN:  Well, I didn't finish

4  what I was going to say, Your Honor.

5          All I was going to say was, I'm going to

6  cover some of the same topics that we've already agreed

7  the courtroom should be cleared on.  And I was just

8  saying, rather than me coming up every time and

9  having -- excuse me -- a side-bar, that I would just

10  indicate to you -- I mean, if -- I assume Your Honor

11  wants to keep the courtroom open as much as possible.

12          THE COURT:  How much cross do you have?

13          MR. VERHOEVEN:  Maybe an hour and a half.

14  Hour, hour and a half.

15          THE COURT:  Okay.  Well, just signal to

16  me.  I'm going to -- I'm going to announce when you --

17  when you pass the witness, I'm going to let them know

18  what I'm going to do.  But I'm going to go ahead and --

19  I'll do that at the -- at the time after you pass the

20  witness, okay?

21          MR. VERHOEVEN:  I'm sorry.  Clear it for

22  the whole time?

23          THE COURT:  No.  I'm going to just -- I'm

24  going to -- you can just signal me from the lectern, but

25  I'm going to let them know there may be -- because of

1 the nature of cross-examination, there may be multiple

2 times I have to invite them to leave.

3 　　　　　　They're invited to -- if they want to or

4 if they elect to stay outside the entirety of the

5 cross-examination anticipated for about an hour and a

6 half.

7 　　　　　　MR. VERHOEVEN:  Thank you.

8 　　　　　　THE COURT:  Okay.

9 　　　　　　(Bench conference concluded.)

10 　　Q.　(By Mr. Nelson) Mr. Bratic, we were discussing

11 this slide.

12 　　A.　Yes.

13 　　Q.　And you were discussing the rates on the low

14 end of this scale.

15 　　　　　　What was your conclusion -- after looking at

16 all of the evidence and all of the data in this case,

17 what do you think the reasonable royalty is that is

18 appropriate in this case?

19 　　A.　Well, my opinion is it's what's highlighted on

20 the very bottom row, that I think an appropriate royalty

21 rate in this case would be 12 percent of the sales of

22 over $5 billion, which would give you that royalty

23 amount of $607 million.

24 　　Q.　Thank you.

25 　　　　　　MR. NELSON:  I'll pass the witness.

1          THE COURT:  Cross-examination.

2          MR. VERHOEVEN:  Yes, Your Honor.  One

3 minute to set up, please.

4          THE COURT:  Of course.

5          While counsel is setting up, let the jury

6 know that one reason for all of the bench conferences

7 that are being requested by the counsel examining the

8 witness is only counsel who knows what questions he's

9 going to ask, and because of prior orders of the Court,

10 it's the responsibility of the lawyer asking the

11 questions to approach the bench and advise the Court if

12 something is likely to come into evidence that's been

13 deemed highly confidential to one or the other of the

14 parties to the case.

15          That's the -- I'm trying to keep the

16 interruptions to a minimum, but that's the nature of the

17 beast in some -- in these types of cases.

18          And, likewise, to the folks in the

19 audience, due to the nature of cross-examination, the

20 questions that are propounded to the witness on

21 cross-examination, we may have several occasions that I

22 have to ask you to exit the courtroom during the

23 cross-examination of -- of this witness.

24          Now, I anticipate the cross-examination

25 is going to take about an hour and a half, so you're

1  invited in for as much of that as you can be here, but I

2  want to let you know, if you want to stay outside for

3  the entirety of the cross-examination, you can do that,

4  or you can come in when I signal the CSO to let you back

5  in.  It's up to you.

6          But just -- I just wanted to alert you in

7  advance that I may have to ask you to leave the

8  courtroom multiple times.

9          Proceed.

10          Yes, sir?

11          MR. ANDERSON:  Permission to approach?

12          MR. VERHOEVEN:  I have a binder, Your

13  Honor, to pass out.

14                    CROSS-EXAMINATION

15  BY MR. VERHOEVEN:

16      Q.   Good morning, Mr. Bratic.

17      A.   Good morning.

18      Q.   Now, the issue here at a really high level is,

19  what kind of license Google and Function Media would

20  have come to during a hypothetical negotiation in July

21  2007, right?

22      A.   At a high level, yes.

23      Q.   And so -- and we looked at a lot of documents

24  that you looked at.  I'm going to look at some documents

25  you haven't looked at.

1           MR. VERHOEVEN:  So let's bring up

2    Exhibit 710, please.

3        A.   I'm sorry.  710?

4           MR. VERHOEVEN:  And if we could just

5    highlight the top third of that page, please, Charles.

6        Q.   (By Mr. Verhoeven) Now, Defendant's

7    Exhibit 710 is a patent purchase and sale agreement,

8    correct, sir?

9        A.   Yes, this document is.

10       Q.   And this is an actual agreement --

11       A.   I'm sorry.  Excuse me one second.

12           (Witness reviews document.)

13           Yes.  This is just a patent purchase and sale

14   agreement.

15       Q.   Right.  It's not an acquisition of an entire

16   company, is it?

17       A.   No.

18       Q.   It's a patent purchase and sale agreement.

19       A.   Correct.

20       Q.   And the analysis that you're supposed to

21   engage in is not to analyze what the price would be

22   or -- or the terms would be for an exact acquisition of

23   an entire company, is it?

24       A.   I'm sorry.  I'm not sure what the question is.

25       Q.   The analysis that you're engaged in is, what

1  would be the terms just for a license for the two

2  patents at issue in this case, right?

3       A.   Yes.

4       Q.   Not for a whole company.

5       A.   Correct.

6       Q.   Not for products.

7       A.   Correct.

8       Q.   Not for software.

9       A.   That's correct.

10      Q.   Just bare patents, right?

11      A.   Correct.

12      Q.   Okay.

13      A.   I agree.

14      Q.   And this is a patent purchase and sale

15  agreement for bare patents, right?

16      A.   I believe so.

17      Q.   Okay.  Well, let's take a look at it.

18           You see the date on this agreement?

19      A.   Yes.

20      Q.   And it's December 18th, 2008?

21      A.   Yes, about a year ago.

22      Q.   And you see Google is a signatory to this

23  agreement?

24      A.   Yes.

25      Q.   This is a real-world agreement that Google

entered into, correct?

A. Yes, it is.

Q. And about a little over a year after the date of the hypothetical negotiation, correct?

A. About a year and a half.

Q. Okay. And you've looked at this agreement as part of your analysis, right?

A. Yes.

Q. Okay. Direct your attention to the schedule.

In the bottom right-hand, it says G65173 in your binder.

A. 173? Okay.

MR. VERHOEVEN: Could we bring that up, Charles?

And can we highlight the top all the way down to the bottom of the chart -- or bring it out? I'm sorry.

Q. (By Mr. Verhoeven) You see the title here? Assignment of Patent Rights.

A. Yes.

Q. Do you see that?

So this is a real-world agreement between Google and Mr. Meyer, correct?

A. I believe that's correct --

Q. Okay.

1     A.   -- yes.

2     Q.   And how many patents are subject to this

3 agreement, sir?

4     A.   There's three patents.

5     Q.   Okay.  And two applications.

6     A.   Correct.

7     Q.   And Google is acquiring an interest in those

8 patents, right?

9     A.   Was requiring the entire interest.

10     Q.   Okay.  So it's not just a license; they're

11 getting the entire interest --

12     A.   They're getting --

13     Q.   -- right?

14     A.   -- they're getting all the rights.

15     Q.   Right, which is more than what we're supposed

16 to assume for a hypothetical negotiation, right?

17     A.   That's correct.

18     Q.   Okay.  And let's look at what these patents

19 concern.

20     You see on the right-hand of the column, it

21 talks about the title of the patent?

22     A.   I do.

23     Q.   And the '808 patent at the top, method,

24 algorithm, and computer program for optimizing the

25 performance of messages, including advertisements.

1          Do you see that?

2     A.   I do.

3     Q.   So this first one concerns advertising.

4     A.   To -- in some way.

5     Q.   Yeah.  And the second one, the '434 patent --

6  do you see that one?

7     A.   I do.

8     Q.   And do you see the title of it?

9          I'll read it for the record.  System and

10 method for improving the performance of electronic media

11 advertising campaigns through multi-attribute analysis

12 and optimization.

13          Do you see that?

14    A.   I do.

15    Q.   And that one also concerns electronic media

16 advertising, doesn't it, sir?

17    A.   Yes, it does.

18    Q.   And then the third one, method and

19 algorithm -- excuse me -- method, algorithm, and

20 computer program for optimizing the performance of

21 messages, including advertisements, in an interactive

22 measurable medium.

23          You see that?

24    A.   I do.

25    Q.   This one also concerns advertisements.

1      A.   Yes, in some way.

2      Q.   And the two applications, if you take a look,

3 also include electronic media advertising campaigns,

4 correct?

5      A.   Yes.  That's what it says.

6      Q.   So all of these patents, on their face, in the

7 title, concern internet advertising, don't they, sir?

8      A.   Yes.  They relate to it.

9      Q.   Okay.  And Google -- this is a real-world

10 agreement where Google purchases these patents, right?

11      A.   Yes.  Google purchased -- well, they purchased

12 the patents and the applications.

13      Q.   Right.  And it's dated about a year and a half

14 after the hypothetical negotiation.

15           Okay.  Let's see, in the real world, what

16 Google paid for that.

17      A.   Okay.

18      Q.   Direct your attention back to the first page

19 of this exhibit.  For the record, it's G65166, Section

20 3.1.

21                MR. VERHOEVEN:  Can we bring that up,

22 Charles?

23      Q.   (By Mr. Verhoeven) And do you see in the

24 middle there, it says, quote, the total purchase price

25 for the assigned rights is -- what is that?  What does

1  that say?

2      A.   3,550,000.

3      Q.   $3,550,000.  Not 600 million, 3 million,

4  right?

5      A.   3-1/2 million.

6      Q.   3-1/2 million.

7      A.   Correct.

8      Q.   So in the real world, on this actual patent

9  purchase agreement that Google actually entered into for

10 bare patents, instead of acquisitions, Google paid $3.5

11 million, right?

12     A.   Well, not quite, because this was an

13 acquisition.

14     Q.   This agreement here is a patent purchase and

15 sale agreement, sir --

16     A.   Yes.

17     Q.   -- correct?

18     A.   Yes.  It's a purchase.  It's an acquisition.

19     Q.   Okay.  It's an acquisition of a company, sir?

20     A.   No.  It's an acquisition of assets.

21     Q.   Applied Semantics was an acquisition of a

22 company, right?

23     A.   Correct.

24     Q.   Dclick was an acquisition of a company, right?

25     A.   Yes.

```
1       Q.   D-Link was an acquisition of a company, right?
2       A.   Yes.
3       Q.   You relied on acquisitions of companies,
4   right?
5       A.   Not quite -- not -- no.  I relied on
6   information regarding the acquisition of those
7   companies.
8       Q.   Okay.  You didn't rely on this agreement, did
9   you, sir?
10      A.   No, I did not.
11      Q.   Okay.
12              MR. VERHOEVEN:  Let's go to DX683.
13      A.   I'm sorry.  683?
14              MR. NELSON:  May we approach, Your Honor?
15              THE COURT:  Yes.
16              (Bench conference.)
17              MR. NELSON:  The last one was a Meyer
18  agreement, which is about the terms of the license.
19              This is the INVENDA agreement.
20              There's also the IBM Agreement in the
21  book, which this Court has, I think -- I'm not sure of
22  the exact scope of the ruling.  I had the impression
23  that is not reliable because of the --
24              THE COURT:  I'm sustaining the objection.
25              MR. VERHOEVEN:  Your Honor, these are
```

written documents that exist in the record that he
reviewed.

I'm not asking to have Mr. Wagner testify
about them, Your Honor.  I'm just asking whether he
looked at these terms and whether he considered them.
He's free to say on redirect that he didn't consider
them because the 30(b)(6) didn't have the ability to
describe them.  That's fine.

