1        IN THE UNITED STATES DISTRICT COURT
         FOR THE EASTERN DISTRICT OF TEXAS
2             MARSHALL DIVISION

3  FUNCTION MEDIA, LLC     *   Civil Docket No.
                    *   2:07-CV-279
4  VS.                *   Marshall, Texas
                    *
5                    *   January 21, 2010
  GOOGLE, INC.         *   1:20 P.M.
6

             TRANSCRIPT OF JURY TRIAL
7     BEFORE THE HONORABLE CHAD EVERINGHAM
        UNITED STATES MAGISTRATE JUDGE

8

9  APPEARANCES:

10  FOR THE PLAINTIFFS:   MR. MAX TRIBBLE
                    MR. JOSEPH GRINSTEIN
11                  Susman Godfrey
                  1000 Louisiana Street
12                 Suite 5100
                  Houston, TX   77002
13                 MR. JUSTIN NELSON
                  Susman Godfrey
14                 1201 Third Avenue
                  Suite 3800
15                 Seattle, WA   98101
                  MR. JEREMY BRANDON
16                 Susman Godfrey
                  901 Main Street
17                 Suite 5100
                  Dallas, TX   75202
18                 MR. ROBERT PARKER
                  Parker, Bunt & Ainsworth
19                 100 East Ferguson
                  Suite 1114
20                 Tyler, TX   75702

21  APPEARANCES CONTINUED ON NEXT PAGE:

22  COURT REPORTERS:      MS. SUSAN SIMMONS, CSR
                  MS. SHELLY HOLMES, CSR
23                 Official Court Reporters
                  100 East Houston, Suite 125
24                 Marshall, TX   75670
                  903/935-3868
25  (Proceedings recorded by mechanical stenography,
  transcript produced on CAT system.)

APPEARANCES CONTINUED:


FOR THE DEFENDANTS:     MR. CHARLES VERHOEVEN
                        MS. AMY CANDIDO
                        Quinn Emanuel
                        50 California Street
                        22nd Floor
                        San Francisco, CA   94111

                        MR. EDWARD DEFRANCO
                        Quinn Emanuel
                        51 Madison Avenue
                        22nd Floor
                        New York, NY   10010

                        MR. HARRY L. GILLAM
                        Gillam & Smith
                        303 South Washington Avenue
                        Marshall, TX   75670

                    P R O C E E D I N G S


            COURT SECURITY OFFICER:  All rise.

            (Jury in.)

            THE COURT:  Please be seated.

            Continue with redirect.

            MR. NELSON:  Thank you, Your Honor.

 WALTER BRATIC, PLAINTIFF'S WITNESS, PREVIOUSLY SWORN

            REDIRECT EXAMINATION (CONTINUED)

BY MR. NELSON:

    Q.   Mr. Bratic, when you are looking at licenses,
are all patents worth the same amount?

    A.   No, absolutely not.

    Q.   Why not?

1      A.   Well, there are a number of factors that have

2 to be evaluated and analyzed.  For example, is the

3 patent you're looking at core or fundamental to the

4 products at issue?

5           Does the patent contribute to and responsible

6 for generation of billions of dollars in revenues and

7 hundreds of millions of dollars in profits?

8           Does that core -- can that technology be

9 designed around?

10           What's the life of the patent?

11           There are a number of factors that have to be

12 considered, and you have to analyze them based on the

13 specifics.

14      Q.   Thank you.

15           Now, we talked about a couple of those

16 licenses right before lunch.  I want to finish talking

17 about the other two that were brought up on your

18 cross-examination.

19           The Hewlett-Packard agreement, that was a

20 cross-license?

21      A.   It was.

22      Q.   Could Mr. Chen and Google's corporate

23 representative talk about the circumstances of those --

24 of that agreement in detail?

25      A.   No.

1    Q.    Was the technology even in the same relevant

2  field as this one?

3    A.    No.

4    Q.    The Alcatel-Lucent agreement, was that a

5  cross-license?

6    A.    It was.

7    Q.    How does a cross-license affect whether you

8  can really compare two licenses?

9    A.    Well, right before the lunch break, I was

10  explaining when you have a cross-license, stuff's going

11  both ways.  In other words, patent rights are going both

12  ways, and it's very hard to unravel and figure out what

13  the value of the license would have been or the license

14  terms would have been if it was just going one way.

15    Q.    Could Google testify in its binding testimony

16  about the circumstances of that agreement?

17    A.    Not about the details, no.

18          MR. NELSON:  Let's bring up Paragraph 109

19  of your exhibit report that was used during your

20  cross-examination.

21    A.    Yes.

22    Q.    (By Mr. Nelson) The latter two sentences were

23  highlighted, but let's highlight actually the first two

24  sentences of your conclusion.

25          You concluded -- or you had spoken to

1 Mr. Dean, and what did Mr. Dean believe to be an

2 appropriate royalty rate here?

3     A.    He believed it should be 20 percent.

4     Q.    Is that also what he testified to on the

5 stand?

6     A.    Yes.

7     Q.    And right here, it talks about the

8 industry-wide profits.

9     A.    Right.

10     Q.    You're aware that he gave more reasons than

11 that for his -- for why on the stand today -- excuse

12 me -- yesterday, correct?

13     A.    Yes.

14     Q.    And did you actually use the rate that

15 Mr. Dean requested?

16     A.    No.

17     Q.    Why not?

18     A.    Well, it was just one of a number of data

19 points I considered, but, obviously, my conclusion is

20 that I think a reasonable royalty rate is 12 percent,

21 not 20 percent.

22     Q.    Regardless of where the starting point would

23 have been, what conclusion would you have reached or did

24 you reach about what the appropriate reasonable royalty

25 rate is here?

1       A.    In my opinion, it's 12 percent for all the

2  reasons I've discussed.

3       Q.    If Google is correct, that it's 25 percent of

4  the profits, have you done a calculation?

5             You started to do this on the

6  cross-examination.  Have you done a calculation of what

7  25 percent of the profits would be under that

8  calculation?

9       A.    Yes.   **REDACTED BY ORDER OF THE COURT**

10      Q.    Mr. -- excuse me -- Google's counsel also

11 started talking about some of these acquisitions and the

12 employees and everything, the technology, the location.

13            Do you recall that testimony?

14      A.    I do.

15      Q.    With respect to Applied Semantics first, are

16 you aware whether Google has ever stated under oath that

17 it never used the Applied Semantics technology?

18      A.    Yes.  I'm aware of that.

19            MR. NELSON:  Let's bring up the

20 deposition testimony of Susan Wojcicki in a different

21 case.  And let's zoom in the bottom -- yeah, there we

22 go.

23      Q.    (By Mr. Nelson) Mr. Bratic, did you rely on

24 this testimony in the formation of your opinion?

25      A.    This testimony, and there was a document or

1   two I saw of Google's.

2       Q.   And what does this say?

3       A.   The witness, which you said is Ms. Wojcicki,

4   says:  I don't believe the program -- I don't believe

5   Google's program changed from the acquisition of Applied

6   Semantics.

7       Q.   And then what was the next question?

8       A.   And then the next question was:  From a

9   technical standpoint, you don't believe that Applied

10  Semantics' technology was used, or do you?

11           I do not believe that the technology was used.

12  The technology being Applied Semantics' technology.

13      Q.   Are you aware whether in that case

14  Ms. Wojcicki was Google's corporate representative?

15      A.   It's my understanding.

16      Q.   We also talked about not just for the Applied

17  Semantics' transaction, but for other acquisitions all

18  the other things that came with the acquisition?

19      A.   Yeah.  Facilities, employees, yes.

20      Q.   Were you able, in your analysis, to separate

21  out the value of the patents and the technology with the

22  patents from everything else?

23      A.   Well, yes, because that's what Houlihan-Lokey

24  was hired to do.  As I testified yesterday, they were

25  hired to assign a value to all the assets acquired, not

1  just the technology and patented technology, but, for

2  example, the workforce that they'd get, experienced

3  workforce, any research facilities or property they

4  owned, buildings, whatever.

5          That's what Houlihan-Lokey's job was.  So they

6  separated it all out, and that's why I was able to

7  isolate and focus on the technology rate charge as

8  applying to the technology.

9      Q.   Let's please turn -- Mr. Verhoeven, Google's

10  counsel, also questioned you about the Stanford license.

11          MR. NELSON:  Can we bring up Plaintiff's

12  Exhibit 318, I believe?

13      Q.   (By Mr. Nelson) Do you recall that testimony?

14      A.   I do remember that discussion.

15      Q.   Yeah.

16          MR. NELSON:  Let's please go to -- I

17  think it's 8.1, which is the relevant terms.

18      A.   Yes.

19      Q.   (By Mr. Nelson) You were asked whether this

20  license was worth $100,000, and you said it was not.

21      A.   160,000.

22      Q.   Excuse me.  $160,000.  And you said it was

23  not.

24      A.   Correct.

25      Q.   Why did you give that answer?

1     A.   Well, because if Google -- excuse me -- if

2  Stanford thought this technology was worth $160,000,

3  they would have taken $160,000.  Instead, they took

4  2 percent of the stock in Google with the expectation --

5  hope and expectation that that stock would perform and

6  do well.

7         And we know that at the hypothetical

8  negotiation that Function Media and Google would have

9  known that Stanford never took $160,000 for that stock.

10  They took that investment and they turned it into $335

11  million in profits.

12     Q.   Does that $335 million include what Stanford

13  ended up giving to the two inventors of the patent?

14     A.   No.  That number -- if you included that

15  portion, that number would have been like $450 million.

16     Q.   What rate did Stanford pay the two inventors

17  and the founders of Google?

18     A.   28 percent of the benefits they got from

19  Google.

20               MR. NELSON:  Approach, Your Honor?

21               THE COURT:  Yes.

22               (Bench conference.)

23               MR. NELSON:  It's that time again.

24               THE COURT:  Okay.

25               MR. NELSON:  I expect it to go about

three minutes at that.

While we're up here, Mr. Verhoeven brought up AdForce and whether it was a design-around. In Mr. Bratic's report, it's not an acquisition, but he says that AdForce was bought for $1 billion.

I'd like to be able to rehabilitate him on that point. If they're going to say that AdForce is so important, I'd like to be able to say that AdForce was actually purchased for $1 billion in 1999. It's in his report. It's not in the acquisition section, I should say.

MR. VERHOEVEN: May I be heard, Your Honor?

THE COURT: Yes.

MR. VERHOEVEN: The reason I brought up AdForce is because the witness said there was no acceptable substitutes. It has to do with the features of the technology of AdForce and whether that would be an acceptable substitute during the hypothetical negotiation.

It has nothing to do with the purchase price of the entire company. It had to do with the technological features.

THE COURT: I agree with that. It doesn't have anything to do with the purchase price of

the entire company, but the way that the testimony came

in suggested that this AdForce -- that it was out there

and they could have turned to it as a reasonable

non-infringing alternative.  You can -- you can prove up

they were acquired, but don't go beyond that.

MR. NELSON:  I'm sorry.

THE COURT:  What are you asking?

MR. NELSON:  I'd like to be able to use

it to say that it was purchased for $1 billion.

THE COURT:  Well, no.

MR. NELSON:  Well, because --

MR. VERHOEVEN:  This is the same thing

you've already ruled on.

MR. NELSON:  The problem is that it's

come in and --

THE COURT:  It wasn't purchased by

Google, though.

MR. NELSON:  That's absolutely correct.

And the issue is that Mr. Verhoeven just was questioning

and saying that it was a free license and all this

stuff.

The point is, actually the technology was

purchased for $1 billion, and so if it's free --

THE COURT:  I'm sustaining the objection.

You're not going to go into that.

1    MR. NELSON:  Okay.  Okay.

2    THE COURT:  Pardon?

3    MR. NELSON:  No, no.  That's okay.

4    (Bench conference concluded.)

5    THE COURT:  Ladies and Gentlemen, I've

6 got about three minutes of testimony that I'm going to

7 have to excuse you for at this time.

8

9

10

11

12    **SEALED BY ORDER OF THE COURT**

13

14

15

16

17

18

19

20

21

22

23

24

25



SEALED BY ORDER OF THE COURT



**SEALED BY ORDER OF THE COURT**





**SEALED BY ORDER OF THE COURT**



**SEALED BY ORDER OF THE COURT**

1          MR. NELSON:  May I continue?

2          THE COURT:  Yes.

3     Q.    (By Mr. Nelson) Mr. Bratic, you were also

4  questioned about the design-arounds, correct?

5     A.    I was.

6     Q.    And you stated that you relied on Dr. Rhyne?

7     A.    That is correct.

8     Q.    What did you do to rely on Dr. Rhyne?

9     A.    Well, as I mentioned in Court, I interviewed

10  him several times?

11     Q.    Did you rely on his testimony as well?

12     A.    I did.  I relied on his -- my interviews of

13  him before I filed my report, and then, of course, I

14  relied on his testimony here in Court upon that subject.

15     Q.    Have you seen documents -- excuse me -- let me

16  back up.

17          What did he conclude about the fundamental

18  importance of these patents?

19     A.    Well, he said they were -- excuse me -- he

20  said they were fundamental to the accused products.

21     Q.    And from -- based on your expert experience,

22  not talking about the patents itself, but based upon

23  what Mr. -- excuse me -- Dr. Rhyne identified, the

24  automation, the scalability, have you seen evidence that

25  those factors are vitally important to Google here?

1      A.    Yes.

2      Q.    In conclusion, is it your opinion that Google

3 and Function Media would have agreed to pay 600 million

4 in 2007?

5      A.    No.  That's not my opinion at all.

6            MR. NELSON:  Let's go to Slide 5, I think

7 it is.

8      Q.    (By Mr. Nelson) What are we looking at here?

9      A.    This is a slide I showed the jury and the

10 Court yesterday.  And this was kind of the guidelines I

11 said for the hypothetical negotiation and what the

12 parties would have agreed to.

13            And if you look here, what I said the parties

14 would have agreed to -- Function Media and Google would

15 have agreed to what products are going to be licensed,

16 which would be AdSense for Content Online and AdSense

17 for Content Online Mobile.

18            And they would agree to the royalty rate, not

19 the amount of the royalty, because on November -- I

20 mean, on July 3rd, 2007, they would not have known the

21 precise amount of the revenues.  So they would agree on

22 that information.

23            I'm sitting in here in Court now looking back,

24 getting an accounting for the amount of usage Google has

25 enjoyed.  And Google has generated over $5 billion in

1  sales of accused products over the last two and a half

2  years.

3        So when you apply the agreed-upon royalty

4  rate, in my opinion, of 12 percent times the over $5

5  billion in accused sales Google has enjoyed from the use

6  of these patents, that gives you a royalty of $607

7  million.

8     Q.   Why do you think that -- the 12-percent rate

9  that you have concluded is appropriate here, why do you

10  think that's reasonable?

11     A.   Well, I discussed a number of different

12  factors I've considered.  I've considered industry

13  royalty rates in the 8 to -- 8- to 13-percent range.

14  ███████████████████████████████████████████████

15  ███████                              **REDACTED BY ORDER OF THE COURT**        ██

16  ██ █

17        I've considered the research that -- the

18  research that Mr. Dean had been doing at Function Media

19  in the early 2000s and leading up to the issuance of the

20  patents where he had been studying the industry royalty

21  rates in this industry in a range of 8 to 10 percent.

22        So -- and I've considered the significance,

23  the fundamental nature of these patents as they relate

24  to the core products, AdSense for Content Online,

25  AdSense for Content Direct.

1          I've considered that these products have

2   generated billions, over $5 billion in sales since

3   infringement began, but over $8 billion since they first

4   launched the product.  And they've generated hundreds of

5   millions of dollars in profits as well.

