```
 1            IN THE UNITED STATES DISTRICT COURT
            FOR THE EASTERN DISTRICT OF TEXAS
 2                    MARSHALL DIVISION

 3  FUNCTION MEDIA, LLC        *    Civil Docket No.
                              *    2:07-CV-279
 4  VS.                        *    Marshall, Texas
                              *
 5                            *    January 22, 2010
    GOOGLE, INC.               *    8:30 A.M.
 6
                    TRANSCRIPT OF JURY TRIAL
 7        BEFORE THE HONORABLE CHAD EVERINGHAM
                UNITED STATES MAGISTRATE JUDGE
 8

 9  APPEARANCES:

10  FOR THE PLAINTIFFS:    MR. MAX TRIBBLE
                          MR. JOSEPH GRINSTEIN
11                         Susman Godfrey
                          1000 Louisiana Street
12                        Suite 5100
                          Houston, TX   77002
13                        MR. JUSTIN NELSON
                          Susman Godfrey
14                        1201 Third Avenue
                          Suite 3800
15                        Seattle, WA   98101
                          MR. JEREMY BRANDON
16                        Susman Godfrey
                          901 Main Street
17                        Suite 5100
                          Dallas, TX   75202
18                        MR. ROBERT PARKER
                          Parker, Bunt & Ainsworth
19                        100 East Ferguson
                          Suite 1114
20                        Tyler, TX   75702

21  APPEARANCES CONTINUED ON NEXT PAGE:

22  COURT REPORTERS:       MS. SUSAN SIMMONS, CSR
                          MS. SHELLY HOLMES, CSR
23                        Official Court Reporters
                          100 East Houston, Suite 125
24                        Marshall, TX   75670
                          903/935-3868
25  (Proceedings recorded by mechanical stenography,
    transcript produced on CAT system.)
```

APPEARANCES CONTINUED:


FOR THE DEFENDANTS:    MR. CHARLES VERHOEVEN
                       MS. AMY CANDIDO
                       Quinn Emanuel
                       50 California Street
                       22nd Floor
                       San Francisco, CA   94111

                       MR. EDWARD DEFRANCO
                       Quinn Emanuel
                       51 Madison Avenue
                       22nd Floor
                       New York, NY   10010

                       MR. HARRY L. GILLAM
                       Gillam & Smith
                       303 South Washington Avenue
                       Marshall, TX   75670

                       P R O C E E D I N G S


                    COURT SECURITY OFFICER:  All rise.

                    (Jury in.)

                    THE COURT:  Thank you.  Please be seated.

                    Morning, Ladies and Gentlemen.  Thank you
again for being here timely.  We're going to resume
testimony this morning.

                    Counsel, you may continue your direct
examination.

                    MR. DEFRANCO:  Thank you, Your Honor.

                    Charles, could we put up 389, please,
Exhibit 389?

  JEFFREY DEAN, DEFENDANT'S WITNESS, PREVIOUSLY SWORN

<u>DIRECT EXAMINATION (CONTINUED)</u>

<u>BY MR. DEFRANCO</u>:

Q.   Good morning, Mr. Dean.

A.   Morning.

Q.   Feels like we never left, doesn't it?

A.   It does.

Q.   Now, just to bring us back to where we were yesterday or close to the end of yesterday, we were talking about different publishing techniques that you at Google were considering in the early days, relating to the ad serving system that you were working on.

Do you remember that?

A.   Yes.

Q.   And you took us through --

MR. DEFRANCO:  Charles, would you mind expanding that?

Q.   (By Mr. DeFranco) And you took us through these two schemes.

A.   Uh-huh.

Q.   You should probably say yes or no to make it easier.

A.   Yes.  Sorry.

Q.   Okay.  You took us through these two schemes.

Do you remember?

A.   Yeah.

1    Q.   And you told us Google used one and not the

2  other?

3    A.   Yes.

4    Q.   Just to remind us, which scheme?

5    A.   Google uses scheme two where the ads are sent

6  from Google directly to the user's browser without going

7  through the publisher.

8    Q.   Let's -- let's put up -- we made some slides

9  last night, didn't we?

10    A.   We did.

11    Q.   You and I to simplify this?

12         MR. DEFRANCO:  Let's put up DX Demo 33,

13  the one we used in opening statement.

14    Q.   (By Mr. DeFranco) Now, do you remember this

15  drawing?

16    A.   Yes.

17    Q.   And can you tell us generally what this shows?

18    A.   Sure.

19         So this is a depiction of scheme two where,

20  when a user requests a web page, they go to, for

21  example, cnn.com, and they make a request to that

22  publisher, the publisher sends back the content.

23         And if you recall from yesterday, the

24  publisher has inserted that little bit of script and

25  code into the published web page.  That is then sent

1　back to the user.

2　　　　And that little bit of code will then trigger

3　a request from the user's browser to Google to fetch ads

4　for that page.  And the ads are then sent directly back

5　to the users.

6　　　Q.  Okay.  Now, just -- let's move to the slide.

7　This was from the opening.  Let's move to the slide that

8　we made last night.

9　　　　　MR. DEFRANCO:  Can you flip to Slide 33A?

10　Oh, you don't have that slide.

11　　　Q.  (By Mr. DeFranco) Let -- let me just show it

12　to you here.  Last night, we took -- we took this slide,

13　and we wrote scheme two on it, right?

14　　　A.  Right.

15　　　Q.  So if we write scheme two, what we're doing is

16　relating this back to this document.

17　　　　Could you explain it to us, please?

18　　　A.  Yes.

19　　　　So this is basically a prettier depiction of

20　the scheme two that is described in the original

21　engineering design document, and the one we actually

22　selected for use in AdSense for Content.

23　　　Q.  Okay.  And then we made a Version B, right,

24　which -- in which we changed it, right?

25　　　　What do we do in Version B?  Can you explain

that?

A.    Sure.

      So in B this -- that is a depiction of scheme one where the user makes a request to the publisher. The publisher then makes a request directly to the -- to Google to get ads.  And the ads are returned to the publisher and are then inserted by the publisher into the text that they then return to the user.

Q.    Okay.  Now, we talked about how this would look differently if it wasn't done in the -- in the Google way, right?

      Do you understand that?

A.    Yes.  Correct.

Q.    And could you explain to us again, instead of -- instead of these lines from Google, instead of the advertisements being served directly to the user's browsers, where would these arrows go?

A.    Okay.  Let's just consider the user in the upper left.

      So the user in the upper left would make a request to cnn.com, and then cnn.com's computers would make a request to Google.  So the flow would go across to the right and then down to Google and then back up to CNN.

      The ads will be returned to CNN.  CNN would

1  insert them in the page, format them how they want, and

2  then send them back to the user.

3       Q.   Okay.  And I apologize; I can't put this on

4  the screen, but let me just show it to you.

5            Is this the slide that was --

6       A.   Yes.

7       Q.   -- made last night?

8       A.   That's what I was describing.

9       Q.   And it shows the arrows for the ads going to

10  the publisher --

11       A.   Right.

12       Q.   -- is that right?

13       A.   Yes.

14       Q.   And then the publisher's page or information,

15  along with the ads, goes to the user, the person who's

16  working on the internet, like any one of us could; is

17  that correct?

18       A.   Correct.  Yes.

19       Q.   And this is not the way Google does it for the

20  products we're talking about, right?

21       A.   Correct.  That is not the way we do it.

22       Q.   All right.  That's what you described to us

23  yesterday, right?

24       A.   Yes.

25       Q.   Now, somebody might say, well, you know,

1  you're sending it here, you're sending it there; the

2  user sees it, that's what matters, right?

3          Somebody could say that, but -- and it's a

4  big -- you explained to us that there's a meaningful

5  explanation as to why it's done this way.

6      A.    Yes.

7      Q.    You did this -- this choice.  You made this

8  choice back in --

9              MR. GRINSTEIN:  Your Honor, objection.

10 This is leading.

11             THE COURT:  Sustained.  Let's avoid

12 leading.

13     Q.    (By Mr. DeFranco) You made this choice when?

14     A.    In 2002.

15     Q.    And why did you make this choice?

16     A.    It turns out that this scheme, scheme two, the

17 one that we use, is much simpler for publishers to do.

18 Essentially, all they have to do is -- remember that

19 script that I walked you through.

20             That little bit of script, they essentially

21 copy and paste that into pages where they want their ads

22 to appear.  So it's as simple as copying and pasting in

23 a word processor.

24             And the other scheme would require them to

25 actually write computer code to make a request to take

1  the results of that request, format it and insert it

2  into their page in sort of a computer software manner as

3  opposed to just cutting and pasting.

4          And so it's much easier for publishers to do

5  scheme two than scheme one.

6          And we're trying to deal with many, many

7  publishers around the world, not all of whom want to

8  have to write complicated software to do that.

9      Q.    Now, is that -- I don't know if you know this

10  or not, but was that something that was publicly known

11  back then in 2003?

12      A.    How we?

13      Q.    How Google did it?

14      A.    Sure.

15          One thing about this -- this way of doing

16  things is that if you are knowledgeable about how web

17  browsers work and so on, you could actually view the

18  source of the page and see that this is how it is being

19  done, because you could actually see the code on the

20  page.

21          If you do the operation called View Source,

22  which I'll sort of show you the formatting that is

23  actually sent to your browser, and you can see that code

24  and trace through exactly what was happening, if you

25  were knowledgeable on these things.

1          MR. DEFRANCO:  Let's go back to

2  Exhibit 389, please.

3          Charles, would you return to the second

4  page, please.

5          Second page.  Yeah.

6     Q.   (By Mr. DeFranco) All right.  And we spent a

7  little bit of time yesterday.  I have some follow-up.

8  We didn't quite finish.

9          Can you remind us in a sentence or two where

10 we were with Items 1 to 4?

11    A.   Sure.

12         So the -- this is the part that we described

13 as the heart of the system.  Basically, it's the part

14 that he's trying to take the text that we're trying to

15 place ads on and determine what advertisements would be

16 relevant to that text.

17    Q.   Okay.  And I want to -- I want to cover this,

18 so we need to get this in the record.

19         MR. DEFRANCO:  But what I'd like you to

20 do is -- Charles, if you could blow up this -- the

21 figure that's behind the text you just put there.  Could

22 you blow that up, please?

23    Q.   (By Mr. DeFranco) Okay.  Now, that -- that

24 text -- those steps relate to the process that's going

25 on here; is that right?

1      A.    Yes, that's correct.

2      Q.    And in a sentence or two, what does this chart

3 show?

4      A.    So this chart is basically showing the

5 different steps that are involved from the time Google

6 received an ad request from the user's browser, to

7 generating the actual ads that we're going to send back

8 to the user.

9      Q.    Okay.

10      A.    And it's a sort of multistep process, and so

11 it's trying to break down those steps into simpler

12 steps.

13      Q.    All right.  So this is internally within

14 Google?

15      A.    Yes.

16      Q.    So we don't see -- do we see that -- you know,

17 advertiser/publisher, that's what we're talking about,

18 right?

19      A.    Right.

20      Q.    And there's a central computer system, right?

21      A.    Yes.

22      Q.    And you're aware generally in this case, when

23 we talk about the centralized computer, everybody is

24 looking at what Google is doing; is that correct?  Is

25 that right?

1    A.    Yes.

2    Q.    Do I have that right?

3    A.    Yes.

4    Q.    Okay.  Is the advertiser shown on here?

5    A.    No.

6    Q.    Is the -- is the publisher shown on here?

7    A.    No.

8    Q.    We're looking at what's going internally,

9  right?

10    A.    Right.  And actually, the client over there

11  actually refers to the user's browser.

12    Q.    That's the user's browser?

13    A.    Yes.

14    Q.    Okay.  What I'd like you to do, and I want to

15  do this efficiently, clearly.

16    A.    Okay.

17    Q.    I want to do it your way, okay?

18    A.    All right.

19    Q.    You tell me.  I want to take -- you to take us

20  through the boxes and the steps just one at a time, and

21  take a break.  I may have a question, but I don't want

22  to go too fast, okay?

23    A.    Okay.

24    Q.    So where -- if you were trying to explain this

25  as simply as you could to somebody who knows very little

```
 1  about it like me --
 2      A.   Okay.
 3      Q.   -- and most of us here, where would you start?
 4      A.   At the left-hand side, at the user's browser.
 5      Q.   And by the way, is --
 6      A.   Where it's labeled client.
 7      Q.   -- this the level of detail -- please tell
 8  us -- we're going into, is this confidential to Google?
 9      A.   No.  It should be fine.
10      Q.   Okay.  Great.
11           So where would you start?
12      A.   At the client.
13      Q.   All right.
14      A.   So the client there refers to the user's
15  browser.
16      Q.   All right.
17      A.   So that little bit of code that we talked
18  about yesterday triggers a request, and that
19  double-ended arrow there on the left indicates the
20  request that's happening.
21           So the client makes a request saying here's
22  some text from a web page.  I'd like you to target
23  advertisements to that.  And so that's handled by some
24  front-end computer software labeled GWS and then Content
25  AdServer.
```

1    Q.   What is GWS?

2    A.   GWS is Google web server.

3    Q.   And, again, that does what?

4    A.   It essentially handles requests from browsers.

5 And in this case, it's going to sort of take that

6 request, send it off to a more specialized piece of

7 software that actually does ad matching for content ads.

8    Q.   Okay.  And I'm going to throw some words out.

9 If I get them wrong, you tell me, and then I want you to

10 keep going, okay?

11    A.   Okay.

12    Q.   Does that make sense?

13    A.   Sure.

14    Q.   We've heard several times about Google having

15 its proprietary system technology that it developed

16 internally to figure out what ads to put on what

17 browsers.

18    Are you with me?

19    A.   Yes.

20    Q.   We've heard terms, contextual targeting

21 process and the auctioning, two behind-the-scene

22 processes, right?

23    A.   Yes.

24    Q.   Does this -- do these boxes -- does this

25 diagram show those two pieces?  Can you just tell us

1 where those two pieces are, if they're on here?

2     A.    Yes.

3 ■■■■■ ■■■■■■ ■■■■■ ■■■■■ ■■■ ■■ ■

4 ■■■■■■■■ ■■■■■ ■■■ ■■ ■■ ■■■ ■■■■

5 ■■■         **REDACTED BY ORDER OF THE COURT**

6 ■■■

7 ■■■

8     ■■■ ■■■■ ■■ ■■■ ■■■ ■■ ■ ■■■■

9     ■■■ ■■■■ ■■ ■■■ ■■■ ■■■ ■■■■

10 ■■ ■■ ■■■ ■■■

11     ■■ ■■■ ■■ ■■ ■■■■

12     ■■ ■■■

13     Q.    All right.  Well, why don't you -- these

14 arrows go back and forth --

15     A.    Yes.

16     Q.    -- in each one of these steps.  What does that

17 show?

18     A.    So, essentially, the different boxes are

19 actually different pieces of software running on

20 different computers.  So what this diagram actually

21 shows is the flow of requests from one computer to

22 another, one piece of software to another running on

23 different computers, in order to accomplish some task.

24     Q.    Okay.  Why don't you -- and are they -- are

25 they back and forth?  In other words, that says step

1  one.

2        Is there information going, you know, from

3  left to right and back again before step two happens?

4      A.   Yes.

5      Q.   All right.

6      A.   So the double-ended arrows, there's a request

7  that gets sent out and then a reply.  You can think of

8  it as sending a letter in the mail and waiting for

9  someone else to send you back a reply card.

10     Q.   Okay.  I think we've got it.

11     A.   Okay.

12     Q.   Thanks.

13         Let's start with step one, please.  Tell us

14  what the back and forth that happens there is.

15     A.   Okay.  So at step one, what we have is the

16  text that we're trying to target advertisements to.  So

17  we have -- you know, maybe it's a page about, you know,

18  the -- a Mexican restaurant, and so we have a menu of

19  different words like enchiladas and so on.  And we're

20  trying to target text to this menu.

21  ████ ██ ████ ██ ████ ██ ████ ██ ████ ██ ████ ████████

22  ████          REDACTED BY ORDER OF THE COURT      ██

23  ██                                                ██

24  ████████ ████ ████ ██ ████ ████ ████ ██ ████ ████████

25  ████ ██ ████ ████ █ ██ ████ ██ ████ ████ ██ ████ ██ ██



REDACTED BY ORDER OF THE COURT

**REDACTED BY ORDER OF THE COURT**

Q.    And when you say that the page is analyzed,
you're talking about the page that the user wants to
see, right?

A.    Right.

Q.    And -- and --

A.    The publisher's text essentially.

Q.    The publisher's text is being analyzed?

A.    Yes.

Q.    Okay.  And then did you do step one?

A.    Yeah.  That's step one.

Q.    Step two?

A.    So in step two, once we have the categories
that are of interest, there's actually a -- a step
that's not -- that happens inside the content AdServer

1  before we do step two, which is now we look up what ads

2  we think are relevant to the different categories, what

3  the page is about.

4         So we might have three categories for the

5  page, which are, you know, big, large cats and South

6  American countries, and a third one.  And we look up ads

7  that we think are also relevant to those categories.

