```
 1          IN THE UNITED STATES DISTRICT COURT
          FOR THE EASTERN DISTRICT OF TEXAS
 2                 MARSHALL DIVISION

 3  FUNCTION MEDIA, LLC          *    Civil Docket No.
                                 *    2:07-CV-279
 4  VS.                          *    Marshall, Texas
                                 *
 5                               *    January 25, 2010
    GOOGLE, INC.                 *    1:15 P.M.

 6
                    TRANSCRIPT OF JURY TRIAL
 7         BEFORE THE HONORABLE CHAD EVERINGHAM
                UNITED STATES MAGISTRATE JUDGE
 8

 9  APPEARANCES:

10  FOR THE PLAINTIFFS:     MR. MAX TRIBBLE
                            MR. JOSEPH GRINSTEIN
11                           Susman Godfrey
                            1000 Louisiana Street
12                          Suite 5100
                            Houston, TX   77002
13                          MR. JUSTIN NELSON
                            Susman Godfrey
14                          1201 Third Avenue
                            Suite 3800
15                          Seattle, WA   98101
                            MR. JEREMY BRANDON
16                          Susman Godfrey
                            901 Main Street
17                          Suite 5100
                            Dallas, TX   75202
18                          MR. ROBERT PARKER
                            Parker, Bunt & Ainsworth
19                          100 East Ferguson
                            Suite 1114
20                          Tyler, TX   75702

21  APPEARANCES CONTINUED ON NEXT PAGE:

22  COURT REPORTERS:        MS. SUSAN SIMMONS, CSR
                            MS. SHELLY HOLMES, CSR
23                          Official Court Reporters
                            100 East Houston, Suite 125
24                          Marshall, TX   75670
                            903/935-3868
25  (Proceedings recorded by mechanical stenography,
    transcript produced on CAT system.)
```

APPEARANCES CONTINUED:


FOR THE DEFENDANTS:     MR. CHARLES VERHOEVEN
                        MS. AMY CANDIDO
                        Quinn Emanuel
                        50 California Street
                        22nd Floor
                        San Francisco, CA   94111

                        MR. EDWARD DEFRANCO
                        Quinn Emanuel
                        51 Madison Avenue
                        22nd Floor
                        New York, NY   10010

                        MR. HARRY L. GILLAM
                        Gillam & Smith
                        303 South Washington Avenue
                        Marshall, TX   75670

                    P R O C E E D I N G S


                COURT SECURITY OFFICER:  All rise.

                (Jury in.)

                THE COURT:  Please be seated.

                All right.  Let's continue.

MARK LANNING, DEFENDANT'S WITNESS, PREVIOUSLY SWORN

                CROSS-EXAMINATION (CONTINUED)

BY MR. GRINSTEIN:

     Q.   Good afternoon, Mr. Lanning.

     A.   Good afternoon.

     Q.   You're feeling better, right?

     A.   Yes.

     Q.   And, again, if you need to stop for any

1    reason, take some water, just let me know.

2         A.   Okay.  Thanks.

3         Q.   When we broke, I was asking you some questions

4    about the website that you've got, tlranch.com; is that

5    right?

6         A.   Yes, sir.

7         Q.   And you mentioned that on your website you run

8    some -- you had some AdSense ads, right?

9         A.   I made a modification so that I'd be an

10   AdSense publisher, yes.

11        Q.   And so if somebody was -- the people who were

12   out there on the internet, if they wanted to see those

13   ads that were being run by AdSense with respect to your

14   website, they would surf to your website, right?

15        A.   No, sir.  I wouldn't agree with that.

16        Q.   Well, how would I get to see the tlranch.com

17   AdSense ads if I didn't go to tlranch.com?

18        A.   Well, you asked the question if they wanted to

19   see the ads with my site.  They don't get to choose what

20   ads come to my site.  My site -- I send my information

21   for my site, and then Google displays the information on

22   my web page.

23        Q.   My question was simply, if web surfers wanted

24   to see AdSense ads at your site, they would have to type

25   tlranch.com, or something like that, into the browser

1  and go to your site.

2          That's fair, right?

3     A.   No, I wouldn't describe it that way either.

4     Q.   I mean, Google doesn't just randomly send ads

5  to people on the internet, does it?

6     A.   It sends ads based on the content of what the

7  user has seen.

8     Q.   Right.  But it's not random.  I mean, a web

9  surfer has got to go to a website that is associated

10 with an AdSense in order to get an AdSense ad, right?

11    A.   AdSense ads are displayed on different web

12 pages associated with different websites based on the

13 content and what a person is viewing.

14    Q.   But those websites are associated with

15 AdSense, right?

16    A.   Yes.  As far as providing ads, yes.

17    Q.   I mean, if I go to whitehouse.gov, I'm

18 probably not going to see a Google AdSense ad, right?

19    A.   I kind of doubt it, but I don't know for sure.

20    Q.   Right.  So those AdSense websites are there

21 for making the Google ads available to web surfers,

22 right?

23    A.   No.  They're not making them available to web

24 servers.

25    Q.   Well, you wouldn't see the ads unless you went

1  to the website, right?

2      A.  You wouldn't see the ad until your browser

3  rendered my page.

4      Q.  Having gone --

5      A.  But it has nothing to do with my web server.

6      Q.  I'm not asking about your web server.

7          I'm saying, unless somebody typed tlranch.com

8  into their browser, they wouldn't go and see -- they

9  wouldn't see your AdSense ads, right?

10     A.  After they typed T.L. Ranch, they would see my

11 website content and AdSense ads on my page, yes.

12     Q.  So T.L. Ranch was making those ads available

13 to web surfers, right?

14     A.  No, sir, not at all.

15     Q.  Let's talk about validity for a second.

16         You understand that the Function Media patents

17 are presumed valid, right?

18     A.  Yes, that's correct.

19     Q.  And that the burden is on Google to invalidate

20 them, correct?

21     A.  Yes, that's correct.

22     Q.  And you also understand that Google has that

23 burden by clear and convincing evidence, correct?

24     A.  Yes, sir.

25     Q.  Now, we've heard some testimony in this case,

and I don't know if you heard it yourself, but are you
aware that there's been testimony in this case that
AdSense was an idea that had been around Google from
before 2002?  Did you hear any of that testimony?

    A.   I don't believe I did.

    Q.   Well, just to be clear, the opinions you've
offered today, you have not claimed that any Google
product comes before the Function Media patents and
anticipates them, have you?

    A.   No, sir.

    Q.   You have not claimed that any Google product
comes before the Function Media patents and renders them
obvious, correct?

    A.   That's correct.

    Q.   Let's talk about the AdForce reference.  And
the first thing I want to do is remind ourselves of the
language of the claims.

         So can we see language of the claims?

         Among other things, the claims talk about
presentation rules, right?

    A.   Yes.

    Q.   So for AdForce to anticipate the claim, it's
got to have presentation rules, right?

    A.   That's a pretty vague statement, but there are
presentation rules required, yes.

1    Q.   Well, if it doesn't have presentation rules,

2 it doesn't anticipate, right?

3    A.   That's correct.

4    Q.   Okay.  And in your slides today, one of the

5 presentation rules about AdForce that you identified

6 that could be entered by an internet media venue, was

7 background color; is that correct?

8    A.   That's correct.

9    Q.   And just to be clear, we talked a lot about

10 background color, but I'm not sure it's totally clear.

11    I've got an ad up here, eat at Joe's, and, you

12 know, this is my ad right here.  The background color is

13 pink; is that fair?

14    A.   Whatever that color is.  I don't know whether

15 it's pink or if I think it's more purple.

16    Q.   Fuchsia, maybe.  I don't know.  But that's the

17 background color, right?

18    A.   Yes.

19    Q.   Okay.  Now, in the AdForce system, advertisers

20 could also enter preferences for background color; isn't

21 that correct?

22    A.   I'm trying to recall.  I don't recall that.

23    Q.   Well, look in your book at Defendant's Exhibit

24 405, which it should be up there at your table.

25    A.   Are we finished with this binder, or do you

1  want me to set it aside?

2      Q.   405 is in the binder.  Sorry.

3      A.   Oh, sorry.

4      Q.   No. 405, sir.  DX405.

5      A.   Okay.  I see it.  I'm there.

6      Q.   And that's a document that's entitled:

7  Guidelines for Creating and Submitting Creatives, right?

8      A.   Yes, it is.

9      Q.   This is one of the AdForce documents on which

10 you relied, right?

11     A.   Yes, it is.

12     Q.   And this is a document that is written to an

13 audience of advertisers to tell them about how to create

14 ads for AdForce, right?

15     A.   Yes, it is.

16     Q.   Turn with me, if you will, to Page 8122 in the

17 lower right corner.

18     A.   Okay.

19     Q.   And in this document talking to advertisers,

20 there's this mention that they can insert to HTML code

21 with respect to BG color, right?  Background color?

22     A.   Where?

23     Q.   You see that highlighted?

24     A.   Yes, I do.

25     Q.   They also even could get the color -- put in

some preferences for the colored fonts, right?

    A.   Yes, they can.

    Q.   All right.  So it's fair to say that in the AdForce system, both the advertisers and the publishers could enter preferences for background color, right?

    A.   Yes.  That's -- I would agree with that.

    Q.   All right.  Let's go back to the claim language.

        Now, this bottom claim -- I'm sorry -- the bottom element of Claim 1 talks about the word processing, right?

    A.   It has the word processing, yes.

    Q.   And so in order for AdForce to anticipate the Function Media patents, AdForce has to meet this element of processing, correct?

    A.   Yes.  It has to meet that element, which includes processing as part of that element, yes.

    Q.   Sure.  And the Court has defined processing or the clause with processing in it; is that correct?

    A.   Yes, they have.

    Q.   Let's look at that definition.  I think we looked at it earlier.

        It talks about executing some operations upon the customized electronic advertisement to make it comply with the presentation rules of the internet media

1 venues.

2          You see that, right?

3     A.    Yes, I do.

4     Q.    It doesn't say to make it comply with the

5 presentation rules of the sellers, right?

6     A.    That's correct.

7     Q.    So what has to be complied with is the website

8 publisher rules, right?

9     A.    The presentation rules, yes.

10    Q.    Okay.  Now, let's talk about the AdForce

11 system.  That means that if an advertiser had entered a

12 preference for a white background color and a publisher

13 had entered a preference for a blue background color, in

14 order to process that and make it comply with the

15 publisher's presentation rules, AdForce would have to

16 render that ad in blue, right?

17    A.    Yes.  That would -- when you say render it,

18 the background color would need to be blue, if that's

19 what you mean by render.

20    Q.    Right.

21          Okay.  So, Mr. Lanning, don't you think that

22 if AdForce let advertisers enter background colors and

23 yet was going to override them with publisher colors,

24 the AdForce documentation would have warned advertisers

25 that that could happen?

1          A.    No, not at all.

2          Q.    DX405, the document you've got in front of you

3     right there, tells advertisers how to enter ads, right?

4          A.    Yes, it does.

5          Q.    Nowhere in there does it warn them that you

6     can put in these color preferences, these background

7     color preferences, but by the way, the AdForce system is

8     going to override them with a publisher preference.

9              Does it say that?

10         A.    No, it doesn't say that.

11         Q.    Let's take a look at the AdForce users manual,

12    which is Defendant's Exhibit 403.  And I'd like to look

13    at Page 5527.

14         A.    Okay.  I'm there.

15         Q.    And there's a statement here that says:  The

16    AdForce software is automated to receive advertisements

17    from advertisers and deliver them to websites.

18             Did I read that correctly?

19         A.    Yes, that's correct.

20         Q.    It doesn't say, does it, the AdForce software

21    is automated to receive advertisements from advertisers,

22    format them to website rules, and deliver them to

23    websites?

24             It does not say that, does it?

25         A.    Not in this page, it does not, no.

1      Q.   Now, Mr. Lanning, let's assume that you're

2 right and let's assume that the AdForce system did

3 enforce a publisher's background color rule over an

4 advertiser's background color rule.

5           It's true that the AdForce system couldn't

6 handle text ads; isn't that right?

7      A.   No, that's not true.

8      Q.   How would it handle a text ad?

9      A.   Very briefly, by a user inputting HTML, where

10 H stands for hypertext, the name in the acronym itself

11 is for text ads.

12     Q.   Okay.  I want you to think about this example

13 for a second, Mr. Lanning.

14          Say you've got a publisher and they've input a

15 background color like you said they could in the AdForce

16 system and the background color was black.

17          Are you with me?

18     A.   Okay.

19     Q.   And, in fact, in the example you used this

20 morning, do you remember how you read the HTML and you

21 said, oh, that background color right there that AdForce

22 is talking about, that one is black?

23     A.   Yes, I do.

24     Q.   Do you remember that?

25     A.   Yes, I do.

1      Q.   So AdForce even provided an example of a

2  publisher using black, right?

3      A.   Yes.

4      Q.   Now, you've got your own website, right?

5      A.   Yes, I do.

6      Q.   We've talked about that.

7           MR. GRINSTEIN:  Can I see Defendant's

8  Demonstrative 157?

9      Q.   (By Mr. Grinstein) I see some text up at the

10 top of that website.  Do you see that?

11     A.   Yes, I do.

12     Q.   It's in a font, right?

13     A.   Yes, it is.

14     Q.   The font color is what?

15     A.   Black.

16     Q.   Okay.  Black is a pretty common font color on

17 the internet, isn't it?

18     A.   I would say so, yes.

19     Q.   A lot of the websites use black as font,

20 right?

21     A.   Yes.

22     Q.   Do you know what would happen if you took an

23 ad, applied a publisher's black background to an

24 advertiser's black font?  Do you know what it would look

25 like?

1    A.    For -- now, which system are we referring to?

2    Q.    AdForce.

3    A.    For AdForce that would be black on black, so

4    it would --

5    Q.    Look kind of like this, wouldn't it

6    (indicates)?

7    A.    No, it would not look like that.

8    Q.    Black on black.

9    A.    You just used the example for my website.  My

10   whole website wouldn't be black.  It would only be the

11   ads for the text where the ads are at.

12   Q.    I'm sorry.  I'm only attempting to depict what

13   an ad would look like.  I'm not talking about the rest

14   of the web page.

15         If you put black text on a black background

16   border -- a black background color, it would look just

17   like that, wouldn't it?

18   A.    For the area for the ad, it would be black

19   text with a black background, so, therefore, you

20   wouldn't see it.  It wouldn't be white.  It would be all

21   black.

22         So I disagree with what you're -- it wouldn't

23   look white; it would be all black.

24   Q.    Right.  And let's try another example.

25         Say, the publisher chose dark blue as the

background color and had black text.  That ad right
there actually says lose weight fast.

Can you see it?

A.   Yes, I can.

Q.   Not easy, though, is it?

A.   No.

Q.   Can't see it from back there; you can't see it
right here, can you?

A.   Not really, no, but I can see it on my
monitor.

Q.   You wouldn't have this problem with
legibility; you wouldn't have this problem without --
not being able to look at ads if, in the AdForce system,
what actually happened was advertiser's rules overrode
publisher's rules; isn't that right?

A.   No, you would have the same problem.  You
could have the same problem.

Q.   No, because then, isn't it true, Mr. Lanning,
that the advertiser could specify a white background
color and then black font, and the publisher's
preferences wouldn't mess up the ad?  Isn't that right?

A.   Now, are you asking me a hypothetical question
about AdForce?

Q.   I'm asking you a hypothetical question.

A.   Hypothetical question about AdForce, I guess

1  anything is true hypothetically.  An advertiser could

2  define a white background with black text.

3         If that's your question, then the answer is

4  yes, they could.

5      Q.   In your direct examination, you put up a slide

6  that said AdForce had served 1 billion ads per month.

7              MR. GRINSTEIN:  Could we see that slide?

8      Q.   (By Mr. Grinstein) Do you remember that slide?

9      A.   Yes, I do.

10     Q.   Do you really think an advertising system that

11 was that successful to serve 1 billion ads per month

12 would be programmed to serve ads that looked like that?

13     A.   If a publisher was silly enough to choose

14 black as their background color for the ad, that's what

15 would be published on that publisher's website.

16     Q.   Silly enough to follow the background color --

17 exact background color example that is provided in the

18 AdForce documentation; isn't that right, Mr. Lanning?

19     A.   Yes.  That's the way it would be if a

20 publisher chose -- chose it to be that way.

21     Q.   Do you think you've cited clear and convincing

22 evidence, Mr. Lanning, that the AdForce system applied

23 publisher's presentation rules?

24     A.   Yes, I do.

25     Q.   Isn't it more likely that the way the AdForce

1  system operated was that advertiser rules trumped

2  publisher rules so you would avoid situations like this?

3      A.   No, not -- not at all.  It's clear in the

4  manual that it doesn't work that way.

5      Q.   Isn't the only reason that publishers entered

6  background colors into the AdForce system was to fill a

7  hole, if AdForce failed to serve an ad?  Isn't that the

8  reason, Mr. Lanning?

9      A.   No, definitely not.

10     Q.   By the way, let me just ask a couple more

11 questions about AdForce.

12          You -- using your example of the post office,

13 do you remember that example?

14     A.   Yes, I do.

15     Q.   Sending the package to the post office or

16 sending it straight to 987 Oak Street?

17     A.   Yes, I do.

18     Q.   Which method did AdForce used?

19     A.   AdForce delivered the package directly to the

20 house.

21     Q.   Okay.  Well, then I'm a little confused,

22 because if Google doesn't infringe by delivering the

23 package directly to the house, then why does AdForce

24 anticipate by delivering the package directly to the

25 house?

1    A.    Because as I understood Dr. Rhyne's testimony

2    and his reports, Dr. Rhyne is claiming that the Google

3    system infringes because it delivers ads to the house.

4    And so as I use Dr. Rhyne's interpretation for the

5    invalidation, the AdForce system also delivers ads to

6    the house.

7              MR. GRINSTEIN:  Matt, can I see DX

8    Demo 144, the 1 billion ads serving it?

9    Q.    (By Mr. Grinstein) So this is an AdForce

10   document, right?

11   A.    Yes, it is.

12   Q.    An AdForce document which uses the

13   delivered-to-the-house method, right?

14   A.    Yes.

15   Q.    Says delivering over 1 billion ads per month

16   to leading sites, including Netscape and GeoCities.

17              Do you see that?

18   A.    Yes, I do.

19   Q.    And so when AdForce was describing the way it

20   publishes ads, it said it delivered ads to websites,

21   didn't it?

22   A.    That's what that text says, yes.

23   Q.    That's the same way that Google does it; that

24   was your testimony earlier, right?

25   A.    That's correct.

1    Q.   And I want to talk to you about DoubleClick.

2            MR. GRINSTEIN:  Can we look at your

3    demonstrative, DX Demo 265?

4    Q.   (By Mr. Grinstein) And right now, we're

5    talking about --

6    A.   I'm sorry.

7    Q.   You'll see it on your screen.  It's not in

8    your --

9    A.   Okay.  You had me confused there.  It's not in

10   my book.

11   Q.   It's on the screen.

12   A.   It's on my screen.

13   Q.   It's one of the demonstratives that you showed

14   during your examination, correct?

15   A.   Yes, it is.

16   Q.   And you list here some examples of

17   presentation rules, right?

18   A.   Yes, that's correct.

19   Q.   You say frame border and BG color.

20        Do you see that?

21   A.   Yes, I do.

22   Q.   And then over on the left, you show, hey,

23   here's the example of how it used presentation rules,

24   right?

25   A.   Yes.  This is one example.

1    Q.   And I see BG color, right?

2    A.   Yes.

3    Q.   Where's the frame border?

4    A.   Can we -- oh, that --

5              THE WITNESS:  Can we blow that up so that

6    when you say where is it --

7    A.   The frame border isn't specifically in there

8    as an attribute, but it would go right next to where you

9    see the BG color.

10   Q.   (By Mr. Grinstein) Okay.  Let me take a look

11   at your Demonstrative 276.

12             And this is the evidence that you cited with

13   respect to claim limitation (f); is that right?

14   A.   Yes, that's correct.

15   Q.   You actually only cited two slides.  That's a

16   very long limitation, but you only cited two slides with

17   respect to it; is that correct?

18   A.   Yes, along with the other slides that support

19   it as well.

20   Q.   And your discussion of how the system

21   processed ads in compliance with presentation rules

22   pointed out this frame header and frame footer

23   discussion right here, right?

24   A.   Yes.

25   Q.   And in particular, we're in a section right

1  here, site configuration.

2        Do you see that?

3     A.   Yes, I do.

4     Q.   And the section about site configuration is

5  telling publishers how they may configure their sites,

6  right?

7     A.   Yes.

8     Q.   Now, I want to look at Defendant's Exhibit

9  370, which is also in your book.

10    A.   Okay.

11    Q.   In Defendant's Exhibit 370, turn with me to

12 Page 4061.

13    A.   Okay.  I'm there.

14        MR. GRINSTEIN:  Matt, if you can blow up

15 this citation right there.

16    Q.   (By Mr. Grinstein) This is one of the

17 DoubleClick documents upon which you relied, correct?

18    A.   Yes, it is.

19    Q.   The document says:  Note that the value

20 specified in an ad placement.  Advertisers give ad

21 placements, right?

22    A.   Yes.

23    Q.   Overrides the value specified in the site

24 properties.

25        The site properties are what you were just

1  talking about were presentation rules, right?

2     A.   Yes, but --

3     Q.   So this sentence says that the value specified

4  by the advertisers override the values specified by the

5  websites.

