```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE EASTERN DISTRICT OF TEXAS
 2                      MARSHALL DIVISION

 3   FUNCTION MEDIA, LLC        *    Civil Docket No.
                                *    2:07-CV-279
 4   VS.                        *    Marshall, Texas
                                *
 5                              *    January 26, 2010
     GOOGLE, INC.               *    8:00 A.M.
 6
                     TRANSCRIPT OF JURY TRIAL
 7        BEFORE THE HONORABLE CHAD EVERINGHAM
                UNITED STATES MAGISTRATE JUDGE
 8

 9   APPEARANCES:

10   FOR THE PLAINTIFFS:    MR. MAX TRIBBLE
                            MR. JOSEPH GRINSTEIN
11                           Susman Godfrey
                             1000 Louisiana Street
12                           Suite 5100
                             Houston, TX   77002
13                           MR. JUSTIN NELSON
                             Susman Godfrey
14                           1201 Third Avenue
                             Suite 3800
15                           Seattle, WA   98101
                             MR. JEREMY BRANDON
16                           Susman Godfrey
                             901 Main Street
17                           Suite 5100
                             Dallas, TX   75202
18                           MR. ROBERT PARKER
                             Parker, Bunt & Ainsworth
19                           100 East Ferguson
                             Suite 1114
20                           Tyler, TX   75702

21   APPEARANCES CONTINUED ON NEXT PAGE:

22   COURT REPORTERS:       MS. SUSAN SIMMONS, CSR
                            MS. SHELLY HOLMES, CSR
23                          Official Court Reporters
                            100 East Houston, Suite 125
24                          Marshall, TX   75670
                            903/935-3868
25   (Proceedings recorded by mechanical stenography,
     transcript produced on CAT system.)
```

APPEARANCES CONTINUED:

FOR THE DEFENDANTS:    MR. CHARLES VERHOEVEN
                       MS. AMY CANDIDO
                       Quinn Emanuel
                       50 California Street
                       22nd Floor
                       San Francisco, CA   94111

                       MR. EDWARD DEFRANCO
                       Quinn Emanuel
                       51 Madison Avenue
                       22nd Floor
                       New York, NY   10010

                       MR. HARRY L. GILLAM
                       Gillam & Smith
                       303 South Washington Avenue
                       Marshall, TX   75670

                    P R O C E E D I N G S

         COURT SECURITY OFFICER:  All rise.

         (Jury in.)

         THE COURT:  All right.  Please be seated.

         Good morning, Ladies and Gentlemen.
Thank you again for being here timely.

         You're about to move into the Plaintiff's
rebuttal case.  And I anticipate that the testimony of
the rebuttal case will be fairly brief, and then we'll
take a break and then come back to the final arguments
of counsel and the -- and the Court's instructions.
Okay.  Call your first witness.

         MR. GRINSTEIN:  Your Honor, Plaintiff

calls Dr. Tom Rhyne.

THOMAS RHYNE, PH.D., PLAINTIFF'S WITNESS, PREVIOUSLY

SWORN

DIRECT EXAMINATION

BY MR. GRINSTEIN:

Q.    Welcome back, Dr. Rhyne.

A.    Thank you.

Q.    Were you in the courtroom when Mr. Lanning was

testifying about -- as to the validity of the patents?

A.    I was.

Q.    And do you agree with the opinions that he

offered?

A.    He and I have come to very different

conclusions.

Q.    In your opinion, are the patents that Function

Media has asserted in this case valid?

A.    I think that they are.

Q.    Let me ask you just a background question or

two.

Have you reviewed the references that

Mr. Lanning discussed during his direct testimony?

A.    Basically, he dealt with three:  The AdForce

system, the DoubleClick system, and if I say Netscape at

any point during my testimony, I mean NetGravity.  It's

just so hard for me not to use the other term, but the

1  NetGravity system.

2        And I've reviewed every one of the documents

3  that have been produced.  I've read the deposition

4  transcripts from the people who talked about it at

5  deposition, and I was here for the trial testimony going

6  through those three systems.

7    Q.   And from reviewing all those materials, have

8  you come to an opinion about the state of the art of

9  internet advertising in the late 1990s?

10    A.   I have.  It's kind of interesting.  If you

11  think about the highway system was developed and people

12  got cars and it opened up an opportunity to put

13  advertisements on billboards on the side of the road.

14  It created a new kind of advertising opportunity that

15  hadn't been around.  In fact, if you're as old as I

16  am --

17            MR. VERHOEVEN:  Beyond the scope of the

18  report.

19            THE COURT:  Well, counsel approach.

20            (Bench conference.)

21            MR. VERHOEVEN:  Well, Your Honor, this

22  is --

23            THE COURT:  No, sustained.

24            (Bench conference concluded.)

25    Q.   (By Mr. Grinstein) Dr. Rhyne, can you explain

whether or not any of the references that you reviewed
include any concept of automatic creation of ads
formatted to publisher's rules?

A.    It's simple.  I've looked at all three of
those.  And individually or collectively, none of the
three teach this concept of having an automatic
processing step done by a computer system to make an
advertisement that was entered in generic form by a
seller be made to comply with presentation rules that
were entered by the publisher.

MR. GRINSTEIN:  Can we please see the
definition of processing that the Court has provided?

Q.    (By Mr. Grinstein) Dr. Rhyne, can you, using
this definition of processing that the Court has
provided, explain why this automatic creation feature
that you just mentioned is relevant to the issue of
anticipation?

A.    Well, again, this phrase, processing the
electronic advertisement in compliance with the
presentation rules on the internet media venues, is in
that last step of the claim where I think someone
characterized it as the long one.

And the Court has said that it requires
executing a systemic sequence of mathematical or logical
operations upon the customized electronic advertisements

to make it comply with the presentation rules of the
internet media venues.

    And what that says is that before you get to
the processing step, that advertisement won't comply.
And then that step is performed, and the advertisement
then complies.  And it's just something that is -- it
wasn't around before the Function Media patent was set
forth.

    Q.   And, Dr. Rhyne, can you remind us, who bears
the burden on the invalidity issue?

    A.   Well, Mr. Lanning does representing Google.
It's -- it's something that I'm here to rebut, but I
don't have -- I don't have the responsibility of
providing, I think I heard, clear and convincing
evidence that the patent, which has been approved and
presumed valid by the Patent Office, has -- really, the
mistake was made.  I don't carry the ball on that one.

    Q.   Okay.  I want to talk to you about the
specific references that Mr. Lanning discussed, and
first let's discuss DoubleClick.

    On the basis of your study, Dr. Rhyne, does
DoubleClick either anticipate or render obvious the
Function Media patents?

    A.   Well, contrary to the opinion that was offered
by Mr. Lanning, I don't think either of those cases is

1   true based on the DoubleClick reference as described in

2   the documents that I've reviewed.

3        Q.   And what are the two reasons or two main reaps

4   you're going to talk about today why you think

5   DoubleClick doesn't do what the Function Media patents

6   do?

7        A.   Well, it was referred to, I think, in one of

8   the early slides that -- that was used with his

9   presentation as an integrated system that served both

10  publishers and sellers.  And I don't believe that there

11  is such an integrated system.  I think they're two

12  separate systems, which were not integrated together.

13           And, secondly -- and this will be true for all

14  three of these references -- there is no disclosure in

15  that system of that publishing, that processing step.

16  There is no automatic processing that's done to make an

17  advertisement that's going to be displayed on a website

18  by the DoubleClick system.  Either one of them be made

19  to comply with presentation rules that were entered by a

20  publisher.

21       Q.   Let's talk about that first reason first.

22  Do you agree with Mr. Lanning or disagree with Mr.

23  Lanning that DoubleClick was an integrated system?

24       A.   I disagree.

25       Q.   And can you explain to us, I guess even using

1  the language of the Claim 1 of the '025 patent, why it's

2  relevant to the issue of anticipation, your opinion that

3  DoubleClick was not an integrated system?

4      A.   Well, I can't quite see it, but I know it.

5  Okay.  The very first paragraph, the preamble says, a

6  computer system for creating and publishing customized

7  electronic advertisements.  And when you work your way

8  down, that system has to have both a first interface for

9  the internet media venues, and later on a second

10  interface for the sellers.

11          And what we've got with the DoubleClick system

12  is one system called DoubleClick for Advertisers that is

13  intended to allow advertisers to work with publishers to

14  do advertisements on the publisher's sites.

15          But then we have a separate system that is

16  DoubleClick for Publishers; has a different name; has a

17  different target.  It's designed to let publishers go

18  out and find advertisers.

19          And while they share some common back-end

20  capabilities, they are two separate systems with

21  different audiences as their targets and different

22  characteristics.

23      Q.   Well, did you hear in this trial Mr. Rupp and

24  Ms. Delfau testify that those two shared some software?

25      A.   I heard them talk -- in fact, particularly Mr.

Rupp talked about some software components that were
able to be used in both DFP and DFA, the DoubleClick for
Publishers and then the other system, the DoubleClick
for Advertisers.

Q.   Does the sharing of software or software
modules between DFA and DFP mean that those two systems
were integrated?

A.   No.

Q.   Why not?

A.   Well, I've managed a lot of complex software
development projects, and one of the things you like to
have is reusability.  If you're going to have software
developers develop a particular program, maybe it's a
program for word processing, it might be useful to take
that word processing program that you've invested in the
development of and use it in another area than the one
that was originally there.

And after listening to what Mr. Rupp said, I
came to the conclusion that what he was talking about is
that the people at DoubleClick developed some sort of
generic software modules, and in the software
development process, it's called reusability.

That some of those modules could be used over
in the DFP system, and some of those modules could also
be installed in and used in the DFA system, but they

1  weren't bridging across between the two systems.  They

2  were separately used.  It's just that it was the same

3  piece of software.

4      Q.  Do you have an analogy?

5      A.  Well, I thought about it.  Think about a

6  company like General Motors.

7           MR. VERHOEVEN:  Objection, Your Honor.

8  None of this is in the report.

9           THE COURT:  Overruled.

10     A.  Okay.  If you think about a company like

11 General Motors in Detroit, there are a lot of

12 third-party companies that make components that are used

13 in cars.  And -- and let's say a company makes a bucket

14 seat, all right?  And they sell it to General Motors,

15 and General Motors says that's a really good seat.  I'm

16 going to use it in this model of the Chevrolet, and I'm

17 going to install it in this model of the Oldsmobile.

18 And, heck, I may even put it in a Corvette, okay?

19 But that doesn't mean that the Corvette, the Chevrolet,

20 and the Oldsmobile are the same system.  It just means

21 that there was a reusable component that was shared

22 among different automobiles.

23     Q.  (By Mr. Grinstein) Did you hear Mr. Rupp

24 testify in Court that if someone at DoubleClick had

25 pulled the plug on the DoubleClick back-end systems,

that would have had an impact on DFP and DFA?

    A.    Yes.

    Q.    And what's your opinion as to that?

    A.    That -- that does not in any way change my
opinion about DFP and DFA being separate systems.

    Q.    What were the back-end systems he was
referring to?

    A.    I went back and reread his testimony both at
his deposition and at trial.  And the DoubleClick
back-end systems perform some basic functions that were
required.  One of the things they did was detect -- look
for click fraud.

         Now, click fraud is an interesting thing.  If
a publisher makes money when people click on
advertisements that have been placed on that publisher's
website, one thing some publishers, maybe not so nice,
might do is to put some ads on their website and then
they click on them themselves.  Every time they click on
them, they make a nickel or 50 cents or whatever it's
going to be, some amount of money.

         So they might just bring somebody in off the
street and say I want you to sit here all day and every
time you see an ad on my website, click on it.  There
are ways to detect for that, a lot of very clever ways
to do that.  And part of the back-end system looked for

that.

The other thing the back-end system did was some of the billing-type accounting, recognizing whose ads had been clicked on, and so you have to charge the seller and you have to pay the publisher for that. But they weren't -- they weren't advertising type things. They were back-end systems.

Q.   Okay.  Let's talk about DFP.

Can you describe for the jury what DFP, DoubleClick for Publisher, or DART for Publishers was?

A.   It's a service offered by the DoubleClick Company to publishers, and the publishers had to go out and round up some advertisers and find people who would be willing to pay money to put their advertisements on that publisher's website.

And DoubleClick then provided a software system that allowed the advertisements from those advertisers to be installed in a computer system exactly as the advertiser had originally created.  And then the DoubleClick system would pick up those ads kind of in rotation and say, well, right now, I'm going to display this one on that publisher's website, and then I'll go get another one and put it on the website and do another one.

But it was for publishers who organized their

1   own set of advertisers, and the advertisers provided

2   fully, complete descriptions of what their

3   advertisements should look like.

4           MR. GRINSTEIN:  Your Honor, may I

5   approach the witness?

6           THE COURT:  Yes.

7       Q.   (By Mr. Grinstein) Dr. Rhyne, I'm handing you

8   a notebook of exhibits.  And I'd like you to turn to

9   Exhibit DX149.  It's a DoubleClick document.

10      A.   I have that.

11      Q.   Is this one of the documents that you analyzed

12  in this case?

13      A.   It was.  I remember the handwritten note from

14  Ms. Delfau on the front cover.

15      Q.   Can you  turn to Page 12?

16          MR. GRINSTEIN:  And, Matt, if you

17  wouldn't mind blowing that up a little bit.

18      Q.   (By Mr. Grinstein) First of all, what system

19  is this document discussing?

20      A.   I believe this is DFP, DART for Publishers.

21      Q.   And what does this document tell you about the

22  kind of access that DFA or advertisers had into the DFP

23  system?

24      A.   If --

25          THE WITNESS:  Well, Matt, if you could

1  blow up the lower left corner where that person is

2  sitting there.

3      A.   That's an advertiser, and you can see from the

4  three arrows that are -- you go up and to the right,

5  that there are three things that the advertiser can do.

6  They can view an insertion order.  That says, I think,

7  how their ads are going to be showed one after the

8  other -- shown one after the other.

9          They can view a placement, which has to do

10 with where would they like their ad to go.  And they can

11 do reports on how much money do they owe, who looked at

12 their ad.

13         There's no place there where an advertiser can

14 enter their advertisement.  That was done by the

15 publisher having rounded up the ads from the

16 advertisers.

17     Q.   Does this chart -- chart show advertisers

18 having the ability to input information to create?

19     A.   No.

20     Q.   Does this chart show advertisers having the

21 ability to input information to select?

22     A.   No.  All they can do is look at stuff.  It

23 doesn't show them being able to enter anything in this

24 figure.

25     Q.   Okay.  Let's talk about DFA for a second,

1  Dr. Rhyne.

2       A.    All right.

3       Q.    Can you tell us what DFA was?

4       A.    Well, it's sort of the polar opposite of DFP.

5  It was intended for an advertiser who created some

6  advertisements just like they wanted them and went

7  around and rounded up a bunch of publishers and said I

8  will pay you money if you'll put my ad on your website.

9  And the DoubleClick system helped those advertisers

10 rotate those ads among those various publishers.

11                  MR. GRINSTEIN:  I'd like to put up

12 Defendant's Demonstrative DX271.

13      Q.    (By Mr. Grinstein) And, Dr. Rhyne, was this a

14 demonstrative that you saw Mr. Lanning discuss?

15      A.    Yes.

16      Q.    And what does this demonstrative tell you

17 about the nature of the DFA system?

18      A.    Well, first off, that chart of capabilities

19 and all, this is essentially describing, I think, an

20 object, it's called.  It has certain characteristics.

21 It's from a DFA manual.

22                  And you can see that down at the lower right,

23 there's an advertiser with a terminal.  That -- that, in

24 a sense, is some kind of an interface to what they

25 labeled as a computer controller.  But notice that the

1  publisher is just hanging out.

2         And -- and like I said, DFP doesn't have an

3  input interface for the advertiser.  This one, DFA,

4  doesn't have an input interface for the publisher.

5     Q.   Okay.  Now, you mentioned that there was a

6  second reason why, in your opinion, DoubleClick didn't

7  meet the limitations of the claims or the second main

8  reason, at least.

9     A.   Yeah.

10    Q.   What was that again?

11    A.   They don't meet that pub -- that processing

12 requirement.  There's nothing that is -- as I found in

13 any of the documents or the testimony about the

14 DoubleClick capabilities in these two systems that says

15 that that -- what has been labeled here computer

16 controller -- ever automatically modifies the ad as

17 entered by the advertiser to make it match

18 publication -- excuse me -- presentation rules that have

19 been entered by the publisher.

20         The ads come in as they are, and they are

21 presented on websites, but they're not made to conform

22 to the requirements of the publisher.

23             MR. GRINSTEIN:  Can we see Defendant's

24 Demonstrative DX276?  DX Demo 276?

25    Q.   (By Mr. Grinstein) And, Dr. Rhyne, is this

1 the -- one of the charts that Mr. Lanning put up when he

2 was discussing this processing element of DoubleClick?

3      A.   If I understood it correctly -- in fact, I

4 think this is the only chart that he showed relative to

5 his -- his belief that the DoubleClick system

6 demonstrated the ability to meet this processing and

7 publishing.  This dealt with the processing requirement,

8 I believe.

9      Q.   Okay.  And can you just sort of explain what

10 the argument that's being made here is, as you

11 understand it?

12      A.   As I understood it, based on the words on this

13 piece of a page, Mr. Lanning found that there was some

14 way that the publisher could affect the characteristics

15 of the ad.  But to my understanding of this same

16 writing, that's not disclosed here.

17      Q.   Have you seen any evidence from your review of

18 the DoubleClick documents that affirmatively say

19 presentation rules are not -- you know, are not promoted

20 by the system?

21      A.   I have, but can I -- I think this is kind of

22 important to understand.  So may I go a little bit

23 further?

24      Q.   Sure.  Explain yourself further, Dr. Rhyne.

25      A.   Okay.  I read this and you can see in yellow,

as it was highlighted, there's something called a frame

header and a frame footer.  If you think about it from

the publisher's point of view, they write software,

probably this html language, to describe how they want

their page to look.

You've seen the CNN or the cheese.com.  The

cheese.com had that big picture of cheese, and it had

some menus and things.  The CNN has the CNN logo and

some news.

At some point in that code, you come to this

frame header, and what that says is, hey, stop putting

my stuff up, but this is where I want you to show an ad.

It's like the beginning alert.  It's like a left

parentheses, okay?  It says ad here.

And the advertisement will be defined by the

advertiser in html, and it will live in between that

frame header and the frame footer.

And there's nothing on this page that says

anything about changing the html for the ad that will

live between the footer and the header.  And that -- I

just don't see anything there that says that it was

automatically made to comply.

Q.    And have you seen any documents in this case

which suggest that, in fact, advertiser rules trumped

publisher rules in a DoubleClick system?

1    A.    I have.

2    Q.    I'd like you to turn to Defendant's

3 Exhibit 370, and we're specifically going to 4061.

4              MR. GRINSTEIN:  And, Matt, if you can

5 blow up the highlighted --

6    Q.    (By Mr. Grinstein) Dr. Rhyne, how does that

7 particular sentence impact your opinion about the

8 DoubleClick system?

9    A.    It makes clear that as disclosed in this

10 manual, there is no capability for the publisher's rules

11 to over -- override the advertiser's rules.  In fact, it

12 says:  Note that the value specified in an ad

13 placement -- that's the ad that the advertiser

14 created -- overrides the value specified in the site

15 properties, which would be the value associated with

16 what the publisher said.

17              So it says advertisers trump publishers.

18              MR. GRINSTEIN:  And, Matt, I'm sorry, but

19 could you put up the definition of processing again,

20 which I think was original Rhyne Demo 55?

21    Q.    (By Mr. Grinstein) And, Dr. Rhyne, while we're

22 putting up the definition of processing, can you explain

23 why it's relevant to anticipation that in the

24 DoubleClick system advertiser -- advertiser's rules

25 overrode publisher's rules?

1    A.    It's because, as the Court had construed that

2   last requirement for processing the electronic

3   advertisement, it says it must make that advertisement

4   comply with the presentation rules of the internet media

5   venues, not with the sellers.

6         Okay.  That was the big shift.  That all of a

7   sudden, instead of the advertisers being in control of

8   the ads, this system says we're going to make the

9   publishers be in control of the ads.

10        And that's -- that's just exactly opposite to

11  what that section of the DoubleClick manual teaches.

12   Q.    Dr. Rhyne, let's turn to the AdForce

13  reference.

14   A.    All right.

15   Q.    On the basis of your study, Dr. Rhyne, does

16  AdForce anticipate or render obvious the claims of the

17  Function Media patents?

18   A.    Again, Mr. Lanning and I have come to an

19  opposite conclusion based on our studies, and I don't

20  believe that it does.

21   Q.    Now, did you hear Mr. Lanning testify that he

22  believed that AdForce allowed for the custom --

23  automatic customization of ads based on publisher

24  presentation rules?

25   A.    I did.

1     Q.   Do you agree with that?

2     A.   No.

3     Q.   Why not?

4     A.   There's nothing in the document about AdForce,

5 that -- what -- User Guide 2.6, that ever shows anything

6 that clearly and convincingly describes having something

7 that the publisher wants to see on the advertisement

8 override what the advertiser said the ad should look

9 like.

10    Q.   I want to show you Defendant's Exhibit 403.

11    A.   Okay.

12    Q.   That's the User Guide 2.6?

13    A.   It is.

14    Q.   And if you can turn to Page 6-22, which is for

15 the record, G005527.

16    A.   Okay.

17    Q.   And is there anything on this particular

18 page --

19          MR. GRINSTEIN:  Matt, can you blow up --

20          THE WITNESS:  Yeah, I think it's probably

21 best if we look at that whole top half.

22    Q.   (By Mr. Grinstein) Okay.  Is there anything on

23 this page which informs your opinion about whether or

24 not presentation rules in the AdForce system affected

25 impact of formatted advertising content?

