1    IN THE UNITED STATES DISTRICT COURT
         FOR THE EASTERN DISTRICT OF TEXAS
2               MARSHALL DIVISION

3   FUNCTION MEDIA, LLC          *    Civil Docket No.
                                 *    2:07-CV-279
4   VS.                          *    Marshall, Texas
                                 *
5                                *    January 20, 2010
    GOOGLE, INC.                 *    8:30 A.M.
6
                  TRANSCRIPT OF JURY TRIAL
7       BEFORE THE HONORABLE CHAD EVERINGHAM
            UNITED STATES MAGISTRATE JUDGE
8

9   APPEARANCES:

10  FOR THE PLAINTIFFS:    MR. MAX TRIBBLE
                           MR. JOSEPH GRINSTEIN
11                          Susman Godfrey
                           1000 Louisiana Street
12                         Suite 5100
                           Houston, TX   77002
13                         MR. JUSTIN NELSON
                           Susman Godfrey
14                         1201 Third Avenue
                           Suite 3800
15                         Seattle, WA   98101
                           MR. JEREMY BRANDON
16                         Susman Godfrey
                           901 Main Street
17                         Suite 5100
                           Dallas, TX   75202
18                         MR. ROBERT PARKER
                           Parker, Bunt & Ainsworth
19                         100 East Ferguson
                           Suite 1114
20                         Tyler, TX   75702

21  APPEARANCES CONTINUED ON NEXT PAGE:

22  COURT REPORTERS:       MS. SUSAN SIMMONS, CSR
                           MS. SHELLY HOLMES, CSR
23                         Official Court Reporters
                           100 East Houston, Suite 125
24                         Marshall, TX   75670
                           903/935-3868
25  (Proceedings recorded by mechanical stenography,
    transcript produced on CAT system.)

APPEARANCES CONTINUED:

FOR THE DEFENDANTS:     MR. CHARLES VERHOEVEN
                        MS. AMY CANDIDO
                        Quinn Emanuel
                        50 California Street
                        22nd Floor
                        San Francisco, CA   94111

                        MR. EDWARD DEFRANCO
                        Quinn Emanuel
                        51 Madison Avenue
                        22nd Floor
                        New York, NY   10010

                        MR. HARRY L. GILLAM
                        Gillam & Smith
                        303 South Washington Avenue
                        Marshall, TX   75670

P R O C E E D I N G S

COURT SECURITY OFFICER:  All rise.

(Jury in.)

THE COURT:  Thank you.  Please be seated.

Good morning, Ladies and Gentlemen.

When we broke yesterday evening, there had been an objection to a question that was posed to Dr. Rhyne.  And in your absence, we were able to sort through that, and the objection was withdrawn.  And so we'll pick up there.

MR. GRINSTEIN:  And, Your Honor, with the Court's indulgence, may I replay that video so I can ask my question?

1          THE COURT:  Of course, yes.

2          MR. GRINSTEIN:  May I have PX36, please?

3          (Video clip playing.)

4          UNIDENTIFIED WOMAN:  Colors play an

5    important part in keeping your ads looking professional

6    and a relevant part of your site.  As text ads show

7    approximately 70 to 80 percent of the time, it's

8    essential that they compliment your site.

9          There are several ways that you can do

10   this.  Simple things like blending in the background of

11   your ads, the color of your site, and removing borders

12   have proven in the past to have a significant impact

13   upon click-through rates.

14         Just be careful of not blending the ads

15   too much so that they look like your site's content.

16   You can also try to highlight the link and URL with

17   shapes that compliment your site's colors.

18         (End of video clip.)

19     VERNON THOMAS RHYNE, Ph.D., PLAINTIFF'S WITNESS,

20                PREVIOUSLY SWORN

21          DIRECT EXAMINATION (CONTINUED)

22   BY MR. GRINSTEIN:

23     Q.   Dr. Rhyne, yesterday we were talking about the

24   distribution rules in the -- I'm sorry -- the

25   presentation rules in the Google system, and in

particular, we talked about things like color.

First of all, what is that video?

A. It's a video that Google has put in a certain location on the internet as part of their support documentation for -- for publishers who they would like to have use AdSense and the Google -- Ads by Google system.

Q. And how does that video impact your views of how important those features are to the Google system?

A. It's a representative of Google telling the publishers that you really need to work to choose your colors. You make them the way you want them, and as a result, she referred to click-through rate. And that's how often somebody who sees your site, like cheese.com, sees an ad over on the right-hand side that sells some other product, a cheese slicer.

And if they go click on it, then the cheese slicer company will pay some money into the Google advertising system, and you, as cheese.com, will make a piece of that money. So that's something they want to attract people's interest.

And that young lady is saying the choice is in color and can have a great deal to do with that.

Q. Did I hear her say the word essential?

A. She said -- she may have. Frankly, I didn't

hear that part. I was struck with the accent, but she

certainly said that colors were important to the

publishers.

Q. I'd like to show you another video.

A. Okay.

Q. This is Plaintiff's Exhibit 30. And, again,

I'm going to ask you similar sort of questions after

we've had a chance to sort of look at it.

A. All right.

(Video clip played.)

Q. (By Mr. Grinstein) Dr. Rhyne, again, is that a

video from Google?

A. Yes. It's produced by Google.

Q. And how does that video inform your -- your

views of how important these particular design features

are to the Google system?

A. It -- it obviously, with its little silent

movie style, makes the point that if you, as a

publisher, select color combinations that aren't

attractive and appealing, you're going to be less

successful than if you select complimentary color

combinations that make the ads fit into your website.

And as a result, you'll get more success in having

people be attracted to the ad.

Q. Okay. Let's continue our discussion about the

1  presentation rules in the Google system.  And I think

2  we -- you mentioned earlier that there are two types of

3  presentation rules mentioned by the patents.

4         And which of the rules have we already

5  discussed?

6     A.   We discussed what are called design or style

7  standards that affect -- also called the look and feel

8  of the websites for the publishers.

9     Q.   Now, what are the other type of rules?

10    A.   They're called distribution factors as your

11 slide shows.

12    Q.   And can you give examples of one or two

13 distribution factors that are present in the Google

14 system?

15    A.   Two come to mind.  One of them is what are

16 called blocked URLs.  I briefly discussed that the other

17 day.  That's the ability to stop someone else's

18 advertisement, who's a competitor of yours, from coming

19 to your website.

20        And the other one is just whether or not you

21 will accept text, say, or image ads.  That becomes a

22 distribution factor, because when you set it for text

23 ads, you'll never receive -- or an image ad will never

24 be distributed to you at all.  You'll never even know

25 it's there.

1   Q.   Let's take a look at Plaintiff's Exhibit 69.

2   A.   Okay.

3   Q.   And I want to direct your attention to the

4   bottom -- well, first of all, what is Plaintiff's

5   Exhibit 69?

6   A.   We actually looked at Step 3 of this

7   earlier -- or later yesterday.  This is what's called

8   the quick-start guide, and it gives you a sequence of

9   steps.

10          THE WITNESS:  There it is, Matt, right

11  there.

12  A.   It tells you, if you're a publisher, how to

13  get started in using AdSense as a publisher.

14  Q.   (By Mr. Grinstein) And what does Step No. 2

15  talk about?

16  A.   Step No. 2 says select the ad type.

17  Q.   Now, what kind of ad types is it talking

18  about?

19  A.   I'm aware of three.  Well, I'm aware -- well,

20  there are a lot of ad types, but at this point, they're

21  talking about text ads versus image ads.

22          And you also can open the door to both text

23  and image ads, either one.

24  Q.   And why do you consider this a distribution

25  rule instead of a look-or-feel rule?

     A.   Well, at any time, there are literally

thousands, if not millions, if not more than that ads

available in the Google system that advertisers have

submitted using this AdWords system, that are sitting

there waiting to get an opportunity to go to one of

their selected websites.

          If you, as a publisher, say I don't ever want

to see an image ad, then all the image ads are off the

plate.  They'll never get through to you.  They won't

ever be there to be customized with your design or style

standards, because you just said I don't want to see

those.  It's as if those ads were never created and made

available in the system.

     Q.   Well, the other distribution factor I think

you just mentioned was blocked URLs?

     A.   Yes.

     Q.   Can you explain what that is?

     A.   I think I touched on it a while back.  I used

the Aggie/UT example.  Another one that I've actually

seen, I think, in some of the literature was Coke and

Pepsi.

          If I've got the Coke website with the red

banner and all that, the way Coke looks, they don't want

a Pepsi-Cola ad coming in on that site.  It can be for

competitors or any other reason.

1          If you are a publisher and there's just some

2   place you don't want an ad coming in, you can squelch

3   it.  You can say just keep it away by entering this

4   universal resource locator.  It would be as if you

5   entered CNN.com.  If you were Fox Network on their

6   advertising page, they would -- on their website page,

7   they wouldn't want maybe CNN.com coming in and

8   advertising one of their news programs.

9       Q.   So, specifically, how would Coke, as a

10  publisher, say I don't want Pepsi ads?

11      A.   There's a prompt, a text box, that's created

12  in AdSense where they can type in -- they can do it with

13  different degrees of specificness (sic), but if they --

14  they could basically type in Pepsi.com, and then any ad

15  that had as its return address Pepsi.com would be

16  blocked from ever even getting through to be made to

17  look and feel like the Coke website.

18      Q.   Let's take a look at Plaintiff's Exhibit 65.

19      A.   Okay.

20      Q.   And, again, what is this document?

21      A.   Just a moment.

22      Q.   Sorry.

23      A.   This is a description in the AdSense Help.

24  You can see it just below the Google logo.  This is

25  another thing that's on the internet, this document that

1  we pulled out and printed.

2          And it's entitled The Competitive Ad Filter.

3  And in the first sentence of the first paragraph, it

4  says:  Google AdSense provides the functionality to

5  block specific ads from appearing on your pages.

6  It continues a little later:  There may be situations in

7  which you don't want to display particular

8  advertisements.  For example, you may wish to block ads

9  leading to competitor's sites.

10         And then they tell you how to do it a little

11 further down where the bullets are.

12     Q.   So is this the blocked URL feature?

13     A.   Absolutely.  They refer to it as the

14 competitive ad filter.

15     Q.   Okay.  I think we're finished with our

16 discussion of presentation rules, Dr. Rhyne.

17         I want to go back to an earlier demonstrative

18 where you talked about the way somebody would get into

19 AdSense --

20     A.   Okay.

21     Q.   -- if they wanted to use the interface.

22 And in this demonstrative, have we talked about the

23 first way?

24     A.   This was the online AdSense interface, yes.

25     Q.   Let's talk about this thing called API.

1    A.   All right.

2    Q.   What is that?

3    A.   That -- that's an acronym for Application

4  Program Interface.  And obviously, the I stands for

5  interface.  It's a software interface that a programmer

6  uses to obtain services from the AdSense software that

7  Google has provided for publishers.

8    Q.   Now, we're in the claim element that talks

9  about seller interface.

10        Have you seen documents from Google that

11  confirm the notion that the API is an interface?

12    A.   I've seen at least one where they defined that

13  term, and they used the term interface in defining it.

14    Q.   Let's look at Plaintiff's Exhibit 1214.

15  Tell us what we're looking at here when you get a

16  chance.

17    A.   Okay.  At the beginning of this -- this is a

18  glossary of terms of relevance to AdSense.  It's part of

19  the AdSense Help documentation that Google provides.

20  And it just has a list of terms, and these are the

21  definitions that Google has provided.  And if you go to

22  the page -- they're in alphabetical order.  I don't know

23  how to tell you which page, but it's the page that talks

24  about the API.

25    Q.   I think if you flip through, it's about

Page 19 or so.

A.   Okay.  And here it says:  The term API means an Application Programming Interface, or API, is an interface that a computer application -- now, that's a term for software -- that a program or system can use to access a set of third-party functions or programs. So they refer to it -- its name has interface, but they refer to it as an interface that a computer application can use to access a set of functions or other programs.

Q.   So if an API is one computer program -- one computer program talking to another computer program, how is -- how is it prompting?

A.   Well, it's -- you actually mischaracterized it a little bit.  The API is not a computer program.  It's a set of what are called calls or -- or subroutine names that -- that Google publishes and says:  Here, if you want to write your program to reach into the AdSense system and maybe find out what you have said your design or style standards were, or if you want to add another blocked URL, you have to write your program using these instructions.

And the person or, I guess, the entity that's being prompted is your program, okay?  Your program makes one of those calls.  And if you do it right, you'll either put some information into AdSense, or

1  you'll get some information out.

2        If you do it wrong, you'll get an error

3  message back that says you didn't do this right.  You

4  didn't call this instruction properly.

5        And I remember that one of the witnesses for

6  Google, Mr. Miller, whom we saw, was asked at one point

7  to define prompt, and he said it's an instruction or a

8  requirement that you have to respond to.

9        And an API, basically, is a set of

10  instructions that you have to write against.  And when

11  you do it properly, then it will allow you to proceed

12  with your program.  If not, it will stop you and say

13  something's gone wrong, and you'll have to respond to

14  that.

15        MR. GRINSTEIN:  Matt, if we can go to the

16  chart of the '025, Claim 1.

17     Q.   (By Mr. Grinstein) So, Dr. Rhyne, we've been

18  talking about this first element of the first interface.

19        So what is your opinion as to whether or not

20  the Google advertising system we've been talking about

21  does all the things that are being mentioned in that

22  first element?

23     A.   It's my opinion, based on the study that I've

24  done, that the AdSense for Content both in the online

25  version and the API version meets that limitation.

1    Q.   Okay.  The next limitation we've got to talk

2  about is this first database.

3         Do you see that?

4    A.   Yes, I do.

5    Q.   And what is your opinion as to whether or not

6  AdSense for Content uses a first database?

7    A.   It does.

8    Q.   Has Google kind of made this database in

9  different ways over time?

10   A.   They changed it in November of 2007, at least

11 that's my understanding from reading the discussions --

12 the depositions that were provided.

13             MR. GRINSTEIN:  Matt, can we --

14   Q.   (By Mr. Grinstein) Dr. Rhyne, I put up a

15 timeline as a chart here.

16         Can you just describe what's going on in this

17 timeline?

18   A.   Well, this chart starts back to July of 2007

19 when I believe infringement began, when the patents were

20 issued.

21         And you can see there's a little tick mark

22 about November.  You can probably point it out better

23 than I can from here, but it's -- let me try to use this

24 screen.  It's about right in here (indicates), okay?

25 That is representative of a change that Google made in

November of 2007. And the headline in dark says prior
to that they used a distributed database for some of
those presentation rules. And after that, they used a
centralized database for all of those presentation
rules.

Q. I'm worried that maybe this chart is a little
bit misleading. When it says distributed database for
some presentation rules, was there a database for the
other rules.

A. Yes. Yes.

Q. So is this chart just making the distinction
between when they used distributed database and when
they didn't?

A. That's right. And before November of 2007,
they used a distributed database technology.

Afterwards, they put all of the presentation
rules of their publishers in a centralized database
operated at Google.

Q. Now, Dr. Rhyne, in analyzing this part of the
claim, did you look to any definitions for database?

A. I did. In fact, this is the one in particular
where I turned to the glossary of the patent, since
neither -- there was not an agreement on the term's
definition by the parties nor was there an agreement --
was there a definition provided by the Court.

1          And this is the definition.  And the -- the

2    active words to me are the very broad language at the

3    end of this where it says:  The term database is used

4    referring not only to some things but also.  And then at

5    the end, it says:  Any method or system of organizing

6    data.

7               THE WITNESS:  Matt, if you could yellow

8    that in at the last three lines.

9         A.   Any method or system for organizing data for

10   storage and access by computers.

11        Q.   (By Mr. Grinstein) Okay.

12        A.   That's fine.

13        Q.   What is -- we mentioned this fancy term

14   distributed database.  What is that?

15        A.   A distributed database is a method or system

16   of organizing data for storage and access by computers

17   where you distribute the data over multiple computer

18   sites.

19             You don't put it all in Marshall.  You put

20   some of it in Marshall and some of it in Austin and some

21   of it in Houston.  But those sites are connected through

22   a communications math so that you can gain access to

23   them.

24             It's a very common thing.  If you can think

25   about the Social Security Administration or the Texas

1 Highway Department, the law enforcement agencies,

2 there's so much information that they don't put it in a

3 single location, but they spread it out.  But then they

4 make sure that there are communications pathways so that

5 that data can be accessed.

6          It's well-known in the computer science art to

7 use distributed databases.

8      Q.   Dr. Rhyne, I'd like to show you Plaintiff's

9 Exhibit 1074.

10      A.   All right.

11      Q.   And --

12      A.   Give me just a second.

13      Q.   Okay.

14      A.   I have that.

15      Q.   First of all, what is Plaintiff's

16 Exhibit 1074?

17      A.   It's another Google document entitled

18 Publisher Controls and AdSense.  It's a draft version of

19 this document as it was written in January of 2006.

20      Q.   Can you flip to the next page?

21      A.   Okay.

22      Q.   And up at the top of that page, you see

23 some -- some fancy language.  What is that?

24      A.   This is what I called the snippet the other

25 day.  In order to allow publishers to get ads to put on

their websites, Google develops, at the end of the

AdSense process, this little -- back -- this is what

they did prior to November of 2007 -- this little piece

of code.

This is computer code that the computers at

Google and at the websites and at the browsers that the

person who's looking at cheese.com understands.  It

tells them how -- how to handle it.  And you can see in

this document that there are colors.

For example, these were things that were

specified by the publisher.  They're specifying the

color of the border, the link which would be a link back

to a website, the background, the text, and the URL.

And this little piece of software was sent out to the

publisher's website, to the people at cheese.com, and

they put it into their software and stored it on their

computer's storage unit rather than having all of that

information be back at Google.  So that's the

distributed part of it.

Every publisher prior to 2007, of November,

had this little bit of code at their -- at their

computer rather than having all of that information back

at Google.

MR. GRINSTEIN:  Can we keep that up

actually, Matt?

1    Q.   (By Mr. Grinstein) Let me just ask quickly, so

2   in your opinion, does the distributed database approach

3   meet the definition of database that you used?

4    A.   That definition is so broad.  It says any

5   method or system of providing a way that computers can

6   get to that data and putting it out there.

7         That -- that remote computer operated by

8   cheese.com has the data, and it is accessible when

9   somebody looks at cheese.com.

10    Q.   Now, looking up at that data that we've got up

11   here, this code snippet, I don't see anything that talks

12   about blocked URLs.

13         Am I missing something?

14    A.   Well, you're correct in your assessment, but

15   that's because Google, even prior to November of 2007,

16   kept the publisher's selections of blocked URLs back at

17   the central data site.

18         They also kept a second thing.  Even though it

19   shows up here, they also kept the ad type as well at the

20   central site.

21    Q.   Did you review any deposition testimony in

22   forming your opinion about where Google stored these

23   blocked URLs?

24    A.   I did.

25    Q.   Let me show you a clip from Mr. Miller's

1    deposition.

2              MR. VERHOEVEN:  Objection, foundation.

3              THE COURT:  Overruled.

4        Q.   (By Mr. Grinstein) Let me show you a clip from

5    Mr. Miller's deposition.  This is Miller Page 337/24 to

6    338/4.

7              (Video clip played.)

8              QUESTION:  Now, did you tell me last time

9    that a publisher's preferences or parameters regarding

10   filtering, ad filtering, are or are not in the

11   cut-and-pasted code?

12             ANSWER:  They are not.  They're only

13   stored in the ads database.

14             (End of video clip.)

15       Q.   (By Mr. Grinstein) So what does that tell you

16   about where those blocked URLs were stored?

17       A.   Well, he used a little bit different language,

18   but the filtering is that competitive ad filter that we

19   saw earlier, the term that Google uses for the ability

20   to block URLs from your competitors.

21             And then he talked about the cut-and-pasted

22   code.  That's that snippet of code that we actually had

23   on the screen just a minute ago.  And he -- he

24   basically, after making those references, says here that

25   the blocked URLs, the filters for competitors, are only

stored in what's called the ads database.  It's the

database where Google keeps the ads.