But aren't I allowed to say, these exist;
these are the terms; you reviewed them; but you didn't
consider them, Your Honor?

THE COURT:  Well --

MR. VERHOEVEN:  This is cross-
examination.

THE COURT:  I know it is, Counselor, but
the reason I excluded them was because y'all didn't
comply with your obligation under 30(b)(6).  That's why
I prevented you from using them in your case-in-chief,
and now you're trying to get it in indirectly what I
told you you couldn't do directly.

So I'm sustaining the objection.

(Bench conference concluded.)

MR. VERHOEVEN:  One minute, Your Honor,
please.

THE COURT:  Yes, sir.

1                     (Pause in proceedings.)

2                     MR. VERHOEVEN:  All right.  Charles, if

3    we could bring up the exhibit -- it's Defendant's

4    Exhibit 710.  I have a couple more questions on that

5    one.

6                     And if we could bring up Article 3,

7    Section 3.1, on the front page, and highlight that

8    sentence, Charles, that we did on the purchase price.

9         Q.   (By Mr. Verhoeven) Now, your opinion is that

10   in the hypothetical negotiation between Google and

11   Function Media in 2007, which concerned a nonexclusive

12   license for two patents, that Google would have agreed

13   to pay $607 million, correct?

14        A.   Well, that's what the math results in.  They

15   would have agreed to pay a royalty of 12 percent.

16        Q.   Is it your testimony that Google would have

17   agreed to pay $607 million as part of the hypothetical

18   negotiation, sir?

19        A.   Yes.  In the end, my total calculation is $607

20   million.

21        Q.   Now, isn't it true that's over 173 times

22   larger than what Google agreed to pay in this real-world

23   patent purchase agreement?

24        A.   I haven't done the math, but it's many times

25   higher.

1    Q.   173.

2    A.   Well, divide 6 by 3 is 180, so, yeah, that's

3  probably close.

4    Q.   Okay.

5         MR. VERHOEVEN:  Let's go to Defendant's

6  Exhibit 703.

7    A.   703.  Okay.

8         MR. VERHOEVEN:  And, Charles, if you

9  could just highlight the -- bring up what the text is.

10        Thank you.

11   Q.   (By Mr. Verhoeven) You see what this is, sir?

12  This is a patent license agreement.

13        Do you see that?

14   A.   I do.

15   Q.   And Google -- this is a real-world agreement

16  that Google entered into, correct?

17   A.   Correct.

18   Q.   This is one of the agreements you reviewed

19  when went through the documents, right?

20   A.   Yes, I did.

21   Q.   And who did -- and you see that the other

22  parties to the agreement are Nokia Corporation?

23   A.   Yes.

24   Q.   Did you know that Nokia Corporation is the

25  largest telephone wireless handset manufacturer in the

1  world, sir?

2     A.   Well, at one time, they were.  I'm not sure

3  that that's the case today.

4     Q.   Do you see the second -- or the third entity

5  down?  It's got a foreign word, and then it says

6  Ericcson?

7     A.   Yes.

8     Q.   You've heard of Ericcson before, right?

9     A.   Oh, yes.

10    Q.   Big company, right?

11    A.   Big Swedish telecommunications company.

12    Q.   One of the biggest companies in the

13  telecommunications industry in the world, right?

14    A.   Yes, I would say so.

15    Q.   Okay.  And then there's yet another company,

16  VoiceAge Corporation, right?

17    A.   Yes.

18    Q.   And what's VoiceAge Corporation?

19    A.   Well, I don't know the details of it, but I'm

20  assuming -- my understanding and my recollection is that

21  VoiceAge was a company that was somehow owned by these

22  two or related to these two companies.

23    Q.   Direct your attention to Page 5.  If you look

24  at the bottom -- not the control numbers, but to the

25  footer, you see there's Page 5 of 39.  The control

1  number is 31975.

2      A.   Okay.  Yes.  Okay.

3            MR. VERHOEVEN:  And, Charles, could you

4  bring out Section 1.15?

5      Q.   (By Mr. Verhoeven) This is the license

6  provision in the agreement, isn't it, sir?

7      A.   Well, it's one of them.

8      Q.   And you see about halfway down, it says:  For

9  convenience, the most recently updated list of such

10 licensed patents is attached to this agreement in

11 Appendix A.

12     A.   Yes.

13     Q.   Do you see that?

14     A.   I'm sorry.  Yes.

15     Q.   So let's go to Appendix A.

16     A.   Okay.

17            MR. VERHOEVEN:  And could we make that a

18 little easier to read, Charles?  Maybe put a box around

19 it and bring it out?

20     Q.   (By Mr. Verhoeven) This is -- this is the

21 licensors' list of licensed patents, right?

22     A.   Yes.

23     Q.   Okay.  And the first list here is from

24 Ericcson, right?

25     A.   Yes.

1     Q.   And, gosh, how many patents are there on this

2 page?  Let's see, there's 14 on the first section --

3     A.   I don't know.  I haven't added it up.

4     Q.   -- 1, then 10, then 4 -- 29 patents on that

5 page, the way I count them.

6     A.   Okay.

7     Q.   Does it look like that to you?

8     A.   I haven't added them up, but I'll agree

9 there's several, probably 20 something.

10    Q.   Okay.

11          MR. VERHOEVEN:  And go to the next page,

12 and bring that out.

13    Q.   (By Mr. Verhoeven) And it looks like there's

14 five more patents listed on this page, right?

15    A.   Yes.

16          MR. VERHOEVEN:  And then the next page,

17 please.

18    Q.   (By Mr. Verhoeven) Now, these are patents that

19 are owned by Nokia, right?

20    A.   That appears to be what to be -- what it is.

21    Q.   Right.  And in the right-hand column, it lists

22 the patents, and it looks like, by my count, there's 19

23 more patents on this page.

24          Do you agree?

25    A.   You want me to add them up?  I agree

1  there's --

2      Q.   Well, take a look at it and tell me if you

3  agree.

4      A.   Okay.  (Witness reviews document.)

5          I counted 21.

6      Q.   21.  Okay.  I was off.

7          MR. VERHOEVEN:  Let's go to the next

8  page.

9      Q.   (By Mr. Verhoeven) Now, these are patents --

10          MR. VERHOEVEN:  If we could highlight

11  that as well and bring it up.

12      Q.   (By Mr. Verhoeven) These are patents that are

13  listed under VoiceAge Corporation.

14          Do you see that?

15      A.   I do.

16      Q.   And on the right-hand column is a list of

17  patents, right?

18      A.   Yes.

19      Q.   That are being licensed by VoiceAge

20  Corporation, right?

21      A.   Yes.

22      Q.   Okay.  How many patents do you count there?

23      A.   Well, it's 20 something, but do you want me to

24  count them specifically?

25      Q.   By my count, I have 16, plus 3, plus 17 -- 36

patents on this page by my count; is that right?

    A.   I'd have to add it up.

    Q.   It's a lot.

    A.   I'll agree it's probably somewhere near your number, if not your number.

    Q.   And then the next page, it continues. VoiceAge Corporation, and we've got another -- by my count, 27 more patents on this page.

         Take a look at it and tell me if you disagree.

    A.   I agree.  Just eyeballing it, it looks like it's over 20.

    Q.   Okay.  So fair to say, this is a license for over a hundred patents?

    A.   I haven't added it up, but it's probably in that range.

    Q.   Do you agree with that?

    A.   Yes.

    Q.   Okay.  And these companies that are licensing these patents, these are big companies, aren't they, sir?

    A.   Well, I don't know about VoiceAge, but the other two are.

    Q.   All right.

         MR. VERHOEVEN:  Let's look at Appendix C, the next page.  And let's -- if we can highlight from

the title down to the end of the box, Charles.

Q.   (By Mr. Verhoeven) Now, you see the title?   It says:  License fees.

Do you see that?

A.   Yes.

Q.   And then under C, it says:  Maximum annual royalty?

A.   I do.

Q.   And then at the very bottom --

MR. VERHOEVEN:  If we could highlight that row in the box.

Q.   (By Mr. Verhoeven) -- it says:  The maximum annual royalty is $2 million; is that right?

A.   Yes.

Q.   So under this agreement with these giant corporations with over a hundred patents, in the real world, Google got a license to all of those patents for how much?

A.   Well, they paid running royalties, but they couldn't exceed $2 million a year.

Q.   Maximum $2 million a year.

A.   Correct.

Q.   Real-world license.

A.   Yes.

Q.   Google entered into it.

1        A.    Yes.

2        Q.    You didn't consider this as part of your

3    opinion, did you, sir?

4        A.    I considered it in my analysis, I certainly

5    did.

6        Q.    Okay.  And what did you consider, sir?

7        A.    Well, I considered the fact that -- as I

8    showed the jury yesterday, that Google told VoiceAge

9    that they had a design-around and that that's why they

10   agreed to the cap, because there was a design-around

11   that Google could go to to avoid using VoiceAge's codec.

12            MR. VERHOEVEN:  Let's go to Plaintiff's

13   Exhibit 313.

14       Q.    (By Mr. Verhoeven) Remember this?  You looked

15   at this yesterday, sir.

16       A.    You have to blow it up for me.

17            MR. VERHOEVEN:  Okay.  Let's blow it up

18   for him.

19       Q.    (By Mr. Verhoeven) Remember this document?

20       A.    Yes.

21       Q.    Okay.

22            MR. VERHOEVEN:  Let's go down to about a

23   third of the way down where it says:  Take it or leave

24   it.

25       Q.    (By Mr. Verhoeven) It says, regarding the cap,

1  take it or leave it?

2      A.   Yes.

3              MR. VERHOEVEN:  Can you bring that up,

4  Charles, and highlight take it or leave it?

5      A.   Yes.

6              MR. VERHOEVEN:  Just take it or leave it,

7  Charles.

8      Q.   (By Mr. Verhoeven) And you remember yesterday,

9  you said this -- this is a situation sometimes you have;

10 somebody says:  Take it or leave it, right?

11     A.   Correct.

12     Q.   And that may make the royalty rate a little

13 bit higher if someone has got that position and that

14 control and that power, right?

15     A.   Correct.

16     Q.   Okay.  This license we're looking at, that's a

17 take-it-or-leave-it license, isn't it?

18     A.   From VoiceAge, yes.

19     Q.   Yeah.

20     A.   Right.

21     Q.   Right?

22     A.   Correct.

23     Q.   Google has no power.  They either have to take

24 it or leave it, right?

25     A.   Well, they either take the license, or they

1　don't practice the technology.

2　　　Q.　They either take the license, or they leave

3　the license, right?

4　　　A.　Okay.　Correct.

5　　　Q.　And they -- they can't up that license; they

6　can't negotiate it.　It's just take it or leave it from

7　these massive corporations, right?

8　　　A.　Well, I don't know if it's take or leave from

9　these massive corporations, but because of the codec

10　technology, it was their choice to either take the

11　license or not practice the license, because they had

12　another way of getting there.

13　　　Q.　It was nonnegotiable.

14　　　A.　From the VoiceAge standpoint, that's right.

15　　　Q.　Right.　Google couldn't negotiate it.　Either

16　take the deal or you leave the deal, right?

17　　　A.　Well, not quite.

18　　　Q.　Google could not negotiate those rates down.

19　You dispute that, sir?

20　　　A.　Look at the -- yes.　Look at the next line.

21　It says:　The only leverage we have is --

22　　　　　　　THE COURT:　Well --

23　　　　　　　THE WITNESS:　I'm sorry.

24　　　　　　　THE COURT:　The question is, do you

25　dispute it?

THE WITNESS:  Yes, I do, Your Honor.

THE COURT:  Okay.

Q.   (By Mr. Verhoeven) Well, yesterday you were --
you pointed to this --

A.   Yes.

Q.   -- as saying, basically, support that, well,
Google would have to take or leave the Function Media
patents, too.

And what this document is talking about is the
VoiceAge agreement, correct?