6          And I've also considered, according to

7   Dr. Rhyne, that there are no substitutes.  There are no

8   ways of teaching the fundamental nature of these patents

9   with the exception of practicing these patents.

10          And that's an example of a lot of things I

11  considered.

12      Q.   And have you also considered what we talked

13  about just a couple of minutes ago in the closed

14  courtroom?

15      A.   Yes.  Those data points and those reference

16  points as reasonableness checks.

17      Q.   Based on all of that data that you've

18  considered, could you please summarize one more time

19  what was the rate you concluded was reasonable here?

20      A.   In my opinion, the royalty rate would be 12

21  percent of the sales of the accused products.

22                  MR. NELSON:  Thank you.

23                  THE COURT:  Recross?

24                  MR. VERHOEVEN:  Three brief points, Your

25  Honor, if I may.

1          THE COURT:  Yes, please.

2              RECROSS-EXAMINATION

3  BY MR. VERHOEVEN:

4      Q.   Mr. Bratic, when I showed you the invoices

5  from this company, CRA -- by the way, you're a

6  consultant there; is that right?

7      A.   I'm a consultant to CRA.  I'm not an employee.

8      Q.   Do you get paid by them?

9      A.   Well, I receive payments from them.

10     Q.   Right.

11     A.   But I'm not an employee.  I'm not a salaried

12 employee.

13     Q.   What percentage of your $600 per hour do you

14 get paid for them when you do these things?

15     A.   Once it's paid to CRA, I receive all of it.

16     Q.   A hundred percent?

17     A.   Yes.

18     Q.   Okay.  You testified you didn't know the

19 amount to the CRA invoices, right?

20     A.   I didn't know the precise amount, because I've

21 never seen the invoice.

22     Q.   Okay.  But then when Counsel got up and did

23 redirect, you testified that you did know what the

24 expert invoices were for Google's experts.

25     A.   I didn't know the invoices.  I knew what the

general amount was.  I was told sometime before trial.

Q.   And you said you knew it was more than your invoices, right?

A.   That's what I recall being told.

Q.   And how did you know that if you didn't know the amount of your invoices?

A.   Oh, because I was told what this amount was.

Q.   When were you told?

A.   Right before trial.

Q.   Okay.  Now, you testified on redirect that it's very important, when you're looking at patent licenses, not only to just read the patent license, but you need to talk to people who negotiated it, and you need to know the details; specifically what do they cover; how are the patents covered; how important are they, right?

A.   I didn't quite say that.

Q.   You didn't say that?

A.   I didn't say you need to talk to the people who negotiated the license.  You needed to learn about it.

Q.   Okay.  You need to learn about what the people who negotiated the license, why they are negotiating, how important it was to them, right?

A.   Right.

1      Q.   Okay.  Now, you relied on a royalty figure

2 based on over a hundred licenses.

3           Do you remember that?

4      A.   That was one of the things I considered.

5      Q.   Yeah.

6      A.   Yes.

7      Q.   You relied on it, right?

8      A.   I relied on it as a data point.

9      Q.   And you didn't talk to anybody about anything

10 regarding the negotiation of any of those licenses, did

11 you?

12     A.   No, I didn't.

13     Q.   And you didn't even read any of those

14 licenses, did you?

15     A.   No, I didn't.

16     Q.   You didn't take any efforts to figure out

17 whether they were bare licenses or whether they were

18 software licenses, did you?

19     A.   No.  We talked about that.  I knew they

20 included software licenses.

21     Q.   And you didn't even look to see if they

22 related to the technology in this case, did you?

23     A.   Not specifically to the patent technology.

24     Q.   But you relied on those licenses, didn't you,

25 sir?

1    A.    Yes, I relied on them as one of many data

2  points.

3    Q.    But you didn't rely on the actual licenses

4  that Google negotiated, did you, sir?

5    A.    I did rely on some of them.

6    Q.    Didn't rely on the Meyer license agreement?

7    A.    No.    That wasn't a license agreement.    That

8  was an asset purchase agreement.

9    Q.    Did you rely on any of the four agreements

10 that I showed you?

11   A.    I relied on parts of them, sure.

12   Q.    Which ones?

13   A.    Well, Hewlett-Packard Development Corporation,

14 I relied on parts of that agreement.    I relied on parts

15 of VoiceAge agreement.    I think you and I talked about

16 that.    I relied on -- I think you've always raised the

17 AOL agreement.

18              MR. VERHOEVEN:    Sorry, Your Honor.    I

19 apologize.

20   Q.    (By Mr. Verhoeven) Did you rely on the fact

21 that Google licensed the Meyer agreement for 3.5

22 million -- or purchased the Meyer patents for 3.5

23 million?

24   A.    No.

25   Q.    Yes or no?

1       A.      No.

2       Q.      Did you rely on the purchase price for the

3  Hewlett-Packard license, yes or no?

4               Did you rely on the license payment for the

5  Hewlett-Packard license, yes or no?

6       A.      Not the amount, no.

7       Q.      And you didn't rely on the amount of the

8  VoiceAge license agreement, which was a maximum of $2

9  million per year, did you?

10      A.      Not on that amount, no.

11      Q.      And you didn't rely on the Alcatel-Lucent

12 license agreement, which was $6 million per year, did

13 you?

14      A.      That's correct.

15      Q.      Instead, you relied on these industry licenses

16 that you never read, correct?

17      A.      That's not entirely true.

18      Q.      You relied in part on them, didn't you?

19      A.      As a small part.  I told you I looked at a lot

20 of data points.

21      Q.      Now, let's go to the last point.

22              MR. VERHOEVEN:  Let's go to Plaintiff's

23 Slide 14 that was just up.

24      Q.      (By Mr. Verhoeven) Okay.  We just looked at

25 this.

1          MR. VERHOEVEN:  Do we need to clear the

2    courtroom for this?  No?  Yes?

3          MS. CANDIDO:  Yes.

4          MR. VERHOEVEN:  Pull it off.

5          Sorry.  I apologize, Your Honor.

6          THE COURT:  That's alright.

7          Ladies and Gentlemen, we've got one --

8    what I believe will be a brief line of questioning, but

9    I need to excuse you for it.

10

**SEALED BY ORDER OF THE COURT**

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



SEALED BY ORDER OF THE COURT

SEALED BY ORDER OF THE COURT

17    THE COURT:  May this witness be excused?

18    MR. VERHOEVEN:  Yes, Your Honor.

19    MR. TRIBBLE:  Your Honor, Plaintiff

20 rests.

21    THE COURT:  You may step down.

22    THE WITNESS:  Thank you, Your Honor.

23    THE COURT:  All right.  Counsel,

24 approach.

25    (Bench conference.)

1          THE COURT:  We're not anywhere close to

2    where I would break.  May we have a stipulation to those

3    making motions for judgment as a matter of law until the

4    afternoon break.  They would be deemed to be timely

5    made.

6          MR. VERHOEVEN:  We could do that, but we

7    would -- we would like to be able to file a brief, if

8    that's --

9          THE COURT:  No, no.

10          MR. VERHOEVEN:  I would prefer to do that

11    so we don't take up the Court's time.

12          Here's what I would suggest, Your Honor,

13    and I'll do whatever you want to do.  But I want to be

14    careful and make sure we've put in the record our

15    arguments so there's no question about waiver after the

16    verdict comes in.

17          And so we'd like to file a paper, and it

18    may make the most sense to do argument once the Court

19    has the paper.  But I'll do whatever you want.  I'll

20    argue this afternoon, if you'd like or --

21          THE COURT:  Well, for present purposes, I

22    just want to continue on with the testimony until the

23    break.

24          MR. VERHOEVEN:  No problem with that.

25          THE COURT:  We'll sort this out at the

```
 1  break about whether -- you know, whether and to what
 2  extent you want paper.
 3              MR. VERHOEVEN:  We can.  Your Honor, just
 4  so you know, I was going to head back to get some
 5  witnesses ready for tomorrow.  Mr. DeFranco will be
 6  here.
 7              THE COURT:  Okay.  You may be excused.
 8              MR. VERHOEVEN:  Okay.  He'll address it
 9  with you.
10              THE COURT:  That's fine.
11              MR. VERHOEVEN:  That's fine with us.
12              THE COURT:  Okay.  Then in that case,
13  I'll go ahead -- you rest in front of the jury.  I'm
14  going to let them know what that means, and then I'm
15  going to invite Google to call its first witness.
16              MR. TRIBBLE:  We are -- of course, our
17  validity part of the case, we're going to do in
18  rebuttal.
19              THE COURT:  I understand.
20              MR. TRIBBLE:  You understand?
21              THE COURT:  I got you.  Well, I assume
22  you're going to do it in response to their
23  case-in-chief.
24              MR. TRIBBLE:  I guess I'll wait until and
25  see how it comes in.
```

1           THE COURT:  I understand.  I understand

2    that.

3           Okay.  Y'all can step back.

4           MR. VERHOEVEN:  Thank you, Your Honor.

5           THE COURT:  Okay.  Thank you.

6           (Bench conference concluded.)

7           THE COURT:  All right.  Ladies and

8    Gentlemen of the Jury, you've heard Mr. Tribble state

9    that the Plaintiff rests.  That's what we call a

10   milestone in these types of cases.

11          You've heard all of the evidence in the

12   Plaintiff's case, in what's call the Plaintiff's

13   case-in-chief.  And we're now going to enter the phase

14   of the trial that is the Defendant's case-in-chief.

15          So with that, the Defendant may call its

16   first witness.

17          MR. DEFRANCO:  Yes, Your Honor.  Our

18   first witness is Susan Wojcicki.

19          THE COURT:  Okay.  Come around, ma'am,

20   and be sworn first.

21          (Witness sworn.)

22          THE COURT:  Okay.  If you'll come right

23   around here.  Speak into the microphone and try to keep

24   your voice up, please.

25          THE WITNESS:  Okay.

1          MR. ANDERSON:  Your Honor, we have some

2    exhibits, if that will be okay.

3          THE COURT:  Yes.

4          MR. DEFRANCO:  May I proceed, Your Honor?

5          THE COURT:  Yes, please.

6          SUSAN WOJCICKI, DEFENDANT'S WITNESS, SWORN

7                  DIRECT EXAMINATION

8    BY MR. DEFRANCO:

9        Q.   Good afternoon.

10            Would you please state your full name for the

11   record.

12       A.   Yes.  Susan Wojcicki.

13       Q.   And, Ms. Wojcicki, where do you work?

14       A.   I work at Google.

15       Q.   And please tell us what your position is at

16   Google.

17       A.   My position is VP of Product Management.

18       Q.   VP stands for?

19       A.   Vice President.

20       Q.   And is that a fairly senior position within

21   the company?

22       A.   Yes, it is.

23       Q.   Would you just tell us who you report to as a

24   Vice President at Google?

25       A.   Yes.  I report to Jonathan Rosenberg, who is

1  Senior Vice President at Google.

2      Q.   Now, can you tell us -- I take it there are

3  some committees within the company of Google?

4      A.   Yes.

5      Q.   What's the most senior-level committee in the

6  company?

7      A.   The most senior-level committee in the company

8  is the Operating Committee, and that's a committee that

9  I sit on.

10     Q.   About -- can you just tell us about how many

11 people are on the Operating Committee of Google as a

12 corporation?

13     A.   There are about 15 people.

14     Q.   And if you would, please describe for us

15 generally what that committee does.

16     A.   That committee is responsible for all

17 decisions in the company, and that committee has a head

18 of each department on that committee.

19     Q.   Now, Google, as a company, has been around for

20 some number of years; is that correct?

21     A.   Yes.  It was founded in 1998.

22     Q.   And are there a couple of individuals who are

23 considered to be the founders of the company?

24     A.   Yes.  Sergey Brin and Larry Page.

25     Q.   And are they both still with the company?

1      A.   Yes.

2      Q.   And you -- I'm sorry.

3      A.   Yes.  They're both still with the company, and

4  I am with the company, too.

5      Q.   Okay.  Sergey Brin, Larry Page, the two

6  founders?

7      A.   Yes.  They are the two founders.

8      Q.   And you work with them at Google today?

9      A.   Yes.  I work with them often.

10      Q.   Let's go back a little bit in time.

11           How long have you worked at Google?

12      A.   I've worked at Google for 10 and a half years.

13      Q.   And we should probably just cover your

14  educational background briefly.  If you wouldn't mind

15  describing that for us, please.

16      A.   Sure.  I have an undergraduate degree from

17  Harvard University.  I graduated in 1999 -- sorry --

18  1990.  It was a long time ago.

19           I have a master's in economics from UC-Santa

20  Cruz.  I graduated in 1993.  And I have an MBA from

21  UCLA.  I graduated in 1998.

22      Q.   We're going to deal with a lot of terms today.

23  I'm going to ask you what some of the terms you use mean

24  just so everybody knows what we're talking about, okay?

25  You said an MBA.  Could you just tell us what an MBA is,

1  please?

2      A.    An MBA is a Master's of Business

3  Administration.

4      Q.    So three degrees.  Are any of those -- would

5  you classify any of those as technical degrees?

6      A.    No.

7      Q.    Do you manage people with technical degrees?

8      A.    Yes, I do.

9      Q.    Why don't you please just give us a general

10  sense of the number of people you manage, just in very

11  general terms what they do for the company, so we can

12  get some sort of sense for what your day-to-day work is

13  like.

14      A.    I manage about 125 people, and the people I

15  manage are product managers.  Product managers are

16  responsible for designing the next generation of

17  products that we have.

18          And my -- the product managers on my team are

19  responsible for designing AdWords and AdSense and all

20  our advertising products.

21      Q.    All of the -- all of Google's advertising

22  products?

23      A.    Yes, all of Google's advertising products.

24      Q.    Okay.  Well, you've used a term -- a few names

25  of products that we've heard in this case, and I just

want to make sure we're all on the same page, if we start now.

AdWords, can you just give us a sentence of what AdWords is?

A. So AdWords is an advertising product where if you have a website and you want to drive users to your site, you can write a description about your product, enter your website URL, and put in a bid of how much you want to pay for users to come to your site.

And then whenever anyone clicks on your ad, you pay for it on a cost-per-click. So you pay -- for example, if you bid 35 cents, then you can -- every single time someone clicks on the ad, you would pay 35 cents for a user to come to your site.

Q. Okay. We're going to -- that's great. Thank you. We're going to talk about that in some more detail in a little bit.

But can you just tell us -- we've heard about two different parties in this case. We've heard about advertisers who use one interface and publishers who use a different interface.

Are you with me?

A. Yes.

Q. Can you tell -- can you tell us which of those two use -- use the AdWords product?

1     A.   The advertisers use the AdWords product.

2     Q.   Okay.  Let's -- let's just now briefly cover

3 AdSense.  That's another category that you mentioned.

4 Can you -- can you just give us a sentence or two of

5 what Google's AdSense product is or products are?

6     A.   Yes.  So publishers use the AdSense products,

7 and publishers use the AdSense product by putting a

8 little piece of code on their site.  So they copy and

9 paste something, and they put it on their site, and that

10 little piece of code can -- enables it so that Google

11 serves ads on the site that are dynamically targeted to

12 the content on the page.

13        So if the page is about flowers, the ads will

14 be specifically about flowers.

15     Q.   Now, AdSense for Search, there are

16 subproducts, or is that an umbrella term for a number of

17 products within that?

18     A.   So AdSense for Search is when Google serves

19 ads on search results, and those search results are on

20 other websites.

21     Q.   And are you aware that that product is not at

22 issue in this case?

23     A.   Yes.

24     Q.   Okay.  There is another product in the -- in

25 the AdSense group that is at issue in this case.

1    Is that AdSense for Content?  You're aware of

2 that?