8  And so the way we do that is we take the text the

9  advertiser has given us.  The advertiser has given us a

10  bunch of keywords, and they've also given us the text of

11  the actual ads that they want to appear.  And we kind of

12  treat that all as a big document in the same way we

13  treated the publisher's text as a big document.

**REDACTED BY ORDER OF THE COURT**

**REDACTED BY ORDER OF THE COURT**

Q. And yesterday, you told us about a processor notion that -- the way Google focuses its system is trying to figure out what ads are most relevant to the user, right?

A. Correct.

Q. The person putting in?

A. Right.

Q. Is that -- is that right?

A. Yes.

Q. Is that part of that process?

A. Yes, because what -- the user is actually viewing the page from the publisher, and the publisher's text is what they're interested in presumably, because they're viewing that page.

And so by targeting the ads to the text of the page, you're essentially trying to ensure that the ads that you show the user are sort of in the same categories of interest of -- as the text of the page.

**REDACTED BY ORDER OF THE COURT**

Q.   Okay.  Done step two?

A.   Yes.

Q.   Step three?

A.   So in step three, we now have the set of candidate ads, and we actually now need to run an auction to decide which ads we're actually going to show, because we probably have space for two or three ads, not 50, and we probably don't want to show 50 anyway.  We'd confuse our users.

So we take the best -- most -- the ads we believe are most relevant, and we run an auction.  We've described how the auction process works.  So advertisers enter bids, and we also decide how relevant we think the ad is.  And the combination of those factors decides who wins the auction.

And so then the AdServer will run the auction and reply to the Content AdServer with the two ads that won.  It will say, these two advertisements are the ones you should show.  And then, finally, it will send it all back to the user -- to the user's browser.

Q.   Now, we've -- we've heard the term algorithms

1  used in this case.

2          Are there algorithms used in these various

3  steps?

4          First, what is an algorithm, and are they used

5  in these various steps?

6      A.    Yes.

7          So there are algorithms in all of those boxes

8  actually, because they're all computer software.

9          So an algorithm is sort of a description of a

10  series of steps that you need to go through to

11  accomplish some task in a computer.  So it might be I

12  would like to paint the screen white.  There's an

13  algorithm for that where you would, for example, paint

14  the first line white, and then you'd paint the second

15  line white.  And that can be broken down into painting

16  each dot white.

17          So an algorithm is just a description of steps

18  broken down into very easy, simple steps that the

19  computer can understand.  And by building those up, you

20  can do more and more complicated things, like analyze

21  text and run auctions and so on.

22      Q.    Okay.  Did -- did we -- now, do these -- so

23  it's three steps, but we can talk about -- can we call

24  this contextual targeting on the top half and the

25  auction process on the bottom?

1      A.   Sure.

2      Q.   And are these going on at the same time or one

3 after the other?

4      A.   They actually have to be done one after the

5 other, which is because the output of step one is needed

6 for step two.

7      Q.   Oh, okay.

8      A.   And then the output of step two is needed for

9 step three.

10     Q.   And when -- when is it that Google figures out

11 which ads are going to be served to the browser?

12     A.   After we've done steps one, two, and three.

13     Q.   And then -- okay.  And then where does the ad

14 come from -- or ad or ads, they come from?

15     A.   So the -- the final decision of which ads are

16 selected eventually get sent to the Content AdServer as

17 the sort of output of step three.

18          The Content AdServer then says, oh, I'm going

19 to show these two ads.  So it will then send the text of

20 the ad.  It will use information about the publisher to

21 decide how to format the ad.  So in our system, the

22 publisher kind of controls some aspects of the

23 appearance of the ad.

24          So the publisher might say I want a blue

25 background, and that will get set up and then sent back

1  to the client, to the user's browser, that will

2  eventually get shown on the user's screen.

3      Q.   Now, the auction that you described, is this

4  the first Google product in which an auction was used?

5      A.   No.

6          So we've actually used auctions in the

7  AdServer for normal search queries where you don't have

8  to do the contextual targeting.  You already have a

9  query from the user, like running shoes, and you find

10 out what ads want to be targeted to the keyword running

11 shoes, and then you run an auction on those.

12     Q.   Let me explore that, because I often get that

13 confused, and I want to make sure we all have it

14 straight.

15         There's Google Search where I'm going to

16 Marshall, Texas, and I'm interested in the sites as long

17 as I'm here.  And I put in Marshall, Texas, right, in a

18 search box?

19     A.   Uh-huh.

20     Q.   And what would come back when I did that?

21     A.   So what would come back when you do a search

22 on Google is, first, a list of non-advertisements, the

23 ten related links that show up on the results, and then

24 in some cases will show ads.

25         And those ads are generated by taking the

1   query the user's entered -- so Marshall, Texas in his

2   example -- and deciding what advertisers want to

3   advertise on the keyword Marshall or Texas or Marshall,

4   Texas, and taking that candidate set of ads, running an

5   auction on them to determine which ones are most

6   relevant, and then returning those as part of their

7   search for that page.

8           MR. DEFRANCO:  Let's put up Demo No. 8.

9   I don't know if I remember the number right.  If not, we

10  won't use it.

11      Q.   (By Mr. DeFranco) This is the second thing I

12  want to talk about.  Let's talk about the first thing

13  still, okay?

14      A.   Okay.

15      Q.   I want to make this clear, because I -- it's

16  important.

17          We've got two different things, right?  We've

18  got -- I'm a computer user, right?  And I can do

19  searches on the internet for something in general terms.

20  Okay.  This -- those are the two --

21          MR. DEFRANCO:  Thanks.  Thanks very much.

22  We're even now.  Thanks very much.

23      Q.   (By Mr. DeFranco) Okay.  Let's talk about this

24  one first.  This is what you just described, right?

25      A.   Right.

1     Q.  I want to go to Marshall, Texas.  I don't know

2  any Marshall, Texas websites.  I don't know what I want

3  to do.  I go to the internet, and let's change this a

4  little.  Put in bass fishing, right?  Let's say this

5  said that -- I'm sorry -- this said Marshall, Texas,

6  right?

7     A.  Okay.

8     Q.  I put it in the Google Search box.

9     A.  Uh-huh.

10     Q.  And I would get back -- what would this list

11  show?

12     A.  Results that are relevant to Marshall, Texas.

13     Q.  And what would this show?

14     A.  Advertisements that are relevant to Marshall,

15  Texas.

16     Q.  This is Google's Search --

17     A.  Yes.

18     Q.  -- searching the internet, right?

19     A.  Right.

20     Q.  And that was before AdSense for Content?

21     A.  Correct.

22     Q.  An earlier product, right?

23     A.  Right.

24     Q.  New product came out, right, AdSense for

25  Content?

1    A.    Right.

2    Q.    It's different, right?

3          MR. DEFRANCO:   Now the next slide, now 8.

4    Q.    (By Mr. DeFranco) Now, this is AdSense for

5    Content, right?

6    A.    Correct.

7    Q.    And if I've got it right, the difference is

8    I'm not just putting in Marshall, Texas.  I already know

9    that, well, Marshall, Texas, there's -- there's bass

10   fishing, right?  Or there may be bass fishing, right?

11   So I could put in a site in Marshall that's got

12   information about bass fishing, a resource guide, right?

13   A.    Yeah.

14   Q.    And -- and what would happen when I put in,

15   you know, www.marshallbassfishing.com?

16   A.    So the -- that would be the publisher in this

17   case.  And the publisher has written the text on the

18   right-hand side here, which is, you know, related to

19   bass fishing.

20         So that would be the text that would be sent

21   back to the user's browser.  The little bit of code that

22   they've inserted would say I would like, in this case,

23   five ads in the left-hand side and kind of this size

24   box.  And that code from the user's browser would

25   trigger a request to Google to say please give me ads

1 that are relevant to this content.

2     Q.    Okay.  Now, in the earlier -- in Google

3 Search, is there a publisher in that?  What we looked

4 at, is there a publisher involved?

5     A.    Not really.  Google is sort of the publisher

6 in that.

7     Q.    Google is the publisher --

8     A.    Yes.

9     Q.    -- because the ads appear on Google's page,

10 right?

11     A.    Correct.  Yes.

12     Q.    This is different because I'm putting in a

13 website I want to go to, right?  And Google is figuring

14 out this whole process you took us through before,

15 contextual targeting and the auction?

16     A.    Yes.

17     Q.    That does happen with the publisher, right?

18     A.    Yeah.

19     Q.    And when you described -- you know, I think

20 you used the term clusters that was on that page and a

21 lot of other terms I can't remember now, but all that

22 analysis, that's being done on this page I want to go

23 to --

24     A.    Yes.

25     Q.    -- to figure out what ads are most relevant to

1  the user, and they'll appear over here; is that right?

2      A.    That's correct.  Yes.

3      Q.    Now, in the opening, you weren't here for

4  that, but Mr. Verhoeven showed a slide with a magnifying

5  glass showing contextual targeting.  That would be on a

6  page like this, right?  Figuring out, analyzing the

7  words on the page and showing the most relevant ads.

8      A.    Yes.

9      Q.    Is that what we're talking about?

10     A.    Yes.

11     Q.    Now, again, was that something that -- there's

12 been a lot of discussion here about, you know, whether

13 there were new things in AdSense for Content or where

14 they came from.

15          Contextual targeting, was that in products

16 before AdSense for Content?

17     A.    Not that I'm aware of.  There were certainly

18 ads on pages, but, in general, they did not use the text

19 of the -- of the pages themselves to decide what ads

20 would be relevant.

21          Instead, they would use sort of more opaque

22 things.  Like they would just say I would like an ad,

23 and the ad would not really be relevant to the page's

24 content.

25     Q.    And just as a refresher, is that what you were

1  talking about yesterday when you said -- when you first

2  started thinking about what became AdSense for Content,

3  in your contribution, you were working on web search and

4  you noticed -- can you explain that for us?

5      A.   Yes.

6          So without doing contextual targeting, you end

7  up with ads that are not really relevant to

8  that content.  And so you see banner ads for things

9  like -- you know, there might be -- on a bass-fishing

10 page, there might be an ad for, you know, get a home

11 mortgage or get a Visa card or buy a car, which doesn't

12 really seem that relevant to bass fishing.

13         And the reason that's untargeted is it's

14 actually very hard to know what ads to put on there

15 without actually understanding the context in which

16 they're going to appear.

17         And so by analyzing the text of the page, you

18 can do a much better job of getting relevant ads.  In

19 this case, it looks like we did pretty well, sort of

20 bass fishing-related ads.

21     Q.   And all of that -- all that of happens -- if I

22 go to www.marshalltexas.bassfishing.com, all of that

23 happens fast?

24     A.   As fast as we can make it happen, yeah.

25     Q.   And the --

1     A.    Quarter of a second usually.

2     Q.    And the -- whoever owns this Marshall, Texas

3 bass-fishing site is sending their part of the web page

4 to the user's browser, right, on my desktop here like

5 this?

6     A.    Yes.

7     Q.    And at Google, what are you sending?

8     A.    So then the user's browser sends the request,

9 and we send back just the formatted ads on the left-hand

10 side --

11     Q.    Okay.

12     A.    -- to the user's browser.

13     Q.    Let's just -- I don't want to forget this.

14          MR. DEFRANCO:  Charles, can you put up,

15 please, DX Demo 112?

16     Q.    (By Mr. DeFranco) You mentioned the text that

17 the publisher pastes in their page a few times, and I

18 wanted to -- you talked about that yesterday, and I just

19 want to remind us of that.

20          MR. DEFRANCO:  And I'm making Charles'

21 life interesting this morning, because I didn't tell him

22 what I was going to put on the screen.

23              Okay.  Thank you.

24     Q.    (By Mr. DeFranco) Is this that text you're

25 talking about?

1      A.    Right.  So this is the text that we walked

2  through yesterday where the advertiser would -- or the

3  publisher would literally --

4      Q.    I want to take this slow.

5      A.    Okay.

6      Q.    Hold on.

7      A.    Okay.

8      Q.    If I'm making the web page

9  www.marshalltexas.bassfishing.com -- and I know I keep

10  changing that every time I say it, but I know you know

11  what I'm talking about.

12      A.    I do.

13      Q.    I have a space for an ad, right?

14      A.    Yes.

15      Q.    And I've set up this relationship with Google;

16  is that correct?

17      A.    Uh-huh.

18      Q.    And --

19      A.    Yes.

20      Q.    -- after I do the sign-on process and

21  everything, I get some -- some code, right?  To put on

22  my web page, my bass-fishing web page, right?

23      A.    Yes.  That's correct.

24      Q.    And how -- is this something -- how does this

25  code get there?

1    A.    So the way we generated this page is you said

2 I would like ads that are roughly 300 pixels wide by 250

3 high.

4          And then this page gets generated for you.

5 And it puts this code in a box, and you literally copy

6 that code.  So you drag your curser over it, and any

7 pages you want AdSense ads to appear on your site, you

8 paste that code into the file that represents that

9 content.

10    Q.    So we --

11    A.    So you might have three pages about bass

12 fishing on your site.  If you wanted ads to appear on

13 all three of them, you would just copy -- copy and paste

14 this script into all three boxes.

15    Q.    Okay.  Copy and paste, we use a mouse with

16 computers?

17    A.    Yes.

18    Q.    Is that what you're talking about?

19    A.    Yes.  Sort of like you would do in a word

20 processor, if you're copying and pasting text in a word

21 processor.

22    Q.    So it's a -- I'm using my hands to do that.

23 It's a manual process, right?

24    A.    Yes.

25    Q.    And how does the publisher get the text to

1  manually paste on their web page?

2      A.   They enter some numbers in a form that says

3  how wide and how high they want the ads to be as a

4  result, and then they click submit.

5          As a result of that, it shows this code that

6  they then copy and paste.

7      Q.   Okay.  Let's -- let's -- let's -- thank you

8  for that.

9          Let's -- let's go to some slides that were

10  used in opening.  And what I'm going to try to do,

11  obviously, is relate what you've given us at a technical

12  level and relate it to some slides we've shown before.

13              MR. DEFRANCO:  Can we -- can we put up --

14  we're going to do 28 -- 27 to 31, Charles.

15      Q.   (By Mr. DeFranco) Now, I showed you these

16  before.  There's just four of them.

17              MR. DEFRANCO:  Can you just -- can you

18  just cycle through the four, please?

19              Okay.  Let's go back to the first.

20      Q.   (By Mr. DeFranco) I just wanted you to see --

21  I want you to take us through these --

22      A.   Okay.

23      Q.   -- any way you want.

24      A.   Okay.

25      Q.   You tell us when you're ready to move to the

next slide, okay?

A.   Okay.

So this first picture is meant to symbolize all the different advertisers in our system.  And one of the things we do is we sort of assign relevant categories to those advertisers' ads.  So if we think the ad is about bass fishing, we'll assign it one category number.  If we think it's about jaguars, we'll assign it another.

And, essentially, we -- as part of that content analysis phase, we analyze the text of the page, decide what categories we think are relevant to that content.  And then we're going to throw out all the ones that are in irrelevant categories.

So that's going from step -- this -- this picture to the next one.

Q.   Okay.  To the next one.

A.   Right.

So we've now winnowed things down to just the ads we believe are relevant to the content of the page. And at that point, we now have a bunch of candidates. We have more candidates than we can show on the actual page.  And they're from many different advertisers.  So each box might be one ad from one advertiser.

So at this point, we then run an auction to

decide, based on both the relevance and on the other --
and on the advertiser's bids, what -- who is going to
win the auction.

So we only have space for two or one ad, which
one is going to win the auction. You know, some
advertisers might have bid a lot, but we don't actually
think they're that relevant for the content. We
actually don't want to show them. We'd rather show ads
that are less relevant with -- that are more relevant
with lower cost, lower -- lower bids, because we think
that's a better user experience.

So we take the combination of how relevant we
think it is and how much the advertiser bid in order to
decide who's going to win the auction.

So at that point, we run the auction. And now
we have a set of candidate ads for the auction.

And notice that all of these phases are
influenced by several things. One is what other
advertisers in the system are doing. So I can't just
assume that if I win an auction today, I'm going to win
the same auction tomorrow, because other advertisers
might have entered new ads in the system. They might
have changed their bids. The text on the publisher's
page might have changed slightly, and all of those
things can change who's going to win the auction.

1           And at that point -- is that the fourth one?

2           Let's see.  Yes.

3           And now we're going to display the ad.

4      Q.   Okay.  Now, that -- that part of the

5  process -- we've been spending a lot of time on, you

6  know, ads appearing on user's browsers and the process

7  inside of Google, right?  That relates to that; is that

8  correct?

9      A.   Yes.

10     Q.   And just before this happens or at the same

11  time, whatever, there's an advertiser piece, right?

12     A.   Yes.

13     Q.   And the -- the advertiser will put in text --

14     A.   Yes.

15     Q.   -- that makes its way to the ad?

16     A.   Yes.

17     Q.   And the advertiser -- there's -- there's words

18  that an advertiser can put in also as part -- in

19  addition to their text, they can put in words, right --

20     A.   Yes.

21     Q.   -- in contextual targeting?

22          What are those called?

23     A.   Ad keywords.

24     Q.   And how -- the -- I don't want to put it back

25  on the screen, but that -- that process that you showed

1   internally, are those used by Google somehow?