6         Is that what it says?

7     A.   That's what that text says, yes.

8     Q.   So DoubleClick avoided that black-on-black

9  problem by having advertiser rules override publisher

10  rules; isn't that correct?

11     A.   No, sir, not at all.

12     Q.   Let's look -- do you really think that the one

13  screen shot that you cited with respect to applying

14  presentation rules is clear and convincing evidence that

15  the -- the DoubleClick system made ads comply with

16  publisher presentation rules?

17     A.   Yes, I do, in conjunction with all the other

18  slides that I showed for the other interfaces and other

19  claims in the patents.

20         MR. GRINSTEIN:  Matt, can you get us to

21  Defendant's Demonstrative 351, please?

22     Q.   (By Mr. Grinstein) This is another cite --

23  slide that you cited with respect to the DoubleClick

24  system; is that correct?

25     A.   Yes, it is.

1    Q.   And this is our famous Claim 90, right?  We

2  were discussing this before -- before lunch, right?

3    A.   I don't know about famous, but I agree that

4  it's Claim 90.

5    Q.   And we were talking about how internet media

6  venues may enter distribution factors, right?  Those are

7  associated with internet media venues?

8    A.   That's part of this claim, yes.

9    Q.   And then you say keyword targeting is a

10 distribution factor, right?

11   A.   Yes.

12   Q.   But read the sentence:  DART provides

13 advertisers with the ability to target their search

14 keywords, right?

15   A.   Yes.

16   Q.   Doesn't say websites, does it?

17   A.   No.  Not in that phrase, no.

18   Q.   Let me talk to you about the NetGravity

19 reference, please.

20   A.   Okay.

21        MR. GRINSTEIN:  Actually, Matt, could you

22 get me quickly Defendant's Demonstrative 209?

23   Q.   (By Mr. Grinstein) There's an AdForce point I

24 forgot to make with you, Mr. Lanning, and so I'm sorry

25 for jumping back and forth.  I just want to talk about

1  the AdForce interface issues, so I'm going back to the

2  reference I've already talked about.

3      A.   Okay.  I'm with you.

4      Q.   This is the slide that you cited as evidence

5  of a first interface for internet media venues; is that

6  right?

7      A.   Yes, that's correct.

8      Q.   And up top, it says:  Add a content unit for

9  Joe's Guitars.

10          Do you see that?

11      A.   Yes, I see that.

12      Q.   Who is Joe's Guitars?

13      A.   Joe's Guitars is a -- in this case, this is a

14  publisher.

15      Q.   Okay.

16              MR. GRINSTEIN:  Can we flip to

17  Defendant's Demonstrative 218?

18      Q.   (By Mr. Grinstein) Now, you're citing a second

19  interface in the computer system for the seller's.

20          That's the seller interface, right?

21      A.   Yes, it is.

22      Q.   Look who the seller is.  Who does it say the

23  seller is?

24      A.   Joe's Guitars.

25      Q.   So the AdForce documents you cited to

establish separate interfaces, a seller and a publisher

interface are using the same person as both?

    A.   No.  This is just like my situation for my

website.  I'm both the publisher and the advertiser.

They just simply use Joe's Guitars as both examples of a

publisher and an advertiser.

    Q.   Let's finish by talking about NetGravity.

           MR. GRINSTEIN:  And if I can see

Defendant's Demonstrative 309.

    Q.   (By Mr. Grinstein) Here, you're discussing the

processing element in limitation (f).

           Do you see that?

    A.   Yes.

    Q.   And your testimony was that these predesigned

styles were publisher presentation rules; is that right?

    A.   Yes.  That's -- that's part of it, but, yes,

to answer your question.

    Q.   On this page, color is never mentioned, is it?

    A.   Not on this specific page, no.

    Q.   Font is never mentioned, is it?

    A.   I can't read any of the page.  I don't --

    Q.   It's up on your screen, sir.

    A.   I can't read it even there.  If he could blow

that up, I would appreciate it.

           MR. GRINSTEIN:  If you can blow that part

up, Matt.  I appreciate it.

Q.  (By Mr. Grinstein) There's no mention of font,
is there?

A.  No, I don't see any there.

Q.  No mention of border, frame border, or
anything like that?

A.  Not on this page, no.

MR. GRINSTEIN:  Can we go to Defendant's
Demonstrative 312, please?

Q.  (By Mr. Grinstein) This is your discussion of
custom styles; is that correct?

A.  Yes.  And it's -- it's the page there that
defines design or style standards.

Q.  And you said that this had to do with -- I'm
sorry -- you just answered that question.

Again, on this page --

MR. GRINSTEIN:  Matt, if you could blow
up just the text.

Q.  (By Mr. Grinstein) There's no discussion of
color, is there?

A.  Color is not on this page that I see, no.

Q.  No discussion of font?

A.  No, I don't see font -- the word font on here
either.

Q.  There is a line that says:  Place horizontal

lines above and below the ads.

Do you see that?  Do you see that line, sir?

A.   Yes, I do.

Q.   It doesn't say within the ad, does it?

A.   It says what it says.  But, no, it isn't discussing that it's inside the ad.

Q.   And just so we're clear, with respect to NetGravity, you're arguing obviousness, correct?

A.   That's correct.

Q.   And when you filed your expert report in this case, you mentioned in the expert report that NetGravity anticipated, right?

A.   That's correct.

Q.   And then when I took your deposition and I asked you the first time, does it anticipate or does it render obvious, the first time I asked you a question, you said it renders obvious; it does not anticipate. That's what you said in your deposition, right?

A.   That's correct, but I corrected that in the deposition, yes.

Q.   Then -- so first it was anticipation; then it was obviousness; then your lawyers in your deposition came back and asked you some follow-up questions, at which point you said no, no, no, it's not obviousness; it's anticipation, right?

1       A.   No, sir.  That's not what I said.

2       Q.   Well, you did say I made a mistake; I meant to

3  say it's anticipation, right?

4       A.   No, sir.  That's not what I said either.

5       Q.   Did you say, when your lawyers asked you the

6  question in your deposition, after my questions, that

7  NetGravity did anticipate?

8       A.   I said that it anticipated.  NetGravity both

9  anticipated and was obvious.

10      Q.   Okay.  So you started out anticipation, then

11 you went obviousness, then you went back to

12 anticipation, and today in Court, you're back to

13 obviousness; is that correct?

14      A.   No, sir, that's not correct.

15      Q.   You had a very difficult time figuring out the

16 NetGravity system, didn't you?

17      A.   No, I did not.

18           MR. GRINSTEIN:  No further questions.

19           THE COURT:  Redirect?

20           MR. VERHOEVEN:  No redirect, Your Honor.

21           THE COURT:  Okay.  May this witness be

22 excused?

23           MR. VERHOEVEN:  Mr. Lanning may be

24 excused, Your Honor.

25           MR. GRINSTEIN:  Yes, Your Honor.

```
 1                    THE COURT:  Okay.  You may step down.
 2                    MR. VERHOEVEN:  Your Honor, may I have
 3   just one minute to speak to --
 4                    (Pause in the proceedings.)
 5                    THE COURT:  Who will be your next
 6   witness?
 7                    MR. DEFRANCO:  Next witness is Mr. Mark
 8   Scheele, Your Honor.
 9                    THE COURT:  Okay.  Come on in, sir.  Just
10   come right around here and be sworn.
11                    THE WITNESS:  Okay.  Right here?
12                    THE COURT:  Yes, sir.
13                    (Witness sworn.)
14                    THE COURT:  If you don't mind coming
15   around the rail and take a seat back here.  If you'll
16   please keep your voice up and speak into the microphone,
17   it will make it easier for folks to hear you and the
18   court reporter to take down what you're saying.
19                    THE WITNESS:  Okay.  Will do.
20                    MR. DEFRANCO:  Your Honor, may I
21   approach?
22                    THE COURT:  Sure.
23            MARK SCHEELE, DEFENDANT'S WITNESS, SWORN
24                       DIRECT EXAMINATION
25   BY MR. DEFRANCO:
```

1      Q.    Good afternoon, Mr. Scheele.

2      A.    Good afternoon.

3      Q.    Would you please state your full name for the

4 record?

5      A.    Mark Arnold Scheele.

6      Q.    Now, you're here to tell us today about

7 AdForce.  You worked at a company called AdForce back in

8 the late 1990s; is that true?

9      A.    Yes.

10      Q.    Coincidentally, today you work for?

11      A.    Google.

12      Q.    Okay.  And in between the time you worked for

13 AdForce and you worked for Google, did you work for

14 several other companies?

15      A.    Yes, I did.

16      Q.    Just tell us, when did you join Google?

17      A.    So I joined Google in February of 2006.

18      Q.    And you've been there from February of 2006 to

19 the present; is that correct?

20      A.    That's correct.

21      Q.    Let's go back in time, okay?  Let's go back to

22 1998 when you were with AdForce.

23          Are you with me?

24      A.    Yes.

25      Q.    Now, can you just tell us in a couple

1  sentences what the business that AdForce was in, please?

2      A.   Yes.  AdForce was an internet ad delivery

3  system.  It was a centralized-based system.  We worked

4  with advertisers and publishers.  We had a centralized

5  database management system that lived and ran on AdForce

6  servers.

7          All the information from the advertisers and

8  publishers were loaded into that centralized server

9  running on AdForce -- in Adforce.

10     Q.   I'm sorry.  I don't mean to interrupt you.

11  We're going to get into that in more detail.  A little

12  more background first, okay?

13     A.   Okay.

14     Q.   Tell us your title when you were with AdForce,

15  please.

16     A.   I was vice president of engineering.

17     Q.   And your responsibilities as vice president of

18  engineering, please?

19     A.   So I was responsible for a lot of different

20  things.  Especially at the beginning, I did a lot of

21  design documents.  I did a lot of the development.  I

22  was responsible for the hiring of people, budgets,

23  putting presentations together, helping present to

24  venture capitalists, all those activities.

25     Q.   Now, is AdForce still around as a company

1  today, sir?

2      A.   No, it's not.

3      Q.   And just what happened to it?

4      A.   So AdForce went public in April of '99, CMGi

5  purchased AdForce in September of '99 and then CMGi

6  closed it down in the summer of 2001.

7      Q.   And coincidentally, years later, you made your

8  way to Google as an employee?

9      A.   That's correct.

10     Q.   All right.  Let's go back to where you were.

11 Thank you for -- for that segue.

12          You were telling us about the AdForce system.

13 Can you describe for us in general terms the -- however

14 you would do it, the basic building blocks of the

15 AdForce system, please?

16     A.   Certainly.  So AdForce had an advertiser

17 component interface.  It lived where the advertisers

18 were, and they used that to upload campaigns into the

19 system.

20          We also had a web publisher component.  That

21 was used by the websites to create and layout their

22 sites and enter all the information about their site and

23 how they wanted ads to be delivered.

24          And then there was a central server that lived

25 in the AdForce data centers.  It held all the

information that was entered by advertisers and web
publishers.  It had the ad servers that we used to push
ads out to the users' browsers.  That was pretty much a
quick snapshot of what it was.

Q.   And you mentioned the word campaign.

What did a campaign include back in the 1998
timeframe?

A.   So a campaign included the ad itself, the
creative, which could be a text ad; it could be a rich
creative ad; it could have been a GIF image.  It
included the targeting capabilities, what websites you
wanted to target.

All that information was part of the -- of the
ad.

Q.   And what do you mean by targeting
capabilities?  Just give us another sentence or two on
that, please.

A.   Sure.  So a website or an advertiser could
target various websites and also pages within websites.

Q.   In 1998, were you, as vice president of
engineering, dealing with customers?

A.   I did some work with customers, yes.

Q.   Can you give us some examples of AdForce
customers back in that timeframe?

A.   Sure.  So our largest customer back in that

1  time was a company called Petry Media.  They were a rep

2  firm.  We also worked with a company called Katz Media,

3  actually the two of them merged in '97 and became 24/7

4  Media.  It was a large rep firm that we worked with;

5  again, were our largest customer.

6          We also worked with a company called

7  GeoCities, which was a fairly large website.  And

8  Netscape was another one of our large customers in '98.

9      Q.   Okay.  All right.  Well, let's -- let's turn

10  to a document or two, and one that -- that people have

11  seen in the courtroom before, but obviously you're new

12  to us here.

13          Do you have this AdForce User's Guide in front

14  of you?

15      A.   Yes, I do.

16      Q.   Version 2.6.  Do you see a copyright date on

17  the front of that document?

18      A.   Yes, I do.  It says copyright 1998, AdForce,

19  Inc.

20      Q.   I'm sorry.  I keep cutting you off.  Are you

21  finished?

22      A.   Yep.

23      Q.   Is this a document -- this user's guide, is

24  this something that you worked with at AdForce at the

25  time back in 1998?

```
 1       A.   Yes, it is.  I helped contribute to the
 2  content of this as well.  I wrote a number of sections
 3  of it.
 4       Q.   Was this -- was this given to any customers
 5  back in 1998, do you remember, of AdForce?
 6       A.   Yes, it was.
 7       Q.   Well, let's -- let's spend some time walking
 8  through some of the information that's set forth in the
 9  manual, okay?
10       A.   Okay.
11       Q.   I'm going to do this the best I can with the
12  chapter page and numbers on the -- on the document.
13       A.   Okay.
14       Q.   And to help Charles out back there or for him
15  to help me, I'm also going to read the G number that the
16  lawyers put on it in the case, okay?
17       A.   Okay.
18       Q.   So let's start with Chapter 2, Page 2-4, and
19  it's G5447.
20            MR. DEFRANCO:  If we could put that up on
21  the screen.
22       Q.   (By Mr. DeFranco) Mr. Scheele, I'll do this
23  any way that's easiest for you, which will be easiest
24  for me, but I'm going to walk through these pages and --
25  and ask you what the page is about, okay?
```

1    A.    Okay.

2    Q.    So we'll start with 2-4.  This is -- can you

3  just tell us what's shown there?

4    A.    Yeah.  So this is a screen shot of the AdForce

5  home page as it existed in 1989.

6    Q.    And where -- where would this be seen?

7    A.    So this would be seen as somebody was going to

8  the AdForce home page on the internet on the web.

9    Q.    Okay.  And I think this also has a copyright

10  date on it.

11         Could you point that out to us, please?

12    A.    Yes, it does right down at the bottom.  It

13  says copyright AdForce, Inc., 1998, all rights reserved.

14    Q.    All right.  And I -- and I have a note to

15  remind myself to ask you about this button in the lower

16  right-hand corner.

17         Can you tell us what that button is, please?

18    A.    Certainly.  One of the AdForce users would

19  click that button and then be prompted to log in to the

20  AdForce system and either download software or run

21  reports.

22    Q.    Okay.  Now, to the best of your memory, was

23  this version of AdForce, Version 2.6, was this a fully

24  operational product back in 1998?

25    A.    Yes, it was.

Q.   Now, how do -- how do you know that?

A.   Because -- I mean, I worked on it.  I made sure that it got out.  Actually, when we launched, I happened to be in Hawaii on vacation, and I remember it very distinctly.  I actually have a picture still in a office of me building a sand castle with my three-year-old daughter at the time.  So I remember it very clearly.

Q.   And can you tell us generally back in that -- back in that timeframe, 1998 or so, when a new version of the AdForce software or system would come out, how did the company go about getting that into the hands of customers?  Do you remember that?

A.   How the software was delivered to customers?

Q.   Right.  Yeah.

A.   So there was a couple different ways that the software could be delivered.  Somebody could log in by clicking on this button that you just pointed out, and they would log into the website and then be able to download the software.

We also distributed it on CDs.  It was fairly large, so often, it was just distributed on CDs and people got it that way and were able to install it.

Q.   Okay.  Thank you.

Let's keep going through the manual.  I have

1 next Page 2-6, which is G5449.

2      Can you tell us what's shown on this page or

3 screen shot?

4     A.  Yes.  So the top section of the page is

5 showing the page that you would get to, that a user

6 would get to after logging in to the AdForce system to

7 download software.  And, in fact, the icon is pointing

8 on that, download AdForce software.

9     Q.  And let's -- let's turn now to Page 3-3, which

10 is 5464.  And I think you know the drill.

11      What's shown here, please, sir?

12     A.  Okay.  So this is showing, after installing

13 the AdForce software on your desktop, this is what the

14 user would see.  So it's prompting them to click the

15 log-in button so that they could then log in to the

16 AdForce desktop system running -- running on their

17 machine.

18     Q.  Okay.  And I just want to turn two pages now

19 to 3-5, which is 5466, if I have that right.  Yeah.

20      Can you tell us what that is?

21     A.  Certainly.  So after logging in, this would be

22 the screen that a user would see.  If you look on the

23 left, you can see all the menu icons that were available

24 to the user.  The bigger pane area would be where the

25 windows were drawn that somebody would work on and work

1  with.

2      Q.   Okay.  Well, I see some icons on 3-8, which is

3  5469.

4           Are you -- are you on the same page?

5      A.   Yeah.  Yes, I am.

6      Q.   There it is.

7      A.   So those are showing the advertiser icons and

8  menu items, so these are basically all the items and

9  menu items for an advertiser.  This is what an

10 advertiser could do.

11          For instance, the second one that's shaped

12 like a target, that's what an advertiser would click on

13 to actually be able to go in and enter campaigns --

14 enter campaigns, edit campaigns, and do their targeting

15 and get their campaign set up.

16     Q.   Okay.  Early on, I think when you were

17 describing generally the system, you briefly mentioned

18 the two interfaces:  Advertiser, publisher interfaces.

19          Let's walk through those briefly, okay?

20     A.   Okay.

21     Q.   Are you with me?

22     A.   Sure.

23     Q.   All right. I've got Page 6-30 as next on the

24 list.  That looks to be right.

25          Can you tell us what's on this Page 6-30 and

1    its document 5535, please?

2        A.    Certainly.    So this page is showing what an

3    advertiser would get to when they were uploading the

4    actual ad into the AdForce system.    So it's prompting

5    for a number of different things.    It's asking for the

6    ad style.

7            In this particular case, the GIF is selected.

8    There's also Java applets or html script, which were our

9    rich media kind of ads that we could display.    Ad sizes

10   is being prompted there for all the different ad sizes

11   that were supported showing 468-by-60.

12           A person could put in a description of this

13   creative.    They could also say where it was being linked

14   to.    So if a user is browsing a publisher's website and

15   they click on the ad, the link area would -- that's

16   where they would go once a user links or clicks on that

17   particular ad.

18       Q.    Before you used the word targeting, I believe.

19   Is that -- is that different or the same?

20           How did that relate to it in any way to the

21   link -- the links-to entry?

22       A.    Okay.    So the targeting would allow you to

23   select specific websites or pages within websites of

24   where you wanted your ad to run.    And that was an

25   earlier screen in the whole process of selecting, you

1  know, and uploading an ad campaign.

2      Q.   And if -- and if there was specific targeting

3  by a user -- let's say they listed five different sites.

4      A.   Uh-huh.

5      Q.   In which of those sites would they see in

6  their browser of the advertisement?

7      A.   They would run in all those sites.

8      Q.   Every one that had been selected?

9      A.   Every one that had been selected, yes.

10      Q.   Now, you gave us a list of advertisements, and

11  I'm not sure I got them all down, but there were a

12  couple -- you said a rich media ad?

13      A.   Yes.

14      Q.   What -- what is a --

15      A.   So a rich media ad was an ad that basically

16  would allow you to run everything.  You could run text

17  ads.  You could run a very interactive ad where it could

18  have drop-down list boxes or radio buttons that you

19  could select and the user could interact with that ad.

20  It could even get to the point where you could have a,

21  say, video stream running within that ad.  So it

22  basically could do anything you could do on a web page.

23  So anything you do on a web page, you could put in that

24  ad with rich media tag.

25      Q.   And I don't remember you listing banner ads,

1  but I've heard banner ads come up in the context of

2  AdForce.

3       What is a banner ad and did it also handle --

4  did the AdForce system also serve banner ads?

5       A.   Yes.  A banner ad, that's what's depicted by

6  the GIF tag right here, the ad style.  So a banner ad

7  was basically a banner, an image ad that could get

8  uploaded into the AdForce system and then delivered to a

9  user's browser.

10      Q.   All right.  I think I'm backtracking a little,

11 but let's go back to 622, which is 5527, if I have that

12 page right.

13      Let's -- are you -- are you there with me?

14      A.   On 5527, yes.

15      Q.   Yeah.  What don't you -- there's a heading

16 called Creatives, if I have the right page.  And then

17 there's a sentence that says:  The AdForce service can

18 deliver virtually any ad style, such as html scripts,

19 Java scripts, and Java applets, in addition to static,

20 slash, animated GIFs, and redirects.

21      I'm not going to ask you to do that in detail,

22 but does that generally relate to the types of ads that

23 you listed for us?

24      A.   Yes, it does.  I mean, the html script,

25 JavaScript, and Java would be what we would classify as

rich creative. And then the static GIFS is the
banner-type ad, the GIF ad that you would be talking
about.

Q. I apologize if I asked you this before, but an
html script, what is that?

A. So an html script would be anything that you
could put into an html file. Again, it's pretty much
anything you could run on a web page, including text
ads, for instance.

Q. Okay. There -- there's a heading there that
says important, and it says --

MR. DEFRANCO: If we can blow that up,
Charles -- up.

There. Thank you.

Q. (By Mr. DeFranco) It says: The submitted
advertisements must be entirely correct and follow
AdForce service's rich media ad guidelines or campaign
delivery can be delayed.

Do you see that?