1     A.   Part of what -- there's sort of a link between

2 this and another document, but just to remind the jury,

3 this is headed creatives, and creatives are a term in

4 the art for advertisements.  It's what the advertiser

5 has created.

6          And it says in the second paragraph:  The

7 AdForce software is automated to receive advertisements

8 from advertisers and deliver them to websites.  That's

9 what it was for.  It doesn't say anything there about

10 changing them.

11          It says that the submitted advertisements must

12 already have been tested, debugged, and functioning.  So

13 the advertisers submit ads to this system, the AdForce

14 system, that are ready to go, okay?

15          In fact, it says in the next paragraph:  The

16 submitted advertisements must be entirely correct and

17 follow AdForce service's rich media ad guidelines or

18 campaign delivery may be delayed.  And they reference

19 you to this guidelines for creating and submitting

20 creatives, technical document, to see more about what

21 those guidelines are.

22     Q.   Let's look at that document, actually.  I

23 think that's Defendant's Exhibit 405.

24          And is -- is that the guidelines for creating

25 document that -- that you just mentioned?

1    A.    It has the same name, and I have operated

2 under the assumption that although there wasn't anything

3 very -- more specific than the title, that this is that

4 document.

5    Q.    All right.  And what kind of formatting

6 instructions does this document disclose that AdForce

7 advertisers could include with their advertisements?

8    A.    A couple of times, but primarily html, at

9 least for what we've been interested in.

10    Q.    And does it disclose that advertisers could

11 affect colors or borders or fonts or anything like that?

12    A.    I think, in fact, there was a question asked

13 of one of the AdForce witnesses, does it ever disclose

14 colors.  And I think this is the -- the particular prior

15 reference where there was no disclosure of color.

16         There is a mention of frame border in one of

17 the examples, but I think -- I think -- I have yet -- I

18 haven't seen anything about color in this particular

19 document.

20    Q.    Actually, Dr. Rhyne, I think you might be

21 talking about a different document.

22    A.    Oh, okay.

23              MR. GRINSTEIN:  Can we turn to 8122,

24 Matt?

25    A.    All right.

1    Q.    (By Mr. Grinstein) And remember, this is the

2  advertiser creatives document, Dr. Rhyne?

3    A.    I do.

4    Q.    And what does 8122 tell advertisers they can

5  include with their ads?

6    A.    All right.  I may have that wrong.

7          Okay.  It says that in your ad as an

8  advertiser, you can put border.  Okay, you can -- oh,

9  that's right.  It has font color.

10         It says that you can do font, size, and color,

11 but this is in the advertiser's input as to how the

12 advertiser creates their ad in html.

13   Q.    Now, did you hear Mr. Lanning and Mr. Scheele

14 mention that in the AdForce system publishers could

15 include background color?

16   A.    Yes.

17   Q.    I'm going to ask you some questions about how

18 publishers could include background color.

19   A.    Okay.

20   Q.    We'll talk about how the system processed it

21 later, but I want to first talk about how exactly they

22 could provide that background color.

23         And so I want to ask you about Defendant's

24 Exhibit 404.

25   A.    Okay.

1    Q.    This is document you reviewed, correct?

2    A.    Yes.  Yes, it is.  Uh-huh.

3    Q.    And if you could turn to Page 5740.

4    A.    I have it.

5    Q.    What does this document indicate to you about

6  the manner in which publishers could provide background

7  color to the AdForce system?

8    A.    Well, I think the bottom part of this from the

9  header background, BG color was shown during

10  Mr. Lanning's presentation.  And it says that background

11  color is a six-digit code used to indicate what

12  background color is to be used for the I-frame tag.  So

13  what this is telling you is that you -- as a publisher,

14  can specify a background color for this whole -- this

15  I-frame that you're going to -- leave in your web page.

16          And -- and it's -- it's what will be behind

17  the advertisement.  That's why it's called a background

18  color.

19    Q.    Does that page indicate to you that AdForce

20  had an interface that prompted?

21    A.    No.  This is something that you have to type

22  in yourself in a word processor, and then having typed

23  it in, you would cut and paste it and in some way put it

24  into the html description of your own as a publisher web

25  page.

1    Q.    Now, do you have an opinion as to whether or

2 not the AdForce system used that background color and

3 processed it to make ads comply with the background

4 color?

5    A.    I'm kind of two minds here.  And the first

6 point is that there's nothing in that description that

7 tells me anything about what's going to happen

8 downstream with those BG colors equals black, or

9 whatever FFF7D6 is.

10        There's -- there's some passable parameters,

11 they're called, that appear after some question marks in

12 four rows.  It's my understanding that what they're

13 basically doing is saying, at this time, some people use

14 Internet Explorer as their browser; some people use

15 Netscape as their browser.  And this is how you would

16 write an ad to make it possibly pass a background color

17 out to those.

18        But there's really nothing in any of the

19 disclosure.  I haven't seen any software or any further

20 information as to what's going to be there.  So my first

21 point is I don't see anything.

22        And my second point is that if those

23 background colors that are highlighted here are passed

24 as the background color of the I-frame, then, as I just

25 said, that's going to get covered up by the -- the

advertisements.  It's not going to be used to change any

characteristic of the advertisement entered by the

advertiser.

Q.   Well, then why would publishers have the

option to include background color?

A.   Well, because it's possible at least with this

system that the advertisements didn't appear.  And they

would not necessarily want to have a beautifully

formatted web page and then have a section of it that's

just left white or -- or, you know, some -- whatever

color might be there as the default color in their

browser.

They would like to have their web page still

look nice, even if the advertisements don't show up.

Q.   Okay.  And let me ask you about another

difference between AdForce and the Function Media

patents.

Did AdForce disclose a seller interface?

A.   No.

Q.   Let me show you --

MR. GRINSTEIN:  Let's go to Defendant's

Exhibit 403.  And I want to look at Page 5479, please,

Matt.

Q.   (By Mr. Grinstein) Dr. Rhyne, how does this

impact your opinion about whether or not AdForce had a

1  seller interface?

2      A.    Well, I looked at the permission profile

3  that's set in the bottom.  And as I understand that,

4  this is something that the IT manager for AdForce as a

5  company --

6                  MR. VERHOEVEN:  Objection.  Beyond the

7  scope of the report, Your Honor.

8                  (Bench conference.)

9                  MR. GRINSTEIN:  He discusses the lack of

10  the seller interface in his report, and he discusses the

11  fact that it's not disclosed in this document.

12                  MR. VERHOEVEN:  It's not in his report.

13  About half of what he's testified to has not been in his

14  report, Your Honor.  And this one is also not in his

15  report.

16                  MR. GRINSTEIN:  I mean, his report

17  says that --

18                  MR. VERHOEVEN:  It's not in his report.

19  In his deposition, he didn't rely on this either.

20                  THE COURT:  Well --

21                  MR. VERHOEVEN:  Do you dispute that?

22                  MR. GRINSTEIN:  Yeah.  He talks about the

23  fact that the AdForce -- I don't have the report with

24  me.

25                  MR. VERHOEVEN:  He testified in his

1  deposition that he --

2              MR. GRINSTEIN:  Your Honor, I'll move on.

3              THE COURT:  I'm not going to -- I'm

4  accepting your representation that this is discussed in

5  his report, okay?  And that the line of testimony that

6  you're going to elicit is discussed in his report.

7              That's your representation.

8              MR. GRINSTEIN:  I'm going to move on,

9  Your Honor.  I believe that's true.  But if I'm

10  mistaken -- I don't want to make a mistake, so I'm going

11  to move on.

12          (Bench conference concluded.)

13      Q.   (By Mr. Grinstein) Dr. Rhyne, I want to talk

14  to the issue of obviousness.  When you look at

15  obviousness, what point of view do you use?

16      A.   You use the point of view of someone that's

17  this hypothetical person of ordinary skill in the art.

18      Q.   And did you hear Mr. Lanning provide a

19  definition of ordinary skill in the art?

20      A.   I did.

21      Q.   What's your opinion about his definition of

22  the ordinary skill?

23      A.   I thought it was inordinately high.  I think

24  basically he looked at a person who had a number of

25  years of experience, had a bachelor's degree, and had

1  indepth experience with a variety of internet-related

2  tools, like website development tools, a variety of

3  description language -- descriptive languages, like html

4  and others, and even had indepth experience with the

5  network protocols that are used to transmit data over

6  the internet.

7          And it seemed to me that he basically was

8  almost --

9          MR. VERHOEVEN:  I'm sorry.  I object.

10 This is not in his report.

11          (Bench conference.)

12          MR. GRINSTEIN:  Your Honor, the level of

13 ordinary skill in the art is absolutely in his report.

14          MR. VERHOEVEN:  But he never took issue

15 with Mr. Lanning, and now he's taking issue the very

16 first time.  We've never heard the reasons why he

17 disagrees.

18          MR. GRINSTEIN:  They have two competing

19 ordinary skill definitions.  Of course, he can talk

20 about why he likes his better than Mr. Lanning's.

21 They're two competing ordinary skill definitions.

22          THE COURT:  Is there one that he put

23 forth in his report different?

24          MR. GRINSTEIN:  Yes, it's different

25 from -- it's different from the one Mr. Lanning put

1  forth.

2            THE COURT:  All right.  I'm going to

3  overrule the objection.

4            (Bench conference concluded.)

5     Q.  (By Mr. Grinstein) Dr. Rhyne, again, can you

6  explain what your view is of Mr. Lanning's ordinary

7  skill definition?

8     A.  Well, to put it simply, I think it's unusually

9  high, particularly in requiring such an extensive amount

10  of industrial experience with areas of technology on the

11  internet that aren't in any way impacting on the claims

12  of the Function Media patents.

13     Q.  Now, Dr. Rhyne, based on Mr. Lanning's

14  definition of ordinary skill, did you hear him testify

15  that he thought the Function Media inventions were

16  obvious?

17     A.  That's correct, he did.

18     Q.  Do you agree?

19     A.  No.

20     Q.  Why not?

21     A.  Well, even at his high level of ordinary

22  skill, I think that there's evidence that I've seen that

23  would support exactly the opposite, that this -- this

24  using obviousness to fill holes in the references is --

25  is -- is inappropriate.

1    Q.  Have you seen documents, evidence you

2 discussed in your report that suggests that the prior

3 art was going in a different direction?

4    A.  I've looked at documents that I cite

5 deposition testimony and other things that said that at

6 this time, at the time before the Function Media patent

7 hit the street, that -- that the advertising world was

8 advertiser-centric.

9        Okay.  That the person of -- you have this

10 pair between the seller and the publisher.  That it was

11 the advertiser who set the looks and feels of their ads;

12 that it was important to them to do so; and that no

13 people thought they wouldn't -- they would never give

14 up, as an advertiser, the right to look -- to set the

15 way their advertisement was going to look and have some

16 other system automatically change its -- its appearance

17 to make it happy for the publisher; that the advertiser

18 wanted it to make them happy, not the publisher happy.

19    Q.  Now, did you hear Mr. Lanning mention a

20 reference known as NetGravity?

21    A.  Yes.

22    Q.  Does NetGravity alone render the claims

23 obvious?

24    A.  No.

25    Q.  Why not?

1    A.    Well, primarily in simple terms, it doesn't

2 teach automatic processing to make an advertisement

3 modify -- match the presentation rules of the publisher.

4 And also it doesn't have a seller interface.

5         It's aimed at publishers who rounded up ads,

6 got fully defined ads from a bunch of advertisers, put

7 them in their system, and NetGravity put those ads on a

8 variety of publisher sites.

9    Q.    So just so we're clear, did NetGravity have an

10 internet media venue interface?

11    A.    I don't think it had an interface for internet

12 media venues that prompted the internet media venue to

13 input presentation rules.  It didn't meet that

14 particular limitation.

15    Q.    What about a seller interface?

16    A.    It didn't have a seller interface at all.

17    Q.    Did it process ads to make them compliant with

18 publisher rules?

19    A.    No.

20    Q.    Let's take a look at the NetGravity User

21 Guide, Defendant's Exhibit 422.  You've discussed that

22 in your report obviously.

23    A.    Yes.

24    Q.    And I want to look at Page 17187.

25         MR. GRINSTEIN:  It's the next one, 17187,

1  please.

2        A.    Okay.

3        Q.    (By Mr. Grinstein) Now, you heard Mr. Lanning

4  discuss setting an ad style as being relevant to the

5  publisher presentation rule limitation in the patents?

6        A.    Yes.

7        Q.    And there's discussion down at the bottom of

8  this document about ad styles and NetGravity.

9              Do you see that?

10       A.    Yes.

11       Q.    What's your opinion about whether or not those

12  qualify as presentation rules that NetGravity made

13  advertisements comply with?

14       A.    Well, the presentation rules are supposed to

15  be the thing that comes into play during the processing

16  step where you make the ad compliant.  And these are

17  really placement -- positioning rules on the website.

18  These say do I want the ad in the middle of the page; do

19  I want it in the upper left; or do I want it on the

20  right margin or the left margin?

21              But none of them, as I read them, change the

22  characteristics of the ad at all.  It just tells you

23  where you're going to place it on the -- on the

24  publisher's page, not how the ad is going to look.

25       Q.    If you had a style that said put a horizontal

1 line above and below an ad, does that process the ad to

2 make it comply with anything?

3      A.    No.   It processes the page on which the ad is

4 going to appear, but putting a line above it or below it

5 as part of the publisher's page doesn't change the ad at

6 all.   In fact, if there weren't an ad, you'd see those

7 two lines.

8      Q.    So you've discussed what NetGravity doesn't

9 have.

10          Is it your opinion that NetGravity renders the

11 claims obvious?

12      A.    No.

13      Q.    What about the document that Mr. Lanning

14 discussed where a NetGravity founder had said he was

15 thinking about adding a seller interface?   Does that

16 render the claims obvious?

17      A.    No.   The point there, I guess first off, is he

18 didn't do it.   Okay.   He said, well, our advertisers

19 have to submit their ads to us by e-mail.   They have to

20 mail us a little disk.   They have to drive to our office

21 and hand it to us.

22          First off, that shows you what I've said all

23 along, that the advertisers were in control of the ads.

24 They brought them to the NetGravity people and said

25 here's my ad; put it on somebody's website.

1    But to -- what I read that quote as saying is
2 that the advertisers would like a more automatic way to
3 be able to submit their ads, maybe by sending them in in
4 some way other than having to e-mail them to us.  Maybe
5 we could reach out and get them every day from them.
6 But I didn't see anything there that implied that it
7 would be a seller interface that would prompt the seller
8 to input information to select or information to create.
9    Q.    And just to conclude NetGravity, do you
10 believe that NetGravity, in combination with either
11 DoubleClick or AdForce, renders the claims obvious?
12    A.    No.  And I've got a simple reason for that.
13 While there were differences as to what each of them did
14 or didn't disclose, none of those three references
15 discloses this processing to make the ad comply with the
16 publication rules of a publisher.
17    And it's kind of like if you had three pieces
18 of paper and I punched holes in them that indicated
19 where the missing parts of the claim was, if you hold
20 all three pieces of paper one on top of the other, if
21 there's a hole that's at the same place for all of them,
22 you'll just see right through it.
23    As far as that last limitation, that (f), none
24 of them meet that limitation.  So if you put them
25 together and say, well, hey, in combination they teach

something, they never teach that.

Q. I want to talk to you about another topic relating to obviousness, and this is called secondary considerations of non-obviousness.

Can you just, you know, summarize what that means?

A. Right. You know, the other day I slipped into legalese and referred to a Markman construction, and Judge Everingham was kind enough to explain what that meant.

As I understand it, the secondary considerations are something that have come out of some prior legal cases, and they are things that can be identified that push against the idea that something is obvious.

They're factors -- you heard the two economic experts talk about the Georgia-Pacific Factors. Well, the secondary considerations are factors that if they're in evidence, they -- they argue against or support against the idea that something is just obvious.

Q. Is there a factor relating to commercial success?

A. There is.

Q. And can you explain how, in your opinion, that factor impacts your obviousness opinion?

1    A.   Sure.

2              MR. VERHOEVEN:  Objection, Your Honor.

3         May I approach?

4         THE COURT:  Yes.

5         (Bench conference.)

6              MR. VERHOEVEN:  In his report, there is

7    absolutely no nexus between -- there's no point to the

8    commercial success of the Google products.  And in his

9    report, there's absolutely no nexus between that as

10   required by law.

11             You can't just point to the fact that the

12   accused product is successful and say that that's

13   commercial success.

14             THE COURT:  Well, I'm going to hear his

15   opinion.  And I think the record will allow the jury to

16   find a nexus.  So I think there's sufficient evidence in

17   the record.  So I'm going to overrule the objection.

18             (Bench conference concluded.)

19        Q.   (By Mr. Grinstein) Dr. Rhyne, to repeat my

20   question again, what's your opinion about commercial

21   success and how it relates to obviousness in this case?

22        A.   As I understand, the reason that commercial

23   success is one of the secondary -- and something that's

24   called indicia or factors ought to argue against

25   obviousness is that if somebody has an idea and they are

very successful financially, it implies that their idea

must be kind of unique among all of the marketplace,

because if it was obvious, then all their competitors

would be doing it, and -- and there wouldn't be an

opportunity to make that kind of profitability out of

that idea.

Q.   And what do you see here with respect to that?

A.   Well, first off, it's my opinion, as I

explained a week ago, that the AdSense for Content and

AdSense for Mobile services processes offered by Google

infringe the Function Media patents.

Because of that, I believe that those patents

are fundamental to the success that that Ad -- that

Google has made financially and -- and in the

marketplace, their penetration in the marketplace

through use of those patents.

And, certainly, I -- I saw all kinds of big

numbers that were produced during this case and

discussed by the economics experts that show that

Google's use of those patents has been commercially

successful.

Q.   Is there another one of these considerations

known as long-felt need?

A.   Yes.

Q.   Can you explain that and how it impacts your

1    opinions in this case?

2        A.    The way it relates to being -- showing that

3    something is not obvious is, if there were a lot of

4    people working in and around that field at the time of

5    the invention, and none of them, no one else came

6    upon -- even though they wanted to be successful in that

7    field, they never came upon that particular idea.

8            They knew that it was something good; they

9    wanted it to be successful; but they just never found

10   that particular solution.

11       Q.    And how do you see that present in this case?

12       A.    Well, with that AdForce, with a bunch of

13   really smart people; we've got DoubleClick working with

14   DFP and DFA, working with publishers and advertisers;

15   we've got Netscape -- I knew I would say it --

16   NetGravity.

17           All of those people are out there working in

18   and around, trying to be financially successful in the

19   advertising on the internet field, and I have yet to see

20   amongst anything those people did prior to the year 2000

21   when the Function Media patents came out, that somebody

22   else came up with the idea of turning the -- the game

23   around.

24           And instead of having the advertisers say:  I

25   want my ads to look just like I want them to look, going

1  over to the other end and saying:  No.  You submit your

2  ads, and you'll get the benefit of going to lots and

3  lots of places, but you have to give up control of the

4  look and feel of your ad and let the publisher modify it

5  automatically to make it comply with their view, and --

6  and nobody else did that.

7      Q.    And the last factor I want to talk to you

8  about is praise.  Can you explain that and briefly see

9  what evidence you saw of it in this case?

10     A.    Sure.

11         If -- if the industry looks to something and

12 says -- if other people in the industry say, you know,

13 that's a good idea; that's been very successful, things

14 I've seen in the past or maybe where an invention won a

15 national or international award -- and in my expert

16 report, I cited to some newspaper and other types of

17 articles that were on the internet about AdSense for

18 Content and specifically said that this was a really

19 sharp and good system, and also some of the users of the

20 system have praised its ability to help them sell their

21 products.

22         MR. GRINSTEIN:  Your Honor, may I

23 approach?

24         (Bench conference.)

25         MR. GRINSTEIN:  Your Honor, the next

topic I want to get into is his rebuttal on noninfringing alternatives.

If you recall, during his direct testimony, I wanted to discuss -- sort of pre-rebut that issue, and you said, let's see what comes in and let him discuss it, if it's appropriate, in his rebuttal.

So I don't want to get into this topic without warning anybody about it, but --

THE COURT: No. It's -- it's -- what I told them at the bench, I believe, earlier was to wait and let's hear what they said about it. I mean, I don't remember that exact bench conference, we've had so many, but --

MR. VERHOEVEN: My expert did not -- on direct did not testify about noninfringing alternatives.

MR. GRINSTEIN: Well, I've got about --

MR. VERHOEVEN: So there's nothing to rebut from Mr. Lanning.

MR. GRINSTEIN: Sorry.

MR. VERHOEVEN: -- that was not a subject that I talked about.

MR. GRINSTEIN: I mean, their -- I'm sorry.

MR. VERHOEVEN: Sorry. I'll let you know when I'm done.

1          I talked about noninfringement and

2  invalidity.  I did not ask him questions about

3  noninfringing alternatives, and therefore, there's

4  nothing to rebut.

5          THE COURT:  Well, it's his rebuttal case,

6  though.  I mean, it's his rebuttal expert, but it's a

7  rebuttal case, and I mean, it came out in your

8  case-in-chief, correct, noninfringing alternatives?

9          MR. VERHOEVEN:  It did.

10          THE COURT:  Starting with --

11          MR. VERHOEVEN:  We had Google witnesses

12  talking about that, Your Honor.  But maybe I

13  misunderstood something.  I thought that the rebuttal

14  that they were talking about was that they would rebut

15  on the issue of validity.  Noninfringing alternatives is

16  a damage -- a damages doctrine.

17          THE COURT:  Well, I'm overruling the

18  objection.

19          But, Counsel, you've got all of about

20  12 -- 13 minutes left.

21          MR. GRINSTEIN:  Six questions, Your

22  Honor.

23          (Bench conference concluded.)

24      Q.   (By Mr. Grinstein) Dr. Rhyne, finally, I want

25  to ask you a question about design-arounds and

noninfringing alternatives.