     Q.    I think you mentioned earlier that there was a

second kind of distribution rule that Google stored at

the central database.

          What was that?

     A.    Choice of text versus image as well as blocked

URLs.

     Q.    Let's take a look at Plaintiff's Exhibit 1074

again.

     A.    All right.

     Q.    This time I want to look at Page 3.

     A.    Okay.

     Q.    And can you tell us in that second paragraph

what that tells you about where ad choice, that rule was

stored?

     A.    I can.  Just for the written record, Mr.

Grinstein, this is on Page G25555.  And you can see I've

highlighted a couple of things.

          It says here:  Settings that are currently

stored in the database.  And this is around 2006 when

they were planning what to do after that.

          The third bullet says:  Ad formats.  The set

of ad formats; for example, text, image, that the

publisher supports.

1          THE WITNESS:  And, Matt, if you can look

2  at the very last bullet.

3      A.   It says block lists, a list of advertiser

4  sites that publishers don't want ads from.  That's the

5  blocked URLs.

6      Q.   (By Mr. Grinstein) So prior to November of

7  2007, was every rule stored in some database?

8      A.   Yes.

9      Q.   Some of them were stored at distributed

10  database and some at a central?

11      A.   Some of them were stored at the publisher's

12  locations within collectively a distributed database.

13  And at least two of them were stored by Google at the

14  central database.

15      Q.   Let's talk about the system after November

16  2007.  And Matt's going to put up a -- some code that

17  was put in your report.

18          And I'd like you to explain what this code is

19  that we're looking at.

20      A.   Okay.  First, let me just comment on the

21  redacted.  That's -- that's code that Google had

22  provided at one point from an actual publisher.  And

23  there's a lengthy number there, and I put it in my

24  report, which is marked confidential.

25          But for here, I just took out -- because

that's a real publisher's number.  I didn't want to

expose that, kind of like putting your own phone number

up.

         This is what you might call the new --

although it's been in place since November of a couple

years ago, 2007, this is the new, shortened snippet.

And what Google was basically doing here is they said,

if we keep your publisher rules here at our location,

then if you change your rules using AdSense, they'll be

updated here, and you won't have to go get another

little snippet from us and go back out and change your

code.  You can just change them back at our site, and

you'll have the new colors and the new fonts and all.

So they took them out of sending them outward.  They

kept them in a centralized database at Google.

             MR. GRINSTEIN:  Matt, can we look at the

claim chart again?

    Q.   (By Mr. Grinstein) So putting this all

together, Dr. Rhyne, what's your opinion about whether

or not Google has this first database?

    A.   Although they changed from a distributed to a

centralized technology in November of 2007, it's my

opinion that the distributed database met that

limitation.  And after November of 2007, the centralized

database also met that limitation.

1      Q.   All right.  Let's go to this next one:  A

2  second interface to the computer system.

3           And, Dr. Rhyne, did you, in analyzing that

4  part of the claim, rely on any definitions?

5      A.   Yes, I did, the ones that I think in this case

6  provided by the Court and maybe one that was agreed on.

7      Q.   First of all, Dr. Rhyne, the first definition,

8  did you rely on this definition of create an electronic

9  advertisement?

10     A.   I did.  That came from the Court.

11     Q.   Okay.  The next one, the second interface, did

12  you rely on that?

13     A.   Yes.  Again, it's a software interface.  It's

14  essentially the same definition that we used for the

15  first interface.

16     Q.   Now, what is the name of the seller interface

17  in the Google system?

18     A.   It's called AdWords.

19     Q.   And is AdWords a product that you are

20  including in your analysis of infringement in this case?

21     A.   Yes.

22     Q.   Now, I think I heard in opening argument a

23  reference was made that AdWords has been around since

24  2000.

25           Is that sort of the same AdWords that we're

talking about today?

    A.    I believe that's correct.

    Q.    Okay.  And is the AdWords that was around in 2000, an AdWords that interacted with the AdSense system?

    A.    I don't think -- frankly, I've not gone back much before 2007, in June, to say.  I can't answer that.

    Q.    Okay.  Let's look at a demonstrative for AdWords access.

         And can you explain what we're looking at here?

    A.    It turns out for AdWords, which the advertisers, the sellers, use, there are four ways that they can gain the services of AdWords, and I'm showing them here.

         The first three I've already discussed for AdSense.  There's an online AdWords interface that you can get to through the internet.  There's an applications programming interface for AdWords just like there was one for AdSense.

         There's this direct system where a seller who has enough activity they can call up Google and somebody will answer the phone, and they'll do -- do the ad words.  They'll enter your ad content for you.

         And then there's something we haven't talked

1  about before, which is a special application that Google

2  makes available to sellers called the AdWords Editor.

3      Q.   And let me just try to clarify our

4  understanding of what AdWords is.

5           Is AdWords used only for providing

6  advertisements to these third party other sites on the

7  internet, or does Google use AdWords to get

8  advertisements to some other location?

9      A.   I'll be honest with you.  I didn't understand

10 that question.

11     Q.   Let me try it again.

12          What is the interface that advertisers use to

13 get ads on the google.com search page?

14     A.   Oh, they can -- I think they use AdWords in

15 the same way.  They basically are just submitting an ad.

16 And sometimes that ad might appear on a Google web page

17 along with a search result.  And sometimes those ads --

18 if the publishers have agreed to allow them to come

19 over, it would appear on third-party websites.

20     Q.   So if AdWords were in existence before

21 AdSense, what would AdWords have been used for?

22     A.   Oh, now I understand your question from

23 before.

24          Basically, it's just a way for sellers to

25 enter ads.  And at that earlier time, it would have been

used and available for what Google calls AdSense for

Search.  It would have been another way of putting up

ads on a Google website.

Q.  And we're not analyzing that for infringement

in this case?

A.  Remember, the claim started with internet

media venues owned by other than the company that

operates the computer system.  In this case, Google.

Q.  Okay.  Which of these four methods of getting

into AdWords do you say -- is it your opinion infringe

in this case?

A.  The first, second, and fourth.  I'm excluding

the direct contact, because there -- it's really a

Google person who does the use of AdWords, not the

seller.

Q.  And how does an advertiser get in that first

zone, AdWords, online?  How would they access that?

A.  They get a computer and a browser, and they

point their browser at their number -- names, again, but

one of them is AdWords.google.com.

Q.  And did you rely upon any deposition testimony

in coming to any conclusions about whether or not

AdWords is an interface?

A.  Yes, I did.

Q.  Let's take a look at a clip from Mr. Holden.

1              MR. VERHOEVEN:  Excuse me.  Objection.  I

2  believe the witness can identify what he relied on

3  instead of Counsel just showing excerpts.

4              THE COURT:  Overruled.

5      Q.   (By Mr. Grinstein) I'm going to play a brief

6  clip for you from Mr. Holden, which was mentioned in

7  your export, Page 23, Line 20 to 23, Line 21.

8      A.   Okay.

9              (Video clip played.)

10              QUESTION:  And AdWords has a user

11  interface?

12              ANSWER:  Yes.

13              (End of video clip.)

14      Q.   (By Mr. Grinstein) What does that tell you

15  about whether or not AdWords has a user interface?

16      A.   That Mr. Holden and I are in agreement that

17  AdWords has a user interface.

18      Q.   Did you perform any experiments with the

19  AdWords interface?

20      A.   Yes, I did.

21      Q.   All right.  We're going to go back to your

22  video clip of your personal experiments with the Google

23  system, and I'm going to ask you some questions.

24              So what are we seeing right here?

25      A.   We're entering the e-mail address for a

different entity.  I previously was acting as a

publisher.  Now I'm acting as a seller.  I'm going to

try to sell some services.

This is my password, so I've identified myself

as an authorized advertiser.  And there's some tabs

here.

Q.   So what are those tabs up top?

A.   They give me -- excuse me -- they -- they give

the seller an opportunity to do a variety of things.

Right now, the little yellow dot is on billing, but the

one I'm going to go to is what's called campaigns.  This

is how you start to define an ad campaign.

Q.   And what are you doing right now?

A.   It went by real fast, but I went to a new

campaign, and I'm going to do a campaign ad, and

I'm going -- excuse me -- I'm going to name the campaign

Expert No. 1 Campaign, or Camp.  It shortened it.

And I'm going through some choices that say

I'm going to do this ad campaign.  And now, finally, I'm

down to the point where it says enter -- well, I'm at

the point where I can start entering both the ad and

some of the restrictions that I'd like to place on the

delivery of the ad.

Q.   So let's go back to the claim language of the

claim.  It says a second interface through which a

1  seller is prompted.

2         In that previous video we just watched, were

3  you prompted?

4      A.   Yes.  I was given text boxes and what are

5  called little radio buttons, those little buttons that

6  you can click on and little dot appears in the middle of

7  them, and it shows a selection that you've made to allow

8  you to go on to the continue button.

9      Q.   Did you rely on any deposition testimony in

10 coming to your opinion that the AdWords interface

11 prompts?

12     A.   Yes.

13     Q.   Let's take a look at the deposition of

14 Ms. Angela Lai, Page 59, Lines 18 to 21.

15               (Video clip playing.)

16               QUESTION:  Advertisers are prompted to

17 input various types of information through the user

18 interface, correct?

19               ANSWER:  Yes.

20               (End of video clip.)

21     Q.   (By Mr. Grinstein) Do you think there's any

22 dispute about whether that user interface prompts?

23     A.   I don't believe there is.

24     Q.   All right.

25               MR. GRINSTEIN:  Back to the demonstrative

1   about the claim language, if you don't mind, Matt.

2                 Thank you.

3       Q.    (By Mr. Grinstein) Now, the seller interface

4   here is talking about prompting sellers to do something.

5   And what is that?

6       A.    Well, there actually are two things here.

7   They are prompted to input information to select one or

8   more internet media venues, one or more websites.  And

9   they're also prompted to input information to create an

10  electronic advertisement for publication to the selected

11  internet media venues.

12      Q.    Does it say that they're prompted to select an

13  internet media venue?

14      A.    No.  They're prompted to input information

15  that will be used to select.

16      Q.    Okay.  So what are the methods in the Google

17  system by which a person or an entity could -- could

18  enter information to select?  What kind -- what kind of

19  information to select is there?

20      A.    Well, there -- for example, keywords, okay?

21  Someone can say -- I mentioned earlier I'm trying to

22  sell my caps; they're baseball-style caps, so I'd like

23  to have them show up on a website that is interested or

24  associated with baseball.  Hopefully then, somebody who

25  went to that website would see my ad over on the side or

at the bottom and would then click and really genuinely

be interested in going to my website and maybe buy some

of my caps.

    Q.   What about another way you could enter --

    A.   The other thing you can do is you can actually

name specific websites where you would like to have your

ad go.  You can say I'd like to have it go to

TexasRangers.com, okay?  And that would be good, because

I think maybe they would like to buy one of my caps

or -- or we talked about football and cheese, okay?

    Q.   Let's take a look at another clip from your

experiments.

    A.   Okay.

    Q.   And I want to focus here about information to

select and entering it into the system.

    A.   Okay.

    Q.   So where -- where are we right now?

    A.   I've got two choices:  Keywords and networks.

I'm going to add a positive keyword.  You can also add

negative keywords.  I'll say a word about that when we

get through here.

         But we were going -- basically, made an ad for

expert services, and so my keyword was analysis.  If you

wanted somebody to do analysis for you, I'm looking for

websites that have analysis.

1       Q.   Okay.  And what are you doing right now?

2       A.   Now I'm doing a placement.  I'm going to type

3   in -- now, this is the URL, the name of my other site.

4   It's the one that we were allowed to create as an actual

5   publisher.

6            So I'm saying I'm going to make my ad and --

7   and I'd like to have it go to my publisher website.  I

8   sort of was doing both ends of this at the same time

9   here.

10      Q.   Okay.  So you entered a keyword of analysis.

11  And what would that cause the Google system to do?

12      A.   It would cause it to select for me websites

13  which had as part of their keywords, analysis.

14      Q.   And what about this one that you just entered,

15  the specific, long web address?  What would that do?

16      A.   It would look -- I have selected that specific

17  website as a place I would like to have my advertisement

18  go.

19      Q.   Okay.  And let's see the rest of the video.

20  What's going to happen now?

21      A.   I think I went to continue.  And so I -- I

22  just saved it out, and now you can see that it's -- it's

23  kept up with the fact that I wanted to go to

24  experts.com.  That's a managed placement it calls it.

25      Q.   Okay.  Now, let's say that you're an

1 advertiser, Dr. Rhyne, and you want to run an ad for

2 baseball caps. And you either select, in the Google

3 system, ESPN.com, or, you know, enter a keyword that

4 says baseball. You enter some sort of information to

5 select.

6 By entering that information, are you

7 guaranteed that your ad is going to show up on one of

8 those sites?

9 A. No.

10 Q. What could happen that could prevent your ad

11 from going to ESPN.com or going to a baseball site?

12 A. Well, in simple terms, that site could have

13 blocked my ad. They could have said we don't want any

14 ads to come from that guy. I don't ever want to see an

15 ad from them, even though that guy has said I really

16 want to go to your website, you can, as I said earlier,

17 squelch that. You can say don't show it.

18 Q. Is there another way that the Google system,

19 even though you selected ESPN.com, your ad doesn't get

20 there?

21 A. Well, they go through a complicated process

22 based on bidding. Somebody else may have offered to pay

23 more money, and as a result, their ad might make it

24 through the competition and get there better than

25 yourself, okay?

1    Q.   So, Dr. Rhyne, if the information to select

2 that you're entering into the Google system doesn't

3 always result in a selection, is it still information to

4 select?

5    A.   Sure.  I mean, you're saying -- out of all

6 the, what, billions maybe -- I heard something -- large

7 number of websites that are available, you're saying

8 here's the subset that I want to select where I would

9 like to have my ad go.

10        And you can either do that with keywords, or

11 even more specifically, you can name the websites where

12 you would like to have your ad show up.  But it's

13 information to select.  It doesn't guarantee that that

14 information actually selects any specific website.  It

15 just narrows the choices.

16    Q.   The other type of information that you

17 mentioned was input in this particular claim, was

18 information to create.

19        Do you recall that?

20    A.   Yes.

21    Q.   And did you do an experiment that showed your

22 entry of information to create into the Google system?

23    A.   Yes.  Acting as a seller, we created a little

24 ad with a headline and a couple of lines of text.

25    Q.   Let's take a look at the ad that you created

in the Google system.

What are we seeing right here?

A.   I'm creating an ad, a new ad.  We're going to make it be a text ad.  It could have been an image ad, but it's going to be a text ad.

Q.   So what are you doing right here?

A.   Here's a headline.  The headline we put was Intellectual Property Consulting.  We went to the second line and said looking for an expert, question mark.

The third line, I put in experience is our middle name.  You can see my limited advertising experience.

Q.   Kind of a corny advertisement?

A.   Yes, sir.

And then we put in our return address, and it's MAI-consulting.com.

Q.   And --

A.   And on the right-hand side, you can see they sort of showed me a picture --

Q.   Over here (indicates)?

A.   I guess I'm still in the real stuff.  They give me a little picture of what the ad kind of looked like.

Q.   Okay.

A.   And now I've submitted it, and it -- here you

1  can see -- let me just sort of circle that.  That's --

2  right there, it shows the ad as sort of a representative

3  ad where it -- I'll try to get that off of there, if I

4  can.

5       Q.   That's the ad content that you entered?

6       A.   Yes, it is.  All right.

7       Q.   Okay.

8       A.   I may be stuck with that for the rest of my

9  life.  Okay.

10      Q.   All right.  If we take that down.

11      A.   Yeah.

12      Q.   Now, Dr. Rhyne, in your analysis in this case,

13 did you review any deposition testimony that told you

14 whether or not you enter information to create into the

15 Google system?

16      A.   I certainly did.

17      Q.   Let's take a look at the deposition of

18 Google's corporate representative, Mr. Holden.  This is

19 Page 72, Lines 12 to 19.

20      A.   Yes.

21                (Video clip playing.)

22                QUESTION:  Mr. Holden, I'd like to

23 discuss first generally and then in a little bit more

24 detail some of the information that advertisers input

25 through the -- through the interface.

1           Advertisers can input information that is

2  used to create an advertisement, correct?

3           ANSWER:  Correct.

4           (End of video clip.)

5      Q.   (By Mr. Grinstein) Do you think that in the

6  Google system you can input information to create an

7  advertisement?

8      A.   Mr. Holden and I are in agreement that you

9  can.

10      Q.   Now, do you remember in opening arguments what

11  was said by Google's side about whether or not you can

12  enter information to create an advertisement?

13      A.   I heard the opening arguments.  I believe I

14  did.

15      Q.   Okay.  Let's talk about that issue.

16           At the seller interface, is the seller

17  creating a final ad?

18      A.   No, no.  They're -- they're creating what, in

19  my expert report, called the initially customized ad,

20  which is customized to them.  They put in -- in a text

21  ad such as this, they put in text like Tom's caps.  That

22  identifies me.

23           But they don't know how to create a final ad,

24  because they don't know which particular specific

25  publisher they may go to and what the publication rules

1 that publisher has in mind would be.

2  Q. Does the claim say input -- does the claim say

3 input information to create, or does the claim say that

4 the seller creates the ad?

5  A. It absolutely does not say that the seller

6 creates the ad. It says that they input information to

7 create that customized electronic advertisement.

8  Q. And, again, when the seller inputs this

9 information, how is that advertisement -- how is that

10 customized?

11  A. It's customized as, for example, the text

12 stream that they enter in identifies them as the seller.

13 It has their return address in it, but it doesn't have

14 presentation rules, for example, of color or size or any

15 of the other information that will be applied to that

16 initially seller customized information further down the

17 process.

18  Q. So is there another step of customization that

19 occurs?

20  A. Absolutely.

21    MR. VERHOEVEN: Objection, Your Honor.

22 Objection. May I have a side-bar?

23    THE COURT: Yes.

24    (Bench conference.)

25    MR. VERHOEVEN: Your Honor, in your

claims construction ruling, there is no construction of customization as having two different types of customization; one customized to the seller and one customized to the presentation rules.

This witness, I believe, intends to testify that there's two types of customization; customization to the seller --

MR. GRINSTEIN: First of all, can we keep this down, because arguing right in front of the jury.

If you want a side-bar, we should have a side-bar.

THE COURT: Hold on a second now.

Go ahead.

MR. VERHOEVEN: So I believe this witness intends to testify that there are two types of customization, Your Honor; customization to the seller, which he just testified to, and then later, customization in accordance with presentation rules.

I believe that contradicts Your Honor's claims construction ruling. Your Honor construed the second element very precisely, and the parties agreed to the construction, that creating an electronic advertisement -- and I have it here, but I'll paraphrase -- is -- is creating an ad that's customized to the presentation rules. It's in the second element.

1           And this witness is now going to deviate

2   from that, Your Honor, and talk about his own

3   construction, which is --

4           THE COURT:  I understand the issue.

5   What's the response?

6           MR. GRINSTEIN:  Well, two responses.

7   First, if anyone is deviating from the Markman order,

8   it's Google, because Your Honor held in the Markman

9   order that the customization and creation doesn't occur

10  at the seller interface.

11          Google then filed a summary judgment

12  order trying to win on this point, and Your Honor denied

13  it.  If they want to cross-examine Mr. -- Dr. Rhyne on

14  the Court's definitions of the structure of the claim,

15  they're freely open to do that.  This was in his report.

16          THE COURT:  Well, I'm going to overrule

17  the objection at this time.  I'm going to take a look at

18  the claim construction order.  If I've got issues -- in

19  the instructions to the jury regarding his testimony

20  because he has violated my claim construction order, but

21  I'll do that with the benefit of after I've reviewed it.

22  But I'll overrule it at this time, but -- you know, I

23  understand what the issue is.  I'm going to hear his

24  testimony.