A.   Yes.

Q.   Okay.  And the VoiceAge agreement, the amount
that Google had to take or leave for over a hundred
patents was maximum $2 million a year.

A.   Yes.  The maximum was $2 million a year.

Q.   That's a real-world agreement between (sic)
Google for a license of over hundred patents, right?

A.   Well, I didn't add up the total patents, but I
agree, it's a real-world license.

Q.   And isn't it true that that's over $240
million -- let me -- let me take that back.

Now, let's circle back to your opinion.  Your
opinion is that Google, in a hypothetical negotiation
with Function Media, that has no facilities, has no
employees, has no operations, has no working software,

has no customers, has no impressions, that,
nevertheless, Google would pay them over $600 million
for a license for only two and a half years.

That's your opinion, right, sir?

A.   Correct.   Two and a half years to date.

Q.   Okay.   Now, isn't it true that that is over
$240 million per year more than what Google paid in this
real-world VoiceAge license agreement?

A.   I don't want to quibble with you, but I don't
know exactly what all Google ended up ultimately paying
VoiceAge.   We just know what the maximum was every year.

Q.   Isn't it true that that is over $240 million a
year more -- your opinion of what would have happened in
the hypothetical negotiation, $240 million more than the
maximum Google would ever have to pay under this
real-world license agreement of over a hundred patents
with these massive corporations?

Isn't that true, sir?

A.   Yes, I would agree with that.

MR. VERHOEVEN:   Let's go to DX707.

A.   Okay.

MR. VERHOEVEN:   And in particular,
Charles, if we could go to G64344.

And could we highlight the title in the
top paragraph, please.

```
 1              MR. NELSON:  May we approach, Your Honor?

 2              THE COURT:  Yes.

 3              (Bench conference.)

 4              MR. NELSON:  There were numerous -- there

 5  were numerous agreements that were in -- Mr. Chen

 6  testified that he said, I don't know about, including

 7  this one.  This was not specifically called out in the

 8  motion.

 9              THE COURT:  Okay.  Overrule the

10  objection.

11              MR. NELSON:  Okay.

12              (Bench conference concluded.)

13      Q.   (By Mr. Verhoeven) Now, this is an

14  agreement -- I think the date is October 7th, 2004.

15          Do you see that?

16      A.   Yes.

17              MR. VERHOEVEN:  Could we highlight that,

18  please, Charles?

19              No, no.  Please bring the title and that

20  first paragraph up again and just highlight the date, so

21  the jurors can see it.  It's right up here (indicating).

22              Thank you.

23      Q.   (By Mr. Verhoeven) And the agreement is

24  between Hewlett-Packard and Google.  Do you agree with

25  that?
```

1    A.   Hewlett-Packard Development Company and

2 Google, yes.

3    Q.   Okay.  So this is another real-world agreement

4 that concerns intellectual property that Google entered

5 into, right?

6    A.   Yes.

7    Q.   And Hewlett-Packard, you've heard of them

8 before, haven't you?

9    A.   Yes.

10    Q.   They're a massive corporation, aren't they?

11    A.   They're a big company.

12    Q.   Yeah.  And this agreement was entered into in

13 around 2004, right?

14    A.   Yes.

15    Q.   All right.  I direct your attention to Page 6

16 of this agreement.  Control number is G64349.

17    A.   49?

18    Q.   64349.

19    A.   Okay.  Oh, I see.  Page 6.  Okay.

20          MR. VERHOEVEN:  And could we bring up

21 Section 2.1?

22    Q.   (By Mr. Verhoeven) And it says:  Patent

23 Licenses.

24        Do you see that?

25    A.   Yes.

1      Q.   This is a real-world patent license agreement

2 that Google and HP entered into, correct?

3      A.   Well, it was more than just a patent license.

4      Q.   Does this say:  Patent Licenses?

5      A.   That part of it says:  Patent Licenses.

6      Q.   And it says:  Patent license grant to Google

7 under licensed e-mail and video patents.

8           Do you see that?

9      A.   I do.

10      Q.   And do you see that that paragraph refers to a

11 Schedule 1?

12      A.   Schedule 1.

13      Q.   I apologize.  It doesn't refer to it.  It says

14 that effective as of the effective date and subject to

15 the terms and conditions here of HPDC -- and that's a

16 reference to Hewlett-Packard, right?

17      A.   Yes.

18      Q.   Hewlett-Packard Development Corporation?

19      A.   Yes.

20      Q.   -- hereby grants Google and its affiliates a

21 personal, nontransferable, nonexclusive,

22 nonsublicensable license under the license e-mail and

23 video patents.

24           Do you see that?

25      A.   I do.

1      Q.   I direct your attention to Page 19,

2  Schedule 1.

3      A.   I'm sorry.  Page --

4      Q.   19.

5      A.   Number Page 19.

6      Q.   And this is G64363.

7      A.   Okay.  Let me -- okay.

8             MR. VERHOEVEN:  And if we could bring

9  that a little bit larger, Charles.

10      Q.   (By Mr. Verhoeven) Now, this is a list of the

11  patents that are being licensed by HP, correct?

12             Excuse me.  This is a list of the patents that

13  Google is licensing from HP, correct?

14      A.   Let me look.

15             (Witness reviews document.)

16             Yes.  This -- this -- this -- well, they don't

17  make a reference back in 2 -- Section 2.1.

18             (Witness reviews document.)

19             I can't say for certain only because there's

20  no reference back in the Section 2.1 to Schedule 1

21  and --

22      Q.   You can't tell?

23      A.   Well, I don't have a patent number -- it just

24  says patent numbers; it doesn't say whose the owner of

25  the patents.

1     Q.   You see the title?  It says:  Licensed e-mail

2  and video patents.

3         Do you see that?

4     A.   Yes.

5     Q.   Okay.  And you see there's 14 patents listed

6  there?

7     A.   Yes.

8     Q.   You saw Section 2.1.  Did you forget what that

9  said, or do you remember?

10     A.   No.  I have -- actually have the page open.

11     Q.   It says:  License under the licensed e-mail

12  and video patents.

13         Do you see that?

14     A.   Yes.

15     Q.   These are the licensed e-mail and video

16  patents, aren't they, sir?

17     A.   I agree.

18     Q.   Okay.  So Google takes a license in the real

19  world from a massive corporation, Hewlett-Packard, one

20  of the biggest computer corporations in the world, for

21  14 patents, right?

22     A.   Yes.

23     Q.   Okay.

24         MR. VERHOEVEN:  Now let's look at Page

25  11, G64454.

1    Q.    (By Mr. Verhoeven) Are you there?

2    A.    I am.

3            MR. VERHOEVEN:  Charles?

4    Q.    (By Mr. Verhoeven) And this section is talking

5 about what Google has to pay for those patents, right?

6    A.    That's the consideration, yes.

7    Q.    Yes.

8            MR. VERHOEVEN:  Let's go to the next

9 page, please.

10           And then if we can bring up the first

11 full paragraph, please.

12   A.    I'm sorry.

13   Q.    (By Mr. Verhoeven) In the second sentence --

14   A.    I'm sorry.  Excuse me.  What page are you on?

15   Q.    Page 12, Control No. G64355.

16   A.    Oh, okay.  The top of Page 12.  Thank you.

17   Q.    The second sentence says, quote, no additional

18 payments will be required at such time when aggregate

19 amounts paid under the earlier clauses exceed $20

20 million.

21           Do you see that?

22   A.    I do.

23   Q.    So under this agreement with HP, Google --

24 Google's maximum payment is $20 million, agreed?

25   A.    Correct.

1    Q.   Okay.  Now, you testified that Google would

2  have agreed in the hypothetical negotiation with

3  Mr. Stone and -- or excuse me -- with Mr. Dean and

4  Ms. Stone in 2007, that Google would have agreed to

5  $607.3 million, right?

6    A.   Yes.

7    Q.   Okay.  But this real-world agreement with

8  Hewlett-Packard, a massive company with major worldwide

9  facilities, Google agreed to -- the maximum Google paid

10  for 14 patents is $20 million, right?

11    A.   The maximum they agreed to pay, yes.

12    Q.   That's over $587 million more that you say

13  Google would pay to two individuals, Mr. Dean and

14  Ms. Stone, than it would pay for 14 patents, instead of

15  two patents, to a massive corporation.

16          Is that your testimony, sir?

17    A.   To the two individuals and their company, yes.

18    Q.   That company is Function Media, right?

19    A.   Correct.

20    Q.   Function Media was formed for the sole purpose

21  of enforcing the patents, wasn't it, sir?

22    A.   Well, I don't know if it was for enforcing the

23  patent.  It was an assignment to that company.

24    Q.   It's a holding company, right?

25    A.   It is a holding company.

1      Q.   It has no operations, does it?

2      A.   Other than its licensing program, no.

3      Q.   Doesn't have any facilities?

4      A.   Well, I don't know what facilities --

5      Q.   You don't know?

6      A.   My understanding is that they have

7  operations -- they're based out of Tyler, Texas.

8      Q.   Well, do they have offices?

9      A.   I assume they have some kind of office.

10     Q.   You don't know?

11     A.   Well, I haven't been to their office.

12     Q.   Did you look into it?

13     A.   Not in any detail, no.

14     Q.   Did you look into whether they had any

15  employees?

16     A.   I understand they do not.

17     Q.   They don't have any employees.

18          Did you look into whether they have any

19  customers?

20     A.   I don't know how to answer that question.

21     Q.   Okay.  Well, that's fine.  You don't need to,

22  if you don't know how to.

23               THE COURT:  Let's avoid arguing with the

24  witness.

25               MR. VERHOEVEN:  Yes, Your Honor.

1           Let's go to Defendant's Exhibit 735.

2      A.   Okay.

3           MR. VERHOEVEN:  And if we could just

4 bring that up on the screen, please.

5      Q.   (By Mr. Verhoeven) What does the title of this

6 document say, sir?

7      A.   I'm sorry.  This is 735?

8      Q.   Yes, sir.

9      A.   It's Alcatel-Lucent patent license.

10     Q.   This is a patent -- a real-world patent

11 license agreement that Google entered into with

12 Alcatel-Lucent?

13     A.   Yes.

14     Q.   And who is Alcatel-Lucent?

15     A.   Well, Alcatel-Lucent is a telecommunications

16 company that was formed from the merger of a French

17 company called Alcatel and Lucent, a U.S. company.

18     Q.   Another giant telecommunications company,

19 isn't it?

20     A.   It's very large, yes.

21     Q.   And this is a patent license agreement, right?

22     A.   Yes.

23     Q.   That's what the title says, right?

24     A.   Correct.

25     Q.   So it's a real-world license agreement that

1  Google entered into with this massive company, right?

2       A.   It's a real world agreement.

3       Q.   I direct your attention to Page 16.

4            MR. VERHOEVEN:  And the third paragraph

5  down, if you'll bring that out.

6       Q.   (By Mr. Verhoeven) This is the definition of

7  the Alcatel-Lucent patents that are being licensed,

8  isn't it?

9       A.   I believe so.

10      Q.   And that's 11 patents, right?  You want me to

11 count them?

12      A.   Well, I'm counting them.

13           (Witness reviews document.)

14           Yes.

15      Q.   And I direct your attention to Page 5.

16      A.   You want me to go back?

17      Q.   Page 5, which is G172931, talks about how much

18 Google pays, right?

19      A.   Yes.

20           MR. VERHOEVEN:  Can you bring that out?

21      Q.   (By Mr. Verhoeven) And what does it say?

22      A.   Well, it's got scheduled payments here of $18

23 million.

24      Q.   Six million a year, right?

25      A.   Yes.

1      Q.    Now, the reasonable royalty that you've opined

2    about was for a period of two and a half years.