3    A.   Yes.

4    Q.   Now, again, just -- just remind us, AdSense

5 for Content, that's on which side:  The publisher or

6 advertiser side?

7    A.   AdSense for Content?

8    Q.   Yes.

9    A.   Is on the publisher's side.

10    Q.   Okay.  We talked about AdWords.  That's on

11 the --

12    A.   Advertiser's side.

13    Q.   Okay.  So those are the two products that are

14 at issue in the case; you're aware of that?

15    A.   Yes.

16    Q.   There's also a third AdSense for Mobile.

17    Can you just -- is that for mobile phones,

18 that product?

19    A.   Yes.  So that would be for ads that show on

20 mobile phones.

21    Q.   And does that work in conjunction with a

22 product that the advertisers would use to put in ads?

23    A.   Yes.  Advertisers participate in AdWords and

24 then their ads can appear on mobile phones on AdSense

25 for Mobile.

1     Q.   Okay.  Great.  Thanks for the background.

2  Let's -- let's go back in time again a little bit for

3  just a moment.  Let's talk about the early days of

4  Google, okay?

5     A.   Sure.

6     Q.   Can you just tell us the approximate year --

7  part of a year when Google was founded?

8     A.   Google was founded in 1998.

9     Q.   And you mentioned the founders Sergey Brin and

10  Larry Page.

11        Did you know both of those individuals back

12  then?

13     A.   Yes, I did.

14     Q.   And we've heard a little bit about --

15          MR. DEFRANCO:  Maybe we can put up --

16  why -- why don't we put up a graphic, if you don't mind.

17  If you have it handy, I think it was marked DX Demo 03.

18     Q.   (By Mr. DeFranco) You weren't here, but this

19  was shown in opening statement.

20        Can -- can you identify the two individuals in

21  the photo for us, please?

22     A.   Yes.  That's Larry Page on the left and Sergey

23  Brin on the right.

24     Q.   And back in that timeframe, whose house was

25  that?

1    A.    That was my house.  I lived there.

2    Q.    And did the founders of Google work out of

3  your house then?

4    A.    Yes.  The founders of Google worked out of my

5  house.  It was their office; it was their first office;

6  and I lived in the house.  And I lived there until 1995.

7    Q.    And both -- '95.  This is '98?

8    A.    Sorry.  I lived there until 2005.

9    Q.    No worries.  No worries.

10        So just give us a sentence or two what -- in

11  this timeframe, what Larry and Sergey were doing.  I

12  think we heard they were students.

13        And how did it come about that they began to

14  work in your garage?

15    A.    So Sergey and Larry were students, and they

16  wanted to start a search engine, and they were -- wanted

17  to find their first office space.  And it was really

18  hard to find office space at that time, because there

19  just wasn't a lot of office space.  And so I had just

20  bought a house, and I offered for them to rent part of

21  my house.

22        And so they entered through the garage, and

23  they worked out of a couple of rooms.  And I actually

24  lived in the house while they were working and getting

25  the company started.

1    Q.   Okay.  And did they have any employees in the

2 very, very early days when they were working in your

3 house; do you remember?

4    A.   They started with one employee, and they hired

5 and had about five employees.  And at that point, it got

6 a little crowded, and they moved to a larger office

7 space in Palo Alto.

8    Q.   And just tell us timeframe-wise about how long

9 did they work in your house before they moved out.

10    A.   They worked in my house for about four months.

11    Q.   Now, can you tell us what -- what sort of

12 product or technology they were working on back in 1998?

13    A.   When they first started, they were working on

14 a search engine, and it was -- it was called Google

15 then.  And it's -- it's similar to the search engine

16 that we know today where you enter terms and you get

17 search results back.

18    Q.   And is there a name for that product?

19    A.   Search and google.com, which is our main

20 property.

21    Q.   In the early days, '98 and '99, was Google in

22 the advertising business?

23    A.   Google didn't generate any revenue from the

24 advertising business at that time, although we started

25 to work on our advertising systems in 1999.

1    Q.    Now, were there other search engines around at

2  the time?

3    A.    Yes.  There were lots of other search engines

4  at the time.

5    Q.    And what is it that made you decide to join

6  them as a startup?  At some point, you did that.  What

7  made you decide to do that?

8    A.    So there were a lot of other search engines.

9  In fact, when I joined, everyone said why does the world

10  need another search engine.  And their response was,

11  well, the world needs a better search engine, a better

12  way for people to find information.

13          And the reason I joined, even though it was a

14  really small company and there was a lot of risk, was

15  because I thought they had a much better service and

16  that the search that they had just worked much, much

17  better than the other search engines that were out there

18  at the time.

19    Q.    Okay.  Now, when you joined the company, what

20  was your first position?

21    A.    My first position was marketing manager.

22    Q.    And generally, what did you do in that

23  position?

24    A.    So I was responsible for marketing the product

25  and letting people know that Google was a search engine.

At the time, no one knew that.

Q.   Okay.  And just in very general terms, how did Google make money in the early days?

A.   So the first revenue streams that we made were from licensing our search to other portals.  So, for example, Netscape was our first customer.  AOL would be an example of another large customer that would license our search.

And so we also did site search where we provided search over just a specific site.  And then, lastly, we started working on advertising.

Q.   Okay.  I think that you -- let's take an example.  If you can just tell us a little bit about what you remember about the Netscape business deal with Google at the time in the very early days.

A.   Sure.  So Netscape was the first deal that we did, the first big deal where we gave our search to a provider.  And because it was one of our first deals, we gave it to them for free in exchange for marketing and for driving traffic back to google.com.

Q.   Okay.  I think if my memory is right, at your deposition, you were asked about another early business deal.

Was it Red Hat?

A.   Yes, I was asked about Red Hat.

Q.   Can you just give us a sentence or two about Red Hat?

A.   Yes.  So Red Hat was a -- was a web search deal where we paid for them on a CPM basis, or that was the -- the basic way that we paid for that.

Q.   CPM, what does that stand for?

A.   So CPM means cost per thousand.  It really should be CPT, but M is thousand in Latin, and it's an old advertising term.  It's not a term Google invented. It's a term advertisers used to pay -- to mean the cost to show this advertisement a thousand times or this search a thousand times.

Q.   Okay.  Now, at some point, Google got serious in being in the advertising business; is that right?

A.   Yes.  So -- yes, so it was always part of the plan, but we actually had a product or we started working on a product in 1999.

Q.   Okay.  And at what point did -- did you start working on Google's advertising products?

A.   So I started working on Google's advertising products for real in 2002.  I came back from maternity leave, and I wanted a new project, and I decided to switch over to the advertising side of the business. But it really was an evolution from my previous work, because I had been working with a lot of websites that

put search on their site.  And Google's business evolved

to not just putting search on their site, but also

putting search and ads on their site.

So like the AOL deal, for example, we didn't

just license the search.  We licensed the search and the

ads.  So I began working a lot more with advertisements

and advertisers.

Q.   Now -- now, back then, were there other

companies in the internet advertising space?

A.   Yes.  There were a lot of companies in the

internet advertising space.

Q.   It wasn't -- it wasn't a new field back then?

A.   No, it was not a new field.  It was already a

very competitive field.

Q.   Now, is there something known as google.com?

A.   Yes.  There is google.com.

Q.   And briefly, is that a web page?

A.   So google.com is a site.  When you go there,

there's a page and a search box, and you can search for

pretty much anything you want.

Q.   Well, let's -- let's look at -- let's look at

what was marked before as DX Demo No. 4.  And if I'm

right -- well, you can see; it's got a copyright date

that you can see from there.

It should be on your screen, too.  It's hard

1　to read, but it looks like it's '97/'98.

2　　　A.　Yes.

3　　　Q.　Is that an early search screen?

4　　　A.　Yes.　This is an early search screen.

5　　　Q.　Okay.

6　　　A.　This is an early version of google.com.

7　　　Q.　Now -- now, search is -- just in a sentence,

8　what is search?

9　　　A.　So search means you can go and you can type

10　anything into that box.　So you can type Marshall,

11　Texas, in there, and you'll get a whole bunch of pages

12　about Marshall, Texas.

13　　　　　Really, you could type anything into that box,

14　and you'll get ten results of different pages on the web

15　that will give you information about the topic that you

16　just typed in.

17　　　Q.　Okay.　And did there come a time when Google

18　was serving ads on search results?

19　　　A.　Yes.

20　　　Q.　Okay.

21　　　　　　　MR. DEFRANCO:　I think -- I think if I've

22　got it right, that should be DX Demo -- what's been

23　marked as DX Demo No. 6.

24　　　Q.　(By Mr. DeFranco) Is this -- is this an

25　example of what you're describing to us?

1    A.   Yes.  So this is a page where a user has typed

2  in the term Mavericks.  And what you see on the

3  left-hand side are the search results.  So it's on the

4  left-hand side, the scores, the first page, NBA, Dallas

5  Mavericks.

6        None -- none of the content on the left-hand

7  side are paid, but what you see on the right-hand side,

8  which is in the green box, that's paid.  So that means

9  that first result, the one by ticketsliquidator.com, you

10 can see that in the green below, that's an

11 advertisement.  So that advertiser is paying if a user

12 clicks on that ad.

13   Q.   Okay.  So, again, this is -- these are sites

14 you might go to that are related to the topic that you

15 put in?

16   A.   Yes.  So those are sites that are related to

17 Mavericks.  And no one has paid for those results to

18 show.

19   Q.   Now, those are advertisements over there?

20   A.   Yes.  So the green box are advertisements on

21 the search page.

22   Q.   Okay.  Now, this -- this is AdSense for

23 Search; is that right?

24   A.   So when the -- yeah.  Yes.

25   Q.   I'm sure there's a better question in there,

but I think you know what I'm getting at.

A. Yes. So AdSense for Search is when we show it on another site. So like AOL, if we showed -- if you saw the same page on AOL, yes, that would be AdSense for Search. So yes.

Q. Now, at some point, the scope of Google's advertising business expanded, right?

In other words, this is AdSense for Search. This product is not at issue in the case. Do you understand that?

A. Yes.

Q. There's another product at issue in the case that deals with both advertisers, as we see here, and publishers; is that correct?

A. Yes.

Q. And what's the name of that product?

A. AdSense for Content.

Q. And do you remember generally when the work on AdSense for Content began?

A. So I remember it and I personally started working on it in 2002, although some of the underlying technology that was used was started much earlier, and that, I didn't work on.

Q. Did -- did the technology for AdSense for Content -- that's the one that includes publishers

1   now -- was it in any way related to or based on the

2   AdSense for Search technology that Google already had?

3       A.   Well, the -- the advertisers come in through

4   the same system.  So the advertisers come to Google

5   and -- to show up on Google and to show up on other

6   search sites, and those same advertisers can then appear

7   on a content site.

8       Q.   Okay.  Now, there's been some -- there's been

9   some discussion in this case about who was the -- who

10  was the first person to come up with the idea for

11  AdSense for Content, generally.

12          You're aware of that?

13      A.   Yes, I am.

14      Q.   And do you know who that was?  Is there one

15  person?  Is that you, if there was?  Can you just

16  explain that to us?

17      A.   I think it was many different people's ideas.

18  There were many different people who were working on it.

19  And it was an old idea.  It had been around for a while.

20  So I believe there are many people who think they are a

21  key contributor to AdSense for Content.

22      Q.   Now, we're going to hear from another witness,

23  Jeff Dean, soon.

24          Do you work with Jeff Dean?

25      A.   Yes, I do.

1    Q.   Would you say that he's one of those

2  contributors?

3    A.   Yes.  So Jeff is a distinguished engineer at

4  Google, and he is one of the contributors who worked on

5  it very early on, on the technical side.

6    Q.   And generally -- I think you said you got back

7  from maternity leave.  You wanted to get into

8  advertising.

9         Were you thinking about AdSense for Content

10  and how to make the product, you know, just more

11  appealing to advertisers when you were discussing your

12  ideas and your contribution to the project?

13    A.   So when I came back and I started working on

14  it, I -- as I mentioned, it had been an idea that had

15  been around for a while, but we hadn't done -- we hadn't

16  actually -- there wasn't an effort to really try to

17  expand it.

18         And so I started thinking about how we can

19  really scale this up and working -- started working with

20  the technologist and started thinking of how can we

21  serve and grow this business.

22    Q.   Okay.  Now, to just -- just remind us, do you

23  write software?

24    A.   No.

25    Q.   Do you design product at the technical --

1  products at the technical level?

2      A.   I design products at a high level, not at a

3  detailed technical level.

4      Q.   Okay.  Are there people that work for you that

5  do the technical work?

6      A.   Yes.

7      Q.   One of those is Jeff Dean?

8      A.   So Jeff doesn't work for me, but he is a

9  distinguished engineer.  He's one of our best engineers

10 at Google, and he is one of the people who worked on

11 this early -- on some of the early AdSense for Content

12 work.

13     Q.   Now, I think at your deposition, you

14 mentioned -- and I -- I'm not even going to try to

15 pronounce the gentleman's name, but I remember his first

16 name was Paul, and he worked on Gmail, and you mentioned

17 something about him in the context of early -- the early

18 idea for AdSense for Content.

19          Could you tell us that, please?

20     A.   Sure.

21          So Paul Buccheit is an engineer at Google.

22 He's one of the early Gmail engineers at Google, so he's

23 one of the Google engineers who built Gmail.  And he

24 started testing putting ads on Gmail.

25          And it was just a test for -- for Googlers,

for people who work at Google, for our internal e-mail

system that later became Gmail, but he put ads on those

pages, and people started seeing that the ads were

really useful and relevant.

And so everyone in the company became aware of

serving ads on pages that were not search pages on

content pages.  And that's what -- that's one of the

things Paul Buccheit did.

Q.   Okay.  Now, is there any philosophy or focus

at Google as to, you know, who to make the happiest in

the ad surfing process?

Do you understand that?

A.   Yes, I do.

So all of our products, including our

advertising products, are really designed for users with

the idea that if we do the right thing for our users,

then they'll come to our search site, they'll do more

searches, and they'll get more relevant information.

So even our advertisement needs to be designed for

users, because advertisers only get paid if a user

clicks on it, and we only get paid if a user clicks on

it.  So everybody is motivated to serve relevant

advertising for our users, and that's a basic principle

to everything that we do.

Q.   Okay.  Let me -- let me just back up, because

1  I want to be sure that we're clear, and sometimes my

2  questions aren't terrific, okay?

3      A.   Sorry.

4      Q.   No, no.  Just to step back.

5      A.   Uh-huh.

6      Q.   We're talking about the AdSense for Content

7  system.  Are you with me?

8      A.   Yes.

9      Q.   Now, you told us earlier, there is -- there's

10  one part of that, the advertiser's side.  That's

11  AdWords; is that correct?

12      A.   Yes.

13      Q.   And there's another part of that.  There's the

14  publisher's side that's the --

15      A.   AdSense.

16      Q.   -- AdSense -- right, the AdSense for Content

17  side.

18          You used a word that may have confused us.

19  You said users.  And were you referring -- when you said

20  users and making them happy and focused on -- and

21  focusing on what they want to see, were you referring to

22  advertisers or publishers?

23      A.   So I was referring to the people -- to

24  neither.  I was referring to the people who come to

25  google.com, the people who are not advertisers or

1  publishers, but the people who come looking for

2  information at google.com.

3      Q.   Right.  So we've got the system people, and

4  then we've got the people who are actually on the web,

5  going to pages, seeing advertisements; is that right?

6      A.   Correct.

7      Q.   Do those people -- by the way, do they have

8  any financial stake in the game?

9      A.   No.  They just want to find the right

10 information.

11     Q.   Okay.  And remind us again, between

12 advertisers and publishers, just very simply, who pays

13 the money and who gets the money?