2       A.    Yes.

3           So the -- the advertiser gives us both text

4   that they would like to appear in their ad and a bunch

5   of keywords that they think are relevant to their --

6   their product or whatever it is they're advertising.

7   So we take the combination of those keywords and the

8   text of the ad and use that to help decide where to

9   target things.

10      Q.    And as part of that process, can advertisers

11  decide on which publishers -- let me -- let me start

12  again.

13          As part of that process, can advertisers

14  decide where their advertisements are going to appear?

15          Can they select where their advertisements are

16  going to appear?

17      A.    They cannot select.  They can specify some

18  hints that say I think this would be a good site for me

19  to appear on.  But it's not guaranteed because of all

20  the complexities that I described of the matching

21  process, of the text to the -- to the relevant ads, the

22  auction process, which involves the other advertisers.

23  There's no guarantee that a particular advertiser is

24  going to appear anywhere, and, in fact, we don't want

25  that to happen.  We don't want advertisers to specify

where their ads should appear, because if I'm an

advertiser that's relevant to bass fishing, I don't

want -- we don't want advertisers to have to go find all

the bass-fishing sites in the world.

There's probably 50,000 of them or something.

We don't want them to go find them. We'd rather have

them just give us keywords relevant to bass fishing, and

we match things up to -- whenever we see text that seems

related to bass fishing, we think that's a good place to

put the ad.

And tomorrow, a new bass-fishing site could

come up that didn't exist today, and it would still be a

relevant place for those advertisers.

Q. You gave us -- you gave us an example before

that was better than anything I could come up. You said

jaguar, right?

It could be a car; it could be an animal,

right?

A. Uh-huh.

Q. Let's say we have a user who never heard of a

jaguar before.

A. Okay.

Q. And they just used that as the keyword.

A. They're an advertiser?

Q. That's right.

1    A.    Okay.

2    Q.    If the control was in the advertiser's hands

3    in Google's system, what might happen?

4         If that were a keyword that a user who didn't

5    know that there were Jaguar cars, what could happen?

6    A.    Well, the -- the thing that could happen is

7    because they gave us very little information to go on,

8    they just gave us one keyword jaguar, then we wouldn't

9    know if they meant the -- the car or the animal.

10        And so we might put their animal-related ad on

11   a car page or vice versa.  And so the more text the

12   advertisers give us, or the more text the publishes give

13   us, the better the job we'll be able to do in matching

14   things up.

15   Q.    I'm out of time.  Thank you very much.  See

16   you in a few.

17   A.    Okay.

18             THE COURT:  Cross-examination.

19             MR. GRINSTEIN:  Thank you, Your Honor.

20                  CROSS-EXAMINATION

21   BY MR. GRINSTEIN:

22   Q.    Good morning, Dr. Dean.

23   A.    Morning.

24   Q.    Let me just confirm a few things about your

25   understanding of this case.

1          First of all, when I took your deposition in

2 July, you had not read the Function Media patents; is

3 that correct?

4     A.   Correct.

5     Q.   Still haven't read them?

6     A.   Correct.

7     Q.   And you -- are you aware that this particular

8 case is about the way AdSense has operated since 2007?

9          Are you aware of that?

10    A.   Yes.

11    Q.   Okay.  But you don't really know all that much

12 about how AdSense has operated since 2007, do you?

13    A.   I have not been directly involved in the

14 product, but a lot of the system works the same way it

15 did in 2003.  And so those parts I'm quite familiar

16 with.

17    Q.   But your main involvement with AdSense was in

18 2002 and early 2003, right?

19    A.   Yes.

20    Q.   And as AdSense operates today, you are not the

21 best person to talk to about it, right?

22    A.   Depends what you want to ask about.

23    Q.   Do you remember that I took your deposition in

24 July of this year?

25    A.   Yes, I do.

1    Q.   Remember if I asked you whether or not you

2 were the best person to talk about how the operation of

3 AdSense goes today?

4    A.   Yes.

5    Q.   And do you remember testifying that you were

6 not the best person to talk to about that?

7    A.   I don't recall exactly what I said, but I

8 think I said it depended on what you wanted to ask

9 about.

10    Q.   Well, let's look at your deposition, Page 240,

11 Lines 10 to 21.

12              (Video playing.)

13              QUESTION:  Post-2003, you wouldn't be the

14 best person to ask about the engineering of AdSense for

15 Content?

16              ANSWER:  Yes, that's correct.  I should

17 have qualified that to my period of involvement in it

18 from the initial, sort of, development of the prototype

19 and launch of the product.

20              QUESTION:  So how it operates today, you

21 would not be the best person to talk to?

22              ANSWER:  Probably not.

23              (End of video clip.)

24    Q.   (By Mr. Grinstein) And, Dr. Dean, in fact, you

25 don't know today, or at least you didn't know as of the

time of your deposition, whether AdSense allows

publishers to specify colors for the ads that appear on

their sites, did you?

    A.   I did not know at that time.  That's correct.

    Q.   And you didn't know at the time of your

deposition whether or not AdSense allows publishers to

specify whether a border would appear on ads for their

websites, right?

    A.   That's correct.

    Q.   So because you don't know whether or not

AdSense has features like that today, you can't really

testify today about what are and what are not the

important features of AdSense, right?

    A.   No, I think I can.

    Q.   Well, you don't know all the features of

AdSense today, do you?

    A.   I do not know all of them.  I know some that I

think are important.

    Q.   You can't really say that content targeting is

the most important feature of AdSense today, because you

yourself have conceded that you're not aware of really

all the features of AdSense that are out there today,

right?

    A.   I think content targeting is definitely an

important feature of AdSense.  I can say that, even

1    though I don't know all the other features.

2        Q.    So you don't know all the other features of

3    AdSense, correct?

4        A.    Correct.

5        Q.    So as to whether or not AdSense infringes the

6    Function Media patents today, you're really not the

7    right person to ask, right?

8        A.    I'm not a lawyer, so it's a legal

9    interpretation of things.  So, in that sense, no.

10        Q.    And you don't know all the features of AdSense

11    as it exists today, so you can't testify as to whether

12    or not those features match up with any particular

13    patents, right?

14        A.    Correct.  I cannot testify about features I

15    don't know about.

16        Q.    Now, you testified on your direct examination

17    that you developed a prototype for AdSense in about July

18    2002; is that right, Dr. Dean?

19        A.    Yes.

20        Q.    And prior to working on that prototype, you'd

21    still been involved in the ad system at Google; is that

22    right?

23        A.    Yes.

24        Q.    And the ad system at Google that you'd worked

25    on prior to that prototype was the ad system that was

1　utilized with a google.com search results; is that fair?

2　　A.　Yes.

3　　Q.　But the idea of the prototype that you worked

4　on in July of 2002 was to serve ads to websites that

5　were not associated with Google, right?

6　　A.　Yes, that were not associated with search

7　results.

8　　Q.　Okay.  And you had never talked to anyone at

9　Google and had never heard any discussion at Google

10　mentioning the concept of serving ads to non-Google

11　websites prior to July of 2002; isn't that right?

12　　A.　There's certainly lots of discussion about

13　serving ads to non-search pages.

14　　Q.　Let's talk -- let's go to your deposition

15　again, Page 81, Lines 12 to 18.

16　　　　　　(Video playing.)

17　　　　　　QUESTION:  Prior to your work on the

18　prototype, had you been discussing with anyone within

19　Google or heard any conversations within Google about

20　Google launching a product that would serve ads to

21　websites that were not associated with Google and were

22　not running a Google search product?

23　　　　　　ANSWER:  No.

24　　　　　　(End of video clip.)

25　　　　　　MR. GRINSTEIN:  I'm sorry.  It's Page 81

1 of his deposition, Lines 12 to 18.

2         MR. DEFRANCO: Thank you.

3     Q. (By Mr. Grinstein) So if a witness were to

4 come into Court and say that AdSense for Content was an

5 old idea that had been around for a while at Google

6 before 2002, at least as far as you know, that's not the

7 case, right?

8     A. So there were many discussions at Google about

9 putting ads on non-search result pages. What I said is

10 that there were discussions about that, not discussions

11 of a particular product to launch.

12        But certainly there were lots of discussions

13 about putting advertisements on other places around the

14 web and how could we best do that.

15     Q. So even though you had never discussed the

16 content of serving ads to non-Google websites, you'd

17 never heard that discussion in the halls, according to

18 your deposition, you still say that was an idea that was

19 percolating around Google prior to July of 2002?

20     A. I never did not say that. I said I had never

21 heard of launching a product around that.

22        There were certainly lots of discussions in

23 the halls about targeting advertisements to web pages.

24 That is an important area of our business, so there's

25 lots of discussions around that.

1              THE COURT:  Hold on a second.

2              Dr. Dean, if you're able to answer his

3    question yes or no, please try to limit your answer to

4    yes or no on cross-examination.  I promise you I'll

5    allow Google's lawyers to ask you some more questions

6    here in a minute.

7              THE WITNESS:  Okay.  Thank you.

8              THE COURT:  Continue.

9        Q.   (By Mr. Grinstein) And just so we're clear

10   about this testimony, no one was talking in Google about

11   launching a product prior to July of 2002, at least as

12   far as you've heard, serving ads to non-Google websites;

13   is that correct?

14       A.   For non-search pages?

15       Q.   Yes.  Is that correct?

16       A.   That's correct.

17       Q.   Let's talk about Defendant's Exhibit 389,

18   which is this particular exhibit that I believe you

19   were -- it's Defendant's Exhibit 389.

20             And you discussed this particular exhibit with

21   your counsel during direct examination; is that right?

22       A.   Yes.

23       Q.   And this particular exhibit is discussing the

24   content-based ad-serving system, which later morphed

25   into or became AdSense; is that right?

1      A.    Became AdSense for Content.

2      Q.    And just to be clear, this document is from

3  2002, right?

4      A.    Yes.

5      Q.    AdSense Online didn't launch until after 2002;

6  is that right?

7      A.    I don't recall the exact date.  I thought it

8  was around then.

9      Q.    Are you aware of whether or not there was a

10  distinction between AdSense Direct and AdSense Online?

11      A.    So these are marketing terms that typically

12  our engineering organization doesn't use, so I'm not

13  exactly sure what you're referring to when you say

14  AdSense Direct and AdSense Online.

15      Q.    All right.  So you're not aware of an

16  distinction between AdSense Direct and AdSense Online?

17      A.    Well, I am -- Online refers to publishers or

18  advertisers being able to sort of do a self-service

19  product.  And Direct refers to someone having a direct

20  sales relationship, so having a Google employee contact

21  them by phone or e-mail.

22      Q.    Okay.  So if you do understand the distinction

23  between them, when was AdSense Online launched as

24  opposed to Direct?

25      A.    I don't recall exactly.

1    Q.   In Defendant's Exhibit 389, you were talking

2 about two different schemes that you were considering

3 for the way to serve ads in the eventual AdSense system,

4 correct?

5    A.   Yes.

6    Q.   And everything in Exhibit 389 is accurate?  I

7 mean, you don't have any -- you don't have any dispute

8 with the words or the text about how these schemes are

9 described, correct?

10    A.   I mean, it's a design document, so it leaves

11 some things out, because it's meant to be a high-level

12 overview of the product and the software.

13    Q.   Now, in your direct examination -- if I could

14 just step out here for a second -- your attorney asked

15 you some questions about this background section; is

16 that correct?

17    A.   Yes.

18    Q.   I should say Google's attorney, not your

19 attorney.

20        And Google's attorney also asked you some

21 questions about this overview section; is that correct?

22    A.   Yes.

23           MR. GRINSTEIN:  And then move to the next

24 page, please, Matt.

25    Q.   (By Mr. Grinstein) And I think we also asked

1  some questions about the detailed design section; is

2  that correct?

3      A.   Yes.

4              MR. GRINSTEIN:  Flip back to the first

5  page.

6      Q.   (By Mr. Grinstein) But I didn't hear any

7  questions asked of you about this first section called

8  Objectives.

9          Do you recall answering any questions about

10  that section?

11     A.   I don't recall.

12             MR. GRINSTEIN:  Matt, would you mind,

13  please, blowing that up?

14     Q.   (By Mr. Grinstein) Dr. Dean, the first

15  sentence of the objective and this -- the objective

16  section was trying to set forth the objective that you

17  were attempting to meet with the two schemes describing

18  this document; is that fair?

19     A.   Sure.

20     Q.   The first sentence of the objective section

21  is:  We want to be able to leverage our existing

22  advertiser base to put targeted ads on any web page on

23  the web rather than just search pages.

24          Do you see that?

25     A.   Yes.

1    Q.   And so, Dr. Dean, when documents were being

2   written internal within Google prior to this litigation,

3   you didn't have any problem referring to the issue of

4   putting ads on web pages, did you?

5    A.   No.   That's just commonly how you would say --

6   no matter how the ads actually get to the user's

7   browser, you would say they appear on the page.

8    Q.   Okay.  So scheme two, the scheme that you've

9   been discussing today, was a scheme that was intended to

10   serve the objective of putting ads on web pages; is that

11   fair?

12    A.   Sure.

13    Q.   And by the way, this is -- this demonstrative

14   document right here, Exhibit 389, this is not a

15   marketing document, is it?

16    A.   No.

17    Q.   It's a technical document within Google,

18   right?

19    A.   Yes.

20    Q.   I also want to talk about the background

21   section.

22             MR. GRINSTEIN:  If we can flip down to

23   the next section, background.

24             And if we could blow this up, the first

25   sentence, please.  It's a little hard -- there we go.

1    Q.   (By Mr. Grinstein) And I think you testified

2  on direct that you actually wrote that sentence; is that

3  correct?

4    A.   I believe I did, yes.

5    Q.   And the sentence reads:  Motivating examples

6  of why the web needs well-targeted, nonintrusive ads are

7  probably flashing, blinking, and lurking on or beneath

8  your browser window even as you read this.

9         Do you see that?

10   A.   I do.

11   Q.   So the state of the art before AdSense came

12  along was that web pages along the -- around the

13  internet were cluttered with these flashing, blinking,

14  intrusive advertisements; is that fair?

15   A.   There were certainly a lot of them on lots of

16  web pages.

17   Q.   And those kinds of ads would interfere with

18  the look and feel of those websites, wouldn't they?

19   A.   I suppose.  They would really mostly just

20  annoy the users.

21   Q.   They would annoy the user who was using the

22  website, right?

23   A.   Yeah.

24   Q.   And the -- whoever was running the website

25  probably would not want to have annoyed users; is that

fair?

A.    Well, I would presume they must not have cared too much because they put the ads on their pages.

Q.    Well, they -- the state of the art seemed to care a lot, because after you launched AdSense, a large number of websites started using it instead of the prior systems; isn't that right?

A.    Yes.

Q.    Now, you joined Google back in 1999; is that right?

A.    Yes, correct.

Q.    And upon joining Google, one of the early assignments that you did was to go meet with some folks who were representatives of a software company called AdForce; is that right?

A.    Yes.

Q.    And the reason why you were meeting with these folks from AdForce is that you were considering incorporating the AdForce technology into Google's advertising system; is that right?

A.    We were actually considering using AdForce instead of building our own advertising system.

Q.    Right.  You were considering using the AdForce technology instead of using Google's own self-built technology; is that fair?

1    A.    Yeah, but that's different than incorporating

2  into.

3    Q.    I'm sorry.  You were considering using the

4  AdForce technology instead of building Google technology

5  by yourself, correct?

6    A.    Yes.

7    Q.    But you ultimately concluded that the AdForce

8  technology wasn't very useful, right?

9    A.    Not for what we had in mind.

10    Q.    So you didn't incorporate the AdForce

11  technology into Google, right?

12    A.    We decided not to use their product, yes.

13    Q.    Likewise, in 1999, you and some other people

14  at Google went and met or had a meeting with some

15  representatives from DoubleClick; is that right?

16    A.    Yes, one meeting.

17    Q.    And the idea behind that meeting was,

18  likewise, you were considering whether or not to use

19  DoubleClick technology within Google, instead of some

20  self-built Google technology, right?

21    A.    Yes, correct.

22    Q.    But, again, ultimately, you concluded that the

23  DoubleClick technology would not be useful to Google,

24  correct?

25    A.    We decided it would be better to build our own

system for a variety of reasons.

Q.   So you didn't incorporate that DoubleClick
technology into the Google system back in 1999, right?

A.   Not in 1999, that's correct.

Q.   So if someone were to suggest that Google
could have just gotten rid of AdSense in 2007 and gone
back to using -- or gone to using the old AdForce system
from 1999 or the old DoubleClick system from 1999, you
would probably think that was a bad idea, wouldn't you?

MR. DEFRANCO:  Objection, form.

THE COURT:  Overruled.

A.   It would depend on the context.  I don't
really know what they would be suggesting replacing.

Q.   (By Mr. Grinstein) So you think that it would
be acceptable, it would be okay to replace AdSense in
2007 with that same technology that you decided not to
use in 1999?  You think that would be okay?

A.   It seems pretty unlikely, but I would want to
know more about the context.  Maybe they have something
that is better than what we're doing.

Q.   Okay.

MR. GRINSTEIN:  Thank you for your time,
Doctor.

THE COURT:  Redirect?

MR. DEFRANCO:  Yes.