A. Yes, I do.

Q. Can you tell us a little bit about what that
was referring to, if you remember?

A. Certainly. So what that was referring to is
that when an advertiser would upload an ad that was a
rich media ad, everything had to be there, all the

1  components that would make up that ad, which could

2  include GIFs and numerous html files perhaps, and it

3  should run properly.

4      Q.   Now, does that mean that advertisers -- that

5  advertisements couldn't be changed by the AdForce

6  system?

7      A.   No, not at all.

8      Q.   Let's -- let's -- let's see.  Let's turn to --

9  I think there's a definition in the glossary relating to

10 creative.

11         Is it as fulsome as that definition?

12          MR. DEFRANCO:  I think it's on G for

13 Glossary 8.  Charles, you may not have this, but it's

14 5683.  It's no words.  I'll just read it in.

15     Q.   (By Mr. DeFranco) It says:  Creative, and then

16 it says the advertising banner.

17         Are you there?

18     A.   Yes, I see that.

19     Q.   How does that definition compare to that --

20     A.   That's a very simplistic definition.  It

21 obviously was much more than that as depicted here on

22 Page 622 that we're looking at where it talks about all

23 the different types of ads that could be entered into

24 the AdForce system and all the different creatives that

25 we supported.

1    Q.   Okay.  Let's turn to Page 637, please.  It's
2  5542.  And let's go back to our drill.
3         If you wouldn't mind, sir, telling us what's
4  shown on that screen, please.
5    A.   Certainly.  Should I wait for it to be
6  displayed on the screen?
7    Q.   Why don't you go ahead.  We're having an -- it
8  may take a minute or two.  We'll catch up to you.
9    A.   Okay.  Sounds good.
10        So what this screen is showing is the
11 targeting criteria.  So, basically, it's allowing the
12 advertiser to select the various websites and the very
13 website pages that the ad would be running on.  So this
14 is the targeting that is being selected right now by the
15 advertiser.
16   Q.   Okay.  Great.  Thanks.
17        That's the advertiser interface, a little bit
18 about it.  Let's switch gears, okay, to the publisher
19 interface.
20        Are you with me?
21   A.   Sounds good.
22   Q.   Page 7-2.  Would you please tell us what's
23 shown on that?
24             MR. DEFRANCO:  And, Charles, that's 5615.
25   A.   So 7-2 is showing -- it's a screen shot again

of the working AdForce system, and it's showing what the

website publisher would be prompted with to enter the

name of their company perhaps, the name of their

website, and a home page of their website.

Q.    (By Mr. DeFranco) And are you familiar with

the term content unit?

A.    Yes, I am.

Q.    Could a -- could a publisher -- could they ad

a content unit in the -- using the AdForce interface?

A.    They certainly could.  So a content unit was

like a logical grouping of a website where somebody

could group, say, all their sport pages by a given

content unit and other pages by other content unit.  So

a logical grouping of websites.

Q.    Okay.  Page 7-16, please.  I have it as 5629.

Please, Mr. Scheele, what is there?

A.    So that page is showing somebody setting up a

content unit, the final stages of setting up a content

unit.  It's showing the name of the content unit, again

the revenue split that the advertiser or the website

would get for running ads on that content unit.

It's showing the ad size.  Again, in this

case, it's showing 468-by-60.  It's also saying that

this particular content unit or site was Java ready.

And it's allowing a user to enter a network niche, which

1    was used for targeting by advertisers to put pages into

2    various groupings like entertainment, here finance

3    gallery.

4         Q.   Okay.  Let's turn to 7-30, please.  And

5    there's a screen.

6              MR. DEFRANCO:  I'm interested in the

7    bottom screen, Charles, please.

8         Q.   (By Mr. DeFranco) And, Mr. Scheele, would you

9    please tell us what's shown there?

10        A.   Sure.  This screen is showing example tags

11   that would be generated for a given content unit.  So

12   it's showing two different types:  The html tag and then

13   the more rich media tag, the I-frame tag.

14        Q.   And could an advertisement be modified

15   or adjusted in any way using those tags?

16        A.   Yes, it could.  A number of different things

17   could be modified, the sizes, the border, background

18   color.

19        Q.   Okay.  That's the list?

20        A.   Uh-huh.

21        Q.   You have to answer --

22        A.   Yes.

23        Q.   -- yes or no.

24        A.   Sorry.

25        Q.   Okay.  And give us an example.  If -- if a

1  publisher wanted to change the border, could you just

2  give us an example of what they would need to do?

3      A.   Yes.  So here the border is shown to say

4  equals 0, which means there is no border around the ad.

5  But if you would make that a 1 or some other number,

6  that would create a border around the ad.

7           The higher number, the more pixels, the larger

8  size the border would be around the ad, for instance.

9      Q.   Was there something similar done for

10 background color?  You mentioned background color.

11     A.   Yes.  Background color, the user could put in

12 the tag the BG color equals and put a hex value for the

13 color.  And then that would be the background color of

14 ads that -- rich creative ads that were delivered to a

15 particular website.

16     Q.   Okay.  Let's -- let's turn briefly to Exhibit

17 404.

18           And can you tell us what this is and date us

19 for it generally, please?  Put a timeframe on it?

20     A.   Certainly.  So this is a tech doc.  We created

21 a number of these for our users to get into a little bit

22 more detail than the manual got into on how to do

23 specific things.

24           This one is about sending multiple parameters

25 into the AdForce servers from a website page.  It was --

1  the review date, as you can see, is November 17th, '98,

2  and the return date was the next day, the 18th.

3      It's going through a final review cycle about

4  to be released to the public.  It typically would have

5  been completed within, you know, a matter of a day or

6  so.  Things were moving very quickly at that time, so we

7  didn't let these things sit around very long.

8      Q.    And do you remember, is this -- is this one --

9  I know that there are others of these.  Is this one

10 referenced in the AdForce User Manual?

11     A.    This one is not.  There are others that are,

12 but I don't believe that this one is particularly.

13     Q.    Okay.  Let's -- let's look at -- let's look at

14 the section entitled Background Color.  And if this

15 is -- 5740.

16          MR. DEFRANCO:  We can blow up the bottom

17 half.  Right.

18     Q.    (By Mr. DeFranco) Now, if you wouldn't mind

19 reading that sentence underneath the heading, Background

20 Color, and just explain to us what that is about,

21 please.

22     A.    So BG color is a six-digit code used to

23 indicate what background color is to be used for the

24 I-frame tag.  So it's saying that to set the background

25 color that would be displayed of the ad as it's rendered

1    in the user's browser for this particular website, you

2    would set that color, as it's shown in the bold type on

3    that page, BG color equals, and then the hex digit value

4    for the color that you would want to have displayed.

5        Q.    Now, is this -- what language is this -- is

6    this denoting?

7        A.    This is -- this is typically, you know, html,

8    something that a web master could clearly understand as

9    they were putting these tags on to a web page.

10       Q.    Okay.  Html, is that like a set of

11   instructions for appearance?  I mean, we see different

12   color attributes here.

13             Can you just give us a sentence or two about

14   that again, please?

15       A.    Certainly.  For appearance, I mean, it's

16   basically what web pages are made up of are html script.

17   And this is just an example of that.  And, again, a web

18   master would -- would have no problem understanding what

19   to do with this and put this on a page.

20       Q.    Well, let me -- let me ask you generally.

21   You're -- you have a degree in software -- as master's

22   degree in software, right?

23       A.    Uh-huh.

24       Q.    If I want to design a web page, do I use a

25   language or a code like html to describe various aspects

1  of it?  Could you explain that to us?

2      A.   Yes, you would.  I mean, you would set up your

3  web page and use a language similar to html to define

4  the layout of your pages, all the text and everything

5  that would be displayed on that web page.  You would be

6  using a language similar to html or hgml.

7      Q.   And we've heard the word tag a lot over the

8  course of this trial, or at least a few times.

9           Can you tell us what a tag is in the context

10 of using html code to render a page that's shown in the

11 browser on the internet?

12     A.   So a tag is -- this represents a tag.  It's

13 something that the web master would put on a web page.

14 It's what's used to direct a user's browser as they're

15 visiting that web page to come and get something from,

16 in this case, AdForce.

17          There's a number of different components to

18 this particular tag.  That's because back in '98, the

19 browsers -- certain browsers worked on different things.

20 And so as the user was cruising this page, looking on

21 this page, their browser would determine which one of

22 those tags they could work with.

23          They would take that tag and send it to the

24 AdForce servers.  The AdForce server would then read the

25 tag.  It would select what ad should be delivered.  It

1  would take the background color and adjust the

2  background color for the particular advertiser ad as it

3  then shipped it down to the user's browser that was

4  browsing that website.

5      Q.   And is -- this concept of the background

6  color, is that mentioned specifically in the AdForce

7  manual; do you remember?

8      A.   I don't believe it is mentioned specifically

9  in the manual.

10     Q.   But is that a feature, to your understanding,

11 customers were aware of and used back in 1998; do you

12 know?

13     A.   Yes.  It definitely was being used in '98.

14     Q.   Let's just finish up and go back to the manual

15 for a few minutes, please.

16          I-4, there are a couple of --

17          MR. DEFRANCO:  Charles, we're going to

18 talk about this box here.  Can you blow that up?

19     Q.   (By Mr. DeFranco) Advertiser, module,

20 publisher, super-user module.

21     A.   Uh-huh.  Sure.

22     Q.   Can you just do the best you can to describe

23 what those different modules are for us, please?

24     A.   Certainly.

25          So we've been talking a little bit about the

advertiser module.  And the advertiser module is the

module that an advertiser would use to create campaigns

and upload campaigns into the AdForce system.  It would

talk to the AdForce centralized database and store all

that information.

The web publisher module was the one that was

used by websites to lay out their website, create all

the website information about pages, how they would want

to have ads presented, and load that all up into the

AdForce database as well.

The super-user module was a super set of all

that.  It contained everything that you had in the

advertiser module, as well as the web publisher module,

and it included a number of other things that a, quote,

super user could do.

A super user was kind of the person that was

in charge of the entire network or system that AdForce

would sell to.  And they could do things like establish

defaults and permissions around the network.  They could

create user log ins with passwords.  They could give

permissions to the various users and then just generally

controlled how users would use this system.

Q.   Okay.  And let's turn -- let's finish up with

one or two more.  I-5, which is -- I had as 5442, is

that -- did we discuss this page, remind me, the top

1  advertiser module?

2      A.   Yes.

3      Q.   We covered that before, right?

4      A.   No.

5      Q.   Okay.  Why don't you -- why don't you tell us

6  what's shown there, please.

7      A.   Okay.  So it's -- it's basically saying that

8  the advertiser module is the portion of the super-user

9  module, so the component of that that's used for

10  advertisers to do their -- their thing, basically, to --

11  and it's used by ad sales organizations, by media rep

12  firms, agencies.  All of those were users of that

13  particular module that AdForce provided.

14      Q.   So in your experience, in 1998, were

15  advertisers using AdForce to have their ads appear on

16  publisher's sites?

17      A.   Yes, they certainly were.

18      Q.   Were any changes made according to inputs or

19  parameters, I think is the word you used, that

20  publishers might want to impose?

21      A.   Yes, we were.

22              MR. DEFRANCO:  Thank you very much.  See

23  you in a minute.

24              THE WITNESS:  Okay.

25              THE COURT:  Cross-examination.

1          MR. BRANDON:  Yes, Your Honor.

2          May I go ahead and approach the witness?

3          THE COURT:  Yes.

4          MR. BRANDON:  Thank you.

5                    CROSS-EXAMINATION

6    BY MR. BRANDON:

7     Q.   Good afternoon, Mr. Scheele.

8     A.   Good afternoon.

9     Q.   My name is Jeremy Brandon, and we haven't met.

10   I just have a few questions for you today.

11    A.   Okay.

12    Q.   I believe you testified that you're currently

13   an employee at Google; is that correct?

14    A.   Yes, that's correct.

15    Q.   And what's your title, sir?

16    A.   Engineering manager.

17    Q.   And how many years have you been at Google?

18    A.   So I started at Google in February of 2006.

19    Q.   Thank you, sir.

20         Have you read the patents in this case?

21    A.   I've briefly looked over some of the claims,

22   yes.

23    Q.   All right, sir.  I just handed you a binder,

24   and it contains three documents, Defendant's Exhibits

25   403, 404, and 405.

1            403 is a user guide that we've already looked

2  at a little bit today.

3            404, we've also looked at.  It's a document

4  entitled Passing and Using Multiple Parameters.

5            And then 405 is a document entitled Guidelines

6  for Creating and Submitting Creatives.

7            I'd like to talk to you briefly today about

8  those three documents.  And let's go ahead and start

9  with the user guide.

10            MR. BRANDON:  And, Matt, thanks for

11  putting that up.

12      Q.   (By Mr. Brandon) Mr. Scheele, you're familiar

13  with this document, correct?

14      A.   Yes.

15      Q.   And you participated in the drafting of it,

16  did you not?

17      A.   Yes, sir.

18      Q.   All right.  Now, sir, can you point the jury

19  to anywhere in this user guide, anywhere at all, where

20  it shows that publishers can input color specifications

21  for ads?

22      A.   The -- there's an area where the tags are

23  displayed, which we looked at earlier.  It's showing the

24  html that was generated, and it's showing a number of

25  different parameters.  It doesn't specifically show a

color parameter. So, no, not...

Q. And we heard earlier about this different doc. I believe it's Defendant's Exhibit 404, if you'd like to go and turn to that.

A. Sure.

MR. BRANDON: And, Matt, could you please put that one on the screen, please, sir?

Q. (By Mr. Brandon) And, sir, let's take a look at Page 005740 of this document.

A. Uh-huh.

Q. And you can see here at the bottom the phrase background color. I believe Google's lawyer pointed that out.

Sir, my question to you on this document is, does this document talk at all about a publisher interface?

A. I -- I'd have to read it all to be clear, but I don't recall if it does or not.

Q. Any discussion at all, sir, that you can recall where this document is talking about a publisher being prompted to input a background color through an interface?

A. Not that I can recall.

Q. And, in fact, sir, it says that, I believe, BG color is a six-digit code used to indicate what

background color is to be used.

That would mean, I take it, that a publisher is going to need a little coding if they're going to want to put in the background color; is that right?

A.   They would put in the code, yes.

Q.   And setting this document to the side, sir, can you point me to anything back in that user guide, that DX 403 document, that shows a publisher being prompted to input a background color through any sort of interface?

A.   I can't think of one, no.

Q.   And you can't point me to anywhere in the user guide, can you, sir, to a part that discusses publishers being prompted for borders -- to add borders through an interface?

A.   Only, as we mentioned earlier, in the tag example layout.

Q.   And is that that Page 7-30?

A.   Yes.

MR. BRANDON:  Matt, could we please put 730 on the screen, please, sir?  Page 7-30 at the bottom.

Q.   (By Mr. Brandon) While he's -- while he's doing that, Mr. Scheele, if we could just turn to it together.

1    A.    Uh-huh.

2    Q.    730 does not depict any sort of interface,

3    does it, sir?

4    A.    It's depicting an interface of the tags that

5    could be modified and saved.

6    Q.    So your testimony is that 7-30 does, in fact,

7    depict an interface by which border tags are prompted to

8    be added?

9    A.    They're displayed, and a user could go and

10   modify it and save it.  That's -- that's my testimony.

11   Q.    And I'm sorry.  Just to be clear, is it your

12   testimony that 7-30 is, in fact, an interface by which

13   border tags are prompted to be added?

14   A.    I'm not sure what I would classify as

15   prompted, but, I mean, there was entry areas here for

16   somebody to come on in and put -- and adjust the

17   information that's in these -- these screen areas and

18   save it.

19   Q.    Do you recall, sir, being asked in your

20   deposition the question of whether 7-30 actually showed

21   an interface by which publishers were prompted to input

22   border tags?

23   A.    I don't recall that specifically, no.

24        MR. BRANDON:  Matt, could you please play

25   a deposition clip of Mr. Scheele's deposition?  It's

1  Page 194, 17 through 195, 1.

2                    (Video playing.)

3                    QUESTION:  Tell me where on 6-20 or the

4  pages that follow it, that this AdForce user guide,

5  Version 2.6, discusses the system providing publishers

6  with the option to add border tags?

7                    ANSWER:  I believe the only area that,

8  you know, we've discussed where it shows -- discusses

9  that is on Page 7-30.

10                   QUESTION:  7-30 doesn't actually show any

11  interface by which border tags are added, does it?

12                   ANSWER:  Correct.

13                   (End of video clip.)

14     Q.   (By Mr. Brandon) All right, sir.  If you could

15  take a look now at the user guide.  We're going to turn

16  to Page 622.

17     A.   Uh-huh.

18                   MR. BRANDON:  And that's DX 304, Matt,

19  Page 622.

20     Q.   (By Mr. Brandon) We've talked a little bit

21  about this.  This, again, is a page describing

22  advertisements, right, or creatives; is that correct?

23     A.   Just a second.  I'm not there.

24     Q.   Yes, sir.  I'm sorry.

25     A.   Yes, I'm there.

1      Q.   And we see at the top where it says -- where

2 AdForce is saying:  Providing striking interactive

3 advertisements is necessary when attracting consumers to

4 advertise -- to advertise products.

5         And after it says that, the page says, does it

6 not, that the AdForce software is automated to receive

7 advertisements from advertisers and deliver them to

8 websites.

9         Do you see that?

10     A.   Yes, I do.

11     Q.   And the sentence doesn't say anything about

12 AdForce using or applying publisher preferences to

13 create customized ads, does it?

14     A.   No, it does not.

15     Q.   In fact, it talks about receiving ads from

16 advertisers, correct?

17     A.   That's what it says here, yes.

18     Q.   And if we look just down a little bit further

19 at the next sentence, it says:  The submitted

20 advertisements must already have been tested, debugged,

21 and functioning.

22         Do you see that?

23     A.   Yes, I do.

24     Q.   And there's no discussion there, sir, of

25 formatting parameters from publishers at all; is that

1  right?

2  A.   No.

3  Q.   And along these same lines -- and I believe

4  Google's lawyer pointed out this just a moment ago -- in

5  bold letters, it says:  Important.  The submitted ads

6  must be entirely correct and follow AdForce's

7  guidelines.

8       Do you see that, sir?

9  A.   Yes, I do.

10  Q.   And no discussion there about publisher or

11  formatting parameters, correct?

12  A.   No.

13  Q.   All right.  And then having just told folks

14  that the uploaded advertisements needed to be entirely

15  correct and needed to comply with guidelines, this user

16  guide then points us to another document called

17  Guidelines and Submitting Creatives.

18       Do you see that, sir?

19  A.   Yes, I do.

20  Q.   And I don't believe we looked at that document

21  in your direct examination, but it's in your binder,

22  sir.  It's Defense Exhibit 405, and I'd like to turn to

23  that one.

24       MR. BRANDON:  Matt?  Thank you, sir.

25  And let's look at Page G008121 and continuing to 22.

1        Q.    (By Mr. Brandon) Sir, Exhibit 405 is the doc

2   that was referenced in this user manual, correct?

3        A.    Correct.

4        Q.    And this is the document that advertisers must

5   follow when submitting advertisements to the system,

6   right?

7        A.    That's correct.

8        Q.    All right.  Now, it tells advertisers right

9   here, I believe, on this second page over there, to

10  input their own parameters, right, to input background

11  color and font color.

12            Do you see that, sir?

13       A.    I see that it's entered there, yes.

14       Q.    And that's telling advertisers, is it not, to

15  input their own background color and font color and

16  border color for their rich media ads?

17       A.    I think it's telling them that they could

18  enter those fields, yes.

19       Q.    Sir, where in any of these docs -- we've just

20  seen where AdForce is telling folks -- telling

21  advertisers that they could input their font color and

22  background color.

23            Where in any of these docs does it show that

24  the publisher preferences actually control, actually

25  trump what the background -- what the advertiser is

1   entering?

2       A.    Well, the -- the previous document that we

3   looked at, Exhibit 404 --

4       Q.    Yes, sir.

5       A.    -- shows the background color and how it's

6   applied within the tag.

7       Q.    Okay.

8       A.    If --

9                MR. BRANDON:  Matt, could we just --

10      Q.    (By Mr. Brandon) I'm sorry, sir.  Were you

11  finished?

12      A.    I was just going to finish and say, if it

13  wouldn't trump, there would be no reason for having it

14  there.  I mean, that's the whole purpose of providing an

15  ability to override the background color.

16               MR. BRANDON:  Well, let's look quickly,

17  Matt, at 404 again, just so the jury can see what Mr.

18  Scheele is talking about.

19               And if you'll go to that page, Matt, that

20  we looked at earlier where it was talking about

21  publisher parameters and BG color.

22               Thank you.

23      Q.    (By Mr. Brandon) Now, does it say anywhere on

24  this page, sir, that the publisher background color

25  trumps the advertiser background color?

1     A.    It does not.

2     Q.    Now, let me just --

3     A.    But -- but, again, that was the purpose of it.

4     Q.    Let me just run through a quick example, and

5     then -- and then we'll be done.

6           So my dad is a cotton farmer out in West

7     Texas, and he doesn't know much about computers at all,

8     but let's assume that he does want to advertise on the

9     internet, and he wants to advertise using AdForce,

10    Version 2.6.

11          And so he goes on, and he reads that user

12    guide that we saw and we ran through, and he runs across

13    that little warning that says:  Warning.  You know, your

14    advertisements had better be entirely correct if you

15    don't want any delay.  And it directs him over there to

16    this other doc, this 405 doc that we looked at.