Have you heard testimony in this trial about a product called Explorer that Google has been discussing?

A.   Not a product.  I've heard about a project that's been under internal testing and maybe even some limited external testing at Google called Explorer.

MR. VERHOEVEN:  I apologize, Your Honor.

May I approach one more time?  And then I'll be done.

THE COURT:  Yes.

MR. VERHOEVEN:  I'm sorry.

(Bench conference.)

MR. VERHOEVEN:  Just for the record, this discussion that he's going to present about Explorer also is not in his report, and it's not in any of his deposition, Your Honor.  We raised it, and it was not responded to.

MR. GRINSTEIN:  Your Honor --

MR. VERHOEVEN:  As part of the Rule 26 process, they're supposed to --

THE COURT:  No.  I understand.

MR. GRINSTEIN:  Your Honor, the -- his report says that he did not see the existence of any noninfringing alternative.  This is an argument they've come up with at trial based on a document, an e-mail

that they produced two weeks ago showing this Explorer
issue.

And this is the exact argument that we
had before Your Honor, which was that we were being
prejudiced, because they weren't producing any documents
on Explorer and then coming in here and offering
testimony on it.

And we were not able to go look at the
source code; we were not able to do any of these things.

So at the very least, we should be able
to put up a witness who can respond.

MR. VERHOEVEN:  Quick response, Your
Honor.

I'm being told that the Explorer
noninfringing alternative was in Mr. Lanning's Rule 26
report.  There was an opportunity for that to be
addressed.  The point of these reports is so people
aren't surprised, and this was not in.

THE COURT:  Here's what I'm going to do.
I allowed your witnesses to testify about it to the
extent that it was disclosed in documents that came in
very late in this case, okay?  And I allowed them to get
into that based on documents over y'all's -- over their
objection.

I'm going to similarly allow him to rebut

1    it based on documents that are in the record where you

2    can point to the absence of things, that he hasn't seen

3    documents, okay?  But he's not going to get into

4    document production.  But restrict him to what was used

5    at trial.

6                    MR. GRINSTEIN:  Yes, Your Honor.

7                    THE COURT:  Overruled.

8                    (Bench conference.)

9         Q.   (By Mr. Grinstein) What is your understanding

10   of this Explorer project as it was discussed at trial?

11        A.   It's my understanding that what Google is

12   investigating is the possibility of having -- instead of

13   having the advertisers submit keywords that identify --

14   like we talked about, baseball caps or something, that

15   they say, I would like my advertisement to show up on

16   websites that focused on baseball or sports, that the --

17   Google would use software to analyze the words of the ad

18   itself, okay?

19             And I think it probably, as best I know, only

20   works with text ads, and they would look at the words of

21   the text that were entered by the advertiser and say,

22   based on reading your words, we think some good keywords

23   for you would be whatever it's going to be.

24             But they would -- they would -- they would

25   supply the keywords for the advertiser instead of the

1    advertiser supplying the keyword.

2        Q.    Is that alternative noninfringing?

3                MR. VERHOEVEN:   Objection, Your Honor,

4    beyond the scope.

5                THE COURT:   Overruled.

6        A.    I don't think it is.   When I heard about it

7    recently, I thought about it, and -- and, basically, in

8    that case, I think the words of the ad themselves, after

9    they've been processed by Google, become keywords,

10   become the kind of information to select websites so

11   that what the advertiser would enter is both in the same

12   set of words, information to create an ad and

13   information to select where they would like that ad to

14   go.

15               And the example I would give you is, if I have

16   an advertisement that -- we saw one, bass fishing, okay?

17   Well, if -- if I say bass fish -- Fred's Bass Fishing

18   Service; we'll -- we'll -- we're excellent guides; we'll

19   supply the tackle; here's our return address, when you

20   analyze those words, what are you going to find?

21               Bass, fishing, tackle, lessons.   Those are the

22   same words that you would expect the advertiser to have

23   suggested.   And if you get the same words out of the

24   content of the ad, those keywords were taken by

25   information that was entered by the advertisers.

1    So I don't see that as being a noninfringing

2 alternative.  It's an alternative, but I believe that

3 that would infringe as well.

4    Q.  (By Mr. Grinstein) Have you seen any evidence

5 discussed in this trial or heard any testimony in this

6 case that that Explorer would somehow work better than

7 the current system?

8    A.  I don't recall any -- there was some

9 discussion that some limited set of advertisers were

10 using it, but I didn't hear any factual data to imply

11 that it was more superior than to give the advertiser

12 the right to specify where they wanted their ad to go.

13    Q.  Do you think it would work better?

14    A.  I -- if I'm an advertiser -- a good example

15 would be, suppose I said -- well, we've seen it.  Joe's

16 Guitars.  Well, Joe is a word for coffee, you know, and

17 I don't think I would want my guitar ad to be

18 misinterpreted to be on a Starbucks website.

19    Q.  Does this noninfringing alternative that

20 Google has discussed in any way change your opinion

21 about whether these patents are new, important,

22 fundamental?

23    A.  No.  Based on all my study and all that I've

24 heard, both in depositions and at trial, I don't -- my

25 opinion remains that the patents are infringed and

valid.

                MR. GRINSTEIN:  No further questions.

                THE COURT:  Cross-examination.

                MR. VERHOEVEN:  Very briefly, Your Honor.

                THE COURT:  Yes, sir.

                MR. VERHOEVEN:  May I approach and move
out the easel?

                THE COURT:  Of course, yes.

                MR. VERHOEVEN:  Can I get some help,
please?

                Can everyone see that okay?

                Your Honor, is it okay if I stand out
here, so I can point at this?

                THE COURT:  Yes, sir.

                MR. VERHOEVEN:  Thank you.

                    CROSS-EXAMINATION

BY MR. VERHOEVEN:

    Q.  Mr. Rhyne, I'll be very brief.  I just want to
ask you a couple of questions about this noninfringing
alternative subject matter --

    A.  All right.

    Q.  -- Explorer.

    A.  Yes.

    Q.  You understand that the testimony was that
Google has a system; it's in beta form; it's available

1 that they could use called Explorer, right?

2     A.    I don't know what you mean by available, but

3 it is in beta test form.  I heard that.

4     Q.    Okay.  And the Explorer system would not allow

5 an advertiser to ask to be placed on particular

6 websites, correct?

7     A.    It would not allow the -- I don't know about

8 allow, but it was designed to replace having the

9 advertiser send in keywords.

10     Q.    The advertiser couldn't put in the placement

11 field that we looked at before and say:  I want to be

12 on -- my ad to be on www.fishing.com, right?

13     A.    I have no opinion on that, because I don't

14 remember whether there was testimony about placement --

15 placement or not.  I focused on keywords.

16     Q.    Well, do you recall one way or the other?

17     A.    I don't recall whether that was testified to

18 in Court.

19     Q.    You're not aware of any evidence that the user

20 with Explorer could ask for a specific website, are you?

21     A.    I'm not aware of any evidence either way.

22     Q.    And you're aware that with Explorer, the

23 advertiser couldn't even put in keywords saying, I'd

24 like to be associated with these subjects, right?

25     A.    It's my understanding that they wouldn't --

1  would be -- the keywords would be generated

2  automatically by the -- by Google.

3      Q.   The advertiser could not put in keywords,

4  could it, sir, that would say, I want to be associated

5  with these keywords using Explorer, correct?  Yes or no.

6      A.   I don't know whether they would -- that

7  feature was completely turned off or not.

8      Q.   You don't know.

9      A.   I don't know.

10      Q.   Did you hear testimony that it was?

11      A.   I don't remember if there was testimony that

12  it was completely turned off.

13      Q.   Now, with the Explorer system, all the

14  advertiser can do is put in the headline and the

15  advertisement and the link, right, sir?

16      A.   Yeah, that's my understanding.

17      Q.   Okay.  And it's your testimony to this jury,

18  that that functionality meets this second interface of

19  the computer system through which the seller is prompted

20  to input information to select one or more of the

21  internet media venues.

22          Is that your testimony to this jury?

23      A.   As I understand Explorer, yes, that's my

24  testimony.

25      Q.   Okay.  What if they just put a headline and no

1  description of an ad?  Would that meet that?

2       A.   If there was a word in the headline, yes, it

3  would -- that could be used as a keyword, it would.

4       Q.   Okay.  So if I'm an advertiser; I don't ask

5  for any keywords; I don't ask for any websites; I just

6  say headline is fishing --

7       A.   Okay.

8       Q.   -- it's your testimony that the seller has

9  input information to select one or more of the internet

10 media venues.

11           Is that your testimony to this jury?

12      A.   As I understand the way Explorer works, yes,

13 sir.

14      Q.   Okay.

15           MR. VERHOEVEN:  That's all I have, Your

16 Honor.

17           THE COURT:  Okay.

18           MR. GRINSTEIN:  No further questions.

19           THE COURT:  Okay.  You may step down.

20           THE WITNESS:  Thank you.

21           THE COURT:  Who will be your next

22 witness?

23           MR. GRINSTEIN:  Your Honor --

24           MR. NELSON:  May we approach, Your Honor?

25           THE COURT:  Yes.

```
 1                    (Bench conference.)

 2                    MR. NELSON:  Before evidence closes,

 3  there's an open issue about Plaintiff's Exhibit 157,

 4  which is the U.S. Today article about Ms. Wojcicki.

 5  Multiple witnesses have testified that this was posted

 6  within Google.  Ms. Wojcicki herself has testified, I

 7  believe, about this.  We'd like to move to admit this

 8  document.

 9                    THE COURT:  Okay.  Is there an objection?

10                    MR. VERHOEVEN:  Has he even talked about

11  this?

12                    MR. NELSON:  Yes.

13                    MR. DEFRANCO:  Are you going to use it --

14  I don't understand.

15                    MR. NELSON:  No.  We just want to make

16  sure we -- we've actually referenced it, so we just want

17  to make sure it's in evidence.

18                    MR. DEFRANCO:  If that's all they're

19  using it for, that's fine, Your Honor.

20                    We're not going to hear about something

21  in closing that hasn't been presented on this article?

22                    MR. NELSON:  Just to be clear, we are

23  going to talk about this, but it has been presented to

24  the jury.

25                    MR. DEFRANCO:  Well, there's all sorts
```

```
 1  of hearsay information --
 2                  MR. NELSON:  It is a quote from
 3  Ms. Wojcicki.  Sorry.
 4                  THE COURT:  Don't talk over.
 5  Make your objection.
 6                  MR. DEFRANCO:  Your Honor, there was
 7  testimony at deposition about what she said or didn't
 8  say about this.  For them to come in now and quote this
 9  as fact and truthful statements when it's a reporter's
10  recapping of an interview with Ms. Wojcicki, I don't
11  think that's appropriate.
12                  THE COURT:  I'm overruling the objection.
13  It's admitted.
14                  MR. NELSON:  And one -- just one
15  logistical -- I want to make sure for the record -- I
16  don't think they object -- PX1700, I'm not sure we were
17  on the record as that having been admitted.  I don't
18  think there's an objection, but I'm --
19                  THE COURT:  What is it?
20                  MR. NELSON:  It's -- it's a document that
21  was admitted from the Sergey Brin deposition, and we
22  gave it to you -- I'm almost positive it's already been
23  preadmitted, but before the evidence closes, I just want
24  to make sure it's in the record.
25                  THE COURT:  Well, can I -- well, are you
```

getting ready to rest in front of the jury?

MR. NELSON:  Yes, sir.

THE COURT:  Okay.  I'm -- I'm going to leave the -- leave the record open for the limited purpose of PX1700.  Y'all talk about it.  If y'all have an objection to it, I'll hear it, you know.  If not, I'll just go ahead and I'll rule on the objection --

MR. DEFRANCO:  Yes, sir.

THE COURT:  -- once the jury has --

MR. DEFRANCO:  Okay.

MR. VERHOEVEN:  Since we're here, after they close, remember, I told you I was going to call Mr. Lanning to rebut?  That will be real quick.

THE COURT:  Okay.  I'm sorry?

MR. VERHOEVEN:  Remember yesterday when we were -- I was doing the direct of Mr. Lanning, and I asked you if I would be able to have him be called after Mr -- Mr. Rhyne, so we'll be calling him for just 15, 20 minutes.

THE COURT:  Okay.

MR. GRINSTEIN:  Your Honor, this is going to be -- I'm not quite sure I understand the purpose of the testimony.

My understanding is, if he came up with something new, he could call Mr. Lanning and rebut, but

Mr. Lanning has already had a say on validity.  They

don't get two -- like we can't call Dr. Rhyne and argue

infringement again.

            MR. VERHOEVEN:  I specifically addressed

this with Your Honor yesterday --

            MR. GRINSTEIN:  Well, I understand.

            MR. VERHOEVEN:  -- and you said I could

call him, and they agreed.

            And I probably said I didn't know what he

was going to testify about.  It might be less than what

you had.  But I'd like to have him address Dr. Rhyne's

arguments afterwards, and Your Honor said I could do

that, and he agreed that I could do that.

            MR. GRINSTEIN:  I agreed that there could

be a rebuttal, but I didn't agree as to the scope of the

rebuttal.

            THE COURT:  Well, folks, come on.  I'm

going to allow him to call him.  Let's get the evidence

in.  You've got a time limit.  If you need to call Rhyne

back to rebut something he says, but we're going to play

under the same rules.  This is unorthodox, to say the

least.

            Let's go.

            (Bench conference concluded.)

            MR. TRIBBLE:  Your Honor, Plaintiff

rests.

        THE COURT:  Okay.  Ladies and Gentlemen, you've now heard the Plaintiff's rebuttal evidence.  I was advised at the bench that we had a limited amount of surrebuttal testimony as well.

        So Mr. Verhoeven?

        MR. VERHOEVEN:  Thank you, Your Honor.

        Defense calls Mr. Lanning.

        Proceed, Your Honor?

        THE COURT:  Please.

<u>MARK LANNING, DEFENDANT'S WITNESS, PREVIOUSLY SWORN</u>

DIRECT EXAMINATION

<u>BY MR. VERHOEVEN:</u>

    Q.   Morning, Mr. Lanning.

    A.   Good morning.

    Q.   Now, you were sitting in the courtroom for Dr. Rhyne's testimony, correct?

    A.   Yes, I was.

    Q.   I'd like to start by asking you a couple questions about AdForce.

    Did you -- were you here in the courtroom today when Dr. Rhyne testified that AdForce did not have a seller interface?

    A.   Yes, sir.

    Q.   Can you tell the jury whether you agree with

1  that opinion?

2      A.   I don't agree with that opinion.  And I

3  understand now that you've heard two opposing opinions

4  from Dr. Rhyne and myself about whether the AdForce

5  system had an advertiser interface, and I believe it

6  does, and I believe the AdForce user manual clearly

7  shows that it does.

8      Q.   Okay.

9          MR. VERHOEVEN:  Can we go to DX demo 223,

10  please.

11     Q.   (By Mr. Verhoeven) Can you explain to the jury

12  what we're looking at here?

13         And before I -- before you answer that, just

14  for the record, this is a screen shot of Exhibit DX 403

15  in evidence, Page 5469.

16         The question is:  Can you explain to the jury

17  what we're looking at here?

18     A.   Yes.  This is a page from the AdForce user

19  guide, this manual, like we looked at yesterday in

20  detail, and I've blown up a section of this document

21  which says:  Advertising allows users to create, copy,

22  and modify campaigns.

23         And as has been discussed multiple times, as

24  well as I have explained, a campaign is creating an ad,

25  deciding where you want that ad to be displayed, and

```
 1  when you want to start sending that ad out and when you
 2  want to stop it.
 3       Q.   Okay.
 4            MR. VERHOEVEN:  Can we go to DX 403,
 5  5509.
 6            And can you highlight that, please,
 7  Charles?
 8       Q.   (By Mr. Verhoeven) Mr. Lanning, can you
 9  explain to the jury what we're looking at here?
10       A.   Yes.  This is another page from the AdForce
11  user guide, which a new advertiser is being added to the
12  AdForce system.  If we look at the very top of the
13  screen shot from the AdForce menu, the text says:  Ad a
14  new advertiser.
15            Now, what's occurring here is that the system
16  administrator for AdForce or a super-user, as they refer
17  to, is adding information for a new advertiser.  And
18  they provide the log-in name that's highlighted there,
19  the password that's at the second slot, and they confirm
20  the password, which is the same.
21            And this is showing very clearly that an
22  advertiser is being given a log-in interface so that
23  they can have a second interface.
24       Q.   Okay.
25            MR. VERHOEVEN:  Let's go to DX 224.
```

1 And for the record, this is Exhibit DX 403 in evidence,

2 Page 5481.

3     Q.   (By Mr. Verhoeven) Mr. Lanning, is this from

4 the user manual as well?

5     A.   Yes, it is.

6     Q.   It's this document here?

7     A.   Yes.  Again, it's another page.

8     Q.   Can you explain to the jury how this relates

9 to your opinion?

10     A.   This -- the way the AdForce system worked is

11 that you could provide permissions or capabilities for

12 different users in the system and define what they were

13 capable of doing on this AdForce system.

14        This is explaining, as highlighted by the --

15 the words that I've highlighted in the bottom sentence,

16 that network administrators can assign any permission to

17 any user.  And what that effectively says is that an

18 advertiser can perform any function that's defined by

19 this manual if the network administrator decides that

20 that's appropriate.

21        So regardless of where it's shown in the

22 manual or what's done, the network administrator can.

23 And there's one part that I'd also like -- and when you

24 determine which of our opinions that you decide that

25 you're going to agree with, Dr. Rhyne's or myself, I'd

1 like you to ask yourself, if you look -- what I need to

2 explain in the AdForce user guide, the AdForce user

3 guide has a whole chapter for advertisers.

4          It starts on Page 6-1, which has a production

5 number G005506.  This page --

6                THE WITNESS:  I don't know if you can

7 pull it up or not, Charles.

8     A.    Right at the top, we can see it says

9 advertising.  Now we have it on the screen.

10          If we look at the outline of what's in this

11 whole Chapter 6, there's 107 pages that have been

12 included in this manual for advertisers.

13          And I'd like you to ask yourself, if AdForce

14 didn't have an ad -- advertiser interface, why would the

15 AdForce user manual have 107 pages describing all the

16 functionality that could be performed by a user or the

17 seller in this case?

18          It also has a chapter that's a different

19 chapter, Chapter 7, for publishers, which defines all

20 the publisher capabilities.

21          I just showed you how an advertiser is added,

22 so they can use all of the capabilities that are listed

23 in chapter 6, as well as capabilities in the rest of the

24 manual if the network administrator gives them the

25 permission to do so.

1     Q.   Now, Mr. -- or Dr. Rhyne testified, with

2 respect to AdForce, that under the AdForce system, the

3 media venues presentation rules would not have any

4 control.

5          Do you agree with that?

6     A.   No, absolutely not.

7     Q.   And can you explain to the jury why you

8 disagree with that.

9     A.   Because the whole design of the AdForce system

10 is designed -- is -- there are two different pieces of

11 information, among others, but the two key pieces of

12 information is an advertiser defines an ad, and then a

13 publisher defines what they refer to in the AdForce user

14 guide as a content unit, which is the area for the ad

15 and the presentation rules for that ad.

16          And it's clear to me that the AdForce user

17 guide, it's -- there's some real simple examples.  If I,

18 as a publisher, define a content unit with a green

19 background color and the ad is text, this -- the AdForce

20 system is clearly going to apply the green background

21 color for the ad, as I defined for the publisher, and as

22 I described in detail yesterday of how different

23 presentation rules are applied to give different

24 backgrounds, to give frame borders and other

25 characteristics.

1     Q.   Mr. Lanning, I'd like to switch now to the

2  subject of the DoubleClick DART system, which was

3  another system that you testified on direct that you

4  believed anticipates, right?

5     A.   Yes, that's correct.

6     Q.   And you heard Dr. -- Dr. Rhyne's testimony

7  about DoubleClick, correct?

8     A.   Yes, I did.

9     Q.   Did you hear his testimony that he did not

10  believe DoubleClick was an integrated system?

11     A.   Yes, I did.

12     Q.   Do you agree with that opinion?

13     A.   No, I do not.

14     Q.   Can you explain to the jury why?

15     A.   Again, we have two different opinions, and you

16  have to decide which one you agree with, with Dr. Rhyne

17  and myself.

18     If we think about the DART DoubleClick system,

19  it has two modules that Dr. Rhyne described, the DFA,

20  which is DART for Advertisers, and DFP, which is DART

21  for Publishers.

22     The AdForce system, as I just showed you,

23  decided to include both modules in the same document.

24  They had 107 pages for the advertiser interface, and

25  they had a Chapter 7, I believe, that has 37 pages for

1  the publisher.

2          The DoubleClick system, instead of publishing

3  it all in one user guide, this software was going out to

4  different types of users.  So they split the software or

5  the manuals up for the software into two pieces.

6          If it was an advertiser, they would send the

7  DART for Advertiser documentation and product out to the

8  advertiser.  If the person was a publisher, they would

9  get the DFP manuals.

10          The only reason they're saying that -- in my

11  mind, that the systems are different is because they're

12  published in two different manuals, but they still

13  depend on the same system to publish ads based on the

14  presentation rules that are defined by the publishers.

15      Q.    Now, did you hear some testimony from

16  witnesses that were involved with DoubleClick in this

17  case?

18      A.    Yes, I did.

19      Q.    And did that help inform your opinion?

20      A.    Yes.  It supported my opinion.  It was my

21  opinion, reading the documentation in the first place,

22  that this is the way the system worked.

23      Q.    And what -- what portions of the testimony do

24  you believe supports your opinion that you've heard?

25      A.    Both Ms. Delfau and Mr. Rupp that you listened

to the other day -- the days have kind of blended

together for me, maybe you, too, but both of the people

that actually worked on the DART DoubleClick system

explained that if you pulled the plug on the back-end

part of the system, both the DFA and DFP functionality

would not work.