25          Step back.

1              (Bench conference concluded.)

2      Q.   (By Mr. Grinstein) So, Dr. Rhyne, let me ask

3  the question again.

4           Is the information that is input by the seller

5  at this stage customized in any way?

6      A.   Yes.  It's customized by the seller to

7  identify themselves and how someone who's interested in

8  their product would get in touch with them, for example,

9  on the internet.

10     Q.   Have you seen any deposition testimony that

11  confirms for you that Google performs this multiple

12  customization kind of thing?

13     A.   Yes.  Exactly.

14     Q.   Let me show you the deposition of another

15  Google corporate representative, Paul --

16     A.   It's Mr. Feng.

17     Q.   Paul Feng; that's right.  Page 109, Lines 8

18  through 14.

19              (Video clip playing.)

20              QUESTION:  The content is entered by the

21  advertiser, right?

22              ANSWER:  That's right, yes.  The content

23  of the ad, which I think of it as the ad, right?  I

24  mean, there are some specific display kind of parameters

25  which the publisher has some control over, but I think

1 of those as secondary.

2               (End of video clip.)

3     Q.   (By Mr. Grinstein) So what does that tell you,

4 Dr. Rhyne?

5     A.   Well, what he's describing is exactly my

6 understanding of both the claim and the way the Google

7 system operates.  It's what Mr. Dean called the raw

8 content.  He calls that the content.  It's the text of

9 the ad.

10        But then he says there's some other rules that

11 the publisher has control over; I think of those as

12 secondary.  So after I submit the text of my ad and

13 after the Google system uses my selection information to

14 locate a place to show my ad, then the publication rules

15 as a secondary form of customization are applied to what

16 I entered as the raw content.

17        And lo and behold, that creates the ad that

18 looks like the publisher wanted it to look like on their

19 website.

20     Q.   Now, you mentioned that there were two other

21 ways that an advertiser could access the AdWords

22 interface.

23        What were those other two ways?

24     A.   The AdWords API, the application program

25 interface for a software program, and the AdWords

1  Editor.

2      Q.    Let me -- first of all, did you review any

3  deposition testimony that helped you understand what

4  AdWords Editor is?

5      A.    Yes.  Yes.

6      Q.    Let me show you a clip from Google's corporate

7  representative on AdWords, Mr. Holden.  This is his

8  deposition Page 29, Lines 16 to 22.

9                  (Video clip playing.)

10                 QUESTION:  Can you describe AdWords

11  Editor for me, please?

12                 ANSWER:  AdWords Editor is a downloadable

13  client that runs on the user's machine.  It's an

14  alternate -- it's an alternate interface for AdWords.

15  It's a -- it provides similar functionality to the

16  AdWords interface but not exactly the same.

17                 (End of video clip.)

18     Q.    (By Mr. Grinstein) Does that confirm for you

19  that AdWords Editor acts as an interface?

20     A.    It acts as an interface.  And it's, as he

21  said, similar to the AdWords online interface.  And he

22  referred to it as a downloadable client.  That's kind of

23  computer jargon.

24     Q.    The other thing you mentioned was the API?

25     A.    Yes.

1    Q.   I think we talked about the AdSense API.

2    A.   Yes.

3    Q.   Is this similar?

4    A.   It's -- it's another application program

5  interface that's similar, but it gives you access to the

6  AdWords program that Google provides as opposed to the

7  AdSense program.  It's for sellers.

8    Q.   Let's hear from Mr. Holden again, Page 64,

9  Line 19 to Page 65, Line 3.

10                 (Video clip playing.)

11                 QUESTION:  Let's talk a little bit about

12  the API.  What does API stand for?

13                 ANSWER:  Application programming

14  interface.

15                 QUESTION:  And what does it do?

16                 ANSWER:  It's a set of rules,

17  essentially, that a third party can use to interact

18  programmatically with our ad systems without coming

19  through a defined interface that we've built for them.

20                 QUESTION:  So it serves as a programming

21  interface?

22                 ANSWER:  Yes.

23                 (End of video clip.)

24    Q.   (By Mr. Grinstein) Dr. Rhyne, what does that

25  tell you about whether or not API -- the AdWords API is

an interface?

    A.   It's an interface that the -- as he said, a programmer can use to gain access to the capabilities of Google's AdWords product.

    Q.   Okay.  Let's go back to our claim chart. And, Dr. Rhyne, having talked about the evidence about this third element, second interface, what's your opinion as to whether or not Google does that?

    A.   I think they do that in at least three ways: The online AdWords interface, the AdWords application program interface, and this downloadable program, the AdWords Editor.

    Q.   All right.  Now, we've got the next limitation, a second database.

        And, Dr. Rhyne, in your opinion, how does Google have this second database?

    A.   They have -- I mentioned it earlier.  The ads database -- that's their name for it -- and it's a centralized database that stores all the content that was entered by the sellers.  It's just a little collection of ads hoping to break free and finally get their way to some publication website.  That's where they hold them.

    Q.   Did you see any deposition testimony that tells you Google has got an ads database?

1    A.   I have.

2    Q.   Let's show a clip.  This is Dr. Badros, his

3 deposition, Page 21, Line 25 to Page 22, Line 3.

4              (Video clip playing.)

5              QUESTION:  AdWords, the ad entered by the

6 advertiser through the AdWords front end would be stored

7 in the ads database?

8              ANSWER:  That's right.

9              (End of video clip.)

10    Q.   (By Mr. Grinstein) Does Google have an ads

11 database?

12    A.   They do, and that's where they store what's

13 entered by the advertiser through the AdWords, as it was

14 said here, front end.

15    Q.   Okay.  Let's go back to the demonstrative --

16 or --

17              MR. GRINSTEIN:  I'm sorry.  The claim

18 chart, please, Matt.

19    Q.   (By Mr. Grinstein) So this fourth limitation,

20 second database, does Google have that?

21    A.   Yes.

22    Q.   Let's talk finally about this last really big

23 one.

24              First of all, in looking at that really long

25 last limitation, did you consider any definitions?

1    A.    I did, the ones that were available to me.

2    Q.    I think the Court construed the claim -- the

3  claim phrase that starts with processing.

4          Did you rely on that definition?

5    A.    Yes.  And I think it's very interesting that

6  the processing step must make the advertisement comply

7  with the presentation rules of the internet media

8  venues.

9    Q.    We'll talk about that in a second.

10   A.    Yes, we will.

11   Q.    And the next one, publishing; that's another

12  phrase.

13         Did you rely on that?

14   A.    I did.

15   Q.    The Court's construction of it, did you rely

16  on that?

17   A.    That's correct.

18   Q.    Let's go back to the claim chart so we can

19  analyze the words of this claim.

20         First of all, there's discussion there of a

21  computer controller.  Dr. Rhyne, what's a computer

22  controller?

23   A.    It's a computer that's used to control the

24  system.  It executes software, and it -- it's what makes

25  the process go.

1     Q.   Are there any particular Google software

2 modules that you looked at in analyzing this particular

3 last claim element, all the things that are going on in

4 there?

5     A.   There are two.

6     Q.   What are those?

7     A.   They have name -- computer programmers -- we

8 all do; I do it -- give their modules various types of

9 names.  One of them is called CAFE.  That's the -- the

10 F-E front end.  It's Content Ads Front End, I think.

11 And the other one is called CAT2, C-A-T and then it has

12 the digit 2 after it.  It's the second generation of

13 that program.

14     Q.   And, Dr. Rhyne, I'd like to show you

15 Plaintiff's Exhibit 1090.

16     A.   Okay.  Just a moment.

17     I have that.

18     Q.   Plaintiff's Exhibit 1090, is this a Google

19 document you've looked at?

20     A.   Yes.  It's -- it's a presentation, kind of a

21 slide show presentation that's called Content Ads.

22     Q.   And I'd like you to turn to Page 34 of this

23 presentation.

24     A.   Okay.  I have marked it.

25     Q.   And there's a chart there that looks like it

1   will answer all of our questions, because it says

2   everything on the slide.

3           Do you see that?

4       A.   I -- I do.

5       Q.   Can you explain, using this chart, how an ad

6   request to the Google system sort of starts?

7       A.   I'll try, okay?  There's a lot of information

8   here.

9           But here's the user.  That's like me or one of

10  you who went to your computer and typed in cheese.com,

11  and you want to see what's on that website.  That sends

12  information to the GFE, which is the Google front end.

13  That's where they -- they receive that request and say,

14  ah, this guy probably is looking at a website where we'd

15  like to put an ad by Google.

16          It then sends information to this CAFE

17  program, which recognizes that there's an opportunity to

18  display an ad and then sends that information over to

19  the CAT2, and you can see that it's called a mixer.

20          And -- and that's the process.  CAT2 does

21  something; CAFE does something going back; and

22  ultimately, the ad will be sent back to the user.

23      Q.   So what precisely happens at CAT2?  I mean,

24  what's its role in this?

25      A.   Its role is to select ads that meet the

criteria of both the seller and the publisher.

And so it -- it really simply is an ad selection

process.  It mixes together things like the blocked URLs

entered by the publisher and the keywords entered by the

seller and this preferred URLs entered by the seller.

It also implements the -- you can see the auction is

down here.  It does the dollars part of the process.

But, ultimately, it produces a set of ads which meet the

selection criteria of both the publisher and the seller

and sends it back to CAFE.

 Q. And just to be clear, this document we're

looking at, did you put this together, or is this a

Google document?

 A. Oh, no.  That's a Google drawing that this

gentleman who made this slide show presentation put

together.

 Q. Let me ask this question to you, Dr. Rhyne:

Does the Google system select websites on which to

display ads, or does it select ads on which to display

on websites?

 A. It does both.

 Q. Can you explain?

 A. Well, the ads get to say, I'd like to select

websites that have keywords -- I think the picture that

Mr. Verhoeven used in his opening was of a -- I think a

bass fishing website, and it had a list of keywords:

Trout or bass or something, fishing rods.  Well, the ads

that were found to be relevant were the ads that had

those keywords.

　　　　　So it says, from the ads point of view, here

are the things I'd like to do.  I will select you one or

more websites to show your ads that meet your criteria.

　　　　　From the publisher's point of view, he says or

she says, I would like to have ads that don't have

this -- they don't have an URL that's my competitor.

So there's a selection process going in both directions.

The ads get to select where they would hope to see

themselves published.  The publishers get to select

where they don't want to have ads come, for example.  So

it works both ways.

　　Q.　Have you seen any Google documents that

confirm for you the idea that sellers get to select

websites?

　　A.　Yes, I have.  I've seen that language.

　　Q.　Or at least get to select information to

select?

　　A.　They do.  They input information that is used

by the Google Ads by Google system to select places

where those ads might occur.  I've seen that.

　　Q.　Let me show you Plaintiff's Exhibit 1293, and

1  I'd like to direct your attention to that second

2  paragraph.

3      A.   Okay.

4      Q.   Do you see that second paragraph --

5      A.   Right.

6      Q.   -- We do the targeting for you?

7           Who is we?

8      A.   We is Google.

9      Q.   Okay.  And what does it say here?

10     A.    In this particular page that Google provides

11 on the internet about AdWords, it says:  With contextual

12 targeting -- that's the keyword technique -- Google

13 automatically targets your ads to the most relevant

14 sites and page placements based on a given page, which

15 is content, and your chosen keywords.

16     Q.   Who is the you?

17     A.   The seller.

18     Q.   So the seller is inputting keywords?

19     A.   Yes.

20     Q.   And what does this document say Google does?

21     A.    They target your ads to the most relevant

22 sites based on what the -- those sites have as their

23 characteristics and your chosen keywords.

24     Q.    Dr. Rhyne, does the fact that in the Google

25 system, there is actions by which the sell -- the ads

pick websites and there are actions by which the

websites pick ads impact in any way your opinion as to

whether or not there is publishing that's going on in

the system?

A.   No.  No.  Both of those processes are just

fine.

Q.   I want to talk about the other clause that's

been -- the next clause I want to talk to you about is

this processing definition.

A.   Okay.

MR. GRINSTEIN:  Matt, can we take a look

at it?

Q.   (By Mr. Grinstein) This is processing the

electronic ad in compliance.

Do you see that?

A.   Yes.

Q.   First of all, there's this long discussion

here that says:  Executing a systematic sequence of

mathematics and/or logical operations.

Do you see that?

A.   I do.

Q.   Can -- can you just explain?

A.   I've seen it before.  It's a dictionary

definition of what's sometimes call an algorithm.  It's

what a computer program does.

1    Q.   Okay.

2    A.   When I write a computer program, it -- it

3 defines a systematic sequence of math or logical

4 operations, and when that program runs, those operations

5 are executed.

6    Q.   Now, the -- it talks about perform the

7 operations upon the customized electronic advertisement.

8 You've already discussed the extent to which the

9 electronic advertisement was customized prior to the

10 processing step; is that right?

11    A.   I read that on -- the seller customized

12 what -- the so-called raw content that has been entered

13 by the seller and stored in the ads database.

14    Q.   Okay.  And the last clause right here is:

15 Make it comply with the presentation rules of the

16 internet media venues.

17         Do you see that?

18    A.   I do.

19    Q.   Dr. Rhyne, what presentation rules are we

20 going to be talking about right here -- what

21 presentation rules is the claim necessarily talking

22 about here?

23    A.   It's talking about the presentation rules of

24 the internet media venues where the ad is going to be

25 displayed.  It's the -- it's what was set up by the

1  publishers when they -- they entered themselves into the

2  Ads by Google system.

3      Q.   And we earlier talked about the two types of

4  presentation rules:  Distribution factors and look or

5  feel, design or style rules.

6      A.   Yes.

7      Q.   Excuse me.  Of those two, which one is this

8  claim talking about?  I mean, which -- which

9  presentation rules could you use?

10      A.   It must be talking about, at this point, the

11  design or style standards.

12      Q.   Why do you say that?

13      A.   Well, it says it's going to operate on the

14  customized advertisements to make it comply with the

15  presentation rules.

16           Those distribution rules, if they have blocked

17  an ad, it will never get to this point in the process.

18  They'll be just still in the ads database, and there

19  will never be an opportunity or need to make the ad

20  comply with the presentation rules of the internet media

21  venue, because it's never going to be displayed.  It's

22  been blocked.

23           So this is a reference to presentation rules,

24  which must be the design or style standard rules.

25      Q.   All right.  I want to talk to you now about

the Google source code that Google uses and programs

into its computers to do this processing step.  And

we're going to be talking about Plaintiff's

Exhibit 1204.

    A.    Okay.

    Q.    Is this Plaintiff's Exhibit 1204?

            MR. GRINSTEIN:  Take that down, Matt.

    A.    Okay.  I was going to caution you, because I'm

aware that -- having written source code for products,

this is very confidential and important material to

Google.

            THE COURT:  Approach.

            (Bench conference.)

            MR. GRINSTEIN:  This is the one instance

in which -- sorry.

            THE COURT:  Okay.  All right.  I'm going

to -- the way I'm going to handle this is, I'm going to

tell them that by agreement of the parties before trial,

the Court had been advised that there were certain

portions of the testimony that I'd have to seal the

courtroom for and ask everybody that is not involved in

the case as either a -- well --

            MR. GRINSTEIN:  Anyone who has not agreed

to the terms of the protective order.  That might be --

or is not bound by it.

1          THE COURT:  Well, are there people in

2   here that --

3          MR. GRINSTEIN:  There's a shadow jury in

4   here, obviously, Your Honor.

5          THE COURT:  Okay.  Well, have they been

6   cleared of the protective order?

7          MR. GRINSTEIN:  They're not clear of the

8   protective order.

9          THE COURT:  Oh, okay.  So they should be

10  excused.  Then that's exactly what I'm going to do,

11  okay?

12          (Bench conference concluded.)

13          THE COURT:  All right.  Ladies and

14  Gentlemen, occasionally, in cases like this -- and my

15  comments are directed towards everybody in the

16  courtroom.

17          Occasionally, in cases like this, there

18  will come a time in the testimony that it requires the

19  Court to seal the courtroom from public access.  And the

20  Court does not do that lightly, but under certain

21  circumstances, there are portions of the testimony that

22  we'll discuss information that's highly confidential.

23          And with the agreement of the parties to

24  the case, entered into before the trial, the Court is

25  going to ask all of the people who are seated in the

gallery of the courtroom at this time, who have not been

cleared under the Court's protective order and have not

agreed to the terms of the Court's protective order, to

please remove yourselves from the courtroom, and the

Court will have the security officer advise you when

this portion of the testimony has been concluded.

So I'm going to ask the folks seated out

there now, if you'll please exit the courtroom.  We'll

get through the testimony as quickly as we can and then

invite you back in.

MR. GRINSTEIN:  And I only expect this to

take a couple minutes, Your Honor.

THE COURT:  Okay.  All right.

(Courtroom cleared for confidentiality.)

MR. GRINSTEIN:  May I proceed,

Mr. Verhoeven?

MR. VERHOEVEN:  I'm not sure who those

two folks are.

MR. NELSON:  In the back?  Is that who

you're talking about?

THE COURT:  Two are here from Judge

Ward's chambers.

MR. VERHOEVEN:  We have no problem with

that, Your Honor.

MR. GRINSTEIN:  May I proceed,

1  Mr. Verhoeven?

2              THE COURT:  All right.  You may proceed.

3

4  (REPORTER'S NOTE:  This portion of the testimony was

5  filed under seal.  See Sealed Portion No. 1)

6

7              MR. GRINSTEIN:  Your Honor, this

8  concludes our questions about the source code.

9              THE COURT:  All right.  Mr. Potts, if

10 you'll...

11              (Audience brought back in courtroom.)

12              MR. GRINSTEIN:  May I proceed?

13              THE COURT:  You may proceed.

14     Q.    (By Mr. Grinstein) The second clause in the

15 claim term I want to talk to you about, Dr. Rhyne, is

16 this publishing definition.

17     A.    Okay.

18     Q.    Do you see publishing the electronic

19 advertisement?  Do you see that?

20     A.    Yes.

21     Q.    And does the Google system place or make

22 available customized electronic ads within the

23 framework of and at each internet media venue so that

24 it's accessible by end-users and so on?

25     A.    Absolutely.

1    Q.   Let's look at our favorite screen shot of

2  cheese.com.  Is Google here making ads available within

3  the framework of and at this website?

4    A.   Of course.  Here are the ads, okay, over here

5  on the right-hand side.  The overall cheese.com website

6  provides the framework that's going to surround that.

7  And they're there.  You can see them.  They're on that

8  website.  They've been sent to it so that you see them

9  on your browser.  It certainly meets that requirement.

10  They're accessible by me as a viewer.

11    Q.   I want to talk to you about your experiments

12  with the Google system in Plaintiff's Exhibit 24.  And

13  with respect to your experiments with the Google system,

14  did you confirm that the Google system does this

15  processing and this publishing that we're talking about

16  in this last element?

17    A.   Right.  As the final step in my experiment as

18  a publisher and a seller, I was able to have my ad be

19  published on my publisher website.

20    Q.   Let's look at Plaintiff's Exhibit 24 again.

21  Could you tell us what we're doing right now?

22    A.   Here I am.  I'm formatting my ad.  You can see

23  that it's there.

24         Moving along, I've got my ad.  I'm going to

25  save it in a minute.

1    Q.   So we're in the AdWords side of the process?

2    A.   Right.  We're still in AdWords.  We're

3  finishing that up.

4        Okay.  So now the ad is going to go out and go

5  into the ads database.  And here is the target publisher

6  site, AR Consulting, and you can see on that site, using

7  my colors, like them or not, yellow, green, and purple,

8  with a border with rounded corners is that little ad I

9  made up.

10        IP consulting.  Looking for an expert.

11  Experience is our middle name.  And you can see in

12  purple the return address for that little seller's

13  location.

14    Q.   So that right there is the ad you entered into

15  the AdWords interface?

16    A.   Yes.

17    Q.   And the appearance of the ad, the way it looks

18  right now, is that -- those are the rules that you

19  entered in for the website?