3      A.    Yes.

4      Q.    Okay.  And under this agreement, what Google

5    would have to pay this large corporation, Alcatel-

6    Lucent, for 11 patents is $6 million a year, right?

7      A.    In part.

8      Q.    $6 million a year is what it says right here,

9    right, sir?

10      A.    Yes.

11      Q.    Okay.

12      A.    But I'm saying in part in response to your

13    question.

14      Q.    $6 million a year.

15            Now, you've opined, again, that Google would

16    have agreed to pay Mr. Dean and Ms. Stone $607 million

17    for only two and a half years, right?

18      A.    Yes.

19      Q.    Okay.  Isn't it true that that is over $240

20    million per year more than what Google agreed in the

21    real world, in this license agreement, to pay

22    Alcatel-Lucent, a massive corporation?

23      A.    I haven't done the math, but I agree.  It's a

24    lot.  What I'm saying that Google owes -- would go --

25    owe Function Media would be a lot more than $6 million a

year.

Q.   Do you dispute that at -- what your opinion is, is over 240 million times per year larger than what this actual real-world agreement is?

A.   240 million times?

Q.   Well, maybe I misspoke.

Do you agree, sir -- or let me -- let me withdraw.

Do you dispute, sir, that your opinion of $607.3 million for two and a half years amounts to over 240 million more per year, in your opinion, that Google would have paid these two individuals for two patents than what Google, in the real world, agreed to pay a large company, Alcatel-Lucent, for 11 patents per year?

A.   Well, I -- I don't disagree that they would pay significantly more under my analysis.

Q.   Do you dispute it's 240 million than this agreement?

A.   I don't have a pen, but I can --

Q.   Do you dispute it?

A.   Well, I haven't done the math.  So I'm just saying, the reason I ask -- I'm saying that is because there's a half a year involved, not a full year.  But I would agree, for the first two full years, it would be 240, more or less.

     Q.   So we've looked at four real-world patent
agreements that Google actually entered into that are
license agreements, haven't we, sir?

     A.   Yes and no.

     Q.   The Carl Meyer agreement, Google paid $3.5
million.

     A.   I'm sorry.  Did you say that was a license
agreement?

     Q.   The Carl Meyer agreement was more than a
license agreement, wasn't it, sir?  It was a purchase of
the patents.

     A.   That document was a purchase, yes.

     Q.   So it was even more -- it should cost more
than a license, right?

     A.   Not necessarily.

     Q.   The Carl Meyer agreement, Google paid $3.5
million to purchase the patents at issue, right?

     A.   Yes, the patents in --

     Q.   And that real --

     A.   I'm --

     Q.   That's a real-world agreement, right?

     A.   Yes.

     Q.   And your opinion is over 173 times more than
that for what you think that Google would have paid --
agreed to pay Function Media, right?

1    A.    I agree with you that -- I haven't done the

2  math, but that sounds about right.

3    Q.    And the VoiceAge agreement we looked at,

4  that's a license to over a hundred patents, right, sir?

5    A.    I haven't added up the number of patents.

6    Q.    And Google -- that's a real-world agreement

7  that Google entered into with massive corporations,

8  Nokia, Ericcson, right?

9    A.    Yes, except we don't know if -- VoiceAge, I

10  don't believe, is massive.

11    Q.    And Google paid a maximum of 2 million per

12  year for over a hundred patents, right?

13    A.    Again, I don't know if it's over a hundred

14  patents, but I agree, they agreed to pay no more than 2

15  million a year.

16    Q.    And that's over -- in your opinion as to what

17  Google would have paid Mr. Dean and Ms. Stone, is over

18  $240 million more per year than what Google actually, in

19  the real world, in this VoiceAge agreement, agreed to

20  pay for over a hundred patents to VoiceAge and its

21  affiliates, right?

22    A.    That would be approximately.  I agree with you

23  approximately, because I haven't done the math.

24    Q.    And we looked at another real-world agreement

25  between Google and Hewlett-Packard?

1          THE COURT:  Well, let's -- excuse me for

2   interrupting you.

3          MR. VERHOEVEN:  Yes.

4          THE COURT:  We're going to take our

5   morning recess at this point.

6          Ladies and Gentlemen, be back ready to

7   come in the courtroom at 10:30.

8          Remember my prior instructions -- excuse

9   me -- and don't talk about the case.

10         COURT SECURITY OFFICER:  All rise.

11         (Jury out.)

12         THE COURT:  All right.  Let's try to

13  avoid repetition, okay?

14         MR. VERHOEVEN:  Yes, Your Honor.

15         THE COURT:  I mean, when you start

16  introducing your questions with, and we looked at and

17  again, it's a pretty good indication that you're being

18  repetitive.

19         MR. VERHOEVEN:  I appreciate that.

20         THE COURT:  And I'm giving you some

21  latitude because it's cross-examination, but don't be

22  repeating yourself.

23         And avoid side-bars, okay?  I know it's

24  cross-examination, and you're trying to represent your

25  client, but I don't allow you to argue with the witness,

1  okay?

2              MR. VERHOEVEN:  Yes, Your Honor.

3              THE COURT:  All right.

4              MR. VERHOEVEN:  Thank you.

5              THE COURT:  We'll be in recess.

6              (Recess.)

7              COURT SECURITY OFFICER:  All rise.

8              (Jury in.)

9              THE COURT:  Please be seated.

10             Let's continue.

11             MR. VERHOEVEN:  Thank you, Your Honor.

12      Q.   (By Mr. Verhoeven) Now, Mr. Bratic, on your

13  direct examination, I recall you gave some testimony

14  about an acquisition that Google made of a company

15  called Applied Semantics.

16             Do you remember that, generally?

17      A.   I do.

18      Q.   Now, the deal between Google and Applied

19  Semantics, that was an acquisition of an entire company,

20  wasn't it, sir?

21      A.   Yes.

22      Q.   So that had -- Google bought people, right?

23      A.   You don't buy people.

24      Q.   Well, it --

25      A.   You get --

1    Q.   It acquired employees?

2    A.   Yes -- yes.

3    Q.   Engineers?

4    A.   Yes.

5    Q.   Applied Semantics had products?

6    A.   Yes, it did have a product.

7    Q.   Applied Semantics had customers?

8    A.   Yes.

9    Q.   They had offices and facilities?

10   A.   They did.

11   Q.   The Google acquisition of Applied Semantics

12   was not a bare license agreement, was it, sir?

13   A.   No, it wasn't.

14        MR. VERHOEVEN:  Let's go to Plaintiff's

15   Exhibit 807, and would you go to Page -- I think it's 3;

16   it bears Control No. 4299.

17        THE WITNESS:  Okay.

18        MR. VERHOEVEN:  If we can highlight the

19   bullet there.

20   Q.   (By Mr. Verhoeven) There's a reference to 19

21   engineers and 38 to 44 employees, right?

22   A.   I'm sorry.  I didn't get the last part.

23   Q.   There is a reference there --

24   A.   Oh.  Oh, I'm sorry.

25   Q.   -- to the ASI employees who would go and be

1    hired by Google, right?

2         A.    Yes.

3         Q.    So there's an acquisition of employees.

4              MR. VERHOEVEN:    Let's go to the next

5    page.

6         Q.    (By Mr. Verhoeven) You see the title --

7              MR. VERHOEVEN:    If we could just

8    highlight the -- Charles, just highlight from the

9    factors considered to value ASI all the way down to the

10   bottom.

11        Q.    (By Mr. Verhoeven) And among the factors

12   considered to value ASI, you see the second bullet under

13   the first heading, Proven Success of Domain Products.

14              Do you see that?

15        A.    I do.

16        Q.    Do you know what that's a reference to?

17        A.    Well, they had an AdSense -- excuse me --

18   Applied Semantics had a product.

19        Q.    And this document is saying one of the

20   factors -- it's a Google document, right?

21        A.    Yes, this is a Google document.

22        Q.    You considered a number of Google documents as

23   part of your opinion, right?

24        A.    And this one.

25        Q.    And this says factors considered when they

1 valued this acquisition of an entire company, and they

2 say proven success of domain products, right?

3     A. Yes.

4     Q. Fair to say that that was a factor that Google

5 considered when they decided to do this transaction?

6     A. Yes.

7     Q. And so ASI had proved that it had successful

8 domain products at that time, right?

9     A. Yes.

10     Q. Now, Function Media, in this hypothetical

11 negotiation, they didn't have any proven success of any

12 products, did they?

13     A. No. They had no products.

14     Q. Right.

15     I direct your attention down to the second

16 part of this. In the second -- third to last bullet

17 there, it says establishes Southern California product

18 development center.

19     Do you see that?

20     A. Yes.

21     Q. So -- and above that, it says synergies with

22 Google.

23     Do you see that?

24     A. Yes.

25     Q. So one of the synergies is it would help

1  establish a Southern California product development

2  center, if Google did this acquisition.  Fair?

3      A.   It appears to be the case.

4      Q.   Now, in this hypothetical negotiation that

5  you've given your opinion about, Mr. Dean and Ms. Stone,

6  they don't have any product development center, do they?

7      A.   No.

8      Q.   Don't have any -- any products even?

9      A.   Not as far as I know.

10     Q.   Okay.

11          MR. VERHOEVEN:  Let's go to PX441.

12     A.   I'm sorry.  441?

13     Q.   (By Mr. Verhoeven) Uh-huh.

14          And if we could go to --

15     A.   I'm sorry.  Let me find my copy.

16     Q.   Certainly.  Take your time.

17     A.   Okay.  I've got it.  Thank you.

18          MR. VERHOEVEN:  And if we could go to

19  Page 4 of 18, G14470, and highlight from why Google

20  acquired ASI on down.

21     Q.   (By Mr. Verhoeven) And you'll see again, this

22  is a Google document, right?

23     A.   It's the same document.

24     Q.   And it says why Google acquired ASI, right?

25     A.   Yes.

1    Q.   And then one of the reason listed is proven

2  success of domain products, right?

3    A.   Yes.

4    Q.   The next bullet:  Increasing traction of ASI

5  news and enterprise solutions.

6         Do you see that?

7    A.   I do.

8    Q.   What's your understanding of what that refers

9  to?

10   A.   Apparently, Applied Semantics had some kind

11 of -- I'm not sure what the news is, but enterprise

12 solutions, they had some kind of products for companies

13 to use.

14   Q.   And that was the reason -- one of the reasons

15 why Google acquired them, right?

16   A.   It was one of the reasons, yes.

17   Q.   Right.

18        And if you look down below that, the second

19 bullet in the next section says:  Google will be able to

20 grow its engineering presence and recruiting efforts in

21 the Southern California region.

22        Do you see that?

23   A.   Yes.

24   Q.   So that's one of the synergies to Google of

25 acquiring an entire company here is that Google will be

1  able to grow its engineering presence by acquiring this

2  company in Southern California, right?

3      A.   Yes.

4      Q.   Okay.  Now, in your hypothetical negotiation,

5  this is just supposed to be a bare patent license, not

6  an acquisition of a whole company, right?

7      A.   Correct.

8      Q.   And in your hypothetical negotiation, you

9  would agree with me that Function Media does not have

10 any engineering presence?

11     A.   Function Media, yes.

12     Q.   They do not have one, right?

13     A.   Yes, they do not have an engineering presence

14 as far as I know.

15     Q.   All they have are the two patents, right?

16     A.   Yes.

17     Q.   Nothing else?

18     A.   I -- I thought Mr. Dean said that Function

19 Media held some other patents.

20     Q.   In our hypothetical negotiation, is that

21 relevant?

22     A.   No, but --

23     Q.   Okay.

24     A.   -- I was just responding to your question.

25     Q.   Okay.  So in our hypothetical negotiation, all

1  we're talking about acquiring is a license that's

2  non-exclusive for just those two patents, right?

3      A.   Yes.

4      Q.   And only for two and a half years, right?

5      A.   Well, under Georgia-Pacific, it's presumed

6  that the license is for the life of the patent.