14     A.   Okay.  So advertisers pay.  Advertisers pay

15 every single time someone clicks on their ad, and

16 publishers pay -- get paid.

17          Advertisers get paid whenever anyone clicks on

18 the ad.  So publishers generate revenue by having ads on

19 their site, and advertisers pay by -- pay when users are

20 sent to their site.

21     Q.   Okay.

22          MR. DEFRANCO:  Let's put up -- because it

23 makes it a little more interesting, let's put up -- it's

24 been marked as DX demo No. 8.

25     Q.   (By Mr. DeFranco) Now, is this -- is this a

1  page of what you might see when using -- doing the

2  search, and AdSense for Content has been run?

3       A.   Yes.

4       Q.   And can you just describe for us generally

5  what you see on this page?

6       A.   So this is a page, the Ultimate Bass Fishing

7  Resource Guide.  And so a user may go here looking for

8  bass fishing information.  And what you see on the

9  left-hand side where it says Ads by Google -- and that's

10 highlighted now -- those are the ads.

11            And so where it -- the first ad, FLW Outdoors

12 on VERSUS, this advertiser pays every single time

13 someone clicks on their ad.  And you'll notice that

14 these ads are targeted to the content of the page.

15            So Google has looked at the content of the

16 page, we figured out dynamically what this page was

17 about, that it was about bass fishing, and we served ads

18 that are targeted to that specific page, and we've

19 looked in our database of millions of ads, found the

20 right ads, and served them to this page in less than a

21 second.

22      Q.   Okay.  Now -- now, when you say -- let's --

23 let's just break that down for just a second, okay?

24 I'm -- I'm a user, okay?  I'm at home on my desktop

25 computer.

A.    Yes.

Q.    And I could put in -- I could put in a search query at google.com, or -- well, that's probably not a very good example.

I put in a query that comes up with a page of results, and it gives me advertisements; is that correct?

A.    For AFC?

Q.    Yes.

A.    Yes.

Q.    Let me back up.  Let me back up.  Let me slow down.

Let's say I type in cnn.com or some other publisher's page.

Are you with me?

A.    Yes.

Q.    Now, after I type that in, you said that Google targets ads to the specific content of the web page that I want to look at; is that basically right?

A.    Yes.  So Google looks at the page, figures out what that page is about -- not the site, but the page -- and then from that page, figures out the key concepts, sends that to our ad system, and figures out the right ads to serve on that page.

Q.    Okay.  Now, when I'm -- when I'm using my

1    browser --

2        A.    Yes.

3        Q.    -- if I -- if I have a -- if I have a slow --

4    if I have a very slow system and the web page that I've

5    asked for comes up and is displayed in my browser --

6        A.    Yes.

7        Q.    -- is it possible that I might not see an ad?

8        A.    Yes, it's possible you might not see an ad.

9        Q.    And is that because the Google system is

10   trying to figure out what ad to display on a

11   particular -- what ad to send to the user's browser?

12       A.    Yes.  So Google is sending ads to the user's

13   browser.

14       Q.    And if it's -- today computers are pretty

15   fast?

16       A.    Yes.

17       Q.    So pretty often, you don't see any sort of

18   delay.  It comes up, and I'll see the search -- I'll see

19   the page that I asked for, and I'll see the

20   advertisements on the side; is that fair?

21       A.    Yes.  You don't notice the difference, but

22   Google is sending the ads to the user's browser.

23       Q.    Now, if -- if -- if I have two different

24   people who want to look at the same bass fishing page --

25       A.    Yes.

1    Q.   -- is it possible that they might not see the

2 same advertisements?

3    A.   Yes, that's very possible.

4    Q.   And why is that?

5    A.   Because every single time a page is called up,

6 we run a new auction.  And every single time we run a

7 new auction there may be different ads that we consider

8 for that page, and so there are often different ads

9 shown on the same page.

10    Q.   Now, you used the word targeting.  We're going

11 to talk about it a little bit more later on with some

12 other witnesses.  Is -- is that also called contextual

13 targeting?

14    A.   Yes.

15    Q.   And -- and that's -- that's analyzing the page

16 that the user wants to go to, to see what information is

17 there?

18    A.   Yes.  It's analyzing the page, figuring out

19 from this page dynamically what this page is about, bass

20 fishing and about catching -- and about spinner bait

21 tips, for example, and then serving ads related to those

22 two topics.

23    Q.   Okay.  Now, I don't want to get into the --

24 we're going to get into the details more later with

25 other witnesses, but very -- very generally, you talked

1  about the auction process?

2      A.   Yes, we run an auction.

3      Q.   You talked about some contextual targeting.

4  Does that have anything to do with figuring out what ads

5  might be relevant to the page that the user has asked to

6  go to?

7      A.   Yes.  So when we look at the page, there will

8  be -- and we figure out the pages about bass fishing,

9  there are a lot of ads in our system.  We have millions

10  of ads.

11          So if you look here on this page, we're only

12  serving five ads.  So the question is, out of millions

13  of ads, which is the right ads to serve?

14          And so we have a lot of complicated systems

15  that figure out which are the five best ads to serve on

16  this page.  And we look -- we run an auction based on

17  how much the advertiser is willing to pay and how

18  related we think that ad is.

19      Q.   Now, for contextual targeting, whatever it

20  is -- and I don't want to get into a lot of detail about

21  the information, but whatever information is put in

22  by -- by the advertiser, for contextual targeting for

23  that -- for that type, is there any guarantee that the

24  advertiser is going to see their advertisement at any

25  particular site that's shown on the user's browser?

A.   No, there's no guarantee that the ad will appear in any specific page at any specific time.

Q.   And you -- you mentioned part of that is the auction process and how much they're willing to pay, for example?

A.   Yes.

Q.   Okay.  How about for -- there's another type of targeting.  What is the other type of targeting called?

A.   Placement targeting.

Q.   And how is -- how is placement targeting different than contextual targeting?

A.   So placement targeting is where the advertiser can say:  I would like to appear on these sites.

So on the bass fishing, if I'm -- if I'm one of the bass fishing advertisers, I can say:  I would like to appear on fishing.com, bass fishing.com, but it's not a guarantee that your ad will appear there. It's just a recommendation.  And you still need to be -- to bid enough, and you still need to compete in that auction for the ad to appear.

In fact, one of the number one questions we get from our advertisers is, how do I make my ad appear?

Q.   Well, why not just let advertisers decide in what user's browsers, when they see a page, their

1  advertisement is going to appear?

2      A.   So the reason we -- there are many reasons why

3  we can't do that.

4          So one of them is that the whole system

5  benefits when we serve the most relevant ad on that

6  page.  And so Google is the one that's deciding what is

7  the most relevant one -- ad to serve, because there are

8  millions of ads that we could choose from.

9          And there are a lot of complicated things like

10  there could be more than five advertisers that want to

11  appear on this page.  What if there are a hundred that

12  want to appear on this page?  How would Google decide

13  which of the five?  And what if some want to pay $10,

14  but some want to pay $1?

15          So there's a lot of complexity to decide which

16  ad needs to appear on which page.

17      Q.   And in determining which ad is best suited to

18  a particular page, does Google focus on any one of the

19  three players we've talked about:  The advertiser, the

20  publisher, or the user, who's going to a -- to a --

21  using their browser to go see a web page?

22      A.   So we focus on the user.  And the reason we

23  focus on the user is because, when the ads are relevant

24  to the user, then the user is more likely to click on

25  the ad.

1          If the users are more likely to click on the

2 ad, then the publisher is going to make more money.

3 And the advertiser is going to get a more qualified lead

4 to their site if the ad is relevant for those set was

5 users.

6     Q.   Okay.  I have a few minutes left.  I want to

7 shift gears, okay?

8     A.   Okay.

9     Q.   Now, let's talk a little bit about the

10 economic side of the business, okay?

11     A.   Sure.

12     Q.   And -- and you're an economist, right?

13 One -- let's start with the types of publishers there

14 are.  And you haven't been here.  There's been talk

15 about two different types of publishers, I believe.

16          Can you tell me those, what the -- what the

17 two types of publishers are that Google deals with?

18     A.   Online and direct.

19     Q.   Okay.  What are online publishers?

20     A.   Online publishers are publishers that come in

21 through an online interface.  They sign up via the

22 online interface.  They get the little piece of code,

23 which is just really like a few lines of text that they

24 copy and paste and put on their page.

25     Q.   Okay.  And --

```
 1        A.    The direct --

 2        Q.    Sorry.  Go ahead.

 3        A.    Okay.  The direct are the publishers where we

 4   have a direct sales team that goes out and speaks to

 5   them and says:  Would you like to become an AFC partner?

 6   And then we usually do a contractual deal with those

 7   publishers.

 8        Q.    Now, one of those two publishers is using the

 9   automated Google system; is that correct?

10        A.    The automated sign-up, yes.

11        Q.    Yes.

12              And which publisher is that?

13        A.    Online.

14        Q.    Okay.  That -- that -- that's a good point.

15   Can you just -- the -- the direct publishers don't use

16   an interface to sign on and -- I'm sorry.

17              The direct advertisers don't use a system to

18   sign on and show their ads; is that correct?

19        A.    The direct advertisers --

20        Q.    Yeah.

21        A.    -- or publishers?

22        Q.    Let's talk -- let's talk about the -- I'm

23   sorry.  Let's move back to the direct publishers.

24              Excuse me.

25              The direct publishers don't use an interface;
```

1  is that right?

2       A.   No.   The -- we have a direct sales team, and

3  the direct sales team is -- there's a person who goes

4  out and speaks to the publishers.

5       Q.   Okay.   Let me back up, because I don't want

6  there to be any confusion.

7       A.   Okay.

8       Q.   I -- I'm thinking two questions ahead, and

9  that's not good.

10      A.   Okay.

11      Q.   Two different types of publishers:   Online and

12  direct, right?

13      A.   Yes.

14      Q.   You're aware that there's -- one of those two

15  types are at issue in the case, right, the online --

16  online publishers?

17           Are you aware of that?

18      A.   Yes.

19      Q.   Those are the publishers that use the

20  interface to put in their information, right?

21      A.   Yes.

22      Q.   There are something -- there's something

23  different.   Direct publishers, right?

24      A.   Yes.

25      Q.   Do they use the interface?

1        A.    No.

2        Q.    Okay.  And -- and do they still -- are they

3   still able to act as Google publishers, even though they

4   don't use the interface?

5        A.    Yes.

6        Q.    And can you just tell us generally -- you

7   don't have to give us an exhaustive list, but why might

8   a publisher choose to be a direct publisher as opposed

9   to an online publisher?

10       A.    So a publisher may choose to be a direct

11  publisher because they may, for example, already have a

12  deal with Google for search, like AOL, for example, and

13  also -- that would be one reason.

14            The second reason why they may choose it is

15  because they want to know what their -- the period of

16  time, and they want some kind of commitment.  They want

17  to know Google will serve ads on my site for the next

18  two years at this revenue share number.

19       Q.    Okay.

20            MR. DEFRANCO:  Your Honor, I'm almost

21  done, but I need to ask to have the courtroom cleared.

22            THE COURT:  Okay.  I've got another line

23  of questioning that involves some highly confidential

24  information.  I'd ask you to leave at this time.

**SEALED BY ORDER OF THE COURT**

25  ███████████   ████████   █████   ███████████



SEALED BY ORDER OF THE COURT



SEALED BY ORDER OF THE COURT



**SEALED BY ORDER OF THE COURT**



**SEALED BY ORDER OF THE COURT**



SEALED BY ORDER OF THE COURT



SEALED BY ORDER OF THE COURT



**SEALED BY ORDER OF THE COURT**



**SEALED BY ORDER OF THE COURT**



SEALED BY ORDER OF THE COURT



**SEALED BY ORDER OF THE COURT**



SEALED BY ORDER OF THE COURT



**SEALED BY ORDER OF THE COURT**

SEALED BY ORDER OF THE COURT





**SEALED BY ORDER OF THE COURT**



**SEALED BY ORDER OF THE COURT**

CROSS-EXAMINATION

BY MR. TRIBBLE:

Q.   Good afternoon.

A.   Good afternoon.

1      Q.   Now, tell me your position again.  You're the

2  vice president of product?

3      A.   I'm the vice president of product management.

4      Q.   And the products that you manage, they include

5  AdSense for Content, correct?

6      A.   Correct.

7      Q.   Both AdSense for Content Online, which has --

8  which is at issue in this -- this patent case, and also

9  AdSense for Content Direct, which is not at issue in

10 this case; is that right?

11     A.   Yes.

12     Q.   Have you read the patents that are being

13 asserted in this lawsuit?

14     A.   No, I have not.

15     Q.   Well, as product manager for the accused

16 products in this case -- I mean, first of all, let me

17 say, you've applied for patents in the past, haven't

18 you?

19          MR. DEFRANCO:  Your Honor, I apologize.

20 May we have a brief side-bar?

21          THE COURT:  Yes.

22          (Bench conference.)

23          MR. DEFRANCO:  Briefly, Your Honor, we

24 have four Google witnesses coming up.  I'm not going to

25 speak about Google's patents.  We had a discussion in

chambers the other day, and I don't see how that's

relevant, and we don't think that Google patents should

be part of the case. We're not going to get into patent

applications.

MR. TRIBBLE: I'm not --

THE COURT: I understand that the

questioning is, I assume, about the importance of

patents and something at high level --

MR. TRIBBLE: Yes.

THE COURT: -- is that correct?

MR. DEFRANCO: I understand that. Thank

you.

(Bench conference concluded.)

Q. (By Mr. Tribble) You've applied for patents

yourself, haven't you?

A. Yes.

Q. Okay. And did any business person at Google

come to you, as the product manager for the accused

products in this lawsuit, hand you the two patents being

asserted in the case so that you could look at them and

get some idea of whether Google -- Google is infringing

these patents?

A. No.

Q. And just so it's clear, you have not offered

any opinion in your testimony today that Google does not

1  infringe the two patents being asserted against it, have

2  you?

3      A.   I didn't discuss the patents.

4      Q.   And you're not offering any opinion as to

5  whether the patents are valid or not, are you?

6      A.   I wasn't discussing the patents.

7      Q.   Okay.  Let's talk about Google -- you started

8  your testimony --

9              MR. TRIBBLE:  Can we put the Defendant's

10 demonstratives up again, the one with the garage?

11     Q.   (By Mr. Tribble) The -- Google started out as

12 a small company, right?

13     A.   Yes.

14     Q.   Just like Function Media; is that fair to say?

15     A.   I don't know that much about Function Media,

16 but we're both -- I mean, if they're a small company,

17 then -- most companies start small.

18     Q.   Well, Google started with just two people.

19     A.   Yes.

20     Q.   And they came up with a revolutionary new

21 technology that they protected through patents, didn't

22 they?

23     A.   They did patent one piece of it, but that was

24 just one piece of the technology.  And I'm not a lawyer;

25 I'm not an expert on anything to do with patents.

```
 1       Q.   Are you talking about the Stanford -- the
 2  patent that was licensed in the Stanford license that
 3  we've heard about?
 4       A.   No, I'm not.
 5       Q.   So you're talking about the search patent?
 6       A.   I only know about one patent that Google
 7  applied for, which is our page rank patent.
 8       Q.   And that's the technology that's used for its
 9  search engine, correct?
10       A.   It is one of many, many technologies.
11       Q.   But that was their -- their first patent,
12  right?
13       A.   I'm actually -- I don't know.  I don't work in
14  patents.
15       Q.   Okay.  Well, just -- you were at Google in the
16  very early days, because they started in your garage,
17  correct?
18       A.   Yes.
19       Q.   Just two people who had invented a
20  revolutionary new technology to do searching.
21       A.   Yes.
22       Q.   Okay.  And in the early days, Google made its
23  money, its very first money -- by the way, Google was
24  unprofitable in the early days, wasn't it?
25       A.   Yes, it was.
```

1    Q.   Didn't have a lot of equipment?

2    A.   Well, certainly, a lot less than we have

3 today.