REDIRECT EXAMINATION

BY MR. DEFRANCO:

Q.   Isn't this fun?

A.   Yeah.

Q.   On direct examination, you did tell us about your early days at Google and your involvement in develop -- in the early development of the products that are at issue in this case up to 2003; is that correct?

A.   Yes.

Q.   Now, you told us -- you told us about all that work, right?  In great detail, right?

A.   Yes.

Q.   Including the document that Mr. Grinstein put up.  Do you remember that?

A.   Yes.

Q.   Were you in any way meaning to suggest that you were the most knowledgeable person from that point on going forward to the present, including when you became a fellow at Google?

A.   No, of course not.

Q.   You were shown a portion of your deposition testimony.  Do you remember that?

A.   Yes.

Q.   I want to show you a piece you weren't shown, but just give us a ballpark number of the engineers at

1  Google that have worked on the systems at issue in this

2  case from 2003, when you did that preliminary work in

3  the prototype and getting it set up, to the present.

4  Just a general ballpark.

5      A.    That have worked continuously on the product?

6      Q.    Yes, developing, improving it, adding

7  features.

8      A.    Like probably zero have worked on it for the

9  entire period.

10     Q.    Oh, no.  I mean, put them all in a room.

11 We're going to have an AdSense for Content party,

12 celebrate the --

13     A.    Woo-hoo.

14     Q.    -- seventh anniversary.  How many people would

15 be there?

16     A.    I would estimate maybe a hundred people, a

17 hundred engineers.

18     Q.    A hundred engineers who have worked on the

19 code?

20     A.    Yeah.

21     Q.    Do you know everything that those engineers

22 have done since 2003 to the present?

23     A.    No, of course not.

24     Q.    Let's show you -- let me show you a portion of

25 the testimony that wasn't played for you.

```
 1              MR. DEFRANCO:  It's on Page 81, Lines --
 2   hold on a second.  There it is.  Thanks.  A little help
 3   from my friends there.
 4              Let's go to Page 240, Lines 22 to 241,
 5   Line 1.
 6      Q.   (By Mr. DeFranco) And this, again, was the
 7   piece that wasn't played for you.
 8              MR. DEFRANCO:  Actually, let's start
 9   with -- can you start --
10              (Video playing.)
11              QUESTION:  And you -- just one more
12   thing.  You said that with respect to the AdSense
13   system --
14              (Video stopped.)
15              MR. DEFRANCO:  Can you start at what was
16   played for him?  Is that too late to do that?  Too late.
17   That's okay.  My fault.
18      Q.   (By Mr. DeFranco) Okay.  Let me read what was
19   played for you.
20      A.   Okay.
21              MR. DEFRANCO: (Reading)  QUESTION:  Just
22   one more thing.  You said that with respect to AdSense
23   for Content system and engineering questions, you would
24   be the best person to ask.  I take it that opinion is
25   sort of bounded in time.
```

1    Post-2003, you would not be the best

2 person to ask about the engineering of the AdSense for

3 Content system.

4    ANSWER:  Yes, that's correct.  I should

5 have qualified that to my period of involvement in it

6 from the initial sort of development of the prototype

7 and launch of product early in 2003.

8    QUESTION:  So how it operates today, you

9 would not be the best person?

10    ANSWER:  Probably not.

11    Q.   (By Mr. DeFranco) And then let me play the

12 question and answer that wasn't played for you.

13    MR. DEFRANCO:  Go ahead, Charles.

14    (Video playing.)

15    QUESTION:  Do you know who would be?

16    ANSWER:  No.  The product has gotten much

17 more complicated, and more subsystems are involved, and

18 so there's probably not a single person you would go

19 talk to.

20    (End of video clip.)

21    Q.   (By Mr. DeFranco) Now, let's use an analogy,

22 because I want to get this straight and make sure I

23 understand it.

24    You said there were about a hundred engineers

25 since 2003 to the present?

1    A.    Correct.

2    Q.    Do you know everything those -- every detail

3    those engineers have worked on since then?

4    A.    No.

5    Q.    Do you know every feature that have been

6    incorporated, tinkered with, adjusted, made better in

7    the products since 2003 to the present?

8    A.    No, I do not.

9    Q.    Let's take an example, a Model-T, one of the

10   early cars, right?

11   A.    Yes.

12   Q.    You designed the early system, like the

13   Model-T, right, the pieces, the main -- the engine.  You

14   put it together; you got the car working, right?  Is

15   that a fair analogy in 2003?

16   A.    Sure.

17   Q.    Engineers have been working on it from 2003 to

18   the present, is that right, the hundred or so you

19   mentioned?

20   A.    Yes.

21   Q.    We have a Jaguar today, right?  Jaguar is

22   complicated, lots of little details, electronics, right?

23   A.    Yes.

24   Q.    Is that what you were saying, that at this

25   time, you're not the best person to ask about every

1  detail --

2      A.   Yes.

3      Q.   -- that those hundred engineers have worked

4  on?

5      A.   Correct.

6      Q.   Let's go to -- you were asked about the

7  patents here, and we keep hearing that you're not a --

8  did you look at patents?  Did you study the claims?

9  Are you a patent lawyer?

10     A.   No, I'm not.

11     Q.   Do you want to be a patent lawyer?

12     A.   No.

13     Q.   Do you understand that it's for the Court, the

14 parties, to -- to battle out what the -- the nitty words

15 mean in the claim -- I shouldn't use the word nitty -- I

16 mean specific words?

17     A.   Yes.

18     Q.   And we -- and the Court issues an order, which

19 says these three words mean this, and these three words

20 mean that.

21          Do you understand that?

22     A.   I do.

23     Q.   Now --

24     A.   At a high level, yes.

25     Q.   You haven't -- you haven't seen that analysis,

1  right?

2      A.   No.

3      Q.   You haven't --

4              MR. GRINSTEIN:  Your Honor, leading.

5              THE COURT:  Sustained.  Let's avoid

6  leading.

7      Q.   (By Mr. DeFranco) Have you seen that analysis,

8  sir?

9      A.   No, I have not.

10     Q.   Now, has anybody asked you to analyze the

11 claims and determine whether you think they infringe?

12     A.   No, nor -- I would hope they would not, since

13 I'm not a lawyer.

14     Q.   And so what is it that you're here to do for

15 us?

16     A.   I'm here to tell you about how the system

17 works as an engineer or my understanding of it and to

18 sort of provide testimony so that people can make that

19 judgment.

20     Q.   All right.  Are you here to give us an opinion

21 on infringement?

22     A.   No.

23     Q.   Or noninfringement?

24     A.   No.

25     Q.   Are you aware that Google has an expert -- a

1  technical expert in this case, like Function Media does?

2      A.    Yes.

3      Q.    Now, you talked about -- I didn't understand

4  this point, but you were asked about what happened in

5  the hallway, and did anybody talk about this product.

6  And I don't want to take the time in showing other

7  testimony, but can you generally explain what you were

8  talking about when you said you were trying to explain

9  that no one had discussed a specific product launch?

10     A.    Sure.  So, I mean, I think there's a

11 distinction between the idea of putting ads on web

12 pages, which was around even before Google existed.

13 Since 1995, people have been putting advertisements on

14 web pages.

15         And certainly, as a company that derives a lot

16 of our revenue from advertising, that's clearly going to

17 be the source of hallway discussion.  People are going

18 to discuss, you know, how can we make advertising better

19 and so forth.

20         But I never heard anyone discussing putting

21 together a product that is like AdSense for Content

22 before we did it.

23     Q.    Thank you.

24             MR. DEFRANCO:  Let's go back to

25 Exhibit 389.

1     Q.  (By Mr. DeFranco) I asked you about this

2 document.

3     A.  Yes.

4     Q.  I didn't ask you about every sentence.

5     A.  No.

6     Q.  I wish I had, but let's go back.  Let's talk

7 about -- you were asked about the objective.

8         Do you remember that?

9     A.  Yes.

10     Q.  And you were asked about some language talking

11 about putting targeted ads on any web page on the web.

12         Do you remember that?

13     A.  Yes.

14     Q.  Did you have any specific patent language in

15 mind when you wrote that?

16     A.  No.

17     Q.  When we get down to the technical level of

18 detail of precisely how the products work, apart from a

19 general description, the way you decided to make the

20 products work, is it one of these two configurations?

21         Can you remember?

22     A.  Yeah.

23     Q.  Can you tell us which one?

24     A.  It's scheme two.  I only wish my diagrams had

25 been better.  They're kind of ugly.

1      Q.   They're good enough.

2           The last thing you were asked about -- the

3    last thing you were asked about were AdForce and

4    DoubleClick.

5           Do you remember that?

6      A.   Yes.

7      Q.   Let's put up Exhibit 163, which I don't think

8    you were shown.

9           Now --

10               MR. DEFRANCO:  Can you -- can you --

11   Charles, can you blow up until the part that says George

12   Harik?

13     Q.   (By Mr. DeFranco) Have you seen this before?

14     A.   Yes.

15     Q.   Your name is on it?

16     A.   Yes.

17     Q.   Can you tell us what this is?

18     A.   So from the very beginning of Google, one of

19   our engineering practices was to send out a few brief

20   sentences to the rest of the engineering group about

21   what we had been working on that week, from what sort of

22   issues we were facing, what we expected to work on the

23   next week, that kind of thing.

24          And so this is my what's called weekly snippet

25   from -- I guess it's August 23rd, 1999.

1     Q.    Okay.  And what was a snippet?

2     A.    A snippet is just a little -- sentences about

3  what we've been up to.

4     Q.    Okay.  Now, you were asked about meeting with

5  AdForce and DoubleClick.

6           Do you remember that?  There's a bullet point

7  there.

8     A.    Yeah.

9     Q.    Can you read that?

10     A.    Sure.

11     Q.    Bullet point to us -- to us?

12     A.    It says:  Met with AdForce and DoubleClick to

13  see if they are viable alternatives to writing the

14  entire ad system ourselves.  We'd like to use them

15  initially, because they have nice reporting issues that

16  advertisers will probably expect.

17     Q.    Now, you'd like to use them initially.  You

18  were thinking about using those products at Google; is

19  that correct?

20     A.    We were pondering it, yes.

21     Q.    You decided not to, right?

22     A.    Correct.

23           THE COURT:  Counsel, approach, please,

24  briefly.

25           (Bench conference.)

                    THE COURT:  Excuse me.  Mr. DeFranco,

1   I've asked you twice now to avoid leading.  This is your

2   witness, so let's --

3                   MR. DEFRANCO:  I apologize, Your Honor.

4                   THE COURT:  -- let's conduct a direct

5   examination like we know how to do it, okay?

6                   MR. DEFRANCO:  Yes, Your Honor.

7                   THE COURT:  All right.  I don't want to

8   have to do it in front of the jury, but you're trying my

9   patience, okay?

10                  MR. DEFRANCO:  Yes, Your Honor.

11                  THE COURT:  Thank you.

12                  (Bench conference concluded.)

13      Q.   (By Mr. DeFranco) Now, have you heard of the

14  concept of control and ownership?

15      A.   Yes.

16      Q.   When we talk about engineering terms, what

17  does control and ownership mean?

18      A.   Essentially, it means that you -- in software

19  projects, you would control the software, and you could

20  make changes to it easily.

21          And one of the reasons we decided not to use

22  AdForce and DoubleClick was, since they're another

23  company's solution, we wouldn't be able to make changes

24  if we wanted to have, you know, the system deal with 10

million advertisers or something instead of 10,000.

And we felt it was better to have control over the

advertising system by writing it ourselves so that we

could make changes more quickly, adopt it to our -- to

our needs, and so on.

     Q.   And what, if anything, did that have to do

with the decision at that time not to use AdForce and

DoubleClick by Google?

     A.   Oh, it was a pretty big factor.  I mean, I

would say the two main factors were that both AdForce

and DoubleClick weren't really thinking in terms of

having millions of advertisers, so it wasn't clear their

systems would be able to deal with that.

          And also, the issue of ownership and control.

We wanted to be able to make changes to the ad system

more easily.

               MR. DEFRANCO:  Thank you.

               THE WITNESS:  Sure.

               THE COURT:  Recross?

               MR. GRINSTEIN:  No further questions,

Your Honor.

               THE COURT:  Okay.  May this witness be

excused?

               MR. DEFRANCO:  Yes.

               MR. GRINSTEIN:  Yes, Your Honor.

 1                    THE COURT:  You may step down.

 2                    Call your next witness.

 3                    MR. DEFRANCO:  Yes, Your Honor.

 4  We'll be calling Jason Miller.

 5                    (Witness enters the courtroom.)

 6                    THE COURT:  Come on in, Mr. Miller.  If

 7  you'll come up here and be sworn in.

 8                    COURTROOM DEPUTY:  Raise your right hand,

 9  please.

10                    (Witness sworn.)

11                    THE COURT:  If you'll come right around

12  here and take a seat.

13                    Please talk into the microphone and keep

14  your voice up for me, okay?

15                    THE WITNESS:  Okay.

16                    MR. DEFRANCO:  Your Honor, may we hand

17  out these binders?

18                    THE COURT:  Yes, please.

19          JASON MILLER, DEFENDANT'S WITNESS, SWORN

20                       DIRECT EXAMINATION

21  BY MR. DEFRANCO:

22      Q.   Good morning, Mr. Miller.

23           Would you please state your full name, please?

24      A.   Jason Christopher Miller.

25      Q.   And where do you work, sir?

1  A. Google.

2  Q. And what do you do there?

3  A. I'm a group product manager.

4  Q. How long have you been doing that?

5  A. I've been a -- at Google for about four and a

6 half years.  I've been a group product manager for about

7 two years.

8  Q. And just generally, what does a group product

9 manager do?

10  A. As a group product manager, you manage a team

11 of product managers, who work together putting together

12 a vision for a product.

13  Q. And just so we have it, can you just, in a

14 sentence or two, describe your educational background?

15  A. Sure.

16   So I -- I have two computer science and

17 engineering degrees from the Massachusetts Institute of

18 Technology, and then I later got a business degree from

19 Harvard.

20  Q. Now, what products did you work on when you

21 first got to Google?

22  A. I worked on the AdSense for Content product.

23  Q. And have you worked on that to the present?

24  A. Yes.  So pretty much for my entire time at

25 Google, I've worked on the AdSense for Content product.

1  Q. And have you received promotions since you've

2 been at the company?

3  A. I have. I've gotten -- I started at Google as

4 a -- as a product manager, and I was promoted to a

5 senior product manager after about a year, and then to a

6 group product manager about a year later.

7  Q. A little background, please. Can you just

8 tell us, in general terms, what AdSense for Content is?

9  A. Sure.

10  So AdSense for Content is one of our

11 advertising products at Google, and it's a free product

12 where a -- a website owner, who wants to show

13 advertisements and get money for their site, can use.

14  Q. Well, let's -- let's -- let's take a look

15 briefly at some --

16   MR. DEFRANCO: Let's take a look briefly

17 at Exhibit 71, please, PX71.

18  Q. (By Mr. DeFranco) Can you tell us what this

19 is, please?

20  A. Sure.

21  So this is a -- a web page, Google web page.

22 It's a marketing-type document that explains the AdSense

23 for Content program to a potential customer.

24  Q. When you use the term marketing, marketing

25 compared to what?

1  A. It's compared to, you know, a -- a technical

2 document that explains all the engineering.  It's --

3 it's sort of a simplified explanation for what our

4 product does.

5  Q. Okay.  Briefly -- we've been through some of

6 this before.  I just want to cover some concepts.

7    Is this document made public?

8  A. Yes, it is.

9  Q. All right.  Let's -- just some things -- the

10 document says:  Enhance your site and your profits.

11    Just in general terms, what is that talking

12 about?

13  A. So it's -- it's talking about -- so a site

14 means a website or a web page.

15    And so what it's saying is that if you have a

16 website and you're looking for a way to make money for

17 yourself to support your website, you can use AdSense

18 for Content to do that.

19  Q. And is there -- the system's advertisers,

20 publishers, is this directed, this marketing document,

21 to one or the other?

22  A. Yes.  So this is directed to -- to publishers.

23 That's our word for a website or a website owner.

24  Q. I promise you, somewhere in here, it talks

25 about contextual targeting.  Can you just tell us what

contextual targeting is?

     A.   Sure.

          So -- so contextual targeting -- it's actually
the first paragraph.  It's probably one of the most
important things that makes AdSense for Content
different.  And it was really, when we launched our
products, one of the things that was really evolutionary
about our product.

          What it means is that we're going to show ads
to your user when they come to your site.  And the ads
they're going to see are the ads that are going to be
relevant to them.  They're going to be useful to them.
And so I know in this page, there's a picture further
down.  It's a picture of a dog website.  Right -- yeah,
right there.  And so it's Jerry's Dog Naming sites.
And so the idea is that if someone is going to Jerry's
site to read about how to name their dog, we're going to
show contextually relevant ads, which means you're going
to see ads about, you know, dog bones and dog products,
things which should be relevant to you and are relevant
to the page you're reading about.

     Q.   That's got to be the worst picture I've ever
seen.  I apologize for that.  But I think we've got the
point.

          In this document, it also says somewhere, when

1  your content changes, so do your ads.  Just very

2  generally, again, what does that refer to?