17          Do you recall that one?

18    A.    Yes, I do.

19    Q.    All right.  And that's the one where it says,

20    now, you know, as an advertiser, you've got to input

21    your background color, your font color, et cetera.

22          So my first question is -- I mean, my dad's a

23    farmer.  Is he going to -- is he going to know how to

24    input code like that?

25    A.    I don't know your father, so I can't really

say that for sure.

Q. Well, let me -- let me try to ask a little better question.

It's correct that an advertiser that wants to use this AdForce system is going to have to know a little html code, right?

A. That's fair to say, yes.

Q. They're not going to be able to go through some easy-to-use interface and have the computer system sort of say, do you want a blue background color or a pink background color; is that right?

A. That's fair, yes.

Q. And let's say my dad, you know, in this example, has finally figured out how to do this coding. He goes down to the book store and buys a book or two and learns how to do some code so he can come in and create an ad, and he wants to advertise on tractors.com.

And so he goes through all the coding, and he puts a little white background. He wants a white background with some black text on it. It just says: Buy my tractors. And he wants to advertise on tractors.com.

Now, tractors.com, as we saw in that Exhibit 404, you say, has the ability to input a background color as well, right?

1      A.    Correct.

2      Q.    All right.  Let's just assume for the sake of

3   argument that the tractors.com inputs a black background

4   color.

5          Follow me?

6      A.    Yes, I do.

7      Q.    All right.  So in that instance -- and if

8   AdForce is working the way you say it works, then what

9   would happen is that when that ad actually -- my dad's

10  ad actually goes to tractors.com, we're going to have a

11  black background color that overrides my dad's white

12  background color, and we won't even able to see the text

13  that says:  Buy my tractors; is that right?

14     A.    That would be the case, yes.

15     Q.    And so in that instance, my dad is not --

16  nobody's going to -- nobody is going to buy his

17  tractors, right?

18     A.    Not unless he changes the ad, no.

19     Q.    All right.

20              MR. BRANDON:  I have nothing further.

21              THE COURT:  Redirect?

22              MR. DEFRANCO:  Just a few, Your Honor.

23                  REDIRECT EXAMINATION

24  BY MR. DEFRANCO:

25     Q.    Well, we started out talking about some of

1   your testimony from your deposition.

2           Do you remember that?

3       A.   Yes.

4       Q.   About html tags and what could be done on the

5   screens and the interfaces and what couldn't be done.

6           Do you remember that?  Let's play a piece of

7   that?

8               MR. DEFRANCO:  Charles, do you have this

9   cued up?  Charles, I'd like to see -- we'd like to see

10  196:25 to 197:19.

11              (Video playing.)

12              ANSWER:  7-20 -- 7-30.  Sorry.

13              QUESTION:  The html tag that's in that

14  window, is that generated by the AdForce system?

15              ANSWER:  Yes.

16              QUESTION:  And the idea is that a

17  publisher takes that html tag and cuts and pastes --

18  cuts and pastes it into his website, correct?

19              ANSWER:  Correct.

20              QUESTION:  So when a user -- and this

21  particular one says frame border equals zero, right?

22  Correct?

23              ANSWER:  Correct.

24              QUESTION:  And when a user clicks on the

25  publisher's ad, an advertisement will be sent back, and

1  it will not have a border; is that correct?

2              ANSWER:  Correct.

3              QUESTION:  Well, how do you know that?

4              ANSWER:  I mean, the html shows that.

5              QUESTION:  That's part of the html code?

6              ANSWER:  Yes.

7              (End of video clip.)

8      Q.    (By Mr. DeFranco) You gave that testimony,

9  sir?

10     A.    Yes.

11     Q.    Html programming language, is that a language

12 that many people who use the internet and make web pages

13 for themselves for advertisements to appear, is that a

14 pretty simple language to use, or would you say it's

15 complicated?

16     A.    I would say it's very simple to use, yes.

17     Q.    Now, let's say my dad is a former New York

18 cop, and he's got a web page about the police

19 department, and he likes blue, light blue background,

20 and he's an amateur computer scientist.  He likes to

21 play around with html tags.

22         If back in 1998, he wanted a light blue

23 background when advertisements appear, could he insert

24 that code to have that happen?

25     A.    Yes, he could.

1    Q.   Were you aware of customers doing that sort of

2  thing back in the 1998 timeframe --

3    A.   Yes, they were.

4    Q.   -- when they were acting as publishers?

5    A.   Yes.

6    Q.   Let's turn back to this manual.  You were

7  asked about this Page 622.

8         Do you remember that?

9         MR. DEFRANCO:  It's document 5527.  Could

10  you put that up, please, Charles?

11    Q.   (By Mr. DeFranco) Let me just ask you about

12  it.  It's entitled Creatives.

13         Do you see that?

14    A.   Yes, I do.

15    Q.   You were asked about that on

16  cross-examination.

17         Do you remember that?

18    A.   Yes.

19    Q.   You were asked about the definition of

20  advertisements.  You were asked about the sentence where

21  it says:  They must be entirely correct and follow

22  AdForce service rich media and guidelines.

23         Do you remember that?

24    A.   Yes.

25    Q.   Those are the same sections we talked about on

1  direct, correct?

2      A.   Yes.

3      Q.   And I asked you on direct, I believe, does

4  that mean that a publisher couldn't over -- couldn't

5  change any appearances of an ad?  Is that what that

6  meant?

7      A.   No, not at all.  As I testified earlier, it

8  meant that they needed to include everything that was

9  needed for the ad, and they also needed to run it

10  properly.

11      Q.   Thank you very much.

12              THE COURT:   Recross?

13              MR. BRANDON:  No further questions, Your

14  Honor.

15              THE COURT:  May this witness be excused?

16              MR. DEFRANCO:  Yes, Your Honor.

17              THE COURT:  Any objection?

18              MR. BRANDON:  No objection, Your Honor.

19              THE COURT:  Okay.  You may step down.

20              Thank you for coming.

21              THE WITNESS:  Leave everything here, Your

22  Honor?

23              THE COURT:  Someone will take care of it.

24              THE WITNESS:  Yes, sir.

25              THE COURT:  Call your next witness.

1          MR. DEFRANCO:  May I have one minute,

2   Your Honor.

3          THE COURT:  Yes.

4          (Pause in proceedings.)

5          THE COURT:  Hold on.  Go ahead right

6   there.

7          COURTROOM DEPUTY:  Please raise your

8   right hand.

9          (Witness sworn.)

10         MR. DEFRANCO:  We're calling Sandi

11  Mathers, Your Honor, Sandi Lee Mathers.

12         THE COURT:  Okay.  Ms. Mathers, if you'll

13  come right around here.

14         If you don't mind, speak into the

15  microphone for me and keep your voice up, all right.  It

16  makes it easier for the folks on the jury to hear and

17  also for our court reporter to take down what you're

18  saying --

19         THE WITNESS:  Okay.

20         THE COURT:  -- okay?  Thank you.

21     SANDI LEE MATHERS, DEFENDANT'S WITNESS, SWORN

22              DIRECT EXAMINATION

23  BY MR. DEFRANCO:

24     Q.   Good afternoon.

25          Would you please state your full name for the

1  record.

2      A.    Sandy Lee Mathers.

3      Q.    And did you used to work for AdForce,

4  Ms. Mathers?

5      A.    Yes.

6      Q.    Back in what timeframe?

7      A.    1998 to '99.

8      Q.    Okay.  And did you know Mr. Scheele, who we

9  just heard from, back then?

10     A.    Yes.

11     Q.    Okay.  What was your job back in that

12  timeframe?

13     A.    I was a technical writer, and I did all the

14  manuals and online help for their product.

15     Q.    Okay.  Does this look familiar?

16     A.    Yeah.  That's mine, yeah.

17     Q.    Did you prepare this manual?

18     A.    Yes, I did.

19     Q.    Back when?

20     A.    In 1998.

21     Q.    We just saw it has a copyright date of '98.

22  You should have a copy in your binder, but let me just

23  ask, is this -- is this the same manual that you worked

24  on back in 1998?

25     A.    That's it.

1    Q.   And it says -- do you remember about what --

2  what part of 1998 you prepared this manual?

3    A.   I started on it in May.

4    Q.   And about when was it completed?

5    A.   By October.

6    Q.   And you were asked to look for some documents

7  in this case, go back in your records.  People were

8  looking for manuals and things.

9    A.   Right.

10   Q.   Did you find this actual manual?

11   A.   Yes, I did.

12   Q.   And had that manual that you found, had that

13 been in possession the entire time from back in '98 to

14 the present?

15   A.   Yes.

16   Q.   Did you make any changes to it?

17   A.   No.

18   Q.   You've seen it in this case, right?

19   A.   Yes.

20   Q.   Are you certain that it's the same manual that

21 you had back in 1998?

22   A.   Yes.

23   Q.   And about when did you stop working for

24 AdForce?

25   A.   In '99 when they were acquired by another

1  company.

2      Q.   And have you gone on to do other things since

3  then?

4      A.   Yes.  I am a consultant now on my own, so...

5      Q.   And what do you do?

6      A.   Technical writing.

7      Q.   That's what you were doing back in '98?

8      A.   Yes.

9      Q.   Have you been pretty much doing that --

10     A.   Ever since, yes.

11     Q.   -- ever since?

12     A.   Uh-huh, yes.

13     Q.   Have you ever worked for Google?

14     A.   No.

15     Q.   Okay.

16          MR. DEFRANCO:  That's all I have.  Thank

17  you very much.

18          THE COURT:  Cross-examination.

19          MR. BRANDON:  Briefly, Your Honor.

20               CROSS-EXAMINATION

21  BY MR. BRANDON:

22     Q.   Good afternoon, Ms. Mathers.

23     A.   Hello.

24     Q.   We've met before.  My name is Jeremy Brandon.

25  Again, I promise not to ask you as many questions this

1  time around.

2         Google has retained you as a paid consultant

3  in this case; is that correct?

4      A.   I'm getting paid for my time.

5      Q.   And you wrote portions of the AdForce user

6  guide; is that right, ma'am?

7      A.   Yes.  I wrote it; I put it together; I

8  research today, everything, yeah.

9      Q.   And, in fact, you wrote a lot of it from

10 scratch, didn't you?

11     A.   Yes, I did.

12     Q.   Yet you're not here today to testify in any

13 way, one way or the other, what AdForce did or didn't

14 do; is that right?

15     A.   No.  I'm just here to prove that I wrote the

16 manual in 1998 and released it in '98.

17     Q.   And Google's lawyer hasn't asked you to

18 confirm or deny anything they're saying about this

19 manual that you wrote; is that right?

20     A.   No.  They just want me to come up and tell the

21 truth.

22     Q.   And they're not asking you to explain anything

23 in the manual, even though you wrote several parts of

24 it?

25     A.   No.

1    Q.    And even though your authority -- you're an

2    authority on the screen shots; is that right, ma'am?

3    A.    Well, I -- I'm an authority on putting the

4    manual together, you know, setting up the screen shots,

5    explaining the screen shots, you know, telling a user

6    how to use the manual, how to use the software.

7    Q.    And during your deposition in this case,

8    Ms. Mathers, you told me you wrote the user guide so

9    that, quote, a kid or grandma could do any of the tasks

10   in it.

11        Do you recall that testimony?

12   A.    Right.

13   Q.    Yet you couldn't show me anywhere in the user

14   guide where a kid or a grandma could read the user guide

15   and see that the AdForce system was creating customized

16   ads; is that right?

17   A.    Well, you were trying to have me remember

18   from, you know, 11, 12 years ago what the software did,

19   and I mean, who remembers that?

20        So no.    If I sat down and read it again with

21   the software, I would remember it, but...

22   Q.    Ma'am, did you take the time to read the --

23   the manual before you came in here to testify today?

24   A.    No.    No.

25   Q.    All right.

1    MR. BRANDON:  Thank you.

2    THE COURT:  Redirect?

3    MR. DEFRANCO:  Just a couple.  I just

4  want to clear something up.  That reminds me.

5                REDIRECT EXAMINATION

6  BY MR. DEFRANCO:

7    Q.   How many companies have you worked for as a

8  consultant since '98?

9    A.   Oh, my gosh.  So many I can't even -- I'd have

10  to sit down and go through my resume and invoices and

11  everything, so many.

12    Q.   Are you a computer programmer?  Is that what

13  you do for a living?

14    A.   No.  I'm a technical writer.  I don't do

15  programming.

16    Q.   Is it fair to say that some people are --

17  they're good with words; they're good at explaining

18  things; they're good at describing pictures; and they go

19  into the business of explaining how to use things to

20  people, as opposed to the technical people, who actually

21  write the software and do the technical work?

22    A.   Yeah.  It's a big difference, because the --

23  the programmers do the code for the software, and then I

24  explain to, you know, just a normal regular Joe how to

25  use the software, so...

1    Q.   Joe or Jill?

2    A.   Joe or Jill.

3    Q.   Whoever?

4    A.   Whoever.

5    Q.   Would you describe yourself as more

6 technically inclined or as more of a creative, an

7 expressive person?

8    A.   Both.  I mean, I'm -- I -- I was going to be a

9 programmer early on in my career, but I went this route,

10 because I -- I think it's more like teaching, and -- and

11 I like it.  And I hate manuals where I can't figure

12 things out, so...

13            MR. DEFRANCO:  Thank you very much.  We

14 appreciate it.

15            MR. BRANDON:  No further questions, Your

16 Honor.

17            THE COURT:  May this witness be excused?

18            MR. DEFRANCO:  Yes, Your Honor.

19            MR. BRANDON:  Yes, Your Honor.

20            THE COURT:  You may step down.  Thank you

21 for coming.

22            Call your next witness.

23            MR. VERHOEVEN:  Google calls Mike Wagner.

24            THE COURT:  Okay.

25            MR. DEFRANCO:  Your Honor, may we have a

1  one-second side-bar?

2              THE COURT:  Yes.

3              (Bench conference.)

4              MR. DEFRANCO:  I apologize for asking

5  Your Honor, but would you mind giving us -- could we ask

6  for a time check?  Would that be appropriate?

7              THE COURT:  Well --

8              MR. DEFRANCO:  We can keep going, if it

9  is.

10             THE COURT:  Well, I prefer to give you

11 one at the break in about 35 minutes.  But hold on just

12 a second.  I'll give you -- I tell you what, get started

13 with his qualifications, and then I'll invite you up

14 here to the bench once I figure that out.  That way I

15 don't waste any more time.

16             MR. DEFRANCO:  I appreciate it.

17             THE COURT:  Is that okay?

18             MR. DEFRANCO:  That's great.  Thank you.

19             THE COURT:  I'll give it to both sides,

20 all right?

21             (Bench conference concluded.)

22             THE COURT:  Was this witness previously

23 sworn?

24             MS. CANDIDO:  No, Your Honor.

25             (Witness sworn.)

1          THE COURT:  Same drill.

2              THE WITNESS:  I understand, Your Honor.

3              THE COURT:  Keep your voice up.

4      MICHAEL J. WAGNER, DEFENDANT'S WITNESS, SWORN

5                  DIRECT EXAMINATION

6  BY MS. CANDIDO:

7      Q.   Good afternoon, Mr. Wagner.

8      A.   Good afternoon, Ms. Candido.

9      Q.   Would you please state your full name for the

10 record.

11     A.   Michael Joseph Wagner.

12     Q.   And what do you do for a living?

13     A.   I'm a management consultant that specializes

14 in intellectual property matters.

15     Q.   What is your educational background?

16     A.   I have a Bachelor of Science in engineering,

17 which I received from the University of Santa Clara in

18 1969.

19          I have a master's in business administration,

20 which I received from UCLA in 1971.

21          And I have a juris doctorate degree from

22 Loyola University School of Law, which I received in

23 1975.

24     Q.   Do you have any professional licenses?

25     A.   I do.  I'm a certified public accountant in

the State of California.  I'm also a licensed attorney

in the State of California, and I'm certified in

financial forensics by the American Institute of

Certified Public Accountants.

Q.   Do you have any publications in this field?

A.   I have 25 professional publications.  Probably

the most important is the Litigation Services Handbook,

which is in its fourth edition, is probably the leading

book on what financial experts do in litigation.

Q.   Have you been qualified as an expert witness

in federal court before?

A.   I have.

Q.   How many times have you testified as an expert

at trial?

A.   At trial, in a court, I've testified 115 times

before today.

Q.   Have you been asked to perform a damages

analysis in this case?

A.   I have.

Q.   Is your firm, LitiNomics, being paid for your

time in this case?

A.   They are.

Q.   And they're being paid at your customary

hourly rate?

A.   Yes.  The normal rate I bill is $750 an hour,

1    and that's what your client is paying.

2        Q.   Does your compensation depend in any way on

3    the outcome of this case?

4        A.   No.

5             MS. CANDIDO:  Your Honor, Google moves to

6    qualify Mr. Wagner as a qualified expert in patent

7    damages.

8             THE COURT:  Objection?

9             MR. TRIBBLE:  No objection, Your Honor.

10            THE COURT:  The Court and jury will hear

11   his testimony.

12       Q.   (By Ms. Candido) Mr. Wagner, what was your

13   assignment in this case?

14       A.   You gave me two assignments.

15            The first was to review the opinion and the

16   work of the damage expert, Mr. Walt Bratic, for Function

17   Media.

18            And the second assignment was to come up with

19   my own independent opinion of what a reasonable royalty

20   rate would be in this case.

21       Q.   What are your opinions in this case?

22       A.   I disagree with Mr. Bratic's conclusions.  I

23   believe some of the methods he used, although

24   acceptable, were not carried through properly.  And I

25   believe that the appropriate reasonable royalty, at a

1  maximum, that should be paid in this case would be 0.25

2  percent of infringing sales.

3      Q.   So you said that's the maximum reasonable

4  royalty?

5      A.   Yes.

6      Q.   So in forming your opinions, were you asked to

7  assume that Google infringes the patents-in-suit and

8  that those patents were invalid?

9      A.   That was the assumption I was asked to make.

10     Q.   First, I'd like you to explain to the jury

11 some of the more significant disagreements that you have

12 with Function Media's expert, Mr. Bratic.

13          Let's start with Georgia-Pacific Factor 13.

14 In your opinion, does Mr. Bratic's analysis of the

15 hypothetical negotiation between Function Media and

16 Google take into consideration the importance of what

17 Google brings to the table at the negotiation?

18     A.   I reviewed his report.  I read his deposition.

19 I've reviewed his trial testimony.  And in none of those

20 sources has he considered any of the contributions that

21 Google brought to the hypothetical negotiation.

22     Q.   Mr. Wagner, have you prepared a demonstrative

23 listing some of the important features of Google's

24 products that aren't covered by the patents-in-suit?

25     A.   I have.

1    MS. CANDIDO:  Charles, would you please

2  put up DX demo 383?

3    Q.   (By Ms. Candido) Is this a demonstrative that

4  you prepared?

5    A.   It is.

6    Q.   Would you please walk us through these

7  features and why they're important in this case?

8    A.   I will.

9       Well, the first one I described as Google

10  systems providing contextually relevant ads.  What that

11  means is, the reason why Google is so successful and why

12  the infringing products here are so successful is that

13  Google, through its ingenuity, its technology, has

14  entitled users, people that want to search for certain

15  information on the web, when they do that and they see

16  an ad, that ad has direct relevance to what they're

17  looking for.

18       So that's what I mean by contextually relevant

19  ad.  And this is what everyone in the industry, all

20  industry observers say is the reason why AdWords for

21  Content is successful.

22       None of these industry observers mention the

23  features enabled by the patents-in-suit.  It is Google's

24  substantive contributions as to why these products are

25  successful.

1   Q. Would you address the second bullet, please?

2   A. Yes. The second is Google's superior search

3 engine. The reason why advertisers and publishers are

4 attracted to Google is because there's so many users of

5 Google's product.

6    And there's so many users of Google's product

7 because of their very good search engine. They have the

8 best search engine in the world. And so when you, as a

9 computer user, who wants to try to find information on

10 the web, you use Google because you're going to get the

11 best results.

12    And that is all technology developed by

13 Google. It has nothing to do with these

14 patents-in-suit.

15   Q. Does the fact that advertisers, when they sign

16 up with Google, have the opportunity to place ads both

17 on Google's search results page and publishers content

18 pages an advantage for Google?

19   A. It is.

20   Q. And that's a nonpatented feature?

21   A. It is.

22   Q. The third bullet is the value of the Google

23 brand. Could you please explain that?

24   A. Yes. Google's users trust Google. They have

25 one of the most loyal user bases of any company in the

1  world, because Google gives them a good product, one in

2  which they can use easily and gives them really good

3  results.

4       This is giving them a good reputation in the

5  marketplace.  That's the brand.  And the name Google now

6  is just synonymous with search in the world.  And

7  that's -- all that was developed by Google's technology,

8  their patents, all of their ingenuity and engineering

9  and software.  It has nothing to do with the

10 patents-in-suit in this case.

11     Q.   Of the -- the next bullet is the innovative

12 auction design Google developed to sell slots to

13 advertisers.  Why does the auction design matter?

14     A.   Well, that's what's really important to

15 advertisers.  Google did something that no one else had

16 ever done.  They used what's called a second price

17 auction.

18       And what that means is advertisers in any

19 media are always wondering, have I overpaid for this

20 exposure of my product in the marketplace?

21       Google developed an auction that you would not

22 pay what you bid; what you'd paid is a penny more than

23 the next lowest bid.  So that gave advertisers

24 confidence they're not overpaying for their ads.