Now, I also heard that Dr. Rhyne said, well,

that's just some other functionality, and that's not

what really should be considered.  That's not that

important.

Well, it is very important, because if you

have a DART for Advertiser interface, and an advertiser

is trying to select the websites that they want to

select and put their ad on that -- be displayed on, if

the DART back-end system is down, they can't display all

of the different websites that are available on the

system.

So it's very important to understand that the

overall system for DART and the controller was necessary

for both DFA and DFP to operate.

MR. VERHOEVEN:  Charles, can we put up

the January 22, 2010, transcript of Mr. Rupp, Page 49,

Line 6, through 50, Line 1?

You want me to say that again?

Your Honor, may I, quickly?

                    THE COURT:  Uh-huh.

1

2       Q.   (By Mr. Verhoeven) Take a second, Mr. Lanning,

3  and look at this testimony.

4       A.   (Complies.)

5                    MR. VERHOEVEN:  Let's go to the -- leave

6  it at the top, please, Charles.

7       Q.   (By Mr. Verhoeven) Is this some of the

8  testimony you're referring to?

9       A.   Yes, it is.

10      Q.   And can you explain to me why this testimony

11  confirms your opinion?

12      A.   The first part is describing, as we see,

13  about -- gives us a sentence about DFA, which is the

14  DART for Advertisers.

15                The answer is:  DFA is a product for online

16  advertisers.

17                And I won't read all of that answer, but

18  that's describing -- and then it -- and then it goes

19  on -- I should have included the next sentence.

20  It allows them, meaning the advertisers, to create

21  online campaigns, run them on various websites, collect

22  all the information into a central place, and run

23  reports on it.

24                And then the question was:  And DFP?  And so

25  that was asked.

1          Answer:  DFP is a product for online
2    publishers websites.  It allows them to manage ad
3    campaigns and control which ads show on their websites.
4          Question:  And did they both use DART, meaning
5    did both DFA and DFP both use the overall DART system?
6          The answer to this clearly:  Yes.  They
7    were both built out of the DART technology, meaning it
8    was the overall system.
9          Question:  And did they work together in that
10   sense?
11          Answer:  Absolutely.
12          Question:  Could you give us a few sentences
13   on that?
14          And then the answer is:  First of all, they
15   shared almost all their technology.  So they had a
16   common AdServer, a common back-end data processing
17   system, that part that I worked on.  There was a common
18   database.  Most of the UI, which means the interface,
19   and reporting code was shared between the two systems.
20          Now, this is much more than just a few
21   components.  Look at this.  There are the ads, the
22   common database, the AdServer.  The AdServer is what
23   sends the ads out to websites.
24          This isn't just some supplemental software and
25   hardware that wasn't needed.  These are very key

components in the overall DART system for both DFA and
DFP.

    Q.   So you believe it is an integrated system?

    A.   Yes, definitely.

    Q.   Now, finally, you've heard Dr. Rhyne say, with
respect to DoubleClick, as well as AdForce, that
DoubleClick, they didn't have the capability that the
media venues presentation rules would control.

        Did you hear that testimony?

    A.   Yes.  I think they referred to that the ad
would trump or override the publisher presentation
rules.

    Q.   Do you agree with that opinion?

    A.   No, absolutely not.

    Q.   And can you explain to the jury why not?

    A.   Yes.  Because one of the key components that's
provided -- if we look at the advertiser -- if we look
at the publisher system, if we look at Page 730 -- I
went through this very fast, and there was a lot of
information on the page, which has a publication number
G005643.

        It's the one menu that you look at that looks
like a foreign language to you, because it has a lot of
different information on it.

           THE WITNESS:  Charles, do you think

1  you'll be able to find that?

2      A.   But this page -- I'll talk a little bit about

3  the page while they're finding it.  I'm taking them by

4  surprise a little bit, I guess, moving around.

5          But this is a page that's created by the

6  AdForce system.  And if I go in -- and as explained by

7  at the AdForce manual, I go in as a publisher, and I

8  answer the questions to the different menu choices about

9  my content unit, which means where I want my ad to be,

10 and the characteristics for the presentation rules --

11          THE WITNESS:  If we can blow up the

12 bottom portion of that, the bottom menu, please.

13      A.   I think as soon as you see it, you'll remember

14 this slide.  Right.

15          There's not very many whole words on here.

16 Everything looks somewhat cryptic.  I didn't explain, I

17 don't think, in detail.  Without getting into a little

18 bit of detail, this is information that is provided to

19 the publisher.  It's a screen menu, and if you look down

20 on the bottom left, it says save.

21          So this is provided to the publisher that

22 says, this is our understanding, meaning the AdForce

23 system creates this -- this is our understanding of what

24 the publisher is asking for.  Do you want to change

25 anything?

1          And the one thing that I showed is prompting

2   the publisher to change their preferences, is down in

3   the middle of the slide that says frame border.

4          THE WITNESS:  Charles, can you find that?

5   Yes.  Go straight to the right from the cursor.

6      A.    Frame border equals zero.  If I want a frame

7   border on my ad, you may recall that I said, all I need

8   to do as a publisher is change that zero to a one and

9   then push the save button, and those preferences are

10  saved.

11         So this is definitely prompting the publisher.

12  As a matter of fact, that's the beauty of the AdForce

13  system is, it gives a publisher a lot of different

14  preferences.

15         And if that ad were entered, then this frame

16  border would have -- if I change it to a one, my ad

17  would have a frame border around it, regardless of what

18  the advertisement...

19         So the presentation rules are applied by the

20  AdForce system.  They're not trumped or overridden by

21  the ad.

22     Q.    Thank you, Mr. Lanning.

23         MR. VERHOEVEN:  Nothing further.

24         THE COURT:  Cross-examination.

25                 CROSS-EXAMINATION

BY MR. GRINSTEIN:

Q.   Mr. Lanning, I want to start with DoubleClick first.

You just testified that in your opinion, the DoubleClick system processed ads such that it would apply presentation rules from publishers.

Was that just your testimony?

A.   Yes, that was.

Q.   But the document you just showed was from AdForce, right?

A.   I -- I believe that -- well, the document -- I don't know how to answer your question.  There were documents and -- I don't know.

Q.   In fact, you only showed one document in your rebuttal -- or surrebuttal testimony about the issue of processing, and it was that AdForce screen shot we just looked at, right?

A.   When you say "surrebuttal testimony," are you referring to what I'm doing right now?

Q.   Right now.

A.   I only showed one document, and that's the AdForce document.

Q.   You didn't show any DoubleClick documents, did you?

A.   Not in this testimony, no.

1    Q.    And you did not explain away the document that

2  Dr. Rhyne cited in his testimony and the fact that I

3  cross-examined you about, that said:  Ad placements

4  override site properties.

5          Did you explain that away in your surrebuttal

6  testimony?

7    A.    Yes, I believe I did.

8    Q.    Did you address that document specifically in

9  your surrebuttal testimony?

10   A.    No.  In the interest of time, I did not.

11   Q.    Mr. Lanning, I want to talk to you about your

12 opinion that DFP and DFA were integrated.

13         You did not cite any documents in your

14 surrebuttal testimony about this alleged integration,

15 did you?

16   A.    No, I did not.

17   Q.    You cited to the testimony of Ms. Delfau,

18 correct?

19   A.    I don't believe that was Ms. Delfau.  I think

20 that could have been Mr. Rupps.

21   Q.    Well, you just -- in your surrebuttal

22 testimony, you discussed the testimony of both

23 Ms. Delfau and Mr. Rupp, didn't you?

24   A.    I described and paraphrased the testimony, and

25 then we read the testimony of one of them, yes.

1      Q.   Both of them work for Google; is that correct?

2      A.   That's my understanding, yes.

3      Q.   And the Judge is about to instruct the jury

4  about the nature of disinterested witnesses and

5  corroboration.

6           Mr. Lanning, did those two witnesses, who work

7  for Google, qualify as disinterested witnesses?

8      A.   That's sounds like a legal term to me, but I

9  believe they were accurate, as supported by the AdForce

10 user guide and the DART documentation.

11     Q.   Let me ask you some questions about AdForce.

12 You said that AdForce applied publisher presentation

13 rules, and you showed that screen shot that we just put

14 up and discussed, correct?

15     A.   That's correct.  Well, wait a minute.  I don't

16 understand which screen.  Maybe I can help.  It was -- I

17 remember the page.  Was it 7-30 of the AdForce user

18 guide?  Is that the one?

19     Q.   I believe that's the one we were just looking

20 at.

21     A.   Okay.

22     Q.   Did -- anywhere on that page did it say that

23 AdForce would apply presentation rules from publishers

24 to override advertiser's rules?

25     A.   It did to me, and it would to one of ordinary

1   skill in the art, yes.

2                THE COURT:  Well --

3       Q.    (By Mr. Grinstein) Tell me the words on that

4   page that said:  AdForce will apply publisher background

5   color and will override an advertiser background color.

6   I want to hear the words that were on the page.

7       A.    Okay.  That's a different question.  Those

8   words are not on the page.

9       Q.    And, in fact, those words don't appear in any

10  AdForce documentation; isn't that correct?

11      A.    Those specific words do not appear in the

12  AdForce document.

13      Q.    There's not a single word in any of the

14  AdForce documents that you have reviewed that tells the

15  users of the AdForce system that AdForce will override

16  advertiser rules and apply publisher rules instead;

17  isn't that correct?

18      A.    That -- those specific words, the way you

19  phrased them, are not in the AdForce user guide, that's

20  correct.

21                MR. GRINSTEIN:  Thank you.

22                THE COURT:  Anything further?

23                MR. VERHOEVEN:  Nothing further, Your

24  Honor.

25                THE COURT:  Okay.  Step down.

1            MR. VERHOEVEN:  We have no further

2    evidence to present, Your Honor.

3            THE COURT:  You close?  You rest?

4            MR. VERHOEVEN:  We rest.

5            THE COURT:  Okay.  The Plaintiff close,

6    subject to the housekeeping matter we discussed at

7    bench?

8            MR. TRIBBLE:  Plaintiff closes, Your

9    Honor.

10           THE COURT:  Defendant close?

11           MR. VERHOEVEN:  Defendant closes, Your

12   Honor.

13           THE COURT:  Okay.  Ladies and Gentlemen,

14   you've now heard all the evidence that you're going to

15   hear in the case.  I'm going to break you at this time.

16           Be back ready to come into the courtroom

17   to begin final arguments at -- well, we've got a couple

18   of housekeeping matters to take care of during your

19   break, so we'll start at 10:00 o'clock with the final

20   arguments.

21           Each party -- just for purposes of our

22   schedule, each party has 45 minutes in which to present

23   their final arguments, and I think it will take

24   somewhere -- take me somewhere between 30 and 40 minutes

25   to read the Court's charge to you.

1      So once -- once we come back in at 10:00

2 o'clock, we'll go until after I've concluded reading the

3 Court's charge to you, and then the case will be in your

4 hands for deliberations, okay?

5      Remember my prior instructions.  Don't

6 talk about the case.

7      COURT SECURITY OFFICER:  All rise.

8      (Jury out.)

9      THE COURT:  All right.  Y'all have a

10 seat.

11      I told you last -- yesterday, rather, at

12 the charge conference, that I'd take formal objections

13 to the Court's charge.  I believe my clerk transmitted a

14 most recent version of it to you last night.

15      Let's hear from the Plaintiff your

16 objections to the Court's jury instructions.

17      MR. NELSON:  Your Honor, we have four

18 proposed instructions to add.

19      THE COURT:  Okay.

20      MR. NELSON:  And should I read them, or

21 should I proffer them?

22      THE COURT:  You can proffer them to me.

23      MR. NELSON:  I'll do it all at once.

24      THE COURT:  Okay.  Do you have a copy

25 for --

1           MR. NELSON:  Yes, sir.

2           THE COURT:  -- counsel?

3           MR. NELSON:  The first, Your Honor, is --

4  and should I go to the podium?

5           THE COURT:  Yes.

6           MR. NELSON:  The first is an instruction

7  regarding Google's own patents and that it's not a

8  defense to patent infringement.  Evidence has come in

9  about Google's patents, and given the fact that it's

10 come in as black letter law, that it's not a defense to

11 patent infringement, and we would request this

12 instruction be added.

13          THE COURT:  Okay.  What's the next one?

14          MR. NELSON:  The second is that evidence

15 has come in regarding a noninfringing alternative.  This

16 is, I believe, an instruction that is directly out of

17 case law -- or is it out of a model jury instruction?

18          MR. BURNS:  Case law.

19          MR. NELSON:  It's directly out of case

20 law regarding noninfringing alternative, and we would

21 request, because the evidence had come in, this be added

22 regarding the noninfringing alternative.  We cited the

23 case law right below it, Your Honor.

24          The third instruction is -- first of all,

25 Your Honor has given an instruction with respect to

1   Section 271(a), and this is an alternative construction.

2                   MR. BURNS:   That's right.

3                   MR. NELSON:   This is our alternative

4   construction to that on the top, Your Honor, under

5   271(a), regardless of that issue -- and we understand

6   Your Honor already has a proposed construction in that.

7                   Regardless of that issue, there is a

8   separate instruction on the bottom that is not addressed

9   in -- in the jury instructions right now, and one of our

10  arguments is just straight out of the patent law, which

11  is made, use, or sell, has occurred in the United States

12  or offered to sell has occurred in the United States.

13                  And so we would request that the bottom

14  instruction be added, regardless of the -- the ruling on

15  the 271(a) point.

16                  And lastly, Your Honor, we have an

17  instruction regarding our AdForce inference.  We can get

18  that into more detail, if you want, but briefly, we

19  believe that under any standard, certainly, the

20  bad-faith standard, we -- we've shown that here.

21  Certainly, with respect to patent law and damages and

22  design-around, which we don't have any of these

23  documents, we believe that it's -- that that doesn't

24  even apply, but even with that higher standard, it

25  should apply.

1          You know, we have met that standard,

2  given what Google has done, especially with Ms.

3  Wojcicki, who as you know, did not produce documents,

4  came in much later and is now at trial.  We were

5  substantially prejudiced in being able to cross-examine

6  her, given -- given the destruction of her documents.

7  So with those, Your Honor, those would be our additions

8  and changes to the -- to the -- proposed changes to the

9  jury instructions.

10          THE COURT:  Okay.  Let's hear -- is there

11  any objection to the offer-to-sell instruction,

12  including that?

13          I've given the one that -- or I have

14  crafted an instruction and included it in the --

15          MS. CANDIDO:  Yes.

16          THE COURT:  -- charge that was tendered

17  to y'all last night that was based out of -- on the

18  Research in Motion case.

19          My question to you is, do you have any

20  objection to the one they proposed for offers to sell

21  from a legal standpoint?

22          MS. CANDIDO:  No, we don't, Your Honor.

23          THE COURT:  Okay.

24          MS. CANDIDO:  And we believe Your Honor's

25  instruction on the international sales is appropriate.

THE COURT:  Okay.  Well, you had it as a

three-prong test, and when I went back and looked at the

case, it looked like there were two elements required

to -- to prove where the system, as a whole, is put into

service.  That's why I rephrased it.

So what I'm going to do is, I'm telling

the Plaintiff, I'm going to give the instruction to the

jury that -- leave the one in place that's in there with

respect to the international sales, and I'm also going

to add the one that relates to where an offer to sell

occurs.

Do you have objection, in light of the

testimony about -- it was not detailed, but there was

testimony related to your own patents.  Do you have an

objection to -- a legal objection to the phrasing of the

one that they've tendered to you?

MS. CANDIDO:  I'll let Mr. DeFranco

address that, but I would just note for the record that

we had a conference yesterday, and the parties didn't --

the Plaintiff didn't mention three of these four

yesterday, so we're addressing them.

THE COURT:  Well, okay.  We had a

conference, too, and I'm just trying to get -- trying to

resolve it.

MR. DEFRANCO:  That's fine, Your Honor.

We don't have an objection legally to this instruction.
I just want to note for the record that, you know, we're
not conceding that this can be used to go into subject
matter areas on closing that, obviously, the Court has
prohibited, but as to -- as the legal instruction, we
don't have an objection to this.

THE COURT:  Okay.  I'm going to include
that under the instructions for infringement.

MR. NELSON:  Thank you, Your Honor.

THE COURT:  I am not giving a spoliation
instruction, but I'm not denying the motion for
sanctions either.  I'm going to develop that record a
little bit more than it's developed now, and I'll take
that into account at the close of the evidence, as I
know a little bit more about the change in corporate
policy before I make any final rulings.

MR. NELSON:  Okay.

THE COURT:  So -- but I'm not going to
give a spoliation instruction.

MR. NELSON:  Oh, I'm sorry.

THE COURT:  The last one is the
noninfringing alternative instruction.  What's the --

MR. DEFRANCO:  Your Honor, I'm not as
quick on my feet on this one.  Could we just look at the
case -- cases over the break and come back just

1 before --

2              THE COURT:  Sure.

3              MR. DEFRANCO:  -- and comment on this

4 one?

5              THE COURT:  Just let me know about a

6 quarter till.

7              MR. DEFRANCO:  Yes, Your Honor.

8              MS. CANDIDO:  And the, Your Honor --

9              THE COURT:  Hold on just a second.

10              MS. CANDIDO:  Okay.

11              THE COURT:  Did you have any additional

12 objections to the Court's charge?

13              MR. NELSON:  No, Your Honor.

14              THE COURT:  How about to the verdict

15 form?

16              MR. NELSON:  No, Your Honor.

17              THE COURT:  Okay.  Now I'll hear the

18 Defendant's objections to the Court's charge.

19              MS. CANDIDO:  We do have one supplemental

20 instruction I mentioned yesterday about the

21 Georgia-Pacific factors that we'd like to have the Court

22 replace the current instruction.

23              THE COURT:  Okay.

24              MS. CANDIDO:  In addition -- sorry.

25 In terms of objections, as I mentioned yesterday, we

1    object to the inclusion of the factors tending to show

2    nonobviousness, except for the commercial success,

3    long-felt need, and acceptance by others, because

4    there's been no testimony offered on the other -- the

5    other factors.

6                    THE COURT:  Okay.  Any other objections?

7                    MS. CANDIDO:  Other than that, I do not

8    think we have any other objections to the jury

9    instructions.

10                    THE COURT:  Okay.  I've endorsed as

11   refused today the instruction you tendered up on the

12   Georgia-Pacific factors.

13                    I'm overruling the objection on the

14   secondary consideration.

15                    Objections to the verdict form?

16                    MS. CANDIDO:  I guess it's more of a

17   request.  With respect to the jury form, as we mentioned

18   yesterday, we'd like to have a question oriented towards

19   the U.S. versus international sales, in terms of

20   infringement.

21                    THE COURT:  Okay.  I'm going to over --

22   decline that request.  I'm going to submit it as I've

23   tendered it to you.

24                    I've given an instruction on what

25   constitutes infringement and directing the jury that

they have to consider sales in the United States to
determine infringement of the United States patent and
then what they have to find in order to find
infringement in the United States.

I'm going to overrule that request.

What kind of warnings do y'all want to --
for your argument?

Well, are there any other objections or
requests to the verdict form?

MS. CANDIDO:  No, there aren't, Your
Honor.

THE COURT:  Okay.

MS. CANDIDO:  Thank you.

THE COURT:  All right.

MR. TRIBBLE:  Your Honor, I was thinking
I would go about 30 minutes and 15 minutes, and so I
would think --

THE COURT:  Let you know when you've used
25?

MR. TRIBBLE:  Yes, sir.

THE COURT:  And five minutes left?

MR. TRIBBLE:  Yes, sir.

THE COURT:  You want a two-minute warning
or anything towards the end?

MR. TRIBBLE:  Sure.

                    THE COURT:  I'll give you whatever

warnings you want, but I just don't want to interrupt

you more than you want me to.

                    MR. TRIBBLE:  I understand.  That's fine.

                    THE COURT:  I'll tell you when you've

used 25 in opening, when you have five minutes left in

final arguments, and I'll give you -- I'll let you know

when you have one minute remaining as well.

                    MR. TRIBBLE:  Okay.

                    MR. VERHOEVEN:  I'm assuming I'm doing

the whole 45, right, Your Honor?

                    THE COURT:  That's correct.  Well --

                    MR. VERHOEVEN:  You're not going to let

me --

                    THE COURT:  I'm assuming you're going to

use all of your time.

                    MR. VERHOEVEN:  Yes.  And I'm not going

to be permitted to get up after --

                    THE COURT:  That's correct.

                    MR. VERHOEVEN:  So I would like a warning

at fifteen and two, if I may, Your Honor.

                    THE COURT:  Okay.  I'll let you know when

you have fifteen minutes left and when you have two

minutes left.

                    MR. VERHOEVEN:  Thank you, Your Honor.

1    THE COURT:  Okay.  Okay.  Court's in

2  recess until 10:00 o'clock.

3    Mr. DeFranco, if you'll let me know --

4  take 10 minutes from now -- what your view is on the

5  noninfringing alternative instruction.

6    MR. DEFRANCO:  Yes, Your Honor.

7    COURT SECURITY OFFICER:  All rise.

8    (Recess.)

9    COURT SECURITY OFFICER:  All rise.

10    (Jury in.)

11    THE COURT:  Please be seated.

12    I'll hear closing arguments from the

13  lawyers.

14    Mr. Tribble, you may address the jury.

15    MR. TRIBBLE:  Yes, Your Honor.

16    Good morning.

17    It's been two and a half years that this

18  case has been pending.  It's been a long, hard road, but

19  we're finally here.

20    And as I told you at the beginning of

21  this case, this is a case about property rights.  Only

22  in this case, they're intellectual property rights that

23  are duly issued in United States patents.

24    But the case is also about fundamental

25  notions of -- of things like our laws apply to everyone

equally, and everyone has to play by the rules, even a
company like Google.