20    A.   That's been made to conform to the

21  presentation rules that I set up as a publisher.

22    Q.   And is this ad appearing within the framework

23  of the website?

24    A.   Yes.  Here you can see it's within a border.

25  It's set in the space that was allocated by that little

snippet of code.  And it's also within the general

characteristics of this entire web page.

Q.   Is that ad at an internet location?

A.   It's right there.

Q.   Now, I understand that Google may argue in

this case that in order for an ad to be displayed at an

internet media venue, it's got to be sent and, you know,

exist at the computers and the servers of the venue.

What is your opinion as to that?

A.   Well, I go back to the Court's constructions,

okay?

The Court's construction of an internet media

venue is a location on the internet.  And the Court's

construction of the two words, media venue, is either a

physical location or what's called a virtual location,

something that appears on the internet.

And there's the imagery.  That -- that is the

website.  That is a location on the internet, just like

cheese.com.  And there's no question but what the ads

are there.

So they have been published at or on or to.  I

don't care which word you use.  Those ads show up when I

point my browser at, in this case, AR experts, or if I

point it at cheese.com.

Q.   Can we go back to the claim language, Matt --

1   Dr. Rhyne?  Excuse me.

2          The last -- very last part of this long claim

3   is this clause that says:  Whereby the electronic ad is

4   displayed on each of the one or more of the -- so on and

5   so forth.

6          Do you see that?

7     A.   Yes.

8     Q.   In your opinion, does Google cause electronic

9   ads to be displayed, quote, unquote, on media venues?

10    A.   Yes.  And it's not just my opinion.

11    Q.   In forming -- you know, coming to that

12  conclusion, did you look at any Google documents?

13    A.   I did.  I looked for documents to see if

14  Google ever used the terminology of publishing the ad on

15  the websites, and I found that they often do.

16    Q.   Let's just see some of those documents.  Let's

17  see Plaintiff's Exhibit 127.

18    A.   All right.  I have it.

19    Q.   What does the first paragraph, first line say

20  about where ads appear?

21    A.   Okay.  This is a Google policy document

22  written in 2009.  It says:  Google AdWords is our

23  automated online program that enables advertisers to

24  place targeted text-based and display ads on our

25  websites and our Google network members' websites.

1    Q.    What about the second paragraph, first line?

2    A.    It says:  Google AdSense refers to the online

3 programs through which we distribute our advertisers

4 AdWords ads for display on the websites of our Google

5 network members.

6    Q.    What does this document say about where those

7 ads go?

8    A.    It says that Google puts ads on the websites

9 of the publishers that are participating in the ads for

10 Google program.

11    Q.    How about Plaintiff's Exhibit 70?  Can you

12 take a look at that?

13    A.    I can.

14    Q.    Plaintiff's Exhibit 70, what is this?

15    A.    This is some more of the AdSense help document

16 that Google provides -- documentation that Google

17 provides online.

18    Q.    And what does Plaintiff's Exhibit 70 say about

19 where these ads go?

20    A.    Okay.  Under the question, how does Google

21 target ads to my website, it says:  Once you've added

22 the Google ad code to the web pages on which you wish --

23 want to display Google ads, we take care of the rest by

24 automatically delivering relevant Google ads to those

25 web pages.

1    Q.    So it says that the ads are delivered to?

2    A.    To the web pages.

3    Q.    Okay.

4    A.    Okay.

5    Q.    Let's take a look at Plaintiff's Exhibit 62.

6    A.    All right.

7    Q.    What is Plaintiff's Exhibit 62?

8    A.    It's an AdSense help document, again, online.

9    Q.    And what does it tell you about where Google

10   sends its ads?

11   A.    In question and answer format, the question

12   was:  How many Google ads can I display per page?

13   The second -- I guess it's the third sentence says:

14   This system -- talking about AdSense -- automatically

15   displays an optimal number of highly targeted Google ads

16   on each page.

17   Q.    Let's take a look at Plaintiff's Exhibit 1296,

18   second paragraph.  Again, what is this document?

19   A.    It's another question and answer form of

20   AdWords help.  Now, not AdSense, but AdWords.  Can I run

21   ads on my website?

22   Q.    And what does this document say?

23   A.    At the second part, it says:  As the content

24   of your website changes, the type of ad that appears on

25   your website changes as well.  You'll generate earnings

1  when users click or view the ads on your website.

2     Q.   Dr. Rhyne, I thought I heard Google argue in

3  opening argument that Google only sends ads to browsers

4  and not to websites.  So are all these documents I just

5  showed you wrong?

6     A.   I think we're just dealing with semantics

7  here.  Google certainly has repeatedly characterized the

8  manner in which their AdSense program operates as

9  placing ads on websites, and I agree with that, given

10 the Court's construction of internet media venues and

11 media venues.

12          MR. GRINSTEIN:  Matt, can we go back to

13 the claim language?

14    Q.   (By Mr. Grinstein) We've already talked about

15 this phrase in compliance with, have we not, Dr. Rhyne?

16    A.   Yes.

17    Q.   And let me finally ask you about the clause.

18 It says:  On each of the one or more of the selected

19 media venues.

20          Do you see that?

21    A.   Yes.

22    Q.   Does that clause mean that the ads are to be

23 displayed on every media venue that the seller input

24 information to select about?

25    A.   Remember, the seller doesn't select.  The

seller enters information to select.

So the selection process is done by the computer controller. In particular, we talked about that CAT2 program.

And every ad that is ultimately selected and sent to CAFE by CAT2, for every one of those, that -- the ads that are selected at that point are actually displayed on the user's browser back on the right-hand side of that figure we looked at -- left-hand side we looked at before.

MR. VERHOEVEN: Your Honor, I object to that testimony. Can we have a quick side-bar?

THE COURT: Yes.

(Bench conference.)

MR. VERHOEVEN: Okay. Your claims construction was very precise on entering information to select.

The parties argued during claims construction, during the Markman hearing, Your Honor, vehemently on both sides about whether it should be construed that the system selects or the seller selects. And Your Honor's construction was very precise. And what he's doing in that answer is interpreting your construction to mean that the system does the selection and the seller does not.

1              And we believe that since Your Honor's

2  order said that you're not allowed to talk about the

3  reasoning or whatnot, that that violates or goes beyond

4  interpreting the claim construction.

5              THE COURT:  I'm going to overrule the

6  objection, but, you know, it's not -- he's not going to

7  explain why it's there if he uses the reasoning that I

8  got there, okay?

9              So let's -- you know, I'm going to

10 overrule the objection, but let's -- you know, you need

11 to let him finish his answer and --

12             MR. GRINSTEIN:  I'm actually done, Your

13 Honor.

14             THE COURT:  Well, I mean, he's been on

15 for an hour and a half yesterday, and he's been on since

16 8:30 this morning, and we're just now through the first

17 claim.

18             So let's move along, okay?

19             (Bench conference concluded.)

20     Q.   (By Mr. Grinstein) So just to conclude this

21 discussion, Dr. Rhyne, what's your opinion as to whether

22 or not Google meets this final limitation of Claim 1,

23 Limitation (e)?

24     A.   They do.

25     Q.   And so what is your opinion as to whether or

1  not Google infringes Claim 1?

2      A.   Because they meet every limitation of every

3  element and the preamble of Claim 1, Google's AdSense

4  for Content system infringes Claim 1 of the '025 patent.

5      Q.   All right.  It took us a while to get through

6  Claim 1.  There are some other claims in this patent and

7  in the other patent.  We're going to go much more

8  quickly through those, okay, Dr. Rhyne?

9      A.   Okay.  Yes.

10     Q.   The next claim I want to talk to you about is

11  Claim 179.  And what is Claim 179?

12     A.   It's another independent claim, but it's a

13  method claim rather than a system or apparatus claim.

14     Q.   And the -- the claim starts:  A method of

15  using a computer system.

16          Have you already described in your previous

17  testimony what that computer system was?

18     A.   Yes.  That's -- if you look through the words,

19  with a couple of exceptions here, everything else in

20  this -- in this thing is Claim 1.  It's this computer

21  system of Claim 1.

22     Q.   And who, in your opinion, performs all the

23  steps and does all of this use that's described here in

24  Claim 179?

25     A.   Google does.  They use that system to

1  implement the AdSense for Content system using the

2  computer system of Claim 1.

3      Q.   So what's your opinion as to whether or not

4  Google infringes Claim 179?

5      A.   They do.

6      Q.   Does it meet each and every -- does Google

7  meet each and every one of the elements of Claim 179?

8      A.   Yes.  When they've used that system, when they

9  do use it, as they have since June -- July of 2007,

10 they -- they have met this method claim.

11     Q.   Let's talk about Claim 20.  Claim 20 is what

12 you called earlier a dependent claim; is that right?

13     A.   Yes.

14     Q.   It depends on Claim 1 and 6; is that right?

15     A.   Yes.

16     Q.   We've already established your opinion as to

17 Claim 1?

18     A.   Yes.

19     Q.   As to Claim 6, what does Claim 6 add to Claim

20 1?

21     A.   It requires that the second interface, the one

22 used by the seller, be a self-service interface that

23 prompts the seller to input information using a

24 menu-driven format.

25     Q.   What's self-serve?

1    A.   It means that you can use it yourself.  You

2  don't have to -- it's not so sophisticated and

3  complicated that a seller-type person can't use it

4  without having to call up Google and have them send some

5  expert to sit next to you.

6    Q.   And, Dr. Rhyne, did you review any deposition

7  testimony to confirm whether or not this is a self-serve

8  interface?

9    A.   I recall that one of the Google deponents was

10  asked a question as to whether the interface was

11  self-serve.

12    Q.   Let's look at Mr. Holden, Page 62.

13         (Video playing.)

14         QUESTION:  This is a self-serve

15  interface, is it not?

16         ANSWER:  Yes.  It's designed to be.

17         (End of video clip.)

18    Q.   (By Mr. Grinstein) Mr. Holden was the

19  corporate representative on AdWords; is that right?

20    A.   Yes, he was.  And he was being asked about the

21  AdWords system.

22    Q.   And did your experiments with the Google

23  system confirm for you whether or not it's a self-serve

24  interface?

25    A.   It -- well, they did.  I had no trouble using

it.  I can see why a seller would have no trouble.

Q.   Okay.

A.   It's very intuitive.

Q.   All right.

MR. GRINSTEIN:  Back to the chart of the claim language, please, Matt.

Q.   (By Mr. Grinstein) So what's your opinion as to whether or not Google meets the elements of Claim 6?

A.   Well, it certainly had menu-driven, and yes, it does.  It's a self-serve, menu-driven interface in part.

Q.   And the part on top, the Claim 20 language itself, what is that ad?

A.   All it says is that the selection -- in addition to 1 and 6, the selection information input by the seller targets one or more internet media venues.

Q.   Have you seen any documents that confirm to you that information that can be input by sellers can target?

A.   Yes.  That specific language was used.  We may have touched on that document once before, but we've seen it.

Q.   And so what's your opinion about whether or not -- well, first of all, what kind of information -- can you give an example of information that a seller

1  would input to target?

2      A.    Keywords.  They would say, I want my caps to

3  be shown -- my cap ad to be shown on baseball, is the

4  example I've used.

5      Q.    So what's your opinion as to whether or not

6  Google infringes Claim 20?

7      A.    Because it -- they infringe Claim 1 and 6,

8  they also infringe Claim 20.

9      Q.    Let's talk about Claim 37.  Claim 37 depends

10  on a bunch of claims.  The one on the bottom talks about

11  Claim 1.  We've already discussed that, right?

12      A.    Yes.

13      Q.    Claim 31 -- what does Claim 31 talk about?

14      A.    It parallels what we just saw in Claim 6,

15  except now it's talking about instead of the sellers,

16  the internet media venues.  And it says the interface

17  for them must be a self-serve interface that uses a

18  menu-driven format.

19      Q.    In your experiments with the Google system,

20  were you -- did you self-serve?

21      A.    I was self-served, and it had menu-driven

22  formats for selecting things like font sizes and types.

23      Q.    So does Google meet Claim 31?

24      A.    Yes.

25      Q.    What about Claim 32?  What's the difference

there?

A.    What it says is that the claim of 31 where the

menu-driven format comprises one or more forms,

including text-entry areas and menu-driven areas.  And I

saw that from the publisher point of view, for example,

I could type in, in a text form, the blocked URL.

Q.    So does Google meet the requirements of Claim

32?

A.    Yes.

Q.    Claim 36, there it's talking about how the

interface prompts the internet media venue for choice of

advertisement types.

Do you see that?

A.    Absolutely.

Q.    And did we discuss some exhibits earlier about

giving the internet media venues choice as to

advertisement type?

A.    In that Quick Start Guide, the very second

thing was select a type, and I showed the jury how I was

able to select text, as opposed to image.

Q.    And then finally, the top claim, Claim 37,

that says one of the choices is text.

A.    Yes.

Q.    Did you encounter text as a choice when you

were doing your experiments?

1    A.   That's -- we used a text ad for my little

2  seek-out-my-expertise ad.

3    Q.   All right.  Let's go to Claim 52.

4    A.   Well, just for the record, I think Claim 37 is

5  infringed.

6    Q.   Important question to ask.  Thank you.

7  Claim 52.  Claim 52 depends on two claims; is that

8  right?

9    A.   Yes, sir.

10    Q.   First of all, Claim 1, you've already

11  discussed; is that right?

12    A.   Yes.

13    Q.   Claim 47, what is going on in Claim 47?

14    A.   Okay.  It says -- it's got some interesting

15  computer language.  It says:  For the presentation rules

16  of the internet media comprised design or style

17  standards -- we've already shown that in Claim 1 --

18  further comprising a computer program design filter to

19  automatically apply or compare the design or style

20  standards to the information input by the seller.

21    Q.   Okay.

22    A.   So it introduces this thing that the claim

23  writer called a computer program design filter.

24    Q.   And has the Court construed some of the

25  language in that particular claim?

1    A.    I believe so.

2    Q.    Have you used the Court's definition of design

3  or style standards?

4    A.    Yes.

5    Q.    And have you used the Court's definition of

6  the clause automatically apply?

7    A.    Yes, I did.

8    Q.    And did we talk earlier about how some of the

9  presentation rules you saw in the Google system were

10 design or style rules?

11   A.    Yes, the colors, fonts, things like that.

12   Q.    What's a computer --

13           MR. GRINSTEIN:  Can we go back to the

14 claim language?

15   Q.    (By Mr. Grinstein) What's a computer program

16 design filter?

17   A.    Basically, it's just a computer program, which

18 the writer characterizes as a design filter.  It applies

19 or filters the raw ad content through the prism, if you

20 will, of the design rules for the look and feel that the

21 publisher specified.

22           And coming out of that filtering process is an

23 ad that conforms to what the publisher wanted to see.

24   Q.    And what was the name -- what's the name of a

25 software module that you saw that would qualify, in your

1  mind, as a computer program design filter?

2      A.   CAFE.

3      Q.   And there's this phrase here that says:  Look

4  or fill of the advertisement?

5      A.   Yes.

6      Q.   Did you review any testimony by any Google

7  witnesses about whether or not the Google system allows

8  publishers to set the look-and-feel controls for their

9  sites?

10     A.   I did.

11     Q.   Let me take -- let's look at the deposition of

12 Mr. Miller, Page 145 --

13     A.   Yes.

14     Q.   -- Lines 10 to 25.

15               (Video playing.)

16               QUESTION:  If you take a look at

17 Exhibit 16, Google uses the word customized, correct?

18               ANSWER:  Yeah.  In this context, it does.

19               QUESTION:  And it's Google that uses the

20 word look and feel, correct?

21               ANSWER:  Correct.

22               QUESTION:  And it's Google that wrote the

23 sentence:  AdSense lets you customize the appearance of

24 ads to match the look and feel of your site, correct?

25               ANSWER:  Right.

1              QUESTION:  Now, this customization

2   includes choosing colors and sizes?

3              ANSWER:  Yes.

4              (End of video clip.)

5       Q.   (By Mr. Grinstein) So, Dr. Rhyne, going back

6   to the claim chart for this particular claim, 52, first

7   of all, what's your opinion as to whether or not Google

8   meets all the elements of Claim 47?

9       A.   It does.

10      Q.   And I think we just saw Mr. Miller talk about

11  color; is that right?

12      A.   Yes.

13      Q.   And does that impact your opinion as to

14  whether or not Google infringes Claim 52?

15      A.   Claim 52 is infringed.

16      Q.   Let's talk about Claim 63.  We're getting

17  through most -- almost done on these claims.

18           First of all, Claim 1 depends on Claim 6; is

19  that right?

20      A.   Yes.

21      Q.   Or I'm sorry.  Claim 63 first depends on Claim

22  6; is that right?

23      A.   Yeah.  You said it backwards, yeah.

24           Yeah, Claim 1.  Claim 6, we've already dealt

25  with.

1    Q.   So we're talking about Claim 28.  What's Claim

2  28 add?

3    A.   It says that the seller is prompted to input

4  advertising content to create a text advertisement.  And

5  we've seen that.  The seller enters raw content as part

6  of their customization, and it goes into the ads

7  database.

8    Q.   Okay.  How about Claim 46?

9         I'm sorry.  Does Google meet the elements of

10 Claim 28?

11   A.   Yes.

12   Q.   What about Claim 46?  What does that add?

13   A.   It's that same -- it's similar to what we've

14 seen before.  It must be self-serve, and it must have a

15 menu-driven format.  And certainly, AdWords -- excuse

16 me -- AdSense for the internet media venue has that

17 capability.

18   Q.   It also talks about text ads.  Do you see that

19 in Claim 46?

20   A.   Yes, it does.  And we've seen text ad

21 selection is available for the publisher.

22   Q.   So does Google meet the elements of Claim 46?

23   A.   Yes.

24   Q.   And then finally, Claim 63.  It looks a little

25 similar to that other program design filter that we saw

1    earlier?

2        A.    It has the similar language, that you must

3    have design or style standards and that the computer

4    software, acting as a computer program design filter,

5    must do the comparison or application to make the

6    advertisement ultimately have the look and feel desired

7    by the publisher.

8        Q.    All right.  So based upon your previous

9    discussion of the Google advertising system, do you

10   believe that Google -- is it your opinion that Google

11   infringes Claim 63?

12       A.    Yes, it does.

13       Q.    Claim 90.  Two more claims in the '025 patent

14   and one more in the '059.

15            First of all, there's a Claim 31.  Do you see

16   that --

17       A.    Yes.

18       Q.    -- down at the bottom?

19       A.    Yes.

20       Q.    We've already discussed that, right?

21       A.    Yes.

22       Q.    Claim 45.  What does Claim 45 add?

23       A.    It says the second interface for the seller is

24   self-serve and uses menus, and we've seen that.

25       Q.    So do you believe Google meets the elements of

Claim 45?

    A.   Yes.

    Q.   Claim 62.  What does Claim 62 add?

    A.   It's for the publisher.  The internet media venue must have design or style standards, and the software must include a computer program design filter to apply them.  And I believe that's met.

    Q.   All right.  So that's Claim 62 is met.

          Finally, Claim 90 talks about automatically implying or comparing distribution factors.

          Do you see that?

    A.   Yes.

    Q.   Is that a particular claim term that the Court provided a definition for?

    A.   I believe that it did for pretty much the whole language.

    Q.   And is this the definition that you applied?

    A.   Yes, relevant to distribution factors.

    Q.   All right.  Going back to the chart for Claim 90, does Google have a computer program distribution filter that does what the rest of this claim talks about?

    A.   Yes.

    Q.   Let me show you a clip from Mr. Miller, Page 189, Line 24, to 190, Line 13?

1                    (Video playing.)

2                    QUESTION:  Now, publishers can select

3   advertisers for whom they will not accept

4   advertisements, correct?

5                    ANSWER:  Correct.

6                    QUESTION:  Competitors, for example?

7                    ANSWER:  That's right.

8                    QUESTION:  And AdSense contains a

9   competitive ad filter that enables publishers to filter

10  out specific competitors or specific advertisers, right?