7      Q.   Well, your number is only for two and a half

8  years?

9      A.   Yes, because we're here in trial today.

10     Q.   Okay.  You also talked about another

11 acquisition, dMarc.

12     Do you remember that generally?

13     A.   DMarc Broadcasting.

14     Q.   Yes.

15          MR. VERHOEVEN:  DX357, please.

16     A.   I don't think that's in my binder, but -- did

17 you say 357?

18     Q.   (By Mr. Verhoeven) 354 -- I misspoke,

19 Mr. Bratic.  I apologize.  PX354.

20     A.   Okay.

21     Q.   Is that in your binder, sir?

22     A.   354 is.

23     Q.   Okay.  And this is a Google document, correct?

24     A.   It is.

25     Q.   And this is a reference to -- this concerns

1  the dMarc acquisition?

2      A.   Let me take a quick look.

3           I don't see any reference to dMarc in these

4  two pages that you've given me.

5

6  **REDACTED BY ORDER OF THE COURT**

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**REDACTED BY ORDER OF THE COURT**

MR. VERHOEVEN:  Let's go to the second page of this document.  That's Control No. 770 at the bottom.

    A.   Yes.

MR. VERHOEVEN:  And let's highlight the first bullet all the way down through the sub-bullets, Charles.



REDACTED BY ORDER OF THE COURT

■■  **REDACTED BY ORDER OF THE COURT**  ■ ■■

MR. VERHOEVEN:  Now we can take that off the screen, Charles.

Q.  (By Mr. Verhoeven) Now, you testified on direct about what you called industry royalty rates.

Do you remember that generally?

A.  Yes.

Q.  Something you found in a publication called Licensing Economics Review.

Do you recall that?

A.  I do.

Q.  You have no evidence, sir, that those rates are for analogous inventions to the inventions in this case, do you?

A.  No.  Not as to the specific inventions, no.

Q.  And you have no evidence that those rates are for bare patent licenses, do you?

A.  No.

Q.  They're for lots of different things, aren't they?  Software, technology?

A.  Oh, yes.

Q.  Things that aren't patents, right?

A.  Well, they would include software patents and the like.

Q.  They're not just bare patent licenses, are

1  they?

2       A.   No, they're not.

3       Q.   Would agree with me that somebody would pay

4  more to license intellectual property if they got not

5  just a patent but also the technology and the software

6  and the engineers and the know-how?

7       A.   No, not necessarily.

8       Q.   Oh, you think that they wouldn't pay more for

9  that?

10      A.   It depends on the circumstances.

11      Q.   Do you think Google would pay more in a

12  hypothetical negotiation if Function Media actually had

13  a working product that people liked and used and had

14  thousands of impressions per day?

15           Do you think that might be more valuable to

16  Google?

17      A.   No, it wouldn't matter.

18      Q.   Wouldn't matter?

19      A.   No.

20      Q.   Wouldn't matter, in your opinion, to Google's

21  assessment of how much the technology was worth, whether

22  all you had was Mr. Dean and Ms. Stone and a couple of

23  patents versus a functioning product that had millions

24  of impressions per day, that worked well, and customers

25  liked?

1          That wouldn't make a difference to Google?

2     A.   Well, it would because that's exactly what

3 Google had.

4     Q.   In the hypothetical negotiation, sir, do you

5 think it would be more valuable to Google if Function

6 Media had all those products and all that success, other

7 than just the two patents?

8     A.   No, it wouldn't matter.

9     Q.   Wouldn't matter?

10     A.   Because then we'd be talking about lost

11 profits.

12     Q.   Oh, okay.  So it's your testimony that Google

13 wouldn't value that higher than Google would value a

14 hypothetical negotiation where there was no product, no

15 facilities, no employees, just two bare patents?

16     A.   Not under the facts of this case, no.

17     Q.   Okay.  Now, these industry rights, you -- your

18 slide showed that you used -- I think it was a hundred

19 different licenses they were based on.

20          Do you remember that?

21     A.   Yes.

22     Q.   You didn't study those licenses, did you?

23     A.   No.

24     Q.   Didn't even read them, did you?

25     A.   No.

Q.   You don't know if they're bare patent licenses or software licenses, do you?

A.   I do know.

Q.   Okay.  Which ones are bare patent licenses and which ones are software licenses?

A.   What I do know is the document itself says internet licenses, parenthesis, including software.  So I know they include internet software licenses.

Q.   So you know they include software, which isn't part of the hypothetical negotiation, right?

A.   Well, software itself is not.

Q.   So that's a yes?

A.   Yes.

Q.   Okay.  You don't know anything about the terms of the hundred and some licenses, whether they're exclusive, non-exclusive, right?

A.   That's correct.

Q.   Never even read them?

A.   That's correct.

Q.   But you're relying on this?

A.   In part.

MR. VERHOEVEN:  Now, I'm trying to stay organized, Your Honor, but I misplaced a paper.  I want to make sure that I'm organizing this so we can minimize the amount of time we have to have jurors -- or the

1    people out of the room.

2                    THE COURT:  I understand.

3        Q.   (By Mr. Verhoeven) All right.  Let's talk a

4    little bit about the Stanford license.  You talked about

5    the Stanford license in your direct exam.

6                Do you remember that?

7        A.   Yes.

8        Q.   Now, that --

9                MR. VERHOEVEN:  Let's bring up DX689,

10   please.

11               And just can we highlight the title in

12   the first paragraph, please?

13       Q.   (By Mr. Verhoeven) This is the agreement you

14   were testifying about yesterday, right?

15       A.   Yes.

16       Q.   And this is dated December 1, 1998, right?

17       A.   Yes.

18       Q.   What's the date of the hypothetical

19   negotiation?

20       A.   It's July 2007.

21       Q.   July 2007.  So that's nine years later?

22       A.   Yes.

23       Q.   Okay.  Would you agree with me that the

24   internet and the industries surrounding the internet

25   were vastly, exponentially different in 2007 than they

were in 1998?

     A.    Well, I would agree.  The internet grew a lot
in that time period.

     Q.    What you could do was completely expand it,
wasn't it?

     A.    I'm not sure what you mean by --

     Q.    Well, by 1998, you didn't have broadband, did
you?

     A.    I'm not so sure.

     Q.    You couldn't watch -- you couldn't have a good
user experience watching graphics or video on the
internet, could you?

     A.    It's a while ago.  I can't say for certain.

     Q.    You're not sure?

     A.    I'm just saying I can't say for certain.

     Q.    Would you agree with me that the environment
in this industry, in the internet world, was vastly
different in 1998 than it was in 2007?

     A.    Yes, I'll say it was very different.

     Q.    Okay.

     A.    It's grown an awful lot.  It's become much
more important.

     Q.    And the things that you could do on the
internet have advanced greatly, haven't they?

     A.    Yes.  You mean since 1998?

1    Q.   That's right.

2    A.   Yes.  They advance every year.

3         MR. VERHOEVEN:  Now, let's put up DX Demo

4 54.

5    Q.   (By Mr. Verhoeven) And you can stay on this

6 document, sir.  I just have a demonstrative slide to

7 illustrate what I think the terms of the actual

8 agreement were in 1998.

9    A.   I'm sorry.  Can you tell -- bear -- just bear

10 with me.  Let me go -- what is that; Section 8.1 you're

11 talking about?

12   Q.   Yeah.

13   A.   Okay.

14   Q.   Do you dispute, sir, that the value of this

15 deal in 1998 was $180,000?

16   A.   Yes.

17   Q.   You do dispute that?

18   A.   Yes.

19   Q.   Okay.  Do you dispute that 2 percent of $8

20 million is $160,000?

21   A.   I don't dispute that math.

22   Q.   And 8. -- Section 8.1 talks about 2-percent

23 equity of issued shares after the round of investor

24 financing which resulted in 8 -- in 8-million-dollar

25 post-money valuation.

1    Do you see that?

2    A.   Yes, I do.

3    Q.   Okay.  And if you do the math, it comes to

4  $160,000.

5    A.   I agree; 2 percent of 8 million is 160,000.

6    Q.   And then the issue royalty is $20,000, right?

7    A.   Yes, initial payment.

8    Q.   And then the exclusive period royalty is

9  $50,000?

10   A.   Yes.

11   Q.   Okay.  That was the terms of the deal in 1998,

12  correct?

13   A.   No, not quite.

14   Q.   Does that -- is that what 8.1 and 8.2 say,

15  sir?

16   A.   Not the way you've characterized it.

17   Q.   Okay.  Does 8.1 say Google agrees to pay

18  Stanford a non-credible, non-refundable license issue

19  royalty of $20,000?

20   A.   Yes.

21   Q.   In addition, Google agrees to issue to

22  Stanford shares of Google stock equivalent to 2-percent

23  equity of issued shares after the round of investor

24  financing which resulted in an 8-million-dollar

25  post-money valuation.

1         Do you see that?

2     A.    I do.

3     Q.    That's what -- so that says that Google agrees

4 to give Stanford 2 percent of $8 million, right?

5     A.    That's not the whole story.

6     Q.    Is that what it says, sir?

7     A.    That's not all it says.

8     Q.    What else does it say in 8.1?

9     A.    What it says in 8.1 is Google only gets that

10 2 percent of stock, if Stanford is able to raise $8

11 million in funds.  In other words, a 2-percent equity is

12 contingent and dependent on Stanford going out and

13 raising $8 million.

14         So at the time that agreement was executed,

15 that $8 million wasn't in place.

16     Q.    So that might not even happen?

17     A.    Correct.

18     Q.    Okay.  But if it does, it's $160,000?

19     A.    Well --

20     Q.    That's what the math adds up to, sir.

21     A.    That's what the math adds up to.

22     Q.    And that's the transaction in 1998, sir,

23 right?

24     A.    Yes.

25     Q.    Now, your testimony talks about how Google's

1  stock has grown over the years, but no one knew in 1998

2  whether Google would be one of the millions of dot com

3  companies that bailed in the dot com bust, did they?

4      A.    Nobody knew, no, for certain.

5      Q.    And would you agree with me that startup

6  companies, the vast majority of startup companies, fail?

7      A.    I would -- I don't know if I could say the

8  vast majority but a lot of them do.

9      Q.    Yeah, especially where Google comes from,

10  right?  In the Bay Area?

11     A.    In the Silicon Valley area, a number of them

12  failed.  That's true.

13     Q.    Well over 50 percent.

14     A.    That I can't say.  I don't have --

15     Q.    You can't say?

16     A.    I just know a lot.

17     Q.    Okay.  Fair to say that Google and Stanford

18  had no idea in 1998 that their stock would be worth a

19  lot of money 10 years later, did they?

20     A.    I agree with that.

21     Q.    Okay.  The deal they struck was a deal in

22  1998, right?

23     A.    Yes.

24     Q.    And these are the terms of the deal they

25  struck in 1998, right, sir?

1    A.   The terms in Section 8.1, yes.

2    Q.   Okay.

3         MR. VERHOEVEN:  Your Honor, at this

4    point, I'm going to request -- we're going into the same

5    subject matter areas.

6         THE COURT:  Okay.  Folks, I'm going to

7    have to ask you to excuse yourself at this time, and

8    I'll call you back in once we've concluded with this

9    line of testimony.