4    Q.   Fair enough.

5         The -- and the way Google made its money in

6 the beginning was it licensed its patented search

7 results; isn't that right?

8    A.   I don't know if the search results were

9 patented or not.

10    Q.   Okay.  You were in charge, though, of

11 licensing to customers search results; is that fair?

12    A.   No, I was not.

13    Q.   Okay.  You're aware that Google's first

14 customer was Red Hat.

15    A.   Yes.

16    Q.   And the way Google made money is, they

17 licensed their search results to Red Hat; isn't that

18 right?

19    A.   Yes.

20    Q.   And the way Google got paid for licensing its

21 search results to Red Hat was it got paid for -- a

22 certain amount of money for every thousand searches that

23 they sent to Red Hat; isn't that right?

24    A.   Yes.

25    Q.   And so Google, for its technology, it wanted

to be paid -- as the technology was used, paid over time; isn't that right?

A.    That -- that first deal was mostly a CPM deal, was a CPM-based deal, yes.

Q.    Yes.  And so the more their technology was used, the more their customer used their technology or made off of their technology, the more they would pay Google over time, right?

A.    For Red Hat.

Q.    Is that a yes?

A.    Yes.

Q.    Okay.  And even though Google was very small back then --

A.    Although the Netscape deal was different.

Q.    -- they -- I wanted to ask you some questions about some other things you said.  I think they'll come up in these documents.

MR. TRIBBLE:  Why don't we take a look at Defendant's Exhibit 319.

Your Honor, I have --

A.    Do I open this binder?

Q.    (By Mr. Tribble) I'm sorry.  We don't use a binder.

MR. TRIBBLE:  Your Honor, may I approach?

THE COURT:  Yes.

1    Q.   (By Mr. Tribble) And I just wanted to walk

2  through some things that you said.

3         So you have AdSense Direct and AdSense Online,

4  correct?

5    A.   Yes.

6    Q.   And it's fair to say that -- you referred to

7  Paul Buccheit; is that right?

8    A.   Yes.

9    Q.   And you said earlier that -- that AdSense was

10  an old idea.  Isn't that what you said?

11   A.   Well, it had been around for a while before we

12  started working on it.

13   Q.   Let me ask you, didn't you say in your

14  deposition that the genesis was Paul Buccheit when he

15  started putting ads on Google's Gmail application?

16   A.   So I said that he was one of the people that

17  had that idea early on.

18   Q.   Do you remember how early?

19   A.   I don't remember the exact date, no.

20   Q.   Okay.  Can you take a look at Defendant's

21  Exhibit 319?  Is this a Google document titled Overview

22  of AdSense for Content?

23   A.   Yes, it looks like it.

24   Q.   Can you --

25   A.   Yes.

1     Q.   -- turn to the third page?

2         It says right here in the first bullet point:

3 Paul Buccheit put ads on his e-mail as a proof of

4 concept while developing Gmail in late 2002.

5         Did I read that correctly?

6     A.   Yes.

7     Q.   Do you now recall that when this -- the first

8 time ever that Google had put ads on a consent page --

9 do you recall now that it was a proof of concept, an

10 experimental development in late 2002?

11    A.   So that's what I'm reading in this document.

12 I don't know if Rama, who is the author, verified that

13 with Paul.

14    Q.   Let's look at the next bullet point.

15        Launched in March 2003.  Did he get that date

16 right?  Was AdSense launched in March 2003?

17    A.   I don't remember the exact dates, but --

18 but -- it was launched in 2003, but I don't remember

19 about March specifically.

20    Q.   Okay.  Oh, by the way, you were talking about

21 Google -- and there's been a lot of discussion about

22 this.

23        Mr. Verhoeven, in opening -- I guess he's --

24 he's not in the courtroom right now, but the -- there's

25 been a lot of discussion about Google sends ads to a

1  browser or something, right?

2      A.   Yes.

3      Q.   Okay.  Take a look at the second page.

4  By the way, who is Mr. Ranganath?

5      A.   Mr. Ranganath is an engineer that works on

6  AdSense for Content.

7      Q.   Okay.  And do you see in the presentation, it

8  says at the top, what is it AdSense?  And that includes

9  AdSense for Content, correct?

10     A.   Yes.

11     Q.   And what is AdSense?

12     A.   Yes.

13     Q.   Doesn't the first bullet point -- it says:

14  Show AdWords ads on websites of AdSense partners,

15  correct?

16     A.   Yes.

17     Q.   And so the AdWords ads, those are the ads

18  entered in by the advertisers.  The AdSense partners are

19  the people that sign up to publish ads, and it's on

20  their websites that you're putting the ads, isn't it?

21     A.   It may appear that way to users, but it's the

22  browser where the ad appears.

23     Q.   But these are Google's own words to an

24  internal group of Google employees, correct?

25     A.   Yes.  But I think that that from a -- from a

1  user standpoint, there are -- from a user standpoint, it

2  looks like it's on the page, but the browser is actually

3  calling a lot of different things.  And so I don't think

4  he meant this as a technical document.

5      Q.   Wasn't he using website in -- as a virtual

6  location?  If website were defined to be either a

7  physical or a virtual location, then Google would be

8  sending ads to the websites.

9           Would you agree with that?

10     A.   No, I wouldn't.  And I don't know -- it's hard

11 to know what he meant when he wrote this or if he meant

12 a virtual website.  I don't know what that would mean.

13     Q.   Now, I guess --

14           MR. TRIBBLE:  Just give me a second.

15 Your Honor, may I?

16           THE COURT:  Yes.

17     Q.   (By Mr. Tribble) Now, the -- Exhibit 1690, the

18 first page of this -- this is an e-mail from you to

19 Sergey Brin on September 5, 2002, correct?

20     A.   Yes.

21     Q.   And so this is -- you were sending him a --

22 a -- a strategy presentation regarding the upcoming

23 AdSense, correct?

24     A.   Yes.

25     Q.   The -- it says content targeting GPS.  GPS is

1  a Google product strategy meeting, correct?

2      A.    Yes.

3      Q.    And it's referring to the AdSense product,

4  right?

5      A.    AdSense for Content product.

6      Q.    And you oversaw the preparation of this,

7  didn't you?

8      A.    It was a long time ago, but I believe so.

9      Q.    Okay.  Let's turn to the page that ends 164 in

10 the bottom right.

11            This was your big idea summary slide, correct?

12     A.    Yes.

13     Q.    And so you call it a big idea; you don't call

14 it an old idea; fair to say?

15     A.    Yes, that's true.

16     Q.    And then the basic idea summary -- do you see

17 that?

18     A.    Yes.

19     Q.    The first -- the first bullet point under the

20 basic idea -- this is the basic idea of AdSense, isn't

21 it?

22     A.    Well, it's one of the ideas.

23            So an important idea is the contextual dynamic

24 interpretation of the page in serving the ads

25 dynamically.

1       Q.   I understand.  Google's position is that the

2  important thing about AdSense is the contextual

3  targeting, right?

4       A.   Well, that's what makes -- yes, that's what's

5  important.

6       Q.   Okay.  But in the basic idea -- and you

7  mentioned that, but in the basic idea summary, the very

8  first point is to extend Google's ad syndication to

9  publisher's content pages, right?

10      A.   Yes.

11      Q.   And at this time -- and that was something

12  new.  The AdSense product, for the first time, was

13  allowing Google to serve ads on other people's websites

14  in an automated fashion; isn't that right?

15      A.   Well, it wasn't totally new.  And if you

16  actually look at the -- another slide in this

17  presentation, I say we're already serving ads on content

18  page.

19      Q.   Yes, but that's on your search product, right?

20      A.   No, on content pages.

21      Q.   Which -- which page are you looking at?

22      A.   It's the one that ends 169, deal time.  Deal

23  time was not a search provider.  They were a content

24  provider.

25      Q.   Who else?  Anyone else?

1      A.    There were other Ecommerce providers.

2      Q.    But at this time, prior to this, you didn't

3  have an automated way to automatically format ads

4  according to the specialized look-and-feel rules of each

5  publisher, did you?

6      A.    I'm not sure I know what you mean by that.

7      Q.    Okay.  Fair enough.  You haven't read the

8  patents.

9            Skipping ahead, the -- by the way, on the --

10  maybe you can clear something up.

11            On the Applied Semantics deal --

12      A.    Sure.

13      Q.    -- Google used none of that technology,

14  correct?

15      A.    No -- I mean, yes, we used none of their

16  technology.

17      Q.    Google made absolutely no use of any of

18  Applied Semantics's technology?

19      A.    Not for AFC, not for AdSense for Content,

20  although Jeff Dean will be here later, and he was one of

21  the engineers who built the systems, and he can --

22  probably will be a better witness on that topic.  But I

23  do not believe we used their technology, no.

24      Q.    Okay.  I wanted to get back to this.  You said

25  that one of the design-arounds was that you could move

1  all the online users to -- to AdSense for Content

2  Direct; isn't that right?

3      A.   Yes.

4              MR. TRIBBLE:  And do we have

5  Exhibit 1696?

6      Q.   (By Mr. Tribble) Isn't it true -- isn't it

7  true that AdSense for Content Direct is losing money?

8      A.   In what timeframe?  In -- I'm not sure I

9  understand your question.

10     Q.   Hadn't it been losing money?

11     A.   I'm not aware of it losing money.

12             MR. TRIBBLE:  Can you pull up Bratic

13 Slide -- oh, we'll come back to that.  We might have to

14 clear the courtroom.

15             THE COURT:  Yes.

16             MR. TRIBBLE:  Thank you.

17             THE WITNESS:  Thank you.

18             MR. TRIBBLE:  In fact, Your Honor, I'm

19 going to go ahead and give her, if you allow it, three

20 more exhibits that go right along with this topic.

21             THE COURT:  Yes.

22     Q.   (By Mr. Tribble) Perhaps you can explain

23 something to us.

24             It is true -- you will agree, at a minimum,

25 that the profit margins are higher for AdSense Online

1　versus AdSense Direct.

2　　　A.　　No.

3　　　Q.　　Okay.　Do you have the -- Exhibit 1696?

4　　　A.　　Yes, I do.

5　　　Q.　　Okay.　And this is an e-mail from your boss to

6　the top person at the company, Sergey Brin, or at least

7　he's copied on it, forwarding a presentation that you

8　had put together titled AdSense Business Review,

9　correct?

10　　　A.　　Yes.

11　　　Q.　　Okay.　And you and I reviewed this document

12　just, what, two weeks ago?

13　　　A.　　Yes.

14　　　Q.　　Okay.　And this was in November of 2003.

15　　　A.　　Yes.

16　　　Q.　　Okay.　And so first, I want to talk about --

17　at that timeframe -- let's turn to Page 718.

18　　　　　　And this is discussing the product performance

19　on Online Direct versus -- excuse me -- AdSense Direct

20　versus AdSense Online, is it not?

21　　　A.　　Let me just go to that site.

22　　　Q.　　Certainly.

23　　　A.　　Yes.

24　　　Q.　　Okay.　And underneath your graph, you say:

25　Online RPMs outperform Direct, correct?

1      A.    Yes.

2      Q.    And this is talking about AdSense Online

3   outperforming AdSense Direct.

4      A.    Yes.

5      Q.    And the difference is, AdSense Direct, those

6   are the large customers, and you have account managers

7   and engineers that work on those -- on that advertising

8   for those customers, correct?

9      A.    Yes, we have account managers, but no -- but

10  no dedicated engineers.

11     Q.    Okay.  But you have staff that assists the

12  preparations of ads and things like that.

13     A.    Yes, but we do for Online as well.

14     Q.    Okay.  Well, for Online, you do have an

15  automated system that does automatic formatting.  You'll

16  agree with that, won't you?

17     A.    No.  We have a system that shows the -- Google

18  shows the ad on -- in the user's browser, and Google

19  does the UI for the ad.

20     Q.    Does the formatting of the ad?

21     A.    Google -- yes.

22     Q.    Okay.

23     A.    Google does --

24     Q.    Excuse me.  I'm sorry.

25     A.    Sorry.  I was just repeating.  Yes, Google

does the formatting of the ad.

Q.   And it does it automatically, doesn't it?

A.   Yes.

Q.   And that's in AdSense for Content Online, right?

A.   It's the same system that serves both of them, Online and Direct.

So Google serves the same ad on a -- and decides for both Online and Direct.  It's the same back-end system.

Q.   There's manual intervention in the AdSense Direct system, isn't there?

A.   There's also manual intervention on the Online.  So there can be optimization for both.  We have account managers for Online as well.

Q.   I think we've heard some other testimony about that, but in comparing AdSense Online versus AdSense Direct, you did say that for AdSense for Content Online, there's a lack of comparable alternatives, did you not?

A.   Yes.  I wrote that in 2003.

Q.   And you wrote, there is no competition from other advertisers, correct?

A.   Yes, but I don't believe those to be true today.

Q.   Okay.  Now let's go to the next page.

1          Do you see this chart here?

2     A.   Yes.

3     Q.   These are your words?

4     A.   Yes.

5     Q.   And you were talking about the automated

6 competitive advantage of AdSense Online, right?

7     A.   Yes.

8     Q.   You said it had faster penetration.  That's

9 faster penetration into the website market, right?

10    A.   I'm not sure what I meant in 2003.

11    Q.   You said better monetization.

12    A.   Yes.

13    Q.   That means more money, right?

14    A.   Yes.

15    Q.   In fact, Google often refers to AdSense for

16 Content Online as its monetization engine, correct?

17    A.   No.  It's AdSense, not AdSense for Content

18 Online.

19    Q.   Just AdSense generally?

20    A.   AdSense generally.

21    Q.   Including AdSense for Content Online?

22    A.   Yes.

23    Q.   Okay.  And the -- and the other advantage,

24 better margins via a low-cost structure --

25 infrastructure, correct?

1       A.      Yes.

2       Q.      Those are all advantages of AdSense; is that

3  fair?

4       A.      Yes.  That's what I wrote in 2003.

5               But I also, in my deposition two weeks ago,

6  said there's been a lot of debate about the margins of

7  Online versus Direct, and depending on how you look at

8  the data, there are different opinions about that.

9               THE COURT:  Let's pick up there after our

10 afternoon recess, okay?

11              Now, Ladies and Gentlemen, be back ready

12 to come in the courtroom at 3:35.

13              Remember my prior instructions.  Don't

14 talk about the case.

15              COURT SECURITY OFFICER:  All rise.

16              (Jury out.)

17              THE COURT:  All right.  Y'all have a

18 seat.

19              If you'll do me a favor and try to listen

20 to his question.  If you can answer it yes or no, then

21 please answer it yes or no, and I promise you, I'll let

22 Google's lawyer to ask you some follow-up questions.  If

23 you're unable to answer yes or no, just say, I can't

24 answer yes or no, okay?

25              THE WITNESS:  Okay.

1          THE COURT:  Thank you very much.

2          THE WITNESS:  Sure.

3          THE COURT:  See y'all at 3:35.

4          (Recess.)

5          COURT SECURITY OFFICER:  All rise.

6          (Jury in.)

7          THE COURT:  Please be seated.

8          MR. TRIBBLE:  Your Honor, may I approach?

9          THE COURT:  Yes.

10          MR. TRIBBLE:  And I think we're about to

11 get into some sensitive material.

12          THE COURT:  Okay.  I think they're

13 beginning to catch on to what I'm going to say before I

14 even say it.