3      A.   Well, what it means is that, you know, we're

4  showing ads that are relevant to the web page.  And so

5  if Jerry decides, you know, he's tired of talking about

6  dogs, and now he wants to talk about cats, we're going

7  to start showing ads about cats.

8          So it's -- you know, our ads will change

9  depending on what the page is about.

10      Q.   All right.  Just so we have the timeframe

11  right, you came to Google in 2005, right?

12      A.   That's right.

13      Q.   And you've been working on AdSense for Content

14  since you got there?

15      A.   The entire time, yeah.

16      Q.   Do you know Jeff Dean?

17      A.   I met Jeff Dean.

18      Q.   Did you work with him?

19      A.   Not -- not really, no.  Not closely.

20      Q.   Is he working on AdSense for Content today; do

21  you know?

22      A.   No, he's not.

23      Q.   Why don't you give us generally a list --

24  just -- just a general understanding of -- given that

25  you're full time on AdSense for Content, what projects

do you and the people that work for you do?

      Any way you want to do it.  I don't want to spend a lot of time, but from 2005 to the present, I want to give us all some feel about what it means to work on a product that's already out there working in the world.

    A.   Sure.

    Q.   Do you know -- do you know what I'm saying?

    A.   Yeah, I understand.

      Yeah, I mean, I think -- I mean, the product was around before I started.  And, you know, there's just lots of ways to make it -- make it better and -- you know, better for website owners.

      One -- one important thing about our -- our product is that, for most of our ads, the -- the website owner -- owner only makes money if someone clicks on their ads.  So people need to find the ads interesting and useful; otherwise, the website owner won't make much money.

      And so there are lots of, you know, techniques and, you know, experimentation for you to figure out, you know, what are better ways to figure out what ads are more useful.

      And so, you know, in some ways, we're kind of like a -- like a laboratory, you know, where we're

trying different things, and we're -- we're not sure

what's going to work, but we're trying to figure out,

you know, how can we teach our computers to better

understand what Jerry is talking about, and then what

ads, you know, would a user find interesting, if we show

it to them?

And so that's been my -- that's been my focus

for most of the time, is really trying to just improve

our computers with the engineers and -- and really make

the ads more, you know, helpful for people so we get

more clicks and help the website owners make more money

for themselves.

Q. And how fast is the auction process at Google

that takes place?

A. So -- so every time someone visits a web page,

we run an auction, and it's -- it's less than a second,

a fraction of a second. We are trying to figure out

what ads to show and running an auction to figure out

what ads we're going to show to a user.

Q. And how long does the -- in addition to the

auction, is there another part of the Google system

process in serving ads?

A. Yeah. I mean, there's -- I mean, there's a

lot of steps that happen to -- to determine what ads we

show.

1      Q.   And why don't -- we talked about the auction.

2  What other steps are there?

3      A.   Well, so in the case of Jerry's web page, we

4  first have to read his web page ourselves at Google and

5  understand, you know, what is it about?

6           So we have to -- you know, our computers will

7  understand, are we -- is he talking about dogs?  He's

8  talking about how to name dogs.  So there's a lot of

9  technology to help computers understand, you know, what

10 he's talking about.

11          And then we have a lot of technology which

12 figures out what ads would be useful.  We have millions

13 of ads in our -- our database that people have given us,

14 and we need to figure out, you know, of these million

15 ads, what ads -- we can only show maybe four ads on

16 Jerry's page.  Which of these million ads should we

17 choose to show on his page?

18          And once we have an idea of -- you know, maybe

19 we'll narrow the million down to a couple thousand.

20 It's still a lot of ads.  We have to try to narrow them

21 down even more to what we think are the best ones to

22 show to a person, and then we run an action.

23          And so -- and the auction -- the auction

24 itself is -- it's -- it's a complicated process.  It's

25 not your typical auction where the winner is the person

who pays the most.  You know, our auction actually is a

combination of not just how much someone is going to

pay, but, you know, how useful we think the ad is to the

user.

MR. DEFRANCO:  Your Honor, I think we're

going to get into some technical details that we --

THE COURT:  Okay.  All right.  Ladies and

Gentlemen, I'm going to have to ask you to leave at this

time, and I'll invite you back in as soon as I can.

**SEALED BY ORDER OF THE COURT**



**SEALED BY ORDER OF THE COURT**



**SEALED BY ORDER OF THE COURT**



**SEALED BY ORDER OF THE COURT**



SEALED BY ORDER OF THE COURT



**SEALED BY ORDER OF THE COURT**



**SEALED BY ORDER OF THE COURT**



**SEALED BY ORDER OF THE COURT**



**SEALED BY ORDER OF THE COURT**



SEALED BY ORDER OF THE COURT



SEALED BY ORDER OF THE COURT



SEALED BY ORDER OF THE COURT



**SEALED BY ORDER OF THE COURT**



SEALED BY ORDER OF THE COURT



**SEALED BY ORDER OF THE COURT**



**SEALED BY ORDER OF THE COURT**



SEALED BY ORDER OF THE COURT

```
1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16        COURT SECURITY OFFICER:  All rise.
17        (Jury in.)
18        THE COURT:  Please be seated.
19        Do we have a witness?
20        MR. DEFRANCO:  I apologize, Your Honor.
21        I think he'll be right here.
22        Here he is.
23        THE COURT:  Here he is.
24        Let's continue.
25        MR. DEFRANCO:  Thank you, Your Honor.
```

        Q.    (By Mr. DeFranco) Mr. Miller, before the
break, we had up DX Demo 100.  And rather than me
showing you a slide and asking you the question, I'd
like you to just walk us through the interface for
AdSense for Content and just -- this is the product you
deal with, right?  One of the products?

        A.    That's right.

        Q.    Okay.  Why don't you just take a slide at a
time and walk us through it, please.

        A.    Okay.  If I go too fast, let me know.

              So this is the -- the interface for AdSense
for Content.  So if you're a web publisher using our
product, this is what you would go to to use our
product.

              And so this slide, this is the first page you
would see to use our system.  And you see there's a
button there that says sign up now.  So if you're a new
customer, you would click on that sign-up-now button.

        Q.    And there's four products here, the two at
issue in the case, if I have it right, Content, Mobile?

        A.    That's correct.  So that's referring to
AdSense for Content and AdSense for Mobile.

        Q.    Next.

        A.    So, yes, let's -- so if I was a new customer,
I would click on the sign-up-now button.  That would

```
 1  take me to, I think, the next slide.
 2          Yes.  So this is kind of a long -- long form,
 3  but, you know, if you're a new customer, this is -- this
 4  is how you sign up for AdSense for Content.  You tell
 5  us, you know, your name and your website that you
 6  want -- you want, you know, users to see ads for when
 7  they visit.
 8          So, you know, Jerry would put down his website
 9  here.  He would tell us his name.  He would tell us how
10  to pay him, because it's a free product, and we actually
11  pay him money that we collect from advertisers.  And so
12  he would tell us how to send him a check or his bank
13  account so we can pay him.
14          But there's a couple -- couple choices and
15  things you have to do, but that's basically what you
16  tell us to get started.
17      Q.   Okay.
18      A.   So --
19      Q.   And then the next?
20      A.   Yeah.  So the next -- next page.
21          So -- so let's pretend, you know, Jerry is
22  going to our product.  He has an account.  He's going
23  in, so the first thing Jerry would see is this summary
24  of -- of today, a report.
25          So it's a report saying, Jerry, here's how
```

much money you've made today from AdSense for Content.
So this is actually a picture of my -- my account.  I
made zero dollars, but, hopefully, Jerry would see, you
know, some money he's made and some numbers showing, you
know, how many people have come to his -- his site and
how much money he's made from the ads we've shown to his
users.

Q.   And -- but say, Jerry, we have advertisers,
publishers.  Which one are you talking about?  What is
Jerry's?

A.   So Jerry -- I'm using the earlier example
where Jerry is a publisher who has a dog-naming website
that he wants us to show ads on when his user is
visited.

Q.   And when it says the earnings, where -- where
does Jerry get his earnings from?

A.   Well, Google has millions of advertisers who
are, you know, in our -- in our system.  And when people
click on their ads, you know, we collect money from the
advertisers, and we pay it to people like Jerry, the
publishers.

Q.   All right.  Let's go to the next slide.  Keep
moving, please.

A.   So let's say Jerry wants to put ads -- you
know, he wants to show ads to his users.  And so this is

1 the set-up process he would go through to tell us, you

2 know, please show ads to my users when they visit their

3 site.

4          So if you see the top there, you see AdSense

5 for Content in blue, you would click there and that

6 would be -- get them into the first step of, you know,

7 setting up ads to be shown to users.

8          So if you go to the next page.

9          So this is sort of the first step, and there's

10 sort of four steps he has to go through to -- to get

11 ads.  And what you see is there's -- there's two

12 options.  You see ad unit there, and you see link unit.

13 Those are two different kind of -- of ads we can display

14 to users.

15          And I think -- I think for this purpose, I

16 think the main focus -- I think the only focus is the ad

17 unit.  And so what he would do is, he would say I want

18 to add an ad unit.

19          And you see to the right there, you see that

20 it says ad title, ad text, that's an example of what an

21 ad unit would look like.  So when someone visits Jerry's

22 page, he would see a little square like that with words

23 which is the ad that we're showing.

24          So if we go to the next page.

25          So this is the same page as before, and what

I'm -- you see there is in that box, we have a couple

different options that Jerry can pick in deciding the

ads that Google is going to show.  He can say -- it says

text and image ads, text ads only, or image ads only.

And what that means is we have two different types of

ads.  We have text ads, which are like the one on the

right there.  It's, you know, three lines of words, and

there could be a website address.

But we also have image ads, which are

basically pictures, almost like a billboard.  And so

Jerry can say, you know, I'm happy seeing -- I'm happy

to have my users see both text and image ads, or he

could say, you know, I only want text ads; I don't want

any pictures shown to my users.  And so he has that

flexibility in the ads.

So let's go to the next page.

All right.  So this is where we're getting

into some of the more details and choices that Jerry

has.  And so I'll start at the top.  So you see a

section called format.

Actually, maybe before I get into it, what

this is really doing is this is a way for Jerry to

change how the ads will appear to his users.  So let's

say Jerry said he wants text ads, only text ads.  So

what he can do is change, you know, the colors and other

1    things.

2            So when a user visits his site and sees ads,

3    they look different.  And so the first thing he can do

4    is he can choose the format of the ads.

5        Q.    Keep going.

6        A.    Keep going?

7            Okay.  So formatting the ads, what that means

8    is the size of the ads.

9        Q.    Okay.  Next slide.

10       A.    And so he can choose, you know, a big square,

11   a small square.  He can choose different sizes of the

12   ads that we're going to show.

13       Q.    Okay.  Next?

14       A.    Next, he can also choose -- change the colors.

15   And so he can say I want the text ads to be, you know,

16   red or orange like on the left there.  He can do blue;

17   he can really make them look different depending on his

18   preferences.

19       Q.    Okay.  Next?

20       A.    He can also change how the ads -- the font,

21   meaning how the text is displayed.  He can also change

22   the -- the -- what we call the corners.  So, you know,

23   you have a square box with sharp corners.  You can have

24   kind of rounded corners, like on a table.  So he has

25   also -- he can also change that option as well.

1           Next page.

2           So this is -- so Jerry's done; you know, he's

3    made his choices.  He can also use some what we call

4    channels.  This is like a label, like a reporting label.

5    He can also use labels to help him measure things.  And

6    it's an optional feature.

7           Next page.

8           And then he can give us his ad unit, you know,

9    this block of ads, a name.  So this is -- this is where

10   he can choose the name.  And then he would hit submit

11   and get code, and that would take you to the next page.

12          So this is the final step.  So Jerry's -- he's

13   created that unit.  He's ready to show, you know, ads to

14   his users.  And so what's -- what this is showing here

15   is that there is some computer code you see in that box

16   there.  We call it JavaScript.  That's the computer

17   language.

18          And Jerry can take that JavaScript computer

19   code put it, you know, on his website, and then what

20   would happen is when someone visits his website, Google

21   will show user add.

22          And that's kind of the final step.  So within

23   a couple of minutes, Jerry can really kind of walk

24   through these steps and, hopefully, start making money

25   for his site.

1    Q.   Thanks.

2         Let's do the same thing on the -- we started

3 this morning talking about what happens at Google,

4 right?

5         This is what side of the system, publisher or

6 advertiser?

7    A.   This is the publisher; this is the website

8 owner.

9    Q.   Let's -- let's just do the same thing for the

10 advertiser's side.

11    A.   Okay.

12    Q.   And that was great.  That -- just do that

13 again for us.

14    A.   Okay.  So the next slide.

15         MR. DEFRANCO:  The next slide, Charles, I

16 think it's 113.

17         THE WITNESS:  Yeah, that looks right.

18    A.   All right.  So I was just talking about the

19 website, the publisher, but we also have advertisers who

20 also need to -- to put ads and -- and create ads in our

21 system.

22         And so what -- maybe I'll use another -- I

23 used Jerry for websites.  Maybe I'll use, like, Charlie.

24 I'll make up a name, Charlie.  Let's say Charlie wants

25 to sell dog bones just to make it easy -- or actually,

let's do even simpler.

Charlie wants to do guitar lessons.  He's a guitar instructor.  He wants to show ads for guitar lessons.

So Charlie would come to this -- this is the -- a Google web page for AdWords.  And AdWords is our -- is our interface for an advertiser who wants to put ads into our system.

And so -- and Charlie would come here and create -- log in to our system.

So can you go to the next page?

So once Charlie has, you know, logged into our system, you know, we show basic reporting.  We show him how much money he's spending with Google.  And we show a list of his advertising campaigns.

You'll see kind of one -- you'll see a little green circle and a name next to it.  That's -- that's one of the campaigns he may be running.

And a campaign is just -- it's a word we use for a bunch of ads that work together.  So it's all his -- it's kind of a folder for all his ads.

So next page.

So let's say, you know, Charlie wants to create a new advertising campaign.  He wants to get new customers for his guitar lessons, and so he's going to

create a new campaign.

So what this page is showing you is the steps he would go through to start a new advertising campaign at Google. And there's a bunch of options. And so at the top, you see locations, languages, and demographics. Right there.

So what -- what this means is that Charlie can say, you know, I want to show my ad to people in the United States, or -- and he can be really specific. He could say only to people, you know, in Dallas; or he can -- he can kind of choose who he wants to see his ads.

He can also choose the language of the users. I mean, let's say Charlie only speaks English, and he wants English customers. And so he can say please only show my ad to people who speak English.

Okay. Can you do the next slide?

Q. Yeah. Some of these have more detail than you want to go in.

Do you want it skip this one?

A. Yeah. Please skip.

Q. Okay.

MR. DEFRANCO: Skip that one, please, Charles.

A. Yes, please.

1      Q.   (By Mr. DeFranco) Skip that one?

2      A.   Yeah, it's not important.

3      Q.   If somebody else wants to ask you about that,

4  they will.

5      A.   Okay.  Actually -- I'm sorry -- let me go back

6  one more time.  One more time.

7           So there's other things Jerry can also do.  He

8  can decide to show his ads to people on google.com, our

9  search website.  And for most people, that's why they're

10  coming to Google; they want to show their ads on our

11  website.  So he can say only show my ad to people who

12  are doing searches on google.com.

13           And he can also -- in the final section, you

14  see on the bottom there, it says bidding and budget.

15           And this -- this refers to our -- our

16  auctions.

17           So Jerry can say, you know, here's my -- my

18  bid.  I'm willing to pay a dollar for a click.  And this

19  is how he tells us, you know, his bid for the auctions.

20           And that's the last step on this page.

21           So next page.

22           So let's say Jerry has gone through setting up

23  his campaign, and he wants to start advertising.  So

24  he's going to give us information about the ads he wants

25  to show.

1          And so maybe if you skip ahead to the next

2  one.  I think it's better.

3          So -- and on the top there, you see a -- a box

4  that says create an ad.

5          Let's go to that.

6          A little -- a little hard to read, but -- so

7  what this is, is Jerry wants to show a text ad to users.

8  And so you can see, there's a word headline and

9  description line.  There are a couple of lines there,

10  and -- exactly right there.

11          And what Jerry is doing is -- or sorry -- what

12  Charlie is doing is he's entering information about his

13  guitar lessons.  So his ads, you know, would say guitar

14  lessons.

15          And you can see a preview on the right of what

16  his ad would look like on google.com.  And he can sort

17  of change the words that it would show to a user.  So

18  he's going to say guitar lessons.  He might say I have

19  the best guitar lessons in Texas, if that's who he's

20  advertising to.

21          And he also has the address for his website to

22  click and learn more about his lessons.

23          Okay.

24          And you see -- further down, you see keywords.

25  So earlier, I talked about contextual targeting.  This

is where advertisers can give us keywords or words that
suggest where they want their ads to be shown.

So in this case, you see a box in the left
there that says enter one keyword per line. And so what
Charlie can do here is tell us the kind of -- of, you
know, places he would like to show his ad.

So he may want to show his ad when someone
does a search for guitar lessons. Maybe he wants to
show his ad on sites about learning to play guitar. And
so he can give us those -- those hints, those keywords.