25 And Google did this.  And these billions of auctions

1    occur every day in milliseconds, faster than you can

2    blink your eye.  All this technology was developed by

3    Google, not by the patents-in-suit.

4         Q.   The next bullet is Google's critical mass of

5    users, advertisers, and publishers attained before the

6    alleged infringement.  What relevance does that have?

7         A.   Well, that just goes to show that a lot of the

8    success, the reason why Google is successful were due to

9    other factors that had nothing to do with these

10   patents-in-suit before they infringed these patents.

11             So they brought all this value together, and

12   that's why these products were successful long before

13   they were allegedly infringing the patents-in-suit.

14        Q.   The next item is Google's advertising tools.

15   What's the importance there?

16        A.   Here is that Google helps these advertisers,

17   and they do it through their own products and services

18   where they help advertisers understand whether they're

19   doing the right thing or not with their ads.

20             They let them know how many impressions that

21   they are -- people are seeing, what their click-through

22   rate is.  They give all kinds of analytics that these

23   advertisers can then rejigger their programs and what

24   they're doing so they can have more success.

25             All of this technology, again, has nothing to

1  do with the patents-in-suit and everything to do with

2  Google's engineers and their ingenuity.

3     Q.   The next item is Google's ability to serve ads

4  in multiple languages.  Can you explain that?

5     A.   Yes.  Google has developed its software to

6  make it usable in 35 different languages all around the

7  world.

8          So you can have someone who doesn't speak

9  English.  You can have an advertiser who doesn't speak

10  English.  You can have a publisher who doesn't speak

11  English.  And they can use this Google system outside

12  the United States, which adds again to the worldwide use

13  of this program.

14     Q.   The next item is Google's global network of

15  data centers and fiberoptic links.  What relevance does

16  that have?

17     A.   The relevance of that is that, again, to have

18  your users have a good experience -- we're an impatient

19  lot, and we want our results instantly.

20          And Google has invested hundreds of millions

21  of dollars in infrastructure, in computers, in servers

22  all around the world and linkages and all these other

23  things that put all this system together and can work

24  all around the world in milliseconds.

25          Again, all this cost and contribution is due

1    to Google, not to the patents-in-suit.

2        Q.    And the final item is Google's own patents and

3    patents licensed from third parties.  Why is that

4    important?

5        A.    What you have to understand is that the two

6    patents being asserted in this case are not the only two

7    patents that contribute to the success of Google's

8    products.

9            They have hundreds of patents themselves that

10   they have had issued to them.  They have licensed in

11   hundreds of patents from other technology companies.

12           All these patents also contribute to the

13   success of the infringed -- or the allegedly infringing

14   products.

15       Q.    So that's a lot.  What impact does all that

16   have on the hypothetical negotiation in this case?

17       A.    Well, you have to understand what the

18   hypothetical negotiation is.  The impact is that each

19   party of the hypothetical negotiation have to be

20   reasonable people.  They have to recognize the value

21   that the other person is bringing to this bargaining

22   table.

23           So these are all things that Function Media

24   would have to realize that Google is contributing to the

25   success of this product, just as Google would have to

1  recognize the contribution that the Function Media

2  patents are bringing to their product.

3      Q.   In the hypothetical negotiation, does either

4  party have the upper hand?

5      A.   No.  I don't think it's -- someone can hold

6  someone up or have an advantage.  Google is a very large

7  company and very successful company, but they can't use

8  that to try to pound an unfair reasonable royalty rate

9  from the two patent owners here in the courtroom.

10          But by the same token, they can't hold up

11  Google and say, if you can't sell your product without

12  our patents, you have to pay us a lot of money.  Neither

13  party can do that in this reasonable negotiation.

14              THE COURT:  Counsel, will you approach

15  real quick?

16              (Bench conference.)

17              THE COURT:  I didn't mean to cut you off,

18  but at the last bench conference, they asked for a time

19  total.  So I told them, after you got your witness

20  qualified, I'd give you an update.

21              MS. CANDIDO:  Okay.

22              THE COURT:  The Defendant, at the time

23  you called Wagner, had used 13 hours and 22 minutes.

24              MR. VERHOEVEN:  13:22.

25              THE COURT:  22.  And the Plaintiff has

1  used -- had used 13:06.  The time you put Wagner on was

2  at 2:45, okay?  So he's been going exactly 10 minutes,

3  so you need to add that to your total.

4                MR. VERHOEVEN:  13:32 then.

5                THE COURT:  As of now, that's correct.

6                MR. VERHOEVEN:  Thank you.

7                (Bench conference concluded.)

8       Q.   (By Ms. Candido) Mr. Wagner, we were talking

9  about all of the inputs that Google brings to the table.

10               In your opinion, did Mr. Bratic properly

11  account for the importance of these nonpatented

12  features?

13      A.   No.  I reviewed his writeup on GP Factor

14  No. 13 in his report.  It consisted of only two

15  paragraphs.

16               In those two paragraphs, he did not mention

17  one of these items that I've listed on the screen as to

18  something he considered in arriving at his reasonable

19  royalty rate.

20      Q.   In your view, is there any way that an opinion

21  that gives 65 percent of the profit to Function Media

22  and 35 percent of the profit to Google has properly

23  accounted for these Google nonpatented inputs?

24      A.   Not in my professional opinion.

25      Q.   So in your opinion, what impact does

Mr. Bratic's failure to have apportioned profits between the patents-in-suit and Google's nonpatented contributions have on the reliability of his conclusions?

     A.   By only focusing on what he thought the value of the patents-in-suit were and ignoring the rest of these factors, I believe he's overstated what the reasonable royalty rate would be.

     Q.   Is that a small overstatement?

     A.   Well, obviously, my conclusion is significantly lower, so I think it's a large overstatement in my opinion.

     Q.   Mr. Wagner, Mr. Bratic testified about various metrics related to Google's acquisitions of certain other companies, such as Applied Semantics and DoubleClick.  Did you review that testimony?

     A.   I did.

     Q.   Do you agree with Mr. Bratic's use of Google's acquisitions of entire companies --

     A.   I do not.

     Q.   -- in forming his opinion?

     A.   I'm sorry.  I do not.

     Q.   Why not?

     A.   That -- when you use a yardstick, any yardstick, to measure what is received in the

1 hypothetical negotiation, you have to compare it to what

2 Google is receiving in this hypothetical.

3         What they're getting is a nonexclusive right

4 to use these two patents-in-suit in the United States to

5 use, sell, offer to sell products in the United States.

6 That's all they're getting.

7         Now, when Google acquires a company, they get

8 far more from a company than just those rights.  First

9 off, they'll get any patents the company has, but owning

10 a patent is much more valuable than just getting a

11 nonexclusive right to use it.  Google's competitors can

12 get a license to these two patents-in-suit.

13         If Google owned patents, they could prevent

14 their competitors from that technology.  They also get

15 the products of the company that they have purchased.

16 They get the customer relationships.  They get the

17 employees.  They get copyrights and trade secrets.  And

18 they get synergies between the two companies.  They get

19 a working force that are organized engineers that are

20 developing products.

21         All these other things they're getting of

22 value have to be accounted for or taken out of the

23 acquisition if you're going to use that to measure the

24 value of this nonexclusive license.

25     Q.   Are there any circumstances under which it's

1 reasonable to consider the acquisition of an entire

2 company in the context of a reasonable royalty analysis?

3    A.   Yes.  If you could isolate the value of just

4 the patents, that could get you close.  You'll still

5 have to do more adjustments, but it could be used if

6 you've done that step.

7    Q.   Did Mr. Bratic attempt to do that step, to

8 identify the specific value of any patents acquired as

9 part of Google's acquisitions of entire companies?

10    A.   He made no such effort to do that.

11    Q.   So does Google's acquisitions of entire

12 companies, in your opinion, have any relevance at all to

13 what Google would pay for a reasonable royalty in this

14 case?

15    A.   Not without an attempt to adjust for all the

16 things that I said, so I would say no.

17    Q.   Mr. Wagner, Mr. Bratic also showed various

18 comparisons to internet royalty rates, to technology

19 charges, and to impressions.  Did he make the same

20 mistake in those comparisons?

21    A.   He made the exact same mistake in all of those

22 comparisons as well.

23    Q.   Could you explain that a little more for the

24 jury, please?

25    A.   Yes.  When he looked at internet licenses in

general, again, most of those licenses -- or many of

them include a lot more value than just a nonexclusive

right to a license.

The source he used, many of those licenses are

software licenses. Again, that's a finished product.

If you have a finished product, which you can

immediately use and make money with, it's far more

valuable than just a patent that gives you concepts,

some ideas, some novelty to maybe create a software

program.

So using those as yardsticks just isn't right

without a proper adjustment.

The impressions. Again, impressions were only

possibly because DoubleClick had developed a very good

product after many, many man years of effort, and they

actually had customers; they had revenues. Again,

comparing that to this nonexclusive license is just not

appropriate.

And the technology charges were for developed

technology. Again, those are finished products. If

someone hands you a finished product right now, that's a

lot more valuable to you than if they said: Here's a

patent. Go figure out how to make a product with it.

So, no, without investment, none of those

yardsticks were useful to me.

1     Q.   The technology charges ██ ██ ██ ████

2 ████████ **REDACTED BY ORDER OF THE COURT** ████████ all relate

3 to developed technology; is that correct?

4     A.   They do.

5     Q.   What is the difference between -- well,

6 actually, let me restate that.

7     Did you make a demonstrative illustrating the

8 difference between developed technology and a patent?

9     A.   I did.

10     MS. CANDIDO:  Charles, would you please

11 put up DX demo 373?

12     Q.   (By Ms. Candido) Mr. Wagner, would you please

13 explain this demonstrative?

14     A.   Yes.  The top part is showing -- the left is

15 really supposed to be a patent.  That's a piece of paper

16 that has the claims and all the elements of a patent.

17 It is an invention.  It's a new idea.

18     And that, in this case, is used eventually to

19 get a product.  Here, this is AdForce for Content, and

20 this is a result of that program.  You have a web page.

21 This is CNN.  You have some ads on it.  And that's an

22 actual product that is useful to someone.

23     The bottom half is just an analogy, and the

24 bottom left is a drawing of a house, a sketch.  That's

25 kind of like the patent.  And then on the right is a

98

finished house that you can live in.

And when you're using developed technology,
that is like the house, and the patent is like the
sketch.  So without making proper adjustments, you just
can't compare the two.

Q.   So Mr. Bratic, in his analysis of these
technology charges and internet -- sorry -- the
technology charges ■ **REDACTED BY ORDER OF THE COURT**      ■
█████ █████  in connection with acquisitions, he's
essentially comparing the price of a fully developed,
built house you can live in with a sketch of a house?

A.   That's, in my opinion, a good comparison, yes.

Q.   I take it you think that's not a proper
comparison under Georgia-Pacific for a reasonable
royalty in this case?

A.   Correct.  Without proper adjustment, it is not
a good comparison.

Q.   Mr. Bratic testified that Google could pay
Function Media a 12 percent royalty because Google would
simply lower the amount that it would pay to its
publishers, and Google's profit would not be impacted.

Do you recall that testimony?

A.   I do.

Q.   In your opinion, is Mr. Bratic correct about
the likely effects of reducing payments to publishers?

1    A.    Not in my opinion.

2    Q.    If Google lowered the amount that it paid its

3 AdSense for Content publishers, as Mr. Bratic suggests

4 that it could, would -- what effect would you expect

5 that to have?

6    A.    I would expect that Google would lose some

7 percentage of their customers.  When the customers are

8 getting paid higher for their contribution to this whole

9 process, and now all of the sudden, they're paid

10 something less, they're going to seek other

11 alternatives.

12        They could actually go out and try to get ads

13 themselves with no other help and keep a hundred percent

14 of the profit of that.  They could go to one of Google's

15 competitors.

16        So there's other choices.  They're not locked

17 into Google.  So under the law of supply and demand

18 under basic economic theory, you'd expect some loss of

19 customers.

20    Q.    So, in your opinion, Mr. Bratic's opinion is

21 inconsistent with the basic law of supply and demand?

22    A.    It is.

23    Q.    And for that reason, I take it you think it's

24 unreliable?

25    A.    It is.

1    Q.   Have you seen any evidence in this case that

2  Google could cut its payments to publishers with no

3  impact on its business?

4    A.   Well, I've seen -- and I believe it was in his

5  testimony, and I saw it before.  There was one e-mail

6  from one executive who believed they could do it.  But,

7  obviously, that executive was not believed by the rest

8  of Google management, because they've never done what

9  she suggested.

10    Q.   And I believe you've prepared a demo slide of

11  testimony that you've seen in this case that suggests

12  that Google could not cut its payments to publishers?

13        Do you recall --

14    A.   Well, this was testimony of another Google

15  executive, yes.

16    Q.   But testimony in this trial?

17    A.   Yes.

18    Q.   Okay.

19        MS. CANDIDO:  I'd like to put that up.

20  It's DX demo 392.

21    Q.   (By Ms. Candido) I'm not going to read all of

22  this, but in this testimony, Ms. Wojcicki, one of the

23  Google vice presidents, indicates here what?

24    A.   I'm sorry.  Could you repeat that?

25    Q.   I'm sorry.  Could you summarize for the jury

1    your understanding of Ms. Wojcicki's testimony that's

2    replicated on this slide?

3         A.   Well, I think what she was saying is, she

4    believed there would be a lot of publishers that Google

5    would lose if they cut their prices.  And what Google's

6    publishers care about is the amount of money they're

7    paid.  If they're paid less money, they may leave.

8         Q.   Mr. Wagner, Mr. Bratic testified about a

9    royalty base for AdSense for Content Online products.

10             Do you recall that?

11        A.   I do.

12        Q.   Could you explain what a royalty base refers

13   to?

14        A.   Well, a royalty base are -- in this case, if

15   there's a running royalty as a percent of sales or

16   revenues, would be all the sales and revenues of the

17   allegedly infringing products in the United States.

18        Q.   Have you been asked to identify which revenues

19   for the accused products are specifically tied to the

20   United States?

21        A.   Yes.

22        Q.   Have you done that?

23        A.   I have made two calculations or estimates of

24   the amount of Google sales in the United States.

25        Q.   Okay.  I believe we have a slide that

1  summarizes that.

2              MS. CANDIDO:  If you could put up DX demo

3  385, please, Charles.

4      Q.   (By Ms. Candido) So, Mr. Wagner, could you

5  tell us the two different calculations that you -- you

6  made of U.S. revenue?

7      A.   Yes.  The top two lines in this exhibit.

8  The top one says, U.S.-only based on public financials.

9  Google reports its results to the public and to the

10 federal government, because they are a publicly owned

11 company.

12             And in those financial statements, they report

13 the percentage of their business that is in the United

14 States.  And based on those public financials,

15 48.7 percent of Google's revenues for the allegedly

16 infringing products are in the United States.

17     Q.   And why does Google publicly report revenue

18 information to the SEC?

19     A.   Because it is a requirement of the SEC rules,

20 which are rules of the federal government, that a public

21 company must segment its financial information

22 geographically.

23     Q.   Could you tell us about the second way that

24 you calculated U.S. revenue?

25     A.   The second way I calculated is what's called

unserved revenues. This is where the revenues or the
publisher is located.

So if they look at the location, the
geographic location of the publishers who are using the
allegedly infringing products, 31.2 percent of their
customers are in the United States or their revenues
from those customers.

MR. VERHOEVEN: One second, Your Honor.

THE COURT: Okay.

MR. VERHOEVEN: Can we take that off the
screen, Charles? I need to check on the --

MS. CANDIDO: The confidentiality issue.

THE COURT: Okay.

(Pause in proceedings.)

MR. VERHOEVEN: We're okay.

MS. CANDIDO: Okay. So you can put that
back up, please.

MR. VERHOEVEN: I apologize, Your Honor.

THE COURT: That's all right.

Q.    (By Ms. Candido) So, Mr. Wagner, just going
back for a second, the -- why did the U.S. -- I'm sorry.

Let me restate that.

The U.S.-only based on public financials, is
that the U.S. income on which Google pays taxes in the
United States?

A.   Yes.  This is the way they report their
revenue, so they'll pay taxes to the U.S. Government.

Q.   Does that have any impact on your opinion
about why this is or isn't a reliable metric?

A.   Yes.  It's also the federal government's rules
patent law that only U.S. revenues are relevant to a
damage calculation for a U.S. patent.  So it's the same
government that is saying this is the amount of sales in
the United States.

Q.   I take it, if the U.S. Government could figure
out a way to tax more income, it would?

A.   I assume that they would.  If they thought it
was legitimately in the United States, they would want
Google to pay more U.S. taxes.

Q.   Were you asked to make any other calculations
of an appropriate royalty base in this case?

A.   Yes.  It's the third line down, which is
called non-keyword royalty base worldwide.

Q.   How did you calculate the non-keyword royalty
base?

A.   Google internally has certain indicators that
they know how people generated searches, and they know
the number of times that are non-keyword searches, where
someone didn't put a keyword in to get to the ultimate
search results.

And if you take out all keyword searches, then my calculation of the royalty base, using the same information Mr. Bratic did, would be $569 million.

Q.   So if the jury finds that keyword targeting alone does not infringe, then, in your opinion, the appropriate royalty base for any damages award should be this 569-million-dollar number, not Mr. Bratic's 5-billion-dollar number?

A.   Yes, and that would be before adjusting for U.S. sales.

Q.   So that would be a conservative royalty base?

A.   That would.

Q.   And just for completeness, the bottom line here, that's Mr. Bratic's royalty base from his report?

A.   Yes.  And I used that as the starting point to calculate my three calculations of adjusted royalty base.  We do not disagree on that amount for worldwide sales of the allegedly infringing products.

Q.   Oh, so that royalty base of 5 billion includes sales anywhere in the entire world, including activities that take place outside the United States?

A.   It does.

Q.   And for that reason, is it your opinion that that's overbroad?

A.   I'm not here to give a legal opinion about

what sales should or should not be included.  I've only

given you these calculations.

Q.   But if -- if the jury determines that

activities outside the United States don't infringe,

then that's why you've provided these alternative

calculations?

A.   That is why I provided the information.

Q.   What is a design-around?

A.   A design-around is when you technically can

redesign your product so that it can accomplish pretty

much the same functionality but not practice the claims

that are in suit.

Q.   What impact does an available design-around

have on the hypothetical negotiation?

A.   Well, it depends on the cost of it, but if the

cost is lower than what the patent owners are asking

for, that is your next best alternative.  And if the

patent owner is asking an unreasonable amount, you would

not pay the royalty; you would go to your next best

alternative.

So it puts a cap on what the reasonable

royalty rate should be.

Q.   In really layman's terms, I mean, is this

essentially saying that, you know, if tomorrow, I went

to the supermarket, and a pint of ice cream was suddenly

1  $30, but frozen yogurt was still only, you know, 2.50,

2  that I would buy frozen yogurt for 2.50 and not the ice

3  cream?

4      A.    That's a close example, but that could work.

5      Q.    Do you have any understanding about whether

6  there are design-arounds available to the

7  patents-in-suit in this case?

8      A.    It is my understanding that there are.

9      Q.    Where does your understanding come from?

10      A.    From conversations with Mr. Lanning and from

11  the trial testimony of Mr. Miller and Ms. Wojcicki.

12      Q.    Can you tell us briefly what your

13  understanding of Google's available design-arounds are?

14      A.    That they have actually implemented -- and

15  it's not just a prototype; it's in beta test -- a

16  program called Explorer where Google is the one that

17  decides what keywords to use, and the advertisers do not

18  provide that information to Google.  And my

19  understanding is that that would be a noninfringing

20  alternative.

21      Q.    I believe you've prepared a slide of some

22  testimony in this case regarding Explorer.

23            MS. CANDIDO:  Let's put that up.  It's DX

24  demo 389, please.

25      Q.    (By Ms. Candido) So in this testimony,

1  Ms. Wojcicki is explaining what Explorer is and says:

2  There are no keywords, and Google designs and does all

3  the targeting and figures out the right place to serve

4  the ad.

5        Is this one of the pieces of testimony that

6  you relied upon in your opinion?

7     A.   It is.

8     Q.   And I take it, this trial testimony supports

9  your opinion about design-arounds?

10    A.   Well, I'm not a technical expert.  I have to

11 rely on my client.  I can tell you the financial impacts

12 of it, but this tells me that there is a viable

13 noninfringing alternative, if this is truly

14 noninfringing, and that Google can do it, because

15 they've actually already done it and incurred most of

16 the cost to do it.

17    Q.   So, in your opinion, what is the impact of

18 Google's available design-arounds on the hypothetical

19 negotiation in this case?

20    A.   Well, if the patent owners coming in and

21 asking for $600 million, it would really incentivize

22 Google to look at these types of alternatives and

23 actually execute them in order not to have to pay $600

24 million.

25    Q.   Does Mr. Bratic take into account the effect

1   of the design-arounds at all in his analysis?

2       A.   No.  He relies on the technical expert of

3   Function Media who says there are no infringing

4   alternatives.

5       Q.   So what impact did that have on Mr. Bratic's

6   reasonable royalty rate?

7       A.   Well, I think it means there isn't this cap,

8   this next best alternative; in his mind, would raise the

9   royalty rate.

10      Q.   Mr. Wagner, you testified earlier that you

11  also formed an independent opinion on a reasonable

12  royalty that's adequate to compensate Function Media in

13  the event that Google is determined to infringe the

14  patents-in-suit; is that right?