In a minute, the Judge will instruct you
on the law, and the case will be in your hands.  And
you'll be instructed to weigh the evidence that you've
heard.  And just as I told you at the beginning of the
case, in weighing that evidence, please consider what
Google did and said back at the time, what they put in
writing in their own documents internal, and what they
were telling the world versus what they're saying now
that there's a lawsuit, and the lawyers have gotten
involved, and they have to take litigation positions in
order to try to avoid a finding of infringement and
validity and damages.

At the end of the day, applying the
Court's law and weighing the evidence, I think you'll
find that these patents are fundamental.  They're core
technology.  They are of immense value to Google.  They
are valid.  They are different than what had come
before.

And as Google's own damages expert said,
the issue is, what is the value of this technology to
Google, the technology that has generated over $5
billion in revenues?

Now, I'm going to talk to you for about

1  30 minutes, and then I'll sit down, and then Google's

2  attorney will talk to you for about 45 minutes, and then

3  I'll get to stand up for about 15 minutes of rebuttal.

4                    Here's what I'm going to talk about:

5  Infringement, validity, and damages.

6                    Let's talk about infringement.  Remember,

7  on the issue of infringement, we bear the burden of

8  proof, but the Court will instruct you our burden is

9  merely a preponderance of the evidence, more likely than

10 not, just a slight tipping of the scale in our

11 direction.  And so as you're weighing the evidence, if

12 it tips ever so slightly in favor of infringement, then

13 you should find infringement.

14                    In this case, we believe the evidence is

15 overwhelming, and remember that if even one claim of a

16 patent is infringed, then the patent is infringed.  In

17 this case, all eight of the claims that we were

18 asserting in this suit have been shown to be infringed.

19                    The Court will instruct you, though, that

20 you must consider each of the patent claims separately.

21 And pay attention to the Court's instructions.  If you

22 find that each and every limitation in a claim is

23 present in the accused system, then that system acute --

24 infringes that claim regardless of whether even if the

25 accused products or their methods may be more or less

efficient or may contain additional features or

functions not found in the claims.

There was a lot of testimony in this case

about extra features.  It's irrelevant.  As long as the

system has each and every one of these elements, the

fact that they have something additional, it doesn't

matter.  It still infringes the claim.

In addition, it's no defense whether

Google knew about the patents.  If someone comes and

drills an oil well on your property, they are

responsible for paying you a reasonable royalty for the

value of the oil that was generated, regardless of

whether they knew it was your property at the time or

not.

As -- there's been an issue made as to we

didn't implement the invention.  As Google's own expert

admits, it's completely irrelevant.  The only thing

that's relevant is, did we conceive of the idea first?

Did we file for a patent?

Did we go through that long examination

process?

Did we receive a patent at the end of the

day?

And all the evidence shows that we did.

It makes absolutely no difference whether Virtual Cities

Reservation site was the same or whether we implemented
the invention or not.

Now, on this issue of additional
elements, I believe the Judge will instruct you about
comprising claims.  The claims at issue in this case,
they're written with the word comprising in the
preamble.  And what that means is you'll say a system
comprising, and then you'll have a list of elements.

And the Judge will instruct you that a
system will infringe that claim as long as it has each
and every one of the specified elements, even if it has
additional features.

But look at the example he gives.  If the
claim recites a table -- suppose you had a patent on a
table.  If it recites a table comprising a table top,
legs, and glue -- here we have an example -- the claim
will cover any table that contains those structures:
Table top, legs, and glue, even if the table also
contains other structures, such as a leaf or wheels on
the leg.

And that's what we have here in the
AdSense system.  AdSense AdWords system has each and
every one of our elements.

Does it have additional features, content
targeting, auction process?

1          Yes, it does.  Those -- that's old

2   technology they were doing years before the

3   revolutionary idea of implementing what we patented.

4          And it's just like this.  Watch this.

5   It's just like a leaf in the table:  Content targeting

6   and auction process, but at the end of the day, it's

7   still a table with a table top, legs, and glue.  And,

8   therefore, it infringes.

9          Now, the -- the only issue at the end of

10  the day is whether Google's system falls within the

11  scope of what's specified in each of our claims.  And

12  you have to consider them one by one.

13         In this case, we've had some help.

14  Dr. Rhyne, one of the most distinguished and recognized

15  engineers, computer scientists in the United States, has

16  come here and testified.  He looked extensively at the

17  Google system.

18         And remember, he walked you in

19  excruciating detail, claim element by element by

20  element, every element of every claim that we're

21  asserting in this case and showed you, through their own

22  pictures, screen shots, demonstration of their own

23  software, how each and every claim infringes -- is being

24  infringed by the Google system.

25         And remember, Jason Miller of Google.  He

walked through a lot of screen shots, too.  He agreed

that the system operates exactly as Dr. Rhyne testified.

He didn't get it wrong.  He understands exactly how it

works.  And -- and, in fact, Mr. Miller even admitted

certain elements that are in our patents are embodied in

the Google system.

Now, in response, there have been a lot

of word games.  There have been a lot of word games and

confusing testimony elicited, but at the end of the day,

Dr. Rhyne showed you the infringement.

Google has three arguments still.  One is

that the seller doesn't implement an ad that's fully

customized for each of the media venues.  And, of

course, the argument makes no sense, but they point to

language saying, does the Google system enter an ad at

all?  And, of course, it does.

If you had Coca-Cola, for example, trying

to advertise using AdWords, it might enter in the ad

Coco-Cola, have a Coke and a smile, whereas Pepsi might

enter in Pepsi is the choice of a new generation.

Each of those just entering in that text,

that is a customized ad.  It's customized according to

the message that that advertiser wants to convey to the

consumers.  Coke wants to promote Coke; Pepsi wants to

promote Pepsi.  They've customized the ads for those

words.

It's like a classified ad. It doesn't have to have color and all the fancy formatting. That's what's done by the computer controller, the central system.

The seller interface up here, it's sufficient to just enter in customized text that sends your customized message. It would make no sense to customize it according to all of the different website's rules up here, and then do it again down here.

And, in fact, the Court has instructed us that publishing -- that processing requirement for the central controller, it processes the ads to make it comply with the website's rules. It doesn't say make sure it complies. It says make it comply.

And that's exactly what the AdSense system does. It's more word games coming from Google's litigation position.

Now, Google has a second argument.

Oh, by the way, speaking of word games, recall that the Google witnesses each testified that they had not read the patents, but, of course, when Ms. Wojcicki was on the stand, she answered questions from her lawyer, the Google lawyer, regarding presentation rules, a term in the patent.

1          But, of course, when I asked her on

2  cross-examination, she said she didn't understand what

3  presentation rules were.  It's more word games.

4          And that's why you need to look at what

5  they did and said at the time versus what they're saying

6  in their litigation position today.

7          Google's second argument is that Google

8  does not place or make ads available at websites.  Judge

9  Everingham has instructed you on this.  All that's

10  required is that the ad be placed at -- placed or made

11  available within the framework of the media.

12          Here we're talking about the internet.

13  The framework of the internet media is the web page.

14  Media venues can be physical or virtual locations, and

15  this has been beaten to death, so I'm not going to spend

16  any more time on it, but, I mean, the documents are

17  legion, okay, that -- they've even admitted on slip-ups

18  on the stand Google is serving ads on a web page.

19          And remember, they're serving it to that

20  virtual location so that it is accessible by the end

21  users, including viewers.  It literally meant some

22  physical location.  For someone to view

23  newyorktimes.com, I guess they would have to get on an

24  airplane and fly to New York.

25          It's word games.  Their position doesn't

make any sense.  You've seen dozens and dozens of Google

documents saying they're serving websites, including

their Securities and Exchange filing filed under oath.

Recall Ms. Wojcicki first testified one

way on the stand, then changed it to the company line:

No, no, we just -- it's the browser where the ad

appears.  But, of course, that's contrary to a sworn

declaration she gave prior to this lawsuit.

Look at what they did and said at the

time instead of what they're saying now to be consistent

with their litigation position.

And still, Mr. Lanning -- and he's very

likeable, but the Google lawyers had him parrot the

company line:  Google does not display ads on websites,

despite all the evidence to the contrary.

Now, Google's third argument is it does

not allow users to input information to select.

Dr. Rhyne explained to you it does it two

ways:  Through entering keywords and through direct

placement.  Two ways in the AdSense system.

Jason Miller confirmed this.  Do you use

keywords?  Yes.

Is that information that's input used to

select?  Yes, it is.

It's the system that's doing the

selection.  And, yes, there's an auction process that
goes on, but is the information input?  The keywords or
the direct name, is it used in the selection process by
the system?  Yes, it is.  Jason Miller confirms it.

Ms. Wojcicki testified that AdSense for
Content was an old idea.  This was to beef up their
valid -- their invalidity argument saying, oh, this has
been around a long time.  But, in fact, their documents
say that it was revolutionary and that it was new and
that it was different than what had come before.

It was.  It was different than everything
other than our patented technology, which we invented in
1998, and first disclosed to the Patent Office in
January of 2000.

Mr. Verhoeven slipped up during opening
argument, and even he said AdSense was an ingenious new
technology, which is inconsistent with the idea that it
was an old idea.  And, in fact, this was confirmed by
Google's Jeff Dean on the stand.  He said he had never
heard anyone discussing putting together a product that
is like AdSense for Content before we did it.

Let's play a clip from Brian Axe.

(Video playing.)

QUESTION:  I'll ask it again.  Do you
feel you can't answer the question yes or no, is there

an online interface for AdSense for Content?

                   ANSWER:  If I define interface in the way
that it --

                   (End of video clip.)

                   MR. TRIBBLE:  I'll cut if off.  That's
the one where he paused for about two minutes.  I asked
him if there was an online interface, and, of course,
Jason Miller admitted the document showed it.  The
system itself, Dr. Rhyne showed it to you.  Of course,
they had an interface.

                   He denied knowing what an interface was.
It turned out later he was on a user interface committee
at Google.  It's just word games.

                   Here's the testimony of Angela Lai about
websites.

                   (Video playing.)

                   QUESTION:  So you're saying the answer to
the question whether an ad by Google is displayed on a
website depends on how one defines a website?

                   ANSWER:  Yes, because that question means
different things, if you ask it differently.

                   (End of video clip.)

                   MR. TRIBBLE:  One of the largest internet
companies in the world doesn't know what a website is.
Word games.

1                    Now, let's talk about validity.  The

2      Court will instruct you, first of all, that just like

3      infringement on validity, you have to go claim by claim.

4      You have to look at each claim independently.

5                    Some of the claims are very narrow and

6      some are broader.  It could be possible that one claim

7      is valid and another is invalid.  Fortunately in this

8      case, what we did is completely different than what came

9      before, and all of our claims are valid.

10                    But the Court will instruct you that in

11     order to be anticipated, that's one type of invalidity.

12     For a patent claim to be anticipated by prior art, each

13     and every limitation of the claim must be present.  It's

14     not enough that it's close.  It kind of looks the same.

15     You can't say, well, you can take a little bit of this

16     product over here and a little bit over there and here,

17     we'll get the third element from up here.  You can't do

18     that.

19                    For anticipation, you cannot find that

20     the prior art anticipates a patent claim by combining

21     two or more items of prior art.  It all has to be in a

22     single system.

23                    Furthermore, remember the burden of

24     proof.  We talked about this during jury selection.  Our

25     burden of proof, preponderance of the evidence, for

invalidity, a much higher burden of proof, clear and
convincing evidence.  And the Judge will instruct you as
such.

And the reason for that, remember, is
that every patent that's issued by the United States
Patent & Trademark Office is presumed to be valid,
because it's gone through the examination process.  And
to overcome that presumption of validity, you need a
higher amount of evidence.  You need clear and
convincing evidence.

Now, let's talk about our system.
Remember, in this -- this is just supposed to show that
there -- there -- there are at least three parts to our
system.  You have the central controller, and you have a
seller interface and an internet media venue interface;
in other words, advertisers, websites, publishers.

Remember how -- for -- to prove
infringement, Dr. Rhyne walked you through each and
every element of every single claim check by check by
check.

But remember, in contrast, Mr. Lanning,
he walked you through Claim 1.  We disagree that there
was support for -- for what he was saying, but then at
the end of it, they put up this chart and already
checked off a bunch of stuff.  They never even went

1  through the claim elements.  That's not right.

2              You have to go through each and every

3  element and prove by clear and convincing evidence that

4  it exists.  You can't just gloss over this and say, oh,

5  it's kind of close or something.

6              You know, did he show you drop-down

7  menus, menu-driven interfaces?

8              If you look at the actual documents that

9  he was showing, they're not even interfaces, but he

10  certainly didn't show you any menu-driven interface.  As

11  to patents, he didn't even talk about a design filter,

12  which is one of the elements in one of the other claims.

13              He hasn't shown -- Google hasn't shown by

14  clear and convincing evidence that each and every

15  element of each and every one of these claims exists in

16  the prior art.  And, therefore, it's not invalidated.

17              Now, let's talk about DoubleClick.

18  DoubleClick, as you'll recall from the testimony,

19  required that the -- the advertiser and the publisher

20  individually negotiate a contract each time.

21              Remember what I showed you in opening.

22  That's one of the things that this invention was

23  designed to overcome, to speed up that process, to

24  automate it so that you didn't have to negotiate

25  individually.

The reason was -- and this was admitted by Ms. Delfau on the stand -- you have to negotiate with each of the different advertisers. The DoubleClick system didn't have any automatic customization. There was no central system that was customized to make them comply with each publisher's rules.

Here's an example from the manual. Note that the value specified in an ad placement overrides the value specified in the site properties. That's exactly the opposite of our system.

The web -- we had the websites setting the presentation rules, and then the system makes it comply.

Here the advertisers had total control, and that's what I was talking about in opening when I told you the entire industry was headed in a different direction. They gave the advertiser total control over the look and feel of their ad, because they thought that advertisers wouldn't pay for it unless they had it.

In our invention, we saw it from the website operator's point of view, because Function Media operated a website, or at least Mr. Dean and Ms. Stone did. And that's why they conceived of a way that would allow the websites to have control over how their ads looked.

And finally, there was no integrated
system.  You recall that Ms. Delfau admitted the ads
don't go cross-network.  And so think about this, and
this applies to all of the invalidity contentions by
Google.

There's a weakness in their case.  They
chose not to cross-examine Dr. Rhyne on the stand
regarding any of his validity testimony.  He walked you
through, testified how none of these references do what
the Function Media technology does, and how the patents
are indeed valid.  They chose not to cross-examine
Dr. Rhyne at all.

Instead, they put Mr. Lanning up on the
stand and led him into questions which ended up with him
testifying about DoubleClick using an AdForce document.
He just -- you know, he had the wrong system.

Now --

THE COURT:  You've used 25 minutes.

MR. TRIBBLE:  Thank you, Your Honor.

Let's talk about AdForce.  Again, look at
the documents.  There's no seller interface.  There's no
prompting self-service interface on either side.  You
didn't see any user interface where you could
automatically enter information.

In fact, Mark Scheele admitted as much

right there on the stand.  You're not going to be able
to go through some easy-to-use interface.

He answers:  That's fair.  Yes.

There's no automatic customization.  They
have to have all of these things by clear and convincing
evidence to invalidate these patents.  It's just not
there.

NetGravity.  You heard Dr. Rhyne about
NetGravity.  All I'll say about it is this:  In opening
argument, Google's attorney told you he was going to
rely on two prior systems:  AdForce and DoubleClick.
Here's an opening slide.  Didn't even mention
NetGravity.  NetGravity is a red herring, and this is
the most important point, perhaps, about validity.

The Judge will instruct you that the
testimony -- they can't just say, oh, I recall that's
how it operated 10 years ago.  It has to be corroborated
specifically in the documents.  And you have to have
testimony of a disinterested party.  A disinterested
party.

Every single witness that they presented
was -- all of them were Google employees, except for
one, and that remaining one was a paid consultant of
Google.  There is no disinterested testimony offering
evidence on behalf of Google that these patents were

1  invalid.

2              Finally, as to obviousness, the Judge

3  will instruct you as to these factors regarding

4  obviousness, but the first instruction is you must be

5  careful not to determine obviousness with the benefit of

6  hindsight.  Everything is obvious once someone does it

7  or puts it down on paper.  Looking back, hindsight, it

8  all looks obvious, but put yourself back in the year of

9  2000.

10             Was it obvious back then so long ago in

11  the infancy of the internet?

12             Dr. Rhyne says it was not.

13             Now -- and just briefly, of course,

14  the -- the biggest problem with the invalidity case are

15  Google's own words.  You've seen the documents where

16  this was Sergey Brin's big idea, the documents where it

17  was revolutionary.  And moreover, when Susan Wojcicki

18  gave the interview to USA Today newspaper, did she say,

19  oh, this was old technology; oh, we're just copying

20  AdForce or DoubleClick?

21             No.  She said this is a really novel

22  idea.

23             The Function Media patents predated that

24  by years.  The disclosure of their invention in 2000 was

25  years before the AdSense system, and that's when it was

1  really, really novel.

2            Let me talk briefly about damages.  You

3  recall Mr. Wagner, Google's damages expert.  He agreed

4  that the purpose of a reasonable royalty is to

5  compensate Function Media for the actual use of its

6  property; that the test -- the test is the value to

7  Google of this important technology; that important

8  patents are usually licensed through litigation.

9            And the Judge will instruct you that one

10  of the factors to consider are any royalty arrangements

11  that were generally used and recognized in the

12  particular industry at that time.

13            Industry rates, the rates used in the

14  industry.  And that's exactly what Mr. Bratic used.  He

15  showed you the average rates.  He used -- there was an

16  average of 13 percent right before the date of the

17  hypothetical negotiation.  His -- the rate he concluded

18  was -- was lower, but that is an industry rate as

19  referred to in the Court's instructions.

20            Google's expert admitted that he used to

21  rely on exactly that same kind of data, but he chose not

22  to in this case.  You were cited other bases, these

23  acquisitions of Google, the post -- all of these other

24  ones here, this is unrelated technology.

25            The one that's on point is Applied

1    Semantics.  It has a post-tax technology rate of 21.9

2    percent, which -- when you look at the average of 8.6

3    percent, Mr. Wagner and Mr. Bratic agree that you should

4    be looking at the pretax, not post-tax.  And when you

5    make that adjustment, it equals exactly 12 percent,

6    additional support for Mr. Bratic's number.

7                    The technology rate that was applied by

8    the experts that were valuing the technology, Applied

9    Semantics, again, 21.9 percent.

10                   This is the Stanford license.  I think

11   that I'll come back to this when I have a chance in

12   rebuttal, but I'll just say this:  Google's expert

13   relies heavily on the Stanford license, and the fact of

14   the matter is that in the Stanford license -- the

15   purchase of only the licensing of the patent

16   application, Google gave 2 percent of its entire company

17   for that.

18                   He values our patents at being worth

19   about half of that.  And the value of that 2 percent of

20   stock that they gave to Stanford at the time of the

21   hypothetical negotiation in this case was $1.4 billion,

22   and so half of that would be $700 million.

23                   Thank you.

24                   THE COURT:  Mr. Verhoeven?

25                   MR. VERHOEVEN:  Thank you, Your Honor.

1          May I have one second to take down the

2     slide and put one up?

3               THE COURT:  Yes, sir.

4               MR. VERHOEVEN:  Thank you.

5               Charles, you can put that down for one

6     second.

7               Function Media, Mr. Dean and Ms. Stone in

8     this case, have accused Google of infringing their

9     patents.

10               Google takes that accusation seriously.

11     Google brought from California a senior vice president,

12     Susan Wojcicki, to come talk to you, to tell you how the

13     Google system works.  Ms. Wojcicki was at Google at the

14     start of the company.

15               You remember there was testimony about

16     how Google was started in a garage.  It was her garage.

17     She's now a senior vice president.  She told you about

18     Google and how it built AdSense for Content without any

19     use of these patents prior to the issuance of these

20     patents.

21               We also brought, so that you could hear

22     him testify, Mr. Jeff Dean.  Mr. Dean was one of the

23     visionary engineers who built the original AdSense for

24     Content prototype.  He built it on his own with his own

25     engineers well before the patents in this case issued.

1           We also brought from California

2 Mr. Miller, Jason Miller.  Mr. Miller testified to you

3 he was currently responsible for the accused

4 technologies, AdSense for Content, and he explained to

5 you how they worked.

6           We also presented to you the testimony of

7 Mr. Lanning, our technical expert.  And Mr. Lanning

8 walked through the three reasons why Google does not

9 infringe the claims here, which I'm going to go back

10 over in a minute.

11           Mr. Lanning also provided you with

12 testimony about the subject of validity or invalidity,

13 and walked you through two -- two references, two

14 systems that were on sale prior to the patents.

15           But that wasn't all.  We also brought you

16 actual witnesses who were involved in the development of

17 those prior art systems.  For AdForce, we brought you

18 Mr. Scheele.  For DoubleClick, we brought and had Mr.

19 Dell -- or Mrs. Delfau and Rupp testify to you.  And

20 they told you, I was there; we did this; this was prior

21 to the inventions.

22           You also heard from several witnesses why

23 the Plaintiff's damages claim in this case, $600 million

24 for only two and a half years, for a non-exclusive

25 license, wasn't reasonable.

1          So it's important -- if I may come around

2   here, Your Honor -- to look at the timeline here.

3   Google developed its first advertising program way back

4   in '99.  The patents here didn't issue until 2007.

5          Google built the AdSense for Content

6   prototype in 2002, well before any of these patents

7   issued.  They launched AdSense for Content in 2003.

8   The testimony from Ms. Stone was that she started using

9   AdSense for Content in her own bed-and-breakfast

10  business in 2004.