11                   ANSWER:  The way -- the way -- the way

12  the competitive filter works is that an advertise --

13  sorry -- a publisher can list URLs of advertisers they

14  don't wish to appear on their pages.

15                   (End of video clip.)

16      Q.   (By Mr. Grinstein) Does that testimony confirm

17  for you that Google has one of these filters for

18  distribution rules?

19      A.   Yes.  We looked at the page earlier where they

20  referred to that system as a competitive ad filter.

21      Q.   Okay.  So going to Claim 90, is it your

22  opinion that Google infringes Claim 90?

23      A.   Yes.

24      Q.   And let's talk about Claim 231.  This is a

25  method claim?

1    A.    Yes.

2    Q.    It depends on Claim 226.  And what does Claim

3 226 provide?

4    A.    Well, it depends -- Claim 226 depends on 179,

5 which I already said is infringed.  And it says, in 226,

6 that the presentation rules must include design or style

7 standards and that the system must -- the method must

8 further comprise the step of automatically applying the

9 design or style standards to result in a control of the

10 look and feel of the advertisement.  And we've seen that

11 repeatedly.

12    Q.    So what's your opinion as to whether or not

13 Google infringes Claim 226?

14    A.    They do.

15    Q.    Based upon your prior analysis of the AdSense

16 system?

17    A.    Yes.

18    Q.    And --

19    A.    When they use that system, on behalf of

20 sellers and publishers, they infringe Claim 226.

21    Q.    And what about 231?

22    A.    All that adds is that there must be colored

23 stand -- color standards for the advertisement set by

24 the publisher, and we've seen that repeatedly.

25    Q.    All right.  Let's switch to the next --

1     A.   Well --

2     Q.   I'm sorry.  Oh.  So does Google infringe Claim

3 231?

4     A.   Yes, it did.

5     Q.   All right.  We've now talked about all the

6 claims you've analyzed of the '025 patent.

7     A.   Yes.

8     Q.   Let's switch to the '059 patent.

9     A.   Yes.

10    Q.   And we've got here a lengthy claim chart for

11 the '059 patent.

12        Do you see that?

13    A.   I do.

14    Q.   Can you remind the jury how the '059 differs

15 from the '025?

16    A.   It's -- adds this third-party professional.

17 It provides a way for a -- an advertising agency, for

18 example, to use the Google system to submit ads on

19 behalf of their seller clients.

20    Q.   And is there a particular Google interface or

21 product that you're aware of that meets that element of

22 the claim?

23    A.   It's called the MCC interface, My -- My Client

24 interface.  And that's something that they provide as a

25 way for authorized third parties to enter AdWords and

1  act as if they were one of that third party's seller

2  clients.

3      Q.   So through that My Client Center, does Google

4  satisfy the elements of the preamble --

5      A.   Yes.

6      Q.   -- to Claim 1 of the '059?

7      A.   It does.

8      Q.   The next limitation of this particular claim

9  talks about a first interface.  Is that the same as the

10 first interface you've already analyzed for the '025?

11     A.   Yes.

12     Q.   So for the same reasons, do you believe Google

13 meets that element of the claim?

14     A.   As what I did for Claim 1 of the '025, yes.

15     Q.   So -- and also for the first database?

16 Analysis the same?

17     A.   Same as Claim 1.

18     Q.   The third limitation talks about a seller

19 inputting information into the second interface.  Does

20 that claim differ at all?

21     A.   Yes.

22     Q.   How does that element differ from the '025

23 patent?

24     A.   Here they simply require that the second

25 interface allow the seller to input information

1 identifying themselves.

2     Q.   And when you used the AdWords interface, did
3 you input information identifying yourself?

4     A.   I typed in an e-mail address and a password
5 identifying me, acting as a seller.

6     Q.   So does Google have an interface that allows
7 sellers to do that?

8     A.   Yes.

9     Q.   So do you believe that the third element of
10 this claim is met?

11     A.   Yes.

12     Q.   The fourth element of the claim is another
13 database?

14     A.   Yes.

15     Q.   In your opinion, does Google have a database
16 that stores this identifying information?

17     A.   Yes.  They have a -- it's a different
18 database.  It's called the GAIA, G-A-I-A, interface
19 where they store the information on people who have
20 accounts of various kinds with Google, and they store
21 the seller information there.

22     Q.   Is that sometimes referred to as Google
23 accounts?

24     A.   Yes.  I think that's where the G-A and the
25 Google and the GAIA name came from.

1      Q.   So do you believe Google has a second

2  database?

3      A.   Yes.

4      Q.   How about the next element, a third

5  interface -- this one looks a little different.  Is it,

6  from the '025 patent?

7      A.   Is it different from what's in the '025

8  patent?

9      Q.   Yeah.

10     A.   In the sense that it is -- allows a

11  third-party professional to input information to select

12  internet media venues and information to create an ad,

13  as opposed to, in the Claim 1 of the '025, it was the

14  seller themselves who did that.

15     Q.   And, again, what's an example of a third-party

16  professional?

17     A.   It would be an advertising agency who

18  specializes in helping sellers get ads into and active

19  on AdSense for Content.

20     Q.   Let me show you --

21          THE COURT:  All right.  We're going to

22  stop right there for our morning recess.

23          Ladies and Gentlemen, take 20 minutes.

24          Be back ready to come into the courtroom

25  at 10:30.

1            Please remember my prior instructions,

2 and don't talk about the case.

3            COURT SECURITY OFFICER:  All rise.

4            (Jury out.)

5            THE COURT:  Be seated.

6            Court will be in recess.

7            Mr. Tribble, Mr. Grinstein,

8 Mr. Verhoeven, Mr. Gillam, I need to see you in

9 chambers.

10            (Recess.)

11            COURT SECURITY OFFICER:  All rise.

12            (Jury in.)

13            THE COURT:  Continue.

14      Q.    (By Mr. Grinstein) Dr. Rhyne, when we stopped,

15 we were talking about the third interface in the '059

16 patent, Claim 1; is that correct?

17      A.    I believe that's correct.

18      Q.    And what did you identify as the Google

19 product that is that third interface?

20      A.    This -- My Client Center, or MCC, interface.

21            MR. GRINSTEIN:  Can we look at

22 Plaintiff's Exhibit 85?

23      Q.    (By Mr. Grinstein) And can you tell us what

24 we're looking at, when you get there?

25      A.    This is an AdWords Help page that talks about

what Google calls the advertising professional program.

And in the second paragraph, it says members of this

program receive access to their own My Client Center, or

MCC, which makes it easy to manage multiple accounts

through a single interface.

Q.   What does that tell you about whether or not

this MCC acts as an interface?

A.   Obviously, it does -- it is.

Q.   And we're not going to go through the clips in

Plaintiff's Exhibit 24, but did you perform experiments

with the My Client Center interface that are reflected

in that exhibit?

A.   I did.  We created an account, logged in as

MCC, and we made our seller account a client of that

third-party professional account.

And when I had logged in, it was as if I were

my seller, I then make an ad and do all of the things

that the seller could do for themselves.

Q.   Were you able to input information to create

and information to select?

A.   Exactly as I did when I was practicing as the

seller.

MR. GRINSTEIN:  Let's go back to the

claim chart, please, Matt.

Q.   (By Mr. Grinstein) So in your opinion, is this

1  third interface element met?

2       A.    Yes.

3       Q.    As to the next to the -- next to last element,

4  third database storing the information, does that

5  database differ in any way from the databases you've

6  already discussed?

7       A.    No.   Although the ad was created by a

8  different party on behalf of the seller, the same

9  information is stored in that same ads database.

10      Q.    And this final element, I think, is nearly

11  identical to the element -- or the final element in

12  Claim 1 of the '025.

13           Does your analysis there apply as well?

14      A.    Yes, it does.

15      Q.    So what's your opinion as to infringement by

16  Google of Claim 1 of the '059 patent?

17      A.    It's also infringed by providing My Client

18  Center interface for the AdWords -- excuse me -- AdSense

19  for Content.

20      Q.    Okay.   Dr. Rhyne, I've got three more

21  relatively brief topics I'd like to talk to you about.

22      A.    All right.

23      Q.    First of all, at the beginning of your

24  testimony yesterday, you mentioned that there were two

25  different AdSense products that you would be analyzing

today, or in the course of the last two days.

What was that first product that we spent most of our time on?

A.   AdSense for Content.

Q.   And what's the second product?

A.   AdSense for Mobile.

Q.   And can you describe for the jury what is AdSense for Mobile and how does it differ?

A.   It's a system that's designed to allow ads to be placed on the smaller displays that you have with mobile phones, so that when you go to a website using the kinds of mobile phone that you have today that let you do web surfing from the phone, you can see an advertisement from a seller.

Q.   And did you do experiments in Plaintiff's Exhibit 24 with the AdSense for Mobile system?

A.   Yes, we did.  Because the ads are -- the screens are smaller, they restrict you a little bit in characters and lines, but, basically, you can enter the same information as a publisher and a seller in the AdSense for Mobile.

Q.   And that was all recorded in the video, Plaintiff's Exhibit 24?

A.   Yes.  I actually went in and instead of selecting AdSense for Content, I went to the bottom of

the menu and selected AdSense for Mobile and created an

advertisement.

Q.   And when you were performing your experiment

with Mobile, did you observe the use of presentation

rules?

A.   Yes.

Q.   Did you observe the use of distribution

factors?

A.   Yes.

Q.   Let's talk about the seller side of things.

A.   All right.

Q.   When you were doing your experiments with

AdSense, Mobile, and I guess using AdWords, were you

able to input information to select?

A.   Yes.

Q.   Were you able to input information to create?

A.   Yes.

Q.   Finally, let's talk about the last kind of

long element of AdSense for Mobile, this processing and

publishing element.

       Is there a way that AdSense for Mobile

performs the publishing that is any different than the

way AdSense for Content does it?

A.   For some classes of phones, there is a

different way.

1    Q.   And what -- can you just describe generally

2 for the jury what that different way is?

3    A.   In AdSense for Content with regular internet

4 websites, the -- the user browser sends a message back

5 to Google, and Google finds an ad and sends it directly

6 back to the browser on the computer of the user who is

7 actually talking on the internet.

8         For some types of -- of mobile phones, instead

9 of sending the advertisement back to the user's browser,

10 what Google does is they send it to the website, like

11 cheese.com, where it's stored as part of the information

12 at cheese.com.  And then cheese.com sends it on to the

13 cell phone.

14         So it's just a different pathway to arrive at

15 the cheese.com website.

16    Q.   Does that difference impact in any way your

17 opinions as to whether the AdSense for Mobile product

18 infringes the claims?

19    A.   No.  Ultimately, those advertisements appear

20 on or at, or they're sent to the website.  And the claim

21 doesn't, in my opinion, restrict you to either of those

22 two ways to do that.

23    Q.   And have you seen any evidence that AdSense

24 for Mobile, the use of it, you can still customize ads

25 to match the look and feel of publisher's websites?

1     A.   Yes.  I was able to actually do that.

2     Q.   Can we take a look at Plaintiff's Exhibit 122?

3 And what is this document?

4     A.   It's an AdSense Help document that is an

5 AdSense for Mobile set-up guide, and it tells you to

6 choose -- and format your ad type.  And in Step 3, it

7 tells you to pick your colors.

8         And up in the first paragraph -- second

9 paragraph, it says just like standard Google ads, Mobile

10 ads can be customized to best match the look and feel of

11 your pages.  Pick a type, pick a color.

12     Q.   So in your opinion, does or does not AdSense

13 for Mobile infringe the claims of the '025 patent that

14 you've analyzed in a way similar to AdSense for Content?

15     A.   They do.  I haven't found any material

16 difference in a way that would affect my opinions of

17 infringement for both AdSense for Content and AdSense

18 for Mobile.

19     Q.   Is the answer the same with respect to the

20 '059 patent?

21     A.   Yes, it is.

22     Q.   All right.  Next, I'd like to talk to you

23 about the question of where this Google computer

24 advertising system is located.

25         Have you analyzed in your work in this case

the manner in which or the location in which certain of

the Google computers reside?

A.   I've read information about that, that was

provided by one of the witnesses who was deposed on

behalf of Google.

Q.   Is that Mr. Curtiss?

A.   Mr. Curtiss.

Q.   Okay.  Just based upon your understanding of

what you've done in Plaintiff's Exhibit 24, if an

advertiser wants to sign up with the Google system, what

do they do?

A.   They -- they can sign up through AdSense, just

as part of the preliminary process of deciding to be a

publisher and specifying their presentation rules.

Q.   So if the publisher wants to sign up, they

sign up with AdSense?

A.   Yes.

Q.   And what computer software program do they use

to sign up for AdSense?

A.   The AdSense program.  Okay.

Q.   The interface?

A.   The AdSense user interface, just like they

will ultimately use to specify their presentation rules.

Q.   And if an advertiser wants to sign up to

participate in the AdSense program, what interface do

1  they use?

2      A.    They use the AdWords interface.

3      Q.    What about web surfers, people who are surfing

4  the internet users; do they sign up to use the Google

5  advertising system?

6      A.    No.  They just go look at cheese.com or

7  CNN.com.

8      Q.    Does Google pay a web surfer anything when

9  they encounter an ad?

10     A.    No.

11     Q.    Does the web surfer pay Google anything when

12  they encounter an ad?

13     A.    No, it's free.

14     Q.    Now, what is the term that Google uses to

15  define, I guess, the buildings where Google keeps its

16  computers?

17     A.    I think of it more of the computer equipment

18  than the building, but they call them data centers.

19     Q.    And where are -- what's your understanding of

20  where those data centers are located?

21     A.    They're located in multiple locations around

22  the world.

23                 MR. VERHOEVEN:  May I confer with him for

24  a minute?

25                 THE COURT:  Yes.

1              (Pause in proceedings.)

2              MR. VERHOEVEN:  Thank you, Your Honor.

3              THE COURT:  Proceed.

4      Q.   (By Mr. Grinstein) I want to show a

5  demonstrative for you, Dr. Rhyne, that depicts a diagram

6  of the world.  And just to be clear in this

7  demonstrative, I've kind of made up all the locations of

8  where all the different things are.  But I'm just trying

9  to use this to help you understand -- help you describe

10 the system.

11             First of all, we've got this AdWords seller

12 down here, and, hypothetically, where have we placed

13 him?

14     A.   Looks like in South America maybe, in Brazil,

15 I think.

16     Q.   And the AdWords user -- when an AdWords seller

17 wants to interface with the Google system, from what

18 country in the world does Google provide that interface?

19     A.   It's provided by a computer on a data center

20 that's, I believe, in either Atlanta or there also is

21 one in California.

22     Q.   It's in the United States?

23     A.   It is.

24     Q.   Okay.

25     A.   It's within the United States.

1       Q.   Let me just -- let's just talk generally about

2   whether it's in the United States or not.

3       A.   All right.

4       Q.   So it's in United States?

5       A.   Yes.   They serve -- the AdWords seller, when

6   they go on the internet and see the AdWords user

7   interface that the computer that's providing that

8   interface, is in the United States.

9       Q.   And let's say that there's a publisher,

10  someone who's got a website, and they reside in

11  Australia.

12      A.   Okay.

13      Q.   If they wanted to sign up for the AdSense

14  system, where would Google provide them the interface

15  from?

16      A.   From a Google data center that has a server

17  operating in the United States.

18      Q.   Okay.   So as based on your understanding of

19  the Google system, does it matter where the AdWords user

20  is, about where the data center that responds to their

21  interface request is located?

22      A.   As best as I could parse that question out,

23  regardless of where the AdWords seller is, when they're

24  operating with the AdWords user interface, they are

25  being served from a Google computer that's located in

1  the United States.

2      Q.   And is the same -- is the answer true, the

3  same for publishers?

4      A.   The same for the publishers.

5      Q.   Let me show you a clip from Mr. Curtiss.

6      A.   All right.

7      Q.   This is his deposition, Page 68, Lines 10 to

8  16.

9              (Video clip playing.)

10              QUESTION:  So that means that the AdWords

11  NetAPI servers as well as the AdWords/AdSense front-end

12  servers as of 2006 were all located in the United

13  States; is that right?

14              ANSWER:  That's correct.

15              QUESTION:  And that's the same today,

16  correct?

17              ANSWER:  I believe so.

18              (End of video clip.)

19      Q.   (By Mr. Grinstein) So what does that tell you

20  about where the AdWords and AdSense interfaces are

21  served from?

22      A.   That clip is actually the basis for my

23  understanding that both AdSense and AdWords are served

24  out of the United States.

25      Q.   Okay.  Now, let's go back to the

1  demonstrative.  Now, I've got a hypothetical web surfer.

**REDACTED BY ORDER OF THE COURT**



REDACTED BY ORDER OF THE COURT



REDACTED BY ORDER OF THE COURT

**REDACTED BY ORDER OF THE COURT**



REDACTED BY ORDER OF THE COURT

106



REDACTED BY ORDER OF THE COURT



REDACTED BY ORDER OF THE COURT

**REDACTED BY ORDER OF THE COURT**

to infringe any of these asserted claims, it's not

enough if Google is just similar to some of the claim

language, right?

A.    I believe that this case has been restricted

to the type of infringement that requires literal

infringement.

Q.    And in order for Google to infringe any of the

asserted claims, the jury has to conclude that Google

infringes each and every element of that asserted claim,

correct?

A.    Yes, sir.

Q.    So it's not enough if there's an overlap,

right?

A.    I don't know what you mean by overlap.

1      Q.   Well, if it's similar but some of the elements

2  aren't made or met, that's not infringement is it?

3      A.   If -- if an element is not met, that's not

4  infringement.

5      Q.   So if the system looks similar but there's a

6  couple elements missing, that's not infringement, right?

7      A.   If a couple of elements are missing, that's

8  not infringement.

9      Q.   Okay.  In fact, if there's only one element

10 missing, that's not infringement, right?

11     A.   Yes.

12     Q.   Okay.  I'd like to put up Slide 21.  It's an

13 illustrative slide.

14          Do you see Slide 21 up on the screen, sir?

15     A.   I see it now, although I couldn't see it very

16 well from the gallery, but I did see it when you showed

17 it in your opening.

18     Q.   And you see this is -- this is Claim 1 of the

19 '025 patent, right?

20     A.   Yes.

21     Q.   And then we have it over here, too.

22     A.   Actually, the glare -- but I have it here.

23     Q.   Okay.

24     A.   I think I can see it.

25     Q.   And I'm going to ask you some questions about

1  this element here.  It's called the second interface of

2  the computer system.

3       A.   Yes.

4       Q.   Do you see that?

5       A.   Yes.

6       Q.   In particular, one of the elements -- there's

7  two things in here, correct?  Two things the seller

8  does, right?

9       A.   The seller is prompted to do.

10      Q.   Yeah.  The seller is prompted to do two

11 things, right?

12      A.   Well, the seller is prompted.  It's not

13 necessary that the seller actually do it, but the

14 interface prompts the seller to do two things.

15      Q.   It's your testimony that it's not necessary to

16 infringe this element that the seller do what it's

17 prompted to do here on this element?

18      A.   As long as the seller is prompted, I think

19 that's what the computer system does.  The seller will

20 respond to that prompt.

21      Q.   Is it your testimony that if Google prompts

22 the seller, but the seller doesn't input any information

23 to select, that that's infringement, sir?

24      A.   I -- I think that as long as the prompt does

25 it, they might elect to bypass entering information to

1  select.

2      Q.   That would be infringement?

3      A.   Yeah.  As long as the interface prompts them

4  and gives them an opportunity do it, if they

5  selected -- if they decided not to enter keywords, I

6  think that that would still be infringement.

7      Q.   So it's your testimony to this jury that if

8  the Google system puts up a menu, prompts a seller, and

9  says you can enter information to select media venue,

10 and the seller doesn't do that, that that nevertheless

11 infringes this element?

12     A.   That the computer system would have met the

13 requirement of that claim, yes, sir, I believe so.