10

11

12        **SEALED BY ORDER OF THE COURT**

13

14

15

16

17

18

19

20

21

22

23

24

25



SEALED BY ORDER OF THE COURT



SEALED BY ORDER OF THE COURT



SEALED BY ORDER OF THE COURT



SEALED BY ORDER OF THE COURT



**SEALED BY ORDER OF THE COURT**



SEALED BY ORDER OF THE COURT



SEALED BY ORDER OF THE COURT

121



SEALED BY ORDER OF THE COURT



SEALED BY ORDER OF THE COURT



SEALED BY ORDER OF THE COURT



SEALED BY ORDER OF THE COURT



SEALED BY ORDER OF THE COURT



SEALED BY ORDER OF THE COURT



SEALED BY ORDER OF THE COURT



SEALED BY ORDER OF THE COURT



**SEALED BY ORDER OF THE COURT**



SEALED BY ORDER OF THE COURT



SEALED BY ORDER OF THE COURT



SEALED BY ORDER OF THE COURT



SEALED BY ORDER OF THE COURT



**SEALED BY ORDER OF THE COURT**



SEALED BY ORDER OF THE COURT



**SEALED BY ORDER OF THE COURT**



SEALED BY ORDER OF THE COURT



SEALED BY ORDER OF THE COURT

1

2

3

4

5

6

7

8

9

10

11

12

13

14          MR. VERHOEVEN:   Thank you, Your Honor.

15     Q.   (By Mr. Verhoeven) Now, on your direct

16 examination, you did a comparison of a nonaccused

17 product, AdSense for Content Direct --

18     A.   Yes.

19     Q.   -- with AdSense for Content Online.

20          Do you remember that, generally?

21     A.   Yes.

22     Q.   Now, AdSense for Content Direct, did you know

23 that the customers for Google that primarily comprise

24 AdSense for Content Direct are powerful industry

25 advertisers?

1     A.   I understand they're large companies.

2     Q.   Yeah.  Large companies --

3     A.   Yeah.

4     Q.   -- right?

5     A.   Yes.

6     Q.   And did you understand that Google can't

7 simply tell these companies:  We want you to use our

8 automated service because it's more profitable?

9     A.   I'm sorry?

10    Q.   Did you understand -- do you understand,

11 Mr. Bratic, that Google can't simply tell these large

12 advertising companies:  We want you to move over to

13 on -- the online service, because it's more profitable

14 for us?

15         Do you understand that?

16    A.   Not from the documents I saw.

17    Q.   You think that -- that Google can simply tell

18 these major advertising companies, who want to do direct

19 advertising, that we're not going to do that; you got to

20 go and use our online service just because it's more

21 profitable for us?

22    A.   No, that's not my testimony.

23    Q.   Okay.  They couldn't do that, could they?

24    A.   I don't understand the question.

25    Q.   In the real world, if you have major customers

1    who prefer Product A, you can't just say:  We're going

2    to move you to Product B because it's more profitable,

3    can you?

4         A.    Depends on the circumstance.

5         Q.    Well, if they say no and they're one of your

6    major customers, you're going to lose the customer,

7    right?

8         A.    Maybe; maybe not.  It depends if they have a

9    choice.

10        Q.    Okay.  You don't know one way or the other.

11        A.    Right.

12        Q.    You can't simply assume that we can just move

13   all these major advertisers out of their preferred

14   product into another product that's more profitable, and

15   there's no problem there, can you?

16        A.    No.  I never did assume that.

17        Q.    Okay.  Do you think maybe the difference in

18   profitability between AFC Online, AdSense for Content

19   Online, the accused product, and AdSense for Content

20   Direct, which has all the major advertisers -- do you

21   think maybe the difference in profitability is that the

22   major advertisers have more power and can negotiate a

23   better deal?

24        A.    Oh, yes, I'm sure that's part of it.

25        Q.    And that's part of the reason why AdSense for

1  Content Direct is less profitable, isn't it, sir?

2      A.   AdSense for Content Direct?

3      Q.   Yes.

4      A.   Yes.

5      Q.   That's one of the reason it's less profitable

6  than AdSense for Content Online, right?

7      A.   Well, right, because -- yes, because Google

8  has more control over its AdSense for Content Online

9  publishers.

10     Q.   Right.  And those publishers happen to be a

11 lot smaller than the AdSense for Content Direct

12 publishers, don't they?

13     A.   Yes, they do.

14     Q.   Okay.  So you can't simply take the

15 profitability or lack thereof of the nonaccused product,

16 AdSense for Content Direct, and say, well, we can just

17 move all those guys over for to AdSense for --

18              MR. VERHOEVEN:  Sorry, Your Honor.  I hit

19 the thing.

20     Q.   (By Mr. Verhoeven) We can just take all these

21 products over and move them for AdSense for Content

22 Online and be a wash.  No problem.

23          That's not realistic, is it, sir?

24     A.   Well, I never said that.

25     Q.   And it's not realistic, is it?

1     A.   No.

2     Q.   Now, you said that, in your opinion, there

3 aren't any noninfringing substitutes to these patents.

4     A.   Acceptable noninfringing substitutes.

5     Q.   Thank you.  You said there are no acceptable

6 noninfringing substitutes.  And your opinion is based

7 100 percent on somebody else's testimony, right?

8     A.   Yes.  Dr. Rhyne.

9     Q.   So it's not -- you're just pointing to him,

10 right?

11    A.   Yes.  I'm not a technical expert.  I'm relying

12 on him.

13    Q.   Okay.  Did you ever hear of AdForce?

14    A.   Yes.

15    Q.   Did you know that AdForce was out, and people

16 were doing it before the patents had issued in this

17 case?

18    A.   I don't know when people were doing AdForce.

19    Q.   Did you know that AdForce was a fully

20 automated system?

21    A.   I don't know that to be true.

22    Q.   Did you know AdForce had a publisher interface

23 and a seller interface?

24    A.   The specifics, I don't recall.

25    Q.   Did you know that AdForce didn't get a patent

1  on its technology so people could use it without

2  violating their patent?

3      A.   I did not make an investigation of AdForce's

4  patent.

5      Q.   You didn't look into that?

6      A.   I don't recall.

7      Q.   Now, if -- if it turns out that I'm right,

8  AdForce was out there, and it did this functionality,

9  it's fully automated, and Google could use it for free,

10  that would be an alternative for Google instead of

11  signing a license in the hypothetical negotiation,

12  right?

13      A.   Not necessarily.

14      Q.   It could be, couldn't it?

15      A.   Well, we don't know, because you don't know

16  what terms AdForce would agree to, and you don't know

17  whether AdForce's technology is comparable.

18      Q.   Well, let's assume that it had the same

19  automatic technology that we're talking about.  That

20  would be a noninfringing substitute, right?

21      A.   If it had the same functionality.

22      Q.   Now, it's interesting you talk about

23  functionality.  By functionality, do you mean the claim

24  elements?

25      A.   Not at all.

1     Q.   Okay.

2     A.   I mean the characteristics.  In other words --

3     Q.   The characteristics.

4     So what are the characteristics that you think

5 is the functionality that can't be designed around?

6     A.   Well, I'm not a technical expert, so I'm not

7 sure what you want me to --

8     Q.   Well, you told -- I'm sorry.  Go ahead and

9 finish.

10    A.   No.  I'm just saying -- I don't want to give

11 you a long answer, so why don't you please restate your

12 question.

13    Q.   What are the technical characteristics you

14 just referred to that would be an acceptable

15 noninfringing substitute that you've concluded aren't

16 available to Google?

17    A.   I've just told you, I'm not a technical

18 expert.  I'm relying on Dr. Rhyne regarding the

19 technical aspects of that issue.

20    Q.   You've told the jury that there's no

21 acceptable noninfringing substitutes.

22    A.   Yes.

23    Q.   Okay.  What are the features that you think

24 are the accept -- the functionality that would be

25 acceptable that can't be designed around?

1   A.  Okay.

2   Q.  Can you tell us that?

3   A.  Yes, I can, just with the caution that I'm not

4 a technical person, so I'll explain to you what I

5 understand.

6   Q.  Okay.

7   A.  And so I'll give you just a general overview.

8 My understanding is, what's critical and core and

9 fundamental about the patents-in-suit is that they have

10 taught a method -- a way of taking -- allowing

11 advertisers to -- on a self-service, fully automatic

12 basis, loading information regarding their preferences

13 for how they want their ads -- what they want their ads

14 to have in them, and then here on the other side --

15 imagine three wheels.

16     You have one wheel out here, which is the

17 advertisers, completely automated, doing their thing,

18 completely loading in all their advertising information

19 with no human intervention.

20     Imagine another wheel over here, which are

21 publishers.  Publishers are putting in all their

22 publication -- what are called publication rules,

23 meaning the look, the feel, the font, the color, the

24 background of their website, how they want the ads to

25 match both the color, the texture, everything, so that

there's a seamless introduction of the advertisement
when it pops up on that customer's website.

That's a completely different and completely
independent wheel, again, taught by the patents.

The third wheel or circle in the middle is
where both of those publisher and advertiser wheels or
circles come together in a completely self --
self-contained, automated fashion and allow for the
creation -- automatic creation of advertisers --
advertisements that then end up on those publishers'
websites.

And it's that contextual look and feel, that
automatic process, which enables Google to do it on a
mass scale.

And when I talk about scalability, we're
talking about able to take those publishers' websites
and make money for the publishers and Google, because
those publishers otherwise would not have made money,
because all they had was content, and they had no way,
because of their size and the many millions of
publishers out there -- it was a unique way for
publishers and Google to make money.

And that's what my understanding it is.

MR. VERHOEVEN:  Your Honor, may I come
around and use the butcher paper here?

1          THE COURT:  Yes.

2     Q.   (By Mr. Verhoeven) Can you see here?

3     A.   I can see the top part.  I can stand up, if

4 you like.

5          THE COURT:  Just move it over a little

6 bit closer.

7          THE WITNESS:  I tell you what, if I move

8 over here, I think we're good.

9     Q.   (By Mr. Verhoeven) Okay.  So I think you

10 talked about three -- did you call them wheels?

11     A.   Yes, circles or wheels.

12     Q.   Okay.  So one is the publisher interface?

13     A.   The publisher network, yes.

14     Q.   Publisher network?

15     A.   Well, I call it the automated publisher

16 system.

17     Q.   Okay.  So this is the publisher.

18          And then the other is what?

19     A.   The advertisers.

20     Q.   And the third one?

21     A.   Is Google.

22     Q.   No.  I'm talking about the patents.  Features

23 in the patents that you think are needed for there to be

24 an acceptable substitute.

25     A.   I can't tell you what's needed, because that's

a technical question.  I can just tell you what I

understand --

    Q.   Okay.

    A.   -- is the way the system operates and what's

taught and what the benefits of doing -- or practicing

the patent is.

    Q.   Well, you're -- you're an expert, who has

provided an opinion on whether there's any acceptable

noninfringing substitutes, correct?

    A.   What my understanding is on them.

    Q.   Do you have an opinion on it?

    A.   I've told you my opinion is based on

Dr. Rhyne.

    Q.   Okay.  So this is -- is this the computer

controller?

    A.   That's what I've heard it referred to.  I'm

not sure if that's the correct term, but it's the Google

interface that links those two wheels.

    Q.   Well, I want to make sure I have your

understanding, so what would you call this?

    A.   I would just call it the Google system that

links both of the wheels.

    Q.   I'm talking about the patent, sir.

    A.   Yes.  That's what I'm talking about.  But I'm

not --

1     Q.   The patents -- the patents don't say the

2  Google system, do they?

3     A.   I haven't looked at them in a while.

4     Q.   This is the central controller that manages

5  all this and publishes, right?

6     A.   I would agree -- I understand that there is an

7  automated computer system at Google that manages the

8  whole process.  That's the third wheel I'm talking

9  about.

10     Q.   Okay.  And so the publishers.  Then the

11  information the publishers put in it goes here

12  (indicating), right?

13     A.   Yes.

14     Q.   And the information the advertisers put in

15  goes here (indicating), right?

16     A.   Correct.

17     Q.   Okay.  Do you know -- did you know that

18  AdSense has a publisher interface and advertiser

19  interface and central computer system?

20     A.   AdSense?

21     Q.   Yes.

22     A.   Yes.  Yes, of course.

23     Q.   You did know that.

24     A.   Yes.  AdSense for Content.

25     Q.   Did you know -- I'm sorry.  I misspoke.

Did you know that AdForce has a publisher interface, an
advertiser interface, and a central computer system?