15          Thank you all.

16          ███████  ██████  ████  ██████████
**SEALED BY ORDER OF THE COURT**

17    ████  █████  ████  █████ █  ████  ██████  ████  █████

18 ██████  █████  ██████  ██████  █████  ████  █████  ████

19 ██████  █████  ████  █████  ██████

20      █████  ████  █████  ████  ██████  █████  ████  ████

21 █████  ████  █████  ██████  █████  █████  █████  ████

22 █████

23    █████  ████  █████  █████  ████  █████  █████  █████

24 ██████  █████  █████  ████  █████  █████  █████  █████

25 █████  ████  █████  ████  █████  █████  █████  █████



**SEALED BY ORDER OF THE COURT**



SEALED BY ORDER OF THE COURT



**SEALED BY ORDER OF THE COURT**



**SEALED BY ORDER OF THE COURT**



SEALED BY ORDER OF THE COURT



**SEALED BY ORDER OF THE COURT**



SEALED BY ORDER OF THE COURT



SEALED BY ORDER OF THE COURT



SEALED BY ORDER OF THE COURT



SEALED BY ORDER OF THE COURT



**SEALED BY ORDER OF THE COURT**



SEALED BY ORDER OF THE COURT



**SEALED BY ORDER OF THE COURT**



SEALED BY ORDER OF THE COURT



**SEALED BY ORDER OF THE COURT**



**SEALED BY ORDER OF THE COURT**



**SEALED BY ORDER OF THE COURT**



SEALED BY ORDER OF THE COURT



SEALED BY ORDER OF THE COURT



SEALED BY ORDER OF THE COURT



**SEALED BY ORDER OF THE COURT**

123



**SEALED BY ORDER OF THE COURT**



SEALED BY ORDER OF THE COURT



SEALED BY ORDER OF THE COURT



SEALED BY ORDER OF THE COURT



**SEALED BY ORDER OF THE COURT**



SEALED BY ORDER OF THE COURT



**SEALED BY ORDER OF THE COURT**



**SEALED BY ORDER OF THE COURT**



SEALED BY ORDER OF THE COURT

1          THE COURT:  Please be seated.

2          You can proceed.

3          MR. DEFRANCO:  I can go ahead.

4     Q.   (By Mr. DeFranco) We were talking about these

5 early days of Google.  Do you remember that?

6     A.   Yes, I do.

7     Q.   You were -- the set-up was a small company,

8 like Function Media, couple of people trying to get a

9 business going.

10          Do you remember that?

11     A.   Yes.

12     Q.   How many of those were there in Silicon Valley

13 would you say over the years?  Last ten -- you've lived

14 there for ten years?

15     A.   More.

16          There are a lot of them.

17     Q.   If you knew which ones were going to be

18 successful, would you invest in them?

19     A.   Everybody would.

20     Q.   And what makes it unpredictable whether a

21 business is going to be successful?

22     A.   Lots of things.  It's really hard to know

23 which company will be successful.

24     Q.   And let's -- let's talk specifically about the

25 early days of Google.  The Netscape deal, did Google

1  make money from that deal?

2       A.   No.

3       Q.   Was there any -- and I'll get this wrong --

4  CPC or CPM, or whatever it was, was there any sort of

5  relationship where Google got a piece of every bit of

6  action that was going on?

7       A.   No.

8       Q.   Why?

9       A.   We gave them the search for free, and they

10 give us advertising that drove back.  And it was because

11 we wanted users to know about Google.

12      Q.   So you gave away the technology.  At that

13 time, this is the technology that led you, as you said,

14 to join that company.

15           By the way -- to join that company, you gave

16 it away to Netscape, right?

17      A.   Yes.

18      Q.   Now, Red Hat, they -- they paid you money,

19 right, on some basis?

20      A.   Yes.

21      Q.   On a transaction basis, right?

22      A.   Yes.

23      Q.   Very -- in general terms -- we haven't seen a

24 document that shows the number, but you were asked about

25 that, and it was compared to the situation here.

 1          Can you just -- do you remember very generally

 2    about how much money that Red Hat deal -- relationship

 3    generated for the Google founders in the early days?

 4          A.    So I remember that number to be less than a

 5    hundred thousand.

 6          Q.    Less than a hundred thousand dollars?

 7          A.    Yes.

 8          Q.    So you're saying whatever the basis was,

 9    impressions, CPMs, CPC, on an ongoing basis, all that

10    money added together was less than $5 million, right?

11          A.    Definitely.

12          Q.    It was less than $2-1/2 million, right?

13          A.    Yes.

14          Q.    It was less than a million dollars, right?

15          A.    Yes.

16          Q.    And it was closer to a hundred thousand

17    dollars?

18          A.    Yes.

19               MR. DEFRANCO:  Thank you very much.

20               THE COURT:  Recross?

21               MR. TRIBBLE:  Just a couple, Your Honor.

22                     RECROSS-EXAMINATION

23    BY MR. TRIBBLE:

24          Q.    You're aware that at least according to Walt

25    Bratic's calculations in the AOL deal --

1          MR. TRIBBLE:  Do we have to seal for

2    this?

3          MS. CANDIDO:  If it's a calculation

4    number.

5          MR. TRIBBLE:  This?

6          MS. CANDIDO:  Yes.

7          THE COURT:  Once again.

8          MR. TRIBBLE:  Five seconds, just ten

9    seconds.

10

**SEALED BY ORDER OF THE COURT**



**SEALED BY ORDER OF THE COURT**



SEALED BY ORDER OF THE COURT



SEALED BY ORDER OF THE COURT



**SEALED BY ORDER OF THE COURT**



**SEALED BY ORDER OF THE COURT**



**SEALED BY ORDER OF THE COURT**

**SEALED BY ORDER OF THE COURT**

THE COURT:  Come around, sir, and be

sworn in.

(Witness sworn.)

THE COURT:  Come right around here,

please, and take a seat.  And speak into the microphone

and keep your voice up for me, okay?

THE WITNESS:  Okay.

THE COURT:  Thank you.

MR. DEFRANCO:  Your Honor, may we pass

1  out some exhibits?

2           THE COURT:  Yes.

3        JEFFREY DEAN, DEFENDANT'S WITNESS, SWORN

4                  DIRECT EXAMINATION

5  BY MR. DEFRANCO:

6      Q.   You have the privilege of being our last

7  witness today, Mr. Dean.

8           Why don't you start for us and say your full

9  name for the record, please.

10     A.   My name is Jeffrey Dean, but everyone calls me

11  Jeff.

12     Q.   Dean is a familiar name.  Are you any relation

13  with Michael Dean, the inventor on the patents in this

14  case?

15     A.   Not that I know of.

16     Q.   Have you ever met him before?

17     A.   No.

18     Q.   Where do you currently work, sir?

19     A.   I work at Google in Mountain View, California.

20     Q.   And do you have a title at Google?

21     A.   I'm a Google fellow.

22     Q.   What is a Google fellow?

23     A.   A Google fellow is -- we have a series of

24  ladders on our technical ladder, so I'm in our

25  engineering organization.  I write software.

And Google fellow is the top of nine job titles or

something on the technical ladder, sort of parallel to a

vice president on our management chain.

Q.   Do you have any engineer -- well, how many

engineers generally does Google have?

A.   We have about 10,000 people in our engineering

organization.

Q.   That's worldwide, right?

A.   Worldwide.

Q.   10,000.

A.   Yes.

Q.   Okay.  And do you supervise currently any of

those employees?

A.   Oh, no.

Q.   Why not?

A.   Because I'm not in the management side of

things.  I'm in the technical software development side.

And so I typically work on small projects.  I don't

supervise people formally but work with a group of maybe

five or six people.

Q.   And there are -- I'm sure you're aware there

are a couple of products at issue in this case, AdSense

for Content, AdWords, AdSense for Mobile.  Are you aware

of those products?

A.   Yeah.

1     Q.   Now, do you currently work on those products

2 today?

3     A.   Not currently.

4     Q.   When was the last time you worked on any of

5 those products?

6     A.   In early 2003.

7     Q.   So -- I'm sorry.  When did you join Google?

8     A.   In mid 1999, in August.

9     Q.   Okay.  So you're going to tell us about the

10 early days of Google and some of the products we're

11 talking about, right?

12     A.   Sure.

13     Q.   Now, when did you join Google?

14     A.   In August of 1999.

15     Q.   And what was your first position when you

16 joined the company?

17     A.   I was a software engineer.  That's what

18 everyone in the engineering group was.

19     Q.   And what were you -- well, I should -- I

20 should do this for completeness.

21          Can you just tell us, please, about your

22 educational background?

23     A.   Sure.

24          So I went to collegiate at University of

25 Minnesota where I studied economics and computer

science.  Then I went on to graduate school at

University of Washington, and I got a Ph.D. in computer

science there in 1996.

    Q.  And, again, you joined Google in 1999?

    A.  Yes.

    Q.  And when did you become a fellow?

    A.  I believe it was 2006.

    Q.  Is that some form of distinguished position at

Google in any way?

    A.  So as I said, it's the top level of our

technical ladder.  There are four Google fellows

currently in our engineering group.

    Q.  4 out of 10,000 --

    A.  10,000.

    Q.  -- company-wide?

    A.  It's one level above a distinguished engineer.

    Q.  1999 -- you weren't here, obviously, a moment

ago, but the company was just getting started then; is

that right?

    A.  That's correct.

    Q.  And when you when you came, about how many

employees did Google have?

    A.  We had about 25 people.

    Q.  And out of how many -- out of 25 people, how

many were engineers; do you remember?

1    A.    About 12 or 13.

2    Q.    And what did -- what did you do when you -- so

3  about half when you first joined?

4    A.    Yeah, roughly.

5    Q.    And what did you work on when you first joined

6  the company?

7    A.    When I showed up, someone who was in my office

8  said, We need an ad system.  You should work on an

9  advertising software system to place ads and show ads.

10    Q.    And can you just tell us a little bit about

11  the first advertising system you worked on?

12    A.    Sure.

13          So I and two other people who started soon

14  after me started working on a system to show ads on

15  Google search result pages.  So when a user does a

16  query, maybe they search for running shoes or for

17  Mexican restaurants or something, we wanted to be able

18  to show ads next to those search results.

19          And so we were trying to build the system

20  to -- when the user types in a query, figure out what

21  ads would be relevant and then show them on the page.

22    Q.    Now, when you say -- remind us.  Google.com,

23  is that the Google search home page, web page, whatever?

24    A.    Yes.  Yes.

25    Q.    And the ad system was designed for use with

that; is that right?

A. Yes, that and for other search syndication partners.

Q. Now, we've heard the term search technology. Would you tell us what -- just describe that for us generally. In other words, you put in a -- put some words in a search page. What happens?

A. Sure.

So the sort of key pieces behind a search engine are a crawling system that goes out and fetches all the web pages in the world that it can find and then an indexing system that builds an index that's kind of like the back of a book where you have a list of where -- which documents contain which words.

So if I have a search for running shoes, I want to find all the pages that have the word running and then all the pages that have the word shoes and find all the ones that have both of those words by using the index that gets built.

And then you want to find which pages sort of are most related to running shoes. Maybe they have the word a lot or they have it in a bigger font or lots of people talk about this page in the context of running shoes.

So you want to find all the relevant pages,

1  find which ones you think are most relevant, and then

2  select those and show those as your first 10 results for

3  your search result page.

4      Q.   And you said something to the effect, when a

5  user would put in a search, and they would get pages,

6  right, that related in some way to that search, terms --

7  ads would appear; is that right?

8      A.   Yes.  So the advertising system was trying to

9  find ads that were relevant to that query as well.

10     Q.   And did Google work with -- in dealing with

11 ads early on, did it work with other websites?

12     A.   Yes.  We had --

13     Q.   NonGoogle websites?

14     A.   Yes.

15          So part of our early business at Google was

16 not running -- not just running our own web page at

17 google.com for doing searches, but there were a lot of

18 other search engines on the web who wanted to provide a

19 search facility but didn't want to build their own sort

20 of software to do that.

21          And so we would outsource -- they would

22 outsource their search service to us.  So, for example,

23 Netscape was another prominent web company that wanted

24 to offer a search service.

25          So when people would go to Netscape's web

1  pages and type in a query, then they would send that

2  query to us, and we would handle the searching and also

3  selecting advertisements to show.  And then they

4  would -- we would send it back to Netscape, and they

5  would show it.

6      Q.   Now, in the -- in the early days for

7  google.com, did the ads that would appear after I put in

8  a search as a user of the internet, would they relate to

9  the search that I did?  Do you remember?

10      A.   Yes.  That was always part of our goal with

11  the advertising system, was to make the ads relevant.

12  So if you have an ad for, you know, running shoes, it

13  would be good to show ads for Foot Locker or other

14  places you could get running shoes and not for a place

15  to buy a car or a place to get a credit card, because we

16  believe that advertisements should be relevant to

17  whatever it is -- information the person is looking at

18  so that they don't get annoyed, but they're actually

19  useful to people.

20      Q.   Now, let's -- let's just look at a -- a

21  document briefly.

22              MR. DEFRANCO:  Let's take a look, please,

23  at DX315.

24      A.   Okay.

25      Q.   (By Mr. DeFranco) It should be in your binder

1  there.

2      A.   Yes.

3      Q.   And it's going to be the same drill

4  everybody's seen with documents.

5           Do you recognize that?

6      A.   I do.

7      Q.   Can you just tell us what this is briefly?

8      A.   Sure.

9           So whenever you're building a software system,

10 it's good sort of engineering practice to write up a

11 document in English that describes what the goals of the

12 system that you're trying to build are.  So that's sort

13 of the objective section.

14          The background section often has information

15 about why you're building what you're building.  It will

16 have things like, roughly, how the system works so that

17 if someone else wants to then modify the software you've

18 written, they can read this document and get kind of an

19 overview.

20          Think of it sort of an outline written in

21 English for people wanting to understand the software

22 you've written.

23     Q.   Now, the first -- the first sentence, if I

24 have this right, of that document --

25               MR. DEFRANCO:  Maybe we can focus on

1    that.

2        Q.    (By Mr. DeFranco) It reads something like --

3             MR. DEFRANCO:   Well, I can read it now.

4    Thank you.

5        Q.    (By Mr. DeFranco) The advertising system is

6    responsible for deciding what advertisements should be

7    placed within pages that are generated by the Google

8    website.

9             Do you see that?

10       A.    I do.

11       Q.    Now, can you tell us generally what you meant

12   by that at the time?

13       A.    Sure.

14            So that's just sort of the highest level goal

15   of what the advertisement system is trying to do.  It's

16   trying to figure out what ads we should show, in terms

17   of when we're going to place them on ads on google.com

18   web property.

19       Q.    Now, what, if any, focus did Google, at this

20   early time, have on the user experience, the person

21   putting in the search?

22       A.    So as I said, we believe that ads should be

23   relevant to what the user was looking for.  They'll be

24   helpful and useful to users if they pertain to the

25   information that that user is seeking at the moment.

1          And they also shouldn't be sort of flashy and

2     gaudy.  They should be kind of fairly unobtrusive,

3     clearly labeled as advertisements, as opposed to sort of

4     being hidden, the fact that it's an advertisement versus

5     a nonadvertising link.

6          We believe that -- you know, for all of our

7     search results, we'd like the page to return quickly.

8     So that means that the advertising system also has to

9     figure out what ads needs to be shown quickly.  And so

10    that was one of the objectives for the system, was to

11    return, you know, results quickly and so on.

12         Q.   Who was responsible for designing this early

13    Google advertising is?

14         A.   I and two other people designed it.  I wrote

15    probably most of the text in this document.  Other

16    people made a few small modifications over time to it.