Q. Can I -- can Jerry -- I forgot.

A. Charlie. Charlie.

Q. I can't -- Charlie. Can Charlie guarantee
where his ad will appear on a particular publisher's --
sent to browsers and where they will appear on what
sites?

A. No. So -- I mean, what could -- what Charlie
is doing is he can say -- let's say he wants his ad to
be shown on the AdSense for Content. He's hoping his ad
will be shown on Jerry's site, someone's site.

There's no way to really guarantee it.

Q. Can Jerry -- Jerry -- we talked about the
publisher earlier putting in the -- the first interface
was which interface?

A. That was for the publisher of the websites.

1     Q.   And you talked about publishers can control

2 certain aspects or ad appearances?

3     A.   That's right.

4     Q.   What were some of those examples?

5     A.   Yeah.  So, you know, Jerry could have made the

6 ads look blue or black.  He could change the corners;

7 make them round or sharp.

8     Q.   Can -- can the advertiser -- can Charlie do

9 that?

10     A.   No.

11     So -- so this advertiser -- he can change the

12 words in his ad, but he can't change the color or the

13 borders.  That's something that only the publisher can

14 do, only someone like Jerry can do.

15     So -- I mean, before there was a picture of

16 the ad on the right.  And the advertiser really has no

17 idea how his ad is going to look when it shows up on

18 someone's site.  It could be black or blue.  He really

19 has no idea.

20          THE COURT:  Excuse me just a second.

21 You might want to slow your answers down.

22          THE WITNESS:  Sorry.

23          THE COURT:  Well, she's trying to take

24 down what you say, and it will be easier for her.

25          MR. DEFRANCO:  I apologize.  I

1  should have -- I'm sorry.

2      Q.   (By Mr. DeFranco) Where does taking

3  information, the words Charlie, the advertiser, put in

4  and conforming them to color, font, those types of

5  attributes that Jerry, the publisher, put in?

6          Where does that occur in Google's system?

7      A.   Well, it sort of occurs, I guess, at the end

8  of the process.  So -- I mean, the advertiser, Charlie,

9  he's giving us kind of like a -- a blank formatted ad.

10 He's just giving us the words for the ad.

11          You know, we don't actually, you know, add the

12 colors and things until, you know, Jerry -- Jerry's

13 site -- until someone goes to Jerry's site, and then

14 we -- we figure out what ads to show and then we figure

15 out, oh, Jerry likes blue ads.

16          So at that point, we actually color in the ads

17 and add the -- add the formats.

18     Q.   When you say we, is that some system at

19 Google?

20     A.   Yeah.  So there's a computer system at Google

21 that does that.

22     Q.   And you said -- just to clarify, you said

23 blank formatted ads?

24     A.   Blank formatted ads.

25     Q.   You mean no format?

A.   It's -- there's -- there's no format.  It's just the words that -- that Jerry or -- sorry -- that Charlie has put into the ad.

Q.   Could we go back -- I'm sorry.  Now I'm rushing you.  I apologize.

A.   No problem.

MR. DEFRANCO:  Charles, can we go back to the prior set of screen shots, the one we showed before AdSense for Content?  AdSense for Content, Demo 100.  Sorry?  100.  Let's try 100.

Oh, this is the one.

Q.   (By Mr. DeFranco) Different products, AdSense for Mobile is also generally at issue in this case, the front end and back end.

The ads in AdSense for Mobile, they go to phones, right?

A.   That's right.

Q.   But, generally, is the process basically the same for AdSense for Mobile products in terms of the -- let's take it one at a time -- the advertiser interface?

A.   Yeah.  So -- so for Mobile advertisements, an advertiser like Charlie would also use what I showed before, the advertiser interface.

Q.   And phones -- are phones getting more or less sophisticated?

1    A.    More sophisticated.

2    Q.    And do some phones today have browsers like

3 computers have browsers?

4    A.    Yes.  Like I have an iPhone, and iPhones have

5 web browsers like computers.

6    Q.    And the way ads are sent from Google to -- to

7 a desktop computer, if I'm using the web, is it similar

8 to the way that it's done for phones?

9    A.    Yeah.  So if I'm -- if I'm on a phone using a

10 web browser, it's just -- it's the same as a computer.

11    Q.    All right.  One more -- one more topic.

12         MR. DEFRANCO:  Let's -- let's put up

13 Exhibit 897.

14         MR. TRIBBLE:  May we approach, Your

15 Honor?  That's not in evidence.

16         THE COURT:  Yes.

17         (Bench conference.)

18         MR. TRIBBLE:  Your Honor, it's an e-mail,

19 not a business record.  We have an outstanding hearsay

20 objection, and we also object that this was only

21 added -- this is the document -- this is the one

22 document they've produced.  They added it to their

23 exhibit list last week.

24         MR. DEFRANCO:  Your Honor, it's the

25 same -- that's the same argument.  I used this exhibit

1   with Ms. Wojcicki.

2               MR. TRIBBLE:  You didn't move for it to

3   be entered, though.  I have no objection to him talking

4   generally about this topic.

5               I tell you what; I withdraw my objection,

6   Your Honor.

7               THE COURT:  Okay.

8               MR. TRIBBLE:  Just let it in.

9               THE COURT:  All right.

10              MR. TRIBBLE:  Thank you.

11              THE COURT:  It will be admitted.

12              (Bench conference concluded.)

13      Q.   (By Mr. DeFranco) I'm just putting this e-mail

14  up.  It's got a word, and I got this word wrong.  I want

15  to make sure I've got it right.

16              It says Explorer, right?  Do you see that?

17      A.   Can you zoom in a little bit?

18      Q.   Explorer Project, is that something you're

19  familiar with?

20      A.   Yes.  I know the Explorer Project.

21      Q.   Okay.  At a very general level -- I don't want

22  you to talk about software.  Please don't get down to

23  the software level.

24              At a general level, how does Explorer -- well,

25  let's start slow.  I'm sorry.  I'm trying to do three

1  things at once, and none of them are coming out very

2  well.  Let me try again, please.

3          Is Explorer a project in development?  Is it a

4  prototype or beta?  Is it something that's full-blown,

5  out on the market?  Can you tell us just briefly the

6  status of it?

7      A.   Sure.  It's -- it's a prototype or beta.  So

8  some people are starting to use it, some advertisers.

9      Q.   And in general terms, what is it?  Is it

10 something you're working one?

11     A.   It's actually something that I -- I started at

12 Google.

13     Q.   Okay.

14     A.   So I'm really familiar with it.

15     Q.   When you say -- you're the one that started

16 this project?

17     A.   I mean, I -- I named it Explorer.

18     Q.   Okay.  So when -- tell us, generally, what

19 Explorer is.

20     A.   So generally what Explorer is, is that Google

21 will not require an advertiser to give us any keywords

22 or -- or placements, any -- any hints on where they

23 want -- want their ad to be shown.

24          Google does all that work for them, and Google

25 basically determines where we think an ad will do well,

on what publishers we should show an ad.

Q.   Is there -- in addition to just the user, the advertiser, just putting in the words that will be used ultimately in the ad, is there any other keyword or hints, I think you used, that's given by the user, the advertiser?  Excuse me.

A.   No.  So, I mean, if -- with Explorer, if Charlie wanted to have an ad for guitar lessons, he would just say -- you know, he would -- he would create the -- the text for the ad, basically guitar lessons, and then that would be it.

So the process would be a lot simpler than what it looks like right now, and Google would do all the hard work for him.

Q.   And is that -- what's the state of that product?  Is it working?  Is it not working?

A.   I mean, it's -- it's -- it's working.  It's -- you know, we've been testing it with advertisers for a number of months.  And for many of them, it's working really well.

MR. DEFRANCO:  See you in a minute.

Thank you very much.

THE COURT:  Mr. Tribble, cross-examination?

MR. TRIBBLE:  Yes, Your Honor.

1               Your Honor, can I get one side-bar for

2 clarification?

3               THE COURT: Yes, of course.

4               (Bench conference.)

5               MR. TRIBBLE: He just went beyond the

6 face of the document and said, oh, we've been testing

7 it; it's been working really well.

8               None of that's in the document. I'd like

9 to get into the fact that they didn't produce the source

10 code, didn't produce this. They haven't produced any of

11 these tests showing that it's working.

12               THE COURT: Well, the way you can -- you

13 can get into that by saying there's no software that's

14 going to be introduced about this. There's no test data

15 that's been introduced and all that. But you can't get

16 into the failure to produce documents.

17               MR. TRIBBLE: Okay.

18               THE COURT: You can say, you know, you've

19 seen no document in this trial, for instance, that it's

20 not in trial, okay?

21               MR. TRIBBLE: Okay.

22               THE COURT: All right.

23               (Bench conference concluded.)

24               CROSS-EXAMINATION

25 BY MR. TRIBBLE:

1     Q.   Good morning.

2     A.   Good morning.

3     Q.   Let's talk about this last item.

4         What did you call it?  Is it auto-targeting or

5 something?

6     A.   We call it Explorer.  It's also called

7 auto-targeting.

8     Q.   And the point of this new prototype design --

9 and this is to be used for AdSense Online; is that

10 right?

11     A.   Yes, AdSense for Content.

12     Q.   You said the point was so that the advertiser

13 would not have to enter keywords; isn't that right.

14     A.   That's correct.

15           MR. TRIBBLE:  And can we put up --

16     Q.   (By Mr. Tribble) What page of your

17 demonstrative that you were walking through on AdWords

18 has the spot where they enter keywords?

19     A.   That was DX Demo 119.

20           MR. TRIBBLE:  Can we put that up?  Do you

21 have that demonstrative?

22     Q.   (By Mr. Tribble) Okay.  Is this the page?

23     A.   Yes.

24           MR. TRIBBLE:  Can we blow up the spot

25 where you enter the keywords?

1     Q.    (By Mr. Tribble) Okay.  This is how AdSense

2 currently operates, correct?

3     A.    Yes.

4     Q.    This is the way it's operated the entire time

5 you've been employed at Google?

6     A.    Yes.  That's right.

7     Q.    It's the same way it's worked since the very

8 beginning of AdSense?

9     A.    Yes.

10     Q.    And entering keywords -- have you read the

11 patents at issue in this lawsuit?

12     A.    No, I haven't.

13     Q.    Okay.  The -- there's a requirement -- one of

14 the elements in the patent claim is that you must have a

15 second interface, the interface for the advertisers that

16 prompts them to input information to select a site.

17          The difference between -- you understand,

18 don't you, that your testimony is being introduced by

19 the Defendant in this case, because Defendant's

20 non-infringement expert will testify later today or

21 tomorrow that that new system constitutes a

22 non-infringing alternative?

23               THE COURT:  Well, let me just --

24               MR. DEFRANCO:  Object to the --

25               THE COURT:  Well, hold on a second.

1            He's not going to testify tomorrow.  I

2 can assure you that.

3            MR. TRIBBLE:  Fair enough, Your Honor.

4 Fair enough.

5            THE COURT:  I just want to put the jury

6 at ease.

7            MR. TRIBBLE:  Okay.  Fair enough.

8            THE COURT:  Go ahead.  I'm sorry to

9 interrupt.

10     Q.   (By Mr. Tribble) You understand that your

11 testimony in this case only relates to whether there's a

12 non-infringing alternative.

13            You understand that, don't you?

14     A.   I mean, I don't -- I don't -- I just know my

15 role is to talk about the product.

16     Q.   Okay.

17     A.   I don't know how it gets into things.

18     Q.   But the patent requires that there be an

19 interface to enter information to select, and the

20 difference between your system and the actual system

21 that's being used and has been used the entire time at

22 AdSense Online has been in place is that the actual

23 system prompts the user to enter keywords.

24            MR. DEFRANCO:  Objection to the reference

25 of the patent with this witness, Your Honor.

1          THE COURT:  Overruled.

2      Q.    (By Mr. Tribble) I'll just ask it a different

3  way.

4      A.    Yeah.  I'm not sure I understand the question.

5      Q.    You'll agree that AdWords -- when used with

6  AdSense, AdWords has a user interface for the

7  advertiser?

8      A.    Yes.

9      Q.    And that it has a spot for the advertiser to

10  enter keywords, correct?

11      A.    Yes.

12      Q.    And -- and the difference with the alternative

13  system, the prototype that you're working on, it

14  requires no keywords.

15          Let me ask you, are you aware that this --

16  entering keywords, this was the system put in place when

17  AdWords first started out?

18      A.    Yes.

19      Q.    Okay.  And are you aware that in 2006, Google

20  added a -- a different type of information that the

21  advertiser could put in that was used in the selection

22  of the websites for the ads?

23      A.    Are you referring to placements?

24      Q.    Yes.

25      A.    Yes.

1    Q.   Can you show us -- is it on the same spot, the

2  placement?

3    A.   Yes.  It's further down.

4    Q.   Okay.  In 2006, three years after AdSense came

5  out, they added placement targeting, correct?

6    A.   That's right.

7    Q.   And in placement targeting, the information

8  that's inputted are the actual URLs, the website

9  addresses, correct?

10   A.   That's right.

11   Q.   So that's even narrower and more specific than

12 the keyword targeting, isn't it?

13   A.   It's -- it's different.  I don't know if I

14 would say it's more narrow, more or less specific.  It

15 depends on the situation.

16   Q.   Well, in this type of targeting that was added

17 later in the evolution of the product, you have to know

18 the exact URL, don't you?

19   A.   You do.

20   Q.   Okay.  Now -- in fact, I want to clear up a

21 huge source of confusion, I believe, in this trial.  I

22 mean, you understand that Dr. Rhyne in our -- in our

23 part of the case, he walked through slides that showed

24 these same types of boxes and things and walked the jury

25 through this in his infringement analysis.

1        Has anyone made you aware of that?

2     A.   No.

3            MR. DEFRANCO:  Objection --

4            MR. TRIBBLE:  Okay.  I'll move on.

5            MR. DEFRANCO:  I object to that.

6            THE COURT:  Well, I'll overrule the

7  objection.

8            MR. TRIBBLE:  I was actually checking

9  into that, Your Honor.  Thank you.

10     Q.   (By Mr. Tribble) Now, do you see any claim --

11  well, let me ask you this.

12            Just looking at the claim as you have it here

13  today, do you see content targeting listed in any of

14  these words in the claim?

15            MR. DEFRANCO:  Objection.  It's for the

16  Court to interpret the claims, Your Honor.

17            THE COURT:  Overruled.

18     A.   I don't see content targeting.

19     Q.   (By Mr. Tribble) Do you see auctioning or

20  auction process or pricing?

21     A.   No, I don't.

22     Q.   Have you applied for patents on other things?

23            MR. DEFRANCO:  I object.  This is the

24  patent issue, Your Honor.

25            THE COURT:  Overruled.

1          A.    Yes, I have filed for patents.

2          Q.    (By Mr. Tribble) Well, you are aware, aren't

3    you, as -- from your familiarity with the patent process

4    that for a patent to be infringed, all that's necessary

5    is that the elements listed in the claim are present in

6    the accused system?

7          A.    I mean, I'm -- I don't -- I've filed patents,

8    but I'm definitely not a patent expert.

9          Q.    Okay.  Fair enough.

10                THE COURT:  Well, are you aware of that,

11   in response to his question?

12                THE WITNESS:  So maybe you can ask the

13   question again.

14         Q.    (By Mr. Tribble) I'm not trying to beat up on

15   you.

16         A.    Okay.

17         Q.    It's simply this:  To infringe a patent, all

18   that's required is the accused system embodies the

19   elements listed in the claim.  And so, for example, if

20   it had a bunch of other features -- you know, it might

21   have all kinds of features.

22                As long as it had the elements listed in the

23   claim, it would infringe that claim.  Are you aware of

24   that?

25         A.    I guess that makes sense to me.

1    Q.    Okay.  And so if auctioning and content

2 targeting are not part of these claims listed here in

3 this asserted claim in this lawsuit, then they would not

4 be relevant to infringement of this claim.

5          Would you agree with that?

6    A.    Well, I noticed -- I think I saw the word

7 select on that claim, and I think for us the contextual

8 targeting option is how we select our ads.

9    Q.    Okay.

10   A.    So it's hard for me to separate the

11 separate --

12   Q.    Fair enough.

13          And I think Dr. Rhyne testified about that as

14 well, that the system -- the way the system does the

15 selection, the Google system, it does content targeting

16 to do the selection, but that the information --

17 information used in that process is input through the

18 AdWords interface.

19          Would you agree with that?

20   A.    So -- I mean, our option -- I'm not sure I

21 totally agree, to be honest.  I think -- you know, we

22 use the information.

23   Q.    Let me ask it this way.

24   A.    Yeah.

25   Q.    In the matching process, are you more

1  comfortable with that?

2      A.   Okay.

3      Q.   Okay.  In the matching process, do you use

4  those keywords?

5      A.   Yes, we do.

6      Q.   And so in the selection process, are you

7  comfortable with that?

8      A.   Yes.

9      Q.   Is that information that's input used to

10  select?

11      A.   Yes.

12      Q.   Okay.

13      A.   So it's -- I mean, I'm not sure I discussed

14  selection, but it selects the ads that, you know, may go

15  into the auction.

16      Q.   Okay.  Let's go through a few other things.

17  Ad -- AdSense Direct, it has a couple hundred customers,

18  correct?