15      A.   I did.

16      Q.   What is that opinion?

17      A.   The opinion is that at a maximum, the

18  reasonable royalty rate to apply to whatever is the

19  appropriate royalty base is a 0.25 percent royalty.

20      Q.   So a 0.25 percent royalty for folks like me,

21  who are not very good at math, that is essentially

22  saying a quarter of 1 percent; is that fair?

23      A.   That's another way of saying it.

24      Q.   Okay.  Did you apply that to Mr. Bratic's

25  royalty base to determine what damages would be

1  calculated based on Mr. Bratic's large royalty base?

2      A.   If you use Mr. Bratic's 5-billion-dollar

3  royalty base, that would result in a reasonable royalty

4  of $12.5 million for the period from the date of first

5  infringement through trial.

6      Q.   Did you also look at -- well, actually, let's

7  skip ahead for a moment.

8          Could you explain why you considered the

9  Stanford license to be relevant to your reasonable

10 royalty analysis?

11              THE COURT:  Well, we're moving into a new

12 area.  Let's go ahead and take our afternoon recess.

13              Ladies and Gentlemen, be back ready to

14 come into the courtroom at 3:35.  Take 20 minutes.

15 Remember my prior instructions.  Don't talk about the

16 case.

17              COURT SECURITY OFFICER:  All rise.

18              (Jury out.)

19              THE COURT:  All right.  Court will be in

20 recess until 3:35.

21              (Recess.)

22              COURT SECURITY OFFICER:  All rise.

23              (Jury in.)

24              THE COURT:  Please be seated.

25              Let's proceed.

1           MS. CANDIDO:  Thank you.

2      Q.   (By Ms. Candido) Mr. Wagner, before the break,

3  you gave an opinion about a maximum reasonable royalty

4  rate.

5           Do you recall that?

6      A.   I did.

7      Q.   Before we go on, I just want to clarify

8  something, because I think it's important.

9           You understand that Google believes that it

10 does not infringe the patents-in-suit, right?

11     A.   I am fully aware of their position.

12     Q.   And you also understand that Google believes

13 that the patents-in-suit are invalid, correct?

14     A.   That is correct.

15     Q.   So it's also Google's position, as I assume

16 you understand, that there should be no damages in this

17 case.

18           Do you understand that?

19     A.   If they are right about either of those two

20 things, there are no damages in this case.

21     Q.   So given that, why are you calculating a

22 damages number for Google?

23     A.   Because it's possible the jury here will

24 disagree with my client's position, and if they do, they

25 need a reasonable estimate of damages.  And that's why

1 they asked me to perform that calculation.

2 　　Q.　So why wouldn't the jury just rely on

3 Mr. Bratic, if they find that Google infringes?

4 　　A.　Well, that's their prerogative, but both my

5 client and I do not believe that's a reasonable number.

6 　　Q.　I take it that's for all the reasons we've

7 discussed before the break?

8 　　A.　Yes, it is.

9 　　Q.　So turning back to your opinion, what is the

10 basis for your quarter percent, or 0.25 percent, maximum

11 reasonable royalty rate?

12 　　A.　The foundation for this analysis is the

13 original Stanford/Google license agreement entered into

14 on December 1st, 1998, where Google got the rights to

15 the foundational patent that entered -- enabled them to

16 enter the search business commercially.

17 　　Q.　So could you summarize for us the rights

18 granted -- that Stanford granted to Google under this

19 agreement?

20 　　A.　Yes.　They gave an exclusive license for at

21 least six years to Google to practice and sell licensed

22 products that practice this foundational patent.

23 　　　　It was actually invented by Mr. Page and Mr.

24 Brin and a few others while students at Google -- pardon

25 me -- students at Stanford.

1          Also, it gave them worldwide rights, not just

2   in the United States but worldwide.

3          Another aspect of the agreement was that not

4   only to get this right to use the patent, they got

5   software that had already been developed.  So, again,

6   they got some developed technology.  They got some

7   source code which they could use.

8          They got sublicensing rights, which they could

9   sublicense this technology to others, if they so choose.

10  So -- and they also had a 20-year term to this

11  agreement.

12      Q.   Did Google also get the rights to the Google

13  name and trademark as part of this deal?

14      A.   Yes.  That was also other consideration.

15  Although the Google name at that point didn't have as

16  much value as it does today, they did get the right for

17  the logo and for the name.

18      Q.   So there's -- just to compare that for a

19  moment to the hypothetical negotiation, could you

20  explain for us the differences in the terms of those two

21  agreements?

22      A.   Yes.

23      Q.   Or I should say, between the agreement and the

24  hypothetical negotiation?

25      A.   Yes.  In the agreement I'm talking about, the

Stanford/Google agreement, there was an exclusive

license, which has a lot more value than just a

non-exclusive license.

No one else could use this technology in the

search business, except for Google.  And that has a lot

more value to Google than just a non-exclusive right to

use an invention where everyone else in the industry

could also license that technology.  So that's one major

difference.

The other major difference is all these other

rights that Google got that they're not going to get in

this hypothetical negotiation, and those are the rights

to the developed technology, to the software, to the

source code.  Those aren't rights they're going to get.

They also had a broader geography.  The wider your area

you can sell into, the more value is.  So having

worldwide rights in the Stanford agreement is more

valuable than the rights they're going to get in this

hypothetical negotiation.

Q.    So given those differences, can you please

explain why you consider the Stanford license agreement

to be relevant to reasonable royalty analysis?

A.    Because it's going to put a maximum, because I

think that this is as high as you could go.  You could

possibly go lower.  But it's going to put a ceiling on

1  what a reasonable royalty rate would be.

2      Q.    So even if the jury believes Function Media's

3  contentions, that their patents are foundational to

4  Google's products, I take it your view is that the

5  Stanford patent, the Page/Brin patent, that was licensed

6  to Google in the Stanford agreement, is -- is also a

7  very, very foundational patent?

8      A.    Well, it is the foundational patent.  It is

9  what enabled Google to do what they've done in search.

10 And Google is search.  Without search, Google is

11 nothing.  You have nothing to offer anyone else.

12     Q.    So when you took the Stanford license, how did

13 you get to your quarter percent royalty rate?  Could you

14 explain that, please?

15     A.    Yes.  First off, Google paid a very small lump

16 sum to enter the license agreement, $20,000.  They also

17 had to pay $50,000 a year to keep the exclusivity

18 portion of the agreement, but the real consideration is

19 they gave Stanford University 2 percent of the stock of

20 the company.

21          Now, there was a contingency on this 2 percent

22 of the stock.  Google had to be worth at least $8

23 million according to a fund -- a raising of funds for

24 the company in order for Google to have to pay this

25 stock to Stanford.

```
 1              So it didn't occur right in 1998.  It occurred
 2   in the next year, but that was getting the measure that
 3   Stanford and Google placed on this 2-percent stock.  So
 4   2 percent of $8 million is $160,000.
 5              So at the time that they entered this
 6   agreement, that's the value that both Google and
 7   Stanford agreed was the value of all the rights granted
 8   in this agreement.
 9        Q.   I believe you prepared a slide comparing the
10   value to Google of the Stanford agreement at the time of
11   the agreement with the -- what Mr. Bratic says Function
12   Media should get in the hypothetical negotiation; is
13   that correct?
14        A.   It is.
15              MS. CANDIDO:  Let's put up that slide,
16   please.  It's DX Demo 380.
17        Q.   (By Ms. Candido) Would you please explain this
18   slide, Mr. Wagner?
19        A.   Yes.  First, both circles or pies are the
20   profit.  That's what that whole pie is.
21              In the left-hand side, you see that according
22   to Mr. Bratic and his opinion that 65 percent of the
23   profit will go to Function Media, and 35 percent will be
24   kept by Google.
25              And what Google is getting in this
```

hypothetical negotiation is just a non-exclusive license

and for a two-and-a-half-year term.

Now, what Stanford, which is the right-hand

side, for the rights they gave to Google are only going

to get 2 percent of the profit, because 2 percent of the

stock of the company gives you the rights to all the

future profits of the company.  And it's only the rights

to the profit.

So, again, they're getting a much smaller

piece of the pie, and this is for a much greater bundle

of rights, including an exclusive license to the

foundational patent that gave rise to their search

technology.  It's 20 years in length.

They also got the Google name and logo, and

then all the other developed technology, which is the

software and source code.

Q.   So you said here we're looking at pie charts

representing Google's profits; is that right?

A.   That is correct.

Q.   So in the Stanford agreement, it was 2 percent

of the profits?

No.  I'm sorry --

A.   That's correct.

Q.   Okay.  And you converted that 2 percent of

profits, though, into a royalty percentage that's based

1  on gross revenue, right?

2      A.   Right.  In patent licenses, the normal base

3  that you use is revenues, not a percentage of profits.

4  So I have to convert this 2 percent of profit into what

5  is 2 percent of profit as a percent of sales.

6          And how I did that was I analyzed the average

7  after-tax profitability of Google throughout this entire

8  period, from 2002 through 2009.  And it's a little bit

9  less than 25 percent.

10         So think of now a pie that's all revenue; 25

11  percent of that revenue is going to be left over in

12  profit, and now 2 percent of that 25 percent is the

13  license grant.

14         So if you multiply 2 percent times 25 percent,

15  that would equal to 0.5 percent of sales or a half a

16  percent.  So it's -- I can equate the 2 percent of

17  profit to a half a percent of sales.

18     Q.   Mr. Wagner, is it common to analyze a

19  transfer -- well, backing up -- the 2 percent in the

20  agreement is 2 percent of equity, correct?

21     A.   That is correct.

22     Q.   And you're representing it here as 2 percent

23  of profits; is that right?

24     A.   Right, because that's what you have as a

25  stockholder.  You're entitled to the distributions of

company based on their profits.

Q.   And that doesn't depend on whether or not the
company actually makes distribution, does it?

A.   No.  In fact, a lot of companies don't make
distributions, but also they have a share price, which
based on financial theory, is the present value of all
those future cash flows discounted back to today.

So if you as a shareholder want to cash out
and get your present value of those profits, you can do
that on any day.

Q.   So from a theoretical standpoint, rather than
a company that pays distributions, if a company just
puts all of its profits into a bank account and just
keeps growing and growing, is the theory that at some
point, by virtue of owning this stock, if the company
was broken up, you would have a right to your percentage
share of that cash?

A.   You would.

Q.   Okay.  Is it common to analyze a transfer of
stock as a running royalty on future revenues?

A.   No.  This is an unusual calculation.  In the
academic literature -- and there's financial theory, and
it's really called a discounted cash flow analysis,
where analysts all the time look at the future profits
of a company, discount those future cash flows back to

1  what is the value today, and value a company that way.

2  I used that financial and economic theory in this work,

3  but I've really just done it in reverse.  And there's --

4  there's no academic interest in what I have done.  So

5  there's not a lot of writing on it, but all I've done is

6  use the math backwards.

7     Q.   It's just this situation doesn't occur often

8  enough for there to be academic literature on this

9  specific subject?

10     A.   Correct.  This is not a widely popular

11  subject.  Finding the value of companies is very

12  valuable and used all the time.  The calculation I have

13  done is not a usual calculation.

14     Q.   So you mentioned that you -- your calculation

15  resulted in a .5 percent or half-a-percent figure.

16        Did you make any adjustment to that figure?

17     A.   I made only one adjustment to that figure for

18  all these additional bundled rights you see on the

19  right-hand side of this demonstrative.

20     Q.   And what adjustment was that?

21     A.   The only adjustment I made is to adjustment

22  for the fact that the Stanford license is exclusive

23  versus non-exclusive.

24        Based on my review of thousands of license

25  agreements and the different terms, it is typical that

an exclusive license is worth twice as much as a
non-exclusive license.  And people will pay that much
more for it.

So I've reduced the 0.5 percent that I
calculated from this down to 0.25 percent as a result of
the difference between exclusivity and non-exclusivity.

Q.   So you didn't make any adjustments for the
different year license term, the 2.5 versus 20 years, or
all the other technology -- developed technology or
rights and source code in the deal.  You made no
adjustments for those?

A.   I did not.  And that's a conservative
assumption that I have made.

Q.   When you say it's a conservative assumption,
what do you mean by that?

A.   If I did make some attempt and used some
methodology to make these adjustments, my rate would
only be lower than what I have calculated.

Q.   So by not making those adjustments, you're
essentially putting the -- the -- well, you're
essentially penalizing Google, I guess; is that right?

A.   That is correct.  They'll pay more as the
result of my calculation.

Q.   So is it your opinion that a quarter percent
running royalty is a reasonable damages measure in this

1  case?

2      A.    I believe it is reasonable.

3      Q.    You believe it is the maximum reasonable

4  value?

5      A.    I do.  And I've said so in my report and in my

6  deposition.

7      Q.    Mr. Wagner, just to be clear, the Stanford

8  license is not a pure patent license, right?

9      A.    No.  It involves also other technology

10 transfer.

11     Q.    Is it reasonable to use the Stanford license

12 as a comparable license for the hypothetical negotiation

13 in this case, given that it's not a bare license?

14     A.    Well, it's reasonable for me to use it,

15 since -- if I don't make proper adjustments, I will

16 overstate the damages.  If I was working for Function

17 Media, I would make additional adjustments.

18     Q.    So, essentially, Google can like penalize

19 itself, but it's not fair for the other side to penalize

20 Google?

21     A.    I agree with that statement.

22     Q.    Did you consider the Georgia-Pacific Factors

23 in this case?

24     A.    I did consider the Georgia-Pacific Factors.

25     Q.    Now, let's talk for a moment about how

Mr. Bratic views the Stanford agreement.  Mr. Bratic

looks at the amount of money that Stanford sold its

stock for many years after the agreement was entered

into as well as of what the stock might have been worth

today or might have been worth at the hypothetical

negotiation.

Do you recall that?

A.   I do.

Q.   Do you agree with that approach?

A.   No.  I think that's not appropriate.

Q.   Could you explain why, please?

A.   Yes.  The real value that was exchanged and

what people agreed upon was at the time of the agreement

in 1998.  And as I told you, it's really at a maximum

$560,000 that Google was willing to pay for these

rights:  The $160,000, which is the 2 percent of

8-million-dollar equity value, the 20,000-dollar initial

payment, and the $50,000 a year for six years.  So

that's what they agreed to.

Now, you go 10 years later and you try to

value Google's stock, there's all other kinds of things

that have happened in those 10 years.  Thousands of

people have joined Google as employees.  All kinds of

technology has been developed.  The market has changed.

There's all other kinds of reasons why that stock can be

1  worth something different sometime in the future than

2  when the transaction actually occurred, which you can't

3  tie exactly to a patent.

4          So I think that's an inappropriate method to

5  value the patent license, for example.

6      Q.   And, again, just to be clear, you believe that

7  the Stanford agreement was -- well, what do you believe

8  the Stanford agreement's value was at the date that it

9  was entered into?

10     A.   A maximum of $560,000.

11     Q.   And you believe that's, generally speaking,

12  the appropriate way to value that -- that agreement?

13     A.   That is the only proper way to value that

14  agreement.

15     Q.   But despite that you've sort of taken this

16  additional step of trying to convert the equity interest

17  into a running royalty rate?

18     A.   That is correct.

19     Q.   And that, again, is a conservative approach,

20  because it results in a number that's much larger than

21  what you believe the number is?

22     A.   Well, it's not conservative, because that will

23  take into consideration the value that this patent has

24  increased over time based on the sales of products using

25  the invention.

1          So it is appropriate to do it that way, and it

2    does mean that today, based on the expansion of the

3    internet and particularly the value Google has brought

4    to the internet, that it's -- there is value that should

5    be paid for a patent.  That it would be $12 million,

6    based on a running royalty rate.

7        Q.    I believe you prepared a slide showing your

8    calculations with respect to this quarter-percent

9    running royalty rate.

10          Do you recall that?

11        A.    You mean as applied to the proper royalty

12    bases, yes, I have.

13        Q.    Correct.

14          MS. CANDIDO:  Could we put that slide up,

15    please?  I believe it's DX Demo 386.

16        Q.    (By Ms. Candido) Would you please explain, Mr.

17    Wagner, what we're looking at here?

18        A.    Yes.  This is really the same chart we had up

19    before, but I've added two more columns, which is the

20    maximum royalty rate and the maximum royalties due,

21    which is strictly multiplying the royalty rate times the

22    royalty base.

23          In the bottom figures are applying my 0.25

24    percent to the royalty base that Mr. Bratic has used for

25    his calculations.  And that results in a maximum royalty

1    due of approximately $12.6 million.

2        Q.    So, again, it's Google's position that it

3    should not have to pay any damages, correct?

4        A.    That's their position.

5        Q.    But this is -- in the -- in the alternative

6    situation where if the jury disagrees with Google, this

7    is what you offer as one reasonable measure of maximum

8    measure of damages in this case?

9        A.    Yes.  And if they believe worldwide sales is

10   the appropriate royalty base.

11       Q.    And so if they believe worldwide sales is

12   appropriate, then it's the 12-million number at the

13   bottom corner?

14       A.    That is correct.

15       Q.    And if they believe that there should be some

16   adjustment with respect to activities taking place

17   outside the United States, then you've provided two

18   options of ways of getting at that number; is that

19   correct?

20       A.    I have.  And those are the top two

21   calculations.

22       Q.    So in that situation, there's a range of

23   between about 4 million to 6.1 million; is that fair?

24       A.    That is fair.

25       Q.    And then finally, just to round this out,

1  you've also provided the non-keyword -- keyword royalty

2  base.  If the jury finds that keyword targeting doesn't

3  infringe, but if finds that other things do, this would

4  be the appropriate royalty base?

5      A.   Yes.  On a worldwide basis, it would be

6  approximately $1.4 million.

7      Q.   That would be the appropriate damages award?

8      A.   Yes.

9      Q.   If you didn't account for the U.S.

10 international issue?

11     A.   That is correct.

12     Q.   You also, I believe, looked at another Google

13 real-world patent license agreement; is that correct?

14     A.   I did.

15     Q.   Did you look at the Carl Meyer patent purchase

16 agreement?

17     A.   I did.

18     Q.   Could you please explain why you found that --

19 well, let me ask you first.

20          Did you find that agreement to be relevant to

21 your analysis?

22     A.   I did find it to be relevant.

23     Q.   Could you explain why you found that agreement

24 to be relevant?

25     A.   I think it had a lot of the elements that

would exist in a hypothetical negotiation, although there are some differences as well. But it gave me some information as to what the appropriate value would be.

Q. Could you go through some of the comparisons of that Carl Meyer agreement with the hypothetical negotiation assumptions in this case?

MR. TRIBBLE: Objection. May we approach, Your Honor?

THE COURT: Yes.

(Bench conference.)

MR. TRIBBLE: It sounds like he's going to go beyond the terms of what's on the face of the agreement.

MS. CANDIDO: He's absolutely not.

THE COURT: Okay. Reask your question, what about the Carl Meyer agreement? Give us this opinion.

MS. CANDIDO: Okay.

THE COURT: Okay. Phrase it in the terms of the agreement.

MS. CANDIDO: Okay. That's no problem.

(Bench conference concluded.)

Q. (By Ms. Candido) Mr. Wagner, you read the Carl Meyer agreement; is that right?

A. I did.

1      Q.    What about the terms of that agreement led you

2  to believe it had a relevance to the hypothetical

3  negotiation in this case?

4      A.    Well, first off, it's only related to patents.

5  It is a patent acquisition, which gives more value than

6  a license, but it is only patents.

7           There's nothing about developed technology or

8  an acquisition of a company.  So that makes it a better

9  yardstick than a lot of others.

10          Number two, the licensee in that -- actually,

11  the acquirer, which is like a licensee, is Google.  So

12  it's -- the same party is in that transaction as one of

13  the parties in the hypothetical negotiation.

14          The third thing is the substance of the

15  patents.  There were three patents and two patent

16  applications.  And all of them deal with electronic

17  advertising, the exact same field of use and -- that is

18  relevant to the patents in this lawsuit.

19          Another common characteristic is the term.

20  The term of the license agreement is very similar to the

21  term of the hypothetical license in this case.  So

22  that's another reason.

23          Another reason is that it was entered into on

24  December 18th, 2008, which is fairly close in time to

25  the hypothetical negotiation in July of 2007.  In both

those times, the licensor, or the seller in the Carl

Meyer, was aware of the commercial success of Google's

products.  So they both had that same understanding and

would theoretically have the same understanding of all

the contributions that Google brought up to that date to

why they're successful in the marketplace.

So for all those reasons, I thought it

provided some useful information.

Q.   And what did Carl Meyer -- I got that mixed

up.  What did Google pay to Carl Meyer to acquire the

patents that you just referenced?

A.   To acquire these three patents and two patent

applications, Google paid $3,550,000.

Q.   Are you aware of Mr. Bratic's testimony

regarding the probative value of the Carl Meyer

agreement?

A.   I am.

Q.   What's your opinion of Mr. Bratic's testimony?

A.   That he was inconsistent with other yardsticks

that he used to arrive at his opinion.

Q.   What do you mean by that?

A.   Mr. Bratic decided not to use this agreement,

even though he could read it like I did and understand

all these similarities, because he couldn't go beyond

just the information in the agreement and had no other

source of information.

But he used to inform his opinion hundreds of licenses from publications, from studies that he had no knowledge what those patents were about.  They clearly -- most of them didn't have anything to do with electronic advertising.  He didn't know whether they were exclusive.  He didn't know whether there was other technology granted them.  He didn't know the terms of licenses.