11         You also heard testimony from deposition

12  of Mr. Dean -- he wouldn't admit it on the stand -- but

13  his deposition, that they decided they were going to sue

14  Google for patent infringement in 2005.

15         Did they send a letter?  No.

16         Did they pick up the phone?  No.

17         Did they do anything to tell Google, hey,

18  this system you've been building infringes and using all

19  these engineers to develop infringes on our patents that

20  we have?  No, they didn't.  They waited.

21         And then on the very day the patents

22  issued, they filed this lawsuit, and now say they're

23  entitled to 65 percent of all the money, all the profit

24  that Google made over developing this program.

25         Is that fair?  We don't think so.

1                    The undisputed evidence shows that

2    Mr. Dean and Ms. Stone, they tried to develop a software

3    program to work on -- that would embody their patent,

4    but they couldn't.  They tried to sell part of the

5    product they developed, but no one liked it.  They have

6    no product, no consumers, no business.

7                    You were asked -- you're going to be

8    asked to think about what would have happened in the

9    hypothetical negotiation.  Would Google really have

10   agreed to pay $600 million to license this patent in

11   these circumstances?

12                   We think you'll conclude that they would

13   not under these circumstances.

14                   Now, let me go into the details of the

15   two defenses that Google has in this case.  Remember in

16   my opening statement, I told you there's two defenses

17   that Google has.  One is non-infringement; the second is

18   invalidity.

19                   On the non-infringement subject, Google

20   has presented evidence that there's three reasons why it

21   doesn't infringe.

22                   And, Charles, if we could put it up on

23   the screen.

24                   Okay.  And we've seen this slide before.

25   Now, Mr. Tribble said, oh, this is all word games.  This

whole case is about words. Words are very important in a patent case.

Your charge is to look at the words of the claim as construed by the Court and ask yourself the question: Does the accused Google product perform this? And we presented three elements of the claims that are not infringed. And as you know, as I've told you and as the Judge will tell you, if there's one element that's not infringed in this case, you must find non-infringement.

Here we've got three, okay?

The first one is this element here: Seller is prompted to input information to create an electronic advertisement for publication to be selected in the internet media venues. I call this the creation step, for shorthand. This is at what's called the seller interface, okay?

And the seller is prompted by the system to enter information to create an electronic advertisement. And the Court's told us that what that means is that to create an electronic advertisement means for publication in a form customized to each of the selected internet media venue's presentation rules.

That means that at the seller interface, the advertiser in this case is prompted to input

1    information to create an advertisement customized to

2    what?

3                    Customized to the presentation rules of

4    the internet media venue that was selected, okay?

5                    We showed you that in the Google system,

6    all that the seller can do is enter ad information,

7    keywords, placements, and bids.  The seller cannot

8    change the color of the ads to confirm with the

9    presentation rules of the publisher.  The seller cannot

10   change the font in their ads to conform with the

11   presentation rules of the media venue.  Can't change the

12   border settings.

13                   It can only enter generic information.

14   It's the same information no matter what the media venue

15   the ads end up being presented on.  It's undisputed

16   evidence here that in the Google system, the seller

17   cannot -- excuse me -- the seller cannot create an ad

18   customized to each of the selected internet media

19   venue's presentation rules.

20                   You heard from our expert, Mr. Lanning,

21   on direct exam on this subject.  And remember, he showed

22   you this screen.  This is the actual screen that an

23   advertiser would look at, if they are creating an ad.

24   And as you can see, and as Mr. Lanning testified, they

25   can only put in a headline, description, and a URL.

They cannot -- there's nothing they can do to customize
that ad to presentation rules of the media venue.

Remember, he talked about, well, you can
ask for hometips.com, which is a media venue, or you can
ask for houseblogs.net, which is a media venue.  They
have different presentation rules, remember?

One had a blue -- the blue headline; one
had a black; one had a border; one didn't have a border.
Those are different presentation rules that the
publishers have -- these sites have.

Can the advertiser customize this ad to
those presentation rules?  Absolutely not.  There's no
field in here to do that.

And Mr. Lanning testified they couldn't.
But that's not all.  Mr. -- Dr. Rhyne, the Plaintiff's
expert, admitted the same thing.  And I asked him this:
Isn't it true, sir, that the advertisers cannot create
an electronic advertisement in the form customized to
each of the selected internet media venues presentation
rules?

Yes.

They cannot do that, can they?

That's correct.

It's undisputed on this record.  Both
experts have found and told you that the advertiser at

the seller interface cannot create an ad that's

customized to the presentation rules.

Their expert, Dr. Rhyne, on

cross-examination admitted that.  So that's number one.

That's the first reason we don't infringe.

Number two goes to this other element.  I

refer to this in shorthand as the publishing-to element,

and this is the element here highlighted, and it says

publishing the electronic advertisement to one or more

of the selected internet media venues.

And the Court has said that means placing

or making available the customized electronic

advertisement within the framework of and at each

internet media venue.  So the claim language says you

have to publish the ad to the media venue.  And the

Court's construction says that means making it available

at the internet media venue.

You heard from Mr. Jeff Dean from Google.

He testified that back in 2002, when Google was

developing the accused technology AdSense for Content,

they considered doing it the way the patent talks about

doing it.  They considered having Google over here, the

ad system, send the ad to the content provider.  Content

provider is another name for the publisher, which is the

internet media venue.

1    They considered doing that.  And then the

2  content provider would send it to the internet user.

3  They thought about it.  They didn't even know this

4  patent existed.  They thought about it and they decided

5  this other method works better.  And he testified to

6  that.

7    And this is the method Google uses.  In

8  the Google system, here's the media venue.  In our

9  example, we looked at it from a demonstrative, cnn.com.

10  Here's Google and here's the internet user.  Google does

11  not send ads to the content provider or publisher.

12  What does Google do?

13    It serves the ad directly to the internet

14  user.  This is an internal document from Google's files.

15    You heard Mr. Tribble say, well, they say

16  this in litigation, but what did the document show back

17  then?

18    This is a document from back then, and

19  this shows very clearly that Google considered the

20  method that would be in the patent, rejected it, and

21  used a different method.

22    And he testified:  Question:  Where does

23  Google send those ads?

24    Answer:  Directly to the user's browser.

25  That's the internet user.

1              Question:  And is that the scheme you

2    showed us earlier that you chose?

3              Yes.

4              Scheme two, right?

5              Yes, scheme two.

6              And is that scheme in use today for

7    AdSense for Content?

8              Yes.

9              And has that scheme been used throughout

10   the life for AdSense for Content since when it was first

11   introduced today when people are using this as we sit

12   here today?

13             Yes.  Absolutely.

14             The testimony of Google's witnesses shows

15   the Google system doesn't infringe.

16             This is scheme one in a demonstrative.

17   The ad system publishes to the internet media venue.

18             This is the -- what the patent talks

19   about, and the media venue then puts everything on the

20   internet user.  Google does not do that.

21             Google does this.  Google serves the ads

22   directly to the internet user.  It does not send the ads

23   to the internet media venue, CNN.  The claim language we

24   just looked at says publish to the selected internet

25   media venues.  That means that, going up, publishing-to.

1 Google doesn't do that.  Google publishes to the

2 internet user.  It does not infringe.

3                    And, again, there's some documents that

4 say we send ads to web -- to web pages.  And the

5 Plaintiff is making a big deal over those documents.

6 Let's keep in mind -- let's keep focused on the fact

7 it's undisputed that both technical experts do not

8 dispute how the Google system works.  Both say Google

9 serves the ads.

10                    So, for example, this is Dr. Rhyne,

11 Plaintiff's expert.  Question:  And the server that's

12 operated by cnn.com served up the web page, right?

13                    Well, the server is operated by CNN.  It

14 serves up the framework of the web page.

15                    Question:  Serves up the web page.

16 Doesn't serve up the ad, does it?

17                    It does not serve up the ad.  So he

18 admits CNN is not serving the ad.

19                    It doesn't even have the ad.  Google

20 serves the ad?

21                    Answer:  Yes.  Undisputed.

22                    What happens is Google sends that ad

23 directly to the internet user.  The publisher, the

24 internet media venue, doesn't even know what the ad is.

25                    So that's the second reason there's no

infringement.  There's no publishing to the internet

media venue.

                    Now, there's a third reason why there's

no infringement, and that relates to the display here.

                    As you'll recall on the seller interface,

it says the seller is prompted to input information to

select one or more of the internet media venues -- let

me start over.

                    The seller is prompted to input

information to select one or more of the internet media

venues, and then it goes on in the later step, the

electronic advertisement is displayed on each of the one

or more of the selected internet media venues.

                    The evidence shows this does not happen

in the Google system.  Now, you saw this when

Mr. Lanning walked through this for us.  The way the

Google system works, as we saw, the seller inputs this

information and submits a bid.  It's just a bid.  It's

not selecting anything.  It says here's my bid of this

much money and here's my ad.

                    Then Google takes that, and this is

represented just by a red square, and it puts that in

his database, this big database of millions of millions

of ads.

                    Is Google just -- does Google just take

that order and transfer it to selected media venues?
No.  Google puts it in this database, and this ad, if
it's ever going to get displayed, has to go through
hurdles.  And we went -- and Mr. Lanning went through
this example, free dieting, where first the system --
when a user goes to a web page, the Google system reads
the web page and figures out what's the web page about.
Figures out it's about dieting, eating, calories,
weight.  And then the next thing the Google system does
is it takes this information about what the website is
and eliminates the vast, vast majority of ads in its
database, because they don't -- aren't relevant to this
subject matter.

So if your ad isn't relevant to the
subject matter of a web page, it isn't going to get
selected.  Even if you say specifically I'd like to be
on that web page, if the ad is not relevant, it's not
going to get selected.

In this example, it was selected because
it was relevant.  So it passed the first hurdle, but
then there's a second hurdle.  There's an auction that
goes on in the Google system.

And in order to get displayed, not only
do you have to be relevant, you have to win the auction.
And here the bid wasn't high enough.  So there was no --

so it didn't win the auction. And even though in this
example, the advertiser wanted to be on free dieting,
the advertiser didn't get to be on free dieting, because
it didn't win the auction process or the bid.

So this goes back to the language I
showed you earlier which says -- where the Court has
said that the ad must be displayed on each of the
selected internet media venues. That does not happen on
the Google system. So this is a third reason why there
isn't infringement.

And, again, Plaintiff's own expert
agrees. Question: And I could actually put in in the
placement section specific websites that I hope and wish
my ad would appear in, right?

Answer: You can do it very specifically
or a little less specifically, but you can specify
targets you would like to get to.

Okay. Would you agree with me that that
doesn't mean that my ad is actually going to be
displayed on that website, right?

I would agree with you on that.

So their own expert has agreed that on
the Google system, a seller can say I want to be on 10
websites, but there's no guarantee. It doesn't mean
they're actually going to be displayed.

1          Well, the claim language says it's

2 displayed on each of the selected internet media venue

3 sites.  It doesn't happen.  That's a third reason why

4 there's no infringement here.

5          And any one of these three reasons is

6 sufficient for you members of the jury to find

7 non-infringement.

8          So this is just a summary of the three

9 reasons why.  You've already seen this, and Mr. Lanning

10 has talked about it.  I'm not going to go over it.

11 Now, let's talk about the second defense that Google

12 has.  The second defense is that these patents are not

13 valid.  It's undisputed in this case that the two

14 references that Mr. Lanning relied on for his opinions,

15 AdForce and DoubleClick were never considered by the

16 Patent Office.  They aren't listed in the face of the

17 patent as relevant art at all.

18          So the Patent Office didn't know about

19 these when it issued the patent.  So my question -- my

20 request to you as jurors, when you're looking at the

21 evidence on validity, is to ask yourself the question:

22 What if the Patent Office had known about this?  What if

23 the Patent Office did know -- what if it had this

24 instruction manual?  Which it didn't.  But what if it

25 did, would the result have been different?

1            Would the Patent Office allow these

2 patents to issue in light of that?

3            We think the answer is no.  But let me

4 quickly go through the evidence.

5            We showed you that AdForce was around in

6 1998.  We had a whole manual that I don't have in front

7 of me that had detailed descriptions of how AdForce

8 works.  Mr. Lanning testified that the first interface

9 element we've talked about is met in the AdForce system.

10 And this is hard to read, but if you look up here, you

11 can see it says ad sizes, and there's different sizes.

12            Java you can select if you wanted your

13 rules to be Java.  All these are presentation rules.

14 And this goes into the publisher interface, which is

15 exactly what the patent is talking about.

16            The second interface Mr. Lanning talked

17 about, he showed you screen shots from the second

18 interface.  And it's hard to read again, but these are

19 specific websites:  CNN, classic car.  These are checks

20 that the advertiser can check to select specific

21 websites.  And that's in the advertiser interface, which

22 AdForce had, same as the patent.

23            Same thing with create.  There's a box in

24 there for creating electronic advertisement that's in

25 the advertiser interface.  Again, same as the patent.

                    And the processing and publishing,
Mr. Lanning talked about documents from the system that
showed when a user views the web page, the web tag makes
a request to an AdForce server for an advertisement,
which is then delivered to the user.  It's processed;
it's published.  It does the same thing as the patent.
It did it beforehand, but the Patent Office didn't know
about it.

                    Same thing with DoubleClick DART.  It
existed in 1998 before the priority date.  Again,
Mr. Lanning went through meticulously to show you that
these different interfaces are present in the
DoubleClick DART.

                    And here you may recall, he showed you
this screen shot from the publisher interface, which
allows the publisher to put in presentation rules, and
that goes right here in the publisher interface part of
the system.

                    He then showed you the second interface
and how that would be a web -- a menu that would go over
here in the advertiser side, which is the second
interface in the claims.  And that goes to the central
controller.

                    He also showed you how the computer
controller of the system would process and publish the

ads.  All the three basic elements, the same thing that

the patent talked about.

He concluded that AdForce did the same

thing as the patents did beforehand.  DoubleClick DART

did the same thing as the patents did beforehand.  The

Patent Office didn't know about those.

And he also showed you that it would have

been obvious, given these two things, to -- either alone

or in combination with each other or this third site,

NetGravity, it would have been obvious to combine those

or look at those, if there's one element missing, to add

that element.

So you've got evidence here, very

substantial evidence.  I don't know how more clear and

convincing you can get than a great big user manual that

has all these screen shots in it.  And that's in

evidence in this case, and the evidence shows clearly

these patents are not valid.

Now, let me finish by talking about

damages.  We think that -- we think that there are no

damages in this case.  Let me be crystal clear.  We

don't think there's liability.

We strongly urge you to consider the

evidence.  There's no infringement.  There's three

reasons why there's no infringement.  And these patents,

we believe, aren't valid, because these other pieces of art that the Patent Office didn't know about.

We think damages should be zero, because there's no liability.  But we only have one chance to address you, and if you disagree with us and you think there is liability, we have to deal with damages.  And so I'm going to talk about damages a little bit.

Now, the Plaintiff presented Mr. Bratic as an expert witness on damages.  And he'll -- he gave you the opinion that Google would in a -- remember the test is a hypothetical negotiation in 19 -- or in 2007.  What would Google have agreed to?  What would Function Media have agreed to?

And he said that Google would have agreed to $607.3 million, over approximately 65 percent of all money it would make on this complicated system.

Well, we showed you on cross-examination some real-world actual patent license agreements that Google had entered into.  With the exception of Stanford, none of them had been relied upon by Mr. Bratic.  These are real-world agreements.  You saw them; I put them on the screen on cross-examination.

The Stanford agreement, when it was entered into in 1998, conservatively, Google paid $600,000, not $600 million.  The Meyer agreement, in

1  1998, three patents, two applications, $3.5 million is

2  what Google actually paid in the real world.

3              Again, Mr. Bratic says, oh, they went for

4  less patents.  And this, by the way, was a purchase of

5  the entire patent, not a license for a non-exclusive

6  license to use it, but bought the entire patents for

7  3.5.

8              Yet Mr. Bratic says Google would have

9  agreed just for a bare license of two of the accused

10 products to pay $600 million, not $3.5 million.

11             The VoiceAge, we looked at that

12 agreement.  Over a hundred patents were licensed in the

13 VoiceAge agreement.  For two and a half years, Google

14 paid $5 million.  Five million dollars is a lot less for

15 a hundred patents than $600 million for two licenses --

16 license for two patents.

17             Alcatel-Lucent, huge corporation, one of

18 the telephone company corporations.  Google licensed a

19 bunch of patents from them.  We looked at that.  How

20 much did they pay for two years?  $15 million.

21             And then finally, Hewlett-Packard, one of

22 the biggest computer corporations in the United States

23 of America, a whole passel of patents licensed by Google

24 from them.  How much?  $20 million.

25             That's the most.  And yet Mr. Bratic

ignores all of this and -- and talks about industry

rates and acquisitions and distribution agreements,

things that aren't patent license agreements, and comes

up with $607 million, exponentially higher than anything

that Google actually agreed to or actually would agree

to.

It's important to remember that when

you're talking about and thinking about how much Google

would pay in a hypothetical negotiation, you have to

look at the Google product, AdSense for Content, and the

patent and say, well, what does -- is the reason that

the Google product is so successful attributable to the

patent or something else?

Well, you heard testimony that the reason

the product was successful was because it does this

contextually targeting -- contextual targeting, a

revolutionary technology that allows Google every time

someone assessed a web page, to have ads that are

relevant to that web page.  That was a huge

technological innovation.

But Mr. Tribble and Mr. Wagner had this

colloquy about it.  Question:  So the first item

unrelated to the patents-in-suit is that Google systems

provide contextually relevant ads.  That contextual

targeting, that is something that Google had been doing

1   prior to the year prior to AdSense Online; is that

2   right?

3                   That's correct.  So Mr. Tribble agrees

4   contextual targeting is not related to the patents here.

5   And that's one of the primary reasons Google's AdSense

6   for Content is successful.

7                   And there's other things.  The search

8   engine, the brand value, the advertising auction

9   technology that happens millions of times every fraction

10  of a second that allows for this sophisticated process

11  to work, none of that has anything to do with the

12  patent.

13                  Mr. Tribble:  Not related to the patents?

14                  I agree with that.

15                  So would Google -- ask yourself this:

16  Given that contextual targeting and auction process, if

17  those are the innovative features that made Google so

18  successful in AdSense for Content, have nothing to do

19  with the patent, would Google have agreed to give 65

20  percent of the money it made from contextual targeting

21  and its brand and its auction process?

22                  And the answer is no.

23                  You heard from Ms. Wojcicki.  She was

24  asked if someone said to you they want 600 million for a

25  couple of patents, what would you do?

1    She says:  That's a huge amount of money.
2  This is a senior vice president.  This is not an expert
3  witness, Members of the Jury.  This is a senior vice
4  president of Google telling you what the truth is.
5    That's a huge amount of money.  So I've
6  sat in every deal review the company has had -- or I've
7  tried to sit in every deal review and I've never seen
8  this license technology or patents or anything -- to
9  anything even close to that number.
10   Yet Mr. Bratic says it doesn't matter.
11 I'm still saying $605 million.
12   Ms. Wojcicki was asked:  What would you
13 do if you were presented with that?
14   She said:  We would find a way to work
15 around it.  Now, this is important, because when you're
16 asked to think about hypothetical negotiation, one of
17 the factors you look at is how easy could Google simply
18 change its product?
19   Even assuming it infringes, which we
20 contend it does not, could it make a change that would
21 remove any doubts?  And if it could, how much would that
22 cost and would that be cheaper than paying 65 percent of
23 your profits?
24   That's one of the things you need to look
25 at.

1           THE COURT:  You've got 15 minutes

2   remaining.

3           MR. VERHOEVEN:  Thank you, Your Honor.

4           And we presented evidence from Jason

5   Miller that Google not only could but already has

6   developed a system that there's no way could be argued

7   and argued that infringes in this case.  And that system

8   is called Explorer.

9           And he testified that, generally, what

10  Explorer is, is that Google will not require an

11  advertiser to give us any keywords or placements, any

12  hints on where they want their ads to be shown.  Google

13  does all that work for them, and Google basically

14  determines where we think the ad will do well, on what

15  publishers we should show the ad.

16          I apologize, Your Honor.  I just need to

17  put this up.

18          Now, this is important.  This Explorer

19  system would change the Google system so that the seller

20  interface -- the seller couldn't ask for a website.  It

21  couldn't put in www.borders.com.  It couldn't even say I

22  want some keywords associated with my ad.

23          All the seller could do using Explorer is

24  put in the title and the ad text and the URL.  That's

25  it.  There's no information input by the seller saying

anything about where they want their ad to go.

Okay.  Well, the claim language here on the second interface says a second interface to the computer system through which the seller is prompted to input information to select one or more of the internet media venues.  That's a requirement of the claims. But this Explorer system wouldn't allow the seller to input anything.  Can't ask for a website.  Can't even ask for a keyword.  There's no opportunity for the seller to input information to select one or more of the internet media venues.

This is what's called a design-around. Google not only could do this, they have.  Mr. Miller said that this was already in beta form.  So when you're thinking about the hypothetical negotiation, you need to keep in mind that in the hypothetical negotiation, Google already has a system that they've developed in beta form that unquestionably wouldn't do this input information to select.

And rather than pay 65 percent of all their profits and $600 million, they could simply implement that system, and there wouldn't be any infringement.  So that would lower the amount that a hypothetical negotiation amount would be.  And so this is an important thing to remember.

So let me conclude briefly. We think that -- there's no liability in this case, no infringement. The patents are invalid. Damages should be zero. We walked through that with you.

There's a couple of other points just to bear in mind when you're thinking about this. This case is not about copying. There's no allegation by the Plaintiffs that Google knew about these patents and did something wrong, that they knew about these patents and said, oh, we're going to do this anyway.

Google didn't know. You saw the timeline I just showed you. Google developed AdSense for Content and later AdSense for Mobile. That was built by Google with its own engineers with its own ingenuity, and it made it very successful through a lot of hard work.

These patents didn't even exist. They weren't even issued. Google didn't know anything about them. There's no question in this case that Google knew about something and acted badly. It didn't.