14     Q.   And is it your testimony that if the computer

15 system prompts the seller to input information to create

16 an electronic advertisement for publication to the

17 selected internet media venues, but the seller doesn't

18 do that, that still constitutes infringement?

19     A.   No.  I feel differently about the requirement

20 to enter information to create the advertisement because

21 of the manner of the last element of the claim.

22     Q.   Okay.  So the seller has to enter information

23 to create an electronic advertisement or else there's no

24 infringement of this element.

25          Is that your testimony?

1    A.   I believe that's correct.

2    Q.   Okay.  And the language here --

3              MR. VERHOEVEN:  If I may come over here,

4    Your Honor, and point to this?

5              THE COURT:  Yes.

6    A.   If you could cant that just a little.

7    Q.   (By Mr. Verhoeven) I'll try.  I'll try to do

8    that, sir.

9    A.   Okay.  That's fine.

10   Q.   Is that better?

11   A.   A little better.  That's fine.

12             THE COURT:  Well, can the Members of the

13   Jury see it?  Raise your hand if you can't see it.

14   Okay.  Go ahead.

15   Q.   (By Mr. Verhoeven) Okay.  Now, language is

16   really important in patent claims, right?

17   A.   I believe every word is important.

18   Q.   You have to be very precise, right?

19   A.   The language as construed by the Court is what

20   I think is very important.

21   Q.   Okay.  Now, let's take a look at this language

22   here, because it's important to get the language right.

23   It says a second interface to the computer system

24   through which, and then there's two things.  The first

25   is through which the seller is prompted to input

1  information to select one or more of the internet media

2  venues.

3  　　　　　Do you see that?

4  　　A.　Yes.

5  　　Q.　And then it goes on with the very same

6  language:　Through which the seller is -- through which

7  the seller is prompted -- through which the seller is

8  prompted to input information to create an electronic

9  advertisement for publication to the selected internet

10  media venues.

11  　　　　　Do you see that?

12  　　A.　Yes.

13  　　Q.　And in both instances, the claim says through

14  which the seller is prompted to input information.

15  　　　　　Do you see that?

16  　　A.　Yes.

17  　　Q.　So is it correct that in this part of the

18  claim, the exact language is used -- through which the

19  seller is prompted to input information -- for each of

20  those two things?

21  　　A.　Yes.

22  　　Q.　And it's your testimony that notwithstanding

23  that language is the same, that for creation, the seller

24  has to actually input information to create or else

25  there's no infringement.

1          But for selection, the seller can just opt not

2    to do -- put any information to select, and there would

3    still be infringement.

4          Is that your testimony?

5      A.    I really haven't dealt with that situation.

6    In every instance that I have found infringement, the

7    seller has done that; that they have entered the

8    keywords.

9      Q.    Well, you just testified to me, sir, that you

10   believe that if the seller didn't input any information

11   to select, it would still be infringement of this

12   element, right?

13     A.    I believe that the interface of the computer

14   system is responsible for prompting the seller to do so.

15   That's the way the claim is written.

16     Q.    You testified to the jury in response to my

17   question --

18     A.    Uh-huh.

19     Q.    -- that even if the seller does not input

20   information to select one or more of the -- of the

21   internet media venues, there would still be infringement

22   of this part (indicates), right?

23     A.    I don't think they would have a basis to do a

24   selection, so I -- I think I will agree with you at this

25   point, that, yes, they should put it in.

1      Q.   That's what you just said.

2      A.   I'll correct that opinion.

3      Q.   So you're changing your testimony?

4      A.   I will go along with what you suggested to

5  me --

6      Q.   I don't want you to go along with me.

7      A.   I agree with you.

8           THE COURT:  Well, let's not talk over

9  each other, okay?

10          MR. VERHOEVEN:  Thank you, Your Honor.

11     Q.   (By Mr. Verhoeven) What is your opinion?

12     A.   I think --

13     Q.   I don't want you to go along with me.

14     A.   -- relative to the information the seller has

15 to input, that there will not be a selection process if

16 they don't actually enter a keyword.  And I don't recall

17 seeing a default keyword set.

18     Q.   Okay.

19     A.   So I don't think there is a default.

20     Q.   So you're changing your answer?

21     A.   I'm correcting it.

22     Q.   Okay.

23     A.   But that's a change; you bet.

24     Q.   Okay.  So if the seller does not input

25 information to select, there's no infringement of the

1   this element?

2      A.   To the best of my current understanding,

3   that's correct.

4      Q.   Okay.  And if the seller does not input

5   information to create an electronic advertisement,

6   there's no infringement to the second part of that

7   element, right?

8      A.   I'm staying with my same opinion there.

9      Q.   So the answer is, yes, there would be no

10   infringement?

11      A.   Yes.  Yes.

12      Q.   Okay.  And if there's no infringement of

13   either of those two things, Google doesn't infringe?

14      A.   That's correct.

15      Q.   Okay.  Now, I want to focus on the second part

16   here where -- where it says -- it's hard to read up

17   there, so I'll just go back over here.

18      A.   I have it on the screen.

19      Q.   So the computer system through which the

20   seller is prompted to input information to create an

21   electronic advertisement.

22         Do you see that?

23      A.   Yes.

24      Q.   Now, the Court has construed the phrase create

25   an electronic advertisement, right?

1      A.   Yes.

2      Q.   And I have this up here on the screen, and

3 I'll just read it into the record, and tell me if you

4 disagree.  I think I've accurately reproduced the

5 Court's construction.

6           The Court's construction is the term, quote,

7 create an electronic advertisement for publication to

8 the selected internet media venues means create an

9 electronic advertisement for publication in a form

10 customized to each of the selected internet media venues

11 presentation rules.

12          Do you see that?

13     A.   Yes.

14     Q.   So that means, according to the Court's

15 construction, that the seller is prompted to input

16 information to create an electronic advertisement in a

17 form customized to each of the selected internet media

18 venues presentation rules, doesn't it, sir?

19     A.   That's what the words say.

20     Q.   Okay.  And in the Google system, there's what

21 you call a seller interface that you went through,

22 right?

23     A.   Yes.

24     Q.   And advertisers input information, don't they?

25     A.   Yes.

1     Q.   But isn't it true, sir, that the advertisers

2 cannot create an electronic advertisement in the form

3 customized to each of the selected internet media venues

4 presentation rules, sir?

5     A.   Yes.

6     Q.   They cannot do that, can they?

7     A.   That's correct.

8           MR. VERHOEVEN:  Let's go to DX Demo 147,

9 please.

10    Q.   (By Mr. Verhoeven) This is an attempt by us to

11 illustrate what the seller can do on the Google system.

12 I used part of this slide in my opening.  You may

13 remember it.

14    A.   Again, I was sitting at a steep angle, but

15 I've had an opportunity to see your slide subsequently.

16    Q.   Okay.  So this is the Google advertiser, okay?

17    A.   Yes.  Yes.

18    Q.   And this is the Google system that you

19 testified about already.

20    A.   Yes.

21    Q.   And what the Google advertiser can do on the

22 interface, they can enter ad information, right?

23    A.   That would be like the content.

24    Q.   They can put in keywords, if they want to?

25    A.   Yes.

1    Q.   They can put in placements, if they want to?

2    A.   Yes.

3    Q.   And they have to bid, right?

4    A.   I believe they have to enter a price they're

5 willing to pay per click.

6    Q.   And if they don't bid enough, they might not

7 get -- they might not win the auction, right?

8    A.   I think that's correct.

9    Q.   By the way, if their keywords are a bad match

10 to their ad, it probably won't get selected either, will

11 they?

12    A.   They will not get selected for a bad

13 publication site, a website, but...

14    Q.   For example, if their ad was Jim's Donut Shop

15 and their keyword was Maui vacation, they're never going

16 to get selected, are they?

17    A.   I would have thought they would show up on

18 trying to sell donuts to people who were interested in

19 going to Hawaii.

20    Q.   Okay.

21    A.   They would still get selected, but it would

22 not be a place they would be happy to be selected.

23    Q.   All right.  But you agree that this is what

24 the users could enter, correct?

25    A.   That's my understanding.

1      Q.   Now, isn't it true, sir, that in this seller

2  interface that you're talking about, that the advertiser

3  cannot change the color of their ad, right?

4      A.   Yes.

5      Q.   I'm right, that the seller cannot change the

6  color of the ad?

7      A.   I agree with what you said.

8      Q.   Okay.  The seller can't change the font of the

9  ad?

10     A.   Yes.

11     Q.   And the seller can't change the border

12 settings, right?

13     A.   Yes.

14     Q.   All the seller can do is put in this generic

15 information; isn't this true, sir?

16     A.   Yes.

17     Q.   Now, we talked about presentation rules.

18 Those are -- those are rules that were sent by the

19 publisher, right?

20     A.   Yes.

21     Q.   And they get sent to the central system,

22 right?

23     A.   Yes.

24     Q.   Okay.  The seller, when the seller is in this

25 interface, the seller cannot create an ad that's

1  customized to those presentation rules from the

2  publisher, can it?

3       A.    Yes.

4       Q.    It can't do that, can it?

5       A.    I don't know how to answer a negative

6  question.

7       Q.    Well --

8       A.    I agree with you.

9       Q.    Okay.

10       A.    I'm trying to help you.

11       Q.    Okay.  Let's go to -- I have another

12  demonstrative that was based on a slide you used

13  yesterday, Old Slide 32.

14            Do you remember this one?

15       A.    Yes.

16       Q.    Okay.  And you gave some testimony yesterday

17  in connection with this slide, and I'd like to put up

18  the transcript, if I might --

19       A.    All right.

20       Q.    -- right next to it.

21            MR. VERHOEVEN:  If we could do that,

22  Charles.

23            Oh, boy, this is going to be hard to read.

24       Q.    (By Mr. Verhoeven) Now, you testified -- you

25  remember this slide, right?

1    A.    I remember the slide.

2    Q.    And this has to do with presentation rules

3 that the publisher could select and ask Google to input,

4 right?

5          Maybe I should rephrase the question.

6    A.    I wouldn't put it that way.

7    Q.    Well, let me rephrase the question.

8          Color, size, corner style, font, you spent a

9 lot of time talking about that, right?

10   A.    Relatively so.

11   Q.    And you were talking about how you could

12 change that and you could select different colors.

13         Remember, you went through all of that?

14   A.    Yes.

15   Q.    Now, what you were talking about was what the

16 publisher could do, right?

17   A.    Yes.

18   Q.    Okay.  And so if we went back to the claim

19 language here, sir, where is -- where does the claim

20 language talk about what the publisher is doing in here?

21   A.    In the first interface.

22   Q.    In the first interface, right?

23   A.    Yes, sir.

24   Q.    So all that testimony that you gave yesterday

25 when you were talking about the colors and what-not --

1  and this slide is just to help you refresh your

2  recollection on the subject -- that was all in

3  connection with whether this element was met, right?

4      A.   Yes.

5      Q.   And you presented evidence that, well,

6  publishers could say I want ads that Google matches to

7  my website to be blue or purple or have a certain size,

8  right?

9      A.   Yes.

10     Q.   Had nothing to do with what the seller could

11  do, right?

12     A.   Yes.

13     Q.   And, in fact, you testified this is not for

14  the seller.  The seller has no control over this, okay?

15  All the seller does in a text ad is give the -- here are

16  the characters that will be displayed.  These are the

17  options that the publisher specifies to how they're

18  willing to accept ads on their website.

19         So these are the options the publisher

20  specifies, and the seller has no control over that,

21  right?

22     A.   Yes.

23     Q.   Okay.

24             MR. VERHOEVEN:  Let's go to DX Demo 58.

25     Q.   (By Mr. Verhoeven) And I pulled this out of

1    one of your screens that you illustrated.

2              Does this look familiar?

3         A.    It does.

4         Q.    And can you tell the jury what this is?

5         A.    I believe this was apparently a shot from a

6    piece of the video when I was using AdWords as a seller

7    to create an initial ad, what they call a campaign.

8         Q.    Okay.  So would you -- you characterize this

9    as the seller interface, right?

10        A.    This is one of the parts of the seller

11   interface.

12        Q.    Right.

13              Okay.  And this here -- it's a little hard to

14   read; I apologize for that -- but do you see where it

15   says create an ad?

16        A.    Yes.

17        Q.    Okay.  This is the -- this is where somebody

18   who wants to adver -- or some advertiser who wants to

19   submit an ad for the auction at Google would input their

20   information, right?

21        A.    Yes, for AdSense for Content.

22        Q.    For AdSense for Content?

23        A.    Yes, sir.

24        Q.    To create an ad --

25        A.    Yes.

1      Q.    -- right?

2            So this is to create an ad.  And what the user

3  can do, is they can put in a headline.

4      A.    For a text ad.

5      Q.    And put in a description.  They get two lines

6  for description, right?

7      A.    Yes, 35 characters each --

8      Q.    And that's it?

9      A.    -- or less.  Right.

10     Q.    No more?

11     A.    Well, they get 25 for the headline or less,

12 and 35 for each of the two lines of description.

13     Q.    Okay.  And then they can put a display URL.

14     A.    I characterize that as their return address,

15 yes.

16     Q.    They can put that in.

17           And a destination URL, right?

18     A.    Yes.

19     Q.    But as far as creating an ad, that's all they

20 do, isn't it?

21     A.    As far as the creation part.

22     Q.    Yeah.

23     A.    I believe I would agree with that, as far as I

24 understand your question.

25     Q.    They can't create -- they can't create this ad

1  in a manner that's customized to a particular website's

2  presentation rules, can they?

3      A.    They cannot.

4      Q.    Okay.  All right.  Let's go to -- let's change

5  subjects.

6                MR. VERHOEVEN:  I'm going to go to DX

7  demo 23, Charles.  I'm sorry.  I misspoke, Charles.  DX

8  demo 22, Charles.

9      Q.    (By Mr. Verhoeven) Now I'd like to ask you a

10 question about another element.  I'll try to do it on

11 the slide, because it's highlighted, but if you need to

12 look over here, that's fine.

13     A.    I have it.

14     Q.    So this is the computer controller.  It's also

15 right over here (indicating), computer controller.

16 It says:  The computer controller of the computer system

17 processing and publishing the electronic advertisement

18 to one -- to one or more of the selected internet media

19 venues.

20               Do you see that language?

21     A.    Yes.

22     Q.    I just put it up here in bigger text, so it's

23 easier to read.

24               Publishing the electronic advertisement to one

25 or more of the selected internet media venues.

1          Do you see that?

2     A.   I do.

3     Q.   And that language requires that the ad be

4 published to the internet media venue, correct?

5     A.   Well, it's actually been construed by the

6 Court order that has a different set of language, and

7 that's the language that I used.

8     Q.   Okay.  Well, would you agree with me that this

9 set -- set says that you're publishing the electronic

10 advertisement to one or more of the selected internet

11 media venues?

12     A.   That's the original claim language before the

13 Court construed it.

14     Q.   Okay.  And then the Court did construe it.

15 You've got it right here on the slide, and I think I

16 accurately reproduced it.  Tell me if you disagree.

17 The Court's order was:  The term means, quote, placing

18 or making available the customized electronic

19 advertisement within the framework of and at each

20 internet media venue.

21          Do you see that?

22     A.   Yes.

23     Q.   So the claim language says you have to publish

24 it to the internet media venue, and the Court's

25 construction says that means you're placing or making it

1    available at each internet media venue, fair?

2         A.   Yes.

3         Q.   Okay.

4              MR. VERHOEVEN:  Now, let's go to DX148.

5         Q.   (By Mr. Verhoeven) Okay.  I used this one in

6    my opening, too.  I took off the argument part, but I --

7    it had some argument on it.

8              Do you recognize this from my opening?

9         A.   I do.

10        Q.   Okay.  Here's Google, and just for sake of an

11   example, I picked CNN.  CNN is a media venue, right?

12        A.   The CNN web page, the cnn.com, is a location

13   on the internet, and that web page is a media venue the

14   way the Court has construed it.

15        Q.   CNN is a media venue, sir, right?

16        A.   Cnn.com is a media venue.

17        Q.   Okay.  And here are three internet users --

18        A.   Yes.

19        Q.   -- okay?

20             And the first one types in the URL for

21   cnn.com, and it goes to this media venue, and it returns

22   a web page, correct?

23        A.   Well, I disagree with your question a little

24   bit.

25        Q.   User types in the URL, cnn.com, right?

1    A.    Yes.

2    Q.    Goes over to their website, and it retrieves a

3  web page, correct?

4    A.    It will retrieve a web page, a framework, if

5  you will, from a server operated on behalf of CNN.

6    Q.    Web page comes back from cnn.com to the user's

7  browser, correct?

8    A.    Well, it shows up on -- it is seen on the

9  user's browser.

10    Q.    And if you have a really slow internet

11  connection, there will be a little ad thing here that's

12  blank, right?

13    A.    I've never seen that.

14    Q.    You've never seen that.

15    A.    Not once.

16    Q.    Okay.  Isn't it true, sir, that the way the

17  Google system works is, Google serves the ads directly

18  to that user's browser?  Isn't that true, sir?

19    A.    For all but one type of -- the mobile, that's

20  correct.

21    Q.    Okay.  And then the second person types in the

22  cnn.com, that goes to the cnn.com website and returns

23  the web page, right?

24    A.    Yes.  It will go to a server operated by CNN,

25  which will send them the html code that will render on

1  their screen the cnn.com web page.

2      Q.   And the ad in the accused technology comes

3  from the Google server, and it goes directly to the

4  second individual's browser, correct?

5      A.   For all but that one class of mobile phones.

6      Q.   Okay.  The ad doesn't come from any servers

7  that are owned or operated by cnn.com, right?

8      A.   That's correct.

9      Q.   It comes from the Google servers, right?

10      A.   It comes from a Google computer.

11      Q.   And the Google ad does not go to cnn.com or

12  any servers owned or operated by cnn.com, does it, sir?

13      A.   Except for that class of mobile phone.

14      Q.   Okay.  For AdSense for Content, it does not do

15  that, does it?

16      A.   That's correct.

17      Q.   In fact, cnn.com has no idea what ad's being

18  served up with its web page, does it, sir?

19      A.   Well, the -- the server at -- that's operated

20  by CNN doesn't know.  As far as the image shown on the

21  screen, it's just a composite image with both the ads

22  and the framework for the ads.

23      Q.   And the server that's operated by cnn.com

24  served up the web page, right?

25      A.   Well, the server is operated by CNN, but it --

it -- it serves up the framework of the web page.

Q.   Serves up the web page.  Doesn't serve up the ad, does it?

A.   It does not serve up the ad.

Q.   Google serves the ad.

A.   Yes.

Q.   And Google serves it directly to the user's browser.

A.   That's correct, except for those mobile phones.

Q.   Okay.  I'll limit my phone to AdSense for Content --

A.   Certainly.

Q.   -- if that makes it's easy for you.

A.   It will.

Q.   Okay.  For AdSense for Content, Google serves the ads, and it serves them to the internet user browser, right?

A.   It shows -- it will serve them to the browser where it will appear on the ad.

Q.   It does not send the ad to cnn.com or any servers owned or operate by CNN, does it?

A.   I can't answer your question the way you asked it, because it had a -- it was compound.

Q.   It does not -- the Google system does not send

1 the ad or serve the ad -- let's use served the ad.

2 The Google system does not serve the ad to cnn.com,

3 right?

4     A.    I don't agree with that.

5     Q.    Google servers do not send -- do not transmit

6 or serve the ad to CNN, whether it's cnn.com or CNN

7 servers, does it, sir?

8     A.    That makes a big difference under the Court's

9 construction of both media venue and internet media

10 venue, so I don't agree with your statement.

11     Q.    Oh.  So it's your testimony that the Google

12 servers serve ads to cnn.com?

13     A.    They serve them to the internet media venue,

14 cnn.com on the --

15     Q.    They serve them -- I'm sorry.  I'm sorry.  Go

16 ahead and finish your answer, sir.

17     A.    -- on the browser that is where the cnn.com

18 virtual media venue is rendered.