    A.    Not specifically, no.

    Q.    You didn't know that?

    A.    No.  I don't know the details -- from a
technical standpoint, I don't know the details about
AdForce.

    Q.    Okay.  Did you know that DoubleClick DART has
a publisher interface, an advertiser interface, and a
central controller?

    A.    Well, I knew that DoubleClick had DART for
publishers and DART for advertiser --

    Q.    Did you know --

    A.    -- as an automated management system -- let me
finish, please -- as an automated management system.
That, I knew.

    Q.    You knew it was automated?

    A.    Yes.

    Q.    Okay.  Did you know that AdForce was
automated, also?

    A.    I understood that.

    Q.    And is it your testimony that if these two
systems were around and created by others prior to the
inventors, they would still be noninfringing acceptable
substitutes?

1    A.    I'm sorry.  You'll have to repeat that.

2    Q.    Is it your testimony that if AdForce and

3  DoubleClick were out there before the patents, that they

4  would still not be an acceptable noninfringing

5  substitute?

6    A.    Oh.  That's an issue I have no opinion on.

7    Q.    Okay.  You're being paid by the hour today?

8    A.    For my time, yes.

9    Q.    Yeah.  $600 an hour?

10    A.    Yes.

11    Q.    Is it true that you've given expert testimony

12  on damages in court in 28 different matters in the last

13  four years?

14    A.    Sounds about right.

15    Q.    Is it true that you've given deposition

16  testimony as an expert witness under oath 69 times in

17  the last four years?

18    A.    That sounds about right.

19    Q.    Is it fair to say you're a professional

20  damages witness?

21    A.    No.  I'm a professional -- I'm a professional

22  and an expert in patent damages.

23    Q.    Fair to say you're --

24    A.    But I've testified on a number of occasions.

25    Q.    Okay.  Now, your expertise is with numbers,

1 right?

2     A.   Well, it's economics, finance, accounting,

3 statistics.

4     Q.   You're supposed to be pretty good with

5 numbers?

6     A.   Try to be.

7     Q.   Okay.  Now, at your deposition, you were asked

8 how much you billed Function Media in this case in

9 connection with this matter.  Do you remember that

10 testimony?

11     A.   Somewhat.

12     Q.   You said that you billed somewhere between 150

13 and $175,000?

14     A.   That's what CRA billed.

15     Q.   Okay.

16     A.   That's what my recollection was.

17     Q.   Do you remember that?

18     A.   Yes.

19     Q.   That was your testimony under oath.

20     A.   Yes.  That was my understanding.

21           MR. VERHOEVEN:  Let's bring up DX demo

22 153.  No.  153.

23     Q.   (By Mr. Verhoeven) Do you recognize this

24 document?

25     A.   No.

1  Q. It says: Summary of CRA International, Inc.'s

2 invoices related to Function Media, LLC, versus Google,

3 Inc., in this matter.

4    Do you see that?

5  A. I do.

6  Q. And if we pull out the bottom total, the total

7 is $524,177.

8    Do you see that?

9  A. I do.

10  Q. So that's off by a factor of over two times

11 what you said in your deposition, right?

12  A. Well, it's a different time period, too.

13  Q. Okay. Your deposition asked through the end

14 of November, right?

15  A. Yes.

16  Q. So if you look at this invoice, can you tell

17 me what your CRA invoice is worth at the end of

18 November?

19  A. CRA invoiced --

20    THE WITNESS: Can you take the shading

21 off? Because I can't read it on the screen.

22  A. CRA invoiced $100,000 between November and

23 January.

24  Q. (By Mr. Verhoeven) So let's take off $100,000,

25 just to be safe, okay?

1    A.    Okay.  All right.

2    Q.    So you testified at deposition that it was 150

3 to 175, but it's actually 400, right?

4    A.    That's what it turns out to be, yes.

5    Q.    It's off by a major factor.

6    A.    Well, yes.  It's different.  I mean, in other

7 words, what I estimated, based on what I knew or

8 recalled, was different than the total.

9    Q.    So as a damages expert, at your deposition,

10 when you testified under oath as to how much you billed,

11 you were inaccurate by a factor of two, weren't you?

12    A.    No, I wasn't inaccurate.  I just -- I didn't

13 have access to the invoices.  I don't work for CRA, so I

14 don't get their invoices.

15    Q.    Oh, you don't work for CRA.

16    A.    No, I'm not an employee.  I'm a consultant.

17 So I don't see any invoices.

18    Q.    So you don't look at them to see if they're

19 accurate --

20    A.    They're not --

21    Q.    -- if they accurately reflect your time?

22    A.    I have -- no, I do not.  I don't get to see

23 any invoices CRA sends out.  That's a CRA matter.

24 That's why I don't know anything about these invoices.

25    Q.    Okay.  So you're -- you were unable to get

access to information to tell us accurately at your

deposition how much CRA billed.

Is that your testimony?

A.   No.  My testimony is, what I recall that

somebody had told me we had billed that fall, was in the

range of 175,000 or so.  That's what I recalled, because

I had never seen the invoices.

Q.   And that was off by a factor of two.

A.   Well, they've invoiced more, yes.

Q.   Okay.

MR. VERHOEVEN:  No further questions,

Your Honor.

THE COURT:  Redirect?

MR. NELSON:  Yes, sir.

REDIRECT EXAMINATION

BY MR. NELSON:

Q.   Let me take that last point first.

A.   Sure.

Q.   And then we'll go out, and we're going to hit

actually, I think, every single major point that he

discussed during the next few minutes or so, hopefully,

even before lunch.

A.   Okay.

Q.   First, the bills that he just put up -- I

think you just testified to this, but you do not see

these bills, correct?

A.   I've never seen these bills.  In fact, I've never seen that list.

Q.   At your deposition, you specifically said that you didn't know for sure what had been billed, right?

A.   Correct.

Q.   Okay.  And I don't mean to quote exactly on that, but you've made clear that you were not trying to give an exact number on it, correct?

A.   Correct.  And I also explained in my deposition that I don't work -- I'm not an employee of CRA, so I don't see their information.

Q.   Okay.  At that time, your bills were significantly lower than $100,000 at the time, correct?

A.   Yes.

Q.   So any difference would be what CRA, a company you don't work for, had billed; is that right?

A.   Correct.

Q.   Okay.  Generally, what's your understanding -- in terms of your rate, is your rate higher or lower than Google's damages expert?

A.   Oh, it's a lot lower.

Q.   Okay.  In terms of a -- sort of a monthly average of -- of what you and your firm -- or your consulting firm has billed compared to Google's expert

1  and his damages experts, has -- on a monthly basis, has

2  Google billed for more -- or Google's damages expert

3  billed more for its damages consulting than you have?

4              MR. VERHOEVEN:  Objection, leading,

5  foundation.

6              THE COURT:  Overruled.

7      A.   From my recollection, they billed a little

8  more.  Excuse me.  They billed more.

9      Q.   (By Mr. Nelson) And their period, actually,

10 was only over a four-month period, right?

11     A.   Yes.  I've been working on this for a year and

12 a half.

13     Q.   And you're aware, actually, Google had another

14 damages expert before their current damages expert got

15 hired, and they billed for that case, too, right?

16             MR. VERHOEVEN:  Objection, leading.

17             THE COURT:  Sustained.

18     Q.   (By Mr. Nelson) Are you aware of whether

19 Google had another damages expert before the expert they

20 had just retained a few months ago?

21     A.   I learned that during this case, yes, that

22 they ended up with two different experts.

23     Q.   And any amount that Google's own damages

24 expert billed, that is already more than you, wouldn't

25 even include the other amount that Google's first

damages expert, who was not testifying at trial, has

billed, correct?

          MR. VERHOEVEN:  Objection, leading.

          THE COURT:  Sustained.

   Q.  (By Mr. Nelson) Would any amount include, as a

comparison, what Google had -- or Google's first damages

expert had billed to Google?

   A.  Yes.  In other words, you had the combined

total of what Mr. Wagner and his company billed, plus

what Mr. -- I'm trying to remember his name, but the --

the other consulting firm, Keith Ugone's firm, billed to

Google.  You'd have to take the combined total to

represent their effort on damages.

   Q.  Did you learn, one way or the other, why

Google changed damages experts here?

   A.  No, I don't know why.

   Q.  You were questioned about some -- I think

there were four patent licenses that -- or patent

technology agreements that Mr. Verhoeven put in front of

you, and I'd like to go through every single one of

those with you.

      First, let me start from the beginning as we

get to the substance here.

      Did anything in Mr. Verhoeven's cross-

examination change your opinion that it would be a

1  reasonable royalty of 12 percent?

2      A.   No, nothing changed.

3      Q.   Okay.  Earlier yesterday in your direct

4  examination, we saw a clip of Mr. Chen testifying over

5  and over again:  I don't know; I don't know; I don't

6  know.

7           Do you recall that testimony?

8                MR. VERHOEVEN:  Objection,

9  characterization.

10                THE COURT:  Sustained.

11      Q.   (By Mr. Nelson) Did you recall Mr. Chen's

12  testimony yesterday?

13      A.   Oh, yes.  I read his deposition.

14      Q.   And you -- and also during --

15      A.   And the testimony yesterday.

16      Q.   Can you please recap for the jury what they

17  saw yesterday on that to remind the jury of that?

18      A.   Well, he was asked about a number of licenses

19  and some transactions, like the Carl Meyer agreement,

20  and he didn't know anything about them.  He knew very

21  little about them.

22      Q.   What is the importance, what is the

23  relevance -- if a company cannot explain what licenses

24  are about, how does that affect your analysis?

25      A.   Well, I wasn't at any of those transactions,

so I have to rely on information, such as information
from Google's own witnesses and corporate
representatives, who testified under oath, about the
subject matter of those transactions.

     And if you don't have -- you, as an expert,
damages expert or economic expert, don't have
information that you can get access to as to who the
parties were to the transaction, why the transaction was
executed, in other words, what was the business purpose,
what were the reasons associated with it, you can't put
it in any context, and it's a meaningless analysis.

    Q.   Let me try to give you a hypothetical and see
what you think about that.

    A.   Sure.

    Q.   Is it a fair comparison, if I go to a used car
lot and I buy the rattiest, worst car on that lot for
$750, and then -- can I say that, because I bought that
car for $750, that, therefore, a Rolls Royce is worth
$750?

    A.   No, of course not.  You need --

    Q.   Why not?

    A.   Well, you need to know the details.  You're
dealing with a spanking new Rolls Royce, which has got a
lot of bells and whistles to it, and you've got a 10-,
15-year-old car that have dings and dents in it, and for

1    all I know, may have bald tires.

2         But you have to understand what's in that used

3    car and what's in that new car in order to make an

4    analysis of that.

5         Q.   And did Google -- was Google able to give any

6    of the analysis, the car facts, for what it was about?

7         A.   In those transactions, no.

8         Q.   Okay.  For example, on the Carl Meyer patent,

9    we heard yesterday -- did Google even know who Carl

10   Meyer was?

11        A.   No.  Google did not know who Carl Meyer was.

12        Q.   You did independent research about this

13   transaction, correct?

14        A.   Yes.

15        Q.   Did you find that there was actually a

16   relationship, one way or another, between Carl Meyer and

17   Google?

18        A.   Yes.

19        Q.   And what was that relationship?

20        A.   One of the inventors on the Carl Meyer's

21   patents was actually an employee of Google at the time

22   of the December 2008 agreement.

23        Q.   And, Mr. Bratic --

24             MR. VERHOEVEN:  Objection.  May I

25   approach?

1               THE COURT:  Yes.

2               (Bench conference.)

3               MS. CANDIDO:  We have already made it

4  clear at the argument on this motion that this purported

5  employee of Google has never worked for Google.  And yet

6  Counsel is continuing to raise that as a fact.  It's not

7  in evidence, and it's not correct.