17         Q.   You write software yourself?

18         A.   Yes, a lot of it.  I mean, with a group of two

19    other people.

20         Q.   Were you writing more software back then even

21    than now?

22         A.   No.  I still write lots of software.  It's

23    great.

24         Q.   How long did it take to write this software;

25    do you remember?

1      A.   We went from, basically, nothing to sort of a

2   functional system in about a month and a half or two

3   months.  Yeah, we were working pretty long hours then,

4   and we were working pretty fast.

5           So it was about two months.  And then,

6   obviously, the system continued to evolve.  This sort of

7   laid the framework for a lot of other enhancements to

8   the advertising system over -- over the years that were

9   done by a number of other people.

10      Q.   Did it work?

11      A.   Yeah.  I mean, you could type in queries and

12   get in -- get ads back.  That was the goal.

13           A lot of the hard work was building up an

14   advertiser base, which, you know, we designed the

15   software to handle lots of advertisers, but there was a

16   lot of other work on the business side and so on to

17   build up a collection of advertisers.

18      Q.   Thank you.

19           Let's go to another document.  Let's go to

20   Exhibit 389.

21      A.   Okay.

22      Q.   This one is a little harder to read, but it

23   says:  Content-based ad serving system.

24           Do you see that?

25      A.   I do.

1     Q.   And it's -- it's got -- you can -- you should

2 have a binder in front of you, if you need to see it.

3     A.   I do.

4     Q.   Now, have you seen this document before?

5     A.   Yes.

6     Q.   And who wrote this document; do you know?

7     A.   I and several other people, who were working

8 on this particular system, wrote the text of the

9 document.

10    Q.   And were these all Google employees at the

11 time?

12    A.   Yes.

13    Q.   And it says:  With input from many others.

14 Do you know what that was referring to?

15    A.   Yes.  This was a fairly complicated system,

16 and so, you know, we had various side discussions with

17 people about one or more aspects of it, and so it's

18 always nice to give credit to other people, even if

19 they're too lengthy to name.

20        So we, yeah, put that in.  But they were all

21 Google employees that we had these discussions with.

22    Q.   Now, it says:  A content-based ad system.

23 Do you see that?

24    A.   Yes.

25    Q.   How is that different from any ad serving that

Google did before this project?

A.   So in the original advertising system where we were trying to figure out what ads should appear on search result pages, the information you have from -- at hand is the -- the query that the user typed in.

So if they typed in running shoes, you're going to look for advertisers who wanted to advertise on running shoes and related keywords, maybe running shoes or Nike or soccer shoes or those kind of related keywords.

So you have the user's query to use in guiding what advertisements to select.

But in a content-based ad system, you're trying to show ads on web pages that weren't the result of a query.  It's just an article about knitting or an article about, you know, how to repair your car.

And you have a lot of text on the page, and you want to show relevant ads that are related to whatever the topic of the page is.  You know, for a knitting page, you want to show maybe a yarn supply store's ads, or a car part store, you want to show car magazines or something like that.

And so it uses the text of the page to understand what the topics of the page are about and then targets ads to those topics.

1      Q.   So you took us through their two systems,
2 right?  The -- if I have this right -- correct me if I'm
3 wrong -- the google.com advertising system; is that
4 right?
5      A.   Yes.
6      Q.   And the second and different -- what became
7 AdSense for Content; is that correct?
8      A.   Yes, correct.
9      Q.   Now, was there any -- was there any contextual
10 targeting in the google.com search advertising?
11     A.   Other than the query that the user typed in
12 and sometimes the user's location, no.  We were just
13 using the inputs the user gave us.
14     Q.   Now, in your personal -- your personal
15 experience at the time, did you -- in your work with
16 google.com, did you see anything that led you to start
17 thinking about the relevancy of ads that users would
18 see?
19     A.   Well, I -- whenever you're working on an
20 advertising system, one -- one of our goals for Google's
21 ads was that they should always be relevant to the
22 context in which the user is seeing them, so be it the
23 result of a query or be it some web page that we're
24 trying to place ads on.
25     Q.   Now, when -- we're -- this document is about

1  AdSense for Content, right?

2       A.   Yes.

3       Q.   Do you remember, just very generally, about

4  when you started working on that?

5       A.   Yes.  This was kind of mid 2002, July or

6  August.

7       Q.   And who wrote the first -- what would you call

8  it -- prototype, sample?

9       A.   Right.

10          So the way this sort of more formal design and

11  system came about was, at -- I had put together a

12  prototype system that was originally motivated because I

13  was doing some work on our search algorithms, so trying

14  to figure out what -- you know, what factors we should

15  consider when trying to decide, is this page relevant

16  for this user's query.

17          And as part of that, I was looking at a

18  collection of pages -- of web pages that I had selected

19  from our index.  I picked a thousand web pages, and that

20  was a good number.  I could flip through those in about

21  an hour, hour and a half.

22          And I was trying to look at what information

23  we could use on the page to improve our -- our search

24  results.  And one thing I noticed in doing that was that

25  a lot of the pages had kind of big, flashy, gaudy banner

ads, the kinds you probably get annoyed by when you're reviewing pages, and they weren't very relevant to the content of the page.

So they were pretty untargeted. They were things like a big ad for -- you know, maybe you want a credit card or a home mortgage on pages about knitting or, you know, car parts.

And so I thought that that could do a lot better job of getting more relevant ads that would be both better for the people -- the publishers and better for users, because they would see more relevant information in context.

And so I put together a prototype system that would do fairly simple things to try to use the text of the page in order to select ads that were relevant to that text.

Q.   Now, we've heard some talk, I'll tell you, about early contributors who came up with the idea.  The technology you just described, that stuff, is -- was that your early contribution to this product?

A.   Yeah.

So I put together this prototype and then showed it to a few other people in the company and said, you know, I think we could really select more relevant ads by looking at the text of the pages.

1          And the prototype was kind of a clunky thing.

2   It wasn't really meant to be a release product.  So it

3   was only an internal thing for people to look at at my

4   desk.

5          What it would do is it would go out and fetch

6   the contents of the web page that you wanted to show ads

7   on, and then it would sort of analyze the text of the

8   page, figure out what ads would be good ones to put on

9   that page but wouldn't actually put them on the page,

10  because we didn't have a spot on the page to put them.

11  We would just put them in another window kind of next to

12  the other -- the other page.

13      Q.    And about when did you start working on the

14  prototype?

15      A.    That was in July, I think, late July.

16      Q.    Of what year?

17      A.    Of 2002.

18      Q.    And how many people were helping you?

19      A.    I kind of did it myself.  It took about three

20  or four days to put this together, and then I kind of

21  showed it to my office manager and a few other people.

22      Q.    Three or four days.  An hour a day, two hours

23  a day?

24      A.    No.  It was probably, you know, five or six

25  hours, something like that.  Not all my time, but a fair

amount of it.

Q.   And when you were done with that, you had a
prototype; is that right?

A.   Right.

Q.   Prototype means a system to test to see if
it -- well, let me ask you, what does a prototype mean?

A.   So it's kind of a -- whenever you're doing
software engineering or other kinds of engineering, you
want to build something that maybe doesn't focus on some
aspects of the problem, if you were trying to build a
real product, but sort of is a proof of concept, so you
can demonstrate that, yes, if we use the text on the
page, we can get relevant ads through these techniques.
But, for example, it wasn't very fast.  So it took a
long time to analyze the text of the page.  You'd load
up the page and then five seconds later, you would
get -- it would figure out what ads it wanted to show
and then show them up in another window.

So it wasn't a very smooth experience, but you
could tell that once it had finished computing what ads
it should show, that they were relevant.  You know,
you'd load up a knitting page, and in your other window,
you'd see knitting ads and things like that.

So it was a little clunky.  You know, that's
sort of how software develops over time, is you start

out with the unknowns, try to isolate those, and then
you can worry about, you know, making whatever you did
faster and better and smoother and polishing all the
corners.

Q.   Did it work?

A.   Yeah.  I mean, it was, as I said, clunk -- it
was a prototype, but it pretty clearly demonstrated that
this was a good idea.  The techniques were going to work
and give us relevant ads.

Q.   And what do you mean by give us relevant ads?

A.   I mean, just looking at the pages that you
would -- you know, you could try out any URL on this
prototype.  So you could load it just like a browser.
You could say, I want to go to this page, and it would
load up the text of that page.  And then it would, you
know, figure out what ads.

And you could, you know, load 10 pages that
you picked out of -- out of thin air.  You could say,
oh, I'll try this -- you know, this great car part site
or this great Mexican restaurant, and the ads were
relevant.

Q.   Let's go back to that document, please, for a
second.

MR. DEFRANCO:  Can we blow up this part?
This is really hard to read.

1      A.    The bottom part, just --

2      Q.    (By Mr. DeFranco) Okay.  I just -- I want to

3 take a couple of minutes to go through this.

4      A.    Okay.

5      Q.    And you may talk even faster than I do, so

6 let's just keep the answers a little short, because I

7 want to make sure I've got it, okay?

8      A.    Okay.

9      Q.    Just in a sentence or two -- it talks about

10 the overall architecture that we envisioned.  Do you see

11 that?

12     A.    Yes.

13     Q.    In very general terms, what were you

14 describing there?

15     A.    So one of the key problems in doing this

16 content-based system is figuring out how to get the

17 content into the ad system so that -- into the AdSense

18 system so that we could analyze the text of the page,

19 figure out what ads are relevant, and then show those to

20 the user.

21          And so there were two different schemes we

22 came up with, and this -- these -- I apologize for my

23 diagrams.  They're a little clunky.  But these two

24 schemes show two different ways that we could accomplish

25 that.

1          Q.    Two different ways you could accomplish what?

2          A.    Getting -- basically, getting the text of the

3    page that the user is trying to view to our advertising

4    system, analyzing that, deciding what ads are relevant,

5    and then eventually sending those ads back to the user.

6          Q.    Okay.  And what does this show about where the

7    ads could be sent to?

8          A.    So the two different schemes actually have two

9    different flows of how the -- the information gets to

10   our ad system and then back to the user.

11          So in scheme one, we have a user on the left.

12   They want to view a web page, so they make a request to

13   the server that is hosting that web page.  Maybe it's a

14   site about knitting.  And so that knitting site has the

15   text for the -- whatever page they're trying to view.

16   And as part of putting together the text they're going

17   to send back to the user, they would then send an ad

18   request to Google saying, here's some text.  Please give

19   me relevant ads to insert into the thing I'm going to

20   send back to the user.

21          So they make a request to Google.  Google

22   sends back some ads.  The content provider then takes

23   those ads, formats them, sends them back to the user --

24   well, inserts them into the text of the page that

25   they're -- eventually, that they then send back to the

1  user, and then the user's browser shows the page, just

2  like whenever you view a web page.

3         So that's scheme one.

4     Q.   So let me see if I got this right.

5         So the -- let's convert this to some terms

6  we're using in this case, okay?

7         Are you with me?

8     A.   Sure.

9     Q.   Content provider, we've used advertiser,

10  publisher.  Is it one of those two?

11     A.   It is publisher in this case.

12     Q.   And that's -- the Google content ad system, is

13  that all Google's technology to figure out what ads to

14  match the content on the page and run that auction, that

15  instantaneous process?  Is that what that is?

16     A.   Yes.  That's all software running on our

17  machine -- on Google's machines in our data centers.

18     Q.   So this doesn't show advertisers, right?

19     A.   No.

20     Q.   This is showing ads and how they can get to

21  the publisher's site; is that correct?

22     A.   Right.  This is sort of assuming the

23  advertisers have already entered their advertising

24  information.  This is just what happens when we want to

25  show a web page.

1    Q.   And in scheme one, where is the advertisement

2 from Google being sent to?

3    A.   It's being sent back to the publisher.

4 So the publisher makes the request to Google's ad

5 system.   We figure out what ads are relevant, send back

6 information about those ads, and then the publisher, in

7 this case written as the content provider, then sticks

8 those into the text of the page and sends the whole

9 thing back to the user.

10    Q.   Let's do scheme two.

11    A.   Okay.

12    Q.   Is that a different way of doing it?

13    A.   That is a different way of doing it, yes.

14    Q.   Okay.

15    A.   Okay.  So --

16    Q.   Take -- take it slow.

17    A.   Okay.  So in scheme two, the user makes a

18 request to the content provider, the publisher -- that's

19 arrow one there -- just like they did before.

20         The content provider, in this case, the

21 knitting site, sends back the text of the knitting page

22 that the user requested, say.  Included -- in scheme

23 two, included in that result page is a little bit of

24 code that is sent back to the user's browser.

25         So when the user's browser tries to display

1  this page -- so it's going to show it on their screen --

2  it comes across the code that the content provider

3  inserted into that page.

4        And that code is going to make the user's

5  browser send a request directly from the user to Google

6  to get ads to insert on to -- into a frame on the page.

7        So there's a little spot reserved on the page.

8  The user's browser sends the request saying, what ads

9  should I put in this spot, and then the ad system

10 returns the ads directly to the user's browser, sticks

11 them in the spot reserved on the page on the screen, and

12 that -- and then the user's browser sort of -- the user

13 perceives this as a page with ads on it, but really it's

14 two separate requests that are happening.

15       There's one slot on the page, kind of a

16 rectangle, that's going to hold the ads, and what

17 trigger is filling that in is a request from the user's

18 browser.

19    Q.   Now, those are two different ways of doing it,

20 right?  Two different ways of -- of publishing an ad or

21 sending an ad from Google --

22    A.   Correct.

23    Q.   -- out, right?

24    A.   Yes.

25    Q.   One is, it goes to the publisher's site --

1    A.    Yes.

2    Q.    -- right?

3    A.    Uh-huh.

4    Q.    Those arrows up there?

5    A.    Yeah.

6    Q.    The other is that it goes to the user's

7    browser, right?

8    A.    Correct.

9    Q.    Now --

10   A.    Directly.

11   Q.    Sir?

12   A.    Directly.

13   Q.    Directly, yes sir.

14         Those are two different -- there's two

15   different technologies behind that, right?

16   A.    Yes.

17   Q.    Did -- did you pick one of those two?

18   A.    Yes.

19   Q.    Which one?

20   A.    For the vast majority of publishers, we use

21   scheme two.

22   Q.    Well, we're talking about AdSense for Content.

23   A.    Okay.

24   Q.    For all AdSense for Content.  That's the

25   product at issue here.

1      A.    Okay.  So we use scheme two.

2      Q.    For AdSense for Content --

3      A.    Yes.

4      Q.    -- is that correct?

5      A.    Yes.

6      Q.    Is there a -- is there any reason -- from a

7  technical perspective, is there something meaningful you

8  can tell us about why, as the person designing this, the

9  technology, the software, you considered these two

10  alternatives and picked the one where it goes to the

11  user's browser?

12      A.    Sure.

13            It turns out that scheme two is a lot easier

14  for the publisher.  What they end up having to do is

15  just put a little bit of code into each web page where

16  they want ads to appear.

17            And they don't have to end up making a request

18  to Google dealing with what happens when that request

19  takes a long time or finding where the AdSense servers

20  are.  All they have to do is paste a little bit of text.

21  So it's like copying and pasting.  And that's all they

22  have to do, and then it's much simpler for the

23  publisher.

24            And since we wanted to have, you know, tens of

25  thousands of different publishers around the web doing

this, it didn't make sense to us that we would force

each of them to do this fairly complicated technical

integration that they'd have to do in scheme one.  And

instead, we went with scheme two, because it's much

easier for them.

Q.    Time is of the essence, right?

A.    Exactly.

Q.    You're talking about getting the ad and the

publisher's page to the user's browser as quickly as

possible, so there's no delay; is that right?