19      A.   That's correct.

20      Q.   A couple hundred.  How many customers does

21  AdSense Online have?

22      A.   Probably over a million.

23      Q.   Over a million.

24           And it wouldn't be feasible to move all the

25  AdSense Online customers on over to AdSense Direct,

1  would it?

2      A.   No.

3      Q.   And so if someone were arguing that a

4  non-infringing alternative to the AdSense Online system

5  would be that Google could simply move all those million

6  customers over to AdSense Direct, which currently has a

7  couple hundred customers, you would disagree with that,

8  wouldn't you?

9      A.   So the question is, could you move --

10     Q.   Let me ask it this way.

11     A.   Yeah.

12     Q.   Do you think it would be profitable to move a

13  million AdSense Online customers over to becoming

14  AdSense Direct customers?

15     A.   I mean, it wouldn't be feasible to move a

16  million AdSense publishers over to Direct.

17     Q.   Fair enough.

18          And -- and let's -- do I have your slide?

19          Here they are.

20          Let's go back to your AdWords exhibit.  Which

21  one did you cover first, AdSense?

22     A.   I did AdSense first and then AdWords.

23     Q.   Let's look at AdSense.  That's -- what is

24  that, DX100?

25     A.   Yes.

1      Q.    DX Demo 100.  Let's go to Page 106.

2            And Dr. Rhyne went over this, but just -- this

3  is a user interface for the publishers to use, right?

4  The web pages?

5      A.    That's right.

6      Q.    And it allows you to set color, background

7  color, right?

8      A.    That's right.

9      Q.    Border color?

10     A.    That's right.

11     Q.    Font color?

12     A.    Yes.

13     Q.    Okay.  Is that information stored in a

14 database?

15     A.    Presently it is, yes.

16     Q.    Presently?

17           First interface -- database, are you -- are

18 there plans to change that as well?

19     A.    No, there are not.

20     Q.    Okay.  Just checking.

21           Let's go to the AdWords demo.  I think we -- I

22 guess we've talked about all this.  It's a user

23 interface.

24           You agree with that?

25     A.    On AdWords?  Yes.

```
 1      Q.   Yes.  Okay.

 2           Now, I just have a few documents I wanted to

 3  go through with you, if I can find them.

 4           Here they are.

 5                MR. TRIBBLE:  Let's look at 1668.

 6  Your Honor, I have copies.

 7                THE COURT:  Of course.

 8                MR. TRIBBLE:  Thank you.

 9                THE WITNESS:  Thank you.

10                MR. TRIBBLE:  Thank you.

11      Q.   (By Mr. Tribble) And I just had a couple of

12  questions about this.

13           This is a Google presentation about AdSense

14  for Content, correct?

15      A.   I'm not sure I know this document, but it

16  looks like it is, yes.

17      Q.   And it says confidential.  This is an internal

18  Google document discussing AdSense, correct?

19      A.   Yes.  Yes.

20      Q.   Okay.  I just wanted to ask you -- turn to

21  Page 3546.

22           Do you see the question:  What is the revenue

23  share?

24      A.   Yes, I see that question.

25      Q.   The revenue share, that's the portion of the
```

1  money that Google pays back to the publishers?

2      A.   Yes.

3      Q.   Okay.  And do you agree that it is true that

4  Google does not disclose to the publishers the exact

5  revenue share, correct?

6      A.   For -- for Online publishers, that's correct.

7      Q.   Yeah.  But it says:  However, we, Google, are

8  being very aggressive and generous with the amount we

9  provide publishers.

10          Do you agree with that?

11          MR. DEFRANCO:  Object, Your Honor.  This

12  is a technical person.  He doesn't deal with financial

13  considerations about revenue.

14          THE COURT:  Overruled.

15      A.   Do I agree with that?

16      Q.   (By Mr. Tribble) Yeah.

17      A.   I mean, we are -- we are paying publishers the

18  majority of the revenue we collect from advertisers.

19      Q.   And do you agree that Google is being very

20  aggressive and generous in setting the amount that it

21  pays out to the publishers?

22      A.   It seems generous.  I don't know if it's

23  aggressive.  I don't really have a good way to measure

24  that --

25      Q.   Okay.

1    A.    -- to be honest.

2    Q.    Fair enough.

3    A.    I mean, I would say it's -- it's -- it's their

4 website, so they kind of deserve it, is the way I would

5 think about it.

6    Q.    Do you know the amount they're getting?

7    A.    I do, yes.

8    Q.    Okay.

9              MR. TRIBBLE:  Now, let's go to

10 Exhibit 1656.

11    Q.    (By Mr. Tribble) I just wanted to ask you one

12 question.  You were talking about, in discussing your

13 prototype, you know, that -- satisfying users' needs and

14 things like that.

15              Do you recall that?

16    A.    Yes.

17    Q.    And you have some familiarity with what the

18 customers of AdSense want and what they value.

19    A.    Yes.

20    Q.    Okay.  Would you agree that the AdSense

21 publishers value the ease of use of the system?

22    A.    Yes.

23    Q.    And that it's automated?

24    A.    Yes.

25    Q.    Okay.  And I just -- take a look at the third

page. In this customer survey, customers of AdSense

were asked, what do you like best about AdSense?

And do you see that the -- the highest answer, 31

percent of those responding, the single feature that

they liked best was the ease of use and the ease of

setup?

Do you see that?

A. Yes, I see that.

Q. And second was the revenue that was generated

by this automated system.

A. Okay.

Q. Fourth was the customization.

And fifth was the clean user interface.

A. Okay.

Q. And so all of those combined are about 68

percent of everyone responding; would you agree with

that?

A. Yes.

MR. TRIBBLE: I pass the witness.

THE COURT: Redirect?

REDIRECT EXAMINATION

BY MR. DEFRANCO:

Q. I've got to earn my keep, so let's see what I

can ask you.

You were asked a series of questions about an

1   expert, Dr. Rhyne.

2           Do you remember that?

3       A.    Yes.

4       Q.    Do you understand that you're not allowed to

5   be in the courtroom when other witnesses are testifying?

6       A.    Yes.  Yes, that's right.

7       Q.    Have you ever heard of Dr. Rhyne before?

8       A.    No, I haven't.

9       Q.    Now, you were asked about content targeting

10  and selection.  Is the content targeting that Google

11  does part of the -- the selection process as to which ad

12  is going to be -- appear on a user's browser?

13      A.    Yes, it is.

14      Q.    And -- and among the three pieces, parts,

15  contributor, advertisers, Google publishers, is there

16  one you would point to as to where the selection process

17  takes place?

18      A.    I mean, I would -- I would say Google --

19  Google is managing the selection process.

20      Q.    You were asked about Online versus Direct.

21      A.    Yes.

22      Q.    Is there a separate group for Online within

23  Google?

24      A.    Separate group?

25      Q.    In other words, you're -- you're in the --

1  you're in the Online group, right?

2       A.   Yes.  I --

3       Q.   And how many -- do you have an idea,

4  generally, how many people service the -- the Google

5  noncomputer customers, like the Online customers?

6       A.   How many people?

7       Q.   I'm sorry.  Bad question.  Hunger.

8            Do you know how many people within Google

9  service the customers, the publishers, who are Direct

10  publishers?

11      A.   Who are Direct publishers?  I don't really

12  know.

13      Q.   Okay.  But you said it's -- there's

14  something -- about a hundred customers now, right?

15      A.   A couple hundred customers.

16      Q.   Okay.  And what -- the Direct sales force team

17  currently serves a hundred customers; is that correct?

18      A.   Yes.  There's a Direct sales team that manages

19  those couple hundred customers.

20      Q.   And you said it wasn't feasible for the -- for

21  Google to handle a million customers directly; is that

22  right?

23      A.   That's right.

24      Q.   With the hundred people, right?

25           Could Google hire more people to service more

1  people directly?

2      A.   We would have -- we would have to hire more

3  people to do that, that's right.

4      Q.   Could it be handled, the million or more, with

5  the current number of Direct people?

6      A.   No.

7                  MR. DEFRANCO:  That's it.  Thank you.

8                  MR. TRIBBLE:  No questions, Your Honor.

9                  THE COURT:  May this witness be excused?

10                  MR. DEFRANCO:  Yes, Your Honor.  Thank

11  you.

12                  THE COURT:  All right.  You may step

13  down.  If you'd just leave this stuff up there, someone

14  will take care of it.

15                  THE WITNESS:  Okay.  Thank you.

16                  THE COURT:  Call your next witness.

17                  MR. DEFRANCO:  Your Honor, we're going

18  to -- that was the last Google witness.  We're now going

19  to talk to prior art witnesses, and the first is Karen

20  Delfau.

21                  THE COURT:  It's a live witness or --

22                  MR. DEFRANCO:  Yes, Your Honor.

23                  COURTROOM DEPUTY:  Raise your right hand,

24  please.

25                  (Witness sworn.)

1          THE COURT:  If you'll speak into the

2 microphone and keep your voice up for me, it will help.

3          Also, don't talk too quickly, because

4 she'll have a difficult time taking down your answers,

5 okay?

6          THE WITNESS:  Yes.

7          THE COURT:  Proceed.

8          MR. DEFRANCO:  Thank you, Your Honor.

9          KAREN DELFAU, DEFENDANT'S WITNESS, SWORN

10                  DIRECT EXAMINATION

11 BY MR. DEFRANCO:

12     Q.    Would you please state your full name for the

13 record?

14     A.    Karen Elaine Delfau.

15     Q.    You're going to need -- can you speak a little

16 bit more into the microphone?  I'm guilty of the same

17 thing, so...

18     A.    Okay.

19     Q.    And where do you currently work?

20     A.    I work at Google.

21     Q.    So there's no confusion, you're here to

22 testify about what product today, generally?

23     A.    The DoubleClick DART product.

24     Q.    Okay.  And how did you come to work at Google?

25     A.    Well, I worked at DoubleClick since February

1   of 1998, and DoubleClick was acquired by Google in March

2   of 2008, and I became a Google employee at that time.

3       Q.   Okay.  And are you aware, just very generally,

4   that one of the issues in this case is whether the

5   DoubleClick system is prior art to the patents at issue?

6       A.   Yes, vaguely aware of that.

7       Q.   Well, have you ever -- have you ever read the

8   patents?

9       A.   I have not.

10      Q.   Okay.  Well, we want to ask you about

11  DoubleClick, so let's just get a little background on

12  the record.

13           If you wouldn't mind just telling us, we ask

14  everyone, your educational background, please.

15      A.   Okay.  So I went to the United States of

16  California at San Diego where I was a chemistry major

17  for three years, and then I decided chemistry wasn't for

18  me, so I ended up graduating with a bachelor's in

19  communications and a minor in chemistry and a minor in

20  writing.

21           And then I went to the American University of

22  Paris where I got a graduate certificate in technical

23  writing.

24      Q.   Okay.  And why don't you just -- briefly just

25  walk through your employment background generally for

1  us.

2      A.   So after the American University, I had an

3  internship and was a technical writer at a small firm

4  in -- just outside of Paris.  I moved -- called Morpho

5  Systems.

6          I moved to another company called Bull/Zenith

7  Data Systems and was, again, a technical writer.

8          After about 18 months, I changed jobs and went

9  to a small French company that worked in financial risk

10 management, and I was a technical writer and then

11 managed a group of technical writers and then began

12 working on training materials.

13         So then we were purchased by Reuters, and they

14 sent me to New York when they purchased another company

15 and asked me to, basically, do the same thing, create a

16 documentation team and training program.

17     Q.   Okay.  And at some point, did you join

18 DoubleClick?

19     A.   And after about a year -- two years in New

20 York at Reuters, I joined DoubleClick.

21     Q.   And what did you do when you first joined the

22 company?  What was your job title, if you remember?

23 What were your responsibilities, please?

24     A.   So I was hired as -- in client relations, and

25 the responsibility was to build a training program for

1  DoubleClick clients.

2      I quickly realized that we needed training

3  materials, user documentation, and that I couldn't do it

4  all, so I began hiring a team of both technical writers

5  and trainers to do that.

6      Q.   And what -- what type of -- what types of user

7  -- what are user manuals used for?

8      A.   They're -- they're just guides or information

9  that we give to clients to show them how to use our

10 products.

11     Q.   And you -- did you mention technical

12 documents?  Is that different from user manuals or --

13     A.   We did a little bit of both.  We did some kind

14 of overview and concepts documents that were for our

15 engineers that explained the complex algorithms.  I

16 hired somebody to do that.  The majority of our work was

17 focused on user documentation.

18     Q.   Okay.  You don't have a -- I apologize, if you

19 said this.  Do you have any kind of software degree?

20     A.   I don't.

21     Q.   It's in a different area of science?

22     A.   Yes.  It was in chemistry.

23     Q.   Okay.  Do -- but, generally, in the work that

24 you do, user manuals, technical documents, do you have

25 to have a technical understanding of the systems you

deal with?

A. Yes. The way I usually talk about it is, it's almost like you're a translator talking to the engineers technically and then communicating that to a layperson in a way they can understand the information.

Q. Okay. And tell -- tell us, as best you can, what business was DoubleClick in at the time you joined the company back in '98?

A. In internet advertising.

Q. Was that your first experience in that area?

A. Yes, it was.

Q. And tell us a little bit -- give us just a little bit more detail about DoubleClick's internet advertising business at the time you joined the company.

A. Well, when I joined the company, the primary focus was the DoubleClick media network. And that was a company that used technology to help advertisers run ad campaigns on publisher websites.

As I joined -- I joined to be part of a new division, which was selling that DART technology to other publishers so that they could create their own AdNetworks.

Q. Okay. Let -- let's get some -- let's get some terms down, because we're going to -- we're going to talk about these systems, and I think we'll use your

1   terms, but they're not familiar to many of us.

2         What -- what does DART stand for?

3      A.   Dynamic Advertising Reporting and Targeting.

4      Q.   And is there a term known as DFA?

5      A.   Yes.

6      Q.   And what's DFA?

7      A.   DART for Advertisers.

8      Q.   And -- and is there DFP?  What's DFP?

9      A.   DART for Publishers.

10     Q.   And what was -- when you say DART, D-A-R-T --

11  right -- you said it's Dynamic Advertising Reporting and

12  Targeting?  What did that do?

13     A.   Well, the DART system was the technology

14  behind our ability to sell and manage online advertising

15  campaigns to serve ads, to report on how ads were

16  served, to target ads.

17     Q.   And was that system located within -- well,

18  where was it?  Was it at DoubleClick?  Was it someplace

19  else?

20     A.   Well, we -- I mean, the system is run from a

21  data center.  You know, we grew from one data center to

22  many data centers.  It's a redundant distributed system.

23     Q.   And where do -- where do the advertisements

24  that are in that part of the system, where did they come

25  from?

     A.   Well, when advertisements are entered into the
application, they're stored in the DART production
database.

     Q.   And where do -- and where do advertisements go
from that system?

     A.   Well, they get served on publisher websites.

     Q.   And what -- what interface or part of the
system is used to get advertisements into the
DoubleClick system?

     A.   So both DART for Advertisers and DART for
Publishers have a graphical user interface that the --
our clients would use to describe the ad, to enter
information about the ad, targeting criteria, where the
ad was -- sorry -- to be served, what time of day, what
day of week, how you wanted it to look, all kinds of
information about the campaign start and end dates.

     Q.   And -- well, can you give us -- let's talk
about examples to make this clear.

          Can you give us an example of somebody that
would want to use -- let's start with the DART for
Publisher piece.  Can you give us an example of that?

     A.   Sure.

          So an example of a publisher would be CNN.
And just like a newspaper, CNN would need to run
advertisements to run their business.

1    And so CNN would have a sales force that would

2 go out and make deals with advertisers and then book

3 their ads and have ads served to the user's browser when

4 the user was on the CNN website.

5    Q.   And give us an example of somebody who had

6 used the DFA part.

7    A.   So a good example is like General Motors would

8 want to run campaigns across many sites on the internet.

9 And so GM might have multiple campaigns -- one campaign

10 and multiple ads, and they would want to run an ad on

11 maybe cars.com; they could run on CNN; they could run an

12 ad on Kelley Blue Book, basically, any site on the

13 internet.

14    Q.   And D-A-R-T, did that relate to the other two

15 pieces that -- in the examples you just described?

16    A.   Well, DART is the underlying technology of the

17 application.

18    Q.   Okay.  And we're going to get into this -- in

19 this in more detail, but do you remember generally when

20 DFA was first used by people outside of DoubleClick?

21    A.   So I started in February -- early February of

22 1998, and one of the -- kind of first things I did in

23 the first couple of months was to start learning DFA.

24 We were just in the process of rolling that out, so it

25 was the spring of '98.

1    Q.   When was -- when was the -- I think I started

2 with DFA.  When was DFP first available?

3    A.   Well -- so the technology was available in

4 1996 when the company was founded.  And they began

5 licensing DFP to clients in the fall of 1997.  The first

6 company was Wall Street Journal, who wanted to use the

7 software on their own.

8    Q.   Okay.  Let's -- let's talk about some

9 documents.

10          MR. DEFRANCO:  Let's put up on the

11 screen, please, Exhibit 596.

12    Q.   (By Mr. DeFranco) You'll have one in your

13 binder, if you see it.  You should be able to see it on

14 the screen, and, hopefully, that will help.