But yet he was willing to use all those yardsticks he explained to you to inform his opinion where I think he had far less information from those sources than by reviewing the Carl Meyer agreement.

Q.   So what was your conclusion with respect to the Carl Meyer agreement reading its terms?

A.   That I think it was a very good piece of information to use to come up with a range of value of the patents-in-suit.

Q.   Is it your opinion that the Carl Meyer -- the terms of the Carl Meyer agreement are a comparable agreement to the hypothetical negotiation?

A.   Well, all the things I've already described are comparable.  There are some differences.

Q.   The differences inure to the benefit of the Carl Meyer agreement, essentially -- well, let me strike

1  that.

2  In the Carl Meyer agreement, Google obtained

3  more rights than it would obtain in the hypothetical

4  negotiation; is that fair?

5  A.  That's fair.

6  Q.  So the 3.5 million that Google paid to Carl

7  Meyer is a conservative valuation of that agreement as

8  applied to the hypothetical negotiation?

9  A.  If you didn't make any adjustments based on

10  the reasons why Carl Meyer gives more value to Google

11  than they will get in this hypothetical negotiation.

12  Q.  So is your conclusion that the results of a

13  hypothetical negotiation between Google and Function

14  Media would result in a reasonable royalty of

15  approximately 3.5 million, but in no event more than

16  12.5 million?  Is that your opinion?

17  A.  That's a fair statement of my opinion.

18  Q.  Is that opinion consistent with the evidence

19  and testimony that you have reviewed up to and

20  throughout this trial?

21  A.  It is.

22  MS. CANDIDO:  Thank you.

23  MR. TRIBBLE:  Cross-examination, Your

24  Honor?

25  THE COURT:  Yes, sir.

CROSS-EXAMINATION

BY MR. TRIBBLE:

Q.   Good afternoon, Dr. Wagner.

A.   Good afternoon, Mr. Tribble.  I'm not doctor.

Q.   Oh, sorry.

A.   Thank you for the promotion.

Q.   Let's -- well, speaking of your background, you're not a certified licensing professional like Mr. Bratic, are you?

A.   I am not.

Q.   Because you don't have the real-world experience that he does in actually negotiating patent licenses, correct?

A.   I have never negotiated a patent license. I've only assisted with financial analysis.

Q.   And I would appreciate it if on cross-examination, you would try to limit your answers to yes or no when possible.

A.   I will try to do that.

Q.   Fair enough?

A.   That's fair.

Q.   Your hourly rate is $750 an hour?

A.   Yes.

Q.   And you were hired just this last August?

A.   My firm was hired last August, yes.

1     Q.   And I don't want to get into it.  Do you

2 remember the testimony with Mr. Bratic on

3 cross-examination from Mr. Verhoeven about how much he'd

4 been paid?

5     A.   Well, again, Mr. Bratic wasn't paid.  His firm

6 was paid.

7     Q.   Fair enough.

8          Are the bills that you've -- your firm has

9 charged, are they larger than the bills Mr. Bratic's

10 firm has charged?

11     A.   No.  In total, they were slightly less.

12 That's why I didn't understand the testimony, but

13 they're very close.

14     Q.   Okay.  Fair enough.

15          Now, yes or no, you've relied on Dr. Rhyne,

16 our technical expert, in the past?

17     A.   I have worked with Dr. Rhyne on common clients

18 in the past, yes.  And I've relied upon his testimony.

19     Q.   And for purposes of your analysis in this

20 case, you're assuming that the Function Media patents

21 are 100 percent valid and are absolutely 100 percent

22 infringed by Google AdSense and AdWords, correct?

23     A.   Yes.  Otherwise, my work is not relevant.  So

24 I've made those assumptions.

25     Q.   And you agree that Function Media is entitled

1  to no less than a reasonable royalty?

2       A.   I do.

3              MR. TRIBBLE:  Let's put up that first

4  cross -- Wagner cross slide.

5       Q.   (By Mr. Tribble) The -- remember the slide you

6  showed the ladies and gentlemen of the jury, you said

7  that a patent is like a deed to property, like a sketch

8  of a house is to building a house or something?

9       A.   That's close.

10             MR. TRIBBLE:  Do we need to switch it

11  over?

12             Okay.  There we go.

13      Q.   (By Mr. Tribble) This is your slide?

14      A.   It is.

15      Q.   Did you prepare this?

16      A.   It was per my direction.  I can't even draw

17  that well.

18      Q.   Okay.  So you directed somebody to prepare

19  this?

20      A.   I did.

21      Q.   Do you think that that's the right analogy for

22  a patent?

23      A.   I do.

24      Q.   You do?

25      A.   Yes.

1      Q.   Isn't it true that in prior sworn testimony --

2   MS. CANDIDO:  Objection, Your Honor.

3                 May I approach?

4                 THE COURT:  Yes.

5                 (Bench conference.)

6                 MS. CANDIDO:  Mr. Wagner's prior sworn

7   testimony in other matters is not relevant to this

8   matter.  I think it's similar to Mr. Verhoeven's

9   analysis with respect to the 02 Micro case and Mr.

10  Bratic, which Your Honor didn't allow them to inquire

11  into.

12                Depending on where he's going with this

13  might require many trials on the issues in these various

14  other cases.

15                THE COURT:  What question are you going

16  to ask him?

17                MR. TRIBBLE:  Well, he's -- he uses

18  our -- he's contradicted his prior testimony by saying

19  it's just like a sketch of a house when, in fact, he

20  said it's like a deed to property.

21                THE COURT:  I'll allow that.  I'll allow

22  that.  I mean, he's drawn --

23                MR. TRIBBLE:  Okay.

24                THE COURT:   -- different analogies in

25  other cases than he's drawn in this case.  I'm going to

1 allow it.

2                    (Bench conference concluded.)

3      Q.   (By Mr. Tribble) So in prior cases, in prior

4 sworn testimony, you've used a different analogy,

5 haven't you?

6      A.   I'm sure I have.

7      Q.   Isn't it fair it say that in i4i --

8               MR. TRIBBLE:  Can we put that up?

9      Q.   (By Mr. Tribble) -- you testified in this case

10 that, well, a royalty is simply a payment for use of

11 someone else's property and a very common form of

12 royalty here in Texas is if you're lucky enough to own

13 land that has oil or gas underneath and the oil and gas

14 company wants to extract that material, they may pay you

15 a royalty check every month, if they're getting that oil

16 out of your property?

17          That's your testimony, isn't it?

18      A.   You didn't read it exactly right, but you got

19 the substance.  And I would -- I would agree with that

20 analogy.

21      Q.   I'm sure I did.

22               MR. TRIBBLE:  Can we go back one?

23               THE COURT:  Well, counsel approach.

24               (Bench conference.)

25               THE COURT:  Don't refer to the names of

1 these other cases.

2             MR. TRIBBLE:  Yes, sir.

3             THE COURT:  You've got slides that have

4 it on there.  Don't use them, okay?

5             MR. TRIBBLE:  Okay.

6             (Bench conference concluded.)

7      Q.   (By Mr. Tribble) Now, I mean, a patent is a

8 property right, correct?

9      A.   Absolutely.

10      Q.   Absolutely.  And a sketch to a house is not a

11 property right, is it?

12      A.   Oh, certainly.  People sell sketches all the

13 time.

14      Q.   They sell a sketch, but someone could still go

15 and build a house, and just because I had a sketch that

16 I had done, it doesn't mean someone else could not build

17 the same house; isn't that right?

18      A.   There is no exclusivity to that or monopoly

19 for that house drawing, yes.

20      Q.   It's completely different than having a deed

21 to a piece of property and Exxon comes on and drills an

22 oil well and uses your property.

23           Wouldn't you agree with that?

24      A.   Those two analogies are very different, yes.

25      Q.   Yes.

1          Okay.  Let's move on.  You agree that Function

2    Media is entitled to a reasonable royalty?

3          A.    I do.

4          Q.    Okay.  And royalties could be paid either as a

5    running royalty or as a lump sum?

6          A.    Those are two alternatives, yes.

7          Q.    And you've opined in this case that a running

8    royalty is appropriate?

9          A.    That is -- that is one reasonable method of

10   the reasonable royalty in this case.

11         Q.    And that's -- Mr. Bratic, he also applies a

12   running royalty method?

13         A.    He does.

14         Q.    And the difference between the two of you is

15   that he's opined that the royalty rate is 12 percent,

16   and you say that it's 0.25 percent.

17                Is that fair to say?

18         A.    That's fair.

19         Q.    Okay.  And now -- and like Mr. Bratic, you

20   agree that a running royalty makes sense, because you're

21   trying to compensate Function Media for the actual use

22   of its property?

23         A.    I do.  I've said that many times.

24         Q.    And, in fact, you think it would be crazy in

25   the hypothetical negotiation analysis where the

1  patent -- all facts are known and the parties agree that

2  the patents are a hundred percent valid and a hundred

3  percent infringed.

4          You believe that it would be crazy for the

5  patent holder in that hypothetical negotiation to agree

6  to anything other than a running royalty?

7      A.   I need more facts to answer that question.

8  Under certain circumstances, I would agree with that and

9  others I would not.

10     Q.   In any event, a reasonable royalty is a good

11 measure -- excuse me -- a running royalty is a good

12 measure, because it allows both the parties to share in

13 the risks and rewards of the invention?

14     A.   I agree with that.

15     Q.   Okay.  And you agree that the proper test here

16 is to figure out what the value of this invention was to

17 Google, not to Function Media, right?

18     A.   That's absolutely correct.

19     Q.   The value that you're looking at in setting

20 the royalty rate is the value of this patented

21 technology to Google, correct?

22     A.   It is.

23     Q.   Okay.  Now -- and you also agree that the

24 really important patents -- in cases where the two

25 companies are not competing, the really important

1  patents are usually licensed through litigation?

2       A.   That's my experience.

3       Q.   Okay.  Now, I want to clear up a few things

4  that have been -- that have come out during the trial.

5  Function Media never implemented its invention.  You're

6  aware of that?

7       A.   I am aware of that fact.

8       Q.   You believe that that fact is completely

9  irrelevant to setting the reasonable royalty in this

10 case, don't you?

11      A.   It is as far as my financial calculation, yes.

12      Q.   Makes absolutely no difference whether they

13 built the system or not; is that right?

14      A.   It does not based on my -- my analysis.

15      Q.   Now, let's go through some of the licenses.

16 From an economic standpoint, licenses that are in the

17 same field of use still may not be comparable from a

18 technological point of view; isn't that right?

19      A.   That is correct.

20      Q.   And not all patents have the same value?

21      A.   I agree with that statement.

22      Q.   Not all patents in the same field of use have

23 great value?

24      A.   Often that's true.

25      Q.   If the patent is core technology or of great

1  use or great financial benefit to a company, then they

2  could be of enormous value.  Is that fair to say?

3      A.   It's fair.  That's possible.

4      Q.   Now, let's talk about the Carl Meyer

5  agreement.  That's one agreement that you testified

6  about.

7          You agree that -- that damages analysts often

8  approach the hypothetical royalty by examining the

9  party's past policies and behaviors prior to litigation?

10     A.   I do, and I've written on that subject.

11     Q.   It's in your book?

12     A.   It is.

13     Q.   And you agree that the Carl Meyer license that

14  you testified about, it was entered into after this

15  lawsuit was filed, wasn't it?

16     A.   Yes, but you misspoke.  It's not a license.

17  It's an acquisition.

18     Q.   Okay.  Fair enough.

19          The agreement -- it's still is post-litigation

20  behavior by Google, correct?

21     A.   It is.

22     Q.   And, in fact, you don't usually believe that

23  it's appropriate to use the defendant's -- one of the

24  Defendant's own licenses as some kind of baseline

25  starting point, do you?

A.   No.   That's G-P Factor No. 2, and I've done
that a number of times in my career.

Q.   Okay.   And as far as this license between
Google and Carl Meyer, it was entered into after the
litigation started, which is contrary to your normal
practice.

Fair enough?

A.   No.   I use all information that's known
before.   It doesn't matter when -- what it is in
connection with the timing of the litigation.

Q.   The -- and were you here during Mr. Bratic's
testimony about the relationship or potential
relationship between Mr. Meyer and Google?

A.   No, I wasn't here in Texas yet, but I did read
that testimony, so I know what you're talking about.

Q.   Did you read the testimony where after this
litigation started, Mr. Meyer entered into this
agreement with Google for this low purchase amount, but
it turns out that Mr. Meyer is co-inventor with a Google
employee on some other patents?

Did you read that testimony?

A.   I did.

Q.   Okay.   Did you consider that?

A.   I was aware of that before his testimony, so,
yes, I considered that.

1    Q.   Now, about the substance of the Carl Meyer

2  patents, do you recall that we deposed Google's

3  corporate representative on that issue?

4    A.   I am aware of that, and I read that

5  deposition.

6    Q.   There were a lot of I-don't-know answers,

7  correct?

8    A.   There were.

9    Q.   And in his deposition, Google's representative

10  couldn't tell us anything other than what's on the face

11  of the document?

12    A.   I think that's fair.

13    Q.   Not the face of the patents, the face of the

14  actual purchase agreement.  Fair to say?

15    A.   That's fair.

16    Q.   And so in your testimony today, you did not

17  testify that the Carl Meyer patent is some kind of

18  patent -- excuse me -- the Carl Meyer agreement, that it

19  covers patents that are core technology?

20    A.   That is correct.  I can't make that

21  determination from just looking at the terms of the

22  agreement.

23    Q.   You didn't testify that the patents are even

24  being -- or for technology that is even being used by

25  Google.  Fair to say?

1    A.    That's fair.

2    Q.    And it's fair to say that you have not

3 testified today that the patents that were subject to

4 the Carl Meyer agreement have been made use of by Google

5 and generated billions and billions of dollars of

6 revenues?

7    A.    Well, since it's a fairly recent acquisition,

8 I don't think it would be that level anyway.  But as I

9 just said, I don't have any information as to the use of

10 that technology by Google.

11    Q.    Now, when we took your deposition in this

12 case, at that time, you could not recall any prior time

13 when you had done an analysis in which you had relied on

14 a defendant's license to be a starting point for the

15 hypothetical negotiation; isn't that right?

16    A.    I believe sitting there then, I couldn't

17 recall the name of a client where I had done that, yes.

18    Q.    And let's turn to some of Mr. Bratic's

19 licenses.  He relies upon the Google/Stanford license.

20          You believe that that's a relevant license,

21 correct?

22    A.    We both do, yes.

23    Q.    And you agree that -- the two patents in the

24 Houlihan-Lokey DoubleClick report and valuation that

25 Mr. Bratic relies on, you agree that those patents

1   are -- those two patents are relevant?

2       A.   I do.

3       Q.   And --

4       A.   Well, it's not two patents.  It's two patent

5   agreements are relevant.

6       Q.   Fair enough.

7            And you agree that the Houlihan-Lokey studies

8   were done -- Houlihan-Lokey had a duty to correct --

9   correctly value those patents; isn't that right?

10      A.   Their job was not to value necessarily the

11  patents.  Their job was to do a purchase price

12  allocation after a company had been acquired.  But I

13  think they were doing their professional best to come up

14  with the value.

15      Q.   They had a duty to correctly apportion the

16  value and assign part of it to the patents?

17      A.   No.  They didn't have that level of

18  responsibility.  They only did an allocation to what

19  they call developed technology, which includes patents.

20  So they did not do what you suggest.

21            MR. TRIBBLE:  Can we put up the Wagner

22  depo clip?  Just put up the text, 232.

23      Q.   (By Mr. Tribble) This was in discussion of the

24  Houlihan-Lokey report.  You were asked:  The independent

25  valuation expert has a duty to calculate the correct

1  amount of the value of the patent or developed

2  technology, correct?

3      A.   I did.  That's a compound question.  I was

4  asking (sic) both at the same time, and it was the

5  combination of what Houlihan-Lokey did.

6      Q.   My question simply is, did you -- in response

7  to that question, did you answer:  They do?

8      A.   I do, but it was more than just the yellow

9  highlighted question that I answered.

10             THE COURT:  Well, if you can answer with

11  a yes or no, please do.  And if Google's lawyers need to

12  ask you some follow-up to get you to explain, you know,

13  the additional portions of the highlighted material, if

14  they want to ask you about that, they'll have to chance

15  to do that, okay?

16             THE WITNESS:  I will, Your Honor.

17             MR. TRIBBLE:  Now, let's take that down.

18      Q.   (By Mr. Tribble) In your testimony, there was

19  some criticism of Mr. Bratic relying on these published

20  industry rates.

21             Do you recall that?

22      A.   I do.

23      Q.   But the fact of the matter is that in the

24  past, you've relied on industry average -- averages in

25  forming your opinions regarding royalty rates, haven't

1  you?

2      A.   I have done so.

3      Q.   Let's go through your demonstratives.

4           Let me ask this first:  You criticize

5  Mr. Bratic for relying on some combined software and

6  patent licenses, but you do -- you've done exactly the

7  same thing, correct?

8      A.   But I only do it after I've made adjustments.

9      Q.   And that's -- that's my point.  As long as the

10 part for adjustments are made, there's nothing wrong

11 with relying on one of those combined licenses, is

12 there?

13     A.   I absolutely agree with that statement.

14     Q.   Okay.

15           MR. TRIBBLE:  Now, let's show Wagner

16 Demonstrative 374.

17           Let's not show that, I guess, since it

18 wasn't shown on direct.

19     Q.   (By Mr. Tribble) You had some demonstratives

20 prepared that you decided not to use; is that fair to

21 say?

22     A.   That's fair.

23     Q.   Okay.  In your analysis -- now, I need to see

24 which -- the pictures so I can see which ones you used.

25           Well, let's go ahead and go through what you

1   were going to show the jury.

2                   MR. TRIBBLE:  Put up demonstrative 374.

3                   MS. CANDIDO:  Objection, outside the

4   scope.

5                   MR. TRIBBLE:  It's --

6                   THE COURT:  Overruled.

7                   MR. TRIBBLE:  -- cross-examination.

8                   MS. CANDIDO:  It's also confidential.

9   Will you take it down, please?

10                  MR. TRIBBLE:  Oh, I'm sorry.  Fair

11  enough.

12                  I guess we need to clear the courtroom,

13  Your Honor.

14                  THE COURT:  Okay.  Ladies and Gentlemen,

15  if you're not covered under the terms of the Court's

16  protective order, I need to ask you to excuse yourselves

17  at this point.  There's going to be some material

18  discussed that is highly confidential.

19

**SEALED BY ORDER OF THE COURT**

20

21

22

23

24

25



**SEALED BY ORDER OF THE COURT**



SEALED BY ORDER OF THE COURT



**SEALED BY ORDER OF THE COURT**



**SEALED BY ORDER OF THE COURT**



SEALED BY ORDER OF THE COURT



SEALED BY ORDER OF THE COURT



SEALED BY ORDER OF THE COURT



SEALED BY ORDER OF THE COURT



SEALED BY ORDER OF THE COURT



**SEALED BY ORDER OF THE COURT**



**SEALED BY ORDER OF THE COURT**



SEALED BY ORDER OF THE COURT



SEALED BY ORDER OF THE COURT



SEALED BY ORDER OF THE COURT



SEALED BY ORDER OF THE COURT

SEALED BY ORDER OF THE COURT
██████ █████ ██ ██ ██████████

Q.    (By Mr. Tribble) I want to talk finally about the Stanford license.

MR. TRIBBLE:  While they're coming in, why don't we approach on one issue.

(Bench conference.)

MR. TRIBBLE:  Your Honor, he has testified that the Stanford license, it was 2 percent of the equity of the company that was given, and he's converted that into some kind of reasonable royalty, whereas we -- of course, we feel that even if you follow his step, which he says has never been done before, you convert it into a royalty, the -- from the equity, the royalty would be on the revenues of the entire company. That's what he said, that the 2 percent represented profits of the entire company.

And so at that point in the examination, I'd like to clear the courtroom and have him multiply his 0.25 percent by the entire revenues of Google, which yields about $140 million.  But I think it's fair cross-examination.

THE COURT:  Well, I do, too, in light of what he's done.  I mean, I'll clear the courtroom.

MR. TRIBBLE:  Okay.

THE COURT:  But, I mean, I think in light

1    of the testimony that he gave, that it entitles the

2    shareholder to the net present value of the entire

3    company, I'm going to allow it.

4                    (Bench conference concluded.)

5         Q.    (By Mr. Tribble) Now, the -- you had your

6    slide about the -- the differences -- the extra things

7    that the Stanford deal brought to the table versus the

8    hypothetical deal with Function Media.

9         A.    I did.

10         Q.    The Stanford/Google agreement that you were

11    talking about.

12              To be clear, the Stanford agreement in which

13    Stanford received 2 percent of the stock of the equity

14    of Google, that deal was for a patent application at the

15    time, correct?

16         A.    That is correct.

17         Q.    In other words, the hypothetical negotiation

18    with Function Media is over two issued patents, correct?

19         A.    It is.

20         Q.    Whereas the Stanford deal, those patents

21    hadn't issued at all; they were applications, right?

22         A.    There's only one application.  No patents had

23    issued from that application yet.

24         Q.    And you know, during the application process

25    at the Patent and Trademark Office, it might never have

1 issued.

2     A.    That is a possibility.

3     Q.    And yet they still -- in return for those

4 rights to that patent application, Google paid Stanford

5 2 percent of the equity of the company, correct?

6     A.    They did.

7     Q.    And you believe that you -- in doing your

8 analysis, you have to consider the terms of the licenses

9 as they were actually entered into.