Google doesn't infringe. And -- and what this case is really about is a Plaintiff who got a patent; was using the Google system and thought, well, I can make some arguments and file a lawsuit; who didn't call Google; didn't tell Google, hey, we think that there's a problem here; can we work it out?

```
 1                    Instead, they waited.  They did nothing.
 2   And on the very first day their patent issued, the very
 3   first day, without a phone call, without anything, they
 4   filed a lawsuit, and they say give us 65 percent of your
 5   profits.
 6                    Google is not taking any land from
 7   Mr. Dean and Ms. Stone, to use the property-line
 8   analogy.  What's going on here, Members of the Jury, is
 9   that Function Media is trying to make a land grab from
10   Google.
11                    That concludes my closing argument.  I
12   want to thank you all.  You've all been very attentive,
13   and I appreciate the taking notes.  And thank you for
14   your time.
15                    THE COURT:  Thank you, Counselor.
16                    Mr. Tribble?  You've got about 14 minutes
17   remaining.
18                    MR. TRIBBLE:  Thank you, Your Honor.
19                    Land grabbing.  You can imagine Exxon
20   making the same arguments of if they drilled a well on
21   your property, if you didn't have a well or you tried to
22   drill a well and it didn't succeed, you don't have
23   refineries; you don't have all the employees and
24   equipment that we do.
25                    But the fact of the matter is that they
```

did drill a well on your property, generated $5 billion,

and they would be liable to pay you a reasonable

royalty.  All of this, word games.

I was stunned that they made this

design-around alternative argument still.  Remember, at

the beginning of the case, their original argument was

every one can switch from AdSense Online to AdSense

Direct.

But then, of course, on

cross-examination, it turned out that just wasn't true.

It wasn't feasible.  That's exactly what Jason Miller

testified to.  Word games.

The -- we finally have it admitted clear

and upfront that context targeting and the auction

process are not involved in the issue of whether there's

infringement here.

Remember how much testimony we heard on

that?  Hours and hours.  Finally, the truth is out.

It's been word games and distractions all the way along.

The -- Google on its -- more word games.  It's

non-infringement arguments.  Seller is prompted to input

information to select.  It's not -- they're reading it

as seller is prompted to select.

All they have to do is put information

in.  And as to the design-around argument, after the

first one failed, then they came up with this Explorer

system where on that -- unlike the ones that are

actually at issue here, they don't put any keywords in,

okay -- inputting information.

As Dr. Rhyne explained, it does infringe

this system, or it would if they ever actually turned it

on commercially, because you have to type in the text.

Those become the new keywords.

And guess what?  Mr. Lanning didn't rebut

that testimony.  The sole expert testimony on that issue

is that that design-around is no design-around at all.

Let's go through.  I wanted to point out the Judge will

instruct you on obviousness, that there are these

factors that if they're present, they tend to show that

the idea was not obvious.

First of all, you have to show some kind

of system and reasons to combine that just aren't

present here.  But the Judge will instruct you that the

factor such as the commercial success of a property.

Due to the merits of the claimed invention, the product

is AdSense, the AdSense AdWords system.

The fact that it's Google's product, that

doesn't mean that it doesn't count.  The success of that

invention, if you find infringement, that means it is

the patented invention.  The tremendous success of

AdSense shows that it was not obvious to the industry.
Otherwise, there would have been dozens and dozens and
dozens of people out there doing it.

The unexpected and superior results, the
long-felt need for the solution, acceptance by others
and the awards and praise that the AdSense AdWords
system has achieved.

Let's go through damages. Remember both
experts agree it's the value to Function Media, not to
Google. And I want you to remember earlier this month,
you were asked in jury selection that if the law and the
evidence were such that it proved that Function Media
were entitled to as much as $600 million, would you be
willing to follow the law and award that amount of
money?

And I think that's where we're at. Let's
go through it.

Remember, Mr. Bratic, he started with the
average industry royalty rates for internet advertising,
same methodology relied on by Google's expert until
hired by Google. He cited all these other rates.
The Stanford license he says that were worth half of the
Stanford license. If you look at the equity value,
which is what Stanford actually got, equity, it's $1.4
billion dollars. Half of that is 700 million.

And by the way, Mr. Wagner, this methodology that he
admits he's never done before, and as far as he knows,
no one's ever done this before, you know, he turns that
2-percent equity in the company, turns it into --
somehow into a 0.25-percent running royalty.

Remember that applies to the -- the
revenues of all of Google, not just for the accused
products.  $56 billion and when you multiply that out,
even by his own methodology, the reasonable royalty is
$140 million.

Other than the Stanford license, he
relies on the Carl Meyer license.  There's been no
testimony -- that unlike our patents, which are core
technology used by Google, had generated $5 billion,
there's no testimony that they even use the Carl Meyer
technology, that it has anything to do with anything.
And so it's like saying if someone stole your sports car
and crashed it and you wanted to recover the fair value,
someone would say, well, I owe you a hundred dollars
because I bought this beat up old wreck for a hundred
dollars, and they're both cars.

That means nothing.  There's no
applicability of the Carl Meyer patent.

And by the way -- Your Honor, we may have
to clear the courtroom for this next slide.

1          THE COURT:  Okay.  Well, ladies and

2  gentlemen in the audience, I'm going to have to ask you,

3  if you're not covered by the terms of the Court's

4  protective order, to please exit the courtroom at this

5  time.  I'll invite you back in momentarily.

6  ████████████  ██████  ████  ████████

**SEALED BY ORDER OF THE COURT**

7  ████  ██████  ████  ████████

8  ████  ████████  ████  ████  ████  ██████  ████████

9  ██████  ████  ████████  ████  ████████  ████████  ████████  ████

10  ████  ████████  ████  ████████  ████████  ██████  ████████  ████████

11  ████████

12  ██████  ████████  ████  ████████  ████  ████  ████████  ████

13  ████  ████  ████████  ████  ████████  ████  ████  ████████  ████████  ████

14  ████████  ████  ██████  ████████  ████  ████████  ████████  ████████

15  ████  ████  ████████  ████████  ████  ██████  ████  ████  ████████  ████

16  ████  ████  ████  ████████  ████  ████████  ████████  ████  ████

17  ████████  ████████  ████  ████████  ██████  ████████  ████████  ████████

18  ████████

19  ██████  ████  ████  ████  ████████  ████████  ████████

20  ████  ████████  ████████  ████  ██████  ████  ████████

21  ██████  ████  ████████  ████  ████████  ████████

22  ██████  ████  ████████  ████  ████████  ████  ████████  ████

23  ████████  ████████  ████  ████████  ████  ████████  ████████  ████████

24  ████  ████  ████████  ████████  ████████  ████  ████████

25  ████  ████  ████  ████  ████  ██████  ████████  ████



SEALED BY ORDER OF THE COURT

**SEALED BY ORDER OF THE COURT**

THE COURT:  Okay.  You can go ahead and proceed, Mr. Tribble.

MR. TRIBBLE:  Question No. 1 that is asked is, do you find that Function Media has proven by

a preponderance of the evidence that Google has directly

infringed Claims 1, 20, 37, 52, 63, 90, 179, and 231 of

the U.S. Patent No. -- the '025.

Those are exactly -- Dr. Rhyne walked you

through each and every element, each and every one of

those claims.

And so we would ask that you find those

patents infringed and that for both products, AdSense

for Content Online and AdSense for Mobile, which the

testimony by all the witnesses worked exactly in the

same way for purposes of these patents, that you answer

those questions yes, yes, yes, there was infringement.

The second question you'll be asked will

be the same question for the '059 patent.  Do you find

that it has infringed?

Answer:  Yes, yes.

The next question you'll be asked:  Do

you find that Google has proven by clear and convincing

evidence that any of the following claims of the '025

patent are invalid for the following reasons?

Yes means the claims are invalid.

No means the claims are valid.

And you have to look at each claim,

because there are extra elements in the various claims.

But the clear answer is actually in our favor.

1                 But certainly, there's no -- Google has

2 failed to meet the clear and convincing standard for

3 proving that any of these claims are invalid. And so we

4 would ask that you answer those claims no, no, no, the

5 patents are valid.

6                 Same question as to obviousness. No, no,

7 no, no.

8                 Same questions for the '059 patent. Is

9 it anticipated by the prior art or rendered obvious?

10                 No.

11                 And finally, if you find that the patents

12 are infringed and you do not find that they're invalid,

13 then you answer Question 5 -- do you find that Google

14 has proven -- oh, excuse me. This is for the '059 --

15 yeah, here it is.

16                 The question is wrong on the chart, but

17 the question is: What sum of money, if any, if paid now

18 in cash would fairly and reasonably compensate the

19 Plaintiff as a reasonable royalty for any infringement

20 you have found? Answer in dollars and cents.

21                 And you have to answer in dollars and

22 cents, but remember, both experts agree that the

23 appropriate way to calculate the reasonable royalty in

24 this case -- there's no dispute among the experts -- is

25 to take the revenue base and multiply it. And I believe

143

both experts in their calculations have used $5 billion.

THE COURT: You've got one minute left.

MR. TRIBBLE: And the difference is that
Mr. Bratic applies a rate of 12 percent, and you just
multiply them together, and that's $600 million.

And Mr. Wagner applies a rate of 0.25
percent. Again, you've seen the various rates, the
percentages that the licenses and acquisitions roll
into. And you heard Mr. Bratic talk about a rate of 8
percent as well, which would be a reasonable royalty of
$400 million.

At the end of the day, it's totally
within your discretion. And I know that on behalf of
Function Media and Michael Dean and Lucinda Stone, we
want to thank you. You have been very attentive
throughout the entire case. We really want to thank you
for paying such close attention.

We ask you to listen to the law, apply
and weigh the evidence and render your verdict.

Thank you.

THE COURT: All right. Ladies and
Gentlemen of the Jury, you have heard the evidence
presented by the parties to this suit and the argument
of the respective attorneys in support of their
positions.

It is now my duty to give you the charge in this case. It will be an oral charge and is given in an effort to assist you in your deliberations in deciding the issues which you must decide in order to reach a fair and impartial verdict in this case.

Perhaps this function of the Court is the most important one that the Court performs in the trial of a case, so I ask you to pay close attention to my remarks.

You will remember that at the beginning of the trial, I gave you some general instructions and definitions. Rather than repeat them, I ask you to recall them now in deciding the facts and issues which you are to decide.

As I instructed you at the beginning of the trial, you are the exclusive judges of the facts, the credibility of the evidence, and the weight to be given the testimony of the witnesses.

You are to perform your duty without bias or prejudice to any party. The law does not permit jurors to be governed by sympathy or prejudice.

A corporation and all other persons, including the Plaintiff and Defendant in this case, are equal before the law and must be treated as equals in a court of justice. The law is no respecter of persons.

The Court and the parties expect that you will carefully and impartially consider all of the evidence, follow the law, as I will give it to you, and reach a just verdict.

I will now briefly review the contentions of the parties and give you some additional instructions and definitions that will guide you in -- in deciding the issues or facts that you must resolve in this case.

With respect to the Plaintiff's claims and the Defendant's defenses, the Plaintiff, Function Media, contends that the Defendant, Google, infringes certain claims of the two United States patents, specifically Claims 1, 20, 37, 52, 63, 90, 179, and 231 of U.S. Patent No. 7,240,025 B2, which has been referred to as the '025 patent, and Claim 1 of United States Patent No. 7,249,059 B2, which has been referred to as the '059 patent.

Specifically, Function Media contends that Google directly infringes the asserted claims of the '025 and the '059 patents by making and using AdSense for Content Online and AdSense for Mobile Online. Function Media seeks damages in the form of a reasonable royalty to compensate it for Google's alleged infringement.

Google denies Function Media's

assertions. Specifically, Google denies that either AdSense for Content Online or AdSense for Mobile Online directly infringes Claims 1, 20, 37, 52, 63, 90, 179, and 231 of the '025 patent and Claim 1 of the '059 patent.

Google also contends that the asserted claims of the '025 and the '059 patents are invalid.

Function Media bears the burden of proof by a preponderance of the evidence that Google directly infringes the asserted claims of the '025 and '059 patents.

Function Media also has the burden of proving by a preponderance of the evidence the amount of damages caused by Google's infringement. Google bears the burden of proof by clear and convincing evidence that the asserted claims of the patents are invalid.

I will now give you some instructions and definitions to help you in answering the questions to follow.

Now, with respect to patent infringement, claim interpretation, Function Media contends that Google committed patent infringement. To decide the questions of infringement, you must first understand what the claims of the patent cover, that is, what they prevent anyone else from doing. This is called claim

interpretation.

It is my duty under the law to interpret what the words used in the patent claims mean. I have made my determination, and I will instruct you accordingly. You must apply the meaning I give the patent claims to your decisions on infringement and validity.

I will now instruct you how those words are to be construed and understood when deciding the issues of infringement and validity.

You have been provided with written copies of the '025 and '059 patents and copies of these claim term definitions, and you may use them in your deliberations.

Now, publishing means the act of placing or making available the presentation or information within the framework of a media venue so that it is accessible by the end-users, consumers, viewers, or buyers.

Presentations means any content intended to inform or influence the viewers or readers of a given media venue. It may be in an advertising, public service, editorial, informational, or any other format. It may be text, graphics, audio, multimedia, or a combination of any communication methods.

1            Now, seller means a person, corporation,

2 partnership, group, or any other legal entity that

3 desires representation of its goods, products, services,

4 reservations for services, ideas, views, or any legal

5 intent or desire to be made public and offered for sale,

6 exchange, trade, or distribution either paid for or

7 free.

8            Network of computers means two or more

9 computers that may communicate either continuously or on

10 demand for the purpose of sharing, processing,

11 transferring information and data.

12            Media venues means those physical or

13 virtual locations where presentations are placed or made

14 available to present the information within the

15 framework of the media so that it is accessible by the

16 end-users, consumers, viewers, or buyers.

17            Internet media venues means internet

18 locations where presentations are placed or made

19 available to present the information within the

20 framework of the media so that it is accessible by the

21 end-user, consumers, viewers, or buyers.

22            Presentation rules means rules to be set

23 by a media venue for use in creating advertisements to

24 be published on that media venue.

25            Create an electronic advertisement for

publication to the selected internet media venues means

create an electronic advertisement for publication in a

form customized to each of the selected internet media

venue's presentation rules.

Selection information input by the seller

means the selection of information input by the seller

that targets one or more media venues.

Blocked URLs means internet locations

that are precluded from displaying a presentation.

Third-party professional means

professional individuals, as well as business entities,

that traditionally create and manage advertising either

in whole or in part for sellers or supply content,

products, and services to those that create and manage

advertising.

Create an electronic advertisement for

the seller for publication to the selected internet

media venues means create an electronic advertisement

for publication in a form customized to each of the

selected internet media venue's presentation rules.

First interface to the computer system

means software that enables the internet media venue

user to interact with the computer system.

Second interface to the computer system

means software that enables the seller user to interact

with the computer system through which the seller user

is prompted to -- to enter information to select one or

more internet media venues.

        Publishing the electronic advertisement

to one or more of the selected internet media venues

means placing or making available the customized

electronic advertisement within the framework of and at

each internet media venue so that it is accessible by

the end-users, consumers, viewers, or buyers.

        Processing the electronic advertisement

in compliance with the presentation rules of the

internet media venue means executing a systemic sequence

of mathematical and/or logical operations upon the

customized electronic advertisements to make it comply

with the presentation rules of the internet media

venues.

        Design or style standards means

presentation rules which control the look and feel of an

advertisement.

        Automatically apply or compare the

internet media venue design or style standards to the

information input by the seller or the advertisement

means execute a systemic sequence of mathematical and/or

logical operations to apply or compare the internet

media venue's design or style standards to the

information input by the seller or to the advertisement.

Automatically apply or compare the internet media venue distribution factors to the information input by the seller or the advertisement means execute a systemic sequence of mathematical and/or logical operations to apply or compare the internet media venue's distribution factors to the information input by the seller or to the advertisement.

Publish the advertisement to the internet media venue means place or make available the customized electronic advertisement within the framework of and at each media venue so that it is accessible by the end-users, consumers, viewers, or buyers.

The third-party professional is prompted to input information to select one or more of the internet media venues means the third-party professional is prompted to input information to select one or more internet media venues.

Now, with respect to determining infringement, once the patent is issued, the owner of a patent has a right to exclude others from making, using, offering to sell, or selling the patented invention throughout the United States or importing the patented invention into the United States for a period of 20 years.

1          Thus, infringement occurs when a person,

2   without the owner's permission, makes, uses, offers to

3   sell, or sells the patented invention anywhere in the

4   United States or imports the patented invention into the

5   United States while the patent is in force.

6          To determine whether there is an

7   infringement, you must compare the allegedly infringing

8   product with the scope of the patent claims as I have

9   defined them for you.

10          In order to infringe a patent claim, a

11  product or method must include each and every limitation

12  of the claim.

13          In determining whether Google infringes

14  Function Media's asserted claims, you must determine

15  whether AdSense for Content Online or AdSense for Mobile

16  Online or their methods of use contain each and every

17  limitation recited in a claim.

18          A claim limitation is present if it

19  exists in the accused product or its method of use just

20  as it is described in the claim language, either as I

21  have explained that claim language to you, or if I did

22  not explain it, as it would be understood by one of

23  skill in the art.

24          If AdSense for Content Online and AdSense

25  for Mobile Online or their methods of use omit even a

single limitation, then you must find that the claim is not infringed.

You must consider each of the patent claims separately. If you find that each and every limitation of a patented claim is found in the accused products or their methods of use, then the claim is infringed, even if the accused products or their methods of use may be more or less efficient or may include additional features or functions not found in the claims.

Whether or not Google knew that what it was doing was an infringement does not matter for direct infringement.

A person may be found to be a direct infringer of a patent even if he or she believed in good faith that what he or she was doing was not an infringement of any patent and even if he or she did not even know of the patent.

You have heard evidence in this case about Google's own patents relating to certain of its products or methods; however, owning a patent is not a defense to infringement of another patent.

A party can infringe someone else's patents even though it may have patents of its own.

Now, the asserted claims use the word

comprising.  When a claim uses the word comprising,

comprising means including or containing.

A claim that uses the word comprising or

comprises is not limited to products or methods having

only the elements that are recited in the claim but also

covers products or methods that add additional elements.

Let's take as an example a claim that

covers a table.  If the claim recites a table comprising

a tabletop, legs, and glue, the claim will cover any

table that contains these structures, even if the table

also contains other structures, such as a leaf or wheels

on the legs.

Now, you are instructed that infringement

of a United States patent may occur only in the United

States.  In determining whether infringement occurs

within the United States, there are two different

standards for what counts as occurring within the United

States.

The first standard is used for patent

claims that cover a system; in this case, Claims 1, 20,

37, 52, 63, and 90 of the '025 patent and Claim 1 of the

'059 patent.

For these claims, a system is used within

the United States if the system as a whole is put into

service within the United States.

1        A system is put into service within the

2 United States if:

3            (1) control of the system is exercised

4 within the United States;

5            And (2) the beneficial use of the system

6 is obtained within the United States.

7            For patent claims that cover a method, in

8 this case, Claims 179 and 231 of the '025 patent, a

9 different standard is used.

10           A claimed method is used within the

11 United States only if every step of the claimed method

12 is performed within the United States.

13           In determining whether a person, without

14 the owner's permission, offered to sell the patented

15 invention anywhere in the United States, an offer to

16 sell occurs in the United States if it was extended

17 within the United States.

18           Let's talk about dependent claims.  My

19 instructions on infringement so far have related to

20 independent claims.  Patent claims may exist in two

21 forms referred to as independent claims and dependent

22 claims.

23           An independent claim does not refer to

24 any other claim of the patent.  Thus, it is not

25 necessary to look at any other claim to determine what

an independent claim covers.

Claims 1 and 179 of the '025 patent and Claim 1 of the '059 patent are independent claims.

A dependent claim refers to at least one other claim in the patent. A dependent claim includes each of the elements of the other claim to which it refers, plus additional elements recited in the dependent claim itself.

Claim 20 of the '025 patent is a dependent claim that depends on Claim 6. In order for you to find Claim 20 of the '025 patent is infringed, you must first find that Claims 1 and 6 are infringed.

If you find that independent Claim 1 or that dependent Claim 6 of the '025 patent is not infringed, you must find that independent Claim 20 is not infringed.

Claim 37 of the '025 patent depends on Claim 36. In order for you to find that Claim 37 of the '025 patent is infringed, you must first find that Claims 1, 31, 32, and 36 are infringed.

If you find that independent Claim 1 or that dependent Claims 31, 32, or 36 of the '025 patent are not infringed, you must find that dependent Claim 37 is not infringed.

Claim 52 of the '025 patent depends on

1 | Claim 47.  In order for you to find that Claim 52 of the
2 | '025 patent is infringed, you must first find that
3 | Claims 1 and 47 are infringed.
4 |                 If you find that independent Claim 1 or
5 | that dependent Claim 47 of the '025 patent is not
6 | infringed, you must find that dependent Claim 52 is not
7 | infringed.
8 |                 Claim 63 of the '025 depends on Claim 46.
9 | In order for you to find that Claim 63 of the '025
10 | patent is infringed, you must first find that Claims 1,
11 | 6, 28, and 46 are infringed.
12 |                 If you find that independent Claim 1 or
13 | that dependent Claims 6, 28, or 46 of the '025 patent
14 | are not infringed, you must find that dependent Claim 63
15 | is not infringed.
16 |                 Claim 90 of the '025 patent depends on
17 | Claim 62.  In order for you to find that Claim 90 of the
18 | '025 patent is infringed, you must first find that
19 | Claims 1, 31, 45, and 62 are infringed.
20 |                 If you find that independent Claim 1 or
21 | that dependent Claims 31, 45, or 62 of the '025 patent
22 | are not infringed, you must find that dependent Claim 60
23 | is not infringed -- or excuse me -- dependent Claim 90
24 | is not infringed.
25 |                 Claim 231 of the '025 patent depends on

Claim 226. In order for you to find that Claim 231 of the '025 patent is infringed, you must first find that Claims 179 and 226 are infringed.