19     Q.    So it's your testimony --

20     A.    -- and that's where it will appear.

21     Q.    How many users, at any given time, do you

22 think use cnn.com?

23     A.    I have no idea.  A lot.

24     Q.    Millions.

25     A.    Last few days with Boston and the votes up

1  there, probably millions.

2      Q.   Millions.

3           Is it your testimony, sir, that the cnn.com

4  media venue is located at a million different locations?

5      A.   That's where it's been rendered.

6      Q.   And that's your testimony.

7      A.   Yes, sir.

8      Q.   So the media venue for cnn.com is a million

9  different internet browsers of users that use it.

10     A.   Those are the --

11     Q.   Is that your testimony?

12     A.   Those are the locations.

13     Q.   And it changes every day, right?

14     A.   (No response.)

15     Q.   Right?

16     A.   I would very much appreciate it if you would

17 just let me finish my answer, okay?  Would you, please?

18     Q.   Does it change every day?

19     A.   It would change every time somebody opens a

20 browser that renders the cnn.com images.

21     Q.   So if a hundred thousand people are using --

22 or let's say -- let's say 10 million people are on

23 cnn.com, because there's a big news event --

24     A.   Uh-huh.

25     Q.   -- and they're in every state in the country,

it's your testimony that the media venue location of
cnn.com is every state in the country?

A.   Every one of them --

Q.   Okay.

A.   -- is seeing a rendering of the cnn.com
location on the internet.

Q.   Okay.  But stepping back, there's no dispute
here that what -- where Google serves the ads is
directly to the browsers on the internet users, right?

A.   It sends it as a component of that rendering
of the cnn.com internet media venue on those browsers,
that's correct.

Q.   It serves the ads to the browser -- internet
user's browsers.

A.   It serves them to the imagery that their
browser is rendering for cnn.com.

Q.   And that's located on their computers.

A.   Yes.

Q.   Okay.  So it serves the ads to the internet
user's computers.

A.   It serves it to the browser that's running on
that computer --

Q.   Okay.

A.   -- which is rendering the image that they see
like, like cheese.com.

1    Q.   Okay.

2         MR. VERHOEVEN:  Let's go to DX demo 21.

3   I apologize, Your Honor.  I got the wrong slide.  I'll

4   get it right in a second.  23, please.

5    Q.   (By Mr. Verhoeven) So we talked earlier about

6   this creation element, and then we just talked about the

7   publishing element.  Now I'd like to talk about a

8   third -- I'm going to do them together, but a third set

9   of elements that I've highlighted here on the board.

10  The first is -- and we've talked about this a little bit

11  already -- that the seller is prompted to input

12  information to select one or more of the internet media

13  venues.

14         Do you see that, sir?

15   A.   Yes.

16   Q.   And then later in the claim, after -- it's

17  talking about the processing and publishing, and it

18  says:  Whereby the electronic advertisement is displayed

19  on each of the one or more of the selected internet

20  media venues.

21         Do you see that?

22   A.   Yes.

23   Q.   And so for the sake of simplicity, I just

24  pulled that out, so it's easier to read.  So what I'm

25  talking about is, these two elements:  Seller is

1  prompted to input information to select one or more of

2  the internet media venues, and then later, the

3  electronic advertisement is displayed on each of the one

4  or more of the selected internet media venues.

5        Are you with me?

6     A.    Yes.  You left out a lot of words, but I

7  understand what -- I think I understand --

8     Q.    Okay.

9     A.    -- the linkage you're -- you're talking about.

10    Q.    Okay.  Now, in the Google system, if I -- one

11 of the things I can do is this -- is what's called

12 placements, right?

13    A.    Yes.

14    Q.    If I'm a seller, if I'm in advertising, right?

15    A.    Yes.

16    Q.    And I could actually put in, in the placement

17 section, specific websites that I hope and wish my ad

18 would appear in, right?

19    A.    You can do it very specifically or a little

20 less specifically, but you can specify targets you would

21 like to get to.

22    Q.    Okay.  You would agree with me, wouldn't you,

23 that that doesn't mean that my ad is actually going to

24 be displayed on that website, right?

25    A.    I would agree with you on that.

1      Q.    At a minimum, got to win the auction, right?

2      A.    That's part of the process.

3      Q.    So -- it's part of the Google process.

4      A.    I'm sorry.  That's part of the Google process.

5      Q.    Right.  And so if I say, geez, I'd like to be

6   on cnn.com, but I don't -- I only offer to pay half of

7   what the big boys are paying on cnn.com, I'm not going

8   to get displayed, am I?

9      A.    I don't know whether the system absolutely

10   guarantees that, but it -- it would certainly be

11   statistically less likely.

12      Q.    You don't know whether the system guarantees

13   it or not?

14      A.    I don't know but what they have some sort of a

15   low priority lockout where periodically somebody who --

16   might get a chance in, but they have a very complicated

17   process with that auction.

18            But, certainly, the people who pay more have a

19   statistically higher likelihood of having their ad be

20   presented.

21      Q.    Well, you agree with me, in order to get

22   displayed, you have to win the auction.

23      A.    I -- that's part of the process.  You have to

24   come out of CAT2, and part of the CAT2 process is the

25   auction.

1     Q.   If you don't win the auction, even though you

2  put in, I want to be on cnn.com, you don't get displayed

3  on cnn.com.

4     A.   I believe that's correct.

5     Q.   Okay.  So would you agree with me that if I

6  put in 10 different specific websites I want to be on,

7  that doesn't guarantee that I'm going to be on any of

8  those websites, right?

9     A.   Yes, I agree with that.

10     Q.   Among other things, I have to win the auction,

11  right?

12     A.   Yes.

13     Q.   My ad also has to be relevant, doesn't it?

14     A.   It would have to -- if you specified keywords,

15  and it would -- it would be -- it would have -- it would

16  have to be located toward a website that had similar

17  keywords.

18     Q.   So would you agree with me that even if the

19  seller advertiser inputs information for 10 specific

20  websites, it's not the case that the electronic

21  advertisement will always be displayed on each of the

22  one or more selected websites, sir?

23     A.   Well, the question there is, who did the

24  selection?

25          If the advertiser is -- enters information to

1  select, and that information happens to have a list of

2  10 websites, then there's no guarantee on the part of

3  the seller that those 10 websites will ever see their

4  ad.

5      Q.   It's not the case that the electronic

6  advertisement is displayed on each of the one or more of

7  the selected media venues, is it, sir?

8      A.   That's wrong.

9      Q.   Oh, so it's your testimony, if I put in 10

10  websites, no matter what I bid, it's always the case

11  that the electronic advertisement is displayed on each

12  of the one or more of the selected internet media

13  venues?

14      A.   No, that's not my testimony either.

15      Q.   It's not always the case, is it?

16      A.   I can explain it, if you like, but I know you

17  like short answers during cross-examination.

18           It is not the --

19           THE COURT:  Well, if you can answer it

20  yes or no, answer it yes or no.  If not, just tell him

21  you can't answer it.

22      A.   I've already told you what I agreed with and

23  what I didn't agree with, so I think I've answered it.

24      Q.   (By Mr. Verhoeven) Is it the case, sir, that

25  if I put in 10 internet websites, specific websites that

1  I want to be on --

2      A.  Yes.

3      Q.  -- that it's not the case that the electronic

4  advertisement will be displayed on each of the one or

5  more of those selected websites?

6      A.  No, I don't agree with it, that those 10

7  websites are selected websites.  Those are information

8  to select a website.

9      Q.  Okay.

10     A.  So it -- they won't be displayed on those

11 media venues necessarily.  Where I'm having trouble is

12 your injection of the word selected and using it with

13 relation to the 10, which I treat and I believe the

14 claim treats as information to select, not selected.

15     Q.  Okay.  Well, let me see if I can change the

16 question to address your concern.

17     A.  All right.

18     Q.  If I input 10 specific websites, okay, is it

19 your testimony that I have input information to select

20 one or more of the -- of the internet media venues?

21     A.  That's one of the ways to do it.

22     Q.  Okay.  So that meets that, right?

23     A.  Yes.

24     Q.  So if I do that, isn't it true, that it's

25 not the case that the electronic advertisement I

1  created is displayed on each of the one or more of

2  those selected internet media websites?

3      A.    You put the word selected in again.  Those are

4  not selected websites.  That is information to select a

5  website.

6      Q.    I'm reading the Court's claim construction --

7  or I'm sorry.  I'm reading the claim language, sir.  It

8  says:  The electronic advertisement is displayed on each

9  of the one or more of the selected internet media

10  websites.

11      A.    The language --

12      Q.    It's not the case, sir -- it's not the case,

13  sir, that those 10 websites are going to be displayed on

14  each of the one or more of the selected internet media

15  venues, is it, sir?

16      A.    The language is fine.  The problem you're

17  having is that you're treating those 10 websites that

18  are entered as information to select as if they identify

19  selected websites, which are different issues.

20      Q.    So can you answer my question then?

21      A.    I just did, I thought.

22      Q.    Are those 10 websites displayed on each of the

23  selected internet media venues in the Google system?

24      A.    I think you meant, are -- is that

25  advertisement displayed on each of those 10 websites?

No.  But those are not the selected websites.

     Q.   So the answer is no.

                    THE COURT:  Okay.  You'll get a chance to
explain on redirect.

                    THE WITNESS:  All right.  I'm sorry.

     Q.   (By Mr. Verhoeven) Now, let's go back to this
phrase, input information to select one or more of the
internet media venues.

             Your testimony -- is it your testimony that if
I'm an advertiser and I put in an ad, headline,
description, URL, nothing else, no key words, no
placements, that nevertheless meets this language:
Input information to select one or more of the internet
media venues?  Is that your testimony?

     A.   You know, you asked me that -- that's the very
first thing we started with.  And, frankly, it's just
something I've never thought about.

             I know that the keywords are there.  I know
I'm prompted to enter them.  Every time I've gone
through an example, Mr. Verhoeven, I've thought through
entering in keywords or placement targets.  I do not
have a well-thought-out opinion on that issue.

             If they don't use the system in its full
capacity, which it provides, I just -- I don't have an
answer for that.

1    Q.   You don't have an answer for that.

2    A.   I don't -- it's not something I've written

3  about, to the best of my knowledge, in my report nor

4  have I been asked about it before.

5         I know that the system does have that

6  capability.  It does prompt me to enter them.

7    Q.   Now, we went over -- or I tried to go over

8  three different topics here.

9         The first was this language:  Input

10  information to create.

11         Now, if the jury concludes that Google doesn't

12  input information to create ads that are customized to

13  the presentation rules, et cetera, it's true, isn't it,

14  that there's no infringement in this case?

15    A.   If they -- if they find that element is not

16  met, as it is appropriately interpreted under the

17  Court's construction, then there -- there would be no

18  infringement.

19              MR. VERHOEVEN:  Your Honor, if I may

20  approach and give the witness -- this is just a copy of

21  the claims.

22              THE COURT:  Yes.

23    A.   Thank you.

24    Q.   (By Mr. Verhoeven) For the record, this has

25  been marked as DX demo 47.  It's simply a copy of all of

1 the asserted claims.  So I just I want to -- I want to

2 make sure we're on the same page.

3          If the jury finds that Google does not meet

4 the language, the seller is prompted to input

5 information to create an electronic advertisement in the

6 form customized to the presentation rules, Claim 1 is

7 not infringed, right?

8     A.   I believe you're -- you're inserting the

9 Markman construction at the last part?

10    Q.   Yes.

11    A.   Okay.  That's correct.  If you replace the

12 language in that claim with the Markman language and the

13 jury finds that the -- I'm sorry.  I apologize.  A

14 Markman is --

15               THE COURT:  Ladies and Gentlemen, the

16 Markman language refers to the Court's construction of

17 the terms that are contained in the patent claims.

18 That's a -- Markman refers to a United States Supreme

19 Court opinion that places the obligation on the Court to

20 construe the relevant claim terms of the patents.

21 So that's what was meant by the term Markman.

22               THE WITNESS:  Thank you.  I should say

23 the Court's construction.  I just slipped in the term.

24    A.   If they find that as the Court has construed

25 the second interface element, that Google does not do

that, then there would be no infringement of Claim 1.

Q. (By Mr. Verhoeven) And then if you turn to the second page, there also would be no infringement of Claim 20, because it depends on Claim 1, right?

A. That's correct.

Q. And if you turn to the third page --

MR. VERHOEVEN: Maybe we can put this up on the screen, DX demo 49.

Q. (By Mr. Verhoeven) Let's start at the beginning just so the jury can follow along. I apologize.

A. No problem.

MR. VERHOEVEN: First page -- first page? Charles, first page.

Q. (By Mr. Verhoeven) Okay. So I asked you about this Claim 1, and you said, if the jury finds that it's not met, there's no infringement, correct?

A. If they find that any of those limitations is not met, then Claim 1 is not infringed.

Q. Okay. And next -- the next page, Claim 20, same thing, right? Because Claim 20 depends on Claim 1. So if the jury finds that creation step is not met, there's no infringement of Claim 20.

A. If they don't -- if they find that any of the limitations of Claim 1 is not met, then there would be

1 no infringement of that claim or Claim 20 -- right,

2 Claim 20.

3                  MR. VERHOEVEN: The next slide?

4     Q. (By Mr. Verhoeven) And the same is true for

5 Claim 37, because it's a dependent claim, too, right,

6 sir?

7     A. Yes.

8                  MR. VERHOEVEN: And next slide?

9     Q. (By Mr. Verhoeven) Same is true for asserted

10 Claim 52, correct, sir?

11     A. Yes.

12                  MR. VERHOEVEN: And next slide?

13     Q. (By Mr. Verhoeven) This is another asserted

14 claim, 63. It's a dependent claim, too, correct?

15     A. It refers back to Claim 1, ultimately, and

16 that would be correct.

17     Q. So if the jury finds that this creation step

18 that we've been talking about is not met, this claim is

19 not infringed either, right?

20     A. It's not actually a step, but -- it's an

21 apparatus; it's an interface limitation.

22        But if they find that limitation is not

23 present in Claim 1, then Claim 63 would not be

24 infringed.

25                  MR. VERHOEVEN: Okay. Next slide?

1    Q.   (By Mr. Verhoeven) Same thing for Claim 90,

2 right?

3    A.   Yes, sir.

4    Q.   No infringement if the jury finds any of the

5 elements are not met, right?

6    A.   Of Claim 1 or any of these other claims.

7    Q.   Okay.

8         MR. VERHOEVEN:  And then the next slide?

9    Q.   (By Mr. Verhoeven) Now, this is Claim 179 that

10 Mr. Grinstein went through pretty quickly.

11         You see this also has that same creation

12 language in it; is that right, sir?

13    A.   (No response.)

14    Q.   I direct your attention to --

15    A.   I -- I see that.  It's a little different, and

16 I was just digesting that.  And it does have a

17 requirement for the seller being prompted to input

18 information to create an electronic advertisement, yes,

19 sir.

20    Q.   So it's right -- just -- just so the jury gets

21 this, prompting the seller through the second interface

22 to input information to create an electronic

23 advertisement for publication to the selected internet

24 media venues.

25         That's the language, right?

A.   Yes, sir.

Q.   And the Court's construction of create an electronic advertisement applies to that language as well, correct, sir?

A.   Actually, the Court separately construed that, but it's about the same.  It's a little bit different, that language.

But it does say -- the Court's construction of that phrase is create an electronic advertisement for publication in a form customized to each of the selected internet menu -- media venues presentation rules.

Q.   So if the jury finds that in Google, the seller can't create an electronic -- or can't enter information to create an electronic advertisement that's customized to the presentation rules at the selected internet media venues, then that element isn't met, right?

A.   As I understand your question, you're basically asking me if they find that if that step is not met, then if they find that, then this claim is not infringed.

Q.   And you agree with that?

A.   I agree that if they find that's not there, then the whole claim goes out.

Q.   Okay.  And then let's go to the last slide on

1  this illustrative, Claim 231 -- or second to last slide.

2  I'm sorry.

3          That depends on Claim 179, right?

4     A.   Yes, sir.

5     Q.   And so if they so find, then 179 won't be

6  infringed either, correct?

7     A.   I think you misspoke.

8     Q.   If the jury finds that the

9  input-information-to-create step is not met, then this

10 claim would not be infringed either, correct?

11    A.   Yeah.  You may not realize it.  You said Claim

12 179 again.  You're referring to Claim 231.

13    Q.   That's correct, sir.

14    A.   And it would not be infringed if they find

15 that Claim 179 is not infringed.

16          MR. VERHOEVEN:  Now let's go to the last

17 slide.

18    Q.   (By Mr. Verhoeven) This is the other patent,

19 the '059 patent, Claim 1.  And this also has that same

20 language in here, except it's in the third interface in

21 the '059 patent.

22          Do you see it there, sir?

23    A.   I do.

24          MR. VERHOEVEN:  Can we highlight that?

25    Q.   (By Mr. Verhoeven) A third interface to the

1  computer system through which a third-party

2  professional -- the third-party professional is someone

3  that's handling the advertisement on behalf of the

4  advertiser, right?

5      A.   Yes, sir.

6      Q.   That's the only difference, right?

7      A.   That's the only difference I'm aware of in

8  this claim.

9      Q.   All right.  So --

10     A.   Well, let me rephrase that.  There was a

11  subtle difference as to what's asked of the second guy.

12  But relative to that particular limitation, that's the

13  only thing.

14     Q.   Okay.  And the third -- so the third interface

15  of the computer system for which the third-party

16  professional is prompted to input information to create

17  an electronic advertisement for the seller for

18  publication to the selected internet media venues,

19  basically, the same language, but it's talking about a

20  third party doing it, right?

21     A.   As best as I recall, it's the same as the

22  second interface for Claim 1 of the '025 patent, but

23  here, instead of a seller, it says the third-party

24  professional.

25     Q.   And so similarly with this claim, if the jury

1  were to find that the third-party professional on the

2  Google system doesn't input information to create an

3  electronic advertisement in the form that's customized

4  to the presentation rules of the selected media venues,

5  then this element wouldn't be met, right?

6      A.    Yes.  If that element is not met, then -- as

7  to however it's appropriately interpreted by the jury,

8  and the Court -- then that's true.

9      Q.    Okay.  And we talked about publish to,

10 processing and publishing the electronic advertisement

11 to one or more of the selected internet media venues.

12 Do you remember that?

13     A.    Yes.

14     Q.    Similarly, if the jury found that element

15 wasn't met, if I went through all these claims, it would

16 be the same thing, right?

17     A.    If -- it's true for any element, but

18 specifically for that element, that's correct.

19     Q.    So if the jury were to find, well, that one is

20 not met, there's no infringement by Google, correct?

21     A.    If -- for that element, that is as good as any

22 of the other elements.

23     Q.    And when we were talking about whereby the

24 electronic advertisement is displayed on one or more

25 selected -- same analysis there, right?

1     A.   If they find that that limitation of Claim 1

2  of the '025 and Claim 1 of the '059 is not met, then all

3  of the claims that are asserted are not met.

4     Q.   Now, you're testifying today as a retained

5  expert, correct?

6     A.   Yes.  I have been hired by the attorneys

7  representing Function Media.

8     Q.   Can you tell the jury how much you're getting

9  paid?

10     A.   $600 an hour.

11     Q.   Is it true that for the past 10 years, your

12  primary source of work has been testifying as an expert

13  witness?

14     A.   That's true.  Since I retired from the

15  university, when I work for pay, this has been my

16  primary source.

17     Q.   Is it true that in the past year, you billed

18  out between 600 to $800,000 working full time as an

19  expert witness?

20     A.   I believe that that's -- that's exactly,

21  correct.  I haven't done my income tax for 2009 yet, but

22  it's somewhere in that fairly widely stated range.

23     Q.   Thank you, Dr. Rhyne.

24             MR. VERHOEVEN:  I have no further

25  questions.