8               MR. NELSON:  They can certainly do

9  recross on the fact that what is in the public record is

10  not accurate, but the public record states he's an

11  employee.

12               THE COURT:  Well --

13               MR. VERHOEVEN:  Your Honor --

14               MR. NELSON:  And he's relied on that, and

15  they --

16               MS. CANDIDO:  Excuse me.  Mr. Verhoeven

17  was pointing out to me that we're not stuck with the

18  terms of the agreement, but yet Function Media's counsel

19  is going beyond the terms.

20               THE COURT:  Well, I'm going to overrule

21  the objection.  You can call a witness, if you want to,

22  to testify about whether this person was actually a

23  witness (sic) or not.

24               But based on what's represented as being

25  in the public record, I'm going to allow -- I'm going to

allow this line of testimony.

Overruled.

(Bench conference concluded.)

Q.   (By Mr. Nelson) Mr. Bratic, in the public record, you've seen evidence that there is a connection between Carl Meyer and Google, right?

A.   Yes.

Q.   And this license -- Mr. Verhoeven glossed over this fact, but what -- this transaction was how long after this case actually was filed for suit?

A.   About a year and a half.

Q.   Okay.  In fact, it was, what, December 18th, 2008; is that right?

A.   Right.  And the lawsuit was filed in July 2007.

Q.   And is it possible that there was litigation between the parties?

A.   It's possible.

Q.   Is it --

A.   I don't know.

Q.   Is it possible that there was an agreement between the parties to buy at a low number?

A.   It's possible.

Q.   You just don't know.

A.   No, I don't.

1     Q.   And Google doesn't know.

2     A.   And Google does not know.

3     Q.   Okay.  Or at least in this case, Google

4 doesn't know?

5     A.   Well, put it this way:  Nobody at Google has

6 said anything about it, that they know anything about

7 it.

8     Q.   It's certainly not in the record, right?

9     A.   Correct.

10     Q.   Okay.  And let's go to -- oh, I'm sorry.  One

11 other point on the Carl Meyer patent.  And I want to --

12 you mentioned this before, but this is, I think,

13 relevant to all the patents.

14        Part of your analysis is the fact that there

15 is no design-around; is that a fair --

16     A.   Correct.

17     Q.   Okay.  Do you know, for example, how easy it

18 would be for Google to design around these licenses that

19 they showed us?

20     A.   No, I don't.

21     Q.   Okay.

22     A.   Well, I do know that in the VoiceAge

23 transaction, Google -- one of the negotiating points

24 Google had in its favor that it went back to VoiceAge

25 on, was that they had a design-around for that codec.

1    Q.   And we'll get to that in a second, but with

2 respect to Carl Meyer --

3    A.   Right.

4    Q.   -- we don't know anything.

5    A.   We don't know.

6    Q.   We don't know whether --

7              THE COURT:  Excuse me.

8              MR. VERHOEVEN:  I'm sorry to interrupt.

9 I'd like to be able to see, Your Honor, if I could.

10             THE COURT:  Back up just a little bit.

11             MR. VERHOEVEN:  Thank you.

12             MR. NELSON:  Sorry.

13    Q.   (By Mr. Nelson) We don't know, for example,

14 whether, based on these I-don't-know answers, Google

15 even practices these technologies and uses these

16 inventions.

17    A.   Yeah.  There's no way to know if Google even

18 uses them.

19    Q.   Okay.  Now, do we even know whether they're

20 related to AdSense?

21    A.   No.

22    Q.   Okay.  Let's go to -- about the VoiceAge.

23             MR. NELSON:  And let's put up Plaintiff's

24 Exhibit 313.

25    Q.   (By Mr. Nelson) We've seen this document a

1  lot.

2      A.    Yes.

3      Q.    Mr. Chen, Google's corporate representative,

4  the person who spoke for Google on licensing, is --

5  what, Mr. Bratic, in this document allows you to state

6  that the design-arounds and the ability to design around

7  a particular patent is important?

8      A.    Well, you can see the last line on the bottom

9  of this document where it's showing on the screen.  It

10 says:  The only leverage we have is that we have another

11 codec.

12         So this is Google's analysis that they have an

13 alternative, they have a substitute, to the VoiceAge

14 technology.  So they can avoid -- they can leave it;

15 they can avoid the VoiceAge patent.  They don't have to

16 take a patent license from VoiceAge, because they have

17 an alternative.

18     Q.    And, first of all, let me ask you a basic

19 question about VoiceAge.

20     A.    Yes.

21     Q.    That concerned phones?

22     A.    Yes.

23     Q.    Are phones part of the relevant field here?

24     A.    No.

25     Q.    Does Mr. Wagner, Google's expert, agree that

1   phones are not part of the relevant field here?

2       A.   Yes.

3       Q.   And part of your analysis of analyzing

4   relevant licenses, are you supposed to look at the

5   relevant field here?

6       A.   Yes.

7       Q.   Okay.  Now, did you review and rely on

8   Mr. Chen's deposition testimony about whether there was

9   a design-around anywhere?

10      A.   Yes.

11      Q.   Okay.

12              MR. NELSON:  Let's go to Page 131 of

13  Mr. Chen's deposition.  Let's go to Line 16 first.

14      Q.   (By Mr. Nelson) This is -- you see, I asked

15  the question, and then what is his answer?

16      A.   It says:  Actually, what we did was -- it's

17  interesting.  In this particular deal, we actually

18  developed a workaround.  We actually have a new -- our

19  own codec.  So those -- for those phones, we're not even

20  using AMR.

21      Q.   Okay.  And Mr. Verhoeven, if you remember,

22  talked about how there were two big corporations that

23  were at issue, and therefore, perhaps that the license

24  should be higher.

25              Mr. Bratic, if two big corporations get

1  together jointly, are you aware generally whether there

2  are laws in place that these corporations have to act --

3  that they can't violate the antitrust laws, for example?

4      A.   Yes.

5      Q.   And, generally, do they have to impose

6  reasonable and nondiscriminatory forums on license

7  agreements?

8      A.   Yes.

9      Q.   Okay.

10             MR. NELSON:  Let's go to the top of that

11  same page.

12      Q.   (By Mr. Nelson) And this is Mr. Chen's

13  testimony, too?

14      A.   Yes.

15      Q.   Okay.  What is he saying about the terms of --

16             THE COURT:  And, Counsel, you need to

17  slow down a little bit.

18             MR. NELSON:  Excuse me, Your Honor.

19      Q.   (By Mr. Nelson) What did Mr. Chen testify to

20  about the terms and the reason why the terms were what

21  they were in the VoiceAge agreement?

22      A.   Well, because he said with -- well, in

23  addition to the fact that Google had a design-around, he

24  said, with respect to VoiceAge, because there's a

25  standard, there's noncompetitive and nonpreferential

1 treatment laws, that they have -- they, being

2 VoiceAge -- have to abide by, that there's not much

3 deviation from the standard contract.

4       In other words, they pretty much have to give

5 it on standard terms to everybody who wants a license.

6     Q. How would this differ from a hypothetical

7 negotiation?

8     A. There are no standards and there's no --

9 there's no standards governing -- and what I mean by

10 standards is, there's no legal standards or law

11 standards regarding technology standards that are

12 subject to the hypothetical negotiation.

13       So neither Function Media nor Google have to

14 deal with the issue about having to give licenses on a

15 nondiscriminatory or other basis to anybody.

16     Q. And when Mr. --

17         MR. NELSON: Let's go back to PX313.

18     Q. (By Mr. Nelson) When Mr. Chen said, take it or

19 leave it, he was -- what was he recognizing here?

20     A. He was recognizing that the terms of that

21 agreement had this standard provision, that it was a

22 standard agreement across the industry.

23     Q. And what was he recognizing in terms of the

24 ability of a design-around?

25     A. He was recognizing there was one. In fact, we

just saw it in his deposition.  They actually achieved a

design-around.

    Q.    Okay.  And with respect to the Hewlett-Packard

agreement, the third license they talked about --

    A.    Yes --

    Q.    -- was that a cross-license?

    A.    -- it was.

    Q.    What, in your opinion, makes a cross-license

different from a regular bare patent license?

    A.    Yeah.  A cross-license is what it says.  A

cross-license, each party is giving something to the

other side.  Hewlett-Packard was giving something to

Google, and Google was giving something to

Hewlett-Packard.

        And Hewlett-Packard -- Google has still agreed

to pay, even in that cross-license -- after Google got

something from Hewlett-Packard and Hewlett-Packard got

something from Google, Google agreed to pay running

royalties.  They just capped it at $20 million.

        What you can't do from a cross-license, at

least not from the information that Google provided in

this case, is unravel that cross-license to find out

what Google -- I mean, what Hewlett-Packard would have

charged Google if there had been no cross-license.

In other words, if Hewlett-Packard hadn't received

1   anything from -- any technology rights from Google, you

2   don't know what Hewlett-Packard would have charged in

3   the alternative.

4       Q.   And was that in the same relevant technology

5   field anyway, that Hewlett-Packard agreement?

6       A.   It had to do with search technology.  They

7   excluded it.

8       Q.   Yeah, they excluded it.

9            And was it about e-mail?

10      A.   Yes.  It had to do with e-mail technology.

11      Q.   Was it -- was it a relevant license in this

12  field?

13      A.   No.

14      Q.   Now, Mr. Verhoeven spent a fair amount of time

15  asking you questions about whether Function Media was an

16  ongoing business where they had developed software.

17           Let me ask you, are you aware of what Google's

18  own damages expert's opinion is on whether it even

19  matters if they completed this product?

20           MR. VERHOEVEN:  Objection, Your Honor.

21  The witness -- he's asking the witness to characterize

22  testimony that hadn't occurred yet.

23           THE COURT:  Overruled.

24      A.   I'm sorry.  You're going to have to repeat the

25  question.

Q.   (By Mr. Nelson) Are you aware, Mr. Bratic, of whether Google's own damages expert states that it does not matter whether Function Media has attempted to commercialize the invention, in terms of setting the royalty rate here?

A.   Yes, I'm aware.  Mr. Wagner, his report said it did not matter.

Q.   Okay.  And are you aware that Mr. Wagner, Google's own damages expert, has stated that it does not matter whether a company is large or small in terms of setting the rate for a reasonable royalty negotiation?

A.   Yes.

Q.   Okay.  Thank you.

MR. NELSON:  Your Honor, I have actually about 10 more minutes worth of cross -- five or ten minutes worth of cross-examination (sic).  I'm happy to try to continue it now.  I know we're right at noon. I'm at the Court's pleasure.

THE COURT:  Well, as much as I would like to be through and move on to another witness, I think we'll break for lunch, because I anticipate there will be some additional recross.

Ladies and Gentlemen, be back at 1:15. Have a nice lunch, and don't talk about the case.

You're excused.

1              COURT SECURITY OFFICER:  All rise.

2              (Jury out.)

3              THE COURT:  Recess till 1:15.

4              Stay behind the podium so he can see me,

5    okay?

6              MR. NELSON:  Yes, sir.

7              THE COURT:  I asked you to do that once

8    for me --

9              MR. NELSON:  Oh, I'm sorry.

10             THE COURT:  -- okay?

11             MR. NELSON:  Yes, sir.

12             (Recess.)

13             *      *      *      *

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3                    <u>CERTIFICATION</u>

4

5          I HEREBY CERTIFY that the foregoing is a

6   true and correct transcript from the stenographic notes

7   of the proceedings in the above-entitled matter to the

8   best of my ability.

9

10

11

12  /s/_____          _____

    SUSAN SIMMONS, CSR                    Date
13  Official Court Reporter

    State of Texas No.:  267
14  Expiration Date:  12/31/10

15

16

17  /s/_____          _____

    SHELLY HOLMES, CSR                    Date
18  Deputy Official Court Reporter

    State of Texas No.:  7804
19  Expiration Date  12/31/10

20

21

22

23

24

25