A.    Correct.

Q.    And you picked which scheme again?

A.    Scheme two.

Q.    Well, let's turn -- let's turn away from that

technical document.  Let's -- let's take a look at --

you mentioned code that the publisher pastes on their

web page, right?

A.    Yes.

Q.    Do you remember that?

A.    Uh-huh.

Q.    And I want to show you that code and walk you

through it briefly.

A.    Okay.

Q.    But, generally, what does that code do?

A.    That code, basically, identifies which

1    publisher this is, has some information about how large

2    an advertising area, like this many inches wide and this

3    tall, how many ads they'd like to place in that -- in

4    that advertising slot.

5              So it, basically, just tells -- when we --

6    Google receives the request, how many ads to generate,

7    whose account to credit, when a user clicks on an ad,

8    things like that.

9              MR. DEFRANCO:  Can we put up, please, No.

10   112, Demonstrative 112?

11       Q.   (By Mr. DeFranco) Okay.  This -- this says:

12   Your AdSense unit code.

13            Do you see that?

14       A.   Yes.

15       Q.   Can you tell us what that is, please?

16       A.   Sure.

17            So this is the code that the advertise -- the

18   publisher would paste into the pages where they would

19   like AdSense for Content ads to appear.

20            And the nice thing is, publishers don't have

21   to really understand that.  They just have to cut and

22   paste it into the pages where they would like to appear.

23       Q.   And just take a minute so we have it -- so we

24   have it in the record.

25       A.   Okay.

1      Q.   I'm sorry to make you do this work --

2      A.   No.

3      Q.   -- but just take it line by line and tell us

4 what's shown there, please.

5      A.   Sure.

6      So the first line says script type, text, java

7 script.  It's just indicating that this is a little bit

8 of code that's going to continue until that's -- about

9 six lines down where you see a slash on the script.

10 So everything between there is code that I'll describe

11 in a moment, okay?

12      So the second line -- second line says we're

13 going to set this variable called Google ad client to

14 this string.

15      So this is an identifier of which publisher

16 this is, so that when we figure out that an ad has been

17 clicked on, we'll know which publisher's website this

18 came from, who to credit the money to their account.

19      So, basically, think of that as an account

20 number in some sense.

21      Okay.  The third line --

22      Q.   And that's -- by the way, let me -- I'm sorry

23 to interrupt, but that's how you figure out how much to

24 pay the publisher?

25      A.   That's partial -- that's how to figure out who

1    to pay.

2         Q.   Who to pay.

3         A.   Right.

4         Q.   Got it.  Go ahead.

5         A.   So the third line is actually not part of the

6    code.  It's just a human comment, so that if you're

7    looking at the code, after you've pasted it in a month

8    earlier, you can remember what it is that this code

9    refers to.

10             So this says it's a 300 pixel.  A pixel is one

11   dot on a computer screen.  So it's saying a 300-pixel

12   wide, 250-pixel high ad slot.  So almost square,

13   probably about that big (indicates).

14        Q.   All right.  Can you take -- the next three

15   lines look similar.

16             Can you just take those three at a time?

17        A.   Sure.

18             So those three identify information about how

19   big the ad slot is.  That's the width and height number

20   lines.

21             And then the first line is actually some

22   encoding of information, like how many ads they should

23   put -- try to generate for that slot and some other

24   information.

25        Q.   And I think we have a couple of lines.  This

1  line here?

2      A.   Yeah.

3      Q.   Can you tell us what that line is?

4      A.   So the next line says here's another bit of

5  code, but instead of having the code be right after

6  this, we're going to say get the code from this other

7  place.  And that place is identified by the http colon

8  slash slash, so on.

9          And that is actually another piece of code

10 that ends up using the information from the first five

11 or six lines to actually make a request to Google.

12         And that second bit of code can be the same

13 for all publishers all around the web.  And so that's

14 why it's not replicated here, because we'd be

15 replicating it on a million different publishers.

16     Q.   In the last minute we have, I just want to

17 review this with you, please.

18     A.   Okay.

19     Q.   So this is pasted where, this code?

20     A.   This is pasted by the publisher onto any web

21 pages where they would like their ads to appear.

22     Q.   And when this code -- when I say I want to go

23 to a publisher's website --

24     A.   Uh-huh.

25     Q.   -- what -- what -- what happens with this

1    code?  Is there an action that's activated?

2        A.    Right.  So when you -- if you remember scheme

3    two, when you go to the publisher's website and they put

4    this code into the web page text that is returned by

5    their website, then when the user's browser sees this

6    code, it will trigger a request to Google saying please

7    give me ads for this publisher for this size advertising

8    slot, and Google will then send back ads and format them

9    and put them on.

10       Q.    And where does Google send those ads?

11       A.    Directly to the user's browser.

12       Q.    And is that the scheme that you showed us

13   earlier that you chose?

14       A.    Yes.

15       Q.    Scheme two, right?

16       A.    Scheme two.

17       Q.    That's scheme two?

18       A.    Yes.

19       Q.    And is that scheme in use today for AdSense

20   for Content?

21       A.    Yes.

22       Q.    And has that scheme been used throughout the

23   life for AdSense for Content since when it was first

24   introduced to today when people are using this as we sit

25   here?

1    A.   Yes, absolutely.

2              MR. DEFRANCO:  Your Honor, I'm not going

3    to finish today.  Should I --

4              THE COURT:  Go until about 10 after.

5              MR. VERHOEVEN:  Thank you, Your Honor.

6              Let's call up Demonstrative No. 33,

7    please.

8    Q.   (By Mr. DeFranco) This was something that was

9    seen earlier in the case.

10             Do you see -- does this describe generally --

11   does this kind of depict that scheme two that you

12   discussed?

13   A.   Yes.  So you can sort of see it with a much

14   better diagram than the one I drew in my document.

15             What happens is, a user's browser makes a

16   request to the publisher; in this case, cnn.com.  And

17   cnn.com sends back the text of whatever page they're

18   trying to view.

19             Then that -- when the user's browser gets that

20   bit of code that CNN has put into their web page, the

21   user's browser will trigger a request to Google to fetch

22   the ads to put in on the little part of the page that

23   the publisher has -- has indicated where the ads should

24   appear.

25   Q.   Now, if you were going to use scheme one, if

1  you were going to use the scheme where the ads don't go

2  to the user's browser, but they go to the publisher,

3  right, that was the scheme you decided not to use, what

4  would change about these arrows?

5      A.   Ah.  So the arrows from Google to the user

6  instead would go from Google to the media venue.  And so

7  the flow would go internet users to media venue to

8  request the page down to Google to get the ads back to

9  the media venue and then back to the user.

10     Q.   All right.

11          MR. DEFRANCO:  Let's go back, please, to

12 Exhibit 389.

13     Q.   (By Mr. DeFranco) And this is the design

14 document you took us through, scheme one, scheme two.

15          MR. DEFRANCO:  Let's go to the second

16 page.

17     Q.   (By Mr. DeFranco) There's a section there

18 under detailed design, it says:  Deciding which ads to

19 match to content.

20          Do you see that?

21     A.   Yes.

22     Q.   And it says there -- mine's hard to read --

23 this is the heart of the system.

24          Do you see that?

25     A.   Yes, I do.

 1    Q.   Is that referring to deciding which ads to

 2  match to content?

 3    A.   Yes.

 4    Q.   What content were you talking about there?

 5    A.   The text of whatever page is being viewed by

 6  the user.

 7    Q.   And what did you mean by the heart of the

 8  system?

 9    A.   Well, simply that since we wanted to get ads

10  that were relevant to whatever text or page the user was

11  viewing, the -- the product was really going to succeed

12  or fail based on whether or not we could get very

13  relevant ads.

14         So if we could -- you know, whenever you view

15  a page about knitting, showed knitting ads, and whenever

16  you viewed a Mexican restaurant ad page, get ads about

17  sort of Mexican food and cooking, that would be a very

18  compelling product for publishers, because they would

19  have more relevant ads that users would be more likely

20  to be interested in, and they would be able to make more

21  money as publishers when people click on those ads.

22              MR. DEFRANCO:  Your Honor, I'm afraid I'm

23  going to have to ask -- we're getting into the technical

24  area.

25              THE COURT:  Okay.  We're going to have to

close the courtroom once again. We have about five

minutes in the day, so...

           MR. DEFRANCO: Well, I apologize. Let me

do it a different -- it's only five minutes. Let me do

it differently.

           THE COURT: Okay.

           MR. DEFRANCO: I'm sorry.

           THE COURT: You can proceed.

           MR. DEFRANCO: Thank you, Your Honor.

    Q. (By Mr. DeFranco) Now, there's -- there's a

list of items down there.

        Do you see that? And if you can't read it on

your page, I'm sorry it's so bad.

    A. No, no. I can read it.

    Q. Okay.

    A. The one, two, three, four?

    Q. Yeah. First, just tell us what those -- what

that list of items refers to.

    A. Sure.

        So this is a sequence of steps that -- that

the system is going to go through when we have text and

we're trying to figure out which ads are relevant.

So the first step is to sort of categorize the text of

the page so we understand what kind of topics it's

about.

1          And then we're going to use those categories

2   in step two to decide what ads are relevant to those

3   categories.

4          And in step three, we're going to essentially

5   refine the initial set of candidates.  So we're going to

6   say, okay, this page is roughly about knitting and arts

7   and crafts.  And then we're going to select as

8   candidates all ads that seem to be related to those

9   topics.

10          And then in step three, we're going to winnow

11  that step down a bit more to use more information about

12  how well the text of the ad matches the text on the

13  page, use other kinds of information to winnow that set

14  down a bit more and come up with an -- a final set of

15  candidate ads that we think are relevant enough to show

16  on the page.

17          And then in step four, we're going to end up

18  running an auction to decide which advertisers are going

19  to end up getting to have their ad displayed on this

20  particular publisher's page.

21      Q.   Now, those four steps, is that what happens at

22  the back end at Google when I say I want a particular

23  web page, like a bass-fishing page?

24      A.   Uh-huh.

25      Q.   Is that the process, these four steps, what

1    happens at Google instantaneously or very, very quickly

2    to figure out what ad to place in that particular user's

3    browser based on the page they're on?

4         A.    Yes.    That's sort of the high -- high-level

5    steps that that system goes through to decide what ads.

6         Q.    And is that -- is that the system that you

7    implemented?

8         A.    Yeah.    I mean, I implemented the initial

9    version in 2002 with about five or six other people, and

10   it's evolved a bit since then, but the overall process

11   is pretty much the same.

12        Q.    Okay.    Let's just finish up on a couple of

13   quick follow-ups to that.

14             Did -- did -- I apologize if I asked you this.

15   How many engineers worked on setting up the system?

16        A.    So I did the initial prototype myself, and

17   then once we decided that the prototype was promising,

18   we decided to turn it into a full-fledged group of

19   people working on a real production system.

20             We had about six or seven people working on

21   this system to get it from, you know, where I had it at

22   the prototype to where we could actually launch it as a

23   real product.

24        Q.    Six or seven people, are they -- was that

25   marketing sales, engineering, or --

1     A.   No.  That's just engineering.  There are about

2 three or four other people who were not writing software

3 but were otherwise involved in launching the product.

4     Q.   And about how long -- just very generally -- I

5 don't want to pin you down, because it's a long time

6 ago -- but very generally, how long did it take?

7     A.   We went from the prototype to launching in six

8 weeks.  Actually, pretty proud of it.

9     Q.   Prototype is the what again?

10     A.   That was the kind of half-baked little thing

11 on my desktop that you could view and would be kind of

12 clunky in two windows.

13     Q.   And launch is?

14     A.   We actually launched an extra -- another

15 publisher's website.  So we were actually serving ads.

16 And our first site was a site called howstuffworks.com.

17 We liked them, because they had lots of different kinds

18 of content, and so we could see how well the system was

19 working on lots of different kinds of pages.

20     Q.   Now --

21            THE COURT:  Well, I think that's a good

22 place to break for this evening.

23            MR. DEFRANCO:  Thank you.

24            THE COURT:  Ladies and Gentlemen, I'll

25 excuse you at this time.

```
 1                 Start back up at 8:30 in the morning.  I
 2   know y'all have been working hard and paying attention.
 3                 Please remember my prior instructions,
 4   and don't talk about the case.
 5                 And I call your attention to one of my
 6   earlier instructions, and that is this:  You should not
 7   read any internet or newspaper accounts or television
 8   broadcasts about the trial.
 9                 I understand you've been informed that
10   there have been some media reports about it, and should
11   you see something in the newspaper or on the television
12   or on the internet, you should disregard it and not read
13   it.  Please follow that instruction, okay?
14                 Y'all are excused.  Please travel safely
15   and have a nice evening.  I'll see you in the morning.
16                 COURT SECURITY OFFICER:  All rise.
17                 (Jury out.)
18                 THE COURT:  All right.
19                 MR. DEFRANCO:  Your Honor?
20                 THE COURT:  Yes, sir.  Do you need --
21                 MR. DEFRANCO:  I had a question.
22                 THE COURT:  Sure.
23                 MR. DEFRANCO:  The JMOL, may we submit a
24   written paper?  Is that okay?
25                 THE COURT:  Yes.
```

 1                What I'm going to do is, with respect to

 2   the JMOLs that you wish to make, I'll allow you to

 3   submit them on -- in writing, if you want to.  I'll

 4   allow you to make, you know, oral present -- a short

 5   oral presentation, likewise, if you want to.

 6                But, otherwise, I'll just wait to get

 7   your written submissions.

 8                MR. DEFRANCO:  Thank you, Your Honor.

 9                THE COURT:  Okay.  Any objection to that

10   procedure from the Plaintiffs?

11                MR. TRIBBLE:  No objection, Your Honor.

12                THE COURT:  Okay.  That's what we'll do.

13                Tell me this:  The time I've got,

14   Plaintiff has used 10 hours and 24 minutes, and the

15   Defendant has used 6 hours and 33 minutes through today.

16                When do y'all anticipate being finished

17   with the testimony, or do you anticipate using all of

18   your 15 hours?

19                MR. TRIBBLE:  It just kind of depends on

20   what they do, Your Honor.

21                THE COURT:  Okay.

22                MR. DEFRANCO:  We'll have a better

23   answer, Your Honor, if that's okay.

24                THE COURT:  Okay.  That's fine.

25                I mean, I'm not -- we're in good shape,

1 given the schedule that I gave the jury. I just kind of

2 wanted to see where we were. If I could let them go

3 tomorrow about 4:00, they've been working hard, and I'd

4 like to do that, if it looks like we're going to be

5 finished with the testimony on Monday.

6 MR. TRIBBLE: I think we can make it. I

7 mean, our crosses are going to be dramatically shorter.

8 That was just the first witness, and

9 perhaps --

10 THE COURT: Cumulatively, it will be four

11 and a half hours.

12 MR. TRIBBLE: Yes, it will, or less.

13 THE COURT: I know how long the total

14 will be, but I just -- I didn't know if we were on

15 schedule to give them a little bit of a break tomorrow

16 afternoon.

17 MR. DEFRANCO: Yeah. We'll do some

18 calculating tonight.

19 THE COURT: Okay. Very good.

20 All right. Thank y'all. Court's in

21 recess.

22 (Court adjourned.)

23 *     *     *     *

24

25

## CERTIFICATION

      I HEREBY CERTIFY that the foregoing is a true and correct transcript from the stenographic notes of the proceedings in the above-entitled matter to the best of my ability.


/s/_____          _____
SUSAN SIMMONS, CSR                        Date
Official Court Reporter
State of Texas No.:  267
Expiration Date:  12/31/10




/s/_____          _____
SHELLY HOLMES, CSR                        Date
Deputy Official Court Reporter
State of Texas No.:  7804
Expiration Date  12/31/10