15          Would you tell us, please, what this document

16 is?

17    A.   This is training material for DART for

18 Advertisers' clients.

19    Q.   And there's a -- there's a date, I think,

20 right here.

21          MR. DEFRANCO:  If we could scroll -- can

22 you blow that out?

23    Q.   (By Mr. DeFranco) Can you see that date?

24    A.   Yes.

25    Q.   And can you read that to us, please?

1            MR. NELSON:  Do you have copy of the

2 documents?

3            MR. DEFRANCO:  Oh, I'm sorry.  I

4 apologize.

5            Your Honor, may I approach the witness?

6            THE COURT:  Yes.

7            MR. DEFRANCO:  It's 596.

8      Q.   (By Mr. DeFranco) Okay.  Have you seen this

9 before?

10     A.   Yes.

11  And I'm sorry.  I cut you off.  You were telling us the

12 date of the document?

13     A.   June, July of 1998 is when the document was

14 created.

15     Q.   Okay.  Let's talk about some of the

16 information that's in the document.

17            MR. DEFRANCO:  Turn to the second page,

18 the bottom half of -- let's see, I'm going to look

19 for -- Charles, can you put up the document number

20 again?

21            Let's look at Page No. 40241 of

22 Exhibit 596.

23     Q.   (By Mr. DeFranco) Okay.  There's a -- there's

24 a chart there.  It talks about -- do you see it says:

25 Concepts of the DFA network?

1      A.    Yes.

2      Q.    How to set up and manage ad campaigns using

3 the DFA network.

4            Targeting capabilities, do you remember what

5 that was about?

6      A.    Well, targeting capabilities are the different

7 properties you set for an ad that is the way that the ad

8 is served.

9            So I mentioned before, you can target an ad to

10 run only on a specific day of the week, time of day,

11 only to users who have a McIntosh or who have a PC, to

12 specific websites.  There's -- there's a very long list

13 that is listed later in this document --

14     Q.    Okay.

15     A.    -- of all the targeting capabilities.

16     Q.    Okay.

17            MR. DEFRANCO:  Charles, next page,

18 please, the bottom half of the document.

19     Q.    (By Mr. DeFranco) There's a business model

20 architecture there.

21            Do you see that?

22     A.    Yes.

23     Q.    Can you tell us what that shows, please?

24     A.    This is kind of a very high-level overview of

25 kind of how DFA works.

1        So it shows -- if you start with the little

2    user on the computer, that's the user who goes to the

3    site, and it looks like it's www.clubtours.com.

4        So when you go enter a URL to a site, the

5    site -- the browser calls the site's web server to load

6    the page.  On that page, there are html ads, which are

7    represented by this ad banner, that calls the DFA ad

8    servers, which in turn serve the ad that you see there.

9        Q.   Okay.

10            MR. DEFRANCO:  Let's turn to the next

11    slide, please.

12            And the top -- Charles, would you please

13    expand the top, please?

14        Q.   (By Mr. DeFranco) We've talked -- I'll tell

15    you -- I'll try to get this straight.

16        We've been talking in this case about

17    different pieces of -- of Google's system.  I don't want

18    to get into Google's system with you, but talking about

19    advertisers on one end and publishers on one side.

20        A.   Uh-huh.

21        Q.   Can you tell us, on this slide, are those two

22    parties discussed here?

23        A.   So the advertiser, you see that there's a

24    definition of that, a client who runs or buys campaigns.

25    A publisher is the person or business entity running the

1  site.

2        So that is a reference to a publisher.

3    Q.   And it talks about ad placement.

4        Do you see that?

5    A.   Yes.

6    Q.   What was -- what was that describing?

7    A.   That's what we generally refer to in shorthand

8  as an ad and all of the information about the ad, the

9  dates, times, targeting, et cetera.

10   Q.   Okay.

11        MR. DEFRANCO:  Let's keep going, please.

12 Let's move to Document No. 44.  I'm going to skip a

13 page, Page 5.

14   Q.   (By Mr. DeFranco) There's a chart down at the

15 bottom that says the DFA process.

16   A.   Yes.

17   Q.   And it's got a number of steps there.

18   A.   Yes.

19   Q.   What are those steps -- who are those steps

20 for?  Those are for the advertiser or the publisher?

21   A.   This is for the advertiser.  The intent here

22 is just to give the person in training an overview of

23 the -- of the process involved in getting DFA to start

24 serving ad -- your ads.

25   Q.   Okay.  And can you just, in a couple of

1  sentences -- I don't want to belabor the point -- just

2  walk through those steps with us?  Is that okay?  Can

3  you -- can you do that?

4      A.    Sure.  Yeah.  Yeah.  Very clear.

5            I mean, this is really the steps that the --

6  the advertiser works with the sales engineer to set up

7  their system to -- to use DFA.

8      Q.    Is that initially when they want to --

9      A.    It's a one-time thing, right.

10     Q.    Yeah.

11     A.    Then the media buyer goes and buys advertising

12  space from publishers on publisher websites.

13           Then they hand off information to a

14  trafficker, and the trafficker is the person at the

15  advertiser who actually enters the information about the

16  ad, the targeting criteria, the properties, all those

17  things I've been referring to.

18           And then DFA generates the html tags that the

19  trafficker then sends to those websites where the ad is

20  running or it's targeted to.

21     Q.    Okay.

22           MR. DEFRANCO:  Let's -- let's move ahead

23  a couple of pages, No. 7 in this document.

24     Q.    (By Mr. DeFranco) And at the bottom half of

25  the page, there's something called -- I think it's

1  called create advertiser --

2      A.   Yes.

3      Q.   -- at the top?

4           Do you see that?

5      A.   Yes.

6      Q.   What is that menu showing?

7      A.   So that's part of the one-time setup that I

8  mentioned.  This is where the DART sales engineer would

9  work with the -- probably the technical person at the

10 advertiser to, you know, enter basic information about

11 the advertiser.

12     Q.   All right.

13          MR. DEFRANCO:  Let's turn to Page 10,

14 please, of this document at the top.

15     Q.   (By Mr. DeFranco) It talks about rich media.

16 What is rich media?

17     A.   I'm sorry.  Where are you?

18     Q.   Let me slow down.  It's Page 10 --

19     A.   No.  I don't know which page.

20     Q.   -- at the top.  It's got two bullet points,

21 actually, browsers and banners, rich media.

22          Do you see that?

23     A.   Oh, yes.  Sorry.

24     Q.   What -- what are those two bullet points

25 referring to?

1    A.   So this talks -- sorry.  I need a little

2  context here.  Just a second.

3           (Witness reviews document.)

4           So this is explaining the various fields on

5  the create advertiser page that you just referred to,

6  and it kind of gives some information about each field

7  and the type of information that should be put in there.

8    Q.   Are there -- are there different types of

9  advertisements that the DFA system could handle?

10   A.   Yes.

11   Q.   What are those types?

12   A.   There's the standard image ads.  There's

13 animated -- which are GIFS or JPEGS.  There's animated

14 images, which are kind of rotating or looping images.

15 There is a wide variety of rich media, which is anything

16 from an html text ad to a CGI to Shockwave, JavaScript,

17 more sophisticated type of ads.  There's simple text

18 ads.

19   Q.   Okay.

20   A.   That's about it.

21   Q.   Just give -- give us a little simpler

22 understanding of what an image ad is.

23   A.   It's just an image.

24   Q.   That was good.  Yeah.

25           So image versus text, how do they differ?

1    A.   Well, text is just simply words.  An image is,

2    you know, like any image.  It can be anything from a

3    photograph to a picture.

4    Q.   Okay.  And if -- if a user of the DFA system

5    wanted to put in a text ad, is there a place in this

6    document where it's shown how that works?

7    A.   Yes.  There's -- there's several ways to do

8    it, but --

9    Q.   Well, I don't want to miss anything.

10   A.   Okay.

11   Q.   Is there a first way?

12   A.   There is a first way.

13        So one of the ways of doing that --

14   Q.   Is there -- let me just cut you off to save

15   time.

16        Is there an interface in here they can use?

17   A.   Yes.

18   Q.   All right.  Why don't we jump to that.

19   A.   So I don't know the page offhand.  It's in the

20   general properties, ad properties page.

21   Q.   I've got it down -- what's shown on Page 12?

22   I have a tab on Page 12 in my binder.  I thought that

23   was it, but maybe I'm wrong.

24        Can you turn to Page 12 at the top?

25   A.   I don't know what page you're referring to.

1    Okay.  Sorry, sorry, sorry.

2         Q.    Do you know what's shown there?

3         A.    Yes.  That is the parameters that you would

4    set at the site level to indicate how the site receives

5    and displays any kind of rich media or html.

6         Q.    Okay.  So to be clear, is this at the

7    advertisers' side or the publishers' side?

8         A.    So this is on the advertisers' side.  And the

9    site would give the advertiser that information.

10             So you see the note that site technical

11   specifications will be set to default unless otherwise

12   addressed with your sales engineer.

13        Q.    Okay.  And you talked about -- about text that

14   could be used as an ad.  Could text be put in here as an

15   ad?

16        A.    No.  This is -- these are the headers and

17   footers that go and surround the text ad --

18        Q.    Okay.

19        A.    -- when the ad's delivered.  So it's part of

20   that dynamic generation of the ad.

21        Q.    Okay.  And where would -- where would the user

22   put in text if they wanted to put in a text ad?

23        A.    You could do that on the ad properties page.

24        Q.    Okay.  Is that what you're looking for?

25        A.    Yeah.

1      Q.   All right.  Well, let me -- sorry for that

2  diversion, but that was helpful.

3           If you -- is that -- is the properties page

4  shown in here; do you know?

5      A.   It is.

6      Q.   Okay.

7      A.   I can't find it.

8      Q.   Okay.  We'll come back to that.  It may be in

9  another document.  I'll take a look for it.

10     A.   It's here.  It's here.  Okay.

11     Q.   There's -- if you look at -- we're going to --

12 we're going to go to another exhibit in a little bit,

13 but let's turn to -- there's something in your binder

14 called 594?

15     A.   Uh-huh.

16     Q.   And at the bottom, it's 209, is the number.

17 Is that the ads property page?

18     A.   Yes.

19     Q.   Okay.  Why don't -- why don't you tell us

20 what -- what that page is about.

21     A.   So this is where I mentioned you set the

22 general properties of an ad.

23     Q.   When you say you?

24     A.   Sorry.  A trafficker.

25     Q.   Or --

1    A.    An advertiser.  So it's the --

2    Q.    Okay.  Can you walk us through this a little

3  bit?

4    A.    Yeah.

5         So the -- the way this worked was, there was a

6  section called General Properties.  If you see all the

7  way over to the very right, there's a link that says:

8  Set guarantee properties.

9         So you would click that, and you would have a

10  form to fill out with the name of the ad, after

11  click-through, URL, banner size, and so on.  And so a

12  variety of properties.

13        And then I think on the next page or two pages

14  later, there's the rest of the pages shown.

15    Q.    And is there a place where text could be put

16  in?

17    A.    Yes.

18    Q.    Where -- where would -- did you point that

19  out?  Where would that be?

20    A.    So it's very small.  I can't see it.  It's

21  called -- it's such a bad copy.  It's called either ad

22  html or it's called rich media.

23        And the reason that I don't know which one it

24  is, is because that was part of a change in terminology

25  that happened in kind of -- probably late '98, beginning

1  of '99.  I think probably '98, we just -- we changed the

2  name of that field.

3         But you just click that and open a form and

4  enter the text.

5     Q.   Now, this document -- the first document that

6  we looked at, which had some dates on the front, can you

7  go back and remind us of the dating convention that you

8  were using at the time at DoubleClick?

9     A.   This document or the previous one?

10    Q.   The 596, that document.

11    A.   So one of the conventions we used for training

12  materials was the creation date.  So that was the June,

13  July 1998.

14         And then that second date was 12/13/99.  And

15  so that was when the document was printed to be used in

16  a training class.

17    Q.   That -- this version or --

18    A.   Yes.

19    Q.   Okay.  And generally -- and when did you get

20  to DoubleClick?

21    A.   In February of '98.

22    Q.   Okay.  The features we went over in this

23  document, do you remember dealing with those features in

24  the -- in the June, July '98 timeframe.

25    A.   Yes.

1    Q.   And let's go to a different exhibit for a

2 moment.

3              MR. DEFRANCO:  It's DX671.

4    Q.   (By Mr. DeFranco) Are you with me?

5    A.   Yes.

6    Q.   Okay.  Now, can you tell us what this page is?

7    A.   So this is the ad properties page for DART for

8 Publishers.

9    Q.   Okay.  And this is a little bit easier to read

10 than the other copy we looked at, I think.

11    A.   Yeah.

12    Q.   And, again, can you remind us, what different

13 kinds of ads could DoubleClick serve?

14    A.   I mean, really it was kind of up to the

15 imagination of the client.  For the most part, we served

16 standard image ads, animated images, any kind of rich

17 media, which is anything from html to Shockwave to video

18 and standard text.

19    Q.   Did -- did customers, advertisers actually use

20 standard text ads back when you joined DoubleClick?

21    A.   Yeah, some did.

22    Q.   Were image ads or text ads -- was one or the

23 other more prevalent in the internet at that time?

24    A.   Well, I don't know about in the internet, but,

25 you know, that was one of the things that we did, is

1  allow clients to do both, depending on what their needs

2  were, image ads or text ads.

3          MR. DEFRANCO:  Now, let's turn to another

4  document Exhibit 373.

5      Q.   (By Mr. DeFranco) Have you seen that document

6  before?

7      A.   I don't know if I have a tab.

8      Q.   It's a tab -- I'm sorry.  It's Tab 373.

9      A.   I don't think I have --

10     Q.   It's a different document in your binder.

11     A.   Oh.

12     Q.   Okay.  Have you seen this before?

13     A.   Yes, I have.

14     Q.   Is this something that was prepared by people

15  who worked for you or with you at DoubleClick?

16     A.   Yes.

17     Q.   And was this a -- did this document exist back

18  in 1998; do you know?

19     A.   Yeah.  That's when we started writing those --

20  all the documents for the DART for Advertisers products.

21          MR. DEFRANCO:  And let's turn to Page

22  4610, is one I want to take you to.

23     Q.   (By Mr. DeFranco) Can you tell us generally

24  what's shown on that page?

25          And we use -- we use the term -- I know you

1  use traffickers, and I'm not trying to correct you, but,

2  you know, that's the term we understand here.

3           If you can use advertisers --

4       A.   Okay.

5       Q.   -- when it is an advertiser, that would be --

6  make it easier.

7           But can you describe, generally, what's shown

8  on this page?

9       A.   So this is the process that the advertiser

10 takes to enter a campaign into DART for Advertisers.  It

11 starts with, you know, log in to DART for advertisers.

12 There's the one-time setup that's shown here, creating

13 buys, indicating which sites that the ad is running or

14 targeted to, and then talking about all of the ad

15 properties that the advertiser would enter about the ad.

16      Q.   Okay.

17           MR. DEFRANCO:  And let's go to 4623.

18      Q.   (By Mr. DeFranco) And what does this -- what

19 does this page describe?

20      A.   This is the step-by-step procedure that the

21 advertiser follows, first, to declare the buy.  So what

22 was purchased, what kind of advertising was purchased on

23 which sites.

24      Q.   Now, it's got some -- in Box 5, I want to

25 point you to something that says CLK command.

1          Do you see that?

2     A.   Yes.

3     Q.   What does that refer to?

4     A.   So that's the click command.

5     Q.   And what's a click command?

6     A.   Well, that's a means that you have of tracking

7 clicks on text ads.

8     Q.   We saw something before, a term html.  Are you

9 familiar with html?

10     A.   Well, yes.

11     Q.   What is html?

12     A.   Html is a simple markup language that's used

13 to display text or pages on the internet.

14     Q.   Can you -- can you give us an example of that?

15 If I have text, and I'm using html, how do the two

16 relate?

17     A.   Well, you can use html to change how the text

18 looks, to change the font, to change the color of the

19 font, to put a box around it.

20     Q.   When using DoubleClick, do you remember, did

21 an -- did an advertiser have to use html code?

22     A.   No.

23          MR. DEFRANCO:  Let's turn to Page 625.

24          THE COURT:  Mr. DeFranco, it's -- we're

25 at the noon hour now, and we're going to break, take a

1  lunch recess.

2            Ladies and Gentlemen, take an hour and 15

3  minutes.  Have a nice lunch.

4            Remember my prior instructions, and don't

5  talk about the case.

6            COURT SECURITY OFFICER:  All rise.

7            (Jury out.)

8            THE COURT:  All right.  Court will be in

9  recess until 1:15.

10            (Recess.)

11            *      *      *      *      *

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>CERTIFICATION</u>

I HEREBY CERTIFY that the foregoing is a true and correct transcript from the stenographic notes of the proceedings in the above-entitled matter to the best of my ability.


/s/_____                    _____
SUSAN SIMMONS, CSR                            Date
Official Court Reporter
State of Texas No.:  267
Expiration Date:  12/31/10




/s/_____                      _____
SHELLY HOLMES, CSR                            Date
Deputy Official Court Reporter
State of Texas No.:  7804
Expiration Date  12/31/10