10     A.    I do.

11     Q.    And this process where, instead of using the

12 2 percent of equity as the royalty, you converted it

13 into some kind of -- excuse me -- 2 percent of equity,

14 you converted that into -- through some mathematical

15 process into a running royalty of 0.25 percent, correct?

16     A.    Well, I actually did it to 0.5 and then made

17 another adjustment.

18     Q.    That's right.  You did it to 0.5, and then you

19 cut it in half.  And was -- was -- were you saying that

20 was for Google's benefit, to cut it in half?

21     A.    No, I didn't say that.

22     Q.    Okay.  That was to Function Media's detriment,

23 right?

24     A.    Well, clearly, anytime I lower the rate, it's

25 to their detriment.

1    Q.   Okay.  But you agree you should consider the

2  terms of the agreement as actually entered into, but

3  instead of using 2 percent of equity or using some rate

4  based upon the percentage of Google, you converted it

5  into a reasonable royalty, and you told us on the stand

6  that you've never done that before, correct?

7    A.   I have not.

8    Q.   You don't know of anyone else who's ever done

9  it before.

10    A.   No.

11    Q.   This is the first time ever that someone has

12  gone through this process to convert the equity into a

13  reasonable royalty to apply in patent damages.

14    A.   As far as I know, it is.  I've never seen

15  someone else do it.

16    Q.   Okay.  And you understand that --

17         MR. TRIBBLE:  Let's put up the

18  demonstrative --

19    Q.   (By Mr. Tribble) You heard Mr. Bratic -- or

20  you know of Mr. Bratic's testimony that that 2

21  percent -- that that value of the Stanford agreement,

22  the 2 percent equity in Google that it received, that at

23  the time of the present -- the hypothetical negotiation

24  in this case, that that was worth about $1.4 billion.

25    A.   I'm aware of that.

1          MR. TRIBBLE:  Can we put that slide up?

2     Q.   (By Mr. Tribble) And even if we do your

3 adjustment and cut it in half --

4          MR. TRIBBLE:  Next slide.

5     Q.   (By Mr. Tribble) -- that still yields $700

6 million, right?

7     A.   It does.

8     Q.   And that's lower than the reasonable royalty

9 sought by Function Media.

10     A.   No.  It's higher.

11     Q.   Excuse me.

12     A.   700 is higher than 600.

13     Q.   Thank you.

14          And so if it were left in terms of equity, the

15 way the terms were actually entered into with Stanford,

16 the 700-million-dollar figure would be higher than the

17 600-million-dollar figure that Mr. Bratic testified to.

18     A.   It would.

19     Q.   Okay.  And also, I do want to do one further

20 calculation.  Even using your --

21          MR. TRIBBLE:  And, Your Honor, we'll have

22 to clear the courtroom for about one minute.

23          THE COURT:  All right.  Ladies and

24 Gentlemen, please, seated back in the audience, excuse

25 yourself for about one minute.



**SEALED BY ORDER OF THE COURT**



SEALED BY ORDER OF THE COURT



**SEALED BY ORDER OF THE COURT**



SEALED BY ORDER OF THE COURT



**SEALED BY ORDER OF THE COURT**



**SEALED BY ORDER OF THE COURT**



SEALED BY ORDER OF THE COURT



SEALED BY ORDER OF THE COURT



**SEALED BY ORDER OF THE COURT**



SEALED BY ORDER OF THE COURT



SEALED BY ORDER OF THE COURT



**SEALED BY ORDER OF THE COURT**



SEALED BY ORDER OF THE COURT



SEALED BY ORDER OF THE COURT



**SEALED BY ORDER OF THE COURT**



SEALED BY ORDER OF THE COURT



SEALED BY ORDER OF THE COURT

**SEALED BY ORDER OF THE COURT**

THE COURT:  Folks who are seated in the

audience, I excused you for what I thought was going to

be only a short period of time, but as it turned out,

due to the witness examinations by each side, each side

got into some additional confidential information, so I

had to keep you out of the courtroom.

I've got a witness who is getting ready to

testify at this time, who's -- the subject of his

testimony is also highly confidential.  So I'm going to

have to ask you to continue to remain outside, but I did

want to give you an explanation as to why you've been

out there so long.  I'll invite you back in as soon as I

188

can.



SEALED BY ORDER OF THE COURT


SEALED BY ORDER OF THE COURT



**SEALED BY ORDER OF THE COURT**



SEALED BY ORDER OF THE COURT



**SEALED BY ORDER OF THE COURT**



**SEALED BY ORDER OF THE COURT**



SEALED BY ORDER OF THE COURT



SEALED BY ORDER OF THE COURT



SEALED BY ORDER OF THE COURT



SEALED BY ORDER OF THE COURT



SEALED BY ORDER OF THE COURT



SEALED BY ORDER OF THE COURT



SEALED BY ORDER OF THE COURT



SEALED BY ORDER OF THE COURT



SEALED BY ORDER OF THE COURT



**SEALED BY ORDER OF THE COURT**

1

**SEALED BY ORDER OF THE COURT**

2

3

4

5

6

7

8             All right.  Counsel approach.

9             (Bench conference.)

10             THE COURT:  You have a five-minute

11 witness?

12             MR. VERHOEVEN:  We're done.

13             THE COURT:  Okay.

14             MR. VERHOEVEN:  We're resting.

15             THE COURT:  All right.

16             MR. VERHOEVEN:  I was going to announce

17 that.

18             THE COURT:  No.  I'll let you do that in

19 front of the jury.  I just didn't know if you were

20 through yet.

21             Okay.  How long you got with Dr. Rhyne or

22 your rebuttal case?

23             MR. GRINSTEIN:  Dr. Rhyne is probably

24 about half an hour.  We've got some depos, which are 15

25 minutes.  Dr. Rhyne is probably about half an hour.

1          We've got some depositions that are, you

2 know, roughly 15 minutes, although we do have to resolve

3 the patent issue.

4          THE COURT:  Uh-huh.

5          MR. GRINSTEIN:  But I'd say between --

6 everything is about 45 minutes.

7          MR. VERHOEVEN:  You know how much I have,

8 which is not a lot.

9          THE COURT:  Well, I'm going to -- I'm

10 going to go ahead and let you rest in front of the jury,

11 and then I'm going to ask -- tell them we've got some

12 matters to take up this evening that may shorten the

13 testimony that they're going to hear tomorrow.  But I'm

14 going to ask them to be -- if they've got any problems

15 being here at 8:00 a.m., so we can get the thing to the

16 jury sooner rather than later.

17          MR. VERHOEVEN:  I understand.

18          THE COURT:  Okay.

19          (Bench conference concluded.)

20          THE COURT:  Mr. Verhoeven?

21          MR. VERHOEVEN:  Your Honor, Defendant

22 Google rests.

23          THE COURT:  Okay.  All right.  Ladies and

24 Gentlemen, that's another milestone.  You've now heard

25 the evidence that the Defendant is presenting in its

case-in-chief.

I have some matters to take up this evening with the parties that I believe we will be through with the evidence in a very short period of time in the morning, and then we'll take a recess, and we'll come back and hear the final arguments from the lawyers. You'll get the Court's charge, and I believe the case will be in your hands somewhere around lunchtime, maybe 12:30-ish or so.

Then after that, you'll be glad to know you're on your schedule and not on mine anymore. But that's -- that's where we are in the case. We do have a little bit more testimony that we'll get to in the morning.

Once again, I'm going to excuse you at this time. Would you raise your hand if you've got any problems being here by 8:00 a.m. in the morning? If we could start at 8:00, would that present a problem for anybody?

Seeing no hands, then, why don't you be here just -- just before 8:00 o'clock in the morning, and we'll get started at 8:00. And that way I'll get you the case -- the case will be in your hands sooner rather than later, okay?

Y'all are excused. Drive safely, and

1  don't talk about the case.

2                  COURT SECURITY OFFICER:  All rise.

3                  (Jury out.)

4                  THE COURT:  All right.  Y'all have a

5  seat.

6                  If my math, in particular my subtraction,

7  is correct, I've got that the Defendant has 26 minutes

8  left, and that the Plaintiff has 59 minutes left, total.

9  Okay.  My cross-check indicates I'm fairly accurate.

10                 Okay.  Let's talk about a couple of

11 things; the first thing being Google's motion to exclude

12 reference to patent activities.

13                 MR. DEFRANCO:  Thank you, Your Honor.

14                 Your Honor, we're obviously at the

15 eleventh hour of the case, closer to the twelfth

16 probably.  We've heard very, very little about Google's

17 patents and its application -- and patent applications.

18 And we think that that is actually the way this case

19 should go into the jury, without reference or analysis

20 or consideration of how similar or dissimilar any of

21 Google's issued patent claims are or pending claims are.

22                 This case is deceptively complex in many

23 ways to the jury.  They have enough issues to grapple

24 with in the nine claims that we have before them now.

25 If we were to finish out this case by doing a detailed

analysis or comparison of Google issued claims or

pending claims that are not before them, it wouldn't

only confuse the jury about the issues that they're left

with, but it would muddle, I think, potentially,

hopelessly, the issues that they have now before them in

terms of validity and infringement of the claims that

they've heard about for the last week.

The only -- the only respect in which

Google's patents have come into this case are on the

damages issue for licensing as we've heard.  We haven't

heard any testimony; we haven't seen documents from

Google witnesses about their patents and applications,

even though we've heard from a series of in-house

technical people who do have many patents and

applications.

We are not putting forth some

counter-balance that, you know, the patents at issue in

this case should be weighed against Google and its

patent activities.  That is not what our case is about,

and we don't think -- we think it would be prejudicial

and unfair for the Defendants -- excuse me -- for

Plaintiff at this late hour to come in and somehow

litigate this case on the merits of any Google claims

that are pending and any similarities or dissimilarities

that they may assert exists.

1        We're going to have to, you know, have

2  our experts at the last stage come in here and debate

3  patents and claims that are not at issue and should not

4  be at issue.  And that is the basis for our motion.

5        THE COURT:  Okay.

6        MR. GRINSTEIN:  Your Honor, the

7  description of this motion as eleventh hour is quite

8  telling.  In fact, this motion should have been filed

9  much earlier than the eleventh hour.

10        Dr. Rhyne provided an expert testimony

11  and expert analysis of these patents.  We deposed Google

12  witnesses on these patents months ago.  And, in fact,

13  Google filed a motion in limine on this issue but

14  withdrew it because of the agreement between the parties

15  that Google's patent activities would be fair game.

16  That's why they were able to get up there and talk about

17  Google's own patents for purposes of damage, because of

18  the motion in limine stage, they made a deal with us.

19        Our response on the motion to exclude

20  Google's patents was, Your Honor, if you want -- if you

21  want to take out the Tomasz Tunguz patent, then Google

22  shouldn't get to mention anything at all.

23        We lived up to our end of that bargain,

24  but apparently Google has a different idea.  Suffice it

25  to say that we only want to talk about one patent, one

patent application I should say, Plaintiff's

Exhibit 1632.

Plaintiff's Exhibit 1632 that Dr. Rhyne

provided expert analysis on, they've had full and fair

opportunity to analyze it, to come back on it.  And the

claim itself could not be closer.  Could not be closer

to the claims in this case.

The claim reads -- this is the amended

claim as of April of 2009.  We can talk about some

subsequent patent activity that they have done, which is

not coming into this case, because it's not of the

record.

But the amended claim as of April 2009

reads:  A computer-implemented method for displaying

advertisements.  The method comprising, one, identifying

at a computer general instructions for formatting

advertisements, the instructions being provided by a

publisher of a medium.

That's presentation rules, Your Honor.

Two, identifying at the computer content for a specific

advertisement provided by an entity that is different

from the publisher.  That's two things, Your Honor.

One, that is information to create; and,

two, that is owned or controlled by other than the

publisher.

1           And then the third element of the claim

2  is displaying the identified content provided by the

3  entity on a medium according to the identified

4  formatting instructions provided by the publisher.  That

5  is that processing and publishing element that comes at

6  the end of our claim.

7           I mean, how on earth do you display it

8  according to the formatting instructions if you haven't

9  processed and published it?

10          The point about this is simple, Your

11  Honor.  If in April of 2009 Google is representing to

12  the Patent and Trademark Office that that claim is new

13  and novel, that is relevant evidence about what a

14  company of ordinary skill in the art thought was new and

15  novel and non-obvious as of April 2009, much less as of

16  November 2007 when they first filed the claim.

17          So the jury ought to be able to hear the

18  evidence that out of one side of its mouth in this

19  trial, Google is claiming that our claims from back in

20  the year 2000 are novel -- are not novel and are

21  obvious, and yet out of the other side of their mouth,

22  they're filing a claim like that, that if there's

23  daylight in between that and the Function Media patent

24  claims, I'd really like to hear about it.

25          So for that reason, Your Honor, we're

1  making limited use of this information.  Google had the

2  chance to exclude it.  They've waited until the last

3  minute to do it.  And for that reason, we'd ask that it

4  be admitted.

5              THE COURT:  Well, what specifically was

6  the agreement at the motion in limine stage?

7              MR. GRINSTEIN:  Google filed a motion in

8  limine that said let's bar all patent activities.  I'm

9  sorry.  Let's bar all reference to Google patent

10 activities.

11             We came back and said -- and in our

12 papers, I think it's stated in the opposition.  If I

13 remember correctly, we opposed that, but if we don't --

14 but if, you know, that's the way it's going to go, then

15 everything comes out, and, you know, there should be no

16 reference at all to Google ever getting a patent.

17             And off the record, we withdrew our

18 motion, and they withdrew their motion.  All the motions

19 about patents got withdrawn.

20             THE COURT:  They withdrew their motion in

21 limine?

22             MR. GRINSTEIN:  Correct.

23             THE COURT:  But was it in the context,

24 though -- was there an additional side agreement that

25 all could come in?

1            MR. GRINSTEIN:  I guess the best way I

2 can say this, Your Honor, is that they were saying they

3 did not want these patents in for this purpose.  Our

4 opposition to Your Honor was, hey, if this comes out,

5 then the other ones come out.  And we reached an

6 agreement that it's all fair game.

7            That's my understanding and my memory of

8 what happened, although, admittedly, this was all off

9 the record, it was before the hearing.

10            THE COURT:  Well, I don't care where an

11 agreement is reached.

12            MR. GRINSTEIN:  I understand, Your Honor.

13            THE COURT:  My question was, was this an

14 agreement where they withdraw their motion in limine, or

15 was it an agreement that, you know, each side could make

16 affirmative use of the other's patent -- or the Google

17 patents and their patent activities?

18            I mean, the next thing that came in after

19 that was the deposition designations and objections to

20 it.  And I know there wasn't an agreement then.

21            MR. GRINSTEIN:  Correct, Your Honor.

22 And the only -- the only -- the best confirmation of the

23 fact that there was such an agreement is the fact that

24 they withdrew their motion in limine.

25            Absent such an agreement, obviously

they're opposed to it now, so I don't know why they

would have withdrawn their motion in limine at the time

in which -- unless there was, in fact, a quid pro quo.

THE COURT:  Well, motions in limine are

not dispositive rules on the admissibility of evidence.

They're orders to approach the bench before you launch

into them.

MR. GRINSTEIN:  That's correct, Your

Honor.

THE COURT:  Okay.  Let me hear from the

other side.

MR. DEFRANCO:  Well, that last comment --

we -- we deal very regularly together and closely

together, Your Honor.  But that last comment, I don't

know they would have withdrawn without a quid pro quo,

there was no -- there was no deal.

At the time of the motion in limine --

THE COURT:  It was your motion in limine.

MR. DEFRANCO:  Yes, Your Honor.  There

were many -- there was a long list of motions in limine,

and there were reasons why both sides decided to

withdraw certain motions in limine.

We at that time had a couple of issues

that we wanted to get in the case.  We wanted to get in

the reexam story.  We wanted to get in even more

importantly the fact that they drafted their claims to
cover our products.

    And we did argue that motion, and Your
Honor granted that motion originally.  And that's why we
held this other motion back.  We're waiting for these
things to play out and for the case to formulate, so...

    THE COURT:  I denied Function Media's
Motion No. 47 originally.

    MR. DEFRANCO:  Yes, Your Honor.

    And -- and that's why we never conceded
that all this would come in.  Your Honor is exactly
right.  We fought that with respect to deposition
designations.

    It just -- you know, at that time at this
motion in limine stage, we did have argument that it's
fundamentally unfair to tell one side of the story and
not the other side of the story.  I made that very
argument on the claim drafting motion.

    And -- and the reexam is out.

    THE COURT:  I told you you could tell the
story so long as I found it to be relevant.

    MR. DEFRANCO:  That's right, Your Honor.
That's right.

    THE COURT:  I'm granting the motion.

    I've looked at the claims.  I've looked

at the application, and, you know, there's interface

terms.  There's prompting terms we've all heard about.

I just -- under Rule 403, I think that line of

questioning is unfairly prejudicial and would be

confusing to the issues.  And for that reason I'm

granting the motion.

                    I will send to you all an updated copy of

the Charge and verdict forms tonight.  Those will be the

ones you need to be prepared to make your objections to.

Yes?

                    MR. VERHOEVEN:  Very quickly.  We were

trying to get an agreement to exchange any new

demonstratives to be used in closing this evening.

Unfortunately, the Plaintiffs won't agree to do that.

We got sort of surprised by the opening slides of the

two-face person and everything, and I tried to raise it

to Your Honor in the morning.  There wasn't time, and I

apologize.  It was my fault.  I should have known to

come in earlier.

                    But if we don't get the slides beforehand

on the closing, we're not going to have an adequate

opportunity, if there's an issue, to raise it.  So I

just ask Your Honor for guidance on this.

                    We're prepared to disclose any new

demonstratives we have for closing tonight at 7:00 or

1 8:00. But if we don't get theirs until they show them,

2 that's going to be prejudicial to us, and I think

3 contrary to the spirit of the local rules, which is

4 there's no sandbagging here.

5         MR. TRIBBLE: Well, I mean, our slides

6 aren't ready. And, you know, the -- the evidence isn't

7 even fully in, of course.

8         But my proposal, Your Honor, was that we

9 disclose them to each other like 8:00 o'clock tomorrow.

10 We're going to have -- the whole purpose is just to --

11 for objections.

12         THE COURT: Well, it's for objections to

13 demonstratives.

14         MR. TRIBBLE: Yes.

15         THE COURT: And I -- you know, I think

16 both sides have an interest in preparing their closing

17 arguments without -- well, without believing that the

18 other side is knowing what they're preparing. I think

19 that cuts both ways.

20         You can exchange -- both sides can

21 exchange at 8:00 in the morning when we get here, and

22 I'll take up any objections to them when we take formal

23 objections to the Charge, okay?

24         MR. TRIBBLE: Just so it's clear, we're

25 not disclosing that's real evidence like testimony or --

1          THE COURT:  I understand.

2          MR. TRIBBLE:  Yes.

3          THE COURT:  It's demonstratives; it's

4 not -- it's demonstratives that each side intends to use

5 in closing.

6          MR. GRINSTEIN:  Your Honor, very quick

7 for the record, I understand that the way that JMOL

8 motions are going to proceed is that we're allowed to

9 make a written filing.

10          We understand the JMOL on their validity

11 case, they closed their case.  I just don't want to

12 waive anything.  Just like they have filed the JMOL

13 after they close their case and before the jury --

14          THE COURT:  How do you file written

15 motions?  You want a deadline for doing so?  I mean --

16          MR. VERHOEVEN:  Well, we -- I think we

17 filed two last night, late last night, Your Honor.

18          MR. GRINSTEIN:  We intend to file ours

19 overnight.  I just didn't want to waive anything by not

20 having mentioned it.

21          THE COURT:  The same rule applies to

22 their JMOLs.

23          MR. VERHOEVEN:  Absolutely, Your Honor.

24          THE COURT:  Well, then can you get them

25 filed by 8:00 in the morning?

1          MR. GRINSTEIN:  We will file them by 8:00

2  in the morning.

3          THE COURT:  Then they will be timely if

4  they're filed by 8:00 in the morning.

5          MR. GRINSTEIN:  Thank you, Your Honor.

6          MR. VERHOEVEN:  I just didn't hear you.

7  Did you say that there's another conference that we're

8  going to have?  We're going to take up objections on

9  demonstratives as well as the Charge?

10          THE COURT:  Well, formal objections to

11  the Court's Charge, I'm going to take after I've heard

12  all the testimony, and then I'll give the jury about a

13  30-minute break and take up --

14          MR. VERHOEVEN:  Tomorrow morning?

15          THE COURT:  Tomorrow morning after we've

16  completed the testimony.

17          MR. VERHOEVEN:  Thank you, Your Honor.

18          THE COURT:  All right.  We're in recess.

19          COURT SECURITY OFFICER:  All rise.

20          (Court adjourned.)

21          *      *      *      *      *

22

23

24

25

1

2

3

4                          <u>CERTIFICATION</u>

5

6              I HEREBY CERTIFY that the foregoing is a

7   true and correct transcript from the stenographic notes

8   of the proceedings in the above-entitled matter to the

9   best of my ability.

10

11

12

13  /s/_____              _____

    SUSAN SIMMONS, CSR                        Date
14  Official Court Reporter
    State of Texas No.:  267
15  Expiration Date:  12/31/10

16

17

18  /s/_____              _____

    SHELLY HOLMES, CSR                        Date
19  Deputy Official Court Reporter
    State of Texas No.:  7804
20  Expiration Date  12/31/10

21

22

23

24

25