If you find that independent Claim 179 or that dependent Claim 226 of the '025 patent are not infringed, you must find that dependent Claim 231 is not infringed.

Now, I will talk to you about the validity of the patents.

Google contends that the asserted claims of the '025 and '059 patents are invalid. A patent issued by the United States Patent Office is presumed to be valid. In order to rebut this presumption, the Defendant must establish by clear and convincing evidence that an asserted claim of the patents-in-suit is not valid.

Clear and convincing evidence is a more exacting standard than proof by a preponderance of the evidence, which only requires that the party's claim be more likely true than not true.

When a party has the burden of proving any claim or defense by clear and convincing evidence, it means that the party must persuade you that it is highly probable that the facts are as that party contends.

Nevertheless, the clear and convincing standard is not as high as the burden of proof applied in a criminal case, which is beyond a reasonable doubt.

Each claim of a patent is presumed valid regardless of the status of any other claim in the patent.  Google contends that the asserted claims of the '025 and '059 patents are invalid because they are anticipated or rendered obvious by the prior art.

If you find by clear and convincing evidence that a claim is anticipated or obvious, then you should find that claim invalid and render a verdict for Google on that claim.

Some of these instructions will refer to prior art.  Prior art means technology and information that was publicly available before the date of the invention.

In considering prior art, you should consider prior art that is relevant to the particular problem the inventor faced.

Prior art includes:

(1) patents issued more than one year before the filing of the patent or before the date of the invention;

(2) publications having a date more than one year before the filing date of the patent or before

the date of the invention;

(3) United States patents having a filing date prior to the date of the invention of the subject matter in the patent;

(4) any process or apparatus in public use or on sale in the United States more than one year before the filing date of the patent in issue;

(5) any process or apparatus that was publicly known or used by others in the country before the date of the invention of the claimed subject matter in the patent;

And (5) any process or apparatus that was made or built in this country by another person before the date of the invention of the claimed subject matter in the patent and not abandoned, suppressed, or concealed.

Now, these instructions have sometimes referred to the date of invention. In this regard, you are instructed that there are two parts to the making of an invention.

The inventor has the idea of the invention. This is referred to as conception of the invention.

A conception of an invention is complete when the inventor has formed the idea of how to make and

use every aspect of the claimed invention and all that
is required is that it be made without the need for any
further inventive effort.

The actual making of the invention is
referred to as reduction to practice.  An invention is
said to be reduced to practice when it is made and shown
to work for its intended purpose.

Under the patent laws, the date of
invention is generally the date that the patent
application was filed.  This is also referred to as
constructive reduction to practice.

In this case, that date is January 10th,
2000, for the '025 patent, and July 11th, 2002, for the
'059 patent.

The public use of a product or process of
a patent claim in the United States more than one year
before the filing date of the application for the patent
may be prior art to the patent claim.

First, the use must occur in the United
States more than one year before the patent application
was filed.

In this case, the '025 patent was filed
on January 10th, 2000, so that date is January 10th,
1999.  And the '059 patent was filed on July 11th, 2003,
so that date is July 11th, 2001.

The date of invention is irrelevant to this category of prior art. If the public use is more than one year before the patent application was filed, then that public use may be prior art regardless of the date of the invention.

Second, the use may be by anyone, including the inventor or patent owner.

Third, if the use was by someone other than the inventor, the use must have been accessible to the public in order to be prior art.

Fourth, commercial exploitation of the product or process constitutes public use even if there was a confidentiality agreement or circumstances existed creating a similar expectation of privacy or secrecy.

Commercial exploitation includes sale of the invention or a charge for use of the invention to generate commercial benefits.

Fifth, in order for a public use to be prior art, the invention must have been ready for patenting when it was used. An invention is ready for patenting if the product offered for sale has been developed to the point where there was reason to expect it would work for its intended purpose.

The product may be ready for patenting even if it is not ready for commercial production or has

1 not been technically perfected.

2 The sale or offer for sale in the United

3 States of a product may be prior art to a patent claim

4 covering the product or a method of making the product

5 if the product was sold or offered for sale in the

6 United States more than one year before the application

7 for the patent was filed.

8 The date of invention for the patent

9 claims is irrelevant to this category of prior art. If

10 the sale or offer of sale of a product is more than one

11 year before the patent application was filed, then the

12 product or method of making it may be prior art,

13 regardless of the date of invention.

14 Let's talk about anticipation.

15 The patent laws of the United States

16 require that an invention must be new for a person to be

17 entitled to a patent. Google contends that the asserted

18 claims are invalid because they were not new or lacked

19 novelty.

20 If an invention is not new, we say that

21 it was anticipated by the prior art. An invention that

22 is anticipated by the prior art is not entitled to

23 patent protection.

24 In order for a patent claim to be

25 anticipated by the prior art, each and every limitation

of the claim must be present within a single item of

prior art, whether that prior art is a publication, a

prior patent, a prior invention, a prior public use or

sale, or some other item of prior art.

You may not find that the prior art

anticipates a patent claim by combining two or more

items of prior art.

In deciding whether or not a single item

of prior art anticipates a patent claim, you should

consider that which is expressly stated or present in

the item of the prior art and also that which is

inherently present.

Something is inherent in an item of prior

art if it is always present in the prior art or always

results from the practice of the prior art and if a

skilled person would understand that to be the case.

Now let's talk about obviousness.

The Defendant also contends that the

asserted claims of the '025 and '059 patents are invalid

because the invention was obvious.  Not all innovations

are patentable.

A patent claim is invalid if the claimed

invention would have been obvious to a person of

ordinary skill in the field at the time the invention

was made; in this case, January 10th, 2000, for the '025

patent and January 11th, 2002, for the '059 patent.

This means -- well, it's January 10th, 2000, for the '025 patent, and July 11th, 2002, for the '059 patent.

This means that even if all of the requirements of the claim cannot be found in a single prior art reference, a person of ordinary skill in the field of art, who knew about all this prior art, would have come up with a claimed invention.

However, a patent claim composed of several elements is not proved obvious merely by demonstrating that each of its elements was independently known in the prior art.

In evaluating whether such a claim would have been obvious, you may consider whether the Defendant has identified a reason that would have prompted a person of ordinary skill in the field to combine the elements or concepts from the prior art in the same way as in the claimed invention.

There is no single way to define the line between true inventiveness, on one hand (which is patentable) and the application of common sense and ordinary skill to solve a problem, on the other hand (which is not patentable).

For example, market forces or other

design incentives may be what produced a change rather
than true inventiveness.

You may consider whether the change was
merely the predictable result of using prior art
elements according to their known functions or whether
it was the result of true inventiveness.

You may also consider whether there is
some teaching or suggestion in the prior art to make the
modification or combination of elements claimed in the
patent.

Also, you should consider whether the
innovation applies a known technique that had been used
to improve a similar design in a similar way.

You may also consider whether the claimed
invention would have been obvious to try, meaning that
the claimed innovation was one of a relatively small
number of possible approaches to the problem with a
reasonable expectation of success by those skilled in
the art.

However, you must be careful not to
determine obviousness using the benefit of hindsight.

Many true inventions might seem obvious
after the fact.

You should put yourself in the position
of a person of ordinary skill in the field at the time

the claimed invention was made, and you should not
consider what is known today or what is learned from the
teaching of the patent.

The ultimate conclusion of whether a
claim is obvious should be based on your determination
of several factual decisions.

First, you must decide the level of
ordinary skill in the field that someone would have had
at the time the claimed invention was made.

Second, you must decide the scope and
content of the prior art.

Third, you must decide what difference,
if any, existed between the claimed invention and the
prior art.

Where these matters are in dispute, the
party asserting invalidity has the burden to establish
that it is highly likely that its version of the facts
is correct.

Finally, you should consider any of the
following factors that you find have been shown by the
evidence.

Now, the factors tending to show
nonobviousness are:

(1) commercial success of a product due
to the merits of the claimed invention;

                    (2) a long-felt need for the solution
provided by the claimed invention;

                    (3) unsuccessful attempts by others to
find the solution provided by the claimed invention;

                    (4) unexpected and superior results from
the claimed invention;

                    (5) acceptance by others of the claimed
invention, as shown by praise from others in the field
or from the licensing of the claimed invention;

                    (6) other evidence tending to show
nonobviousness.

                    And factors tending to show obviousness
are:

                    (1) independent invention of the claimed
invention by others before or at about the same time as
the named inventor thought of it;

                    And (2) other evidence tending to show
obviousness.

                    The presence of any of the above factors
that tend to show nonobviousness may be considered by
you as an indication that the claimed invention would
not have been obvious at the time the claimed invention
was made, and the presence of any of the above factors
that tend to show obviousness may be considered by you
as an indication that the claimed invention would have

1  been obvious at such time.

2          Although you should consider any evidence

3  of these factors, the relevance and importance of any of

4  them to your decision on whether the claimed invention

5  would have been obvious is up to you.

6          If you find that the Defendant has proved

7  obviousness by the clear and convincing standard, then

8  you must find that the claim is invalid.

9          Now, with respect to corroboration, you

10  are instructed that corroboration is required of any

11  witness whose testimony alone is asserted to invalidate

12  a patent.

13          Both physical evidence, such as documents

14  and things, and other oral testimony of a disinterested

15  party can serve to satisfy the corroboration

16  requirement.

17          In determining whether a witness'

18  testimony is corroborated, you should consider the

19  following factors:

20          (1) the relationship between the

21  corroborating witness and the alleged prior user;

22          (2) the time period between the event and

23  trial;

24          (3) the interest of the corroborating

25  witness in the subject matter in suit;

1          (4) contradiction or impeachment of the

2 witness' testimony;

3          (5) the extent and details of the

4 corroborating testimony;

5          (6) the witness' familiarity with the

6 subject matter of the patented invention and the prior

7 use;

8          (7) probability that a prior use could

9 occur considering the state of the art at the time;

10          And (8) impact of the invention on the

11 industry and the commercial value of its practice.

12          Now, with respect to damages, I will now

13 instruct you as to the calculation of damages should you

14 find that Function Media has met its burden on any of

15 its claims.

16          If you find that Google has infringed any

17 of the asserted claims of Function Media's patents and

18 that these claims are valid, then you should consider

19 the amount of money Function Media should receive as

20 damages.

21          Function Media has the burden of proving

22 by a preponderance of the evidence the amount of damages

23 caused by Google's conduct.

24          Even though I am instructing you on how

25 you should measure damages, this should not be taken to

mean that I believe that Google has infringed the
patents or that the patents are valid.  These are issues
for you to resolve under the instructions that I have
given you.

I am instructing you on damages only so
that you will have guidance should you decide that the
Plaintiff is entitled to recover.

If you find that there has been an
infringement and that these infringed claims are valid,
the owner of a patent is entitled to an award of damages
adequate to compensate for the infringement, but in no
event less than a reasonable royalty for the use the
Defendant made of the invention.

Function Media is asking for damages in
the amount of a reasonable royalty.  Generally, a
reasonable royalty is defined by the patent laws as the
reasonable amount that someone wanting to use the
patented invention should expect to pay the patent owner
and the owner should expect to receive.

A royalty is the amount of money a
licensee pays to a patent owner for each article the
licensee makes or uses or sells or offers to sell under
the patent or for the right to use the claimed method.

A reasonable royalty is the amount of
money a willing patent owner and a willing prospective

licensee would have agreed upon at the time of the
infringement for a license to make, use, sell, or offer
to sell the invention.

In making your determination of the
amount of a reasonable royalty, it is important that you
focus on the time period when the infringer first
infringed the patent and the facts that existed at that
time.

Your determination does not depend on the
actual willingness of the parties to this lawsuit to
engage in such negotiations.  Your focus should be on
what the party's expectations would have been had they
entered negotiations for royalties at the time of the
infringing activity.

The infringer's actual profits may or may
not bear on the reasonableness of an award based on a
reasonable royalty.

In determining the reasonable royalty,
you should consider all of the facts known and available
to the parties at the time the infringement began.  Some
of the kinds of factors that you may consider in making
your determination are:

(1) whether the patent holder had an
established royalty for the invention; in the absence of
such a licensing history, any royalty arrangements that

were generally used and recognized in the particular industry at that time;

(2) the nature of the commercial relationship between the patent owner and the licensee, such as whether they were competitors or whether their relationship was that of an inventor and a promoter;

(3) the established profitability of the patented product, its commercial success, and its popularity at the time;

(4) whether the patent owner had an established policy of granting licenses or retaining the patented invention as its exclusive right or whether the patent holder had a policy of granting licenses under special conditions designed to preserve his monopoly;

(5) the size of the anticipated market for the invention at the time the infringement began;

(6) the duration of the patent and of the license, as well as the terms and scope of the license, such as whether it is exclusive or nonexclusive or subject to territorial restrictions;

(7) the rates paid by the licensee for the use of other patents comparable to the Plaintiff's patent;

(8) whether the licensee's sales of the patented invention promote sales of its other products

and whether the invention generates sales to the
inventor of his nonpatented items;

(9) the utility and advantages of the
patent property over the old modes or devices, if any,
that had been used for working out similar results;

(10) the extent to which the infringer
used the invention and any evidence probative of the
value of such use;

(11) the portion of the profits in the
particular business that are customarily attributable to
the use of the invention or analogous inventions;

(12) the portion of the profits that
should be credited to the invention as distinguished
from nonpatented elements, the manufacturing process,
business risks, or significant features or improvements
added by the infringer;

(13) the opinion and testimony of
qualified experts and of the patent holder;

And (14) any other factors which, in your
mind, would have increased or decreased the royalty the
infringer would have been willing to pay and the patent
owner would have been willing to accept acting as
normally prudent business people.

You may consider the existence of
noninfringing alternatives.  A noninfringing alternative

1 must possess all the beneficial characteristics of the

2 patented device.  The existence of a competing device

3 does not make that device an acceptable substitute.

4 　　　　　If purchasers are motivated to purchase

5 because of the particular features available only from

6 the patented product, products without such features,

7 even if otherwise competing in the marketplace, would

8 not be acceptable noninfringing substitutes.

9 　　　　　You must not award the Plaintiff more

10 damages than are adequate to compensate for the

11 infringement nor shall you include any additional amount

12 for the purpose of punishing the Defendant or setting an

13 example.

14 　　　　　You may not include damages that are

15 speculative, damages that are only possible, or damages

16 that are based on guesswork.

17 　　　　　Now, nothing that I may have said or done

18 during the course of this trial is intended to indicate

19 any view of mine as to which party should or should not

20 win this case.

21 　　　　　As I instructed you previously, the jury

22 is the sole judge of the credibility of the testimony

23 and the weight to be given the evidence.

24 　　　　　These instructions are given to you as a

25 whole, and you are not to single out one instruction

alone as stating the law but must consider the

instructions as a whole.

You have heard all of the evidence in the

case, and you've heard the argument of counsel.  The

Court has given you the charge in this case.

In a few moments, you will retire to the

jury room, select one of your members to act as a

foreperson, and begin performing the function for which

you have been chosen and for which you have been

impaneled in accordance with the oath you took as

jurors.

You will remember that at the beginning

of the trial and throughout the trial, the Court

admonished you not to discuss with each other until it

was submitted to you.

Well, now is the time for you to begin

your discussion, and you certainly may express an

opinion from the evidence that you have heard and use

any reasonable means to persuade other members of the

jury to your convictions and to your honest opinion.

You are to reach a verdict which speaks

the truth and which does justice to all parties without

favor, bias, or prejudice in any particular way either

for or against any party to this lawsuit.

In the course of your deliberations, do

not hesitate to re-examine your own views and change

your opinion, if convinced it is erroneous.  But do not

surrender your honest conviction as to the weight or

effect of the evidence solely because of the opinions of

your fellow jurors or for the mere purpose of returning

a verdict.

The verdict must represent the considered

judgment of each juror.  In order to return a verdict,

it is necessary that each juror agree thereto.  Your

verdict must be unanimous.

As soon as you have reached a verdict,

you will let this fact be known to the officer who will

be waiting upon you, and he will be report to the Court.

Mr. Potts, are you going to be with the

jury?

COURT SECURITY OFFICER:  I will be, Your

Honor.

THE COURT:  Okay.  Your verdict will be

in the form of questions for you to answer.  You'll take

these questions to the jury room, and when you've

reached a unanimous agreement as to your verdict, you'll

have your foreperson fill in, date, and sign the form,

and then advise the court security officer that you've

reached a verdict.

During your deliberations, you may have

1  any of the exhibits which have been offered in evidence,

2  and the Court will send them to you upon written

3  request.

4          If you desire further instructions, your

5  foreperson may make this known in writing, and the Court

6  will try to comply with your wishes.

7          All communications with the Court must be

8  in writing, but at no time should you indicate to the

9  Court or to anyone else how the jury is divided in

10  answering any particular question.

11          Any notes that you have taken during this

12  trial are only aids to your memory.  If your memory

13  should differ from your notes, then you should rely on

14  your memory and not on the notes.  The notes are not

15  evidence.

16          A juror who has not taken notes should

17  rely on his or her independent recollection of the

18  evidence and should not be unduly influenced by the

19  notes of other jurors.  Notes are not entitled to any

20  greater weight than the recollection or impression of

21  each juror concerning the testimony.

22          Now, you are now in control of your

23  schedules.  I'll tell you mine.  I'm going to break for

24  lunch, and then I've got a proceeding to handle this

25  afternoon.  I will break that proceeding if I get a

1  communication from you—all related to this case.  So, in

2  other words, y'all have priority, okay?

3            Now, when I say you're in charge of your

4  own schedules, that means if you, you know, get to a

5  point this afternoon and want to take a break from

6  deliberations, you're in charge of when you can take

7  your breaks and how long they last, okay?

8            I'm just telling you, I'll not -- I'll be

9  at lunch probably from -- for the next hour or so, and

10 then my proceeding starts at 1:30.  So I'll be

11 available, you know, beginning in an hour, if you need

12 to communicate with me, okay?

13           With that, I will hand the questions to

14 the court security officer, and you will follow him into

15 the jury room, select one of your members as foreperson,

16 and begin your deliberations.

17           COURT SECURITY OFFICER:  All rise for the

18 jury.

19           (Jury out.)

20           THE COURT:  All right.  Any additional

21 objections to the charge as read from the Plaintiff?

22           MR. NELSON:  No, Your Honor.

23           THE COURT:  From the Defendant?

24           MR. VERHOEVEN:  No, Your Honor.

25           THE COURT:  Okay.

1          MR. DEFRANCO:  Well, one second.  I'm

2    sorry, Your Honor.

3               (Counsel confer.)

4          MR. VERHOEVEN:  No, Your Honor.

5          THE COURT:  Okay.

6          MR. NELSON:  May we just put on the

7    record what we agreed to, that it was an agreed charge

8    on --

9          THE COURT:  With respect to the

10   instruction on noninfringing alternatives, that charge

11   was agreed to -- or that jury instruction was agreed to

12   by the parties.  That was my understanding from the

13   Plaintiff's standpoint --

14         MR. NELSON:  Yes, Your Honor.

15         THE COURT:   -- and from the Defendant.

16         MR. DEFRANCO:  Your Honor, there was -- I

17   would just like to note, if it's asked to be reread,

18   there was a little confusion in the edit that was made.

19   I think the word mere was taken out.

20         I had -- in any case, I'd like to just

21   note that for the record, that if they ask it to be

22   reread, I think the sentence, as edited, doesn't make

23   precise sense.

24         THE COURT:  Well --

25         MR. DEFRANCO:  I just wanted to note that

1  in case it comes up again.

2          THE COURT:  Well, does the sentence, as

3  read, reflect the agreement that was reached in chambers

4  before I read it?

5          MR. DEFRANCO:  Yes, Your Honor.

6          THE COURT:  Okay.  All right.  All right.

7          Court's in recess pending communication

8  from the jury.

9          I need y'all to start clearing out some

10 of the boxes, but please don't have your technical folks

11 take down their equipment, because one thing that often

12 happens is I get requests from the jury to review

13 demonstratives or slides, and my practice is not to send

14 demonstratives back to the jury room, but if there is a

15 request to see slides, to bring the jury back into the

16 courtroom for purposes of -- of viewing demonstratives

17 in the courtroom.

18          So I don't want there to be a long time

19 the jury has to wait before coming in to view

20 demonstratives.  So that's all I ask.

21          I'll conduct my other proceeding

22 downstairs, but at some point, Judge Ward is going to

23 want his courtroom back, okay?

24          Thank y'all.

25          MR. VERHOEVEN:  Just for the record, Your

```
 1  Honor, in my experience, I've had courts not allow
 2  jurors to see demonstratives.  If there's a request, I'd
 3  just -- for the record, I want to preserve my right to
 4  see if I want -- I may file and ask for an objection.
 5              THE COURT:  I'll allow you to make
 6  whatever objections you want --
 7              MR. VERHOEVEN:  Thank you, Your Honor.
 8              THE COURT:  -- at the time the request is
 9  made, okay?
10              MR. VERHOEVEN:  Thank you, Your Honor.
11              THE COURT:  All right.  Court's in
12  recess.
13              (Recess.)
14              *     *     *     *     *
15
16
17
18
19
20
21
22
23
24
25
```

CERTIFICATION


        I HEREBY CERTIFY that the foregoing is a true and correct transcript from the stenographic notes of the proceedings in the above-entitled matter to the best of my ability.




/s/_____          _____
SUSAN SIMMONS, CSR                Date
Official Court Reporter
State of Texas No.:  267
Expiration Date:  12/31/10




/s/_____          _____
SHELLY HOLMES, CSR             Date
Deputy Official Court Reporter
State of Texas No.:  7804
Expiration Date  12/31/10