1          THE WITNESS:  Thank you, Mr. Verhoeven.

2          THE COURT:  Redirect?

3          MR. GRINSTEIN:  Thank you, Your Honor.

4          Matt, can we put up the second

5    demonstrative for Dr. Rhyne, Rhyne Demonstrative No. 2?

6                    REDIRECT EXAMINATION

7    BY MR. GRINSTEIN:

8      Q.   Dr. Rhyne, I'd like to ask you some questions

9    about the language, because you spent quite a bit of

10   time talking about it to Mr. Verhoeven.  And let's focus

11   on this second interface to the computer system claim

12   element.

13         Dr. Rhyne, where in that claim element does it

14   say that the seller creates a customized electronic --

15   or an advertisement customized for publication to

16   selected internet media venues?

17     A.   It does not say that.

18     Q.   Does that claim require sellers to create?

19         MR. VERHOEVEN:  Objection, Your Honor.

20   The claim -- the witness should stick to the claim

21   construction and the words of the claim.

22         THE COURT:  Overruled.

23     Q.   (By Mr. Grinstein) Does that claim say the

24   seller creates advertisements?

25     A.   No.

1    Q.   Is Google, in your opinion, reading words out

2  of the claim?

3    A.   Yes.

4    Q.   Have you seen any demonstratives from Google

5  which suggest to you that Google is reading words out of

6  this claim?

7    A.   Yes, I have.

8    Q.   Now, Mr. Verhoeven showed you several

9  demonstratives from his opening argument -- opening

10 statement about infringement.  I would like to show you

11 one that he did not share with you that's Defendant's DX

12 demonstrative 15.

13         This is a demonstrative from Mr. Verhoeven's

14 opening argument.  Do you recall this demonstrative?

15   A.   Yes.

16   Q.   And Google highlighted some information in the

17 second interface element, didn't it?

18   A.   They did.

19   Q.   Tell us what they highlighted when they got to

20 the discussion of second interface creating.

21   A.   Well, they jumped from the second interface --

22 and you can see with the first part of the yellowing --

23 they skipped over through which a seller is prompted to

24 input information to, and they went to select one or

25 more of the venues, and then they skipped over prompted

1  to input information to, and they went to create an

2  electronic advertisement.

3         So they omitted in their highlighting the two

4  references to entering information to select and

5  information to create.

6     Q.   So based on your understanding, how is Google

7  reading the claim as it relates to creation?

8     A.   I believe that much of what Mr. Verhoeven

9  asked me about was predicated on reading this claim to

10  say:  A second interface through which the seller

11  selects internet media venues and through which the

12  seller creates an electronic advertisement customized to

13  a publisher's presentation rules.

14     Q.   Did any of the Court's claim constructions

15  about which you're aware tell us to omit these words --

16     A.   No.

17     Q.   -- when we're construing this claim?

18     A.   Absolutely not.

19     Q.   As I understand Google's argument, the

20  argument is, is that the seller customizes an

21  advertisement to an internet media venues' presentation

22  rules at the seller interface.

23         Is that your understanding of what they're

24  arguing?

25     A.   That, in fact, is shown in some of the other

1  slides that were in Mr. Verhoeven's opening slides.

2      Q.   In your opinion, is that --

3           MR. VERHOEVEN:  Objection, Your Honor.

4  That totally mischaracterizes my testimony (sic) --

5           THE COURT:  Well, overruled.  The jury

6  will recall what slides were or were not displayed and

7  what they said.

8           Continue.

9      Q.   (By Mr. Grinstein) In your opinion, is that

10 consistent with all of the elements of the claim as they

11 have been construed by the Court?

12     A.   It's inconsistent with the constructions that

13 the Court has made on other terms and particularly the

14 processing term.

15     Q.   Let's look at that construction of the

16 processing term.

17          MR. GRINSTEIN:  Can we see Dr. Rhyne's

18 demonstrative, No. 57?

19     Q.   (By Mr. Grinstein) Tell us how this notion

20 that a seller would create -- not input information to

21 create but create a customized electronic advertisement

22 customized to the presentation rules of an internet

23 media venue at the seller interface is inconsistent with

24 your understanding of the Court's construction.

25     A.   Well, this is what the computer controller has

to do at the end of the -- Claim 1.  And one, it has to
publish, and -- it has to process, and it has to
publish.

        And the Court construed processing as
executing a systematic sequence of mathematical and/or
logical operations upon the customized electronic
advertisement -- and here's the key phrase to me -- to
make it comply with the presentation rules of the
internet media venues.

        That, to me, means it didn't comply before the
processing step was -- was performed by the computer
controller.

    Q.    So if the UT website wanted burnt orange, did
the seller color their ad burnt orange?

    A.    No.  They wouldn't even be assured of ever
getting to the UT website.  They might show up on the
Aggie website.

        They -- they just entered in the text of their
ads and other related information and waited for the
system, the computer controller, to make that ad comply
with the presentation rules of the internet media
venues.

    Q.    Just to be clear, we're talking right here
about the computer controller, not this seller
interface.

1     A.    Right.

2     Q.    So I don't quite understand, Dr. Rhyne.  If

3 the seller had input a burnt orange ad, why would the

4 computer controller need to make that ad comply with the

5 burnt orange presentation rule?

6     A.    I don't understand that either.  It seems

7 inconsistent with the Court's construction.

8     Q.    And just another question about some of these

9 claim language and claim terms, this second interface

10 that talks about prompting -- do you see that?

11     A.    Yes.

12     Q.    Who does the prompting, in your opinion?

13     A.    The computer system prompts by providing an

14 opportunity for the seller in this case to provide the

15 input.

16     Q.    And in your opinions that you've already

17 offered today, who has that computer system?

18     A.    Google.

19     Q.    Does the seller, in the second interface,

20 prompt?

21     A.    No.

22     Q.    Does the seller infringe this second element

23 of the claim, the second interface?

24     A.    No.

25     Q.    Who infringes that second interface element?

1    A.   Google infringes that element by providing a

2  computer system that prompts the seller to input

3  information to select and input information to create.

4    Q.   Let's next talk about this published to

5  argument?

6    A.   Okay.

7    Q.   Now, I think you agreed with Mr. Verhoeven

8  that Google serves ads to user's browsers.

9    A.   They send them to the computer where the --

10  the user is using their browser to display an internet

11  media venue.

12    Q.   Does that fact alone answer the question for

13  you as to whether or not Google is placing or making

14  available ads at an internet media venue?

15    A.   Well, I'm not sure what you mean by that fact.

16  The fact that I'm relying on is that when I go to my

17  browser and I say, I'd like to see cheese.com, I see on

18  that screen, with the cheese.com information, the Ads by

19  Google.  They are on my screen.  They've been sent to

20  me.  And what I'm looking at is the cheese.com internet

21  media venue.

22    Q.   Let me show you a document we talked about in

23  direct, Plaintiff's Exhibit 70.

24    A.   All right.

25    Q.   And we talked about this document on direct.

1          Can you read the first highlighted portion of

2   Plaintiff's Exhibit 70.

3          Matt's going to blow it up.

4       A.    This is an answer to a question, how does

5   Google target ads to my website?

6          It says:  Once you've added the Google ad code

7   to the web pages on which you want to display Google

8   ads -- and this is from the point of view of the

9   internet media venue or the publisher.

10         Once you've added the code to the web pages on

11  which you want to display Google ads, we take care of

12  the rest by automatically delivering relevant Google ads

13  to those content plate -- pages.

14      Q.    This is Google talking?

15      A.    Yes, sir.

16      Q.    Does Google say right here:  We don't deliver

17  ads to web pages or websites; we only deliver them to

18  browsers?

19      A.    No.  It says:  We deliver them to the content

20  pages.

21      Q.    And what does that mean, Dr. Rhyne?

22      A.    It delivers it to the location on the

23  internet, like cnn.com, which is the Court's

24  construction of an internet media venue.

25      Q.    And by the way, just so we're clear,

Mr. Verhoeven, during your cross-examination, did he

show you charts that he had created or his team had

created?

A.  Those were charts I -- my understanding, his

graphics people had created.

Q.  Did he show you a single document, internal

Google document, a document that Google puts out on its

websites?

A.  I don't recall them.

Q.  The last issue I want to talk about is

information to select, and I think you've actually

already dealt with this issue quickly.

MR. GRINSTEIN:  Can we see Defendant's

demonstrative 15 again?

Q.  (By Mr. Grinstein) And back on Defendant's

demonstrative No. 15, what words didn't Google highlight

when they were talking about selection?

A.  That the seller was prompted to input

information to select.

Q.  So does the second interface element require

that the seller make a selection or input information to

select?

A.  They input information, which will be used

later to select.

Q.  In your opinion, how is Google trying to read

1  this claim?

2      A.   I think that it's -- it's being proposed that

3  the claim says:  A second interface to the computer

4  system through which a seller is prompted to select one

5  or more internet media venues.

6              MR. GRINSTEIN:  Dr. Rhyne, I have no

7  further questions.

8              THE COURT:  Recross?

9              MR. VERHOEVEN:  Yes, Your Honor.

10             You want to put up DX demo 15?

11             Do I need to push a button, Charles?

12  Okay.

13                  RECROSS-EXAMINATION

14  BY MR. VERHOEVEN:

15      Q.   Mr. Grinstein --

16             MR. VERHOEVEN:  Grinstein (pronouncing)?

17             MR. GRINSTEIN:  Grinstein (pronouncing).

18             MR. VERHOEVEN:  I'm sorry.

19      Q.   (By Mr. Verhoeven) Mr. Grinstein suggested

20  that we're -- was somehow suggesting that we're trying

21  to mislead someone by highlighting -- by not

22  highlighting input information to select over here.

23             Do you recall that?

24      A.   I'm not sure that he -- he said what he said.

25      Q.   You didn't get that from that?

1    A.    Well, what I got was, when I first saw this

2    ad, the omission of the highlighting on what I consider

3    the -- the important language --

4    Q.    Now --

5    A.    -- to input.

6    Q.    Now, we -- we pulled out big boxes here to

7    help the jury understand that language, right?

8    A.    For whatever purpose you created that

9    demonstrative.

10    Q.    And this is one of the big boxes, second

11    interface.

12    A.    Yes.

13    Q.    And this says:  Sellers input information to

14    select.

15          Do you see that?

16    A.    I do.

17    Q.    So what's misleading about that, sir?

18    A.    Putting it over there in gray is fine.  I just

19    noticed myself, independent of Mr. Grinstein --

20    Q.    Okay.

21    A.    -- that the other was not highlighted in

22    yellow.

23    Q.    Okay.

24              MR. VERHOEVEN:  Let's go to DX demo 21.

25    Q.    (By Mr. Verhoeven) Now, you testified that the

1  customization would happen later but not at the seller

2  interface.

3          Well, the language says:  The seller is

4  prompted to input information to create an electronic

5  advertisement, and it goes on.

6          Do you see that?

7     A.   Yes.

8     Q.   And that's in this element here, the second

9  interface, right?

10    A.   Yes.

11    Q.   So that's part of what happens at the second

12 interface, right?

13    A.   No.  They do input information to create.

14    Q.   That happens in the second interface, right?

15    A.   The second interface is where they input

16 information to create.

17    Q.   That doesn't happen down here in the

18 processing and publishing, does it, sir?

19    A.   I -- I don't agree with what you just said.

20    Q.   Okay.  So you're saying that the seller being

21 prompted to input information to create an electronic

22 advertisement occurs down here in the processing and

23 publishing?

24    A.   Given the way the Court construed processing,

25 absolutely.

1     Q.   Okay.  So this should be moved down here

2 (indicating).

3     A.   No.

4     Q.   Okay.  So this should be happening at the

5 seller interface?

6     A.   I'm sorry?

7     Q.   This language here -- there's two things that

8 are -- that the seller has to do, right?

9     A.   Yes.

10     Q.   Input information to select --

11     A.   Yes.

12     Q.   -- media venue and input information to create

13 an electronic advertisement, right?

14     A.   Yes.

15     Q.   That has to happen at the second interface,

16 doesn't it, sir?

17     A.   Yes.

18     Q.   It doesn't happen at the processing and

19 publishing step; it happens at the second interface,

20 right?

21     A.   Yes.

22     Q.   Okay.  And the Court constructed, create an

23 electronic advertisement as creating electronic

24 advertisement for publication in a form customized to

25 each of the selected internet media venues' presentation

1  rules, correct?

2      A.   Yes.

3      Q.   And the seller cannot create an advertisement

4  at the seller interface on Google in a form customized

5  to each of the selected internet media venues'

6  presentation rules, can it, sir?

7      A.   Yes.

8      Q.   Do you agree with me?

9      A.   Yes.

10     Q.   Okay.

11           MR. VERHOEVEN:  Now let's go to PX -- the

12 illustrative Page 57, Charles.

13     Q.   (By Mr. Verhoeven) Now, we talked about the --

14 processing the electronic advertisement in compliance

15 with the presentation rules of the internet media venue.

16 This is in the processing and publishing.  This down

17 here (indicating), right?

18     A.   It's in the computer controller, last

19 limitation.

20     Q.   Right.  So this is talking about something

21 that occurs down here (indicating), not up at the second

22 interface, right?

23     A.   Yes.

24     Q.   Okay.  And the Court's construction is:

25 Executing a systematic sequence of mathematical and/or

1  logical operations upon the customized electronic

2  advertisement.

3      It's already been customized, hadn't it?

4      A.    There is an initial customization exactly as I

5  explained to Mr. DeFranco at my deposition.

6      Q.    And that's referring to what happens at the

7  second interface, isn't it, sir?

8      A.    That's -- as a result of storing it in the

9  second database, I think they create a -- an --

10 initially, what I call the seller customized version of

11 the advertisement.

12     Q.    That's a reference to the seller's input of

13 information to create electronic advertisement at the

14 seller interface, correct?

15     A.    That's correct.

16     Q.    Now, finally, I thought I heard you say that

17 you thought Google was changing the words in the claims

18 by omitting the phrase input information to select one

19 or more internet media venues.

20     But then when you were asked what does this

21 mean, my notes show -- and maybe I wrote it down

22 wrong -- that this -- this means input information that

23 is later selected by the system.

24     Is that your testimony as to what this means?

25     A.    I'm -- I'm sure -- I don't think I said

whatever you just said I said.

I said that the information to select that's entered by the seller through the second interface is later used to select the internet media venues where the ad will be displayed.

Q. It doesn't say that in the claim language, does it, sir?

A. I think it does.

Q. Where does it say, is later used to select in this element?

A. Well, it's -- you've got to get down to the last place to find where the selection takes place.

Q. Well, you were asked what this means.

A. It means that you enter information to select. It does not mean that you select.

Q. And it does not mean -- does not say input information that is later selected by the system, does it, sir?

A. It doesn't say that.

Q. And if you did that, you would be adding words to the claim, wouldn't you?

A. It's my understanding as to what the claim means. But you're right. It doesn't say that. It -- it -- it just says that you input information to select.

Q. And if you said that, you'd be adding words to

1 this claim language, wouldn't you?

2     A.   If I said, and I'm sure I didn't, that the

3 words were -- that it was for later selection, it

4 doesn't say that specifically.

5     Q.   But if it -- but if you argued that, you'd be

6 adding words to the claim language, wouldn't you, sir?

7     A.   That's a semantic issue.  I don't -- I don't

8 think that my interpretation of what it means is

9 necessarily adding words.

10     Q.   Does this -- does this language say that is

11 later selected by the system?

12     A.   It does not.

13     Q.   Thank you.

14           MR. VERHOEVEN:  I have no further

15 questions, Your Honor.

16           THE COURT:  Redirect?

17           MR. GRINSTEIN:  We're done, Your Honor.

18           THE COURT:  You may step down --

19           THE WITNESS:  Thank you.

20           THE COURT:  -- Dr. Rhyne.

21           Ladies and Gentlemen, we're going to take

22 our lunch recess at this time.  Be back ready to start

23 at 1:20.  Have a nice lunch, and don't talk about the

24 case.

25           COURT SECURITY OFFICER:  All rise.

```
 1                      (Jury out.)

 2                      THE COURT:  All right.  Please be seated.

 3                      Would counsel approach?

 4                      (Bench conference.)

 5                      THE COURT:  Wanted to make sure the

 6   shadow jury got out.

 7                      What issues do we have for -- evidentiary

 8   issues?

 9                      MR. VERHOEVEN:  Amy, can you come up?

10                      MR. TRIBBLE:  Justin, it's preadmission.

11                      THE COURT:  Step back so I can talk to

12   the people in charge.

13                      Tell me what issues we have for

14   preadmission issues, evidentiary-type.

15                      MS. CANDIDO:  With respect to the

16   acquisition documents?

17                      MR. NELSON:  We have worked out every one

18   except for one, which I'm not going to use on Mr. Bratic

19   anyway, that one.

20                      THE COURT:  My question is how you're

21   going to use it then.

22                      MS. CANDIDO:  Are you withdrawing it?

23                      MR. NELSON:  Oh, no, no, no.  It's -- my

24   point is, I want to -- we're conferring over that one

25   still.
```

1              THE COURT:  Okay.

2              MR. NELSON:  I'm sorry for any

3 miscommunication.

4              She's also raised some objections to the

5 demonstratives that --

6              THE COURT:  Okay.

7              MR. NELSON:  -- that we can go over now

8 or before lunch -- I mean -- excuse me -- before we come

9 back from lunch.

10             THE COURT:  Well, I guess, are they

11 objections that you are maintaining, despite having

12 talked about or --

13             MS. CANDIDO:  Talked about them with him?

14             THE COURT:  The demonstratives, yeah.

15             MS. CANDIDO:  We haven't had an

16 opportunity to engage at that level.

17             THE COURT:  Okay.  That's what --

18             MR. VERHOEVEN:  Gone over them late last

19 night.

20             MS. CANDIDO:  Yeah.

21             THE COURT:  I'm not -- I'm not fussing

22 about it; I just --

23             MS. CANDIDO:  Right.

24             THE COURT:  Do you want to talk about

25 them before you have me look at them?

                    MR. NELSON:  Well, yes.  We asked, and

she said, I think --

                    MS. CANDIDO:  Well, you asked me briefly

if we needed to talk about them when we were waiting,

and I said I thought my objections were obvious.  But we

can talk about them.

                    MR. VERHOEVEN:  The answer is, yes, we

would.

                    MS. CANDIDO:  We would like to talk about

them.

                    THE COURT:  Okay.  Well, good.  Try to do

it over a sandwich or something.

                    MR. NELSON:  All right.

                    THE COURT:  And I'll see -- I'll be in

the courthouse for lunch every day, so if -- if you've

still got something, come down about -- come downstairs

about ten till or five till.

                    Does that give you enough time to --

                    MR. NELSON:  Yes, Your Honor.

                    THE COURT:  -- grab a bite and eat

and visit?  That's 50 minutes or so.

                    MR. NELSON:  Yes, Your Honor.

                    THE COURT:  Okay.  Or straight up 1:00.

I can probably go through them pretty quickly.  That

gives us 20 minutes to work.  Just probably come by

1   around about 1:00.

2                  MR. NELSON:  Yes, sir.

3                  THE COURT:  Okay.

4                  MR. VERHOEVEN:  Thank you, Your Honor.

5                  THE COURT:  And we'll talk about the

6   other issue -- if you've got an issue, I'll deal with

7   that at the same time, all right?

8                  MR. NELSON:  Okay.  Thank you.

9                  (Bench conference concluded.)

10                 THE COURT:  We're in recess.

11                 (Recess.)

12                 *      *      *      *      *

13

14

15

16

17

18

19

20

21

22

23

24

25

CERTIFICATION

      I HEREBY CERTIFY that the foregoing is a true and correct transcript from the stenographic notes of the proceedings in the above-entitled matter to the best of my ability.

/s/_____          _____
SUSAN SIMMONS, CSR                    Date
Official Court Reporter
State of Texas No.:  267
Expiration Date:  12/31/10

/s/_____          _____
SHELLY HOLMES, CSR               Date
Deputy Official Court Reporter
State of Texas No.:  7804
Expiration Date  12/31/10